# EXHIBIT 1



# UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (UNCITRAL)

## *UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment*

---

### CONTENTS

*Part One*

### UNCITRAL MODEL LAW ON CROSS-BORDER INSOLVENCY

PREAMBLE

CHAPTER I.  GENERAL PROVISIONS

    Article 1. Scope of application

    Article 2. Definitions

    Article 3. International obligations of this State

    Article 4. *[Competent court or authority]*

    Article 5. Authorization of *[insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State] to act in a foreign State*

    Article 6. Public policy exception

    Article 7. Additional assistance under other laws

Article 8. Interpretation

## CHAPTER II. ACCESS OF FOREIGN REPRESENTATIVES AND CREDITORS TO COURTS IN THIS STATE

Article 9. Right of direct access

Article 10. Limited jurisdiction

Article 11. Application by a foreign representative to commence a proceeding under *[identify laws of the enacting State relating to insolvency]*

Article 12. Participation of a foreign representative in a proceeding under *[identify laws of enacting State relating to insolvency]*

Article 13. Access of foreign creditors to a proceeding under *[identify laws of the enacting State relating to insolvency]*

Article 14. Notification to foreign creditors of a proceeding under *[identify laws of the enacting State relating to insolvency]*

## CHAPTER III.  RECOGNITION OF FOREIGN PROCEEDING AND RELIEF

Article 15. Application for recognition of a foreign proceeding

Article 16. Presumptions concerning recognition

Article 17. Decision to recognize a foreign proceeding

Article 18. Subsequent information

Article 19. Relief that may be granted upon application for recognition of foreign proceeding

Article 20. Effects of recognition of a foreign main proceeding

Article 21. Relief that may be granted upon recognition of a foreign proceeding

Article 22. Protection of creditors and other interested persons

Article 23. Actions to avoid acts detrimental to creditors

Article 24. Intervention by a foreign representative in proceedings in this State

CHAPTER IV. COOPERATION WITH FOREIGN COURTS AND FOREIGN REPRESENTATIVES

Article 25. Cooperation and direct communication between a court of this State and foreign courts or foreign representatives

Article 26. Cooperation and direct communication between the *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State] and foreign courts or foreign representatives*

Article 27. Forms of cooperation

CHAPTER V. CONCURRENT PROCEEDINGS

Article 28. Commencement of a proceeding under *[identify laws of the enacting State relating to insolvency] after recognition of a foreign main proceeding*

Article 29. Coordination of a proceeding under *[identify laws of the enacting State relating to insolvency] and a foreign proceeding*

Article 30. Coordination of more than one foreign proceeding

Article 31. Presumption of insolvency based on recognition of a foreign main proceeding

Article 32. Rule of payment in concurrent proceedings

*Part Two*

**GUIDE TO ENACTMENT OF THE UNCITRAL MODEL LAW**

**ON CROSS-BORDER INSOLVENCY**

**I. PURPOSE AND ORIGIN OF THE MODEL LAW**

Purpose of the model law

Preparatory work and adoption

II. PURPOSE OF THE GUIDE TO ENACTMENT

III. MODEL LAW AS A VEHICLE FOR THE HARMONIZATION OF LAWS

IV. MAIN FEATURES OF THE MODEL LAW

Background

Fitting the Model Law into existing national law

Scope of application of the Model Law

Types of foreign proceedings covered

Foreign assistance for an insolvency proceeding taking place in the enacting State

Foreign representative's access to courts of the enacting State

Recognition of foreign proceedings

Cross-border cooperation

Coordination of concurrent proceedings

V. ARTICLE-BY-ARTICLE REMARKS

Title

Preamble

Chapter I.  General provisions

Article 1. Scope of application

Article 2. Definitions

Article 3. International obligations of this State

Article 4. *[Competent court or authority]*

Article 5. Authorization of *[insert the title of the person or body
administering a reorganization or liquidation under the law of the enacting
State]* to act in a foreign State

Article 6. Public policy exception

Article 7. Additional assistance under other laws

Article 8. Interpretation

Chapter II. Access of foreign representatives and creditors to courts in this State

Article 9. Right of direct access

Article 10. Limited jurisdiction

Article 11. Application by a foreign representative to commence a
proceeding under *[identify laws of the enacting State relating to insolvency]*

Article 12. Participation of a foreign representative in a proceeding under
*[identify laws of the enacting State relating to insolvency]*

Article 13. Access of foreign creditors to a proceeding under *[identify laws
of the enacting State relating to insolvency]*

Article 14. Notification to foreign creditors of a proceeding under *[identify
laws of the enacting State relating to insolvency]*

Chapter III. Recognition of a foreign proceeding and relief

Article 15. Application for recognition of a foreign proceeding

Article 16. Presumptions concerning recognition

Article 17. Decision to recognize a foreign proceeding

Article 18. Subsequent information

Article 19. Relief that may be granted upon application for recognition of a
foreign proceeding

Article 20. Effects of recognition of a foreign main proceeding

Article 21. Relief that may be granted upon recognition of a foreign
proceeding

Article 22. Protection of creditors and other interested persons

Article 23. Actions to avoid acts detrimental to creditors

Article 24. Intervention by a foreign representative in proceedings in this
State

Chapter IV. Cooperation with foreign courts and foreign representatives

Article 25. Cooperation and direct communication between a court of this
State and foreign courts or foreign representatives

Article 26. Cooperation and direct communication between the *[insert the
title of a person or body administering a reorganization or liquidation
under the law of the enacting State]* and foreign courts or foreign
representatives

Article 27. Forms of cooperation

Chapter V.   Concurrent proceedings

Article 28. Commencement of a proceeding under *[identify laws of the
enacting State relating to insolvency]* after recognition of a foreign main
proceeding

Article 29. Coordination of a proceeding under *[identify laws of the
enacting State relating to insolvency]* and a foreign proceeding

Article 30. Coordination of more than one foreign proceeding

Article 31. Presumption of insolvency based on recognition of a foreign
main proceeding

Article 32. Rule of payment in concurrent proceedings

VI. ASSISTANCE FROM THE UNCITRAL SECRETARIAT

Assistance in drafting legislation

Information on the interpretation of legislation based on the Model Law

*Annex.* General Assembly resolution 52/158 of 15 December 1997

*Part one*

# UNCITRAL
# MODEL LAW ON CROSS-BORDER INSOLVENCY

## Preamble

The purpose of this Law is to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of:

*(a)* Cooperation between the courts and other competent authorities of this State and foreign States involved in cases of cross-border insolvency;

*(b)* Greater legal certainty for trade and investment;

*(c)* Fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor;

*(d)* Protection and maximization of the value of the debtor's assets; and

*(e)* Facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

## Chapter I.  General provisions

### *Article 1.  Scope of application*

1. This Law applies where:

*(a)* Assistance is sought in this State by a foreign court or a foreign representative in connection with a foreign proceeding; or

*(b)* Assistance is sought in a foreign State in connection with a proceeding under *[identify laws of the enacting State relating to insolvency]*; or

*(c)* A foreign proceeding and a proceeding under *[identify laws of the enacting State relating to insolvency]* in respect of the same debtor are taking place concurrently; or

*(d)* Creditors or other interested persons in a foreign State have an interest in requesting the commencement of, or participating in, a proceeding under *[identify laws of the enacting State relating to insolvency]*.

2. This Law does not apply to a proceeding concerning *[designate any types of entities, such as banks or insurance companies, that are subject to a special insolvency regime in this State and that this State wishes to exclude from this Law]*.

### *Article 2.  Definitions*

For the purposes of this Law:

*(a)* "Foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation;

*(b)* "Foreign main proceeding" means a foreign proceeding taking place in the State where the debtor has the centre of its main interests;

*(c)* "Foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment within the meaning of subparagraph *(f)* of this article;

*(d)* "Foreign representative" means a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding;

*(e)* "Foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

*(f)* "Establishment" means any place of operations where the debtor carries out a non-transitory economic activity with human means and goods or services.

*Article 3.  International obligations of this State*

To the extent that this Law conflicts with an obligation of this State arising out of any treaty or other form of agreement to which it is a party with one or more other States, the requirements of the treaty or agreement prevail.

*Article 4.*  [Competent court or authority][1]

The functions referred to in this Law relating to recognition of foreign proceedings and cooperation with foreign courts shall be performed by *[specify the court, courts, authority or authorities competent to perform those functions in the enacting State]*.

*Article 5.  Authorization of* [insert the title of the person or body administering reorganization or liquidation under the law of the enacting State] *to act in a foreign State*

A *[insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State]* is authorized to act in a foreign State on behalf of a proceeding under *[identify laws of the enacting State relating to insolvency]*, as permitted by the applicable foreign law.

*Article 6.  Public policy exception*

Nothing in this Law prevents the court from refusing to take an action governed by this Law if the action would be manifestly contrary to the public policy of this State.

*Article 7.  Additional assistance under other laws*

Nothing in this Law limits the power of a court or a *[insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State]* to provide additional assistance to a foreign representative under other laws of this State.

*Article 8.   Interpretation*

In the interpretation of this Law, regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith.

# Chapter II.  Access of foreign representatives and creditors to courts in this state

*Article 9.  Right of direct access*

A foreign representative is entitled to apply directly to a court in this State.

### Article 10.  Limited jurisdiction

The sole fact that an application pursuant to this Law is made to a court in this State by a foreign representative does not subject the foreign representative or the foreign assets and affairs of the debtor to the jurisdiction of the courts of this State for any purpose other than the application.

### Article 11.  Application by a foreign representative to commence a proceeding under [identify laws of the enacting State relating to insolvency]

A foreign representative is entitled to apply to commence a proceeding under *[identify laws of the enacting State relating to insolvency]* if the conditions for commencing such a proceeding are otherwise met.

### Article 12.  Participation of a foreign representative in a proceeding under [identify laws of the enacting State relating to insolvency]

Upon recognition of a foreign proceeding, the foreign representative is entitled to participate in a proceeding regarding the debtor under *[identify laws of the enacting State relating to insolvency]*.

### Article 13.  Access of foreign creditors to a proceeding under [identify laws of the enacting State relating to insolvency]

1. Subject to paragraph 2 of this article, foreign creditors have the same rights regarding the commencement of, and participation in, a proceeding under *[identify laws of the enacting State relating to insolvency]* as creditors in this State.

2. Paragraph 1 of this article does not affect the ranking of claims in a proceeding under *[identify laws of the enacting State relating to insolvency]*, except that the claims of foreign creditors shall not be ranked lower than *[identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims]*.[2]

### Article 14.  Notification to foreign creditors of a proceeding under [identify laws of the enacting State relating to insolvency]

1. Whenever under *[identify laws of the enacting State relating to insolvency]* notification is to be given to creditors in this State, such notification shall also be given to the known creditors that do not have addresses in this State. The court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.

2. Such notification shall be made to the foreign creditors individually, unless the court considers that, under the circumstances, some other form of notification would be more appropriate. No letters rogatory or other, similar formality is required.

3. When a notification of commencement of a proceeding is to be given to foreign creditors, the notification shall:

*(a)* Indicate a reasonable time period for filing claims and specify the place for their filing;

*(b)* Indicate whether secured creditors need to file their secured claims; and

*(c)* Contain any other information required to be included in such a notification to creditors pursuant to the law of this State and the orders of the court.

## Chapter III.  Recognition of a foreign proceeding and relief

*Article 15.  Application for recognition of a foreign proceeding*

1. A foreign representative may apply to the court for recognition of the foreign proceeding in which the foreign representative has been appointed.

2. An application for recognition shall be accompanied by:

*(a)* A certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; or

*(b)* A certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative; or

*(c)* In the absence of evidence referred to in subparagraphs *(a)* and *(b),* any other evidence acceptable to the court of the existence of the foreign proceeding and of the appointment of the foreign representative.

3. An application for recognition shall also be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative.

4. The court may require a translation of documents supplied in support of the application for recognition into an official language of this State.

*Article 16.  Presumptions concerning recognition*

1. If the decision or certificate referred to in paragraph 2 of article 15 indicates that the foreign proceeding is a proceeding within the meaning of subparagraph *(a)* of article 2 and that the foreign representative is a person or body within the meaning of subparagraph *(d)* of article 2, the court is entitled to so presume.

2. The court is entitled to presume that documents submitted in support of the application for recognition are authentic, whether or not they have been legalized.

3. In the absence of proof to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.

### *Article 17.  Decision to recognize a foreign proceeding*

1. Subject to article 6, a foreign proceeding shall be recognized if:

   *(a)* The foreign proceeding is a proceeding within the meaning of subparagraph *(a)* of article 2;

   *(b)* The foreign representative applying for recognition is a person or body within the meaning of subparagraph *(d)* of article 2;

   *(c)* The application meets the requirements of paragraph 2 of article 15; and

   *(d)* The application has been submitted to the court referred to in article 4.

2. The foreign proceeding shall be recognized:

   *(a)* As a foreign main proceeding if it is taking place in the State where the debtor has the centre of its main interests; or

   *(b)* As a foreign non-main proceeding if the debtor has an establishment within the meaning of subparagraph *(f)* of article 2 in the foreign State.

3. An application for recognition of a foreign proceeding shall be decided upon at the earliest possible time.

4. The provisions of articles 15, 16, 17 and 18 do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist.

### *Article 18.  Subsequent information*

From the time of filing the application for recognition of the foreign proceeding, the foreign representative shall inform the court promptly of:

> *(a)* Any substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment; and

> *(b)* Any other foreign proceeding regarding the same debtor that becomes known to the foreign representative.

### *Article 19.   Relief that may be granted upon application for recognition of a foreign proceeding*

1. From the time of filing an application for recognition until the application is decided upon, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including:

> *(a)* Staying execution against the debtor's assets;

> *(b)* Entrusting the administration or realization of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy;

> *(c)* Any relief mentioned in paragraph 1 *(c), (d)* and *(g)* of article 21.

2. *[Insert provisions (or refer to provisions in force in the enacting State) relating to notice.]*

3. Unless extended under paragraph 1 *(f)* of article 21, the relief granted under this article terminates when the application for recognition is decided upon.

4. The court may refuse to grant relief under this article if such relief would interfere with the administration of a foreign main proceeding.

### *Article 20.   Effects of recognition of a foreign main proceeding*

1. Upon recognition of a foreign proceeding that is a foreign main proceeding,

> *(a)* Commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

> *(b)* Execution against the debtor's assets is stayed; and

*(c)* The right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.

2. The scope, and the modification or termination, of the stay and suspension referred to in paragraph 1 of this article are subject to *[refer to any provisions of law of the enacting State relating to insolvency that apply to exceptions, limitations, modifications or termination in respect of the stay and suspension referred to in paragraph 1 of this article].*

3. Paragraph 1 *(a)* of this article does not affect the right to commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor.

4. Paragraph 1 of this article does not affect the right to request the commencement of a proceeding under *[identify laws of the enacting State relating to insolvency]* or the right to file claims in such a proceeding.

*Article 21.   Relief that may be granted upon recognition of a foreign proceeding*

1. Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including:

*(a)* Staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph 1 *(a)* of article 20;

*(b)* Staying execution against the debtor's assets to the extent it has not been stayed under paragraph 1 *(b)* of article 20;

*(c)* Suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1 *(c)* of article 20;

*(d)* Providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

*(e)* Entrusting the administration or realization of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court;

*(f)* Extending relief granted under paragraph 1 of article 19;

*(g)* Granting any additional relief that may be available to *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]* under the laws of this State.

2. Upon recognition of a foreign proceeding, whether main or non-main, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court, provided that the court is satisfied that the interests of creditors in this State are adequately protected.

3. In granting relief under this article to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

### Article 22.  Protection of creditors and other interested persons

1. In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article, the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

2. The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

3. The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or at its own motion, modify or terminate such relief.

### Article 23.  Actions to avoid acts detrimental to creditors

1. Upon recognition of a foreign proceeding, the foreign representative has standing to initiate *[refer to the types of actions to avoid or otherwise render ineffective acts detrimental to creditors that are available in this State to a person or body administering a reorganization or liquidation]*.

2. When the foreign proceeding is a foreign non-main proceeding, the court must be satisfied that the action relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding.

### Article 24.  Intervention by a foreign representative in proceedings in this State

Upon recognition of a foreign proceeding, the foreign representative may, provided the requirements of the law of this State are met, intervene in any proceedings in which the debtor is a party.

## Chapter IV.  Cooperation with foreign courts and foreign representatives

### Article 25.  Cooperation and direct communication between a court of this State and foreign courts or foreign representatives

1. In matters referred to in article 1, the court shall cooperate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]*.

2. The court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives.

*Article 26.   Cooperation and direct communication between the* [insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State] *and foreign courts or foreign representatives*

1. In matters referred to in article 1, a *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]* shall, in the exercise of its functions and subject to the supervision of the court, cooperate to the maximum extent possible with foreign courts or foreign representatives.

2. The *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]* is entitled, in the exercise of its functions and subject to the supervision of the court, to communicate directly with foreign courts or foreign representatives.

*Article 27.   Forms of cooperation*

Cooperation referred to in articles 25 and 26 may be implemented by any appropriate means, including:

*(a)* Appointment of a person or body to act at the direction of the court;

*(b)* Communication of information by any means considered appropriate by the court;

*(c)* Coordination of the administration and supervision of the debtor's assets and affairs;

*(d)* Approval or implementation by courts of agreements concerning the coordination of proceedings;

*(e)* Coordination of concurrent proceedings regarding the same debtor;

*(f) [The enacting State may wish to list additional forms or examples of cooperation]*.

