# EXHIBIT 2

# UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation





UNITED NATIONS

*Further information may be obtained from:*
UNCITRAL Secretariat, Vienna International Centre
P.O. Box 500, 1400 Vienna, Austria
Telephone: (+43-1) 26060-4060          Telefax: (+43-1) 26060-5813
Internet: www.uncitral.org          E-mail: uncitral@uncitral.org

UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

# UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation



UNITED NATIONS
New York, 2014

**Note**

Symbols of United Nations documents are composed of letters combined with figures. Mention of such symbols indicates a reference to a United Nations document.

UNITED NATIONS PUBLICATION
Sales No.: E.14.V.2
ISBN 978-92-1-133819-5
e-ISBN 978-92-1-056399-4

© United Nations, January 2014. All rights reserved, worldwide.

The designations employed and the presentation of material in this publication do not imply the expression of any opinion whatsoever on the part of the Secretariat of the United Nations concerning the legal status of any country, territory, city or area, or of its authorities, or concerning the delimitation of its frontiers or boundaries.

Information on uniform resource locators and links to Internet sites contained in the present publication are provided for the convenience of the reader and are correct at the time of issue. The United Nations takes no responsibility for the continued accuracy of that information or for the content of any external website.

This publication has not been formally edited.

Publishing production: English, Publishing and Library Section, United Nations Office at Vienna.

## Contents

*Page*

**Part One.   UNCITRAL Model Law On Cross-Border Insolvency**

Preamble . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

Chapter I.   General provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    Article 1.   Scope of application . . . . . . . . . . . . . . . . . . . . . . . . .   3

    Article 2.   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

    Article 3.   International obligations of this State . . . . . . . . . . .   4

    Article 4.   [*Competent court or authority*] . . . . . . . . . . . . . . . .   5

    Article 5.   Authorization of [*insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State*] to act in a foreign State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

    Article 6.   Public policy exception . . . . . . . . . . . . . . . . . . . . . .   5

    Article 7.   Additional assistance under other laws . . . . . . . . . .   5

    Article 8.   Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

Chapter II.   Access of foreign representatives and creditors to courts in this State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    Article 9.   Right of direct access . . . . . . . . . . . . . . . . . . . . . . . .   6

    Article 10.   Limited jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . .   6

    Article 11.   Application by a foreign representative to commence a proceeding under [*identify laws of the enacting State relating to insolvency*] . . . . . . . .   6

    Article 12.   Participation of a foreign representative in a proceeding under [*identify laws of the enacting State relating to insolvency*] . . . . . . . . . . . . . . . . . .   6

    Article 13.   Access of foreign creditors to a proceeding under [*identify laws of the enacting State relating to insolvency*] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    Article 14.   Notification to foreign creditors of a proceeding under [*identify laws of the enacting State relating to insolvency*] . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

Chapter III.   Recognition of a foreign proceeding and relief . . . . . . . . . . . . .   8

    Article 15.   Application for recognition of a foreign proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

    Article 16.   Presumptions concerning recognition . . . . . . . . . . .   8

    Article 17.   Decision to recognize a foreign proceeding . . . . . .   9

*iii*

*Page*

Article 18.   Subsequent information . . . . . . . . . . . . . . . . . . . . . . . . 9

Article 19.   Relief that may be granted upon application for recognition of foreign proceeding . . . . . . . . . . . . . 9

Article 20.   Effects of recognition of a foreign main proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Article 21.   Relief that may be granted upon recognition of a foreign proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Article 22.   Protection of creditors and other interested persons   12

Article 23.   Actions to avoid acts detrimental to creditors . . . . 12

Article 24.   Intervention by a foreign representative in proceedings in this State . . . . . . . . . . . . . . . . . . . . . 12

Chapter IV.   Cooperation with foreign courts and foreign representatives . . . 13

Article 25.   Cooperation and direct communication between a court of this State and foreign courts or foreign representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Article 26.   Cooperation and direct communication between the [*insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State*] and foreign courts or foreign representatives . . . . . . . . . . . . . . . 13

Article 27.   Forms of cooperation . . . . . . . . . . . . . . . . . . . . . . . . 13

Chapter V.   Concurrent proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Article 28.   Commencement of a proceeding under [*identify laws of the enacting State relating to insolvency*] after recognition of a foreign main proceeding . . . 14

Article 29.   Coordination of a proceeding under [*identify laws of the enacting State relating to insolvency*] and a foreign proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Article 30.   Coordination of more than one foreign proceeding   15

Article 31.   Presumption of insolvency based on recognition of a foreign main proceeding. . . . . . . . . . . . . . . . . 15

Article 32.   Rule of payment in concurrent proceedings . . . . . . 15

**Part Two.   Guide to Enactment and Interpretation of the UNCITRAL Model Law on Cross-Border Insolvency**

I.   Purpose and origin of the Model Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A.   Purpose of the Model Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.   Origin of the Model Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.   Preparatory work and adoption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.   Purpose of the Guide to Enactment and Interpretation. . . . . . . . . . . . . . . 24

*Page*

III. The model Law as a vehicle for the harmonization of laws . . . . . . . . . . 24
    A. Flexibility of a model law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    B. Fitting the Model Law into existing national law . . . . . . . . . . . . . . . 25

IV. Main features of the model law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    A. Access. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    B. Recognition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    C. Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    D. Cooperation and coordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

V. Article-by-article remarks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    A. Preamble. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    B. Chapter I. General provisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        Article 1. Scope of application. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        Article 2. Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
        Article 3. International obligations of this State . . . . . . . . . . . . . . 48
        Article 4. [*Competent court or authority*] . . . . . . . . . . . . . . . . . . . 49
        Article 5. Authorization of [*insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State*] to act in a foreign State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
        Article 6. Public policy exception . . . . . . . . . . . . . . . . . . . . . . . . . . 52
        Article 7. Additional assistance under other laws. . . . . . . . . . . . . 53
        Article 8. Interpretation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    C. Chapter II. Access of foreign representatives and creditors to courts in this State. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
        Article 9. Right of direct access . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
        Article 10. Limited jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
        Article 11. Application by a foreign representative to commence a proceeding under [*identify laws of the enacting State relating to insolvency*]. . . . . . . . . . . . . 57
        Article 12. Participation of a foreign representative in a proceeding under [*identify laws of the enacting State relating to insolvency*] . . . . . . . . . . . . . . . . . . . . . 58
        Article 13. Access of foreign creditors to a proceeding under [*identify laws of the enacting State relating to insolvency*] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
        Article 14. Notification to foreign creditors of a proceeding under [*identify laws of the enacting State relating to insolvency*] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    D. Chapter III. Recognition of a foreign proceeding and relief . . . . . 64
        Article 15. Application for recognition of a foreign proceeding . . 64

*Page*

Article 16.  Presumptions concerning recognition . . . . . . . . . . . . . .  68

Article 17.  Decision to recognize a foreign proceeding . . . . . . . . .  73

Article 18.  Subsequent information . . . . . . . . . . . . . . . . . . . . . . . . .  78

Article 19.  Relief that may be granted upon application for recognition of a foreign proceeding . . . . . . . . . . . . . .  80

Article 20.  Effects of recognition of a foreign main proceeding. .  82

Article 21.  Relief that may be granted upon recognition of a foreign proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . .  87

Article 22.  Protection of creditors and other interested persons . .  90

Article 23.  Actions to avoid acts detrimental to creditors . . . . . . .  91

Article 24.  Intervention by a foreign representative in proceedings in this State . . . . . . . . . . . . . . . . . . . . . . .  93

E.  Chapter IV.    Cooperation with foreign courts and foreign representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94

Article 25.  Cooperation and direct communication between a court of this State and foreign courts or foreign representatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  97

Article 26.  Cooperation and direct communication between the [*insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State*] and foreign courts or foreign representatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  97

Article 27.  Forms of cooperation . . . . . . . . . . . . . . . . . . . . . . . . . .  98

F.  Chapter V.  Concurrent proceedings . . . . . . . . . . . . . . . . . . . . . . . . .  100

Article 28.  Commencement of a proceeding under [*identify laws of the enacting State relating to insolvency*] after recognition of a foreign main proceeding . . . . . . . . . .  100

Article 29.  Coordination of a proceeding under [*identify laws of the enacting State relating to insolvency*] and a foreign proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  102

Article 30.  Coordination of more than one foreign proceeding. . .  104

Article 31.  Presumption of insolvency based on recognition of a foreign main proceeding . . . . . . . . . . . . . . . . . . . . . . . .  105

Article 32.  Rule of payment in concurrent proceedings. . . . . . . . .  106

VI.  Assistance from the UNCITRAL secretariat . . . . . . . . . . . . . . . . . . . . . . .  108

A.  Assistance in drafting legislation . . . . . . . . . . . . . . . . . . . . . . . . . . . .  108

B.  Information on the interpretation of legislation based on the Model Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  108

*Annexes*

I.  General Assembly resolution 52/158 of 15 December 1997 . . . . . . . . .  109

II.  Decision of the United Nations Commission on International Trade Law  111

*Part one*

# UNCITRAL MODEL LAW
# ON CROSS-BORDER INSOLVENCY

# UNCITRAL Model Law on
# Cross-Border Insolvency

## PREAMBLE

The purpose of this Law is to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of:

*(a)* Cooperation between the courts and other competent authorities of this State and foreign States involved in cases of cross-border insolvency;

*(b)* Greater legal certainty for trade and investment;

*(c)* Fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor;

*(d)* Protection and maximization of the value of the debtor's assets; and

*(e)* Facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

## CHAPTER I.   GENERAL PROVISIONS

### *Article 1.   Scope of application*

1.   This Law applies where:

*(a)* Assistance is sought in this State by a foreign court or a foreign representative in connection with a foreign proceeding; or

*(b)* Assistance is sought in a foreign State in connection with a proceeding under [*identify laws of the enacting State relating to insolvency*]; or

*(c)* A foreign proceeding and a proceeding under [*identify laws of the enacting State relating to insolvency*] in respect of the same debtor are taking place concurrently; or

*(d)* Creditors or other interested persons in a foreign State have an interest in requesting the commencement of, or participating in, a proceeding under [*identify laws of the enacting State relating to insolvency*].

2.   This Law does not apply to a proceeding concerning [*designate any types of entities, such as banks or insurance companies, that are subject to a special insolvency regime in this State and that this State wishes to exclude from this Law*].

### *Article 2.   Definitions*

For the purposes of this Law:

*(a)* "Foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation;

*(b)* "Foreign main proceeding" means a foreign proceeding taking place in the State where the debtor has the centre of its main interests;

*(c)* "Foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment within the meaning of subparagraph *(f)* of this article;

*(d)* "Foreign representative" means a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding;

*(e)* "Foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

*(f)* "Establishment" means any place of operations where the debtor carries out a non-transitory economic activity with human means and goods or services.

### *Article 3.   International obligations of this State*

To the extent that this Law conflicts with an obligation of this State arising out of any treaty or other form of agreement to which it is a party with one or more other States, the requirements of the treaty or agreement prevail.

*Article 4.*   [Competent court or authority][a]

The functions referred to in this Law relating to recognition of foreign proceedings and cooperation with foreign courts shall be performed by [*specify the court, courts, authority or authorities competent to perform those functions in the enacting State*].

*Article 5.   Authorization of* [insert the title of the person or body administering reorganization or liquidation under the law of the enacting State] *to act in a foreign State*

A [*insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State*] is authorized to act in a foreign State on behalf of a proceeding under [*identify laws of the enacting State relating to insolvency*], as permitted by the applicable foreign law.

*Article 6.   Public policy exception*

Nothing in this Law prevents the court from refusing to take an action governed by this Law if the action would be manifestly contrary to the public policy of this State.

*Article 7.   Additional assistance under other laws*

Nothing in this Law limits the power of a court or a [*insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State*] to provide additional assistance to a foreign representative under other laws of this State.

*Article 8.   Interpretation*

In the interpretation of this Law, regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith.

———————

[a]A state where certain functions relating to insolvency proceedings have been conferred upon government-appointed officials of bodies might wish to include in article 4 or elsewhere in chapter I the following provision:

Nothing in this Law affects the provisions in force in the State governing the authority of [*insert the title of the government-appointed person or body*].

## CHAPTER II.   ACCESS OF FOREIGN REPRESENTATIVES
## AND CREDITORS TO COURTS IN THIS STATE

*Article 9.   Right of direct access*

A foreign representative is entitled to apply directly to a court in this State.

*Article 10.   Limited jurisdiction*

The sole fact that an application pursuant to this Law is made to a court in this State by a foreign representative does not subject the foreign representative or the foreign assets and affairs of the debtor to the jurisdiction of the courts of this State for any purpose other than the application.

*Article 11.   Application by a foreign representative to commence
a proceeding under* [identify laws of the enacting State
relating to insolvency]

A foreign representative is entitled to apply to commence a proceeding under [*identify laws of the enacting State relating to insolvency*] if the conditions for commencing such a proceeding are otherwise met.

*Article 12.   Participation of a foreign representative in a proceeding
under* [identify laws of the enacting State relating to insolvency]

Upon recognition of a foreign proceeding, the foreign representative is entitled to participate in a proceeding regarding the debtor under [*identify laws of the enacting State relating to insolvency*].

*Article 13.   Access of foreign creditors to a proceeding under*
[identify laws of the enacting State relating to insolvency]

1.   Subject to paragraph 2 of this article, foreign creditors have the same rights regarding the commencement of, and participation in, a proceeding under [*identify laws of the enacting State relating to insolvency*] as creditors in this State.

2.   Paragraph 1 of this article does not affect the ranking of claims in a proceeding under [*identify laws of the enacting State relating to*

*insolvency*], except that the claims of foreign creditors shall not be ranked lower than [*identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims*].[b]

*Article 14.  Notification to foreign creditors of a proceeding under*
[identify laws of the enacting State relating to insolvency]

1.    Whenever under [*identify laws of the enacting State relating to insolvency*] notification is to be given to creditors in this State, such notification shall also be given to the known creditors that do not have addresses in this State. The court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.

2.    Such notification shall be made to the foreign creditors individually, unless the court considers that, under the circumstances, some other form of notification would be more appropriate. No letters rogatory or other, similar formality is required.

3.    When a notification of commencement of a proceeding is to be given to foreign creditors, the notification shall:

*(a)*  Indicate a reasonable time period for filing claims and specify the place for their filing;

*(b)*  Indicate whether secured creditors need to file their secured claims; and

*(c)*  Contain any other information required to be included in such a notification to creditors pursuant to the law of this State and the orders of the court.

---

[b] The enacting State may wish to consider the following alternative wording to replace paragraph 2 of article 13:

"2.    Paragraph 1 of this article does not affect the ranking of claims in a proceeding under [*identify laws of the enacting State relating to insolvency*] or the exclusion of foreign tax and social security claims from such a proceeding. Nevertheless, the claims of foreign creditors other than those concerning tax and social security obligations shall not be ranked lower than [*identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims*]."

## CHAPTER III.   RECOGNITION OF A FOREIGN PROCEEDING AND RELIEF

*Article 15.   Application for recognition of a foreign proceeding*

1.   A foreign representative may apply to the court for recognition of the foreign proceeding in which the foreign representative has been appointed.

2.   An application for recognition shall be accompanied by:

*(a)*   A certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; or

*(b)*   A certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative; or

*(c)*   In the absence of evidence referred to in subparagraphs *(a)* and *(b)*, any other evidence acceptable to the court of the existence of the foreign proceeding and of the appointment of the foreign representative.

3.   An application for recognition shall also be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative.

4.   The court may require a translation of documents supplied in support of the application for recognition into an official language of this State.

*Article 16.   Presumptions concerning recognition*

1.   If the decision or certificate referred to in paragraph 2 of article 15 indicates that the foreign proceeding is a proceeding within the meaning of subparagraph *(a)* of article 2 and that the foreign representative is a person or body within the meaning of subparagraph *(d)* of article 2, the court is entitled to so presume.

2.   The court is entitled to presume that documents submitted in support of the application for recognition are authentic, whether or not they have been legalized.

3.   In the absence of proof to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.

*Article 17.  Decision to recognize a foreign proceeding*

1.  Subject to article 6, a foreign proceeding shall be recognized if:

*(a)*  The foreign proceeding is a proceeding within the meaning of subparagraph *(a)* of article 2;

*(b)*  The foreign representative applying for recognition is a person or body within the meaning of subparagraph *(d)* of article 2;

*(c)*  The application meets the requirements of paragraph 2 of article 15; and

*(d)*  The application has been submitted to the court referred to in article 4.

2.  The foreign proceeding shall be recognized:

*(a)*  As a foreign main proceeding if it is taking place in the State where the debtor has the centre of its main interests; or

*(b)*  As a foreign non-main proceeding if the debtor has an establishment within the meaning of subparagraph *(f)* of article 2 in the foreign State.

3.  An application for recognition of a foreign proceeding shall be decided upon at the earliest possible time.

4.  The provisions of articles 15, 16, 17 and 18 do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist.

*Article 18.  Subsequent information*

From the time of filing the application for recognition of the foreign proceeding, the foreign representative shall inform the court promptly of:

*(a)*  Any substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment; and

*(b)*  Any other foreign proceeding regarding the same debtor that becomes known to the foreign representative.

*Article 19.  Relief that may be granted upon application
for recognition of a foreign proceeding*

1.  From the time of filing an application for recognition until the application is decided upon, the court may, at the request of the foreign

representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including:

*(a)* Staying execution against the debtor's assets;

*(b)* Entrusting the administration or realization of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy;

*(c)* Any relief mentioned in paragraph 1 *(c)*, *(d)* and *(g)* of article 21.

2.   [*Insert provisions (or refer to provisions in force in the enacting State) relating to notice.*]

3.   Unless extended under paragraph 1 *(f)* of article 21, the relief granted under this article terminates when the application for recognition is decided upon.

4.   The court may refuse to grant relief under this article if such relief would interfere with the administration of a foreign main proceeding.


*Article 20.   Effects of recognition of a foreign main proceeding*

1.   Upon recognition of a foreign proceeding that is a foreign main proceeding:

*(a)* Commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

*(b)* Execution against the debtor's assets is stayed; and

*(c)* The right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.

2.   The scope, and the modification or termination, of the stay and suspension referred to in paragraph 1 of this article are subject to [*refer to any provisions of law of the enacting State relating to insolvency that apply to exceptions, limitations, modifications or termination in respect of the stay and suspension referred to in paragraph 1 of this article*].

3.   Paragraph 1 *(a)* of this article does not affect the right to commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor.

4.    Paragraph 1 of this article does not affect the right to request the commencement of a proceeding under [*identify laws of the enacting State relating to insolvency*] or the right to file claims in such a proceeding.

### *Article 21.  Relief that may be granted upon recognition of a foreign proceeding*

1.    Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including:

*(a)*  Staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph 1 *(a)* of article 20;

*(b)*  Staying execution against the debtor's assets to the extent it has not been stayed under paragraph 1 *(b)* of article 20;

*(c)*  Suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1 *(c)* of article 20;

*(d)*  Providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

*(e)*  Entrusting the administration or realization of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court;

*(f)*  Extending relief granted under paragraph 1 of article 19;

*(g)*  Granting any additional relief that may be available to [*insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State*] under the laws of this State.

2.    Upon recognition of a foreign proceeding, whether main or non-main, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court, provided that the court is satisfied that the interests of creditors in this State are adequately protected.

3.    In granting relief under this article to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

*Article 22.    Protection of creditors and other interested persons*

1.    In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article, the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

2.    The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

3.    The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or at its own motion, modify or terminate such relief.

*Article 23.    Actions to avoid acts detrimental to creditors*

1.    Upon recognition of a foreign proceeding, the foreign representative has standing to initiate [*refer to the types of actions to avoid or otherwise render ineffective acts detrimental to creditors that are available in this State to a person or body administering a reorganization or liquidation*].

2.    When the foreign proceeding is a foreign non-main proceeding, the court must be satisfied that the action relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding.

*Article 24.    Intervention by a foreign representative
in proceedings in this State*

Upon recognition of a foreign proceeding, the foreign representative may, provided the requirements of the law of this State are met, intervene in any proceedings in which the debtor is a party.

21-11854-dsj Doc 38-2 Filed 06/30/23 Entered 06/30/23 15:09:46 Exhibit 2 - 2013 Enactment Guide Pg 22 of 123

*Part one. UNCITRAL Model Law on Cross-Border Insolvency* 13

## CHAPTER IV. COOPERATION WITH FOREIGN COURTS AND FOREIGN REPRESENTATIVES

*Article 25.   Cooperation and direct communication between a court of this State and foreign courts or foreign representatives*

1.   In matters referred to in article 1, the court shall cooperate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a [*insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State*].

2.   The court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives.

*Article 26.   Cooperation and direct communication between the* [insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State] *and foreign courts or foreign representatives*

1.   In matters referred to in article 1, a [*insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State*] shall, in the exercise of its functions and subject to the supervision of the court, cooperate to the maximum extent possible with foreign courts or foreign representatives.

2.   The [*insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State*] is entitled, in the exercise of its functions and subject to the supervision of the court, to communicate directly with foreign courts or foreign representatives.

*Article 27.   Forms of cooperation*

Cooperation referred to in articles 25 and 26 may be implemented by any appropriate means, including:

*(a)*   Appointment of a person or body to act at the direction of the court;

*(b)*   Communication of information by any means considered appropriate by the court;

*(c)*   Coordination of the administration and supervision of the debtor's assets and affairs;

*(d)* Approval or implementation by courts of agreements concerning the coordination of proceedings;

*(e)* Coordination of concurrent proceedings regarding the same debtor;

*(f)* [*The enacting State may wish to list additional forms or examples of cooperation*].

## CHAPTER V.   CONCURRENT PROCEEDINGS

### *Article 28.   Commencement of a proceeding under* [identify laws of the enacting State relating to insolvency] *after recognition of a foreign main proceeding*

After recognition of a foreign main proceeding, a proceeding under [*identify laws of the enacting State relating to insolvency*] may be commenced only if the debtor has assets in this State; the effects of that proceeding shall be restricted to the assets of the debtor that are located in this State and, to the extent necessary to implement cooperation and coordination under articles 25, 26 and 27, to other assets of the debtor that, under the law of this State, should be administered in that proceeding.

### *Article 29.   Coordination of a proceeding under* [identify laws of the enacting State relating to insolvency] *and a foreign proceeding*

Where a foreign proceeding and a proceeding under [*identify laws of the enacting State relating to insolvency*] are taking place concurrently regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:

*(a)* When the proceeding in this State is taking place at the time the application for recognition of the foreign proceeding is filed,

> (i)   Any relief granted under article 19 or 21 must be consistent with the proceeding in this State; and

> (ii)   If the foreign proceeding is recognized in this State as a foreign main proceeding, article 20 does not apply;

*(b)* When the proceeding in this State commences after recognition, or after the filing of the application for recognition, of the foreign proceeding,

> (i)   Any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the proceeding in this State; and

> (ii) If the foreign proceeding is a foreign main proceeding, the
> stay and suspension referred to in paragraph 1 of article 20
> shall be modified or terminated pursuant to paragraph 2 of
> article 20 if inconsistent with the proceeding in this State;

*(c)*  In granting, extending or modifying relief granted to a representa-
tive of a foreign non-main proceeding, the court must be satisfied that the
relief relates to assets that, under the law of this State, should be adminis-
tered in the foreign non-main proceeding or concerns information required
in that proceeding.

*Article 30.  Coordination of more than one foreign proceeding*

In matters referred to in article 1, in respect of more than one foreign
proceeding regarding the same debtor, the court shall seek cooperation and
coordination under articles 25, 26 and 27, and the following shall apply:

*(a)*  Any relief granted under article 19 or 21 to a representative of a
foreign non-main proceeding after recognition of a foreign main proceeding
must be consistent with the foreign main proceeding;

*(b)*  If a foreign main proceeding is recognized after recognition, or
after the filing of an application for recognition, of a foreign non-main
proceeding, any relief in effect under article 19 or 21 shall be reviewed by
the court and shall be modified or terminated if inconsistent with the foreign
main proceeding;

*(c)*  If, after recognition of a foreign non-main proceeding, another
foreign non-main proceeding is recognized, the court shall grant, modify
or terminate relief for the purpose of facilitating coordination of the
proceedings.

*Article 31.  Presumption of insolvency based on recognition
of a foreign main proceeding*

In the absence of evidence to the contrary, recognition of a foreign
main proceeding is, for the purpose of commencing a proceeding under
[*identify laws of the enacting State relating to insolvency*], proof that the
debtor is insolvent.

