# EXHIBIT 5

**IN THE GENERAL DIVISION OF**
**THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

**[2023] SGHC 82**

Originating Summons No 16 of 2022

In the matter of Section 252 of the Insolvency, Restructuring and Dissolution Act 2018 (2020 Rev Ed)

And

In the matter of Article 15 of the Model Law on Cross-Border Insolvency

And

In the Matter of Ascentra Holdings, Inc (In Official Liquidation)

Between

| | | |
|---|---|---|
| (1) | Ascentra Holdings, Inc (In Official Liquidation) | |
| (2) | Graham Robinson | |
| (3) | Chua Suk Lin Ivy | |

… *Applicants*

And

SPGK Pte Ltd

… *Non-party*

---

# GROUNDS OF DECISION

---

[Insolvency Law — Cross-border insolvency — Recognition of foreign insolvency proceedings — Recognition of foreign solvent liquidation proceedings]

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

BACKGROUND ..................................................................................... 2

   THE PARTIES ..................................................................................... 2

   ASCENTRA'S LIQUIDATION ............................................................. 3

   ASCENTRA'S SOLVENCY ................................................................. 6

THE LAW ............................................................................................... 7

   RECOGNISING A FOREIGN PROCEEDING UNDER THE THIRD SCHEDULE ........... 7

ISSUE TO BE DETERMINED ............................................................. 9

THE INTERPRETATIVE APPROACH AS REGARDS THE
MODEL LAW ..................................................................................... 10

   THE PURPOSIVE APPROACH GENERALLY ..................................... 10

   TYPES OF EXTRINSIC MATERIAL ................................................. 11

   PURPOSES TO WHICH EXTRINSIC MATERIAL MAY BE PUT ............ 15

INTERPRETING ART 2(*H*) OF THE THIRD SCHEDULE .................. 16

   THE TEXT OF ART 2(H) OF THE THIRD SCHEDULE ....................... 16

   *The meaning of "insolvency"* ..................................................... 16

      (1)    Insolvency in Singapore law ..................................... 16

      (2)    Insolvency for the purposes of the Third Schedule .................. 18

   *The meaning of "law"* ............................................................... 20

   *The meaning of "relating to"* .................................................... 22

   *The ordinary meaning of the words "under a law relating to
insolvency"* ................................................................................. 24

THE UNDERLYING PURPOSE OF THE MODEL LAW .........................................27

THE PREPARATORY RECORDS AND DOCUMENTS.............................................31

    *The Working Group papers* .......................................................*31*

    *The 1997 Guide and the 2013 Guide* ........................................*34*

THE CASE LAW ..............................................................................39

    *The position in Singapore law* .................................................*39*

    *The position under US law should not be adopted* .................................*41*

       (1)    The US authorities should be accorded less weight ..................41

       (2)    The approach under US bankruptcy law has been
            criticised...................................................................45

    *The English position in Re Sturgeon is not an outlier* ...........................*54*

    *The Australian position should not be adopted* ......................................*58*

**ASCENTRA'S LIQUIDATION IS NOT A "FOREIGN
PROCEEDING" WITHIN THE MEANING OF THE MODEL
LAW** ......................................................................................**61**

**CONCLUSION** ...........................................................................**63**

> This judgment is subject to final editorial corrections approved by the
> court and/or redaction pursuant to the publisher's duty in compliance
> with the law, for publication in LawNet and/or the Singapore Law
> Reports.

# *Re* Ascentra Holdings, Inc (in official liquidation) and others (SPGK Pte Ltd, non-party)

## [2023] SGHC 82

General Division of the High Court — Originating Summons No 16 of 2022
Vinodh Coomaraswamy J
23, 25 March, 27 May 2022

3 April 2023

**Vinodh Coomaraswamy J:**

## Introduction

1        The question which this application raises is whether the liquidation in
another jurisdiction of a company which is neither insolvent nor in severe
financial distress is a "foreign proceeding" within the meaning of Art 2(*h*) of
the Third Schedule ("the Third Schedule") of the Insolvency, Restructuring and
Dissolution Act 2018 (2020 Rev Ed) ("the IRDA"). The Third Schedule sets out
Singapore's adaptation of the Model Law on Cross-Border Insolvency (30 May
1997) ("the Model Law") promulgated by the United Nations Commission on
International Trade Law ("UNCITRAL").

2        The applicants' case is that nothing in the Third Schedule requires the
company which is subject to the "foreign proceeding" to be insolvent or in
severe financial distress.

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

3      I have dismissed the application. In my view, the Model Law and the Third Schedule were never intended to apply to a solvent company.

4      The applicants have appealed against my decision. I now set out the grounds for my decision.

**Background**

*The parties*

5      The first applicant is Ascentra Holdings, Inc ("Ascentra"). Before it went into liquidation, Ascentra sold health and beauty products as well as computer communications software in Hong Kong, Taiwan and Singapore. It did this through both a personal marketing referral programme and an e-commerce platform.[1]

6      The second and third applicants are Mr Graham Robinson ("Mr Robinson") and Ms Ivy Chua ("Ms Chua"). Mr Robinson and Ms Chua are the two joint official liquidators of Ascentra appointed by the Grand Court of the Cayman Islands ("the Grand Court").

7      Ascentra's application is opposed by SPGK Pte Ltd ("SGPK Singapore"), a company incorporated in Singapore. SPGK Singapore's sole shareholder is Shang Peng Gao Ke, Inc ("SPGK Cayman"), a company incorporated in the Cayman Islands.[2] It appears that SPGK Cayman is connected to an individual who is a director of Ascentra and one of its major shareholders.

---

[1]      Graham Robinson's First Affidavit dated 6 January 2022 ("Graham Robinson's First Affidavit") at para 11; Ryunosuke Yoshida's First Affidavit dated 3 February 2022 ("Ryunosuke Yoshida's First Affidavit") at paras 14 and 16.

[2]      Ryunosuke Yoshida's First Affidavit at para 12.

*Re Ascentra Holdings, Inc*                                         [2023] SGHC 82

8      The applicants consider that Ascentra has potential claims for US$282.3m and US$77m against SPGK Cayman and for US$160m against SPGK Singapore.[3] They also consider that Ascentra has potential claims against another company incorporated in Singapore, Scuderia Bianco Pte Ltd ("Scuderio Bianco").[4]

9      Part of the applicants' purpose in seeking recognition of Ascentra's liquidation in Singapore is to allow the liquidators to secure information and documents from SPGK Singapore and Scuderia Banco in order to, among other things: (a) decide on the possible claims that Ascentra may bring; (b) formulate Ascentra's causes of action with greater precision; and (c) identify the appropriate defendants to commence proceedings against.[5] That is how SPGK Singapore came to be heard in opposition to Ascentra's application even though it is not a party to the application.

*Ascentra's liquidation*

10     The ultimate beneficial shareholders of Ascentra are seven natural persons, some of whom are or were at various times directors of Ascentra.[6] Ascentra finds itself in voluntary liquidation as a result of a number of disputes that arose between these shareholders starting in 2018 over the strategic direction of Ascentra's business.

---

[3]      Graham Robinson' First Affidavit at paras 15–17, 26–27 and 29.

[4]      Graham Robinson's First Affidavit at para 24(c).

[5]      Graham Robinson's Second Affidavit dated 10 March 2022 ("Graham Robinson's Second Affidavit") at para 22.

[6]      Graham Robinson's First Affidavit at para 8.

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

11      Because of these disputes, on 1 June 2021, the shareholders of Ascentra
resolved to place it in voluntary liquidation and to appoint Mr Robinson as its
liquidator.[7] On 2 June 2021, the company filed the documents required by the
Companies Act (2021 Revision) (Cayman Islands) ("the Cayman Act") to
initiate its voluntary liquidation with the Cayman Islands Registrar of
Companies. The Cayman Act deems Ascentra's voluntary liquidation to have
commenced on 2 June 2021.[8]

12      The Cayman Act and its subsidiary legislation required Ascentra's
directors to file a declaration of solvency no later than 28 days after the
voluntary liquidation commenced, *ie* by 30 June 2021.[9] For undisclosed reasons,
presumably related to the shareholder disputes, Ascentra's directors failed to
file this declaration by 30 June 2021 or at all.

13      Under the Cayman Act, this failure obliged Mr Robinson, as Ascentra's
liquidator, to present a petition to the Grand Court for an order that Ascentra's
voluntary liquidation continue under the supervision of the Grand Court.[10]
Mr Robinson duly presented a petition on 2 July 2021.

14      On 17 September 2021, the Grand Court allowed Mr Robinson's
petition and made two orders:[11]

        (a)      an order appointing Mr Robinson and Ms Chua as the joint
        official liquidators of Ascentra ("the Liquidators"); and

---

[7]       Graham Robinson's First Affidavit at para 23.

[8]       Graham Robinson's First Affidavit at para 25.

[9]       Applicant's Further Bundle of Authorities dated 22 April 2022 at Tab 1.

[10]      Graham Robinson's First Affidavit at para 26.

[11]      Graham Robinson's First Affidavit at para 27.

4

*Re Ascentra Holdings, Inc*                                      [2023] SGHC 82

    (b)    an order authorising the Liquidators to take the necessary action to obtain the recognition of their appointment in other relevant jurisdictions.

15    As contemplated by the Grand Court's order, the applicants filed this application under Art 15 of the Third Schedule on 6 January 2022. By this application, the applicants seek three orders:[12]

    (a)    an order recognising the Cayman liquidation in Singapore and by the Singapore courts as a "foreign main proceeding" within the meaning of Article 2(*f*) of the Third Schedule and the Model Law;

    (b)    an order recognising Mr Robinson and Ms Chua as joint liquidators in Singapore and by the Singapore courts as "foreign representatives" of Ascentra within the meaning of Article 2(*i*) of the Model Law; and

    (c)    an order granting the Liquidators powers in relation to Ascentra's property and assets "as are available to a liquidator under Singapore insolvency law".

---

[12]    Graham Robinson's First Affidavit at para 5.

5

*Re Ascentra Holdings, Inc*                                                      [2023] SGHC 82

***Ascentra's solvency***

16       The striking feature of this application is that the Liquidators accept that
Ascentra is and has at all material times been solvent. Thus, on 23 September
2021, the Liquidators certified Ascentra's solvency in the following terms:[13]

**JOINT OFFICIAL LIQUIDATORS' CERTFICATE**

**Ascentra Holdings, Inc – In Official Liquidation (the
"Company")**

**Grand Court FSD Cause No: 189 of 2021 (DDJ)**

> TAKE NOTICE that the Joint Official Liquidators hereby certify
> that they have determined that the abovenamed Company
> should be treated as **solvent**, for the purposes of section 110
> (4) of the [Cayman] Act and CWR Orders 8 and 9.
>
> AND FURTHER TAKE NOTICE that the Joint Official
> Liquidators may change their determination from time to time
> in the light of changes of relevant circumstances and/or their
> assessment of the Company's financial position.
>
> Dated this 23rd day of September 2021.
>
> [emphasis in original]

17       So too, on 14 October 2021, the Liquidators confirmed Ascentra's
solvency in their letter to its shareholders:[14]

> ...
>
> On 17 September 2021, the Supervision Order was made by
> [the Grand Court] and [Mr Robinson] together with [Ms Chua]
> ... were appointed as the Joint Official Liquidators ("**JOLs**") of
> [Ascentra]. ...
>
> *The JOLs have determined that [Ascentra] is solvent* and the
> relevant [certificate] has been filed in [the Grand Court]. ...
>
> [original emphasis in bold; emphasis added in italics]

---

[13]      Graham Robinson's Second Affidavit at p 570.

[14]      Graham Robinson's First Affidavit at p 92.

6

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

18      On 10 March 2022, in his affidavit filed in support of this application, Mr Robinson confirmed again that Ascentra continues to be solvent.[15]

19      The Liquidators do not suggest that there is even the remotest risk that Ascentra may be found to be insolvent at any time during the remainder of its voluntary liquidation. In that sense, and without being facetious, the evidence establishes that Ascentra is hopelessly and irretrievably *solvent*.

**The law**

***Recognising a foreign proceeding under the Third Schedule***

20      The court cannot exercise its power under Art 17 of the Third Schedule to recognise any proceeding unless it is a "foreign proceeding" within the meaning of Art 2(*h*):

> **Article 17. Decision to recognise a foreign proceeding**
>
> 1. Subject to Article 6, a proceeding must be recognised if —
>
> > (*a*) it is a foreign proceeding within the meaning of Article 2(*h*);
> >
> > (*b*) the person or body applying for recognition is a foreign representative within the meaning of Article 2(*i*);
> >
> > (*c*) the application meets the requirements of Article 15(2) and (3); and
> >
> > (*d*) the application has been submitted to the Court mentioned in Article 4.

