# EXHIBIT 6

a

# Re Sturgeon Central Asia Balanced Fund Ltd (in liquidation) (No 2)

## Carter v Bailey and another

### [2020] EWHC 123 (Ch)

b

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
INSOLVENCY AND COMPANIES LIST (Ch D)

c

CHIEF ICC JUDGE BRIGGS

5–6 DECEMBER 2019, 27 JANUARY 2020

*Cross-border insolvency – Foreign proceeding – Just and equitable winding up of solvent investment company in Bermuda – Bermudan winding up recognised as foreign main proceeding by English High Court – Director of company applying for review and termination of recognition order – Whether director had standing to apply for review as person affected by recognition – Whether winding up of solvent company could be recognised as foreign proceeding – UNCITRAL Model Law for Cross-Border Insolvency, arts 2(i), 17(4) – Cross-Border Insolvency Regulations 2006, SI 2006/1030, Sch 2.*

d

e

The applicant was a director of Sturgeon Central Asia Balanced Fund Ltd, a closed-ended investment company incorporated in Bermuda. Its share capital principally comprised participating shares which were held by a licensed Japanese securities company on behalf of investors or in its own right. The company also had a small number of management shares with voting rights but no material economic rights. Under the original bye-laws of the company there was a provision allowing participating shareholders to pass a resolution in 2014 to wind it up from the end of 2015, subject to a deferral of up to two years. At the AGM in 2014 the management shareholder adopted amended bye-laws which had the effect that the participating shareholders lost their power to wind the company up, without being given notice or permitted to vote. The Court of Appeal of Bermuda decided that the company should be wound up on the just and equitable ground on the basis that the participating shareholders had been deprived of the right to vote. The company was solvent, with assets of about $39m. The majority of the assets were managed by a London-based investment manager. The company's liquidators applied without notice to the English High Court for an order recognising the Bermudan liquidation as a foreign main proceeding under the UNCITRAL Model Law for Cross-Border Insolvency adopted by the UN Commission on International Trade Law and implemented in England by the Cross-Border Insolvency Regulations 2006, SI 2006/1030 ('CBIR'). Falk J considered the terms of the Model Law and other UNCITRAL documents, including the 1997

f

g

h

i

*a* Guide to Enactment of the Model Law and the revised 2014 Guide, the case law and the textbooks. She found that the Model Law focused on cross-border insolvency, but that there had been a deliberate choice to define 'foreign proceeding' as a proceeding 'pursuant to a law relating to insolvency', rather than using the concept of insolvency proceeding or defining insolvency; and that recognition was intended to be available in

*b* circumstances where insolvency had not been established as well as in cases where an entity was obviously insolvent. She noted that, based on *Re Stanford International Bank Ltd* [2010] EWCA Civ 137, [2011] Ch 33, [2010] BPIR 679, a winding up on just and equitable grounds could qualify for recognition in circumstances where the entity was insolvent. She concluded that the wording of the Model Law was not limited to companies

*c* that were insolvent or in severe financial distress. She accordingly made an order recognising the winding up in Bermuda as a foreign main proceeding. The applicant sought to terminate the recognition order under the review provisions in Sch 2 to the CBIR, on the basis that the grounds for granting the order were lacking at the time, because the solvent liquidation of the

*d* company was not a 'foreign proceeding' for the purpose of art 2(i) of the Model Law. The liquidators argued that the applicant was not a person 'affected by recognition' and therefore entitled to make a review application pursuant to art 17(4), because he had no interest in the winding up.

**Held** – (1) The test of whether a person was 'affected by recognition' within

*e* art 17(4) was not the same as the test under domestic law which required a person wishing to challenge the decision of an officeholder to have an economic interest in the solvent or insolvent estate. Having regard to the effect of an order recognising a foreign main proceeding, the applicant, as an officer of the company being wound up, was a person affected by

*f* recognition. He was not seeking to challenge a decision of an officeholder and did not need to show that he was a person aggrieved by the decision within the Insolvency Act 1986, s 168(5). If that was wrong and only a person who had a direct economic interest in the company could apply under art 17(4), it was appropriate to permit the application to proceed as if it was of the court's own motion as also envisaged by that paragraph. Not

*g* to permit the application to proceed would be to turn a blind eye to a serious challenge to jurisdiction, permitting a foreign representative to take advantage of powers provided only to UK officeholders and those properly recognised. *Re Rica Gold Washing Co* (1879) 11 Ch D 36, *Deloitte & Touche AG v Johnson* [2000] 1 BCLC 485, [1999] 1 WLR 1605, PC, *Mahomed v Morris* [2000] 2 BCLC 536, [2001] BCC 233, CA, *Re*

*h* *Westmead Consultants Ltd* (*in liq*)*, Ward v Evans* [2002] 1 BCLC 384 considered.

(2) When interpreting the Model Law and CBIR, the court could have regard not just to the language used, but to the papers and reports of the UNCITRAL Working Group, the explanatory memorandum to the CBIR, and the 1997 and 2014 Guides to Enactment. The Preamble and updated

*i* Judicial Perspective were also relevant interpretative tools. The court should adopt a purposive construction and not ignore updated guidance provided by UNCITRAL after the CBIR came into effect. In view of those materials, there was no obvious justification for allowing recognition of a members' voluntary winding up as a foreign proceeding. There was no conflict

between the earlier and later guidance on the issue of interpreting the meaning of 'foreign proceeding'. Given the background to the CBIR, the commentary and recent guidance the words 'for the purpose of reorganisation or liquidation' in art 2(i) should be read as referring to insolvency (liquidation) or severe financial distress (reorganisation). It would be contrary to the stated purpose and object of the Model Law to interpret 'foreign proceeding' to include solvent debtors and more particularly include actions that were subject to a law relating to insolvency but had the purpose of producing a return to members not creditors. For recognition to be ordered in England and Wales, the proceedings in respect of which recognition was sought had to relate to the resolution of the debtor's insolvency or the debtor's financial distress. As the foreign proceedings in this case were for the purpose of winding up a solvent company, which was not in financial distress, the recognition order was terminated. *Re Betcorp Ltd* (2009) 400 BR 266 doubted; *Re Stanford International Bank Ltd* [2010] EWCA Civ 137, [2011] Ch 33, [2010] BPIR 679 and *Re Chow Cho Poon (Private) Ltd* [2011] NSWSC 300, (2011) 80 NSWLR 507 considered; *Re OJSC International Bank of Azerbaijan* [2018] EWCA Civ 2802, [2019] 1 BCLC 1, [2019] 2 All ER 713 applied.

### Cases referred to

*Agrokor DD, Re* [2017] EWHC 2791 (Ch), [2018] 2 BCLC 75, [2018] Bus LR 64, [2018] BPIR 1.

*Arm Asset Backed Securities SA, Re* [2013] EWHC 3351 (Ch), [2013] All ER (D) 107 (Nov).

*Betcorp Ltd, Re* (2009) 400 BR 266, US Bankruptcy Ct, Nevada.

*Cabell v Markham* (1945) 148 F 2d 737, US CA 2nd Cir.

*Chow Cho Poon (Private) Ltd, Re* [2011] NSWSC 300, (2011) 80 NSWLR 507, NSW SC.

*Dalnyaya Step LLC (in liq), Re* [2017] EWHC 3153 (Ch), [2018] BPIR 378, [2018] Bus LR 789.

*Deloitte & Touche AG v Johnson* [2000] 1 BCLC 485, [1999] 1 WLR 1605, [1999] 4 LRC 281, PC.

*Ebrahimi v Westbourne Galleries Ltd* [1972] 2 All ER 492, [1973] AC 360, [1972] 2 WLR 1289, HL.

*Edennote Ltd, Re, Tottenham Hotspur plc v Ryman* [1996] 2 BCLC 389, [1998] BCC 718, CA.

*Hans Place Ltd (in liq), Re* [1993] BCLC 768, [1992] BCC 737, [1992] 2 EGLR 179.

*Mahomed v Morris* [2000] 2 BCLC 536, sub nom *Mahomed v Morris (No 2)* [2001] BCC 233, CA.

*OGX Petróleo e Gás SA, Re, Nordic Trustee ASA v OGX Petróleo e Gás SA (Em Recuperação Judicial)* [2016] EWHC 25 (Ch), [2017] 2 All ER 217, [2016] Bus LR 121.

*OJSC International Bank of Azerbaijan, Re, Bakhshiyeva v Sberbank of Russia* [2018] EWCA Civ 2802, [2019] 1 BCLC 1, [2019] 2 All ER 713, [2019] BPIR 269, CA.

*Pan Ocean Co Ltd, Re* [2014] EWHC 2124 (Ch), [2014] Bus LR 1041, [2014] All ER (D) 03 (Jul).

*a*  *R* (*on the application of Quintavalle*) *v Secretary of State for Health* [2003]
    UKHL 13, [2003] 2 All ER 113, [2003] 2 AC 687, [2003] 2 WLR 692,
    (2003) 71 BMLR 209, HL.
    *Rica Gold Washing Co, Re* (1879) 11 Ch D 36, [1874–80] All ER Rep Ext
    1570, CA.
*b*  *Rubin v Eurofinance SA, New Cap Reinsurance Corp Ltd v Grant* [2012]
    UKSC 46, [2012] 2 BCLC 682, [2013] 1 AC 236, [2013] 1 All ER 521,
    [2012] 3 WLR 1019.
    *Stanford International Bank Ltd, Re* [2009] EWHC 1441 (Ch), [2009]
    BPIR 1157; *affd* [2010] EWCA Civ 137, [2011] Ch 33, [2010] BPIR 679,
    [2011] BCC 211, [2010] 3 WLR 941, [2010] Bus LR 1270.
*c*  *Videology Ltd, Re* [2018] EWHC 2186 (Ch), [2018] BPIR 1795.
    *Westmead Consultants Ltd* (*in liq*)*, Re, Ward v Evans* [2002] 1 BCLC 384.
    *Zetta Jet Pte Ltd, Re,* (*Asia Aviation Holdings Pte Ltd, intervener*) [2019]
    SGHC 53, [2019] SLR 1343, Sing HC.

**Application**
*d*  Mr Michael Carter, as a director of Sturgeon Central Asia Balanced
    Fund Ltd, a closed-ended investment company incorporated in Bermuda,
    which was being wound up in Bermuda on the just and equitable ground,
    applied to the court under the review provisions in the Cross-Border
    Insolvency Regulations 2006, SI 2006/1030, Sch 2 for the termination of an
    order made by Falk J on 17 May 2019 recognising the Bermudan
*e*  liquidation as a foreign main proceeding under the UNCITRAL Model Law
    for Cross-Border Insolvency art 17.

*James Potts QC* and *Conor McLaughlin* (instructed by *Pinsent
    Masons LLP*) for the applicant.
*f*  *Joseph Curl* (instructed by *Clyde & Co LLP*) for the respondent.

*Judgment was reserved.*

*g*  27 January 2020. The following judgment was delivered.

**CHIEF ICC JUDGE BRIGGS.**

| | |
|---|---|
| Introduction | [1]–[3] |
| Summary | [4]–[8] |
| Sturgeon Central – background | [9]–[15] |
| Application for recognition | |
|     A. The application for recognition, heard without notice | [16]–[22] |
|     B. The decision of Falk J | [23]–[32] |
| Review application | |
|     A. Provisions | [33]–[47] |
|     B. The standing of Mr Carter to make the application to terminate | [48]–[54] |

| | |
|---|---|
| C. The right of Mr Carter to be heard | [55]–[56] |
| The inter partes challenge | |
| A. A summary of the challenge | [57]–[58] |
| B. Working Group papers | [59]–[70] |
| C. The 1997 Guide and the Guide to Enactment 2014 | [71]–[84] |
| D. The Judicial Perspective | [85]–[88] |
| E. Legislative Guide on Insolvency Law | [89] |
| Case law | [90]–[103] |
| Textbook commentary | [104]–[108] |
| Applicable principles for interpretation | [109]–[112] |
| Conclusion | [113]–[124] |

## INTRODUCTION

**[1]** The UNCITRAL Model Law for Cross-Border Insolvency adopted by the UN Commission on International Trade Law on 30 May 1997 ('Model Law') was implemented in England and Wales (and Scotland) by the Cross-Border Insolvency Regulations 2006 ('CBIR'). On an application made under the CBIR, the joint provisional liquidators of Sturgeon Central Asia Balanced Fund Ltd ('Sturgeon') obtained an order recognising the liquidation of Sturgeon in Bermuda as a foreign main proceeding on 17 May 2019 ([2019] EWHC 1215 (Ch), [2019] 2 BCLC 412). The recognition order made by Falk J is the first order to recognise the liquidation of a solvent company as a foreign proceeding in this jurisdiction. The application before the court is made pursuant to review provisions in Sch 2 to the CBIR under which the applicant seeks to terminate the order made.

