# EXHIBIT 5

**Civil Appeal No. 17 of 2019**

**Civil Appeal No. 27 of 2019 (Consolidated)**

**On appeal from the Grand Court**
**Cause No. FSD 232 of 2018 (RMJ)**

**Civil Appeal No. 26 of 2019**

**On appeal from the Grand Court**
**Cause No. FSD 72 of 2019 (IKJ)**

IN THE MATTER OF SECTION 131 OF THE COMPANIES LAW (2018) REVISION
AND IN THE MATTER OF ASIA PRIVATE CREDIT FUND LIMITED
(IN VOLUNTARY LIQUIDATION)
BETWEEN:

**ADAMAS GLOBAL ALTERNATIVE INVESTMENT MANAGEMENT INC**

Appellant/Cross Respondent

**-and-**

(1) **THE PUBLIC INSTITUTION FOR SOCIAL SECURITY FOR THE STATE OF KUWAIT**

First Respondent/Cross Appellant

(2) **MR RUSSELL SMITH**
(3) **MR KENNETH YEO**

Respondents

**AND**

IN THE MATTER OF SECTION 131 OF THE COMPANIES LAW (2018) REVISION
AND IN THE MATTER OF ADAMAS ASIA STRATEGIC OPPORTUNITY FUND LIMITED
BETWEEN:

**ADAMAS CAPITAL PARTNERS LIMITED**

Appellant

**-and-**

(1) **THE PUBLIC INSTITUTION FOR SOCIAL SECURITY FOR THE STATE OF KUWAIT**

First Respondent

(2) **MS MARGOT MACINNIS**
(3) **MR DAVID BENNET**

Respondents

**Before:**    **The Hon Sir Richard Field, JA**
**The Hon C Dennis Morrison JA**
**The Rt Hon Sir Jack Beatson, JA**

1

**Appearances:**

Appeals Nos. 17 and 27 of 2019:

Mr Stephen Cogley QC and Mr Shaun Maloney of Ogier for the Appellant and the Cross-Respondent.
Mr David Allison QC and Mr Chris Keefe of Walkers for the Respondent and the Cross-Appellant.
Mr Sam Dawson and Mr Denis Olarou of Carey Olsen for the Second and Third Respondents

Appeal No. 26:

Mr Stephen Cogley QC and Mr Shaun Maloney of Ogier for the Appellant
Mr David Allison QC and Mr Chris Keefe of Walkers for the Respondent
Mr Sam Dawson and Mr Denis Olarou of Carey Olsen for the Second and Third Respondents

**Heard:** **20th and 21st August 2019**

**Judgment Delivered:** **8 November 2019**

**JUDGMENT**

**Sir Richard Field JA**

*Introduction*

1. These two related appeals are concerned with the meaning and effect of s. 131 (b) of the Companies Law (2018 Revision) ("the Law") first introduced in 2009. It is this provision that sets out the requirements of which the Court must be satisfied before ordering that a voluntary solvent liquidation be continued under the supervision of the Court.

2. Each of the appellants is an affiliated Cayman Islands company and is the Manager of a mutual fund incorporated in the Cayman Islands as an exempted company. In appeal No. 17 of 2019 ("the 1st appeal"), the appellant is Adamas Global Alternative Investment Management Inc ("AGAIM" or "the Manager") and the fund is Asia Private

Credit Fund Limited ("APCF"). In appeal No. 26 of 2019 ("the 2nd appeal"), the appellant is Adamas Capital Partners Limited ("ACPL" or "the Manager") and the fund is Adamas Asia Strategic Opportunity Fund Limited ("AASOF").

3.  To the extent relevant, the Articles of Association of both funds are essentially in identical terms and follow the usual structure for Cayman Island mutual funds. The Managers each hold 100 shares in the fund at a low par value which carry the right to vote as a member at general meetings and the right in a winding up to repayment of the par value of the shares. However, these shares have no rights as to income or dividends or as to redemption[1]. The redeemable Participating Shares held by the investors in the funds carry no voting rights in general meeting but have a right to receive dividends and the right to participate in the surplus assets of the company in a winding up after the Managers' right to be repaid the par value of their shares.[2] The investors' Participating Shares also carry the right to hold meetings for passing resolutions authorising the liquidator to divide among themselves any part of the assets in kind.[3]

4.  The First Respondent in both of the appeals is the Public Institution for Social Security for the State of Kuwait ("SSSK" or the "Petitioner"). At a time when it was the sole remaining Participating Shareholder in the two funds, SSSK caused letters to be sent first to APCF's lawyers and later to ACPL complaining about various aspects of the management of the respective funds and calling for the funds to be placed in voluntary liquidation and Mr David Griffin and Mr Andrew Morrison of FTI Consulting (Cayman) Limited to be appointed as the liquidators ("the FTI liquidators"). In each case, the Managers passed the necessary resolution to put the funds in voluntary liquidation but they appointed different liquidators than those insisted on by SSSK. In the 1st appeal, the liquidators appointed by AGAIM were Mr Russell Smith and Mr Kenneth Yeo respectively of BDO CRI (Cayman) Ltd and BDO Financial Services Ltd (together "the BDO liquidators"). In the 2nd appeal, the liquidators appointed by ACPL were Ms Margot Macinnis and Mr David Bennett respectively of Grant Thornton Specialist Services Ltd and Grant Thornton Recovery & Reorganisation Ltd (together "the GT liquidators").

5.  The first of these resolutions passed by the Managers was that passed by AGAIM on 14 December 2018 in respect of APCF. Four days later on 18 December 2018, SSSK presented a petition under section 131 of the Law seeking an order that the voluntary liquidation of APCF be supervised by the Court and the FTI liquidators be appointed in place of the BDO liquidators appointed by the managers.

6.  The resolution that AASOF be put into voluntary liquidation with liquidators chosen by the Managers (called "Founders" in the Articles of Association) rather than those insisted on by SSSK was passed on 14 January 2019. SSSK presented its section 131 petition on 18th April 2019.

---

[1] Article 4.1 (APCF); Article 16 (AASOF).
[2] Article 51.2 (b) (APCF); Articles 196.2 and 196.3(AASOF).
[3] Article 51.3 (APCF); Article 197 (AASOF).

7. In the 1st appeal, the Petitioner's s. 131 application was heard by MacMillan J who ordered that the voluntary liquidation continue as a liquidation supervised by the Court and directed that the FTI liquidators be appointed in addition to the BDO liquidators.

8. In the 2nd appeal, the Petitioner's s.131 application was heard by Kawaley J who also ordered that the liquidation be supervised by the Court. He further ordered that the FTI liquidators should be appointed but in place of rather than in addition to the GT liquidators.

9. Section 131 of the Law provides:

   "When a resolution has been passed by a company to wind up voluntarily, the liquidator or any contributory or creditor may apply to the Court for an order for the continuation of the winding up under the supervision of the Court, notwithstanding that the declaration of solvency has been made in accordance with section 124, on the grounds that:

      (a) the company is or is likely to become insolvent; or

      (b) the supervision of the Court will facilitate a more effective, economic or expeditious liquidation of the company in the interests of the contributories and creditors".

10. Under s.133, a supervision order takes effect for all purposes as if it was an order that the company be wound up by the Court, except as regards the commencement of the liquidation under s. 117 and the prior actions of the voluntary liquidator are valid and binding upon the company and its official liquidator.

*The factual background to the 1st appeal*

11. In the period 2010 to 2014, the Petitioner made subscriptions for shares in APCF totalling US$106,478,634.39.

12. In 2014 there was a partial restructuring by which almost all of APCF's assets valued at approximately US$115,000,000 were transferred to an associate of AGAIM, Adamas Finance Asia Limited ("AFAL"), a London AIM listed company in return for the issue of approximately 75% of the issued shares in AFAL to a wholly-owned subsidiary of APCF, Elypsis Solutions Limited ("Elypsis"). At the time of the s.131 petition, none of the former employees of the Petitioner who had been directly involved in the restructuring remained employed by the Petitioner and the Petitioner's management were concerned about the restructuring because they could see no benefit resulting from it and it been completed without any formal documentation between AGAIM and the Petitioner. Another cause of concern was that the former Director-General of the Petitioner, Mr Fahad Al Rajaan, had been involved in negotiating and approving the restructuring but had since been sentenced *in absentia* by a Kuwaiti Court to a 10 year prison term for the misappropriation and embezzlement of state funds during

his time as Director General of the Petitioner between January 1984 and January 2014. Mr Al Rajaan had been arrested in London from where the Kuwaiti Government was seeking his extradition.

13. The Petitioner had also been informed by a notice received from the Attorney General of Switzerland on 27 January 2015 that in 2012 the Swiss Attorney General's Office had opened a criminal investigation against Mr Al Rajaan and his wife. This investigation was focussed on secret bribes paid to Mr Al Rajaan and his wife by financial institutions in which the Petitioner had invested. The investigation was continuing. In the meantime, Mr Al Rajaan had been charged with criminal mismanagement, misappropriation and money laundering. At the time of the s.131 petition, the Petitioner did not know whether Mr Al Rajaan's criminal activities extended to his involvement with APCF and the restructuring but this was subject to on-going investigation by the authorities in Kuwait.

