# EXHIBIT 7

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO. FSD 27 OF 2013 (IKJ)

IN THE MATTER OF THE COMPANIES ACT (2021 REVISION)

AND IN THE MATTER OF HERALD FUND SPC (IN OFFICIAL LIQUIDATION)

IN CHAMBERS

| | |
|---|---|
| Appearances: | Mr Matthew Goucke and Mr Jonathan Turner of Walkers on behalf of the Principal Liquidators |
| | Mr Colm Flanagan, of Nelsons on behalf of the Liquidation Committee |
| Before: | The Hon. Justice Kawaley |
| Heard: | 8 March 2021 |
| Draft Ruling Circulated: | 25 March, 2021 |
| Ruling Delivered: | 1 April 2021 |

### HEADNOTE

*Joint official liquidators' costs and expenses-application for Court approval opposed by Liquidation Committee-governing principles- Companies Act (2021 Revision), sections 109(2), 115(1)-Insolvency Practitioners Regulations 2018, regulations 10-13-Companies Winding Up Rules 2018, Order 25 rule 3(2)*

### RULING ON FEE APPROVAL APPLICATION

**Introduction**

1. By Summons dated January 14, 2021, the Principal Liquidators sought approval for their fees for the period March 1, 2020 to August 31, 2020 (the "Relevant Period"). The application was

supported by the Nineteenth Affidavit of Russell Smith and approval was sought for fees and disbursements totalling US$805,909.60 (excluding legal fees). Walkers' legal fees for the Relevant Period amounted to US$442,805.03. These sums viewed in isolation seem large. The Principal Liquidators invited the Court to have regard to the fact that in the course of the Relevant Period in excess of US$123 million was distributed to stakeholders, with the lion's share being distributed to a small group of large shareholders including all of the members of the Liquidation Committee.

2. At the beginning of the hearing, I indicated that my initial impression was that the objections to the application appeared to be motivated by the Committee's perception that the Principal Liquidators had failed to pay due regard to their views as to what scope of work was properly required. The objections themselves lacked coherence and seemed somewhat artificial. The application appeared to me to raise for adjudication the broader question of the extent to which official liquidators are required to seek the approval of or tacit support from the Liquidation Committee when defining the scope of their operational functions and, consequentially, incurring liquidation costs and expenses.

3. Both the objections and the wider liquidation governance question fall to be determined within the statutory framework of Cayman Islands liquidation law.

**Legal findings: statutory framework**

**Companies Act (2021 Revision) ("Act")**

4. The relevant provision on remuneration in the Act is section 109:

> " *Remuneration of official liquidators*
>
> *109. (1) The expenses properly incurred in the winding up, including the remuneration of the liquidator, are payable out of the company's assets in priority to all other claims.*
>
> *(2) There shall be paid to the official liquidator such remuneration, by way of percentage or otherwise, that the Court may direct acting in accordance with rules made under section 154; and if more liquidators than one are appointed such remuneration shall be distributed amongst them in such proportions as the Court directs.*"

5. At the primary legislation level, the Court alone is empowered to approve remuneration in general terms, but the detail is left for rules to prescribe.

6. The broader statutory context is directly relevant to the underlying "dispute" about the respective roles of the Principal Liquidators and the Committee as regards whether official liquidators can, subject to this Court's ultimate supervision, define for themselves the scope of their mission. However, this broader statutory context is indirectly relevant to the construction of the remuneration approval jurisdiction as it indirectly informs how the remuneration approval provisions should be understood. The following subsections of section 110 of the Act ("Functions and powers of official liquidators") are pertinent in this regard:

> "**110**. *(1) It is the function of an official liquidator —*
>
> *(a)   to collect, realise and distribute the assets of the company to its creditors and, if there is a surplus, to the persons entitled to it; and*
>
> *(b)   to report to the company's creditors and contributories upon the affairs of the company and the manner in which it has been wound up.*
>
> *(2) The official liquidator may —*
>
> *(a)   with the sanction of the Court, exercise any of the powers specified in Part I of Schedule 3; and*
>
> *(b)   with or without that sanction, exercise any of the general powers specified in Part II of Schedule 3.*
>
> *(3) The exercise by the liquidator of the powers conferred by this section is subject to the control of the Court, and subject to subsection (5), any creditor or contributory may apply to the Court with respect to the exercise or proposed exercise of such powers (hereinafter referred to as a 'sanction application')."*

7. That the main function of an official liquidator is to "collect, realise and distribute the assets of the company to its creditors and, if there is a surplus, to the persons entitled to it" is the overarching statutory definition of an official liquidator's mission. This much is obvious and uncontroversial.

