# EXHIBIT 9

[2003 CILR 211]

WIGHT, PILLING and MACKEY v. ECKHARDT MARINE G.m.b.H.

JUDICIAL COMMITTEE OF THE PRIVY COUNCIL (Lord Hoffmann, Lord Nolan, Lord Hobhouse of Woodborough, Lord Scott of Foscote and Lord Walker of Gestingthorpe): May 14th, 2003

Conflict of Laws—companies—compulsory winding up—proper law of debt—foreign proper law of original debt remains constant and not changed by winding-up order for debtor company in Cayman Islands—no new right to participate in Cayman winding up if debt already discharged under proper law

Companies—compulsory winding up—creditors—to participate in distribution, creditor must be creditor at date of distribution—no entitlement under principle of pari passu distribution for creditor at date of order to participate in distribution if debt since discharged

   The respondent applied to the Grand Court to set aside liquidators' rejection of its proof of debt.

   The respondent entered a contract of sale, the performance of which was guaranteed by the Bangladeshi branch of BCCI (Overseas), a bank incorporated in the Cayman Islands. When the purchaser defaulted on the contract, the respondent demanded payment from the bank on the guarantee. In the meantime, however, the Bangladeshi Government had closed the bank and it therefore did not honour the guarantee. The respondent commenced proceedings against the bank in Bangladesh.

   A winding-up order against BCCI(O) was made in the Cayman Islands and the respondent subsequently filed a proof of debt in respect of the guarantee. The Bangladeshi Bank, in the exercise of its statutory powers, then imposed a reconstruction scheme establishing a new bank which assumed all the liabilities of BCCI(O) and all legal proceedings against BCCI(O) were deemed to be against the new bank. The respondent's proof of debt was rejected by the liquidators on the basis that, pursuant to the reconstruction scheme, all claims against the Bangladeshi branch of BCCI(O) had been assumed by the new bank.

   On appeal to the Grand Court (Murphy, J.), the court dismissed the application, stating that the respondent's claim failed because under Bangladeshi law—the law of the *situs* of the debt and the proper law to be applied—the claim had been extinguished.

   On further appeal, the Court of Appeal reversed the Grand Court

2003 CILR 212

decision and held that the validity of the debt was governed not by its proper law, but by its *situs.* The *situs* of the debt had originally been Bangladesh, but when the winding-up order was made, the debt became a claim to participate in the distribution of assets in the Cayman Islands, the *situs* of that claim being the Cayman Islands. It was not therefore affected by the Bangladeshi scheme. The proceedings in the Court of Appeal are reported at 2000 CILR 325.

   On the liquidators' further appeal, they submitted that (a) the question was whether the Bangladeshi scheme had the effect of discharging BCCI(O)'s obligation to the respondent, which was governed by Bangladeshi law; (b) under the Bangladeshi scheme, the new bank assumed the liabilities of BCCI(O) and thus the latter's obligation to the respondent was discharged; (c) the Court of Appeal had wrongly found that, despite the discharge of BCCI(O)'s obligation under the Bangladeshi scheme, the respondent had a further right under Cayman law, created by the winding-up order, to take part in the liquidation process; and (d) furthermore, it did not follow from the

principle of *pari passu* distribution that the respondent could prove a debt, if that debt had been discharged subsequent to the date of the winding-up order.

The respondent submitted in reply that (a) in identifying the proper law of the debt it was important to look to the substance of the issue rather than to apply the characterization mechanistically; (b) the Bangladeshi scheme did not affect the respondent's claim against BCCI(O), because on its true construction it merely created an additional liability on the part of the new bank; and (c) as it had a debt at the date of the winding-up order, the principle of *pari passu* distribution (by which all debts were valued at the date of the winding-up order) meant that its right to participate in the distribution of assets was not later divested by the discharge of the obligation under the Bangladeshi scheme.

**Held**, allowing the appeal:

(1) Whether the debt owed by BCCI(O) to the respondent had been discharged depended on the proper law of the debt, which was the law of Bangladesh. Under Bangladeshi law, the effect of the reconstruction scheme, whereby the new bank assumed all the liabilities of BCCI(O), was to discharge the debt owed by BCCI(O) (para. 14; para. 19).

