# EXHIBIT 10

[2010 (1) CILR 234]

IN THE MATTER OF THE SPHINX GROUP OF COMPANIES

GRAND COURT, FINANCIAL SERVICES DIVISION (Smellie, C.J.): February 12th, 2010

Companies—compulsory winding up—creditors—contingent liabilities—costs—for purposes of setting monetary reserve to meet contingent liabilities, potential costs to be incurred by indemnified parties is maximum sum that might reasonably be incurred and taxed on "attorney and own client" basis—court to be satisfied to high degree of assurance that reserve adequate—preferable to calculate sum using time/activity approach estimating time spent and likely fees at each stage of litigation

Companies—compulsory winding up—creditors—contingent liabilities—monetary reserve may be established by court to protect contingent creditors from risk of irremediable prejudice, court to establish monetary reserve of maximum possible contingent liabilities before liquidators may distribute assets to shareholders— inadequate reserve risks non-compliance with statutory priority to discharge liability to contingent creditors before returns to shareholders, under Companies Law (2009 Revision), s.140(1) and Companies Winding Up Rules, O.18, r.4

   The liquidators and liquidation committee of a group of investment funds applied for the setting of a monetary reserve to meet its contingent liabilities.

   The liquidators had initiated proceedings in New York seeking damages for negligence and fraudulent mismanagement against former professional service providers to the group. The nine defendants to the proceedings sought to rely on indemnities contained in their contracts with the group indemnifying them from liability—except for that arising from gross negligence, fraud or other intentional wrongdoing—and for the costs of

---

2010 (1) CILR 235

successfully defending any claims. Four of the indemnity claimants also appealed in the Cayman Islands against the liquidators' rejection of their proofs of debt. There were also 25 other potential indemnity claimants who had not been joined to the New York proceedings. The group was solvent and the liquidators and liquidation committee applied for the setting of a reserve to meet any potential contingent liabilities so that a distribution of surplus assets could be made immediately to investors and shareholders.

   The liquidators submitted an expert report assessing the legal costs that were, on the balance of probabilities, likely to be incurred in the New York proceedings by the nine indemnity claimants. The expert used a "holistic" approach, comparing the proceedings with comparable litigation and using his own experience and that of others to determine the likely costs. He did not, however, provide any calculations to demonstrate his conclusions and nor did he estimate costs for (i) the Cayman proceedings; (ii) defending other contribution or independent damages claims; (iii) the other indemnity claimants not featuring in the New York proceedings; (iv) the possibility of retrials; or (v) experts.

   Two of the indemnity claimants submitted alternatively an expert report that determined the maximum costs that might reasonably be incurred in the New York and other proceedings using a "time/activity" method based on the hours likely to be taken for each phase of litigation and multiplying it by the likely charge-out rates for the lawyers involved.

   **Held,** setting the monetary reserve at the maximum amount that might reasonably be incurred:

(1) The reserve would have to be set at the full amount of potential liability since liabilities to contingent creditors had to be discharged before returns were made to shareholders, as outlined in s.140(1) of the Companies Law (2009 Revision) and O.18, r.4 of the Companies Winding Up Rules 2008. The court had to be aware of the risk of irremediable prejudice to the indemnity claimants if the reserve were set too low—investors with established proofs of debt might otherwise receive greater dividends than those to which they were entitled (through assets which might not turn out to be surplus), at the expense and subordination of contingent creditors. In respect of the monetary reserve for meeting legal costs, the court would set it at the maximum sum that might reasonably be incurred—rather than the sum *likely* to be incurred—by the indemnity claimants in defending any claims, usually to be taxed on the "attorney and own client" basis. In determining that sum, and given the risk of irremediable prejudice to the claimants, the court would need to be given a high degree of assurance—and not just satisfied on a balance of probabilities—that the reserve would be adequate. It would also need to consider other potential claims for indemnification that might arise from awards to the joint official liquidators and claims for contribution or from rogue investors made against the indemnity claimants. It was determined that the proposed scheme of distribution would not be able to proceed

2010 (1) CILR 236

until other arrangements (through set-off agreements and consensual and compulsory releases recognized as enforceable both in the Cayman Islands and the United States) were in place, to the satisfaction of the court, to meet these other heads of contingent claims (paras. 9–16; paras. 18–19; paras. 30–35; para. 39).

(2) The time/activity approach (based on estimated fees and costs for time spent on the litigation) used by the expert of the two indemnity claimants would be favoured to determine the maximum costs they might reasonably incur at each stage in the New York proceedings and then uplifted ratably to give the total reserve for the nine indemnity claimants. The absence of any detailed workings and comparables in the liquidators' expert report was a fundamental failing which meant the court could not assess the reliability of its holistic approach and it would therefore be rejected. Having used the time/activity approach to calculate the maximum costs of the nine indemnity claimants for each stage of the New York proceedings, the court also accounted for costs which might potentially arise (a) in defending the other claims such as those for contribution or damages; (b) in proceedings involving the other 25 indemnity claimants; (c) for retrials; and (d) for the Cayman proof of debt proceedings, and fixed a total reserve of nearly US$120m. (paras. 48–55; para. 68; paras. 70–110).

Cases cited:

(1)  *Bristol Fund Ltd., In re*, 2008 CILR 317, referred to.

(2)  *Davie* v. *Edinburgh Magistrates*, 1953 S.C. 34; 1953 SLT 54, considered.

(3)  *E.M.I. Records Ltd.* v. *Ian Cameron Wallace Ltd.*, [1983] Ch. 59; [1982] 3 W.L.R. 245; [1982] 2 All E.R. 980, referred to.

(4)  *English Exporters (London) Ltd.* v. *Eldonwall Ltd.*, [1973] Ch. 415; [1973] 2 W.L.R. 435; [1973] 1 All E.R. 726; (1972), 25 P. & C.R. 379, referred to.

(5)  *Glaub Jewelers Inc.* v. *New York Daily News* (1988), 535 N.Y.S. (2d) 532; 141 Misc.2d 890; 16 Media L. Rep. 1269, referred to.

(6)  *Gomba Holdings (U.K.) Ltd.* v. *Minories Fin. Ltd. (No. 2)*, [1993] Ch. 171; [1992] 3 W.L.R. 723; [1992] 4 All E.R. 588; [1992] BCC 877; [1993] BCLC 7, referred to.

(7)  *Gooch* v. *London Banking Assn.* (1886), 32 Ch. D. 41; 1 T.L.R. 642, referred to.

(8)   *Hughes* v. *Richards*, [2004] P.N.L.R. 35; [2004] EWCA Civ 266, referred to.
(9)   *Levine* v. *American Fed. Group Ltd.* (1992), 580 N.Y.S. (2d) 287; 180 A.D.2d. 575, referred to.
(10)   *Midland Coal Coke & Iron Co.*, *Re*, [1895] 1 Ch. 267; (1895), 64 L.J. Ch. 279; 39 Sol. Jo. 112; 71 L.T. 705; 11 T.L.R. 100, referred to.
(11)   *National Comm. Bank Jamaica Ltd.* v. *Olint Corp. Ltd.*, [2009] 1 W.L.R. 1405; [2009] Bus. L.R. 1110; [2009] 1 CLC 637; [2009] 5 LRC 370; [2009] UKPC 16, considered.

---

2010 (1) CILR 237
(12)   *Oppenheimer* v. *British & Foreign Exch. & Inv. Bank* (1877), 6 Ch. D. 744; 46 L.J. Ch. 882; 26 W.R. 391; 37 L.T. 629, referred to.
(13)   *R.* v. *Abadom*, [1983] 1 W.L.R. 126; [1983] 1 All E.R. 364; (1982), 76 Cr. App. R. 48; [1983] Crim. L.R. 254, considered.
(14)   *R-R Realisations*, *In re*, [1980] 1 W.L.R. 805; [1980] 1 All E.R. 1019, *dictum* of Megarry, V.C. applied.
(15)   *Telewest Communs. Plc (No. 2)*, *In re*, [2005] BCC 36; [2005] 1 BCLC 772; [2004] EWHC 1466 (Ch); further proceedings, US Bankruptcy Ct., Southern District of N.Y., July 1st, 2004, unreported, referred to.
(16)   *Transnational Ins. Co. Ltd.*, *In re*, 1998 CILR 114; on appeal, 1999 CILR 207; on further appeal, *sub nom. Cleaver* v. *Delta American Reins. Co.*, 2001 CILR 34, referred to.
(17)   *Wight* v. *Eckhardt Marine G.m.b.H.*, 2003 CILR 211, referred to.
Legislation construed:
Companies Law (2009 Revision), s.140(1): The relevant terms of this sub-section are set out at para. 10.
Companies Winding Up Rules 2008, O.18, r.4: The relevant terms of this rule are set out at para. 11.
*T. Lowe*, *Q.C.*, *Ms. C.J. Bridges* and *A. Horsbrugh-Porter* for the joint official liquidators;
*M. Phillips*, *Q.C.* and *A. Turner* for the liquidation committee;
*R. Sheldon*, *Q.C.*, *A.J. Walters* and *J.G. Manning* for DPM;
*R. Gillis*, *Q.C.* and *A.J. Bolton* for Mr. Owens and Mr. Kavanagh;
*N.R.F.C. Timms*, *Q.C.* and *R.L. Nelson* for PricewaterhouseCoopers LLP;
*K.J. Farrow*, *Q.C.* for Mr. Aaron;
*R. Davern* for PricewaterhouseCoopers Cayman Islands.

