Robert J. Feinstein
Bradford J. Sandler
Jeffrey M. Dine
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone:     (212) 561-7700
Facsimile:      (212) 561-7777
E-Mail:          rfeinstein@pszjlaw.com
                    bsandler@pszjlaw.com
                    jdine@pszjlaw.com

*Counsel for Shang Peng Gao Ke Inc. SEZC and SPGK Pte Ltd*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Ascentra Holdings, Inc. (In Official Liquidation),<br><br>Debtor in a Foreign Proceeding. | Case No. 21-11854 (DSJ)<br><br>Chapter 15 |

**DECLARATION OF RYUNOSUKE YOSHIDA IN SUPPORT OF MOTION OF SHANG PENG GAO KE INC. SEZC AND SPGK PTE LTD. PURSUANT TO 11 U.S.C. § 1522(c) TO TERMINATE RESTRAINT**

I, Ryunosuke "Luke" Yoshida, declare as follows:

1.  I am the sole director of Shang Peng Gao Ke, Inc. SEZC ("SPGK Cayman") and SPGK Pte Ltd. ("SPGK Singapore" and, with SPGK Cayman, "SPGK"). I am authorized to make this declaration on behalf of SPGK and SPGK Singapore.

2.  Save where I indicate to the contrary, the facts and matters to which I declare herein are either within my own knowledge and are true, or are true to the best of my knowledge, information and belief, being derived from the information I have obtained personally or from SPGK, and from documents which I have reviewed.

3.  I submit this declaration in support of SPGK's motion to terminate the restraint imposed by order of this Court on funds of SPGK held at its credit card payment

processor, Planet Payment Inc. (the "SPGK Planet Payment Funds"). The SPGK Planet Payment Funds amount to approximately $72 million. A true and correct copy of a summary report for March 2023 of BMO Harris Bank, N.A. for the SPGK Planet Payment Funds, provided to SPGK through SPGK's counsel by Planet Payment, which shows the amount of the SPGK Planet Payment Funds, is attached hereto as **Exhibit 1**.

4. I lay out the history of Ascentra Holdings, Inc, ("Ascentra") and SPGK in some detail because the details of Ascentra's history and the formation and operation of SPGK are important to understanding why the supposed Cancellation Agreement, on which the JOLs rely, was not ever an operative agreement, as it would contradict and negate the organizational separation of Ascentra and SPGK, which was important to Ascentra's principals in reducing the risk that they might face criminal inquiry or penalties in the People's Republic of China ("PRC").

5. I was a director of Ascentra between 31 December 2013 and 30 March 2018, and I again held such office between 18 December 2018 and 1 June 2021.

6. I have been a director of SPGK since 15 May 2019 and its sole director since 9 December 2019. I have beneficially owned 100% of the shares in SPGK through my wholly owned Cayman company Growth Today Inc ("Growth Today") since 15 December 2018.

7. I have also been a director of SPGK Singapore (a wholly owned subsidiary of SPGK Cayman) since May 2019.

8. I am therefore generally well-acquainted with the business of Ascentra and other companies within the Ascentra group, and with the business of the SPGK group (which includes SPGK, SPGK Singapore and SPGK LLC[1]). Consequently, I am also fully aware of the existence and nature of the business and the trading relationship between the Ascentra group and

---

[1] A wholly owned subsidiary of SPGK that was de-registered on 3 March 2021.

the SPGK group. The current corporate structure charts relating to both the Ascentra group and the SPGK group are attached hereto as **Exhibit 2**.

**A.    The History Of The Interush Business**

9. The business known as "Interush," now Ascentra, was founded by Yoshio Matsuura and Motohiko Homma around 2003. The principal operating entity in around 2013 (when I first became involved with the Interush business) was Interush Inc (a U.S. entity subsequently renamed HEC Global, Inc).

10. Interush was a multi-level marketing ("MLM") business and was originally run from the United States but was aimed at the Japanese market.

11. The Interush business utilized a personal referral marketing introduction strategy. The people involved in this system of business operations were known as "Affiliates." Affiliate activity was governed by Interush's policies and procedures (which were country-specific and were designed to cater to the different policies and regulations that apply in the countries within which it operates).

12. By way of a high-level explanation of how the business worked: Affiliates earned commissions based upon the amount of monthly subscription revenues earned by Interush from consumers/customers and other Affiliates as a consequence of referrals generated by the relevant Affiliates. Affiliates could earn additional commissions based upon the subscription revenues generated by "new" Affiliates where the "new" Affiliates had been introduced as a result of referrals generated by the "original" Affiliates.

