# EXHIBIT 7

21-11854-dsj    Doc 44-7    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit  7 -
Agreements between Radial IT and SPGK    Pg 2 of 39

FSD2021-0318                    Page 20 of 365                    2023-04-24

### PRODUCT SUPPLY AGREEMENT

This PRODUCT SUPPLY AGREEMENT (this "Agreement") is effective as of October 1, 2016 ("Effective Date") by and between iHealthScience LLC, Hong Kong Branch ("Provider"), the Hong Kong branch of a Delaware limited liability company located at Room 301, 3rd Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong, and Shang Peng Gao Ke, Inc. ("Company", and collectively with Provider "the Parties"), a corporation incorporated or organized under the laws of the Cayman Islands and located at 5th Floor, Genesis Building, Genesis Close, PO Box 446, Grand Cayman KY1-1106, Cayman Islands. This Agreement includes any and all Schedules, Addenda, Exhibits, and Attachments hereto, and any references to this Agreement shall include any Schedule, Addenda, Exhibit and Attachment.

### RECITALS

A.      Provider is a distributor of certain goods and is interested in selling such goods to Company, and Company is the purchaser of such goods and Company is interested in purchasing such goods from Provider.

B.      As of the Effective Date, by Provider agreed to provide said goods to Company for compensation, all as more particularly set forth herein.

C.      The Parties now wish to memorialize and clarify the terms of that agreement, as set forth herein.

### TERMS OF AGREEMENT

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**Section 1.    Purchase and Sale**.

(a)      Subject to the terms and conditions set forth in this Agreement, Provider agrees to provide and sell to Company the Products set forth on and further defined in *Exhibit A* (the "Products").

(b)      During the Term of this Agreement, Provider shall sell to Company, and Company shall purchase from Provider, the Products on the terms set forth herein.  Not later than the end of each calendar month during the Term of this Agreement, Company shall submit in good faith a non-binding, rolling six-month forecast (the "Forecast") for the quantity of each Product it expects to purchase during each month of the applicable six-month forecast period.  Provider shall make reasonable efforts to fill all Purchase Orders ("POs") for any Product that exceed those reflected in the applicable Forecast, but shall not be in breach of this Agreement if it is unable, despite such efforts, to fill such excess orders.  Provider is not obligated and shall also not be in breach of this Agreement if it is unable, despite reasonable efforts, to fill any PO for reasons attributable to any third-party supplier of Products.  Should Provider no longer offer any Product listed in *Exhibit A* during the Term of this Agreement (the "Discontinued Product"), Provider shall offer a replacement or successor product (the "Replacement Product") to Company, if any exists.  Any Replacement Product offered to and accepted by the Company shall be deemed a "Product" for all purposes hereunder, and shall be sold in accordance with all pricing and other terms set forth herein.

(c)      All POs will be placed in a manner consistent with the practices of the Parties during the twelve (12) months immediately preceding the date of this Agreement.  Provider shall make reasonable efforts to fill all POs requesting delivery under lead times, but shall not be in breach of this Agreement if it is unable despite

such efforts to deliver within such requested times (provided delivery shall meet the applicable lead time requirement herein).

(d)      Provider shall not withhold acceptance of any PO that is consistent with the terms and conditions of this Agreement and consistent with the most recent Forecast. No pre-printed terms of any PO shall be of any force or effect, and in the event of a conflict between the terms of the PO and this Agreement, the terms of this Agreement shall control. Any provisions of any acknowledgement or invoice issued by Provider that are in addition to or inconsistent with the terms of a PO are hereby rejected by Company and will be null and void unless specifically accepted by Company in writing.

**Section 2.      Term**.  Subject to the terms and conditions of this Agreement, the Term of this Agreement (the "Term") shall be as set forth in ***Exhibit A***.

**Section 3.      Products Pricing and Payment**.

3.1      The prices for the Products purchased shall be the market price determined by Provider in good faith and in the ordinary course of Provider's business, in all respects consistent with commercially practicable business PLUS all costs of freight associated with delivery of the Products to their destination. Upon any material change in Provider's product prices, it will communicate such change in writing to Company, and the affected Product prices will be adjusted for all POs placed subsequent to the date of such notice.

3.2      Company will pay Provider within 30 days from Company's receipt of an invoice properly submitted hereunder (which shall not be submitted prior to shipment of Products).

**Section 4.      Warranty**.

4.1      Provider warrants that the Products will conform to all specifications, descriptions, samples and quality standards that applied to the Products during the twelve-month period preceding the date of this Agreement, or any standard specifications, descriptions, samples and quality standards set forth by Provider for future-developed or modified products (collectively, the "Specifications").

4.2      Claims for defective or non-conforming Products shall be made within 30 days after delivery to Company.  Provider shall promptly either replace or correct defects of any goods not conforming to the foregoing warranties, without expense to Company, when notified of such nonconformity by Company. Except for the indemnification obligations of the Parties set forth herein, this Section 4.2 shall be the sole remedy of Company for breach of warranty by Provider.

**Section 5.      Delivery**.  Provider shall make all deliveries of the Product in compliance with the delivery terms and conditions set forth in ***Exhibit B*** (the "Delivery Terms").

**Section 6.      Indemnity**.

6.1      Upon notice and demand from Company, Provider shall promptly assume full responsibility for the defense, at Provider's expense, of any claim, demand, proceeding or action that may be brought (or threatened to be brought) against Company or its agents, successors, assigns, parents, subsidiaries or affiliates (collectively, "Company Indemnified Persons") alleging any of the following (collectively, "Covered Company Claims"): (a) violation or infringement of any patent, trademark or copyright or of any other intellectual property rights of any third parties arising out of the sale or use of any Product under the terms of this Agreement, except to the extent arising due to the use of any design, specification, software, system, method, service offering, trademark or logo that is unique to or specified by Company or due to the use of any Products in combination with products or services of the Company not supplied by Provider;

(b) any loss or damage arising out of or resulting from any manufacturing defect in any Product or any breach of any warranty made by Provider in this Agreement in connection with any Product; or (c) Provider's acts or omissions in connection with the supply of any Product.  Provider further agrees to indemnify and save harmless the Company Indemnified Persons from any and all costs, expenses, losses, royalties, profits, and damages (including reasonable court costs and attorneys' fees) (collectively, "Damages") resulting from any Covered Company Claim, including any settlement that complies with the terms of this Agreement.  A Company Indemnified Person may be represented by and actively participate through its own counsel in any such suit or proceeding at its own expense.  The indemnification obligations under this paragraph shall survive the termination of this Agreement and shall continue for as long as the statute of limitations applicable to any potential Covered Company Claim remains unexpired.

6.2     Upon notice and demand from Provider, Company shall promptly assume full responsibility for the defense, at Company's expense, of any claim, demand, proceeding or action that may be brought (or threatened to be brought) against Provider or its agents, successors, assigns, parents, subsidiaries or affiliates (collectively, "Provider Indemnified Persons" and, together with Company Indemnified Persons, "Indemnified Persons") alleging any of the following (collectively, "Covered Provider Claims" and, together with Covered Company Claims, "Covered Claims"): (a) violation of any laws of the People's Republic of China (the "PRC") arising out of the offer or sale of the Products by Company or the Company's operations in the PRC; or (b) Company's acts or omissions in connection with the performance of Company's obligations under this Agreement.  Company further agrees to indemnify and save harmless the Provider Indemnified Persons from any and all Damages resulting from any Covered Provider Claim, including any settlement that complies with the terms of this Agreement.  A Provider Indemnified Person may be represented by and actively participate through its own counsel in any such suit or proceeding at its own expense.  The indemnification obligations under this paragraph shall survive the termination of this Agreement and shall continue for as long as the statute of limitations applicable to any potential Covered Provider Claim remains unexpired.

6.3     The party responsible for indemnification (an "Indemnifying Party") will provide the above indemnity even if Damages are due, or alleged to be due, in part to any Indemnified Person's concurrent negligence or other fault, breach of contract or warranty, or strict liability without regard to fault; *provided, however,* that an Indemnifying Party's contractual obligation of indemnification shall not extend to the percentage of the Indemnified Person's Damages or injuries or the settlement amount attributable to the Indemnified Person's negligence or other fault, breach of contract or warranty, or to strict liability imposed upon an Indemnified Person as a matter of law.

6.4     In the event of an incurrence of any Covered Claim, the Indemnified Person(s) shall: (a) promptly notify the Indemnifying Party of such Covered Claim, (b) reasonably cooperate, at the Indemnifying Party's expense, with the Indemnifying Party in the defense thereof, and (c) not settle any Covered Claim without the Indemnifying Party's consent which will not be unreasonably withheld or delayed.  The Indemnifying Party shall keep the Indemnified Persons informed at all times as to the status of its efforts and consult with the Indemnified Persons(s) (or their counsel) concerning its efforts, with respect to the defense of such Covered Claim; and, the Indemnifying Party shall not settle any Covered Claim without the applicable Indemnified Person's prior written consent, which shall not be unreasonably withheld or delayed.  Such consent shall be given to any settlement that includes an unconditional release of the Indemnified Person(s), requires no payment, action or forbearance on the part of the indemnified Person(s), and includes no admission of fault on the part of the Indemnified Person(s).  Notwithstanding the foregoing, the Indemnified Person(s) reserves the right, in its sole discretion, to assume its own defense (at the Indemnifying Party's expense) with respect to any Covered Claim to the extent the Indemnifying Party fails to timely and adequately undertake the defense of a Covered Claim or a conflict of interest arises that, in the reasonable and good faith judgment of the Indemnified Person(s), compromises the  Indemnifying Party's ability to adequately represent the interests of the Indemnified Person(s).

