# EXHIBIT 8

A think that the character of the payment is other than a payment of rent. Secondly, the payment was made with a view to selling the lease. But, by virtue of the statutory hypothesis in paragraph 5 (2), the lease at the time it was sold was part of the fixed capital of a trade. What the liquidator undertook, therefore, was to pay arrears of rent of property forming part of the fixed capital of a trade. The consequent payment was, in my view, a payment of rent in respect of the fixed asset of a trade and deductible in computing the profits or gains.

B

Mr. Whiteman contended that the purpose of the concluding words of paragraph 5 (2) are to ensure that a taxpayer would get a deduction either for capital gains tax purposes or income tax purposes, but not both. That intention would be frustrated in circumstances such as the present if the taxpayer was not entitled to the deduction now claimed,

C since as there were no trading receipts there would be no question of any deduction of the payment for tax purposes. I do not think that is correct. Where one is dealing with a non-trader, there may be deductions which are not available either for capital gains tax purposes or for income tax purposes.

In the circumstances, I take the view that this payment falls within the exclusion specified in paragraph 5 (2) of Schedule 6, and is therefore

D not allowable as a deduction on the disposal. Accordingly, I allow the appeal.

*Appeal allowed.*
*By agreement, the Crown to pay tax-*
*payer company's costs.*

E    Solicitors: *Solicitor of Inland Revenue; Kingsley, Napley & Co.*

———

[CHANCERY DIVISION]

F
*\* In re* DYNAMICS CORPORATION OF AMERICA
(IN LIQUIDATION)

[No. 001 753 of 1972]

1975 Dec. 17, 18                                           Oliver J.
G

*Company—Winding up—Foreign corporation—Foreign and English debts—Liquidation abroad—Subsequent compulsory winding up in England—Scheme of arrangement with foreign creditors abroad entitling them to dividends in English liquidation— Date for conversion of claims into sterling*

The company which was incorporated in New York on
H March 31, 1924, carried on business both in the U.S.A. and the U.K. and had creditors in both countries. In August 1972 a petition for its winding up was presented in the courts of New York. On October 2, 1972, a creditor of the company presented a petition in this country, under section 399 of the Companies Act 1948, for its compulsory winding up. An order was made on that petition on May 23, 1973. Under the Federal Bankruptcy Code, which contained a provision broadly similar to section 206 of the Act of 1948, a scheme of arrangement was entered into with creditors and on November 29, 1974, was

21-11854-dsj   Doc 45-8   Filed 06/30/23   Entered 06/30/23 17:19:16   Exhibit 8 -
758                        Dynamics Corp [1976] 1 W.L.R. 757   Pg 3 of 20

In re Dynamics Corpn. (Ch.D.)                                    [1976]

approved in New York. The scheme provided for each creditor   A
to be paid 28·5 per cent. of his debt, to receive two shares of
the common stock of the company, and, in addition, such
dividend as might be paid in the English liquidation.

On a summons by the English liquidator to determine, before
any arrangements were made with the dollar creditors, the date
or dates on which the company's debts and other liabilities
should be converted into sterling:—

*Held,* that in a winding up the court sought to ascertain the   B
liabilities of the company at a particular date and to distribute
the available assets as at that date pro rata according to the
amounts of those liabilities; that in practice the process could
not be immediate but notionally it was, although subsequent
events could be taken into account in quantifying the liabilities
at the relevant date; that, in the context of a liquidation the
relevant date to ascertain the amount of liability was the
notional date of discharge of that liability and that date had to   C
be the same for all creditors and was "the date of payment"
for the purposes of any judgment which had been entered for
the sterling equivalent at the date of payment of a sum
expressed in foreign currency (post, pp. 774G—775A), and that,
accordingly, the date of the winding up order, namely, May
23, 1973, was the date at which the conversion should be
made (post, p. 775E).

Dicta of Lord Wilberforce and Lord Cross of Chelsea in   D
*Miliangos* v. *George Frank (Textiles) Ltd.* [1976] A.C. 443,
467, 497, H.L.(E.) not applied.

The following cases are referred to in the judgment:

*British American Continental Bank Ltd., In re* [1922] 2 Ch. 575, P. O.
Lawrence J. and C.A.
*British Eagle International Airlines Ltd.* v. *Compagnie Nationale Air France*   E
[1975] 1 W.L.R. 758; [1975] 2 All E.R. 390, H.L.(E.).
*City Equitable Fire Insurance Co. Ltd. (No. 2), In re* [1930] 2 Ch. 293,
C.A.
*City Life Assurance Co. Ltd., In re* [1926] Ch. 191, C.A.
*Daintrey, In re* [1900] 1 Q.B. 546, C.A.
*Davidson (Charles R.) and Co.* v. *M'Robb* [1918] A.C. 304, H.L.(Sc.).
*Dodds, In re* (1890) 25 Q.B.D. 529.                                            F
*Ellis and Co.'s Trustee* v. *Dixon-Johnson* [1924] 1 Ch. 342.
*European Assurance Society Arbitration, In re (Wallberg's* case) (1872) 17
S.J. 69.
*Holloway* v. *York* (1877) 25 W.R. 627.
*Humber Ironwork and Shipbuilding Co., In re* (1869) L.R. 4 Ch.App. 643.
*Institute of Patent Agents* v. *Lockwood* [1894] A.C. 347, H.L.(Sc.).         G
*Law Car and General Insurance Corporation, In re* [1913] 2 Ch. 103, C.A.
*Miliangos* v. *George Frank (Textiles) Ltd.* [1976] A.C. 443; [1975] 3
W.L.R. 758; [1975] 3 All E.R. 801, H.L.(E.).
*National Benefit Assurance Co. Ltd., In re* [1924] 2 Ch. 339.
*Northern Counties of England Fire Insurance Co., In re* (1880) 17 Ch.D.
337.
*Parana Plantations Ltd., In re* [1946] 2 All E.R. 214, C.A.                    H
*Russian Commercial and Industrial Bank, In re* [1955] Ch. 148; [1955] 2
W.L.R. 62; [1955] 1 All E.R. 75.
*Savin, In re* (1872) L.R. 7 Ch.App. 760.
*Schorsch Meier G.m.b.H.* v. *Hennin* [1975] Q.B. 416; [1974] 3 W.L.R.
823; [1975] 1 All E.R. 152, C.A.
*United Railways of Havana and Regla Warehouses Ltd., In re* [1961] A.C.
1007; [1960] 2 W.L.R. 969; [1960] 2 All E.R. 332, H.L.(E.).

21-11854-dsj Doc 458 Filed 06/30/23 Entered 06/30/23 17:19:16 Exhibit 8 - Dynamics Corp [1976] 1 W.L.R. 757 Pg 4 of 20

1 W.L.R. In re Dynamics Corpn. (Ch.D.)

A   The following additional cases were cited in argument:

*Bates, Ex parte* (1879) 11 Ch.D. 914, C.A.
*Browne (A Bankrupt), In re* [1960] 1 W.L.R. 692; [1960] 2 All E.R. 625.
*Cummings v. London Bullion Co. Ltd.* [1952] 1 K.B. 327; [1952] 1 All E.R. 383, C.A.
*Dawson, In re* (1966) 84 W.N.(N.S.W.) 339.
*Hawkins, decd., In re* [1972] Ch. 714; [1972] 3 W.L.R. 265; [1972] 3
B    All E.R. 386.
*Montreal Trust Co. v. Abitibi Power & Paper Co.* [1944] 3 D.L.R. 505.
*Parana Plantations Ltd., In re* [1948] 1 All E.R. 742.
*Ruffle, Ex parte* (1873) L.R. 8 Ch.App. 997.
*Searle, Hoare and Co., In re* [1924] 2 Ch. 325.