## Chapter V.  Concurrent proceedings

*Article 28.   Commencement of a proceeding under* [identify laws of the enacting State relating to insolvency] *after recognition of a foreign main proceeding*

After recognition of a foreign main proceeding, a proceeding under *[identify laws of the enacting State relating to insolvency]* may be commenced only if the debtor has assets in this State; the effects of that proceeding shall be restricted to the assets of the debtor that are located in this State and, to the extent necessary to implement cooperation and coordination under articles 25, 26 and 27, to other assets of the debtor that, under the law of this State, should be administered in that proceeding.

*Article 29.  Coordination of a proceeding under* [identify laws of the enacting State relating to insolvency] *and a foreign proceeding*

Where a foreign proceeding and a proceeding under *[identify laws of the enacting State relating to insolvency]* are taking place concurrently regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:

*(a)* When the proceeding in this State is taking place at the time the application for recognition of the foreign proceeding is filed,

(i) Any relief granted under article 19 or 21 must be consistent with the proceeding in this State; and

(ii) If the foreign proceeding is recognized in this State as a foreign main proceeding, article 20 does not apply;

*(b)* When the proceeding in this State commences after recognition, or after the filing of the application for recognition, of the foreign proceeding,

(i) Any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the proceeding in this State; and

(ii) If the foreign proceeding is a foreign main proceeding, the stay and suspension referred to in paragraph 1 of article 20 shall be modified or terminated pursuant to paragraph 2 of article 20 if inconsistent with the proceeding in this State;

*(c)* In granting, extending or modifying relief granted to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

*Article 30.  Coordination of more than one foreign proceeding*

In matters referred to in article 1, in respect of more than one foreign proceeding regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:

*(a)* Any relief granted under article 19 or 21 to a representative of a foreign non-main proceeding after recognition of a foreign main proceeding must be consistent with the foreign main proceeding;

*(b)* If a foreign main proceeding is recognized after recognition, or after the filing of an application for recognition, of a foreign non-main proceeding, any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the foreign main proceeding;

*(c)* If, after recognition of a foreign non-main proceeding, another foreign non-main proceeding is recognized, the court shall grant, modify or terminate relief for the purpose of facilitating coordination of the proceedings.

*Article 31.  Presumption of insolvency based on recognition of a foreign main proceeding*

In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a proceeding under *[identify laws of the enacting State relating to insolvency]*, proof that the debtor is insolvent.

*Article 32.  Rule of payment in concurrent proceedings*

Without prejudice to secured claims or rights *in rem*, a creditor who has received part payment in respect of its claim in a proceeding pursuant to a law relating to insolvency in a foreign State may not receive a payment for the same claim in a proceeding under *[identify laws of the enacting State relating to insolvency]* regarding the same debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received.

Part two

## GUIDE TO ENACTMENT OF
## THE UNCITRAL MODEL LAW ON
## CROSS-BORDER INSOLVENCY

## I.  PURPOSE AND ORIGIN OF THE MODEL LAW

## Purpose of the Model Law

1. The UNCITRAL Model Law on Cross-Border Insolvency, adopted in 1997, is designed to assist States to equip their insolvency laws with a modern, harmonized and fair framework to address more effectively instances of cross-border insolvency. Those instances include cases where the insolvent debtor has assets in more than one State or where some of the creditors of the debtor are not from the State where the insolvency proceeding is taking place.

2. The Model Law reflects practices in cross-border insolvency matters that are characteristic of modern, efficient insolvency systems. Thus, the States enacting the Model Law ("enacting States") would be introducing useful additions and improvements in national insolvency regimes designed to resolve problems arising in cross-border insolvency cases. Both jurisdictions that currently have to deal with numerous cases of cross-border insolvency and jurisdictions that wish to be well prepared for the increasing likelihood of cases of cross-border insolvency will find the Model Law useful.

3. The Model Law respects the differences among national procedural laws and does not attempt a substantive unification of insolvency law. It offers solutions that help in several modest but significant ways. These include the following:

*(a)* Providing the person administering a foreign insolvency proceeding ("foreign representative") with access to the courts of the enacting State, thereby permitting the foreign representative to seek a temporary "breathing space", and allowing the courts in the enacting State to determine what coordination among the jurisdictions or other relief is warranted for optimal disposition of the insolvency;

*(b)* Determining when a foreign insolvency proceeding should be accorded "recognition" and what the consequences of recognition may be;

*(c)* Providing a transparent regime for the right of foreign creditors to commence, or participate in, an insolvency proceeding in the enacting State;

*(d)* Permitting courts in the enacting State to cooperate more effectively with foreign courts and foreign representatives involved in an insolvency matter;

*(e)* Authorizing courts in the enacting State and persons administering insolvency proceedings in the enacting State to seek assistance abroad;

*(f)* Providing for court jurisdiction and establishing rules for coordination where an insolvency proceeding in the enacting State is taking place concurrently with an insolvency proceeding in a foreign State;

*(g)* Establishing rules for coordination of relief granted in the enacting State in favour of two or more insolvency proceedings that may take place in foreign States regarding the

same debtor.

## Preparatory work and adoption

4. The project was initiated by the United Nations Commission on International Trade Law (UNCITRAL), in close cooperation with the International Association of Insolvency Practitioners (INSOL). The project benefited from the expert advice of INSOL during all stages of the preparatory work. In addition, assistance during the formulation of the Law, consultative assistance was provided by Committee J (Insolvency) of the Section on Business Law of the International Bar Association.

5. Prior to the decision by UNCITRAL to undertake work on cross-border insolvency, the Commission and INSOL held two international colloquiums for insolvency practitioners, judges, government officials and representatives of other interested sectors.[3] The suggestion arising from those colloquiums was that work by UNCITRAL should have the limited but useful goal of facilitating judicial cooperation, court access for foreign insolvency administrators and recognition of foreign insolvency proceedings.

6. When UNCITRAL decided in 1995 to develop a legal instrument relating to cross-border insolvency, it entrusted the work to the Working Group on Insolvency Law, one of the three subsidiary bodies of UNCITRAL.[4]  The Working Group devoted four two-week sessions to the work on the project.[5]

7. In March 1997, another international meeting of practitioners was held to discuss the draft text as prepared by the Working Group. The participants (mostly judges, judicial administrators and government officials) generally considered that the model legislation, when enacted, would constitute a major improvement in dealing with cross-border insolvency cases.[6]

8. The final negotiations on the draft text took place during the thirtieth session of UNCITRAL, held at Vienna from 12 to 30 May 1997. UNCITRAL adopted the Model Law by consensus on 30 May 1997.[7] In addition to the 36 States members of UNCITRAL, representatives of 40 observer States and 13 international organizations participated in the deliberations of the Commission and the Working Group. Subsequently, the General Assembly adopted resolution 52/158 of 15 December 1997 (see annex), in which it expressed its appreciation to UNCITRAL for completing and adopting the Model Law.

## II.  PURPOSE OF THE GUIDE TO ENACTMENT

9. UNCITRAL considered that the Model Law would be a more effective tool for legislators if it were accompanied by background and explanatory information. While such information would primarily be directed to executive branches of Governments and legislators preparing the necessary legislative revisions, it would also provide useful insight to other users of the text such as judges, practitioners and academics. Such information might also assist States in considering which, if any, of the provisions should be varied in order to be adapted to the particular national circumstances.

10. The present Guide to Enactment has been prepared by the Secretariat pursuant to the request of UNCITRAL made at the close of its thirtieth session, in 1997. It is based on the deliberations and decisions of the Commission at that session,[8] when the Model Law was adopted, as well as on considerations of the Working Group on Insolvency Law, which conducted the preparatory work.

## III.  MODEL LAW AS A VEHICLE FOR THE HARMONIZATION OF LAWS

11. A model law is a legislative text that is recommended to States for incorporation into their national law. Unlike an international convention, a model law does not require the State enacting it to notify the United Nations or other States that may have also enacted it.

12. In incorporating the text of the model law into its system, a State may modify or leave out some of its provisions. In the case of a convention, the possibility of changes being made to the uniform text by the States parties (normally referred to as "reservations") is much more restricted; in particular trade law conventions usually either totally prohibit reservations or allow only specified ones. The flexibility inherent in a model law is particularly desirable in those cases when it is likely that the State would wish to make various modifications to the uniform text before it would be ready to enact it as a national law. Some modifications may be expected in particular when the uniform text is closely related to the national court and procedural system (which is the case with the UNCITRAL Model Law on Cross-Border Insolvency). This, however, also means that the degree of, and certainty about, harmonization achieved through a model law is likely to be lower than in the case of a convention. Therefore, in order to achieve a satisfactory degree of harmonization and certainty, it is recommended that States make as few changes as possible in incorporating the model law into their legal systems.

## IV.  MAIN FEATURES OF THE MODEL LAW

### Background

13. The increasing incidence of cross-border insolvencies reflects the continuing global expansion of trade and investment. However, national insolvency laws have by and large not kept pace with the trend, and they are often ill-equipped to deal with cases of a cross-border nature. This frequently results in inadequate and inharmonious legal approaches, which hamper the rescue of financially troubled businesses, are not conducive to a fair and efficient administration of cross-border insolvencies, impede the protection of the assets of the insolvent debtor against dissipation and hinder maximization of the value of those assets. Moreover, the absence of predictability in the handling of cross-border insolvency cases impedes capital flow and is a disincentive to cross-border investment.

14. Fraud by insolvent debtors, in particular by concealing assets or transferring them to foreign jurisdictions, is an increasing problem, in terms of both its frequency and its magnitude. The modern, interconnected world makes such fraud easier to conceive and carry out. The cross-border cooperation mechanisms established by the Model Law are designed to confront such international fraud.

15. Only a limited number of countries have a legislative framework for dealing with cross-border insolvency that is well suited to the needs of international trade and investment. Various techniques and notions are employed in the absence of a specific legislative or treaty framework for dealing with cross-border insolvency. These include the following: application of the doctrine of comity by courts in common-law jurisdictions; issuance for equivalent purposes of enabling orders (*exequatur*) in civil-law jurisdictions; enforcement of foreign insolvency orders relying on legislation for enforcement of foreign judgements; and techniques such as letters rogatory for transmitting requests for judicial assistance.

16. Approaches based purely on the doctrine of comity or on *exequatur* do not provide the same degree of predictability and reliability as can be provided by specific legislation, such as the one contained in the Model Law, on judicial cooperation, recognition of foreign insolvency proceedings and access for foreign representatives to courts. For example, in a given legal system general legislation on reciprocal recognition of judgements, including *exequatur*, might be confined to enforcement of specific money judgements or injunctive orders in two-party disputes, thus excluding decisions opening collective insolvency proceedings. Furthermore, recognition of foreign insolvency proceedings might not be considered as a matter of recognizing a foreign "judgement", for example, if the foreign bankruptcy order is considered to be merely a declaration of status of the debtor or if the order is considered not to be final.

17. To the extent that there is a lack of communication and coordination among courts and administrators from concerned jurisdictions, it is more likely that assets would be dissipated, fraudulently concealed, or possibly liquidated without reference to other more advantageous solutions. As a result, not only is the ability of creditors to receive payment diminished, but so is the possibility of rescuing financially viable businesses and saving jobs. By contrast, mechanisms in national legislation for coordinated administration of cases of cross-border insolvency make it possible to adopt solutions that are sensible and in the best interest of the creditors and the debtor; the presence of such mechanisms in the law of a State is therefore perceived as advantageous for foreign investment and trade in that State.

18. The Model Law takes into account the results of other international efforts, including the Convention on Insolvency Proceedings of the European Union, the European Convention on Certain International Aspects of Bankruptcy (1990),[9] the Montevideo treaties on international commercial law (1889 and 1940), the Convention regarding Bankruptcy between Nordic States (1933) and the Convention on Private International Law (Bustamante Code) (1928).[10]  Proposals from non-governmental organizations that have been taken into account include the Model International Insolvency Cooperation Act and the Cross-Border Insolvency Concordat, both developed by Committee J of the Section on Business Law of the International Bar Association.

19. When the European Union Convention on Insolvency Proceedings enters into effect, it will establish a cross-border insolvency regime within the European Union for cases where the debtor has the centre of its main interests in a State member of the Union. The Convention does not deal with cross-border insolvency matters extending beyond a State member of the European Union into a non-member State. Thus, the Model Law offers to States members of the European Union a complementary regime of

considerable practical value that addresses the many cases of cross-border cooperation not covered by
the Convention.

## Fitting the Model Law into existing national law

20. With its scope limited to some procedural aspects of cross- border insolvency cases, the Model Law
is intended to operate as an integral part of the existing insolvency law in the enacting State. This is
manifested in several ways:

*(a)* The amount of possibly new legal terminology added to existing law by the Model
Law is limited. New legal terms are those specific to the cross-border context, such as
"foreign proceeding" and "foreign representative". The terms used in the Model Law are
unlikely to be in conflict with terminology in existing law. Moreover, where the
expression is likely to vary from country to country, the Model Law, instead of using a
particular term, indicates the meaning of the term in italics within square brackets and
calls upon the drafters of the national law to use the appropriate term;

*(b)* The Model Law presents to enacting States the possibility of aligning the relief
resulting from recognition of a foreign proceeding with the relief available in a
comparable proceeding in the national law;

*(c)* Recognition of foreign proceedings does not prevent local creditors from initiating or
maintaining collective insolvency proceedings in the enacting State (article 28);

*(d)* Relief available to the foreign representative is subject to the protection of local
creditors and other interested persons, including the debtor, against undue prejudice; relief
is also subject to compliance with the procedural requirements of the enacting State and to
applicable notification requirements (article 22 and article 19, paragraph 2);

*(e)* The Model Law preserves the possibility of excluding or limiting any action in favour
of the foreign proceeding, including recognition of the proceeding, on the basis of
overriding public policy considerations, although it is expected that the public policy
exception will be rarely used (article 6);

*(f)* The Model Law is in the flexible form of model legislation that takes into account
differing approaches in national insolvency laws and the varying propensities of States to
cooperate and coordinate in insolvency matters (articles 25-27).

21. The flexibility to adapt the Model Law to the legal system of the enacting State should be utilized
with due consideration for the need for uniformity in its interpretation and for the benefits to the
enacting State in adopting modern, generally acceptable international practices in insolvency matters.
Thus it is advisable to limit deviations from the uniform text to a minimum. One advantage of

uniformity is that it will make it easier for the enacting States to obtain cooperation from other States in insolvency matters.

## Scope of application of the Model Law

22. The Model Law may be applied in a number of cross-border insolvency situations, including the following: *(a)* the case of an inward-bound request for recognition of a foreign proceeding; *(b)* an outward-bound request from a court or administrator in the enacting State for recognition of an insolvency proceeding commenced under the laws of the enacting State; *(c)* coordination of concurrent proceedings in two or more States; and *(d)* participation of foreign creditors in insolvency proceedings taking place in the enacting State (see article 1).

## Types of foreign proceedings covered

23. To fall within the scope of the Model Law, a foreign insolvency proceeding needs to possess certain attributes. These include the following: basis in insolvency-related law of the originating State; involvement of creditors collectively; control or supervision of the assets and affairs of the debtor by a court or another official body; and reorganization or liquidation of the debtor as the purpose of the proceeding (see article 2, subparagraph *(a)*).

24. Within those parameters, a variety of collective proceedings would be eligible for recognition, be they compulsory or voluntary, corporate or individual, winding-up or reorganization. It also includes those in which the debtor retains some measure of control over its assets, albeit under court supervision (e.g. suspension of payments, "debtor in possession").

25. An inclusive approach is used also as regards the possible types of debtors covered by the Model Law. Nevertheless, the Model Law refers to the possibility of excluding from its scope of application certain types of entities, such as banks or insurance companies specially regulated with regard to insolvency under the laws of the enacting State (article 1, paragraph 2).

## Foreign assistance for an insolvency proceeding
## taking place in the enacting State

26. In addition to equipping the courts of the enacting State to deal with incoming requests for recognition, the Model Law authorizes the courts of the enacting State to seek assistance abroad on behalf of a proceeding taking place in the enacting State (article 25). Addition of the authorization for the courts of the enacting State to seek cooperation abroad may help to fill a gap in legislation in some States. Without such legislative authorization, the courts, in some legal systems, feel constrained from seeking such assistance abroad, which creates potential obstacles to a coordinated international response in case of cross-border insolvency.

27. The Model Law may similarly help an enacting State to fill a gap in its legislation as to the

"outward" powers of persons appointed to administer insolvency proceedings under the local insolvency law. Article 5 authorizes those persons to seek recognition of, and assistance for, those proceedings from foreign courts.

**Foreign representative's access to courts
of the enacting State**

28. An important objective of the Model Law is to provide expedited and direct access for foreign representatives to the courts of the enacting State. The Model Law avoids the need to rely on cumbersome and time-consuming letters rogatory or other forms of diplomatic or consular communications that might otherwise have to be used. This facilitates a coordinated, cooperative approach to cross-border insolvency and makes fast action possible.