*Article 32.  Rule of payment in concurrent proceedings*

Without prejudice to secured claims or rights *in rem*, a creditor who
has received part payment in respect of its claim in a proceeding pursuant

to a law relating to insolvency in a foreign State may not receive a payment
for the same claim in a proceeding under [*identify laws of the enacting State
relating to insolvency*] regarding the same debtor, so long as the payment
to the other creditors of the same class is proportionately less than the
payment the creditor has already received.

*Part two*

# GUIDE TO ENACTMENT AND INTERPRETATION OF THE UNCITRAL MODEL LAW ON CROSS-BORDER INSOLVENCY

# Guide to Enactment and Interpretation
# of the UNCITRAL Model Law
# on Cross-Border Insolvency

## I.   Purpose and origin of the Model Law

### A.   Purpose of the Model Law

1.   The UNCITRAL Model Law on Cross-Border Insolvency, adopted in 1997, is designed to assist States to equip their insolvency laws with a modern, harmonized and fair framework to address more effectively instances of cross-border proceedings concerning debtors experiencing severe financial distress or insolvency. Those instances include cases where the debtor has assets in more than one State or where some of the creditors of the debtor are not from the State where the insolvency proceeding is taking place. In principle, the proceeding pending in the debtor's centre of main interests is expected to have principal responsibility for managing the insolvency of the debtor regardless of the number of States in which the debtor has assets and creditors, subject to appropriate coordination procedures to accommodate local needs.

2.   The Model Law reflects practices in cross-border insolvency matters that are characteristic of modern, efficient insolvency systems. Thus, the States enacting the Model Law would be introducing useful additions and improvements in national insolvency regimes designed to resolve problems arising in cross-border insolvency cases. By adopting legislation based upon the Model Law, States recognize that certain laws relating to insolvency may have to be or might have been amended in order to meet internationally recognized standards.

3.   The Model Law respects the differences among national procedural laws and does not attempt a substantive unification of insolvency law. Rather, it provides a framework for cooperation between jurisdictions, offering solutions that help in several modest but significant ways and facilitate and promote a uniform approach to cross-border insolvency. Those solutions include the following:

*(a)* Providing the person administering a foreign insolvency proceeding ("foreign representative") with access to the courts of the enacting State,[1] thereby permitting the foreign representative to seek a temporary "breathing space", and allowing the courts in the enacting State to determine what coordination among the jurisdictions or other relief is warranted for optimal disposition of the insolvency;

*(b)* Determining when a foreign insolvency proceeding should be accorded "recognition" and what the consequences of recognition may be;

*(c)* Providing a transparent regime for the right of foreign creditors to commence, or participate in, an insolvency proceeding in the enacting State;

*(d)* Permitting courts in the enacting State to cooperate more effectively with foreign courts and foreign representatives involved in an insolvency matter;

*(e)* Authorizing courts in the enacting State and persons administering insolvency proceedings in the enacting State to seek assistance abroad;

*(f)* Providing for court jurisdiction and establishing rules for coordination where an insolvency proceeding in the enacting State is taking place concurrently with an insolvency proceeding in a foreign State;

*(g)* Establishing rules for coordination of relief granted in the enacting State to assist two or more insolvency proceedings that may take place in foreign States regarding the same debtor.

4.   For jurisdictions that currently have to deal with numerous cases of cross-border insolvency, as well as jurisdictions that wish to be well prepared for the increasing likelihood of cases of cross-border insolvency, the Model Law is an essential reference for developing an effective cross-border cooperation framework.

### B.   *Origin of the Model Law*

5.   The increasing incidence of cross-border insolvencies reflects the continuing global expansion of trade and investment. However, national insolvency laws by and large have not kept pace with the trend, and they are often ill-equipped to deal with cases of a cross-border nature. This frequently results in inadequate and inharmonious legal approaches, which hamper the rescue of financially troubled businesses, are not conducive to a fair and efficient administration of cross-border insolvencies, impede the protection

---

[1] The "enacting State" refers to a State that has enacted legislation based on the Model Law. Unless otherwise provided, that term is used in the *Guide to Enactment and Interpretation* to refer to the State receiving an application under the Model Law.

of the assets of the insolvent debtor against dissipation and hinder maximization of the value of those assets. Moreover, the absence of predictability in the handling of cross-border insolvency cases can impede capital flow and be a disincentive to cross-border investment.

6.    Fraud by insolvent debtors, in particular by concealing assets or transferring them to foreign jurisdictions, is an increasing problem, in terms of both its frequency and its magnitude. The modern, interconnected world makes such fraud easier to conceive and carry out. The cross-border cooperation mechanisms established by the Model Law are designed to confront such international fraud.

7.    Only a limited number of countries have a legislative framework for dealing with cross-border insolvency that is well suited to the needs of international trade and investment. Various techniques and notions are employed in the absence of a specific legislative or treaty framework for dealing with cross-border insolvency. These include the following: application of the doctrine of comity by courts in common-law jurisdictions; issuance for equivalent purposes of enabling orders (exequatur) in civil-law jurisdictions; enforcement of foreign insolvency orders relying on legislation for enforcement of foreign judgements; and techniques such as letters rogatory for transmitting requests for judicial assistance.

8.    Approaches based purely on the doctrine of comity or on exequatur do not provide the same degree of predictability and reliability as can be provided by specific legislation, such as contained in the Model Law, on judicial cooperation, recognition of foreign insolvency proceedings and access for foreign representatives to courts. For example, in a given legal system general legislation on reciprocal recognition of judgements, including exequatur, might be confined to enforcement of specific money judgements or injunctive orders in two-party disputes, thus excluding decisions opening collective insolvency proceedings. Furthermore, recognition of foreign insolvency proceedings might not be considered as a matter of recognizing a foreign "judgement", for example, if the foreign bankruptcy order is considered to be merely a declaration of status of the debtor or if the order is considered not to be final.

9.    To the extent that there is a lack of communication and coordination among courts and administrators from concerned jurisdictions, it is more likely that assets would be dissipated, fraudulently concealed, or possibly liquidated without reference to other more advantageous solutions. As a result, not only is the ability of creditors to receive payment diminished, but so is the possibility of rescuing financially viable businesses and saving jobs. By contrast, mechanisms in national legislation for coordinated

administration of cases of cross-border insolvency make it possible to adopt solutions that are sensible and in the best interest of the creditors and the debtor; the presence of such mechanisms in the law of a State is therefore perceived as advantageous for foreign investment and trade in that State.

10.   The Model Law takes into account the results of other international efforts, including the negotiations leading to the European Council (EC) Regulation No. 1346/2000 of 29 May 2000 on insolvency proceedings (the "EC Regulation"), the European Convention on Certain International Aspects of Bankruptcy (1990),[2] the Montevideo treaties on international commercial law (1889 and 1940), the Convention regarding Bankruptcy between Nordic States (1933) and the Convention on Private International Law (Bustamante Code) (1928).[3] Proposals from non-governmental organizations that have been taken into account include the Model International Insolvency Cooperation Act and the Cross-Border Insolvency Concordat, both developed by the former Committee J (Insolvency) of the Section on Business Law of the International Bar Association.[4]

11.   The EC Regulation establishes a cross-border insolvency regime within the European Union for cases where the debtor has the centre of its main interests in a State member of the Union. The Regulation does not deal with cross-border insolvency matters extending beyond a State member of the European Union into a non-member State. Thus, the Model Law offers to States members of the European Union a complementary regime of considerable practical value that could address the many cases of cross-border cooperation not covered by the EC Regulation.

### C.   Preparatory work and adoption

12.   The project was initiated by the United Nations Commission on International Trade Law (UNCITRAL), in close cooperation with INSOL International. The project benefited from the expert advice of INSOL during all stages of the preparatory work. In addition, during the formulation of the Law, consultative assistance was provided by the former Committee J (Insolvency) of the Section on Business Law of the International Bar Association.

13.   Prior to the decision by UNCITRAL to undertake work on cross-border insolvency, the Commission and INSOL held two international colloquiums for insolvency practitioners, judges, government officials and representatives

--------

[2] European Treaty Series, No. 136.

[3] League of Nations, Treaty Series, vol. LXXXVI, No. 1950.

[4] Available from http://www.iiiglobal.org/component/jdownloads/finish/396/1522.html (last visited 1 August 2013).

21-11854-dsj   Doc 38-2   Filed 06/30/23   Entered 06/30/23 15:09:46   Exhibit 2 -
2013 Enactment Guide   Pg 32 of 123

*Part two.   Guide to Enactment and Interpretation*                                      *23*

of other interested sectors.[5] The suggestion arising from those colloquiums
was that work by UNCITRAL should have the limited but useful goal of
facilitating judicial cooperation, court access for foreign insolvency repre-
sentatives and recognition of foreign insolvency proceedings.

14.   When UNCITRAL decided in 1995 to develop a legal instrument relat-
ing to cross-border insolvency, it entrusted the work to the Working Group
on Insolvency Law, one of the subsidiary bodies of UNCITRAL.[6] The Work-
ing Group devoted four two-week sessions to the work on the project.[7]

15.   In March 1997, another international meeting of practitioners was held
to discuss the draft text as prepared by the Working Group. The participants
(mostly judges, judicial administrators and government officials) generally
considered that the model legislation, when enacted, would constitute a
major improvement in dealing with cross-border insolvency cases.[8]

16.   The final negotiations on the draft text took place during the thirtieth
session of UNCITRAL, held in Vienna from 12 to 30 May 1997. UNCITRAL
adopted the Model Law by consensus on 30 May 1997.[9] In addition to the
36 States members of UNCITRAL, representatives of 40 observer States
and 13 international organizations participated in the deliberations of the
Commission and the Working Group. Subsequently, the General Assembly
adopted resolution 52/158 of 15 December 1997 (see annex), in which it
expressed its appreciation to UNCITRAL for completing and adopting the
Model Law.

---

[5] The first was the UNCITRAL-INSOL Colloquium on Cross-Border Insolvency (Vienna, 17 to
19 April 1994) (for the report on the Colloquium, see document A/CN.9/398 and http://www.uncitral.
org/uncitral/en/commission/colloquia_insolvency.html; for the proceedings of the Colloquium, see Inter-
national Insolvency Review, Special Conference Issue, vol. 4, 1995; and for the considerations of
UNCITRAL relating to the Colloquium, see *Official Records of the General Assembly, Forty-ninth
Session, Supplement No. 17* (A/49/17), paras. 215-222). The second colloquium, organized to elicit the
views of judges, was the UNCITRAL-INSOL Judicial Colloquium on Cross-Border Insolvency (Toronto,
22 to 23 March 1995) (for the report on the Judicial Colloquium, see document A/CN.9/413 and
http://www.uncitral.org/uncitral/en/commission/colloquia_insolvency.html; and for the considerations of
UNCITRAL relating to the Judicial Colloquium, see *Official Records of the General Assembly, Fiftieth
Session, Supplement No. 17* (A/50/17), paras. 382-393).

[6] *Official Records of the General Assembly, Fiftieth Session, Supplement No. 17* (A/50/17), paras. 392
and 393.

[7] For the reports of the Working Group see: eighteenth session, (Vienna, 30 October to 10 November
1995), document A/CN.9/419 and Corr.1; nineteenth session (New York, 1 to 12 April 1996), document
A/CN.9/422; twentieth session (Vienna, 7 to 18 October 1996), document A/CN.9/433; and twenty-first
session (New York, 20 to 31 January 1997), document A/CN.9/435; all documents are available from
http://www.uncitral.org/uncitral/en/commission/sessions.html.

[8] The Second UNCITRAL-INSOL Multinational Judicial Colloquium on Cross-Border Insolvency
was held at New Orleans from 22 to 23 March 1997. A brief account of the Colloquium appears in the
report of UNCITRAL on the work of its thirtieth session (Vienna, 12 to 30 May 1997) (*Official Records
of the General Assembly, Fifty-second Session, Supplement No. 17* (A/52/17), paras. 17-22) and the
report on the Colloquium is available from http://www.uncitral.org/uncitral/en/commission/colloquia_
insolvency.html.

[9] For the discussion, see the report of UNCITRAL on the work of its thirtieth session (*Official
Records of the General Assembly, Fifty-second Session, Supplement No. 17* (A/52/17), paras. 12-225).

## II.   Purpose of the Guide to Enactment and Interpretation

17.   UNCITRAL considered that the Model Law would be a more effective tool if it were accompanied by background and explanatory information. While such information would primarily be directed to executive branches of Governments and legislators preparing the necessary legislative revisions, it would also provide useful insight to those charged with interpretation and application of the Model Law, such as judges,[10] and other users of the text such as practitioners and academics. Such information might also assist States in considering which, if any, of the provisions should be adapted to address particular national circumstances.

18.   The present Guide was prepared by the Secretariat pursuant to the request of UNCITRAL made at the close of its thirtieth session, in 1997. It is based on the deliberations and decisions of the Commission at that thirtieth session,[11] when the Model Law was adopted, as well as on considerations of the Working Group on Insolvency Law, which conducted the preparatory work. The Guide has been revised in accordance with the request of UNCITRAL at its forty-third session (2010)[12] in order to include additional guidance with respect to the interpretation and application of selected aspects of the Model Law relating to "centre of main interests". The revisions are based on the deliberations of Working Group V (Insolvency Law) at its thirty-ninth (2010), fortieth (2011), forty-first (2012), forty-second (2012) and forty-third (2013) sessions, as well as of the Commission at its forty-sixth session (2013) and were adopted by the Commission as the "Guide to Enactment and Interpretation of the UNCITRAL Model Law on Cross-Border Insolvency" on 18 July 2013.

## III.   The model law as a vehicle for the harmonization of laws

19.   A model law is a legislative text that is recommended to States for incorporation into their national law. Unlike an international convention, a model law does not require the State enacting it to notify the United Nations or other States that may have also enacted it.

---

[10] Where "judges" would include a judicial officer or other person appointed to exercise the powers of the court or other competent authority having jurisdiction under domestic insolvency laws [enacting the Model Law].

[11] *Official Records of the General Assembly, Fifty-second Session, Supplement No. 17* (A/52/17), para. 220.

[12] *Official Records of the General Assembly, Sixty-fifth Session, Supplement No. 17* (A/65/17), para. 259.

## A.   Flexibility of a model law

20.   In incorporating the text of a model law into its system, a State may modify or leave out some of its provisions. In the case of a convention, the possibility of changes being made to the uniform text by the States parties (normally referred to as "reservations") is much more restricted; in particular trade law conventions usually either totally prohibit reservations or allow only specified ones. The flexibility inherent in a model law is particularly desirable in those cases when it is likely that the State would wish to make various modifications to the uniform text before it would be ready to enact it as a national law. Some modifications may be expected in particular when the uniform text is closely related to the national court and procedural system (which is the case with the UNCITRAL Model Law on Cross-Border Insolvency). This, however, also means that the degree of, and certainty about, harmonization achieved through a model law is likely to be lower than in the case of a convention. Therefore, in order to achieve a satisfactory degree of harmonization and certainty, it is recommended that States make as few changes as possible in incorporating the Model Law into their legal systems.

## B.   Fitting the Model Law into existing national law

21.   With its scope limited to some procedural aspects of cross-border insolvency cases, the Model Law is intended to operate as an integral part of the existing insolvency law in the enacting State. This is manifested in several ways:

*(a)*   The amount of possibly new legal terminology added to existing law by the Model Law is limited. New legal terms are those specific to the cross-border context, such as "foreign proceeding" and "foreign representative". The terms used in the Model Law are unlikely to be in conflict with terminology in existing law. Moreover, where the expression is likely to vary from country to country, the Model Law, instead of using a particular term, indicates the meaning of the term in italics within square brackets and calls upon the drafters of the national law to use the appropriate term;

*(b)*   The Model Law presents to enacting States the possibility of aligning the relief resulting from recognition of a foreign proceeding with the relief available in a comparable proceeding under the national law (article 20);

*(c)*   Recognition of foreign proceedings does not prevent local creditors from initiating or continuing collective insolvency proceedings in the enacting State (article 28);

*(d)* Relief available to the foreign representative is subject to the protection of local creditors and other interested persons, including the debtor, against undue prejudice; relief is also subject to compliance with the procedural requirements of the enacting State and to applicable notification requirements (article 22 and article 19, paragraph 2);

*(e)* The Model Law preserves the possibility of excluding or limiting any action in favour of the foreign proceeding, including recognition of the proceeding, on the basis of overriding public policy considerations, although it is expected that the public policy exception will be rarely used (article 6);

*(f)* The Model Law is in the flexible form of model legislation that takes into account differing approaches in national insolvency laws and the varying propensities of States to cooperate and coordinate in insolvency matters (articles 25-27).

22. The flexibility to adapt the Model Law to the legal system of the enacting State should be utilized with due consideration for the need for uniformity in its interpretation (see paras. 106-107 below) and for the benefits to the enacting State of adopting modern, generally acceptable international practices in insolvency matters. Thus it is advisable to limit deviations from the uniform text to a minimum. This will assist in making the national law as transparent as possible for foreign users (see also paras. 20 and 21 above). The advantage of uniformity and transparency is that it will make it easier for enacting States to demonstrate the basis of their national law on cross-border insolvency and obtain cooperation from other States in insolvency matters.

23. If the enacting State decides to incorporate the provisions of the Model Law into an existing national insolvency statute, the title of the enacted provisions would have to be adjusted accordingly and the word "Law", which appears at various places in the title and in the text of the Model Law, would have to be replaced by the appropriate expression.

## IV.   Main features of the model law

24. The text of the Model Law focuses on four key elements identified, through the studies and consultations conducted in the early 1990s prior to the negotiation of the Model Law, as being the areas upon which international agreement might be possible:

*(a)* Access to local courts for representatives of foreign insolvency proceedings and for creditors and authorization for representatives of local proceedings to seek assistance elsewhere;

*(b)* Recognition of certain orders issued by foreign courts;

*(c)* Relief to assist foreign proceedings; and

*(d)* Cooperation among the courts of States where the debtor's assets are located and coordination of concurrent proceedings.

## A. Access

25. The provisions on access address both inbound and outbound aspects of cross-border insolvency. In terms of outbound aspects, article 5 authorizes the person or body administering a reorganization or liquidation under the law of the enacting State (referred to as the insolvency representative)[13] to act in a foreign State (article 5) on behalf of local proceedings. In terms of inbound requests, a foreign representative applying in the enacting State has the following rights: of direct access to courts in the enacting State (article 9); to apply to commence a local proceeding in the enacting State on the conditions applicable in that State (article 11); and to apply for recognition of the foreign proceedings in which they have been appointed (article 15). Upon recognition, a foreign representative is entitled to participate in insolvency-related proceedings conducted in the enacting State under the law of that State (article 12); to initiate in the enacting State an action to avoid or otherwise render ineffective acts detrimental to creditors (article 23); and to intervene in any local proceedings in which the debtor is a party (article 24).

26. The fact that a foreign representative has the right to apply to the courts of the enacting State does not subject the foreign representative or the foreign assets and affairs of the debtor to the jurisdiction of the enacting State for any purpose other than that application (article 10).

27. Importantly, foreign creditors have the same right as local creditors to commence and participate in proceedings in the enacting State (article 13).

28. Questions of notice to interested persons, while closely related to the protection of their interests, are in general not regulated in the Model Law. Thus, such questions are governed by the procedural rules of the enacting State, some of which may be of a public-order character. For example, the law of the enacting State will determine whether any notice is to be given

---

[13] This terminology reflects the language used in article 5 of the Model Law and is used for consistency with the *UNCITRAL Legislative Guide on Insolvency Law*, which explains that an "insolvency representative" is "a person or body, including one appointed on an interim basis, authorized in insolvency proceedings to administer the reorganization or liquidation of the insolvency estate": Introduction, para. 12 *(v)*.

to the debtor or another person of an application for recognition of a foreign proceeding and the time period for giving the notice.

## *B.   Recognition*

29.   One of the key objectives of the Model Law is to establish simplified procedures for recognition of qualifying foreign proceedings that would avoid time-consuming legalization or other processes and provide certainty with respect to the decision to recognize. The Model Law is not intended to accord recognition to all foreign insolvency proceedings. Article 17 provides that, subject to article 6, when the specified requirements of article 2 concerning the nature of the foreign proceeding (i.e. that the foreign proceeding is, as a matter of course, a collective proceeding[14] for the purposes of liquidation or reorganization under the control or supervision of the court) and the foreign representative are met and the evidence required by article 15 has been provided, the court should recognize the foreign proceeding without further requirement. The process of application and recognition is aided by the presumptions provided in article 16 that enable the court in the enacting State to presume the authenticity and validity of the certificates and documents, originating in the foreign State, that are required by article 15.

30.   Article 6 allows recognition to be refused where it would be "manifestly contrary to the public policy" of the State in which recognition is sought. This may be a preliminary question to be considered on an application for recognition. No definition of what constitutes public policy is attempted as notions vary from State to State. However, the intention is that the exception be interpreted restrictively and that article 6 be used only in exceptional and limited circumstances (see paras. 101-104). Differences in insolvency schemes do not themselves justify a finding that enforcing one State's laws would violate the public policy of another State.

31.   A foreign proceeding should be recognized as either a main proceeding or a non-main proceeding (article 17, paragraph 2). A main proceeding is one taking place where the debtor had its centre of main interests (COMI) at the date of commencement of the foreign proceeding (see paras. 157-160 on timing). In principle, a main proceeding is expected to have principal responsibility for managing the insolvency of the debtor regardless of the number of States in which the debtor has assets and creditors, subject to appropriate coordination procedures to accommodate local needs. Centre of main interests is not defined in the Model Law, but is based on a

---

[14] On what constitutes a collective proceeding, see paras. 69-72 below.

presumption that it is the registered office or habitual residence of the debtor
(article 16, paragraph 3).

32.   A non-main proceeding is one taking place where the debtor has an
establishment. This is defined as "any place of operation where the debtor
carries out non-transitory economic activity with human means and goods
or services" (article 2, subparagraph *(f)*). Proceedings commenced on a dif-
ferent basis, such as presence of assets without a centre of main interests
or establishment, would not qualify for recognition under the Model Law
scheme. Main and non-main proceedings are discussed in more detail below
at paras. 81-85.

33.   Acknowledging that it might subsequently be discovered that the
grounds for granting recognition were lacking at the time of recognition,
have changed or ceased to exist, the Model Law provides for modification
or termination of the order for recognition (article 17, paragraph 4).

34.   Recognition of foreign proceedings under the Model Law has several
effects. Principal amongst them is the relief accorded to assist the foreign
proceeding (articles 20 and 21), but additionally, as noted above, the foreign
representative is entitled to participate in any local insolvency proceeding
regarding the debtor (article 13), has standing to initiate an action for avoid-
ance of antecedent transactions (article 23) and may intervene in any
proceeding in which the debtor is a party (article 24).

## C.   *Relief*

35.   A basic principle of the Model Law is that the relief considered neces-
sary for the orderly and fair conduct of a cross-border insolvency should be
available to assist foreign proceedings, whether on an interim basis or as a
result of recognition. Accordingly, the Model Law specifies the relief that
is available in both of those instances. As such, it neither necessarily imports
the consequences of the foreign law into the insolvency system of the enact-
ing State nor applies to the foreign proceeding the relief that would be
available under the law of the enacting State. However, it is possible, as
noted above, to align the relief resulting from recognition of a foreign
proceeding with the relief available in a comparable proceeding commenced
under the law of the enacting State (article 20).

36.   Interim relief is available at the discretion of the court between the
making of an application for recognition and the decision on that application
(article 19); specified forms of relief are available on recognition of main
proceedings (article 20); and relief at the discretion of the court is available

for both main and non-main proceedings following recognition (article 21). In the case of main proceedings, that discretionary relief would be in addition to the relief available on recognition. Additional assistance might be available under other laws of the enacting State (see article 7).

37. Key elements of the relief accorded upon recognition of a foreign "main" proceeding include a stay of actions of individual creditors against the debtor or a stay of enforcement proceedings concerning the assets of the debtor, and a suspension of the debtor's right to transfer or encumber its assets (article 20, paragraph 1). Such stay and suspension are "mandatory" (or "automatic") in the sense that either they flow automatically from the recognition of a foreign main proceeding or, in the States where a court order is needed for the stay or suspension, the court is bound to issue the appropriate order. The stay of actions or of enforcement proceedings is necessary to provide "breathing space" until appropriate measures are taken for reorganization or liquidation of the assets of the debtor. The suspension of transfers is necessary because in a modern, globalized economic system it is possible for a multinational debtor to move money and property across boundaries quickly. The mandatory moratorium triggered by the recognition of the foreign main proceeding provides a rapid "freeze" essential to prevent fraud and to protect the legitimate interests of the parties involved until the court has an opportunity to notify all concerned and to assess the situation.