---

[15]      Graham Robinson's Second Affidavit at paras 16 and 30.

7

*Re Ascentra Holdings, Inc*                                        [2023] SGHC 82

21      Article 2(*h*) of the Third Schedule defines "foreign proceeding" as
follows:

> **Article 2. Definitions**
>
> For the purposes of this Law —
>
> …
>
> (*h*)  "foreign proceeding" means a *collective judicial or
> administrative proceeding in a foreign State*, including an
> interim proceeding, *under a law relating to insolvency or
> adjustment of debt* in which proceeding the *property and affairs
> of the debtor are subject to control or supervision by a foreign
> court*, for the *purpose of reorganisation or liquidation*;
>
> [emphasis added]

22      In *United Securities Sdn Bhd (in receivership and liquidation) and
another v United Overseas Bank Ltd* [2021] 2 SLR 950 ("*United Securities*"),
the Court of Appeal held (at [53]) that Art 2(*h*) contains four cumulative
requirements which must be established before a proceeding is a "foreign
proceeding" within the meaning of the Third Schedule:

> (a)      the proceeding must involve creditors collectively;
>
> (b)      the proceeding must have its basis in a law relating to insolvency;
>
> (c)      the court must exercise control or supervision of the property and
> affairs of the debtor in the proceeding; and
>
> (d)      the purpose of the proceeding must be the debtor's
> reorganisation or liquidation.

8

*Re Ascentra Holdings, Inc*                                      [2023] SGHC 82

23      Only the second of these four requirements is in issue on this application.
SPGK Singapore, quite rightly, accepts that Ascentra's liquidation satisfies the
first, third and fourth of these requirements.[16]

### Issue to be determined

24      The single issue in this application is therefore whether Ascentra's
liquidation has "its basis in a law relating to insolvency" within the meaning of
Art 2(*h*) of the Third Schedule.

25      I take the phrase "a law relating to insolvency" from the second *United
Securities* requirement (see [22(b)] above). I shall treat this phrase as intending
to capture precisely the same meaning as the longer phrase by which Art 2(*h*)
of the Third Schedule defines "foreign proceeding": "a…proceeding…under a
law relating to insolvency or adjustment of debt". The applicants do not, quite
rightly, suggest that there is any difference in the meaning of the second *United
Securities* requirement and the longer definition in Art 2(*h*) which it is intended
to summarise. The applicants also do not suggest that Ascentra's liquidation is
"a…proceeding…under a law relating to adjustment of debt" within the
meaning of Art 2(*h*).

26      The applicants submit, instead, that Ascentra's liquidation is "a…
proceeding…under a law relating to insolvency" for the following reasons.
Ascentra's liquidation commenced and now carries on under the Cayman Act.
The Cayman Act incorporates a comprehensive and integrated statutory scheme
that was enacted to govern the liquidation of *all* Cayman companies, solvent
*and* insolvent. It is therefore "a law relating to insolvency" within the meaning

---

[16]      SPGKPL's Supplemental Written Submissions dated 8 April 2022 ("SPGKPL's
Supplemental Written Submissions") at paras 24(a) and (b).

*Re Ascentra Holdings, Inc* [2023] SGHC 82

of Art 2(*h*). Further, Art 2(*c*) of the Third Schedule does not exclude a solvent company from the scope of the term "debtor" and therefore from the scope of the Third Schedule altogether. Similarly, Art 2(*h*) does not exclude a solvent liquidation from the scope of the term "foreign proceeding". Indeed, both Arts 2(*c*) and 2(*h*) say nothing at all about the financial state of the company which is subject to the foreign proceeding.[17] Ascentra's liquidation is therefore a "foreign proceeding" within the meaning of Art 2(*h*) of the Third Schedule.[18] It is therefore entitled to recognition under Art 17 of the Third Schedule.

27     In response, SPGK Singapore submits that Ascentra's liquidation is not a proceeding under a law relating to insolvency because the specific provisions of the Cayman Act under which Ascentra's liquidation commenced and carries on deal with *solvent* liquidation, not *insolvent* liquidation.

**The interpretative approach as regards the Model Law**

28     I must interpret Art 2(*h*) of the Third Schedule purposively. The Third Schedule is "written law" within the meaning of s 2(1) of the Interpretation Act 1965 (2020 Rev Ed) ("the IA"). Section 9A of the IA therefore obliges me to prefer an interpretation of the Third Schedule that will promote its purpose or object to one which will not.

*The purposive approach generally*

29     The Court of Appeal in *Tan Cheng Bock v Attorney-General* [2017] 2 SLR 850 ("*Tan Cheng Bock*") (at [37]) endorsed the three-stage approach to the purposive interpretation of a statutory provision set out in the minority

---

[17]     Applicants' Supplementary Written Submissions dated 22 April 2022 ("Applicants' Supplementary Written Submissions") at paras 20–21.

[18]     Ascentra's Written Submissions at paras 21–28.

*Re Ascentra Holdings, Inc* [2023] SGHC 82

judgment in *Attorney-General v Ting Choon Meng and another appeal* [2017] 1 SLR 373 ("*Ting Choon Meng*") (at [59]):

> 59    It follows from this that the court's task when undertaking a purposive interpretation of a legislative text should begin with three steps:
>
> > (a)    First, ascertain the possible interpretations of the provision, having regard not just to the text of the provision but also to the context of that provision within the written law as a whole.
> >
> > (b)    Second, ascertain the legislative purpose or object of the statute.
> >
> > (c)    Third, compare the possible interpretations of the provision against the purposes or objects of the statute.

30    Section 9A of the IA expressly permits a court to consider extrinsic material when interpreting a provision purposively. Thus, a court may ascertain the purpose of a provision from its text and context in the written law (*ie*, material intrinsic to the written law) and also from material which does not form part of the written law at all (*ie*, material extrinsic to the written law): *Tan Cheng Bock* at [42]. But in ascertaining the purpose of a provision, the court should accord primacy to intrinsic material over extrinsic material. The written law to be interpreted and applied is the text which Parliament has chosen to embody and give effect to its purpose. Parliament's purpose should therefore, as far as possible, be derived from the text of the written law, read in context: *Tan Cheng Bock* at [43].

### Types of extrinsic material

31    Section 9A(2) of the IA provides that a court may consider "*any material not forming part of the written law*" [emphasis added] so long as it is "capable of assisting in the ascertainment of the meaning of the provision" (see also *Tan Cheng Bock* at [42] and [51]). Without limiting the generality of s 9A(2), s 9A(3)

*Re Ascentra Holdings, Inc*                                            [2023] SGHC 82

of the IA permits a court to consider six categories of extrinsic material in order to ascertain the legislative purpose of a provision. In particular, s 9A(3)(*f*) of the IA permits the court to consider "any document that is declared by the written law to be a relevant document for the purposes of [s 9A of the IA]."

32      Section 252(2) of the IRDA provides that the following two documents are relevant for the purposes of s 9A(3)(*f*) of the IA on the interpretation of any provision of the Third Schedule:

> (a)      any document relating to the Model Law that is issued by, or forms part of the record on the preparation of the Model Law maintained by, UNCITRAL and its working group for the preparation of the Model Law; and

> (b)      a specific document issued by UNCITRAL in 1997 bearing the title, *Cross-Border Insolvency: Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency*, 30th Sess, UN Doc A/CN.9/442 (1997) ("the 1997 Guide").

33      In 2013, UNCITRAL revised the 1997 Guide and promulgated the *UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation* (2013) ("the 2013 Guide"). Am I empowered to consider the 2013 Guide in the purposive interpretation of Third Schedule even though s 252(2) of the IRDA refers expressly and only to the 1997 Guide? It is true that the 2013 Guide was published several years *before* Singapore adopted the Model Law and enacted s 252(2)'s predecessor, the now-abolished s 354B(2) of the Companies Act (Cap 50, 2006 Rev Ed) ("Companies Act (2006 Rev Ed)"). One could therefore take the view that Parliament's decision to refer only to the 1997 Guide in s 252(2) of the IRDA and its statutory predecessor was a

12

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

considered decision, and indicating by necessary implication a legislative intent to prohibit any consideration of the 2013 Guide as extrinsic material in a purposive interpretation of the Third Schedule.

34      I do not consider this to be the correct view. In my view, the 2013 Guide is part of the extrinsic material which a court can consider for this purpose. I say that for two reasons.

35      First, the scheme of s 9A of the IA is that the list of categories of extrinsic material enumerated in s 9A(3)(*f*) is inclusive and not exhaustive. That is why the chapeau of s 9A(3) concludes with the words "shall *include*" [emphasis added]. Further, the opening words of s 9A(3) provide expressly that its list of six categories is not intended to limit the generality of s 9A(2) of the IA. As I have already mentioned, s 9A(2) is expressed in the widest possible terms (as manifested by the words "*any* material"). The only limitation in s 9A(2) is the obvious one: the extrinsic material must be "capable of assisting in the ascertainment of the meaning of the provision". The 2013 Guide, as an official UNCITRAL publication, is undoubtedly capable of assisting in the interpretation of the provisions of the Third Schedule.

36      Second, I accept Aedit Abdullah J's holding in *Re Zetta Jet Pte Ltd and others (Asia Aviation Holdings Pte Ltd, intervener)* [2019] 4 SLR 1343 ("*Re Zetta Jet*") that it promotes consistency and comity for the Singapore courts to consider the 2013 Guide in the purposive interpretation of the Third Schedule (at [37]). This imperative, as Abdullah J points out in *Re Zetta Jet*, comes from Art 8 of the Third Schedule. That article requires the Singapore courts to interpret the Model Law, as enacted in the Third Schedule, having regard to its international origin and the need to promote uniformity in its application. This imperative also leads me to conclude that Parliament cannot have intended

13

*Re Ascentra Holdings, Inc*                                          [2023] SGHC 82

s 252(2) of the IRDA to freeze the universe of extrinsic material which the Singapore courts can legitimately consider in the purposive interpretation of the Third Schedule, regardless of the updates or additions to that universe of material. Parliament's purpose in enacting the Model Law was to facilitate cooperation and coordination between the courts of Singapore and courts outside Singapore in a proceeding covered by the Third Schedule. That suggests that Parliament intended the Singapore courts to facilitate cooperation and coordination by interpreting and applying the Third Schedule in a manner consistent with prevailing international norms and practices. In a field such as cross-border insolvency, it is inevitable that those norms and practices will evolve over time. Parliament must have intended the courts to gather those norms and practices from the universe of extrinsic material that is available at the time they interpret and apply the Third Schedule, not merely the specific extrinsic material enumerated in s 252(2) of the IRDA.

37      The express reference to the 1997 Guide in s 252(2) of the IRDA must nevertheless be given *some* meaning. As Abdullah J points out in *Re Zetta Jet*, this reference indicates Parliament's intention that, if there is an inconsistency between the 1997 Guide and the 2013 Guide, the 1997 Guide must prevail. But if there is no such inconsistency, there is no reason to ignore the 2013 Guide and every reason to take it into account. Further, like Abdullah J, I do not consider there to be an inconsistency between the two guides for this purpose if the 2013 Guide takes a positive position on an issue on which 1997 Guide is silent. I consider there to be an inconsistency for this purpose only if both Guides take positive and conflicting positions on the same issue.

14

*Re Ascentra Holdings, Inc*                                        [2023] SGHC 82

**Purposes to which extrinsic material may be put**

38      Once the universe of extrinsic material which the court may legitimately
consider in the purposive interpretation of the Third Schedule has been
delimited, the question which arises is the legitimate use to which the court may
put that extrinsic material in carrying out the purposive interpretation.

39      The IA permits the court to use extrinsic material only to achieve one of
the three objectives set out in s 9A(2) of the IA: (a) to confirm the ordinary
meaning of the provision; (b) to resolve a patent ambiguity; or (c) to ascertain
the meaning of the provision where the ordinary meaning is manifestly absurd.
The Court of Appeal in *Tan Cheng Bock* (at [47] noted this as follows, citing
*Ting Choon Meng* at [65]):

> 47    In *Ting Choon Meng*, the three situations under which the
> court may consider extraneous material as set out under s 9A(2)
> were outlined as follows (at [65]):
>
> > (a)      under s 9A(2)(*a*), to *confirm* that the ordinary
> > meaning deduced is the correct and intended meaning
> > having regard to any extraneous material that further
> > elucidates the purpose or object of the written law;
> >
> > (b) under s 9A(2)(*b*)(i), to *ascertain* the meaning of the
> > text in question when the provision on its face is
> > ambiguous or obscure; and
> >
> > (c) under s 9A(2)(*b*)(ii), to *ascertain* the meaning of the
> > text in question where having deduced the ordinary
> > meaning of the text as aforesaid, and considering the
> > underlying object and purpose of the written law, such
> > ordinary meaning is manifestly absurd or unreasonable.
>
> [emphasis in original]

40      It is thus impermissible to rely on extrinsic material "to give the statute
a sense which is contrary to its express text" (*Tan Cheng Bock* at [50], citing
*Seow Wei Sin v PP* [2011] 1 SLR 1199 at [21]), at least in a case outside
s 9A(2)(*b*)(ii) of the IA. There is no suggestion by either party that the ordinary

15

*Re Ascentra Holdings, Inc* [2023] SGHC 82

meaning of Article 2(*h*) of the Third Schedule is "manifestly absurd or unreasonable" within the meaning of s 9A(2)(*b*)(ii) of the IA.