**[2]** The foreign representatives are Roy Bailey of EY Bermuda Ltd and Keiran Hutchinson of EY Cayman Ltd. They were appointed Joint Provisional Liquidators (JPLs) of Sturgeon by an order of the Supreme Court of Bermuda dated 22 January 2019, following an earlier decision of the Court of Appeal for Bermuda that the company should be wound up on just and equitable grounds. The JPLs resist the application to terminate the recognition order.

**[3]** The key question this application raises is whether the winding up in Bermuda should continue to be recognised in this jurisdiction. This raises the issue as to whether those proceedings are a 'foreign proceeding' for the purposes of the Model Law and the CBIR. To assist the reader, I have summarised my conclusions in this respect immediately below. I have concluded that the proceedings in question should not be so recognised.

## SUMMARY

**[4]** The Model Law, as enacted in Great Britain, is set out in Sch 1 to the CBIR; unless otherwise stated, references in this judgment to articles of the Model Law are to the text as set out in Sch 1. Article 2(i) defines a 'foreign proceeding'. It means a 'collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are

a  subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation.' The purpose of the Model Law is to promote modern and fair legislation for cases where an insolvent debtor has assets in more than one State.

[5] It would be contrary to the stated purpose and object of the Model Law to interpret 'foreign proceedings' to include solvent debtors and more

b  particularly include actions that are subject to a law relating to insolvency which have the purpose of producing a return to members not creditors.

[6] Read in context and employing a purposive approach, the words 'for the purpose' in art 2(i) should be read as meaning the purpose of insolvency (liquidation) or severe financial distress (reorganisation).

c  [7] For recognition to be ordered in England and Wales, the proceedings in respect of which recognition is sought, must relate to the resolution of the debtor's insolvency or the debtor's financial distress.

[8] As the foreign proceedings in this case are for the purpose of winding up a solvent company, which is not in financial distress, the recognition order should be terminated. I shall now set out my reasoning in this respect

d  in further detail, starting with a consideration of the background to the winding up.


**STURGEON**

e  [9] The background to the winding up of Sturgeon is not contentious. The JPLs have provided no further evidence since the hearing of the recognition application in May 2019. I gratefully adopt the position as set out in paras [4]–[10] of the judgment given by Falk J ([2019] 2 BCLC 412):

f    '[4] The Company was incorporated under the laws of Bermuda in March 2007, to act as a closed-ended investment company. It was aimed at Japanese investors wishing to invest in Central Asia. It was listed on the Irish Stock Exchange, but its shares were apparently never traded on it. The Company had a Bermudian corporate company secretary and its administration was carried out there under a corporate services agreement. It had three directors at the time of its liquidation,

g  one in Japan, one in the UK and one in Kazakhstan. A London based investment manager has management of the majority of its assets.

[5] The Company has a small number of management shares with voting rights but no material economic rights. Its share capital principally comprises participating shares which are held on behalf of investors. Of a total of 7.6 million such shares (ignoring shares held in

h  treasury), Capital Partners Securities Co Ltd ("CPS"), a licensed Japanese securities company, is the nominee for over 7.2 million shares and holds most of the remainder in its own right.

[6] Under the original bye-laws of the Company there was a provision allowing participating shareholders to pass a resolution in 2014 to wind it up from the end of 2015, subject to a deferral of up to two years. At

i  the AGM in 2014 the management shareholder adopted amended bye-laws which had the effect that the participating shareholders lost their power to wind the Company up, without being given notice or permitted to vote. There was an alternative structure under which the Board could allow participating shares to be redeemed, but this was

*a*

very restricted and under the proposed timetable it would take 40 years for shareholders to redeem in full, and on terms that involved a discount to net asset value.

[7] CPS petitioned for the Company's winding up on just and equitable grounds, contending that there had been a serious breakdown in the basis on which the Company was set up and investors were being denied their rights. There was no suggestion that the Company was insolvent, and that remains the case.

*b*

…

[9] Winding up was ordered under s 161 of the Bermuda Companies Act 1981. This is based on s 222 of the Companies Act 1948. It provides for winding up by the court on a number of different bases, including insolvency.

*c*

"*Circumstances in which company may be wound up by the Court*
161. In addition to any other provision in this or any other Act prescribing for the winding up of a company a company may be wound up by the Court if–

…

*d*

(e) the company is unable to pay its debts;

…

(g) the Court is of the opinion that it is just and equitable that the company should be wound up."

[10] Permission to appeal to the Privy Council was refused, and the stay that had previously been imposed was lifted. …'

*e*

[10] I mention a few further words about the nature of the winding-up proceedings, drawn from the winding-up petition, and the judgments in the Supreme Court of Bermuda and Court of Appeal for Bermuda.

[11] First, CPS's petition pleaded at para 76: 'in the event that the Fund is wound up there will be a surplus for the benefit of contributors including the Petitioner and UBOs'. Secondly, the Supreme Court of Bermuda said that the merits of the petition 'largely depend[ed] upon the interpretation of Bye-Law 78'. It provided that shareholders may resolve by special resolution proposed at an annual general meeting held in the year 2014 to wind up and dissolve the company with effect from 31 December 2015. If Sturgeon was to be wound up, the liquidator may 'divide among the shareholders in cash or kind the whole or any part of the assets of the Company'. The exercise of interpretation was not easy. Chief Justice Ian RC Kawaley said (at para 8):

*f*

*g*

'The draftsman of the Bye-Laws could have denied counsel and this Court the intriguing challenge of having to unravel this most difficult first limb of the construction conundrum by explicitly providing either (a) that the winding up vote would be approved by a "Special Resolution of the Management Shareholders" or (b) by not using the term "Special Resolution" at all. CPS nevertheless submitted that this term required a super-majority of both Management and Participating Shareholders …'

*h*

*i*

[12] The Chief Justice found that CPS succeeded in establishing that Bye-Law 78 conferred voting rights on participating shareholders which the management shareholder unlawfully expropriated through the 2014

*a*  amendments; CPS failed to establish that the participating shareholders were deprived of a positive right to a winding up by December 31 2017; and the voting rights of which CPS and other participating shareholders were deprived were consultative in nature.

[13] The Court of Appeal upheld the decision of the Chief Justice in that CPS failed to make out that Sturgeon had acted in bad faith as it had acted

*b*  on advice. It upheld the Chief Justice in finding that the advice relied upon was not relied upon as a result of 'advice shopping': 'The Board members were Mr Tsutsui representing CPS, Mr Sjoerdsma representing Sturgeon Capital and Mr Michael Carter as an independent.' Mr Michael Carter is the applicant on the application before this court.

[14] The Court of Appeal differed from the decision of the Chief Justice

*c*  when finding that 'the effect of changing the bye-laws was to deprive the participating shareholder of what I have held to be its right to vote at the 2014 AGM on a Resolution put before all the shareholders to wind up the Fund on 31 December 2015 or 2017.' There being no finding of *mala fides* the conclusion reached was that it was sufficient to wind up Sturgeon on

*d*  the basis that the participating shareholders had been deprived of the right to vote.

[15] After referring to *Ebrahimi v Westbourne Galleries Ltd* [1972] 2 All ER 492, [1973] AC 360, the Court of Appeal of Bermuda allowed the appeal and made an 'order that the Fund be wound up.' In his affidavit Mr Carter says that the combined findings of the Supreme Court and Court

*e*  of Appeal for Bermuda demonstrate that Sturgeon is 'demonstrably solvent'; Sturgeon's 'solvency and a surplus for shareholders was a pre-requisite for the making of a just and equitable winding-up order on the petition of a shareholder'; the reason 'that the winding up of the Fund was the only suitable remedy 'rather than, say, a buy-out of the Participating Shareholders' shares following a petition that the Fund's affairs had been

*f*  conducted in an oppressive or prejudicial manner' was based on the fact that this was the specific right that had been removed from the Participating Shareholder. As Falk J observed (para [10]): 'the statement of affairs as at 22 January 2019 shows net assets of just under US $39m.'

*g*  ## APPLICATION FOR RECOGNITION

### A. The application for recognition, heard without notice

[16] The application first came before Insolvency and Companies Court Judge Burton for a hearing on 29 March 2019. A skeleton argument was produced by Mr Ouwehand of counsel with a recommended reading time of 30 minutes and an equal amount of time allotted for the hearing. In his

*h*  skeleton argument (written submission) he submitted (I set it out, as the same argument was run before Falk J and myself):

'The Liquidation will be a winding up process which is similar to the just and equitable winding-up of a solvent company under British insolvency law … It follows that the Liquidation is taking place "under

*i*  the supervision of" the Supreme Court of Bermuda and is a "collective proceeding" in that it will consider the rights and obligations of all creditors.

In relation to the requirement that the proceeding be "pursuant to a law relating to insolvency": a. a liquidation can be conducted under a

law that is not labelled as insolvency law, for example company law, but which nonetheless deals with insolvency; b. the words "relating to" are "wide words of connection" and "the law concerned certainly does not have to be a law confined to insolvency": see *In re Agrokor dd* [2017] EWHC 2791 (Ch) at [55]. Having considered the Court of Appeal decision in *In re Stanford International Bank Ltd* [2010] Bus LR 1270, the US decision of *In re Betcorp Ltd* (2009) 400 BR 266 and a decision of the New South Wales Supreme Court in *In re Chow Cho Poon* (*Private*) *Ltd* (2011) 80 NSWLR 507, Judge Paul Matthews (sitting as a High Court Judge) in *In re Agrokor dd* summarised the relevant principle as follows (at [63]):

"From these authorities and guides to interpretation, it is clear that the requirement that the law under which the proceeding is brought be "an insolvency law" is satisfied if insolvency is one of the grounds on which the proceeding can be commenced, even if (as in *In re Betcorp Ltd*) insolvency could not actually be demonstrated, and there was another basis for commencing the proceeding."

At [73], Judge Paul Matthews noted that "… in *In re Betcorp Ltd* …, the evidence was that the company subject to members' voluntary winding up was in fact solvent. But insolvency would have been a basis for such a winding up, as it was in *In re Stanford International Bank* …" '

[**17**] ICC Judge Burton immediately recognised that the application raised an important, novel point of law regarding the scope of the court's jurisdiction under the CBIR and transferred it to a High Court Judge for determination. The application was brought before Mann J in the applications court on 29 March 2019. He adjourned to a full hearing with a time estimate of two hours.

[**18**] The full hearing of the application was heard by Falk J on 8 May 2019, without notice to any other party. The point in question is whether CBIR recognition is available to a solvent company that is subject to just and equitable winding up. In her careful judgment Falk J remarked 'The point is simply stated but rather less simply answered.' Mr Curl informs the court that he focussed his submissions on the Guide to Enactment 2014 rather than the original Guide to Enactment of the UNCITRAL Model Law (1997) (the '1997 Guide').