14. A further cause for concern for the Petitioner's management was that APCF's net asset value per share had deteriorated significantly from US$1,053.08 in March 2016 to a low of US$352.89 on 31 March 2018. The Petitioner had also not been provided with an update on the net asset value of its investment since 31 March 2018, at which date its shareholding in APCF was worth approximately US$37,208,691.88.

15. By letter dated 5 February 2018, the Petitioner's solicitors, Walkers, wrote to ACPL stating that the Petitioner had serious concerns with respect to the management of fund, citing the decline in the net asset value per share and complaining that the Directors of the Fund and AGAIM had failed to provide a proper explanation for this decline or any proposal for the improvement of the fund's performance. The letter went on to demand that AGAIM should within 7 days transfer all the Management Shares in the fund to the Petitioner so that it could pass a resolution for a voluntary winding up with independent liquidators, failing which the Petitioner would petition for the fund to be wound up on just and equitable grounds. This letter led to a lengthy exchange of correspondence at the end of which the directors of the fund and AGAIM wrote on 14 November 2018 agreeing that APCF should be wound up voluntarily and independent liquidators appointed.

16. By letter dated 6 December 2018, Walkers wrote to APCF's solicitors, Ogier, attaching a resolution which the Petitioner required AGAIM to pass by midday on 10 December 2018 placing APCF in voluntary liquidation and appointing the FTI liquidators to conduct the liquidation.

17. As already noted, on 14 December 2018, AGAIM passed written resolutions winding up APCF voluntarily and appointing the BDO liquidators; and on 18 December 2018 the Petitioner presented its petition seeking orders that the winding up continue under the supervision of the Court and for the appointment of the FTI liquidators.

18. The Petition set out the Petitioner's above-related concerns about AGAIM's
    management of APCF and the Petitioner's belief that supervision by the Court of the
    liquidation would facilitate a more effective, economic or expeditious liquidation in
    the interests of the contributories and creditors for the following reasons:

    > (a) it would allow the liquidators to carry out a comprehensive investigation
    > into APCF's affairs;

    > (b) it would provide the liquidators with the power to apply to the Court for an
    > order to examine any "relevant person" (as defined in s. 103 (1) of the Law) for
    > the investigating APCF's affairs, including the identity of its shareholders;

    > (c) it would provide the liquidators with power to apply to the Court to compel
    > any "relevant person" to transfer or deliver up to the liquidators any property
    > of documents belonging to APCF; and

    > (d) it would assist in the orderly realisation and distribution of APCF's assets.

19. The Petitioner's concerns on which the Petition was based were attested to in the
    first affidavit of Mr Hamad Mishari Al-Humaidhi, the current Director General of the
    Petitioner.

20. AGAIM's evidence consisted of an affidavit from Mr Barry Lau, AGIM's Managing
    Partner and Chief Investment Officer, and two affidavits sworn by Mr Paul Lincoln
    Heffner, the Managing Partner and CEO of AGAIM.

21. Mr Lau deposed that AGAIM opposed the relief sought in the Petition because it did
    not agree that that would result in a more effective, economic or expeditious
    liquidation. He also stated that before passing the winding-up resolution on 14
    December 2018, AGAIM had given consideration to various potential candidates to
    be appointed as independent professional liquidators, including the FTI liquidators.
    The BDO liquidators each had in excess of 25 years' professional experience as
    liquidators and receivers and their hourly rates were the most competitive of the five
    firms who had supplied fee information.

22. In his first affidavit, Mr Heffner deposed, inter alia, that the latest NAV of APCF was
    US$ 24,542,799.22, APCF's directors had signed a declaration of solvency on 28 and
    31 December 2018 and AGAIM was a creditor in respect of US$11,306,447.25 for
    performance and management fees. AGAIM also had a claim for legal fees under an
    indemnity provision in respect of its participation in the liquidation process and would
    have a claim if AGAIM succeeded in any claims made against in the liquidation. Mr
    Heffner then went on to give an account of the restructuring during which in January
    and February 2013 he held meetings with Mr Al Rajaan to update him on the
    investments being made on the Petitioner's behalf and to discuss and obtain approval
    for the restructuring. After these meetings, Mr Heffner continued to provide Mr Al
    Rajaan and his team at the Petitioner, including Sheik Abdullah Jaber Al-Ahmed Al
    Sabah ("Sheik Abdullah"), with updates on the restructuring, although from

November 2013, he stopped dealing with Mr Al Rajaan. By 30 January 2014, Mr Al Rajaan had left the Petitioner's employment and his (Mr Al Rajaan's) involvement in the restructuring was limited to initial discussions on that subject.

23. Mr Heffner also described discussions with Mr Al Rajaan, and later with Sheik Abdullah, relating to a plan under which the Petitioner would increase its investment in AGAIM's managed vehicles and refer potential investors to AGAIM to invest in AFAL. In addition, Mr Heffner offered an explanation for the drop in value in the Petitioner's underlying investment in AFAL, stating that AFAL's share price dropped: (1) after (a) the closure of Rothschild's broking and marketing business and its resignation as broker for AFAL; (b) the Petitioner's redemption request; (2) AFAL's share value is inherently susceptible to market forces beyond AGAIM's control.

24. In an affidavit served on behalf of the Petitioner in reply to Mr Heffner's first affidavit, Dr Ayman Bader Al Buloushi, the Petitioner's Head of Governance and Compliance, exhibited two emails exchanged on 9 August 2017 between an employee of the Petitioner, Nour Yousef Al Rashed, and Mr Heffner in order to challenge Mr Heffner's evidence that Mr Al Rajaan's involvement in the restructuring was limited to initial discussions. In the first of those emails Ms Al Rashed asked Mr Heffner to confirm whether the restructuring had been documented in a separate side agreement and in his reply Mr Heffner stated no separate agreement existed but the Manager had obtained verbal approval for the restructuring from Mr Al Rajaan. In Dr Al Buloushi's view these emails clearly demonstrated that the Petitioner's purported approval of the restructuring was given by Mr Al Rajaan, as opposed to any other employee of the Petitioner.

25. Dr Al Buloushi also answered Mr Heffner's critical observation that Mr Al Humaidhi had deposed that a supervised liquidation was required to obtain the identity of the fund's shareholders, when the liquidators had already been provided with the identity of the current and past shareholders. What Mr Humaidhi had in fact said in his affidavit was that a court supervised liquidation would provide the liquidators with power to apply for an order to examine "any relevant" person as defined in s. 103 (1) of the Law (including directors or officers and anyone who had taken part in the management of the company) for the purpose of investing APCL's affairs (including the identity of the company's shareholders.

26. In a second affidavit Dr Al Buloushi suggested, on the basis of an email from the lawyers acting for AGAIM that was marked "Subject to common interest privilege", that it was to be inferred that there had been collusion between AGAIM and the BDO liquidators. This affidavit was subsequently struck out as scandalous pursuant GCR O41 R6 and the proceedings continued on the basis that the BDO liquidators had discharged their responsibilities impeccably.

27. In his second affidavit, Mr Heffner challenged Dr Al Buloushi's statement that the Petitioner's purported approval of the restructuring was given only by Mr Al Rajaan on the ground that it was his (Mr Heffner's) understanding that the Petitioner had

and continues to have an investment committee and that accordingly, Mr Al Rajaan would have obtained that committee's support before giving his approval.

28. The Court had before it the first report of the voluntary liquidators dated 20 February 2019. In this report, the liquidators stated that they had made a number of requests for information and documents from AGAIM as to which AGAIM had assisted and responded to a large proportion of these requests. The liquidators also reported they had written to Walkers on a number of occasions inviting the Petitioner's views on the conduct of the liquidation but the Petitioner had not responded positively to these invitations. At the date of the report, the liquidators had insufficient information to form a concluded view on the Petitioner's concerns and further investigatory steps were required. At that time the liquidators did not think they required recourse to the powers afforded to an official liquidator but they would keep the position under review. At the time of the report, the liquidators were not in a position to opine whether the liquidation should ultimately continue as a voluntary liquidation or be brought under the supervision of the court.

29. It was common ground that APCF was solvent, with assets that amply covered AGAIM's claims as a creditor and as a contributory in respect of the par value of its Management Shares amounting to just US$100. The Petitioner was therefore the sole economic and financial stakeholder in APCF's liquidation.

*McMillan J's judgment*

30. Towards the end of the hearing before McMillan J that took place on 27 February 2019 the judge indicated, without giving reasons, that he was going to order a supervised winding up and later said that he would be more assured if there were a liquidator from each of BDO and FTI, one in Cayman and the other in Hong Kong. The parties were then left to draw up an order.