8. It also ought to be obvious and uncontroversial that the liquidator's powers under Part I of Schedule 3 are exercisable "with the sanction of the Court" and that the powers under Part II of

that Schedule are exercisable "with or without that sanction". The Liquidation Committee has no statutory power of sanction at all. The Liquidation Committee has no statutory function under the primary legislation at all. I remind myself of these basic provisions, because they reflect a different approach to that adopted in my "mother" insolvency law regime.

9. Section 175 of the Bermudian Companies Act 1981 distinguishes between liquidators' powers which are exercisable:

   (a)   "*with the sanction either of the Court or of the committee of inspection*" (section 175(1)); and

   (b)   without any sanction at all (section 175(2)); and

   (c)   the powers which require a sanction correspond broadly to Schedule 3 Part I powers, while the powers which do not correspond broadly to Schedule 3 Part II powers. However, Part II is in some respects a more modern provision and confers broader express powers on official liquidators which do not require sanction than under the corresponding Bermudian 1948 UK Companies Act-derived provisions.

10. Official liquidators can most pertinently exercise the following powers without sanction of the Court or the Committee under Part II of Schedule 3 of the Act:

    > "*1. The power to take possession of, collect and get in the property of the company and for that purpose to take all such proceedings as that person considers necessary.*"[1]

11. Although the Liquidation Committee has no express statutory role under the Act, section 115 provides:

    > "*(1) The Court shall, as to all matters relating to the winding up, have regard to wishes of the creditors or contributories and for that purpose it may direct reports to be prepared by the official liquidator and meetings of creditors or contributories to be summoned.*"

12. Moreover section 110(3) of the Act provides that an official liquidator's powers, in addition to being subject to control by the Court, are also indirectly subject to challenge by creditors or contributories: "any creditor or contributory may apply to the Court with respect to the exercise

---

[1] The Court's sanction <u>is</u> required under Part I "*to bring or defend any action or other legal proceeding in the name and on behalf of the company*".

or proposed exercise of such powers". So although the Liquidation Committee has no express statutory role in sanctioning the exercise of liquidators' powers in the ordinary course of a liquidation, it arguably has standing to challenge the proposed exercise of a liquidator's powers.

13. However, it is to subsidiary legislation that one must turn to discern the statutory functions of the Liquidation Committee.

**Companies Winding Up Rules 2018 ("CWR")**

14. The CWR provide for, inter alia, the establishment of the Liquidation Committee (Order 9, rule 1), its membership (Order 9 rule 2), the official liquidator's duty to report (Order 9 rule 4) and the proceedings of the Committee (Order 9 rule 5). Although the Committee may pass resolutions, it has no express or implied power to bind an official liquidator by its decisions. The primary express obligation of the liquidator is to inform the Committee; the primary implied obligation is to consult with the Committee. For example, Order 9 rule 4 provides:

> *"(1) It is the duty of the official liquidator to report to the members of the liquidation committee all such matters as appear to him to be, or as the members have indicated to him as being of concern to them with respect to the winding up.*
>
> *(2) The official liquidator need not comply with a request for information where it appears to him that –*
>
> *(a) the request is frivolous or unreasonable;*
>
> *(b) the cost of complying would be excessive, having regard to the relative importance of the information; or*
>
> *(c) there are not sufficient assets to enable him to comply…"*

15. The Committee's function under the CWR appears to be consultative one. However, this role is not an insignificant one, because the primary function of an official liquidator is to discharge the company's obligations to its stakeholders and it is a general principle of company law that those interested in a company are generally the best judges of where their best interests lie. This principle underpins section 115(1) of the Act cited above. Official liquidators will generally seek to obtain the support of the Liquidation Committee for any important decisions in the liquidation. By way of analogy, the trustee of a discretionary trust considering exercising an unfettered

discretion will, in relation to important and potentially controversial matters, consult with the beneficiaries (even if they are strictly only mere objects of a discretionary power) and seek to obtain their support.