(2) The Court of Appeal had erred in finding that the winding-up order had created a new right in the respondent to participate in the distribution of assets, such right being based in the Cayman Islands and thus unaffected by the Bangladeshi scheme. The effect of the winding-up order was in fact to create a process for the collective enforcement of debts owed by BCCI(O), and did not affect the nature of the debts but merely the method for enforcing them. The winding-up order was not the equivalent of a judgment against the bank, converting the respondent's claim into something juridicially different, like a judgment debt. The winding-up order in the Cayman Islands did not alter the fact that the respondent had a debt against BCCI(O), the *lex situs* of which remained

---

2003 CILR 213

Bangladesh. Therefore, after the respondent's debt was discharged by the Bangladeshi scheme, the respondent did not have a right in Cayman law to apply in the liquidation process, and its proof of debt had been properly rejected (paras. 25–26; para. 34).

(3) The right to participate in the liquidation depended on being a creditor until the time of distribution—as emphasized in the wording of the statutory form of proof of debt. The principle of *pari passu* distribution, by which debts were valued at the date of the winding-up order, was a principle of fairness between creditors rather than a rigid rule. Adjustments might be made after that date and the principle did not lead to the conclusion that someone who was a creditor at the date of the winding-up order must be allowed to participate in the distribution, if he were no longer a creditor. When the respondent's debt was discharged under the Bangladeshi scheme, it ceased to be provable in the Cayman Islands and the liquidators had therefore properly rejected it (paras. 27–28; paras. 32–34).

Cases cited:

  (1)   *Ayerst (Inspector of Taxes)* v. *C. & K. (Constr.) Ltd.*, [1976] A.C. 167; [1975] 2 All E.R. 537, considered.

  (2)   *Banque des Marchands de Moscou (Koupetschesky), Re,* [1952] 1 All E.R. 1269; [1952] 1 T.L.R. 739, considered.

  (3)   *Banque des Marchands de Moscou (Koupetschesky) (No. 2), Re,* [1954] 1 W.L.R. 1108; 98 Sol. Jo. 557; [1954] 2 All E.R. 746, considered.

  (4)   *Dynamics Corp. of America*, *In re,* [1976] 1 W.L.R. 757; 120 Sol. Jo. 450; [1976] 2 All E.R. 669, *dicta* of Oliver, J. applied.
  (5)   *European Assur. Socy. Arbitration, In re (Wallberg's Case)* (1872), 17 Sol. Jo. 69, *dicta* of Lord Westbury considered.
  (6)   *Humber Ironworks & Shipbuilding Co., In re* (1869), L.R. 4 Ch. App. 643; 38 L.J. Ch. 712, *dicta* of Selwyn, L.J. not followed.
  (7)   *Jabbour (F. & K.)* v. *Custodian of Israeli Absentee Property*, [1954] 1 W.L.R. 139; [1954] 1 All E.R. 145, distinguished.
  (8)   *Lines Bros. Ltd., In re,* [1983] Ch. 1; [1982] 2 All E.R. 183, *dicta* of Brightman, L.J. applied.
  (9)   *Northern Counties Fire Ins. Co., In re* (1880), 17 Ch. D. 337, applied.
 (10)   *Raiffeisen Zentralbank Osterreich A.G.* v. *Five Star Trading LLC*, [2001] Q.B. 825; [2001] 3 All E.R. 257, considered.
 (11)   *Russian Bank for Foreign Trade, In re*, [1933] Ch. 745; 102 L.J. Ch. 309, considered.
 (12)   *United Railways of Havana, In re,* [1960] Ch. 52; [1959] 1 All E.R. 214, *dicta* of Jenkins, L.J. applied.

Legislation construed:
Companies Law (2002 Revision) (Laws of the Cayman Islands, 1963, *cap.* 22, revised 2002): s.136(a): The relevant terms of this sub-section are set out at para. 28.

---

2003 CILR 214
Insolvency Rules 1986 (S.I. 1986/1925), r.4.77 and Form 4.26: The relevant terms of this rule and Form are set out at para. 33.

*R.M. Sheldon, Q.C.* and *J.M. Dingemans, Q.C.* for the appellants;
*T.W.G. Lowe* for the respondent.