1   **SMELLIE, C.J.:** The SPhinX Group of Companies are investment fund entities now in official liquidation under the aegis of this court. The joint official liquidators have applied to the court for the setting of a monetary reserve to meet the contingent liabilities of the SPhinX companies, as such contingent liabilities may arise from certain indemnities given by them. These are contractual indemnities given to persons in respect of various fiduciary relationships formerly held as between those persons and the SPhinX companies and in respect of which those persons have filed or may yet file claims in the liquidations.

2   There are potentially 34 such indemnity claimants, nine of whom have participated in the hearing of this, the joint official liquidators' application. It is, however, accepted by the joint official liquidators that the monetary reserve must also cover the contingent liabilities of the other 25 possible claimants. The indemnity claimants are individuals who were in various capacities engaged as auditors, directors or other professional service

---

providers to the SPhinX companies and whose contracts of engagement contained the indemnities which are contemplated by this application.

3   Subject to their proper construction and to the admission by the joint official liquidators of the contingent proofs of debts submitted by reliance on them, the contractual indemnities would protect the indemnity claimants from liability arising from their relationships with the SPhinX companies and with related third parties, except for liability arising from gross negligence, fraud or other intentional wrongdoing. Thus, liability for negligence, non-intentional wrongdoing, would be covered by the indemnities, as well as liability for the legal costs of *successfully* defending against any claim whatsoever—whether of non-intentional or intentional wrongdoing. This contingent liability for the legal costs of the indemnity claimants became, in the course of these proceedings, the subject for which the joint official liquidators, with the support of the liquidation committee, pressed most urgently for the setting of the reserve. However, legal costs aside, the indemnity claimants have identified at least three other heads of potential contingent liabilities for which they say provision must be made now and they object to the monetary reserve being set for legal costs alone, unless some arrangement (monetary or otherwise) is made to provide for those other heads of contingent liabilities.

4   For their part, the joint official liquidators and the liquidation committee contend that the reserve for legal costs should now be set so that a distribution of surplus assets can be made to the investors/shareholders of the SPhinX companies. The joint official liquidators have reported that the SPhinX funds are solvent, with some US$535m. worth of assets realized over the course of the past three years of the liquidation and available for distribution.

5   While the indemnity claimants who are present on this application ("the indemnity claimants") and the other 25 indemnity claimants may properly be regarded as contingent creditors to the extent of their potential indemnity claims, the joint official liquidators believe that indemnity claims could—even if they were all realized—come to represent but a fraction of the assets and so should not stand in the way of a timely distribution to the investors/shareholders now. In this, the liquidation committee naturally joins in support. However, in the view of the joint official liquidators, no distribution scheme can be finally agreed, or is likely to be appealing to the various classes of investors/shareholders, until the reserve for the contingent indemnity claims has been quantified. It is to resolve this issue that the joint official liquidators apply now to the court and in order to meet the contingent liabilities other than for legal costs (for which they seek the immediate setting of the reserve) they make other proposals, about which more is stated below.

2010 (1) CILR 239

6   By way of background, it is to be noted that the joint official liquidators have been engaged for some time in two sets of proceedings being heard together in the Southern District of New York against, amongst others, the indemnity claimants who are present in these proceedings. The New York proceedings are complex consolidated proceedings in which the joint official liquidators also seek to recover some US$300m. in damages, not only as against the indemnity claimants, but also as against others who had been closely involved in the management of the SPhinX companies and of its fund managers—the ill-fated Refco Group of Companies—in claims of gross negligence and fraudulent mismanagement. These consolidated proceedings will be referred to as "the New York proceedings" or "the Refco MDL," as the context requires. There are also in

progress proceedings brought by four of the indemnity claimants (Mr. Kavanagh, Mr. Owens, DPM and Mr. Aaron) here in the Cayman Islands by way of appeals against the joint official liquidators' rejection of their proofs of debt, based on their indemnities, for legal costs already incurred in the New York proceedings.

7   If the joint official liquidators are successful in the New York proceedings on the grounds of intentional wrongdoing, they would also expect to establish that the exclusionary provisions of the indemnities apply. But if the joint official liquidators fail to establish such liability against the indemnity claimants or succeed only on grounds of negligence, then the indemnity claimants (and potentially the other 25 indemnity claimants who may yet be joined in the New York proceedings) will seek to rely on the indemnities for the recovery of all their costs. It is therefore accepted by the joint official liquidators that the reserve for costs must be calculated on the footing that the joint official liquidators lose both in the New York and the Cayman proceedings.

**Priorities**

8   The directions and orders which the joint official liquidators seek are, against the background of the contingent liabilities which may arise on the indemnities, of personal importance to them as well. Were it not for the protection which the sanction of the court will afford them, the joint official liquidators—being on notice of the full extent of the potential contingent liabilities—would be at risk of themselves having to meet any shortfall which might arise from keeping too small a reserve.

9   The court must therefore be alive to the risk of prejudice to the indemnity claimants and the other 25 indemnity claimants, which may arise from it setting too small a reserve to meet the costs which may be indemnified. The same risk of prejudice would arise from too small a reserve for meeting any other liabilities which may be owed arising under the indemnities.

---

2010 (1) CILR 240

10   It is in this respect that the indemnity claimants assert correctly that as contingent creditors of the SPhinX liquidation estate, they are entitled to priority over the investors/shareholders. The Companies Law (2009 Revision) in s.140(1) provides that in a winding up ". . . the property of the company shall be applied in satisfaction of its liabilities *pari passu* and subject thereto shall be distributed amongst the members according to their rights and interests in the company."

11   The statutory priority and *pari passu* principles are reflected in the winding up rules and, for present purposes, the important rule is Companies Winding up Rules 2008, O.18, r.4, which provides:

"(1)   In the calculation and distribution of a dividend the official liquidator shall make provision for—

(a)   any debts which appear to him to be due to persons who, for whatever reason, may not have had sufficient time in which to tender and establish their proofs;

(b)   any debts which are the subject of claims which have not yet been determined;

(c)   disputed proofs and claims; and

(d)   expenses of the liquidation which are anticipated but not yet incurred."

The contingent liabilities here contemplated would come within para. (d) and the disputed proofs of the indemnity claimants, Mr. Kavanagh, Mr. Owens, DPM and Mr. Aaron, already the subject of appeals before this court, would come within para. (c).

12   The purpose of Companies Winding Up Rules, O.18, r.4 is clear: provision must be made by a liquidator for the matters there identified in order that the priority of creditors over shareholders and the *pari passu* principle can be honoured, before a

liquidator calculates and distributes a dividend. If no or inadequate provision is made for the matters identified in r.4, claimants whose proofs have been admitted may receive a greater dividend than they should at the expense and to the prejudice of claimants (including contingent creditors) who subsequently establish their claims. In this case, a failure to make provision as required would allow investors/shareholders to receive assets which may turn out not to be surplus assets and so to which they have no entitlement.

13    The amount of the provision which is required to be made for the types of claim identified in O.18, r.4 of the Companies Winding Up Rules is the full amount of the potential liability: *Gooch* v. *London Banking Assn.* (7), *Oppenheimer* v. *British & Foreign Exch. & Inv. Bank* (12) (6 Ch. D. at 747) and *Re Midland Coal Coke & Iron Co.* (10). The principle that full provision must be made for the contingent liabilities of companies in

---

2010 (1) CILR 241

liquidation is well established also in the local case law (see *In re Transnational Ins. Co. Ltd.* (16) and *In re Bristol Fund Ltd.* (1)).

14    If the court errs in setting a reserve that is too small, the indemnity claimants will suffer irremediable prejudice because—absent some provisions for "claw back" from recipients or insurance provision to cover any shortfall—once a distribution has been made, a creditor who could have proved his debt in the liquidation has no claim against those to whom a distribution has been made and the distribution cannot be reopened to let in such a creditor. In the words of Megarry, V.-C. in *In re R-R Realisations* (14) ([1980] 1 W.L.R. at 810), "what has gone has gone."

15    Thus, an outcome in which the indemnity claimants receive less than their entitlement in the liquidation would be unacceptable: the statutory order of priority—the requirement that all liabilities to creditors shall be discharged in full before returns to shareholders—the principle mandated by s.140 of the Companies Law mentioned above and which lies at the heart of the regime for the compulsory winding up of companies—would not have been applied.