13. The Interush business launched its first cross-border e-commerce product (in Japan) in 2004.

14. Following on from this, Interush's Hong Kong operation, Interush Limited, was incorporated in Hong Kong on 29 September 2006 (although it did not commence business in Hong Kong until mid-2010).

15. In 2007, Interush expanded its business operations to Taiwan. Its Taiwan business was operated from Taiwan by a local entity called Interush International Co., Ltd (subsequently renamed HEC International Co., Ltd.).

16. Also in 2007, Interush Holdings Ltd (a Bermuda company) was incorporated and became the holding company for the Interush business. Interush Holdings Ltd was owned by Mr Matsuura and Mr Homma in equal shares through their respective nominee companies: South Asian Ventures Ltd ("SAV") and New South East Traders Ltd ("NSET") (both incorporated in the BVI).

17. As noted above, in mid-2010, Interush's operations commenced in Hong Kong, and the Hong Kong business was operated by a Hong Kong entity called Interush Limited (although most of its customers were, in fact, located in mainland China). Hong Kong served as the base through which Interush coordinated recruitment and training of sales Affiliates in the PRC.

18. In around July 2011, Martin Matthews became the President and CEO of Interush Holdings Ltd. I believe he was employed in the Interush business before that.

19. In 2013, there was a significant increase in Affiliate recruitment activity in Hong Kong. On 6 November 2013, the Interush offices were raided by Hong Kong's Commercial Crimes Bureau ("CCB") based on a warrant which alleged violation of Hong Kong's Pyramid Selling Prohibition Ordinance. The CCB seized all computer equipment, books and records in the Hong Kong offices and arrested six individuals (including Mr Matthews). As a result, Interush

4

attracted unwanted media attention in Hong Kong, as the media reported that police had found evidence that Interush was using pyramid selling to recruit members.

20. Due to this, Interush ceased recruiting additional Affiliates and holding large training sessions for its Affiliates in Hong Kong. Furthermore, Interush also repurposed its staff in Hong Kong to support the e-commerce business in Taiwan and provide local customer support to the centralized customer service centre in Taiwan. The Interush business continued, albeit somewhat reduced, and focused on MLM in Taiwan through HEC International Co Ltd ("HEC Taiwan") and in Japan through HEC and HEC Singapore.

21. Shortly after the CCB's raid of Interush's offices in Hong Kong, Interush's banks suspended operations of its bank accounts in view of the police investigation. The Hong Kong Court issued a Restraint Order on 9 April 2015 prohibiting Interush[2] from dealing with its property in Hong Kong.

22. Over time, in part to prepare for a hoped-for public listing on the Hong Kong Stock Exchange, Interush Holdings Ltd and its subsidiaries, and ultimately its beneficial owners, recapitalized the business and revised the entities' ownership structure such that, ultimately a new Cayman parent company, Interush Holdings Inc, which later changed its name to Ascentra Holdings Inc (Ascentra, as defined above) was formed and became the sole shareholder of Interush Holdings Ltd.

23. The ultimate shareholding structure of Ascentra was as follows:

   a. IR-P: 58.50% of the shares;

   b. INTL: 30.64% of the shares; and

---

[2] Interush Limited and Interush (Singapore) Pte Limited.

DOCS_NY:47723.5 78263/001

  c. Three management members / related parties (Ryosuke Kojima, Jeffrey Boshears and Alex Oliva): 10.86% of the shares.

24. Taking into account beneficial ownership of these entities, the principal shareholders of Ascentra are:

  a. Yoshio Matsuura: 22.98%

  b. Motohiko Homma and then myself: 22.98%

  c. Martin Matthews: 21.59%

  d. Mari Matthews: 21.59%

25. On 31 March 2015, Mr Matthews (following on from his arrest in November 2013 referred to at paragraph 19 above) was charged with money laundering by the Hong Kong authorities (although Mr Matthews was later – in May 2017 – acquitted of that charge), and the plan for the IPO was seriously hindered.

26. In June 2015, Mr Matthews was placed on administrative leave as CEO and Chairman of Interush Holdings Ltd in order to allow him time to address the charges against him.