3

Product Supply Agreement

21-11854-dsj    Doc 44-7    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit  7 -
Agreements between Radial IT and SPGK    Pg 5 of 39

**FSD2021-0318**          **Page 23 of 365**          **2023-04-24**

**Section 7.        Limitation of Liability**.  NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INDIRECT OR PUNITIVE DAMAGE OR ANY DAMAGES FOR LOST REVENUES OR PROFITS FOR ANY REASON WHATSOEVER, WHETHER OR NOT THE LIKELIHOOD OR CERTAINTY OF SUCH DAMAGES WAS KNOWN OR SHOULD HAVE BEEN KNOWN, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; PROVIDED THAT THE FOREGOING SHALL NOT LIMIT THE INDEMNIFICATION OBLIGATIONS OF EITHER PARTY IN RESPECT OF DAMAGES OWED TO THIRD PARTIES.

**Section 8.        Termination**.

8.1      Either party may terminate this Agreement (and any outstanding PO) in the event of a material breach of this Agreement by the other party which remains uncured for thirty (30) days after written notice of breach is given to the breaching party.

8.2      Either party may immediately terminate this Agreement (and any outstanding PO) by giving written notice to the other party if: (a) the other party is insolvent or has a petition brought by or against it under the insolvency laws of any jurisdiction; (b) the other party makes an assignment for the benefit of creditors; or (c) a receiver, trustee or similar agent is appointed with respect to any property or business of Company.

8.3      Any purchases of the Products after the termination or expiration of this Agreement shall not be, and shall not be deemed to be, an extension of the Term of this Agreement.

**Section 9.        General**

9.1      *Survival of Terms*.  Regardless of the circumstances of termination or expiration of this Agreement, the provisions of <u>Section 4</u> ("Warranty"), <u>Section 5</u> ("Delivery"), <u>Section 6</u> ("Indemnity"), <u>Section 7</u> ("Limitation of Liability"), and <u>Section 9</u> ("General") will survive the termination or expiration and continue according to their terms.

9.2      *Confidentiality*.

(a)      Any confidential information that is disclosed by one party (a "disclosing party") to the other (a "recipient") in connection with this Agreement ("<u>Confidential Information</u>") shall be kept confidential pursuant to the terms of this <u>Section 9.2</u>.  Any marketing plans, product specifications, formulations, or other trade secrets or proprietary information of the disclosing party, whether oral, visual or written, shall constitute Confidential Information even if not marked as such.  The terms and conditions of this Agreement shall be deemed to be Confidential Information.

(b)      No recipient shall use Confidential Information except as necessary to perform its obligations under this Agreement nor shall any recipient disclose or provide the Confidential Information to any third party without the express prior written consent of the disclosing party in each instance.  This Section 9.2(b) imposes no obligation of confidentiality upon a recipient with respect to any information that can be shown by written records: (i) is or becomes publicly known or publicly available or otherwise in the public domain through no act of the recipient or its affiliates; (ii) is already known to, or in the possession of, the recipient or its affiliates at the time of the disclosure; or (iii) is rightfully received by the recipient from a third party without a duty of confidentiality to the disclosing party; (iv) is independently developed by the recipient, outside the course of this Agreement, without use of or reliance upon Confidential Information; or (v) is required to be disclosed by law or regulation, including by order of a court or governmental agency; *provided, however,* that in such a case, the recipient will make all reasonable efforts to notify the disclosing party of such order in sufficient time for the disclosing party to seek a protective order or other appropriate relief.  Each party acknowledges and agrees that all Confidential Information is the sole property of the

21-11854-dsj    Doc 44-7    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit  7 -
Agreements between Radial IT and SPGK    Pg 6 of 39

FSD2021-0318                    Page 24 of 365                    2023-04-24

disclosing party.  The obligations under this Section 9.2(b) shall survive any expiration or termination of this Agreement for a period of three (3) years thereafter.

(c)    This _Section 9.2_ is in addition to, and shall not limit, any separate obligations of confidentiality arising under any other agreement between Company and Provider and/or their affiliates.

9.3    _Records_.  Provider shall maintain accurate and legible records in English and shall grant Company and any representatives access to and copies of, any information reasonably requested by Company with respect to Provider's performance under this Agreement (including quality programs and test documentation) for five years after the expiration or termination of this Agreement or such longer times as may be required by applicable law.

9.4    _Remedies_.  The rights or remedies of the Parties are not exclusive, and either party shall be entitled alternatively or cumulatively, subject to the other provisions of this Agreement, to Damages for breach, to an order requiring specific performance, or to any other remedy available at law or in equity.

9.5    _Independent Contractors_.  The Parties are each independent contractors and neither party is an employee, agent, representative, partner, or joint venturer of the other or has any authority to assume or create any obligation or liability of any kind on behalf of the other.

9.6    _Governing Law_.

(a)    The interpretation and construction of this Agreement, and all matters relating to this Agreement, will be governed by the laws of the Cayman Islands.

(b)    COMPANY IRREVOCABLY WAIVES ITS RIGHTS TO TRIAL BY JURY OF ANY CAUSE OR ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION OR OTHER PROCEEDING WITH RESPECT TO ANY MATTER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR ANY PORTION OF THIS AGREEMENT, WHETHER BASED UPON CONTRACTUAL, STATUTORY, TORTIOUS OR OTHER THEORIES OF LIABILITY. COMPANY REPRESENTS THAT IT HAS CONSULTED WITH COUNSEL REGARDING THE MEANING AND EFFECT OF THE FOREGOING WAIVER OF ITS JURY TRIAL RIGHT.

9.7    _Notices_.  Any notice required or permitted by this Agreement shall be in writing, in English and delivered by overnight commercial courier (such as FedEx) providing proof of delivery, addressed as set forth on the first page of this Agreement (or to such other addresses as may be designated by notice from one party to the other).

9.8    _Severability_.  If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any Person or circumstance is held invalid, illegal or unenforceable in any respect by a tribunal of competent jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision of this Agreement (or the remaining portion thereof) or the application of such provision to any other Persons or circumstances.

9.9    _Waiver_.  Except as otherwise provided in this Agreement, any failure of any party to comply with any obligation, covenant, agreement or condition in this Agreement may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition will not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

5

Product Supply Agreement

9.10    *No Third-Party Beneficiary*.  Each party to this Agreement intends that this Agreement will not benefit or create any right or cause of action in or on behalf of any Person other than the Parties to this Agreement.

9.11    *Assignment*.  This Agreement may not be assigned, by operation of law or otherwise by Company in whole or in part without the express, written permission of Provider (a merger or stock sale shall be deemed to constitute an assignment for purposes of this restriction).  Any attempt to assign this Agreement will be null and void.  Notwithstanding the foregoing, either party may assign this Agreement without consent to an affiliate or to a purchaser of all or substantially all of such party's assets to which this Agreement relates.

9.12    *Entire Agreement*.  This Agreement and any related Schedules, Addenda, Exhibits and Attachments, as so designated, set forth the entire agreement and understanding of the Parties relating to the subject matter contained herein, and merges all prior discussions and agreements, both oral and written, between the Parties. Each party agrees that use of pre-printed forms, including email, purchase orders, acknowledgements or invoices, is for convenience only and all pre-printed terms and conditions stated thereon, except as specifically set forth in this Agreement, are void and of no effect.  Unless expressly amended by Schedule, the terms and conditions of this Agreement shall prevail.  No amendment or modification to this Agreement shall be valid unless set forth in writing and signed by authorized representatives of both Parties.

9.13    *Interpretation*.  The headings and section references contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include," "includes," "including" or similar expressions are used in this Agreement, they will be understood to be followed by the words "without limitation".  The term "Person" means any individual, trustee, firm, corporation, partnership, limited liability company, trust, joint venture, bank, government authority, trust or other organization or entity.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

9.14    *Counterparts; Delivery by Facsimile or E-Mail*.  This Agreement may be executed in one or more counterparts, all of which taken together will constitute one instrument.  Any signature page delivered via facsimile or e-mail shall be binding to the same extent as an original signature page.

9.15    *No Use of Affiliates for Prohibited Actions*.  Each party shall not direct, authorize or permit any of its affiliates to take any action that would be prohibited if taken by such party, and any such action by an affiliate of such party shall be deemed a breach of this Agreement on the part of such party.  For purposes of this Agreement, an "affiliate" of either party is any person or entity that controls, is controlled by or is under common control with such party.

[Signature Page Follows]

6

Product Supply Agreement

9.16   *Force Majeure*. Neither party shall be deemed to be in breach hereof or liable to to the other in any manner on account of any delay in delivery or other performance to the extent caused by any contingency beyond such party's reasonable control, including without limitation, fire; flood; riot; hostilities; strikes or other labor disputes; freight embargoes; shortage of labor; acts of God or of a public enemy; or the effect of any existing or future laws, acts or regulations of any applicable federal, state or local government.  A party claiming force majeure shall provide prompt written notice to the other party of the event and use all commercially reasonable efforts to mitigate the impact of the force majeure event and to resume performance as promptly as practicable.

    IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date(s) indicated below and effective as of the Effective Date.