SUMMONS

C   On September 9, 1975, the liquidator in England of the company, Dynamics Corporation of America, issued a summons against the respondents, Westinghouse Electric Corporation, of Park Avenue, New York City, U.S.A., a creditor of the company in respect of whose debt the monetary unit of account was the U.S. dollar, and Electronic Visuals Ltd., of High Road, Byfleet, Surrey, a creditor of the company in respect
D   of whose debt the monetary unit of account was the pound sterling. The summons, as amended, sought to determine whether the liquidator should convert into sterling (a) debts arising from contracts, (b) liabilities for damages for breach of contract, and (c) any other liabilities which were provable and were payable in a monetary unit of account other than the pound sterling, at the rate of exchange prevailing on (i) the date such debt became due, such breach occurred or such other liability
E   accrued due, or (ii) the date of the commencement of the winding up of the company, or (iii) the date of the order to wind up the company, or (iv) the date on which the proof for each such debt or liability was admitted, or (v) the date or dates on which distributions were to be made to creditors.

The facts are stated in the judgment.

F
*Andrew Morritt* for the liquidator.
*S. D. Graham* for the first respondents.
*Robin Potts* for the second respondents.

OLIVER J. The Dynamics Corporation of America is a company which was incorporated in the State of New York on March 31, 1924,
G   and has at all material times carried on business both in the U.S.A. and in the U.K. Up to 1969 it conducted its business in the United Kingdom through a subsidiary company, Dynamco Ltd., but in that year that company ceased to trade and thereafter the company itself traded here, through its United Kingdom division. It thus acquired dollar creditors in the United States and sterling creditors in this country. The company
H   got into difficulties and in August 1972 a petition was issued in the courts of New York under which a scheme of arrangement was proposed with creditors pursuant to the Federal Bankruptcy Code which contains a provision broadly similar to section 206 of the Companies Act 1948. On October 2, 1972, a creditor of the company issued a petition in this court under section 399 of that Act, for the compulsory winding up of the company as an unregistered company, and an order was duly made on that petition on May 23, 1973.

21-11854-dsj    Doc 45-8    Filed 06/30/23    Entered 06/30/23 17:19:16    Exhibit 8 -
Dynamics Corp [1976] 1 W.L.R. 757    Pg 5 of 20

760
Oliver J.    In re Dynamics Corpn. (Ch.D.)    [1976]

The arrangement proposed was approved in New York on November 29, 1974. It is, I think, unnecessary for present purposes to consider its detailed provisions, but, in broad outline, each creditor was to be paid 28·5 per cent. of his debt, to receive two shares of the common stock of the company, and to receive in addition such dividend as might be paid in the English liquidation. The contemplation then was that there would also be a scheme of arrangement in the liquidation here, but that has not yet been formulated—and, indeed, cannot yet be formulated—because certain questions have arisen, and, in particular, the question which I am called upon to answer on the present summons which relates to the date at which the sterling value of claims in the liquidation is to be ascertained. Creditors of the company outside the United Kingdom, in respect of whose debts the monetary unit of account is the U.S. dollar, amount to $48,875,855, and, for convenience, I will refer to those creditors by the shorthand description of "dollar creditors." Creditors in respect of whose debts the monetary unit of account is the pound sterling amount to approximately £8·9 m. The amount of the available assets in the United Kingdom is not capable of being ascertained with complete accuracy at the moment. It depends, I am told, upon the outcome of certain litigation at present in progress, but it is thought to be between £400,000 and £900,000.

At the date when the petition was presented in this country the rate of exchange was $2.42 to the pound; at the date of the winding up order it was $2.56 to the pound. It has since fluctuated widely. For instance, in February 1974 it was $2.27; in September 1974 it was $2.31; in March this year it was $2.43, and at the beginning of last month it was $2.07. It thus makes a critical difference, not only to the different classes of creditors (dollar or United Kingdom) but also, on one view, to the individual dollar creditors, what date is selected as that upon which, for the purposes of distribution of the United Kingdom assets, the dollar creditors' claims are to be treated as converted into sterling, the money of the forum. For instance, on the basis of the rule thought to represent the law, until the decision of the Court of Appeal in *Schorsch Meier G.m.b.H.* v. *Hennin* [1975] Q.B. 416 namely, that the relevant date for conversion was the date when payment fell due—often referred to as "the breach date"—and on the assumption of a divisible fund of £900,000, the dollar creditors would receive 67·67 per cent. of the fund and the United Kingdom creditors 32·22 per cent. If, on the other hand, the relevant date is the date of winding up order, the dollar creditors would do better. They would receive 68·09 per cent. and the United Kingdom creditors 31·91 per cent. If, again, the date to be taken is the date when the liquidator admits the proofs of creditors, then assuming for the sake of example that he did this in the latter part of September 1976, when the rate of exchange was $2.06, the dollar creditors would collect 73·04 per cent. and the United Kingdom creditors 26·96 per cent. The liquidator has not yet adjudicated on claims of the dollar creditors, and, indeed, one of the questions raised by this summons (which I am not asked to decide at the moment) is whether he needs to do so having regard to the fact that these claims have been adjudicated and admitted in the New York proceedings.

By this summons, as originally framed, the first question asked (and which was raised as a result of the *Schorsch Meier* case) was whether debts or liabilities the monetary unit of account of which was a currency

A  other than sterling ought to be converted as at the breach date, the date of the winding up order, the date of distribution, or some other date. In the light, however, of the subsequent case, *Miliangos* v. *George Frank (Textiles) Ltd.* [1976] A.C. 443, that question has been amended to distinguish between (a) debts arising under contracts, (b) liabilities for damages for breach of contract (and in each case distinguishing between contracts the proper law of which is English and other contracts) and (c) other liabilities. The range of available dates has also had to be expanded to include the date of the commencement of the winding up and the date on which each proof of debt is admitted.

B

At present there is no evidence that there are any claims of which the monetary unit of account is a currency other than sterling, which do not fall within the first category raised by the amended summons,
C  that is to say debts arising under contracts the proper law of which is of a country other than the United Kingdom, and in what follows I confine my remarks to that category.

Until recently this problem would not have given rise to very much difficulty. It is, of course, necessary in a liquidation, if a proportionate distribution among creditors of the available assets is to be achieved,
D  that the claims of all creditors be reduced at some stage to a common unit of account, and the point of time at which that should be done had been concluded by a series of cases which established that the conversion must be made at the date when payment became due, so that the sterling amount of any claim was ascertainable either before, or at latest upon, the commencement of the winding up; for instance, see *In re Russian Commercial and Industrial Bank* [1955] Ch. 148. This may
E  not have been a rule which operated fairly in all cases but at least it had the merit of being relatively easy to apply. The wind of change, however, bloweth where it listeth and the recent decisions of the Court of Appeal in *Schorsch Meier G.m.b.H.* v. *Hennin* [1975] Q.B. 416, which I have referred to already, and of the House of Lords in *Miliangos* v. *George Frank (Textiles) Ltd.* [1976] A.C. 443, have established a
F  different rule, namely, that at least in the cases of a debt payable in a foreign currency, as opposed to damages for breach of contract or trust, judgment may be given by an English court in the appropriate currency and that, for the purpose of enforcement, the conversion is to be made at the date of the swearing of the affidavit leading to execution.