29. In addition to establishing the principle of direct court access for the foreign representative, the Model Law:

   *(a)* Establishes simplified proof requirements for seeking recognition and relief for foreign proceedings, which avoid time-consuming "legalization" requirements involving notarial or consular procedures (article 15);

   *(b)* Provides that the foreign representative has procedural standing for commencing an insolvency proceeding in the enacting State (under the conditions applicable in the enacting State) and that the foreign representative may participate in an insolvency proceeding in the enacting State (articles 11 and 12);

   *(c)* Confirms, subject to other requirements of the enacting State, access of foreign creditors to the courts of the enacting State for the purpose of commencing in the enacting State an insolvency proceeding or participating in such a proceeding (article 13);

   *(d)* Gives the foreign representative the right to intervene in proceedings concerning individual actions in the enacting State affecting the debtor or its assets (article 24);

   *(e)* Provides that the mere fact of a petition for recognition in the enacting State does not mean that the courts in that State have jurisdiction over all the assets and affairs of the debtor (article 10).

**Recognition of foreign proceedings**

*Decision whether to recognize a foreign proceeding*

30. The Model Law establishes criteria for determining whether a foreign proceeding is to be recognized (articles 15-17) and provides that, in appropriate cases, the court may grant interim relief pending a

decision on recognition (article 19). The decision includes a determination whether the jurisdictional basis on which the foreign proceeding was commenced was such that it should be recognized as a "main" or a "non-main" foreign insolvency proceeding. Procedural matters related to notice of the filing of an application for recognition or of the decision to grant recognition are not dealt with in the Model Law; they remain to be governed by other provisions of law of the enacting State.

31. A foreign proceeding is deemed to be the "main" proceeding if it has been commenced in the State where "the debtor has the centre of its main interests". This corresponds to the formulation in article 3 of the European Union Convention on Insolvency Proceedings, thus building on the emerging harmonization as regards the notion of a "main" proceeding. The determination that a foreign proceeding is a "main" proceeding may affect the nature of the relief accorded to the foreign representative.

*Effects of recognition and discretionary relief available to a foreign representative*

32. Key elements of the relief accorded upon recognition of the representative of a foreign "main" proceeding include a stay of actions of individual creditors against the debtor or a stay of enforcement proceedings concerning the assets of the debtor, and a suspension of the debtor's right to transfer or encumber its assets (article 20, paragraph 1). Such stay and suspension are "mandatory" (or "automatic") in the sense that either they flow automatically from the recognition of a foreign main proceeding or, in the States where a court order is needed for the stay or suspension, the court is bound to issue the appropriate order. The stay of actions or of enforcement proceedings is necessary to provide "breathing space" until appropriate measures are taken for reorganization or fair liquidation of the assets of the debtor. The suspension of transfers is necessary because in a modern, globalized economic system it is possible for multinational debtors to move money and property across boundaries quickly. The mandatory moratorium triggered by the recognition of the foreign main proceeding provides a rapid "freeze" essential to prevent fraud and to protect the legitimate interests of the parties involved until the court has an opportunity to notify all concerned and to assess the situation.

33. Exceptions and limitations to the scope of the stay and suspension (e.g. exceptions for secured claims, payments by the debtor made in the ordinary course of business, set-off, execution of rights *in rem*) and the possibility of modifying or terminating the stay or suspension are determined by provisions governing comparable stays and suspensions in insolvency proceedings under the laws of the enacting State (article 20, paragraph 2).

34. In addition to the mandatory stay and suspension, the Model Law authorizes the court to grant "discretionary" relief for the benefit of any foreign proceeding, whether it is a "main" proceeding or not (article 21). Such discretionary relief may consist of, for example, staying proceedings or suspending the right to encumber assets (to the extent such stay and suspension have not taken effect automatically under article 20), facilitating access to information concerning the assets of the debtor and its liabilities, appointing a person to administer all or part of those assets, and any other relief that may be available under the laws of the enacting State. Urgently needed relief may be granted already upon filing an application for recognition (article 21).

*Protection of creditors and other interested persons*

35. The Model Law contains provisions such as the following to protect the interests of the creditors (in particular local creditors), the debtor and other affected persons: the availability of temporary relief upon application for recognition of a foreign proceeding or upon recognition is subject to the discretion of the court; it is expressly stated that in granting such relief the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected (article 22, paragraph 1); the court may subject the relief it grants to conditions it considers appropriate; and the court may modify or terminate the relief granted, if so requested by a person affected thereby (article 22, paragraphs 2 and 3).

36. In addition to those specific provisions, the Model Law in a general way provides that the court may refuse to take an action governed by the Model Law if the action would be manifestly contrary to the public policy of the enacting State (article 6).

37. Questions of notice to interested persons, while closely related to the protection of their interests, are in general not regulated in the Model Law. Thus, such questions are governed by the procedural rules of the enacting State, some of which may be of a public-order character. For example, the law of the enacting State will determine whether any notice is to be given to the debtor or another person of an application for recognition of a foreign proceeding and the time period for giving the notice.

### Cross-border cooperation

38. A widespread limitation on cooperation and coordination between judges from different jurisdictions in cases of cross-border insolvency is derived from the lack of a legislative framework, or from uncertainty regarding the scope of the existing legislative authority, for pursuing cooperation with foreign courts.

39. Experience has shown that, irrespective of the discretion courts may traditionally enjoy in a State, the passage of a specific legislative framework is useful for promoting international cooperation in cross-border cases. Accordingly, the Model Law fills the gap found in many national laws by expressly empowering courts to extend cooperation in the areas covered by the Model Law (articles 25-27).

40. For similar reasons, provisions are included authorizing cooperation between a court in the enacting State and a foreign representative and between a person administering the insolvency proceeding in the enacting State and a foreign court or a foreign representative (article 26).

41. The Model Law lists possible forms of cooperation and leaves the legislator an opportunity to list others (article 27). It is advisable to keep the list, when enacted, illustrative rather than exhaustive so as not to stymie the ability of courts to fashion remedies in keeping with specific circumstances.

### Coordination of concurrent proceedings

*Jurisdiction to commence a local proceeding*

42. The Model Law imposes virtually no limitations on the jurisdiction of the courts in the enacting
State to commence or continue insolvency proceedings. Pursuant to article 28, even after recognition of
a foreign "main" proceeding, jurisdiction remains with the courts of the enacting State to institute an
insolvency proceeding if the debtor has assets in the enacting State. If the enacting State would wish to
restrict its jurisdiction to cases where the debtor has not only assets but an establishment in the enacting
State, the adoption of such a restriction would not be contrary to the policy underlying the Model Law.

43. In addition, the Model Law deems the recognized foreign main proceeding to constitute proof that
the debtor is insolvent for the purposes of commencing local proceedings (article 31). This rule would be
helpful in those legal systems in which commencement of an insolvency proceeding requires proof that
the debtor is in fact insolvent. Avoidance of the need for repeated proof of financial failure reduces the
likelihood that a debtor may delay the commencement of the proceeding long enough to conceal or carry
away assets.

*Coordination of relief when proceedings take place concurrently*

44. The Model Law deals with coordination between a local proceeding and a foreign proceeding
concerning the same debtor (article 29) and facilitates coordination between two or more foreign
proceedings concerning the same debtor (article 30). The objective of the provisions is to foster
coordinated decisions that would best achieve the objectives of both proceedings (e.g. maximization of
the value of the debtor's assets or the most advantageous restructuring of the enterprise). In order to
achieve satisfactory coordination and to be able to adapt relief to changing circumstances, the court is in
all situations covered by the Model Law, including those that limit the effects of foreign proceedings in
the face of local proceedings, directed to cooperate to the maximum extent possible with foreign courts
and the foreign representatives (articles 25 and 30).

45. When the local insolvency proceeding is already under way at the time that recognition of a foreign
proceeding is requested, the Model Law requires that any relief granted for the benefit of the foreign
proceeding must be consistent with the local proceeding. Furthermore, the existence of the local
proceeding at the time the foreign main proceeding is recognized prevents the operation of article 20.
When there is no local proceeding pending, article 20 mandates the stay of individual actions or
enforcement proceedings against the debtor and a suspension of the debtor's right to transfer or
encumber its assets.

46. When the local proceeding begins subsequent to recognition or application for recognition of the
foreign proceeding, the relief that has been granted for the benefit of the foreign proceeding must be
reviewed and modified or terminated if inconsistent with the local proceeding. If the foreign proceeding
is a main proceeding, the stay and a suspension, as mandated by article 20, must also be modified or
terminated if inconsistent with the local proceeding.

47. When the court is faced with more than one foreign proceeding, article 30 calls for tailoring relief in such a way that will facilitate coordination of the foreign proceedings; if one of the foreign proceedings is a main proceeding, any relief must be consistent with that main proceeding.

48. Another rule designed to enhance coordination of concurrent proceedings is the one on rate of payment of creditors (article 32). It provides that a creditor, by claiming in more than one proceeding, does not receive more than the proportion of payment that is obtained by other creditors of the same class.

# V.  ARTICLE-BY-ARTICLE REMARKS

## Title

*"Model Law"*

49. If the enacting State decides to incorporate the provisions of the Model Law into an existing national insolvency statute, the title of the enacted provisions would have to be adjusted accordingly, and the word "Law", which appears at various places in the title and in the text of the Model Law, would have to be replaced by the appropriate expression.

50. In enacting the Model Law, it is advisable to adhere as much as possible to the uniform text in order to make the national law as transparent as possible for foreign users of the national law (see also paragraphs 11-12 and 21 above).

*"Insolvency"*

51. The word "insolvency", as used in the title of the Model Law, refers to various types of collective proceedings against insolvent debtors. The reason is that the Model Law (as pointed out above in paragraphs 23-24) covers proceedings concerning different types of debtors and, among those proceedings, deals with proceedings aimed at reorganizing the debtor and proceedings leading to a liquidation of the debtor as a commercial entity.

52. It should be noted that in some jurisdictions the expression "insolvency proceedings" has a narrow technical meaning in that it may refer, for example, only to collective proceedings involving a company or a similar legal person or only to collective proceedings against a natural person. No such distinction is intended to be drawn by the use of the term "insolvency" in the title of the Model Law, since the Model Law is designed to be applicable to proceedings regardless of whether they involve a natural person or a legal person as the debtor. If in the enacting State the word "insolvency" may be misunderstood as referring to one particular type of collective proceeding, another term should be used to refer to the

proceedings covered by the Law.

53. However, when referring to foreign insolvency proceedings, it is desirable to utilize the wording of article 2, subparagraph *(a),* so as not to exclude recognition of foreign proceedings that, according to article 2, subparagraph *(a),* should be covered.

Preamble

The purpose of this Law is to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of:

>   *(a)* Cooperation between the courts and other competent authorities of this State and foreign States involved in cases of cross-border insolvency;
>
>   *(b)* Greater legal certainty for trade and investment;
>
>   *(c)* Fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor;
>
>   *(d)* Protection and maximization of the value of the debtor's assets; and
>
>   *(e)* Facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

54. The Preamble gives a succinct statement of the basic policy objectives of the Model Law. It is not intended to create substantive rights, but rather to give a general orientation for users of the Model Law and to assist in the interpretation of the Model Law.

55. In States where it is not customary to set out preambular statements of policy in legislation, consideration might be given to including the statement of objectives either in the body of the statute or in a separate document, in order to preserve a useful tool for the interpretation of the law.

*"State"*

56. The word "State", as used in the preamble and throughout the Model Law, refers to the entity that enacts the Law (the "enacting State"). The term should not be understood as referring, for example, to a state in a country with a federal system.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 136-139.

A/CN.9/422, paras. 19-23.
A/CN.9/433, paras. 22-28.
A/CN.9/435, para. 100.

## Chapter I.  General provisions

### Article 1.  Scope of application

1. This Law applies where:

(a) Assistance is sought in this State by a foreign court or a foreign
representative in connection with a foreign proceeding; or

(b) Assistance is sought in a foreign State in connection with a proceeding
under *[identify laws of the enacting State relating to insolvency]*; or

(c) A foreign proceeding and a proceeding under *[identify laws of the
enacting State relating to insolvency]* in respect of the same debtor are
taking place concurrently; or

(d) Creditors or other interested persons in a foreign State have an interest
in requesting the commencement of, or participating in, a proceeding under
*[identify laws of the enacting State relating to insolvency]*.

2. This Law does not apply to a proceeding concerning *[designate any types of entities,
such as banks or insurance companies, that are subject to a special insolvency regime in
this State and that this State wishes to exclude from this Law]*.

*Paragraph 1*

57. Article 1, paragraph 1, outlines the types of issues that may arise in cases of cross-border insolvency
and for which the Model Law provides solutions: *(a)* inward-bound requests for recognition of a foreign
proceeding; *(b)* outward-bound requests from a court or administrator in the enacting State for
recognition of an insolvency proceeding commenced under the laws of the enacting State; *(c)*
coordination of proceedings taking place concurrently in two or more States; and *(d)* participation of
foreign creditors in insolvency proceedings taking place in the enacting State.

58. The words "this State" are used in the preamble and throughout the Model Law to refer to the State
that is enacting the text. The national statute may use another expression that is customarily used for this
purpose.

59. "Assistance" in paragraph 1, subparagraphs *(a)* and *(b),* is meant to cover various situations, dealt

with in the Model Law, in which a court or an insolvency administrator in one State may make a request directed to a court or an insolvency administrator in another State for taking a measure encompassed in the Model Law. Some of those measures the Law specifies (e.g. article 19, subparagraphs 1 *(a)* and *(b);* article 21, subparagraphs 1 *(a)-(f)* and paragraph 2; and article 27, subparagraphs *(a)-(e)*), while other possible measures are covered by a broader formulation (such as the one in article 21, subparagraph 1 *(g)*).

*Paragraph 2 (Specially regulated insolvency proceedings)*

60. In principle, the Model Law was formulated to apply to any proceeding that meets the requirements of article 2, subparagraph *(a),* independently of the nature of the debtor or its particular status under national law. The only possible exceptions contemplated in the text of the Model Law itself are indicated in paragraph 2 (see, however, paragraph 66 below, for considerations regarding "consumers").

61. Banks or insurance companies are mentioned as examples of entities that the enacting State might decide to exclude from the scope of the Model Law. The reason for the exclusion would typically be that the insolvency of such entities gives rise to the particular need to protect vital interests of a large number of individuals, or that the insolvency of those entities usually requires particularly prompt and circumspect action (for instance to avoid massive withdrawals of deposits). For those reasons, the insolvency of such types of entities is in many States administered under a special regulatory regime.

62. Paragraph 2 indicates that the enacting State might decide to exclude the insolvency of entities other than banks and insurance companies; the State might do so where the policy considerations underlying the special insolvency regime for those other types of entities (e.g. public utility companies) call for special solutions in cross-border insolvency cases.

63. It is not advisable to exclude all cases of insolvency of the entities mentioned in paragraph 2. In particular, the enacting State might wish to treat, for recognition purposes, a foreign insolvency proceeding relating to a bank or an insurance company as an ordinary insolvency proceeding if the insolvency of the branch or of the assets of the foreign entity in the enacting State do not fall under the national regulatory scheme. The enacting State might also wish not to exclude the possibility of recognition of a foreign proceeding involving one of those entities if the law of the State of origin does not make that proceeding subject to special regulation.

64. In enacting paragraph 2, a State may wish to make sure that it would not inadvertently and undesirably limit the right of the insolvency administrator or court to seek assistance or recognition abroad of an insolvency proceeding conducted in the territory of the enacting State, merely because that insolvency is subject to a special regulatory regime. Moreover, even if the particular insolvency is governed by special regulation, it is advisable, before generally excluding those cases from the Model Law, to consider whether it would be useful to leave certain features of the Model Law (e.g. on cooperation and coordination and possibly on certain types of discretionary relief) applicable also to the specially regulated insolvency proceedings.

65. In any case, with a view to making the national insolvency law more transparent (for the benefit of foreign users of the law based on the Model Law), it is advisable that exclusions from the scope of the law be expressly mentioned by the enacting State in paragraph 2.

*Non-traders or natural persons*

66. In those jurisdictions that have not made provision for the insolvency of consumers or whose insolvency law provides special treatment for the insolvency of non-traders, the enacting State might wish to exclude from the scope of application of the Model Law those insolvencies that relate to natural persons residing in the enacting State whose debts have been incurred predominantly for personal or household purposes, rather than for commercial or business purposes, or those insolvencies that relate to non-traders. The enacting State might also wish to provide that such exclusion would not apply in cases where the total debts exceed a certain monetary ceiling.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 141-150.
A/CN.9/422, paras. 24-33.
A/CN.9/433, paras. 29-32.
A/CN.9/435, paras. 102-106 and 179.

*Article 2.  Definitions*

For the purposes of this Law:

> *(a)* "Foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation;

> *(b)* "Foreign main proceeding" means a foreign proceeding taking place in the State where the debtor has the centre of its main interests;

> *(c)* "Foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment within the meaning of subparagraph *(f)* of this article;

> *(d)* "Foreign representative" means a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or

affairs or to act as a representative of the foreign proceeding;

*(e)* "Foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

*(f)* "Establishment" means any place of operations where the debtor carries out a non-transitory economic activity with human means and goods or services.

*Subparagraphs* (a)-(d)

67. Since the Model Law will be embedded in the national insolvency law, article 2 only needs to define the terms specific to cross-border scenarios. Thus, the Model Law contains definitions of the terms "foreign proceeding" (subparagraph *(a)*) and "foreign representative" (subparagraph *(d)*), but not of the person or body that may be entrusted with the administration of the assets of the debtor in an insolvency proceeding in the enacting State. To the extent that it would be useful to define in the national statute the term used for such a person or body (rather than just using the term commonly employed to refer to such persons), this may be added to the definitions in the law enacting the Model Law.