38. Exceptions and limitations to the scope of the stay and suspension (e.g. exceptions for secured claims, payments by the debtor made in the ordinary course of business, set-off, execution of rights *in rem*) and the possibility of modifying or terminating the stay or suspension are determined by provisions governing comparable stays and suspensions in insolvency proceedings under the laws of the enacting State (article 20, paragraph 2).

39. With respect to interim and discretionary relief, the court can impose conditions and modify or terminate the relief to protect the interests of creditors and other interested persons affected by the relief ordered (article 22).

### D.  Cooperation and coordination

*Cooperation*

40. The Model Law expressly empowers courts to cooperate in the areas governed by the Model Law and to communicate directly with foreign counterparts. Cooperation between courts and foreign representatives and between foreign representatives is also authorized. Cooperation is not dependent upon recognition and may thus occur at an early stage and before

an application for recognition is made. Since the articles of chapter 4 apply to the matters referred to in article 1, cooperation is available not only in respect of applications for assistance made in the enacting State, but also applications from proceedings in the enacting State for assistance elsewhere (see also article 5). Moreover, cooperation is not limited to foreign proceedings within the meaning of article 2, subparagraph *(a)* that would qualify for recognition under article 17 (i.e. that they are either main or non-main), and cooperation may thus be available with respect to proceedings commenced on the basis of presence of assets. Cooperation is discussed in detail in paragraphs 209-223.

41.   Recognizing that the idea of cooperation might be unfamiliar to many judges and insolvency representatives, article 27 sets out some of the possible means of cooperation. These are further discussed and amplified in the *UNCITRAL Practice Guide on Cross-Border Insolvency Cooperation*,[15] which also compiles practice and experience with respect to the use and negotiation of cross-border insolvency agreements.

*Coordination of concurrent proceedings*

42.   Several provisions of the Model Law address coordination of concurrent proceedings and aim to foster decisions that would best achieve the objectives of both proceedings.

43.   The recognition of foreign main proceedings does not prevent commencement of local proceedings in the enacting State (article 28), nor does the commencement of local proceedings in that State terminate recognition already accorded to foreign proceedings or prevent recognition of foreign proceedings.

44.   Article 29 addresses adjustment of the relief available where there are concurrent proceedings. The basic principle is that relief granted to a recognized foreign proceeding should be consistent with the relief granted in local proceedings, irrespective of whether the foreign proceeding was recognized before or after the commencement of the local proceeding. For example, where local proceedings have already commenced at the time the application for recognition is made, relief granted to the foreign proceeding must be consistent with the local proceeding. If the foreign proceeding is recognized as a main proceeding, the automatic relief available on recognition under article 20 will not apply.

---

[15] The *Practice Guide* is available from: http://www.uncitral.org/uncitral/uncitral_texts/insolvency.html

45.   Articles 31 and 32 contain additional means of facilitating coordination. Article 31 establishes a presumption to the effect that recognition of a foreign proceeding is proof that the debtor is insolvent where insolvency is required for commencement of a local proceeding. Article 32 establishes the hotchpot rule to avoid situations in which a creditor might make claims and be paid in multiple insolvency proceedings in different jurisdictions, thereby potentially obtaining more favourable treatment than other creditors.

## V.   Article-by-article remarks

---

PREAMBLE

The purpose of this Law is to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of:

*(a)*   Cooperation between the courts and other competent authorities of this State and foreign States involved in cases of cross-border insolvency;

*(b)*   Greater legal certainty for trade and investment;

*(c)*   Fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor;

*(d)*   Protection and maximization of the value of the debtor's assets; and

*(e)*   Facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

---

46.   The Preamble gives a succinct statement of the basic policy objectives of the Model Law. It is not intended to create substantive rights, but rather to provide general orientation for users of the Model Law and to assist in its interpretation.

47.   In States where it is not customary to set out preambular statements of policy in legislation, consideration might be given to including the statement of objectives either in the body of the statute or in a separate document, in order to preserve a useful tool for the interpretation of the law

*Use of the term "insolvency"*

48.   Acknowledging that different jurisdictions might have different notions of what falls within the term "insolvency proceedings", the Model Law does

not define the term "insolvency".[16] However, as used in the Model Law, the word "insolvency" refers to various types of collective proceedings commenced with respect to debtors that are in severe financial distress or insolvent. The reason is that the Model Law (as pointed out above in paragraphs 23-24) covers proceedings concerning different types of debtors and, among those proceedings, deals with proceedings aimed at liquidating or reorganizing the debtor as a commercial entity. A judicial or administrative proceeding to wind up a solvent entity where the goal is to dissolve the entity and other foreign proceedings not falling within article 2 subparagraph *(a)* are not insolvency proceedings within the scope of the Model Law. Where a proceeding serves several purposes, including the winding up of a solvent entity, it falls under article 2, subparagraph *(a)* of the Model Law only if the debtor is insolvent or in severe financial distress.

49.   Debtors covered by the Model Law would generally fall within the scope of the *UNCITRAL Legislative Guide on Insolvency Law* and would therefore be eligible for commencement of insolvency proceedings in accordance with recommendations 15 and 16 of the *Legislative Guide*,[17] being debtors that are or will be generally unable to pay their debts as they mature or whose liabilities exceed the value of their assets.

50.   It should be noted that in some jurisdictions the expression "insolvency proceedings" has a narrow technical meaning in that it may refer, for example, only to collective proceedings involving a company or a similar legal person or only to collective proceedings against a natural person. No such distinction is intended to be drawn by the use of the term "insolvency" in the Model Law, since the Model Law is designed to be applicable to proceedings regardless of whether they involve a natural or a legal person as the debtor. If, in the enacting State, the word "insolvency" may be misunderstood as referring to one particular type of collective proceeding, another term should be used to refer to the proceedings covered by the Law.

---

[16] The *UNCITRAL Legislative Guide on Insolvency Law* explains insolvency as being "when a debtor is generally unable to pay its debts as they mature or when its liabilities exceed the value of its assets" and insolvency proceedings as being "collective proceedings, subject to court supervision, either for reorganization or liquidation", Introduction, paras. 12 *(s)* and *(u)*.

[17] Recommendations 15 and 16 of the *Legislative Guide* provide:

15.   The insolvency law should specify that insolvency proceedings can be commenced on the application of a debtor if the debtor can show either that:

*(a)*   It is or will be generally unable to pay its debts as they mature; or

*(b)*   Its liabilities exceed the value of its assets.

16.   The insolvency law should specify that insolvency proceedings can be commenced on the application of a creditor if it can be shown that either:

*(a)*   The debtor is generally unable to pay its debts as they mature; or

*(b)*   The debtor's liabilities exceed the value of its assets.

51. However, when referring to foreign insolvency proceedings, it is desirable to utilize the wording of article 2, subparagraph *(a)*, so as not to exclude recognition of foreign proceedings that, according to article 2, subparagraph *(a)*, should be covered.

*"State"*

52. The word "State", as used in the preamble and throughout the Model Law, refers to the entity that enacts the Law (the "enacting State"). The term should not be understood as referring, for example, to a state in a country with a federal system. The national statute may use another expression that is customarily used for this purpose.

*Discussion in UNCITRAL and in the Working Group*

*(a) Model Law*

A/52/17, paras. 136-139.

A/CN.9/422, paras. 19-23.

A/CN.9/WG.V/WP.46, pp. 4-5.

A/CN.9/433, paras. 22-28.

A/CN.9/WG.V/WP.48, p. 5.

A/CN.9/435, para. 100.

*(b) Guide to Enactment*

A/CN.9/436, paras. 37-38.

A/CN.9/442, paras. 54-56.

*(c) Guide to Enactment and Interpretation*

A/CN.9/738, paras. 14-16.

A/CN.9/WG.V/WP.103, paras. 54, 51-52 and 56.

A/CN.9/742, para. 23.

A/CN.9/WG.V/WP.112, paras. 54, 51-51A and 56.

A/CN.9/766, paras. 21-25.

---

CHAPTER I.   GENERAL PROVISIONS

*Article 1.   Scope of application*

1. This Law applies where:

*(a)* Assistance is sought in this State by a foreign court or a foreign representative in connection with a foreign proceeding; or

*(b)* Assistance is sought in a foreign State in connection with a proceeding under [*identify laws of the enacting State relating to insolvency*]; or

*(c)* A foreign proceeding and a proceeding under [*identify laws of the enacting State relating to insolvency*] in respect of the same debtor are taking place concurrently; or

> *(d)* Creditors or other interested persons in a foreign State have an inter-
> est in requesting the commencement of, or participating in, a proceeding under
> [*identify laws of the enacting State relating to insolvency*].
>
> 2.   This Law does not apply to a proceeding concerning [*designate any types
> of entities, such as banks or insurance companies, that are subject to a special
> insolvency regime in this State and that this State wishes to exclude from
> this Law*].

*Paragraph 1*

53.   Article 1, paragraph 1, outlines the types of issue that may arise in
cases of cross-border insolvency and for which the Model Law provides
solutions: *(a)* inward-bound requests for recognition of a foreign proceeding;
*(b)* outward-bound requests from a court or insolvency representative in the
enacting State for recognition of an insolvency proceeding commenced under
the laws of the enacting State; *(c)* coordination of proceedings taking place
concurrently in two or more States; and *(d)* participation of foreign creditors
in insolvency proceedings taking place in the enacting State.

54.   "Assistance" in paragraph 1, subparagraphs *(a)* and *(b)*, is intended to
cover various situations dealt with in the Model Law, in which a court or
an insolvency representative in one State may make a request directed to a
court or an insolvency representative in another State for assistance within
the scope of the Model Law. The Law specifies some of the types of assis-
tance available (e.g. article 19, subparagraphs 1 *(a)* and *(b)*; article 21,
subparagraphs 1 *(a)-(f)* and paragraph 2; and article 27, subparagraphs *(a)-(e)*),
while other possible types of assistance are covered by a broader formula-
tion (such as the one in article 21, subparagraph 1 *(g)*).

*Paragraph 2 (Specially regulated insolvency proceedings)*

55.   In principle, the Model Law was formulated to apply to any proceeding
that meets the requirements of article 2, subparagraph *(a)*, independently of
the nature of the debtor or its particular status under national law. The only
possible exceptions contemplated in the text of the Model Law itself are
indicated in paragraph 2 (see, however, para. 61 below, for considerations
regarding "consumers").

56.   Banks or insurance companies are mentioned as examples of entities that
the enacting State might decide to exclude from the scope of the Model Law.

The reason for the exclusion would typically be that the insolvency of such
entities gives rise to the particular need to protect vital interests of a large
number of individuals or that the insolvency of those entities usually requires
particularly prompt and circumspect action (for instance to avoid massive
withdrawals of deposits). For those reasons, the insolvency of such types of
entity is administered in many States under a special regulatory regime.

57.   Paragraph 2 indicates that the enacting State might decide to exclude
the insolvency of entities other than banks and insurance companies; the
State might do so where the policy considerations underlying the special
insolvency regime for those other types of entity (e.g. public utility compa-
nies) call for special solutions in cross-border insolvency cases.

58.   It is not advisable to exclude all cases of insolvency of the entities
mentioned in paragraph 2. In particular, the enacting State might wish to
treat, for recognition purposes, a foreign insolvency proceeding relating to
a bank or an insurance company as an ordinary insolvency proceeding if
the insolvency of the branch or of the assets of the foreign entity in the
enacting State do not fall under the national regulatory scheme. The enacting
State might also wish not to exclude the possibility of recognition of a
foreign proceeding involving one of those entities if the law of the State of
origin does not make that proceeding subject to special regulation.

59.   In enacting paragraph 2, a State may wish to make sure that it would
not inadvertently and undesirably limit the right of the insolvency representa-
tive or court to seek assistance or recognition abroad of an insolvency pro-
ceeding conducted in the territory of the enacting State, merely because that
insolvency is subject to a special regulatory regime. Moreover, even if the
particular insolvency is governed by special regulation, it is advisable, before
generally excluding those cases from the Model Law, to consider whether
it would be useful to leave certain features of the Model Law (e.g. on
cooperation and coordination and possibly on certain types of discretionary
relief) applicable also to the specially regulated insolvency proceedings.

60.   In any case, with a view to making the national insolvency law more
transparent (for the benefit of foreign users of a law based on the Model
Law), it is advisable that exclusions from the scope of the law be expressly
mentioned by the enacting State in paragraph 2.

*Non-traders or natural persons*

61.   In jurisdictions that have not made provision for the insolvency of
consumers or whose insolvency law provides special treatment for the

insolvency of non-traders, the enacting State might wish to exclude from the scope of application of the Model Law insolvencies that relate to natural persons residing in the enacting State whose debts have been incurred predominantly for personal or household purposes, rather than for commercial or business purposes, or insolvencies that relate to non-traders. The enacting State might also wish to provide that such exclusion would not apply in cases where the total debts exceed a certain monetary ceiling.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 141-150.

A/CN.9/WG.V/WP.44, pp. 6-7.

A/CN.9/422, paras. 24-33.

A/CN.9/WG.V/WP.46, p. 5.

A/CN.9/433, paras. 29-32.

A/CN.9/WG.V/WP.48, pp. 6 and 15.

A/CN.9/435, paras. 102-106 and 179.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 39-42.

A/CN.9/442, paras. 57-66.

*(c)   Guide to Enactment and
        Interpretation*

A/CN.9/WG.V/WP.103, paras. 57-59.

A/CN.9/742, para. 24.

A/CN.9/WG.V/WP.107, para. 65.

A/CN.9/763, paras. 22.

A/CN.9/WG.V/WP.112, paras. 58-59
   and 65.

A/CN.9/766, para. 26.

---

*Article 2.   Definitions*

For the purposes of this Law:

*(a)*   "Foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation;

*(b)*   "Foreign main proceeding" means a foreign proceeding taking place in the State where the debtor has the centre of its main interests;

*(c)*   "Foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment within the meaning of subparagraph *(f)* of this article;

*(d)*   "Foreign representative" means a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer

---

*Article 2. Definitions* (continued)

the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding;

*(e)* "Foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

*(f)* "Establishment" means any place of operations where the debtor carries out a non-transitory economic activity with human means and goods or services.

---

*Subparagraphs* (a)-(d)

62. Since the Model Law will be embedded in the national law, article 2 only needs to define the terms specific to cross-border scenarios. Thus, the Model Law contains definitions of the terms "foreign proceeding" (subparagraph *(a)*) and "foreign representative" (subparagraph *(d)*), but not of the person or body that may be entrusted with the administration of the assets of the debtor in an insolvency proceeding in the enacting State. To the extent that it would be useful to define in the national statute the term used for such a person or body (rather than just using the term commonly employed to refer to such persons), this may be added to the definitions in the law enacting the Model Law.

63. By specifying the required characteristics of a "foreign proceeding" and a "foreign representative", the definitions limit the scope of application of the Model Law. For a proceeding to be susceptible to recognition or cooperation under the Model Law and for a foreign representative to be accorded access to local courts under the Model Law, the foreign proceeding and the foreign representative must have the attributes specified in subparagraphs *(a)* and *(d)*.

64. Proceedings and foreign representatives that do not have those attributes would not be eligible for recognition under the Model Law.

*Subparagraph* (a) – *Foreign proceeding*

65. The definitions of proceedings or persons emanating from foreign jurisdictions avoid the use of expressions that may have different technical meaning in different legal systems and instead describe their purpose or function. This technique is used to avoid inadvertently narrowing the range of possible foreign proceedings that might obtain recognition and to avoid unnecessary conflict with terminology used in the laws of the enacting State. As noted

in paragraph 50 above, the expression "insolvency proceedings" may have a technical meaning in some legal systems, but is intended in subparagraph *(a)* to refer broadly to proceedings involving debtors that are in severe financial distress or insolvent.

66.  The attributes required for a foreign proceeding to fall within the scope of the Model Law include the following: basis in insolvency-related law of the originating State; involvement of creditors collectively; control or supervision of the assets and affairs of the debtor by a court or another official body; and reorganization or liquidation of the debtor as the purpose of the proceeding (article 2, subparagraph *(a)*). Whether a foreign proceeding possesses or possessed those elements would be determined at the time the application for recognition is considered.

67.  As noted in subparagraph *(e)* of the preamble, the focus of the Model Law is upon severely financially distressed and insolvent debtors and the laws that prevent or address the financial distress of those debtors. As noted above (para. 49), these are debtors that would generally fall within the commencement criteria discussed in the *Legislative Guide*, being debtors that are or will be generally unable to pay their debts as they mature or whose liabilities exceed the value of their assets (recommendations 15 and 16).

68.  The following paragraphs discuss the various characteristics required of a "foreign proceeding" under article 2. Although discussed separately, these characteristics are cumulative and article 2, subparagraph *(a)* should be considered as a whole.

### (i)  *Collective proceeding*

69.  For a proceeding to qualify for relief under the Model Law, it must be a collective proceeding because the Model Law is intended to provide a tool for achieving a coordinated, global solution for all stakeholders of an insolvency proceeding. It is not intended that the Model Law be used merely as a collection device for a particular creditor or group of creditors who might have initiated a collection proceeding in another State. Nor is it intended that the Model Law serve as a tool for gathering up assets in a winding up[18] or conservation proceeding that does not also include provision for addressing the claims of creditors. The Model Law may be an appropriate tool for certain kinds of actions that serve a regulatory purpose, such as receiverships for such publicly regulated entities as insurance companies or

---

[18] "Winding up" is a procedure in which the existence of a corporation and its business are brought to an end.

brokerage firms, provided the proceeding is collective as that term is used in the Model Law. If a proceeding is collective it must also satisfy the other elements of the definition, including that it be for the purposes of liquidation or reorganization (see paras. 77-78 below).

70.   In evaluating whether a given proceeding is collective for the purpose of the Model Law, a key consideration is whether substantially all of the assets and liabilities of the debtor are dealt with in the proceeding, subject to local priorities and statutory exceptions, and to local exclusions relating to the rights of secured creditors. A proceeding should not be considered to fail the test of collectivity purely because a class of creditors' rights is unaffected by it. An example would be insolvency proceedings that exclude encumbered assets from the insolvency estate, leaving those assets unaffected by the commencement of the proceedings and allowing secured creditors to pursue their rights outside of the insolvency law (see *Legislative Guide on Insolvency Law*, part two, chap. II, paras. 7-9). Examples of the manner in which a collective proceeding for the purposes of article 2 might deal with creditors include providing creditors that are adversely affected by the proceeding with a right (though not necessarily the obligation): to submit claims for determination and to receive an equitable distribution or satisfaction of those claims, to participate in the proceedings, and to receive notice of the proceedings in order to facilitate their participation. The *Legislative Guide* deals extensively with the rights of creditors, including the right to participate in proceedings (part two, chapter III, paras. 75-112).

71.   Within the parameters of the definition of a foreign proceeding, a variety of collective proceedings would be eligible for recognition, be they compulsory or voluntary, corporate or individual, winding-up or reorganization. The definition would also include those proceedings in which the debtor retains some measure of control over its assets, albeit under court supervision (e.g. suspension of payments, "debtor in possession").

72.   The Model Law recognizes that, for certain purposes, insolvency proceedings may be commenced under specific circumstances defined by law that do not necessarily mean the debtor is in fact insolvent. Paragraph 235 below notes that those circumstances might include cessation of payments by the debtor or certain actions of the debtor such as a corporate decision, dissipation of its assets or abandonment of its establishment. Paragraph 236 below notes that for use in jurisdictions where insolvency is a condition for commencing insolvency proceedings, article 31 establishes, upon recognition of foreign main proceedings, a rebuttable presumption of insolvency of the debtor for the purposes of commencing a local insolvency proceeding.

### (ii)  *Pursuant to a law relating to insolvency*

73.  This formulation is used in the Model Law to acknowledge the fact that liquidation and reorganization might be conducted under law that is not labelled as insolvency law (e.g. company law), but which nevertheless deals with or addresses insolvency or severe financial distress. The purpose was to find a description that was sufficiently broad to encompass a range of insolvency rules irrespective of the type of statute or law in which they might be contained[19] and irrespective of whether the law that contained the rules related exclusively to insolvency. A simple proceeding for a solvent legal entity that does not seek to restructure the financial affairs of the entity, but rather to dissolve its legal status, is likely not one pursuant to a law relating to insolvency or severe financial distress.

### (iii)  *Control or supervision by a foreign court*

74.  The Model Law specifies neither the level of control or supervision required to satisfy this aspect of the definition nor the time at which that control or supervision should arise. Although it is intended that the control or supervision required under subparagraph *(a)* should be formal in nature, it may be potential rather than actual. As noted in paragraph 71, a proceeding in which the debtor retains some measure of control over its assets, albeit under court supervision, such as a debtor-in-possession would satisfy this requirement. Control or supervision may be exercised not only directly by the court but also by an insolvency representative where, for example, the insolvency representative is subject to control or supervision by the court. Mere supervision of an insolvency representative by a licensing authority would not be sufficient.

75.  Expedited proceedings of the type referred to in the *Legislative Guide* (see part two, chap IV, paras. 76-94 and recommendations 160-168) should not be excluded. These are proceedings in which the court exercises control or supervision at a late stage of the insolvency process. Proceedings in which the court has exercised control or supervision, but at the time of the application for recognition is no longer required to do so should also not be excluded. An example of the latter might be cases where a reorganization plan has been approved and although the court has no continuing function with respect to its implementation, the proceedings nevertheless remain open or pending and the court retains jurisdiction until implementation is completed.

---

[19] A/CN.9/422, para. 49.

76. Subparagraph *(a)* of article 2 makes it clear that both assets and affairs of the debtor should be subject to control or supervision; it is not sufficient if only one or the other are covered by the foreign proceeding.

### (iv)   *For the purpose of reorganization or liquidation*

77. Some types of proceeding that may satisfy certain elements of the definition of foreign proceeding in article 2, subparagraph *(a)* may nevertheless be ineligible for recognition because they are not for the stated purpose of reorganization or liquidation. They may take various forms, including proceedings that are designed to prevent dissipation and waste, rather than to liquidate or reorganize the insolvency estate; proceedings designed to prevent detriment to investors rather than to all creditors (in which case the proceeding is also likely not to be a collective proceeding); or proceedings in which the powers conferred and the duties imposed upon the foreign representative are more limited than the powers or duties typically associated with liquidation or reorganization, for example, the power to do no more than preserve assets.

78. Types of procedures that might not be eligible for recognition could include financial adjustment measures or arrangements undertaken between the debtor and some of its creditors on a purely contractual basis concerning some debt, where the negotiations do not lead to the commencement of an insolvency proceeding conducted under the insolvency law.[20] Such measures would generally not satisfy the requirement for collectivity nor for control or supervision by the court (see paras. 74-76). Because they could take a potentially large number of forms, those measures would be difficult to address in a general rule on recognition.[21] Other procedures that do not require supervision or control by the court might also be ineligible.

*Interim proceeding*

79. The definitions in subparagraphs *(a)* and *(d)* cover also an "interim proceeding" and a representative "appointed on an interim basis". In a State where interim proceedings are either not known or do not meet the requisites of the definition, the question may arise whether recognition of a foreign

---

[20] Such contractual arrangements would clearly remain enforceable outside the Model Law without the need for recognition; nothing in the Model Law or *Guide to Enactment and Interpretation* is intended to restrict such enforceability.

[21] A/CN.9/419, paras. 19 and 29.

"interim proceeding" creates a risk of allowing potentially disruptive consequences under the Model Law that the situation does not warrant. It is advisable that, irrespective of the way interim proceedings are treated in the enacting State, the reference to "interim proceeding" in subparagraph *(a)* and to a foreign representative appointed "on an interim basis" in subparagraph *(d)* be maintained. The reason is that in the practice of many countries insolvency proceedings are often, or even usually, commenced on an "interim" or "provisional" basis. Except for being labelled as interim, those proceedings meet all the other requisites of the definition in article 2, subparagraph *(a)*. Such proceedings are often conducted for weeks or months as "interim" proceedings under the administration of persons appointed on an "interim" basis, and only some time later would the court issue an order confirming the continuation of the proceedings on a non-interim basis. The objectives of the Model Law apply fully to such "interim proceedings" (provided the requisites of subparagraphs *(a)* and *(d)* are met); therefore, these proceedings should not be distinguished from other insolvency proceedings merely because they are described as being of an interim nature. The point that an interim proceeding and the foreign representative must meet all the requirements of article 2 is emphasized in article 17, paragraph 1, according to which a foreign proceeding may be recognized only if it is "a proceeding within the meaning of subparagraph *(a)* of article 2" and "the foreign representative applying for recognition is a person or body within the meaning of subparagraph *(d)* of article 2".