**Interpreting Art 2(*h*) of the Third Schedule**

41     I turn now to interpret Art 2(*h*) of the Third Schedule purposively, as mandated by s 9A of the IA. The critical phrase within Art 2(*h*) of the Third Schedule that I must interpret is "law related to insolvency". I begin by ascertaining the ordinary meaning of this phrase in context.

*The text of Art 2(**h**) of the Third Schedule*

42     To ascertain the ordinary meaning of this phrase, it is a useful analytical tool to consider in turn the phrase's three constituent elements as to both their ordinary meaning and with reference to Art 2(*h*)'s statutory context in the following sequence: (a) "insolvency"; (b) "law"; and (c) "relating to".

*The meaning of "insolvency"*

(1)     Insolvency in Singapore law

43     The only substantive test of insolvency in the IRDA appears in s 125(2)(*c*). It is useful to look at s 125(2)(*c*) in the context of s 125(2) as a whole:

> **Circumstances in which company may be wound up by Court**
>
> **125.**—…
>
> (2) A company is deemed to be unable to pay its debts if —
>
>> (*a*) a creditor (by assignment or otherwise) to whom the company is indebted in a sum exceeding $15,000 then due has served on the company, by leaving at the registered office of the company, a written demand by the creditor or the creditor's lawfully

*Re Ascentra Holdings, Inc*                                           [2023] SGHC 82

> authorised agent requiring the company to pay the
> sum so due, and the company has for 3 weeks after
> the service of the demand neglected to pay the sum,
> or to secure or compound for it to the reasonable
> satisfaction of the creditor;
>
> (*b*)  execution or other process issued on a judgment,
> decree or order of any court in favour of a creditor of
> the company is returned unsatisfied in whole or in
> part; or
>
> (*c*)  it is proved to the satisfaction of the Court that the
> company is unable to pay its debts; and in
> determining whether a company is unable to pay its
> debts the Court must take into account the
> contingent and prospective liabilities of the
> company.

44      Although s 125(2) expressly frames its three limbs as deeming
provisions, s 125(2)(*c*) is not in truth a deeming provision. Only ss 125(2)(*a*)
and 125(2)(*b*) are true deeming provisions. The effect of those two provisions
is to deem proof of a single objective factual predicate as establishing that a
company is unable to pay its debts. These provisions are incapable of
functioning as a test of insolvency of general applicability. That is because they
cannot apply outside the context of contemplated insolvency proceedings
(s 125(2)(*a*)) or concluded civil proceedings (s 125(2)(*b*)). Only s 125(2)(*c*) sets
out a test of insolvency which is capable of general application: *BNY Corporate
Trustee Services Ltd v Eurosail-UK 2007-3BL plc and others* [2013] 1 WLR
1408 ("*BNY v Eurosail*") at [24]–[25] and [35].

45      Under s 125(2)(*c*) of the IRDA, a company is insolvent if it is unable to
pay its debts, taking into account its contingent and prospective liabilities. The
Court of Appeal analysed the content of this test in *Sun Electric Power Pte Ltd
v RCMA Asia Pte Ltd (formerly known as Tong Teik Pte Ltd)* [2021] 2 SLR 478
("*Sun Electric*").  The statutory provision which the Court of Appeal considered

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

there was s 254(2)(*c*) of the Companies Act (2006 Rev Ed), the predecessor in
near-identical terms of s 125(2)(*c*) of the IRDA.

46      The Court of Appeal noted that s 254(2)(*c*) of the Companies Act (2006
Rev Ed) is framed in the present tense. It therefore tests the company's present
ability to pay its debts (*Sun Electric* at [62]). A company is obviously insolvent
on this test if, on the date at which the test is applied, it cannot pay the debts
which have already fallen due. But, as the Court of Appeal held in *Sun Electric*,
a company is also insolvent on this test if it is unable to continue to pay its debts
as they fall due into the "reasonably near future": *Sun Electric* at [65] and [66].
For the typical company in the typical case, and following standard accounting
practice, the "reasonably near future" for this purpose is 12 months: *Sun Electric*
at [65].

47      A company is therefore insolvent under Singapore's law if, and only if,
it is unable to pay its debts as they fall due at present *and* into the reasonably
near future, defined in accordance with the standard accounting definition as the
next 12 months, bearing in mind when its current liabilities will fall due and
how long it will need to realise its current assets: *Sun Electric* at [56], [65] and
[66].

(2)      Insolvency for the purposes of the Third Schedule

48      The test in s 125(2)(*c*) of the IRDA as analysed in *Sun Electric* is the test
of insolvency in Singapore law. This is not directly relevant to the meaning of
"insolvency" for the purposes of the definition of "foreign proceedings" in
Art 2(*h*). The subject of Art 2(*h*) is a "proceeding in a foreign State". It could
be argued that the proper characterisation of that proceeding must necessarily

18

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

take into account, at least as one of many factors, the law of that foreign State. In this case, that points to Cayman law, not Singapore law.

49      Fortunately, it appears that there is no material difference between the concept of insolvency under Cayman law and the concept of insolvency under Singapore law. Section 93(*c*) of the Cayman Act is the analogue of s 125(2)(*c*) of the IRDA, and provides as follows:

> **Definition of inability to pay debts**
>
> **93**. A company shall be deemed to be unable to pay its debts if —
>
>> (a)  a creditor by assignment or otherwise to whom the company is indebted at law or in equity in a sum exceeding one hundred dollars then due, has served on the company by leaving at its registered office a demand under that person's hand requiring the company to pay the sum so due, and the company has for the space of three weeks succeeding the service of such demand, neglected to pay such sum, or to secure or compound for the same to the satisfaction of the creditor;
>>
>> (b)  execution of other process issued on a judgment, decree or order obtained in the Court in favour of any creditor at law or in equity in any proceedings instituted by such creditor against the company, is returned unsatisfied in whole or in part; or
>>
>> (c)  *it is proved to the satisfaction of the Court that the company is unable to pay its debts.*
>
> [emphasis added]

50      The first 18 words of s 125(2)(*c*) of the IRDA are identical to the entirety of s 93(*c*) of the Cayman Act. Those 18 words trace their origin back to s 80(4) of the Companies Act 1862 (c 89) (UK) (*BNY v Eurosail* at [27]). The phrase "as they fall due" is understood to be implicit in this test (*BNY v Eurosail* at [30]). Both Cayman law and Singapore law therefore appear to adopt the same statutory test of insolvency.

*Re Ascentra Holdings, Inc*                                              [2023] SGHC 82

51      Unlike s 125(2)(*c*) of the IRDA, s 93(*c*) of the Cayman Act does not
expressly require the court to take into account contingent and prospective
liabilities in applying the statutory test of insolvency. However, neither party
before me suggests that this is a material difference. As Lord Walker held in
*BNY v Eurosail* (at [37]), the substance of this statutory test of insolvency did
not change in English law even though its statutory form changed significantly
between 1862 and 1986.  In 1862, the statutory test in English law was identical
to s 93(*c*) of the Cayman Act. In 1986, the statutory test in English law was
amended to incorporate the words "as they fall due" and an express provision
requiring the court to take into account the company's contingent and
prospective liabilities. These statutory changes merely codified the manner in
which the English judges had interpreted and applied the statutory test of
insolvency found in the 1862 statute. In any case, since the applicants have taken
no steps to rely on or prove the test for insolvency under Cayman law, it is open
to me to presume that the test for insolvency in Cayman law is the same as it is
in Singapore law: *EFT Holdings, Inc and another v Marinteknik Shipbuilders
(S) Pte Ltd and another* [2014] 1 SLR 860 at [58].

52      On its ordinary meaning, therefore, "insolvency" in Art 2(*h*) means a
company's inability to pay debts which have already fallen due or which will
fall due within the reasonably near future.

*The meaning of "law"*

53      I accept that the word "law" is not capable of exhaustive or even formal
definition. The Oxford English Dictionary defines "law" as "a system of rules
which a particular country or community recognises as regulating the actions of
its members and which it may enforce by the imposition of penalties". That
suffices as a working definition for present purposes. I would add to this only

two points. First, that the rules may also be enforced by awarding compensation and by declaring rights or liabilities as well as by imposing penalties. Second, the penalties must be imposed through the country's public institutions (*eg,* by way of civil orders or judgments or criminal sentences) and not through private or social means (*eg*, by way of shame or ostracism). Systems of rules which impose private or social penalties no doubt exist, but they are not law.

54     In the modern state, established with the now-typical separation of powers, it is the role of the legislature to make the rules which constitute its "law". It is also now generally accepted that a country's judiciary, in the course of performing its judicial function of resolving disputes, also performs a law-making function, albeit a limited one and one which is subject to substantial externally imposed and self-imposed constraints. This is most obviously true in common law jurisdictions but is also true, albeit to a much smaller extent, in civil law jurisdictions. In a functional sense then, even if not in a constitutional sense, the legislature and the judiciary together are the public institutions that, in a modern state, make "law".

55     I therefore accept that, for the purposes of Art 2(*h*), "law" includes both legislation and judge-made law. This view is supported by the decision of the English Court of Appeal in *Re Stanford International Bank Ltd* [2010] 3 WLR 941 ("*Re Stanford* (EWCA)"). In that case, Sir Andrew Morritt LJ said (at [24]):

> I would start with the phrase "pursuant to a law relating to insolvency" for this governs all the other factors. *It is contended that such law does not have to be statutory. I agree.* … The law of England and Wales relates to insolvency in the sense that it includes the Insolvency Act but unless the proceeding in question is taken under that Act (or some similar jurisdiction) it cannot sensibly be described as "pursuant to a law relating to insolvency". So it is necessary, in my view, to start by identifying the law, *whether statutory or not*, under or pursuant

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

to which the relevant proceeding was brought and is being
pursued. ...

[emphasis added]

56      In any case, it is common ground that the Cayman Act, under which
Ascentra's liquidation is proceeding, is "law" within the meaning of Art 2(*h*) of
the Third Schedule. What divides the parties is how broadly or narrowly the
word "law" is to be construed in that Article. Specifically, whether "law" should
be construed broadly as referring to the entire Cayman Act or more narrowly to
a coherent and sufficiently discrete subset of provisions in the Cayman Act.

57      The answer to that question, to my mind, turns on the meaning of the
phrase "relating to".

*The meaning of "relating to"*

58      The applicants submit that the phrase "relating to" must be construed
broadly, such that a "law" under which a proceeding has been commenced
"relates to" the subject-matter of "insolvency" if the law has any type of formal
nexus with insolvency. For instance, the applicants suggest that it is
conceptually possible for a statutory provision permitting a person to wind up a
company on the just and equitable ground to be a law "relating to" insolvency,
if that provision is located within a statute which deals generally with the subject
matter of insolvency.

59      I do not accept the applicants' submission. It subordinates substance
entirely to form. If the applicants are correct, then any type of proceeding, no
matter how far removed it may be from any connection to insolvency, would be
"a … proceeding … under a law relating to insolvency" within the meaning of

22

*Re Ascentra Holdings, Inc*                                          [2023] SGHC 82

Art 2(*h*) simply because that proceeding is commenced under a provision which happens to be found in a statute which also deals generally with insolvency.

60      The extent to which this approach subordinates substance entirely to form can be illustrated by an example. Until July 2020, corporate insolvency in Singapore was governed by the Companies Act (2006 Rev Ed). On the applicants' approach, therefore, the entire Companies Act (2006 Rev Ed) was until 2020 "a law relating to insolvency". Section 216 of the Companies Act (2006 Rev Ed) grants a shareholder a right to seek relief from the court on the ground that the affairs of a company are being conducted oppressively. On the applicants' approach, a proceeding under s 216 was "a…proceeding…under a law relating to insolvency" within the meaning of Art 2(*h*) simply because s 216 was until 2020 located in the same Act as our corporate insolvency provisions were located.