[**19**] He set out the position of the JPLs in his written submissions to Falk J:

'a. recognition is available to a "foreign proceeding", as defined in article 2 of the Model Law;

b. the relevant inquiry is into whether or not the proceeding for which recognition is sought falls within the meaning of the scope of the term "foreign proceeding";

c. discussion of any other term (such as "insolvency proceeding") is irrelevant to the meaning and scope of "foreign proceeding";

d. the "insolvency" requirement in the definition of "foreign proceeding" relates to the law under which the relevant proceeding was opened, not the entity that is subject to that proceeding;

*a*
    e. in fact, both the Model Law and the Guide to Enactment contemplate that recognition may be granted to a proceeding where the company in question is solvent;

    f. for a law to be one that is "pursuant to insolvency", the law in question must be considered as a whole, and it does not matter if the particular proceedings were commenced on some ground other than insolvency;

*b*
    g. where the words used in the Model Law are clear, they must be applied; and

    h. where the commentary in the Guide to Enactment is inconsistent with the words of the Model Law, the Model Law must be preferred and followed.'

*c*
[20] Mr Curl submitted first, that the terms 'insolvency proceeding' or 'severe financial distress' is not used in the Model Law. Secondly, neither the 1997 Guide nor the Guide to Enactment 2014 define these terms. Lastly, that the recognising court should not have to conduct factually difficult questions of insolvency which have been determined by a foreign jurisdiction.

*d*
[21] In post-hearing written submissions Mr Curl covered the following issues: a) whether the procedural requirements for recognition had been met; b) whether the passages in the Guide to Enactment 2014 appeared in the 1997 Guide which was the version specifically referred to in reg 2 of the CBIR; c) the implications, if any, of the Vienna Convention on the Law of Treaties; d) whether or not it would be appropriate to bestow the effects of recognition, in particular a stay, on a solvent company; e) whether the Bermudian court made a finding of solvency; f) the implications, if any, of *Re Arm Asset Backed Securities SA* [2013] EWHC 3351 (Ch), [2013] All ER (D) 107 (Nov); g) commentary on *Betcorp*; and h) the concept of 'severe financial distress'. In respect of the Guide to Enactment 2014 it was submitted:

*e*

*f*

    'To the extent the court thinks that either of the iterations of the Guide to Enactment is useful in interpreting the words of the Model Law …the 1997 Guide to Enactment remains the version referred to in the CBIR. Those regulations could have easily been amended by statutory instrument in this country to refer to the Revised Guide to Enactment but they have not been. It is difficult to identify any justification for permitting the Working Group to alter by *ad hoc* committee discussion the terms and effect of the Model Law by adding a gloss in the Revised Guide to Enactment but simultaneously making no amendment to the Model Law itself. The court may decide that both versions of the Guide to Enactment, but especially the Revised Guide to Enactment, are so inconsistent both internally and with the Model Law itself …The court may decide that they do not constitute a useful tool to interpretation.'

*g*

*h*

*i*
[22] There is no note of the hearing but by a combination of the written submissions to which I have referred, and the judgment of Falk J (she sets out the 'Liquidator's case' at paras 23 to 27), it is possible to glean the nature and extent of the submissions that persuaded the court to grant a recognition order.

### B. The judgment of Falk J

[23] Mr Potts QC criticises the presentation of the case to the judge on the basis that it failed to provide substantive or any argument that recognition is confined to entities that are insolvent or in financial distress. The judge endorsed her judgment pursuant to para 6 of the *Practice Direction* (*Citation of Authorities*) [2001] 2 All ER 510, [2001] 1 WLR 1001 'notwithstanding that the application for recognition was attended by one party only, this judgment may be cited in court on the basis that it establishes a new principle or extends the current law'. It is apparent from her judgment that Falk J was concerned about the principles of interpretation or construction of the Model Law. The intention of this section of my judgment is to tie the submissions made in relation to interpretation with Falk J's judgment.

[24] Mr Curl was asked by the judge to address if and how the Vienna Convention (the 'Convention') may assist. He did so in the post-hearing written submission. Mr Curl brought to the judge's attention art 31 of the Convention which is headed 'General Rule of Interpretation' and submitted that she need not determine whether 'the CBIR is a 'treaty' within the terms of the Vienna Convention but said it 'is supportive of the interpretation given to the Model Law by the courts, as advanced by the Liquidators in this application.' Article 31 provides (I set it out in full for the sake of completeness):

'1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:
   (a) Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;
   (b) Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3. There shall be taken into account, together with the context:
   (a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;
   (b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;
   (c) Any relevant rules of international laws applicable in the relations between the parties.

4. A special meaning shall be given to a term if it is established that the parties so intended.'

[25] After analysing the Model Law (focusing on the definition of 'foreign proceeding'), the 1997 Guide and the Guide to Enactment 2014, a report dated May 1994 of an UNCITRAL Colloquium on Cross-border insolvency, a report dated April 1995 of a Judicial Colloquium, and reports of the 18th–21st sessions of the UNCITRAL Working Group V (Insolvency Law) dated December 1995, April 1996, October 1996 and February 1997, Falk J turned to the case law: *Re Stanford International Bank Ltd* at first instance [2009] EWHC 1441 (Ch), [2009] BPIR 1157 and in the Court of Appeal [2010] EWCA Civ 137, [2011] Ch 33, [2010] BPIR 679; *Re*

*a*   *Betcorp Ltd* (2009) 400 BR 266; *Re Chow Cho Poon* (*Private*) *Ltd* [2011] NSWSC 300; and *Re Agrokor DD* [2017] EWHC 2791 (Ch), [2018] 2 BCLC 75, [2018] Bus LR 64. She was also taken to commentary including *Treaty Interpretation* (2nd edn), by Richard Gardiner; *Cross-Border Insolvency* (4th edn), edited by Richard Sheldon QC; and *Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law*

*b*   (4th edn), edited by Look Chan Ho.

[**26**] The judge reasoned (para [34]):

'The original (1997) version of the Guide to Enactment does not contain all the passages that troubled Judge Burton. The only reference to "severe financial distress" appears in para 71, part of a discussion of

*c*   art 2. This is in virtually identical terms to para 65 of the 2014 version, set out above at para 21. The background to the changes can be found in a report of the 40th session of the Working Group in November 2011, which records the relevance of the preamble, in particular para (e), and a suggestion that the existing reference to severe financial distress or insolvency should be emphasised to ensure clarity of scope. It

*d*   also cross refers to the definition of insolvency proceedings in the Legislative Guide on Insolvency Law, which it suggests might be helpful. That defines insolvency proceedings as "collective proceedings, subject to court supervision, either for reorganisation or liquidation". It is worth noting that neither this nor a separate explanation of the concept of 'reorganisation proceedings' in the Guide indicates that they are

*e*   necessarily limited to companies that are in fact insolvent.'

[**27**] Falk J concluded that the Guide to Enactment 2014 should not carry the same weight as the 1997 Guide when interpreting the text of the Model Law (para [46]):

*f*   'Dealing with the last of these points first, art 31(3) of the Convention refers to subsequent agreements between the parties, and to subsequent practice in the application of the treaty which establishes the agreement of the parties. Neither of these is an apt description of the 2014 version of the Guide, which is in the nature of a unilateral document published by UNCITRAL. This reinforces the view I had reached, based on the

*g*   specific reference in reg 2 of CBIR to the 1997 version of Guide, that the later version must be approached with some circumspection.'

[**28**] And later in her judgment (paras [50]–[51]):

'[50] It is clear from the preamble to the UNCITRAL Model Law that

*h*   its focus is on cross-border insolvency. The objectives are clearly set out, including increased cooperation, greater certainty and fair and efficient administration of cross-border insolvencies. There is however a specific reference to "financially troubled businesses", a term which is not defined but may include businesses that are not necessarily insolvent.

[51] It is also clear from the UNCITRAL documents referred to at

*i*   paras [28] to [33] above that there was a deliberate choice to focus on the question of whether the relevant proceeding was commenced pursuant to a law relating to insolvency, rather than using the concept of insolvency proceeding or even defining insolvency. The latter alternative was rejected as not being feasible. Concerns were expressed

about different meanings of the term in different jurisdictions, but there    *a*
was also emphasis on not putting the recognising court in the position
of having to determine whether there was an insolvency. Against the
background that the key aims of the Model Law included the
development of streamlined procedures to allow the efficient
administration of cross-border insolvencies, reducing the risk of
time-consuming conflicts between processes in different jurisdictions,    *b*
this is hardly surprising. This point is reflected in an UNCITRAL
document entitled 'Model Law on Cross-Border Insolvency: The
Judicial Perspective' produced in 2012, which describes the
"recognition" principle, being one of the principles behind the Model
Law, as having the object of avoiding "lengthy and time-consuming
processes by providing prompt resolution of applications for    *c*
recognition", which "brings certainty to the process and enables the
receiving court ... to determine questions of relief in a timely fashion"
(page 13).'

[29] In her determinations she found that during its 18th session, the    *d*
Working Group changed the emphasis in the definition of a foreign
proceeding 'from one which had the *purpose* of liquidating assets for
distribution to creditors, to one undertaken pursuant to a law relating to
insolvency ...'. She concluded (para [55]):

  'recognition is intended to be available in circumstances where    *e*
  insolvency has not been established as well as in cases where an entity is
  obviously insolvent ...'.

[30] Commenting on the Court of Appeal's decision in *Stanford* she
concluded that para [15] of that judgment (highlighted in Mr Curl's
skeleton argument) provided a useful and careful summary. She said (at
para [56]): 'As noted by the Chancellor in *Stanford*, the concept of just and    *f*
equitable grounds also conventionally includes insolvency. It is clearly right,
based on *Stanford*, that a winding up on just and equitable grounds can
qualify for recognition in circumstances where the entity is insolvent.'
[31] Returning to the Guide to Enactment 2014 Falk J said (para [59]): 'I
accept that there is wording in the 2014 version of the Guide to Enactment    *g*
in particular, and to some extent in the original version, which appears to
contradict my conclusion and indicate that the Model Law applies only to
companies that are insolvent or in "severe financial distress". However, I
agree with Mr Curl that this limitation is not reflected in the text of the
Model Law. Whilst it is the case that the Model Law is aimed at entities
that are insolvent or otherwise in financial distress, confining recognition    *h*
under it to entities that are demonstrated to have these characteristics
would conflict with the plain meaning of the words used. It is also wholly
unclear how financial distress might be determined, or what the threshold
is. Furthermore, it would run counter to the aim of allowing recognition on
an efficient basis, because of the factual enquiry that would be required.'
[32] Finally, the judge considered the EC Regulation on Insolvency    *i*
Proceedings (since recast as the EU Regulation on Insolvency Proceedings)
as both versions of the Guide to Enactment refer to it as a complementary
regime. The jurisprudence in respect of the EC reg did not assist on the
point she had to decide.

*a*   **REVIEW APPLICATION**

**A. Provisions**

[33] I shall from this point refer to the judgment of Falk J as the 'ex parte hearing' (a term used in para 34 of Sch 2 to the CBIR).

[34] The relevant regulations and schedules are as follows: reg 2(1) of the CBIR provides that: 'The UNCITRAL Model Law shall have the force of
*b*   law in Great Britain in the form set out in Schedule 1 to these Regulations (which contains the UNCITRAL Model Law with certain modifications to adapt it for application in Great Britain).'

[35] Article 17, para 1 of Ch III of Sch 1 provides that subject to art 6 (public policy exception) a 'foreign proceeding shall be recognised if– (a) it
*c*   is a foreign proceeding within the meaning of sub-paragraph (i) of article 2'. Article 2 defines foreign proceeding as 'a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a *law relating to insolvency* in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, *for the purpose of reorganisation or liquidation*.' (emphasis
*d*   added).

[36] Article 17, para 4 of Ch III, Sch 1 provides:

'The provisions of articles 15 to 16, this article and article 18 do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have fully
*e*   or partially ceased to exist and in such a case, the court may, on the application of the foreign representative or a person affected by recognition, or of its own motion, modify or terminate recognition, either altogether or for a limited time, on such terms and conditions as the court thinks fit.'