31. On 19 March 2019, McMillan J (hereafter in this and the next section "the judge") delivered a brief written judgment. In paragraph 12 he set out s. 131 and in paragraph 13 he said:

> In considering whether to make such an Order, it is for the Court to decide whether the supervision of the Court will facilitate a more effective, economic or expeditious liquidation of a company in the interests of the contributories and creditors. In other words, facilitating these broadly expressed factors is not simply a precondition for making the order but the actual reason or reasons for exercising the discretion to do so.

32. The judge then referred to an observation of Mangatal J in *In the Matter of Exten Investment Fund* (Unreported Grand Court, Cause Nos FSD 96-99 of 2017) that the language of sub-section (b) of s. 131 is "wide", which McMillan J thought emphasised "that the approach of the Court should be broad and purposive".

33. In paragraph 22, the judge said:

> While the Court fully recognises the weight of [the parties' submissions]
> nonetheless the Court reminds itself of its responsibility to act in an
> independent and impartial manner as distinct from exercising a more passive
> acquiescence, as is perhaps unintentionally implied.

34. In paragraph 24, the judge said:

> The Court does not accept that there is a formal test as such. There must of
> course be grounds for the exercise of the Court's *discretion*, but the ambit of
> the Court's jurisdiction is not defined simply by what is called a test. As
> indicated, the Court's *discretion* once it is activated upon the relevant grounds
> is wide rather than narrow. This approach is fully consistent with the guidance
> of Mangatal J. (Emphasis added).

35. In paragraph 26, the judge observed that the potential for the prejudicial effect a
supervision order may have on the interests of all stakeholders was a factor for
discretionary consideration and rejected AGAIM's contention that the Petitioner had
to demonstrate that supervision was "necessary". He also noted in paragraph 28
AGAIM's contention that the dispute was not about a justifiable need for supervision
but about a desire to replace the current liquidators.

36. In paragraphs 31 and 32, the judge said:

> [31] The Court is satisfied that the grounds for the exercise of its discretion
> under section 131 have been amply made out.

> [32] In these circumstances where a contributory has suffered a very
> significant loss of its original investment, it is particularly important in the
> interests of justice and in order to maintain the reputation and standing of this
> jurisdiction that supervision should be ordered. At the same time, this decision
> is no reflection whatever on the professional standing and proficiency of the
> current JVLs, who have acted entirely impeccably.

37. In the final paragraph, the judge said that it was inappropriate to replace both BDO
liquidators with the Petitioner's nominees, given the serious loss of knowledge and
expertise that this replacement would represent.

38. On 18 June 2019, the parties having been unable to agree the order concerning the
appointment of the FTI liquidators, McMillan J ordered that the two FTI liquidators
be appointed in addition to the two BDO liquidators who were to stay in place.

*AGAIM's grounds of appeal in the 1st appeal*

39. The principal grounds of appeal advanced by AGAIM in the 1st appeal are:

(i) the judge failed to find or identify which of the jurisdictional requirements prescribed in paragraph (b) of s. 131 had been made out and in consequence his judgment should be set aside;

(ii) if the judge did find that one or some of the jurisdictional requirements had been made out he failed to give any or any sufficient reasons for this finding;

(iii) If the judge is to be taken to have found a ground within s.131 (b), it was not a ground within the purview of the provision because: (a) it had not been proven to exist at the hearing; (b) it did not relate to the future conduct of the liquidation; and (c) supervision by the Court would not actually positively and definitely result in the liquidation proceeding in a more effective, more economic, or more expeditious way than if the supervision order were not made;

(iv) the judge had acted on a misconstruction of s.131 (b) by proceeding on the basis that that provision conferred a wide discretion on the Court which he proceeded wrongly to exercise in favour of the Petitioner.

*The cross-appeal in the 1st appeal*

40. The Petitioner cross-appeals against the decision of McMillan J to appoint the two FTI liquidators to conduct the liquidation in addition to the BDO liquidators. The Petitioner submits that in making this decision the judge took into account irrelevant considerations or came to a decision that is outside the margin of appreciation in which the judge was entitled to operate. These grounds of appeal assume, I think, that the judgment of McMillan J is not set aside for want of sufficient reasons for his decision to make a supervision order. If the judgment is set aside, the question arises whether the order parasitic thereon appointing all four liquidators to conduct the supervised liquidation also falls away.

*The factual background to the 2nd appeal*

41. AASOF's assets principally comprised investments in six underlying funds ("the underlying funds"). In the period between 2006 and 2008 the Petitioner made cash subscriptions totalling US$75,000,000 of which US$31,445,136.43 had been redeemed. In November 2018, ACPL confirmed to the Petitioner that at 31 August 2018, AASOF was worth approximately US$55,381,802.

42. ACPL was a creditor in respect of performance fees of US$13,611.10 and was entitled as a contributory to US$1.00 in respect of its 100 voting non-redeemable non-participating Founders Shares with a par value of US$0.01 each. The assets of AASOF therefore amply covered ACPL's claims as a creditor and as a contributory in respect of the par value of the Founders Shares. The Petitioner, as sole participating shareholder, was accordingly the sole economic and stakeholder in the AASOF's liquidation.

43. In December 2017, the Petitioner had submitted a redemption request in respect of 730,969.4 units in accordance with the Private Placement Memorandum of 29 June 2017 and the Articles of Association but, having acknowledged receipt of the redemption request on 14 March 2018, in August 2018, ACPL informed the Petitioner that AASOF's directors had determined it necessary to declare a suspension of redemption requests with effect from 2 October 2018. AASOF did, however, indicate that it intended to carry out a special redemption in the amount equal to 14% of AASOF's issued share capital as at 1 November 2018. But in October 2018, ACPL cancelled the special redemption on the ground that an emergency existed as a result of which the disposal of AASOF's interests in the underlying funds was not practically feasible. In addition, the underlying funds were locked up until December 2019.

44. It was the Petitioner's case that repeated requests made on its behalf by its lawyers, Cleary Gottlieb Steen & Hamilton ("Cleary") for further details of the alleged emergency that led to the suspension of redemptions and what steps were being taken by ACPL and AASOF to end the suspension had not elicited any proper information on these matters which remained a mystery.

45. On 20 September 2018, AASOF's legal counsel, Maples and Calder ("Maples"), informed Cleary that certain interests held within the underlying funds were subject to "lock ups" which significantly restricted AASOF's ability to liquidate its positions and continue redemptions. Cleary responded by asking, inter alia, for detailed evidence of the lock ups, including to the extent that they can be provided, the agreements containing the lock up provisions, to which Maples replied: "[W]e understand that it will not be possible to provide the requested information in respect of …[A]ASOF".

46. By letter dated 18 November 2018, Dr Al Buloushi wrote to Mr Heffner raising a number of concerns including the delay in producing a written implementation plan detailing what steps were being taken to end the redemption suspensions, the "flagrant" fee multiplication to which the Petitioner had been subjected in respect of its investments in AASOF and another fund, Adamas Japan Opportunity Fund ("JOF"), and the Petitioner's unanswered request that management fees cease to be charged during the suspension periods. Mr Heffner on behalf of ACPL replied by letter dated 26 November 2018 stating that ACPL had agreed in principle to waive all of the management fees and performance fees with effect from 1 December 2018 but this waiver would not endure indefinitely and would cease to apply from the end of the suspension period of the relevant fund. However, despite repeated requests from the Petitioner, ACPL failed to confirm whether the waiver also applied to fees payable in connection with the underlying funds and failed to provide the Petitioner with the requested information and justification for all fees to which the Petitioner's investment in AASOF has been subject.

47. Following a further letter of complaint about the above-related matters dated 9 December 2018 from the Petitioner in which ACPL was asked to confirm that they would within 7 days pass resolutions commencing the voluntary liquidation of AASOF and irrevocably appoint independent joint liquidators from a reputable firm of the

Petitioner's choosing, ACPL wrote by letter dated 14 December 2018 stating that it did not see any "material issues" with passing the requested resolutions. On 23 December 2018, the Petitioner wrote requiring ACPL to pass resolutions putting AASOF into voluntary liquidation and appointing the FTI liquidators to conduct the liquidation, failing which the Petitioner would petition to wind up AASOF on just and equitable grounds.

48. On 14 January 2019, ACPL informed the Petitioner that it had passed resolutions putting AASOF into voluntary liquidation and appointing the GT liquidators rather than the FTI liquidators.

49. As already stated, the Petition was presented on 18 April 2019. By this time McMillan J had decided to order that the voluntary liquidation of APCF should be supervised by the Court and had indicated that at least one of the FTI liquidators should be appointed alongside the BDO liquidators. The Petition sets out the above-related concerns and background and also refers to the Petitioner's wider concerns with respect to its investments in funds managed by ACPL and its affiliates, in particular the concerns it had about its investment in APCF including those arising from Mr Al Rajaan's conviction for misappropriation and embezzlement of state funds during his time as Director General of the Petitioner between January 1984 and January 2014.

50. The Petition was verified by two affidavits sworn by Dr Al Buloushi. The evidence relied on by ACPL consisted of two affidavits sworn by Mr Barry Lau Wang Chi, the main thrust of which was that there was no factual or other basis as to why it would be more effective, economic or expeditious for the liquidation to be supervised by the Court where the company was solvent and independent professional voluntary liquidators were already in place.