16. As the Walkers fees were initially challenged, mention must be made of the rule which underpins the practice of official liquidators not seeking Court approval of their attorneys' fees. CWR Order 25 rule 2 provides:

> "(2) If the official liquidator or the liquidation committee consider that the amount of fees and expenses charged by the official liquidator's lawyer is excessive, the official liquidator may require that such fees and expenses be taxed on the indemnity basis by the taxing officer."

**Insolvency Practitioners Regulations 2018 (the "Regulations")**

17. The Regulations are most directly relevant to the present remuneration approval application. Regulation 10 enunciates the dominant principle reflective of the position under section 109(2) of the Act:

> "(1) Subject to paragraph (2), an official liquidator is not entitled to receive any remuneration out of the assets of a company in provisional or official liquidation (including liquidation under the supervision of the Court) without the prior approval of the Court."

18. Regulation 12 ("Consideration of Remuneration by the Liquidation Committee") provides most importantly as follows:

> "(1) An official liquidator may not make an application to the Court under Regulation 13 without first:-
>
> (a) seeking the liquidation committee's approval of the basis of his remuneration and the amount of the remuneration for which he intends to seek the Court's approval; or, if there is no liquidation committee
>
> (b) convening a meeting of creditors and/or contributories in accordance with CWR Order 8 at which the official liquidator proposes a resolution approving the basis of his remuneration and the amount of the remuneration for which he intends to seek the Court's approval; or

> *(c) complying with the requirements of any international protocol (insofar as it relates to the official liquidator's remuneration) which has been approved by both the Court and a foreign court.*
>
> *(2) The official liquidator shall prepare a report and accounts containing all the information reasonably required to enable a creditor or contributory to make an informed decision about the reasonableness of the proposed basis of remuneration and amount for which the official liquidator intends to seek the Court's approval…"*

19. Regulation 13 ("*Application to Court*") provides in salient part as follows:

> *"(1) An application by an official liquidator for approval of his remuneration shall be made by summons in CWR Form No 16 and shall be served on –*
>
> *(a) each member of the Liquidation Committee ; or*
>
> *(b) counsel to the Liquidation Committee, if an attorney has been appointed by the liquidation committee with authority to act generally…"*

20. The scheme of the Regulation clearly envisages as a starting assumption, that the basis of remuneration and the actual remuneration received by official liquidators will be approved by the Liquidation Committee. Applications for approval of remuneration (or the basis of remuneration) cannot be made without first seeking the Committee's approval. This statutory scheme arguably, by necessary implication:

    (a) enables the Court to place considerable reliance on the commercial judgment of the Committee when it has approved a liquidator's fees; and

    (b) requires the Court to scrutinise a remuneration application far more closely when such approval has been positively withdrawn by the Committee.

21. What is somewhat unclear, in terms of a preliminary analysis, is the breadth of the Committee's "reasonableness" assessment jurisdiction, taking into account the wider statutory context in which substantive decision-making by the liquidators does not require the Committee's positive approval. Common sense suggests that the Committee must be able to complain that the amount of remuneration claimed is unreasonable both by reference to:

(a) the amount of time spent on a particular task relative to the corresponding benefit to the estate (assuming that the relevant work-stream was itself a reasonable one); and

(b) the fact that it was unreasonable to pursue a particular work-stream at all.

22. On the other hand it must be doubted that it is possible to establish any form of "unreasonableness" without meeting a test analogous to the public law test; otherwise both the Committee and the Court, at the first and second level stages of approval respectively, would be required to undertake a disproportionately detailed scrutiny of each fee approval application.

**Relevant judicial decisions**

23. The Principal Liquidators placed various relevant authorities before the Court. Mr Flanagan for the Committee relied on two apposite passages from the Chief Justice's decision in Re Sphinx, FSD 16 of 2009 (ASCJ), Judgment dated November 13, 2012 (unreported)[2]. Firstly:

> "10. *In circumstances where the approval of the LC is not forthcoming, the JOLs bear the burden of proving that the remuneration sought is reasonable and justified.*"

24. This principle was not controversial. At paragraph 18 of the same Judgment, Smellie CJ cited with approval dicta from Mirror Group Newspapers [1998] BCC 324 at 333-334 (Ferris J):