1  **LORD HOFFMANN,** delivering the judgment of the Board: Eckhardt Marine G.m.b.H. ("Eckhardt") is a well-known shipping company based in Hamburg. On April 4th, 1991, it agreed to sell an old motor tanker, *Min Hai You No. 12*, to S.L. Steels Ltd. ("the buyer"), of Chittagong, Bangladesh, for scrapping. The price of US$2,275,602 was to be paid by a letter of credit, opened 10 days before the arrival of the vessel. The memorandum of agreement also stipulated that the buyer should provide a deposit, in the form of a guarantee issued by a bank in Chittagong, for 10% of the purchase price in local currency (Tk 83,038,611.78), payable if it failed to open the letter of credit. The buyer duly procured the issue of a letter of guarantee in those terms by the Chittagong branch of the Bank of Credit and Commerce International (Overseas) Ltd. ("BCCI(O)"), a bank incorporated in the Cayman Islands. As security for the bank, the buyer deposited an equivalent amount.

2  On July 5th, 1991, Eckhardt telexed BCCI(O) in Chittagong, giving notice that the vessel would arrive on July 18th and asking that the letter of credit be established by July 8th at the latest. But, on the same day, banking regulators around the world closed down BCCI(O) and its associated companies. Unsurprisingly, no letter of credit was opened. On July 8th, 1991, when Eckhardt made a call on the guarantee, no payment was made.

3  A petition to wind up BCCI(O) was presented in the Cayman Islands on July 22nd, 1991, which eventually led to a winding-up order being made on January 14th, 1992. On August 20th, 1991, the Bangladeshi Government exercised its powers under the Banking Ordinance to impose a moratorium, which stayed all proceedings against BCCI(O) in Bangladesh. The provisional liquidators appointed in the Cayman Islands tried to negotiate a scheme by which all the creditors of BCCI(O) could share all the

available assets, but the Bangladeshi Government preferred to go its own way. On August 19th, 1992, the Bangladeshi Bank, exercising statutory powers (s.77(4) of the Bank Company Act 1991) made a scheme for the reconstruction of "all business activities of [BCCI(O)] in Bangladesh, hereinafter called BCCI."

4  The scheme established a new bank, called Eastern Bank Ltd. and referred to in the scheme as "the Bank," with capital subscribed, as to 20% by the Government, 40% by various financial institutions and 40% by those depositors who elected to convert their deposits into equity. Clause 6 dealt with the assets of BCCI(O)'s business in Bangladesh as follows:

2003 CILR 215

"(1) On the establishment of the Bank, the entire business, assets, cash and liabilities of BCCI, as they stand after reduction or adjustment in accordance with the provisions of the scheme or order of the government, shall vest in the Bank.

 (2) Subject to the provisions of the scheme and conditions imposed by the Bangladeshi Bank, all contracts, bonds, powers of attorney and other similar legal instruments, subsisting or having effect immediately before the establishment of the Bank and to which BCCI is a party or which were in favour of BCCI, shall be deemed to be the contracts, bonds, powers of attorney or other legal instruments of the Bank as if the Bank had been a party thereto or as if they had been issued in favour of the Bank."

Clause 7 dealt with legal proceedings:

"(1) All suits, appeals or other legal proceedings of whatever nature pending on the date of establishment of the Bank by or against BCCI shall be deemed to be suits, appeals and other legal proceedings pending by or against the Bank.

 (2) The Bank shall have authority to prosecute and make any claims, compensation or assets against any liquidator of the Bank of Credit and Commerce International Ltd. or, as the case may be, against its majority shareholders and to compromise or relinquish such claims if it is considered desirable in the interest of the creditors of BCCI in Bangladesh."

5  Although cl. 6 contains a reference to the vesting of the liabilities of BCCI in the Bank, the subject of liabilities was more fully dealt with in cl. 11: "(1) Subject to the other provisions of the scheme, the liabilities as recorded in the books of accounts of BCCI shall, after adjustment as per the provisions in the scheme, be the liabilities of the Bank from the appointed day."

6  A number of sub-clauses then made special provision for depositors, including reductions of up to 50% according to the amounts of the deposit. But there was no reduction of other debts, which were governed by cl. 11(1).

7  Eckhardt tried to enforce payment of the forfeited deposit by action on two fronts. In February 1992, it commenced proceedings against BCCI(O) in the Commercial Court at Chittagong. After the introduction of the scheme, Eastern Bank was substituted as a defendant. And, in May 1992, Eckhardt lodged a proof with the joint liquidators of BCCI(O) in the Cayman Islands.