16    This risk of prejudice—the wrongful subordination of creditors to shareholders—is therefore that of which I must be acutely aware in my approach to the exercise at hand. For this reason, not only must I seek to set the appropriate reserve for the legal costs of the indemnity claimants relative to the New York proceedings and Cayman proceedings, I must also address their concerns about the other three heads of contingent liability claims. This is especially so against the background of some of the indemnity claimants having objected from the outset to any distributions at all being made to investors/shareholders pending the determination of the New York proceedings and their reluctant acceptance that the court might now proceed as requested by the joint official liquidators, only because of the joint official liquidators' assertion that the SPhinX funds are solvent *vis-à-vis* creditor claims.

**Nature of the contingent claims**

17    While the contingent claims for legal costs are by their very nature dependent on what may happen in the future course of complex litigation and thus not given to precise estimation, the contingent claims which may arise under the other three heads are entirely within the realm of the unknown. For that reason, it was eventually accepted that the court might not sensibly be asked at this stage to embark upon the setting of a monetary reserve for them. Some other mechanism must be found to provide for them if the joint official liquidators' proposed scheme for distribution is to

proceed now rather than much later when those claims may be estimated or actually
evaluated.

2010 (1) CILR 242

18    I am therefore called upon to make it expressly clear that the monetary reserve,
which I now set for meeting the legal costs of the New York and Cayman proceedings,
provides no basis for the joint official liquidators proceeding with their proposed
scheme of arrangement for distribution unless and until arrangements, to the
satisfaction of the court, for meeting the other heads of contingent indemnity claims are
in place. I now do so.

19    Those other heads of contingent indemnity claims I describe as follows, largely
adopting the summary of them as they were addressed in these proceedings.

**(i)** *Claims for indemnification by the indemnity claimants arising from awards*
*made in favour of the joint official liquidators based on non-intentional wrongdoing*
In the event that the joint official liquidators recover damages from the indemnity
claimants on the basis of non-intentional wrongdoing (for example negligence), the
indemnity claimants would be entitled to indemnification from the estate. As the
liabilities would thus cancel each other out, the joint official liquidators have proposed
that there is no need for a reserve to meet the indemnity claimants' claim in this regard.
The joint official liquidators propose, instead, that this head of contingent liability be
addressed through set-off agreements.

**(ii)** *Contribution claims which may be brought against the indemnity claimants*
   (a) In the event that a third party who is successfully sued by the joint official
liquidators for non-intentional wrongdoing obtains a contribution to the damages
awarded from the indemnity claimants, based also on non-intentional wrongdoing, the
indemnity claimants would be entitled to indemnification from the estate. The joint
official liquidators propose to avoid the need for a reserve for this aspect (as it may
arise in the New York proceedings) by undertaking to hold any moneys paid by a third
party judgment debtor until the period for issuing contribution claims against the
indemnity claimants had expired or any such contribution claim had been determined.
   (b) The time for holding such payments became an obvious question. It was, however,
agreed by the experts on New York law who testified in these proceedings (the attorney,
Mr. William Reid, and the attorney and retired US bankruptcy judge, Melanie
Cyganowski) that contribution could not be demanded until *after* payment of a
judgment award. Thus, this undertaking as expressed by the joint official liquidators not
to pay out such recoveries from the estate, appeared to obviate the need to reserve for
any liabilities of the indemnity claimants for *damages* under

2010 (1) CILR 243

contribution claims in the New York proceedings. That then left the question of the
reserve as it relates to potential legal costs of the indemnity claimants in defending
contribution claims in the New York proceedings. The indemnity claimants would be
entitled to indemnity for their legal costs in successfully defending against contribution
claims in those proceedings, or of unsuccessfully defending against contribution claims
which are based only on non-intentional wrongdoing. It was accepted by the joint
official liquidators that the monetary reserve which they invite the court to set now
must include these heads of potential costs in relation to contribution claims, even if
their undertaking is accepted for dealing with contribution damages awards. I will
therefore approach the setting of the reserve on that basis.

**(iii)** *Separate or "rogue" investor claims*

The joint official liquidators' proposal that the monetary reserve need only cover the contingent liability to indemnity claimants for legal costs is crucially dependent upon the acceptance by the SPhinX investors generally that they should not seek to bring their own claims against the indemnity claimants (or other 25 indemnity claimants), but should allow any claims which may properly be brought to be pursued by the joint official liquidators on behalf of the SPhinX liquidation estate. For these among other purposes, the joint official liquidators intend to propose a scheme of arrangement for the distribution of the assets which would bind all shareholders/investors. As part of that scheme, the joint official liquidators propose that investors provide releases of any such separate claims as they might otherwise seek to bring against the indemnity claimants (or the other 25 indemnity claimants).

20   Thus, it is of pivotal importance to the workability of the proposed scheme that the joint official liquidators are able to bring all claims which the estate may have against the indemnity claimants within the realm of the liquidation.

21   While in the absence of orders of the court which personally enjoin them, investors are not precluded by liquidation proceedings from suing third parties in their own right; by participating in the liquidation they are expected to be confined to the collective enforcement procedure that results in the *pari passu* distribution of a company's assets which is itself aimed at achieving fairness between creditors (and/or ultimately, shareholders/investors): *Wight* v. *Eckhardt Marine G.m.b.H.* (17) (2003 CILR 211, at paras. 26 and 27). There are obvious good reasons why shareholders/investors would be well advised to adhere to this principle in the circumstances of this case.

22   For instance, to the extent that their separate claims might succeed against the indemnity claimants on grounds other than intentional

---

wrongdoing, the indemnity claimants would be entitled to indemnification from the estate for any damages they must pay. To the extent the indemnity claimants incur costs in successfully defending against any such separate claims, they would also be entitled to rely on their indemnity. In such circumstances, the returns from the estate to shareholders/investors would be *pro tanto* stultified. Such potential indemnity liabilities as may arise from separate investor claims are at present entirely unknown and unquantifiable, and are thus obviously not given to the setting of a monetary reserve.

23   To address this problem, the joint official liquidators initially proposed that the scheme of arrangement would obtain consensual releases from or impose compulsory releases upon investors of all their potential rogue claims, as a condition of participating in the distributions under the scheme.

24   However, as such claims would probably be brought not in the Cayman Islands (where the law would govern the scheme) but in the United States or some other foreign jurisdiction where investors might reside, questions of the enforceability of compulsory releases as part of the enforceability of the scheme immediately arose.

25   In the case of the United States, the joint official liquidators' expert attorney, Mr. Reid, opined (in his evidence in these proceedings before me) that the scheme would be automatically enforced by the US courts whose discretion in such matters had become curtailed by Title 18 of the US Code. This was on the basis, as he argued, that the joint official liquidators had already obtained "foreign non-main proceedings recognition" in

the New York Bankruptcy Court under Title 18 in respect of the SPhinX liquidation proceedings.

26    But Judge Melanie Cyganowski, on behalf of the indemnity claimants, opined otherwise to the effect that, although recognition and enforcement of the releases may be obtainable in New York (or elsewhere in the United States), it remained a matter for the exercise of judicial discretion likely to involve considerations such as whether the enforcement of compulsory releases might operate so as unconstitutionally to deprive potential claimants of such rights to property as they might have in their causes of action.

27    In the end, Judge Cyganowski's patently more plausible opinion led the joint official liquidators to the concession that this court, in being now asked to set a limited monetary reserve, could not proceed on the certain basis that the proposed compulsory releases would be automatically recognized and enforced by the US (or for that matter other foreign) courts.

***

2010 (1) CILR 245

28    Accordingly, the joint official liquidators conceded that they would need to obtain recognition of the scheme in the relevant jurisdictions as a condition of seeking this court's sanction of the scheme. On the basis of precedent for this procedure (see *In re Telewest Communs. Plc (No. 2)* (15)) it was accepted that I might proceed to set the monetary reserve limited as to legal costs, without reserving for the indemnity claims which may arise as the result of damages which may be awarded on rogue investor claims.

**The law for setting a costs reserve**

29    Having thus explained the other three heads of potential indemnity claimant claims and the proposals for dealing with them, I may now turn to the detailed treatment of the monetary reserve for meeting the legal costs. Here, too, there was early debate over the correct principles to be applied. In the end, however, there was general agreement about the principles, save for the question of the standard of proof—that is the degree of assurance I should have about the appropriateness of the amount of the reserve that I set.