27. Due to various reasons including the CCB's investigation, the risks facing the Interush business in Hong Kong (where, as noted above, a large number of its customers were located in the PRC, where MLM businesses are illegal), negative press and Mr Matthews being charged with money laundering, Interush decided to:

  a. rebrand its business and change the name "Interush" to "Ascentra." The businesses in Taiwan and Japan were renamed as "HEC," and various other entities were renamed in a similar fashion;

  b. suspend the operation of its business in Hong Kong; and

6

      c. supply products to a new separate entity – SPGK – which was established[3] as a separate e-commerce marketing business that was focused on the PRC market. SPGK was not part of the Ascentra group and was a wholesale purchaser of Ascentra's products. SPGK then sold these products to its customers in the PRC. This allowed the Interush/Ascentra business to de-risk its business by no longer selling directly to the PRC market, where Ascentra's MLM business model is illegal.

**B.    Establishment of SPGK**

28. As stated in paragraph 27 above, Interush/Ascentra decided it would no longer operate in Hong Kong (which had been focused on the PRC market since late 2015). However, it continued to operate in other countries, such as Taiwan and Japan.

29. King & Wood Mallesons China ("KWM," a PRC law firm) assisted in the establishment of SPGK and the development of its business model. SPGK was established as an e-commerce marketing company focused on the PRC market. Attached hereto as **Exhibit 3** is a true and correct copy of a script for Mr Matthews' presentation at a pre-launch event for SPGK in August 2016. The presentation emphasizes that SPGK was identified to associates as a wholly separate company from Ascentra.

30. As a new business (with an untested model) operating in a new market, KWM could not guarantee that SPGK would be fully compliant with all relevant PRC laws. Accordingly, there were legal and financial risks for SPGK as well as its owners and controllers.

---

[3]    SPGK was incorporated on 14 June 2016.

7

31. SPGK commenced business in the PRC in or around October 2016. At this time, the shares in SPGK were wholly owned by Growth Today, which company was (at that time) owned and controlled by Mr Homma.

32. Around the time SPGK commenced operations in the PRC (in 2016), Interush Limited issued an announcement (a true and correct copy of which is attached as **Exhibit 4** to existing affiliates of Interush which stated that:

> Interush International, LLC subsidiary company which offered products in Hong Kong, Macau and the PRC, is ending its operations and ceasing to provide support to customers in these markets. As such we must cancel our affiliate agreements with you and terminate our relationship as of October 1 2016.
>
> However, we are pleased to advise that we have identified a dynamic company, Shang Peng Gao Ke, Inc. ("Shang Peng") which will enable you to continue earning an income through a business which has very similar IT and Health products and customer support within China.
>
> Shang Peng is a unique e-commerce marketing company whose exclusive IT and Health products are developed in the USA and available in Hong Kong and Macau, plus the PRC market through cross-border e-commerce. Starting on September 7th, you will have the opportunity to join this company at no cost, and work towards your financial goals. I have been working with this company to ensure a smooth transition and make this process as easy as possible for you.
>
> . . . .
>
> Along with this transition, Ascentra Holdings, Inc. will continue to honor the Loyalty Bonus program to current Interush qualifiers, as well as offer an Annual RSP Bonus program, and honor the legacy Introduction Bonus program formerly provided by Interush for your tenure with Interush.
>
> You are invited to join Shang Peng at no cost. The company will use a formula based on your experience at your legacy position with Interush to transition you to their business. We recommend that you complete the transition as soon as possible. Interush will cease supporting customers in Hong Kong, Macau and the PRC as of October 1, 2016, with final commission payment to follow in October.

33. This announcement makes clear that SPGK was identified as a separate business to take over operations from Interush (rather than form part of Interush's operations), and that alongside the option to transition over to SPGK, Interush would continue to honour its legacy

8

bonus program. However, for those who signed up with SPGK, Interush/Ascentra offered to provide some unspecified form of continuity with the loyalty bonus program for those affiliates.

34. SPGK's business model differed from Ascentra's in that SPGK was not an MLM business. Instead, SPGK purchased products (such as IT products and health products) from Ascentra and third parties. Consumers could then purchase these products from SPGK through the SPGK website[4] and, depending on the product purchased, the relevant product would either be made available for download or would be physically delivered to the customer.

35. SPGK also operated a referral program where users could refer other potential purchasers to SPGK and earn a percentage of any sales revenue generated by such a referral. Additionally, users could become service providers and work for one of SPGK's independent third-party service provider companies in the PRC, with the user being engaged through a service agreement.