**COMPANY**                                              **PROVIDER**

Shang Peng Gao Ke, Inc.                                  iHealthScience LLC

By: _____                             By: _____
Printed Name: Theodore R Sanders, Jr.                    Printed Name: Chris Miller
Title: Director                                          Title: Manager
Date: _____                            Date: _____

7

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit  7 -
Agreements between Radial IT and SPGK   Pg 9 of 39

FSD2021-0318                    **Page 27 of 365**                    **2023-04-24**

## EXHIBIT A

### LIST AND DESCRIPTION OF PRODUCTS

**Description of Products:** "Products" shall mean any product supplied by Provider to Company during the Term.

**Term of Agreement**: Subject to the terms and conditions of this Agreement, the "Term" shall commence on the Effective Date and continue until five (5) years thereafter, unless the Term is extended in a writing signed by authorized representatives of both Parties.

Product Supply Agreement – Exhibit A

21-11854-dsj    Doc 44-7    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit  7 -
Agreements between Radial IT and SPGK    Pg 10 of 39

FSD2021-0318                     Page 28 of 365                     2023-04-24

## EXHIBIT B

### DELIVERY TERMS AND CONDITIONS

*Delivery Terms*:

Provider shall use commercially reasonable efforts to deliver all orders within the applicable lead times required by this Agreement.  Provider fulfils its obligation to deliver the Products when the Products have been made available to the Company as set forth below. Provider shall send the Company documents related to the Products within 10 days after delivery of Products and at the Company's address set out in herein.

*Shipping*:

Unless otherwise clearly specified in the Agreement, Provider shall ship all orders on a freight prepaid basis, DDP (Destination), where title and risk of loss shall pass to Company. Provider shall arrange the loading of Products, and the Products shall be packed in a manner reasonably acceptable to the parties. Unless otherwise expressly provided herein, the Products shall be packed in manner adequate to protect the Products. The Company hereby declares it has received all information regarding the Products necessary to arrange insurance coverage.

Product Supply Agreement – Exhibit B

# LICENSE AGREEMENT

This LICENSE AGREEMENT (the "Agreement") is made and entered into as of October 1, 2016 (the "Effective Date") by and between Radial IT Systems, Ltd., a Cayman Islands company ("Licensor"), and Shang Peng Gao Ke, Inc., a Cayman Islands company ("Licensee"). Each of the signatories hereto is individually, a "Party" and collectively, the "Parties."

## RECITALS

A.     Licensor and Licensee are in the business of marketing various software applications, tangible products and related services by means of online sales.

B.     As of the Effective Date, Licensor agreed to license to Licensee the Licensed Materials (as defined below) for compensation as set forth in Exhibit B attached hereto.

B.     The Parties now wish to memorialize and clarify the terms of that agreement, as set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.     Definitions. As used herein, the following words, phrases, or terms in this Agreement shall have the following meanings:

1.1     "Affiliates" mean any corporation or legal entity which is controlled by, controls, or is under common control of a Party. For this purpose, the meaning of the word "control" shall include, without limitation, direct or indirect ownership of more than fifty percent (50%) of the voting shares of interest of such corporation or legal entity.

1.2     "Business" means the marketing business, the business of providing cloud-based internet productivity and communications applications and related services, and the business of providing tangible consumer products and services in the People's Republic of China ("PRC") and to PRC customers and users.

1.3     "Confidential Material" means any information which is confidential in nature, that is designated or identified as confidential by a Party or by any of its Affiliates, or that has not been voluntarily disclosed or made available to the general public, and that is furnished by or on behalf of such Party or any of its Affiliates (collectively, the "Disclosing Party") to the other Party or to any of its Affiliates (collectively, the "Receiving Party"), whether such information is or has been conveyed verbally or in written or other tangible form, and whether such information is acquired directly or indirectly such as in the course of discussions or other investigations by the Receiving Party. Confidential Material shall not include information that: (a) was known by the Receiving Party without obligation of confidentiality prior to disclosure thereof by the other Party; (b) was in or entered the public domain through no fault of the Receiving Party; (c) is disclosed to the Receiving Party by a third party legally entitled to make such disclosure without violation of any

License Agreement (Radial IT Systems to SPGKI)

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit 7 -
Agreements between Radial IT and SPGK   Pg 12 of 39

FSD2021-0318                    Page 30 of 365                    2023-04-24

obligation of confidentiality; (d) is required to be disclosed by applicable laws or regulations (but in such event, only to the extent required to be disclosed, and provided that the Disclosing Party is given the opportunity to review and redact the Agreement prior to disclosure); or (e) is independently developed by the Receiving Party without reference to any Confidential Material of the other Party.

1.4    "Intellectual Property Rights" mean: (a) copyright, patents, database rights and rights in trademarks, designs, know-how and confidential information (whether registered or not); (b) applications for registration and the right to apply for registration for any of these rights; and (c) all other intellectual property rights and equivalents or similar forms of protection existing anywhere in the world.

1.5    "Licensed Materials" means the trademarks, software, technology and other Intellectual Property Rights set forth on Exhibit A attached hereto, and with respect to any software or applications shall include all related user documentation as well as later authorized or released versions of such program or documentation, and with respect to any tangible consumer products shall include all related user guides, instructions and training manuals as well as later authorized or released versions thereof. All updates and modifications to the Licensed Materials shall constitute "Licensed Materials" subject to this Agreement and be promptly provided to Licensee.

2.    License.

2.1    Grant of License. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee during the Term an exclusive, royalty-bearing, non-transferable right and license to use, copy, use, modify, manufacture, have manufactured, sell, distribute, and advertise and otherwise exploit the Licensed Materials in connection with Licensee's Business.

2.2    Restrictions. Only those licenses expressly set forth in this Agreement are granted. All licenses granted by Licensor to Licensee under this Agreement are personal to Licensee and are subject to the following further limitations:

(a)    Except as expressly authorized in this Agreement or by applicable law, Licensee agrees (i) it will not otherwise reproduce, assign, transfer, lease, rent or distribute any Licensed Materials; and (ii) it will not remove, efface or obscure any copyright notices, logos or other proprietary notices or legends included in any Licensed Materials.

(b)    Except as expressly authorized in this Agreement or by applicable law, (i) Licensee is not granted any sublicense rights and (ii) no other licenses are granted under this Agreement, whether by implication, estoppel, course of conduct, or otherwise.

(c)    Any modifications, improvements or derivative works of any part of the Licensed Materials shall be owned solely and exclusively by Licensor and shall constitute "Licensed Materials" for purposes of this Agreement.

2.3    Delivery. Within a commercially reasonable period of time following the execution of this Agreement and from time to time during the Term, Licensor shall deliver to Licensee, on the terms and conditions specified herein, the Licensed Materials necessary for Licensee to exercise its license rights in accordance herewith.

License Agreement (Radial IT Systems to SPGKI)

2

21-11854-dsj    Doc 44-7    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit  7 -
Agreements between Radial IT and SPGK    Pg 13 of 39

FSD2021-0318                        Page 31 of 365                        2023-04-24

3.    Schedule of Compensation.  In consideration of Licensor's grant of the license pursuant to Section 2 above, Licensee shall pay Licensor the compensation in the form and manner as more particularly described on the "Schedule of Compensation" attached as Exhibit B hereto and incorporated herein by reference.

4.    Tax Withholding.  The Parties acknowledge and agree that Licensee shall be responsible to calculate, withhold, and submit all applicable withholding taxes.  Licensor shall be responsible for providing sufficient information to Licensee to facilitate such calculation.

5.    Ownership.

5.1    General.  Licensor retains exclusive right, title and interests in and to the Licensed Materials, related documentation and any other proprietary Licensor technology and materials delivered to Licensee pursuant to this Agreement.

5.2    No Transfer of Ownership.  Nothing in this Agreement is intended to transfer any Intellectual Property Rights from Licensor to Licensee. If Licensee is ever inadvertently or erroneously held or deemed to be the owner of any such Intellectual Property Rights, Licensee agrees to assign and hereby irrevocably assigns to Licensor all such interests as of the Effective Date, and agrees to execute all documents to implement and confirm the letter and intent of this Section 5.2.

6.    Term and Termination.

6.1    Term.  The term (the "Term") of this Agreement shall commence as of the Effective Date and shall continue until terminated in accordance with Section 6.2 below.

6.2    Termination.  The Agreement may terminate in the following circumstances:

(a)    Termination Upon Notice or Mutual Agreement.  This Agreement may be terminated by either Party, with or without cause, upon thirty (30) days' prior written notice to the other Party.  In addition, this Agreement may be terminated upon mutual agreement of the Parties.

(b)    Material Breach. In the event of a material breach by either Party, the non-breaching Party may terminate this Agreement upon written notice to the breaching Party if such breach is not corrected within thirty (30) calendar days after written notice is received by the breaching Party for the subject breach.

(c)    Bankruptcy or Insolvency. Either Party may terminate this Agreement if the other Party files a petition in bankruptcy or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or discontinues or dissolves its business, or if a receiver is appointed for such Party or for such Party's business and such event is not discharged within thirty (30) days.

6.3    Effect of Termination.

(a)    Upon termination of this Agreement, Licensee shall promptly cease all use of the Licensed Materials.

License Agreement (Radial IT Systems to SPGKI)

3

(b)      Termination of this Agreement for any reason shall not release either Party from any liability which, at the time of such termination, has already accrued to the other Party or which is attributable to a period prior to such termination nor preclude either Party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this Agreement.

(c)      The Parties' obligations under this Agreement, which by their nature would continue beyond the termination of this Agreement, shall survive the termination of this Agreement. Specifically, the following Sections of this Agreement shall survive any termination of this Agreement: Sections 5 (Ownership), 6.3 (Effect of Termination), 8 (Limitation of Liability), 9 (Indemnification), 10 (Confidential Material) and applicable provisions in 11 (Miscellaneous).