What, now, is the position when such a debt, in respect of which no
G  judgment has been obtained, or, indeed, of such a debt where judgment has been obtained but has not yet been enforced, is owed by a company which is wound up in England? I take it to be well established that the purpose of both the Bankruptcy Act 1914 and its predecessors, and of the winding up provisions of the Companies Act 1948 and its predecessors, was to ascertain the liabilities of the bankrupt or of the company, as the case may be, as at the date of the bankruptcy or
H  liquidation, and to secure the division of the debtor's property among the claimants pro rata according to the value of their claims at that date. It is, I apprehend, for this reason that the Limitation Act 1939 ceases to run at the date of the winding up order, and that a creditor claiming in respect of an interest bearing debt due and payable before the bankruptcy or winding up, cannot, in general, claim interest beyond the date of the bankruptcy or winding up.

Oliver J.                    **In re Dynamics Corpn. (Ch.D.)**                    [1976]

In the case of bankruptcy the rule is stated in *In re Savin* (1872) L.R. 7   A
Ch.App. 760, in two short passages from the judgment of James L.J.
where he says, at p. 764:

> "There is a general rule in bankruptcy—whether a right and a
> reasonable rule or not—that there is to be no proof in bankruptcy
> for interest subsequent to the bankruptcy . . . I believe, however,
> that if the question now arose for the first time I should agree with   B
> the rule, seeing that the theory in bankruptcy is to stop all things
> at the date of the bankruptcy, and to divide the wreck of the
> man's property as it stood at that time."

Exactly the same principle was expressed with regard to the liquidation
of a company by Selwyn L.J. in *In re Humber Ironworks and Ship-
building Co.* (1869) L.R. 4 Ch.App. 643. The whole passage is, I think,   C
worth reading because it sets out in a simple, and, at the same time, a com-
pelling way the theory behind the rule, that is to say that the liquidation
and the distribution are to be treated as notionally simultaneous. Selwyn
L.J. says, at p. 646:

> "There remains the question when the estate is insolvent. Now, it
> has been very properly admitted, on the part of the appellant, that   D
> there can be no question as to any interest due at the time of the
> winding up. Suppose, at the date of the winding up there is a
> creditor having £1,000 due to him for principal, and £100 due to
> him for interest. He would prove for £1,100; and if a dividend of
> 10s. in the pound were declared, he would be entitled to receive
> £550, because his interest due at the date of the winding up is just
> as much a debt as the principal. Suppose, at the same time, there   E
> was a creditor with a debt of £1,000, which, like that of the res-
> pondents in the present case, carried interest but had no interest
> due upon it at the time, and a dividend of 10s. in the pound were
> paid, he would, in my judgment, receive £500. That would be
> obviously the case if the court were able to do what it would wish
> to do, namely, to realize all the assets immediately, and distribute   F
> them amongst the creditors. It is very difficult to conceive a case in
> which the assets of a company could be thus immediately realized
> and divided; but suppose they had a simple account at a bank,
> which could be paid the next day, that would be the course of
> proceeding. Justice, I think, requires that that course of proceeding
> should be followed, and that no person should be prejudiced by   G
> the accidental delay which, in consequence of the necessary forms
> and proceedings of the court, actually takes place in realizing the
> assets; but that, in the case of an insolvent estate, all the money
> being realized as speedily as possible, should be applied equally and
> rateably in payment of the debts as they existed at the date of the
> winding up. I, therefore, think that nothing should be allowed for   H
> interest after that date. . . . I think the tree must lie as it falls;
> that it must be ascertained what are the debts as they exist at the
> date of the winding up, and that all dividends in the case of an
> insolvent estate must be declared in respect of the debts so ascer-
> tained. Of course, it will be understood that we are laying down
> this rule as applicable to all cases under the recent Act where
> creditors' actions are stayed."

21-11854-dsj Doc 452-8 Filed 06/30/23 Entered 06/30/23 17:19:16 Exhibit 8 - Dynamics Corp [1976] 1 W.L.R. 757 Pg 8 of 20

1 W.L.R. In re Dynamics Corpn. (Ch.D.) Oliver J.

A  Giffard L.J. says much the same thing, at p. 647:

> "As to the rule which my learned brother has laid down, it is the rule in bankruptcy. That rule was, as has been said, judge-made law; but it was made after great consideration, and no doubt because it works with equality and fairness between the parties; and if we are to consider convenience, it is quite clear that, where an estate is insolvent, convenience is in favour of stopping all the computations at the date of the winding up. For these reasons I am of opinion that dividends ought to be paid on the debts as they stand at the date of the winding up; for when the estate is insolvent this rule distributes the assets in the fairest way; ..."

My attention has been drawn also to *In re European Assurance Society Arbitration* (*Wallberg's* case) (1872) 17 S.J. 69 where Lord Westbury, talking about the valuation of debts in a winding up, says, at p. 70:

> "... then where does the necessity for this valuation arise? It arises immediately on the property of the company, the debtor, being directed to be equally distributed. But when is the property of the debtor company subjected to equal distribution among the creditors? At the date of the winding up order. Then, and not till then, is the company divested of its property. In effect, the property is handed over to the official liquidator to be broken up and distributed in proportionate parts among the creditor claimants who are entitled. Well, then, it follows immediately that the valuation must be made when the necessity for a valuation arises. The necessity arises, as I have said, when the order to wind up is made; and that, therefore, becomes necessarily the date of valuation."

And, having referred to section 158 of the Companies Act 1862, which is broadly equivalent to section 316 of the Companies Act 1949, he says:

> "Well, but the right to be admitted as a creditor must be considered as arising immediately that the property is handed over to the creditors, and no longer remains in the hands or under the administration of the debtor company. That is again at the date of the order to wind up."

More recently this was expressed in the well known case, *In re British American Continental Bank Ltd.* [1922] 2 Ch. 575, first of all by P. O. Lawrence J. where he says, at p. 582:

> "In a winding up, this court has to ascertain all the liabilities of the company being wound up for the purpose of effecting the proper distribution of its assets amongst its creditors. A date has necessarily to be fixed on which all debts and other liabilities are to be treated as definitely ascertained, both for the purpose of placing all creditors on an equality and for the purpose of properly conducting the winding up of the affairs of the company. According to the rules and practice now prevailing, the date so fixed is the date of the winding up order. One effect of fixing that date is to compel those creditors whose claims do not consist of debts or of liquidated demands ascertained and payable before that date to estimate and assess the amounts which they claim to be due to them on that date. Another effect of fixing that date is that when a claim is disputed this court will decide the dispute as though it

were being determined on the day when the winding up order was made. Accordingly, in a case where a creditor has an unsatisfied claim against the company for damages for breach of contract, and the amount of those damages is in dispute, this court will ascertain the correct amount as if it were sitting on the day of the winding up order and was then trying an action for damages for the breach of that contract."