68. By specifying required characteristics of the "foreign proceeding" and "foreign representative", the definitions limit the scope of application of the Model Law. For a proceeding to be susceptible to recognition or cooperation under the Model Law and for a foreign representative to be accorded access to local courts under the Model Law, the foreign proceeding and the foreign representative must have the attributes of subparagraphs *(a)* and *(d)*.

69. The definitions in subparagraphs *(a)* and *(d)* cover also an "interim proceeding" and a representative "appointed on an interim basis". In a State where interim proceedings are either not known or do not meet the requisites of the definition the question may arise whether recognition of a foreign "interim proceeding" creates a risk of allowing potentially disruptive consequences under the Model Law that the situation does not warrant. It is advisable that, irrespective of the way interim proceedings are treated in the enacting State, the reference to "interim proceeding" in subparagraph *(a)* and to a foreign representative appointed "on an interim basis" in subparagraph *(d)* be maintained. The reason is that in the practice of many countries insolvency proceedings are often, or even usually, commenced on an "interim" or "provisional" basis. Except for being labelled as interim, those proceedings meet all the other requisites of the definition in article 2, subparagraph *(a)*. Such proceedings are often conducted for weeks or months as "interim" proceedings under the administration of persons appointed on an "interim" basis, and only some time later would the court issue an order confirming the continuation of the proceedings on a non-interim basis. The objectives of the Model Law apply fully to such "interim proceedings" (provided the requisites of subparagraphs *(a)* and *(d)* are met); therefore, these proceedings should not be distinguished from other insolvency proceedings merely because they are of an interim nature. The point that an interim proceeding and the foreign representative must meet all the requirements of article 2 is emphasized in article 17, paragraph 1, according to which a foreign

proceeding may only be recognized if "the foreign proceeding is a proceeding within the meaning of subparagraph *(a)* of article 2" and "the foreign representative applying for recognition is a person or body within the meaning of subparagraph *(d)* of article 2".

70. Article 18 addresses a case where, after the application for recognition or after recognition, the foreign proceeding or foreign representative, whether interim or not, ceases to meet the requirements of article 2, subparagraphs *(a)* and *(d)*. Article 18 obligates the foreign representative to inform the court promptly, after the time of filing the application for recognition of the foreign proceeding, of "any substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment". The purpose of the obligation is to allow the court to modify or terminate the consequences of recognition.

71. The definitions of proceedings or persons emanating from foreign jurisdictions avoid the use of expressions that may have different technical meaning in legal systems and instead describe their purpose or function. This technique is used to avoid inadvertently narrowing the range of possible foreign proceedings that might obtain recognition and to avoid unnecessary conflict with terminology used in the laws of the enacting State. As noted in paragraph 52 above, the expression "insolvency proceedings" may have a technical meaning in some legal systems, but it is intended in subparagraph *(a)* to refer broadly to proceedings involving companies in severe financial distress.

72. The expression "centre of … main interests", used in subparagraph *(b)* to define a foreign main proceeding, is used also in the Convention on Insolvency Proceedings.

73. Subparagraph *(c)* requires that a "foreign non-main proceeding" take place in the State where the debtor has an "establishment". Thus, a foreign non-main proceeding susceptible to recognition under article 17, paragraph 2, may be only a proceeding commenced in a State where the debtor has an establishment in the meaning of article 2, subparagraph *(f)*. This rule does not affect the provision in article 28, namely, that an insolvency proceeding may be commenced in the enacting State if the debtor has assets there. It should be noted, however, that the effects of an insolvency proceeding commenced on the basis of the presence of assets only are normally restricted to the assets located in that State; if other assets of the debtor located abroad should, under the law of the enacting State, be administered in that insolvency proceeding (as envisaged in article 28), that cross-border issue is to be dealt with as a matter of international cooperation and coordination under articles 25-27 of the Model Law.

*Subparagraph* (e)

74. A foreign proceeding that meets the requisites of article 2, subparagraph *(a),* should receive the same treatment irrespective of whether it has been commenced and supervised by a judicial body or an administrative body. Therefore, in order to obviate the need to refer to a foreign non-judicial authority whenever reference is made to a foreign court, the definition of "foreign court" in subparagraph *(e)* includes also non-judicial authorities. Subparagraph *(e)* follows a similar definition contained in article 2, subparagraph *(d),* of the European Union Convention on Insolvency Proceedings.

*Subparagraph* (f)

75. The definition of the term "establishment" (subparagraph *(f)*) has been inspired by article 2, subparagraph *(h),* of the European Union Convention on Insolvency Proceedings. The term is used in the definition of "foreign non-main proceeding" (article 2, subparagraph *(c)*) and in the context of article 17, paragraph (2), according to which, for a foreign non-main proceeding to be recognized, the debtor must have an establishment in the foreign State (see also paragraph 73 above).

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 152-158.
A/CN.9/419, paras. 95-117.
A/CN.9/422, paras. 34-65.
A/CN.9/433, paras. 33-41 and 147.
A/CN.9/435, paras. 108-113.

### Article 3.  International obligations of this State

To the extent that this Law conflicts with an obligation of this State arising out of any treaty or other form of agreement to which it is a party with one or more other States, the requirements of the treaty or agreement prevail.

76. Article 3, expressing the principle of supremacy of international obligations of the enacting State over internal law, has been modelled on similar provisions in other model laws prepared by UNCITRAL.

77. In enacting the article, the legislator may wish to consider whether it would be desirable to take steps to avoid an unnecessarily broad interpretation of international treaties. For example, the article might result in giving precedence to international treaties that, while dealing with matters covered also by the Model Law (e.g. access to courts and cooperation between courts or administrative authorities), were aimed at the resolution of problems other than those that the Model Law focuses on. Some of those treaties, only because of their imprecise or broad formulation, may be misunderstood as dealing also with matters dealt with by the Model Law. Such a result would compromise the goal of achieving uniformity and facilitating cross-border cooperation in insolvency matters and would reduce certainty and predictability in the application of the Model Law. The enacting State might wish to provide that, in order for article 3 to displace a provision of the national law, a sufficient link must exist between the international treaty concerned and the issue governed by the provision of the national law in question. Such a condition would avoid the inadvertent and excessive restriction of the effects of the legislation implementing the Model Law. However, such a provision should not go so far as to impose a condition that the treaty concerned has to deal specifically with insolvency matters in order to satisfy that condition.

78. While in some States binding international treaties are self-executing, in other States those treaties are, with certain exceptions, not self-executing in that they require internal legislation for them to become enforceable law. With respect to the latter group of States, in view of their normal practice in dealing with international treaties and agreements, it would be inappropriate or unnecessary to include article 3 in their legislation or it might be appropriate to include it in a modified form.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 160-162.
A/CN.9/422, paras. 66-67.
A/CN.9/433, paras. 42-43.
A/CN.9/435, paras. 114-117.

*Article 4.* [Competent court or authority][1]

The functions referred to in this Law relating to recognition of foreign proceedings and cooperation with foreign courts shall be performed by *[specify the court, courts, authority or authorities competent to perform those functions in the enacting State].*

79. If in the enacting State any of the functions mentioned in article 4 are performed by an authority other than a court, the State would insert in article 4 and in other appropriate places in the enacting legislation the name of the competent authority.

80. The competence for the various judicial functions dealt with in the Model Law may lie with different courts in the enacting State, and the enacting State would tailor the text of the article to its own system of court competence. The value of article 4, as enacted in a given State, would be to increase the transparency and ease of use of the insolvency legislation for the benefit of, in particular, foreign representatives and foreign courts.

81. In defining jurisdiction in matters mentioned in article 4, the implementing legislation should not unnecessarily limit the jurisdiction of other courts in the enacting State, in particular to entertain requests by foreign representatives for provisional relief.

*Footnote*

82. In a number of States, insolvency legislation has entrusted certain tasks relating to the general supervision of the process of dealing with insolvency cases in the country to government-appointed officials who are typically civil servants or judicial officers and who carry out their functions on a permanent basis. The names under which they are known vary and include, for example, "official receiver", "official trustee" or "official assignee". The activities and the scope and nature of their duties vary from State to State. The Model Law does not restrict the authority of such officials, a point that some enacting States may wish to clarify in the law, as indicated in the footnote. However, depending on

the wording that the enacting State uses in articles 25 and 26 in referring to the "*title of the person or body administering a reorganization or liquidation under the law of the enacting State*", the officials may be subjected to the duty to cooperate as provided under articles 25-27.

83. In some jurisdictions, officials referred to in the preceding paragraph may also be appointed to act as administrators in individual insolvency cases. To the extent that occurs, such officials would be covered by the Model Law.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 163-166.
A/CN.9/419, para. 69.
A/CN.9/422, paras. 68-69.
A/CN.9/433, paras. 44-45.
A/CN.9/435, paras. 118-122.

*Article 5.  Authorization of* [insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State] *to act in a foreign State*

> *A* [insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State] *is authorized to act in a foreign State on behalf of a proceeding under* [identify laws of the enacting State relating to insolvency]*, as permitted by the applicable foreign law.*

84. The intent of article 5 is to equip administrators or other authorities appointed in insolvency proceedings commenced in the enacting State to act abroad as foreign representatives of those proceedings. The lack of such authorization in some States has proved to be an obstacle to effective international cooperation in cross-border cases. An enacting State in which administrators are already equipped to act as foreign representatives may decide to forgo inclusion of article 5, although even such a State might want to keep article 5 in order to provide clear statutory evidence of that authority.

85. Article 5 is formulated to make it clear that the scope of the power exercised abroad by the administrator would depend upon the foreign law and courts. Action that the administrator appointed in the enacting State may wish to take in a foreign country will be action of the type dealt with in the Model Law, but the authority to act in a foreign country does not depend on whether that country has enacted legislation based on the Model Law.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 167-169.
A/CN.9/419, paras. 36-39.
A/CN.9/422, paras. 70-74.

A/CN.9/433, paras. 46-49.
A/CN.9/435, paras. 123-124.

### *Article 6.  Public policy exception*

Nothing in this Law prevents the court from refusing to take an action
governed by this Law if the action would be manifestly contrary to the
public policy of this State.

86. As the notion of public policy is grounded in national law and may differ from State to State, no
uniform definition of that notion is attempted in article 6.

87. In some States the expression "public policy" may be given a broad meaning in that it might relate in
principle to any mandatory rule of national law. In many States, however, the public policy exception is
construed as being restricted to fundamental principles of law, in particular constitutional guarantees; in
those States, public policy would only be used to refuse the application of foreign law, or the recognition
of a foreign judicial decision or arbitral award, when that would contravene those fundamental principles.

88. For the applicability of the public policy exception in the context of the Model Law it is important to
note that a growing number of jurisdictions recognize a dichotomy between the notion of public policy
as it applies to domestic affairs, as well as the notion of public policy as it is used in matters of
international cooperation and the question of recognition of effects of foreign laws. It is especially in the
latter situation that public policy is understood more restrictively than domestic public policy. This
dichotomy reflects the realization that international cooperation would be unduly hampered if public
policy would be understood in an extensive manner.

89. The purpose of the expression "manifestly", used also in many other international legal texts as a
qualifier of the expression "public policy", is to emphasize that public policy exceptions should be
interpreted restrictively and that article 6 is only intended to be invoked under exceptional circumstances
concerning matters of fundamental importance for the enacting State.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 170-173.
A/CN.9/419, para. 40.
A/CN.9/422, paras. 84-85.
A/CN.9/433, paras. 156-160.
A/CN.9/435, paras. 125-128.

### *Article 7.  Additional assistance under other laws*

Nothing in this Law limits the power of a court or a *[insert the title of the*

*person or body administering a reorganization or liquidation under the law
of the enacting State]* to provide additional assistance to a foreign
representative under other laws of this State.

90. The purpose of the Model Law is to increase and harmonize cross-border assistance available in the enacting State to foreign representatives. However, since the law of the enacting State may, at the time of enacting the Law, already have in place various provisions under which a foreign representative could obtain cross-border assistance and since it is not the purpose of the Law to displace those provisions to the extent that they provide assistance that is additional to or different from the type of assistance dealt with in the Model Law, the enacting State may consider whether article 7 is needed to make that point clear.

*Discussion in UNCITRAL*

A/52/17, para. 175.

## Article 8.  Interpretation

In the interpretation of this Law, regard is to be had to its inter-national origin and to the need to promote uniformity in its application and the observance of good faith.

91. A provision similar to the one contained in article 8 appears in a number of private-law treaties (e.g. article 7, paragraph 1, of the United Nations Convention on Contracts for the International Sale of Goods). More recently, it has been recognized that, also in a non-treaty text such as a model law, such a provision would be useful in that a State enacting a model law also has an interest in its harmonized interpretation. Article 8 has been modelled on article 3, paragraph 1, of the UNCITRAL Model Law on Electronic Commerce.

92. Harmonized interpretation of the Model Law will be facilitated by the Case Law on UNCITRAL Texts (CLOUT) information system, under which the UNCITRAL secretariat publishes abstracts of judicial decisions (and, where applicable, arbitral awards) that interpret conventions and model laws emanating from UNCITRAL. (For further information about the system, see paragraph 202 below.)

*Discussion in UNCITRAL*

A/52/17, para. 174.

## Chapter II.  Access of foreign representatives and creditors to courts in this State

## Article 9.  Right of direct access

A foreign representative is entitled to apply directly to a court in this State.

93. Article 9 is limited to expressing the principle of direct access by the foreign representative to courts of the enacting State, thus freeing the representative from having to meet formal requirements such as licences or consular action. Article 4 deals with court competence in the enacting State for providing relief to the foreign representative.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 176-178.
A/CN.9/419, paras. 77-79 and 172-173.
A/CN.9/422, paras. 144-151.
A/CN.9/433, paras. 50-58.
A/CN.9/435, paras. 129-133.

## *Article 10.  Limited jurisdiction*

> The sole fact that an application pursuant to this Law is made to a court in this State by a foreign representative does not subject the foreign representative or the foreign assets and affairs of the debtor to the jurisdiction of the courts of this State for any purpose other than the application.

94. Article 10 constitutes a "safe conduct" rule aimed at ensuring that the court in the enacting State would not assume jurisdiction over all the assets of the debtor on the sole ground of the foreign representative having made an application for recognition of a foreign proceeding. The article also makes it clear that the application alone is not sufficient ground for the court of the enacting State to assert jurisdiction over the foreign representative as to matters unrelated to insolvency. The article responds to concerns of foreign representatives and creditors about exposure to all-embracing jurisdiction triggered by an application under the Model Law.

95. The limitation on jurisdiction over the foreign representative embodied in article 10 is not absolute. It is only intended to shield the foreign representative to the extent necessary to make court access a meaningful proposition. It does so by providing that an appearance in the courts of the enacting State for the purpose of requesting recognition would not expose the entire estate under the supervision of the foreign representative to the jurisdiction of those courts. Other possible grounds for jurisdiction under the laws of the enacting State over the foreign representative or the assets are not affected. For example, a tort or a misconduct committed by the foreign representative may provide grounds for jurisdiction to deal with the consequences of such an action by the foreign representative. Furthermore, the foreign representative who applies for relief in the enacting State will be subject to conditions that the court may order in connection with relief granted (article 22, paragraph 2).

96. Article 10 may appear superfluous in States where the rules on jurisdiction do not allow a court to

assume jurisdiction over a person making an application to the court on the sole ground of the applicant's appearance. Enacting the article in those States would be useful, however, as it would eliminate possible concerns of foreign representatives or creditors over the possibility of jurisdiction based on the sole ground of applying to the court.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 179-182.
A/CN.9/422, paras. 160-166.
A/CN.9/433, paras. 68-70.
A/CN.9/435, paras. 134-136.

*Article 11.  Application by a foreign representative to commence a proceeding under*
[identify laws of the enacting State relating to insolvency]

> A foreign representative is entitled to apply to commence a proceeding under *[identify laws of the enacting State relating to insolvency]* if the conditions for commencing such a proceeding are otherwise met.

97. Many national laws, in enumerating persons who may request the commencement of an insolvency proceeding, do not mention a representative of a foreign insolvency proceeding; under those laws, it might be doubtful whether a foreign representative might make such a request.

98. Article 11 is designed to ensure that the foreign representative (of a foreign main or non-main proceeding) has standing (or "procedural legitimation") for requesting the commencement of an insolvency proceeding. However, the article makes it clear (by the words "if the conditions for commencing such a proceeding are otherwise met") that it does not otherwise modify the conditions under which an insolvency proceeding may be commenced in the enacting State.

99. A foreign representative has this right without prior recognition of the foreign proceeding because the commencement of an insolvency proceeding might be crucial in cases of urgent need for preserving the assets of the debtor. Article 11 recognizes that not only a representative of a foreign main proceeding but also a representative of a foreign non-main proceeding may have a legitimate interest in the commencement of an insolvency proceeding in the enacting State. Sufficient guarantees against abusive applications are provided by the requirement that the other conditions for commencing such a proceeding under the law of the enacting State have to be met.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 183-187.
A/CN.9/422, paras. 170-177.

A/CN.9/433, paras. 71-75.
A/CN.9/435, paras. 137-146.