80. Article 18 addresses a case where, after the application for recognition or after recognition, the foreign proceeding or foreign representative, whether interim or not, ceases to meet the requirements of article 2, subparagraphs *(a)* and *(d)* (see paras. 168-169 below).

*Subparagraph* (b) *– foreign main proceeding*

81. A foreign proceeding is deemed to be the "main" proceeding if it has been commenced in the State where "the debtor has the centre of its main interests". This corresponds to the formulation in article 3 of the EC Regulation (based upon the formulation previously adopted in the European Union Convention on Insolvency Proceedings (the European Convention)), thus building on the emerging harmonization as regards the notion of a "main" proceeding. The determination that a foreign proceeding is a "main" proceeding may affect the nature of the relief accorded to the foreign representative under articles 20 and 21 and coordination of the foreign proceeding with proceedings that may be commenced in the enacting State under chapter IV and with other concurrent proceedings under chapter V.

82. The Model Law does not define the concept "centre of main interests". However, an explanatory report (the Virgos-Schmit Report),[22] prepared with respect to the European Convention, provided guidance on the concept of "main insolvency proceedings" and notwithstanding the subsequent demise of the Convention, the Report has been accepted generally as an aid to interpretation of the term "centre of main interests" in the EC Regulation. Since the formulation "centre of main interests" in the EC Regulation corresponds to that of the Model Law, albeit for different purposes (see para. 141 below), jurisprudence interpreting the EC Regulation may also be relevant to interpretation of the Model Law.

83. Recitals (12) and (13) of the EC Regulation state:

"(12)   This Regulation enables the main insolvency proceedings to be opened in the Member State where the debtor has the centre of his main interests. These proceedings have universal scope and aim at encompassing all the debtor's assets. To protect the diversity of interests, this Regulation permits secondary proceedings[23] to be opened to run in parallel with the main proceedings. Secondary proceedings may be opened in the Member State where the debtor has an establishment. The effects of secondary proceedings are limited to the assets located in that State. Mandatory rules of coordination with the main proceedings satisfy the need for unity in the Community.

"(13)   The 'centre of main interests' should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties."

84. The Virgos-Schmit Report explained the concept of "main insolvency proceedings" as follows:

"**73.   Main insolvency proceedings**

"Article 3 (1) enables main insolvency universal proceedings to be opened in the Contracting State where the debtor has his centre of main interests. Main insolvency proceedings have universal scope. They aim at encompassing all the debtor's assets on a world-wide basis and at affecting all creditors, wherever located.

"Only one set of main proceedings may be opened in the territory covered by the Convention.

---

[22] M.Virgos and E. Schmit, *Report on the Convention on Insolvency Proceedings*, Brussels 3 May 1996. The report was published in July 1996 and is available from http://aei.pitt.edu/952 (last visited 1 August 2013).

[23] The EC Regulation refers to "secondary proceedings", while the Model Law uses "non-main proceedings".

...

"75. The concept of 'centre of main interests' must be interpreted as the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.

"The rationale of this rule is not difficult to explain. Insolvency is a foreseeable risk. It is therefore important that international jurisdiction (which, as we will see, entails the application of the insolvency laws of that Contracting State) be based on a place known to the debtor's potential creditors. This enables the legal risks which would have to be assumed in the case of insolvency to be calculated.

"By using the term 'interests', the intention was to encompass not only commercial, industrial or professional activities, but also general economic activities, so as to include the activities of private individuals (e.g. consumers). The expression 'main' serves as a criterion for the cases where these interests include activities of different types which are run from different centres.

"In principle, the centre of main interests will in the case of professionals be the place of their professional domicile and for natural persons in general, the place of their habitual residence.

"Where companies and legal persons are concerned, the Convention presumes, unless proved to the contrary, that the debtor's centre of main interests is the place of his registered office. This place normally corresponds to the debtor's head office."

Centre of main interests is discussed further in the remarks on article 16.


*Subparagraph* (c) – *foreign non-main proceeding*

85. Subparagraph *(c)* requires that a "foreign non-main proceeding" take place in the State where the debtor has an "establishment" (see paras. 88-90 below). Thus, a foreign non-main proceeding susceptible to recognition under article 17, paragraph 2 may be only a proceeding commenced in a State where the debtor has an establishment within the meaning of article 2, subparagraph *(f)*. This rule does not affect the provision in article 28, namely, that an insolvency proceeding may be commenced in the enacting State if the debtor has assets there. It should be noted, however, that the effects of an insolvency proceeding commenced on the basis of the presence of assets only are normally restricted to the assets located in that State; if other assets of the debtor located abroad should, under the law of the enacting State, be administered in that insolvency proceeding (as envisaged in article 28), that

cross-border issue is to be dealt with as a matter of international cooperation and coordination under articles 25-27 of the Model Law.

*Subparagraph* (d) *– foreign representative*

86.   Subparagraph *(d)* recognizes that the foreign representative may be a person authorized in the foreign proceedings to administer those proceedings, which would include seeking recognition, relief and cooperation in another jurisdiction, or they may simply be a person authorized specifically for the purposes of representing those proceedings. The Model Law does not specify that the foreign representative must be authorized by the court (as defined in article 2, subparagraph *(e)*) and the definition is thus sufficiently broad to include appointments that might be made by a special agency other than the court. It also includes appointment made on an interim basis (see paras. 79-80 above). The fact of appointment of the foreign representative in the foreign proceeding to act in either or both of those capacities is sufficient for the purposes of the Model Law; article 15 requires either a certified copy of the decision appointing the representative, a certificate affirming the appointment or other evidence of that appointment that is acceptable to the receiving court. The definition in subparagraph *(d)* is sufficiently broad to include debtors who remain in possession after the commencement of insolvency proceedings.

*Subparagraph* (e) *– foreign court*

87.   A foreign proceeding that meets the requisites of article 2, subparagraph *(a),* should receive the same treatment irrespective of whether it has been commenced and supervised by a judicial body or an administrative body. Therefore, in order to obviate the need to refer to a foreign non-judicial authority whenever reference is made to a foreign court, the definition of "foreign court" in subparagraph *(e)* includes also non-judicial authorities. Subparagraph *(e)* follows a similar definition contained in article 2, subparagraph *(d)* of the EC Regulation, which is also used in the *Legislative Guide* (Intro., para. 12(i)) and the *UNCITRAL Practice Guide* (Intro., paras. 7-8).

*Subparagraph* (f) *– establishment*

88.   The definition of the term "establishment" was inspired by article 2, subparagraph *(h)* of the EC Regulation. The term is used in the Model Law in the definition of "foreign non-main proceeding" (article 2, subparagraph *(c)*) and in the context of article 17, paragraph 2, according to which,

21-11854-dsj   Doc 38-2   Filed 06/30/23   Entered 06/30/23 15:09:46   Exhibit 2 -
2013 Enactment Guide   Pg 56 of 123

*Part two. Guide to Enactment and Interpretation*                                              *47*

for a foreign non-main proceeding to be recognized, the debtor must have an establishment in the foreign State (see also para. 85 above).

89. The Virgos-Schmit Report on that Convention provides some further explanation of "establishment":

"Place of operations means a place from which economic activities are exercised on the market (i.e. externally), whether the said activities are commercial, industrial or professional.

"The emphasis on an economic activity having to be carried out using human resources shows the need for a minimum level of organization. A purely occasional place of operations cannot be classified as an 'establishment'. A certain stability is required. The negative formula ('non-transitory') aims to avoid minimum time requirements. The decisive factor is how the activity appears externally, and not the intention of the debtor."[24]

90. Since "establishment" is a defined term, the inquiry to be made by the court as to whether the debtor has an establishment is purely factual in nature. Unlike "foreign main proceeding" there is no presumption with respect to the determination of establishment. There is a legal issue as to whether the term "non-transitory" refers to the duration of a relevant economic activity or to the specific location at which the activity is carried on. The commencement of insolvency proceedings, the existence of debts, and the presence alone of goods in isolation, of bank accounts or of property would not in principle satisfy the definition of establishment.

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a)   Model Law* | *(b)   Guide to Enactment* |
| A/52/17, paras. 152-158. | A/CN.9/436, paras. 43-45. |
| A/CN.9/419, paras. 95-117. | A/CN.9/442, paras. 67-75. |
| A/CN.9/WG.V/WP.44, pp. 7-10. | |
| A/CN.9/422, paras. 34-65. | |
| A/CN.9/WG.V/WP.46, pp. 5-7. | *(c)   Guide to Enactment and Interpretation* |
| A/CN.9/433, paras. 33-41 and 147. | A/CN.9/715, paras. 14-15, 17-22, 32-35 and 46. |
| A/CN.9/WG.V/WP.48, pp. 6-7. | |
| A/CN.9/435, paras. 108-113. | A/CN.9/738, paras. 17-19. |

---

[24] Virgos-Schmit Report (see footnote 22), para. 7.1.

*(c)   Guide to Enactment and
     Interpretation* (continued)

A/CN.9/WG.V/WP.103, paras. 67-68A,
   71-72, 23-23G, 69-70, 31-31C and
   73-75B.

A/CN.9/742, paras. 25-36 and 58.

A/CN.9/WG.V/WP.107, paras. 68,
   23A-24G, 31 and 73-75B.

A/CN.9/763, paras. 23-25.

A/CN.9/WG.V/WP.112, paras. 68-68A,
   71-72, 23-23C, 24-24G, 70, 31-31C
   and 73-75B.

A/CN.9/766, paras. 27-28.

---

*Article 3.   International obligations of this State*

To the extent that this Law conflicts with an obligation of this State arising
out of any treaty or other form of agreement to which it is a party with one
or more other States, the requirements of the treaty or agreement prevail.

---

91.   Article 3, expressing the principle of supremacy of international obliga-
tions of the enacting State over internal law, has been modelled on similar
provisions in other model laws prepared by UNCITRAL.

92.   In enacting the article, the legislator may wish to consider whether it
would be desirable to take steps to avoid an unnecessarily broad interpreta-
tion of international treaties. For example, the article might result in giving
precedence to international treaties that, while dealing with matters covered
also by the Model Law (e.g. access to courts and cooperation between courts
or administrative authorities), were aimed at the resolution of problems other
than those the Model Law focuses on. Some of those treaties, only because
of their imprecise or broad formulation, may be misunderstood as dealing
also with matters dealt with by the Model Law. Such a result would com-
promise the goal of achieving uniformity and facilitating cross-border coop-
eration in insolvency matters and would reduce certainty and predictability
in the application of the Model Law. The enacting State might wish to
provide that, in order for article 3 to displace a provision of the national
law, a sufficient link must exist between the international treaty concerned
and the issue governed by the provision of the national law in question.
Such a condition would avoid the inadvertent and excessive restriction of
the effects of the legislation implementing the Model Law. However, such
a provision should not go so far as to impose a condition that the treaty
concerned has to deal specifically with insolvency matters in order to satisfy
that condition.

93. While in some States binding international treaties are self-executing, in other States those treaties are, with certain exceptions, not self-executing in that they require internal legislation in order to become enforceable law. With respect to the latter group of States, in view of their normal practice in dealing with international treaties and agreements, it would be inappropriate or unnecessary to include article 3 in their legislation or it might be appropriate to include it in a modified form.

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a) Model Law* | *(b) Guide to Enactment* |
| A/52/17, paras. 159-162. | A/CN.9/436, para. 46. |
| A/CN.9/WG.V/WP.44, p. 11. | A/CN.9/442, paras. 76-78. |
| A/CN.9/422, paras. 66-67. | *(c) Guide to Enactment and Interpretation* |
| A/CN.9/WG.V/WP.46, p. 7. | |
| A/CN.9/433, paras. 42-43. | A/CN.9/WG.V/WP.107, para. 78. |
| A/CN.9/WG.V/WP.48, pp. 7-8. | A/CN.9/763, para. 26. |
| A/CN.9/435, paras. 114-117. | A/CN.9/WG.V/WP.112, para. 78. |
| | A/CN.9/766, para. 29. |

---

*Article 4.* [Competent court or authority][1]

The functions referred to in this Law relating to recognition of foreign proceedings and cooperation with foreign courts shall be performed by [*specify the court, courts, authority or authorities competent to perform those functions in the enacting State*].

———————
[1]A State where certain functions relating to insolvency proceedings have been conferred upon government-appointed officials or bodies might wish to include in article 4 or elsewhere in chapter I the following provision:

Nothing in this Law affects the provisions in force in this State governing the authority of [*insert the title of the government-appointed person or body*].

---

94. If in the enacting State any of the functions mentioned in article 4 are performed by an authority other than a court, the State would insert in article 4 and in other appropriate places in the enacting legislation the name of the competent authority.

95. The competence for the various judicial functions dealt with in the Model Law may lie with different courts in the enacting State and the enacting State would tailor the text of the article to its own system of court competence. The value of article 4, as enacted in a given State, would be to increase the transparency and ease of use of the insolvency legislation for the benefit of, in particular, foreign representatives and foreign courts.

96. In defining jurisdiction in matters mentioned in article 4, the implementing legislation should not unnecessarily limit the jurisdiction of other courts in the enacting State, in particular to entertain requests by foreign representatives for provisional relief.

*Footnote*

97. In a number of States, insolvency legislation has entrusted certain tasks relating to the general supervision of the process of dealing with insolvency cases in the country to government-appointed officials who are typically civil servants or judicial officers and who carry out their functions on a permanent basis. The names under which they are known vary and include, for example, "official receiver", "official trustee" or "official assignee". The activities and the scope and nature of their duties vary from State to State. The Model Law does not restrict the authority of such officials, a point that some enacting States may wish to clarify in the law, as indicated in the footnote. However, depending on the wording that the enacting State uses in articles 25 and 26 in referring to the "title of the person or body administering a reorganization or liquidation under the law of the enacting State", the officials may be subjected to the duty to cooperate as provided under articles 25-27.

98. In some jurisdictions, officials referred to in the preceding paragraph may also be appointed to act as insolvency representatives in individual insolvency cases. To the extent that occurs, such officials would be covered by the Model Law.

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a)   Model Law* | A/CN.9/WG.V/WP.46, p. 8. |
| A/52/17, paras. 163-166. | A/CN.9/433, paras. 44-45. |
| A/CN.9/419, para. 69. | A/CN.9/WG.V/WP.48, pp. 8-9. |
| A/CN.9/WG.V/WP.44, p. 11. | A/CN.9/435, paras. 118-122. |
| A/CN.9/422, paras. 68-69. | |

*(b)  Guide to Enactment*

A/CN.9/436, paras. 47-50.

A/CN.9/442, paras. 79-83.

---

> *Article 5.  Authorization of* [insert the title of the person or body
> administering a reorganization or liquidation under the law
> of the enacting State] *to act in a foreign State*
>
> A [*insert the title of the person or body administering a reorganization
> or liquidation under the law of the enacting State]* is authorized to act in a
> foreign State on behalf of a proceeding under *[identify laws of the enacting
> State relating to insolvency*], as permitted by the applicable foreign law.

---

99.   The intent of article 5 is to equip insolvency representatives or other
authorities appointed in insolvency proceedings commenced in the enacting
State to act abroad as foreign representatives of those proceedings. The lack
of such authorization in some States has proved to be an obstacle to effective
international cooperation in cross-border cases. An enacting State in which
insolvency representatives are already equipped to act as foreign representatives
may decide to forgo inclusion of article 5, although retaining that article
would provide clear statutory evidence of that authority and assist foreign
courts and other users of the law.

100.   Article 5 is formulated to make it clear that the scope of the power
exercised abroad by the insolvency representative would depend upon the
foreign law and courts. Action that the insolvency representative appointed
in the enacting State may wish to take in a foreign country will be action
of the type dealt with in the Model Law, but the authority to act in a foreign
country does not depend on whether that country has enacted legislation
based on the Model Law.

*Discussion in UNCITRAL and in the Working Group*

| *(a)  Model Law* | A/CN.9/WG.V/WP.46, p. 8. |
|---|---|
| A/52/17, paras. 167-169. | A/CN.9/433, paras. 46-49. |
| A/CN.9/419, paras. 36-39. | A/CN.9/WG.V/WP.48, p. 9. |
| A/CN.9/WG.V/WP.44, p. 12. | A/CN.9/435, paras. 123-124. |
| A/CN.9/422, paras. 70-74. | |

*(b)  Guide to Enactment*

A/CN.9/436, paras. 51-52.

A/CN.9/442, paras. 84-85.

*(c)  Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.107, para. 84.

A/CN.9/763, para. 26.

A/CN.9/WG.V/WP.112, para. 84.

A/CN.9/766, para. 30.

---

*Article 6.  Public policy exception*

Nothing in this Law prevents the court from refusing to take an action governed by this Law if the action would be manifestly contrary to the public policy of this State.

---

101.  As the notion of public policy is grounded in national law and may differ from State to State, no uniform definition of that notion is attempted in article 6.

102.  In some States the expression "public policy" may be given a broad meaning in that it might relate in principle to any mandatory rule of national law. In many States, however, the public policy exception is construed as being restricted to fundamental principles of law, in particular constitutional guarantees; in those States, public policy would only be used to refuse the application of foreign law, or the recognition of a foreign judicial decision or arbitral award, when that would contravene those fundamental principles.

103.  For the applicability of the public policy exception in the context of the Model Law it is important to note that a growing number of jurisdictions recognize a dichotomy between the notion of public policy as it applies to domestic affairs, as well as the notion of public policy as it is used in matters of international cooperation and the question of recognition of effects of foreign laws. It is especially in the latter situation that public policy is understood more restrictively than domestic public policy. This dichotomy reflects the realization that international cooperation would be unduly hampered if "public policy" were to be understood in an extensive manner.

104.  The purpose of the expression "manifestly", used also in many other international legal texts as a qualifier of the expression "public policy", is to emphasize that public policy exceptions should be interpreted restrictively and that article 6 is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State.

*Discussion in UNCITRAL and in the Working Group*

| *(a) Model Law* | *(b) Guide to Enactment* |
|---|---|
| A/52/17, paras. 170-173. | A/CN.9/436, para. 53. |
| A/CN.9/419, para. 40. | A/CN.9/442, paras. 86-89. |
| A/CN.9/WG.V/WP.44, p. 15. | |
| A/CN.9/422, paras. 84-85. | *(c) Guide to Enactment and Interpretation* |
| A/CN.9/WG.V/WP.46, p. 16. | A/CN.9/715, paras. 26-30. |
| A/CN.9/433, paras. 156-160. | A/CN.9/738, para. 32. |
| A/CN.9/WG.V/WP.48, p. 9. | |
| A/CN.9/435, paras. 125-128. | |

---

*Article 7.   Additional assistance under other laws*

Nothing in this Law limits the power of a court or a [*insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State*] to provide additional assistance to a foreign representative under other laws of this State.

---

105.   The purpose of the Model Law is to increase and harmonize cross-border assistance available in the enacting State to foreign representatives. However, since the law of the enacting State may, at the time of enacting the Law, already have in place various provisions under which a foreign representative could obtain cross-border assistance and since it is not the purpose of the Law to displace those provisions to the extent that they provide assistance that is additional to or different from the type of assistance dealt with in the Model Law, the enacting State may consider whether article 7 is needed to make that point clear.

*Discussion in UNCITRAL and in the Working Group*

| *(a) Model Law* | *(b) Guide to Enactment* |
|---|---|
| A/52/17, para. 175. | A/CN.9/442, para. 90. |

---

*Article 8.   Interpretation*

In the interpretation of this Law, regard is to be had to its international
origin and to the need to promote uniformity in its application and the obser-
vance of good faith.

---

106.    A provision similar to the one contained in article 8 appears in a
number of private law treaties (e.g. art. 7, para. 1, of the United Nations
Convention on Contracts for the International Sale of Goods). More recently,
it has been recognized that such a provision would also be useful in a non-
treaty text such as a model law on the basis that a State enacting a model
law would have an interest in its harmonized interpretation. Article 8 has
been modelled on article 3, paragraph 1, of the UNCITRAL Model Law on
Electronic Commerce.

107.    Harmonized interpretation of the Model Law is facilitated by the Case
Law on UNCITRAL Texts (CLOUT) information system, under which the
UNCITRAL secretariat publishes abstracts of judicial decisions (and, where
applicable, arbitral awards) that interpret conventions and model laws ema-
nating from UNCITRAL. (For further information about the system, see
paragraph 243 below.)

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*
A/52/17, para. 174.

*(b)   Guide to Enactment*
A/CN.9/442, paras. 91-92.

*(c)   Guide to Enactment and
Interpretation*
A/CN.9/715, paras. 23-25.
A/CN.9/WG.V/WP.103, para. 92.
A/CN.9/742, paras. 37-38.
A/CN.9/WG.V/WP.107, para. 91.
A/CN.9/763, para. 26.
A/CN.9/WG.V/WP.112, para. 91.
A/CN.9/766, para. 30.

---

CHAPTER II. ACCESS OF FOREIGN REPRESENTATIVES
AND CREDITORS TO COURTS IN THIS STATE

*Article 9.   Right of direct access*

A foreign representative is entitled to apply directly to a court in this
State.

---

108.   An important objective of the Model Law is to provide expedited and
direct access for foreign representatives to the courts of the enacting State.
Article 9 is limited to expressing the principle of direct access by the foreign
representative to courts of the enacting State, thus freeing the representative
from having to meet formal requirements such as licences or consular action.
Article 4 deals with court competence in the enacting State for providing
relief to the foreign representative.

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a)   Model Law* | *(b)   Guide to Enactment* |
| A/52/17, paras. 176-178. | A/CN.9/436, para. 54. |
| A/CN.9/419, paras. 77-79 and 172-173. | A/CN.9/442, para. 93. |
| A/CN.9/422, paras. 144-151. | *(c)   Guide to Enactment and* |
| A/CN.9/WG.V/WP.46, p. 9. | *Interpretation* |
| A/CN.9/433, paras. 50-58. | A/CN.9/WG.V/WP.103, para. 93. |
| A/CN.9/WG.V/WP.48, p. 10. | A/CN.9/WG.V/WP.112, para. 93. |
| A/CN.9/435, paras. 129-133. | A/CN.9/766, para. 31. |

---

*Article 10.   Limited jurisdiction*

The sole fact that an application pursuant to this Law is made to a court
in this State by a foreign representative does not subject the foreign repre-
sentative or the foreign assets and affairs of the debtor to the jurisdiction of
the courts of this State for any purpose other than the application.

---

109.   Article 10 constitutes a "safe conduct" rule aimed at ensuring that
the court in the enacting State would not assume jurisdiction over all the
assets of the debtor on the sole ground of the foreign representative having

made an application for recognition of a foreign proceeding. The article also makes it clear that the application alone is not sufficient ground for the court of the enacting State to assert jurisdiction over the foreign representative as to matters unrelated to insolvency. The article responds to concerns of foreign representatives and creditors about exposure to all-embracing jurisdiction triggered by an application under the Model Law.

110. The limitation on jurisdiction over the foreign representative embodied in article 10 is not absolute. It is only intended to shield the foreign representative to the extent necessary to make court access a meaningful proposition. It does so by providing that an appearance in the courts of the enacting State for the purpose of requesting recognition would not expose the entire estate under the supervision of the foreign representative to the jurisdiction of those courts. Other possible grounds for jurisdiction under the laws of the enacting State over the foreign representative or the assets are not affected. For example, a tort or misconduct committed by the foreign representative may provide grounds for jurisdiction to deal with the consequences of such an action by the foreign representative. Furthermore, a foreign representative who applies for relief in the enacting State will be subject to conditions that the court may order in connection with relief granted (article 22, paragraph 2).

111. Article 10 may appear superfluous in States where the rules on jurisdiction do not allow a court to assume jurisdiction over a person making an application to the court on the sole ground of the applicant's appearance. Enacting the article in those States would be useful, however, to eliminate possible concerns of foreign representatives or creditors over the possibility of jurisdiction based on the sole ground of applying to the court.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*
A/52/17, paras. 179-182.
A/CN.9/WG.V/WP.44, p. 24.
A/CN.9/422, paras. 160-166.
A/CN.9/WG.V/WP.46, pp. 10-11.
A/CN.9/433, paras. 68-70.
A/CN.9/WG.V/WP.48, p. 10.
A/CN.9/435, paras. 134-136.

*(b)   Guide to Enactment*
A/CN.9/436, paras. 55-56.
A/CN.9/442, paras. 94-96.