61      Assume that a shareholder had commenced proceedings in 2019 under s 216 of the Companies Act (2007 Rev Ed) and had succeeded in securing relief under s 216(2)(*c*) authorising the shareholder to commence civil proceedings in the name of and on behalf of the company. Assume further, that the shareholder had secured an order authorising him to represent the company in commencing the proceedings in a foreign court, thus making the shareholder a "foreign representative" within the meaning of Art 2(*i*) of the Third Schedule. On the applicants' approach, and even if s 216 proceedings had nothing to do with a liquidation of the company, the order under s 216(2)(*c*) would be an order made "under a law relating to insolvency". But nobody has ever suggested, rightly in my view, that a proceeding under s 216 of the Companies Act (2006 Rev Ed) which cannot conceivably involve a company being wound up is a proceeding under a law "relating to" insolvency within the meaning of Art 2(*h*) of the Third Schedule.

23

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

62      It is no answer to say that this s 216 proceeding would have fallen outside the scope of the Third Schedule because it would have failed the first *United Securities* requirement (see [22(a)] above), *ie* that it did not involve creditors collectively. Although it is obviously true that this proceeding does not involve creditors collectively, that is not the true reason that it falls outside the scope of the Third Schedule. It falls outside the Third Schedule because it does not involve creditors *at all*. In other words, the true reason this proceeding falls outside the scope of the Third Schedule is that it has absolutely nothing to do with insolvency whatsoever. It simply is not a proceeding under a law relating to insolvency. That is so even if, when it was commenced in 2019, the Companies Act incorporated in Part X a comprehensive and integrated statutory scheme enacted to govern the liquidation of *all* Singapore companies, solvent *and* insolvent.

63      I therefore cannot accept that the ordinary meaning of the words "relating to" is as broad as the applicants submit.

*The ordinary meaning of the words "under a law relating to insolvency"*

64      Interpreted in its entirety, the plain language of the phrase "under a law relating to insolvency" must, in my view, refer to a body of rules, whether statutory or judge-made, which governs a company that is insolvent. Because assessing a company's solvency or insolvency has an element of futurity to the analysis (*Sun Electric* at [65]), this includes a company which apprehends being unable to pay its debts as they fall due in the reasonably near future, and therefore can be said to be in severe financial distress in the present. It would go against the ordinary meaning of Art 2(*h*) of the Third Schedule to hold, as the applicants submit I should, that it suffices for the relevant body of rules under which the foreign proceeding is taking place simply by happenstance to

*Re Ascentra Holdings, Inc*                                         [2023] SGHC 82

be located in a statute that also contains governing insolvency generally. The inquiry into this requirement must ultimately be one of substance, not form.

65      The following hypotheticals which I put to the applicants' counsel in the course of oral submissions serve to strengthen my conclusion. Assume that X Inc, a solvent corporation, is in liquidation in Ruritania. Assume further that the liquidator seeks to have that liquidation recognised in Singapore as a foreign proceeding. In which of these examples is that proceeding "under a law relating to insolvency" within the meaning of the Third Schedule?

> (a)      Ruritania has two separate statutes governing corporate liquidation and dissolution. The first is the Solvent Liquidations Act and governs the liquidation and dissolution of a solvent company. The second is called the Insolvent Liquidation Act and governs the liquidation and dissolution of insolvent companies. X Inc's liquidation is taking place under the Solvent Liquidations Act.

> (b)      Ruritania has a single statute governing all corporate liquidations and dissolutions. It is called the Liquidations Act. Part I of the Liquidations Act governs the liquidation and dissolution of a solvent company. Part II of the Liquidations Act governs the liquidation and dissolution of insolvent companies. X Inc's liquidation is taking place under Part I of the Liquidations Act.

> (c)      Ruritania has a single statute governing all aspects of its law of companies, including but not limited to the liquidation and dissolution of companies. It is called the Corporations Act. Part X of the Corporations Act governs the liquidation and dissolution of all corporations. Part X is divided into five divisions. Divisions 1 and 4 set out general provisions which apply to all liquidations of all companies,

25

whether ordered by the court or initiated by shareholders and whether of a solvent company or of an insolvent company. Division 2 governs the court-ordered liquidation of companies, primarily but not exclusively on grounds of insolvency. Division 3 governs the shareholder-initiated liquidation of both solvent and insolvent companies. Division 5 governs the liquidation of foreign companies on grounds of insolvency. Division 3 is subdivided into four subdivisions. The first and fourth subdivisions set out general provisions which apply to all shareholder-initiated liquidations. The second subdivision governs the shareholder-initiated liquidation of a solvent company. The third subdivision governs the shareholder-initiated liquidation of an insolvent company. X Inc's liquidation is taking place under the provisions of Part X which apply: (a) only to the liquidation of solvent companies; (b) to all shareholder-initiated liquidations; and (c) to the liquidation of all companies.

66      The applicants accept that X Inc's liquidation in the first hypothetical under the Solvent Liquidations Act would not be a proceeding "under a law relating to insolvency" within the meaning of Art 2(*h*). This must be correct.

67      But on the applicants' case, X Inc's liquidation in the second and third hypotheticals would be "under a law relating to insolvency". The submission is that that is because the provision which X Inc invoked to commence its solvent liquidation is located in a statute which sets out a unified structure of insolvency laws. Indeed, the third hypothetical in fact describes the structure of the liquidation provisions of the Companies Act 1948 (c 38) (UK). That Act is the model for both the Cayman Act and also for our Companies Act (Cap 50, 1985 Rev Ed) (via the Companies Act 1965 (No 79 of 1965) (M'sia)) from the time it was enacted in 1967 until our provisions relating to corporate insolvency were

*Re Ascentra Holdings, Inc*                                           [2023] SGHC 82

decanted into the IRDA in 2020. This continues broadly to be the structure of
the provisions relating to liquidation in Part 8 of the IRDA.

68      I have great difficulty in accepting the applicants' submission. In my
view, the only distinction between the first hypothetical on the one hand and the
second and third hypotheticals on the other is one of form. The applicants cannot
explain why the conclusions ought to differ simply because the relevant "law"
takes a different form. It is to my mind entirely artificial for the test in Art 2(*h*)
of the Third Schedule to turn simply on the form of the relevant "law".

69      Even if I am wrong, and even if the phrase "a law relating to insolvency"
can be construed as including a body of law which does not govern insolvency
in itself but which in form is part of a unified structure of insolvency law, this
simply establishes that that is a possible alternative meaning of the phrase. It
does not establish that the phrase cannot be construed as body of law that
governs only a company that is insolvent or in severe financial distress.

70      If that is the case, s 9A(2) of the IA empowers me to consider extrinsic
material to interpret this provision of the Third Schedule purposively.

71      The effect of s 252 of the IRDA is to give the Model Law the force of
law in Singapore in the form it appears in the Third Schedule. I therefore begin
with the purpose of the Model Law, before turning to the relevant preparatory
records and other documents containing discussions.

**The underlying purpose of the Model Law**

72      A system for the cross-border recognition of insolvency proceedings
ensure, as far as possible, that the assets of a company that operates across
borders are protected in order to preserve or even enhance value for creditors in

27

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

either a rehabilitation or a liquidation. A number of large international insolvencies in the late 20th century showed that national insolvency laws were generally ill-equipped to deal with cross-border insolvencies: 2013 Guide at para 5.

73      This led UNCITRAL and the International Association of Insolvency Professionals ("INSOL") to come together with the goal of formulating a global collective regime to address these difficulties. A joint Colloquium on Cross-Border Insolvency was established in 1994. Following that, an expert committee consisting of members from UNCITRAL and INSOL assembled to draft an international instrument to provide states with a ready-made and standardised procedural framework to recognise insolvency proceedings commenced in other states. This culminated in the promulgation of the Model Law in 2007: Richard Sheldon QC, *Cross-Border Insolvency* (Bloomsbury Publishing, 4th Ed, 2015) ("*Sheldon on Cross-Border Insolvency*") at para 3.1.

74      The Model Law was conceived to advance the principle of modified universalism (see Roy Goode & Kristin Van Zwieten, *Goode on Principles of Corporate Insolvency Law* (Sweet & Maxwell, 5th Ed, 2018) ("*Goode on Insolvency Law*") at para 16–07). This principle holds that national courts should, as far as is consistent with justice and the public policy of the state which has established that court, strive to administer the estate of an insolvent company in cooperation with the courts in the country of the principal liquidation, to ensure that all of the company's assets are distributed to its creditors under a single system of distribution: see *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852 at [6]–[7].

*Re Ascentra Holdings, Inc*                                                    [2023] SGHC 82

75      Modified universalism finds expression in the Model Law through four
key principles (see *UNCITRAL Model Law on Cross-Border Insolvency: The
Judicial Perspective*, UNCITRAL (2022) at [14]):

> (a)      The "Access Principle": a "foreign representative" must be given
> rights of access to the recognising court in the foreign state to seek
> recognition and relief in support of the insolvency proceeding in the
> home state.

> (b)      The "Recognition Principle": foreign proceedings which qualify
> for recognition may be recognised by the recognising court, either as a
> "main" or "non-main" proceeding.

> (c)      The "Relief Principle": upon (or in anticipation of) recognising
> a foreign proceeding, interim, automatic and/or discretionary relief must
> be available to protect the assets of a debtor within the recognising
> court's jurisdiction.

> (d)      The "Cooperation and Coordination Principle": courts and
> insolvency    representatives    across    different    jurisdictions    must
> communicate and cooperate to ensure that the debtor's insolvency estate
> is administered fairly and efficiently, with a view to maximising benefits
> for creditors.

76      The Model Law gives effect to these four principles through a
procedural framework which not only permits but encourages cooperation and
coordination between jurisdictions in cases of cross-border insolvencies: see
*Goode on Insolvency Law* at para 16–07. For instance, Art 20(1) of the
Model Law mandates an automatic moratorium on creditor action upon a court
recognising a foreign proceeding as a foreign main proceeding. The moratorium

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

facilitates the fair and efficient administration of cross-border insolvencies or
reorganisations to preserve or maximise value for creditors and other
stakeholders and reduces the likelihood that the debtor can successfully conceal
or dissipate assets: *Sheldon on Cross-Border Insolvency* at para 3.2.

77      The Model Law provides the procedural tools necessary for national
courts to put in place a global collective regime for the benefit of creditors as a
class. In the absence of a collective regime, each creditor would move quickly
to seize the debtor's assets and gain an advantage over other creditors. The
Model Law thus permits courts to consolidate the administration and resolution
of an insolvency or rehabilitation in the court of the foreign main proceeding,
and to seek relief in other courts to preserve or even enhance value for creditors
collectively until the main proceeding concludes.

78      The purposes of the Model Law are in no way engaged when recognition
is sought of a foreign proceeding involving a company which is neither
insolvent nor in severe financial distress, *ie* a solvent company such as Ascentra.
None of the concerns or risks which arise in the case of a company which is
insolvent or in severe financial distress are even remotely present when a
solvent company goes into liquidation. Indeed, given that the assets of the
company will, by definition, suffice to pay all creditors in full, there will be no
scramble for the company's assets, domestically or across a border. And no
creditor can gain an advantage over other creditors by rushing to judgment.
There is simply no justification for imposing an automatic moratorium on
actions against a company under Art 20 of the Model Law, thereby denying the
company's creditors access to the courts. So too, many of the other forms of
discretionary relief available under Art 21 of the Model Law make no sense in
the context of a solvent company.

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

79      I therefore hold that construing "law relating to solvency" as including laws governing the liquidation of a solvent company is not necessary to promote the purposes of the Third Schedule. Indeed, for the reasons given below, I accept that it is the intent of the Model Law expressly to exclude the liquidation of solvent companies from the scope of the Model Law.