*f*   [37] Regulation 4 gives effect to the procedural Sch 2. Paragraph 1 of that schedule is headed 'Interpretation' and provides a definition of 'review application'. It means 'an application to the court for a modification or termination order'. A definition is given for 'modification or termination order'. This means 'an order by the court pursuant to its powers under the Model Law modifying or terminating recognition of a foreign
*g*   proceeding …' Part 5 of Sch 2 concerns review applications. Such an application must be supported by evidence setting out the grounds upon which it is proposed that the relief applied for should be granted. Schedule 2, para 17 provides:

'On hearing a review application, the court may in addition to its
*h*   powers under the Model Law to make a modification or termination order–
(a) dismiss the application;
(b) adjourn the hearing conditionally or unconditionally;
(c) make an interim order;
(d) make any other order which the court thinks appropriate,
*i*   including an order making such provision as the court thinks fit with respect to matters arising in connection with the modification or termination.'

[38] Part 6 of Sch 2 applies to review hearings and para 25 governs who

may be heard. Persons who may appear or be represented include the 'debtor, and in the case of any debtor other than an individual, any one or more directors or other officers of the debtor' (para 25(1)(b)) and 'with the permission of the court, any other person who appears to have an interest justifying his appearance' (para 25 (1)(j)).

[39] An issue of concern to me was whether the review application was in substance an appeal against the ex-parte hearing.

[40] The 1997 Guide (para 129) explains:

> 'A decision to recognize a foreign proceeding would normally be subject to review or rescission, as any other court decision. Paragraph (4) clarifies that the question of revisiting the decision on recognition, if grounds for granting it were fully or partially lacking or have ceased to exist, is left open to the procedural law of the enacting State other than the provisions implementing the Model Law.'

[41] The Guide to Enactment 2014 (para 164) does not differ in any material way but stops after the word 'exist':

> 'A decision to recognize a foreign proceeding would normally be subject to review or rescission, as any other court decision. Paragraph 4 clarifies that the decision on recognition may be revisited if grounds for granting it were fully or partially lacking or have ceased to exist.'

[42] The 1997 Guide (para 131) states that a decision on recognition may be reviewed if the requirements for recognition were not observed in the decision-making process. Paragraph 166 of the Guide to Enactment 2014 is in similar terms: 'A decision on recognition may also be subject to a review of whether, in the decision-making process, the requirements for recognition were observed.'

[43] This is the very case advanced by Mr Carter through Mr Potts QC.

[44] Following the Guide to Enactment 2014, an appeal is suitable where the appellate court would review the 'merits of the case in its entirety, including factual aspects. It would be consistent with the purpose of the Model Law and with the nature of the decision granting recognition … if an appeal of the decision would be limited to the question whether the requirements of arts 15 and 16 were observed in deciding to recognize the foreign proceeding.' It is apparent that there is some overlap between reviewing the decision-making process in respect of the requirements for recognition and appealing the decision granting recognition. The difference may be fine.

[45] A proceeding will be recognised under the CBIR if: (i) it satisfies the definition of a 'foreign proceeding' in art 2(i), (ii) the applicant is a 'foreign representative' within the meaning of art 2(j), (iii) the application is supported by evidence of the foreign proceeding and the appointment of the foreign representative, as required by art 15(2) and (3), and (iv) in England, the application is made to the Chancery Division of the High Court.

[46] The applicant in this matter seeks to terminate the recognition order on the basis that the grounds for granting the order were fully lacking at the time. This review application focuses not on arts 15 and 16 but art 17(1)(a) and in particular on whether, for the purpose of recognition, the solvent

*a*  liquidation of Sturgeon was a 'foreign proceeding' for the purpose of art 2(i).

[47] Mr Potts QC submitted that, standing back, this is a proper matter for review and not an appeal. In the end there was no argument as to whether the matter before the court was an appeal or fell within the review jurisdiction. The JPLs and Mr Carter agreed that this court has jurisdiction *b*  to review the *ex parte* hearing decision subject to Mr Carter's standing (see below). I am satisfied that the 1997 Guide and Guide to Enactment 2014 direct this court towards review rather than appeal. I am satisfied that the review application is suitable on the ground that it is similar to, if not the same as, the return date of an *ex parte* application for an injunction, albeit that there are procedural differences (an application must be made for the *c*  review application).

**B. The standing of Mr Carter to make the application to terminate**

[48] Mr Curl argues that Mr Carter does not have a legitimate interest because he has no interest in the winding up. As such he cannot fall within *d*  the category of persons who are 'affected by recognition' and therefore entitled to make a review application pursuant to art 17(4). In his submission the only 'person[s] affected by recognition' are those who have a financial interest in the outcome of the insolvency process: *Re Rica Gold Washing Co* (1879) 11 Ch D 36. That case concerned the right of a shareholder to present a petition to wind up a company on grounds that a *e*  fraud had been perpetrated. The Court of Appeal found that the petition was defective and there was no evidence of assets in which the petitioner could participate after payment of the debts and costs of winding up. The petition was dismissed. In my judgment *Re Rica Gold Washing Co* does not support the proposition that Mr Carter is not a 'person affected by *f*  recognition'.

[49] Mr Curl relies on authorities relating to personal and corporate insolvent estates such as: *Deloitte & Touche AG v Johnson* [2000] 1 BCLC 485, [1999] 1 WLR 1605 where the Privy Council recorded that the only persons with an interest in an insolvent liquidation are the creditors, and contributories where the liquidation is solvent; *Re Edennote Ltd,* *g*  *Tottenham Hotspur plc v Ryman* [1996] 2 BCLC 389 which concerned an application to set aside a decision to assign a cause of action by a liquidator by 'any persons aggrieved'; and *Mahomed v Morris* [2000] 2 BCLC 536, [2001] BCC 233 where the court found that a surety did not have standing to make an application to set aside a decision of a liquidator to enter into a settlement agreement. I need not cite all the cases he presented the court *h*  with, since they support the same proposition, namely for a person to have an interest or to have standing to challenge a decision of an office-holder, that person must have a recognisable economic interest in the insolvent estate. I observe that in *Mahomed v Morris* the court accepted that 'someone, like the landlord in *Hans Place Ltd* [1993] BCLC 768, who is *i*  directly affected by the exercise of a power given specifically to liquidators …' will have standing. In *Re Hans Place Ltd* (*in liq*) [1993] BCLC 768, [1992] BCC 737 (para 26) the court expressly stated that although it could not have been the intention of Parliament to permit any outsider to attack a decision of an officeholder 'it may be that other persons can properly bring themselves within the subsection'. If one were to take s 168(5) of the

Insolvency Act 1986 as providing an equivalent test, Mr Carter would not necessarily be shut out.

[50] This is the essence of Mr Curl's submission. That to 'ensure consistency, this court should approach the meaning of a person affected by recognition in the same way' as domestic insolvency law. He argues that Mr Carter's position is contrary to the best interests of Sturgeon, that is the interests of its participating shareholders.

[51] Mr Potts argues that Mr Carter, as a director of Sturgeon at the time it was wound up, can demonstrate a legitimate interest and should be heard. Alternatively, as the matter goes to jurisdiction, the court s hould review the decision of its own motion (as envisaged by art 17) and permit, under its discretion, Mr Carter to be heard. This course will assist the court in protecting its own process.

[52] In my judgment the authorities concerning the Insolvency Act 1986, challenging decisions made by officeholders or seeking to remove officeholders who administer an insolvent estate, are to be distinguished from a decision to challenge recognition in a cross-border insolvency. The test is different and set out in art 17(4) of the Model Law, as enacted by Sch. 1 to the CBIR, namely that the applicant must be 'a person affected by recognition'. The starting point, in my view, is to have regard to the effect of an order recognising a foreign main proceeding (as in this case). Some consequences flow automatically. First, the debtor's power to deal with assets is suspended. Secondly there is a basic stay of proceedings and execution. Thirdly the court may provide for the examination of witnesses: art 21(1)(d). This includes enabling a foreign officeholder to obtain orders for examination pursuant to s 236 of the Insolvency Act 1986: art 21(1)(g). Fourthly, English law transaction-avoidance provisions may be employed by a foreign representative. These are powers that would not have been available but for recognition (absent any application under s 426 of the Insolvency Act 1986 or request for recognition and assistance at common law). Other consequences flow because the foreign main proceeding is treated as a local insolvency proceeding.

[53] These consequences shed some light on those who may be affected by a recognition order. In *Re Westmead Consultants Ltd* (*in liq*), *Ward v Evams* [2002] 1 BCLC 384 at 387 the court explained that there was a degree of oppression to the provisions of s 236: 'It is oppressive to the outsider because he is hauled into court under threat of imprisonment or arrest if he is not compliant and there he has to answer questions about his conduct on oath and under compulsion. That, in my judgment, is plainly oppression.' The judge was not considering an officer of the company but a third party. Mr Curl suggests that Mr Carter should be treated as a third party as he is no longer a director. Regardless of that submission the same observation may be made about oppression, depending upon the circumstances, about an officer or retired officer of a company who is compelled to attend court to answer questions. Mr Potts put it this way: 'what they are now saying is that a director against whom they wish to have the potential to exercise the coercive powers of the English Insolvency Act, and they are coercive, should not be entitled to be heard by the English court to argue that the court had no jurisdiction to make the recognition

a order in the first place. I respectfully suggest that's not a particularly meritorious [position]'.

[54] Having regard to the effect of a recognition order and the effect of the challenges to the officeholders in the cases cited by Mr Curl, a difference may be readily discerned. By seeking to challenge a decision of, or remove, an officeholder, to demonstrate a legitimate 'grievance' or 'dissatisfaction'

b about an officeholder or seek to direct his actions, a person must have some economic interest. This is a policy decision made by Parliament to (i) prevent officeholders facing unnecessary, time-consuming and costly applications and (ii) promote efficiency in the proceeding. In my judgment an officer of a company that has been wound up, who may be directly affected by a recognition order, and who is not seeking to challenge a

c decision of an officeholder (where he would need to demonstrate that he is 'aggrieved by an act or decision' of the officer holder: see s 168(5) of the Insolvency Act 1986) is distinguishable. Different policy considerations attach to different legislation. For these reasons Mr Carter, in my judgment, does fall within the definition of a person 'affected by recognition'.

d

### C. The right to hear from Mr Carter

[55] It has not been argued that 'a person affected by recognition' should not be given permission to be heard at the hearing of a review application. In my judgment, as a person 'affected by recognition' Mr Carter should be

e given permission pursuant to Pt 6 of Sch 2 para 25(1)(j) of Sch 2 to the CBIR. This permission is given regardless of the contention that he was a director of Sturgeon at the time it was wound up and should be heard in accordance with para 25(1)(b) of Sch 2.

[56] If I am wrong and only a person who has a direct economic interest in Sturgeon may fall within Sch 1, para 4 of art 17, it is appropriate to

f permit this application to proceed as if it was of the court's own motion as also envisaged by that paragraph. Not to permit the application to proceed would be to turn a blind eye to a serious challenge to jurisdiction, permitting a foreign representative to take advantage of powers provided only to UK officeholders and those properly recognised.

g

### THE INTER PARTES CHALLENGE

### A. A summary of the challenge

[57] At the inter partes hearing the JPLs adopted and expanded upon the submissions made orally and in writing at the ex parte hearing. The focus of

h submissions was on the meaning of 'foreign proceeding' in art 2(i) of Sch 1 to the CBIR, applied in art 17. They argue that there was a deliberate drafting policy that the term 'insolvency' be restricted to mean the law under which the proceeding was opened. In other words, it matters not whether the debtor was insolvent or in financial distress.

[58] Mr Carter argues that a contributory's winding up in respect of a

i solvent company is not a 'foreign proceeding' and therefore not capable of recognition. It is argued that the definition contained in art 2(a) of the Model Law is reproduced in art 2(i) of Sch 1 to the CBIR and the key to understanding its meaning is to trace the drafting history. I shall turn to this exercise now.

**B. Working Group papers.**

[59] The Model Law was developed by UNCITRAL's Working Group V (Insolvency Law) (the 'Working Group') following a decision by the Commission to develop a legal instrument relating to cross-border insolvency. The Working Group undertook four two-week sessions of work on the instrument that was to be become the Model Law. The Working Group was assisted by reports from judicial colloquia.