51. The first report of the GT liquidators dated 7 June 2019 was also before the Court which set out in some detail the steps they had taken to date and what their next steps would be.

*The judgment of Kawaley J*

52. SSSK's section 131 petition in the matter of AASOF was heard by Kawaley J who, in a wide-ranging and impressive judgment delivered on 23 June 2019 decided that the liquidation of AASOF should continue under the supervision of the Court and that the FTI liquidators should be appointed as liquidators in place of those appointed by ACPL.

53. The Manager having contended that the Articles of AASOF (hereafter in this and the next section "the Company") gave it sole or primary shareholder authority over the Company as long as it was solvent, Kawaley J (hereafter until further notice "the judge") began his judgment by addressing the issue of whose interests as between the Manager and the Participating Shareholders should be given greater weight "as it shapes how the evidence and supporting arguments for and against the Supervision

Order should properly be accessed" [7]. In the judge's view, Articles 196 and 197[4] confirmed that the Participating Shareholders were the primary economic stakeholders in relation to a voluntary (solvent) liquidation despite the fact that the power to commence a voluntary liquidation was placed in the hands of the holders of the Founder Shares. The judge rejected the Manager's submission that in effect the Participating Shareholder had no right to influence the choice of voluntary liquidators or to decide what type of winding up was appropriate. A starting assumption had to be that the Court entertaining an application under section 131 would give greater weight to the views of the majority of economic stakeholders, as is typically done when entertaining a petition for the winding up of the company by the court [22].

54. The judge noted with approval the Petitioner's citation of: (a) Andrew Jones J's dictum in *In re AJW Master Fund* [2011] 1 CILR 363 at [44]: "[B]ut the choice of liquidator is not a formality. In this regard, the court is exercising a discretion in respect of which it should take into the views of the stakeholders;" (b) the dictum of Smellie CJ in *In re Bay Capital Asia Fund* LP (Unreported, Grand Court ) FSD 116 of 2016, 1 October 2015: "[T]he Court must be guided primarily by what is in the best interest of those having the real and ultimate economic interest in this Fund, namely, the creditors"; and (c) paragraph 8.1 of the April 2006 Law Reform Commission Report, "Review of the Corporate Insolvency Law and Recommendations for the Amendment of Part V of the Companies Law" ("the LRC Report"): "The liquidation process should be driven by those having an economic interest in its outcome. Section 105 of the draft bill provides that the liquidator nominated by the petitioning creditor (or shareholder) will hold office only on an interim basis. The general body of creditors (or shareholders in the case of solvent companies) are given an opportunity to elect a liquidator of their own choice."

55. In paragraph 49, the judge said:

> The proposition that liquidation proceedings, whether insolvent or solvent, should be conducted in the interests of those persons who are financially interested in the liquidation process may be viewed as the golden thread which runs through liquidation law in those parts of the world whose statutory winding up concepts have been transplanted from British legal soil. Accordingly, when one is considering what is likely to be a more "*effective, economic or expeditious*" liquidation of a company, in any particular case that

---

[4] Article 196. The assets available for distribution among the Members shall then be applied in the following priority: 1. Firstly to the holders of Participating Shares, an amount equal to the par value of such Participating Shares; 2. secondly, to the holders of Founder Shares; and 3. thirdly, the balance shall be paid to the holder of the Participating Shares …

Article 197. If the Company shall be wound up (whether the liquidation is voluntary or by or under the supervision of the Court) the liquidator may, with the authority of a resolution or resolutions passed by the holders of Participating Shares, divide among the Members in kind the whole or any part of the assets of the Company … The liquidator may, with the like authority vest any part of the assets in trustees upon such trusts for the benefit of the Members as the liquidator, with the like authority, shall fit …

broad concept must be moulded like clay to fit the shape of the particular stakeholder interests which holds sway in the case before the Court. The statutory terms are fixed but the meaning is not cast in stone. And while the Court should never be a "rubberstamp" when it comes to making commercial judgements in particular, the Court should be slow to second-guess the stakeholders as to how efficacy and/or economy is likely best to be achieved. The Court's evaluative function is likely to be in enhanced where stakeholders have different views or their views are not clearly known or easily ascertainable. The rigour of the Court's "evaluative function is likely to be properly diminished where all stakeholders speak with the same voice.

56. The judge expressed the view that subject to particular factual circumstances which might justify a departure from the general rule, where there is a sole Participating Shareholder who nominates a fit and proper person as a proposed voluntary liquidator the holder of the Founder or Management Shares should ordinarily appoint such nominee [32]. Whilst the Participating Shareholders in a fund similar to the Company have no right to appoint directors or otherwise be involved in supervising investment decisions, when those activities are at an end even a solvent voluntary winding up is conducted on terms that the Participating Shareholders assume the mantle of "supervising" the way the liquidator winds up the Company [35]. Notwithstanding the fact the Articles conferred sole power on the Founder Shareholders to resolve to wind up the Company, that power was conferred not for their own benefit but the benefit of the Participating Shareholders who had under the Articles the predominant financial stake in any form of winding up. Accordingly, the starting assumption was that where the majority of the Participating Shareholders nominate a suitable voluntary liquidator, their wishes should be acceded to by the holders of the Founders or Management Shares [36].

57. In paragraph 38, the judge said:

> Accordingly, I find that on an application under section 131 (b) of the Law when it is common ground that the Petitioner as sole Participating Shareholder has standing to apply, the interests of the Petitioner clearly trumps the interests of the Manager qua Founder Shareholder in general terms. In the event of a conflict between the views of the Participating Shareholder and the Manager as to who the official liquidators should be pursuant to a Supervision Order, the starting assumption would again be that the Petitioner's wishes would prevail.

58. When dealing with the interpretation of s. 131 (b) the judge observed that the section by its terms does not confer a broad discretion on the Court to make a supervision order where the grounds for doing so are made out. The language of s. 131 clearly signified that the Court must primarily determine whether the grounds are made out or not. There is a residual discretion which was necessarily narrow because the

exercise of determining whether the grounds for making a supervision order itself
involves making judgments of a discretionary character [45].

59. Whilst the judge disagreed with the weight McMillan J gave in the related APCF case
to the observations of Mangatal J in *In the Matter of Exten Investment Fund and
Others* (above) about how widely the section is drafted, he endorsed McMillan J's
conclusion that the Petitioner had established the requirements for the making of a
Supervision Order. The judge also agreed that those requirements are expressed in
broad terms, flexible enough to be deployed in an infinite variety of circumstances
even though the essential characteristics of each precondition (or ground) are clearly
defined; he further agreed that "the approach of the Court should be broad and
purposive". He also shared McMillan J's view that the Petitioner did not have to show
that supervision was "necessary" [60] & [61].

60. In paragraph [62], the judge observed that since the central object and purpose of
section 131 (b) is to impose "full-blown" supervision over a liquidation, it may help to
clarify how to deal with borderline cases to have in mind the overarching statutory
function of an official liquidation and the central role played by the Court.

61. In paragraph [77] the judge said:

> The Court must independently assess the case put before it, but as is the
> general rule in winding-up matters, the Court will give due weight to bona fide
> views of the financial stakeholders as to where their best interests lie. I would
> add to these findings for avoidance of doubt that the Petitioner must make out
> this case by discharging the usual civil standard of proof.

62. In paragraph [78] the judge accepted the submission made by Counsel for the
Manager, Mr Cogley QC, that whether the preconditions for granting a Supervision
Order had been made out fell to be determined at the date of the hearing of the
Petition. But he rejected "as a *non-sequitur*" Mr Cogley's submission that the
preconditions can only be met by showing that the statutory investigation powers
that go with a Supervision Order are immediately and definitely needed. On the other
hand, context was everything. Thus, where voluntary liquidators applied for a
Supervision Order without actually having formed the view that they propose to
deploy those powers, prematurity might be a ground for dismissing or adjourning the
petition.

63. In paragraphs [70] to [76] the judge considered the evidence before the Court. Having
noted that the affidavit verifying the Petition supported the Petition's central
averments, the judge observed in [71] – [72] that much of the evidence adduced in
Mr Lau's 1st affidavit was premised on the Manager (ACPL) being the key stakeholder,
a proposition that he rejected. In the judge's view, little weight could be attached to
the views of the target of the investigation that the Petitioner was seeking pursuant
to a supervision order. As for Mr Lau's 2nd affidavit in which it was averred that the
Petition impugned the integrity of the joint voluntary liquidators and traduced the
Manager's reputation, the judge held that these assertions were misconceived. No

right thinking person could properly infer that the making of a supervision order cast doubt on the bona fides of the Manager [75].