> "*Thirdly, the test of whether office-holders have acted properly in undertaking particular tasks at a particular cost in expenses or time spent must be whether a reasonably prudent man faced with the same circumstances in relation to his own affairs, would layout or hazard his own money on doing what the office-holders have done. It is not sufficient, in my view, for office-holders to say that what they have done is in the scope of the duties or powers conferred upon them. They are expected to deploy commercial judgment, not to act regardless of expense. This is not to say that a transaction carried out at high costs in relation to the benefit received, or even an expensive failure, will automatically result in the disallowance of expenses or remuneration. But it is to be expected that transactions having these characteristics will be subject to close scrutiny.*"

25. The application of this principle to the facts of the present application was not entirely straightforward. Firstly, as Mr Goucke pointed out, most of the controversial expenses had been incurred in pursuing a recovery action the outcome of which it is impossible presently to assess.

---

[2] It is noted at [2012 (2) CILR Note 11].

> Secondly, what was in issue here was not as serious as a case of alleged acting "regardless of expense". Controversy essentially centred on whether the Principal Liquidators' commercial judgment as to liquidation strategy trumped that of the Committee.

26. Mr Goucke referred to a receivership case, Perry and Perry-v-Lopag Trust Reg. et al, FSD 205 of 2017(NSJ), Judgment dated April 20, 2020. In that case Segal J (at paragraph 23) applied the principles applicable to insolvency officeholders under the Regulations to a receivership fee approval dispute. Mr Goucke submitted that the detailed criticisms of the expenses in that case were to be contrasted with the less specific criticisms made in the present case.

### The Liquidation Committee's Objections

### Background

27. The Company was wound up by Order dated July 16, 2013 for the reasons explained by Andrew Jones J in Re Herald Fund SPC, FSD 27 of 2013 (AJJ), Judgment dated January 16, 2013 (unreported). The Petition was presented by Primeo Fund (in Liquidation). Jones J explained (at paragraph 1):

> *"….I concluded that it was just and equitable to make this order on the basis that Herald has lost its substratum in the sense that it became practically impossible to carry on its business in accordance with the reasonable expectations of its participating shareholders when it was discovered that the whole of its invested assets had been lost in the Madoff Ponzi scheme."*

28. On July 23, 2013, Messrs Russell Smith and Niall Goodsir-Cullen were appointed as Principal Liquidators and Mr Michael Pearson was appointed as Additional Liquidator to deal with, inter alia, the question of whether the Company's register of members should be rectified and the "December Redeemer" issue. Seeking to recover assets lost in the Madoff Ponzi scheme was the most significant overarching liquidation goal. And even before the liquidation commenced, in 2009, the Company had commenced proceedings in Luxembourg against 'HSSL'. It was in large part based on a preliminary judicial view that significant value should be attached to this claim, together with the Company's claim into the estate of BLMIS (Mr Madoff's company) in the US, that Jones J (in an unreported Ruling dated January 28, 2014) invited the Principal Liquidators to reconsider their initial view that the company's solvency was doubtful.

The Principal Liquidators ultimately concluded that the Company was solvent (filing a Certificate of Solvency on February 6, 2014) and the Liquidation Committee was constituted on that basis on the same date. The Committee's present members are:

(a)     Primeo Fund (in Official Liquidation) ("Primeo"), an approximately 31% shareholder;

(b)     FF Investing Ltd ("FFI"), an approximately 18% shareholder;

(c)     Natixis SA ("Natixis"), an approximately 7% shareholder; and

(d)     Herald Structured Funds SPC (in Voluntary Liquidation) ("HSF"), an approximately 2% shareholder.

29. The December Redeemer issue was resolved by Jones J and the Court of Appeal in favour of Primeo. It was held that Primeo's shares had been redeemed on December 1, 2008. The Privy Council (on July 6, 2017 in Pearson-v-Primeo Fund [2017] UKPC 19) dismissed the Additional Liquidator's appeal and held that Later Redeemers (including Natixis) were only entitled to file ordinary contributories' claims.