8  The proceedings in Bangladesh were very slow. Eventually, on January 27th, 2002, the claim was dismissed, apparently on the ground

2003 CILR 216

that the underlying contract had been frustrated by the inability of the buyers to provide a letter of credit. The judgment is under appeal and their Lordships find it

unnecessary to comment. They are content to assume that Eckhardt is right in saying that it has a valid claim against Eastern Bank under the law of Bangladesh.

9  In the Cayman Islands, the liquidators, after first indicating that they would be receptive to a proof from Eckhardt, formally rejected it on December 20th, 1995. The liquidators said that claims against the Bangladeshi branches had been assumed by Eastern Bank and, so far as they knew, had been satisfied. Eckhardt appealed to the Grand Court. Murphy, J. dismissed the appeal on the ground that the proper law of the debt was the law of Bangladesh. By that law, the cause of action against BCCI(O) had been extinguished and a new claim created against Eastern Bank. Accordingly, there was no debt which could be proved in the liquidation. The Court of Appeal (Zacca, P., Georges and Rowe, JJ.A.) reversed this decision. They held that the validity of the debt was governed not by its proper law, but by its *situs.* The *situs* of the debt had originally been Bangladesh. But on the making of the winding-up order on January 14th, 1992, it became a claim to participate in the distribution of assets by the liquidation in the Cayman Islands and the *situs* of that claim was the Cayman Islands. It could not be affected by the making of the scheme under Bangladeshi law on August 19th, 1992. The liquidators appeal to Her Majesty in Council.

10  In a system of conflict of laws, which identifies the appropriate law by reference to a taxonomy of legal questions, it is necessary to characterize the question which arises in this case. The liquidators say that the question is whether the Bangladeshi scheme had the effect of discharging BCCI(O)'s obligation to Eckhardt. It certainly had the effect of creating an obligation on the part of Eastern Bank but, from the point of view of the liquidators, that is of less interest than whether the obligation of BCCI(O) was discharged. The question of whether an obligation has been discharged is governed by its proper law (Dicey & Morris, *The Conflict of Laws* (13th ed.), Rule 178, para. 32–202, at 1266 (2000)), which the liquidators say was the law of Bangladesh.

11  Mr. Lowe, in his able argument on behalf of Eckhardt, said that characterization should not be applied mechanistically. The purpose of the conflicts taxonomy is to identify the most appropriate law. This meant that one has to look at the substance of the issue rather than the formal clothes in which it may be dressed: see *Raiffeisen Zentralbank Österreich A.G.* v. *Five Star Trading LLC* (10) ([2001] Q.B. at 840–841). Ordinarily, looking to the proper law on questions of discharge would give effect to the expectations of the parties. But discharge of a debt by governmental act is sometimes indistinguishable in effect from confiscation of property, where the principle of territoriality requires one to apply the *lex situs* of

---

2003 CILR 217

the debt: Dicey & Morris, *op. cit.,* Rule 120, paras. 25R–001 – 013, at 995–1004. This ambiguity is probably the reason for the somewhat unsatisfactory cases on the expropriation of Russian commercial banks by the Soviet Government. Technically, the Soviet legislation involved an extinguishment of the rights and obligations of the commercial banks and the creation of equivalent obligations on the part of a new state bank: see *In re Russian Bank for Foreign Trade* (11)*, Re Banque des Marchands de Moscou (Koupetschesky)* (2), *Re Banque des Marchands de Moscou (Koupetschesky) (No. 2)* (3). But in practice it amounted to expropriation of the creditors' claims. The Chancery judges who dealt with the cases treated the discharge of the obligations of the commercial banks as being governed by the *lex situs* of the debts, but in at least one case regarded this as equivalent to the proper law, there being no difference on the facts.

12  The question received a more sophisticated analysis from Jenkins, L.J. in *In re United Railways of Havana* (12) ([1960] Ch. at 84–88). This concerned a financing transaction by way of a lease of assets in Cuba by a Pennsylvania corporation, as trustee for foreign bondholders, to an English company carrying on business in Cuba. By a Cuban decree, the assets were transferred to the Cuban Government and the company was put into liquidation in England. The liquidators rejected a proof by the trustees for the payments due under the lease, on the ground that the Cuban decree had transferred liability to the Cuban Government. The court did not accept that the decree had this effect, but on the assumption that it did, went on to consider the question of whether it would have been effective to discharge the company's liability. This depended on whether one applied the *lex situs* of the debt (Cuba) or the proper law of the lease (Pennsylvania).