30    What was agreed was that I should set such a reserve as I determine will be sufficient to satisfy the maximum sum that might reasonably be incurred by the indemnity claimants (and, for that matter, the other 25 indemnity claimants) in defending against claims. Equally, it was accepted that I am not required to make provision for costs which I conclude are merely fanciful. It was accepted and recognized, in any event on high authority, that unreasonable costs do not generally form part of an indemnity (see *Gomba Holdings (U.K.) Ltd.* v. *Minories Fin. Ltd. (No. 2)* (6) ([1993] Ch. at 187–188)). For instance, an indemnity for legal costs is usually taken to refer to the basis of taxation known as "attorney and own client." But what is reasonable as between an attorney and his own client may depend on the scope of instructions and will not necessarily be the same as what is reasonable as between opposing parties to litigation (see *E.M.I. Records Ltd.* v. *Ian Cameron Wallace Ltd.* (3) ([1983] Ch. at 71)).

31    As a simple matter of logic, I accept that the foregoing must be the correct general formulation of the approach to be taken to the basis upon which costs to be indemnified here might be incurred. I can see no reason why this court should accept that costs which might be incurred other than reasonably should be indemnified, for instance, by engaging in processes of interlocutory skirmishing in the New York proceedings having

no better than a fanciful chance of success or by the charging and payment of legal or
related fees which bear no relationship to market realities.

32    Conversely, this court should not put the indemnity claimants in a position where
costs which they reasonably incur in defending against claims cannot be recovered from
the estate. I accept the constant reminder

---

2010 (1) CILR 246

of counsel for the indemnity claimants that, after all, the object of the present exercise is
to minimize the risk of irremediable prejudice—contrary to the statutory order of
priorities mandated by s.140(1) of the Companies Law—that would be caused to the
indemnity claimants were the reserve to be underfunded.

33    But the foregoing statement of the principle is easier than its application in the
exercise of the setting of a reserve, which, at best, still remains an extremely difficult
exercise of seeking to anticipate the future costs of complex litigation and even the
future costs of possible future complex litigation—described during the arguments
respectively as the "known unknowns" and the "unknown unknowns."

34    Such uncertainties require the court to proceed with extreme caution if the risk of
irremediable prejudice to the indemnity claimants who must at this juncture be viewed
as ranking in priority to the shareholders/investors is to be avoided. For that reason, I
felt compelled to accept the submissions of counsel for the indemnity claimants also as
to the standard of proof to be applied—that is that the court should set such reserve as
it can be satisfied to a high degree of assurance—and *not* just on a balance of
probabilities—will be sufficient to satisfy the maximum sum that might reasonably be
incurred by the indemnity claimants by way of legal costs.

35    The joint official liquidators and the liquidation committee did not accept this
proposition but I think they must be wrong. If the court were to conclude, as they
proposed, on the ordinary civil standard of the balance of probabilities (sometimes
expressed mathematically as 51/49) that a reserve would be adequate, there would
clearly be an appreciable risk (that is, 49%) that the reserve would prove to be
inadequate. Acknowledgment of the uncertainties which are inherent in the exercise
reveals the foibles of the mere balance of probabilities and suggests that the court is
better advised to look for a higher degree of assurance, if it is to avoid the risk of
irremediable prejudice.

36    Nor, moreover, would the requirement of a "high degree of assurance" on an
exercise of this kind be illegitimately to import a criminal standard into civil
proceedings, as counsel for the joint official liquidators and liquidation committee
further argued. There are established precedents in this regard.

37    In strike-out proceedings, it is well established that the court must feel *certain* (not
just satisfied on the balance of probabilities) that the claim sought to be struck is bound
to fail (see, for instance, *Hughes* v. *Richards* (8) ([2004] EWCA Civ 266, at para.
22, *per* Peter Gibson, L.J.)).

38    On applications for mandatory interlocutory injunctions, the courts have long
required to be satisfied to a "high degree of assurance" exactly because of the increased
risk of irremediable prejudice such injunctions

---

2010 (1) CILR 247

pose to defendants. In *National Comm. Bank Jamaica Ltd.* v. *Olint Corp. Ltd.* (11), Lord
Hoffmann, in giving the advice of the Privy Council, said ([2009] 1 W.L.R. 1405, at para.
19):

"If it appears that the injunction is likely to cause irremediable prejudice to the defendant, a court may be reluctant to grant it unless satisfied that the chances that it will turn out to have been wrongly granted are low; that is to say, that the court will feel, as Megarry, J. said in *Shepherd Homes Ltd.* v. *Sandham* [1971] Ch. 340, at 351, '*a high degree of assurance* that at the trial it will appear that the injunction was rightly granted.'" [Emphasis supplied.]

39   The analogy with the approach taken on applications for mandatory interlocutory injunctions is apposite. Here, as with those types of applications, the court is being asked to make a decision which future events may prove to have been wrongly made. Equally, as in the case of some mandatory interlocutory injunction applications, irremediable prejudice may be caused (in this case to the indemnity claimants) if the decision proves to be wrong. That is the rationale for the court requiring a high degree of assurance—the minimization of the risk of causing irremediable prejudice.

**The experts' estimates of legal costs**

40   The joint official liquidators engaged Professor Eric Green to advise on the assessment of legal costs "that are likely" to be incurred by the indemnity claimants in the New York proceedings. His initial report, given before the indemnity claimants, Mr. Kavanagh and Mr. Owens, had presented their expert's report (presented by Mr. Martin Karlinsky), was that a reserve of between US$27.5m. and US$49m. should be set. Having seen Mr. Karlinsky's report, Professor Green advised an increase to the outer limit of his estimate to US$56m.

41   Mr. Karlinsky, guided by his instructions (given on behalf of indemnity claimants, Mr. Kavanagh and Mr. Owens) that he should assess "the maximum costs that might reasonably be incurred," arrived at the initially much higher sum of approximately US$90m. While, for reasons to be explained, Mr. Karlinsky's methodology is to be preferred, this sum was, in my view, arrived at in a rather tortuous way.

42   Having concluded that Professor Green's estimation of US$6–10m. for the costs of Mr. Kavanagh and Mr. Owens in the New York proceedings was approximately one-half (at the outer limit of US$10m.) of the sum of US$20m. at which he had himself arrived, Mr. Karlinsky then determined that it would be appropriate simply to double all of the other estimates at which Professor Green had arrived for the other seven of the nine indemnity claimants. His rationale was simply that as Professor Green had underestimated by 50% the reserve for Mr. Kavanagh and Mr.

---

Owens that approach was likely to hold true for the others and so it should suffice simply to double those other estimates of Professor Green's.

43   Thus, by doubling the maximum fees estimated by Professor Green for each of those seven indemnity claimants (the PwC defendants, the DPM defendants and Mr. Aaron), the estimates for them would be US$30m., US$20m. and US$20m., respectively. Adding those sums to the amount of US$20m. Mr. Karlinsky assessed for Mr. Kavanagh and Mr. Owens, Mr. Karlinsky arrived at his initial sum of US$90m.

44   I describe this method as "tortuous" for the reason that Professor Green's methodology and some of his assumptions were roundly criticized by Mr. Karlinsky— and, for reasons to be discussed below, I concluded, criticized for good reason. I therefore do not consider it a sound proposition to interpolate and to extrapolate the findings in the way proposed by Mr. Karlinsky. Rather, having decided on a figure as proper to set the reserve for Mr. Kavanagh and Mr. Owens (based on Mr. Karlinsky's

approach and as to be explained), I consider it a safer approach simply to apply that figure rateably across the board to all of the nine indemnity claimants.

45   Much depended on the nature of the instructions given to the experts by those instructing them, as the assumptions taken from those instructions carried through into the totals at which they arrived. In the end, I was satisfied that the assumptions taken by Professor Green were flawed in so many important respects as, when taken with other considerations also to be identified, were such as to make his estimations far less reliable than those of Mr. Karlinsky. This did not result, however, in a wholesale adoption of the Karlinsky figures, as the following discussion will show.

46   I should note, however, my acceptance that both experts are eminent in their fields, in so far as any form of real expertise can be claimed in this field of assessing the future costs of complex litigation. Both are very experienced lawyers with Professor Green's current field of specialism being, apart from in academia, in alternative dispute resolution—arbitration and mediation, although many years ago (in the mid- to late-1970s) he was an active litigator before the Californian courts. Mr. Karlinsky, by virtue of his consistent practice before the New York courts over the past 32 years, has considerably more current experience as a trial and appellate lawyer. Both gentlemen have very wide experience in the field of complex commercial dispute resolution, with Professor Green claiming to have been involved in the mediation or arbitration of many complex and large commercial disputes and Mr. Karlinsky in the actual litigation of many such cases, albeit not on so large a scale as Professor Green. The difference in their approaches to their assignments was what mattered in the end.