36. The products sold by SPGK were supplied by third party entities (the "Vendors") (beauty and health products) or licensed by Ascentra's subsidiary (IT products). The Vendors were contracted to Ascentra, but their fees for providing products to SPGK (via Ascentra) were paid directly to them by SPGK using SPGK's funds through cash management entities.

37. In around December 2018, Mr. Homma transferred his shares in Growth Today to me (he also transferred his shares in IR-P to Lequios Holdings Ltd[5] in around November 2020).

38. Payments made by customers for products purchased from SPGK through its website were processed through China UnionPay and collected by Planet Payment, a credit card

---

[4] https://www.spgk.com/en/ (no longer online). SPGK was the contracting principal for all sales to customers and agents/affiliates purchasing products through SPGK's website. The website ceased operating in March 2021.

[5] A BVI company which I also own and control.

DOCS_NY:47723.5 78263/001

payment processor based in the United States. SPGK was the contracting party and vendor for all purchases facilitated by SPGK's website.

39. All payments received by China UnionPay were collected by Planet Payment. As a result, SPGK is considered the "merchant" for payments processed by Planet Payment.

40. On or about September 29, 2019, I executed, on behalf of SPGK Singapore, a Merchant Processing Application with Planet Payment (the "PP Agreement"). A true and correct copy of the PP Agreement is attached hereto as **Exhibit 5**.

41. Ascentra is unmentioned in the PP Agreement as it is entirely irrelevant to the funds received and transferred pursuant to the PP Agreement.

42. I am aware that the Joint Liquidators have put forward a document titled "Memorandum of Understanding" and a document labeled "Cancellation Agreement and Acknowledgement" (the "Cancellation Agreement") according to which, they contend, SPGK is obligated to transfer all of its assets, including the SPGK Planet Payment Funds, to Ascentra. I was not aware of the Cancellation Agreement at the time of its purported execution. At that time, April 2018, I had been removed from the board of Ascentra, and Mr Matthews had assumed control of the Company, to the exclusion of me and other stakeholders. Mr Matthews removed me as a director on 30 March 2018.

**C.    The MOU**

43. It was common ground among all relevant parties (Yoshio Matsuura, Motohiko Homma, Martin Matthews, Ted Sanders and myself) that the MOU was not in fact intended to be legally binding. As a matter of fact, in around May 2021, I received an email from Mr Matthews stating that he had confirmed with Tom Poletti (counsel for Ascentra at Manatt

DOCS_NY:47723.5 78263/001

Phelps & Phillips, LLP) that the MOU was not binding. A true and copy of the email from Mr Matthews is attached hereto as **Exhibit 6**.

44. As far as I am aware, no subsequent binding contract giving contractual effect to the terms of the MOU was ever put in place.

45. Moreover, in February 2017, SPGK entered into various binding contracts with Ascentra group companies to formalize, on a contractual basis, their business relationships through which: (i) SPGK agreed to purchase physical products from Ascentra group companies; (ii) SPGK agreed to pay royalties for the license it had obtained from Ascentra group companies for the use of their IT products; and (iii) SPGK agreed to pay for services to be provided by Ascentra group companies, including (but not limited to):

    a. a Product Supply Agreement between iHealthScience LLC, Hong Kong Branch and SPGK;

    b. a License Agreement between Radial IT Systems Ltd ("Radial IT") and SPGK;

    c. a Customer Services Support Agreement between Radial IT and SPGK; and

    d. a Professional Services Agreement between Radial IT and SPGK.

True and correct copies of these agreements are attached hereto as **Exhibit 7**.

**D.     The Supposed Cancellation Agreement**

46.    I should emphasize that I was not aware of the existence of the supposed Cancellation Agreement until I received a copy of Campbells' letter of 20 August 2021.[6] A copy of that letter is attached hereto as **Exhibit 8**.

47.    I can state that the purported obligation in the Cancellation Agreement for SPGK to transfer its assets and business to Ascentra was never undertaken in any respect, and Ascentra has never sought to enforce such an obligation.  The business relationship between Ascentra and SPGK did not change after April 2018.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed June 30, 2023

_____
Ryunosuke Yoshida

---

[6] In the letter, it was stated that the Mr. Robinson (who was then only the voluntary liquidator of Ascentra) was still considering the scope and effect of the Cancellation Agreement and fully reserves his position and all of his rights in relation to the same.