7.    Representations, Warranties and Obligations of Parties.

7.1    Mutual. Each Party represents and warrants to the other Party that: (a) it has the authority, corporate and otherwise, to enter into this Agreement and to perform its obligations in accordance with the terms hereof; and (b) there are no actions, suits, proceedings, or material claims or investigations pending or threatened against it in any court, or by or before any federal, state, municipal, or other governmental department, commission, board, bureau, agency, or other instrumentality, domestic or foreign, or before any arbitrator of any kind, that, if adversely determined, could adversely affect its ability to satisfy its obligations hereunder.

7.2    Licensor Authority. Licensor represents and warrants that it has the right and power to grant the licenses granted herein and that there are no other agreements with any other party in conflict herewith.  Licensor further represents and warrants that to the best of its knowledge, all rights licensed hereunder do not infringe any valid right of any third party.

7.3    Support of Licensee's Business.  Licensee shall be solely responsible for the manufacture, production, sale, and distribution of the Licensed Products in the PRC and will bear all related costs associated therewith.  Licensor shall not in any way, directly or indirectly, engage or support the manufacture, production, sale, and distribution of the Licensed Products in the PRC, except as may be expressly provided pursuant to written agreements between the Parties providing for Licensor and/or its affiliates to support Licensee's Business.

7.4    Quality Control.  The Licensed Products shall be of a high quality which is at least equal to comparable products previously manufactured and marketed by Licensee for the Business and comparable products previously manufactured and marketed by Licensor outside of the PRC. If the quality of a class of the Licensed Products falls below such standard, or standards as previously approved by Licensor, Licensee shall use its best efforts to restore such quality.  In the event that Licensee has not taken appropriate steps to restore such quality within thirty (30) days after notification by Licensor, Licensor shall have the right to terminate this Agreement

7.5    WARRANTY DISCLAIMER. LICENSEE HEREBY ACKNOWLEDGES THAT OTHER THAN THE EXPRESS WARRANTIES SET FORTH HEREIN, THE LICENSED MATERIALS ARE PROVIDED TO LICENSEE "AS IS" AND LICENSOR MAKES NO WARRANTIES TO LICENSEE, EXPRESS, STATUTORY, IMPLIED, OR OTHERWISE, AND LICENSOR SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES AND

License Agreement (Radial IT Systems to SPGKI)

CONDITIONS OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.

8.    Limitation of Liability.

8.1    WITH THE EXCEPTION OF BREACHES OF SECTIONS 5 (OWNERSHIP), 9 (INDEMNIFICATION), AND 10 (CONFIDENTIAL MATERIAL), NEITHER PARTY NOR ANY OF THEIR RESPECTIVE AFFILIATES SHALL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES UNDER THIS AGREEMENT, INCLUDING INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, REGARDLESS OF THE THEORY OF LIABILITY (INCLUDING NEGLIGENCE).

8.2    WITH THE EXCEPTION OF BREACHES DESCRIBED IN SECTION 8.1 ABOVE, IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY UNDER THIS AGREEMENT TO THE OTHER PARTY OR ANY THIRD PARTY, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR ANY OTHER LEGAL THEORY, EXCEED THE ROYALTIES PAID BY LICENSEE TO LICENSOR IN THE FOUR (4) CALENDAR QUARTERS IMMEDIATELY PRECEDING THE CALENDAR QUARTER IN WHICH THE SUBJECT CLAIM ARISES.

8.3    THE LIMITATIONS IN SECTIONS 8.1 AND 8.2 ABOVE APPLY EVEN IF A PARTY HAS BEEN ADVISED BEFOREHAND OF THE POSSIBILITY OF SUCH DAMAGES OR FOR A CLAIM ANY THIRD PARTY, AND NOTWITHSTANDING THE FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

9.    Indemnification.

9.1    General.  Each Party (the "Indemnifying Party") shall indemnify the other Party and its shareholders, members, officers, directors, agents, employees and assigns (each, an "Indemnified Party") and undertake to defend and hold the Indemnified Party harmless from and against any claims, demands, suits, causes of action, losses, penalties, obligations, liabilities, damages, and expenses (including court costs, reasonable attorneys' fees, interest expenses and amounts paid in compromise or settlement) ("Claims") claimed by any third party related to, caused by, arising from or on account of the Indemnifying Party's material breach of any covenant, representation, warranty, provision or agreement of the Indemnifying Party contained in this Agreement.

9.2    Indemnification Procedures.  If an Indemnified Party determines that it is entitled to indemnification under this Section 9, such Indemnified Party shall promptly notify the Indemnifying Party promptly and in writing of the Claim brought against such party, but in no event more than ten (10) business days after the party has received notice of such Claim and provide all reasonably necessary or useful information, assistance and authority to settle and/or defend any such claim or action. The selection of counsel, the conduct of the defense of any lawsuit, arbitration, or other proceeding, and any settlement shall solely be within the Indemnifying Party's control, provided that the Indemnified Party shall have the right to participate in the defense of such Claim using counsel of its choice, at its expense. No settlement that would

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit 7 -
Agreements between Radial IT and SPGK   Pg 16 of 39

FSD2021-0318                     Page 34 of 365                     2023-04-24

impose any costs or expense upon the Indemnified Party shall be made without such party's prior written consent.

10. <u>Confidential Material</u>.

10.1   <u>General</u>.  After Confidential Material is disclosed, the Receiving Party shall not use Disclosing Party's Confidential Material for any purpose other than to exercise or perform its rights or obligations under this Agreement. Receiving Party shall not, without the prior written consent of Disclosing Party, copy or otherwise reproduce Disclosing Party's Confidential Material, or disclose, disseminate or otherwise communicate, in whole or in part, Disclosing Party's Confidential Material to any third party except to Affiliates, officers, directors, employees or advisors (including, but not limited to tax and legal representatives) of Receiving Party who need to know the Confidential Material and who will have undertaken to treat the Confidential Material as confidential in accordance with the provisions of this <u>Section 10</u>. Receiving Party further agrees that it shall safeguard Disclosing Party's Confidential Material from disclosure and, use commercially reasonable efforts to ensure non-disclosure, which efforts shall be commensurate with those Receiving Party uses to protect the confidentiality of its own Confidential Material. In the event that Receiving Party becomes compelled by law or order of court or administrative body to disclose any Disclosing Party's Confidential Material, Receiving Party shall be entitled to disclose such Confidential Material provided that: (a) Receiving Party provides Disclosing Party with prompt prior written notice of such requirements to allow Disclosing Party to take any necessary action to safeguard the Confidential Material; and (b) if required to do so, Receiving Party shall furnish only that portion of Disclosing Party's Confidential Material which is legally required to be disclosed and shall exercise its commercially reasonable efforts to obtain assurances that Confidential Material will be treated in confidence.

10.2   <u>Remedies</u>. Receiving Party acknowledges and agrees that Disclosing Party may be irreparably injured by a breach of this Agreement and that Disclosing Party may be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any action instituted in any court having subject matter jurisdiction, in addition to any other remedy to which Disclosing Party may be entitled at law or in equity in the event of any breach of the provisions hereof.  Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement, but shall be in addition to all other remedies available at law or in equity.

10.3   <u>Return of Confidential Material</u>.  Upon the Disclosing Party's request and, in any event, when this Agreement has terminated, the Receiving Party will promptly return to the Disclosing Party or destroy, except for one copy of Disclosing Party's Confidential Material, which may be retained for evidence purposes only: (a) all Confidential Material that has been supplied by the Disclosing Party and is in the Receiving Party's possession or control; and (b) all analyses, studies, or other materials, or part thereof, that were created by the Receiving Party and that are based on or contain Confidential Material of the Disclosing Party.

10.4   <u>Ownership</u>. Except as otherwise provided in this Agreement, nothing in this <u>Section 10</u> is to be construed as granting Receiving Party any title, ownership, license or other right or

License Agreement (Radial IT Systems to SPGKI)

6

21-11854-dsj    Doc 44-7    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit 7 -
Agreements between Radial IT and SPGK    Pg 17 of 39

**FSD2021-0318**                          **Page 35 of 365**                          **2023-04-24**

interest in any of Disclosing Party's Confidential Material, or to any Intellectual Property Rights of the Disclosing Party embodied therein.

11.    Miscellaneous.

   11.1    Governing Law.  This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the Cayman Islands, and without reference to its principles of conflicts of law.  This Agreement shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is expressly excluded.

   11.2    Nature of Relationship; Agency.  Each Party is and for all purposes shall be deemed to be an independent contractor with respect to the performance of its obligations and duties under this Agreement.  Nothing in this Agreement shall constitute or create a joint venture, partnership, agency or any other similar arrangement between the Parties whatsoever.  Neither Party shall have the authority to assume or create obligations on behalf of the other Party, and neither Party shall take any action that has the effect of creating the appearance of its having such authority.  This Agreement shall not be deemed to constitute either Party to be the agent of the other Party.

   11.3    No Obligation to Bring or Defend Legal Actions.  Neither Party shall have any obligation hereunder to bring any claim or action against any third party for infringement or misappropriation of any of the intellectual property rights licensed hereunder, or to defend any claim or action brought by a third party with respect to any such intellectual property rights (including, without limitation, a claim or action with respect to the validity or enforceability of any such rights).