And Warrington L.J., having referred to the argument of the claimants in the case, said, at p. 587:

"They also rely on an argument of the same nature upon the form of proof, which is as follows: That the company was at the date of the order for the winding up of the same—namely, on such and such a day—justly and truly indebted to the claimants in so many pounds, shillings and pence. But in my opinion all that these provisions, the section of the Act and the form of proof and so forth, lay down is that if you have to ascertain, and you must do it actually after the date of the winding up, when you ascertain you are treated as having dealt with the matter on the date of the winding up, but no more than that;"

This finds, I think, expression in section 257 (1) of the Act of 1948, which provides "As soon as may be after making a winding up order, the court . . . shall cause the assets of the company to be collected, and applied in discharge of its liabilities: . . ." The provisions of both the Companies Act 1948 and the Bankruptcy Act 1914 with regard to the submission of proof are I think all directed to this end, that is to say, to ascertaining what, at the relevant date, were the liabilities of the company or the bankrupt as the case may be, in order to determine what at that date is the denominator in the fraction of which the numerator will be the net realised value of the property available for distribution. It is only in this way that a rateable, or pari passu, distribution of the available property can be achieved, and it is, as I see it, axiomatic that the claims of the creditors amongst whom the division is to be effected must all be crystallised at the same date, even though the actual ascertainment may not be possible at that date, for otherwise one is not comparing like with like; and, indeed, this, as it seems to me, is implicit in the provisions of section 302 of the Act of 1948, which provides: "Subject to the provisions of this Act as to preferential payments, the property of a company shall, on its winding up, be applied in satisfaction of its liabilities pari passu, . . ." In the notes to this section in *Buckley on the Companies Acts*, 13th ed., (1957), p. 601 it is said:

"Distribution of assets pari passu is a prominent feature in the scheme of the Act; in sections which deal with administration of the assets, no construction which would lead to a distribution other than pari passu has ever been entertained with favour,"

and this has received a very striking reiteration recently in the speech of Lord Cross in *British Eagle International Airlines Ltd.* v. *Compagnie Nationale Air France* [1975] 1 W.L.R. 758.

Now the moment that you start introducing into this scheme of things different dates for the ascertainment of the value of the claims of individual creditors or classes of creditors, you introduce, as it seems to

21-11854-dsj    Doc 45-8    Filed 06/30/23    Entered 06/30/23 17:19:16    Exhibit 8 -
The Weekly Law Reports, July 23, 1976
Dynamics Corp [1976] 1 W.L.R. 757    Pg 10 of 20
765

1 W.L.R.              In re Dynamics Corpn. (Ch.D.)              Oliver J.

A   me, potential inequalities and thus the possibility of that which the Act impliedly prohibits, that is to say a distribution of the property of the company otherwise than pari passu. Not only section 302 itself but the winding up rules and the statutory forms referentially incorporated in them point entirely the other way, and these rules, it must be remembered, are produced under statutory authority and their validity is not open to question: see *Institute of Patent Agents* v. *Lockwood* [1894] A.C. 347, and they were clearly framed on the basis that the appropriate date at which claims fell to be ascertained for the purposes of a liquidation was the date of the winding up order. That, indeed, had been established for many years. I have already referred to *Wallberg's* case, 17 S.J. 69, and one can refer also to *In re Law Car and General Insurance Corporation* [1913] 2 Ch. 103, 135, and the judgment

B

C   of Lord Greene M.R. in *In re Parana Plantations Ltd.* [1946] 2 All E.R. 214, 218, 219.

Rule 3 of the Companies (Winding-up) Rules 1949 provides that the forms in the appendix shall be used where applicable, and, where they are not applicable, forms of the like character with such variations as circumstances may require shall be used. Rule 91 imposes on a creditor the obligation in a winding up by the court to prove his debt, and rule 92 specifies the mode of proof, that is to say by an affidavit verifying the debt. The form of affidavit is Form 59 in the appendix, and it provides, as one would expect, for proof of the sterling amount. The creditor or an authorised deponent must swear

D

E   "That the above-named company was, at the date of the order for winding up the same, viz:—the     day of     19  , and still is justly and truly indebted to     in the sum of £    ..."

So the statutory form indicates that the proof must be for a sterling sum and that it must relate to the quantum of indebtedness in sterling at the date of the winding up order.

In the light of the decline in the value of sterling as against the

F   U.S. dollar it is in the interests of those creditors who assert claims payable in U.S. dollars to argue for a conversion at the latest possible date, and Mr. Graham, on their behalf, has forcefully argued that this not only has the support of the authority of the House of Lords in *Miliangos* v. *George Frank (Textiles) Ltd.* [1976] A.C. 443 but that it is inconsistent neither with the scheme of the provisions of the Act of 1948 relating to liquidations nor with the rules made under them.

G   Logically, he says, the date of distribution is the appropriate date having regard to the recent decision of the House of Lords, *Miliangos* v. *George Frank (Textiles) Ltd.*, but the law has to be practical and the liquidator must know before he distributes the amounts which he is going to have to pay. This points to the date upon which the proof of the creditor is admitted as the appropriate date, and that is the date which is indicated

H   in at least some of the speeches of their Lordships in *Miliangos* v. *George Frank (Textiles) Ltd.* There is, Mr. Graham submits, no real difficulty about proving a debt of this sort. Of course it has to be expressed in sterling, because that is the unit of account, and the unit of payment in the liquidation, but there is nothing in the Act or the rules which compulsively points to an ascertainment either at the date of the winding up order, or, indeed, the date when the proof is lodged. Rule 3 of the Rules of 1949, itself, contemplates that there may be circumstances in

which the statutory forms may not be wholly appropriate and may have to be adapted, and the position created by the *Miliangos* case can be met, says Mr. Graham, within the framework of the Act and of the rules by the statutory forms as they now stand. He refers me to section 316 of the Act, which is in these terms:

> "In every winding up (subject, in the case of insolvent companies, to the application in accordance with the provisions of this Act of the law of bankruptcy) all debts payable on a contingency, and all claims against the company, present or future, certain or contingent, ascertained or sounding only in damages, shall be admissible to proof against the company, a just estimate being made, so far as possible, of the value of such debts or claims as may be subject to any contingency or sound only in damages, or for some other reason do not bear a certain value,"

and there is a similar provision in section 30 (4) of the Bankruptcy Act 1914 as regards the estimation of provable debts in the bankruptcy.