*Article 12.  Participation of a foreign representative in a proceeding under*
[identify laws of the enacting State relating to insolvency]

>     Upon recognition of a foreign proceeding, the foreign representative is entitled to participate in a proceeding regarding the debtor under *[identify laws of the enacting State relating to insolvency].*


100. The purpose of article 12 is to ensure that, when an insolvency proceeding concerning a debtor is taking place in the enacting State, the foreign representative of a proceeding concerning that debtor will be given procedural standing (or "procedural legitimation") to make petitions, requests or submissions concerning issues such as protection, realization or distribution of assets of the debtor or cooperation with the foreign proceeding.


101. Article 12 is limited to giving the foreign representative standing and does not vest the foreign representative with any specific powers or rights. The article does not specify the kinds of motions that the foreign representative might make and does not affect the provisions in the insolvency law of the enacting State that govern the fate of the motions.


102. If the law of the enacting State uses a term other than "participate" to express the concept, that other term may be used in enacting the provision. It should be noted, however, that article 24 already uses the term "intervene" to refer to a case where the foreign representative takes part in an individual action by or against the debtor (as opposed to a collective insolvency proceeding).


*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 188-189.
A/CN.9/422, paras. 114-115, 147 and 149.
A/CN.9/433, para. 58.
A/CN.9/435, paras. 147-150.


*Article 13.  Access of foreign creditors to a proceeding under*
[identify laws of the enacting State relating to insolvency]

>     1. Subject to paragraph 2 of this article, foreign creditors have the same rights regarding the commencement of, and participation in, a proceeding under *[identify laws of the enacting State relating to insolvency]* as creditors in this State.

>     2. Paragraph 1 of this article does not affect the ranking of claims in a proceeding under

*[identify laws of the enacting State relating to insolvency], except that the claims of
foreign creditors shall not be ranked lower than [identify the class of general non-
preference claims, while providing that a foreign claim is to be ranked lower than the
general non-preference claims if an equivalent local claim (e.g. claim for a penalty or
deferred-payment claim) has a rank lower than the general non-preference claims].*[2]

103. With the exception contained in paragraph 2, article 13 embodies the principle that foreign
creditors, when they apply to commence an insolvency proceeding in the enacting State or file claims in
such proceeding, should not be treated worse than local creditors.

104. Paragraph 2 makes it clear that the principle of non-discrimination embodied in paragraph 1 leaves
intact the provisions on the ranking of claims in insolvency proceedings, including any provisions that
might assign a special ranking to claims of foreign creditors. Few States currently have provisions
assigning special ranking to foreign creditors. However, lest the non-discrimination principle should be
emptied of its meaning by provisions giving the lowest ranking to foreign claims, paragraph 2
establishes the minimum ranking for claims of foreign creditors: the rank of general unsecured claims.
The exception to that minimum ranking is provided for the cases where the claim in question, if it were
of a domestic creditor, would be ranked lower than general unsecured claims (such low-rank claims may
be, for instance, those of a State authority for financial penalties or fines, claims whose payment is
deferred because of a special relationship between the debtor and the creditor or claims that have been
filed after the expiry of the time period for doing so). Those special claims may rank below the general
unsecured claims, for reasons other than the nationality or location of the creditor, as provided in the law
of the enacting State.

105. The alternative provision in the footnote differs from the provision in the text only in that it
provides wording for States that refuse to recognize foreign tax and social security claims to continue to
discriminate against such claims.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 190-192.
A/CN.9/422, paras. 179-187.
A/CN.9/433, paras. 77-85.
A/CN.9/435, paras. 151-156.

*Article 14.  Notification to foreign creditors of a proceeding under*
[identify laws of the enacting State relating to insolvency]

1. Whenever under *[identify laws of the enacting State relating to insolvency]* notification
is to be given to creditors in this State, such notification shall also be given to the known

creditors that do not have addresses in this State. The court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.

2. Such notification shall be made to the foreign creditors individually, unless the court considers that, under the circumstances, some other form of notification would be more appropriate. No letters rogatory or other, similar formality is required.

3. When a notification of commencement of a proceeding is to be given to foreign creditors, the notification shall:

    *(a)* Indicate a reasonable time period for filing claims and specify the place for their filing;

    *(b)* Indicate whether secured creditors need to file their secured claims; and

    *(c)* Contain any other information required to be included in such a notification to creditors pursuant to the law of this State and the orders of the court.

*Paragraphs 1 and 2*

106. The main purpose of notifying foreign creditors as provided in paragraph 1 is to inform them of the commencement of the insolvency proceeding and of the time-limit to file their claims. Furthermore, as a corollary to the principle of equal treatment established by article 13, article 14 requires that foreign creditors should be notified whenever notification is required for creditors in the enacting State.

107. States have different provisions or practices regarding the methods for notifying creditors; those may be, for example, publication in the official gazette or in local newspapers, individual notices, affixing notices within the court premises or a combination of such procedures. If the form of notification were to be left to national law, foreign creditors would be in a less advantageous situation than local creditors, since they typically do not have direct access to local publications. For that reason, paragraph 2 in principle requires individual notification for foreign creditors but leaves discretion to the court to decide otherwise in a particular case (e.g. if individual notice would entail excessive cost or would not seem feasible under the circumstances).

108. With regard to the form of individual notification, States may use special procedures for notifications that have to be served in a foreign jurisdiction (e.g. sending notifications through diplomatic channels). In the context of insolvency proceedings, those procedures would often be too cumbersome and time-consuming and their use would typically not provide foreign creditors timely notice concerning insolvency proceedings. It is therefore advisable for those notifications to be effected by such expeditious means that the court considers adequate. Those considerations are the reason for the provision in paragraph 2 that "no letters rogatory or other, similar formality is required".

109. Many States are party to bilateral or multilateral treaties on judicial cooperation, which often contain provisions on procedures for communicating judicial or extrajudicial documents to addressees abroad. A multilateral treaty of this kind is the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters (1965),[11] adopted under the auspices of the Hague Conference on Private International Law. While the procedures envisaged by those treaties may constitute a simplification as compared to traditional communication via diplomatic channels, they would often be, for reasons stated in the preceding paragraph, inappropriate for cross-border insolvency cases. The question may arise whether paragraph 2, which allows the use of letters rogatory or similar formalities to be dispensed with, is compatible with those treaties. Each State would have to consider that question in the light of its treaty obligations, but generally the provision in paragraph 2 would not be in conflict with the international obligations of the enacting State because the purpose of the treaties alluded to above is typically to facilitate communication and not to preclude use of notification procedures that are even simpler than those established by the treaty; for example, article 10 of the above-mentioned Convention reads as follows:

"Provided the State of destination does not object, the present Convention shall not interfere with —

"(a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

"(b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

"(c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination."[12]

To the extent that there might still be a conflict between the second sentence of paragraph 2 of article 14 and a treaty, article 3 of the Model Law provides the solution.

110. While paragraph 2 mentions letters rogatory as a formality that is not required for a notification under article 14, in many States such notifications would never be transmitted in the form of a letter rogatory. A letter rogatory in those States would be used for other purposes, such as to request evidence in a foreign country or to request permission to perform some other judicial act abroad. Such use of letters rogatory is governed, for example, by the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (1970),[13] adopted under the auspices of the Hague Conference on Private International Law.

*Paragraph 3*

111. In some legal systems a secured creditor who files a claim in the insolvency proceeding is deemed to have waived the security or some of the privileges attached to the credit, while in other systems failure to file a claim results in a waiver of such security or privilege. Where such a situation may arise, it would be appropriate for the enacting State to include in paragraph 3, subparagraph *(b)*, a requirement that the notification should include information regarding the effects of filing, or failing to file, secured claims.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 193-198.
A/CN.9/419, paras. 84-87.
A/CN.9/422, paras. 188-191.
A/CN.9/433, paras. 86-98.
A/CN.9/435, paras. 157-164.

Chapter III.  Recognition of a foreign proceeding and relief

*Article 15.  Application for recognition of a foreign proceeding*

1. A foreign representative may apply to the court for recognition of the foreign proceeding in which the foreign representative has been appointed.

2. An application for recognition shall be accompanied by:

> (a) A certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; or

> (b) A certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative; or

> (c) In the absence of evidence referred to in subparagraphs (a) and (b), any other evidence acceptable to the court of the existence of the foreign proceeding and of the appointment of the foreign representative.

3. An application for recognition shall also be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative.

4. The court may require a translation of documents supplied in support of the application for recognition into an official language of this State.

*Article 15 as a whole*

112. Article 15 defines the core procedural requirements for an application by a foreign representative for recognition. In incorporating the provision into national law, it is desirable not to encumber the process with additional requirements beyond those referred to. With article 15, in conjunction with article 16, the Model Law provides a simple, expeditious structure to be used by a foreign representative to obtain recognition.

*Article 15, paragraph 2, and article 16, paragraph 2*

113. The Model Law presumes that documents submitted in support of the application for recognition need not be authenticated in any special way, in particular by legalization: according to article 16, paragraph 2, the court is entitled to presume that those documents are authentic whether or not they have been legalized. "Legalization" is a term often used for the formality by which a diplomatic or consular agent of the State in which the document is to be produced certifies the authenticity of the signature, the capacity in which the person signing the document has acted and, where appropriate, the identity of the seal or stamp on the document.

114. It follows from article 16, paragraph 2, (according to which the court "is entitled to presume" the authenticity of documents accompanying the application for recognition) that the court retains discretion to decline to rely on the presumption of authenticity or to conclude that evidence to the contrary prevails. This flexible solution takes into account the fact that the court may be able to assure itself that a particular document originates from a particular court even without it being legalized, but that in other cases the court may be unwilling to act on the basis of a foreign document that has not been legalized, particularly when documents emanate from a jurisdiction with which it is not familiar. The presumption is useful because legalization procedures may be cumbersome and time-consuming (e.g. also because in some States they involve various authorities at different levels).

115. In respect of the provision relaxing any requirement of legalization, the question may arise whether that is in conflict with the international obligations of the enacting State. Several States are parties to bilateral or multilateral treaties on mutual recognition and legalization of documents, such as the Convention Abolishing the Requirement of Legalisation for Foreign Documents (1961),[14] adopted under the auspices of the Hague Conference on Private International Law, which provides specific simplified procedures for the legalization of documents originating from signatory States. In many instances, however, the treaties on legalization of documents, like letters rogatory and similar formalities, leave in effect laws and regulations that have abolished or simplified legalization procedures; therefore a conflict is unlikely to arise. For example, as stated in article 3, paragraph 2, of the above-mentioned convention:[15]

"However, [legalisation] mentioned in the preceding paragraph cannot be required when either the laws, regulations, or practice in force in the State where the document is produced or an agreement between two or more contracting States have abolished or simplified it, or exempt the document itself from legalisation."

According to article 3 of the Model Law, if there is still a conflict between the Model Law and a treaty, the treaty will prevail.

*Subparagraph 2* (c)

116. In order not to prevent recognition because of non-compliance with a mere technicality (e.g. where the applicant is unable to submit documents that in all details meet the requirements of subparagraphs 2 *(a)* and *(b)*), subparagraph 2 *(c)* allows evidence other than that specified in subparagraphs 2 *(a)* and *(b)* to be taken into account; that provision, however, does not compromise the court's power to insist on the presentation of evidence acceptable to it. It is advisable to maintain that flexibility in enacting the Model Law. Article 16, paragraph 2, which provides that the court "is entitled to presume" the authenticity of documents accompanying the application for recognition, applies also to documents submitted under subparagraph 2 *(c)* (see paragraphs 114-115 above).

*Paragraph 3*

117. Paragraph 3 requires that an application for recognition must be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative. That information is needed by the court not so much for the decision on recognition itself but for any decision granting relief in favour of the foreign proceeding. In order to tailor such relief appropriately and make sure that the relief is consistent with any other insolvency proceeding concerning the same debtor, the court needs to be aware of all foreign proceedings concerning the debtor that may be under way in third States.

118. An express provision establishing the duty to inform is useful, firstly, because the foreign representative is likely to have more comprehensive information about the debtor's affairs in third States than the court and, secondly, because the foreign representative may be primarily concerned with obtaining relief in favour of his or her foreign proceeding and less concerned about coordination with another foreign proceeding. (The duty to inform the court about a foreign proceeding that becomes known to the foreign representative after the decision on recognition is set out in article 18; as for co-ordination of more than one foreign proceeding, see article 30.)

*Paragraph 4*

119. Paragraph 4 entitles, but does not compel, the court to require a translation of some or all documents accompanying the application for recognition. If that discretion is compatible with the procedures of the court, it is useful since it allows, when the court understands the documents, to shorten the time needed for a decision on recognition and reduces costs.

*Notice*

120. Different solutions exist also as to whether the court is required to issue notice of an application for recognition. In a number of jurisdictions, fundamental principles of due process, in some cases enshrined in the constitution, may be understood as requiring that a decision of the importance of the recognition of a foreign insolvency proceeding could only be made after hearing the affected parties. In other States, however, it is considered that applications for recognition of foreign proceedings require expeditious treatment (as they are often submitted in circumstances of imminent danger of dissipation or concealment of the assets) and that, because of this need for expeditiousness, the issuance of notice prior to any court decision on recognition is not required. According to that way of thinking, imposing the requirement would cause undue delay and would be inconsistent with article 17, paragraph 3, which provides that an application for recognition of a foreign proceeding should be decided upon at the earliest possible time.

121. Procedural matters related to such notice are not resolved by the Model Law and are thus governed by other provisions of law of the enacting State. The absence of an express reference to notice of the filing of an application for recognition or of the decision to grant recognition does not preclude the court from issuing such notice, where legally required, in pursuance of its own rules on civil or insolvency proceedings. By the same token, there is nothing in the Model Law that would mandate the issuance of such notice, where such requirement does not exist.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 199-209.
A/CN.9/419, paras. 62-69 and 178-189.
A/CN.9/422, paras. 76-93 and 152-159.
A/CN.9/433, paras. 59-67 and 99-104.
A/CN.9/435, paras. 165-173.

### Article 16.  Presumptions concerning recognition

1. If the decision or certificate referred to in paragraph 2 of article 15 indicates that the foreign proceeding is a proceeding within the meaning of subparagraph (a) of article 2 and that the foreign representative is a person or body within the meaning of subparagraph (d) of article 2, the court is entitled to so presume.

2. The court is entitled to presume that documents submitted in support of the application for recognition are authentic, whether or not they have been legalized.

3. In the absence of proof to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.

122. Article 16 establishes presumptions that allow the court to expedite the evidentiary process; at the

same time they do not prevent, in accordance with the applicable procedural law, calling for or assessing other evidence if the conclusion suggested by the presumption is called into question by the court or an interested party.

123. For comments on paragraph 2, which dispenses with the requirement of legalization, see paragraphs 113-115 above.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 204-206.
A/CN.9/435, paras. 170-172.

*Article 17.  Decision to recognize a foreign proceeding*

1. Subject to article 6, a foreign proceeding shall be recognized if:

(a) The foreign proceeding is a proceeding within the meaning of subparagraph (a) of article 2;

(b) The foreign representative applying for recognition is a person or body within the meaning of subparagraph (d) of article 2;

(c) The application meets the requirements of paragraph 2 of article 15; and

(d) The application has been submitted to the court referred to in article 4.

2. The foreign proceeding shall be recognized:

(a) As a foreign main proceeding if it is taking place in the State where the debtor has the centre of its main interests; or

(b) As a foreign non-main proceeding if the debtor has an establishment within the meaning of subparagraph (f) of article 2 in the foreign State.

3. An application for recognition of a foreign proceeding shall be decided upon at the earliest possible time.

4. The provisions of articles 15, 16, 17 and 18 do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist.

124. The purpose of article 17 is to indicate that, if recognition is not contrary to the public policy of the enacting State and if the application meets the requirements set out in the article, recognition will be granted as a matter of course.

125. Apart from the public policy exception (see article 6), the conditions for recognition do not include those that would allow the court considering the application to evaluate the merits of the foreign court's decision by which the proceeding has been commenced or the foreign representative appointed. The foreign representative's ability to obtain early recognition (and the consequential ability to invoke in particular articles 20, 21, 23 and 24) is often essential for the effective protection of the assets of the debtor from dissipation and concealment. For that reason, paragraph 3 obligates the court to decide on the application "at the earliest possible time" and the court should in practice be able to conclude the recognition process within such a short period of time.

126. Article 17 draws in paragraph 2 the basic distinction between foreign proceedings categorized as the "main" proceedings and those foreign proceedings that are not so characterized, depending upon the jurisdictional basis of the foreign proceeding (see paragraph 75 above). The relief flowing from recognition may depend upon the category into which a foreign proceeding falls. For example, recognition of a "main" proceeding triggers an automatic stay of individual creditor actions or executions concerning the assets of the debtor (article 20, subparagraphs 1 *(a)* and *(b)*) and an automatic "freeze" of those assets (article 20, subparagraph 1 *(c)*), subject to certain exceptions referred to in article 20, paragraph 2.

127. It is not advisable to include more than one criterion for qualifying a foreign proceeding as a main proceeding and provide that on the basis of any of those criteria a proceeding could be deemed a main proceeding. An approach involving such a "multiple criteria" would raise the risk of competing claims from foreign proceedings for recognition as the main proceeding.

128. With regard to subparagraph 2 *(b),* as noted in paragraph 73 above, the Model Law does not envisage recognition of a proceeding commenced in a foreign State in which the debtor has assets but no establishment as defined in article 2, subparagraph *(c).*

*Paragraph 4*

129. A decision to recognize a foreign proceeding would normally be subject to review or rescission, as any other court decision. Paragraph 4 clarifies that the question of revisiting the decision on recognition, if grounds for granting it were fully or partially lacking or have ceased to exist, is left to the procedural law of the enacting State other than the provisions implementing the Model Law.