*(c)   Guide to Enactment and
      Interpretation*
A/CN.9/WG.V/WP.107, para. 96.
A/CN.9/763, para. 27.
A/CN.9/WG.V/WP.112, para. 96.
A/CN.9/766, para. 31.

> *Article 11.   Application by a foreign representative to commence*
> *a proceeding under* [identify laws of the enacting State
> relating to insolvency]
>
> A foreign representative is entitled to apply to commence a proceeding
> under [*identify laws of the enacting State relating to insolvency*] if the condi-
> tions for commencing such a proceeding are otherwise met.

112.   Many national laws, in enumerating persons who may request the
commencement of an insolvency proceeding, do not mention a representative
of a foreign insolvency proceeding; under such laws, it might be doubtful
whether a foreign representative might make such a request.

113.   Article 11 is designed to ensure that the foreign representative (of a
foreign main or non-main proceeding) has standing[25] to request the
commencement of an insolvency proceeding. However, the article makes it
clear (by the words "if the conditions for commencing such a proceeding
are otherwise met") that it does not otherwise modify the conditions under
which an insolvency proceeding may be commenced in the enacting State.

114.   A foreign representative has this right without prior recognition of
the foreign proceeding because the commencement of an insolvency
proceeding might be crucial in cases of urgent need for preserving the assets
of the debtor. Article 11 recognizes that not only a representative of a foreign
main proceeding but also a representative of a foreign non-main proceeding
may have a legitimate interest in the commencement of an insolvency
proceeding in the enacting State. Sufficient guarantees against abusive
applications are provided by the requirement that the other conditions for
commencing such a proceeding under the law of the enacting State have to
be met.

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a)   Model Law* | A/CN.9/WG.V/WP.46, p. 11. |
| A/52/17, paras. 183-187. | A/CN.9/433, paras. 71-75. |
| A/CN.9/WG.V/WP.44, pp. 24-25. | A/CN.9/WG.V/WP.48, p. 11. |
| A/CN.9/422, paras. 170-177. | A/CN.9/435, paras. 137-146. |

---

[25] Also known as "procedural legitimation", "active legitimation" or "legitimation".

| *(b)   Guide to Enactment* | *(c)   Guide to Enactment and Interpretation* |
|---|---|
| A/CN.9/436, para. 57. | A/CN.9/WG.V/WP.107, para. 98. |
| A/CN.9/442, paras. 97-99. | A/CN.9/763, para. 27. |
| | A/CN.9/WG.V/WP.112, para. 98. |
| | A/CN.9/766, para. 31. |

---

*Article 12.   Participation of a foreign representative in a proceeding under*
[identify laws of the enacting State relating to insolvency]

Upon recognition of a foreign proceeding, the foreign representative is
entitled to participate in a proceeding regarding the debtor under [*identify
laws of the enacting State relating to insolvency*].

---

115.   The purpose of article 12 is to ensure that, when an insolvency pro-
ceeding concerning a debtor is taking place in the enacting State, the foreign
representative of a proceeding concerning that debtor will be given, as an
effect of recognition of the foreign proceeding, standing[25] to make petitions,
requests or submissions concerning issues such as protection, realization or
distribution of assets of the debtor or cooperation with the foreign
proceeding.

116.   Article 12 is limited to giving the foreign representative standing and
does not vest the foreign representative with any specific powers or rights.
The article does not specify the kinds of motions that the foreign representa-
tive might make and does not affect the provisions in the insolvency law
of the enacting State that govern the fate of any such motions.

117.   If the law of the enacting State uses a term other than "participate"
to express the concept, that other term may be used in enacting the provi-
sion. It should be noted, however, that article 24 already uses the term
"intervene" to refer to a case where the foreign representative takes part in
an individual action by or against the debtor (as opposed to a collective
insolvency proceeding) (see paras. 205 and 208 below).

*Discussion in UNCITRAL and in the Working Group*

<table>
<tr><td>

*(a)   Model Law*

A/52/17, paras. 188-189.

A/CN.9/422, paras. 114-115, 147 and 149.

A/CN.9/WG.V/WP.46, p. 9.

A/CN.9/433, para. 58.

A/CN.9/WG.V/WP.48, p. 11.

A/CN.9/435, paras. 147-150.

</td><td>

*(b)   Guide to Enactment*

A/CN.9/436, paras. 58-59.

A/CN.9/442, paras. 100-102.

*(c)   Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103, para. 100.

A/CN.9/WG.V/WP.107, paras. 100-102.

A/CN.9/763, para. 27.

A/CN.9/WG.V/WP.112, paras. 100-102.

A/CN.9/766, para. 31.

</td></tr>
</table>

---

*Article 13.   Access of foreign creditors to a proceeding under*
[identify laws of the enacting State relating to insolvency]

1.   Subject to paragraph 2 of this article, foreign creditors have the same rights regarding the commencement of, and participation in, a proceeding under [*identify laws of the enacting State relating to insolvency*] as creditors in this State.

2.   Paragraph 1 of this article does not affect the ranking of claims in a proceeding under [*identify laws of the enacting State relating to insolvency*], except that the claims of foreign creditors shall not be ranked lower than [*identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims*].[2]

————————
[2] The enacting State may wish to consider the following alternative wording to replace paragraph 2 of article 13(2):

2.   Paragraph 1 of this article does not affect the ranking of claims in a proceeding under [*identify laws of the enacting State relating to insolvency*] or the exclusion of foreign tax and social security claims from such a proceeding. Nevertheless, the claims of foreign creditors other than those concerning tax and social security obligations shall not be ranked lower than [*identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims*].

---

118.   With the exception contained in paragraph 2, article 13 embodies the principle that foreign creditors, when they apply to commence an insolvency proceeding in the enacting State or file claims in such a proceeding, should not be treated worse than local creditors.

119.   Paragraph 2 makes it clear that the principle of non-discrimination embodied in paragraph 1 leaves intact the provisions on the ranking of claims in insolvency proceedings, including any provisions that might assign a special ranking to claims of foreign creditors. Few States currently have provisions assigning special ranking to foreign creditors. However, lest the non-discrimination principle should be emptied of its meaning by provisions giving the lowest ranking to foreign claims, paragraph 2 establishes the minimum ranking for claims of foreign creditors: the rank of general unsecured claims. The exception to that minimum ranking is provided for cases where the claim in question, if it were of a domestic creditor, would be ranked lower than general unsecured claims (such low-rank claims may be, for instance, those of a State authority for financial penalties or fines, claims whose payment is deferred because of a special relationship between the debtor and the creditor or claims that have been filed after the expiry of the time period for doing so). Those special claims may rank below the general unsecured claims, for reasons other than the nationality or location of the creditor, as provided in the law of the enacting State.

120.   The alternative provision in the footnote differs from the provision in the text only in that it provides wording for States that refuse to recognize foreign tax and social security claims to continue to discriminate against such claims.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*
A/52/17, paras. 190-192.
A/CN.9/WG.V/WP.44, pp. 25-26.
A/CN.9/422, paras. 179-187.
A/CN.9/WG.V/WP.46, pp. 11-12.
A/CN.9/433, paras. 77-85.
A/CN.9/WG.V/WP.48, pp. 11-12.
A/CN.9/435, paras. 151-156.

*(b)   Guide to Enactment*
A/CN.9/436, paras. 60-61.
A/CN.9/442, paras. 103-105.

---

*Article 14.   Notification to foreign creditors of a proceeding under*
[identify laws of the enacting State relating to insolvency]

1.   Whenever under [*identify laws of the enacting State relating to insolvency*] notification is to be given to creditors in this State, such notification shall also

be given to the known creditors that do not have addresses in this State. The court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.

2.   Such notification shall be made to the foreign creditors individually, unless the court considers that, under the circumstances, some other form of notification would be more appropriate. No letters rogatory or other, similar formality is required.

3.   When a notification of commencement of a proceeding is to be given to foreign creditors, the notification shall:

   *(a)*   Indicate a reasonable time period for filing claims and specify the place for their filing;

   *(b)*   Indicate whether secured creditors need to file their secured claims; and

   *(c)*   Contain any other information required to be included in such a notification to creditors pursuant to the law of this State and the orders of the court.

121.   The main purpose of notifying foreign creditors as provided in paragraph 1 is to inform them of the commencement of the insolvency proceeding and of the time limit to file their claims. Furthermore, as a corollary to the principle of equal treatment established by article 13, article 14 requires that foreign creditors should be notified whenever notification is required for creditors in the enacting State.

122.   States have different provisions or practices regarding the methods for notifying creditors, for example, publication in the official gazette or in local newspapers, individual notices, and affixing notices within the court premises or a combination of such procedures. If the form of notification were to be left to national law, foreign creditors would be in a less advantageous situation than local creditors, since they typically do not have direct access to local publications. For that reason, paragraph 2 in principle requires individual notification for foreign creditors but leaves discretion to the court to decide otherwise in a particular case (e.g. if individual notice would entail excessive cost or would not seem feasible under the circumstances).

123.   With regard to the form of individual notification, States may use special procedures for notifications that have to be served in a foreign jurisdiction (e.g. sending notifications through diplomatic channels). In the context of insolvency proceedings, those procedures would often be too cumbersome and time-consuming and their use would typically not provide foreign creditors

timely notice concerning insolvency proceedings. It is therefore advisable for those notifications to be effected by such expeditious means that the court considers adequate. Those considerations are the reason for the provision in paragraph 2 that "no letters rogatory or other, similar formality is required".

124.   Many States are party to bilateral or multilateral treaties on judicial cooperation, which often contain provisions on procedures for communicating judicial or extrajudicial documents to addressees abroad. A multilateral treaty of this kind is the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters of 1965,[26] adopted under the auspices of the Hague Conference on Private International Law. While the procedures envisaged by those treaties may constitute a simplification as compared with traditional communication via diplomatic channels, they would often be, for reasons stated in the preceding paragraph, inappropriate for cross-border insolvency cases. The question may arise whether paragraph 2, which allows the use of letters rogatory or similar formalities to be dispensed with, is compatible with those treaties. Each State would have to consider that question in the light of its treaty obligations, but generally the provision in paragraph 2 would not be in conflict with the international obligations of the enacting State because the purpose of the treaties alluded to above is typically to facilitate communication and not to preclude use of notification procedures that are even simpler than those established by the treaty; for example, article 10 of the above-mentioned Convention reads as follows:

"Provided the State of destination does not object, the present Convention shall not interfere with —

"*a)* the freedom to send judicial documents, by postal channels, directly to persons abroad,

"*b)* the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

"*c)* the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination."[27]

To the extent that there might still be a conflict between the second sentence of paragraph 2 of article 14 and a treaty, article 3 of the Model Law provides the solution.

---

[26] United Nations, *Treaty Series*, vol. 658, No. 9432.
[27] Ibid.

125.   While paragraph 2 mentions letters rogatory as a formality that is not required for a notification under article 14, in many States such notifications would never be transmitted in the form of a letter rogatory. A letter rogatory in those States would be used for other purposes, such as to request evidence in a foreign country or to request permission to perform some other judicial act abroad. Such use of letters rogatory is governed, for example, by the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters of 1970,[28] adopted under the auspices of the Hague Conference on Private International Law.

*Paragraph 3*

126.   In some legal systems a secured creditor who files a claim in an insolvency proceeding is deemed to have waived the security or some of the privileges attached to the credit, while in other systems failure to file a claim results in a waiver of such security or privilege. Where such a situation may arise, it would be appropriate for the enacting State to include in paragraph 3, subparagraph *(b)*, a requirement that the notification include information regarding the effects of filing, or failing to file, secured claims.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 193-198.

A/CN.9/419, paras. 84-87.

A/CN.9/WG.V/WP.44, pp. 19-20.

A/CN.9/422, paras. 188-191.

A/CN.9/WG.V/WP.46, pp. 11-12.

A/CN.9/433, paras. 86-98.

A/CN.9/WG.V/WP.48, pp. 12-13, 16 and 20.

A/CN.9/435, paras. 157-164.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 63-65 and 84.

A/CN.9/442, paras. 106-111 and 120-121.

---

[28] Ibid., vol. 847, No. 12140.

---

### CHAPTER III.   RECOGNITION OF A FOREIGN
### PROCEEDING AND RELIEF

*Article 15.   Application for recognition of a foreign proceeding*

1.   A foreign representative may apply to the court for recognition of the
foreign proceeding in which the foreign representative has been appointed.

2.   An application for recognition shall be accompanied by:

   *(a)*   A certified copy of the decision commencing the foreign proceeding
and appointing the foreign representative; or

   *(b)*   A certificate from the foreign court affirming the existence of the
foreign proceeding and of the appointment of the foreign representative; or

   *(c)*   In the absence of evidence referred to in subparagraphs *(a)* and *(b),*
any other evidence acceptable to the court of the existence of the foreign
proceeding and of the appointment of the foreign representative.

3.   An application for recognition shall also be accompanied by a statement
identifying all foreign proceedings in respect of the debtor that are known to
the foreign representative.

4.   The court may require a translation of documents supplied in support of
the application for recognition into an official language of this State.

---

*Article 15 as a whole*

127.   The Model Law avoids the need to rely on cumbersome and time-
consuming letters rogatory or other forms of diplomatic or consular com-
munications that might otherwise have to be used. This facilitates a
coordinated, cooperative approach to cross-border insolvency and makes
expedited action possible. Article 15 defines the core procedural require-
ments for an application by a foreign representative for recognition. In incor-
porating the provision into national law, it is desirable not to encumber the
process with additional procedural requirements beyond those referred to.
With article 15, in conjunction with article 16, the Model Law provides a
simple, expeditious structure to be used by a foreign representative to obtain
recognition.

128.   The Model Law presumes that documents submitted in support of the
application for recognition need not be authenticated in any special way, in
particular by legalization: according to article 16, paragraph 2, the court is

entitled to presume that those documents are authentic whether or not they have been legalized. "Legalization" is a term often used for the formality by which a diplomatic or consular agent of the State in which the document is to be produced certifies the authenticity of the signature, the capacity in which the person signing the document has acted and, where appropriate, the identity of the seal or stamp on the document.

129.  It follows from article 16, paragraph 2, (according to which the court "is entitled to presume" the authenticity of documents accompanying the application for recognition) that the court retains discretion to decline to rely on the presumption of authenticity or to conclude that evidence to the contrary prevails. This flexible solution takes into account the fact that the court may be able to assure itself that a particular document originates from a particular court even without it being legalized, but that in other cases the court may be unwilling to act on the basis of a foreign document that has not been legalized, in particular when documents emanate from a jurisdiction with which it is not familiar. The presumption is useful because legalization procedures may be cumbersome and time-consuming (e.g. also because in some States they involve various authorities at different levels).

130.  In respect of the provision relaxing any requirement of legalization, the question may arise whether that is in conflict with the international obligations of the enacting State. Several States are parties to bilateral or multilateral treaties on mutual recognition and legalization of documents, such as the Convention Abolishing the Requirement of Legalisation for Foreign Documents of 1961[29] adopted under the auspices of the Hague Conference on Private International Law, which provides specific simplified procedures for the legalization of documents originating from signatory States. In many instances, however, the treaties on legalization of documents, like letters rogatory and similar formalities, leave in effect laws and regulations that have abolished or simplified legalization procedures; therefore a conflict is unlikely to arise. For example, as stated in article 3, paragraph 2, of the above-mentioned convention:[30]

"However, [legalisation] cannot be required when either the laws, regulations, or practice in force in the State where the document is produced or an agreement between two or more Contracting States have abolished or simplified it, or exempt the document itself from legalisation."

According to article 3 of the Model Law, if there is still a conflict between the Model Law and a treaty, the treaty will prevail.

---

[29] Ibid., vol. 527, No. 7625.
[30] Ibid.

*Subparagraph 2* (c)

131.    In order not to prevent recognition because of non-compliance with
a mere technicality (e.g. where the applicant is unable to submit documents
that in all details meet the requirements of subparas. 2 *(a)* and *(b)*), sub-
paragraph 2 *(c)* allows evidence other than that specified in sub-
paragraphs 2 *(a)* and *(b)* to be taken into account; that provision, however,
does not compromise the court's power to insist on the presentation of
evidence acceptable to it. It is advisable to maintain that flexibility in
enacting the Model Law. Article 16, paragraph 2, which provides that the
court "is entitled to presume" the authenticity of documents accompanying
the application for recognition, also applies to documents submitted under
subparagraph 2 *(c)* (see paras. 129-130 above).

*Paragraph 3*

132.    Paragraph 3 requires an application for recognition to be accompanied
by a statement identifying all foreign proceedings in respect of the debtor
that are known to the foreign representative. That information is needed by
the court not so much for the decision on recognition itself, but for any
decision granting relief in favour of the foreign proceeding. In order to tailor
such relief appropriately and ensure the relief is consistent with any other
insolvency proceeding concerning the same debtor, the court needs to be
aware of all foreign proceedings concerning the debtor that may be under
way in third States.

133.    An express provision establishing the duty to inform is useful, firstly,
because the foreign representative is likely to have more comprehensive
information about the debtor's affairs in third States than the court and,
secondly, because the foreign representative may be primarily concerned
with obtaining relief in favour of his or her foreign proceeding and less
concerned about coordination with another foreign proceeding. (The duty to
inform the court about a foreign proceeding that becomes known to the
foreign representative after the decision on recognition is set out in article 18;
as for coordination of more than one foreign proceeding, see article 30.)

*Paragraph 4*

134.    Paragraph 4 entitles, but does not compel, the court to require a
translation of some or all documents accompanying the application for
recognition. If that discretion is compatible with the procedures of the court,
it may facilitate a decision being made on the application at the earliest possible

21-11854-dsj   Doc 38-2   Filed 06/30/23   Entered 06/30/23 15:09:46   Exhibit 2 -
2013 Enactment Guide   Pg 76 of 123

*Part two.   Guide to Enactment and Interpretation*                                          *67*

time, as contemplated by article 17, paragraph 3, if the court is in a position to consider the application without the need for translation of the documents.

*Notice*

135.   Different solutions exist as to whether the court is required to issue notice of an application for recognition. In a number of jurisdictions, fundamental principles of due process, in some cases enshrined in the constitution, may be understood as requiring that a decision on the importance of the recognition of a foreign insolvency proceeding could only be made after hearing the affected parties. In other States, however, it is considered that applications for recognition of foreign proceedings require expeditious treatment (as they are often submitted in circumstances of imminent danger of dissipation or concealment of the assets) and that, accordingly, the issuance of notice prior to any court decision on recognition is not required. In these circumstances, imposing the requirement could cause undue delay and would be inconsistent with article 17, paragraph 3, which provides that an application for recognition of a foreign proceeding should be decided upon at the earliest possible time.

136.   Procedural matters related to such notice are not resolved by the Model Law and are thus governed by other provisions of law of the enacting State. The absence of an express reference to notice of the filing of an application for recognition or of the decision to grant recognition does not preclude the court from issuing such notice, where legally required, in pursuance of its own rules on civil or insolvency proceedings. By the same token, there is nothing in the Model Law that would mandate the issuance of such notice, where such a requirement does not exist.

*Discussion in UNCITRAL and in the Working Group*

| *(a)   Model Law* | *(b)   Guide to Enactment* |
|---|---|
| A/52/17, paras. 199-209. | A/CN.9/436, paras. 66-69. |
| A/CN.9/419, paras. 62-69 and 178-189. | A/CN.9/442, paras. 112-121. |
| A/CN.9/WG.V/WP.44, pp. 22-23. | |
| A/CN.9/422, paras. 76-93 and 152-159. | |
| A/CN.9/WG.V/WP.46, pp. 9-10. | |
| A/CN.9/433, paras. 59-67 and 99-104. | |
| A/CN.9/WG.V/WP.48, pp. 13-15. | |
| A/CN.9/435, paras. 165-173. | |

*(c) Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, para. 112.

A/CN.9/742, para. 40.

A/CN.9/WG.V/WP.107, paras. 119-120.

A/CN.9/763, para. 28.

A/CN.9/WG.V/WP.112, paras. 112 and 119-120.

A/CN.9/766, para. 32.

---

*Article 16.   Presumptions concerning recognition*

1.   If the decision or certificate referred to in paragraph 2 of article 15 indicates that the foreign proceeding is a proceeding within the meaning of subparagraph *(a)* of article 2 and that the foreign representative is a person or body within the meaning of subparagraph *(d)* of article 2, the court is entitled to so presume.

2.   The court is entitled to presume that documents submitted in support of the application for recognition are authentic, whether or not they have been legalized.

3.   In the absence of proof to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.

---

137.   Article 16 establishes presumptions that permit and encourage fast action in cases where speed may be essential. These presumptions allow the court to expedite the evidentiary process. At the same time, they do not prevent the court, in accordance with the applicable procedural law, from calling for or assessing other evidence if the conclusion suggested by the presumption is called into question.

*Paragraph 1*

138.   Article 16, paragraph 1 creates a presumption with respect to the definitions of "foreign proceeding" and "foreign representative" in article 2. If the decision commencing the foreign proceeding and appointing the foreign representative indicates that the foreign proceeding is a proceeding within the meaning of article 2, subparagraph *(a)* and that the foreign representative is a person or body within the meaning of article 2, subparagraph *(d)*, the receiving court is entitled to so presume. That presumption

has been relied upon in practice by various receiving courts when the court commencing the proceedings has included that information in its orders.[31]

139.   Inclusion of information regarding the nature of the foreign proceeding and the foreign representative, defined in article 2, in the orders made by the court commencing the foreign proceeding can facilitate the task of recognition in relevant cases. Those orders or decisions are not binding on the receiving court in the enacting State, which is required to independently satisfy itself that the requirements of article 2 are met (discussed further at paras. 152-153 below).

*Paragraph 2*

140.   For comments on paragraph 2, which dispenses with the requirement of legalization, see paragraphs 128-130 above.

*Paragraph 3*

141.   Although the presumption contained in article 16, paragraph 3 corresponds to the presumption in the EC Regulation, it serves a different purpose. In the Model Law, the presumption is designed to facilitate the recognition of foreign insolvency proceedings and the provision of assistance to those proceedings. Under the EC Regulation, the presumption relates to the proper place for commencement of insolvency proceedings, thus determining the applicable law, and to the automatic recognition of those proceedings by other European Union member States. Under the Regulation, the decision on centre of main interests is made by the court receiving an application for commencement of insolvency proceedings at the time of consideration of that application. Under the Model Law, a request for recognition of a foreign proceeding may be made at any time after the commencement of that proceeding; in some cases it has been made several years later. Accordingly, the court considering an application for recognition under the Model Law must determine whether the foreign proceeding for which recognition is sought is taking place in a forum that was the debtor's centre of main interests when the proceeding commenced (the issue of timing with respect to the determination of centre of main interests is discussed at paras. 157-160 below). Notwithstanding the different purpose of centre of main interests under the two instruments, the jurisprudence with respect to interpretation of that concept in the EC Regulation may be relevant to its interpretation in the Model Law.

---

[31] For examples, see A/CN.9/WG.V/WP.95, paras. 15-16.

142.   The presumption in article 16, paragraph 3 has given rise to considerable discussion, most commonly in the context of corporate rather than individual debtors, with the focus upon the proof required for the presumption to be rebutted. The debtor's centre of main interests may be at the same location as its place of registration and in that situation no issue concerning rebuttal of the presumption will arise.

143.   However, when a foreign representative seeks recognition of a foreign proceeding as a main proceeding and there appears to be a separation between the place of the debtor's registered office and its alleged centre of main interests, the party alleging the centre of main interests is not at the place of registration will be required to satisfy the court as to the location of the centre of main interests. The court of the enacting State will be required to consider independently where the debtor's centre of main interests is located.

### Centre of main interests

144.   The concept of a debtor's centre of main interests is fundamental to the operation of the Model Law.[32] The Model Law accords proceedings commenced in that location greater deference and, more immediate, automatic relief. The essential attributes of the debtor's centre of main interests correspond to those attributes that will enable those who deal with the debtor (especially creditors) to ascertain the place where an insolvency proceeding concerning the debtor is likely to commence. As has been noted, the Model Law establishes a presumption that the debtor's place of registration is the place that corresponds to those attributes. However, in reality, the debtor's centre of main interests may not coincide with the place of its registration and the Model Law provides for the rebuttal of the presumption where the centre of main interests is in a different location to the place of registration. In those circumstances, the centre of main interests will be identified by other factors which indicate to those who deal with the debtor (especially creditors) where the centre of main interests is. It is thus important to consider the factors that may independently indicate that a given State is the debtor's centre of main interests.