80      I now turn to consider the preparatory records and documents that reveal the intention of the Model Law.

### The preparatory records and documents

#### The Working Group papers

81      The first document I consider is the "Cross-Border Insolvency: Report on UNCITRAL–INSOL Colloquium on Cross-Border Insolvency", UNCITRAL, Colloquium on Cross-Border Insolvency, 27th Sess, UN Doc A/CN.9/398 (1994) ("the 1994 Colloquium Report"). That report records the discussions at a colloquium held in Vienna in 1994. The subject of the Colloquium was the desirability and feasibility of developing legal mechanisms to recognise cross-border insolvency proceedings. In that sense, the report records the foundational discussions that eventually resulted in the promulgation of the Model Law. Paragraph 4 of the 1994 Colloquium Report points out that the purpose of developing these legal mechanisms was to preserve or enhance value for the creditors of a company which was insolvent or in severe financial distress, whether through rehabilitation or liquidation:

> … Emphasis was placed [during the Colloquium] on the corresponding need to develop legal mechanisms for limiting the extent to which, in the event of *insolvency* in a cross-border context, disparities in and conflicts between national laws created unnecessary obstacles to the achievement of the basic economic and social objectives of *insolvency* proceedings. Those objectives included, generally, protecting the rights and

*Re Ascentra Holdings, Inc*                                        [2023] SGHC 82

interests of creditors, employees, and debtors. In more specific
terms, the legal rules applied in cases of cross-border
insolvency should *facilitate the rehabilitation of businesses that,
in particular from an economic standpoint, merited preservation,
thereby serving the goal of preservation of employment, and, in
the event of liquidation, maximizing the value of the assets that
were available to pay creditors' claims, without undue regard to
the location of those assets.*

[emphasis added]

82      The next document I consider is a report titled "Cross-Border
Insolvency: Report on UNCITRAL–INSOL Judicial Colloquium on Cross-
Border Insolvency", UNCITRAL, First Multinational Judicial Colloquium on
Cross-Border Insolvency, 28th Sess, UN Doc A/CN.9/413 (1995). This report
records the discussions at a colloquium held in Toronto in 1995. The position
taken was that the proceedings to be recognised should involve only a company
that was insolvent. The reason was that different legal systems treat proceedings
involving solvent companies differently. It was therefore more difficult to
harmonise the treatment of solvent liquidations (at para 19):

> … As to the type of proceedings to be recognized, a view was
> expressed that *the provisions should be limited to proceedings in
> which the debtor was actually insolvent.* …

[emphasis added]

83      Finally, the UNCITRAL Working Group on Insolvency Law considered
issues relating to the definition and scope of "foreign proceeding" in a series of
reports on its various sessions (see the "Report of the Working Group on
Insolvency Law on the work of its eighteenth session", UNCITRAL, Working
Group V: Insolvency Law, 18th Sess, UN Doc A/CN.9/419 (1995), "Report of
the Working Group on Insolvency Law on the work of the nineteenth session",
UNCITRAL, Working Group V: Insolvency Law, 19th Sess, UN Doc
A/CN.9/422 (1996), and "Report of the Working Group on Insolvency Law on
the work of the twenty-first session", UNCITRAL, Working Group V:

*Re Ascentra Holdings, Inc*                                             [2023] SGHC 82

Insolvency Law, 21st Sess, UN Doc A/CN.9/435 (1997)). The consensus was that the definition of "foreign proceeding" and "insolvency" should remain broad to facilitate the recognition of proceedings that may not necessarily fall within the definition of insolvency proceedings under the insolvency law of the recognising jurisdiction.

84      The applicants submit that these documents support taking a broad and inclusive approach to the types of foreign proceeding that are eligible for recognition under the Third Schedule. Accordingly, the applicants make the point that, under this approach, the meaning of "foreign proceeding" in the Third Schedule was intended to encompass even a solvent liquidation.[19]

85      I do not accept the applicants' submission. It does not follow from the intention to adopt a broad and inclusive approach for the Model Law's recognition framework that it was *also* intended to include even a solvent liquidation within the meaning of "foreign proceeding". In my view, the definition of "foreign proceeding" was to be broad in order to prevent a proceeding commenced under a law that was *functionally* applicable to companies that are insolvent or in severe financial distress from falling outside the scope of the Model Law, even though that law was not framed in a way in which the recognising court would expect it to be framed. It was not intended to bring a solvent liquidation within the Model Law. This much is clear from the Working Group's overall discussion, *ie,* that the Model Law would apply only to companies which were insolvent or in severe financially distress.

86      This position is made even clearer in the 1997 Guide and the 2013 Guide, which I now turn to analyse.

---

[19]      Applicants' Supplementary Written Submissions at para 87.

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

*The 1997 Guide and the 2013 Guide*

87      I begin with the 1997 Guide, which explains what "foreign proceeding" was to cover. The 1997 Guide states that a variety of collective proceedings which the debtor is involved in, including voluntary liquidations, would be eligible for recognition under Art 2(*a*) of the Model Law (at paras 23–24):

> **Types of foreign proceedings covered**
>
> 23.      To fall within the scope of the Model Law, a foreign insolvency proceeding needs to possess certain attributes. These include the following: basis in insolvency-related law of the originating State; involvement of creditors collectively; control or supervision of the assets and affairs of the debtor by a court or another official body; and reorganization or liquidation of the debtor as the purpose of the proceeding ...
>
> 24.      Within those parameters, a variety of collective proceedings would be eligible for recognition, be they compulsory or voluntary, corporate or individual, winding up or reorganization. It also includes those in which the debtor retains some measure of control over its assets, albeit under court supervision ...

88      While these paragraphs do not suggest that the solvency of a company is a relevant attribute, the 1997 Guide does go on to provide that the definition of "insolvency proceedings" under Art 2(*a*) of the Model Law refers to proceedings that apply to companies which are in severe financial distress (at para 71):

> ... the expression "insolvency proceedings" may have a technical meaning in some legal systems, but it is intended in subparagraph (a) to refer broadly to proceedings involving companies in *severe financial distress*.
>
> [emphasis added]

89      The applicants submit that it would be go too far interpret this paragraph in the 1997 Guide as indicating an intention that only a proceeding involving a company in "severe financial distress" should be recognised under the Model

*Re Ascentra Holdings, Inc*                                          [2023] SGHC 82

Law.[20] I do not agree. It is notable that the 1997 Guide describes the term
"insolvency" as referring to collective proceedings applying to "insolvent
debtors" (at para 51):

> *"Insolvency"*
>
> 51.    The word "insolvency", as used in the title of [the Model
> Law], refers to various types of collective proceedings against
> *insolvent debtors*. The reason is that the Model Law … covers
> proceedings concerning different types of debtors and, among
> those proceedings, deals with proceedings aimed at
> reorganizing the debtor and proceedings leading to a liquidation
> of the debtor as a commercial entity.
>
> [emphasis added]

90    While I accept the applicants' submission that the Model Law has
adopted a broad and inclusive approach toward the types of foreign proceeding
that may be recognised under the Model Law, I consider that they intended to
draw the net as widely as possible only in order to bring within it all types of
proceedings relating to companies which are insolvent or in severe financial
distress. I do not consider that it was at any time intended to draw the net so
widely as to bring within it proceedings relating to a solvent company.

91    I turn next to consider the position set out in the 2013 Guide.

92    The 2013 Guide goes further than the 1997 Guide. It states, in clear
terms and consistently with the 1997 Guide, two aspects of the Model Law when
it come to the definition of "foreign proceeding". The first relates to the type of
companies covered by the Model Law. The 2013 Guide states that assistance
under the Model Law's recognition framework is intended to be granted only to
companies which are insolvent or in severe financial distress (at para 49):

---

[20]        Applicants' Supplementary Written Submissions at para 79.

*Re Ascentra Holdings, Inc* [2023] SGHC 82

> 49.   Debtors covered by the Model Law would generally fall within the scope of the *UNCITRAL Legislative Guide on Insolvency Law* and would therefore be eligible for commencement of insolvency proceedings in accordance with recommendations 15 and 16 of the *Legislative Guide*, **being debtors that are or will be generally unable to pay their debts as they mature or whose liabilities exceed the value of their assets**.

> [original emphasis in italics; emphasis added in bold]

93   The second relates to the nature of the foreign proceeding sought to be recognised. The 2013 Guide clarifies that the term "insolvency proceedings" in covers companies which are insolvent or in severe financial distress (at para 65):

> *Subparagraph* (a) – *Foreign proceeding*

> 65.   … the expression "insolvency proceedings" may have a technical meaning in some legal systems, but is intended in subparagraph *(a)* to refer broadly to proceedings involving debtors that are in severe financial distress or insolvent.

94   Accordingly, the 2013 Guide makes explicit that the Model Law is not concerned with a judicial or administrative process that focuses solely on dissolving a solvent company (at paras 48 and 73):

> *Use of the term "insolvency"*

> 48.   … as used in the Model Law, the word "insolvency" relates to various types of collective *proceedings commenced with respect to debtors that are in severe financial distress or insolvent. … A judicial or administrative proceeding to wind up a solvent entity where the goal is to dissolve the entity and other foreign proceedings not falling within article 2 subparagraph* (a) *are not insolvency proceedings within the scope of the Model Law.* …

> …

> **(ii) *Pursuant to a law relating to insolvency***

> 73.   … A simple proceeding for a solvent legal entity that does not seek to restructure the financial affairs of the entity,

36

*Re Ascentra Holdings, Inc*                                                      [2023] SGHC 82

98      I make one final point in relation to the applicants' submission that Art 2(*h*) of the Third Schedule, including the phrase "under the law relating to insolvency", is worded so broadly that it would be incorrect to exclude from the scope of the Third Schedule a company which is neither insolvent nor in severe financial distress (see [84] above). The 2013 Guide makes clear that the intent of this phrase was to avoid unduly restricting the scope of *insolvency* proceedings recognised under the Model Law. This is regardless of the sources of law in which such rules are contained and whether those sources dealt exclusively with insolvency (at para 73):

> **(ii) *Pursuant to a law relating to insolvency***
>
> 73.    This formulation is used in the Model Law to acknowledge the fact that liquidation and reorganization might be conducted under law that is not labelled as insolvency law (e.g. company law), but which nevertheless deals with or addresses insolvency or severe financial distress. The purpose was to find a description that was sufficiently broad to encompass a range of insolvency rules irrespective of the type of statute or law in which they might be contained and irrespective of whether the law that contained the rules related exclusively to insolvency. ...

99      I therefore conclude, from considering these extrinsic materials, that the purpose of the Model Law is to empower a recognising court to extend recognition to a foreign proceeding the subject of which is a company that is insolvent or in severe financial distress. This conclusion is also consistent with, and indeed confirms that, the ordinary meaning of the words "under a law relating to insolvency" refers to a law that prescribes a set of procedures that apply to a company that is either insolvent or in severe financial distress.

100      I turn next to consider the case law interpreting the phrase "foreign proceeding" as found in national adaptations of the Model Law.

*Re Ascentra Holdings, Inc* [2023] SGHC 82

**The case law**

*The position in Singapore law*

101     I begin with the applicants' submission that *United Securities* supports,
*sub silentio*, their argument that nothing in the Third Schedule precludes the
recognition of a foreign proceeding involving a solvent company. The
applicants' submission proceeds as follows. *United Securities* was one of the
first cases under the Third Schedule. The Court of Appeal therefore took special
care when setting out its views on the requirements for recognition. Despite this,
when it analysed the phrase "under a law relating to insolvency", the Court of
Appeal did not expressly discuss or consider any requirement that a company
seeking recognition under the Third Schedule be insolvent or in severe financial
distress. The Court of Appeal would not have overlooked a threshold
requirement as fundamental as this. Accordingly, the Court of Appeal's
observations in *United Securities* implicitly include a solvent liquidation within
the meaning of the phrase "foreign proceeding" in Art 2(*h*) of the Third
Schedule.[21]

102     I do not accept this submission. There was no dispute that the company
in *United Securities* was insolvent. The Court of Appeal therefore did not have
to consider whether the Third Schedule distinguishes between solvent and
insolvent companies.

103     In *United Securities*, a company was being wound up in Malaysia. A
bank commenced parallel civil proceedings against the company in Singapore
and in Malaysia to determine its rights and obligations under a loan agreement
and a deed of debenture. The company applied in Singapore under the Third

---

[21]     Applicants' Supplementary Written Submissions at paras 103(c) and 104.

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

Schedule for recognition of both the winding up proceedings in Malaysia and
the bank's civil litigation against the company in Malaysia. The company also
sought a stay of the Singapore civil proceedings.

104     The High Court declined to recognise the bank's civil litigation in
Malaysia, but did recognise the Malaysian winding up proceeding as a "foreign
main proceeding". Despite this, the High Court refused to stay the civil litigation
in Singapore against the company, under both Arts 20 and 21 of the Third
Schedule.

105     The Court of Appeal dismissed the company's appeal. Even though the
Malaysian winding up proceeding was entitled to recognition as a "foreign main
proceeding", the Court of Appeal agreed with the High Court that it was
appropriate to grant the bank leave to proceed with the Singapore civil litigation.
Accordingly, there was no need to determine whether the bank's Malaysian civil
litigation could be recognised under the Third Schedule. There was therefore no
need to determine whether it fell within the meaning of "foreign proceeding" in
Art 2(*h*) of the Third Schedule.

106     It is in this context that the Court of Appeal thought it appropriate to
make several observations on the requirements for recognition of a "foreign
proceeding" under the Third Schedule. As such, the court's views on the
requirements for recognition of a "foreign proceeding" under the Third
Schedule are, with respect, *obiter dicta*.

107     But more to the point, I do not think that the Court of Appeal's *dicta* in
*United Securities* go so far as to imply that a company seeking recognition under
the Third Schedule need not be either insolvent or in severe financial distress.
On the contrary, when discussing whether a proceeding is "under a law relating

40

to insolvency", the Court of Appeal implicitly affirmed that the relevant law must be one which deals with or addresses insolvency or severe financial distress or insolvent (at [66]):

> 66      In light of the above, the court in determining whether a proceeding is conducted "under a law relating to insolvency" should adopt a commonsense approach which focuses on the *substance* of the relevant law. Specifically, *whether the relevant law* "**deals with or addresses insolvency or severe financial distress**". …

> [original emphasis in italics; emphasis added in bold]

108     I therefore do not accept the applicants' submission that the Court of Appeal's *dicta* in *United Securities* on the meaning of the phrase "under a law relating to insolvency" in Art 2(*h*) should be interpreted as bringing within the phrase "foreign proceeding" a proceeding which has as its objective the liquidation of a company which is neither insolvent nor in severe financial distress.