[60] The report on UNCITRAL-INSOL Colloquium on Cross-Border Insolvency held in Vienna on 17–19 April 1994 (A/CN.9/398) helps to set the context of the Model Law as adopted in Great Britain. The reason for and ambition of the Model Law emerge from the text:

'At the UNCITRAL Congress "Uniform Commercial Law in the 21st Century", held in conjunction with the twenty-fifth session (1992), it was proposed that the Commission should consider undertaking work on international aspects of bankruptcy. Consequent to that decision, the Secretariat presented to the Commission at its twenty-sixth session (1993) a note on cross-border insolvency … The prevailing view at the last session was that, despite concerns about the feasibility of a project to harmonize rules on international aspects of insolvency, the practical problems caused by the disharmony among national laws governing cross-border insolvencies warranted further study of legal issues in cross-border insolvencies and possible internationally acceptable solutions. The Secretariat was requested to prepare for a future session of the Commission an in-depth study on the desirability and feasibility of harmonized rules of cross-border insolvencies, a study that would consider which aspects of cross border insolvency law lent themselves to harmonization and what might be the most suitable vehicle for harmonization'.

[61] The context of the study to be undertaken can be understood from the general remarks at para 4 of the Colloquium paper:

'The view was widely shared at the Colloquium that the practical significance of legal aspects of cross-border insolvency would continue to grow, parallel to the ongoing expansion in multi-national economic activity. Emphasis was placed on the corresponding need to develop legal mechanisms for limiting the extent to which, in the event of insolvency in a cross-border context, disparities in and conflicts between national laws created unnecessary obstacles to the achievement of the basic economic and social objectives of insolvency proceedings. Those objectives included, generally, protecting the rights and interests of creditors, employees, and debtors. In more specific terms, the legal rules applied in cases of cross-border insolvency should facilitate the rehabilitation of businesses that, in particular from an economic standpoint, merited preservation, thereby serving the goal of preservation of employment, and, in the event of liquidation, maximizing the value of the assets that were available to pay creditors' claims, without undue regard to the location of those assets.'

[62] It is not necessary to repeat the whole paper here. This passage is

*a*  sufficient to understand the reason for, and the ambition and intended object of, the Model Law.

[63] The purpose of the paper on the INSOL Judicial Colloquium on Cross-Border Insolvency (A/CN.9/413) was to report on a Colloquium held in Toronto on 22–23 March 1995 to obtain the view of judges, and of Government officials concerned with insolvency legislation, on judicial

*b*  cooperation in cross-border insolvency cases. Paragraph 19 of the report reads:

'… As to the type of proceedings to be recognized, a view was expressed that the provisions should be limited to proceedings in which the debtor was actually insolvent. The suggestion not to cover voluntary

*c*  insolvency proceedings and proceedings in which the debtor was left in possession of the assets during the insolvency proceedings, or could be seen as "trading while insolvent", sought to take into account that such cases were either not recognized universally or were treated differently by States.'

*d*  [64] The issue of harmonisation was expressed to raise a concern due to the number of different legal systems. One possibility raised at the Colloquium was to focus 'on the nature of the proceeding rather than on whether the debtor was insolvent'. The report concluded that a working group should consider in detail the views and information presented at the Judicial Colloquium and make recommendations on 'access and recognition

*e*  of a foreign insolvency representative, on the one hand, and, on the other, the determination of the degree of cooperation to be extended in any given case'.

[65] Subsequent to the Colloquium, the Working Group embarked upon the development of a legal instrument relating to cross-border insolvency at

*f*  the 18th session of the Working Group. A preparatory paper (A/CN.9/WG.V/WP.42) was produced by the secretariat from which emerges a clear direction:

'… it may be useful to recapitulate how certain basic terms in this note may be understood. Most legal systems contain rules on various types of proceedings that may be initiated when a debtor is unable to pay its debts. "Insolvency proceedings" is the generic expression used in

*g*  this note for those types of proceedings. Two types of insolvency proceedings may be distinguished, for which uniform terminology has not emerged.'

*h*  [66] A distinction was drawn between a collective process where a third party takes control in order to collect-in and distribute the assets of the debtor, and a restructuring of an insolvent debtor. The paper explained:

'For insolvency proceedings to be initiated, a court order is typically needed. The initiative to open such proceedings may be taken by the insolvent debtor itself (voluntary insolvency) or by a creditor or

*i*  creditors (involuntary insolvency).'

[67] The paper noted that in 'some jurisdictions a filter is applied which limits recognition to foreign proceedings that qualify as 'insolvency' proceedings according to the law of the forum … Provisions of this type

might have the effect, for example, that foreign proceedings … that did not fall within the definition of insolvency proceedings under the law of the requested court would not receive assistance.' The Working Group was invited to consider the 'filter' issue when preparing the text and in particular to consider the difference between 'proceedings in which the debtor is fully deprived of control of its assets and 'debtor in possession' type of proceedings; and between those that involve a debtor that has actually become insolvent and those in which a debtor in trouble is seeking to avoid insolvency'.

[68] The Working Group reported on the 18th session on 1 December 1995 (A/CN.9/419). It suggested that caution should be exercised when imposing conditions so as not to detract from the goal of facilitating recognition of foreign proceedings. There was a 'widely held view' that a definition of 'foreign proceeding' 'should have mainly three characteristics: it should be an insolvency proceeding in the broad sense, so as to cover both liquidation and reorganization proceedings; it should be a collective proceeding, in the sense that representation of the mass of creditors would be involved: and it should be a proceeding that was somehow officially sanctioned …'

[69] The report of the Working Group of its 19th session held in New York was made in April 1996 (A/CN.9/422). It reported on definitions, rules of recognition of 'foreign proceedings', relief afforded upon recognition and judicial cooperation amongst other things. It was said that the preamble would be a useful tool for interpreting and applying the text of the Model Law and gave recommendations on the draft text. In relation to definitions it was reported that the use 'interchangeably of terms such as "insolvency", "insolvencies" and "'insolvency proceedings"' was questioned. It was observed that such terms were not universally understood and might introduce uncertainty. The report of the 20th session of the Working Group was made in October 1996 and focussed on the revised articles of the draft model law. The report of the 21st session (A/CN.9/435) pointed out that 'the word 'insolvency', which was given a broad meaning in the draft Model Provisions, had a narrower connotation in some languages. It was thus suggested that a definition of 'insolvency' should be included in art 2 or, alternatively, that a different word should be used in those languages. The Working Group felt that it would not be feasible to attempt to formulate a definition of 'insolvency' and requested the secretariat to review the language versions of the draft Model Provisions so as to find appropriate wording in respect of those languages in which difficulties had been identified'.

[70] In my judgment the Working Group reports, read as a whole, were focussed on the need to recognise and provide relief upon recognition of foreign proceedings, that concerned debtors that either could not pay their debts or were struggling to pay their debts and seeking to reorganise.

### C. The 1997 Guide and the Guide to Enactment 2014

[71] The heading of the 1997 Guide is 'Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency'. Paragraph 1 provides the purpose of the Model Law: 'to assist States to equip their insolvency laws with a modern, harmonized and fair framework to address more effectively instances of cross-border insolvency. Those instances include

a cases where the insolvent debtor has assets in more than one State or where some creditors of the debtor are not from the State where the insolvency proceeding is taking place.' The purpose of the 1997 Guide is explained at para 9. It is useful to set it out here:

b 'UNCITRAL considered that the Model Law would be a more effective tool for legislators if it were accompanied by background and explanatory information. While such information would primarily be directed to executive branches of Governments and legislators preparing the necessary legislative revisions, it would also provide useful insight to other users of the text such as judges, practitioners and academics …'

c [72] I comment that the same or very similar text is used in the Guide to Enactment 2014 (para 17).

[73] Returning to the 1997 Guide, para 49 provides commentary on the title of the Model Law:

d 'The term "Insolvency", as used in the title of the Model Law, refers to various types of collective proceedings against insolvent debtors. The reason is that the Model Law …covers proceedings concerning different types of debtors, and, among those proceedings, deals with proceedings aimed at reorganizing the debtor as well [as] proceedings leading to a liquidation of the debtor as a commercial entity.'

e [74] This insight is preceded (para 23) by an explanation as to the 'type of foreign proceeding covered'. A foreign insolvency proceeding must possess certain attributes including a 'basis in insolvency-related law of the originating state' and 'reorganization or liquidation of the debtor as the purpose of the proceeding (art 2(a)).' And it is followed by a further break

f down of the types of collective proceedings 'compulsory or voluntary, corporate or individual, winding up or reorganisation …'. The two different types of proceedings reflect the 1994 Colloquium report.

[75] It is noted at para 24 of the 1997 Guide that 'foreign insolvency proceeding' should not be understood as referring to only one type of collective proceeding. This may be construed as meaning that an 'foreign

g proceeding' for the purpose of the Model Law can include collective proceedings that concern solvent bodies but, in my view, that would be a misreading of the text and guidance. The following words in para 50 of the 1997 Guide bear a careful reading: 'the Law is designed to be applicable to proceedings regardless of whether they involve a natural or legal person as the debtor'. Paragraph 71 adds to this: 'the term 'insolvency' is an example

h of a term that may have a technical meaning in some legal systems, but which is intended in sub-para (a) to refer broadly to companies in severe financial distress.' This is a term which is used again in later documents. These words, when having regard to the Working Group reports, place in context the purpose of including proceedings where a State may legislate for the protection of a debtor or provide a collective process for a particular

i kind of debtor, and reminds the reader that the purpose of the Model Law is 'to provide effective mechanisms for dealing with cases of cross-border insolvency': the preamble. As regards the preamble, the 1997 Guide states that it is to provide 'a general orientation for users of the Model Law as well as to assist in the interpretation of the Model Law.' Paragraph 51

makes clear that it is desirable to 'utilize the wording of art 2(a) so as not to *a*
exclude recognition of foreign proceedings that, according to art 2(a)
should be covered'.

[76] As Mr Potts submitted, after the coming into force of the CBIR, the
Working Group considered the issue of the debtor's insolvency at its 40th
and 43rd sessions which led to the adoption of the Guide to Enactment
2014. At the 40th session the Working Group considered that 'clarity as to *b*
the scope of the Model Law' in relation to the solvency of the debtor would
assist:

> 'The relevance of the preamble to the Model Law to this question was
> emphasized, in particular paragraph (e), as well as the references
> already included in the Guide to Enactment to the severe financial *c*
> distress or insolvency of the debtor. It was suggested that those
> requirements could be given greater emphasis to ensure clarity as to the
> scope of the Model Law. It was noted that the UNCITRAL Legislative
> Guide on Insolvency Law (the Legislative Guide) provided commentary
> on, and a definition of, what constituted insolvency proceedings,
> including imminent insolvency, and that that material might be helpful *d*
> to the Guide to Enactment.'

[77] And at para 16 of the same Working Group report: 'After discussion,
the Working Group agreed that the Guide to Enactment should focus on the
insolvency proceedings covered by the Legislative Guide and involving *e*
financial distress of the debtor.'

[78] The 43rd session of the Working Group reported in April 2013. The
relevant amendment proposed was to insert the following sentence at the
end of para 51 mentioned above: 'Where a proceeding serves several
purposes, including the winding up of a solvent entity, it falls under art 2,
sub-para (a), of the Model Law only if the debtor is insolvent or in severe *f*
financial distress.' It was also proposed that there should be some
standardisation in relation to the text to ensure terms were used
consistently. The proposals were accepted. The Guide to Enactment 2014
includes the following passages that are aimed at providing consistency:

> (i) '1. The UNCITRAL Model Law on Cross-Border Insolvency, *g*
> adopted in 1997, is designed to assist States to equip their insolvency
> laws with a modern, harmonized and fair framework to address more
> effectively instances of cross-border proceedings concerning debtors
> experiencing severe financial distress or insolvency … In principle, the
> proceeding pending in the debtor's centre of main interests is expected
> to have principal responsibility for managing the insolvency of the *h*
> debtor …'.
>
> (ii) '3. The Model Law respects the differences among the national
> procedural laws and does not attempt a substantive unification of
> insolvency law. Rather, it provides a framework for cooperation
> between jurisdictions, offering solutions that help in several modest but
> significant ways and facilitate and promote a uniform approach to *i*
> cross-border insolvency. …'
>
> (iii) '48. Acknowledging that different jurisdictions might have
> different notions of what falls within the term "insolvency
> proceedings", the Model Law does not define the term "insolvency".