64. In paragraph [76], the judge said:

> In summary, the Manager's evidence unsurprisingly did not raise any convincing grounds for opposing a Petition which essentially sought a supervision order to *achieve* an independent investigation into the Manager's management of the Company's investments. The fact that the Petitioner is a public institution concerned about possible improprieties on the part of the former Executive only adds weight to the legitimacy of its concerns that the winding-up of the Company be seen to be concerned in a credible manner, an outcome which the Manager itself torpedoed by its legally erroneous obstructive stance.

65. The judge then set out his findings on the Petition. In paragraphs [79] – [80] he said:

> Where the sole investor in a company seeks to appoint its nominees as voluntary liquidators, it does not have the voting power to rescind that appointment nor the legal power to seek the removal of admittedly fit and proper voluntary liquidators save by replacing them with alternative but more suitable official liquidators, this objective standing by self is a valid grounds for making the liquidation more effective… In light of the Manager's refusal to recognise the Petition's right to nominate voluntary liquidators, and taking into account the Petitioner's particular interest as a public authority concerned about satisfying its own public stakeholders that a liquidation process in a distant land is credible, a winding-up under the supervision of the Court is obviously likely to be both more effective and consistent with the interests of the sole contributory. [79]

> Effectiveness in the present context takes into account not simply an immediate need to deploy investigative powers, but the appointment of official liquidators who are manifestly more independent than voluntary liquidators because they cannot be removed by the shareholders eligible to vote in general meeting. Liquidators who will be free without more to engage the full panoply of statutory powers should they see fit to do so. Liquidators who will also, if necessary, be able to seek recognition and assistance overseas…[80]

> … [T]he main reason why supervision is required in this case is that official liquidators expressly empowered by this Court to investigate the public policy and commercial concerns of the Petitioners will lend a credibility-based efficacy to the liquidation that voluntary liquidators will not. It seems obvious that their official status will make it easier for them to obtain information voluntarily from persons who might be inclined to decline to assist the JVLs on the basis that they lack of formal powers to demand cooperation. [81]

16

… Here, a Kuwaiti public authority has invested substantial amounts of public money in a Cayman Islands company while that authority was led by an officer who has since been convicted of misusing public funds. It does not have tangible reasons for suspecting that any wrongdoing occurred, but it wants to ensure that the Company is wound-up in a credible way. It also has unsubstantiated concerns about the way in which its investment was managed and the partially explained suspension of redemptions. These concerns have been exacerbated rather than alleviated by the Manager initially agreeing to appoint the authority's nominees as voluntary liquidators and then adopting and adversarial position based on a somewhat obtuse view of the law which has not been vindicated. [82]

In my judgement the need for the voluntary liquidation to be continued under the supervision of the court to ensure the credibility of the liquidation process has been clearly made out… [83]

66. In paragraphs [85] and [86] the judge said the Court's role in an insolvent or solvent winding-up was most narrowly to provide independent oversight designed to vindicate the statutory rights of all of the parties interested in the liquidation. More broadly, the Court had a duty to uphold the integrity of the Cayman Islands' commercial law framework and the reputation of the jurisdiction as a leading offshore domicile. The Court had also to be protective of the professional reputations of service providers such as the Manager and protect them from unjustified character attacks.

67. In paragraph [87], the judge concluded that the FTI liquidators should be appointed in place of the GT liquidators. The Petitioner's wishes as to who should be appointed as liquidators should have been acceded to from the outset, as it was the sole stakeholder. It was not for the Manager to purport to save the Petitioner's own money. The FTI liquidators were not conflicted, were qualified and would be more independent as officers of the Court.

*ACPL's grounds of appeal in the 2nd appeal*

68. The principal grounds of appeal advanced by ACPL in the 2nd appeal are that: (i) the judge proceeded on the basis that he had the same broad discretion as was conferred by the former s.150 (see paragraph 86 below); (ii) the judge wrongly concluded that s. 131 could be used to achieve the Petitioner's desire to replace the incumbent liquidators with the Petitioner's nominees and this alone was sufficient to engage jurisdiction under the section; (ii) the judge wrongly accorded pre-eminent weight to the views of the Petitioner as to the identity of the liquidators; (iii) the evidence adduced by the Petitioner at the hearing was not sufficient to justify the conclusion that any of the jurisdictional requirements set out s.131 (b) had been met; (iv) the judge erred in failing to find that on an immediate basis a supervised liquidation

would facilitate a more effective, economic or expeditious liquidation; (v) the judge wrongly took into account the fact that McMillan J had made a supervision order in the related APCF matter; (vi) the judge failed to take into account adequately or at all the interests of the Manager as a creditor and contributory and the beneficiary of the contract contained in the Articles risk it faced of reputational damage in a supervision order was made.

*The principal issues arising from both of the appeals*

69. The main issues arising from these appeals are: (i) the meaning and effect of s. 131 (b); (ii) the weight the Court should give to the contractual regime agreed between a Petitioner investor in a fund and the Manager thereof under which the Manager has sole power to place the fund in voluntary liquidation and the identity of the voluntary liquidators; (iii) the extent to which the Court can take into account the views of the stakeholders in the liquidation when determining whether the jurisdictional requirements of s. 131 (b) had been established; (iv) whether the material before the Court was sufficient for it to be held that supervised liquidations should be ordered; (v) whether no supervision order can be made unless on an immediate basis such an order would facilitate a more effective, economic or expeditious liquidation; (vi) whether on an application made under s. 131 (b) by a sole stakeholder investor in a fund whose choice of liquidators for a voluntary winding up has not been acceded to by the Manager it is open to the Court to find that the appointment of official liquidators of the stakeholder's choosing can constitute a ground for holding that a supervised liquidation would be more effective than the voluntary liquidation started by the Manager.

70. Assuming the judgment of McMillan J dated 19 March 2019 is not set aside, the issue on the cross-appeal is whether, in appointing the FTI liquidators in addition to the BDO liquidators, McMillan J failed to have due regard to all relevant considerations or had regard to irrelevant considerations or his decision was outside the margin of appreciation to which he was entitled.

71. If McMillan J's judgment dated 19 March 2019 is set aside, the question arises whether the order parasitic thereon appointing all four liquidators to conduct the supervised liquidation falls away so that it is for the Court to make such order as it sees fit.

*The Statutory Framework*

72. As is well known, there are three ways under s.90 of the Law in which a company can be wound up - compulsorily, voluntarily and under the supervision of the Court - and the five circumstances in which a company can be wound up by the Court are prescribed in s.92. These circumstances include where the company has passed a special resolution requiring the company to be wound up, where the company is

unable to pay its debts and where the Court finds that the company should be wound up because it is just and equitable to do so.[5]


Voluntary winding up

73. The circumstances in which a company may be wound up voluntarily are set out in s. 116 of the Law. They include the situation where the company in general meeting resolves by ordinary resolution that the company be wound up voluntarily (s116 (c)).

74. From the commencement of a voluntary winding up, the company must cease to carry on its business except for the purpose of winding up the company's affairs and distributing the assets (s.118 (1)); and within 28 days the liquidator must apply for an order that the liquidation continue under the Court's supervision unless the directors have signed a declaration of solvency in the prescribed form (s. 124 (1)).

75. By virtue of s. 121 (1) & (2), a voluntary liquidator may be removed from office by resolution of the company in a general meeting convened specially for that purpose; and a general meeting for the purpose of considering such a resolution may be convened by a shareholder or shareholders holding not less than one fifth of the company's issued share capital. In addition, any contributory may apply to the Court to have a voluntary liquidator removed from office on the grounds that he is not a fit and proper person to hold office (s. 121 (3).

76. Under s. 129 (1), a voluntary liquidator or any contributory may apply to the Court to determine any question arising in a voluntary winding up or to exercise any of the powers which the Court might exercise if the company were being wound up under the supervision of the Court.

The powers available to a liquidator in a liquidation ordered by the Court including a voluntary liquidation ordered to be continued under the Court's supervision.

77. A liquidator in a liquidation ordered by the Court is an official liquidator (see the definition of "official liquidator" in s. 89 and s. 105 (1)). By s.108 (2), a liquidator is an officer of the Court, whereas a voluntary liquidator does not have this status and for that reason is outwith the common law power recognised by the House of Lords in *Singularis Holdings Ltd v Price WaterhouseCoopers* [2015] AC 1697 at [25] to assist a foreign insolvency by ordering the production of information in oral or documentary form which is required for the administration of a foreign winding up.

78. By s. 101, an official liquidator is empowered to require directors and officers of the company and professional service providers to the company to submit a statement verified by affidavit dealing with a range of prescribed matters and the persons made

---

[5] The other two circumstances are: where the company does not commence business within a year for its incorporation or suspends its business for a whole year and where the period fixed by the articles for the duration of the company expires or the occurrence of an event which the articles state should lead to the company being wound up

the subject of this requirement commit an offence if without reasonable cause they fail to make the required report.

79. By s. 102 (1), an official liquidator is empowered without seeking the Court's sanction to investigate the causes of the failure of the company and also the promotion, business, dealings and affairs of the company. And by s. 102 (2), subject to obtaining directions of the Court, such a liquidator has power to assist the CIMA and the RCIPS to investigate those persons who can be required to produce a report under s.101 and to institute and conduct a criminal prosecution of such persons.