30. The rectification issue was finally determined by the Judicial Committee of the Privy Council on January 28, 2020: Herald Fund SPC-v- Primeo Fund (in Official Liquidation) [2020] UKPC 3. Jones J held that section 112(2) of the Companies Act did empower liquidators to rectify the register of members, as the Principal Liquidators contended. The Court of Appeal held that it did not, as Primeo contended (representing the interests of members which were aligned with that legal position). The Privy Council upheld the Cayman Islands Court of Appeal, although Lady Arden (in a separate and complex concurring judgment) opined that the power to rectify might be available on different facts.

31. The Principal Liquidators entered the Third Remuneration Agreement with each member of the Committee with effect from January 1, 2019. The most recent Fee Approval application by the Principal Liquidator was heard on September 2, 2020. It related to the period September 1, 2019 to February 29, 2020 and sought approval for US$797,262.87. An oral hearing took place because the Liquidation Committee declined to approve or comment on the application which they were invited to approve in advance of the application for Court approval.

32. Although the Committee had not positively opposed the application, the Principal Liquidators prudently requested an oral hearing which the Committee was at liberty to attend but elected not

to attend. I approved the application after Mr Goucke established that not only had no questions been raised by the Committee, but also that, taking a high level view, the liquidation had been an extremely efficient one when the costs incurred to date were measured against the returns to stakeholders. In approving that application on September 2, 2020, I observed that based on page 49 of the Principal Liquidators' 21st Report, the Principal Liquidators' overall liquidation costs (to September 30, 2019) amounted to US$47,431,384 as against total recoveries of US$666,950,268. By my own estimations the Principal Liquidators' fees and expenses, as a percentage of recoveries, came to roughly 7% of what had been realised. I regard this as a powerful indicator that the Principal Liquidators have established a strong record of producing returns for the investors in a cost-efficient manner over a period of over 7 years.

33. It is against this background that the present Fee Approval application, which the Committee did positively oppose, falls to be determined.

**The Fees Application summarised**

34. The main work-streams were as follows:

    (a) advancing the multi-billion dollar claim against HSSL;

    (b) reviewing the Privy Council Rectification Judgment, preparing for and making the fourth interim distribution "*to 224 of Herald's investors over eight tranches*";

    (c) communication with stakeholders;

    (d) reporting to the Court;

    (e) accounting, banking and compliance.

35. The legal work done was summarised and explained with appropriate detail. The supporting affidavit records why the Principal Liquidators considered a particular sub-issue relating to the HSSL claim was important and refers to an estimate of $400,000 provided to the Committee by email dated February 29, 2020 for work spanning the first half of the Relevant Period. In a call on March 17, 2020, a specific estimate for a related issue was provided to the Committee of $170,000. The following day the Liquidation Committee expressed concern about the new work-

stream stating that it was accepted that there was some benefit to it but would not agree to "the incurring of significant costs in pursuing this matter, including by travelling extensively".

36. These observations are, in hindsight, somewhat ironic in one respect. Four days later, the Cayman Islands border was closed because of the Covid19 pandemic and the possibility of "travelling extensively" was taken off the table. The timing of the disagreement as to litigation strategy was unfortunate in another respect. Not only was a period of unprecedented commercial and personal uncertainty unfolding across the globe, but the "new normal" made impossible what was most likely to breach any developing impasse; a face to face meeting, coupled with an informal social event. The sort of interaction which in my experience is indispensable for building a sense of camaraderie between a committee and the liquidators.

37. On April 9, 2020, the Principal Liquidators responded by email explaining that they were preparing a "detailed document", which came to be known as the "Walkers Memorandum". On April 15, 2020, the Committee (or the non-Primeo members thereof) asked for a "formal proposal, with a budget" to be approved by the Liquidation Committee. The Principal Liquidators apologised for not forwarding the requested information on May 22, 2020, explaining that they had narrowed the work-stream focus, and were busy working on the distribution.

38. On July 2, 2020, the Walkers Memorandum, which recommended various steps in relation to the Luxembourg proceedings, was forwarded to the Committee. This led to a further call following which the Committee recorded their understanding (on July 20, 2020) that further steps would be placed on hold pending confirmation that the liquidators believed they were likely to obtain "substantive new information". The Principal Liquidators quickly responded that this was not the position, and identified which work-streams they were actively pursuing. On July 29, 2020, the Committee reserved the right to object to the work-streams on the basis that they did not understand their relevance to the Luxembourg proceedings. On August 11, 2020, the Principal Liquidators agreed to defer some but not all of the work-streams the Committee objected to. The Principal Liquidators also agreed to a new, monthly fee reporting schedule.