13  Jenkins, L.J. said that the transaction was a statutory novation: the extinction of the liability of one debtor and its replacement by the liability of another. He accepted the argument of Mr. Wilberforce, Q.C., that these two aspects of the transaction were not necessarily governed by the same law and that the question of whether the one debtor was discharged was governed by the proper law of the debt. The court rejected an analogy with the question of whether the benefit of a debt had been transferred to another person ([1960] Ch. at 88):

"The contractual right to receive payment of a debt is an item of property, that is to say, a chose in action. It can be transferred by the creditor to a third party, but the validity of the transfer necessarily depends upon the lex situs, because the courts of the country where the debt is have jurisdiction over the title to it. Novation, on the other hand, does not involve the transfer of any property at all, for, as we have already pointed out, it comprises the annulment of one debt and the creation of another. Moreover, in novation a creditor may be vitally prejudiced, whereas it is immaterial to a debtor to whom he pays his debt provided that he gets a good discharge for it."

---

2003 CILR 218

14  While accepting Mr. Lowe's reminder of the need to look at substance rather than form, their Lordships do not think that this case is tantamount to expropriation of the creditors' claims. They would therefore adopt the analysis of Jenkins, L.J. and consider that the effect of the Bangladeshi scheme on the liabilities of BCCI(O) was governed by the proper law of those liabilities, in this case, the law of Bangladesh. The cases upon which the Court of Appeal of the Cayman Islands relied for adopting the *lex situs*, such as *F. & K. Jabbour* v. *Custodian of Israeli Absentee Property* (7) are concerned with the transfer of title to a chose in action, where the *lex situs* applies for the reasons given by Jenkins, L.J. But they have no application to the question of whether a debt has been discharged.

15  It is, however, unnecessary to spend too much time on this question, because it is accepted that the *situs* of the debt was Bangladesh and that the proper law of the obligation and its *lex situs* were therefore the same. The substantial questions are: first, the effect of the scheme by the law of Bangladesh; and secondly, the effect of the winding-up order in the Cayman Islands.

16  In the judgment of the Court of Appeal ([2000 CILR at 332](2000 CILR at 332)), Mr. Lowe is recorded as saying that "the effect of the reconstruction scheme was to deprive creditors of BCCI(O) of their choses in action against BCCI(O) and by its terms the scheme appears to cover the liabilities owed to [Eckhardt] by BCCI(O)." This appears to have been accepted as the effect of the scheme under Bangladeshi law until the matter came before their Lordships' Board, when Mr. Lowe submitted that the scheme had no effect on

Eckhardt's claim against BCCI(O), and on its true construction created only an additional liability on the part of Eastern Bank.

17  Their Lordships cannot accept this submission. It is true that the scheme does not expressly say that the liabilities of BCCI(O) shall be discharged, but they consider that when the scheme says, in cl. 11(1), that the liabilities as recorded in the books of BCCI "shall … be the liabilities of the Bank," it means in substitution for, not in addition to, BCCI(O). It would be very artificial to read cl. 7(1), which provides that legal proceedings pending against BCCI "shall be deemed to be … legal proceedings … against the Bank," as meaning that the Bank was to be added as a party rather than substituted.

18  As a practical matter, one would expect that if it had been contemplated that creditors in Bangladesh would retain the right to prove in the liquidation of BCCI(O), there would be some provision by which Eastern Bank could obtain credit for what they recovered. This would have been a complicated matter, because the scheme was not merely an ancillary liquidation of the Bangladeshi assets, which could be set off against claims in the principal liquidation under the ordinary hotchpot rules. The scheme was a rescue by a new company, capitalized as to 60% by the

---

2003 CILR 219

Government and financial institutions of Bangladesh. On the other hand, the Bangladeshi Government could hardly have expected that local creditors would be able to prove in the main liquidation without having to account for anything at all. The clear object of the scheme was to segregate both Bangladeshi assets and Bangladeshi creditors and to take them out of the main liquidation altogether.