47   Apart from their differing assumptions, the experts also differed as to the appropriate methodology to be adopted. Professor Green adopted what he termed his "holistic" approach based on comparing the overall litigation as has developed in the New York proceedings with comparable litigation—measuring the comparables by means of his (and of others' whom he consulted but did not name) experience and understanding of the factors which typically drive and determine litigation costs in such types of litigation. He also explained that he then applied a "sanity check" against his results, by using what may be described as the more conventional approach of seeking to measure the hours likely to be taken for each major phase of the litigation and multiplying that by the likely charge out rates for the lawyers involved (by reference to known typical charge out rates for the calibre of lawyer involved). This latter "lodestar" or "time/activity" method was that which was clearly applied from beginning to end by Mr. Karlinsky. But unlike Professor Green, Mr. Karlinsky demonstrated his conclusions by showing his workings; and insisted that the "lodestar" is the only reliable methodology to be applied.

48   Indeed, not only did Mr. Karlinsky explain his application of the time/activity method, he did so by reference to the distinct phases of the extant litigation as he, based on experience, expected to unfold in the New York proceedings. These are phases which all sides came to accept as fairly accurately describing what steps are likely to be taken or stages likely to unfold in the New York proceedings and came to be adopted in the schedules submitted by the parties with their closing submissions. I adopt these phases for the purposes of my conclusions.

49   Mr. Karlinsky expressed his preference for the time/activity method over Professor Green's holistic approach in these words which are plainly sensible:

"In my . . . view, the estimated fees and costs to be incurred [by Mr. Kavanagh and Mr. Owens] must be estimated by considering the particular facts of the New York action itself, and not by categorizing it generically and comparing it in a general sense to other generically categorized actions."

50    Those considerations aside, the holistic approach was eventually admitted by Professor Green to be very much his invention, and unheralded anywhere in the literature (such as there is) in the field of litigation costs estimation. That being so, one would think that Professor Green would have been most anxious to support his methodology by full disclosure of his workings, in particular of the comparables which he adopted. But that was not to be, as he cited "confidentiality" and "privilege" as preventing him from disclosing details even of a single comparable.

---

2010 (1) CILR 250

51    This meant that I was not to be afforded, as the judge trying this matter, even sufficient understanding of the comparables to be able to accept that they are suitable comparables, let alone to decide for myself whether Professor Green had appropriately used them in arriving at his figures.

52    This failure or even refusal by Professor Green to give any details of his workings was, by itself in my view, fatal to the acceptance of his evidence, which was in effect presented to the court to be accepted virtually as an article of faith.

53    This approach of Professor Green would undermine the fundamental purpose of expert evidence which is to assist the court in arriving at its own conclusion. The principle is fully explained in the following *dicta* from *Davie* v. *Edinburgh Magistrates* (2) and heavily relied upon by counsel for the indemnity claimants (1953 S.C. at 40):

"Expert witnesses, however skilled or eminent, can give no more than evidence. They cannot usurp the functions of the jury or Judge sitting as a jury, any more than a technical assessor can substitute his advice for the judgment of the Court . . . Their duty is to furnish the Judge or jury with the necessary scientific criteria for testing the accuracy of their conclusions, so as to enable the Judge or jury to form their own independent judgment by the application of these criteria to the facts proved in evidence. The scientific opinion evidence, if intelligible, convincing and tested, becomes a factor (and often an important factor) for consideration along with the whole other evidence in the case, but the decision is for the Judge or jury. In particular the bare *ipse dixit* of a scientist, however eminent, upon the issue in controversy, will normally carry little weight, for it cannot be tested by cross-examination nor independently appraised, and the parties have invoked the decision of a judicial tribunal and not an oracular pronouncement by an expert."

54    The absence of any information as regards the comparables he used or of the analytical techniques he applied afforded me no opportunity to form my own independent opinion about the reliability of Professor Green's holistic approach. The same criticism must fairly be made in general about his "time/activity based analysis" which he said he applied as a "sanity check." Here too, apart from in one instance (the calculation of deposition costs to be incurred by the indemnity claimants, Mr. Owens and Mr. Kavanagh), Professor Green provided no information to show how he arrived at his cost estimates.

55    Finally in this regard, it must be noted that these shortcomings did not even accord with the basic instructions given to Professor Green on behalf of the joint official

liquidators, as those instructions clearly required him to set out (i) as much detail as possible to show how he had

arrived at his figures; and (ii) the facts relied upon in forming his opinions. This left with me the unfortunate impression that Professor Green was quite deliberate in not providing the court with the means by which it could question and decide for itself whether his methodology was sound. His refusal or failure to share the information he had gleaned from others with whom he said he had discussed his brief and relied upon in coming to his conclusions was a further shortcoming.

56    The failure to disclose extrinsic materials relied upon in arriving at an expert's opinion is a fundamental failing. Hodgkinson, *Expert Evidence: Law & Practice*, 2nd ed., at 229 (2007), provides a comprehensive analysis of the circumstances and the conditions under which expert witnesses may be allowed to draw upon extrinsic materials in arriving at their opinions which they present to the court.

57    The author, in so doing, relies upon a thorough analysis of the leading case: *R.* v. *Abadom* (13). While this was a criminal case, the central principles are equally applicable to civil proceedings and, indeed, *Abadom* itself followed and applied earlier *dicta* of Megarry, J. from the civil case of *English Exporters (London) Ltd.* v. *Eldonwall Ltd.* (4) ([1973] Ch. at 420). The following passage from *Abadom*, in the judgment given on behalf of the Court of Appeal by Kerr, L.J., is most on point ([1983] 1 W.L.R. at 131):

"Once the primary facts on which their opinion is based have been proved by admissible evidence, [the experts] are entitled to draw on the work of others as part of the process of arriving at their conclusion. However, where they have done so, *they should refer to this material in their evidence so that the cogency and probative value of their conclusion can be tested and evaluated by reference to it.*" [Emphasis supplied.]

58    The foregoing catalogue of failings on the part of Professor Green, which could not fairly be levelled also against Mr. Karlinsky, might well be a sufficient basis for rejecting the former's evidence and preferring the latter's.

59    There were, however, also other specific criticisms going to the reliability of Professor Green's evidence which would heighten the concerns. I do not think I need to catalogue those here, as those already identified, when taken with further wrong assumptions taken by him which I will discuss, were in my view conclusive in leading to my rejection of his evidence. Of the further specific criticisms I mention only one: that which was described by counsel for the indemnity claimants in their joint closing submissions as Professor Green's "unprincipled pragmatism." This became moot (from his second report and from cross-examination in response to Mr. Karlinsky's report) in his apparent willingness, without reasoned explanation, to jettison his own estimates

and adopt Mr. Karlinsky's, whenever Mr. Karlinsky's estimates would provide a lower figure than his own.

60    The starkest example of this related to the question of what costs should be reserved for any appeal that the indemnity claimants may be advised to take against an adverse outcome of the trial of the New York proceedings. Here, unusually, Professor Green's initial estimate was significantly higher than Mr. Karlinsky's, with a range of US$1–2m. as against US$1m. (This latter figure was derived from the figure of US$250,000 which Mr. Karlinsky had estimated for appeals by Mr. Kavanagh and Mr.

Owens as he then used the sum of US$250,000 (increased at the hearing to US$262,000) as a typical figure for each of the four sets of indemnity claimants contemplated in his report.)

61    Despite his much higher estimate in his second report as well as under cross-examination, Professor Green readily adopted Mr. Karlinsky's estimate of US$1m., explaining only that this was because he recognized his own "tendency (in the past) to over-estimate the costs of appeals" and that when he saw Mr. Karlinsky's estimate he realized that he "had done it again."

62    Yet, nothing about that response explained why Mr. Karlinsky's estimate of US$1m. was necessarily correct and why his own of US$1–2m., was necessarily incorrect. I was left with the unfortunate impression that Professor Green was, indeed, resorting only to an unprincipled excuse for adopting the lower figure.

63    Apart from the wrong assumption given in his report for approaching his task (that is, seeking "the likely costs to be incurred" rather than "the maximum costs that might reasonably be incurred" discussed above), there were at least two further flawed assumptions underpinning Professor Green's methodology. These related to the cost estimates for dealing with (i) disclosure materials; and (ii) the taking of depositions.

64    As to disclosure costs, Professor Green stated in his first report that he had been instructed on behalf of the joint official liquidators to assume that "several million documents" would comprise the disclosure material in the New York proceedings. These instructions informed his assessment of the time which would be required by the lawyers and others (including document custodians who would digitize, manage and safeguard the documents) to analyse and deploy them in the litigation. This period then informed the costs to be involved in dealing with disclosure material. It turned out that Professor Green's instructions and assumptions about disclosure were grossly wrong. Instead of "several million documents," there are already some 96–106m. pages of documents disclosed in the New York proceedings.

65    Given that Professor Green himself acknowledged that "the costs of the discovery phase (of the litigation) can be enormous," it was hardly surprising that he was compelled under cross-examination to acknowledge also that the information which he had been given and *ex hypothesi* the assumptions which he had taken from it were "significantly inaccurate."