   11.4    Notices.    All notices, demands, consents, approvals, requests or other communications which any of the Parties to this Agreement may desire or be required to give hereunder (collectively, "Notices") will be in writing and will be given by (a) personal delivery, (b) facsimile transmission, (c) electronic mail or (d) delivery to Federal Express or another internationally recognized overnight courier service, fees prepaid, addressed as follows:

|  |  |
|---|---|
| If to Licensor: | Radial IT Systems, Ltd.<br>Samson & McGrath Corporate Services<br>5th Floor, Genesis Building<br>PO 446 GT, KY1-1106<br>George Town, Grand Cayman<br>Cayman Islands<br>Attention:  The Directors |
| If to Licensee: | Shang Peng Gao Ke, Inc.<br>Samson & McGrath Corporate Services<br>5th Floor, Genesis Building<br>PO 446 GT, KY1-1106<br>George Town, Grand Cayman<br>Cayman Islands<br>Attention:  The Directors |

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit 7 -
Agreements between Radial IT and SPGK   Pg 18 of 39

FSD2021-0318                    **Page 36 of 365**                    **2023-04-24**

Either Party hereto may designate another addressee (and/or change its address) for Notices hereunder by a Notice given pursuant to this <u>Section 11.4</u>. A Notice sent in compliance with the provisions of this <u>Section 11.4</u> will be deemed given on the date delivered personally or sent by facsimile or electronic mail or, if sent by courier, five (5) business days following delivery to the courier service.

11.5    <u>Successors and Assigns; Assignment</u>. This Agreement will be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns. Neither this Agreement nor any right hereunder may be assigned by either Party (by operation of law or otherwise) without the prior written consent of the other Party; <u>provided</u>, <u>however</u>, this Agreement and the rights hereunder may be assigned by Licensor to any third party upon thirty (30) days' written notice to Licensee. Any assignment by a Party in violation of this <u>Section 11.5</u> shall be null and void.

11.6    <u>Government Approval</u>. Licensee agrees to submit copies of this Agreement to any governmental agency in any country in which Licensee conducts the Business and approval of a license agreement is necessary, and Licensee agrees to promptly prosecute any such application diligently. This Agreement shall only become effective in such country or countries upon receipt of appropriate approval from the applicable governmental agency.

11.7    <u>Entire Agreement</u>. This Agreement (including the exhibits hereto, which are made a part of this Agreement by this reference) sets forth the entire agreement between the Parties relating to the subject matter hereof and all prior agreements relative thereto which are not contained herein are terminated. Amendments, variations, modifications or changes herein may be made effective and binding upon the Parties by, and only by, a written agreement duly executed by each Party, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any Party.

11.8    <u>Severability</u>. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

11.9    <u>Force Majeure</u>. If performance of this Agreement, or any obligation hereunder (other than the obligation to pay) is prevented, restricted, or interfered with by any act or condition whatsoever beyond the reasonable control of the affected Party, the Party so affected, upon giving prompt notice to the non-affected Party, will be excused from such performance to the extent of such prevention, restriction, or interference.

License Agreement (Radial IT Systems to SPGKI)                    8

21-11854-dsj    Doc 44-7    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit 7 -
Agreements between Radial IT and SPGK    Pg 19 of 39

FSD2021-0318                    Page 37 of 365                    2023-04-24

11.11   <u>Waivers</u>.  The failure at any time of any Party to require performance by any other Party of any responsibility or obligation provided for in this Agreement shall in no way affect the full right to require such performance at any time thereafter, nor shall the waiver by either Party of a breach of any provision of this Agreement by the other Party constitute a waiver of any succeeding breach of the same or any other obligation itself.

11.12   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute but one and the same agreement.

*[Signature Page Follows]*

License Agreement (Radial IT Systems to SPGKI)

9

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit  7 -
Agreements between Radial IT and SPGK    Pg 20 of 39

FSD2021-0318                          Page 38 of 365                          2023-04-24

IN WITNESS WHEREOF, the parties have duly executed this License Agreement by their duly authorized representatives as of the date(s) indicated below and effective as of the Effective Date.

**LICENSOR:**

RADIAL IT SYSTEMS, LTD.,
a Cayman Islands company

By: _____
Name: Timothy Ashcroft
Title: Director
Date: February 17, 2017

**LICENSEE:**

SHANG PENG GAO KE, INC.,
a Cayman Islands company

By: _____
Name: Theodore R. Sanders, Jr.
Title: Director
Date: February 17, 2017

[SIGNATURE PAGE TO LICENSE AGREEMENT]

License Agreement (Radial IT Systems to SPGKI)

### Exhibit A

## LICENSED MATERIALS

1.  All software and applications known as IRIS outside of the PRC (including all technology known as Phytter outside the PRC)

2.  All software and applications known as B88C outside of the PRC

3.  All software and applications designed, developed and/or owned by Licensor

4.  eCommerce platform technology

5.  All Intellectual Property Rights in any way related to the training program system that Licensor or its affiliates have developed or will develop for the Business

6.  All Intellectual Property Rights in any way related to marketing, customer tracking, sales tracking, compensation planning and compensation calculation Licensor or its affiliates have developed or will develop for the Business

7.  All Intellectual Property Rights in any way related to the Business

License Agreement (Radial IT Systems to SPGKI)

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit 7 -
Agreements between Radial IT and SPGK   Pg 22 of 39

FSD2021-0318                     **Page 40 of 365**                     2023-04-24

### Exhibit B

## SCHEDULE OF COMPENSATION

In consideration for the rights granted by Licensor to Licensee pursuant to this Agreement, Licensee will compensate Licensor as follows:

8.    <u>Royalty</u>.    Licensee shall pay Licensor a royalty equal to ten percent (10%) of Licensee's gross revenues on the Licensed Materials in connection with Licensee's Business (the "<u>Royalties</u>").

9.    <u>Payments and Reports</u>.  Royalties for each calendar month shall be due and payable by Licensee to Licensor within thirty (30) days after the close of such calendar month.  Royalty reports setting forth the Royalty calculation shall be included with such payments.

10.    <u>Audit Rights of Royalty Payments</u>.  Licensor shall have the right, at Licensor's expense, to have an independent auditor mutually agreed upon by Licensor and Licensee audit Licensee's gross revenues and Royalty amounts on an annual basis.  If such audit reveals any underpayment of Royalties in an amount greater than five percent (5%) of actual Royalties due for any calendar year, Licensee shall promptly pay the reasonable costs of such audit in addition to an amount equal to the underpayment.  Such audit shall be preceded by at least thirty (30) days' advance written notice and shall be performed during normal business hours of Licensee by the auditor.  The auditor shall have access to only those books and records of Licensee which are reasonably necessary to determine the relevant Royalties due hereunder.  Such audit rights shall continue for one (1) year following the termination of this Agreement.

11.    <u>Tax Withholding</u>.  As provided in <u>Section 4</u> of the Agreement, Licensee will be responsible for calculating, withholding and submitting applicable withholding taxes on the Royalties to the applicable tax authorities.

License Agreement (Radial IT Systems to SPGKI)

## CUSTOMER SERVICES SUPPORT AGREEMENT

This CUSTOMER SERVICES SUPPORT AGREEMENT (the "Agreement") is made and entered into as of October 1, 2016 by and between Shang Peng Gao Ke, Inc., a Cayman Islands company (the "Company"), and Radial IT Systems, Ltd., a Cayman Islands company ("Consultant"). The Company and Consultant are individually a "Party" and collectively the "Parties."

### RECITALS

A.     As of the Effective Date, the Consultant agreed to provide certain services to the Company for compensation, all as more particularly set forth on Exhibit A attached hereto.

B.     The Parties now wish to memorialize and clarify the terms of that agreement, as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.     Consulting Services. Subject to the terms and conditions set forth herein, Consultant shall perform, or contract with vendors to perform, certain services for the Company as set forth in Section 1 of Exhibit A to this Agreement (the "Services").

2.     Compensation and Payment Terms. In consideration for the Consultant's performance of the Services, the Company shall pay the Consultant fees as more particularly described in Section 2 of Exhibit A attached hereto, except as otherwise agreed to between the Parties.

3.     Effective Date. The effective date of this Agreement is the date first stated hereinabove (the "Effective Date").

4.     Tax Withholding. If applicable, the Consultant will be responsible for calculating, withholding, and submitting all applicable withholding taxes to the applicable tax authorities. The Company shall be responsible for providing sufficient information to the Consultant to facilitate such calculation. The Consultant will provide any necessary withholding certificate to the Company within a mutually agreed upon reasonable time period.

5.     VAT Taxes. If applicable, the Company will be responsible for calculating and including VAT taxes on the invoice, collecting VAT taxes from the Consultant, and remitting VAT taxes to the applicable tax authorities.

6.     <u>Indemnification</u>.

    6.1.     <u>Indemnification</u>. Each Party (the "<u>Indemnifying Party</u>") shall indemnify the other Party, its shareholders, present and future officers, directors, agents, employees, and assigns (each, an "<u>Indemnified Party</u>"), and undertake to defend and hold each Indemnified Party harmless from and against any claim, demand, suits, cause of action, losses, penalties, obligations, liabilities, damages, and expenses (including court costs, reasonable attorneys' fees, interest expenses and amounts paid in compromise or settlement) ("<u>Claims</u>") claimed by any person or entity related to, caused by, arising from or on account of the Indemnifying Party's failure to comply with any covenant, provision or agreement of the Indemnifying Party contained in this Agreement.