The claims of the dollar creditors, says Mr. Graham, are claims which do not bear a certain value because they are claims the sterling value of which is, by reason of the principles now enshrined in the *Miliangos* decision, made to depend upon the applicable rate of exchange at some future date. The creditor, therefore, in submitting his proof, has to make the best estimate of what the rate is likely to be at some future time—at which he can only guess—and he must submit his proof for an amount ascertained by the application to his debt of that rate. It will then be for the liquidator to make an adjustment according to the rate applicable at the date when he comes to consider the rejection or admission of the proof. An alternative approach might, I suppose, be to estimate the claim on the basis of the rate prevailing at the date of the winding up order, and for subsequent adjustments to be made. It is the trustee's duty, Mr. Graham points out, in relation to the bankruptcy provisions, to make the estimate, and he says "Well, there is really no difficulty about making any adjustments to reflect what is the actuality at the date when the proof comes to be adjudicated"; and he points out that rules 109 and 110 of the Rules of 1949, and the equivalent bankruptcy rules, 24 and 25, give power to expunge or vary proofs. Thus, for instance, in the analogous case of the contingent claim there is no difficulty about adjusting a proof where, for instance, the contingency occurs after the date of the proof; subject only to this, that prior dividends cannot be disturbed. He refers me to *In re Northern Counties of England Fire Insurance Co.* (1880) 17 Ch.D. 337, and *Ellis and Co.'s Trustee* v. *Dixon-Johnson* [1924] 1 Ch. 342, 357.

There seems to me to be a number of difficulties about this approach. In the first place, the claims of the dollar creditors are clearly not contingent claims, nor do they sound only in damages. But equally, as it seems to me, they are not claims which for any other reason do not bear a certain value. There is nothing in the least bit uncertain about a straight claim for, say, $1,000. This is really the crux of Mr. Graham's submission. He says that the claim is not simply a claim for $1,000. The creditor's right at the date of the winding up order is, as a result of *Miliangos* v. *George Frank (Textiles) Ltd.* [1976] A.C. 443, a right to receive $1,000, or whatever is the sterling equivalent of $1,000 when payment is received. A liquidation is not a payment. Therefore,

1 W.L.R.        **In re Dynamics Corpn. (Ch.D.)**        Oliver J.

A    what falls to be valued is not simply $1,000 but the right to receive the sterling equivalent of $1,000 at the time in the future when payment is received, and he quotes, among other cases, *In re Dodds* (1890) 25 Q.B.D. 529, to show that the valuation should take place at the latest possible moment. I do not feel that I can accept this, principally because it seems to me to be a misreading of the *Miliangos* decision. That case was not concerned, I think, with defining specifically the

B    creditor's substantive rights under his contract, which were not in doubt in fact, but with the procedural question of how, by an English judgment, effect could be given to the rights as nearly as possible, and the concept of the right as a right to damages was decisively rejected. But equally it seems to me implicit in the decision that the right is not treated as a right to $1,000 or its sterling equivalent at the date of

C    payment; that is merely the form of a judgment which the English court will deliver if called upon to give effect to the right. The right is the right to receive $1,000, and Lord Wilberforce, particularly, was at pains to point out that the creditor is not concerned with sterling fluctuations or with the value of sterling. What he wants is the sum expressed in the foreign currency, and when the winding up order is made the creditor has this right, and there is nothing, as I see it, uncertain about

D    it, and it is that right which, so it seems to me, is the right which falls to be valued.

     Secondly, even if these rights could be considered as of uncertain value, one has, I think, to inquire what it is that the creditor is seeking to do when he lodges his proof. What he is directed to do by the form of proof (and what all the previous authorities direct him to do)

E    is to indicate the value of the claim at the date of the winding up order. It seems to me that Mr. Graham's submissions lead to a dilemma. If the purpose of the dollar creditor in submitting his proof is to estimate the value of his claim at some other time than that of the winding up order, then he is doing something which involves (a) not merely a variation of, but a radical departure from, the statutory

F    form of proof, and (b) the assertion of a basis for valuation which not only is not available to any other creditor but which contradicts the whole line of authorities going back over a hundred years, upon which both the winding up rules and the bankruptcy rules have been based. If, on the other hand, what he is seeking to do is, indeed, to value his claim at the date of the winding up order, then the only appropriate value can, as I see it, be the rate of exchange prevailing at that date,

G    for that is the value which it actually would have if it were then paid. But, then, to bring the distribution into line with Mr. Graham's submission, there has, on the basis of a fluctuating exchange rate, to be a subsequent adjustment of the proof to reflect the actuality. It is, however, I think important to grasp just what such an adjustment means. It is, as Mr. Graham has pointed out, perfectly true that in the case

H    of contingent claims the court adjusts the proof if the contingency occurs between the date of the proof and the date of the distribution. A most striking example of that is, I think, *In re Northern Counties of England Fire Insurance Co.*, 17 Ch.D. 337, which Mr. Graham referred to, where the claimant was permitted to prove for the full amount due under a fire insurance policy in respect of a fire which occurred after the date of the winding up order. But the reasoning behind this is that the occurrence of the contingency is the best evidence of the value

21-11854-dsj Doc 45-8 Filed 06/30/23 Entered 06/30/23 17:19:16 Exhibit 8 - Dynamics Corp [1976] 1 W.L.R. 757 Pg 13 of 20

768
The Weekly Law Reports, July 23, 1976

Oliver J.        In re Dynamics Corpn. (Ch.D.)        [1976]

of the claim at the relevant date, that is the date of the winding up order, and the rule as stated by P. O. Lawrence J. in *Ellis and Co.'s Trustee* v. *Dixon-Johnson* [1924] 1 Ch. 342 (and this has been stated as the rule in bankruptcy in successive editions of *Williams on Bankruptcy* to the present day) was expressed in these terms, at pp. 356–357:

> ". . . there is no doubt that a contingent claim for unliquidated damages is a provable debt and its amount has to be estimated as at the date of the receiving order. That, however, does not mean that the effect of the receiving order is to accelerate the happening of the contingency, so as to fix the amount of the defendants' claim on the basis of the contingency having happened on the day of the receiving order. . . . The claim must be stated as on the day of the receiving order: if, when the proof is lodged, the contingency has not happened, the amount of the claim must be estimated as accurately as possible; if the contingency happens before the proof is lodged, that fact is pro tanto evidence of the true value of the claim as at the date of the receiving order, and there will, as a rule, be no difficulty in arriving at the amount of the claim; . . ."

But the adjustment for which Mr. Graham contends is, in my view, something quite different. There is, as I see it, no doubt about what the obligation of the company is at the date of the winding up order: it is not an obligation to pay to the dollar creditor whatever may be the sterling equivalent of his debt at some time, possibly a year or more hence, when the liquidator has time to consider and adjudicate the proof of debt. It is an obligation to pay whatever is the sterling equivalent at that date; and to adjust it subsequently to reflect an altered rate of exchange, whether up or down at the time when the proof falls to be adjudicated is not simply the ascertainment of what was the debt at the date of the winding up order but the substitution for the ascertained (or at least readily ascertainable) value at that date of a new and quite different value ascertained at a different date. Either way, therefore, Mr. Graham has to say, I think, that *Miliangos* v. *George Frank (Textiles) Ltd.* [1976] A.C. 443 has the effect of either creating a special class of dollar creditors, for whom the rules applicable to other creditors do not apply, or that it affects the substantive right of the creditor under his contract and entitles him to receive the amount in foreign currency or the equivalent at the date of payment. But, as I have pointed out, Lord Wilberforce was at pains to point out that the foreign creditor is not concerned with fluctuations in sterling. He said, at p. 466:

> "The creditor has no concern with pounds sterling; for him what matters is that a Swiss franc for good or ill should remain a Swiss franc. . . . The relevant certainty which the rule ought to achieve is that which gives the creditor neither more nor less than he bargained for. He bargained for" so many "Swiss francs; whatever this means in (unstipulated) foreign currencies, whichever way the exchange into those currencies may go, he should get" so many "Swiss francs or as nearly as can be brought about."