130. Modification or termination of the recognition decision may be a consequence of a change of circumstances after the decision on recognition, for instance, if the recognized foreign proceeding has

been terminated or its nature has changed (e.g. a reorganization proceeding might be transformed into a liquidation proceeding). Also, new facts might arise that require or justify a change of the court's decision, for example, if the foreign representative disregarded the conditions under which the court granted relief.

131. A decision on recognition may also be subject to a review of whether in the decision-making process the requirements for recognition were observed. Some appeal procedures under national laws give the appeal court the authority to review the merits of the case in its entirety, including factual aspects. It would be consistent with the purpose of the Model Law and with the nature of the decision granting recognition (which is limited to verifying whether the applicant fulfilled the requirements of article 17) if an appeal of the decision would be limited to the question whether the requirements of articles 15 and 16 were observed in deciding to recognize the foreign proceeding.

*Notice of decision to recognize foreign proceedings*

132. As noted in paragraphs 120-121 above, procedural matters regarding requirements of notice of the decision to grant recognition are not dealt with by the Model Law and are left to other provisions of law of the enacting State.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 29-33 and 201-202.
A/CN.9/419, paras. 62-69.
A/CN.9/422, paras. 76-93.
A/CN.9/433, paras. 99-104.
A/CN.9/435, paras. 167 and 173.

### Article 18.  Subsequent information

From the time of filing the application for recognition of the foreign proceeding, the foreign representative shall inform the court promptly of:

(a) Any substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment; and

(b) Any other foreign proceeding regarding the same debtor that becomes known to the foreign representative.

*Subparagraph* (a)

133. It is possible that, after the application for recognition or after recognition, changes occur in the foreign proceeding that would have affected the decision on recognition or the relief granted on the basis

of recognition. For example, the foreign proceeding may be terminated or transformed from a liquidation proceeding into a reorganization proceeding, or the terms of the appointment of the foreign representative may be modified or the appointment itself terminated. Subparagraph *(a)* takes into account the fact that technical modifications in the status of the proceedings or the terms of the appointment are frequent, but that only some of those modifications are such that they would affect the decision granting relief or the decision recognizing the proceeding; therefore, the provision only calls for information of "substantial" changes. The court would likely be particularly anxious to be kept so informed when its decision on recognition concerns a foreign "interim proceeding" or a foreign representative has been "appointed on an interim basis" (see article 2, subparagraphs *(a)* and *(d)*).

*Subparagraph* (b)

134. Article 15, paragraph 3, requires that an application for recognition be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative. Article 18, subparagraph *(b),* extends that duty to the time after the application for recognition has been filed. That information will allow the court to consider whether relief already granted should be coordinated with the existence of the insolvency proceedings that have been commenced after the decision on recognition (see article 30).

*Discussion in UNCITRAL*

A/52/17, paras. 113-116, 201-202 and 207.

*Article 19.  Relief that may be granted upon application for recognition of a foreign proceeding*

1. From the time of filing an application for recognition until the application is decided upon, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including:

(a) Staying execution against the debtor's assets;

(b) Entrusting the administration or realization of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy;

(c) Any relief mentioned in paragraph 1 (c), (d) and (g) of article 21.

2. [Insert provisions (or refer to provisions in force in the enacting State) relating to notice.]

3. Unless extended under paragraph 1 (f) of article 21, the relief granted under this article terminates when the application for recognition is decided upon.

4. The court may refuse to grant relief under this article if such relief would interfere with the administration of a foreign main proceeding.

*Paragraph 1*

135. Article 19 deals with "urgently needed" relief that may be ordered at the discretion of the court and is available as of the moment of the application for recognition (unlike relief under article 21,which is also discretionary but which is available only upon recognition).

136. Article 19 authorizes the court to grant the type of relief that is usually available only in collective insolvency proceedings (i.e. the same type of relief available under article 21), as opposed to the "individual" type of relief that may be granted before the commencement of insolvency proceedings under rules of civil procedure (i.e. measures covering specific assets identified by a creditor). However, the discretionary "collective" relief under article 19 is somewhat more narrow than the relief under article 21.

137. The reason for the availability of collective measures, albeit in a restricted form, is that relief of a collective nature may be urgently needed already before the decision on recognition in order to protect the assets of the debtor and the interests of the creditors. Exclusion of collective relief would frustrate those objectives. On the other hand, recognition has not yet been granted and, therefore, the collective relief is restricted to urgent and provisional measures. The urgency of the measures is alluded to in the opening words of paragraph 1, while subparagraph 1 *(a)* restricts the stay to execution proceedings, and the measure referred to in subparagraph 1 *(b)* is restricted to perishable assets and assets susceptible to devaluation or otherwise in jeopardy. Otherwise, the measures available under article 19 are essentially the same as those available under article 21.

*Paragraph 2*

138. Laws of many States contain requirements for notice to be given (either by the insolvency administrator upon the order of the court or by the court itself) when relief of the type mentioned in article 19 is granted. Paragraph 2 is the location where the enacting State should make appropriate provision for such notice.

*Paragraph 3*

139. Relief available under article 19 is provisional in that, as provided in paragraph 3, the relief terminates when the application for recognition is decided upon; however, the court is given the opportunity to extend the measure, as provided in article 21, subparagraph 1 *(f)*. The court might wish to do so, for example, to avoid a hiatus between the provisional measure issued before recognition and the measure issued after recognition.

*Paragraph 4*

140. Article 19, paragraph 4, pursues the same objective as the one underlying article 30, subparagraph *(a),* namely that, if there is a foreign main proceeding pending, any relief granted in favour of a foreign non-main proceeding must be consistent (or should not interfere) with the foreign main proceeding. In order to foster such coordination of pre-recognition relief with any foreign main proceeding, the foreign representative applying for recognition is required, by article 15, paragraph 3, to attach to the application for recognition a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 34-46.
A/CN.9/419, paras. 174-177.
A/CN.9/422, paras. 116, 119 and 122-123.
A/CN.9/433, paras. 110-114.
A/CN.9/435, paras. 17-23.

### *Article 20.  Effects of recognition of a foreign main proceeding*

1. Upon recognition of a foreign proceeding that is a foreign main proceeding,

    (a) Commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

    (b) Execution against the debtor's assets is stayed; and

    (c) The right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.

2. The scope, and the modification or termination, of the stay and suspension referred to in paragraph 1 of this article are subject to *[refer to any provisions of law of the enacting State relating to insolvency that apply to exceptions, limitations, modifications or termination in respect of the stay and suspension referred to in paragraph 1 of this article].*

3. Paragraph 1 (a) of this article does not affect the right to commence individual actions
or proceedings to the extent necessary to preserve a claim against the debtor.


4. Paragraph 1 of this article does not affect the right to request the commencement of a
proceeding under *[identify laws of the enacting State relating to insolvency]* or the right to
file claims in such a proceeding.


141. While relief under articles 19 and 21 is discretionary, the effects provided by article 20 are not, for
they flow automatically from recognition of the foreign main proceeding. Another difference between
discretionary relief under articles 19 and 21 and the effects under article 20 is that discretionary relief
may be issued in favour of main and non-main proceedings, while the automatic effects apply only to
main proceedings.


142. In States where an appropriate court order is needed for the effects of article 20 to become
operative, the enacting State, in order to achieve the purpose of the article, should include (perhaps in
the opening words of paragraph 1) language directing the court to issue an order putting into effect the
consequences specified in subparagraphs *(a), (b)* and *(c)* of that paragraph.


143. The automatic consequences envisaged in article 20 are necessary to allow steps to be taken to
organize an orderly and fair cross-border insolvency proceeding. In order to achieve those benefits, it is
justified to impose on the insolvent debtor the consequences of article 20 in the enacting State (i.e. the
country where it maintains a limited business presence), even if the State where the centre of the
debtor's main interests is situated poses different (possibly less stringent) conditions for the
commencement of insolvency proceedings or even if the automatic effects of the insolvency proceeding
in the country of origin are different from the effects of article 20 in the enacting State. This approach
reflects a basic principle underlying the Model Law according to which recognition of foreign
proceedings by the court of the enacting State grants effects that are considered necessary for an orderly
and fair conduct of a cross-border insolvency. Recognition, therefore, has its own effects rather than
importing the consequences of the foreign law into the insolvency system of the enacting State. If
recognition should in a given case produce results that would be contrary to the legitimate interests of an
interested party, including the debtor, the law of the enacting State should provide possibilities for
protecting those interests, as indicated in article 20, paragraph 2 (and discussed in paragraph 149 below).


144. By virtue of article 2, subparagraph *(a),* the effects of recognition extend also to foreign "interim
proceedings". That solution is necessary since, as explained in paragraph 69 above, interim proceedings
(provided they meet the requisites of article 2, subparagraph *(a)*), should not be distinguished from other
insolvency proceedings merely because they are of an interim nature. If after recognition the foreign
"interim proceeding" ceases to have a sufficient basis for the automatic effects of article 20, the
automatic stay could be terminated pursuant to the law of the enacting State, as indicated in article 20,
paragraph 2. (See also article 18, which deals with the obligation of the foreign representative "to inform
the court promptly of any substantial change in the status of the recognized foreign proceeding or the

status of the foreign representative's appointment.)

145. Subparagraph 1 *(a)*, by not distinguishing between various kinds of individual actions, also covers actions before an arbitral tribunal. Thus, article 20 establishes a mandatory limitation to the effectiveness of an arbitration agreement. This limitation is added to other possible limitations restricting the freedom of the parties to agree to arbitration that may exist under national law (e.g. limits as to arbitrability or as to the capacity to conclude an arbitration agreement). Such limitations are not contrary to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (1958).[16] However, bearing in mind the particularities of international arbitration, in particular its relative independence from the legal system of the State where the arbitral proceeding takes place, it might not always be possible, in practical terms, to implement the automatic stay of arbitral proceedings. For example, if the arbitration does not take place in the enacting State and perhaps also not in the State of the main proceeding, it may be difficult to enforce the stay of the arbitral proceedings. Apart from that, the interests of the parties may be a reason for allowing an arbitral proceeding to continue, a possibility that is envisaged in paragraph 2 and left to the provisions of law of the enacting State.

146. Subparagraph 1 *(a)* refers not only to "individual actions" but also to "individual proceedings" in order to cover, in addition to "actions" instituted by creditors in a court against the debtor or its assets, also enforcement measures initiated by creditors outside the court system, measures that creditors are allowed to take under certain conditions in some States. Subparagraph 1 *(b)* has been added to make it abundantly clear that executions against the assets of the debtor are covered by the stay.

147. The Model Law does not deal with sanctions that might apply to acts performed in defiance of the suspension of transfers of assets provided under article 20, subparagraph 1 *(c)*. Those sanctions vary, depending on the legal system; they might include criminal sanctions, penalties and fines or the acts themselves might be void or capable of being set aside. From the viewpoint of creditors, the main purpose of such sanctions is to facilitate recovery for the insolvency proceeding of any assets improperly transferred by the debtor and, for that purpose, the setting aside of such transactions is preferable to the imposition of criminal or administrative sanctions on the debtor.

*Paragraph 2*

148. Notwithstanding the "automatic" or "mandatory" nature of the effects under article 20, it is expressly provided that the scope of those effects depends on exceptions or limitations that may exist in the law of the enacting State. Those exceptions may be, for example, the enforcement of claims by secured creditors, payments by the debtor in the ordinary course of business, initiation of court action for claims that have arisen after the commencement of the insolvency proceeding (or after recognition of a foreign main proceeding), or completion of open financial-market transactions.

149. Sometimes it may be desirable for the court to modify or terminate the effects of article 20. The rules governing the power of the court to do so vary. In some legal systems the courts are authorized to make individual exceptions upon request by an interested party, under conditions prescribed by local

law, while in others the courts do not have that power, in line with the principle that, in general, courts do not have the power to set aside the application of a statutory rule of law. If courts are to be given such a power, some legal systems would normally require setting out grounds on which the court could modify or terminate the mandatory effects of recognition under article 20, paragraph 1. In view of that situation, article 20, paragraph 2, provides that the modification or termination of the stay and the suspension provided in the article is subject to the provisions of law of the enacting State relating to insolvency.

150. Generally, it is useful for persons that are adversely affected by the stay or suspension under article 20, paragraph 1, to have an opportunity to be heard by the court, which should then be allowed to modify or terminate those effects. It would be consistent with the objectives of the Model Law if the enacting State would spell out, or refer to, the provisions that govern this question.

*Paragraph 3*

151. The Model Law does not cover the question of whether the limitation period for a claim ceases to run when the claimant is unable to commence individual proceedings as a result of article 20, subparagraph 1 *(a)*. A harmonized rule on that question would not be feasible; however, since it is necessary to protect creditors from losing their claims because of a stay pursuant to that subparagraph, paragraph 3 has been added to authorize the commencement of individual action to the extent necessary to preserve claims against the debtor. Once the claim has been preserved, the action continues to be covered by the stay.

152. Paragraph 3 might seem unnecessary in a State where a demand for payment or performance served by the creditor on the debtor causes the cessation of the running of the limitation period or where the stay of the kind envisaged in subparagraph 1 *(a)* triggers such cessation. However, paragraph 3 may still be useful even in such States because the question of the cessation of the running of the limitation period might, pursuant to rules concerning conflict of laws, be governed by the law of a State other than the enacting State; furthermore, the paragraph would be useful as assurance to foreign claimants that their claims would not be prejudiced in the enacting State.

*Paragraph 4*

153. Paragraph 4 merely clarifies that the automatic stay and suspension pursuant to article 20 do not prevent anyone, including the foreign representative or foreign creditors, from requesting the commencement of a local insolvency proceeding and from participating in that proceeding. The right to apply to commence a local insolvency proceeding and to participate in it is in a general way dealt with in articles 11, 12 and 13. If a local proceeding is indeed initiated, article 29 deals with the coordination of the foreign and the local proceedings.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 47-60.
A/CN.9/419, paras. 137-143.
A/CN.9/422, paras. 94-110.
A/CN.9/433, paras. 115-126.
A/CN.9/435, paras. 24-48.


*Article 21.  Relief that may be granted upon recognition*
*of a foreign proceeding*


1. Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including:

(a) Staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph 1 (a) of article 20;

(b) Staying execution against the debtor's assets to the extent it has not been stayed under paragraph 1 (b) of article 20;

(c) Suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1 (c) of article 20;

(d) Providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(e) Entrusting the administration or realization of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court;

(f) Extending relief granted under paragraph 1 of article 19;

(g) Granting any additional relief that may be available to [insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State] under the laws of this State.

2. Upon recognition of a foreign proceeding, whether main or non-main, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in this State to the foreign representative or another person

designated by the court, provided that the court is satisfied that the interests of creditors in this State are adequately protected.

3. In granting relief under this article to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

154. Post-recognition relief under article 21 is discretionary, as is pre-recognition relief under article 19. The types of relief listed in article 21, paragraph 1, are typical or most frequent in insolvency proceedings; however, the list is not exhaustive and the court is not restricted unnecessarily in its ability to grant any type of relief that is available under the law of the enacting State and needed in the circumstances of the case.

155. The explanation relating to the use of the expressions "individual actions" and "individual proceedings" in article 20, subparagraph 1 *(a)* and to coverage of execution proceedings (see paragraphs 145-146 above) applies also to article 21, subparagraph 1 *(a).*

156. It is in the nature of discretionary relief that the court may tailor it to the case at hand. This idea is reinforced by article 22, paragraph 2, according to which the court may subject the relief granted to conditions that it considers appropriate.

*Paragraph 2*

157. The "turnover" of assets to the foreign representative (or another person), as envisaged in paragraph 2, is discretionary. It should be noted that the Model Law contains several safeguards designed to ensure the protection of local interests before assets are turned over to the foreign representative. Those safeguards include the following: the general statement of the principle of protection of local interests in article 22, paragraph 1; the provision in article 21, paragraph 2, that the court should not authorize the turnover of assets until it is assured that the local creditors' interests are protected; and article 22, paragraph 2, according to which the court may subject the relief that it grants to conditions it considers appropriate.

*Paragraph 3*

158. One salient factor to be taken into account in tailoring the relief is whether it is for a foreign main or non-main proceeding. The interests and the authority of a representative of a foreign non-main proceeding are typically narrower than the interests and the authority of a representative of a foreign main proceeding, who normally seeks to gain control over all assets of the insolvent debtor. Paragraph 3 reflects that idea by providing *(a)* that relief granted to a foreign non-main proceeding should be limited to assets that are to be administered in that non-main proceeding and *(b)* that, if the foreign representative seeks information concerning the debtor's assets or affairs, the relief must concern

information required in that proceeding. The objective is to admonish the court that relief in favour of a foreign non-main proceeding should not give unnecessarily broad powers to the foreign representative and that such relief should not interfere with the administration of another insolvency proceeding, in particular the main proceeding.

159. The proviso "under the law of this State" reflects the principle underlying the Model Law that recognition of a foreign proceeding does not mean extending the effects of the foreign proceeding as they may be prescribed by the law of the foreign State. Instead, recognition of a foreign proceeding entails attaching to the foreign proceeding consequences envisaged by the law of the enacting State.

160. The idea underlying article 21, paragraph 3, has been reflected also in article 19, paragraph 4 (pre-recognition relief), article 29, subparagraph *(c)* (coordination of a foreign proceeding with a local proceeding) and article 30 (coordination of more than one foreign proceeding).