### Factors relevant to the determination of centre of main interests

145.   In most cases, the following principal factors, considered as a whole, will tend to indicate whether the location in which the foreign proceeding has commenced is the debtor's centre of main interests. The factors are the

<hr/>

[32] As noted in paragraph 82, the concept of centre of main interests also underlies the scheme set out in the EC Regulation.

location: *(a)* where the central administration of the debtor takes place, and *(b)* which is readily ascertainable by creditors. The date at which these factors should be analysed in order to determine the location of the debtor's centre of main interests is addressed in paragraphs 157-160 below.

146.    When these principal factors do not yield a ready answer regarding the debtor's centre of main interests, a number of additional factors concerning the debtor's business may be considered. The court may need to give greater or less weight to a given factor, depending on the circumstances of the particular case. In all cases, however, the endeavour is an holistic one, designed to determine that the location of the foreign proceeding in fact corresponds to the actual location of the debtor's centre of main interests, as readily ascertainable by creditors.

147.    The order in which the additional factors are set out below is not intended to indicate the priority or weight to be accorded to them, nor is it intended to be an exhaustive list of relevant factors; other factors might be considered by the court as applicable in a given case. The additional factors may include the following: the location of the debtor's books and records; the location where financing was organized or authorized, or from where the cash management system was run; the location in which the debtor's principal assets or operations are found; the location of the debtor's primary bank; the location of employees; the location in which commercial policy was determined; the site of the controlling law or the law governing the main contracts of the company; the location from which purchasing and sales policy, staff, accounts payable and computer systems were managed; the location from which contracts (for supply) were organized; the location from which reorganization of the debtor was being conducted; the jurisdiction whose law would apply to most disputes; the location in which the debtor was subject to supervision or regulation; and the location whose law governed the preparation and audit of accounts and in which they were prepared and audited.

*Movement of centre of main interests*

148.    A debtor's centre of main interests may move prior to commencement of insolvency proceedings, in some instances in close proximity to commencement and even between the time of the application for commencement and the actual commencement of those proceedings.[33] Whenever there is

_____

[33] In some examples, the move was intended to give the debtor access to an insolvency process, such as reorganization, that more closely met its needs than what was available under the law of its former centre of main interests. In other examples, the move of the centre of main interests may have been designed to thwart the legitimate expectations of creditors and third parties.

evidence of such a move in close proximity to the commencement of the foreign proceeding, it may be desirable for the receiving court, in determining whether to recognize those proceedings, to consider the factors identified in paragraphs 145 and 147 above more carefully and to take account of the debtor's circumstances more broadly. In particular, the test that the centre of main interests is readily ascertainable by third parties may be harder to meet if the move of the centre of main interests occurs in close proximity to the opening of proceedings.

149. It is unlikely that a debtor could move its place of registration (or habitual residence) after the commencement of insolvency proceedings, since many insolvency laws contain specific provisions preventing such a move. In any event, if this were to occur, it should not affect the decision as to centre of main interests for the purposes of the Model Law, since the date relevant to that determination is the date of commencement of the foreign proceeding (see paras. 157-159 below).

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 204-206.

A/CN.9/WG.V/WP.46, p. 13.

A/CN.9/435, paras. 170-172.

*(b)  Guide to Enactment*

A/CN.9/442, paras. 122-123.

*(c)  Guide to Enactment and Interpretation*

A/68/17, para. 197.

A/CN.9/715, paras. 14-15, 38-41 and 44-45.

A/CN.9/738, paras. 22-30.

A/CN.9/WG.V/WP.103, Add.1, paras. 122-122A and 123A-K.

A/CN.9/742, paras. 41-56.

A/CN.9/WG.V/WP.107, paras. 122B, 123A-123G, 123I and 123K-M.

A/CN.9/763, paras. 29-48.

A/CN.9/WG.V/WP.112, paras. 122-122B, 123A-D, F-G, I, K and M.

A/CN.9/766, paras. 33-40.

---

*Article 17.  Decision to recognize a foreign proceeding*

1.  Subject to article 6, a foreign proceeding shall be recognized if:

   *(a)*  The foreign proceeding is a proceeding within the meaning of sub-paragraph *(a)* of article 2;

   *(b)*  The foreign representative applying for recognition is a person or body within the meaning of subparagraph *(d)* of article 2;

   *(c)*  The application meets the requirements of paragraph 2 of article 15; and

   *(d)*  The application has been submitted to the court referred to in article 4.

2.  The foreign proceeding shall be recognized:

   *(a)*  As a foreign main proceeding if it is taking place in the State where the debtor has the centre of its main interests; or

   *(b)*  As a foreign non-main proceeding if the debtor has an establishment within the meaning of subparagraph *(f)* of article 2 in the foreign State.

3.  An application for recognition of a foreign proceeding shall be decided upon at the earliest possible time.

4.  The provisions of articles 15, 16, 17 and 18 do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist.

---

*Paragraph 1*

150.  The purpose of article 17 is to establish that, if recognition is not contrary to the public policy of the enacting State (see article 6) and if the application meets the requirements set out in the article, recognition will be granted as a matter of course.

151.  In deciding whether a foreign proceeding should be recognized, the receiving court is limited to the jurisdictional pre-conditions set out in the definition. This requires a determination that the proceedings are foreign proceedings within article 2, subparagraph *(a)*. The Model Law makes no provision for the receiving court to embark on a consideration of whether the foreign proceeding was correctly commenced under applicable law; provided the proceeding satisfies the requirements of article 15 and article 6 is not relevant, recognition should follow in accordance with article 17.

152. In reaching its decision on recognition, the receiving court may have due regard to any decisions and orders made by the originating court and to any information that may have been presented to the originating court. Those orders or decisions are not binding on the receiving court in the enacting State, which is required to independently satisfy itself that the foreign proceeding meets the requirements of article 2. Nevertheless, the court is entitled to rely, pursuant to the presumptions in article 16, paragraphs 1 and 2 (see para. 138), on the information in the certificates and documents provided in support of an application for recognition. In appropriate circumstances that information would assist the receiving court in its deliberations.

153. Accordingly, recognition of a foreign proceeding would be assisted if the originating court mentioned in its orders any information that would facilitate a finding by a receiving court that the proceeding is a foreign proceeding within the meaning of article 2. This would be particularly helpful when the originating court was aware of the international character either of the debtor or its business and of the likelihood that recognition of the proceeding would be sought under the Model Law. The same considerations would apply to the appointment and recognition of the foreign representative.

*Paragraph 2*

154. Article 17, paragraph 2 draws the basic distinction between foreign proceedings categorized as the "main" proceedings and those foreign proceedings that are not so characterized, depending upon the jurisdictional basis of the foreign proceeding (see paragraph 88 above). The relief flowing from recognition may depend upon the category into which a foreign proceeding falls. For example, recognition of a "main" proceeding triggers an automatic stay of individual creditor actions or executions concerning the assets of the debtor (article 20, subparagraphs 1 *(a)* and *(b)*) and an automatic "freeze" of those assets (article 20, subparagraph 1 *(c)*), subject to certain exceptions referred to in article 20, paragraph 2.

155. It is not advisable to include more than one criterion for qualifying a foreign proceeding as a main proceeding and provide that on the basis of any of those criteria a proceeding could be deemed a main proceeding. An approach involving such "multiple criteria" would raise the risk of competing claims from foreign proceedings for recognition as the main proceeding.

156. With regard to subparagraph 2 *(b)*, as noted in paragraph 85 above, the Model Law does not envisage recognition of a proceeding commenced in a foreign State in which the debtor has assets but no establishment as defined in article 2, subparagraph *(c)*.

21-11854-dsj   Doc 38-2   Filed 06/30/23   Entered 06/30/23 15:09:46   Exhibit 2 -
2013 Enactment Guide   Pg 84 of 123

*Part two.  Guide to Enactment and Interpretation*                                                    *75*

*Date at which to determine centre of main interests and establishment*

157.   The Model Law does not expressly indicate the relevant date for determining the centre of main interests of the debtor.

158.   Article 17, subparagraph 2 *(a)* provides that the foreign proceeding is to be recognized as a main proceeding "if it *is* taking place in the State where the debtor *has* the centre of its main interests" [*emphasis added*]. The use of the present tense in article 17 does not address the question of the relevant date, but rather requires the foreign proceeding to be current or pending at the time of the recognition decision; if the proceeding for which recognition is sought is no longer current or pending in the originating State at that time (i.e. it is no longer "taking place" having been terminated or closed), there is no proceeding that would be eligible for recognition under the Model Law.

159.   With respect to the date at which the centre of main interests of the debtor should to be determined, having regard to the evidence required to accompany an application for recognition under article 15 and the relevance accorded the decision commencing the foreign proceeding and appointing the foreign representative, the date of commencement of that proceeding is the appropriate date.[34] Where the business activity of the debtor ceases after the commencement of the foreign proceeding, all that may exist at the time of the application for recognition to indicate the debtor's centre of main interests is that foreign proceeding and the activity of the foreign representative in administering the insolvency estate. In such a case, determination of the centre of the debtor's main interests by reference to the date of the commencement of those proceedings would produce a clear result. The same reasoning may also apply in the case of reorganization where, under some laws, it is not the debtor that continues to have a centre of main interests, but rather the reorganizing entity. In such a case, the requirement for a foreign proceeding that is taking place in accordance with article 17, subparagraph 2 *(a)* is clearly satisfied and the foreign proceeding should be entitled to recognition. Moreover, taking the date of commencement to determine centre of main interests provides a test that can be applied with certainty to all insolvency proceedings.

160.   The same considerations apply to the date at which any determination with respect to the existence of an establishment of the debtor should be

---

[34] Under some insolvency laws, the effects of commencement are backdated to the date of the application for commencement or the date of application becomes the date of commencement by virtue of automatic commencement. In both cases, it is appropriate to refer to the date of commencement for the purposes of the centre of main interests determination, since the Model Law is concerned only with existing foreign proceedings and when they commenced.

made. Accordingly, the date of commencement of the foreign proceeding is the relevant date to be considered in making that determination.

*Abuse of process*

161. One issue that has arisen is whether, on a recognition application, the court should be able to take account of abuse of its processes as a ground to decline recognition. There is nothing in the UNCITRAL Model Law itself which suggests that extraneous circumstances should be taken into account on a recognition application. The Model Law envisages the application being determined by reference to the specific criteria set out in the definitions of "foreign proceeding", "foreign main proceeding" and "foreign non-main proceeding". Since what constitutes abuse of process depends on domestic law or procedural rules, the Model Law does not explicitly prevent receiving courts from applying domestic law or procedural rules to respond to a perceived abuse of process. However, the broader purpose of the Model Law, namely to foster international cooperation as a means of maximizing outcomes for all stakeholders, as set out in article 1, as well as the international origins of the Model Law, and the need to promote uniformity in its application, as set out in article 8, should be borne in mind. Courts considering the application of domestic laws and procedural rules might also recall that the public policy exception in article 6 (see paras. 101-104 above) is intended to be narrowly construed and invoked only when the taking of action under the Model Law would be manifestly contrary to a State's public policy. As a general rule, article 6 should rarely be the basis for refusing an application for recognition, even though it might be a basis for limiting the nature of relief accorded.

162. If the applicant falsely claims the centre of main interests to be in a particular State, the receiving court may determine that there has been a deliberate abuse of the process. The Model Law does not prevent receiving courts from applying domestic law or procedural rules in response to such an abuse of process.

*Paragraph 3*

163. The foreign representative's ability to obtain early recognition (and the consequential ability to invoke in particular articles 20, 21, 23 and 24) is often essential for the effective protection of the assets of the debtor from dissipation and concealment. For that reason, paragraph 3 obligates the court to decide on the application "at the earliest possible time". The phrase "at the earliest possible time" has a degree of elasticity. Some cases may be so

straightforward that the recognition process can be completed within a matter of days. In other cases, particularly if recognition is contested, "the earliest possible time" might be measured in months. Interim relief will be available in the event that some order is necessary while the recognition application is pending.

*Paragraph 4*

164.   A decision to recognize a foreign proceeding would normally be subject to review or rescission, as any other court decision. Paragraph 4 clarifies that the decision on recognition may be revisited if grounds for granting it were fully or partially lacking or have ceased to exist.

165.   Modification or termination of the recognition decision may be a consequence of a change of circumstances after the decision on recognition, for instance, if the recognized foreign proceeding has been terminated or its nature has changed (e.g. a reorganization proceeding might be converted into a liquidation proceeding) or if the status of the foreign representative's appointment has changed or the appointment has been terminated. Also, new facts might arise that require or justify a change of the court's decision, for example, if the foreign representative disregarded the conditions under which the court granted relief. The court's ability to review the recognition decision is assisted by the obligation article 18 imposes on the foreign representative to inform the court of such changed circumstances.

166.   A decision on recognition may also be subject to a review of whether, in the decision-making process, the requirements for recognition were observed. Some appeal procedures give the appeal court the authority to review the merits of the case in its entirety, including factual aspects. It would be consistent with the purpose of the Model Law and with the nature of the decision granting recognition (which is limited to verifying whether the applicant fulfilled the requirements of article 17) if an appeal of the decision would be limited to the question whether the requirements of articles 15 and 16 were observed in deciding to recognize the foreign proceeding.

*Notice of decision to recognize foreign proceedings*

167.   As noted in paragraphs 135 and 136 above, procedural matters regarding requirements of notice of the decision to grant recognition are not dealt with by the Model Law and are left to other provisions of law of the enacting State.

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 29-33 and 201-202.

A/CN.9/419, paras. 62-69.

A/CN.9/WG.V/WP.44, pp. 13-15.

A/CN.9/422, paras. 76-93.

A/CN.9/WG.V/WP.46, pp. 12-13.

A/CN.9/433, paras. 99-104.

A/CN.9/WG.V/WP.48, pp. 13-16.

A/CN.9/435, paras. 167 and 173.

*(b)  Guide to Enactment*

A/CN.9/436, paras. 68-69.

A/CN.9/442, paras. 124-131.

*(c)  Guide to Enactment and Interpretation*

A/CN.9/715, paras. 14-15 and 32-35.

A/CN.9/738, paras. 33-35.

A/CN.9/WG.V/WP.103/Add.1, paras. 124-124C, 126, 128A-E, 125 and 129-130.

A/CN.9/742, paras. 57-62.

A/CN.9/WG.V/WP.107, paras. 124B-C, 128A, 128C, 123J, 125 and 130-131.

A/CN.9/763, paras. 49-55.

A/CN.9/WG.V/WP.112, paras. 124-124C, 128A-D, 123J and L, 125 and 129-131.

A/CN.9/766, paras. 41-44.

---

*Article 18.   Subsequent information*

From the time of filing the application for recognition of the foreign proceeding, the foreign representative shall inform the court promptly of:

*(a)*  Any substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment; and

*(b)*  Any other foreign proceeding regarding the same debtor that becomes known to the foreign representative.

---

*Subparagraph* (a)

168.    Article 18 obligates the foreign representative to inform the court promptly, after the time of filing the application for recognition of the foreign proceeding, of "any substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment". The purpose of the obligation is to allow the court to modify or terminate the consequences of recognition. As noted above, it is possible that, after the application for recognition or after recognition, changes occur in the foreign proceeding that would have affected the decision on recognition or the relief

granted on the basis of recognition, such as termination of the foreign proceeding or conversion from one type of proceeding to another. Subparagraph *(a)* takes into account the fact that technical modifications in the status of the proceedings or the foreign representative's appointment are frequent, but that only some of those modifications would affect the decision granting relief or the decision recognizing the proceeding; therefore, the provision only calls for information of "substantial" changes. It is of particular importance that the court be informed of such modifications when its decision on recognition concerns a foreign "interim proceeding" or a foreign representative has been "appointed on an interim basis" (see article 2, subparagraphs *(a)* and *(d)*).

*Subparagraph* (b)

169.    Article 15, paragraph 3, requires an application for recognition to be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative. Article 18, subparagraph *(b)*, extends that duty to the time after the application for recognition has been filed. That information will allow the court to consider whether relief already granted should be coordinated with insolvency proceedings commenced after the decision on recognition (see article 30) and to facilitate cooperation under chapter IV.

*Discussion in UNCITRAL and in the Working Group*

*(a)    Model Law*

A/52/17, paras. 113-116, 201-202 and 207.

A/CN.9/WG.V/WP.48, p. 15.

*(b)    Guide to Enactment*

A/CN.9/442, paras. 133-134.

*(c)    Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, paras. 133-134.

A/CN.9/742, para. 63.

A/CN.9/WG.V/WP.107, paras. 133-134.

A/CN.9/763, para. 56.

A/CN.9/WG.V/WP.112, paras. 133-134.

A/CN.9/766, para. 45.

---

*Article 19.   Relief that may be granted upon application
for recognition of a foreign proceeding*

1.   From the time of filing an application for recognition until the application
is decided upon, the court may, at the request of the foreign representative,
where relief is urgently needed to protect the assets of the debtor or the
interests of the creditors, grant relief of a provisional nature, including:

   *(a)*   Staying execution against the debtor's assets;

   *(b)*   Entrusting the administration or realization of all or part of the
debtor's assets located in this State to the foreign representative or another
person designated by the court, in order to protect and preserve the value of
assets that, by their nature or because of other circumstances, are perishable,
susceptible to devaluation or otherwise in jeopardy;

   *(c)*   Any relief mentioned in paragraph 1 *(c), (d)* and *(g)* of article 21.

2.   [*Insert provisions (or refer to provisions in force in the enacting State)
relating to notice.*]

3.   Unless extended under paragraph 1 *(f)* of article 21, the relief granted
under this article terminates when the application for recognition is decided
upon.

4.   The court may refuse to grant relief under this article if such relief would
interfere with the administration of a foreign main proceeding.

---

170.   Article 19 deals with "urgently needed" relief that may be ordered at
the discretion of the court and is available as of the moment of the applica-
tion for recognition (unlike relief under article 21, which is also discretionary
but available only upon recognition).

171.   Article 19 authorizes the court to grant the type of relief that is usu-
ally available only in collective insolvency proceedings (i.e. the same type
of relief available under article 21), as opposed to the "individual" type of
relief that may be granted before the commencement of insolvency proceed-
ings under rules of civil procedure (i.e. measures covering specific assets
identified by a creditor). However, the discretionary "collective" relief under
article 19 is somewhat narrower than the relief under article 21.

172.   The reason for the availability of collective measures, albeit in a
restricted form, is that relief of a collective nature may be urgently needed
before the decision on recognition in order to protect the assets of the debtor
and the interests of the creditors. Exclusion of collective relief would

frustrate those objectives. On the other hand, recognition has not yet been granted and, therefore, the collective relief is restricted to urgent and provisional measures. The urgency of the measures is alluded to in the opening words of paragraph 1, while subparagraph *(a)* restricts the stay to execution proceedings and the measure referred to in subparagraph *(b)* is restricted to perishable assets and assets susceptible to devaluation or otherwise in jeopardy. Otherwise, the measures available under article 19 are essentially the same as those available under article 21.

*Paragraph 2*

173.   Laws of many States contain requirements for notice to be given (either by the insolvency representative upon the order of the court or by the court itself) when relief of the type mentioned in article 19 is granted. Paragraph 2 is the appropriate place for the enacting State to make provision for such notice.

*Paragraph 3*

174.   Relief available under article 19 is provisional in that, as provided in paragraph 3, it terminates when the application for recognition is decided upon; however, the court is given the opportunity to extend the measure, as provided in article 21, subparagraph 1 *(f)*. The court might wish to do so, for example, to avoid a hiatus between the provisional measure issued before recognition and the measure issued after recognition.

*Paragraph 4*

175.   Article 19, paragraph 4, pursues the same objective as the one underlying article 30, subparagraph *(a)*, namely that, if a foreign main proceeding is pending, any relief granted in favour of a foreign non-main proceeding must be consistent (or should not interfere) with the foreign main proceeding. In order to foster such coordination of pre-recognition relief with any foreign main proceeding, the foreign representative applying for recognition is required, by article 15, paragraph 3, to attach to the application for recognition a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 34-46.

A/CN.9/419, paras. 174-177.

A/CN.9/WG.V/WP.44, pp. 22-23.

A/CN.9/422, paras. 116, 119 and 122-123.

A/CN.9/WG.V/WP.46, pp. 9, 13-16.

A/CN.9/433, paras. 110-114.

A/CN.9/435, paras. 17-23.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 71-75.

A/CN.9/442, paras. 135-140.

*(c)   Guide to Enactment and
Interpretation*

A/CN.9/WG.V/WP.107, paras. 135-140.

A/CN.9/763, para. 57.

A/CN.9/WG.V/WP.48, pp. 16-17.

A/CN.9/WG.V/WP.112, paras. 135-140.

A/CN.9/766, para. 46.

---

*Article 20.   Effects of recognition of a foreign main proceeding*

1.   Upon recognition of a foreign proceeding that is a foreign main proceeding,

*(a)*   Commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

*(b)*   Execution against the debtor's assets is stayed; and

*(c)*   The right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.

2.   The scope, and the modification or termination, of the stay and suspension referred to in paragraph 1 of this article are subject to [*refer to any provisions of law of the enacting State relating to insolvency that apply to exceptions, limitations, modifications or termination in respect of the stay and suspension referred to in paragraph 1 of this article*].

3.   Paragraph 1 *(a)* of this article does not affect the right to commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor.

4.   Paragraph 1 of this article does not affect the right to request the commencement of a proceeding under [*identify laws of the enacting State relating to insolvency*] or the right to file claims in such a proceeding.

176.   While relief under articles 19 and 21 is discretionary, the effects
provided by article 20 are not, for they flow automatically from recognition
of the foreign main proceeding. Another difference between discretionary
relief under articles 19 and 21 and the effects under article 20 is that dis-
cretionary relief may be issued in favour of main and non-main proceedings,
while the automatic effects apply only to main proceedings. Additional
effects of recognition are contained in articles 14, 23 and 24.

177.   In States where an appropriate court order is needed for the effects
of article 20 to become operative, the enacting State, in order to achieve
the purpose of the article, should include (perhaps in the opening words of
paragraph 1) language directing the court to issue an order putting into effect
the consequences specified in subparagraphs *(a)-(c)* of that paragraph.

178.   The automatic consequences envisaged in article 20 are necessary to
allow steps to be taken to organize an orderly and fair cross-border insol-
vency proceeding. In order to achieve those benefits, the imposition on the
insolvent debtor of the consequences of article 20 in the enacting State (i.e.
the country where it maintains a limited business presence) is justified, even
if the State where the centre of the debtor's main interests is situated poses
different (possibly less stringent) conditions for the commencement of insol-
vency proceedings or even if the automatic effects of the insolvency pro-
ceeding in the country of origin are different from the effects of article 20
in the enacting State. This approach reflects a basic principle underlying the
Model Law according to which recognition of foreign proceedings by the
court of the enacting State produces effects that are considered necessary
for an orderly and fair conduct of a cross-border insolvency. Recognition,
therefore, has its own effects rather than importing the consequences of the
foreign law into the insolvency system of the enacting State. If, in a given
case, recognition should produce results that would be contrary to the legiti-
mate interests of a party in interest, including the debtor, the law of the
enacting State should include appropriate protections, as indicated in article
20, paragraph 2 (and discussed in paragraph 184 below).

179.   By virtue of article 2, subparagraph *(a)*, the effects of recognition
extend to foreign "interim proceedings". That solution is necessary since,
as explained in paragraph 79 above, interim proceedings (provided they meet
the requisites of article 2, subparagraph *(a)*), should not be distinguished
from other insolvency proceedings merely because they are of an interim
nature. If after recognition the foreign "interim proceeding" ceases to have
a sufficient basis for the automatic effects of article 20, the automatic stay
could be terminated pursuant to the law of the enacting State, as indicated
in article 20, paragraph 2. (See also article 18, which deals with the obliga-
tion of the foreign representative "to inform the court promptly of any

substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment".)

180.   Subparagraph 1 *(a)*, by not distinguishing between various kinds of individual action, also covers actions before an arbitral tribunal. Thus, article 20 establishes a mandatory limitation to the effectiveness of an arbitration agreement. This limitation is added to other possible limitations restricting the freedom of the parties to agree to arbitration that may exist under national law (e.g. limits as to arbitrability or as to the capacity to conclude an arbitration agreement). Such limitations are not contrary to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958.[35] However, bearing in mind the particularities of international arbitration, in particular its relative independence from the legal system of the State where the arbitral proceeding takes place, it might not always be possible, in practical terms, to implement the automatic stay of arbitral proceedings. For example, if the arbitration does not take place in either the enacting State or the State of the main proceeding, it may be difficult to enforce the stay of the arbitral proceedings. Apart from that, the interests of the parties may be a reason for allowing an arbitral proceeding to continue, a possibility that is envisaged in paragraph 2 and left to the law of the enacting State.