109     I now turn to deal with the applicants' submission that the position taken by the US Bankruptcy Court should be adopted in Singapore.

*The position under US law should not be adopted*

110     In support of their submission that the liquidation of a solvent company falls within the scope of the Third Schedule, the applicants rely on several decisions of the US Bankruptcy Court.

(1)     The US authorities should be accorded less weight

111     At the outset, the applicants submit that US authorities should be given great weight by virtue of Parliament's decision to adopt the definition of "foreign proceeding" set out in s 101(23) of Chapter 15 of the Bankruptcy Code

*Re Ascentra Holdings, Inc*                                              [2023] SGHC 82

11 USC (US) (1978) ("Chapter 15"). This is because Art 2(*h*) of the Third
Schedule is not worded exactly the same as the cognate provision in Art 2(*a*) of
the Model Law. Specifically, Art 2(*h*) includes the words "adjustment of debt",
a term which is not found in the Model Law. Article 2(*a*) of the Model Law
reads as follows:

> **Article 2. Definitions**
>
> For the purposes of this Law:
>
> (*a*) "Foreign proceeding" means a collective judicial or
> administrative proceeding in a foreign State, including an
> interim proceeding, pursuant to a law relating to insolvency in
> which proceeding the assets and affairs of the debtor are
> subject to control or supervision by a foreign court, for the
> purpose of reorganization or liquidation; ...

112     The words "adjustment of debt" are taken from s 101(23) of Chapter 15.
That provision reads as follows:

> **§101. Definitions**
>
> (23) The term "foreign proceeding" means a collective judicial or
> administrative proceeding in a foreign country, including an
> interim proceeding, under a law relating to insolvency or
> *adjustment of debt* in which proceeding the assets and affairs of
> the debtor are subject to control or supervision by a foreign
> court, for the purpose of reorganization or liquidation.
>
> [emphasis added]

113     The applicants submit that Parliament's decision to adopt the words
"adjustment of debt" from s 101(23) of Chapter 15 in Art 2(*h*) of the Third
Schedule is significant for the following reasons.[22] First, it shows that
Parliament considered the US approach to the recognition of a foreign
proceeding and decided that Singapore should adopt a similar approach.[23]

---

[22]     Applicants' Supplementary Written Submissions at para 92.

[23]     Applicants' Supplementary Written Submissions at paras 93–94.

*Re Ascentra Holdings, Inc* [2023] SGHC 82

114     Second, the applicants submit that these US authorities are especially relevant given that Parliament first enacted the Model Law in amendments to the Companies Act in 2017 (see s 50 of the Companies (Amendment) Act 2017 (No 15 of 2017)). By then, it was well settled in US bankruptcy law was that a foreign solvent liquidation was a "foreign proceeding". Indeed, the applicants submit that this position was well entrenched even before the enactment of the Model Law under Chapter 15, as evident by the US Bankruptcy Court's decision in *Re Petition of the Board of Directors of Hopewell International Insurance Ltd* 238 BR 25 (NY United States Bankruptcy Court, 1999). In that case, the US Bankruptcy Court granted ancillary relief to a foreign solvent debtor that was undergoing a scheme of arrangement in Bermuda. In granting this relief, the US Bankruptcy Court held that the foreign solvent debtor's scheme of arrangement qualified as a "foreign proceeding" under s 101(23) of Chapter 15.

115     The applicants thus submit that Parliament must be taken to have been aware of the US Bankruptcy Court's decisions on this issue. Accordingly, Parliament's decision to adopt Chapter 15's definition of "foreign proceeding" demonstrates a legislative intent to include solvent liquidations within the Third Schedule's recognition framework.[24]

116     I do not accept the applicants' submission that the US authorities should be given special weight. First, in the absence of any direct evidence as to what Parliament intended, it is, to my mind, a leap of logic to say that the mere adoption of the words "adjustment of debt" from Chapter 15 indicates Parliament's intention to adopt the approach under US bankruptcy law on the interpretation of the Third Schedule in general or on Art 2(*h*) in particular.

---

[24]     Applicants' Supplementary Written Submissions at paras 95–98.

*Re Ascentra Holdings, Inc* [2023] SGHC 82

117     Second, and more pertinently, in so far as the US Bankruptcy Courts
have accepted that a solvent liquidation may be recognised under Chapter 15,
that approach does not carry any special weight in how the Singapore courts
interpret Singapore's adaptation of the Model Law in the Third Schedule.
Indeed, the English High Court in *Re Agrokor DD and in the matter of the
Cross-Border Insolvency Regulations 2006* [2017] All ER (D) 83 (Nov) ("*Re
Agrokor*") held, albeit with respect to the English adaptation of the Model Law
under the Cross-Border Insolvency Regulations 2006 (SI 2006 No 1030) (UK)
("the CBIR"), national courts should not slavishly follow the decisions of other
national courts in so far as the latter's construction of the relevant Model Law
provision is based on different adaptations of the Model Law or do not accord
with the relevant preparatory materials (at [36]):

> Nor should I slavishly follow the decisions of other countries'
> courts where they are based on different adaptations of the
> Model Law or do not accord with the preparatory materials
> (reports of working groups) that led to the CBIR. In *Re Pan
> Ocean Co Ltd, Fibria Cellulose S/A v Pan Ocean Co Ltd* [2014]
> EWHC 2124 (Ch), [2014] Bus LR 1041 Morgan J was asked to
> grant specific relief under (in particular) art 21 of the CBIR in a
> case where a Korean company was in an insolvency proceeding
> already recognised by the English court. The judge examined
> US authority but concluded that the words "any appropriate
> relief" in art 21 were not to be construed in the way that
> authority indicated.

118     I accept that the approach taken by the US Bankruptcy Court is one of
the approaches which I can consider to the issue at hand. But I do not consider
it to be of any special weight in that exercise. Instead, as counsel for SPGK
Singapore, Mr Ashok Kumar ("Mr Kumar"), points out, the issue before me
must be decided bearing in mind the underlying intent of Parliament in enacting
the Third Schedule. In my view, Parliament's intention explicitly to prescribe
the Model Law's preparatory records and documents, as well as both the 1997
Guide (through s 354B(2)(*b*) of the Companies Act (2006 Rev Ed)) and 2013

*Re Ascentra Holdings, Inc*                                               [2023] SGHC 82

Guide (through the IA), as interpretative guides is telling. This is a strong indication that Parliament intends the courts to accord greatest weight in interpreting the Third Schedule to UNCITRAL's materials.

119     I therefore accept that the modification made to Art 2(*a*) of the Model Law in enacting Art 2(*h*) the Third Schedule could not have been intended by Parliament to detract from Parliament's underlying intent in enacting the Third Schedule. As I have set out above, this underlying intent is confined to companies which are insolvent or in severe financial distress (see [85] and [95] above).

(2)     The approach under US bankruptcy law has been criticised

120     I consider also that I am justified in attaching less weight to authorities from the US Bankruptcy Court because of the criticisms to which these authorities have been subjected by commentators and judges in other jurisdictions.

121     Before I turn to consider these criticisms, it is appropriate to first examine the position taken by these US cases in greater detail, starting with the chief decision on which the applicants rely: *Re Betcorp Limited (in liquidation)* 400 BR 266 (Nevada United States Bankruptcy Court, 2009) ("*Re Betcorp*").

122     *Re Betcorp* involved an Australian company involved in online gaming. The company's business was conducted through a variety of affiliate and subsidiary entities. Following the passing of the Unlawful Internet Gambling Enforcement Act 31 USC (2006) (US) in the United States, the company's business model became unworkable. As a result, the company's shareholders resolved to liquidate the company. Crucially, the company was solvent at the time the resolution was passed. The purpose of the dissolution was therefore to

return value to the company's shareholders by way of a share buy-back,
following which the company would be dissolved by a members' voluntary
winding up carried out under Australian law.

123     Shortly after the shareholders had passed the necessary resolution, the
claimant, a US patent holder, sued the company in the US for alleged patent
infringement under US patent law. To stop the US patent infringement
proceedings, the company's liquidators applied in the US for recognition of the
Australian members' voluntary winding-up under Chapter 15. The application,
if successful, would trigger an automatic stay of the US patent suit. Accordingly,
one of the issues which the court in *Re Betcorp* addressed was whether the
Australian members' voluntary winding up was a "foreign proceeding" within
the meaning of s 101(23) of Chapter 15.

124     In recognising the Australian liquidation, the court in *Re Betcorp* was
satisfied that the members' voluntary winding up in Australia fell within the
meaning of a "foreign proceeding". This was despite the winding up involving
a solvent company. The court reasoned as follows:

> (a)     The requirement that the foreign proceeding be "under a law
> related to insolvency or the adjustment of debts" does not require the
> company to be either insolvent or to be contemplating the adjustment of
> debt (at pp 281–282). The court did not elaborate on why this was the
> case. Neither did the court refer to any of the Model Law's preparatory
> documents in justifying its holding.

> (b)     Accordingly, the court found that the company's Australian
> voluntary winding up satisfied this requirement. It was commenced
> under Chapter 5 of the Australian Corporations Act 2001 (Cth)

("Australian Corporations Act"), which also contained provisions that dealt with corporate insolvency and the adjustment of debts. The "unified structure" of the provisions governing these processes led the court in *Re Betcorp* to conclude that the members' winding up was commenced under a law relating to insolvency or the adjustment of debt. Additionally, the court held that this finding was consistent with the Australian legislature's intention that a company in voluntary winding up be treated as one being administered under a law relating to insolvency (at pp 281–283).

125     The applicants also refer me to several US decisions that have followed *Re Betcorp*, *ie*, that the phrase "under a law related to insolvency or the adjustment of debts" does not require the company to be insolvent or in severe financial distress.

126     In *Re ABC Learning Centres Ltd* 445 BR 318 ("*Re ABC Learning Centres*"), the US Bankruptcy Court held that the debtor company's voluntary winding up in Australia was authorised and conducted pursuant to a law related to insolvency or the adjustment of debts. The court reasoned that since the Australian Corporations Act contained numerous provisions addressing corporate insolvency and the adjustment of corporate debt, it was sufficient that the winding up was initiated pursuant to that Act. As in *Re Betcorp*, the court in *Re ABC Learning Centres* did not discuss the underlying rationale of the Model Law or why it would be in accordance with that rationale to recognise a solvent liquidation as a "foreign proceeding". It is crucial to note, however, that the company's board of directors was of the view that the company was "likely to become insolvent" (*Re ABC Learning Centres* at p 324), thereby suggesting that the debtor company, while not insolvent, was nonetheless in severe financial distress.

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

127     In *Re Manley Toys Limited* 580 BR 632 (NJ United States Bankruptcy
Court, 2018) ("*Re Manley Toys*"), the US Bankruptcy Court concluded that the
debtor company's voluntary liquidation in Hong Kong was a "foreign
proceeding" within the meaning of s 101(23) of Chapter 15. This was because
the liquidation was commenced under the Companies (Winding Up and
Miscellaneous Provisions) Ordinance (Cap 32) (HK) which sets out the
framework for liquidating a company. As such, the court was satisfied that the
debtor company's voluntary winding up was conducted under a law related to
insolvency or adjustment of debts (at 638). It is crucial to note, however, that
the debtor company went into voluntary liquidation because it was facing
numerous legal actions and was also financially troubled owing to "alleged[ly]
declining sales" (*Re Manley Toys* p at 635).

128     Mr Kumar submits that the decisions in *Re Betcorp*, *Re ABC Learning
Centre* and *Re Manley Toys* should not be followed. He submits instead that the
position taken by the English courts in *Re Sturgeon Central Asia Balanced Fund
(in liquidation) Carter v Bailey and another (as foreign representatives of
Sturgeon Central Asia Balanced Fund Ltd)* [2020] EWHC 123 (Ch) ("*Re
Sturgeon*") is the correct approach.

129     In *Re Sturgeon*, a Bermudan company was wound up on just and
equitable grounds under s 161 of the Companies Act 1981 (Bermuda). The
winding up application was brought following a breakdown in the basis on
which the company was set up and with allegations that the investors had been
denied their rights. Crucially, the company was solvent. The liquidators secured
an order recognising the Bermudan liquidation in an *ex parte* hearing before the
Companies Court (now part of the Insolvency and Companies List). The
applicant, a former director of the company, applied to terminate the recognition

48

*Re Ascentra Holdings, Inc*                                                   [2023] SGHC 82

order on the basis that the grounds for granting the order were lacking at the time it was made.