**85**

*a*   However, as used in the Model Law, the word "insolvency" refers to various types of collective proceedings commenced with respect to debtors that are in severe financial distress or insolvent. The reason is that the Model Law (as pointed out above in paragraphs 23–24) covers proceedings concerning different types of debtors and, among those proceedings, deals with proceedings aimed at liquidating or reorganizing the debtor as a commercial entity. A judicial or administrative proceeding to wind up a solvent entity where the goal is to dissolve the entity and other foreign proceedings not falling within article 2 subparagraph (a) are not insolvency proceedings within the scope of the Model Law. Where a proceeding serves several purposes, including the winding up of a solvent entity, it falls under article 2, subparagraph (a) of the Model Law only if the debtor is insolvent or in severe financial distress'.

*b*

*c*

   (iv) '49. Debtors covered by the Model Law would generally fall within the scope of the *UNCITRAL Legislative Guide on Insolvency Law* and would therefore be eligible for commencement of insolvency proceedings in accordance with recommendations 15 and 16 of the *Legislative Guide*, being debtors that are or will be generally unable to pay their debts as they mature or whose liabilities exceed the value of their assets.'

*d*

   (v) '65. … the expression "insolvency proceedings" may have a technical meaning in some legal systems, but is intended in subparagraph (a) [of art 2] to refer broadly to proceedings involving debtors that are in severe financial distress or insolvent'.

*e*

   (vi) '67. … the focus of the Model Law is upon severely financially distressed and insolvent debtors and the laws that prevent or address the financial distress of those debtors. …'

   (vii) '73. This formulation [Pursuant to a law relating to insolvency] is used in the Model Law to acknowledge the fact that liquidation and reorganization might be conducted under law that is not labelled as insolvency law (e.g. company law), but which nevertheless deals with or addresses insolvency or severe financial distress. The purpose was to find a description that was sufficiently broad to encompass a range of insolvency rules irrespective of the type of statute or law in which they might be contained and irrespective of whether the law that contained the rules related exclusively to insolvency. A simple proceeding for a solvent legal entity that does not seek to restructure the financial affairs of the entity, but rather to dissolve its legal status, is likely not one pursuant to a law relating to insolvency or severe financial distress.'

*f*

*g*

*h*   [79] The Guide to Enactment 2014 was adopted by a decision of the Commission on 18 July 2013. The 1997 Guide is no longer included in the materials relating to the Model Law on the UNCITRAL website. It is no longer available on the UNCITRAL website. In the meantime, the courts have had to consider either which guide should take priority or how to utilise the Guide to Enactment 2014.

*i*   [80] This issue was considered by the High Court in Singapore in the very recent case of *Re Zetta Jet Pte Ltd* (*Asia Aviation Holdings Pte Ltd, intervener*) [2019] SGHC 53, [2019] SLR 1343, where Aedit Abdullah J was confronted with the possibility of a conflict between the 1997 Guide and the Guide to Enactment 2014 where the former has been expressly

referenced in local legislation but not the latter. The judge referred to the
Guide to Enactment 2014 as the 2013 Guide. He reasoned (para 37):

> 'Section 354B(2) of the Companies Act refers to the 1997 Guide as a
> relevant document in the interpretation of the Singapore Model Law.
> This is of course a deliberate legislative endorsement of the 1997 Guide;
> the 2013 Guide which introduced a number of amendments is not given
> official status in Singapore law. Nonetheless, the 2013 Guide should not
> be entirely ignored. Consistency and comity should be pursued as far as
> possible in the interpretation of the provisions of the Model Law.
> Where there is any conflict between the two Guides, the 1997 Guide
> trumps. But where the 1997 Guide is silent, the court may consider the
> 2013 Guide in its interpretation of the Singapore Model Law and in
> assessing its statutory objectives.'

[81] There is no suggestion of a conflict between the 1997 Guide and the
Guide to Enactment 2014 on the review application before the court. The
courts have trodden gently on the path to this issue, leaving no deep
imprints. For example, it was submitted that only the 1997 Guide was
relevant, as it is expressly mentioned in reg 2 of CBIR whereas the Guide to
Enactment 2014 is not expressly referred to. In *Re Pan Ocean Co Ltd*
[2014] EWHC 2124 (Ch), [2014] Bus LR 1041, [2014] All ER (D) 03 (Jul),
the court decided to refer to the 1997 Guide but noted that the text of the
later version had not altered. No decision was made as to whether one
should take priority over another.

[82] In my judgment this is not about priorities. The Guide to Enactment
2014 is intended by the Commission to assist with interpreting the Model
Law. By withdrawing from circulation the 1997 Guide it can be inferred
that the body that produced the Model Law, with the assistance of many
experienced insolvency practitioners, Government bodies of enacting States
and in consultation with the judiciary, intended the Guide to Enactment
2014 to provide a useful and updated tool for interpretation. That, in my
view, is how it should be treated.

[83] The argument advanced by Mr Curl is that the Guide to Enactment
2014 uses language that will lead to uncertainty, delay, is unworkable and
too vague to be useful for guidance. The assertion is not supported (in
respect of the matter before this court) by any authority and it does not
appear to have been thought so uncertain to other courts. I observe that
English authorities that postdate the introduction of the Guide to
Enactment 2014 support its use as a tool for interpretation. These include
*Re OJSC International Bank of Azerbaijan, Bakhshiyeva v Sberbank of
Russia* [2018] EWCA Civ 2802, [2019] 1 BCLC 1, [2019] BPIR 269, *Re
Agrokor* [2017] EWHC 2791 (Ch), [2018] 2 BCLC 75, [2018] Bus LR 64,
and the first instance decisions of an eminent insolvency and company law
judge, Snowden J in *Re Videology Ltd* [2018] EWHC 2186 (Ch), [2018]
BPIR 1795. The same judge referred to the Guide to Enactment 2014 in *Re
OGX Petróleo e Gás SA, Nordic Trustee ASA v OGX Petróleo e Gás SA
(Em Recuperação Judicial)* [2016] EWHC 25 (Ch), [2017] 2 All ER 217,
[2016] Bus LR 121.

[84] In my judgment, even if I were to apply the conflict test suggested by
Aedit Abdullah J, the Guide to Enactment 2014 published by UNCITRAL,
endorsed in the Judicial Perspective (see below), is and should be used as an

**87**

a  important tool to interpretation of the Model Law as enacted in England
and Wales by the CBIR.

### D. The Judicial Perspective

b  [85] The UNCITRAL Model Law on Cross-Border Insolvency: The
Judicial Perspective, drafted by Justice Paul Heath of the High Court of
New Zealand and developed through consultation with the Working Group
and other judges was adopted by consensus on 1 July 2011. It was updated
to 'reflect the revisions' to the Guide to Enactment 2014 and jurisprudence
that had developed since adoption in 2011. Reflecting the Guide to
c  Enactment 2014, paras 79–80 states:

'The Model Law includes the requirement that the foreign proceeding
be "pursuant to the law relating to insolvency" to acknowledge the fact
that liquidation and reorganization might be conducted under law that
is not labelled as insolvency law (e.g. company law), but that
d  nevertheless deals with or addresses insolvency or severe financial
distress. The purpose was to find a description that was sufficiently
broad to encompass a range of insolvency rules irrespective of the type
of statute or law in which they might be contained and irrespective of
whether the law that contained the rules related exclusively to
insolvency.

e  This aspect of article 2, subparagraph (a) has been considered by the
courts in several cases concerning voluntary liquidation proceedings. In
*Stanford International Bank*, the English court at first instance
concluded that the liquidation of an Antiguan company, ordered by the
Antiguan court on the basis that it was just and equitable to do so, was
"pursuant to a law relating to insolvency". Although the ground for
f  liquidation was confined to regulatory misbehaviour under the
applicable legislation, the insolvency of the company was a factor
relevant to the Antiguan court's discretion to make the order. That
decision was upheld on appeal, the English appellate court observing
that since the Antiguan law provided for liquidation of corporations on
just and equitable grounds, which included insolvency, as well as
g  infringements of regulatory requirements, it could be characterised as
'pursuant to the law of insolvency'.

[86] Having summarised some of the leading cases at paras 81 and 82,
para 83 commented that the Guide to Enactment 2014 took a different
h  view to these cases and seeks to clarify:

'that a simple proceeding for a solvent legal entity that does not seek
to restructure the financial affairs of the entity, but rather to dissolve its
legal status, is likely not one pursuant to a law relating to insolvency or
severe financial distress for the purpose of article 2 subparagraph (a).
Where a type of proceeding serves several purposes, including the
i  winding up of a solvent entity, it falls under article 2 subparagraph (a)
of the Model Law only if the debtor is insolvent or in severe financial
distress.'

[87] The status of the Guide to Enactment 2014, and the clarification it

provides in conjunction with the Judicial Perspective are important to the                 *a*
outcome of this review application.

[88] The updated Judicial Perspective is important for at least three
reasons. First the 2014 Perspective was prepared by the Secretariat of the
Commission and its publication authorised by the Commission. The
document was produced in consultation with a board of experts (including                 *b*
Justice Paul Heath), it had been made available to the Working Group at
the 43rd session in April 2013 and to judges attending the Tenth
Multinational Judicial Colloquium in the Hague in 2013. Secondly, the text
is expressly designed to guide the judiciary. The document explains that
'over 80 judges from some 40 States, attending a judicial colloquium in
Vancouver, Canada, in June 2009, expressed the view that consideration                 *c*
should be given to the provision of assistance to judges (subject to the
overriding need to maintain judicial independence and the integrity of a
particular State's judicial system) on ways to approach questions arising
under the Model Law. The present text is intended to provide such
assistance.' Thirdly, the updated Judicial Perspective reflects the Guide to
Enactment 2014. In my judgment it provides a valuable guide to the                 *d*
purpose of the Model Law and object of the CBIR.

### E. Legislative Guide on Insolvency Law

[89] The Legislative Guide on Insolvency Law was adopted on 25 June
2004. The document is of historic importance, but it may be noted that the
term 'insolvency proceedings' was confined to 'collective proceedings,                 *e*
subject to court supervision, either for reorganization or liquidation.'
Subsequent paragraphs in the guide are consistent with the restrictive
definition. In particular it defines 'insolvency' as 'when a debtor is generally
unable to pay its debts as they mature or when its liabilities exceed the
value of its assets.' Although 'debtor' is not defined in the Model Law, the                 *f*
term is used throughout its text.

### CASE LAW

[90] In *Re Betcorp Ltd* (2009) 400 BR 266 an Australian company had
entered voluntary liquidation in Australia. The Australian liquidator
applied for the proceedings to be recognised as a foreign main proceeding                 *g*
under Ch 15 of the US Bankruptcy Code. Recognition was contested by an
American company, 1st Technology LLC. Judge Bruce A Markell set out the
argument against recognition:

'[1st Technology LLC] asserts, correctly, that (i) there is no lawsuit or
legal proceeding pending in an Australian court (or anywhere else                 *h*
except the United States) involving any of Betcorp's creditors; (ii)
Betcorp is not a bankrupt or in administration under Australian
bankruptcy laws, or any other bankruptcy laws; and (iii) there is no
lawsuit or other legal process by which a judge or other judicial officer
directly supervises the liquidators' actions in the winding up. Based
upon these facts, 1st Technology contends that Betcorp's actions are                 *i*
nothing more than a unilateral cessation of business followed by a
private and unregulated settling of accounts.'

[91] The Judge considered the 1997 Guide having regard to the definition

*a*  of 'foreign proceeding' and breaking down the elements required for recognition: (i) a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding

*b*  is for the purpose of reorganization or liquidation. The Judge found the elements made out, that the proceedings were collective by nature and commenced pursuant to a law relating to insolvency or the adjustment of debts.