80. Under s.103, it is the duty of every "relevant person"[6] to co-operate with an official liquidator and prior to dissolution of the company, an official liquidator may apply to the Court for an order for the examination of any relevant person or that such a person transfer or deliver up any property or documents belonging to the company. Under s.103 (7), the Court has jurisdiction to make an order under s. 103 against a relevant person resident outside the Islands and to issue a request seeking the assistance of a foreign court in obtaining the evidence of a relevant person resident outside the jurisdiction.

81. Finally, where there is a winding up by the Court, the Court must, as to all matters relating to the winding up, have regard to the wishes of the creditors or contributories and for that purpose may order reports to be prepared by the official liquidator and the summoning of meetings of creditors or contributories (s.115).

*The nature and effect of section 131(b).*

82. As noted by Kawaley J, prior to the judgments challenged in these two appeals there have been four decisions of the Cayman Islands' courts in proceedings where s. 131 was in play. In the first two of these decisions[7] there was no consideration of the meaning and effect of section 131 (b). In the latter two, the effect of s. 131 (b) received some consideration but the wording of the provision was not analysed in any depth.

83. In *Re Consistent Return Limited* [2012] 1 CILR 445, the voluntary liquidators of an open-ended investment fund applied for a supervised liquidation order under s.131 (b) because they wanted to pay the admitted debts and make a distribution to the holders of the participating shares but were concerned that their actions could be later challenged. In their view, if a supervision order was made, they could invoke CWR, O.18, rr 6 and 7 to pay creditors a pro rata sum and in respect of disputed debts

---

[6] Defined as a person, whether resident in the Islands or elsewhere – (a) has made or concurred with the statement of affairs; (b) is or has been a director or officer of the company; (c) is or was a professional service provider to the company; (d) has acted as controller, advisor or liquidator of the company or receiver or manager of the company; (e) not being a person falling within paragraphs (a) to (c), is or has been concerned or has taken part in the promotion, or management of the company.

[77] *In the Matter of Bay Capital Asia Fund LP* (above) and *In the Matter of the Wimbledon Fund, SPC* (unreported FSD 111 of 2017, 5 February 2018, Parker J). In both of these cases it was common ground that a supervision order had to be made on grounds of insolvency.

they could invoke O.16, r.1 (3) to require creditors to submit their proofs of debt and be dealt with under the statutory provisions relating to appeals against rejections or expunging admissions. By agreement with the liquidators, Jones J summarily dismissed the liquidators' petition. The liquidation being a solvent liquidation, the liquidators could not invoke CWR, O.18, rr 6 and 7 and even though they could invoke O.16, r.1(3), they could not force an unwilling creditor to submit a proof of debt, whereas they could protect themselves by putting any disputed creditors on notice that they must issue a writ. Further, the indemnity claims the liquidators apprehended might be made were probably academic and a supervision would increase the costs of the liquidation. It was therefore difficult to see how a supervision order would facilitate a more economic resolution of outstanding matters.

84. In *Re Exten Investment Fund (In Voluntary Liquidation)* (above), the applicant sought supervised liquidation orders under s. 131 and an extension of the dissolution date under s.151 (3) in respect of two funds. However, the applicant was not a contributory and at most was a contingent creditor because at a time when it was the sole investor it was subject to a compulsory redemption when the funds were placed in voluntary liquidation. Unsurprisingly, Mangatal J's judgment focussed on whether the petitioner, as a contingent creditor, was "a person who appears to the Court to be interested" for the purposes of s. 151 (3) and a "creditor" for the purpose of s.131. In the learned judge's view, the petitioner did have standing to apply under s. 151 (3) and was a "creditor" for the purposes of s. 131, there being:

> "nothing in the language of section 131 (b) to suggest that a more limited construction should be placed on the word "creditor". Indeed, the language of sub-section (b) is wide, and states that the application can be made where supervision of the Court will facilitate a more effective, economic or expeditious liquidation of the company in the interests of the contributories or creditors."[para 64]

85. Section 131 was introduced into the Law in 2009. Its predecessor was section 150 in the 2007 Revision which together with the rest of Part V of the 2009 Revision was lifted directly from the UK Companies Act of 1862.

86. Section 150 provided:

> When a resolution has been passed by a company to wind up voluntarily, the Court may make an order directing that the voluntary winding up should continue, be subject to such supervision of the Court, and with liberty for the creditors, contributories or others to apply to the Court, and generally upon such terms and subject to such conditions as the Court thinks just.

87. As we have seen, the 2009 Revision was preceded by the LRC Report. In that report, the Law Commission recommended that the existing law and best practice be codified by re-writing Part V of the Law which suffered from being unduly complex because it was derived from a combination of 19th century legislation, inappropriate foreign rules and local case law. Attached to the report was a draft bill that included

the clause that became s. 131 but neither the Report nor the Commission's Memorandum of Objects and Reason for the bill's provisions says anything about the intended effect of this provision.

88. Paragraph 8.1 of the LRC has already been noted. As to that, it is pertinent to record, as pointed out by Mr Cogley, that in its Final Report No. 3, the Commission accepted the view of the Chief Justice that the removal of official liquidators should be by order of the Court rather than by resolution of the creditors or contributories.

89. It will be seen at once that the old s.150 conferred on the Court an extremely wide discretion whether or not to order a supervised winding up. No such wide discretion is conferred by s. 131 (b). Instead, s.131 (b) provides for jurisdictional thresholds one of which must be met before a supervision order can be made, namely, that supervision of the Court will facilitate a more effective, economic or expeditious liquidation of the company in the interests of the contributories and creditors. And the burden is on the applicant to satisfy the Court that the threshold requirement has been met on the material before the Court at the time the Petition is heard.

90. The jurisdictional thresholds captured by the words "effective", "economic" and "expeditious" are open textured and of broad meaning as both McMillan J and Kawaley J observed.  They overlap but at their core they connote separate concepts. The words "facilitate" and "more" are also open textured and of broad application. Mr Cogley QC for both appellants submitted that the effect of the words "will facilitate a more …" was that the Court had to be satisfied that upon the making of a supervision order there and then there would be an immediate concrete benefit for the contributories and/or the creditors not conferred by the voluntary liquidation presently on foot. It was not enough that one or other of the prescribed circumstances *might* or *could* occur. In my judgment, if a supervised liquidation is more suitable than a voluntary liquidation on the facts because it has the immediate potential for achieving a more thorough investigation, it will be more effective from the outset than the current voluntary liquidation which lacks such potential. And depending on the facts, for instance where an investigation is called for, it may well be that the appointment of official liquidators who cannot be dismissed by resolution in a general meeting in place of voluntary liquidators who can be so dismissed will immediately result in a more effective liquidation, particularly where the Manager of a fund has appointed its own choice of voluntary liquidators in defiance of the choice of the stakeholder or stakeholders in the liquidation.

91. In deciding whether the threshold has been met the Court will make a judgment resulting from an evaluative process in which the words of paragraph (b) are considered in light of the evidence before it. This process is akin to but not the same as the exercise of a discretion properly so called. Although not truly the result of an exercise of discretion, since the court's decision is an exercise of judgment based on an evaluation of a number of different factors, it will be a decision that an appellate court ought to be slow to overturn unless the judge has misconstrued s. 131 or the decision falls outside the generous ambit within which a reasonable disagreement is possible.

92. If Kawaley J was meaning to say in paragraph [45] that after the Court had formed the view that one or all of the jurisdictional requirements of s. 131 (b) had been established, the Court still had a residual discretion, albeit a narrow one, whether to make a supervision order, I disagree with him. As I have said, the process of deciding whether any of those requirements has been established is an evaluative one, but once that process has been completed there is no room for the operation of a residual discretion in respect of the jurisdictional thresholds.

93. Contrary to the view of Kawaley J, I also think that, given the evaluative nature of a decision on a s.131 application, the better view is that the Court has to be <u>satisfied</u> on the material before it that one or more of the jurisdictional thresholds has been met rather than reaching a conclusion on the balance of probabilities i.e. applying the civil standard of proof. In my judgment, the evaluation is akin to that which the Court must undertake when deciding to give leave for the issue and service of a writ out of the jurisdiction as provided for in Ord 11 r.4 (3): "No such leave shall be granted unless it shall *be made sufficiently to appear* to the Court that the case is a proper one for service out of the jurisdiction under this Order". [Italics supplied]

94. As noted above, Kawaley J expressed the view in paragraph [85] that in addition to its narrow duty to provide independent oversight designed to vindicate the statutory rights of all parties interested in a liquidation, the Court had a broader duty to uphold the integrity of the Cayman Islands' commercial law framework. This view echoes that of McMillan J expressed in paragraph 32 of his judgment, that where a contributory has suffered a very significant loss of its original investment, "it is particularly important … in order to maintain the reputation and standing of this jurisdiction that supervision should be ordered."