39. It is clear that there was disagreement as a matter of principle as to whether or not the Committee was entitled to effectively veto steps the Principal Liquidators wished to take in relation to managing litigation being pursued to recover assets for the liquidation estate. The 19th Affidavit of Russell Smith responded to specific complaints in the "Objection Emails" as follows:

(a) in relation to duplication of costs on matters dealt with by the Additional Liquidator as well, it was asserted that (1) a *de minimis* amount of costs (less than US$4,000 was incurred in relation to the Primeo Rebate claim at the request of Primeo, (2) US$17,000 were incurred in relation to the Representative Proceedings, mostly after the Privy Council decision and (3) "limited costs" were incurred in relation to the Alpha Prime *in specie* transfer to determine Alpha Prime's shareholding in the Company;

(b) in relation to "generally excessive" items, the Principal Liquidators asserted that (1) incurring US$84, 000 of costs on distributing over US$123 million during the Relevant Period, was clearly "*necessary and proportionate*", (2) compliance costs of US$56,000 with significant "JOL/Senior Manager" input was justified, taking into account Cayman Islands regulatory and compliance requirements, (3) while 8% of the fees claimed were attributable to fee reporting, this was slightly less than the 9% claimed in the previous two periods. There would be some increase due to the new monthly fee reporting the Committee had requested, and (4) it was necessary to review a pleading filed in foreign proceedings based on legal advice.

40. The First Affidavit of Michael Linn, who represents FFI on the Committee, somewhat surprisingly, deposed that "the Principal Liquidators should re-formulate their application for fee approval and explain why the fees are appropriate". It does not, however, expressly respond to the 19th Russell Smith Affidavit, which was sworn only nine days' earlier. However, the Committee's evidence essentially relies on the points previously advanced in the Objection Email of December 18, 2020, which complained about:

(a) "*the majority of*" expenditure by the Principal Liquidators and their lawyers on the Walkers Memorandum;

(b) "*the majority, if not all*" of liquidator and legal fees on five work-streams in relation to the HSSL claim; and

(c) The "*generally excessive*" and duplicative specific items mentioned above.

41. Based on the presumed validity of these complaints, it is averred that the Principal Liquidators have adopted a "broad and unfocussed" approach to the seemingly inactive Luxembourg proceedings.

**The respective submissions**

42. The respective submissions essentially built on the points addressed in evidence and advanced supportive legal submissions. There was one significant departure. When I put to Mr Flanagan

that the Court does not ordinarily approve the fees of a liquidator's lawyers, he indicated that he was not going so far as to challenge Walkers' fees. Mr Goucke on oral argument additionally pointed out that the estimates provided for the relevant work were never exceeded and explained that the apparent inactivity in the Luxembourg proceedings was largely attributable to the different procedural framework in that legal system. The face value of the claim was a multi-billion dollar one, and the recent developments in parallel proceedings (in which the Company was not a party) only served to fortify prior assessments about the fundamental merit of the HSSL claim.

43. The most important broad point that the Liquidation Committee's written Outline Submissions made clear was that the central complaint was one of scope of work, as opposed to the unreasonableness of individual line items. For instance:

> "24. <u>These workstreams were much wider than the narrow scope approved</u>, in particular by i) the undertaking of various "further" analysis and ii) a very detailed memorandum of advice being produced by Walkers.
>
> 25. It would be disproportionate for the Court or indeed the LC to go through each fee report for each fee earner in detail…
>
> 27. This work was also carried out in circumstances where the LC had, again, on 15 April 2020, expressed its view that the Principal Liquidator should not carry out the wider exercise which the Principal Liquidators had again sought to propose on 9 April 2020 involving, for example, in person meetings with the Trustee and then former Herald directors." [Emphasis added]

44. However, the Committee's submissions do not advance any explicit legal basis for the central thesis that the Principal Liquidators could only properly incur costs on work-streams which the Committee had "approved".

**Findings: merits of the Liquidation Committee's objections**

**Summary of legal principles**

45. Understanding the extent to which a Liquidation Committee may constrain exercise of an official liquidator's powers requires the sort of nuanced analysis which is required to understand the largely unwritten British Constitution. How the formal legal rules operate in practice is heavily influenced by non-binding conventions.