19  Their Lordships therefore consider that by the law of Bangladesh the debt owing by BCCI(O) to Eckhardt was discharged. That leaves the effect of the winding-up order, which had supervened before the scheme took effect. The Court of Appeal, looking to the *lex situs*, said that the effect of the order was to create a new right to participate in the distribution of the company's assets. The *situs* of this right was the place where the liquidation was taking place. The submission of Mr. Lowe, who accepted that one looked at the proper law of the debt, was that Eckhardt could prove, if it had a debt due under the proper law on the date when the winding-up order was made. If it did, the right to participate in the winding up could not be divested by a subsequent change in the proper law, or events having effect under the proper law, which discharged the obligation.

20  Central to both these arguments is the proposition that the right to share in a liquidation is a new right which comes into existence in substitution for the previous debt and is governed by the law of the place where the liquidation is taking place, rather in the way that obtaining a judgment merges the cause of action in the judgment and creates a new form of obligation, namely a judgment debt, governed by its own rules of enforceability.

21  In support of this proposition, the Court of Appeal relied upon the principle that the winding-up order deprives the company of the beneficial interest in its assets. The company becomes trustee of its assets for its creditors: see *Ayerst (Inspector of Taxes)* v. *C. & K. (Constr.) Ltd.* (1). In this respect winding up is certainly an epoch in the company's life, but their Lordships do not understand how this can affect the question of who counts as a creditor entitled to prove and receive a distribution under the statutory trusts.

22  Mr. Lowe, on the other hand, relied on the principle that the claims of creditors are valued as at the date of the winding-up order. As Selwyn, L.J. said in *In re Humber*

*Ironworks & Shipbuilding Co.* (6) (L.R. 4 Ch. App. at 646–647), the assets held on the statutory trusts should be distributed as if they had all been collected and distributed on the date of the winding-up order:

"I think the tree must lie as it falls; that it must be ascertained what are the debts as they exist at the date of the winding-up, and that all dividends in the case of an insolvent estate must be declared in respect of the debts so ascertained."

---

2003 CILR 220

23  On this principle, no allowance is made for interest accruing after the date of the winding-up order (the *Humber Ironworks* case) or subsequent exchange rate fluctuations, which affect the sterling value of a debt in foreign currency (see *In re Dynamics Corp. of America* (4) and *In re Lines Bros. Ltd.* (8)).

24  So Mr. Lowe submits that the question of whether Eckhardt was owed a debt must be ascertained at the date of the winding up. If, as is assumed to be the case, it was at that date entitled to payment under the law of Bangladesh, it cannot be deprived of its entitlement by subsequent events.

25  This argument was skilfully deployed but their Lordships think that it is wrong. It is first necessary to remember that a winding-up order is not the equivalent of a judgment against the company, which converts the creditor's claim into something juridically different, like a judgment debt. Winding up is, as Brightman, L.J. said in *In re Lines Bros. Ltd.* ([1983] Ch. at 20) ". . . a process of collective enforcement of debts …" The creditor who petitions for a winding up is—". . . not engaged in proceedings to establish the company's liability or the quantum of the liability (although liability and quantum may be put in issue) but to enforce the liability."

26  The winding up leaves the debts of the creditors untouched. It only affects the way in which they can be enforced. When the order is made, ordinary proceedings against the company are stayed (although the stay can only be enforced against creditors subject to the personal jurisdiction of the court). The creditors are confined to a collective enforcement procedure that results in *pari passu* distribution of the company's assets. The winding up neither creates new substantive rights in the creditors nor destroys the old ones. Their debts, if they are owing, remain debts throughout. They are discharged by the winding up only to the extent that they are paid out of dividends. But when the process of distribution is complete, there are no further assets against which they can be enforced. There is no equivalent of the discharge of a personal bankrupt, which extinguishes his debts. When the company is dissolved, there is no longer an entity which the creditor can sue. But even then, discovery of an asset can result in the company being restored, for the process to continue.