66    As to deposition costs, Professor Green had been instructed on August 24th, 2009, as he acknowledges in his report and evidence, that the indemnity claimants, Mr. Owens and Mr. Kavanagh, should be expected to marshal some 10–15 depositions of witnesses. However, many months before, in February 2009, the joint official liquidators had been informed that Mr. Owens and Mr. Kavanagh intended to marshal 49 depositions. In his first report, Professor Green also mistakenly assumed that the indemnity claimants, DPM, would conduct 10–20 deposition hearings, whereas DPM's associate general counsel (Mr. Leonard Heinz) explained in his affidavit in these proceedings that DPM intends to participate in all of the more than 100 deposition hearings likely to be convened in the New York proceedings.

67    It is plain that the correction of such errors in setting this reserve would have a significant impact on the sum required. This was nonetheless and surprisingly not accepted by Professor Green, who insisted instead that the range of figures arrived at by his holistic approach for meeting deposition costs was in any event sufficiently broad to have accommodated even such unanticipated increases in the number of depositions.

68    While not giving further basis for criticism of the methodology of his "holistic" approach, Professor Green's exclusion of other factors from his initial report (it seems by agreement with those who instructed him) nonetheless further contributed to its unreliability for setting the final sum of the reserve:

   (i) He addressed only the likely costs of the indemnity claimants in respect of the New York proceedings, excluding any other legal costs, including those arising from the Cayman proceedings.

   (ii) He excluded any estimate for expert fees and costs.

   (iii) He excluded any legal costs for the indemnity claimants' defence against (a) contribution claims, (b) independent damages claims, and (c) civil claims which might be brought by the US Securities Exchange Commission ("the SEC") against the indemnity claimants for breach of security regulations, notwithstanding that the SEC will not be barred from bringing such claims until October 2010. The kind of independent damages claims contemplated here could include actions brought under New York law against an indemnity claimant by those persons who had enjoyed a special relationship with a SPhinX company for the tort of

---

negligent interference with business relationships (see, according to Mr. Karlinsky, *Glaub Jewelers Inc.* v. *New York Daily News* (5)). Loss of profit damages may also be recovered (again according to Mr. Karlinsky) if such damages can be calculated with reasonable certainty and are the natural consequence of a defendant's interfering conduct (citing *Levine* v. *American Federal Group Ltd.* (9)). While there was disagreement between the experts on this issue (Mr. Karlinsky on the one side and Mr. Reid on the other), it is clearly at least arguable that such a tort exists and could found a cause of action in the circumstances of the collapse of the SPhinX companies, and so a costs reserve needs to be set. As to contribution claims, the joint official liquidators' instructions to Professor Green reflected their recognition that such claims could be brought by other defendants to the New York proceedings or by third parties in other actions against the indemnity claimants. Such claims are not time-barred until six years after the payment of the judgment damages to which contribution may be sought from other indemnity claimants. Mr. Reid's opinion on behalf of the joint official liquidators that such claims are only ever rarely brought is not a view, therefore, upon which I can reasonably rely for denying the indemnity claimants' request for a reserve for the legal costs of defending against possible contribution claims. It is to be emphasized, for reasons already explained, that even such a costs reserve would not address the further need for a reserve against substantive awards of contribution damages which may be made against the indemnity claimants and for which they would be entitled to be indemnified.

   (iv) The need for the reserve for the costs of the other 25 indemnity claimants who may yet be joined in the New York proceedings was also overlooked by Professor Green. While Professor Green gave a vague estimate of what the costs of the other indemnity claimants could be, it is clear that there and in his second report he made no real attempt to assess those costs because, as stated in his second report: "I cannot estimate any defence costs for theoretical proceedings that have not yet been brought or articulated. Therefore, I make no allowance for them."

I accept however that an allowance, albeit not in the order of magnitude of the US$14m. proposed by Mr. Karlinsky, should be allowed for the potential legal costs of the other indemnity claimants in the New York proceedings. I state my primary reasons for this

conclusion here although further observations will be made below. First, the other 25 indemnity claimants (not 35 as Mr. Karlinsky calculated) are mainly former or current employees of DPM, PwC firms, Plus Funds or SPhinX personnel, several of whom have already entered into "tolling agreements" with the joint official liquidators. This signifies recognition of the possibility of suit against them and thus the need for a reserve. On the other hand, however, it seems to me that any cause of action against them must already by now have been identified and contemplated and, if not yet taken, it is not very

2010 (1) CILR 255

likely to be taken. Finally, the figures used by Mr. Karlinsky in this regard are acknowledged to be wrong. He estimated US$400,000 per indemnity claimant, multiplying that by 35 to arrive at US$14m. but there are only 25 other indemnity claimants. For the foregoing reasons, there has to be significant discount from the amount of US$14m. proposed by Mr. Karlinsky as a reserve for the legal costs of the other indemnity claimants and this will be reflected in the figures I arrive at.

   (v) Professor Green's evidence is that, as only 5% of actions of the kind of the New York proceedings are eventually tried, there is very little chance of the New York proceedings having to be retried (say following an appeal) and so he saw no need to set a reserve for the costs of retrial. While Mr. Karlinsky made no initial allowance for this either, in the end he agreed it should be allowed. I accept that there is clearly a risk of a retrial which has to be provided for in the reserve. The indemnity claimants argue for a sum of US$9,713,936 which would contain a 30% discount to reflect the reduction in trial preparation the second time around. I accept that approach, taking into account also that in the end Professor Green and Mr. Karlinsky both accepted that if there were to be a retrial, the costs would be considerable.

69    Those five heads of costs, as well as those for documentary disclosure (discovery) and deposition hearings, represented the main heads of divergence, if not outright disagreement, between Professor Green and Mr. Karlinsky.

70    Before turning to my final conclusions on the various heads and the actual sums of the reserve, I think it should suffice for me to note further my general preference for and acceptance of Mr. Karlinsky's opinions. Not only did he crucially adopt the proper "maximum costs which might reasonably be incurred" test, I am satisfied that the application by him of the lodestar method was both fair and sound. Importantly, in this regard and by marked contrast with Professor Green's approach, Mr. Karlinsky presented his report in such a way as to have afforded me the ability to assess for myself the exact basis upon which he had arrived at his conclusions. Indeed, the lodestar ("time and activity based") approach, relying as it does upon estimates and multiples of time and hourly rates, is amenable to being presented in a readily understandable arithmetical format. As already noted, this exercise of estimating future legal costs in complex litigations is fraught with uncertainty. Assumptions must be taken often without concrete basis and nothing can be calculated with anything approaching scientific certainty. Much depends upon the experience and judgment of the assessor.

71    Nevertheless, as the task had to be undertaken, I am satisfied, as the indemnity claimants argued, that it is best approached in the manner taken by Mr. Karlinsky, both as set out in his report and in response to questions

2010 (1) CILR 256

during the proceedings. In the end, it was not an insignificant consideration that he has vastly more current litigation experience than Professor Green, although this must be qualified by the consideration that neither he nor his firm can claim past experience in cases where the costs generated were around US$90–100m. Mr. Karlinsky said that in most of his cases the costs involved were in the range of US$2m. or US$5–6m. However, given the application of his time/activity method to the different and fairly well-defined stages of the litigation, there appeared no reason why he ought not to have been able to arrive, based on his experience, at a reliable conclusion in relation to these very large and complex proceedings. The difference in experience to be brought to the exercise would have been a matter of scale rather than principle.

72    A final word on the importance in principle of the different instructions given to the experts and which informed the methods they applied. A quest to identify the "costs likely to be incurred" can produce results vastly different from that to identify the "maximum costs that might reasonably be incurred." Two common scenarios can serve to illustrate.

73    In the first, a party who is concerned at the ultimate risk of having to pay the costs of complex litigation for lack of any indemnity for such costs might be likely to be very conservative in his choice of lawyers. He might, for instance, opt to go for lawyers of only competent repute whose charge-out rates are more modest than his preferred more expensive lawyers of highest repute. Thus, he may seek to balance the risk of the outcome of the merits of his case against the risk of cost at the end. However, being assured of a full indemnity for his costs, the same party might reasonably decide not to take the risks of the outcome by engaging any but the best lawyers, irrespective of the costs.

74    In the second scenario, without assurance of a full indemnity, a party might be likely to try to share costs with other parties by engaging the same lawyers. However, with a full indemnity, the same party might reasonably prefer and decide to engage his own lawyers with the initial costs being a secondary concern.

75    In either scenario, the impact on the overall costs could be very significant depending on the choices made, but without any proper criticism that the higher costs resulting from the preferred positions would have been unreasonably incurred.