    6.2.     <u>Indemnification Procedures</u>. If an Indemnified Party determines that it is entitled to indemnification under this <u>Section 6</u>, the Indemnified Party shall notify the Indemnifying Party promptly and in writing of the Claim brought against the Indemnified Party, but in no event more than ten (10) days after the Indemnified Party has received notice of such Claim. The selection of counsel, the conduct of the defense of any lawsuit, arbitration, or other proceeding, and any settlement shall be within the Indemnifying Party's control, provided that the Indemnified Party shall have the right to participate in the defense of such Claim using counsel of its choice, at its expense. No settlement that would impose any costs or expense upon the Indemnified Party shall be made without the Indemnified Party's prior written consent.

7.     <u>Confidential Material</u>.

    7.1     <u>General</u>. After Confidential Material is disclosed by a Party (the "Disclosing Party"), the Party receiving such Confidential Material (the "Receiving Party") shall not use Disclosing Party's Confidential Material for any purpose other than to exercise or perform its rights or obligations under this Agreement. Receiving Party shall not, without the prior written consent of Disclosing Party, copy or otherwise reproduce Disclosing Party's Confidential Material, or disclose, disseminate or otherwise communicate, in whole or in part, Disclosing Party's Confidential Material to any third party except to the officers, directors, employees or advisors (including, but not limited to tax and legal advisors) of Receiving Party who need to know the Confidential Material and who have undertaken to treat the Confidential Material as confidential in accordance with the provisions of this <u>Section 7</u> or are otherwise subject to confidentiality obligations with respect to such Confidential Material. Receiving Party further agrees that it shall safeguard Disclosing Party's Confidential Material from disclosure and, use commercially reasonable efforts to ensure non-disclosure, which efforts shall be commensurate with those Receiving Party uses to protect the confidentiality of its own Confidential Material. In the event that Receiving Party becomes compelled by law or order of court or administrative body to disclose any Disclosing Party's Confidential Material, Receiving Party shall be entitled to disclose such Confidential Material provided that: (a) Receiving Party provides Disclosing Party with prompt prior written notice of such requirements to allow Disclosing Party to take any necessary action to safeguard the Confidential Material; and (b) Receiving Party shall furnish only that portion of Disclosing Party's Confidential Material which is legally required to be disclosed and shall exercise its commercially reasonable efforts to obtain assurances that Confidential Material will be treated in confidence. "Confidential Material" means information that is confidential in nature, that is designated or identified as confidential by

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit 7 -
Agreements between Radial IT and SPGK   Pg 25 of 39

**FSD2021-0318**                    **Page 43 of 365**                    **2023-04-24**

the Disclosing Party or that has not been voluntarily disclosed or made available to the general public by the Disclosing Party, or any information that is or was received in confidence by the Disclosing Party from any other person or entity, which is furnished by or on behalf of any Disclosing Party to the Receiving Party, whether such information is or has been conveyed verbally or in written or other tangible form, and whether such information is acquired directly or indirectly such as in the course of discussions or other investigations by the Receiving Party. Disclosing Party's Confidential Material shall not include information that: (i) was known by the Receiving Party without obligation of confidentiality prior to disclosure thereof by the Disclosing Party; (ii) was in or entered the public domain through no fault of the Receiving Party; (iii) is disclosed to the Receiving Party by a third party legally entitled to make such disclosure without violation of any obligation of confidentiality; or (iv) is independently developed by the Receiving Party without reference to Disclosing Party's Confidential Material.

7.2   <u>Return of Confidential Material</u>.  Upon the Disclosing Party's request and, in any event when this Agreement has terminated, the Receiving Party will promptly return to the Disclosing Party or destroy, except for one copy of Disclosing Party's Confidential Material, which may be  retained for evidence purposes only: (a) all Confidential Material that has been supplied by the Disclosing Party and is in the Receiving Party's possession or control; and (b) all analyses, studies, or other materials, or part thereof, that were created by the Receiving Party and that are based on or contain Confidential Material of the Disclosing Party.

7.3   <u>Remedies</u>.  Receiving Party acknowledges and agrees that Disclosing Party may be irreparably injured by a breach of this <u>Section 7</u> and that Disclosing Party may be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court to prevent breaches of this <u>Section 7</u> and to enforce specifically the terms and provisions hereof in any action instituted in any court having subject matter jurisdiction, in addition to any other remedy to which Disclosing Party may be entitled at law or in equity.

7.4   <u>Ownership</u>.  Except as otherwise provided in this Agreement, nothing in this <u>Section 7</u> is to be construed as granting Receiving Party any title, ownership, license or other right or interest in any of Disclosing Party's Confidential Material, or to any intellectual property rights of the Disclosing Party embodied therein.

8.   <u>Term and Termination</u>.

8.1.   <u>Term</u>.  The term (the "<u>Term</u>") of this Agreement shall commence as of the Effective Date and shall continue until terminated in accordance with <u>Section 8.2</u> below.

8.2.   <u>Termination</u>.  The Agreement may terminate in the following circumstances:

(a)   <u>Termination Upon Notice or Mutual Agreement</u>.  This Agreement may be terminated by either Party, with or without cause, upon thirty (30) days' prior written notice to the other Party.  In addition, this Agreement may be terminated upon mutual agreement of the Parties.

(b)      Material Breach.  In the event of a material breach by either Party, the non- breaching Party may terminate this Agreement upon written notice to the breaching Party if such breach is not corrected within thirty (30) calendar days after written notice is received by the breaching Party for the subject breach.

(c)      Bankruptcy or Insolvency.  Either Party may terminate this Agreement if the other Party files a petition in bankruptcy or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or discontinues or dissolves its business, or if a receiver is appointed for such Party or for such Party's business and such event is not discharged within thirty (30) days.

8.3      Effect of Termination.

(a)      Termination of this Agreement for any reason shall not release either Party from any liability which, at the time of such termination, has already accrued to the other Party or which is attributable to a period prior to such termination nor preclude either Party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this Agreement.

(b)      The Parties' obligations under this Agreement, which by their nature would continue beyond the termination of this Agreement, shall survive the termination of this Agreement. Specifically, the following Sections of this Agreement shall survive any termination of this Agreement:  Sections 6 (Indemnification), 7 (Confidential Material), 8.3 (Effect of Termination), and applicable provisions in 9 (Miscellaneous).

9.      Miscellaneous.

9.1.    Governing Law.  This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and without reference to its principles of conflicts of law.

9.2.    Notices.  All notices, demands, consents, approvals, requests or other communications which any of the Parties to this Agreement may desire or be required to give hereunder (collectively, "Notices") will be in writing and will be given by (a) personal delivery, (b) facsimile transmission, (c) electronic mail or (d) delivery to Federal Express or another internationally recognized overnight courier service, fees prepaid, addressed as follows:

If to the Company:
Shang Peng Gao Ke, Inc.
Samson & McGrath Corporate Services
5th Floor, Genesis Building
PO 446 GT, KY1-1106
George Town, Grand Cayman
Cayman Islands
Attention:  The Directors

Customer Services Support Agreement (Radial IT Systems to SPGKI)

4

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit  7 -
Agreements between Radial IT and SPGK    Pg 27 of 39

FSD2021-0318                    **Page 45 of 365**                    2023-04-24

If to the Consultant:
Radial IT Systems, Ltd.
Samson & McGrath Corporate Services
5th Floor, Genesis Building
PO 446 GT, KY1-1106
George Town, Grand Cayman
Cayman Islands
Attention:  The Directors

Either Party may designate another addressee (and/or change its address) for Notices hereunder by a Notice given pursuant to this Section 9.2.  A Notice sent in compliance with the provisions of this Section 9.2 will be deemed given on the date delivered personally or sent by facsimile or electronic mail or, if sent by courier, five (5) business days following delivery to the courier service.

9.3.    Successors and Assigns; Assignment.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns. Neither this Agreement nor any right hereunder may be assigned by either Party (by operation of law or otherwise) without the prior written consent of the other Party.

9.4.    Entire Agreement; Amendment.  This Agreement (including the exhibits hereto, which are made a part of this Agreement by this reference) sets forth the entire agreement between the Parties relating to the subject matter hereof and all prior agreements relative thereto which are not contained herein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the Parties by, and only by, a written agreement duly executed by each Party, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any Party.

9.5.    Remedies.  Consultant acknowledges and agrees that the Company may be irreparably injured by a breach of this Agreement and that they may be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any action instituted in any court having subject matter jurisdiction, in addition to any other remedy to which the Company may be entitled at law or in equity in the event of any breach of the provisions hereof.  Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement, but shall be in addition to all other remedies available at law or in equity.

9.6.    Severability.  If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit  7 -
Agreements between Radial IT and SPGK   Pg 28 of 39

FSD2021-0318                          Page 46 of 365                          2023-04-24

9.7.    Force Majeure.  If performance of this Agreement, or any obligation hereunder (other than the obligation to pay) is prevented, restricted, or interfered with by any act or condition whatsoever beyond the reasonable control of the affected Party, the Party so affected, upon giving prompt notice to the non-affected Party, will be excused from such performance to the extent of such prevention, restriction, or interference.

9.8.    Waivers.  The failure at any time of any Party to require performance by any other Party of any responsibility or obligation provided for in this Agreement shall in no way affect the full right to require such performance at any time thereafter, nor shall the waiver by either Party of a breach of any provision of this Agreement by the other Party constitute a waiver of any succeeding breach of the same or any other obligation itself.

9.9.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute but one and the same agreement.

*[Signature Page Follows]*

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit 7 -
Agreements between Radial IT and SPGK   Pg 29 of 39

**FSD2021-0318**                    **Page 47 of 365**                    **2023-04-24**

IN WITNESS WHEREOF, the parties have duly executed this Customer Services Support Agreement by their duly authorized representatives as of the date(s) indicated below and effective as of the Effective Date.