What the House of Lords was, as I read it, concerned with in the *Miliangos* case was how the English court, in delivering judgment, should give effect to the right which the foreign creditor has to the delivery of a certain quantity of foreign currency. But I certainly do not read

21-11854-dsj Doc 45-8 Filed 06/30/23 Entered 06/30/23 17:19:16 Exhibit 8 - Dynamics Corp [1976] 1 W.L.R. 757 Pg 14 of 20

The Weekly Law Reports, July 23, 1976

1 W.L.R.      In re Dynamics Corpn. (Ch.D.)      Oliver J.

A    the decision as entitling the creditor to an uncertain amount, and there does not appear to me to be at the date of the liquidation any uncertainty in the claim which would justify the claim being estimated under section 316. Of course if the *Miliangos* case had the effect for which Mr. Graham contends, I am bound to apply it, but if that case does compulsively lead to this conclusion it does seem to me, I must say, to accord very ill with the provisions of both the winding up and the

B    bankruptcy rules, and to cut right across the principle of pari passu distribution which is enshrined in section 302 of the Act of 1948, and this must be so, I think, not only as between dollar creditors and sterling creditors but between the dollar creditors inter se. The liquidator in this case has to deal with proofs from numerous dollar creditors whose total debts, as I have said, amount to over $48m., and as a practical

C    matter it would be quite impossible to adjudicate on all proofs on the same day, but the rate of exchange alters daily, or almost daily, and sometimes alters very materially. I have been furnished with a draft which shows the rate of exchange to the nearest cent of lower rate between January 1972 and October 1975, and it is obvious that within even relatively short periods there have been drastic rises and falls. To take only two examples, in the first half of March 1974 the rate rose

D    from approximately $2.29 to approximately $2.35 and in the first 10 days of May 1975 it dropped from approximately $2.35 to approximately $2.30; so even assuming a continuous process of adjudication over either of these two periods, the amount for which substantial creditors for exactly the same dollar amounts would be admitted to proof would vary significantly according to the unlucky, or lucky, accident of the date

E    upon which the liquidator actually considered their respective claims. Nor do the anomalies end there: section 317 of the Act introduces into the winding up the same rules with respect to the respective rights of secured and unsecured creditors and to debts provable as are in force for the time being under the law of bankruptcy, and this includes, inter alia, the mutual credit and set off provisions of section 31 of the Act of 1914. Section 31 is directory. It provides for an account to be taken

F    of what is due from one party to the other, and states in terms that the "balance of the account, and no more, shall be claimed or paid on either side respectively." As regards the availability of the set off, the relevant date is, of course, the date of the commencement of the winding up (see, for instance, *In re Daintrey* [1900] 1 Q.B. 546 and *In re City Equitable Fire Insurance Co. Ltd.* (*No.* 2) [1930] 2 Ch. 293) but it is

G    very difficult to see how the set off provisions could be sensibly made to accord with Mr. Graham's suggested date for conversion. Take, for instance, the hypothetical case of this company having, on October 2, 1972, at the commencement of the winding up, a claim against it for $24,200, and having at the same time a cross claim against that creditor for £10,000, arising out of their mutual dealings. At that date the rate

H    of exchange was $2.42 to the pound, so that if the account is taken, as directed by section 31, there is really nothing due either way, and nothing, therefore, to prove for in the liquidation. But by May 23, 1972, when the order was made, the rate had risen to $2.56, so that even if that be the right date for ascertaining the quantum of set off there would be a balance in the company's favour. On neither view would the dollar creditor have anything to prove for in the liquidation.

    If Mr. Graham's submission is correct, however, the moment the

Oliver J.           **In re Dynamics Corpn. (Ch.D.)**           [1976]

exchange rate fell below $2.40 the dollar creditor could come in and   A
prove, and whether his proof was ever admitted by the liquidator would
depend upon the rate at the time when the liquidator came to consider
it. If, for instance, it was considered on March 1, 1975, the proof
would be rejected. The exchange rate was then $2.43 and there would
be a balance due from the dollar creditor. If, on the other hand, it
was considered on September 1, when the exchange rate was $2.04, it
would be admitted for a sum of £1,860 odd. Again, if I accept Mr.   B
Graham's submissions, there are, as Mr. Potts points out, difficulties
with regard to the application of the provisions of rules 134, 140 and
141, although I think that the difficulties are perhaps less formidable
than Mr. Potts contended, and Mr. Graham has drawn my attention, in
some detail, to the provisions for the valuation of creditors' claims in
relation to voting at creditors' meetings. Finally, Mr. Graham's sub-   C
missions appear to me to create even greater difficulties when it is
sought to apply them to a voluntary liquidation, when, after all, the
date for conversion must be the same as in a compulsory liquidation.
It has to be remembered, I think, that the necessity for proving a debt
arises only in winding up by the court. In a voluntary winding up the
liquidator may call for formal proof of a debt if he is in any doubt, but   D
in the ordinary way he will accept as valid a debt entered in the com-
pany's books without any formal admission, and when, in such a case,
is the conversion to take place? Is it at the time when the liquidator
makes a mental note (if he ever does) that he is not going to challenge
the debt, or is it at the time when he calculates the total indebtedness
of the company for the purposes of making his first distribution?

For all these reasons I feel a strong disinclination to accept Mr.   E
Graham's submissions, and, if I am free to do so, I would be minded
to declare the date for conversion in the instant case to be the date
which seems to me to be more in accord with the scheme of the Act,
and with those authorities which govern the question of the appropriate
date for the valuation of claims in a liquidation. Mr. Graham, however,
contends that I am not free, and that, whether it be convenient or no,   F
the matter is concluded by *Miliangos* v. *George Frank (Textiles) Ltd.*
[1976] A.C. 443. In particular he refers me to the speeches of Lord
Wilberforce and Lord Cross. Lord Wilberforce defines the money
obligations to which his observations relate in these terms, at p. 467:

> " I would confine my approval at the present time of a change in
> the breach-date rule to claims such as those with which we are here
> concerned, i.e., to foreign money obligations, sc. obligations of a   G
> money character to pay foreign currency arising under a contract
> whose proper law is that of a foreign country and where the money
> of account and payment is that of that country, or possibly of some
> other country but not of the United Kingdom . . . As regards foreign
> money obligations (defined above), it is first necessary to establish
> the form of the claim to be made. In my opinion acceptance   H
> of the argument already made requires that the claim must be
> specifically for the foreign currency—as in this case for a sum
> stated in Swiss francs. To this may be added the alternative ' or the
> sterling equivalent at the date of ' . . . (see below). As regards the
> conversion date to be inserted in the claim or in the judgment of
> the court, the choice, as pointed out in the *Havana Railways* case
> [1961] A.C. 1007, is between (i) the date of action brought, (ii) the

21-11854-dsj Doc 45-8 Filed 06/30/23 Entered 06/30/23 17:19:16 Exhibit 8 - Dynamics Corp [1976] 1 W.L.R. 757 Pg 16 of 20

The Weekly Law Reports, July 23, 1976

1 W.L.R.       In re Dynamics Corpn. (Ch.D.)       Oliver J.

A    date of judgment, (iii) the date of payment. Each has its advantages, and it is to be noticed that the Court of Appeal in *Schorsch Meier* [1975] Q.B. 416 and in the present case chose the date of payment meaning, as I understand it, the date when the court authorises enforcement of the judgment in terms of sterling. . . So I would favour the payment date, in the sense I have mentioned. In the case of a company in liquidation, the corresponding date for con-
B    version would be the date when the creditor's claim in terms of sterling is admitted by the liquidator."