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 61-73.
A/CN.9/419, paras. 148-152 and 154-166.
A/CN.9/422, paras. 111-113.
A/CN.9/433, paras. 127-134 and 138-139.
A/CN.9/435, paras. 49-61.

*Article 22.  Protection of creditors and other
interested persons*

1. In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article, the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

2. The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

3. The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or at its own motion, modify or terminate such relief.

161. The idea underlying article 22 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief. This balance is essential to achieve the objectives of cross-border insolvency legislation.

162. The reference to the interests of creditors, the debtor and other interested parties in article 22, paragraph 1, provides useful elements to guide the court in exercising its powers under article 19 or 21. In order to allow the court to tailor the relief better, the court is clearly authorized to subject the relief to

conditions (paragraph 2) and to modify or terminate the relief granted (paragraph 3). An additional feature of paragraph 3 is that it expressly gives standing to the parties who may be affected by the consequences of articles 19 and 21 to petition the court to modify and terminate those consequences. Apart from that, article 22 is intended to operate in the context of the procedural system of the enacting State.

163. In many cases the affected creditors will be "local" creditors. Nevertheless, in enacting article 22, it is not advisable to attempt to limit it to local creditors. Any express reference to local creditors in paragraph 1 would require a definition of those creditors. An attempt to draft such a definition (and to establish criteria according to which a particular category of creditors might receive special treatment) would not only show the difficulty of crafting such a definition but would also reveal that there is no justification for discriminating creditors on the basis of criteria such as place of business or nationality.

164. Protection of all interested persons is linked to provisions in national laws on notification requirements; those may be general publicity requirements, designed to apprise potentially interested persons (e.g. local creditors or local agents of a debtor) that a foreign proceeding has been recognized, or there may be requirements for individual notifications that the court, under its own procedural rules, has to issue to persons that would be directly affected by recognition or relief granted by the court. National laws vary as to the form, time and content of notice required to be given of the recognition of foreign proceedings, and the Model Law does not attempt to modify those laws (see also paragraph 132 above).

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 82-93.
A/CN.9/422, paragraph 113.
A/CN.9/433, paras. 140-146.
A/CN.9/435, paras. 72-78.

## Article 23.  Actions to avoid acts detrimental to creditors

1. Upon recognition of a foreign proceeding, the foreign representative has standing to initiate *[refer to the types of actions to avoid or otherwise render ineffective acts detrimental to creditors that are available in this State to a person or body administering a reorganization or liquidation].*

2. When the foreign proceeding is a foreign non-main proceeding, the court must be satisfied that the action relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding.

165. Under many national laws both individual creditors and insolvency administrators have a right to bring actions to avoid or otherwise render ineffective acts detrimental to creditors. Such a right, insofar as it pertains to individual creditors, is often not governed by insolvency law but by general provisions

of law (such as the civil code); the right is not necessarily tied to the existence of an insolvency proceeding against the debtor so that the action may be instituted prior to the commencement of such a proceeding. The person having such a right is typically only an affected creditor and not another person such as the insolvency administrator. Furthermore, the conditions for these individual-creditor actions are different from the conditions applicable to similar actions that might be initiated by an insolvency administrator. The procedural standing conferred by article 23 extends only to actions that are available to the local insolvency administrator in the context of an insolvency proceeding, and the article does not equate the foreign representative with individual creditors who may have similar rights under a different set of conditions. Such actions of individual creditors fall outside the scope of article 23.

166. The Model Law expressly provides that a foreign representative has "standing" (a concept in some systems referred to as "active procedural legitimation", "active legitimation" or "legitimation") to initiate actions to avoid or otherwise render ineffective legal acts detrimental to creditors. The provision is drafted narrowly in that it does not create any substantive right regarding such actions and also does not provide any solution involving conflict of laws. The effect of the provision is that a foreign representative is not prevented from initiating such actions by the sole fact that the foreign representative is not the insolvency administrator appointed in the enacting State.

167. Granting procedural standing to the foreign representative to institute such actions is not without difficulty. In particular, such actions might not be looked upon favourably because of their potential for creating uncertainty about concluded or performed transactions. However, since the right to commence such actions is essential to protect the integrity of the assets of the debtor and is often the only realistic way to achieve such protection, it has been considered important to ensure that such right would not be denied to a foreign representative on the sole ground that he or she has not been locally appointed.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 210-216.
A/CN.9/433, para. 134.
A/CN.9/435, paras. 62-66.

*Article 24. Intervention by a foreign representative*
*in proceedings in this State*

> Upon recognition of a foreign proceeding, the foreign representative may, provided the requirements of the law of this State are met, intervene in any proceedings in which the debtor is a party.

168. The purpose of article 24 is to avoid the denial of standing to the foreign representative to intervene in proceedings merely because the procedural legislation may not have contemplated the foreign representative among those having such standing. The article applies to foreign representatives of both main and non-main proceedings.

169. The word "intervene" in the context of article 20 is intended to refer to cases where the foreign representative appears in court and makes representations in proceedings, whether those proceedings be individual court actions or other proceedings (including extrajudicial proceedings) instituted by the debtor against a third party or proceedings instituted by a third party against the debtor. The proceedings where the foreign representative might intervene could only be those that have not been stayed under article 20, subparagraph 1 *(a),* or article 21, subparagraph 1 *(a).*

170. Article 24, which is limited to providing procedural standing, makes it clear (by stating "provided the requirements of the law of this State are met") that all other conditions of the local law for a person to be able to intervene remain intact.

171. Many if not all national procedural laws contemplate cases where a party (the foreign representative in this article) who demonstrates a legal interest in the outcome of a dispute between two other parties may be permitted by the court to be heard in the proceedings. Those procedural laws use different expressions to refer to such situations, the expression "intervention" being frequently used. If the enacting State uses another expression for that concept, the use of such other expression in enacting article 24 would be appropriate.

172. The word "participate" as used in the context of article 12 refers to cases where the foreign representative makes representations in a collective insolvency proceeding (see paragraph 102 above), whereas the word "intervene" as used in article 24 covers cases where the foreign representative takes part in proceedings concerning an individual action by or against the debtor.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 117-123.
A/CN.9/422, paras. 148-149.
A/CN.9/433, paras. 51, 58.
A/CN.9/435, paras. 79-84.

Chapter IV.  Cooperation with foreign courts
and foreign representatives

173. Chapter IV (articles 25-27), on cross-border cooperation, is a core element of the Model Law. Its objective is to enable courts and insolvency administrators from two or more countries to be efficient and achieve optimal results. Cooperation as described in the chapter is often the only realistic way, for example, to prevent dissipation of assets, to maximize the value of assets (e.g. when items of production equipment located in two States are worth more if sold together than if sold separately or to find the best solutions for the reorganization of the enterprise.

174. Articles 25 and 26 not only authorize cross-border cooperation, they also mandate it by providing that the court and the insolvency administrator "shall cooperate to the maximum extent possible". The

articles are designed to overcome the widespread problem of national laws lacking rules providing a legal basis for cooperation by local courts with foreign courts in dealing with cross-border insolvencies. Enactment of such a legal basis would be particularly helpful in legal systems in which the discretion given to judges to operate outside areas of express statutory authorization is limited. However, even in jurisdictions in which there is a tradition of wider judicial latitude, enactment of a legislative framework for cooperation has proved to be useful.

175. To the extent that cross-border judicial cooperation in the enacting State is based on the principle of comity among nations, the enactment of articles 25-27 offers an opportunity for making that principle more concrete and adapted to the particular circumstances of cross-border insolvencies.

176. In the States in which the proper legal basis for international cooperation in the area of cross-border insolvency is not the principle of comity, but an international agreement (e.g. a bilateral or multilateral treaty or an exchange of letters between the cooperating authorities) based on the principle of reciprocity, chapter IV of the Model Law may serve as a model for the elaboration of such international cooperation agreements.

177. The articles in chapter IV leave certain decisions, in particular when and how to cooperate, to the courts and, subject to the supervision of the courts, to the insolvency administrators. For a court (or a person or body referred to in articles 25 and 26) to cooperate with a foreign court or a foreign representative regarding a foreign proceeding, the Model Law does not require a previous formal decision to recognize that foreign proceeding.

178. The importance of granting the courts flexibility and discretion in cooperating with foreign courts or foreign representatives was emphasized at the Second UNCITRAL-INSOL Multinational Judicial Colloquium on Cross-Border Insolvency. At that Colloquium, reports of a number of cases in which judicial cooperation in fact occurred were given by the judges involved in the cases. From those reports a number of points emerged that might be summarized as follows: *(a)* communication between courts is possible but should be done carefully and with appropriate safeguards for the protection of substantive and procedural rights of the parties; *(b)* communication should be done openly, in the presence of the parties involved (except in extreme circumstances), who should be given advance notice; *(c)* communications that might be exchanged are various and include: e.g. exchanges of formal court orders or judgements; supply of informal writings of general information, questions and observations; and transmission of transcripts of court proceedings; *(d)* means of communication include, for example, telephone, facsimile, electronic mail facilities and video; and *(e)* where communication is necessary and is intelligently used, there could be considerable benefits for the persons involved in, and affected by, the cross-border insolvency.

*Article 25.  Cooperation and direct communication between a court of this State and foreign courts or foreign representatives*

1. In matters referred to in article 1, the court shall cooperate to the maximum extent

possible with foreign courts or foreign representatives, either directly or through a *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]*.

2. The court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives.

179. The ability of courts, with appropriate involvement of the parties, to communicate "directly" and to request information and assistance "directly" from foreign courts or foreign representatives is intended to avoid the use of time-consuming procedures traditionally in use, such as letters rogatory. This ability is critical when the courts consider that they should act with urgency. In order to emphasize the flexible and potentially urgent character of cooperation, the enacting State may find it useful to include in the enactment of the Model Law an express provision that would authorize the courts, when they engage in cross-border communications under article 25, to forgo use of the formalities (e.g. communication via higher courts, letters rogatory or other diplomatic or consular channels) that are inconsistent with the policy behind the provision.

*Article 26.  Cooperation and direct communication between the* [insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State] *and foreign courts or foreign representatives*

1. In matters referred to in article 1, a *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]* shall, in the exercise of its functions and subject to the supervision of the court, cooperate to the maximum extent possible with foreign courts or foreign representatives.

2. The *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]* is entitled, in the exercise of its functions and subject to the supervision of the court, to communicate directly with foreign courts or foreign representatives.

180. Article 26 on international cooperation between persons who are appointed to administer assets of insolvent debtors reflects the important role that such persons can play in devising and implementing cooperative arrangements, within the parameters of their authority. The provision makes it clear that an insolvency administrator acts under the overall supervision of the competent court (by stating "in the exercise of its functions and subject to the supervision of the court"). The Model Law does not modify the rules already existing in the insolvency law of the enacting State on the supervisory functions of the court over the activities of the insolvency administrator. Generally, a certain degree of latitude and initiative on the part of administrators, within the broad confines of judicial supervision, are mainstays of cooperation in practical terms; it is therefore advisable that the enacting State does not change that in enacting the Model Law. In particular, there should be no suggestion that ad hoc authorization would be

needed for each communication between the administrator and a foreign body.


### Article 27.  Forms of cooperation

Cooperation referred to in articles 25 and 26 may be implemented by any appropriate means, including:

(a) Appointment of a person or body to act at the direction of the court;

(b) Communication of information by any means considered appropriate by the court;

(c) Coordination of the administration and supervision of the debtor's assets and affairs;

(d) Approval or implementation by courts of agreements concerning the coordination of proceedings;

(e) Coordination of concurrent proceedings regarding the same debtor;

(f) [The enacting State may wish to list additional forms or examples of cooperation].

181. Article 27 is suggested to be used by the enacting State to provide courts with an indicative list of the types of cooperation that are authorized by articles 25 and 26. Such an indicative listing may be particularly helpful in States with a limited tradition of direct cross-border judicial cooperation and in States where judicial discretion has traditionally been limited. Any listing of forms of possible cooperation should not purport to be exhaustive, as this might inadvertently preclude certain forms of appropriate cooperation.

182. The implementation of cooperation would be subject to any mandatory rules applicable in the enacting State; for example, in the case of requests for information, rules restricting the communication of information (e.g. for reasons of protection of privacy) would apply.

183. Subparagraph (f) of article 27 offers the enacting State the possibility to include additional forms of possible cooperation. Those might include, for example, suspension or termination of existing proceedings in the enacting State.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 124-129.
A/CN.9/419, paras. 75-76, 80-83 and 118-133.
A/CN.9/422, paras 129-143.
A/CN.9/433, paras. 164-172.
A/CN.9/435, paras. 85-94.


## Chapter V.  Concurrent proceedings


*Article 28.  Commencement of a proceeding under* [identify laws of the enacting State relating to
*insolvency] after recognition of a foreign main proceeding*

> After recognition of a foreign main proceeding, a proceeding under *[identify laws of the
> enacting State relating to insolvency]* may be commenced only if the debtor has assets in
> this State; the effects of that proceeding shall be restricted to the assets of the debtor that
> are located in this State and, to the extent necessary to implement cooperation and
> coordination under articles 25, 26 and 27, to other assets of the debtor that, under the law
> of this State, should be administered in that proceeding.

184. Article 28, in conjunction with article 29, provides that recognition of a foreign main proceeding
will not prevent the commencement of a local insolvency proceeding concerning the same debtor as long
as the debtor has assets in the State.

185. The position taken in article 28 is in substance the same as the position taken in a number of States.
In some States, however, for the court to have jurisdiction to commence a local insolvency proceeding,
the mere presence of assets in the State is not sufficient. For such jurisdiction to exist, the debtor must be
engaged in an economic activity in the State (to use the terminology of the Model Law, the debtor must
have an "establishment" in the State, as defined in article 2, subparagraph *(f)*). In article 28, the less
restrictive solution was opted for in a context where the debtor is already involved in a foreign main
proceeding. While the solution leaves a broad ground for commencing a local proceeding after
recognition of a foreign main proceeding, it serves the purpose of indicating that, if the debtor has no
assets in the State, there is no jurisdiction for commencing an insolvency proceeding.

186. Nevertheless, the enacting State may wish to adopt the more restrictive solution of allowing the
initiation of the local proceeding only if the debtor has an establishment in the State. The rationale may
be that, when the assets in the enacting State are not part of an establishment, the commencement of a
local proceeding would typically not be the most efficient way to protect the creditors, including local
creditors. By tailoring relief to be granted to the foreign main proceeding and cooperating with the
foreign court and foreign representative, the court in the enacting State would have sufficient
opportunities to ensure that the assets in the State would be administered in such a way that local
interests would be adequately protected. Therefore, the enacting State would act in line with the
philosophy of the Model Law if it enacts the article by replacing the words "only if the debtor has assets

in this State", as they currently appear in article 28, with the words "only if the debtor has an establishment in this State".

187. Ordinarily, the local proceeding of the kind envisaged in article 28 would be limited to the assets located in the State. In some situations, however, a meaningful administration of the local insolvency proceeding may have to include certain assets abroad, especially when there is no foreign proceeding necessary or available in the State where the assets are situated (for example, where the local establishment would have an operating plant in a foreign jurisdiction, where it would be possible to sell the debtor's assets in the enacting State and the assets abroad as a "going concern", or where assets were fraudulently transferred abroad from the enacting State). In order to allow such limited cross-border reach of a local proceeding, the article includes the words "and ... to other assets of the debtor that ... should be administered in that proceeding". Two restrictions have been included in the article concerning the possible extension of effects of a local proceeding to assets located abroad: firstly, the extension is permissible "to the extent necessary to implement cooperation and coordination under articles 25, 26 and 27"; and, secondly, those foreign assets must be subject to administration in the enacting State "under the law of [the enacting State]". Those restrictions are useful in order to avoid creating an open-ended faculty to extend the effects of a local proceeding to assets located abroad, a faculty that would generate uncertainty as to the application of the provision and that might lead to conflicts of jurisdiction.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 94-101.
A/CN.9/422, paras. 192-197.
A/CN.9/433, paras. 173-181.
A/CN.9/435, paras. 180-183.

*Article 29.  Coordination of a proceeding under*
[identify laws of the enacting State relating to insolvency]
*and a foreign proceeding*

Where a foreign proceeding and a proceeding under *[identify laws of the enacting State relating to insolvency]* are taking place concurrently regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:

(a) When the proceeding in this State is taking place at the time the application for recognition of the foreign proceeding is filed,

(i) Any relief granted under article 19 or 21 must be consistent with the proceeding in this State; and

(ii) If the foreign proceeding is recognized in this State as a foreign main
proceeding, article 20 does not apply;

(b) When the proceeding in this State commences after recognition, or after the filing of
the application for recognition, of the foreign proceeding,

(i) Any relief in effect under article 19 or 21 shall be reviewed by the court
and shall be modified or terminated if inconsistent with the proceeding in
this State; and

(ii) If the foreign proceeding is a foreign main proceeding, the stay and
suspension referred to in paragraph 1 of article 20 shall be modified or
terminated pursuant to paragraph 2 of article 20 if inconsistent with the
proceeding in this State;

(c) In granting, extending or modifying relief granted to a representative of a foreign non-
main proceeding, the court must be satisfied that the relief relates to assets that, under the
law of this State, should be administered in the foreign non-main proceeding or concerns
information required in that proceeding.