181.   Subparagraph 1 *(a)* refers not only to "individual actions" but also to "individual proceedings" in order to cover, in addition to "actions" instituted by creditors in a court against the debtor or its assets, enforcement measures initiated by creditors outside the court system, being measures that creditors are allowed to take under certain conditions in some States. Subparagraph 1 *(b)* has been added to make it abundantly clear that executions against the assets of the debtor are covered by the stay.

182.   The Model Law does not deal with sanctions that might apply to acts performed in defiance of the suspension of transfers of assets provided under article 20, subparagraph 1 *(c)*. Those sanctions vary, depending on the legal system; they might include criminal sanctions, penalties and fines or the acts themselves might be void or capable of being set aside. From the viewpoint of creditors, the main purpose of such sanctions is to facilitate recovery for the insolvency proceeding of any assets improperly transferred by the debtor and, for that purpose, the setting aside of such transactions is preferable to the imposition of criminal or administrative sanctions on the debtor.

---

[35] United Nations, *Treaty Series*, vol. 330, No. 4739.

*Paragraph 2*

183.   Notwithstanding the "automatic" or "mandatory" nature of the effects under article 20, it is expressly provided that the scope of those effects depends on exceptions or limitations that may exist in the law of the enacting State. Those exceptions may be, for example, the enforcement of claims by secured creditors, payments by the debtor in the ordinary course of business, initiation of court action for claims that have arisen after the commencement of the insolvency proceeding (or after recognition of a foreign main proceeding) or completion of open financial-market transactions.

184.   Sometimes it may be desirable for the court to modify or terminate the effects of article 20. The rules governing the power of the court to do so vary. In some legal systems the courts are authorized to make individual exceptions upon request by an interested party, under conditions prescribed by local law, while in others the courts do not have that power, in line with the principle that, in general, courts do not have the power to set aside the application of a statutory rule of law. If courts are to be given such a power, some legal systems would normally require the grounds on which the court could modify or terminate the mandatory effects of recognition under article 20, paragraph 1 to be specified. In view of that situation, article 20, paragraph 2, provides that the modification or termination of the stay and the suspension provided in the article is subject to the provisions of law of the enacting State relating to insolvency.

185.   Generally, it is useful for persons that are adversely affected by the stay or suspension under article 20, paragraph 1, to have an opportunity to be heard by the court, which should then be allowed to modify or terminate those effects. It would be consistent with the objectives of the Model Law if the enacting State were to spell out, or refer to, the provisions that govern this question.

*Paragraph 3*

186.   The Model Law does not cover the question of whether the limitation period for a claim ceases to run when the claimant is unable to commence individual proceedings as a result of the application of article 20, subparagraph 1 *(a)*. A harmonized rule on that question would not be feasible; however, since it is necessary to protect creditors from losing their claims because of a stay pursuant to subparagraph 1 *(a)*, paragraph 3 has been added to authorize the commencement of individual action to the extent necessary to preserve claims against the debtor. Once the claim has been preserved, the action continues to be covered by the stay.

187.     Paragraph 3 might seem unnecessary in a State where a demand for payment or performance served by the creditor on the debtor causes the cessation of the running of the limitation period or where the stay of the kind envisaged in subparagraph 1 *(a)* triggers such cessation. However, paragraph 3 may still be useful in such States because the question of the cessation of the running of the limitation period might be governed, pursuant to rules concerning conflict of laws, by the law of a State other than the enacting State. Furthermore, the paragraph would be useful as an assurance to foreign claimants that their claims would not be prejudiced in the enacting State.

*Paragraph 4*

188.     Paragraph 4 clarifies that the automatic stay and suspension pursuant to article 20 do not prevent anyone, including the foreign representative or foreign creditors, from requesting the commencement of a local insolvency proceeding and from participating in that proceeding. The right to apply to commence a local insolvency proceeding and to participate in it is in a general way dealt with in articles 11-13. If a local proceeding is indeed initiated, article 29 deals with the coordination of the foreign and the local proceedings.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 47-60.

A/CN.9/419, paras. 137-143.

A/CN.9/WG.V/WP.44, pp. 15-19.

A/CN.9/422, paras. 94-110.

A/CN.9/WG.V/WP.46, pp. 13-16.

A/CN.9/433, paras. 115-126.

A/CN.9/WG.V/WP.48, pp. 17-18.

A/CN.9/435, paras. 24-48.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 76-79.

A/CN.9/442, paras. 141-153.

*(c)   Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, paras. 141 and 143.

A/CN.9/742, para. 64.

A/CN.9/WG.V/WP.107, paras. 144-146, 149 and 151-153.

A/CN.9/763, para. 58.

A/CN.9/WG.V/WP.112, paras. 141, 143, 144-146, 149, 151-153.

A/CN.9/766, para. 47.

---

*Article 21.   Relief that may be granted upon recognition
of a foreign proceeding*

1.   Upon recognition of a foreign proceeding, whether main or non-main,
where necessary to protect the assets of the debtor or the interests of the
creditors, the court may, at the request of the foreign representative, grant any
appropriate relief, including:

   *(a)*   Staying the commencement or continuation of individual actions or
individual proceedings concerning the debtor's assets, rights, obligations or
liabilities, to the extent they have not been stayed under paragraph 1 *(a)* of
article 20;

   *(b)*   Staying execution against the debtor's assets to the extent it has not
been stayed under paragraph 1 *(b)* of article 20;

   *(c)*   Suspending the right to transfer, encumber or otherwise dispose of
any assets of the debtor to the extent this right has not been suspended under
paragraph 1 *(c)* of article 20;

   *(d)*   Providing for the examination of witnesses, the taking of evidence
or the delivery of information concerning the debtor's assets, affairs, rights,
obligations or liabilities;

   *(e)*   Entrusting the administration or realization of all or part of the
debtor's assets located in this State to the foreign representative or another
person designated by the court;

   *(f)*   Extending relief granted under paragraph 1 of article 19;

   *(g)*   Granting any additional relief that may be available to [*insert the
title of a person or body administering a reorganization or liquidation under
the law of the enacting State*] under the laws of this State.

2.   Upon recognition of a foreign proceeding, whether main or non-main, the
court may, at the request of the foreign representative, entrust the distribution
of all or part of the debtor's assets located in this State to the foreign repre-
sentative or another person designated by the court, provided that the court is
satisfied that the interests of creditors in this State are adequately protected.

3.   In granting relief under this article to a representative of a foreign non-
main proceeding, the court must be satisfied that the relief relates to assets
that, under the law of this State, should be administered in the foreign non-
main proceeding or concerns information required in that proceeding.

---

189.   In addition to the mandatory stay and suspension under article 20,
the Model Law authorizes the court, following recognition of a foreign
proceeding, to grant relief for the benefit of that proceeding. This post-
recognition relief under article 21 is discretionary, as is pre-recognition relief

under article 19. The types of relief listed in article 21, paragraph 1, are typical of the relief most frequently granted in insolvency proceedings; however, the list is not exhaustive and the court is not restricted unnecessarily in its ability to grant any type of relief that is available under the law of the enacting State and needed in the circumstances of the case.

190.   The explanation relating to the use of the expressions "individual actions" and "individual proceedings" in article 20, subparagraph 1 *(a)*, and to coverage of execution proceedings (see paras. 180-181 above) applies also to article 21, subparagraph 1 *(a)*.

191.   It is in the nature of discretionary relief that the court may tailor it to the case at hand. This idea is reinforced by article 22, paragraph 2, according to which the court may subject the relief granted to any conditions it considers appropriate.

*Paragraph 2*

192.   The "turnover" of assets to the foreign representative (or another person), as envisaged in paragraph 2, is discretionary. It should be noted that the Model Law contains several safeguards designed to ensure the protection of local interests before assets are turned over to the foreign representative. Those safeguards include the following: the general statement of the principle of protection of local interests in article 22, paragraph 1; the provision in article 21, paragraph 2, that the court should not authorize the turnover of assets until it is assured that the local creditors' interests are protected; and article 22, paragraph 2, according to which the court may subject the relief that it grants to conditions it considers appropriate.

*Paragraph 3*

193.   One salient factor to be taken into account in tailoring the relief is whether it is for a foreign main or non-main proceeding. The interests and the authority of a representative of a foreign non-main proceeding are typically narrower than the interests and the authority of a representative of a foreign main proceeding, who normally seeks to gain control over all assets of the insolvent debtor. Paragraph 3 reflects that idea by providing *(a)* that relief granted to a foreign non-main proceeding should be limited to assets that are to be administered in that non-main proceeding, and *(b)* that, if the foreign representative seeks information concerning the debtor's assets or affairs, the relief must concern information required in that non-main proceeding. The objective is to advise the court that relief in favour of a

foreign non-main proceeding should not give unnecessarily broad powers to the foreign representative and that such relief should not interfere with the administration of another insolvency proceeding, in particular the main proceeding.

194.   The proviso "under the law of this State" reflects the principle underlying the Model Law that recognition of a foreign proceeding does not mean extending the effects of the foreign proceeding as they may be prescribed by the law of the foreign State. Instead, recognition of a foreign proceeding entails attaching to the foreign proceeding consequences envisaged by the law of the enacting State.

195.   The idea underlying article 21, paragraph 3, is also reflected in article 19, paragraph 4 (pre-recognition relief), article 29, subparagraph *(c)* (coordination of a foreign proceeding with a local proceeding) and article 30 (coordination of more than one foreign proceeding).

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 61-73.

A/CN.9/419, paras. 148-152 and 154-166.

A/CN.9/WG.V/WP.44, pp. 15-19.

A/CN.9/422, paras. 111-113.

A/CN.9/WG.V/WP.46, pp. 13-16.

A/CN.9/433, paras. 127-134 and 138-139.

A/CN.9/435, paras. 49-61.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 80-83.

A/CN.9/442, 154-159.

*(c)   Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, para. 154.

A/CN.9/742, para. 65.

A/CN.9/WG.V/WP.48, pp. 18-19.

A/CN.9/WG.V/WP.107, paras. 154, 156, 158 and 160.

A/CN.9/763, para. 59.

A/CN.9/WG.V/WP.112, paras. 154, 156, 158 and 160.

A/CN.9/766, para. 48.

---

*Article 22.   Protection of creditors and other interested persons*

1.   In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article, the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

2.   The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

3.   The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or at its own motion, modify or terminate such relief.

---

196.   The idea underlying article 22 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief. This balance is essential to achieve the objectives of cross-border insolvency legislation.

197.   The reference to the interests of creditors, the debtor and other interested parties in article 22, paragraph 1, provides useful elements to guide the court in exercising its powers under articles 19 and 21. In order to allow the court to tailor the relief appropriately, the court is clearly authorized to subject the relief to conditions (paragraph 2) and to modify or terminate the relief granted (paragraph 3). An additional feature of paragraph 3 is that it expressly gives standing to the parties who may be affected by the consequences of articles 19 and 21 to petition the court to modify and terminate those consequences. Apart from that, article 22 is intended to operate in the context of the procedural system of the enacting State.

198.   In many cases the affected creditors will be "local" creditors. Nevertheless, in enacting article 22, it is not advisable to attempt to limit it to local creditors. Any express reference to local creditors in paragraph 1 would require a definition of those creditors. An attempt to draft such a definition (and to establish criteria according to which a particular category of creditors might receive special treatment) would not only show the difficulty of crafting an appropriate text but would also reveal that there is no justification for discriminating against creditors on the basis of criteria such as place of business or nationality.

199.   Protection of all interested persons is linked to provisions in national laws on notification requirements; those may be general publicity requirements,

designed to notify potentially interested persons (e.g. local creditors or local agents of a debtor) that a foreign proceeding has been recognized or there may be requirements for individual notifications that the court, under its own procedural rules, has to issue to persons that would be directly affected by recognition or relief granted by the court. National laws vary as to the form, time and content of notice required to be given of the recognition of foreign proceedings and the Model Law does not attempt to modify those laws (see also para. 167 above).

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 82-93.

A/CN.9/422, para. 113.

A/CN.9/WG.V/WP.46, pp. 15-16.

A/CN.9/433, paras. 140-146.

A/CN.9/WG.V/WP.48, p. 21.

A/CN.9/435, paras. 72-78.

*(b)  Guide to Enactment*

A/CN.9/436, para. 85.

A/CN.9/442, paras. 161-164.

*(c)  Guide to Enactment and Interpretation*

A/CN.9/715, para. 39.

A/CN.9/WG.V/WP.107, paras. 162-164.

A/CN.9/763, para. 60.

A/CN.9/WG.V/WP.112, paras. 162-164.

A/CN.9/766, para. 49.

---

*Article 23.   Actions to avoid acts detrimental to creditors*

1.   Upon recognition of a foreign proceeding, the foreign representative has standing to initiate [*refer to the types of actions to avoid or otherwise render ineffective acts detrimental to creditors that are available in this State to a person or body administering a reorganization or liquidation*].

2.   When the foreign proceeding is a foreign non-main proceeding, the court must be satisfied that the action relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding.

---

200.   Under many national laws both individual creditors and insolvency representatives have a right to bring actions to avoid or otherwise render ineffective acts detrimental to creditors. Such a right, insofar as it pertains to individual creditors, is often not governed by insolvency law but by general provisions of law (such as the civil code); the right is not necessarily

tied to the existence of an insolvency proceeding against the debtor so that the action may be instituted prior to the commencement of such a proceeding. The person having such a right is typically only an affected creditor and not another person such as the insolvency representative. Furthermore, the conditions for these individual-creditor actions are different from the conditions applicable to similar actions that might be initiated by an insolvency representative. The standing[25] conferred by article 23 extends only to actions that are available to the local insolvency representative in the context of an insolvency proceeding, and the article does not equate the foreign representative with individual creditors who may have similar rights under a different set of conditions. Such actions of individual creditors fall outside the scope of article 23.

201.   Article 23, paragraph 1 expressly provides that, as an effect of recognition of the foreign proceeding under article 17, a foreign representative has standing[25] to initiate actions under the law of the enacting State to avoid or otherwise render ineffective legal acts detrimental to creditors. The provision is drafted narrowly in that it neither creates any substantive right regarding such actions nor provides any solution involving conflict of laws; the Model Law does not address the right of a foreign representative to bring such an action in the enacting State under the law of the State in which the foreign proceeding is taking place. The effect of article 17 is that a foreign representative is not prevented from initiating such actions by the sole fact that the foreign representative is not the insolvency representative appointed in the enacting State.

202.   When the foreign proceeding has been recognized as a "non-main proceeding", it is necessary for the court to consider specifically whether any action to be taken under the article 23 authority relates to assets that "should be administered in the foreign non-main proceeding" (article 23, paragraph 2). Again, this distinguishes the nature of a "main" proceeding from that of a "non-main" proceeding and emphasizes that the relief in a "non-main" proceeding is likely to be more restrictive than for a "main" proceeding.

203.   Granting standing[25] to the foreign representative to institute such actions is not without difficulty. In particular, such actions might not be looked upon favourably because of their potential for creating uncertainty about concluded or performed transactions. However, since the right to commence such actions is essential to protect the integrity of the assets of the debtor and is often the only realistic way to achieve such protection, it has been considered important to ensure that such right would not be denied to a foreign representative on the sole ground that he or she has not been locally appointed.

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 210-216.

A/CN.9/433, para. 134.

A/CN.9/WG.V/WP.48, p. 19.

A/CN.9/435, paras. 62-66.

*(b)  Guide to Enactment*

A/CN.9/436, paras. 86-88.

A/CN.9/442, paras. 165-167.

*(c)  Guide to Enactment and
Interpretation*

A/68/17, para. 197.

A/CN.9/WG.V/WP.103/Add.1,
   paras. 165-167.

A/CN.9/742, para. 66.

A/CN.9/WG.V/WP.107, paras. 165-167.

A/CN.9/763, para. 61.

A/CN.9/WG.V/WP.112, paras. 165-167.

A/CN.9/766, para. 50.

---

*Article 24.   Intervention by a foreign representative
in proceedings in this State*

Upon recognition of a foreign proceeding, the foreign representative may,
provided the requirements of the law of this State are met, intervene in any
proceedings in which the debtor is a party.

---

204.   The purpose of article 24 is to avoid the denial of standing[25] to the
foreign representative to intervene in proceedings merely because the pro-
cedural legislation may not have contemplated the foreign representative
among those having such standing. The article applies to foreign representa-
tives of both main and non-main proceedings.

205.   The word "intervene" in the context of article 20 is intended to refer
to cases where the foreign representative appears in court and makes rep-
resentations in proceedings, whether those proceedings be individual court
actions or other proceedings (including extrajudicial proceedings) instituted
by the debtor against a third party or proceedings instituted by a third party
against the debtor. The proceedings where the foreign representative might
intervene could only be those which have not been stayed under article 20,
subparagraph 1 *(a)*, or article 21, subparagraph 1 *(a)*.

206.   Article 24, which is limited to providing standing,[25] makes it clear
(by stating "provided the requirements of the law of this State are met")
that all other conditions of the local law for a person to be able to intervene
remain intact.

207.   Many if not all national procedural laws contemplate cases where a party (the foreign representative in this article) who demonstrates a legal interest in the outcome of a dispute between two other parties may be permitted by the court to be heard in the proceedings. Those procedural laws use different expressions to refer to such situations, the expression "intervention" being frequently used. If the enacting State uses another expression for that concept, the use of such other expression in enacting article 24 would be appropriate.

208.   The word "participate" as used in the context of article 12 refers to cases where the foreign representative makes representations in a collective insolvency proceeding (see para. 117 above), whereas the word "intervene" as used in article 24 covers cases where the foreign representative takes part in proceedings concerning an individual action by or against the debtor.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 117-123.

A/CN.9/422, paras. 148-149.

A/CN.9/433, paras. 51 and 58.

A/CN.9/WG.V/WP.48, p. 21.

A/CN.9/435, paras. 79-84.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 89-90.

A/CN.9/442, paras. 168-172.

*(c)   Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.107, para. 170.

A/CN.9/763, para. 62.

A/CN.9/WG.V/WP.112, para. 170.

A/CN.9/766, para. 51.

---

## CHAPTER IV.   COOPERATION WITH FOREIGN COURTS AND FOREIGN REPRESENTATIVES

209.   A widespread limitation on cooperation and coordination between judges from different jurisdictions in cases of cross-border insolvency is derived from the lack of a legislative framework, or from uncertainty regarding the scope of the existing legislative authority, for pursuing cooperation with foreign courts.

210.   Experience has shown that, irrespective of the discretion courts may
traditionally enjoy in a State, the passage of a specific legislative framework
is useful for promoting international cooperation in cross-border cases.
Accordingly, the Model Law fills the gap found in many national laws by
expressly empowering courts to extend cooperation in the areas covered by
the Model Law (articles 25-27).

211.   Chapter IV (articles 25-27), on cross-border cooperation, is thus a
core element of the Model Law. Its objective is to enable courts and insol-
vency representatives from two or more countries to be efficient and achieve
optimal results. Cooperation as described in the chapter is often the only
realistic way, for example, to prevent dissipation of assets, to maximize the
value of assets (e.g. when items of production equipment located in two
States are worth more if sold together than if sold separately) or to find the
best solutions for the reorganization of the enterprise.

212.   Cooperation is not dependent upon recognition and may thus occur
at an early stage and before an application for recognition. Since the arti-
cles of chapter 4 apply to the matters referred to in article 1, cooperation
is available not only in respect of applications for assistance made in the
enacting State, but also applications from proceedings in the enacting State
for assistance elsewhere (see also article 5). Cooperation is not limited to
foreign proceedings within the meaning of article 2, subparagraph *(a)* that
would qualify for recognition under article 17 (i.e. that they are either
main or non-main), and cooperation may thus be available with respect to
proceedings commenced on the basis of presence of assets. Such a provi-
sion may be useful when that proceeding is commenced in the enacting
State and assistance is sought elsewhere. That provision may also be rel-
evant when the enacting State, in addition to the Model Law, has other
laws facilitating coordination and cooperation with foreign proceedings
(see article 7).

213.   Articles 25 and 26 not only authorize cross-border cooperation, they
also mandate it by providing that the court and the insolvency representative
"shall cooperate to the maximum extent possible". The articles are designed
to overcome the widespread problem of national laws lacking rules providing
a legal basis for cooperation by local courts with foreign courts in dealing
with cross-border insolvencies. Enactment of such a legal basis would be
particularly helpful in legal systems in which the discretion given to judges
to operate outside areas of express statutory authorization is limited.
However, even in jurisdictions in which there is a tradition of wider judicial
latitude, enactment of a legislative framework for cooperation has proved
to be useful.

214.   To the extent that cross-border judicial cooperation in the enacting State is based on the principle of comity among nations, the enactment of articles 25-27 offers an opportunity for making that principle more concrete and adapting it to the particular circumstances of cross-border insolvencies.

215.   In the States in which the proper legal basis for international cooperation in the area of cross-border insolvency is not the principle of comity, but an international agreement (e.g. a bilateral or multilateral treaty or an exchange of letters between the cooperating authorities) based on the principle of reciprocity, chapter IV of the Model Law may serve as a model for the development of such international cooperation agreements.

216.   The articles in chapter IV leave certain decisions, in particular when and how to cooperate, to the courts and, subject to the supervision of the courts, to the insolvency representatives. For a court (or a person or body referred to in articles 25 and 26) to cooperate with a foreign court or a foreign representative regarding a foreign proceeding, the Model Law does not require a previous formal decision to recognize that foreign proceeding.

217.   The importance of granting the courts flexibility and discretion in cooperating with foreign courts or foreign representatives was emphasized at the Second UNCITRAL/INSOL Multinational Judicial Colloquium on Cross-Border Insolvency. At that Colloquium, reports of a number of cases in which judicial cooperation in fact occurred were given by the judges involved in the cases. From those reports a number of points emerged that might be summarized as follows: *(a)* communication between courts is possible but should be done carefully and with appropriate safeguards for the protection of substantive and procedural rights of the parties; *(b)* communication should be done openly, in the presence of the parties involved (except in extreme circumstances), who should be given advance notice; *(c)* communications that might be exchanged are various and include, for example, exchanges of formal court orders or judgements; supply of informal writings of general information, questions and observations; and transmission of transcripts of court proceedings; *(d)* means of communication include, for example, telephone, facsimile, electronic mail facilities and video; and *(e)* where communication is necessary and is intelligently used, there could be considerable benefits for the persons involved in, and affected by, the cross-border insolvency.

---

*Article 25.   Cooperation and direct communication between a court of
this State and foreign courts or foreign representatives*

1.   In matters referred to in article 1, the court shall cooperate to the maxi-
mum extent possible with foreign courts or foreign representatives, either
directly or through a [*insert the title of a person or body administering a
reorganization or liquidation under the law of the enacting State*].

2.   The court is entitled to communicate directly with, or to request informa-
tion or assistance directly from, foreign courts or foreign representatives.

---

218.   The ability of courts, with appropriate involvement of the parties, to
communicate "directly" and to request information and assistance "directly"
from foreign courts or foreign representatives is intended to avoid the use
of time-consuming procedures traditionally in use, such as letters rogatory.
This ability is critical when the courts consider that they should act with
urgency. In order to emphasize the flexible and potentially urgent character
of cooperation, the enacting State may find it useful to include in the enact-
ment of the Model Law an express provision that would authorize the courts,
when they engage in cross-border communications under article 25, to forgo
use of the formalities (e.g. communication via higher courts, letters rogatory
or other diplomatic or consular channels) that are inconsistent with the policy
behind the provision.

---

*Article 26.   Cooperation and direct communication between the* [insert the
title of a person or body administering a reorganization or liquidation under
the law of the enacting State] *and foreign courts
or foreign representatives*

1.   In matters referred to in article 1, a [*insert the title of a person or body
administering a reorganization or liquidation under the law of the enacting
State*] shall, in the exercise of its functions and subject to the supervision of
the court, cooperate to the maximum extent possible with foreign courts or
foreign representatives.

2.   The [*insert the title of a person or body administering a reorganization
or liquidation under the law of the enacting State*] is entitled, in the exercise
of its functions and subject to the supervision of the court, to communicate
directly with foreign courts or foreign representatives.

---

219.   Article 26 on international cooperation between persons who are appointed to administer assets of insolvent debtors reflects the important role that such persons can play in devising and implementing cooperative arrangements, within the parameters of their authority. The provision makes it clear that an insolvency representative acts under the overall supervision of the competent court (by stating "in the exercise of its functions and subject to the supervision of the court"). The Model Law does not modify the rules already existing in the insolvency law of the enacting State on the supervisory functions of the court over the activities of the insolvency representative. Generally, a certain degree of latitude and initiative on the part of insolvency representatives, within the broad confines of judicial supervision, are mainstays of cooperation in practical terms; it is therefore advisable that the enacting State does not change that in enacting the Model Law. In particular, there should be no suggestion that ad hoc authorization would be needed for each communication between the insolvency representative and a foreign body.