130    The issue which the English High Court had to consider was whether the solvent liquidation of the company was a "foreign proceeding" within the meaning of Art 2(*i*) of the CBIR. Having referred to the Model Law's Working Group's reports and preparatory papers, Chief ICC Judge Briggs concluded that the Model Law's purpose and object is to recognise and provide relief in respect of proceedings involving companies which are insolvent or in severe financial distress (at [59]–[70]). Accordingly, it was contrary to the Model Law's purpose and object to enlarge its scope by interpreting "foreign proceeding" as including solvent companies and proceedings which pay all creditors in full and produce a surplus for members (at [116]–[117]).

131    For these reasons, the court in *Re Sturgeon* criticised the decision in *Re Betcorp* as a "wrong turn" in cross-border insolvency law by accepting that a solvent liquidation could fall within the Model Law when this was clearly not intended. Instead, the court in *Re Betcorp* should have gone "one step further to ask whether the company was insolvent or in severe financial distress" (*Re Sturgeon* at [121]).

132    Having considered these authorities, I hold that the position taken by the US Bankruptcy Court as represented by *Re Betcorp* is, with respect, incorrect and should not be followed in Singapore. The correct position, in my view, is that stated in *Re Sturgeon*, *ie*, that a solvent liquidation was not intended to and does not fall within the definition of a "foreign proceeding" in the Model Law. I say this for the following two reasons.

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

133     First, taking the position in US law on its face, there is some doubt as to
whether *Re Betcorp* and the subsequent decisions endorsing it are correct. Mr
Kumar submits that the legislative intent behind the US adaptation of the Model
Law and s 101(23) of Chapter 15 appears to cover only companies which are
insolvent or in severe financial distress (see United States House of
Representatives Committee on the Judiciary, *Bankruptcy Abuse Prevention and
Consumer Protection Act of 2005* (House Report, HR Report Pub L No 109-31,
8 April 2005) at p 18). Mr Kumar also refers me to an academic commentary
discussing the inclusion of the phrase "adjustment of debt" in s 101(23) of
Chapter 15 as broadening the scope of the US adaptation of the Model Law to
include debtors suffering from severe financial distress (see Jennifer Morton,
"Recognition of Cross-Border Insolvency Proceedings: An Evaluation of
Solvent Schemes of Arrangement and Part VII Transfers under US Chapter 15"
(2006) 29 *Fordham International Law Journal* 1312 at 1339).

134     While it is not, of course, for me to express a view on US bankruptcy
law, I accept that these secondary sources, at the very least, raise some doubt as
to the correctness of the US position as stated in cases such as *Re Betcorp*.

135     Mr Kumar also submits that the US Bankruptcy Court's reasoning in
*Re Betcorp* based on the legislative history and the intent behind Australia's
adaptation of the Model Law is open to doubt. In particular, the US Bankruptcy
Court did not give adequate consideration to the discussions set out in the
Commonwealth of Australia, Parliament, *Cross-Border Insolvency: Corporate
Law Economic Reform Program Proposals for Reform: Paper No. 8* (Report,
2002) ("the CLERP Paper"). The CLERP Paper expressly indicated that

*Re Ascentra Holdings, Inc*                                              [2023] SGHC 82

Australia did not intend to include a members' voluntary winding up within the
scope of Australia's adaptation of the Model Law (at p 23):

> In the Australian Corporations Act context, that means the
> scope of the Model Law would extend to liquidations arising
> from insolvency, reconstructions and reorganisations under
> Part 5.1 and voluntary administrations under Part 5.3A. ... *It
> would also not extend to a members' voluntary winding up or a
> winding up by a court on just and equitable grounds as such
> proceedings may not be insolvency related.*

> [emphasis added]

136     It therefore appears to me, with respect, that the US Bankruptcy Court's
interpretation of Australia's adaptation of the Model Law is not entirely accurate
(see Look Chan Ho (ed), *Cross-Border Insolvency: A Commentary on the
UNCITRAL Model Law* (Globe Law and Business Publishing, 4th Ed, 2017)
("*Commentary on UNCITRAL Model Law*") at pp 186–187).

137     The applicants submit that less weight should be given to the CLERP
Paper as it was merely a consultation document to facilitate gathering views on
the Australian adaptation of the Model Law. Instead, greater weight should be
given to the Explanatory Memorandum accompanying the Cross-Border
Insolvency Bill 2008 (Cth) (which enacted the Model Law in Australia) ("the
Explanatory Memorandum"). The US Bankruptcy Court in *Re Betcorp* relied
on the Explanatory Memorandum in concluding that a voluntary winding up
was a "foreign proceeding" within the meaning of s 101(23) of Chapter 15 (at
283). This was on the basis that Part 5.5 of Chapter 5 of the Australian
Corporations Act governs voluntary winding up proceedings in Australia, and
the Explanatory Memorandum does not exclude this part from the scope of
Australia's adaptation of the Model Law.[25]

---

[25]     Applicants' Supplementary Written Submissions at paras 114–115.

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

138     In my view, the applicants' submissions in this respect fail to consider
the criticisms made of this aspect of the reasoning in *Re Betcorp*. Specifically,
the learned authors of *Commentary on UNCITRAL Model Law* argue that, in
considering the Explanatory Memorandum, the US Bankruptcy Court in *Re
Betcorp* failed to distinguish between a members' voluntary winding up and a
creditors' voluntary winding up. The learned authors point out that, although
both forms of winding up appear in Part 5.5 of Chapter 5 of the Australian
Corporations Act, a creditors' voluntary winding up is generally an insolvent
liquidation and would understandably be included in the Australian
implementation of the Model Law. This explains why the Explanatory
Memorandum does not exclude Part 5.5 of Chapter 5 of the Australian
Corporations Act entirely. However, it does not follow from this that a
members' voluntary winding up, which involves a solvent company, was also
intended to be included in the Australian enactment of the Model Law (see
*Commentary on UNCITRAL Model Law* at pp 187–188).

139     In any event, I accept that the question of whether a foreign proceeding
fulfils the criteria for recognition is a question reserved for the recognising
jurisdiction to be determined in accordance with its adaptation of the Model
Law. The recognising court is not bound by the way in which the foreign
proceeding is characterised in the jurisdiction in which it has been brought (see
*Re Agrokor* at [34]). To that end, I accept that the US Bankruptcy Court in *Re
Betcorp* was entitled to come to its own view as to whether, applying Chapter
15, the Australian member's voluntary winding up was a "foreign proceeding"
under s 101(23) of Chapter 15. Having said that, I nevertheless accept that the
criticisms levelled against *Re Betcorp* on this point is a factor weighing against
my adoption of the position taken by the US Bankruptcy Court in *Re Betcorp*
and the cases which have followed it.

*Re Ascentra Holdings, Inc* [2023] SGHC 82

140     Second, I do not accept the justification in *Re Betcorp* that a proceeding initiated under a body of law which includes provisions for an insolvent liquidation, even if it involves a solvent company, is one that is commenced "under a law related to insolvency or the adjustment of debts". This interpretation fails to give due regard to the ordinary meaning of those words which I have concluded (see [64] above) as referring to a rule, whether statutory or judge-made, that prescribes a set of procedures involving or applying to a company that is either insolvent or in severe financial distress.

141     The learned authors in *Sheldon on Cross-Border Insolvency* also criticise the US Bankruptcy Court's reasoning in *Re Betcorp* on the same point. In the authors' view, the fact that the Part which includes provisions governing a members' voluntary winding up in the Australian Corporations Act also include provisions for insolvent liquidation does not in itself "necessarily justify bringing within the Model Law's scheme of recognition and assistance a proceeding in relation to a solvent company, the purpose of which includes the return of a surplus to members". Further, the learned authors also point out that "there is no obvious justification for allowing creditors' rights to be restrained by recognising a solvent liquidation as a foreign proceeding": *Sheldon on Cross-Border Insolvency* at para 3.35; see also *Goode on Insolvency Law* at p 626.

142     I accept the views in *Sheldon on Cross-Border Insolvency* as consistent with the underlying purpose and intent of the Model Law. It may be that the decision in *Re Betcorp* was made without the benefit of the clarifications provided in the 2013 Guide. However, the fact remains that the preparatory works and documents demonstrate UNCITRAL's intent to confine the scope of a foreign proceeding recognised under the Model Law to one involving only a company that is insolvent or in severe financial distress. As I have held, this is to facilitate either the orderly distribution of the assets of an insolvent company

53

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

amongst its creditors or conceiving and implementing a successful reorganisation or business rescue plan of a company in severe financial distress (see [73] to [77] above). It is in this context that the benefits and reliefs afforded under the Model Law's recognition framework should be granted, *ie*, to restrain creditors' rights to, among other things, bring proceedings against the company. There is no concern that there will be a mad scramble amongst creditors for the assets of a solvent company. There is no justification for recognising a solvent liquidation as a "foreign proceeding" within the meaning of the Model Law's (and hence the Third Schedule's) framework.

*The English position in* Re Sturgeon *is not an outlier*

143     Finally, I do not accept the applicants' submission that *Re Sturgeon* is an outlier and should not be followed in Singapore. The applicants submit that *Re Sturgeon* is an outlier because earlier English decisions did not restrict the nature of a "foreign proceeding" capable of recognition under the CBIR.[26] These include the cases of *Re Agrokor* and *Re Stanford* (EWCA).

144     The applicants interpret these cases as supporting the view that a proceeding is brought "under a law relating to insolvency" if insolvency is one of the grounds on which the proceeding can be commenced, even if insolvency cannot actually be demonstrated in relation to the company which is the subject of the proceedings.

145     I do not accept the applicants' submissions. Dealing first with *Re Stanford* (EWCA), the English Court of Appeal in that case recognised the Antiguan winding up of the company, Stanford International Bank, as a "foreign

---

[26]     Applicants' Supplementary Written Submissions at para 119.

54

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

main proceeding" under the CBIR. Stanford International Bank had failed to comply with regulatory requirements. Accordingly, the Antiguan court held that it was just and equitable that the bank be liquidated and dissolved under the supervision of the Court pursuant to s 300 of the International Business Corporations Act (Cap 222) (Antigua and Barbuda). Crucially, that provision does not list insolvency as a ground for winding up.

146     Nevertheless, the first instance judge held the Antiguan winding up order was "pursuant to a law relating to insolvency" as "an important part of the evidence was that [Stanford International Bank] was insolvent" (see *Re Stanford International Bank Ltd* [2009] EWHC 1441 (Ch) at [94]–[95]). This reasoning was substantially upheld by the English Court of Appeal (see *Re Stanford* (EWCA) at [15]). On this view, the learned authors in *Goode on Insolvency Law* interpret the English Court of Appeal's holding as accepting that a proceeding commenced on, amongst others, a finding of insolvency falls within the scope of the Model Law. This is even if the proceeding could have been opened on multiple grounds, only some of which relate to insolvency (at p 925).

147     In *Re Agrokor*, recognition proceedings were brought in England under the CBIR in respect of the "extraordinary administration" of the largest privately-owned company in Croatia. In considering whether the proceeding fell within the meaning of "foreign proceeding" under the CBIR, the court stated a preference for the approach set out in *Re Betcorp*, *ie*, that the proceeding is brought "under a law relating to insolvency" if insolvency is one of the grounds on which the proceeding can be commenced, even if insolvency cannot actually be demonstrated in relation to the company which is the subject of those proceedings (at [63] and [73]).

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

148     Be that as it may, this part of the judgment is, in my view, *obiter* and
accordingly of little persuasive value. This is because the court was satisfied
that the company was in a state of "serious financial distress" (*Re Agrokor* at
[69]) and that the "extraordinary administration" proceeding could commence
only on grounds either of insolvency or of impending insolvency, whether
proved or deemed (*Re Agrokor* at [68]). Accordingly, the court held that "[i]t is
in fact the insolvency, actual or threatened, of one company which triggers the
proceeding, and the law under which the proceeding is brought is accordingly
in principle a law relating to insolvency for this purpose" (*Re Agrokor* at [73]).
Contrary to the applicants' submission, therefore, I do not think that the decision
in *Re Agrokor* necessarily stands for the proposition that a "foreign proceeding"
within the meaning of the Model Law need not involve a company which is
insolvent or in severe financial distress.

149     Even if I am wrong in my interpretation of these decisions, it is
nevertheless open to me to prefer *Re Sturgeon* to these decisions. I am not bound
in any way by any of these decisions. But I consider that my preference for *Re
Sturgeon* is well-justified. In particular, I bear in mind the 2013 Guide, which
states that a proceeding under a law that prescribes the winding up of an entity
on various grounds falls within the definition of "foreign proceeding" only if
that provision is applied to a company that is insolvent or in severe financial
distress (at para 48):

> 48.     ... Where a proceeding serves several purposes,
> including the winding up of a solvent entity, it falls under
> article 2, subparagraph *(a)* of the Model Law only if the debtor
> is insolvent or in severe financial distress.