[92] In respect of (v) he commented: 'Importantly, this element does not require the company to be either insolvent or to be contemplating using the

*c*  provisions of Australian law to adjust any debts.' The comment raised metaphorical eyebrows in the insolvency world and is criticised in at least two leading texts. First, *Goode on Principles of Corporate Insolvency Law* states (5th edn, 2018) para 16–29 at p 926 that it is 'doubtful' that an English court would reach the same conclusion and permit a 'members'

*d*  voluntary winding up to qualify'.

[93] Secondly, *Sheldon on Cross-border Insolvency* (4th edn, 2015) para 3.35:

'It is true that the members' voluntary winding up was initiated under a body of law which included provisions for an insolvent liquidation, but that coincidence does not necessarily justify bringing within the

*e*  UNCITRAL Model Law's scheme of recognition and assistance a proceeding in relation to a solvent company, the purpose of which includes the return of a surplus to members. Unless some specific modification is made to the UNCITRAL Model Law, it is arguable that there is no obvious justification for allowing creditors' rights to be

*f*  restrained by recognising a solvent liquidation as a foreign proceeding.'

[94] As well as commentary after the case was decided, the explanatory memorandum that accompanied the Australian enactment of the Model Law notes (p 187) that part of the Australian legislation is excluded 'as these proceedings generally relate to winding up on grounds other than

*g*  severe financial distress'. And an earlier discussion paper (Corporate Law Economic Reform Programme 8 Discussion Paper (2002)), in which the Model Law was enacted said (p 23) that the legislation would exclude 'members' voluntary winding up or a winding up by the court on just and equitable grounds as such proceedings may not be insolvency related.'

[95] *Re Betcorp* was decided prior to the introduction of the Guide to

*h*  Enactment 2014 and the updated Judicial Perspective. In view of the material I have mentioned above, there is not and never has been an obvious justification for allowing recognition of a members' voluntary winding up as a foreign proceeding.

[96] For these reasons, in my judgment, *Re Betcorp* cannot be relied upon to support the proposition that a solvent company entering into liquidation

*i*  on just and equitable grounds pursuant to insolvency legislation in a foreign jurisdiction is in and of itself sufficient to justify recognition. It is interesting to note that the Australian High Court considered a winding up on just and equitable grounds in *Re Chow Cho Poon (Private) Ltd* [2011] NSWSC 300, (2011) 80 NSWLR 507. The transparency of Barrett J's reasoning process

can be gleaned from para [39] of the judgment:                                                   *a*

> 'Because it is a winding up "by the Court", according to Singapore law, the winding up of CCP is a "judicial … proceeding". It is also, of its nature, a proceeding in which assets of the company concerned "are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation". Two other questions must be answered in the affirmative to justify the conclusion that the Singapore winding up is a "foreign proceeding": first, is CCP properly regarded as the debtor; second, is the proceeding "pursuant to a law relating to insolvency"?'                                                                       *b*

[97] His instinct was that the answer to these questions was 'no'. He said (para [40]):                                                                                             *c*

> 'It was not the inability of CCP, as a debtor, to pay its debts as they fell due that constituted the ground on which the Singapore court ordered that the company be wound up. Rather, the court concluded, for reasons that the evidence does not disclose, that it was "just and equitable" that the company be wound up.'                                         *d*

[98] Key to his reasoning was a consideration of the decision of Lewison J *in Re Stanford International Bank Ltd* [2009] EWHC 1441 (Ch), [2009] BPIR 1157 which he analysed as follows (para [43]):

> 'According to this approach, the question whether winding up ordered by a foreign court is a proceeding "pursuant to a law relating to insolvency" is to be answered not merely by reference to the content of the foreign law provision under which the foreign court acted in ordering the winding up. The Antigua court accepted the contention of the petitioner that failure to comply with regulatory requirements established a basis for winding up, this being a discrete and sufficient ground under the local law. In addition and although the petitioner apparently did not rely on any just and equitable ground, the Antigua court expressed an opinion that, in the circumstances, "it is just and equitable that [the company] be liquidated and dissolved under the supervision of the Court pursuant to the Act". There was, it seems, no express finding that the company was insolvent but, given the evidence on that matter that was before the Antigua court, Lewison J was prepared to infer that "at least one of the reasons why Harris J made the order he did was that he was satisfied that SIB was insolvent". It was that alone that grounded the English court's decision that the winding up was "pursuant to a law relating to insolvency".'                         *h*

[99] The words 'that alone', are reference to the inference of insolvency. At para [47] he noted that the ground for winding up was confined to regulatory misbehaviour. Insolvency was nevertheless a factor relevant to the court's discretion to make a winding-up order, as he had previously stated. Having commented on the recognition in *Re Betcorp*, the judge commented that there was 'no separate attention given to the question whether the company subjected to winding up was properly described as the 'debtor' in *Stanford International Bank* or in *Re Betcorp*. His view was that the court was 'content to work on the basis that an entity subject to a    *i*

*a*    'foreign proceeding' is, for that reason alone, within the relevant 'debtor' concept'. The decision was made prior to the Guide to Enactment 2014 and prior to the publication of the updated Judicial Perspective, but in any event carries little weight as Barrett J granted the declaratory relief under the local law: s 581(2)(a) of the Corporations Act 2001 (and not under the domestic implementation of the Model Law).

*b*    [100] The consideration of *Chow Cho Poon* naturally leads to *Re Stanford International Bank Ltd* [2009] EWHC 1441 (Ch), [2009] BPIR 1157 where the English court at first instance concluded that the liquidation of an Antiguan company ordered by the Antiguan court on the basis that it was just and equitable to do so, was 'pursuant to a law relating to insolvency'. I can deal with it in brief. As already mentioned insolvency is *c* a factor. The observation made by the first instance judge, Lewison J (as he was), was (at para [94]) that 'an important part of the evidence was that [the Bank] was insolvent'. This was in addition to the infringements of regulatory requirements. The judge was upheld in the Court of Appeal for substantially the same reasons he gave at first instance: [2010] EWCA Civ 137, [2011] Ch 33, [2010] BPIR 679 at paras [15] and [28].

*d*    [101] The case of *Re Agrokor DD* [2017] EWHC 2791 (Ch), [2018] 2 BCLC 75, [2018] Bus LR 64 was decided by HH Judge Paul Matthews, sitting as a High Court Judge of the Chancery Division. A recognition order was sought in England in respect of the 'extraordinary administration' of the largest privately-owned company in Croatia. He was satisfied that the *e* company was insolvent. He explained (para [68]) 'the extraordinary administration proceeding in Croatia is begun on grounds either of insolvency or of impending insolvency, whether proved or deemed. Unlike the cases of just and equitable winding up, it is not possible to start an extraordinary administration proceeding on other grounds'. There is, in my view, no need to deal with the obiter part of the judgment.

*f*    [102] The most recent case on this subject is *Re Zetta Jet Pte Ltd* [2019] SGHC 53, [2019] SLR 1343. I mention it for completeness as the focus of the case was on COMI. Aedit Abdullah J found (para 25): 'The US bankruptcy proceedings in relation to the Zetta Entities were originally restructuring proceedings under Chapter 11 of the Bankruptcy Code 11 USC (US) (1978) ("the US Bankruptcy Code"), but were subsequently *g* converted to Ch 7 proceedings, *ie*, liquidation proceedings. These are clearly a "foreign proceeding" within the meaning of Art 2(h) of the Singapore Model Law.' In my judgment the judge relied upon insolvency.

    [103] Lastly, my attention was drawn to a decision of Vos C in *Re Dalnyaya Step LLC* (*in liq*) [2017] EWHC 3153 (Ch), [2018] BPIR 378, *h* [2018] Bus LR 789. That concerned (among other things) an application to set aside a recognition order on the ground of failures by a liquidator to make full and frank disclosure of matters that engaged the public policy exception in art 6 of the CBIR. I do not find it a helpful authority on this application.

*i* **TEXTBOOK COMMENTARY**

    [104] I have been taken to textbooks such as *Goode on Principles of Corporate Insolvency Law* (5th edn); *Principles of Cross-Border Insolvency Law* by Reinhard Bork; Look Chan Ho, *Cross-Border Insolvency: A commentary on the UNCITRAL Model Law* (4th edn); and *Cross-Border*

*Insolvency* (4th edn) edited by Richard Sheldon QC.

[105] I shall focus on the last two of these texts as the commentary found there is directly relevant to the issue on this application. Look Chan Ho comments that although the CBIR is not restricted to a proceeding in relation to a debtor that is technically insolvent (which would make the presumption in art 31 meaningless) the presumption does not mean that a 'foreign proceeding' includes a solvent liquidation. This is because a company that is not insolvent may be in severe financial distress and require reorganisation. In such an instance it is the interests of creditors that are paramount. A solvent liquidation has nothing to do with insolvency or financial distress. Look Chan Ho concludes:

> 'It is therefore suggested that "foreign proceeding" under the British Model Law should not be interpreted to include a foreign members' voluntary liquidation. True, a foreign proceeding under the British Model Law includes a proceeding in relation to a debtor that is technically solvent; but that should be restricted to cases where the foreign procedure relates to the resolution of insolvency or financial distress.'

[106] In order to reach this conclusion, he relied upon the commentary in the 1997 Guide, gave seven relevant considerations including being influenced by the EC Insolvency Regulation, that he suggested does not apply to solvent members' voluntary liquidation. He further notes that a members' voluntary liquidation 'is a mechanism to return value to shareholders and a common solvent restructuring method to improve efficiency' and that it is difficult to see how it falls within the policy rationale underlying the Model Law, which is concerned with creditors. This is also the case in respect of a contributory's winding-up petition on just and equitable grounds, which is concerned with the return of value to shareholders.

[107] More recently, in *Cross-Border Insolvency: Principles and Practice* (2016) Look Chan Ho has criticised the language used in parts of the Guide to Enactment 2014, but he does not criticise the clarification given to the meaning of 'foreign proceeding'.

[108] The authors of Sheldon criticise the decision in *Re Betcorp*: 'it is true that the members' voluntary winding up was initiated under a body of law which included provisions for an insolvent liquidation, but that coincidence does not necessarily justify bringing within the UNCITRAL Model Law's scheme of recognition and assistance a proceeding in relation to a solvent company, the purpose of which includes the return of a surplus to members … The same criticism can be made of other decisions following *Betcorp*, which have suggested that a just and equitable winding up is entitled to recognition as a foreign proceeding. A just and equitable winding up invariably a shareholder dispute in which a tangible interest in the company is a prerequisite to a petition.' In respect of this last comment the authors will have had in mind cases such as *Re Rica Gold Washing Co* (1879) 11 Ch D 36, where the Court of Appeal held that the petitioner must have a 'tangible interest' in the company's winding up. In other words, the proceeding is a solvent winding up.

a  **APPLICABLE PRINCIPLES FOR INTERPRETATION**

[109] The principles applicable to interpreting the CBIR and Model Law were set out by the Court of Appeal in *OJSC International Bank of Azerbaijan* [2019] 1 BCLC 1, [2019] BPIR 269. It is necessary to repeat part of the text as it includes relevant regulations. I have already commented that the Guide to Enactment 2014 was relied upon and used by
b  the Court of Appeal who defined it simply as the 'Guide':

'[32] There is no dispute about the principles which should guide us in construing the Model Law.

[33] Regulation 2(2) of the CBIR provides:

"Without prejudice to any practice of the courts as to the matters
c  which may be considered apart from this paragraph, the following documents may be considered in ascertaining the meaning or effect of any provision of the UNCITRAL Model Law as set out in Schedule 1 to these Regulations—

(a) the UNCITRAL Model Law;

(b) any documents of the United Nations Commission on
d  International Trade Law and its working group relating to the preparation of the UNCITRAL Model Law; and

(c) the Guide to Enactment of the UNCITRAL Model Law … made in May 1997."