95. I hesitate to differ from these views in what may appear to be a quibble, but in my opinion, the Court's sole duty is to decide, bearing in mind the full width of paragraph (b) including the words "in the interests of the contributories", whether one or more of the jurisdictional requirements of s. 131 (b) has been established and to order accordingly. In other words, the standing of the Cayman Islands as an international financial centre is indirectly one of the objectives of s. 131 (b) and that objective is achieved by the Court evaluating the criteria in that provision in light of the evidence put before it.

96. Following the establishment of a jurisdictional threshold, the choice of which liquidators are to conduct the supervised liquidation is an exercise of discretion properly so called and where the Petitioner is the sole stakeholder in the liquidation, I agree with the view of Kawaley J that the Petitioner's choice of liquidator(s) ought generally to be respected. Given the discretionary nature of the decision as to who should be appointed liquidator, the decision ought only to be interfered with on appeal if the Court took into account an irrelevant matter or failed to take into account a relevant matter or is a decision that is outside the margin of appreciation appropriate in the circumstances.

97. The last eight words of paragraph (b) require the Court to have regard to the interests of the contributories and creditors. Where the company is solvent and the shareholders whose votes in general meeting procured the necessary resolution for the voluntary winding up are the sole shareholders with an interest in the winding up, there will be no question of one set of shareholders having an interest in the winding up that is superior to another set of shareholders, unless exceptionally there are disputant groups within the general body of shareholders, in which case the Court might have to decide whether one group's wishes should predominate over the wishes of the other. And since the company is solvent, the creditors' interest in the winding up will be of much lower (if any) significance than that of the contributories. Where, however, the company is an investment fund and the company is solvent so that all creditors will be paid, as is the case in these two appeals, the Managers with the entitlement to put the fund into the voluntary liquidation will have no financial stake in the winding up and the question arises as to the extent to which the Court in considering the requirements of paragraph (b) can and should have regard to the fact that the Participating Shareholders have the sole stakeholders in the winding up.

98. Mr Cogley submitted in the appeal that the Manager's exclusive entitlement under the Articles to put the fund into voluntary liquidation materially reduced what might otherwise be the significance of the fact that the participating shareholders had the sole economic and financial interest in the liquidation. In particular, he submitted that the nomination of a voluntary liquidator was exclusively the preserve of the Manager and he also argued that the wording of s. 131 (b) precluded the Court from having regard to the wishes of a party which had the sole interest in the liquidation when deciding whether a jurisdictional threshold had been met.

99. I reject these submissions. First, I agree with the view expressed by Kawaley J in paragraphs [35] and [36] of his judgment that the relationship between those holding the Management Shares in a fund and those holding the Participating Shares radically changes when the fund is contemplating the cessation of business and a voluntary winding up. The exclusive power conferred on the Manager to resolve to wind up the company is conferred not for their benefit but for the benefit of the Participating Shareholders who, under the Articles, have the predominant financial interest in the proposed winding up. Accordingly, the starting assumption should be that where the majority of the Participating Shareholders nominate a suitable voluntary liquidator, their wishes should be acceded to by the holder of the Management or Founder Shares. I am also of the view that, as a general rule in a solvent liquidation, the participation by a Manager in an application under s 131 (b) by Participating Shareholders should be measured and neutral, designed to assist the Court both as to whether a jurisdictional threshold has been met and as to who should be the liquidator. As Mr Allison QC for the Petitioners put it in argument, this is because the Manager has "no skin in the game". If a supervised liquidation might significantly delay or otherwise prejudice settlement of the Manager's claims as a creditor, the Manager will of course be entitled to argue against a supervised liquidation for that reason. And if the Manager's interest is to refute allegations made in the Petition that impugn the Manager's bona fides or business judgment, the Manager will be entitled to file evidence answering the Petitioner's allegations, but its stance on whether a

jurisdictional threshold is made out should nonetheless be measured, neutral and designed to assist the Court, as I have said.

100.    Turning to Mr Cogley's submission that the wording of s. 131 (b) precludes the Court from having regard to the wishes of a party which had the sole interest in the liquidation when deciding whether a jurisdictional threshold had been met, I agree with Kawaley J that the Court can have regard to such wishes but I do not endorse his view that the rigour of the Court's evaluative function is likely to be properly diminished where all the stakeholders speak with the same voice. In my opinion, the Court's regard for the general principle that liquidations ought to be conducted in the interests of those persons who are financially interested in the liquidation process must be lighter and more nuanced than Kawaley J appears to contemplate. The Court can take into account the view of the stakeholders in the liquidation[8] that they desire a supervised liquidation and that a threshold requirement for a supervision order has been met, but not at the expense of failing to undertake a full and careful assessment of all the objective factors that are in play in the application. Where these objective factors are finely balanced, the wish of the stakeholders to have a supervised liquidation may tip the decision in favour of their wish. But where those objective factors stand in clear contrast to the view of the stakeholders it would be wrong for the Court to accept the stakeholders' views as a reason for making a supervision order.

*The decision on the first appeal.*

101.    In my judgment, at a minimum, what fairness and due process called for in giving judgment on the Petition, was the identification of which jurisdictional bases provided for in s. 131 (b) were being upheld – more effective, more economic and/or more expeditious – and the reasons for so finding; see *Flannery v Halifax Estates Agents* [2000] 1WLR 377 at 381 G-H. Regrettably, McMillan J failed to meet this minimum requirement and accordingly I would hold that there is no alternative but to decide that his judgment must be set aside.

102.    Very properly, Mr Cogley accepted that if the Court were to reach the conclusion expressed in paragraph 101 above, it was open to the Court to make its own finding on the evidence before the judge at the hearing of the application. He went on to submit that, on the evidence, it is not open to the Court to find that any of the three requirements set out in s.131 (b) for the making of a supervision order can be established.

103.    Mr Cogley, submitted that the Petition was an abuse of process on the ground that its object and intent was to achieve the collateral purpose of the appointment of the FTI liquidators. I reject this submission. Notwithstanding that the Petitioner may not have applied under s. 131 when it did if AGAIM had appointed FTI as the voluntary liquidators, in the face of Manager's appointment of the BDO liquidators the

---

[8] It is the stakeholders who will incur any additional cost of a supervised voluntary liquidation.

Petitioner remained entitled to apply under s. 131 and thereby incur the burden of
establishing one of the requirements for the making of a supervision order[9].

104.     Mr Cogley next submitted that the Manager was exclusively entitled to appoint
the voluntary liquidators and given the work undertaken and proposed to be
undertaken by the GT liquidators, it was premature for a supervision order to be
made. If, subsequently, the voluntary liquidators needed the powers possessed by
official liquidators, they could apply for the conferment of such powers under s. 129
of the Law. In short, the advantage over a voluntary liquidation of a supervised
liquidation conducted by liquidators armed with the powers of official liquidators
could not be demonstrated as at the time of the s. 131 hearing.  Mr Cogley also
submitted that the Petition itself did not adequately plead proper grounds for a
supervised winding up.

105.      This submission I also reject. As I have held above, in this case the Manager's
power under the Articles to appoint voluntary liquidators was held for the benefit of
the Petitioner as sole stakeholder in the liquidation, with the consequence that
AGAIM, in the absence of compelling circumstances to the contrary (of which there
was none), should have appointed the Petitioner's nominees. And as I have also
already observed in paragraph 90  above, if a supervised liquidation is more suitable
than a voluntary liquidation as here because it has the immediate potential for
achieving a more thorough investigation, it will be more effective from the outset
than the current voluntary liquidation which lacks such potential. And where an
investigation is called for (as here) the appointment of official liquidators who cannot
be dismissed by resolution in a general meeting in place of voluntary liquidators who
can be so dismissed will immediately result in a more effective liquidation,
particularly where (as here) the Manager of a fund has appointed its own choice of
voluntary liquidators in defiance of the choice of the stakeholder or stakeholders in
the liquidation.

106.     I also reject the submission that the Petition itself did not adequately plead
proper grounds for a supervised winding up. The Petition is to be read with the
affidavits verifying its contents and so construed there were before the Court proper
grounds for a supervision order.

107.     In my judgment, as heralded above, there is a real need for an investigation
(pursuant to a supervised liquidation) into the affairs of APCF, including in particular
the reasons for the very significant losses sustained on the Petitioner's investment in
the Company and the actions of Mr Al Rajaan. For the reasons that follow, such a
liquidation would clearly, in my opinion, facilitate a more effective liquidation in the
interest of the sole contributory (here the sole stakeholder in the liquidation) than
the voluntary liquidation begun by AGAIM.  As official liquidators, the liquidators
would have the statutory power to apply to the court for an order to examine any

---

[9] Indeed, as recorded above, the Petitioner threatened to apply to wind up APCF on the just and equitable
ground if the Manager did not appoint the FTI liquidators as the voluntary liquidators, this being a ground that
can be relied on where there is the need for an investigation into the affairs of a company, see *In The Matter
of GFN Corporation Ltd* [2009] CILR 135 per Smellie CJ.

relevant person for the purpose of investigating the Company's affairs and to require directors and officers of the Company and its professional service providers to submit a statement verified by affidavit dealing with prescribed matters; and, if necessary, the liquidators will be able to seek recognition and assistance overseas. In addition, unlike the voluntary liquidators, official liquidators will not be dismissible by AGAIM and knowledge in the outside world of this independence will itself assist the liquidators make their enquiries thereby rendering the liquidation that more effective.