46. The Liquidation Committee's sole express statutory function is to assess the "reasonableness" of a liquidator's fees. I find that by necessary implication, such an assessment may take into account the "reasonableness" of the proposed exercise of powers, including an evaluation of whether it is useful to take certain steps at all. As Smellie CJ in Re Sphinx FSD 16 of 2009 (ASCJ), Judgment dated November 13, 2012 (unreported), approved the following statements in the earlier case of In Re Liberty Capital [2002 CILR 606] (Smellie CJ, Sanderson J and Henderson Ag J):

> "57. The liquidator must exercise his own best judgment and determine what has to be done and how to do it most effectively. In the liquidation field, he has extraordinary discretion and latitude. The liquidator must therefore satisfy the court (to which he is by law accountable, in the interests of the creditors and shareholders), as its officer, that the time spent is reasonable in the circumstances, is necessary, and has achieved a useful result."

47. The combined effect of section 110(3) of the Act (which allows creditors or contributories to challenge the proposed exercise of a liquidator's powers) and the statutory role of the Committee under the Regulations is as follows. Although the Committee has no positive legal right to approve what a liquidator proposes to do, whether in relation to litigation strategy or otherwise, the convention is for an official liquidator to seek Committee approval for all significant liquidation decisions and/or all significant incurring of costs. Because the jurisdiction to sanction the exercise of liquidators' powers is vested in the Court, liquidators should ordinarily seek prospective Court sanction for any significant actions which the Committee either:

(a)    clearly does not support; or

(b)    clearly opposes.

A Fee Approval application ought not ordinarily to be the context in which the Court is retrospectively invited to approve high-level policy or operational level strategic decisions made by official liquidators. The reasonableness of fees should, in the ordinary case, be determined by reference to cost incurred in relation to work-streams the general pursuit of which has been informally approved by the Committee or formally approved by the Court. An operational strategic decision made by the liquidators within the rubric of furthering a legitimate liquidation purpose should not be impugned, in the fees context, unless the decision can fairly be said not to be a rational one. The decision to incur the fees would not be rational if the work done was either not "reasonable in the circumstances", not "necessary" or "achieved [no] useful result".

Experience suggests in any event that 21st century professional liquidators have a vested commercial interest in demonstrating their ability to meet the expectations of their stakeholders and to achieve commercially palatable practical results.

48. Applying this test, it will in appropriate cases be necessary for the Court to disallow legal fees. However, the standard practice is that liquidators approve the fees of the advisers they retain. This has a legislative basis. CWR Order 25 rule 2 provides that where the liquidator or the Committee consider that lawyers' fees are excessive, the liquidator may have them taxed. In some cases taxation might not be the appropriate remedy, for instance if a contributory or creditor was challenging the need to hire a lawyer to file a time-barred claim, or the need to hire a lawyer in Japan to advise on a claim in another jurisdiction which had no Japanese connections whatsoever. In the real world, this Court is unlikely to be often properly required to consider the reasonableness of a liquidator's lawyer's fees in the context of a Fee Approval Application.

**Legal expenses**

49. The challenge to the Principal Liquidators' legal expenses, which were not formally part of the present approval application at all, was sensibly not pursued at the hearing. To the extent that it was contended by the Committee that the fees were excessive, the appropriate venue for that complaint was a taxation hearing pursuant to CWR Order 25 rule 2. To the extent that the Committee challenged the allocation of work between different lawyers in different jurisdictions and the timescale within which the work was done, the Principal Liquidators have satisfied me that their strategic decisions fall within the range of decisions which reasonable liquidators might reach. Most notably, there is nothing remarkable about the proposition that the question of what knowledge should be imputed to the Company's directors should be governed by Cayman Islands law irrespective of the litigation forum in which the substantive claim is being pursued. Also, based on my recent experience with an unrelated manner, it is not surprising that pace of litigation in a civil law jurisdiction is somewhat slower than one is entitled to expect in the common law world.