27  Secondly, as Oliver, J. explained in the *Dynamics Corp.* (4) case, the purpose of the rule that debts are valued at the date of winding up is to give effect to the principle of *pari passu* distribution. It is a principle of fairness between creditors ([1976] 1 W.L.R. at 764):

"It is only in this way that a rateable, or pari passu, distribution of the available property can be achieved, and it is, as I see it, axiomatic that the claims of creditors amongst whom the division is to be effected must all be crystallised at the same date … for otherwise one is not comparing like with like …"

---

2003 CILR 221

28  The image of collecting and *uno flatu* distributing the assets of the company on the day of the winding-up order is a vivid one, but the courts apply it to give effect to the

underlying purpose of fair distribution between creditors *pari passu* and not as a rigid rule. Section 136(a) of the Companies Law (2002 Revision) provides that ". . . the property of the company shall be applied in satisfaction of its liabilities pari passu ..." The principle of valuation at the date of winding up ensures that distribution among creditors is truly *pari passu.* It would, however, be pure conceptualism to apply it so as to require payment of a dividend to someone who, at the time of the distribution, is not a creditor at all.

29  So, for example, a life insurance policy of a person living at the date of the order winding up the insurance company is a contingent debt, which will ordinarily be valued in accordance with mortality tables as at the date of the winding up. As Lord Westbury said in *In re European Assur. Socy. Arbitration* (5) (17 Sol. Jo. at 70): ". . . [Y]ou could not withhold out of the assets of the company a large sum of money, and keep it invested ... to answer the claims when they arise. You must have a present value put on these future claims ..."

30  On the other hand, if the person dies during the course of the winding up, the claim at the date of winding up will be revalued on the assumption that it was known at that date that the person insured would die when he did. If all the assets have been distributed, this will not help the beneficiaries, because previous distributions cannot be set aside. But if there are still assets to be distributed, the beneficiaries will participate on the basis of the new valuation. Similarly in *In re Northern Counties Fire Ins. Co.* (9), the premises of an insured, under a fire policy with an insolvent company, were burned down during the course of the winding up. He was held entitled to prove for the full loss, that being (with hindsight) the value which would have been attributed at the date of winding up to his contingent claim under the policy, if it had been known that his premises would burn down.

31  These cases on the use of hindsight to value debts which were contingent at the date of the winding-up order show that the scene does not freeze at that date. Adjustments are made to give effect to the underlying principle of *pari passu* distribution between creditors. Hindsight is used because it is not considered fair to a creditor to value a contingent debt at what it might have been worth at the date of the winding-up order, when one now knows that prescience would have shown it to be worth more. The same must be true of a contingent debt which prescience would have shown to be worth less.

32  It therefore seems to their Lordships, that the principle of *pari passu* distribution according to the values of debts at the date of winding up, does not necessarily lead to the conclusion that someone who was a

2003 CILR 222

creditor at that date must be allowed to participate in the distribution even when he is no longer a creditor at all. There is nothing unfair, or contrary to principle, in a rule which requires that anyone who claims to participate in a distribution should have the status of a creditor at the time when he makes that claim. It would be strange if the court can have regard to subsequent events in valuing a creditor's contingent claim at much less than it would have been thought to be worth at the date of the order, but not to the fact that someone has ceased to be a creditor at all.

33  This view is supported by the statutory form of proof. The Companies Law (2002 Revision) appears to be based on the United Kingdom Companies Act 1948 and their Lordships will therefore refer to the form of proof prescribed by r.94 and Form 59 of the Companies (Winding-up) Rules 1949 (S.I. 1949 No. 330). In the United Kingdom these have been replaced by r.4.77 and Form 4.26 of the Insolvency Rules 1986 (S.I.

1986/1925), but there is no material difference. In each case, the creditor is required to swear that the company "on … the date on which the company went into liquidation was *and still is* justly and truly indebted to me …" [Emphasis supplied].

34  Their Lordships therefore consider that the winding-up order had no effect on Eckhardt's debt, its *situs* or its proper law. Under the principle of universality, it was, at the date of the order, provable in the winding up, notwithstanding that its *lex situs* and proper law were both the law of Bangladesh. But they consider that the right to participate at any stage in the process of collective enforcement by liquidation depends on being a creditor. So when the debt was discharged under its proper law, it ceased to be provable in the Cayman Islands liquidation and was properly rejected.

35  Their Lordships will therefore humbly advise Her Majesty that the appeal should be allowed and the order of Murphy, J. restored. The respondent must pay the liquidators' costs in the Court of Appeal and before their Lordships' Board.

*Order accordingly.*

Attorneys: *Charles Russell,* instructed by *Hunter & Hunter* for the appellants; *Sharpe Pritchard,* instructed by *Myers & Alberga* for the respondent.