**The reserve**

76    I turn now finally to the separate heads of reserve and to the sums to be respectively allocated. I adopt the same 15 heads or "phases" (the first 10 of which were presented by Mr. Karlinsky) used by the joint official liquidators in the Scott Schedule proposed jointly on their and the liquidation committee's behalf at the end of this hearing and the same 15

---

heads further adopted by the indemnity claimants in their final submissions. The initial figures which the first ten heads yield are those which would be applicable to Mr. Kavanagh and Mr. Owens (Mr. Karlinsky's clients) but which, for reasons already explained, form the basis for the overall figures for all nine indemnity claimants.

**1. *Indemnity expenses already incurred***

77    Indemnity expenses incurred to date by the indemnity claimants, Mr. Kavanagh and Mr. Owens, in connection with the New York proceedings. In the end this was not disputed by either the joint official liquidators or the liquidation committee: **US$2,536,597**

**2. *Amendments and motions to dismiss***

78    Possible costs of amendments to the pleadings in the New York proceedings
(including drafting of an answer (defence)) and possible costs to be incurred by the
indemnity claimants in bringing a motion(s) to dismiss the New York proceedings. I
accept the indemnity claimants', Mr. Kavanagh and Mr. Owens' estimates as
reasonable: **US$331,000**

**3. *Document discovery***

79    There was significant debate over the number of documents or pages of documents
to be involved in the discovery exercise in the New York proceedings. As noted above,
figures as high as 106m. pages were mentioned. In the end, however, Mr. Karlinsky
accepted that this could be reduced by 41.5% for the purposes of assessing the costs of
review of the documents by the trial lawyers and similarly for the required cost of initial
document review by outside contract lawyers. This latter cost being recognized as
necessary for the purpose of sifting out the truly relevant material for
review, *i.e.* inspection and deployment by the trial lawyers. This discount of 41.5% was
arrived at by reference to the percentage of the 106m. pages which had already been
disclosed from the Refco database, which itself had already undergone those two
processes of review.

80    In Mr. Karlinsky's assessment, this 41.5% reduced number of pages (from 106m. to
62m.) would incur US$7,970,000 worth of legal costs for the full documentary discovery
process in the New York proceedings by Mr. Kavanagh and Mr. Owens. The joint official
liquidators submitted, however, that even if Mr. Karlinsky's assessment is correct, there
should be applied a further discount of 24% from US$7,970,000 to US$6,082,050. I do
not accept the rationale for that further reduction: **US$7,970,000**

---

2010 (1) CILR 258

**4. *Depositions***

81    While there was considerable debate about this head of reserve, in the end the
issues were fairly narrowed when it was acknowledged that there is a deposition
protocol in the Refco MDL which limits the possible number of depositions to 100, 50 of
which have already been marshalled.

82    Mr. Karlinsky proceeds by allowing an average of 2 days for Mr. Kavanagh and Mr.
Owens for each of the remaining 50 while Professor Green assumed 1.5 days. In this I
think Professor Green's view is to be preferred. It is supported empirically by there
having been taken an average of 1.4 days for the 50 depositions already marshalled. I
do, however, accept Mr. Karlinsky's estimates of hourly rates for professional time to be
involved. This means that his overall estimate of US$3,543,000 for the remaining
depositions should be reduced by 25% to reflect the lower average of 1.5 days per
deposition: **US$2,657,250**

**5. *Experts' fees and costs***

83    Mr. Karlinsky in his initial report assumed that four non-legal experts per group of
indemnity claimants would be needed at US$125,000 each, giving a total of US$500,000
for each group (mistakenly calculated in his report at US$600,000). To this he added
US$216,800 for legal fees to be incurred in instructing the experts, giving a total of
US$716,800 (for Mr. Kavanagh and Mr. Owens).

84    For this head, Professor Green, who had initially omitted it, came to allow the
lower sum of US$600,000. I could find no basis for concluding that the additional sum
(approx. US$216,800) advised by Mr. Karlinsky fell outside the bounds of
reasonableness. (Moreover, having seen the closing submissions for PwC LLP in
particular, I consider that a further global sum of US$1,500,000 should be added to the

total in the event experts are required for defence to contributions claims, etc. This will be added in below): **US$716,800**

### 6. *Motions for summary judgment*

85    It was acknowledged (but deemed highly unlikely by Professor Green) that the indemnity claimants could move for summary judgment in dismissal of the New York proceedings, once discovery and pleadings are closed. Professor Green's scepticism in this regard arose from the not unreasonable proposition that in a fact-intensive case such as the New York proceedings, a summary judgment application is unlikely to succeed and so should be now regarded as unlikely to be brought by the indemnity claimants.

86    On the basis that a reserve should nonetheless be set, Professor Green advised US$300,000 but acknowledged under cross-examination that Mr.

---

2010 (1) CILR 259

Karlinsky's figure of US$484,000 for Mr. Kavanagh and Mr. Owens (and each group of indemnity claimants) was not unreasonable: **US$484,000**

### 7. *Mr. Kavanagh and Mr. Owens' motion for separate trials*

87    Far from accepting that they should be expected to share costs with some of the other 25 indemnity claimants (in particular Gibson Dunn who are their lawyers of choice for the New York proceedings while themselves being the former New York lawyers to the SPhinX companies and so potential defendants in the New York proceedings), Mr. Kavanagh and Mr. Owens have evinced their intention to apply for separate trials.

88    Although it was said by the joint official liquidators that they were unlikely to be successful in such an application, it was accepted that their proposed reserve was reasonable and that similar applications could be brought by other indemnity claimants: **US$57,000**

### 8. *Interlocutory proceedings before the special master*

89    The presiding judge in the New York proceedings has appointed two "special masters" to hear substantive interlocutory motions and to issue reports to him on them. He might review these motions *de novo* if necessary. The parties must bear the costs of special masters, who are private attorneys.

90    There is no dispute over Mr. Karlinsky's figure of US$171,000 for this item for the indemnity claimants' special master costs and, in keeping with my preference for his time/activity method, I accept that a specific reserve needs to be made for this as for other heads of activity for each of the indemnity claimants: **US$171,000**

### 9. *Trial preparation, trial and post-trial motions*

91    In the end there was no disagreement here either. Mr. Karlinsky's estimates of US$3,315,000 (US$1,739,000 for post-trial motions) fell well within Professor Green's holistic range of US$2–4m. I am satisfied with Mr. Karlinsky's figure of US$3,315,000 for Mr. Kavanagh and Mr. Owens (as typical for each set of indemnity claimants): **US$3,315,000**

### 10. *Appeal*

92    This is an aspect already commented on above in paras. 59–61 and in which context Professor Green's "unprincipled pragmatism" was mentioned for his apparent willingness to abandon his own much higher estimate for Mr. Karlinsky's lower estimate of US$250,000 (increased at the hearing to US$262,000) for Mr. Kavanagh and Mr. Owens (as typical for each set of indemnity claimants).

2010 (1) CILR 260

93   Mr. Karlinsky's demonstrated willingness to stand by his lower estimate even when presented with Professor Green's higher estimate, was identified by counsel for the indemnity claimants as a further reason for my reliance on his evidence and for rejecting what was termed the "adjectival" criticism of his evidence by the joint official liquidators and the liquidation committee. I agree: **US$262,000**
*Sub-total*

| | |
|---|---:|
| Total for Mr. Kavanagh and Mr. Owens: | **US$18,500,647** |
| Total for Mr. Kavanagh and Mr. Owens uplifted from 2/9 to 9/9 to set the reserve for the legal costs of the 9 indemnity claimants: | **US$83,252,912** |
| Additional US$1.5m. as extra expert costs (to cover contribution claims, etc. as proposed by PwC LLP): | **US$1,500,000** |
| **Sub-total:** | **US$84,752,912** |

**11. *Contribution and indemnity rights from other sources***

94   This head is already discussed and explained above in <u>para. 68(iii)</u> as to the need for setting a reserve. Thus, the items to be provided for under this head are (i) costs which the indemnity claimants might reasonably incur in defending contribution claims; (ii) costs of defending independent damages claims; and (iii) costs of defending possible SEC claims. Mr. Karlinsky suggested a global reserve of US$10m. for these three heads of costs.

95   There was, in my view, only one point made by counsel for the joint official liquidators in arguing for a reduction in Mr. Karlinsky's estimate which I need mention (Professor Green refusing to proffer an estimate). This was that a reduction from the amount was necessary "to take account of the fact that some defendants will drop out of the case or settle and it was Professor Green's evidence that less than 5% of these cases end up at trial." But these are obviously, as the indemnity claimants argued, not matters that should be taken into account. The purpose of the reserve is to protect the indemnity claimants' position in the event the matter does go to trial and therefore may not be discounted from what may be required in that event.