**COMPANY:**

SHANG PENG GAO KE, INC.,
a Cayman Islands company

By: _____
Name: Theodore R. Sanders, Jr.
Title: Director
Date:  February 24, 2017

**CONSULTANT:**

RADIAL IT SYSTEMS, LTD.,
a Cayman Islands company

By: _____
Name: Timothy Ashcroft
Title: Director
Date:  February 24, 2017

[SIGNATURE PAGE TO SERVICE AGREEMENT]

Customer Services Support Agreement (Radial IT Systems to SPGKI)

## EXHIBIT A

### SCHEDULE OF SERVICES

2.      Scope of Work; Services.  All Services performed hereunder shall be in support of the Business of the Company or the Business of the Company's affiliates.  All Services covered by this Agreement shall be performed in Taiwan by personnel of Consultant or personnel of a vendor or subcontractor of Consultant acceptable to the Company and professionally qualified to perform the Services involved.  In the event the covered services are performed at a business location outside of Taiwan or any other personnel, the Consultant will promptly notify the Company but in any event at least thirty (30) days prior to such performance.  Subject to the terms and conditions of this Agreement, the Consultant shall provide, or contract with vendors to provide, the following Services to the Company and its affiliates during the Term:

(a)      Customer Support Services.  The Consultant's customer support team and/or vendors will provide certain customer support services, including, but not limited to, customer relationship management, processing of customer enrollments, subscriptions and payments, and help desk support.

(b)      Marketing support services:  provide marketing support services, including, but not limited to, promotional and product marketing services.

3.      Billing and Compensation

(a)      Services.  The Services described above shall be billed on a monthly basis at Consultant's cost, with no markup thereon.  For billing purposes, to the extent the Services are performed by the personnel of a vendor or subcontractor of Consultant, costs shall include the Consultant's independent contractor and other vendor costs necessary to provide the services, without any markup thereon.

(b)      Method of Cost Calculation.  Allocation of costs for Services specific to the Company and its affiliates will be based upon actual costs multiplied by the percentage of time spent performing the Services.

(c)      Renegotiation of Method of Cost Calculation.  The method of cost calculation stated herein may be renegotiated from time to time if extraordinary and external business circumstances arise during the year, or both the Consultant and the Company agree to adjust the calculation method, with the renegotiation and the terms to be on an arm's length basis.

(d)      Out-of-Pocket Expenses.  Reimbursement of any out-of-pocket expenses, including but not limited to, travel and supplies costs, will be billed by the Consultant to the Company on the monthly invoice at cost.  For the avoidance of doubt, independent contractor or other similar vendor costs shall be included as "costs" under Section 2(a) above.

(e)      Settlement of Invoices.  Invoices shall be paid in full and settled within 30 days from the invoice date, or as otherwise agreed upon by the Parties.

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit  7 -
Agreements between Radial IT and SPGK   Pg 31 of 39

**FSD2021-0318**                     **Page 49 of 365**                     **2023-04-24**

## PROFESSIONAL SERVICES AGREEMENT

This PROFESSIONAL SERVICES AGREEMENT (the "Agreement") is made and entered into as of October 1, 2016 by and between Shang Peng Gao Ke, Inc., a Cayman Islands company (the "Company"), and Radial IT Systems, Ltd., a Cayman Islands company ("Consultant"). The Company and Consultant are individually a "Party" and collectively the "Parties."

### RECITALS

A.      As of the Effective Date, the Consultant agreed to provide certain services to the Company for compensation, all as more particularly set forth on Exhibit A attached hereto.

B.      The Parties now wish to memorialize and clarify the terms of that agreement, as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.      Consulting Services.  Subject to the terms and conditions set forth herein, Consultant shall perform, or contract with vendors to perform, certain services for the Company as set forth in Section 1 of Exhibit A to this Agreement (the "Services").

2.      Compensation and Payment Terms.  In consideration for the Consultant's performance of the Services, the Company shall pay the Consultant fees as more particularly described in Section 2 of Exhibit A attached hereto, except as otherwise agreed to between the Parties.

3.      Effective Date.  The effective date of this Agreement is the date first mentioned hereinabove (the "Effective Date").

4.      Tax Withholding.  If applicable, the Consultant will be responsible for calculating, withholding, and submitting all applicable withholding taxes to the applicable tax authorities.  The Company shall be responsible for providing sufficient information to the Consultant to facilitate such calculation.  The Consultant will provide any necessary withholding certificate to the Company within a mutually agreed upon reasonable time period.

5.      VAT Taxes.  If applicable, the Company will be responsible for calculating and including VAT taxes on the invoice, collecting VAT taxes from the Consultant, and remitting VAT taxes to the applicable tax authorities.

Professional Services Agreement (Radial IT Systems to
SPGKI)

1

6.    Indemnification.

6.1.    Indemnification.  Each Party (the "Indemnifying Party") shall indemnify the other Party, its shareholders, present and future officers, directors, agents, employees, and assigns (each, an "Indemnified Party"), and undertake to defend and hold each Indemnified Party harmless from and against any claim, demand, suits, cause of action, losses, penalties, obligations, liabilities, damages, and expenses (including court costs, reasonable attorneys' fees, interest expenses and amounts paid in compromise or settlement) ("Claims") claimed by any person or entity related to, caused by, arising from or on account of the Indemnifying Party's failure to comply with any covenant, provision or agreement of the Indemnifying Party contained in this Agreement.

6.2.    Indemnification Procedures.  If an Indemnified Party determines that it is entitled to indemnification under this Section 6, the Indemnified Party shall notify the Indemnifying Party promptly and in writing of the Claim brought against the Indemnified Party, but in no event more than ten (10) days after the Indemnified Party has received notice of such Claim.  The selection of counsel, the conduct of the defense of any lawsuit, arbitration, or other proceeding, and any settlement shall be within the Indemnifying Party's control, provided that the Indemnified Party shall have the right to participate in the defense of such Claim using counsel of its choice, at its expense.  No settlement that would impose any costs or expense upon the Indemnified Party shall be made without the Indemnified Party's prior written consent.

7.    Confidential Material.

7.1    General.  After Confidential Material is disclosed by a Party (the "Disclosing Party"), the Party receiving such Confidential Material (the "Receiving Party") shall not use Disclosing Party's Confidential Material for any purpose other than to exercise or perform its rights or obligations under this Agreement.  Receiving Party shall not, without the prior written consent of Disclosing Party, copy or otherwise reproduce Disclosing Party's Confidential Material, or disclose, disseminate or otherwise communicate, in whole or in part, Disclosing Party's Confidential Material to any third party except to the officers, directors, employees or advisors (including, but not limited to tax and legal advisors) of Receiving Party who need to know the Confidential Material and who have undertaken to treat the Confidential Material as confidential in accordance with the provisions of this Section 7 or are otherwise subject to confidentiality obligations with respect to such Confidential Material.  Receiving Party further agrees that it shall safeguard Disclosing Party's Confidential Material from disclosure and, use commercially reasonable efforts to ensure non-disclosure, which efforts shall be commensurate with those Receiving Party uses to protect the confidentiality of its own Confidential Material.  In the event that Receiving Party becomes compelled by law or order of court or administrative body to disclose any Disclosing Party's Confidential Material, Receiving Party shall be entitled to disclose such Confidential Material provided that: (a) Receiving Party provides Disclosing Party with prompt prior written notice of such requirements to allow Disclosing Party to take any necessary action to safeguard the Confidential Material; and (b) Receiving Party shall furnish only that portion of Disclosing Party's Confidential Material which is legally required to be disclosed and shall exercise its commercially reasonable efforts to obtain assurances that Confidential Material will be treated in confidence.  "Confidential Material" means information that is confidential in nature, that is designated or identified as confidential by

Professional Services Agreement (Radial IT Systems to
SPGKI)

2

the Disclosing Party or that has not been voluntarily disclosed or made available to the general public by the Disclosing Party, or any information that is or was received in confidence by the Disclosing Party from any other person or entity, which is furnished by or on behalf of any Disclosing Party to the Receiving Party, whether such information is or has been conveyed verbally or in written or other tangible form, and whether such information is acquired directly or indirectly such as in the course of discussions or other investigations by the Receiving Party. Disclosing Party's Confidential Material shall not include information that: (i) was known by the Receiving Party without obligation of confidentiality prior to disclosure thereof by the Disclosing Party; (ii) was in or entered the public domain through no fault of the Receiving Party; (iii) is disclosed to the Receiving Party by a third party legally entitled to make such disclosure without violation of any obligation of confidentiality; or (iv) is independently developed by the Receiving Party without reference to Disclosing Party's Confidential Material.

7.2    Return of Confidential Material.  Upon the Disclosing Party's request and, in any event when this Agreement has terminated, the Receiving Party will promptly return to the Disclosing Party or destroy, except for one copy of Disclosing Party's Confidential Material, which may be retained for evidence purposes only: (a) all Confidential Material that has been supplied by the Disclosing Party and is in the Receiving Party's possession or control; and (b) all analyses, studies, or other materials, or part thereof, that were created by the Receiving Party and that are based on or contain Confidential Material of the Disclosing Party.

7.3    Remedies.  Receiving Party acknowledges and agrees that Disclosing Party may be irreparably injured by a breach of this Section 7 and that Disclosing Party may be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court to prevent breaches of this Section 7 and to enforce specifically the terms and provisions hereof in any action instituted in any court having subject matter jurisdiction, in addition to any other remedy to which Disclosing Party may be entitled at law or in equity.