And Lord Cross of Chelsea says, at p. 497:

"I ask myself, therefore, whether there has been any change of circumstances since 1961 sufficiently great to justify us in saying that the
C    rule which in the *Havana* case [1961] A.C. 1007 was accepted on all sides without question and which formed an essential foundation for the judgments delivered ought now to be considered to be no longer an existing rule of our law. I agree with my noble and learned friend, Lord Wilberforce, that the change which has come over the 'foreign exchange' situation generally and the position of sterling in particular in the course of the last 15 years justifies us in answering that question
D    in the affirmative. In this connection I am particularly impressed by the fact that awards in commercial arbitrations are now often made in a foreign currency and that the Court of Appeal has held in the *Jugoslavenska* case [1974] Q.B. 292 that such awards can be enforced as judgments under section 26 of the Arbitration Act 1950. It would be most unfortunate for this House to cast any doubt on the correct-
E    ness of that decision; but, as my noble and learned friend points out, it would be absurd to have one rule with regard to arbitrations on debts expressed in a foreign currency and another with regard to actions brought on similar debts. Like him, however, I would go no further on this occasion than to say that the court has power to give judgment for payment of money in a foreign currency and that one case in which such a judgment should be given is where the action is
F    brought to enforce a foreign money obligation. In that case if the defendant fails to deliver the foreign currency the date for its conversion into sterling should be the date when the plaintiff is given leave to levy execution for a sum expressed in sterling. I say nothing one way or the other as to the date for conversion into sterling of sums ascertained in foreign currency for damages for breach of contract or
G    tort. Further, I agree with my noble and learned friend that where the foreign money obligation is the subject of a proof in bankruptcy or liquidation the date for conversion into sterling should be the date of the admission of the proof."

These are undoubtedly very strong expressions of opinion in carefully considered speeches in a case dealing directly with the appropriateness of
H    giving judgment for a sum of foreign currency, although not dealing directly with the effect of a foreign money claim, whether by an ordinary creditor or a judgment creditor, in a liquidation, and Mr. Graham says that they are part of the ratio decidendi, and so binding upon me; but he also says that, whether binding or no, they are dicta of the highest weight and persuasive authority and that—although I think he avoided putting it so baldly—a puisne judge should consider hard and long before arriving at a different conclusion. That, of course, I accept, subject to the reservation,

**Oliver J.**                **In re Dynamics Corpn. (Ch.D.)**                **[1976]**

first, that dicta of individual members of the House of Lords, although of   A
the greatest weight are not—as Lord Dunedin put it in *Charles R. Davidson and Co.* v. *M'Robb* [1918] A.C. 304, 322—to be accepted against one's own individual opinion unless they can be shown to express a legal proposition which is a necessary step to the judgment which the House pronounces in the case, and, secondly, that they cannot, of course, be followed if to do so would conflict with the provisions of statute.

I turn, therefore, to consider whether the observations of Lord   B
Wilberforce and Lord Cross—which I have quoted above—constitute part of the ratio decidendi of the case and thus amount to a binding decision upon the application to the position of foreign creditors of the provisions of the Act of 1948, the Act of 1914, and the rules made under them respectively. Prior to *Schorsch Meier G.m.b.H.* v. *Hennin* [1975] Q.B. 416 and *Miliangos* v. *George Frank (Textiles) Ltd.* [1976]   C
A.C. 443 the position of the foreign claimant had been exhaustively considered by their Lordships in *In re United Railways of Havana and Regla Warehouses Ltd.* [1961] A.C. 1007. That was a case which concerned a liquidation in which the respondents had claimed to quantify their debts by reference to the exchanges rates prevailing at the date of the winding up. The House of Lords rejected that and held that the   D
correct dates for conversion into sterling of the sums claimed were the dates upon which those sums respectively fell due and were not paid, and not the date of the winding up, and the basis for this decision was threefold: first, that it was axiomatic that a judgment could only be obtained in England for a sum in sterling; secondly, that any action in England for the recovery of a foreign debt was an action for damages for their failure to pay it; thirdly, that convenience and authority had   E
settled that in any action for damages the conversion took place at the date of the breach or the act, that is to say, in the case of a foreign debt, the failure to pay it when it fell due. It was to these three steps that the principal burden of Lord Wilberforce's speech in the *Miliangos* case was directed, and first, and fundamentally, to the underlying assumption that judgment could not be entered for anything but a   F
sterling sum. After considering the authorities he rejected the assumption in these terms, at p. 467:

> "In *Beswick* v. *Beswick* [1968] A.C. 58 this House laid down that in a suitable case specific performance may be ordered of an agreement to pay a sum of money of the United Kingdom. Lord Pearce, at p. 89, quoted from *Hart* v. *Hart* (1881) 18 Ch.D. 670,   G
> 685, the words: '"... when an agreement for valuable consideration ... has been partially performed, the court ought to do its utmost to carry out that agreement by a decree for specific performance".' If this is so as regards money of this country, I can see no reason why it should not be so as regards foreign money: indeed, the latter seems to have a more 'specific' character than the former."   H

This, as it seems to me, is the first ratio of the decision. The question before the House which had been directly raised on the appeal was whether judgment could be given for a sum expressed otherwise than in sterling, and, that having been answered affirmatively, Lord Wilberforce went on to consider the form of the claim. It followed from his reference to specific performance that the claim must be specifically for

21-11854-dsj    Doc 45-8    Filed 06/30/23    Entered 06/30/23 17:19:16    Exhibit 8 -
Dynamics Corp [1976] 1 W.L.R. 757    Pg 18 of 20