188. Article 29 gives guidance to the court that deals with cases where the debtor is subject to a foreign
proceeding and a local proceeding at the same time. The opening words of the provision direct the court
that in all such cases it must seek cooperation and coordination pursuant to chapter IV (articles 25, 26
and 27) of the Model Law.

189. The salient principle embodied in article 29 is that the commencement of a local proceeding does
not prevent or terminate the recognition of a foreign proceeding. This principle is essential for achieving
the objectives of the Model Law in that it allows the court in the enacting State in all circumstances to
provide relief in favour of the foreign proceeding.

190. However, the article maintains a pre-eminence of the local proceeding over the foreign proceeding.
This has been done in the following ways: firstly, any relief to be granted to the foreign proceeding must
be consistent with the local proceeding (article 29, subparagraph *(a)* (i)); secondly, any relief that has
already been granted to the foreign proceeding must be reviewed and modified or terminated to ensure
consistency with the local proceeding (article 29, subparagraph *(b)* (i)); thirdly, if the foreign proceeding
is a main proceeding, the automatic effects pursuant to article 20 are to be modified and terminated if
inconsistent with the local proceeding (those automatic effects do not terminate automatically since they
may be beneficial, and the court may wish to maintain them) (article 29, subparagraph *(b)* (ii)); and
fourthly, where a local proceeding is pending at the time a foreign proceeding is recognized as a main
proceeding, the foreign proceeding does not enjoy the automatic effects of article 20 (article 29,
subparagraph *(a)* (ii)). Article 29 avoids establishing a rigid hierarchy between the proceedings since
that would unnecessarily hinder the ability of the court to cooperate and exercise its discretion under

articles 19 and 21. It is desirable not to restrict that latitude of the court when article 29 is enacted.

191. Article 29, subparagraph *(c),* incorporates the principle that relief granted to a foreign non-main proceeding should be limited to assets that are to be administered in that non-main proceeding or must concern information required in that proceeding. That principle is expressed in article 21, paragraph 3, which deals in a general way with the type of relief that may be granted to a foreign representative, and is restated in article 29, which deals with coordination of local and foreign proceedings. Article 19, paragraph 4, on pre-recognition relief, and article 30, on coordination of more than one foreign proceeding, are inspired by the same principle (see also the comments in paragraph 140 above).

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 106-110.
A/CN.9/435, paras. 190-191.

*Article 30.  Coordination of more than one*
*foreign proceeding*

> In matters referred to in article 1, in respect of more than one foreign proceeding regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:

> (a) Any relief granted under article 19 or 21 to a representative of a foreign non-main proceeding after recognition of a foreign main proceeding must be consistent with the foreign main proceeding;

> (b) If a foreign main proceeding is recognized after recognition, or after the filing of an application for recognition, of a foreign non-main proceeding, any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the foreign main proceeding;

> (c) If, after recognition of a foreign non-main proceeding, another foreign non-main proceeding is recognized, the court shall grant, modify or terminate relief for the purpose of facilitating coordination of the proceedings.

192. Article 30 deals with cases where the debtor is subject to insolvency proceedings in more than one foreign State and foreign representatives of more than one foreign proceeding seek recognition or relief in the enacting State. The provision applies whether or not an insolvency proceeding is pending in the enacting State. If, in addition to two or more foreign proceedings, there is a proceeding in the enacting State, the court will have to act pursuant to both article 29 and article 30.

193. The objective of article 30 is similar to the objective of article 29 in that the key issue in the case of

concurrent proceedings is to promote cooperation, coordination and consistency of relief granted to different proceedings. Such consistency will be achieved by appropriate tailoring of relief to be granted or by modifying or terminating relief already granted. Unlike article 29 (which, as a matter of principle, gives primacy to the local proceeding), article 30 gives preference to the foreign main proceeding if there is one. In the case of more than one foreign non-main proceeding, the provision does not a priori treat any foreign proceeding preferentially. Priority for the foreign main proceeding is reflected in the requirement that any relief in favour of a foreign non-main proceeding (whether already granted or to be granted) must be consistent with the foreign main proceeding (article 30, subparagraphs *(a)* and *(b)*).

*Discussion in UNCITRAL*

A/52/17, paras. 111-112.

### Article 31.  Presumption of insolvency based on recognition of a foreign main proceeding

In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a proceeding under *[identify laws of the enacting State relating to insolvency]*, proof that the debtor is insolvent.

194. In some jurisdictions, proof that the debtor is insolvent is required for the commencement of insolvency proceedings. In other jurisdictions, insolvency proceedings may be commenced under specific circumstances defined by law that do not necessarily mean that the debtor is in fact insolvent; those circumstances may be, for example, cessation of payments by the debtor or certain actions of the debtor such as a corporate decision, dissipation of its assets or abandonment of its establishment.

195. In jurisdictions where insolvency is a condition for commencing insolvency proceedings, article 31 establishes, upon recognition of a foreign main proceeding, a rebuttable presumption of insolvency of the debtor for the purposes of commencing an insolvency proceeding in the enacting State. The presumption does not apply if the foreign proceeding is a non-main proceeding. The reason is that an insolvency proceeding commenced in a State other than the State where the debtor has the centre of its main interests does not necessarily mean that the debtor is to be subject to laws relating to insolvency in other States.

196. For the national laws where proof that the debtor is insolvent is not required for the commencement of insolvency proceedings, the presumption established in article 31 may be of little practical significance and the enacting State may decide not to enact it.

197. Article 31 would have particular significance when proving insolvency as the prerequisite for an insolvency proceeding would be a time-consuming exercise and of little additional benefit bearing in mind that the debtor is already in an insolvency proceeding in the State where it has the centre of its main interests and the commencement of a local proceeding may be urgently needed for the protection

of local creditors. Nonetheless, the court of the enacting State is not bound by the decision of the foreign court, and local criteria for demonstrating insolvency remain operative, as is clarified by the words "in the absence of evidence to the contrary".

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 94 and 102-105.
A/CN.9/422, para. 196.
A/CN.9/433, paras. 173 and 180-189.
A/CN.9/435, paras. 180 and 184.

*Article 32.  Rule of payment in concurrent proceedings*

Without prejudice to secured claims or rights in rem, a creditor who has received part payment in respect of its claim in a proceeding pursuant to a law relating to insolvency in a foreign State may not receive a payment for the same claim in a proceeding under *[identify laws of the enacting State relating to insolvency]* regarding the same debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received.

198. The rule set forth in article 32 (sometimes referred to as the hotchpotch rule) is a useful safeguard in a legal regime for coordination and cooperation in the administration of cross-border insolvency proceedings. It is intended to avoid situations in which a creditor might obtain more favourable treatment than the other creditors of the same class by obtaining payment of the same claim in insolvency proceedings in different jurisdictions. For example, an unsecured creditor has received 5 per cent of its claim in a foreign insolvency proceeding; that creditor also participates in the insolvency proceeding in the enacting State, where the rate of distribution is 15 per cent; in order to put the creditor in the equal position as the other creditors in the enacting State, the creditor would receive 10 per cent of its claim in the enacting State.

199. Article 32 does not affect the ranking of claims as established by the law of the enacting State and is solely intended to establish the equal treatment of creditors of the same class. To the extent claims of secured creditors or creditors with rights *in rem* are paid in full (a matter that depends on the law of the State where the proceeding is conducted), those claims are not affected by the provision.

200. The words "secured claims" are used to refer generally to claims guaranteed by particular assets, while the words "rights *in rem*" are intended to indicate rights relating to a particular property that are enforceable also against third parties. A given right may fall within the ambit of both expressions, depending on the classification and terminology of the applicable law. The enacting State may use another term or terms for expressing those concepts.

*Discussion in UNCITRAL and in the Working Group*

A/52/17, paras. 130-134.
A/CN.9/419, paras. 89-93.
A/CN.9/422, paras. 198-199.
A/CN.9/433, paras. 182-183.
A/CN.9/435, paras. 96 and 197-198.

## VI.  ASSISTANCE FROM THE UNCITRAL SECRETARIAT

*Assistance in drafting legislation*

201. The UNCITRAL secretariat assists States with technical consultations for the preparation of
legislation based on the Model Law. Further information may be obtained from the UNCITRAL
secretariat (mailing address: Vienna International Centre, P.O. Box 500, A-1400 Vienna, Austria;
telephone: (43-1) 26060-4060; facsimile: (43-1) 26060-5813; electronic mail: uncitral@unov.un.or.at;
Internet home page: http://www.un.or.at/uncitral).

*Information on the interpretation of legislation*
*based on the Model Law*

202. Once enacted, the Model Law will be included in the CLOUT information system, which is used
for collecting and disseminating information on case law relating to the conventions and model laws that
have emanated from the work of UNCITRAL. The purpose of the system is to promote international
awareness of the legislative texts formulated by UNCITRAL and to facilitate their uniform interpretation
and application. The secretariat publishes, in the six official languages of the United Nations, abstracts
of decisions and makes available, against reimbursement of copying expenses, the decisions on the basis
of which the abstracts were prepared. The system is explained in a user's guide that is available from the
secretariat in hard copy (A/CN.9/SER.C/GUIDE/1) and on the above-mentioned Internet home page of
UNCITRAL.

### *Annex*

*General Assembly resolution 52/158 of 15 December 1997*

**52/158. Model Law on Cross-Border Insolvency of**
**the United Nations Commission on International Trade Law**

*The General Assembly,*

*Recalling* its resolution 2205 (XXI) of 17 December 1966, by which it created the United Nations Commission on International Trade Law with a mandate to further the progressive harmonization and unification of the law of international trade and in that respect to bear in mind the interests of all peoples, in particular those of developing countries, in the extensive development of international trade,

*Noting* that increased cross-border trade and investment leads to greater incidence of cases where enterprises and individuals have assets in more than one State,

*Noting* also that when a debtor with assets in more than one State becomes subject to an insolvency proceeding, there often exists an urgent need for cross-border cooperation and coordination in the supervision and administration of the insolvent debtor's assets and affairs,

*Considering* that inadequate coordination and cooperation in cases of cross-border insolvency reduce the possibility of rescuing financially troubled but viable businesses, impede a fair and efficient administration of cross-border insolvencies, make it more likely that the debtor's assets would be concealed or dissipated and hinder reorganizations or liquidations of debtors' assets and affairs that would be the most advantageous for the creditors and other interested persons, including the debtors and the debtors' employees,

*Noting* that many States lack a legislative framework that would make possible or facilitate effective cross-border coordination and cooperation,

*Convinced* that fair and internationally harmonized legislation on cross-border insolvency that respects the national procedural and judicial systems and is acceptable to States with different legal, social and economic systems would contribute to the development of international trade and investment,

*Considering* that a set of internationally harmonized model legislative provisions on cross-border insolvency is needed to assist States in modernizing their legislation governing cross-border insolvency,

1. Expresses its appreciation to the United Nations Commission on International Trade Law for completing and adopting the Model Law on Cross-Border Insolvency contained in the annex to the present resolution;[a]

2. Requests the Secretary-General to transmit the text of the Model Law, together with the Guide to Enactment of the Model Law prepared by the Secretariat, to Governments and interested bodies;

3. Recommends that all States review their legislation on cross-border aspects of

insolvency to determine whether the legislation meets the objectives of a modern and
efficient insolvency system and, in that review, give favourable consideration to the
Model Law, bearing in mind the need for an internationally harmonized legislation
governing instances of cross-border insolvency;

4. Recommends also that all efforts be made to ensure that the Model Law, together with
the Guide, become generally known and available.

72nd plenary meeting
15 December 1997

N O T E S

[1]   A State where certain functions relating to insolvency proceedings have been conferred upon
government-appointed officials or bodies might wish to include in article 4 or elsewhere in chapter I the
following provision:

Nothing in this Law affects the provisions in force in this State governing the authority of
*[insert the title of the government-appointed person or body].*

[2]   The enacting State may wish to consider the following alternative wording to replace paragraph 2 of
article 13(2):

2.  Paragraph 1 of this article does not affect the ranking of claims in a proceeding under
*[identify laws of the enacting State relating to insolvency]* or the exclusion of foreign tax
and social security claims from such a proceeding. Nevertheless, the claims of foreign
creditors other than those concerning tax and social security obligations shall not be
ranked lower than *[identify the class of general non-preference claims, while providing
that a foreign claim is to be ranked lower than the general non-preference claims if an
equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank
lower than the general non-preference claims].*

[3]   The first was the UNCITRAL-INSOL Colloquium on Cross-Border Insolvency, held at Vienna from
17 to 19 April 1994 (for the report on the Colloquium, see *United Nations Commission on International
Trade Law Yearbook, Volume XXV: 1994* (United Nations publication, Sales No. E.95.V.20), document
A/CN.9/398; for the proceedings of the Colloquium, see *International Insolvency Review*, Special
Conference Issue, vol. 4, 1995; and for the considerations of UNCITRAL relating to the Colloquium,
see *Official Records of the General Assembly, Forty-ninth Session, Supplement No. 17* (A/49/17), paras.
215-222). The second, organized to elicit the views of judges, was the UNCITRAL-INSOL Judicial

Colloquium on Cross-Border Insolvency, held at Toronto from 22 to 23 March 1995 (for the report on the Judicial Colloquium, see *United Nations Commission on International Trade Law Yearbook, Volume XXVI: 1995* (United Nations publication, Sales No. E.96.V.8), document A/CN.9/413; and for the considerations of UNCITRAL relating to the Judicial Colloquium, see *Official Records of the General Assembly, Fiftieth Session, Supplement No. 17* (A/50/17), paras. 382-393).

[4]   *Official Records of the General Assembly, Fiftieth Session, Supplement No. 17* (A/50/17), paras. 392 and 393.

[5]   For the report of the Working Group on its eighteenth session, held at Vienna from 30 October to 10 November 1995, see *United Nations Commission on International Trade Law Yearbook, Volume XXVII: 1996* (United Nations publication, Sales No. E.98.V.7), document A/CN.9/419 and Corr.1; for the report on its nineteenth session, held in New York from 1 to 12 April 1996, see *United Nations Commission on International Trade Law Yearbook, Volume XXVII: 1996* (United Nations publication, Sales No. E.98. V.7), document A/CN.9/422; and for the report on its twentieth session, held at Vienna from 7 to18 October 1996, see *United Nations Commission on International Trade Law Year book, Volume XXVIII: 1997*, document A/CN.9/433 to be issued as a United Nations sales publication; and for the report on its twentieth session, held in New York from 20 to 31 January 1997, see *United Nations Commission on International Trade Law Yearbook, Volume XXVIII: 1997*, document A/CN.9/435, to be issued as a United Nations sales publication.

[6]   The Second UNCITRAL-INSOL Multinational Judicial Colloquium on Cross-Border Insolvency was held at New Orleans from 22 to 23 March 1997 in conjunction with the5th World Congress of INSOL, held in the same city from 23 to 26 March 1997. A brief account of the Colloquium appears in the report of UNCITRAL on the work of its thirtieth session, held at Vienna from 12 to 30 May 1997 (*Official Records of the General Assembly, Fifty-second Session, Supplement No. 17* (A/52/17), paras. 17-22).

[7]   For the discussion, see the report of UNCITRAL on the work of its thirtieth session (*Official Records of the General Assembly, Fifty-second Session, Supplement No. 17* (A/52/17), paras. 12-225).

[8]   *Official Records of the General Assembly, Fifty-second Session, Supplement No. 17* (A/52/17), para. 220.

[9]   European Treaty Series, No. 136.

[10]   League of Nations, *Treaty Series*, vol. LXXXVI, No. 1950.

[11]   United Nations, *Treaty Series*, vol. 658, No. 9432.

[12]  Ibid.

[13]  Ibid., vol. 847, No. 12140.

[14]  Ibid., vol. 527, No. 7625.

[15]  Ibid.

[16]  Ibid., vol. 330, No. 4739.

[a] The UNCITRAL Model Law on Cross-Border Insolvency is presented in part one of the present publication.

\* \* \*

The United Nations Commission on International Trade Law (UNCITRAL) is a subsidiary body of the General Assembly. It prepares international legislative texts for use by States in modernizing commercial law and non-legislative texts for use by commercial parties in negotiating transactions. Legislative texts include the following: United Nations Convention on Contracts for the International Sale of Goods; Convention on the Limitation Period in the International Sale of Goods; UNCITRAL Model Law on International Commercial Arbitration; UNCITRAL Model Law on Procurement of Goods, Construction and Services; United Nations Convention on Independent Guarantees and Stand-by Letters of Credit; UNCITRAL Model Law on International Credit Transfers; United Nations Convention on International Bills of Exchange and International Promissory Notes; United Nations Convention on the Carriage of Goods by Sea, 1978 (Hamburg); United Nations Convention on the Liability of Operators of Transport Terminals in International Trade; and UNCITRAL Model Law on Electronic Commerce. Non-legislative texts include the following: UNCITRAL Arbitration Rules; UNCITRAL Conciliation Rules; UNCITRAL Notes on Organizing Arbitral Proceedings; UNCITRAL Legal Guide on Drawing Up International Contracts for the Construction of Industrial Works; and UNCITRAL Legal Guide on International Countertrade Transactions.

**NOTE**

Symbols of United Nations documents are composed of capital letters combined with figures. Mention of such a symbol indicates a reference to a United Nations document.

Material in this publication may be freely quoted or reprinted, but acknowledgement is requested, together with a copy of the publication containing the quotation or reprint.

UNITED NATIONS PUBLICATION

Sales No. E.99.V.3

ISBN 92-1-133608-2