---

*Article 27.   Forms of cooperation*

Cooperation referred to in articles 25 and 26 may be implemented by any appropriate means, including:

*(a)*   Appointment of a person or body to act at the direction of the court;

*(b)*   Communication of information by any means considered appropriate by the court;

*(c)*   Coordination of the administration and supervision of the debtor's assets and affairs;

*(d)*   Approval or implementation by courts of agreements concerning the coordination of proceedings;

*(e)*   Coordination of concurrent proceedings regarding the same debtor;

*(f)*   [*The enacting State may wish to list additional forms or examples of cooperation*].

---

220.   Article 27 is suggested for use by the enacting State to provide courts with an indicative list of the types of cooperation that are authorized by articles 25 and 26. Such an indicative listing may be particularly helpful in States with a limited tradition of direct cross-border judicial cooperation and in States where judicial discretion has traditionally been limited and, as an indicative list, leaves the legislator an opportunity to include other forms of cooperation. Any listing of forms of possible cooperation should be illustrative rather than exhaustive, to avoid inadvertently precluding certain forms

of appropriate cooperation and limiting the ability of courts to fashion remedies in keeping with specific circumstances.

221. The implementation of cooperation would be subject to any mandatory rules applicable in the enacting State; for example, in the case of requests for information, rules restricting the communication of information (e.g. for reasons of protection of privacy) would apply.

222. Subparagraph *(f)* of article 27 offers the enacting State the opportunity to include additional forms of possible cooperation. Those might include, for example, suspension or termination of existing proceedings in the enacting State.

223. The *UNCITRAL Practice Guide on Cross-Border Insolvency Cooperation* expands upon the forms of cooperation mentioned in article 27 and, in particular, compiles practice and experience with the use of cross-border insolvency agreements.[36]

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 124-129.

A/CN.9/419, paras. 75-76, 80-83 and 118-133.

A/CN.9/WG.V/WP.44, pp. 21-22.

A/CN.9/422, paras. 129-143.

A/CN.9/WG.V/WP.46, p. 17.

A/CN.9/433, paras. 164-172.

A/CN.9/WG.V/WP.48, p. 22.

A/CN.9/435, paras. 85-94.

*(b)  Guide to Enactment*

A/CN.9/436, paras. 91-95.

A/CN.9/442, paras. 173-183.

*(c)  Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, paras. 173-175, 177, 181 and 183A.

A/CN.9/742, paras. 67-68.

A/CN.9/WG.V/WP.107, paras. 183-183A.

A/CN.9/763, para. 63.

A/CN.9/WG.V/WP.112, paras. 173A, 181 and 183-183A.

A/CN.9/766, para. 52.

---

[36] See footnote 15. The Model Law applies to individual debtors whether corporate or natural. Part three of the *Legislative Guide on Insolvency Law*, however, addresses the treatment of enterprise groups in insolvency and recommendations 240 to 254 focus on cooperation and communication to facilitate the conduct of cross-border insolvency proceedings where they concern members of an enterprise group. Part three of the *Legislative Guide* is available from http://www.uncitral.org/uncitral/uncitral_texts/insolvency.html

CHAPTER V.   CONCURRENT PROCEEDINGS

*Article 28.   Commencement of a proceeding under* [identify laws of the
enacting State relating to insolvency] *after recognition
of a foreign main proceeding*

After recognition of a foreign main proceeding, a proceeding under [*identify laws of the enacting State relating to insolvency*] may be commenced only if the debtor has assets in this State; the effects of that proceeding shall be restricted to the assets of the debtor that are located in this State and, to the extent necessary to implement cooperation and coordination under articles 25, 26 and 27, to other assets of the debtor that, under the law of this State, should be administered in that proceeding.

224.   The Model Law imposes virtually no limitations on the jurisdiction of the courts in the enacting State to commence or continue insolvency proceedings. Article 28, in conjunction with article 29, provides that recognition of a foreign main proceeding will not prevent the commencement of a local insolvency proceeding concerning the same debtor as long as the debtor has assets in the State.

225.   The position taken in article 28 is in substance the same as the position taken in a number of States. In some States, however, for the court to have jurisdiction to commence a local insolvency proceeding, the mere presence of assets in the State is not sufficient. For such jurisdiction to exist, the debtor must be engaged in an economic activity in the State (to use the terminology of the Model Law, the debtor must have an "establishment" in the State, as defined in article 2, subparagraph *(f)*). In article 28, the less restrictive solution was chosen in a context where the debtor is already involved in a foreign main proceeding. While the solution leaves a broad ground for commencing a local proceeding after recognition of a foreign main proceeding, it serves the purpose of indicating that, if the debtor has no assets in the State, there is no jurisdiction for commencing an insolvency proceeding.

226.   Nevertheless, the enacting State may wish to adopt the more restrictive solution of allowing the initiation of the local proceeding only if the debtor has an establishment in the State. The adoption of such a restriction would not be contrary to the policy underlying the Model Law. The rationale may be that, when the assets in the enacting State are not part of an establishment, the commencement of a local proceeding would typically not be the most efficient way to protect the creditors, including local creditors. By tailoring the relief to be granted to the foreign main proceeding and cooperating with

the foreign court and foreign representative, the court in the enacting State would have sufficient opportunity to ensure the assets in the State would be administered in such a way that local interests would be adequately protected. Therefore, the enacting State would act in line with the philosophy of the Model Law if it enacted the article by replacing the words "only if the debtor has assets in this State", as they currently appear in article 28, with the words "only if the debtor has an establishment in this State".

227.   Ordinarily, the local proceeding of the kind envisaged in article 28 would be limited to the assets located in the State. In some situations, however, a meaningful administration of the local insolvency proceeding may have to include certain assets abroad, especially when there is no foreign proceeding necessary or available in the State where the assets are situated (for example, where the local establishment would have an operating plant in a foreign jurisdiction, where it would be possible to sell the debtor's assets in the enacting State and the assets abroad as a "going concern", or where assets were fraudulently transferred abroad from the enacting State). In order to allow such limited cross-border reach of a local proceeding, the article includes the words "and ... to other assets of the debtor that ... should be administered in that proceeding". Two restrictions have been included in the article concerning the possible extension of effects of a local proceeding to assets located abroad: firstly, the extension is permissible "to the extent necessary to implement cooperation and coordination under articles 25, 26 and 27"; and, secondly, those foreign assets must be subject to administration in the enacting State "under the law of [the enacting State]". Those restrictions are useful in order to avoid creating an open-ended ability to extend the effects of a local proceeding to assets located abroad, a result that would generate uncertainty as to the application of the provision and that might lead to conflicts of jurisdiction.

228.   Where under the law of the enacting State the debtor must be insolvent to commence an insolvency proceeding, the Model Law establishes a rebuttable presumption that recognition of a foreign main proceeding constitutes the requisite proof of insolvency of the debtor for that purpose (article 31) (see paras. 235-238).

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a)   Model Law* | A/CN.9/WG.V/WP.46, p. 18. |
| A/52/17, paras. 94-101. | A/CN.9/433, paras. 173-181. |
| A/CN.9/WG.V/WP.44, pp. 26-29. | A/CN.9/WG.V/WP.48, p. 23. |
| A/CN.9/422, paras. 192-197. | A/CN.9/435, paras. 180-183. |

*(b)   Guide to Enactment*

A/CN.9/436, para. 96.

A/CN.9/442, paras. 184-187.

*(c)   Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, paras. 184 and 186-187A.

A/CN.9/742, para. 69.

A/CN.9/WG.V/WP.107, paras. 185 and 187A.

A/CN.9/763, para. 64.

A/CN.9/WG.V/WP.112, paras. 184-186 and 187A.

A/CN.9/766, para. 53.

---

*Article 29.   Coordination of a proceeding under* [*identify laws of the enacting State relating to insolvency*] *and a foreign proceeding*

Where a foreign proceeding and a proceeding under *[identify laws of the enacting State relating to insolvency]* are taking place concurrently regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:

*(a)*   When the proceeding in this State is taking place at the time the application for recognition of the foreign proceeding is filed,

> (i)   Any relief granted under article 19 or 21 must be consistent with the proceeding in this State; and

> (ii)   If the foreign proceeding is recognized in this State as a foreign main proceeding, article 20 does not apply;

*(b)*   When the proceeding in this State commences after recognition, or after the filing of the application for recognition, of the foreign proceeding,

> (i)   Any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the proceeding in this State; and

> (ii)   If the foreign proceeding is a foreign main proceeding, the stay and suspension referred to in paragraph 1 of article 20 shall be modified or terminated pursuant to paragraph 2 of article 20 if inconsistent with the proceeding in this State;

*(c)*   In granting, extending or modifying relief granted to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

229.    Article 29 gives guidance to the court that deals with cases where the debtor is subject to a foreign proceeding and a local proceeding at the same time. The objective of this article and article 30 is to foster coordinated decisions that would best achieve the objectives of both proceedings (e.g. maximization of the value of the debtor's assets or the most advantageous reorganization of the enterprise). The opening words of article 29 direct the court that in all such cases it must seek cooperation and coordination pursuant to chapter IV (articles 25, 26 and 27) of the Model Law.

230.    The salient principle embodied in article 29 is that the commencement of a local proceeding does not prevent or terminate the recognition of a foreign proceeding. This principle is essential for achieving the objectives of the Model Law in that it allows the court in the enacting State in all circumstances to provide relief in favour of the foreign proceeding.

231.    However, the article maintains a pre-eminence of the local proceeding over the foreign proceeding. This has been done in the following ways: firstly, any relief to be granted to the foreign proceeding must be consistent with the local proceeding (article 29, subparagraph *(a)* (i)); secondly, any relief that has already been granted to the foreign proceeding must be reviewed and modified or terminated to ensure consistency with the local proceeding (article 29, subparagraph *(b)* (i)); thirdly, if the foreign proceeding is a main proceeding, the automatic effects pursuant to article 20 are to be modified and terminated if inconsistent with the local proceeding (those automatic effects do not terminate automatically since they may be beneficial, and the court may wish to maintain them) (article 29, subparagraph *(b)* (ii)); and fourthly, where a local proceeding is pending at the time a foreign proceeding is recognized as a main proceeding, the foreign proceeding does not enjoy the automatic effects of article 20 (article 29, subparagraph *(a)* (ii)). Article 29 avoids establishing a rigid hierarchy between the proceedings since that would unnecessarily hinder the ability of the court to cooperate and exercise its discretion under articles 19 and 21. It is desirable not to restrict that latitude of the court when article 29 is enacted.

232.    Article 29, subparagraph *(c)*, incorporates the principle that relief granted to a foreign non-main proceeding should be limited to assets that are to be administered in that non-main proceeding or must concern information required in that proceeding. That principle is expressed in article 21, paragraph 3, which deals in a general way with the type of relief that may be granted to a foreign representative, and is restated in article 29, which deals with coordination of local and foreign proceedings. Article 19, paragraph 4, on pre-recognition relief, and article 30, on coordination of more than one foreign proceeding, are inspired by the same principle (see also the comments in para. 175 above).

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 106-110.

A/CN.9/435, paras. 190-191.

*(b)  Guide to Enactment*

A/CN.9/442, paras. 188-191.

*(c)  Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, para. 188.

A/CN.9/742, para. 70.

A/CN.9/WG.V/WP.112, para. 188.

A/CN.9/766, para. 53.

---

*Article 30.   Coordination of more than one foreign proceeding*

In matters referred to in article 1, in respect of more than one foreign proceeding regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:

*(a)*  Any relief granted under article 19 or 21 to a representative of a foreign non-main proceeding after recognition of a foreign main proceeding must be consistent with the foreign main proceeding;

*(b)*  If a foreign main proceeding is recognized after recognition, or after the filing of an application for recognition, of a foreign non-main proceeding, any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the foreign main proceeding;

*(c)*  If, after recognition of a foreign non-main proceeding, another foreign non-main proceeding is recognized, the court shall grant, modify or terminate relief for the purpose of facilitating coordination of the proceedings.

---

233.   Article 30 deals with cases where the debtor is subject to insolvency proceedings in more than one foreign State and foreign representatives of more than one foreign proceeding seek recognition or relief in the enacting State. The provision applies whether or not an insolvency proceeding is pending in the enacting State. If, in addition to two or more foreign proceedings, there is a proceeding in the enacting State, the court will have to act pursuant to both article 29 and article 30.

234.   The objective of article 30 is similar to the objective of article 29 in that the key issue in the case of concurrent proceedings is to promote

21-11854-dsj   Doc 38-2   Filed 06/30/23   Entered 06/30/23 15:09:46   Exhibit 2 -
2013 Enactment Guide   Pg 114 of 123

*Part two.   Guide to Enactment and Interpretation*   *105*

cooperation, coordination and consistency of the relief granted to different proceedings. Such consistency will be achieved by appropriate tailoring of the relief to be granted or by modifying or terminating relief already granted. Unlike article 29 (which, as a matter of principle, gives primacy to the local proceeding), article 30 gives preference to the foreign main proceeding if there is one. In the case of more than one foreign non-main proceeding, the provision does not a priori treat any foreign proceeding preferentially. Priority for the foreign main proceeding is reflected in the requirement that any relief in favour of a foreign non-main proceeding (whether already granted or to be granted) must be consistent with the foreign main proceeding (article 30, subparagraphs *(a)* and *(b)*).

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a)   Model Law* | *(b)   Guide to Enactment* |
| A/52/17, paras. 111-112. | A/CN.9/442, paras. 192-193. |

---

*Article 31.   Presumption of insolvency based on recognition
of a foreign main proceeding*

In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a proceeding under [*identify laws of the enacting State relating to insolvency*], proof that the debtor is insolvent.

---

235.   In some jurisdictions, proof that the debtor is insolvent is required for the commencement of insolvency proceedings. In other jurisdictions, insolvency proceedings may be commenced under specific circumstances defined by law that do not necessarily mean that the debtor is in fact insolvent; those circumstances may be, for example, cessation of payments by the debtor or certain actions of the debtor such as a corporate decision, dissipation of its assets or abandonment of its establishment.

236.   In jurisdictions where insolvency is a condition for commencing insolvency proceedings, article 31 establishes, upon recognition of a foreign main proceeding, a rebuttable presumption of insolvency of the debtor for the purposes of commencing an insolvency proceeding in the enacting State. The presumption does not apply if the foreign proceeding is a non-main proceeding. The reason is that an insolvency proceeding commenced in a State other than the State where the debtor has the centre of its main interests does not necessarily mean that the debtor is to be subject to laws relating to insolvency in other States.

237. For the national laws where proof that the debtor is insolvent is not required for the commencement of insolvency proceedings, the presumption established in article 31 may be of little practical significance and the enacting State may decide not to enact it.

238. This rule, however, would be helpful in those legal systems in which commencement of an insolvency proceeding requires proof that the debtor is in fact insolvent. Article 31 would have particular significance when proving insolvency as the prerequisite for an insolvency proceeding would be a time-consuming exercise and of little additional benefit bearing in mind that the debtor is already in an insolvency proceeding in the State where it has the centre of its main interests and the commencement of a local proceeding may be urgently needed for the protection of local creditors. Nonetheless, the court of the enacting State is not bound by the decision of the foreign court, and local criteria for demonstrating insolvency remain operative, as is clarified by the words "in the absence of evidence to the contrary".

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 94 and 102-105.

A/CN.9/WG.V/WP.44, p. 27.

A/CN.9/422, para. 196.

A/CN.9/WG.V/WP.46, p. 18.

A/CN.9/433, paras. 173 and 180-181.

A/CN.9/WG.V/WP.48, p. 23.

A/CN.9/435, paras. 180 and 184.

*(b)  Guide to Enactment*

A/CN.9/436, para. 97.

A/CN.9/442, paras. 194-197.

*(c)  Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, para. 197.

A/CN.9/742, para. 71.

A/CN.9/WG.V/WP.112, para. 197.

A/CN.9/766, para. 53.

---

*Article 32.  Rule of payment in concurrent proceedings*

Without prejudice to secured claims or rights *in rem*, a creditor who has received part payment in respect of its claim in a proceeding pursuant to a law relating to insolvency in a foreign State may not receive a payment for the same claim in a proceeding under [*identify laws of the enacting State relating to insolvency*] regarding the same debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received.

---

239.   The rule set forth in article 32 (sometimes referred to as the hotch-potch rule) is a useful safeguard in a legal regime for coordination and cooperation in the administration of cross-border insolvency proceedings. It is intended to avoid situations in which a creditor might obtain more favourable treatment than the other creditors of the same class by obtaining payment of the same claim in insolvency proceedings in different jurisdictions. For example, an unsecured creditor has received 5 per cent of its claim in a foreign insolvency proceeding; that creditor also participates in the insolvency proceeding in the enacting State, where the rate of distribution is 15 per cent; in order to put the creditor in the equal position as the other creditors in the enacting State, the creditor would receive 10 per cent of its claim in the enacting State.

240.   Article 32 does not affect the ranking of claims as established by the law of the enacting State and is solely intended to establish the equal treatment of creditors of the same class. To the extent claims of secured creditors or creditors with rights *in rem* are paid in full (a matter that depends on the law of the State where the proceeding is conducted), those claims are not affected by the provision.

241.   The words "secured claims" are used to refer generally to claims guaranteed by particular assets, while the words "rights *in rem*" are intended to indicate rights relating to a particular property that are enforceable also against third parties. A given right may fall within the ambit of both expressions, depending on the classification and terminology of the applicable law. The enacting State may use another term or terms for expressing those concepts.

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 130-134.

A/CN.9/419, paras. 89-93.

A/CN.9/WG.V/WP.44, pp. 29-30.

A/CN.9/422, paras. 198-199.

A/CN.9/WG.V/WP.46, p. 18.

A/CN.9/433, paras. 182-183.

A/CN.9/WG.V/WP.48, p. 23.

A/CN.9/435, paras. 96 and 197-198.

*(b)  Guide to Enactment*

A/CN.9/436, para. 98.

A/CN.9/442, paras. 198-200.

*108  UNCITRAL Model Law on Cross-Border Insolvency Law with Guide to Enactment and Interpretation*

## VI.  Assistance from the UNCITRAL Secretariat

### A.  *Assistance in drafting legislation*

242.   The UNCITRAL secretariat assists States with technical consultations for the preparation of legislation based on the Model Law. Further information may be obtained from the UNCITRAL secretariat (mailing address: Vienna International Centre, P.O. Box 500, 1400 Vienna, Austria; telephone: (+43-1) 26060-4060; facsimile: (+43-1) 26060-5813; e-mail: uncitral@uncitral.org; Internet home page: http://www.uncitral.org).

### B.  *Information on the interpretation of legislation based on the Model Law*

243.   The Model Law is included in the Case Law on UNCITRAL Texts (CLOUT) information system, which is used for collecting and disseminating information on case law relating to the conventions and model laws developed by UNCITRAL. The purpose of the system is to promote international awareness of those legislative texts and to facilitate their uniform interpretation and application. The secretariat publishes abstracts of decisions in the six official languages of the United Nations and the full, original decisions are available, upon request. The system is explained in a user's guide that is available on the above-mentioned Internet home page of UNCITRAL.

## *Annex I*

*General Assembly resolution 52/158 of 15 December 1997*

### 52/158. Model Law on Cross-Border Insolvency of the United Nations Commission on International Trade Law

*The General Assembly*,

*Recalling* its resolution 2205 (XXI) of 17 December 1966, by which it created the United Nations Commission on International Trade Law with a mandate to further the progressive harmonization and unification of the law of international trade and in that respect to bear in mind the interests of all peoples, in particular those of developing countries, in the extensive development of international trade,

*Noting* that increased cross-border trade and investment leads to greater incidence of cases where enterprises and individuals have assets in more than one State,

*Noting also* that when a debtor with assets in more than one State becomes subject to an insolvency proceeding, there often exists an urgent need for cross-border cooperation and coordination in the supervision and administration of the insolvent debtor's assets and affairs,

*Considering* that inadequate coordination and cooperation in cases of cross-border insolvency reduce the possibility of rescuing financially troubled but viable businesses, impede a fair and efficient administration of cross-border insolvencies, make it more likely that the debtor's assets would be concealed or dissipated and hinder reorganizations or liquidations of debtors' assets and affairs that would be the most advantageous for the creditors and other interested persons, including the debtors and the debtors' employees,

*Noting* that many States lack a legislative framework that would make possible or facilitate effective cross-border coordination and cooperation,

*Convinced* that fair and internationally harmonized legislation on cross-border insolvency that respects the national procedural and judicial systems and is acceptable to States with different legal, social and economic systems would contribute to the development of international trade and investment,

*Considering* that a set of internationally harmonized model legislative provisions on cross-border insolvency is needed to assist States in modernizing their legislation governing cross-border insolvency,

1.  *Expresses its appreciation* to the United Nations Commission on Inter-national Trade Law for completing and adopting the Model Law on Cross-Border Insolvency contained in the annex to the present resolution;[a]

2.  *Requests* the Secretary-General to transmit the text of the Model Law, together with the Guide to Enactment of the Model Law prepared by the Secretariat, to Governments and interested bodies;

3.  *Recommends* that all States review their legislation on cross-border aspects of insolvency to determine whether the legislation meets the objectives of a modern and efficient insolvency system and, in that review, give favourable consideration to the Model Law, bearing in mind the need for an internationally harmonized legislation governing instances of cross-border insolvency;

4.  *Recommends also* that all efforts be made to ensure that the Model Law, together with the Guide, become generally known and available.

*72nd plenary meeting*
*15 December 1997*

---

[a] The *UNCITRAL Model Law on Cross-Border Insolvency* is presented in part one of the present publication.

## *Annex II*

## **Decision of the United Nations Commission on International Trade Law**

At its 973rd meeting on 18 July 2013, the Commission adopted the following decision:

*The United Nations Commission on International Trade Law*,

"*Noting* that legislation based upon the UNCITRAL Model Law on Cross-Border Insolvency[37] has been enacted in some 20 States,

"*Noting also* the widespread increase in the incidence of cross-border insolvency proceedings and, accordingly, the growing opportunities for use and application of the Model Law in cross-border insolvency proceedings and the development of international jurisprudence interpreting its provisions,

"*Noting further* that courts frequently have reference to the Guide to Enactment of the Model Law[38] for guidance on the background to the drafting and interpretation of its provisions,

"*Recognizing* that some uncertainty with respect to the interpretation of certain provisions of the Model Law has emerged in the jurisprudence arising from its application in practice,

"*Convinced* of the desirability, in interpretation of those provisions, of regard to the international origin of the Model Law and the need to promote uniformity in its application,

"*Convinced also* of the desirability of providing additional guidance through revision of the Guide to Enactment of the Model Law with respect to the interpretation and application of selected aspects of the Model Law to facilitate that uniform interpretation,

"*Appreciating* the support for and the participation of international inter-governmental and non-governmental organizations active in the field of insolvency law reform in the revision of the Guide to Enactment of the Model Law,

---

[37] General Assembly resolution 52/158, annex (model law only).
[38] A/CN.9/442, annex.

"*Expressing* its appreciation to Working Group V (Insolvency Law) for its work in revising the Guide to Enactment of the Model Law,

"1.      *Adopts* the *Guide to Enactment and Interpretation of the UNCITRAL Model Law on Cross-Border Insolvency* contained in document A/CN.9/WG.V/WP.112, as revised by the Working Group at its forty-third session (set forth in document A/CN.9/766) and by the Commission at its current session,[39] and authorizes the Secretariat to edit and finalize the text of the Guide to Enactment and Interpretation in the light of those revisions;

"2.      *Requests* the Secretary-General to publish, including electronically, the revised text of the Guide to Enactment and Interpretation of the Model Law, together with the text of the Model Law, and to transmit it to Governments and interested bodies, so that it becomes widely known and available;

"3.      *Recommends* also that the *Guide to Enactment and Interpretation of the Model Law* be given due consideration, as appropriate, by legislators, policy makers, judges, insolvency practitioners and other individuals concerned with cross-border insolvency laws and proceedings; and

"4.      *Recommends* that all States continue to consider implementation of the UNCITRAL Model Law on Cross-Border Insolvency and invites States that have enacted legislation based upon the Model Law to advise the Commission accordingly."

---

[39] *Official Records of the General Assembly, Sixty-eighth session, Supplement No. 17* (A/68/17), para. 197.



V.13-86394—January 2014—400

V.13-86394
ISBN 978-92-1-133879-5