This, in my view, refers clearly to a multi-factorial provision such as the
winding up of a company on the just and equitable ground. Accordingly, the
2013 Guide makes clear that the winding up of a company under a provision of

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

this nature ought not be recognised under the Model Law unless the company is insolvent or in severe financial distress. The interpretation which the applicants submit I should infer from *Re Stanford* (EWCA) and *Re Agrokor* therefore runs contrary to UNCITRAL's intent in promulgating the Model Law. I decline to adopt that interpretation in interpreting the Third Schedule.

150    The second string to the applicants' bow lies in the argument that there is a need to treat the English cases with circumspection. This is because of the differences in the legislative background between the CBIR and the Third Schedule. In particular, the applicants argue that the English courts' decisions are likely to be influenced, at least indirectly, by the Council of the European Union's Regulation on Insolvency Proceedings, EC Council Regulation 1346/2000 (replaced by Regulation of the European Parliament and of the Council of 20 May on Insolvency Proceedings (recast), EU Parliament and Council Regulation 2015/848).[27] This interpretative issue was recognised in *Re Zetta Jet* where Abdullah J observed that the differences in legislative backgrounds may, on occasion, lead to different nuances in interpretation and application (at [34]–[35]).

151    I have no doubt that there is a need to be sensitive to the specific legislative background when considering any decision of a court in a foreign jurisdiction, especially given that Parliament chose not to enact the Model Law wholesale in the Third Schedule but chose instead to customise it for local conditions. And as the court in *Re Agrokor* makes clear (at [36]), the approach adopted by one jurisdiction in interpreting an international convention such as the Model Law need not be adopted slavishly by the courts of another jurisdiction, notwithstanding the injunction to judges in Art 8 of the Model Law.

---

[27]    Applicants' Supplementary Written Submissions at para 125(d).

*Re Ascentra Holdings, Inc* [2023] SGHC 82

The key consideration is always the underlying legislative context of the specific legislation that the court has to interpret and apply (see [117] above).

152    In my judgment however, the applicants' submission may be overstating this issue somewhat. As I have said, the court in *Re Sturgeon* undertook a thorough review of the UNCITRAL reports and preparatory papers, the 1997 Guide, the 2013 Guide, the case law and commentaries relevant to the meaning of "foreign proceeding" under the CBIR (see [130] above). I therefore do not consider that endorsing the analysis *Re Sturgeon* runs the risk of adopting at an interpretation contrary to Parliament's intention as a matter of Singapore law, despite the differing legislative background to the Third Schedule as compared to the CBIR.

*The Australian position should not be adopted*

153    I deal very quickly with the position in Australian law. The applicants rely on the Supreme Court of New South Wales's ("the NSW Supreme Court") decision in *Re Chow Cho Poon (Private) Ltd* (2011) 80 NSWLR 507 ("*Re Chow Cho Poon*") in support of their argument that the solvent liquidation of a company is a "foreign proceeding" within the scope of the Third Schedule.

154    In so far as this remains the position under Australian law, the criticisms that I have made in relation to *Re Betcorp*, *Re Stanford* (EWCA) and *Re Agrokor* apply with equal force (see [132]–[142] and [149] above). In addition, I accept Mr Kumar's submission that the decision in *Re Chow Cho Poon* was rendered without the benefit of the 2013 Guide and should be accorded less weight.

155    *Re Chow Cho Poon* was a recognition application brought in the NSW Supreme Court under s 581(2)(a) of the Australian Corporations Act. That section obliges the Australian courts to "act in aid of" and to "be auxiliary to" a

*Re Ascentra Holdings, Inc*                                              [2023] SGHC 82

foreign proceeding. The foreign proceeding in question was the winding-up of a Singapore-incorporated company on the ground that it was just and equitable to do so. One of the main issues before the NSW Supreme Court was whether s 581(2)(a) of the Australian Corporations Act was inapplicable by virtue of s 22 of the Australian Cross-Border Insolvency Act 2008 (Cth) ("the CBIA"). Section 22 of the CBIA provides that the provisions of Division 9 of Part 5.6 of the Australian Corporations Act, in which s 581(2)(a) is located, has no effect to the extent that these provisions of the Australian Corporations Act are inconsistent with the provisions of the CBIA. It was in this context that the NSW Supreme Court had to consider whether s 581(2)(a) of the Australian Corporations Act was consistent with Art 25 of the CBIA. Article 25 of the CBIA imposed an obligation of cooperation upon the Australian courts where assistance is sought by a "foreign representative" under Art 9 of the CBIA. The definition of "foreign representative" under Art 2 of the CBIA, in turn, required the court to be satisfied that the individual or body was authorised in a "foreign proceeding" to administer the reorganisation or liquidation of the debtor company's assets or affairs. This was why the NSW Supreme Court had to consider the meaning of "foreign proceeding".

156     The NSW Supreme Court in *Re Chow Cho Poon* preferred the position in *Re Stanford* (EWCA) and *Re Betcorp*. Following those cases, the court concluded that the whole of the winding up provisions in the Companies Act (2006 Rev Ed) are to be classified as "a law relating to insolvency". As a result, the court held that a Singapore winding up commenced under the Companies Act (2006 Rev Ed) is a "foreign proceeding" within the meaning of the CBIA (at [51]).

157     For the reasons given above, I decline to follow *Re Stanford* (EWCA) and *Re Betcorp*. Given that, I also decline to follow *Re Chow Cho Poon*.

*Re Ascentra Holdings, Inc*                                    [2023] SGHC 82

Crucially, in considering whether the Singapore winding up was a proceeding "pursuant to a law relating to insolvency", the NSW Supreme Court in *Re Chow Cho Poon* observed that the "instinctive answer … is 'no'", given that the reason for winding up the company was not due it its inability to pay its debts as they fell due, but simply because the Singapore court concluded that it was "just and equitable" for the company to be wound up (at [39] and [40]):

> … Two other questions must be answered in the affirmative to justify the conclusion that the Singapore winding up is a "foreign proceeding": first, is CCP properly regarded as the debtor; second, is the proceeding "pursuant to a law relating to insolvency"?
>
> *The instinctive answer to each question is "no". The winding up is not a winding up in insolvency. It was not the inability of CCP, as a debtor, to pay its debts as they fell due that constituted the ground on which the Singapore court ordered that the company be wound up. Rather, the court concluded, for reasons that the evidence does not disclose, that it was "just and equitable" that the company be wound up.* It exercised jurisdiction under the [Companies Act (2006 Rev Ed)] to make a winding up order where the court was satisfied that it was "just and equitable" to do so. In those circumstances, it is difficult to see how the Singapore law "pursuant to" which the winding up is in place is properly characterised as "a law relating to insolvency".
>
> [emphasis added]

158     This observation is important, because it supports the view that the ordinary meaning of the words "law relating to insolvency" encompass only a proceeding invoked in circumstances where the company is insolvent or in severe financial distress. It is unlikely that the NSW Supreme Court would have arrived at the same conclusion if it had the benefit of the guidance set out in the 2013 Guide.

159     I therefore accept that the Australian position in respect of the interpretation of the term "foreign proceeding" under the CBIA should not be adopted in Singapore.

60

*Re Ascentra Holdings, Inc* [2023] SGHC 82

160     I turn now to consider whether Ascentra's liquidation was commenced "under a law relating to insolvency" within the meaning of Art 2(*h*) of the Third Schedule.

**Ascentra's liquidation is not a "foreign proceeding" within the meaning of the Model Law**

161     For the reasons I have set out above, I do not consider the fact that Ascentra's liquidation was initiated under the Cayman Act means, in itself, that its liquidation has a "basis in a law relating to insolvency". It is necessary for me to go beyond that and determine whether the specific provision under which Ascentra's liquidation was commenced is one that applies to a company which is insolvent or in severe financial distress.

162     As I have mentioned (see [11] above), Ascentra's liquidation started as a voluntary winding up commenced pursuant to a shareholders' resolution. The requirements and procedures for commencing a members' voluntary winding up are set out in ss 116(*c*) read with 117(1)(*a*) of the Cayman Act:

> **Circumstances in which a company may be wound up voluntarily**
>
> **116.** A company incorporated and registered under this Act or an existing company may be wound up voluntarily —
>
>> …
>>
>> (*c*) if the company resolves by special resolution that it be wound up voluntarily; or
>>
>> …
>
> **Commencement of winding up**
>
> **117.** (1) A voluntary winding up is deemed to commence —
>
>> (*a*) at the time of the passing of the resolution for winding up; …
>>
>> …

*Re Ascentra Holdings, Inc* [2023] SGHC 82

> notwithstanding that a supervision order is subsequently made
> by the Court.

163     Section 119(1) of the Cayman Act then prescribes the appointment of
liquidators for the purpose of winding up the company:

> **Appointment of voluntary liquidator**
>
> **119.** (1) One or more liquidators shall be appointed for the
> purpose of winding up the company's affairs and distributing
> its assets.

164     Given that Ascentra's directors failed to sign a declaration of solvency
within 28 days of the commencement of the winding up, Mr Robinson presented
a petition to the Grand Court seeking an order that the liquidation of Ascentra
continue under the supervision of the Grand Court (see [11] above). This
petition was presented under s 124(1) of the Cayman Act:

> **Application for supervision order**
>
> **124.** (1) Where a company is being wound up voluntarily its
> liquidator shall apply to the Court for an order that the
> liquidation continue under the supervision of the Court unless,
> within twenty-eight days of the commencement of the
> liquidation, the directors have signed a declaration of solvency
> in the prescribed form in accordance with subsection (2).

The Grand Court granted Mr Graham's petition, thereby bringing Ascentra's
liquidation proceeding under the supervision of the Grand Court.

165     Having considered the set of provisions which govern Ascentra's
liquidation, I accept Mr Kumar's submission that its liquidation does not fulfil
the second requirement in *United Securities*, *ie*, that the proceeding "must have
its basis in a law relating to insolvency". I am satisfied that the track under which
Ascentra's liquidation was commenced, *ie*, ss 116(*c*) read with 124 of the
Cayman Act, does not and cannot apply to a company that is insolvent or in

*Re Ascentra Holdings, Inc*                                          [2023] SGHC 82

severe financial distress. On a plain reading of the relevant provisions, it is clear
that these provisions apply only to a solvent company.

166     My conclusion is further strengthened by my finding that Ascentra's
liquidation is a procedure that will result in all of Ascentra's creditors being paid
in full, with a surplus returned to shareholders.

167     In so far as the applicants submit that the Liquidators' determination of
solvency relates only to Ascentra's financial position at the time of the
determination, and may be subject to change,[28] that may be true in theory. But
all of the evidence suggests that that is not likely to happen.

168     For all of these reasons, I do not consider that I have the power to make
any order recognising Ascentra's Cayman liquidation under Art 17.

**Conclusion**

169     For the reasons above, I have dismissed the application. Ascentra's
Cayman liquidation does not fall within the meaning of the phrase "foreign
proceeding" as defined in Art 2(*h*) of the Third Schedule.

170     I should also add that the outcome of this decision is simply that the
Liquidators cannot avail themselves of the relief or coercive powers that the
Third Schedule makes available to a company that is insolvent or in severe
financial distress. That is as it should be. It was never intended that the Model
Law or the Third Schedule should have that effect.

---

[28]        Applicants' Supplementary Written Submissions at para 8.

*Re Ascentra Holdings, Inc*                                              [2023] SGHC 82

171    It remains the case, however, that Singapore law recognises the Liquidators' power to cause Ascentra to take steps in Singapore: see *Dicey, Morris and Collins on The Conflict of Laws* (Lord Collins of Mapesbury ed) (Sweet & Maxwell, 15th Ed, 2012) at para 8–091. These steps include those necessary to gather the evidence that the Liquidators need to frame causes of action, to identify defendants and to assess prospects of success in litigation. These steps even include commencing proceedings against SPGK Singapore, SPGK Cayman and Scuderia Bianco in Singapore. Indeed, the applicants accept that it remains open for the Liquidators to seek procedural remedies for and in the name of Ascentra such as a pre-action discovery or non-party discovery under O 11 r 11 of the Rules of Court 2021. That is the appropriate route for the Liquidators, not recognition under the Third Schedule.


Vinodh Coomaraswamy
Judge of the High Court

Keith Han and Angela Phoon (M/s Oon & Bazul LLP)
for the applicants;
Balakrishnan Ashok Kumar, Sanjev Gunasekaran, Berwin Chua
and Gloria Chan (M/s BlackOak LLC) for the non-party.

————————————————

Certified True Copy

Manager, Judge's Chambers
Supreme Court Singapore