[34] We were not directly referred to any of the "travaux préparatoires" apart from the Guide to Enactment ("the Guide"). At
e  the beginning of the Guide, the purpose of the Model Law was described in these terms:

"1. The UNCITRAL Model Law on Cross-Border Insolvency, adopted in 1997, is designed to assist States to equip their insolvency
f  laws with a modern, harmonised and fair framework to address more effectively instances of cross-border proceedings concerning debtors experiencing severe financial distress or insolvency. Those instances include cases where the debtor has assets in more than one State or where some of the creditors of the debtor are not from the State where the insolvency proceeding is taking place. In principle, the proceeding pending in the debtor's centre of main interests is expected to have
g  principal responsibility for managing the insolvency of the debtor regardless of the number of States in which the debtor has assets and creditors, subject to appropriate coordination procedures to accommodate local needs …

3. The Model Law respects the differences among national procedural
h  laws and does not attempt a substantive unification of insolvency law. Rather, it provides a framework for cooperation between jurisdic tions, offering solutions that help in several modest but significant ways and facilitate and promote a uniform approach to cross-border insolvency. Those solutions include the following:

(a) Providing the person administering a foreign insolvency
i  proceeding ("foreign representative") with access to the courts of the enacting State, thereby permitting the foreign representative to seek a temporary "breathing space", and allowing the courts in the enacting State to determine what coordination among the jurisdictions or other relief is warranted for optimal disposition of the insolvency …"

[35] The important point that the Model Law "does not attempt a    *a*
substantive unification of insolvency law" is reinforced by para 21 of
the Guide, which describes its scope as "limited to some procedural
aspects of cross-border insolvency cases", and says that "the Model
Law is intended to operate as an integral part of the existing insolvency
law in the enacting State". It also deserves emphasis that the Model
Law does not depend in any way on reciprocity. Once a state has    *b*
decided to adopt the Model Law, the local version of it adopted by that
state will apply to all cross-border insolvencies which fall within its
scope, whether or not the foreign representative comes from another
enacting state. Thus, at the present time, the Model Law has been
adopted and given effect in Great Britain and some 40 other countries,
but not in Azerbaijan. In this respect, there is a significant contrast both    *c*
with the EC Insolvency Regulation (Council Regulation (EC)
1346/2000 on Insolvency Proceedings), which applies to insolvency
proceedings within the EU, and with international conventions on the
recognition and enforcement of judgments, which as Lord Collins said
in *Rubin* (at [128]) typically depend on a degree of reciprocity.    *d*
    ...
[37] In the commentary on art 21, the Guide notes at para 189 that
the grant of post-recognition relief under that article is discretionary,
and that the types of relief listed in art 21(1) "are typical of the relief
most frequently granted in insolvency proceedings". However, "the list
is not exhaustive and the court is not restricted unnecessarily in its    *e*
ability to grant any type of relief that is available under the law of the
enacting State and needed in the circumstances of the case."
Paragraph 191 adds that "[i]t is in the nature of discretionary relief that
the court may tailor it to the case at hand."
[38] Apart from the Guide, we were also referred to the explanatory
memorandum to the CBIR, which was prepared by the Department of    *f*
Trade and Industry and laid before Parliament. Under the heading
"Description", para 2.1 recorded that a project to produce a model law
on cross-border insolvency was initiated by UNCITRAL, and two
international colloquiums were held in the early 1990's "to discuss
whether that body should facilitate the development of a legal
instrument providing a framework, which would encompass judicial    *g*
cooperation, court access for foreign insolvency administrators and
recognition of foreign insolvency proceedings." A working group was
then established in 1995, whose work led to the adoption by
UNCITRAL of a model law in 1997 "designed to assist States to equip
their insolvency laws with a modern, harmonised and fair framework to    *h*
address more effectively instances of cross-border insolvency."
[39] Under the heading "Policy background", the memorandum
began with an introduction from which I will quote the following
extracts:

    "7.1 ... The UNCITRAL Model Law on cross-border insolvency is    *i*
    that body's attempt to promote modern and fair legislation for cases
    where the insolvent debtor has assets in more than one State. The

*a*  Model Law is, however, designed to respect the differences amongst national procedural laws and does not attempt a substantive unification of insolvency laws.

7.2 The British Government has a commitment to the promotion of a rescue culture and supports the Model Law as an appropriate legislative tool to support this objective on the wider international stage. In addition, implementation of the Model Law will be beneficial in serving *b*  the cause of fairness towards creditors who may be located anywhere in the world. We hope that it may also provide an example to other countries of our readiness to engage in a genuine process of co-operation in international insolvency matters and that our actions will encourage other countries to implement the Model Law. In this *c*  way, insolvency officeholders in Great Britain should be able to enjoy, progressively, the same benefits abroad as their international counterparts, and be able to reduce administrative costs incurred in recovering assets from overseas. As a result funds available for distribution to creditors, wherever they are located, should increase.

*d*  7.3. Limitations on cooperation and coordination between different national jurisdictions can be the result of lack of a legislative framework or from uncertainty regarding the scope of the existing legislative authority, for pursuing cooperation with foreign courts … The Model Law fills the gap found in many national laws by expressly empowering courts to extend cooperation in the areas covered by the Model Law.

*e*  7.4. In May 2002, the European Union adopted its own Regulation on insolvency proceedings. There is a significant element of overlap between the UNCITRAL Model Law and the EC Insolvency Regulation and although the latter governs only the coordination of insolvency proceedings within the European Union, its underlying principles and approaches have been extremely influential in the international *f*  community. However the Regulation does not deal with cross-border insolvency matters extending beyond member States of the European Union. Thus, the Model Law will provide a complementary regime of considerable practical value that will be capable of addressing instances of cross-border insolvency and cooperation outside the European Union. This will place Great Britain, by virtue of the operation of s 426 *g*  of the Insolvency Act 1986, in the unique position of having a suite of statutory procedures available in cross-border insolvency cases, as well as the flexibility of common law."

[40] Paragraph 7.19 of the memorandum noted that the language of the Model Law is similar to that used in international treaties and *h*  conventions, and "will almost certainly … be interpreted purposively. Accordingly the UNCITRAL Guide to Enactment will be a useful tool in interpreting the text."

[41] Finally, it is relevant to note art 8 of the Model Law itself, headed "Interpretation", which states that:

*i*  "In the interpretation of this Law, regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith." '

[110] This passage demonstrates that the court may, when interpreting the CBIR, have regard not just to the language of the CBIR and the

*a*   schedules but the Working Group papers and reports, the explanatory memorandum to the CBIR, the Guide to Enactment 2014 and the 1997 Guide, if still available. The Preamble and updated Judicial Perspective although not mentioned in the CBIR represent documents produced by UNCITRAL after consultation and with the aim of producing clarity to interpreting the Model Law. They are relevant interpretative tools and should be treated as tools, not legislation. They exist to assist an understanding of the purpose behind the Model Law and the drafting.

**[111]** Although there was no argument as to the principles in *OJSC International Bank of Azerbaijan*, a purposive approach to construction is consistent with how English Law interprets statute: *R (on the application of Quintavalle) v Secretary of State for Health* [2003] UKHL 13, [2003] 2 All ER 113, [2003] 2 AC 687. Explaining that the purposive approach permits a degree of 'liberality' within the context of the task at hand Lord Steyn (para [21]) cited *Cabell v Markham* (1945) 148 F 2d 737 where Justice Learned Hand explained the merits of purposive interpretation, at 739:

> 'Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.'

**[112]** It is these principles that are to be employed when interpreting the CBIR and Model Law.

### CONCLUSION

**[113]** The Model Law and the other documents mentioned in reg 2(2) CBIR may be referred to for the purpose of interpreting Sch.1. These were the relevant guides to interpretation at the time the CBIR came into force. In my judgment the court need not be blinkered and ignore updated guidance provided by UNCITRAL published after the CBIR came into effect. To do so would be to approach the method of interpretation in an unsympathetic and unimaginative manner putting at risk the discovery of purpose or the object of the Model Law. Further the language of reg 2 is permissive and not restrictive. It does not prevent the court from considering other materials in order to ascertain purpose or object. I am comforted when reaching this conclusion that the courts of England and Wales have used the Guide to Enactment 2014 since its publication.

**[114]** The object of the Model Law can be discerned from at least the 1994 UNCITRAL-INSOL Colloquium in Vienna. The objectives were stated as including the protection of creditors, employees and debtors. This is the paradigm of an insolvent rescue. The very terms used are revealing. The object was to 'facilitate the rehabilitation of businesses that, in particular from an economic standpoint, merited preservation, thereby serving the goal of preservation of employment, and, in the event of liquidation, maximizing the value of the assets that were available to pay

*a*  creditors' claims, without undue regard to the location of those assets'.

[115] In my judgment there is no conflict between the earlier and later guidance on the issue of interpreting the meaning of 'foreign proceeding' as the Guide to Enactment 2014 merely provides further guidance and clarity.

[116] The definition in art 2(i) in Sch 1 to the CBIR directs the court to the relevant test: a 'foreign proceeding' must be (a) a collective judicial or
*b*  administrative proceeding (b) that proceeding must be in a foreign state (c) the proceeding must be pursuant to a law relating to insolvency (d) the assets and affairs of the debtor are subject to control or supervision by a foreign court by reason of the proceeding and (e) the purpose of the control or supervision is to reorganise or liquidate. By breaking down the definition, key elements become pronounced: collective proceeding; control
*c*  of a foreign court; debtor; purpose of reorganisation or liquidation. Given the background to the CBIR, the commentary and recent guidance the words 'for the purpose' should in my judgment, be read as meaning the purpose of insolvency (liquidation) or severe financial distress (reorganisation).

*d*  [117] It would be contrary to the stated purpose and object of the Model Law to interpret 'foreign proceeding' to include solvent debtors and more particularly include actions that are subject to a law relating to insolvency but have the purpose of producing a return to members not creditors.

[118] The Working Group reports, followed by the 1997 Guide, more recently the Guide to Enactment 2014 and the updated Judicial Perspective
*e*  recognise that different States have different legislation. Some States permit solvent companies to be wound up using insolvency proceedings. Consistency of approach not uniformity is the goal: 48 countries have now enacted the Model Law.

[119] I infer that at least one of the reasons behind the update of the 1997 Guide and Judicial Perspective in respect of the 'foreign proceeding' issue is
*f*  that the Commission was concerned that the Model Law was being used for purposes for which it was not intended. The additional guidance provided by the Guide to Enactment 2014 clarifies the Model Law's purpose, that although the proceeding must be pursuant to a law relating to insolvency, where the law relating to insolvency permits solvent companies to be wound up, such winding up is not suitable for recognition and consequently
*g*  not a 'foreign proceeding'. The foreign procedure must relate to the resolution of insolvency or financial distress.

[120] I agree with the authors of *Goode* (para 16–16) that the Model Law represents a huge accomplishment on the part of UNCITRAL and all of the other organisations and individuals involved, making a major contribution
*h*  to cross-border cooperation and coordination in insolvency proceedings while respecting national procedural and judicial systems. A wrong turn made by accepting proceedings never intended to be brought under the cross-border insolvency laws is evident. The interpretive tools are silent on regulatory collective proceedings such as the breaches present on the facts of *Re Stanford International Bank*, but insolvency was an important factor
*i*  in that case when deciding if the proceeding was a 'foreign proceeding'. It is not inconsistent with this judgment.

[121] In my view a wrong turn was made in *Betcorp* as it was not an insolvent liquidation but a solvent liquidation. It was necessary to go one

step further and ask whether the company was insolvent or in severe    *a*
financial distress.

[122] It has been suggested that by restricting the application of 'foreign
proceedings' every court will have to make an investigation into insolvency.
I do not agree. The vast majority of cases will be obvious.

[123] In my judgment, having heard adversarial argument with the benefit    *b*
of significantly more material than was available at the ex parte hearing, the
recognition order made on 17 May 2019 should not have been made as
there were no jurisdictional grounds upon which to make it. The CBIR only
relates to debtors that are insolvent or in severe financial distress. The
Company was undoubtedly solvent having been wound up on just and
equitable grounds.

[124] I shall accede to the application and terminate the recognition order.    *c*

*Application granted.*

                                        Kenneth Dow   Barrister.