108.    I would therefore hold that this Court should order a supervised liquidation of APCF.

*The decision on the cross-appeal*

109.    The Petitioner applied to the Court to appoint the FTI liquidators as the sole liquidators to conduct the supervised liquidation sought from the Court. McMillan J declined to accede to this application and appointed the FTI liquidators in addition to the BDO liquidators. In paragraph 33 of his judgment, the judge said:

> Equally it is inappropriate to replace both of these JVLs with the Petitioner's nominees, given the serious loss of knowledge and expertise that this replacement would represent. A party who seeks the intervention of the Court will if it is successful then have to accept the consequence of that success. It is necessarily the Court which conducts the supervision and not the Petitioner or the Manager.

110.    In my judgment, the setting aside of McMillan J's judgment dated 27 February 2019 means that his order appointing the FTI liquidators in addition to the BDO liquidators also falls away. As conceded by Mr Cogley, it therefore falls to the Court to make to its own decision as to who should be the liquidators in charge of the supervised liquidation.

111.    In my judgment, the Court should appoint the FTI liquidators in place of the BDO liquidators to be the liquidators with conduct of the supervised liquidation. My reasons are these. First the Court should accede to the wishes of the Petitioner who is the sole stakeholder in the liquidation. Second, the appointment of the BDO liquidators would undermine the effectiveness of the supervised liquidation caused by an **appearance**[10] of partiality attaching to the BDO liquidators resulting from their original appointment by the Manager whose role in and conduct of the affairs of APCF will be one of the matters investigated.

112.    In case I am wrong to conclude that the order appointing all four liquidators to conduct the supervised liquidation falls away with the setting aside of McMillan J's

---

[10] As found by the judge, the BDO liquidators had acted with complete propriety throughout their conduct of the voluntary liquidation.

judgment, I shall consider whether the judge erred in law in exercising his discretion to appoint all four liquidators.

113.    In my judgment, McMillan J did err in law in exercising his discretion in appointing all four liquidators. My reasons are threefold. First, the judge failed to have regard to the line of authority supporting the proposition that liquidation proceedings, whether solvent or insolvent, should be conducted in the interests of those persons who are financially interested in the liquidation process, here the Petitioner which was the sole stakeholder in the liquidation. Secondly, he failed to take into account the negative impact on the effectiveness of the supervised liquidation caused by an appearance of partiality attaching to the BDO liquidators resulting from their original appointment by the Manager whose role in and conduct of the affairs of APCF was to be investigated. Thirdly, he failed to take into account the increased cost of having four liquidators rather than two. Fourthly, these failings taken together also meant that the judge's decision to appoint all four liquidators to conduct the supervised liquidation was manifestly outside the margin of appreciation available to him.

114.    In consequence of these matters, the judge's decision on the appointment of all four liquidators must be set aside and in substitution therefor I would propose that there be an order appointing only the FTI liquidators to conduct the supervised liquidation.

*The decision on the 2nd appeal*

115.    I unhesitatingly reject Mr Cogley's submission that Kawaley J proceeded on the basis that s. 131 (b) conferred on the Court the same broad discretion that was conferred by the former s. 150 of the Law. As recorded above, in [45] the judge stated that s. 131 does not confer a broad discretion and the Court must primarily determine whether the grounds are made out or not. It is true that in the last sentence of [45] the judge said that whether grounds for making a supervision order have been made out "involves judgments of a discretionary character" but I am quite satisfied the judge here was saying that the decision is of an evaluative character, as is borne out by his reference to the "Court's evaluative function" in the last two sentences of [49]. Further, in my judgment, Kawaley did not in fact proceed on the basis that he had broad discretion but instead conducted an evaluative exercise in determining whether which of the jurisdictional grounds provided for in s. 131 (b) had been made out

116.    As noted above, Kawaley J said in [79] that where an application is made under s.131 (b) by a sole investor with the objective of appointing more suitable official liquidators than the voluntary liquidators appointed in defiance of the investor's wishes, that objective by itself is a ground for concluding that a supervised liquidation will be more effective than a voluntary liquidation. Mr Cogley submits that the judge went on to adopt this approach in finding that a supervised liquidation would be more effective than the voluntary liquidation on foot and that this approach was wrong in law because the judge was impermissibly exercising a discretion and giving

disproportionate weight to the views of the Petitioner and no weight to AGAIM's views. Mr Cogley also submits that the Petition should have been dismissed as an abuse of the Court's process because it was presented for the collateral purpose of appointing the FTI liquidators in place of the GT liquidators.

117.     I reject these submissions. First, what Kawaley J said in [79] was not the sole reason the judge gave for his conclusion that a supervised liquidation would be more effective than the on-going voluntary liquidation. He gave other reasons as is clear from his judgment. Second, Mr Cogley's primary submission takes no account of the judge's reference to "more suitable official liquidators". Official liquidators would be more suitable because of the need for an investigation found by the judge which would be more effectively carried out pursuant to a supervised liquidation and because official liquidators would be seen to be independent whereas the voluntary liquidators had been appointed in defiance of the Petitioner's wishes and were dismissible by the Manager (ACPL) by an ordinary resolution passed in general meeting (see s. 121 (1) of the Law). As to Mr Cogley's abuse of process of argument, I reject this contention for the same reasons, *mutatis mutandis,* I gave for rejecting the same contention in the 1st appeal (see paragraph 103 above).

118.     Next, I reject Mr Cogley's submission that the judge erred in giving pre-eminent weight to the views of the Petitioner as to the identity of the liquidators. The Petitioner was the sole stakeholder in the liquidation and, as noted by Kawaley J, there is an abundance of authority for the proposition that that liquidation proceedings, whether insolvent or solvent, should be conducted in the interests of those persons who are financially interested in the liquidation process.

119.     I turn to Mr Cogley's submissions that: (i) the evidence adduced by the Petitioner at the hearing was insufficient to justify the judge's conclusion that the "more effective" jurisdictional ground in s. 131 (b) had been established; (ii) the judge erred in failing to find that on an immediate, "here and now" basis a supervised liquidation would facilitate a more effective, economic or expeditious liquidation.

120.     At the heart of these submissions was the contention that as matters stood at the time of the hearing, the GT liquidators had been carrying out a competent investigation into the concerns pleaded in the Petition without the need for the powers accorded to official liquidators and should they need additional powers they could apply to the Court under s. the 129 to determine any question arising in the voluntary winding-up and to exercise all or any of the powers which the Court might exercise if the company was being wound up under the supervision of the Court.

121.     I have already dealt with this contention in general in paragraph 88 above. In my opinion, a voluntary liquidation was less suitable than a supervised liquidation because of the immediate potential of the latter for achieving a more thorough and independent investigation and for that reason a supervised liquidation would facilitate a more effective liquidation than the voluntary liquidation currently on foot. A supervised liquidation would also be immediately more effective than the voluntary liquidation because official liquidators, who cannot be dismissed by resolution in a

general meeting, would conduct the liquidation in the place of the voluntary liquidators appointed by the Manager in defiance of the Petitioner's wishes, to carry out an enquiry into the way the Manager has managed the Company and the investments made by the Manager on the Company's behalf.

122.    I reject Mr Cogley's contention that Kawaley J's judgment should be set aside because the judge took into account McMillan J's decision to order a supervised liquidation in the APCF proceedings. In my view, Kawaley J was entitled to take McMillan J's decision into account, but even if he was not because of the paucity of reasoning in McMillan J's judgment, Kawaley J gave several other distinct and unchallengeable reasons for ordering a supervised liquidation.

123.    In a few instances I have differed from some of Kawaley J's general observations as to the principles in play when a Petition is presented under s. 131, but I am entirely satisfied that none of Kawaley J's specific findings on the Petition was crucially based on any of the few general observations with which I have disagreed.

124.    In my judgment, the cogent reasons Kawaley J gave for finding that a supervised liquidation should be ordered and the FTI liquidators appointed to conduct the same were compelling and involved none of the errors of law contended for on behalf of ACPL.

*Conclusions*

125.    For the reasons given above, I propose that:

(1) The 1st appeal (by AGAIM) be dismissed.

(2) The cross-appeal (by the Petitioner) be allowed.

(3) The 2nd appeal (by ACPL) be dismissed.

(4) Unless written submissions to the contrary are served by AGLAIM and ACPL within 10 days of the issuance of the Court's judgement herein, AGAIM should pay the costs of the 1st appeal and the cross-appeal; and ACPL should pay the costs of the 2nd appeal, such costs in each case to be taxed on the standard basis unless agreed.

**Morrison JA**

126.    I agree.

**Beatson JA**

127.    I also agree.