**The HSSL work-streams**

50. The Principal Liquidators' litigation strategy is obviously confidential and has accordingly been described herein in general terms. It requires nuanced commercial and legal judgments to be made on a range of complex matters. The Principal Liquidators have already obtained this Court's tacit sanction for pursuing the umbrella work-stream in the context of previous ex parte Fee Approval Applications where the relevant fees were either approved by the Committee or not positively opposed. There is no suggestion that the Committee doubts the fundamental viability of this potentially huge claim. The Principal Liquidators have satisfied me that the strategic decisions which they have made are sufficiently rational to render the Committee's criticisms of their judgment moot, for the purposes of the present Fee Approval application.

51. The Committee is accordingly entirely justified in seeking to ensure that the Principal Liquidators do indeed "deploy commercial judgment not to act regardless of expense". The Committee and the Principal Liquidators appear to have struck the right balance with the recently fortified budget and reporting regime, even though this may increase the reporting costs somewhat. It is true that, left unbridled, litigation costs (particularly in high value cases) can become like a runaway horse. It is, at the present stage, somewhat difficult to reach a firm judgment of precisely what the likely recovery will be; hence assessing the value of particular steps is inherently difficult. This further justifies the Committee's desire to tighten the budgetary controls. On the other hand, a horse that is bridled too tightly may fall before reaching the final fence. The Official Liquidators and their lawyers cannot be second-guessed on every minor operational judgment which they make. This is not a small 'tin pot' case. The specific line items which have been questioned by the Committee were all satisfactorily explained in the context of a Relevant Period in which over US$123 million was distributed to stakeholders. The Committee's opposition to the present application can only be viewed as intended to send a symbolic message about the need for financial discipline rather than to advance a hard-nosed financial critique of the costs incurred in the Relevant Period. This view is supported by the following concluding statement in the Committee's Outline Submissions:

> *"56. Based on the material provided to date, the Principal Liquidators have not demonstrated such justification, or proportionality, as such this fee application should either be rejected, or the Principal Liquidators should be given sufficient time (without incurring further costs to the*

> *estate) to reformulate their application in a manner which permits the LC and the Court to properly consider whether the fees are justified and proportionate.*"

52. With respect, this makes no or little sense. The Affidavit supporting the present Fee Approval Application runs to more than 70 pages. The Exhibit runs to over 600 pages. The Principal Liquidators' Submissions run to 20 pages, and the Fee Reports themselves run to 15 pages. Overall the material placed before the Court by the Principal Liquidators, in part designed to respond to the objections of the Liquidation Committee, was more detailed than the previous applications I have dealt with in this matter. The Liquidators have calmly and coherently explained their work and responded to the objections in a straightforward and easily understandable manner. The Committee, comprised of sophisticated investors, seems to have strained to advance a credible critique and only succeeded in making somewhat artificial complaints. I accordingly grant the following relief on the Principal Liquidators' January 14, 2021 Summons, subject to hearing counsel if required as to costs:

    (1)  The fees of the Principal Liquidators for the Period 1 March 2020 to 31 August 2020 as set out in the Nineteenth Affidavit of Russell Smith sworn herein be approved and paid out of the assets of the Company.

    (2)  All costs of and incidental to this Summons be paid out of the assets of the Company as an expense of the litigation.

**Conclusion**

53. Mr Goucke complained that the Liquidation Committee seemed to want to micro-manage the liquidation. This complaint seems, to some extent at least, justified. In my judgment, micro-management of complex high-value commercial litigation is only likely to undermine the efficacy of recovery actions against sophisticated defendants who can be expected to spare no expense in defending such claims. The Committee's true statutory function is, in my judgment, limited to high-level approval of work-streams coupled with practical commercial assessments of regular budgets and fee reports. What precise balance ought to be struck in the interactions between the Principal Liquidators and the Committee is quintessentially a matter to be determined by the parties. The appropriate working relationship, however, should surely be informed more by

creating a spirit of trust and confidence between the key human actors than by the mechanical application of abstract legal principles. The goal should in my judgment be a consensus-driven approach rather than bluntly asking "who's in charge?" I do not ignore the fact that cultivating the right human chemistry in the business arena is particularly challenging in the present Pandemic era.

54. The Fee Approval Application is granted. I would respectfully encourage the Principal Liquidators and the Committee to use their best endeavours to establish or rekindle an effective and cordial working relationship as that is no more than what the common interests which they serve require.



_____
**THE HON. JUSTICE IAN RC KAWALEY**
**JUDGE OF THE GRAND COURT**