96   There is, however, a further factor which I consider should be borne in mind as properly going towards a reduction of this global sum, a large portion of which would be set aside against possible costs of defending contribution claims. This factor goes to the very nature of a contribution claim which, as already explained, can only arise after payment of primary judgment debts for damages. Where such a judgment debt is already clearly established and paid, one would expect that the liability of an

2010 (1) CILR 261

indemnity claimant to make a contribution would also be *prima facie* established. If the fulfilment of that liability is one for which the indemnity claimant can call for indemnification, one would expect that that would also be fairly and readily established. That being, in my view, the likely scenario, one might reasonably conclude now that full-blown litigation over that very question of liability to contribute will not likely occur as between contribution claimants and indemnity claimants in many instances. Nor, for that matter, as between indemnity claimants and the joint official liquidators over whether the right to indemnity applies.

97    For those reasons, I do not think Mr. Karlinsky's suggested reserve of US$10m. for these three heads (of which costs of defending contribution claims would be a large component) is entirely reasonable. I would reduce the costs reserve by a quarter and still feel comfortably within the bounds of what might reasonably be incurred: **US$7,500,000**

**12. *Other indemnity claimants***

98    This has already been discussed in some detail above at para. 68(iv). As explained, the number of other indemnity claimants being 25, and not the 35 contemplated by Mr. Karlinsky, his figure under the head would be reduced from US$14m. to US$10m. (that is, US$400,000 multiplied by 25 instead of by 35). I make further observations now. The issue here is what allowance should be made for costs that may be incurred by the other 25 indemnity claimants—persons who hold rights of indemnity but who have not yet been joined as parties to the New York proceedings or sued by others for possible damages or contribution claims. These other possible suits could be brought, *inter alia*, by any of the 50 or so other defendants to the New York proceedings and the indemnity claimants say that there is clearly a significant risk that some of the other 25 indemnity claimants could yet be joined as defendants to the New York proceedings, let alone possibly being sued in other proceedings by, for example, rogue investors.

99    Professor Green would make allowance using his holistic approach. This is although a significant part of the risk here would relate to the costs of contribution claims against the other 25 indemnity claimants and potential rogue investors' claims, costs for which type of claims he had refused to provide in his report because, as he stated: "I cannot estimate any defence costs for theoretical proceedings that have not yet been brought or articulated."

100    On the other hand, the indemnity claimants (according to Mr. Karlinsky) seek a significant reserve citing, among other reasons, the fact that the joint official liquidators have entered into tolling agreements already with at least 11 of the other 25 indemnity claimants, signifying that those 11 and the joint official liquidators must all contemplate that there are potential claims that could be brought against them.

101    The converse of this argument would be that, in the absence of a tolling agreement with the remaining 14 other indemnity claimants and with the limitation period thus being allowed to continue to run as against them, the joint official liquidators do not consider that there are viable claims to be brought against them. This same reasoning might apply in respect of possible claims by rogue investors against the other 25 indemnity claimants and as between other defendants to the New York proceedings and the other 25 indemnity claimants.

102    There is, I think, a further relevant consideration, even though tolling agreements already apply to 11 indemnity claimants. It is that the nature of such agreements implies that a claim would eventually be brought only in the event of a successful claim by the joint official liquidators against others, which would suggest a clear claim against the tolled defendants. In that way, both sides to the tolling agreement can avoid the costs and other risks of litigation by not embarking upon it unless and until it becomes plainly necessary and unavoidable.

103    Looked at from the joint official liquidators' point of view as intended plaintiffs, the risk of paying the additional costs of those 11 other indemnity claimants would be deferred pending the outcome of the extant New York proceedings and ultimately avoided in the event that the joint official liquidators do not succeed on grounds of

intentional wrongdoing against the indemnity claimants. If the joint official liquidators succeed, then that should be a clear indication to the other indemnity claimants of the likely outcome and which would likely advise the stance they take. With all of the foregoing factors in mind, I think Mr. Karlinsky's figure of US$14m. is too high and can quite reasonably be reduced by one-third: **US$9,380,000**

**13. *Retrials***

104    I have already discussed this issue above at para. 68(v) and for the reasons set out there, I will adopt Mr. Karlinsky's estimate: **US$9,700,000**

**14. *Investors' suits***

105    This is discussed above (at paras. 19(iii)–28) and for the reasons set out there, no monetary reserve will be made now for possible substantive damages awards against the indemnity claimants arising from rogue investor suits. I repeat that the issue of what reserve should ultimately be set is subject to the court being satisfied about the proposed scheme of arrangement for distribution of assets as it may relate to the consensual and compulsory releases.

**15. *Cayman legal proceedings***

106    These are the proof of debt proceedings, including pending appeals

---

2010 (1) CILR 263

against rejection of some proofs, already mentioned above at para. 6. The joint official liquidators and the liquidation committees assert that a reserve of US$3.6m. would be sufficient for these Cayman legal proceedings. While they did not have Professor Green's assistance on this (he frankly admitted he had no basis for estimating Cayman litigation costs), they argued that the main issue—the joint official liquidators' liability under the indemnities (which are governed by New York law)—will be resolved in the New York proceedings. Thus there should be only narrow scope for litigation on the issue of liability under the indemnities (as distinct from the sums that must be paid) in the Cayman proof of debt proceedings.

107    The indemnity claimants recognize this but nonetheless point to a number of other circumstances under which the issue of liability under the indemnities could arise, even if the joint official liquidators succeed in the New York proceedings on the basis of intentional wrongdoing. These could include where the indemnity claimants have to defend against contribution claims based on non-intentional wrongdoing some time in the future, bearing in mind that the limitation period for such claims would not expire until six years after the main judgment is paid.

108    Moreover, the indemnity claimants submit that the amount of US$3.6m. that the joint official liquidators would offer for reserve now is already exceeded by indemnifiable claims which have already materialized. For instance, the evidence of Mr. Karlan of Gibson Dunn, who act for the indemnity claimants, Mr. Owens and Mr. Kavanagh, is that their indemnifiable fees and costs have already exceeded US$3,389,000. DPM, for their part, assert that they have already incurred US$1,467,500 in costs in respect of the Cayman proceedings. Thus the historic costs alone show that the joint official liquidators' proposed reserve is inadequate.

109    I find this to be compelling enough to require a significantly larger reserve than the US$3.6m. proposed by the joint official liquidators but not such as to justify the amount of US$9m. proposed by the indemnity claimants. I consider that their concerns about potential other claims and actions (apart from the New York proceedings), from which a different view of the operation of the indemnities could arise, are too widely cast. I think it is well within the bounds of reasonable expectation that the New York

proceedings will largely serve to define the meaning of the indemnity provisions so as mainly to determine the extent of their application in the Cayman proceedings. I consider that a reserve for the Cayman proceedings should be safe if set at **US$6,000,000**.

**Total costs reserve: US$117,332,912**

110    I conclude, on the basis of the foregoing discussion, that the reserve to be set for the maximum costs that might reasonably be incurred by the

---

2010 (1) CILR 264

indemnity claimants is the total amount of US$117,332,912, which is itemized in the schedule attached to this ruling. Large though this amount is, I am assured to the extent that it turns out to be an over-estimation of what is required, there would be little, if any risk of prejudice to shareholders/investors, as the assets will no doubt be invested in the meantime.

SCHEDULE

| | Issue | Reserved Amount (US$) |
|---|---|---|
| 1 | Indemnity expenses to date | 2,536,597 |
| 2 | Possible amendments and motions to dismiss | 331,000 |
| 3 | Document discovery | 7,970,000 |
| 4 | Depositions | 2,657,250 |
| 5 | Expert fees and costs | 716,800 |
| 6 | Motions for summary judgment | 484,000 |
| 7 | Mr. Kavanagh and Mr. Owens' motion for separate trials | 57,000 |
| 8 | Objections and other proceedings | 171,000 |
| 9 | Trial preparation, trial and post-trial motion | 3,315,000 |
| 10 | Appeals | 262,000 |
| | **Total for Mr. Kavanagh and Mr. Owens** | **18,500,647** |
| | Uplift (to include all indemnity claimants including PwC firms, DPM and Aaron) from 2/9 to 9/9 | 83,252,912 |
| | Additional amount for PwC LLP experts as proposed by PwC LLP | 1,500,000 |
| | **Sub-total** | **84,752,912** |
| 11 | Contribution, independent damages and SEC claims | 7,500,000 |
| 12 | Other indemnity claimants | 9,380,000 |
| 13 | Retrial | 9,700,000 |
| 14 | Investors' suits (to be otherwise provisioned) | Nil |
| 15 | Cayman legal proceedings | 6,000,000 |
| | **Total:** | **117,332,912** |

*Order accordingly.*

Attorneys: *Ritch & Conolly* for the joint official liquidators; *Turner &*

---

2010 (1) CILR 265

*Roulstone* for the liquidation committee; *Campbells* for DPM; *Appleby* for Mr. Owens and
Mr. Kavanagh; *Nelson & Co.* for PricewaterhouseCoopers LLP; *Mourants*for Mr.
Aaron; *Higgs Johnson Truman Bodden & Co.* for PricewaterhouseCoopers Cayman
Islands.