7.4    Ownership.  Except as otherwise provided in this Agreement, nothing in this Section 7 is to be construed as granting Receiving Party any title, ownership, license or other right or interest in any of Disclosing Party's Confidential Material, or to any intellectual property rights of the Disclosing Party embodied therein.

8.    Term and Termination.

8.1.    Term.  The term (the "Term") of this Agreement shall commence as of the Effective Date and shall continue until terminated in accordance with Section 8.2 below.

8.2.    Termination.  The Agreement may terminate in the following circumstances:

(a)    Termination Upon Notice or Mutual Agreement.  This Agreement may be terminated by either Party, with or without cause, upon thirty (30) days' prior written notice to the other Party.  In addition, this Agreement may be terminated upon mutual agreement of the Parties.

3

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit 7 -
Agreements between Radial IT and SPGK   Pg 34 of 39

**FSD2021-0318**                    **Page 52 of 365**                    **2023-04-24**

(b)   <u>Material Breach</u>.  In the event of a material breach by either Party, the non- breaching Party may terminate this Agreement upon written notice to the breaching Party if such breach is not corrected within thirty (30) calendar days after written notice is received by the breaching Party for the subject breach.

(c)   <u>Bankruptcy or Insolvency</u>.  Either Party may terminate this Agreement if the other Party files a petition in bankruptcy or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or discontinues or dissolves its business, or if a receiver is appointed for such Party or for such Party's business and such event is not discharged within thirty (30) days.

8.3   <u>Effect of Termination</u>.

(a)   Termination of this Agreement for any reason shall not release either Party from any liability which, at the time of such termination, has already accrued to the other Party or which is attributable to a period prior to such termination nor preclude either Party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this Agreement.

(b)   The Parties' obligations under this Agreement, which by their nature would continue beyond the termination of this Agreement, shall survive the termination of this Agreement. Specifically, the following Sections of this Agreement shall survive any termination of this Agreement:  <u>Sections </u>6 (Indemnification), 7 (Confidential Material), <u>8.3</u> (Effect of Termination), and applicable provisions in 9 (Miscellaneous).

9.   <u>Miscellaneous</u>.

9.1.   <u>Governing Law</u>.  This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and without reference to its principles of conflicts of law.

9.2.   <u>Notices</u>.  All notices, demands, consents, approvals, requests or other communications which any of the Parties to this Agreement may desire or be required to give hereunder (collectively, "<u>Notices</u>") will be in writing and will be given by (a) personal delivery, (b) facsimile transmission, (c) electronic mail or (d) delivery to Federal Express or another internationally recognized overnight courier service, fees prepaid, addressed as follows:

If to the Company:
Shang Peng Gao Ke, Inc.
Samson & McGrath Corporate Services
5th Floor, Genesis Building
PO 446 GT, KY1-1106
George Town, Grand Cayman
Cayman Islands
Attention:  The Directors

21-11854-dsj   Doc 44-7   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit  7 -
Agreements between Radial IT and SPGK    Pg 35 of 39

**FSD2021-0318**                    **Page 53 of 365**                    **2023-04-24**

If to the Consultant:
Radial IT Systems, Ltd.
Samson & McGrath Corporate Services
5th Floor, Genesis Building
PO 446 GT, KY1-1106
George Town, Grand Cayman
Cayman Islands
Attention:  The Directors

Either Party may designate another addressee (and/or change its address) for Notices hereunder by a Notice given pursuant to this Section 9.2.  A Notice sent in compliance with the provisions of this Section 9.2 will be deemed given on the date delivered personally or sent by facsimile or electronic mail or, if sent by courier, five (5) business days following delivery to the courier service.

9.3.    Successors and Assigns; Assignment.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns. Neither this Agreement nor any right hereunder may be assigned by either Party (by operation of law or otherwise) without the prior written consent of the other Party.

9.4.    Entire Agreement; Amendment.  This Agreement (including the exhibits hereto, which are made a part of this Agreement by this reference) sets forth the entire agreement between the Parties relating to the subject matter hereof and all prior agreements relative thereto which are not contained herein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the Parties by, and only by, a written agreement duly executed by each Party, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any Party.

9.5.    Remedies.  Consultant acknowledges and agrees that the Company may be irreparably injured by a breach of this Agreement and that they may be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any action instituted in any court having subject matter jurisdiction, in addition to any other remedy to which the Company may be entitled at law or in equity in the event of any breach of the provisions hereof.  Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement, but shall be in addition to all other remedies available at law or in equity.

9.6.    Severability.  If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

9.7.     Force Majeure.  If performance of this Agreement, or any obligation hereunder (other than the obligation to pay) is prevented, restricted, or interfered with by any act or condition whatsoever beyond the reasonable control of the affected Party, the Party so affected, upon giving prompt notice to the non-affected Party, will be excused from such performance to the extent of such prevention, restriction, or interference.

9.8.     Waivers.  The failure at any time of any Party to require performance by any other Party of any responsibility or obligation provided for in this Agreement shall in no way affect the full right to require such performance at any time thereafter, nor shall the waiver by either Party of a breach of any provision of this Agreement by the other Party constitute a waiver of any succeeding breach of the same or any other obligation itself.

9.9.     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute but one and the same agreement.

*[Signature Page Follows]*

Professional Services Agreement (Radial IT Systems to SPGKI)

6

IN WITNESS WHEREOF, the parties have duly executed this Professional Services Agreement by their duly authorized representatives as of the date(s) indicated below and effective as of the Effective Date.

**COMPANY:**

SHANG PENG GAO KE, INC.,
a Cayman Islands company

By: _____
Name: Theodore R. Sanders, Jr.
Title: Director
Date: February 17, 2017


**CONSULTANT:**

RADIAL IT SYSTEMS, LTD.,
a Cayman Islands company

By: _____
Name: Timothy Ashcroft
Title: Director
Date: February 17, 2017


[SIGNATURE PAGE TO PROFESSIONAL SERVICES AGREEMENT]

Professional Services Agreement (Radial IT Systems to SPGKI)

## EXHIBIT A

## SCHEDULE OF SERVICES

1.      Scope of Work; Services.  All Services performed hereunder shall be in support of the Business of the Company or the Business of the Company's affiliates.  All Services covered by this Agreement shall be performed in California by personnel of Consultant or personnel of a vendor or subcontractor of Consultant acceptable to the Company and professionally qualified to perform the Services involved.  In the event the covered services are performed at a business location outside of California or any other personnel, the Consultant will promptly notify the Company but in any event at least thirty (30) days prior to such performance.  Subject to the terms and conditions of this Agreement, the Consultant shall provide, or contract with vendors to provide, the following Services to the Company and its affiliates during the Term:

(a)      Corporate management services:   oversee operations, management, executive, human resources, legal, compliance, contract management functions; product development, manufacturing, delivery and fulfillment support services; provide administrative services; manage the accounting department.

(b)      Bookkeeping, accounting, tax and finance support services:   provide certain bookkeeping, accounting, tax and finance support services, including, but not limited to, treasury and banking management, accounting information systems management, bookkeeping, month-end closing and reconciliation assistance, and audit support.

(c)      Marketing support services:  provide marketing support services, including, but not limited to, promotional and product marketing services.

(d)      IT Business System support services:   support and operate all back-office IT systems, including but not limited to the Exigo system and training system; monitor, evaluate and recommend training and marketing support services for the Company's client (and/or the affiliates thereof) to pursue; monitor and review consulting services performed by consultant personnel under contracts with the Company's client (and/or the affiliates thereof); review, evaluate and process invoices, invoice substantiation, time of performance and services performed by consultant personnel under contracts with the Company's client (and/or the affiliates thereof); monitor and report work performed and wages and/or salaries properly due and owing pursuant to the consultant contracts held by the Company's client (and/or the affiliates thereof); process e-commerce product orders for delivery and fulfillment; monitor, calculate and recommend payment amounts and payment methods of all forms of compensation as may be owed by the Company's client (and/or the affiliates thereof) to customers, referral agents and contracted consulting and customer service providers.

(e)      Technical support services:   provide technical support services related to e-commerce, web hosting and websites of the Company's client (and/or the affiliates thereof) as well as the websites utilized by customers, referral agents, contracted consulting and customer service providers and employees thereof; provide support services related to web content changes and system upgrades and modifications.

Professional Services Agreement (Radial IT Systems to
SPGKI)

A-1

2.    Billing and Compensation

(a)    Services.  The Services described above shall be billed on a monthly basis at Consultant's cost, at no markup.  For billing purposes, "costs" shall include payroll and benefits, overhead and other expenses (including independent contractor and other vendor costs necessary to provide the services).

(b)    Method of Cost Calculation.  Calculation of costs for Services specific to the Company will be based upon actual costs multiplied by the percentage of time spent performing the Services, as agreed by the Parties.

(c)    Renegotiation Method of Cost Calculation.  The method of cost calculation stated herein may be renegotiated from time to time if extraordinary and external business circumstances arise during the year, or both the Consultant and the Company agree to adjust the calculation method, with the renegotiation and the terms to be on an arm's length basis.

(d)    Out-of-Pocket Expenses.  Reimbursement of any out-of-pocket expenses incurred by Consultant personnel, including but not limited to, travel and supplies costs incurred by Consultant personnel, will be billed by the Consultant to the Company on the monthly invoice at cost.  For the avoidance of doubt, independent contractor or other similar vendor costs shall be included in "costs" under Section 2(a) above and do not constitute "out-of-pocket expenses" under this Section 2(d).

3.    Settlement of Invoices.  Invoices shall be paid in full and settled within 30 days from the invoice date, or as otherwise agreed upon by the Parties.