The Weekly Law Reports, August 6, 1976

1 W.L.R.                In re Dynamics Corpn. (Ch.D.)                Oliver J.

A   a foreign currency sum, and, indeed, he so states. Since, however, it might not be practicable to discharge the claim in the foreign currency specified, and since in any event the judgment would have to be so framed as to be capable of being executed in England if it became necessary to enforce it, provision would have to be made for conversion of the sum for which the judgment was entered into sterling, and Lord Wilberforce considers how that is to be done. He says, at p. 468: "To
B   this" ("this" being the stated sum of foreign currency) "may be added the alternative ' or the sterling equivalent at the date of . . .' (see below)" and he goes on then to consider what is to be inserted in the blank represented by the words "see below," and concludes that it is the date of payment interpreted as meaning the date when the court authorises enforcement of the judgment in terms of sterling. So this is the second
C   part of the decision: where judgment is entered for a sum expressed in foreign currency, what is the date to be inserted in the judgment as the appropriate date for conversion of that sum into sterling? And it is in this context that Lord Wilberforce refers to the case of a company in liquidation. It is, I think, obvious, that he was not suggesting for a moment that there should be inserted in the judgment the words "when the court authorises enforcement of this judgment in terms of sterling."
D   He was merely indicating, I think (as had already been said in the Court of Appeal in the *Schorsch Meier* case [1975] Q.B. 416) the court's interpretation of what, in the case of a judgment which had to be enforced by execution, the date of payment would, as a matter of practice, mean. The following words, "in the case of a company in liquidation, the corresponding date for conversion would be the date when the
E   creditor's claim in terms of sterling is admitted by the liquidator" could have no possible relevance to what was to be inserted in the judgment, and can, I think, have been intended as no more than an afterthought, and as an indication of what Lord Wilberforce considered would in practice be the date for conversion if a judgment was entered in these terms but the company went into liquidation before enforcement. It
F   was not in any sense, I think, a necessary step in the conclusion at which his Lordship had already arrived, and was, I think, intended as nothing more than an illustration of how he considered that conclusion would work in a particular hypothetical situation, which had not arisen in the case before the House and with the consideration of which the House was not concerned. The essence of the decision is that judgment may be entered for a sum in foreign currency or the sterling equivalent
G   at the date of payment. How that would operate in the hypothetical situation of a company in liquidation was not, as far as I can gather, argued and was certainly not a matter which was before the House for its decision. Lord Cross did no more than agree with Lord Wilberforce on the point. The other two noble and learned Lords who concurred in the decision do not advert to the point at all, nor does it form any
H   part of the reasoning upon which their decisions were based.
    I must, therefore, I think, reject Mr. Graham's submission that *Miliangos* v. *George Frank (Textiles) Ltd.* [1976] A.C. 443 decides the point which falls for decision in this case. At highest, the passages
▶   upon which he relies are obiter dicta—very powerful and persuasive dicta no doubt, having regard to their source, but I think, nevertheless, dicta. If I could see my way to follow them, I would feel bound loyally to do so, but, for the reasons which I have already outlined, I find myself

21-11854-dsj    Doc 45-8    Filed 06/30/23    Entered 06/30/23 17:19:16    Exhibit 8 -
774                    Dynamics Corp [1976] 1 W.L.R. 757    Pg 19 of 20

Oliver J.            In re Dynamics Corpn. (Ch.D.)            [1976]

unable to do so consistently with what I conceive to be the weight of precedent and the plain interpretation of the relative statutory provisions. Furthermore, the very reasoning of the *Miliangos* decision seems to me to militate against the applicability of what I will refer to as "the proof date" in a liquidation. Essentially the fundamental basis of the change from the breach date to the payment date is the destruction of the assumption upon which the *Havana Railways* decision was based, that a judgment could only be given in sterling, but that destruction rests—as the passage which I have cited shows—upon the ability of the court to decree specific performance. Of course, specific performance of existing contracts for the sale of land can be decreed against the liquidator or a trustee in bankruptcy of the vendor, but that is based upon the existence of the equitable proprietary interest created by the contract for sale. That is, however, a peculiar case. In the ordinary way the court does not, I think, decree specific performance against a trustee in bankruptcy or a liquidator where the obligation is simply to pay money, as, for instance, in the case of the insolvent purchaser of land: see *Holloway* v. *York* (1877) 25 W.R. 627. The reason is not, I think, far to seek. The effect would be in fact that the other party to the contract would be receiving payment otherwise than pari passu with the other creditors. I do not for one moment suppose that any of their Lordships who were parties to the decision in *Miliangos* v. *George Frank* (*Textiles*) *Ltd.* intended to create some special category of creditor who, in a winding up or bankruptcy, would be treated differently from other creditors, nor can they, I think, have conceived that that would be the result of their decision. I cannot think that it is. The effect of the *Miliangos* case, so far at any rate as debts are concerned, is to negative the breach date as the appropriate date for conversion and to give the foreign creditor the right to receive whatever is the appropriate sterling equivalent at the date when he enforces his judgment. The illustration given by Lord Wilberforce and by the Court of Appeal of how that would work in practice if the judgment creditor had to resort to the ultimate sanction of enforcement by execution is not, I feel sure, intended in any way either to add to or to qualify the judgment creditor's rights. For instance, if he levied execution, was not paid out and then petitioned to wind up the debtor company, I cannot conceive that the House of Lords or the Court of Appeal, or anyone else, would consider that his proof in the subsequent liquidation would have to be limited to the amount calculated at the rate of exchange prevailing at the date when he swore the affidavit leading to the unsuccessful execution, whilst every other foreign creditor would prove for a higher amount based upon a subsequent and lower rate of exchange. What the court is seeking to do in a winding up is to ascertain the liabilities of the company at a particular date and to distribute the available assets as at that date pro rata according to the amounts of those liabilities. In practice the process cannot be immediate, but notionally I think it is, and, as it seems to me, it has to be treated as if it were, although subsequent events can be taken into account in quantifying what the liabilities were at the relevant date. In the context of a liquidation, therefore, the relevant date for the ascertainment of the amount of liability is the notional date of discharge of that liability, and, despite what was said by Lord Wilberforce and Lord Cross by way of illustration, that date must, in my judgment, be the same for all

21-11854-dsj Doc 45-8 Filed 06/30/23 Entered 06/30/23 17:19:16 Exhibit 8 - The Weekly Law Reports, August 6, 1976 Dynamics Corp [1976] 1 W.L.R. 757 Pg 20 of 20

775

1 W.L.R. In re Dynamics Corpn. (Ch.D.) Oliver J.

A  creditors and it must be "the date of payment" for the purposes of any judgment which has been entered for the sterling equivalent at the date of payment of a sum expressed in foreign currency.

Two candidates have been suggested as appropriate in the case of a compulsory winding up, the date of the winding up order and the date of the commencement of the winding up—that is the date of the presentation of the petition. The latter has been suggested because it is said
B  that this would be consistent with the set off cases, but I do not think that is right. It is, of course, perfectly true that the question of the availability of set off has to be ascertained at the commencement of the winding up, but that date does not, as I see it, govern the valuation of the claim set off; so, for instance, in *In re National Benefit Assurance Co. Ltd.* [1924] 2 Ch. 339, Eve J. stated, at p. 345:

C  "... in order to bring the mutual dealings section into operation it is not necessary that there should be mutual debts existing at the date of the winding up—that being, according to *In re Daintrey* [1900] 1 Q.B. 546, the material date; it is sufficient if there are contractual obligations the breach of which may give rise to a claim for damages provable in the winding up,"

D  and that decision was approved by the Court of Appeal in *In re City Life Assurance Co. Ltd.* [1926] Ch. 191. There is nothing that I can find in the set off cases which compels a quantification of the amount of the set off as at the commencement of the winding up and, although in this particular case it would pay the dollar creditors if that date were adjudged the appropriate date for conversion, to ascertain their claims then, would, I think, be anomalous when all other claims fall to be
E  ascertained at the date of the winding up order. In my judgment, the latter date is the date at which such conversion should be made, and I will declare accordingly.

*Declaration accordingly.*

F  Solicitor: *Clifford-Turner; Denton, Hall & Burgin; Turner, Garrett & Co., Byfleet.*

A. R.

G

H