Exhibit 2

**CERTIFIED COPY**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

_____

IN RE:                              )

ASCENTRA HOLDINGS, INC. (IN    ) CASE NO. 21-11854

OFFICIAL LIQUIDATION),              )        (DSJ)

                                    ) CHAPTER 15

DEBTOR IN A                         )

FOREIGN PROCEEDING                  )

_____)

DEPOSITION OF

RYUNOSUKE YOSHIDA

AUGUST 10TH 2023

AMY COLEY, COURT REPORTER
1010064





(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose         (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez         (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn         (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

1              UNITED STATES BANKRUPTCY COURT

2               SOUTHERN DISTRICT OF NEW YORK

3

4    _____

5    IN RE:                        )

6    ASCENTRA HOLDINGS, INC. (IN    ) CASE NO. 21-11854

7    OFFICIAL LIQUIDATION),          )         (DSJ)

8                                    ) CHAPTER 15

9    DEBTOR IN A                     )

10   FOREIGN PROCEEDING              )

11   _____)

12

13                    DEPOSITION OF

14                 RYUNOSUKE YOSHIDA

15                      ON

16            THURSDAY, AUGUST 10TH 2023

17

18           TAKEN AT THE OFFICES OF:

19           PILLSBURY WINTHROP SHAW PITTMAN LLP

20           TOWER 42, LEVEL 23

21           25 OLD BROAD STREET,LONDON EC2N 1HQ

22

23           MAGNA LEGAL SERVICES

24               866-624-6221

25

                          1

RYUNOSUKE YOSHIDA

```
 1                    A P P E A R A N C E S

 2

 3    ON BEHALF OF THE LIQUIDATORS:

 4

 5            PILLSBURY WINTHROP SHAW PITTMAN LLP

 6            31 WEST 52ND STREET

 7            NEW YORK, NY 10019-6131

 8                    BY:  MR. HUGH MCDONALD

 9                         MR. JOHN PINTERALLI

10

11            TWENTY ESSEX

12            20 ESSEX STREET

13            LONDON WC2R 3AL

14                    BY:  MISS BLAIR LEAHY

15

16    ON BEHALF OF SPGK:

17

18            PACHULSKI STANG ZIELH & JONES

19            780 THIRD AVENUE

20            34TH FLOOR

21            NEW YORK

22            NEW YORK 10017-2024

23                    BY:  MISS BETH LEVINE

24                         MR. JEFF DINE

25                         MR. JOHN A. MORRIS (VIA ZOOM)
```

2

```
 1

 2          HARNEY WESTWOOD & RIEGELS

 3          3RD FLOOR

 4          HARBOUR PLACE

 5          103 SOUTH CHURCH STREET

 6          GRAND CAYMAN

 7          HY1-1002

 8          CAYMAN ISLANDS

 9

10                 BY:  MR. ANDREW JOHNSTONE

11                      MISS MINA WU

12

13   COURT REPORTER:

14

15          AMY COLEY

16          MARTEN WALSH CHERER LTD

17          2ND FLOOR

18          QUALITY HOUSE

19          6-9 QUALITY COURT

20          CHANCERY LANE

21          LONDON WC2A 1HP

22

23

24

25
```

3

```
 1                      I N D E X

 2

 3   DEPONENT                              PAGE

 4   MR. RYUNOSUKE YOSHIDA

 5   QUESTIONS BY MCDONALD                 6 - 291

 6   QUESTIONS BY MISS LEAHY             291 - 301

 7                  - - - - - - - - - -

 8

 9        EXHIBITS MARKED DURING THIS DEPOSITION

10

11        EXHIBITS                         PAGE
```

|  | | PAGE |
|---|---|---|
| 1 | ........................... | 79 |
| 2 | ........................... | 166 |
| 3 | ........................... | 170 |
| 4 | ........................... | 173 |
| 5 | ........................... | 187 |
| 6 | ........................... | 194 |
| 7 | ........................... | 199 |
| 8 | ........................... | 202 |
| 9 | ........................... | 212 |
| 10 | ........................... | 214 |
| 11 | ........................... | 220 |
| 12 | ........................... | 240 |
| 13 | ........................... | 248 |
| 14 | ........................... | 258 |
| 15 | ........................... | 260 |
| 16 | ........................... | 262 |
| 17 | ........................... | 264 |
| 18 | ........................... | 269 |
| 19 | ........................... | 275 |
| 20 | ........................... | 277 |
| 21 | ........................... | 281 |
| 22 | ........................... | 286 |

```
23

24

25
```

4

1           THE VIDEOGRAPHER:  GOOD MORNING.

2  WE ARE NOW ON THE RECORD.  THIS BEGINS VIDEOTAPE

3  NUMBER 1 IN THE DEPOSITION OF RYUNOSUKE YOSHIDA IN

4  THE MATTER OF IN RE ASCENTRA HOLDINGS INC., IN THE

5  MATTER OF UNITED STATES BANKRUPTCY COURT, SOUTHERN

6  DISTRICT OF NEW YORK, CASE NUMBER 21-11854.

7           TODAY'S DATE IS AUGUST 10TH, 2023,

8  AND THE TIME IS 9.15 A.M.

9           THIS DEPOSITION IS BEING TAKEN AT

10 PILLSBURY WINTHROP SHAW PITTMAN, TOWER 42, 25 OLD

11 BROAD STREET, LONDON EC2.

12          THE VIDEOGRAPHER TODAY IS WENDY

13 VINER OF MAGNA LEGAL SERVICES.

14          THE COURT REPORTER TODAY IS AMY

15 COLEY, ALSO OF MAGNA LEGAL SERVICES.

16          COULD I ASK COUNSEL, AND ALL

17 PARTIES PRESENT, TO STATE THEIR APPEARANCES AND

18 WHOM THEY REPRESENT?

19          MR. HUGH MCDONALD:  HI, GOOD

20 MORNING.  HUGH MCDONALD WITH PILLSBURY WINTHROP

21 SHAW PITTMAN, WITH MY COLLEAGUE JOHN PINTARELLI.

22 WE REPRESENT THE LIQUIDATORS.  ALSO WE HAVE BLAIR

23 LEAHY, OUR BARRISTER FROM ENGLAND, TWENTY ESSEX.

24          MISS BETH LEVINE:  BETH LEVINE FROM

25 PACHULSKI STANG ZIELH & JONES.  MY COLLEAGUES ARE

5

RYUNOSUKE YOSHIDA

1   JEFF DINE, WHO IS WITH ME NEXT ME, AND JOHN MORRIS

2   IS BY ZOOM.  WE REPRESENT THE WITNESS.  WE

3   REPRESENT SPGK.

4                    MR. ANDREW JOHNSTONE:  ANDREW

5   JOHNSTONE OF HARNEY WESTWOOD & RIEGELS.  I

6   REPRESENT SPGK, ALONG WITH MY COLLEAGUE MINA WU.

7                    THE VIDEOGRAPHER:  COULD I ASK THE

8   COURT REPORTER TO PLEASE SWEAR IN THE WITNESS, AND

9   WE CAN PROCEED.

10                   MR. RYUNOSUKE YOSHIDA, SWORN

11                   QUESTIONS BY MR. MCDONALD

12   BY MR. MCDONALD:

13        Q.     GOOD MORNING, MR. YOSHIDA.

14        A.     MORNING.

15        Q.     COULD YOU PLEASE STATE YOUR FULL

16   NAME FOR THE RECORD?

17        A.     MY NAME IS RYUNOSUKE YOSHIDA.

18        Q.     RYUNOSUKE YOSHIDA?

19        A.     YES.

20        Q.     OKAY, MR. YOSHIDA.  AND YOU GO BY A

21   NICKNAME OF LUKE; IS THAT CORRECT?

22        A.     YES.

23        Q.     THAT IS CORRECT, OKAY.  JUST A

24   COUPLE OF GROUND RULES HERE, AND A FEW

25   INSTRUCTIONS.  FIRST OF ALL, WITH REGARD TO

6

RYUNOSUKE YOSHIDA

1   COUNSEL, AS WE DID YESTERDAY, WE WOULD LIKE THE

2   WITNESS TO READ THE TRANSCRIPT AND MAKE ANY

3   TRANSCRIPTION ERRORS, AND PLEASE SIGN IT AND

4   RETURN IT TO US.

5          SO WHAT WILL HAPPEN IS WE WILL GET

6   END COPIES OF THE TRANSCRIPTS, WE WILL SEND THEM

7   TO COUNSEL, THEY WILL SEND THEM TO YOU.  TO THE

8   EXTENT THAT YOU THINK SOMETHING WAS MISTRANSCRIBED

9   AND YOU WANT TO CHANGE THAT, YOU CAN DO IT WITH

10  THE ERRATA PAGE FOR YOU TO WORK WITH, OKAY?  ALL

11  RIGHT, GREAT.

12          A.    YES.

13          Q.    AS YOU CAN SEE, A VIDEO IS ALSO

14  BEING TAKEN.  THE OFFICIAL RECORD HOWEVER WILL BE

15  THE TRANSCRIPT THAT THE COURT REPORTER IS MAKING,

16  OKAY?

17          A.    OKAY.

18          Q.    OKAY, GREAT.  ALL OBJECTIONS,

19  COUNSEL AGREE ARE PRESERVED AND WHAT THAT MEANS IS

20  EVEN THOUGH YOUR COUNSEL OR COUNSEL ON THE ZOOM

21  MAY OBJECT TO THE FORM OF A QUESTION, YOU CAN

22  STILL GO AHEAD AND ANSWER THAT QUESTION, OKAY?

23          A.    OKAY.

24          Q.    THE ONLY TIME YOU CAN REALLY

25  CONSULT WITH YOUR COUNSEL IS IF YOU BELIEVE A

7

RYUNOSUKE YOSHIDA

1   QUESTION THAT IS BEING POSED TO YOU IMPLICATES THE

2   ATTORNEY CLIENT PRIVILEGE.  YOU UNDERSTAND THAT?

3        A.    YES.

4        Q.    OKAY.  OTHERWISE, I PREFER YOU NOT

5   TO BE TALKING TO YOUR COUNSEL DURING THE COURSE OF

6   THE DEPOSITION.

7        A.    OKAY.

8        Q.    YOU UNDERSTAND?

9        A.    YES.

10        Q.    YOU REMAIN UNDER OATH FOR THE

11   ENTIRE DAY, DURING THE COURSE OF THE DEPOSITION.

12        A.    YES.

13        Q.    SO WHAT WE ARE GOING TO TRY TO DO

14   THIS MORNING IS GET THROUGH SOME PRELIMINARY STUFF

15   IN THE MORNING.  WE ARE GOING TO TAKE A BREAK FOR

16   LUNCH AND WE WILL TAKE SOME BREAKS ALONG THE WAY.

17   IF YOU FEEL LIKE YOU NEED A BREAK, IF YOU COULD

18   JUST PLEASE LET ME KNOW AND I WILL TRY TO WEAVE

19   THAT IN AT SOME APPROPRIATE POINT, OKAY?

20        A.    YES.  THANK YOU.

21             MR. MORRIS:  HUGH ----

22             MR. MCDONALD:  YES, JOHN.

23             MR. MORRIS:  ---- IN THAT REGARD,

24   I APPRECIATE THE ACCOMMODATION TO DO THIS BY ZOOM.

25   I WANT TO MAKE SURE THAT YOU CAN HEAR ME OKAY.

8

RYUNOSUKE YOSHIDA

1          MR. MCDONALD:  WE CAN HEAR YOU

2  FINE, JOHN.

3          MR. MORRIS:  OKAY.  I HAVE TO TAKE

4  A CALL, I GUESS AT 1.30 YOUR TIME, SO I DON'T KNOW

5  HOW LONG YOU INTEND LUNCH BREAK TO BE, BUT IF YOU

6  COULD, YOU KNOW, START AT 1 OR 1.15 YOUR TIME IT

7  SHOULD BE FINE, 1.30.  I DON'T CARE HOW LONG YOU

8  WANT TO GO, BUT I JUST WANTED TO ALERT YOU TO

9  THAT.  IT HAS TO DO WITH ANOTHER CASE FOR A

10 CONFERENCE THAT STARTS AT I GUESS 2.30 YOUR TIME.

11 IT IS JUST A SHORT CALL I HAVE TO MAKE AT AROUND

12 1.30 YOUR TIME.

13         MR. MCDONALD:  OKAY.  WE WERE

14 PLANNING ON TAKING LUNCH AROUND 12.30.  WE WILL

15 TRY TO WORK THAT INTO THE SCHEDULE.

16         MR. MORRIS:  EVEN 12.45 WOULD BE

17 GREAT.

18         MR. MCDONALD:  OKAY, FANTASTIC.

19 FANTASTIC.

20 BY MR. MCDONALD:

21     Q.    MR. YOSHIDA, YOU ARE HERE

22 REPRESENTED BY COUNSEL.  ARE THESE COUNSEL

23 REPRESENTING YOU IN YOUR PERSONAL CAPACITY OR AS

24 DIRECTOR OF SPGK?

25         MR. MORRIS:  OBJECTION TO THE FORM

9

RYUNOSUKE YOSHIDA

1  OF THE QUESTION TO THE EXTENT IT CALLS FOR A LEGAL

2  CONCLUSION.

3         A.    I BELIEVE THEY REPRESENT AS THE

4  COUNSEL OF SHANG PENG GAO KE, INC. SEZC.

5         Q.    OKAY.  WE WILL CALL IT SPGK.

6         A.    OKAY.

7         Q.    IS THAT EASIER?

8         A.    SPGK, YES.

9         Q.    OKAY, ALL RIGHT, GREAT.  A COUPLE

10 OF OTHER BASIC QUESTION.  YOU ARE FLUENT IN

11 ENGLISH, CORRECT?

12        A.    MY NATIVE LANGUAGE IS JAPANESE, BUT

13 I AM RELATIVELY FLUENT IN ENGLISH.

14        Q.    OKAY.  SO THERE IS NO NEED FOR A

15 TRANSLATOR TODAY?

16        A.    I DON'T BELIEVE SO.  IF I NEED ANY

17 CLARIFICATIONS ----

18        Q.    PLEASE ASK?

19        A.    ---- I MAY ASK YOU.

20        Q.    OKAY.  I WAS ABOUT TO SAY, IF I ASK

21 YOU A QUESTION AND YOU DON'T UNDERSTAND ANY OF THE

22 WORDS OR HOW IT WAS PHRASED, PLEASE SAY SO AND

23 I WILL TRY TO REPHRASE IT TO MAKE IT CLEAR?

24        A.    THANK YOU.

25        Q.    OKAY.  ALSO WE ARE HAPPY TO HAVE A

10

RYUNOSUKE YOSHIDA

1   QUESTION READ BACK BY THE COURT REPORTER.  IF YOU

2   JUST INDICATE THAT YOU WOULD LIKE TO HAVE IT READ

3   BACK, WE CAN DO THAT AS WELL.

4          A.    OKAY.

5          Q.    OKAY.  ARE YOU UNDER THE INFLUENCE

6   OF ANY MEDICATIONS THAT MIGHT IMPAIR YOUR ABILITY

7   TO TESTIFY TRUTHFULLY HERE TODAY?

8          A.    NO.

9          Q.    OKAY.  LET US TALK ABOUT

10  PREPARATION FOR YOUR DEPOSITION, OKAY?  DID YOU

11  MEET WITH ANYONE TO PREPARE FOR YOUR DEPOSITION

12  TODAY?

13         A.    I MET WITH MY COUNSEL TO PREPARE

14  FOR THIS DEPOSITION.

15         Q.    OKAY.  WHEN DID YOU MEET WITH YOUR

16  COUNSEL?

17         A.    I MET WITH THEM TWO WEEKS AGO IN

18  NEW YORK FOR A DAY AND I ALSO MET WITH THEM

19  YESTERDAY FOR A DAY.

20         Q.    DO YOU RECALL WHO WAS PRESENT

21  DURING THE PREPARATION?

22         A.    THE COUNSEL FROM PSCJ, COUNSEL FOR

23  HARNEYS AND ALSO A CONSULTANT CALLED SEAN HU WAS

24  PRESENT.

25         Q.    WHO IS SEAN HU?

11

RYUNOSUKE YOSHIDA

```
 1          A.    YES.

 2          Q.    WHO IS SEAN HU?

 3          A.    SEAN HU IS A CONSULTANT OF SHANG

 4   PENG GAO KE INC. SEZC, PROVIDING SUPPORT IN TERMS

 5   OF ALL THE LITIGATION AND ALSO COMPLIANCE RELATED

 6   STUFF.

 7          Q.    IS HE WITH A LAW FIRM?

 8          A.    NO.

 9          Q.    HE HAS HIS OWN PRACTICE?

10          A.    HE IS NOT A LAWYER.

11          Q.    WHERE IS HE BASED?

12          A.    HE IS BASED IN DUBAI.

13          Q.    WHAT TYPE OF SERVICES DOES HE

14   PROVIDE TO SPGK WITH RESPECT TO LITIGATION?

15          A.    ASSISTANCE ON COMPLIANCE RELATED TO

16   THE CLOSURE OF SPGK.

17          Q.    WHAT DO YOU MEAN BY CLOSURE?

18          A.    THE COMPANY, SPGK, IS NOT CLOSED

19   YET AND EVENTUALLY IT WILL.  I HOPE IT WILL BE

20   CLOSED AND I NEED ASSISTANCE ON CLOSING THE

21   BUSINESS.

22          Q.    BY CLOSURE YOU MEAN HAVING THE

23   COMPANY WOUND UP?

24          A.    WOUND DOWN, YES, SORRY.

25          Q.    I APPRECIATE THE DISTINCTION THERE.
```

12

RYUNOSUKE YOSHIDA

1    IN WHICH PARTS OF SPGK IS HE ASSISTING WITH THE

2    WIND DOWN?

3          A.    HE IS PROVIDING COMPLIANCE RELATED

4    ASSISTANCE TO CLOSE DOWN THE BUSINESS SAFELY.

5          Q.    SAFELY?

6          A.    YES.

7          Q.    AND BY SAFELY DO YOU MEAN IN

8    ACCORDANCE WITH LOCAL LAW?

9          A.    SPGK HAS A LOT OF CRIMINAL AND ALSO

10   CIVIL RISKS INVOLVED IN THE BUSINESS AND I NEED

11   ASSISTANCE TO CLOSE THE BUSINESS DOWN SAFELY.

12         Q.    WHAT CRIMINAL RISKS IS SPGK FACING?

13         A.    SPGK HAD OCCASION WHERE 214 PEOPLE,

14   AGENTS OF SPGK BEING ARRESTED IN END OF 2019, IF I

15   RECALL CORRECTLY, AND THESE INVESTIGATIONS AGAINST

16   AGENTS I BELIEVE ARE NOT STILL ENDED AND I HAVE TO

17   BE VERY CAREFUL ON WINDING DOWN THE BUSINESS.

18         Q.    WHY WERE THESE AGENTS ARRESTED?

19         A.    I DON'T HAVE FIRSTHAND KNOWLEDGE

20   BECAUSE IT IS SOMETHING THAT HAPPENED IN THE PRC.

21   HOWEVER, MY UNDERSTANDING IS THAT FROM VARIOUS

22   REPORTS IS THAT THERE WERE SUSPICION ON PYRAMID

23   SELLING -- SORRY, I AM TRYING TO THINK OF THE

24   WORD -- PYRAMID SELLING RELATED ISSUES, BECAUSE IN

25   CHINA MULTILEVEL MARKETING OR PYRAMID SELLING IS

13

RYUNOSUKE YOSHIDA

1  ILLEGAL.

2          Q.     SO BY AGENTS YOU MEAN THESE WERE

3  REPRESENTATIVES OF SPGK, SELLING SPGK PRODUCTS IN

4  CHINA, IN PRC?

5          A.     THESE AGENTS WERE REFERRAL AGENTS

6  IN THE PRC, AND THEY WERE REFERRING SPGK PRODUCTS

7  IN CHINA.

8          Q.     WERE THEY BEING COMPENSATED BY SPGK

9  FOR THOSE REFERRALS?

10         A.     THEY WERE COMPENSATED BY SPGK FOR

11  THOSE REFERRALS.

12         Q.     IS SPGK AT ALL MONETARILY

13  RESPONSIBLE FOR THE DEFENCE OF THESE AGENTS IN

14  PRC?

15         A.     CAN YOU CLARIFY YOUR QUESTION?

16         Q.     IS SPGK RESPONSIBLE FOR PAYING THE

17  CRIMINAL DEFENCE COSTS OF THESE AGENTS IN PRC?

18         A.     I AM NOT A COUNSEL, SO I DON'T HAVE

19  THE CLEAREST CLARITY.  HOWEVER, I PERSONALLY DO

20  FEEL CONCERNED, CRIMINAL AND CIVIL CONCERNS ABOUT

21  RUNNING AND CLOSING THIS BUSINESS.

22         Q.     HAVE YOU BEEN -- STRIKE THAT.  HAVE

23  YOU RECEIVED ANY NOTICES FROM THE CHINESE

24  GOVERNMENT THAT YOU ARE UNDER INVESTIGATION?

25         A.     TO THE BEST OF MY KNOWLEDGE, WE DID

14

RYUNOSUKE YOSHIDA

1    NOT RECEIVE DIRECTLY.  HOWEVER, OUR VENDORS IN

2    CHINA, OR COMPANIES WE WORKED WITH IN CHINA, WERE

3    ASKED ABOUT SPGK OR INVESTIGATED.

4            Q.    AND WAS YOUR NAME RAISED IN

5    CONNECTION WITH THESE INVESTIGATIONS?

6            A.    I WILL HAVE TO SAY THAT I DON'T GET

7    EVERY INFORMATION SO I CANNOT BE SURE ABOUT HOW TO

8    ANSWER.  I DON'T KNOW.  I DON'T KNOW I THINK IS

9    THE ANSWER.  I DON'T KNOW IF IT IS IN -- WHETHER

10   MY NAME IS THERE OR NOT.

11           Q.    OTHER THAN YOUR CONSULTANT FROM

12   DUBAI, HAVE YOU RETAINED CRIMINAL DEFENCE COUNSEL

13   IN CONNECTION WITH THESE INVESTIGATIONS?

14           A.    SO WE HAVE -- SPGK HAS ALWAYS

15   ENGAGED WITH KING & WOOD MALLESONS, WHO IS ONE OF

16   THE LARGEST LAW FIRM IN CHINA, AND THEY HAVE BEEN

17   ARRESTING THROUGHOUT THE YEARS FOR ME TO HANDLE

18   SUCH CASES.  I HAVE -- SORRY, CAN I ----

19           Q.    YOU CAN REPHRASE IT.  DID YOU MEAN

20   -- "THEY HAVE BEEN ARRESTING THROUGHOUT THE

21   YEARS", WHAT DID YOU MEAN BY ARRESTING?  YOU SAID,

22   "HAS ALWAYS ENGAGED WITH KING & WOOD MALLESONS,

23   WHO IS ONE OF THE LARGEST LAW FIRM IN CHINA, AND

24   THEY HAVE BEEN ARRESTING THROUGHOUT THE YEARS".

25           A.    I SAID ASSISTING.

15

RYUNOSUKE YOSHIDA

1      Q.      ASSISTING.  I AM SORRY, I MISHEARD

2  OR YOU MIS-SPOKE, WHATEVER ----

3      A.      I AM GETTING A BIT NERVOUS.

4      Q.      THAT IS OKAY, RELAX.  IT IS OKAY.

5  I AM GLAD YOU CLARIFIED THAT, BECAUSE I WAS NOT

6  SURE WHERE YOU WERE GOING WITH THAT.  OKAY.  SO

7  KING & WOOD MALLESONS HAS BEEN ASSISTING SPGK FOR

8  YEARS IN CONNECTION WITH THESE INVESTIGATIONS IN

9  CHINA?

10     A.      YES, AND -- YES.

11     Q.      WE WILL GET TO KING & WOOD

12 MALLESONS IN A LITTLE BIT.  HAS SPGK ADVANCED ANY

13 FUNDS TO THESE AGENTS TO ASSIST THEM WITH THEIR

14 LEGAL COSTS?

15     A.      SORRY, I DON'T REMEMBER.  IT IS A

16 WHILE BACK.

17     Q.      WHO CURRENTLY CONTROLS SPGK'S BANK

18 ACCOUNTS?

19     A.      I DO.

20     Q.      AND WOULD ANY REQUEST FOR ANY

21 ADVANCES OUT OF THOSE BANK ACCOUNTS GO TO YOU?

22     A.      CAN YOU REPEAT THE QUESTION?

23     Q.      IF SOMEONE ASKED FOR AN ADVANCE TO

24 ASSIST THEM WITH THEIR LEGAL DEFENCE COST, WOULD

25 THAT REQUEST GO TO YOU?

16

RYUNOSUKE YOSHIDA

```
 1          A.     YES.

 2          Q.     YOU DON'T RECALL RECEIVING ANY OF

 3   THOSE REQUESTS?

 4          A.     I THINK MY ANSWER WAS THAT I DON'T

 5   REMEMBER.

 6          Q.     YOU DON'T REMEMBER, OKAY?

 7          A.     YES.

 8          Q.     YOU MAY HAVE RECEIVED A REQUEST FOR

 9   THAT?

10          A.     MAYBE.  I DON'T REMEMBER ON THE TOP

11   OF MY HEAD RIGHT NOW.

12          Q.     WHERE ARE SPGK'S FUNDS CURRENTLY --

13   STRIKE THAT.  WHERE DOES SPGK CURRENTLY HAVE BANK

14   ACCOUNTS?

15          A.     IT HAS A BANK ACCOUNT IN TAIWAN.

16          Q.     OKAY.  IS THAT ITS ONLY BANK

17   ACCOUNT CURRENTLY?

18          A.     I BELIEVE SO.

19          Q.     BY SPGK -- WE ARE GOING TO GET A

20   LITTLE MORE DETAIL ABOUT THE DIFFERENT SPGK

21   ENTITIES -- THIS IS SPGK PTE, THE SINGAPORE ENTITY

22   THAT YOU ARE REFERRING TO?

23          A.     CAN YOU REPEAT YOUR QUESTION?

24          Q.     AT SOME POINT WE ARE GOING TO HAVE

25   TO BE PRECISE, AND WE WILL GET INTO THAT.  THERE
```

17

1    ARE A LOT OF SPGK ENTITIES.  WHICH SPGK ENTITY HAS

2    THE BANK ACCOUNT IN TAIPEI?

3           A.     SPGK PTE LIMITED.

4           Q.     PTE LIMITED, OKAY.  AND WHAT BANK

5    ACCOUNT IS THAT CURRENTLY ON?

6           A.     SHANGHAI COMMERCIAL AND SAVINGS

7    BANK.

8           Q.     DO YOU HAVE AN IDEA OF

9    APPROXIMATELY WHAT THE CURRENT BALANCE IS IN THAT

10   ACCOUNT?

11          A.     I HAVEN'T CHECKED RECENTLY, SO

12   I DON'T REMEMBER.

13          Q.     YOUR LAST RECOLLECTION OF A

14   BALANCE?

15          A.     APPROXIMATELY MAYBE 150 MILL, MORE

16   OR LESS.

17          Q.     OKAY.  YOU USE THE WORDS "WOUND

18   DOWN SAFELY" WHEN YOU ARE TALKING ABOUT SPGK.  IS

19   THAT IN ORDER TO INSULATE SPGK FROM ANY FURTHER

20   POTENTIAL CRIMINAL PROSECUTION?

21          A.     CAN YOU REPHRASE YOUR QUESTION?

22          Q.     YOU USE THE TERM "SAFELY" WHEN YOU

23   ARE REFERRING TO THE WIND DOWN OF SPGK, AND I JUST

24   WANT TO UNDERSTAND A LITTLE BIT MORE OF WHAT IS

25   MEANT THERE.  I AM JUST ASKING IS THAT TO BE --

18

1  YOU ARE SEEKING TO DO THAT IN A WAY AS TO MINIMISE

2  ANY CRIMINAL LIABILITY FOR SPGK?

3        A.    I THINK IT IS CRIMINAL AND CIVIL

4  RISKS LIABILITIES.

5        Q.    IN THIS CONSULTANT YOU ENGAGED IN

6  DUBAI, YOU SAID?

7        A.    YES.

8        Q.    WHAT IS HIS EXPERTISE IN?

9        A.    HE IS EX-KING & WOOD MALLESONS'S

10 LAWYER.

11       Q.    SO HE IS AN ATTORNEY?

12       A.    HE WAS AN ATTORNEY.

13       Q.    HE WAS AN ATTORNEY.  WHAT IS HIS

14 AREA OF EXPERTISE?

15       A.    CAN YOU CLARIFY YOUR QUESTION?

16       Q.    WE HAVE ESTABLISHED HE WAS AN

17 ATTORNEY WITH KING & WOOD, RIGHT, AND HE IS IN

18 DUBAI?  WHAT IS HIS AREA OF EXPERTISE?  WHAT DOES

19 HE SPECIALISE IN?

20       A.    HE SPECIALISED IN UNDERSTANDING THE

21 CHINESE LAW AND THE LEGAL SYSTEM.

22       Q.    SO HE IS ENGAGED TO WORK -- TO

23 ADVISE YOU WITH RESPECT TO COMPLIANCE WITH CHINESE

24 LAW AS PART OF THE WIND DOWN OF SPGK?

25       A.    YES.

19

RYUNOSUKE YOSHIDA

1        Q.     ARE YOU WORKING WITH ANY OTHER

2   ADVISORS OR LAW FIRMS IN CONNECTION WITH THE WIND

3   DOWN OF SPGK?

4        A.     I HAVE ONE MORE ADVISOR, WHO IS

5   CALLED DAVID HONG, WHO IS ALSO EX-KING & WOOD

6   MALLESONS'S LAWYER.

7        Q.     WHERE HE IS LOCATED?

8        A.     I BELIEVE HE IS LOCATED IN TAIWAN.

9        Q.     IN TAIWAN.  WE WILL GO IN A LITTLE

10  MORE DETAIL LATER, BUT THANK YOU FOR THAT.  SO, IN

11  PREPARING FOR TODAY, YOU HAVE MET WITH COUNSEL IN

12  NEW YORK AND YOU HAVE MET WITH COUNSEL HERE IN

13  LONDON, CORRECT?

14       A.     CAN YOU REPEAT YOUR QUESTION?

15       Q.     IN PREPARATION FOR TODAY'S

16  DEPOSITION, YOU MET WITH YOUR COUNSEL IN NEW YORK

17  A WEEK AGO, I BELIEVE.

18       A.     TWO WEEKS AGO.

19       Q.     TWO WEEKS AGO.  THANK YOU FOR

20  CLARIFYING THAT.  AND THIS WEEK AS WELL, IN

21  LONDON?

22       A.     YES.

23       Q.     WERE YOU SHOWN ANY DOCUMENTS AS

24  PART OF THAT PREPARATION?

25       A.     WE JUST -- WE LOOKED -- SORRY, YES.

RYUNOSUKE YOSHIDA

1          Q.     DO YOU RECALL WHAT DOCUMENTS YOU

2    WERE SHOWN DURING THAT PREP?

3          A.     MY DECLARATION.

4          Q.     OKAY.

5          A.     AND MY AFFIDAVITS.

6          Q.     BY AFFIDAVITS, CAN YOU PLEASE LET

7    ME KNOW WHICH AFFIDAVITS SPECIFICALLY YOU WERE

8    SHOWN?

9          A.     THE AFFIDAVITS RELATED TO THE HEC

10   PROCEEDINGS, HEC INTERNATIONAL PROCEEDINGS.

11         Q.     THE PROCEEDINGS IN THE CAYMAN

12   ISLANDS?

13         A.     YES.

14         Q.     OKAY.  ANY OTHER AFFIDAVITS YOU

15   WERE SHOWN?

16         A.     I DON'T BELIEVE SO.

17         Q.     OKAY.  SO YOUR DECLARATION AND THE

18   AFFIDAVIT YOU SUBMITTED IN CAYMAN IN CONNECTION

19   WITH THE HEC PROCEEDINGS?

20         A.     YES, AND -- SORRY, THE DECLARATION

21   FOR THIS ----

22         Q.     FOR THIS CASE?

23         A.     YES.

24         Q.     OKAY.  DO YOU RECALL ANY OTHER

25   DOCUMENTS BEING SHOWN TO YOU?

                         21

                 RYUNOSUKE YOSHIDA

```
 1              A.     I DON'T THINK SO.

 2              Q.     DID YOU REVIEW YOURSELF

 3  INDEPENDENTLY ANY DOCUMENTS IN PREPARATION FOR

 4  TODAY'S DEPOSITION?

 5              A.     I LOOKED THROUGH THESE DECLARATIONS

 6  AND AFFIDAVITS AND THE EXHIBITS.

 7              Q.     AND THE EXHIBITS?

 8              A.     YES.

 9              Q.     OKAY.  NO OTHER DOCUMENTS THOUGH?

10              A.     NO.

11              Q.     OKAY.  I WOULD LIKE TO JUST DISCUSS

12  YOUR BACKGROUND A LITTLE BIT.

13              A.     SURE.

14              Q.     WHERE WERE YOU EDUCATED?

15              A.     HONG KONG.

16              Q.     IN HONG KONG.

17              MR. MORRIS:  OBJECTION TO THE FORM

18  OF THE QUESTION.

19  BY MR. MCDONALD:

20              Q.     YOU WERE EDUCATED IN HONG KONG?

21              A.     YES.

22              Q.     WHERE DID YOU ATTEND SCHOOL?

23              A.     THE DELIA SCHOOL OF CANADA.

24              Q.     I AM SORRY?

25              A.     DELIA SCHOOL OF CANADA.
```

22

RYUNOSUKE YOSHIDA

1          Q.     DELIA SCHOOL OF CANADA.  AND THAT

2    WAS IN HONG KONG?

3          A.     YES.

4          Q.     WERE YOU EVER IN CANADA?

5          A.     NO.

6          Q.     DO YOU HAVE ANY POST GRADUATE

7    EXPERIENCE?

8          A.     YOU MEAN COLLEGE?

9          Q.     YES.

10          A.     YES.

11          Q.     AND WHERE WERE YOU POST GRADUATE

12   STUDIES?

13          A.     IN SEATTLE CENTRAL COMMUNITY

14   COLLEGE AND THE HONG KONG POLYTECHNIC UNIVERSITY.

15          Q.     SEATTLE CENTRAL BY SEATTLE

16   WASHINGTON?

17          A.     YES.

18          Q.     DID YOU ATTEND SCHOOL IN

19   WASHINGTON?

20          A.     YES.

21          Q.     WHERE YOU LEARNED YOUR ENGLISH?

22          A.     YES, YES, YES.

23          Q.     FROM DELIA SCHOOL, WHAT IS YOUR

24   DEGREE IN FROM DELIA?

25          A.     ONTARIO CURRICULUM HIGH SCHOOL

23

RYUNOSUKE YOSHIDA

1    DEGREE.

2            Q.    IT IS A HIGH SCHOOL DEGREE, SORRY.

3    AND DID YOU GET A DEGREE FROM SEATTLE?

4            A.    YES.

5            Q.    AND WHAT WAS THAT DEGREE IN?

6            A.    ASSOCIATE OF ARTS.

7            Q.    ASSOCIATE OF ARTS.  WERE THERE ANY

8    SPECIALITY?

9            A.    NO.

10           Q.    JUST GENERAL ARTS?

11           A.    ASSOCIATE OF ARTS, TAKING MORE

12   BUSINESS COURSES.

13           Q.    IN HONG KONG, DID YOU OBTAIN A

14   DEGREE IN YOUR POST GRADUATE STUDIES IN HONG KONG?

15           A.    YES.

16           Q.    WHAT IS THAT IN?

17           A.    BACHELOR IN BUSINESS

18   ADMINISTRATION.

19           Q.    WHEN DID YOU OBTAIN THAT DEGREE?

20           A.    I BELIEVE IT WAS AROUND 2012.

21           Q.    2012.  AFTER YOU OBTAINED YOUR

22   BUSINESS ADMINISTRATION DEGREE, CAN YOU JUST GIVE

23   ME A LITTLE BIT OF HISTORY OF WORK EXPERIENCE

24   SINCE YOUR POST GRADUATE STUDIES?

25           A.    I USED TO WORK AT HOPEWILL


                          24

                  RYUNOSUKE YOSHIDA

1   MARKETING & SERVICES LIMITED.

2         Q.    I AM SORRY, WHAT WAS THAT?

3         A.    HOPEWILL ----

4         Q.    HOPEWILL?

5         A.    YES, HOPEWILL MARKETING & SERVICES

6   LIMITED.

7         Q.    AND WHAT WAS HOPEWILL, OR WHAT IS

8   HOPEWILL?

9         A.    IT WAS CONSULTING COMPANY.  IT WAS

10   A CONSULTING COMPANY.

11         Q.    WHAT TYPE OF CONSULTING WERE THEY

12   ENGAGED IN?

13         A.    ASSISTING JAPANESE COMPANIES EXPAND

14   INTO ASIA.

15         Q.    HOW LONG DID YOU WORK WITH THEM?

16         A.    I DON'T REMEMBER EXACTLY BUT

17   APPROXIMATELY FOUR TO FIVE YEARS, I BELIEVE.

18         Q.    AND FROM THERE WHERE DID YOU MOVE

19   ON TO?

20         A.    I WAS A DIRECTOR OF ASCENTRA

21   HOLDINGS INC.

22         Q.    HOW LONG WERE YOU A DIRECTOR AT

23   ASCENTRA?

24         A.    SORRY, CAN YOU REPEAT THE QUESTION

25   AGAIN?

25

RYUNOSUKE YOSHIDA

```
 1              Q.      HOW MANY YEARS WERE YOU A DIRECTOR
 2    FOR ASCENTRA?
 3              A.      APPROXIMATELY EIGHT OR NINE YEARS.
 4              Q.      HOW DID IT COME TO BE THAT YOU WERE
 5    APPOINTED A DIRECTOR OF ASCENTRA?
 6              A.      CAN YOU ASK ME AGAIN, SORRY?
 7              Q.      CERTAINLY.  LET ME JUST BACK UP A
 8    LITTLE BIT.  YOU SAY YOU ARE A DIRECTOR OF
 9    ASCENTRA, THAT IS CORRECT?
10              A.      YES.
11              Q.      WERE YOU APPOINTED BY SOMEONE TO BE
12    A DIRECTOR OF ASCENTRA?
13              A.      I BELIEVE I WAS APPOINTED BY THE
14    BOARD OF ASCENTRA.
15              Q.      HOW DID YOU COME TO KNOW THE BOARD
16    OF ASCENTRA?
17              A.      I MET WITH YOSHIO MATSUURA, WHO WAS
18    A SHAREHOLDER OF ASCENTRA.
19              Q.      WHEN DID YOU FIRST MEET
20    MR. MATSUURA?
21              A.      I BELIEVE SOME TIME IN 2012-13.
22              Q.      DO YOU REMEMBER HOW YOU CAME TO
23    KNOW MR. MATSUURA?
24              A.      HE WAS A CLIENT OF HOPEWILL
25    MARKETING & SERVICES LIMITED.
```

26

RYUNOSUKE YOSHIDA

1          Q.    WHAT SERVICES DID YOU PROVIDE FOR

2     MR. MATSUURA WHILE YOU WERE AT HOPEWILL?

3          A.    SORRY, CAN YOU REPEAT YOUR QUESTION

4     AGAIN?

5          Q.    CERTAINLY.  WHAT SERVICES DID YOU

6     PROVIDE TO MR. MATSUURA WHILE YOU WERE AT

7     HOPEWILL?

8          A.    HOPEWILL WAS PROVIDING CONSULTING

9     SERVICE TO ASCENTRA HOLDINGS OR THE THEN INTERUSH

10    HOLDINGS INC TO GET LISTED ON THE HONG KONG STOCK

11    EXCHANGE.

12         Q.    THERE WAS A CONNECTION WITH THE

13    PUBLIC OFFERING?

14         A.    THAT WAS RELATED TO GETTING LISTED

15    ON THE HONG KONG STOCK EXCHANGE.

16         Q.    OKAY.  WHAT SERVICES WAS HOPEWILL

17    PROVIDING TO INTERUSH TO ASSIST THEM IN GETTING

18    LISTED ON THE HONG KONG EXCHANGE?

19         A.    HOPEWILL WAS ASSISTING ON ADVISORY

20    TO GET LISTED ON THE HONG KONG STOCK EXCHANGE,

21    SUCH AS WORKING WITH THE STOCK EXCHANGE TO

22    FACILITATE CONNECTIONS BETWEEN THE TWO.

23         Q.    WAS HOPEWILL PROVIDING LEGAL ADVICE

24    ON HOW TO BE LISTED ON THE STOCK EXCHANGE?

25         A.    NO.

27

RYUNOSUKE YOSHIDA

1      Q.     SO HOPEWILL WAS PROVIDING

2  CONNECTIONS TO INDIVIDUALS THAT WORKED AT THE

3  STOCK EXCHANGE TO HELP INTERUSH GET LISTED?

4      A.     CAN YOU SAY THAT ONE MORE TIME?

5      Q.     YES, I AM JUST TRYING TO

6  UNDERSTAND, BECAUSE YOU SAID THAT YOU WERE

7  INTERFACING WITH PEOPLE AT THE EXCHANGE.  I AM

8  SORRY, WE ARE BOTH SPEAKING VERY COLLOQUIAL, WHICH

9  IS FINE.  SHE CANNOT TAKE IT DOWN IF WE BOTH START

10 SPEAKING, SO I AM GOING TO TRY TO HOLD BACK AND WE

11 PROBABLY SHOULD NOT TALK OVER EACH OTHER.  I JUST

12 WANTED TO UNDERSTAND A BIT MORE THE TYPES OF

13 SERVICES HOPEWILL WAS PROVIDING TO INTERUSH IN

14 ORDER TO GET LISTED ON THE STOCK EXCHANGE?

15     A.     TYPES OF SERVICES?

16     Q.     YES.

17     A.     WE BASICALLY -- HOPEWILL WENT TO

18 TALK WITH THE HONG KONG STOCK EXCHANGE TO PREPARE

19 FOR LISTING OF INTERUSH HOLDINGS INC.

20     Q.     WERE YOU PERSONALLY INVOLVED WITH

21 SPEAKING WITH THE HONG KONG STOCK EXCHANGE ON

22 INTERUSH'S BEHALF?

23     A.     MY THEN BOSS WAS FACILITATING, SO

24 PROVIDING A SERVICE.  I WAS ASSISTING ON IT.

25     Q.     AND WHAT TYPE OF ASSISTANCE WERE

28

RYUNOSUKE YOSHIDA

1  YOU PROVIDING?

2          A.     MY ASSISTANCE WAS MORE OF ASSISTING

3  MY BOSS WITH TRANSLATION, ETC.

4          Q.     ANY OTHER SERVICES WERE -- STRIKE

5  THAT.  WERE YOU PROVIDING ANY OTHER SERVICES

6  BEYOND TRANSLATION?

7          A.     ORGANISING DOCUMENTS.

8          Q.     AND THAT IS WHEN YOU CAME TO MEET

9  MR. MATSUURA?

10          A.     YES.

11          Q.     DO YOU RECALL WHEN YOU FIRST MET

12  MR. MATSUURA?

13          A.     I DON'T EXACTLY REMEMBER WHEN WAS

14  THE FIRST TIME.

15          Q.     DO YOU RECALL MEETING ANYONE ELSE

16  AT INTERUSH BESIDES MR. MATSUURA?

17          A.     ARE YOU REFERRING TO THE FIRST

18  MEETING OR ----

19          Q.     LET US DO THAT.  THAT IS EXCELLENT.

20  THAT IS A GOOD STARTING POINT.  DO YOU REMEMBER

21  THE FIRST MEETING WITH INTERUSH?

22          A.     WITH INTERUSH?

23          Q.     YES.

24          A.     YOU MEAN ANYBODY FROM INTERUSH?

25          Q.     ANYBODY, YOUR FIRST ENCOUNTER WITH

29

RYUNOSUKE YOSHIDA

1    THE INTERUSH COMPANY.

2         A.    I DON'T EXACTLY REMEMBER THE FIRST

3    TIME.

4         Q.    OKAY.

5         A.    BUT IT WAS LIKELY YOSHIO MATSUURA.

6    IT WAS LIKELY HIM.

7         Q.    JUST HIM?

8         A.    I DON'T EXACTLY REMEMBER.

9         Q.    AND HOW LONG, FOR HOW MANY YEARS OF

10   YOUR FOUR TO FIVE YEARS AT HOPEWILL, WERE YOU

11   PROVIDING SERVICES TO INTERUSH/WE WILL CALL IT

12   ASCENTRA?

13        A.    I CANNOT REMEMBER EXACTLY.

14   I BELIEVE TWO TO THREE YEARS MAYBE.

15        Q.    TWO TO THREE YEARS.  WHEN DID --

16   STRIKE THAT.  DO YOU REMEMBER WHEN MR. MATSUURA

17   FIRST DISCUSSED HAVING YOU COME ON BOARD WITH

18   INTERUSH/ASCENTRA?  WE WILL JUST CALL IT ASCENTRA,

19   IS THAT EASIER, INSTEAD OF INTERUSH?

20        A.    SURE.

21        Q.    WE CAN JUST CALL IT ASCENTRA.  DO

22   YOU RECALL WHEN MR. MATSUURA FIRST APPROACHED YOU

23   ABOUT BECOMING A DIRECTOR WITH ASCENTRA?

24        A.    I THINK SO.

25        Q.    WHEN WAS THAT?

30

RYUNOSUKE YOSHIDA

```
 1            A.     PROBABLY SOME TIME IN 2013.

 2            Q.     WHAT DID MR. MATSUURA SAY TO YOU

 3    ABOUT JOINING ASCENTRA?

 4            A.     HE SAID HE WANTED ME TO BECOME A

 5    BOARD MEMBER OF ASCENTRA.

 6            Q.     DID HE SAY WHY HE WANTED YOU TO

 7    BECOME A BOARD MEMBER OF ASCENTRA?

 8            A.     CAN YOU REPEAT YOUR QUESTION?

 9            Q.     DID HE SAY WHY HE WANTED YOU BECOME

10    A BOARD MEMBER OF ASCENTRA?

11            A.     I DON'T REMEMBER.

12            Q.     DID YOU HAVE AN UNDERSTANDING AS TO

13    WHY HE WANTED YOU TO BECOME A BOARD MEMBER OF

14    ASCENTRA?

15            A.     I DON'T -- NO, I DON'T CLEARLY

16    REMEMBER.

17            Q.     DO YOU HAVE SOME IDEA AS TO WHY YOU

18    BELIEVED THEY WANTED YOU TO BECOME A BOARD MEMBER

19    OF ASCENTRA?

20            A.     YES.

21            Q.     AND WHAT IS THAT?

22            A.     MY LINGUISTIC CAPABILITIES, MY

23    KNOWLEDGE OF DOING BUSINESS GLOBALLY, OR IN HONG

24    KONG, AND I BELIEVE I WAS TRUSTWORTHY.

25            Q.     OKAY.  ASIDE FROM THE HOPEWILL
```

31

RYUNOSUKE YOSHIDA

1   POSITION, WHICH YOU SAID YOU HAD FOR ABOUT FOUR TO

2   FIVE YEARS, DID YOU HAVE ANY OTHER EXPERIENCE WITH

3   ANY OTHER -- I THINK YOU SAID GLOBAL MARKETING

4   FIRMS?

5          A.     WHICH PERIOD ARE YOU REFERRING TO?

6          Q.     ANY TIME.

7          A.     NO.

8          Q.     WHAT IS YOUR CURRENT -- DO YOU HAVE

9   -- ARE YOU CURRENTLY EMPLOYED?

10         A.     YES.

11         Q.     AND WHERE ARE YOU CURRENTLY

12  EMPLOYED?

13         A.     EIGHT LIGHT YEARS.

14         Q.     I AM SORRY?

15         A.     EIGHT LIGHT YEARS FZCO.

16                THE COURT REPORTER:  EIGHT LIGHT

17  YEARS?

18         A.     FZCO.

19  BY MR. MCDONALD:

20         Q.     EIGHT LIGHT YEARS FCCO [SIC], WHAT

21  IS THAT COMPANY?

22         A.     THAT IS MY COMPANY.

23         Q.     THAT IS YOUR COMPANY?  AND WHAT

24  DOES THAT COMPANY DO?

25         A.     PROVIDING SERVICES TO SHANG PENG

32

1   GAO KE INC.

2          Q.     WHAT TYPE OF SERVICES?

3          A.     AS A DIRECTOR OF SHANG PENG GAO KE

4   INC MANAGING THE COMPANY AND CONSULTING.

5          Q.     AND THAT IS INC, YOU SAID?

6          A.     YES.

7          Q.     THE CAYMAN ENTITY?

8          A.     YES.

9          Q.     AND THAT IS THE PARENT COMPANY OF

10  PTE, TO BE CLEAR?

11         A.     YES.

12         Q.     OKAY.  SO YOU ARE PROVIDING

13  DIRECTORS AND -- SORRY, DID YOU SAY CONSULTING

14  SERVICES?

15         A.     MANAGEMENT AND CONSULTING SERVICES.

16         Q.     OKAY.  WHAT TYPE OF MANAGEMENT AND

17  CONSULTING SERVICES ARE YOU PROVIDING TO -- WE

18  WILL JUST SAY SPGK INC, IS THAT OKAY?

19         A.     SURE.

20         Q.     OKAY.  WHAT TYPE OF MANAGEMENT AND

21  CONSULTANT SERVICES ARE YOU CURRENTLY PROVIDING TO

22  SPGK INC?

23         A.     DAILY OPERATION.  CLOSING OF THE

24  SPGK BUSINESS.

25         Q.     AND WHAT ARE THE DAILY OPERATIONS

33

RYUNOSUKE YOSHIDA

1    OF SPGK INC?

2           A.     WORKING WITH LAW FIRMS.   FOR

3    EXAMPLE, WORKING WITH LAW FIRMS TO WIND DOWN

4    ENTITIES IN MAINLAND CHINA.

5           Q.     WHICH ENTITIES ARE YOU WINDING DOWN

6    IN MAINLAND CHINA?

7           A.     THERE ARE ABOUT 98 ENTITIES THAT

8    WAS A THIRD PARTY SERVICE PROVIDER IN MAINLAND

9    CHINA.

10          Q.     DID YOU SAY 98?

11          A.     YES.

12          Q.     WHAT TYPE OF THIRD PARTY SERVICES

13   WERE THESE 98 ENTITIES PROVIDING TO SPGK?

14          A.     MARKETING AND SUPPORT SERVICES.

15   SORRY, LET ME CORRECT.   IT WAS ORIGINALLY 98

16   ENTITIES.

17          Q.     OKAY.

18          A.     YES, AND I HAVE BEEN WORKING ON

19   WINDING THESE DOWN.

20          Q.     SO ORIGINALLY STARTING WHEN WAS IT

21   98 ENTITIES?

22          A.     I DON'T REMEMBER EXACTLY BUT

23   I BELIEVE SOME TIME IN 2019-2021.

24          Q.     SO AROUND THAT TIME PERIOD YOU HAD

25   98 SEPARATE ENTITIES?

34

RYUNOSUKE YOSHIDA

1          A.     98 THIRD PARTY ENTITIES.

2          Q.     WERE ANY OF THESE ENTITIES

3    AFFILIATED WITH SPGK?

4          A.     CAN YOU ----

5                 MR. MORRIS:  OBJECTION TO THE FORM

6    OF THE QUESTION.

7          A.     CAN YOU DEFINE AFFILIATED?

8    BY MR. MCDONALD:

9          Q.     DID SPGK OWN ANY INTERESTS, BY THAT

10   EITHER EQUITY INTEREST, CONTROL INTERESTS, ANY OF

11   THOSE 98 ENTITIES?

12         A.     NO.

13         Q.     THESE ARE REAL THIRD PARTY

14   PROVIDERS?

15         A.     YES.

16         Q.     ARE THESE INDIVIDUALS OR ARE THEY

17   CORPORATIONS?

18                MR. MORRIS:  OBJECTION TO THE FORM

19   OF THE QUESTION.

20         A.     CORPORATION.  COMPANY.

21   BY MR. MCDONALD:

22         Q.     OKAY.  WHAT TYPES OF SERVICES WERE

23   THEY PROVIDING?

24         A.     MARKETING AND SUPPORT SERVICES.

25         Q.     AND SPGK WAS RESPONSIBLE FOR PAYING

35

1    FOR THOSE SERVICES?

2         A.    YES.

3         Q.    WERE THEY COMPENSATED THROUGH SPGK

4    -- STRIKE THAT.  CAN YOU IDENTIFY THE COMPANY

5    WITHIN SORT OF THE ASCENTRA SPGK GROUPS OF

6    COMPANIES, THE ENTITY THAT WAS RESPONSIBLE FOR

7    PAYING THESE SERVICE PROVIDERS?

8         A.    SPGK INC WAS RESPONSIBLE FOR PAYING

9    THESE PROVIDERS.

10        Q.    DID SPGK INC HAVE CONTRACTS WITH

11   THESE PROVIDERS?

12        A.    YES.

13        Q.    BY SUPPORT SERVICES, COULD YOU

14   PLEASE ELABORATE WHAT YOU MEANT BY SUPPORT

15   SERVICES?

16        A.    IF THE THIRD PARTY SERVICE

17   COMPANIES HAD SERVICE AGREEMENTS WITH THE REFERRAL

18   AGENTS AND THEY WERE RESPONSIBLE TO MANAGE THESE

19   REFERRAL AGENTS.

20        Q.    BEFORE WE GO ON TO ANOTHER

21   QUESTION, COULD YOU PLEASE TELL US WHAT IS A

22   REFERRAL AGENT?

23        A.    A REFERRAL AGENT IS AN AGENT THAT

24   CAN REGISTER AS AN AGENT WITH SPGK THROUGH THE

25   SPGK WEBSITE AND HAVE AN AGREEMENT TO RECEIVE A

36

RYUNOSUKE YOSHIDA

1   REFERRAL FEE WHEN THEY REFER OUR PRODUCTS OR

2   SPGK'S PRODUCT TO OTHER CUSTOMERS.

3          Q.     ARE ANY OF THESE REFERRAL AGENTS

4   INVOLVED WITH THE CRIMINAL ACTIONS YOU REFERRED TO

5   EARLIER?

6          A.     CAN YOU ASK ME THE QUESTION AGAIN?

7          Q.     SURE.  CERTAINLY.  AT THE OUTSET

8   YOU DISCUSSED THE FACT THAT THERE WERE CRIMINAL

9   MATTERS ONGOING IN PRC AND MY QUESTION IS DO ANY

10  OF THOSE CRIMINAL MATTERS INVOLVE THE REFERRAL

11  AGENTS?

12         A.     SOME OF THE REFERRAL AGENTS ARE

13  INVOLVED IN THE CRIMINAL INVESTIGATIONS.

14         Q.     ARE ANY OF THE THIRD PARTY SERVICE

15  PROVIDERS INVOLVED WITH THE CRIMINAL

16  INVESTIGATIONS?

17         A.     I DON'T KNOW.

18         Q.     YOU REFER TO THEM AS THIRD PARTY.

19  SO THERE IS NO WHAT I WOULD CALL OWNERSHIP OF SPGK

20  INTO THESE ENTITIES, CORRECT?

21         A.     YES.

22         Q.     BUT YOU EARLIER HAD STATED THAT

23  SPGK WAS RESPONSIBLE FOR WINDING DOWN THOSE

24  ENTITIES?

25         A.     YES.

37

1          Q.     AND WHY IS THAT?

2          A.     THESE 98 COMPANIES WERE SET UP

3    SOLELY FOR SPGK'S BUSINESS TOWARDS PRC.

4          Q.     WHO SET UP THESE COMPANIES?

5          A.     I BELIEVE THE THEN MANAGEMENT OF

6    SPGK SET THESE UP.

7          Q.     COULD YOU PLEASE ELABORATE ON "THE

8    THEN MANAGEMENT"?

9          A.     I BELIEVE I WASN'T INVOLVED DAILY,

10   SO I CANNOT BE SURE WHO WAS INVOLVED.  YES,

11   I CANNOT BE SURE WHO ACTUALLY DID IT.

12         Q.     DID THESE ENTITIES EXIST BEFORE

13   SPGK WAS FORMED?

14         A.     NO.

15         Q.     WERE ANY OF THESE ENTITIES SET UP

16   AS PART OF THE INTERUSH BUSINESS IN PRC?

17         A.     CAN YOU REPEAT YOUR QUESTION?

18         Q.     WERE ANY OF THESE THIRD PARTY

19   SERVICE PROVIDERS, THESE ENTITIES WE ARE

20   DISCUSSING, SET UP AS PART OF THE INTERUSH

21   BUSINESS IN PRC?

22         A.     NO.

23                MR. MORRIS:  OBJECTION TO THE FORM

24   OF THE QUESTION.

25         A.     NO.

38

RYUNOSUKE YOSHIDA

```
 1   BY MR. MCDONALD:

 2        Q.    WHEN YOU JOINED THE BOARD OF

 3   ASCENTRA, DID ASCENTRA HAVE AN ONGOING BUSINESS IN

 4   PRC?

 5              MR. MORRIS:  SORRY, DID ASCENTRA

 6   HAVE AN ONGOING BUSINESS WITH WHAT?

 7              MR. MCDONALD:  IN PRC.

 8              MR. MORRIS:  THANK YOU.

 9        A.    NO.

10   BY MR. MCDONALD:

11        Q.    THEY DID NOT?

12        A.    THEY DID NOT.

13        Q.    DID INTERUSH HAVE AN ONGOING

14   BUSINESS IN PRC?

15        A.    NO.

16        Q.    BACK TO YOUR CURRENT POSITION WITH

17   EIGHT LIGHT YEARS FCCO [SIC], COULD YOU JUST SHED

18   A LITTLE LIGHT AS TO HOW YOU CAME TO -- WHAT EIGHT

19   LIGHT YEARS FCCO [SIC] MEANS?

20        A.    JUST AN IDEA.

21        Q.    JUST AN IDEA?  OKAY.  IT DOESN'T

22   MEAN ANYTHING?  OKAY.  AND WHERE IS EIGHT LIGHT

23   YEARS FCC -- STRIKE THAT.  WHAT IS THE FORMATION

24   JURISDICTION FOR EIGHT LIGHT YEARS FCCO [SIC]?

25        A.    DUBAI.
```

39

1          Q.      DUBAI.  IS ANYONE EMPLOYED BY EIGHT

2   -- I WILL JUST CALL IT EIGHT LIGHT YEARS, IF THAT

3   IS OKAY.  IS ANYONE ELSE EMPLOYED BY EIGHT LIGHT

4   YEARS?

5          A.      NO.

6          Q.      IT IS SOLELY YOU?

7          A.      YES.

8          Q.      OKAY.  YOU SAID YOU WERE RECEIVING

9   FEES FOR BEING A DIRECTOR AND MANAGEMENT

10  CONSULTANT FOR SPGK INC?

11         A.      YES.

12         Q.      AND WHAT ARE YOU CURRENTLY BEING

13  PAID BY SPGK INC FOR PROVIDING THOSE SERVICES?

14         A.      50,000 US A MONTH.

15         Q.      50,000.  DO YOU HAVE ANY OTHER

16  POSITIONS CURRENTLY?  DO YOU HOLD ANY OTHER

17  EMPLOYMENT POSITIONS BESIDES THIS?

18         A.      NO.

19         Q.      OKAY.  WHERE ARE YOU CURRENTLY

20  RESIDING?

21         A.      IN HONG KONG.

22         Q.      YOU ARE IN HONG KONG?

23         A.      YES.

24         Q.      THANK YOU.  WHEN YOU FIRST JOINED

25  ASCENTRA, WAS IT SOLELY AS A DIRECTOR -- STRIKE

40

RYUNOSUKE YOSHIDA

1   THAT.  WAS YOUR POSITION WITH ASCENTRA AS A

2   DIRECTOR YOUR ONLY POSITION WITH ASCENTRA?

3           A.    CAN YOU RE-ASK YOUR QUESTION AGAIN?

4           Q.    SURE.  I WILL BE A LITTLE BIT MORE

5   PRECISE.  YOU WERE APPOINTED TO BECOME A DIRECTOR,

6   YOU SAID, ROUGHLY IN 2013.  IS THAT CORRECT?

7           A.    APPROXIMATELY AROUND 2013.

8           Q.    DID YOU ASSUME ANY OTHER POSITIONS

9   AT ASCENTRA, APART FROM BEING A DIRECTOR?

10          A.    ARE YOU REFERRING TO THAT PERIOD?

11          Q.    YES.

12          A.    NO.

13          Q.    AFTER THAT PERIOD, DID YOU ASSUME

14  ANY OTHER POSITIONS AT ASCENTRA?

15          A.    ARE YOU REFERRING TO ASCENTRA

16  HOLDINGS INC?

17          Q.    YES.

18          A.    NO.

19          Q.    WHAT ABOUT ANY OF THE ASCENTRA

20  COMPANIES?

21          A.    CAN YOU ELABORATE?

22          Q.    YES.  DID YOU HOLD -- WE WILL GET

23  INTO THESE IN A LITTLE BIT, BUT, FOR EXAMPLE, HAVE

24  YOU EVER HEARD OF A COMPANY CALLED IHEALTHSCIENCE?

25          A.    YES.

41

RYUNOSUKE YOSHIDA

```
1            Q.     DID YOU HAVE A POSITION WITH

2   IHEALTHSCIENCE?

3            A.     I BELIEVE I WAS A DIRECTOR.

4            Q.     ANY OTHER POSITION?

5            A.     NO.

6            Q.     WHAT ABOUT RADIAL IT?

7            A.     I DO KNOW THE COMPANY.

8            Q.     DID YOU HAVE A POSITION AT

9   RADIAL IT?

10           A.     I DON'T EXACTLY REMEMBER.  I THINK

11  SO.

12           Q.     WHAT ABOUT A COMPANY CALLED EVER

13  SKILL?

14           A.     NO.

15           Q.     WHAT ABOUT EVER INNOVATION?

16           A.     NO.

17           Q.     MELS ART?

18           A.     NO.

19           Q.     OTHER THAN IHEALTH, POSSIBLY RADIAL

20  AND ASCENTRA -- I AM SORRY, STRIKE THAT.  WHAT

21  ABOUT HEC?

22           A.     CAN YOU REFER TO WHICH ENTITY?

23           Q.     HEC GLOBAL.

24           A.     GLOBAL INC?

25           Q.     YES.
```

42

RYUNOSUKE YOSHIDA

```
1              A.      I DON'T THINK SO, BUT I DON'T

2    EXACTLY REMEMBER.

3              Q.      DID YOU HAVE A POSITION AT ANY OF

4    THE HEC COMPANIES?

5              A.      YES.

6              Q.      WHICH COMPANY?

7              A.      I WAS A PRESIDENT, HOWEVER I DON'T

8    RECALL WHICH ENTITY IT WAS.

9              Q.      YOU WERE PRESIDENT OF ONE OF THE

10   HEC COMPANIES?

11             A.      YES.

12             Q.      DO YOU REMEMBER THE TIME PERIOD YOU

13   WERE PRESIDENT AT ONE OF THE HEC COMPANIES?

14             A.      IF I REMEMBER CORRECTLY, I BELIEVE

15   IT WAS AROUND 2017.

16             Q.      TO WHEN APPROXIMATELY?

17             A.      APPROXIMATELY END OF -- I BELIEVE

18   I WAS A DIRECTOR UNTIL PROBABLY MID 2021.

19             Q.      OKAY.  SO YOU WERE PRESIDENT OF ONE

20   OF THEM AND DIRECTOR OF THE SAME ONE OR A

21   DIFFERENT ONE?

22             A.      I DON'T EXACTLY REMEMBER.  THERE

23   WERE MANY SUBSIDIARIES.

24             Q.      OKAY, THAT IS FAIR.  DID YOU EVER

25   HOLD A POSITION IN ANY OF THE THIRD PARTY SERVICE
```

43

1  PROVIDERS YOU REFERENCED EARLIER, THE 98 ENTITIES

2  IN PRC?

3       A.    NO.

4       Q.    DID ANY EMPLOYEES OF ASCENTRA OR

5  SPGK HOLD ANY POSITIONS IN ANY OF THESE THIRD

6  PARTY SERVICE PROVIDERS?

7       A.    NO.

8       Q.    GOING BACK TO MY PRIOR QUESTION,

9  YOU SAID SPGK WAS FACILITATING THE WIND DOWN OF

10 THESE COMPANIES.  THAT IS CORRECT, THAT IS WHAT

11 YOU SAID?

12      A.    YES.

13      Q.    WHY IS SPGK PROVIDING THAT SUPPORT

14 TO THESE ENTITIES?

15      A.    A BUSINESS DECISION.

16      Q.    BY WHOM?

17      A.    BY ME.

18      Q.    BY YOU?

19      A.    YES.

20      Q.    WHY?

21      A.    I BELIEVE I CAN MITIGATE MY

22 PERSONAL CRIMINAL AND CIVIL RISK BY ASSISTING IN

23 CLOSING THESE ENTITIES.

24      Q.    WHY DO YOU BELIEVE YOU HAVE

25 POSSIBLE CRIMINAL AND CIVIL RISK?

44

RYUNOSUKE YOSHIDA

1          A.      SPGK -- AS I SAID EARLIER, THE

2    AGENTS OF SPGK HAVE BEEN ARRESTED, 214 PEOPLE

3    ARRESTED, AND THERE WERE MULTIPLE OF THESE

4    INVESTIGATIONS.  SO I BELIEVE IT IS NATURAL FOR ME

5    TO THINK THAT THERE MAY BE CRIMINAL RISKS FOR ME,

6    AND THESE 98 ENTITIES HAVE AN AGREEMENT WITH SPGK,

7    SO THAT IS ALSO A POTENTIAL CIVIL RISK FOR ME.

8          Q.      FOR YOU PERSONALLY?

9          A.      FOR SHANG PENG GAO KE INC, YES.  I

10   AM A NOT A LAWYER.  I CANNOT KNOW THE FULL EXTENT

11   OF MY RISK BUT I AM VERY CAREFUL.

12         Q.      DO YOU KNOW WHO WAS RESPONSIBLE FOR

13   SETTING UP THESE 98 ENTITIES?

14         A.      NO.

15         Q.      DO YOU KNOW IF MR. MATSUURA WAS

16   INVOLVED WITH SETTING UP ANY OF THESE ENTITIES?

17         A.      I DON'T KNOW.

18         Q.      YOU DON'T KNOW?

19         A.      I DON'T KNOW.

20         Q.      AND SPGK HAS A SEPARATE CONTRACTUAL

21   RELATIONSHIP WITH EACH OF THESE 98 ENTITIES?

22         A.      YES.

23              MR. MORRIS:  OBJECTION TO THE FORM

24   OF THE QUESTION.

25         A.      YES.

45

RYUNOSUKE YOSHIDA

1   BY MR. MCDONALD:

2        Q.     YES THEY DO?

3        A.     YES.

4        Q.     I AM SORRY, SPGK INC HAS A SEPARATE

5   CONTRACTUAL RELATIONSHIP?

6        A.     CAN YOU DEFINE SEPARATE?

7        Q.     EACH OF THE 98 ENTITIES HAS ITS OWN

8   CONTRACT WITH SPGK INC?

9        A.     YES.

10       Q.     DID SPGK INC OR SPGK PTE -- WE CAN

11  SEPARATE THESE TWO OUT, OKAY?  DID SPGK INC HAVE

12  ANY EMPLOYEES?

13       A.     I WAS THE DIRECTOR OF SPGK INC.

14       Q.     BESIDE YOUR ROLE AS DIRECTOR, WERE

15  THERE ANY EMPLOYEES FOR SPGK INC?

16       A.     I DON'T THINK SO.

17       Q.     SAME QUESTION FOR SPGK PTE.  DID

18  SPGK -- IT IS A TONGUE TWISTER.  DID SPGK PTE HAVE

19  ANY EMPLOYEES?

20       A.     I AM A DIRECTOR AND I ALSO HAVE

21  ANOTHER NOMINEE DIRECTOR.

22       Q.     AND WHO IS THE OTHER NOMINEE

23  DIRECTOR?

24       A.     I CANNOT REMEMBER ON THE TOP OF MY

25  HEAD RIGHT NOW.

46

RYUNOSUKE YOSHIDA

1          Q.     BESIDE YOURSELF AS DIRECTOR AND

2    YOUR NOMINEE DIRECTOR, DID SPGK PTE HAVE ANY

3    SEPARATE EMPLOYEES?

4          A.     NO, I DON'T THINK SO.  SORRY, LET

5    ME RESTATE THIS.  I DON'T THINK SO.

6          Q.     WE TALKED ABOUT MR. MATSUURA

7    BRIEFLY BEFORE.  NOW, I AM JUST GOING TO GIVE YOU

8    SOME NAMES.  IF YOU COULD LET ME KNOW IF YOU

9    REMEMBER THEM AND WE WILL HAVE SOME FOLLOW UP

10   QUESTIONS, OKAY?

11         A.     SURE.

12         Q.     I APOLOGISE IN ADVANCE IF I AM

13   MISPRONOUNCING NAMES.  MOTOHIKO HOMMA?

14         A.     YES.

15         Q.     HAVE I PRONOUNCED THAT CORRECTLY?

16         A.     I THINK SO.

17         Q.     I AM TRYING MY BEST HERE.  WHO IS

18   MR. HOMMA?

19         A.     HE IS -- WHO IS -- HE IS -- CAN YOU

20   ELABORATE THE QUESTION, SORRY?

21         Q.     HOW DO YOU KNOW MR. HOMMA?

22         A.     I BELIEVE I MET WITH HIM THROUGH

23   YOSHIO MATSUURA.

24         Q.     WAS HE FRIENDS WITH MR. MATSUURA?

25         A.     I DON'T KNOW.

47

RYUNOSUKE YOSHIDA

1          Q.      DID MR. HOMMA WORK WITH ASCENTRA?

2          A.      HE -- YES, YES.

3          Q.      WHAT WAS HIS ROLE AT ASCENTRA?

4          A.      CAN YOU SPECIFY A PERIOD?

5          Q.      IF HIS ROLE CHANGED OVER TIME, IF

6   YOU COULD START FROM THE FIRST TIME YOU MET HIM TO

7   WHATEVER THAT RELATIONSHIP ENDED WOULD BE HELPFUL.

8          A.      WHEN I MET HIM I BELIEVE HE WAS A

9   SHAREHOLDER OF ASCENTRA.  YES, ASCENTRA/INTERUSH

10  HOLDINGS INC BACK THEN.

11         Q.      DID HE HAVE ANY OTHER POSITION WITH

12  THE COMPANY?

13         A.      I DON'T THINK SO.

14         Q.      AND THEN OVER TIME DID HIS POSITION

15  WITH THE COMPANY CHANGE?  STRIKE THAT.  YOU

16  STARTED OUT.  YOU MET HIM WHEN HE WAS A

17  SHAREHOLDER.  DID HE EVER BECOME MORE THAN A

18  SHAREHOLDER OF ASCENTRA OVER, LET US SAY -- 2013

19  YOU SAID HE STARTED WITH ASCENTRA?

20         A.      YES.

21         Q.      TO, LET US SAY, 2021?

22         A.      I BELIEVE, IF I AM CORRECT, HE WAS

23  A DIRECTOR FOR A SHORT PERIOD OF TIME.  I DON'T

24  EXACTLY REMEMBER WHEN.

25         Q.      WAS THAT DURING A TIME WHEN YOU

48

RYUNOSUKE YOSHIDA

1    WERE ALSO A DIRECTOR?

2          A.    I DON'T EXACTLY -- I CANNOT BE 100%

3    ACCURATE, BUT MAYBE WE DID NOT OVERLAP.

4          Q.    OKAY.  DO YOU KNOW A MARTIN, ALSO

5    KNOWN AS MARTY MATTHEWS?

6          A.    YES.

7          Q.    WHEN DID YOU FIRST MEET

8    MR. MATTHEWS?

9          A.    I BELIEVE THE FIRST TIME I MET HIM

10   WAS IN HONG KONG.

11         Q.    TO DO YOU RECALL ROUGHLY WHEN THAT

12   WAS?

13         A.    PROBABLY 2012 OR '13.

14         Q.    WAS THAT WHEN YOU WERE STILL WITH

15   HOPEWILL?

16         A.    YES.

17         Q.    WERE YOU WORKING WITH MR. MATTHEWS

18   ALONG WITH MR. MATSUURA ON THE POTENTIAL LISTING

19   OF INTERUSH?

20         A.    CAN YOU CLARIFY YOUR QUESTION?

21         Q.    YOU SAID EARLIER YOU FIRST MET

22   MR. MATSUURA IN CONNECTION WITH THE POTENTIAL

23   LISTING OF INTERUSH ON THE HONG KONG EXCHANGE.  IS

24   THAT ALSO THE CONTEXT IN WHICH YOU MET

25   MR. MATTHEWS?

49

RYUNOSUKE YOSHIDA

1        A.    YES.

2        Q.    DO YOU RECALL ANYONE ELSE AT

3   ASCENTRA YOU MET WITH BEYOND MR. MATSUURA AND

4   MR. MATTHEWS IN CONNECTION WITH THE LISTING OF

5   INTERUSH ON THE HONG KONG EXCHANGE?

6        A.    I DON'T REMEMBER EVERYTHING, BUT

7   I BELIEVE I ALSO MET -- I DID MEET WITH MOTOHIKO

8   HOMMA.

9        Q.    AT THE SAME TIME?

10        A.    AROUND THE SAME TIME.

11        Q.    OKAY.  HAVE YOU EVER HEARD OF

12   SOMEONE THAT GOES BY THE NAME OF TED SANDERS?

13        A.    YES.

14        Q.    WHEN DID YOU FIRST MEET

15   MR. SANDERS?

16        A.    I DON'T EXACTLY REMEMBER WHEN BUT

17   I BELIEVE IT WAS SOME TIME BETWEEN 2014 TO 2016,

18   I THINK.

19             MR. MORRIS:  I AM SORRY, COULD

20   I HEAR THE ANSWER?

21        A.    2014 TO 2016, I BELIEVE.  I BELIEVE

22   IT IS SOME TIME DURING THIS PERIOD.

23             MR. MORRIS:  THANK YOU.  I JUST DID

24   NOT HEAR YOU.

25             MR. MCDONALD:  JOHN, IS HE PLUGGED

50

RYUNOSUKE YOSHIDA

1   INTO THE SAME SYSTEM AS THE AUDIOS OR IS HIS MIKE

2   DEPENDANT UPON US SPEAKING?

3                    MR. MORRIS:  I CANNOT ANSWER.

4   I HAVE HEARD EVERYTHING JUST FINE.  I THINK IT WAS

5   THE WAY HE ANSWERED THAT QUESTION.

6                    MR. MCDONALD:  OKAY.  I JUST WANTED

7   TO MAKE SURE THE AUDIO WAS FINE FOR YOU.

8                    MR. MORRIS:  YES, NOT A

9   TECHNOLOGICAL ISSUE AT ALL.

10                   MR. MCDONALD:  OKAY.

11  BY MR. MCDONALD:

12       Q.    I AM SORRY, YOU SAID YOU MET

13  MR. SANDERS ROUGHLY AROUND 2014, YOU SAID.  2016 I

14  THINK WAS YOUR TIME FRAME, RIGHT?

15       A.    I BELIEVE I SAID AROUND 2014 TO '16

16  OR SOMEWHERE AROUND THAT.

17       Q.    WAS MR. SANDERS ----

18       A.    '17 MAYBE.  NO, '16 PROBABLY.  YES.

19       Q.    2016?

20       A.    NO, 2014-2016, SOMEWHERE IN

21  BETWEEN.

22       Q.    SOMEWHERE IN BETWEEN.  WAS HE AN

23  EMPLOYEE OF ASCENTRA AT THE TIME YOU MET

24  MR. SANDERS?

25                   MR. MORRIS:  OBJECTION TO THE FORM

51

1  OF THE QUESTION.

2         A.    I THINK SO.

3  BY MR. MCDONALD:

4         Q.    DO YOU KNOW WHAT POSITION HE HELD

5  WITH ASCENTRA?

6         A.    CAN YOU SPECIFY A PERIOD?

7         Q.    YOU SAID YOU MET HIM SOME TIME

8  BETWEEN 2014 AND 2016, CORRECT?

9         A.    YES.

10        Q.    AND YOU WERE A DIRECTOR OF ASCENTRA

11  AT THAT TIME?

12        A.    YES.

13        Q.    DO YOU REMEMBER WHEN YOU FIRST MET

14  MR. SANDERS WHAT POSITION HE HELD AT ASCENTRA?

15        A.    I DON'T REMEMBER -- I CANNOT BE

16  ACCURATE ON WHAT WAS HIS FIRST TITLE.

17        Q.    DO YOU REMEMBER WHAT OTHER ROLES HE

18  MAY HAVE HAD AT ASCENTRA?

19        A.    HE BECAME THE CFO.

20        Q.    THE CHIEF FINANCIAL OFFICER FOR

21  ASCENTRA?

22        A.    YES.

23        Q.    WAS HE CHIEF FINANCIAL OFFICER FOR

24  ANY OTHER COMPANIES THAT WORKED WITH ASCENTRA?

25        A.    I CANNOT BE ACCURATE BECAUSE THERE

52

RYUNOSUKE YOSHIDA

1  ARE MANY ENTITIES.

2         Q.    DO YOU KNOW IF HE WAS -- STRIKE

3  THAT.  DO YOU KNOW IF HE HAD POSITIONS WITH

4  COMPANIES OTHER THAN ASCENTRA?

5         A.    CAN YOU REPEAT YOUR QUESTION?

6         Q.    DID MR. SANDERS HOLD ANY POSITIONS

7  WITH ANY COMPANIES RELATED TO EITHER ASCENTRA OR

8  SPGK AT ANY TIME DURING THE TIME YOU KNOW HIM?

9         A.    YES.

10        Q.    DO YOU RECALL WHAT ANY OF THOSE

11 POSITIONS WERE?

12        A.    I BELIEVE HE WAS A DIRECTOR OF

13 SHANG PENG GAO KE INC. SEZC FOR A PERIOD OF TIME.

14 HE MAY HAVE HAD SOME POSITION AT AOS.  I BELIEVE

15 HE WAS ALSO A DIRECTOR OF SPGK INTERNATIONAL.

16 THERE MIGHT BE OTHERS.  I CANNOT REMEMBER ALL OF

17 THEM.

18        Q.    AND AOS IS -- CAN YOU PLEASE TELL

19 US WHAT DOES AOS MEAN?

20        A.    WHAT DOES AOS MEAN?

21        Q.    YES, WHAT WAS AOS STAND FOR?

22        A.    I DON'T KNOW.

23        Q.    OKAY.  HAVE YOU HAD -- ONE OTHER

24 PERSON.  DO YOU KNOW SOMEONE NAMED MASAMI NAKANO?

25        A.    YES.

53

RYUNOSUKE YOSHIDA

1           Q.      AND WHO IS MASAMI NAKANO?

2           A.      SHE WAS THE FIRST EMPLOYEE OF

3    INTERUSH FROM WHAT I KNOW.

4           Q.      AND WHAT WAS HER POSITION WITH

5    INTERUSH?

6           A.      I CANNOT REMEMBER WHAT HER TITLE

7    WAS.

8           Q.      DO YOU KNOW THE NAMES OF ANY OTHER

9    ENTITIES SHE ALSO WORKED FOR?  I AM TALKING AROUND

10   THE TIME PERIOD WERE YOU WERE WITH ASCENTRA.  SO

11   WE ARE TALKING 2012 TO ROUGHLY 2021.

12          A.      I BELIEVE SHE WAS WORKING AT HEC.

13   EVENTUALLY IT BECAME HEC GLOBAL INC.

14          Q.      OKAY?

15          A.      AND ALSO I BELIEVE SHE IS THE OWNER

16   OF EVER INNOVATION INC AND ALSO PROBABLY THE

17   DIRECTOR OF THAT COMPANY.

18          Q.      HAVE YOU HAD ANY RECENT CONTACT

19   WITH MR. MATSUURA?

20          A.      NO.

21          Q.      DO YOU RECALL THE LAST TIME YOU

22   SPOKE WITH MR. MATSUURA?

23          A.      IT HAS BEEN A WHILE AGO.  MAYBE --

24   CAN YOU CLARIFY SPEAK?

25          Q.      HAVE A PHONE CALL?

54

1           A.      PHONE CALL.  PROBABLY EARLY 2021.

2           Q.      HAVE YOU HAD ANY TEXT MESSAGES TO

3   OR FROM MR. MATSUURA SINCE EARLY 2021?

4           A.      NO.

5           Q.      HAVE YOU HAD ANY CONTACT WHATSOEVER

6   WITH MR. MATSUURA SINCE EARLY 2021?

7           A.      NO.

8           Q.      WHY IS THAT?

9               MR. MORRIS:  OBJECTION TO THE FORM

10  OF THE QUESTION.

11          A.      CAN YOU CLARIFY?

12  BY MR. MCDONALD:

13          Q.      WHY HAVEN'T YOU HAD ANY CONTACT

14  EITHER BY PHONE OR TEXT WITH MR. MATSUURA SINCE

15  EARLY 2021?

16          A.      WHY HAVE I NOT CONTACTED HIM?  I AM

17  SORRY, I DON'T UNDERSTAND YOUR QUESTION.

18          Q.      I JUST WANT TO UNDERSTAND --

19  MR. MATSUURA APPOINTED YOU AS A DIRECTOR OF

20  ASCENTRA, IS THAT CORRECT?

21          A.      INITIALLY.  THAT WAS PROBABLY

22  INITIAL.

23          Q.      INITIAL, OKAY.  I JUST WANTED TO

24  UNDERSTAND WHY SOMEONE YOU HAD PREVIOUSLY WORKED

25  WITH YOU HAVE NOT HAD ANY CONTACT WITH SINCE EARLY

55

RYUNOSUKE YOSHIDA

1    2021?

2              A.    I DON'T WANT TO CONTACT HIM.

3              Q.    AND WHY IS THAT?

4              A.    BECAUSE HE'S THREATENED ME

5    PREVIOUSLY.

6              Q.    WHEN DID HE THREATEN YOU?

7              A.    EARLY 2021.

8              Q.    DID HE VERBALLY THREATEN YOU, AS IN

9    LIKE A PHONE CALL THREATENED YOU?

10             A.    I BELIEVE IT WAS A PHONE CALL.

11             Q.    DO YOU RECALL WHEN?

12             A.    EARLY 2021.

13             Q.    BY EARLY 2021, ARE WE TALKING THE

14   FIRST THREE MONTHS OF 2021, THE FIRST FOUR MONTHS

15   OF 2021, THE FIRST TWO MONTHS?

16             A.    MAYBE SOME TIME DURING THE FIRST --

17   I CANNOT REMEMBER THE EXACT DATE, BUT PROBABLY

18   EARLY 2021.

19             Q.    AND WHAT DID MR. MATSUURA SAY TO

20   YOU THAT YOU FELT WAS THREATENING?

21             A.    "I'M GOING TO REPORT YOU TO THE

22   CHINESE AUTHORITY."

23             Q.    FOR WHAT?

24             A.    I DON'T KNOW.

25             Q.    DID HE SAY WHY HE WOULD BE

                         56

                  RYUNOSUKE YOSHIDA

1   REPORTING YOU TO THE CHINESE AUTHORITIES?

2        A.    HE WAS DEMANDING ME TO TRANSFER

3   ASSETS OF SPGK.

4        Q.    TO WHOM?

5        A.    DIFFERENT TO -- IT WAS DIFFERENT,

6   DEPENDING ON THE PERIOD.

7        Q.    I DON'T UNDERSTAND YOUR ANSWER.

8   COULD YOU PLEASE ELABORATE?

9        A.    HE DEMANDED -- WELL, ONE EXAMPLE IS

10  HE SUDDENLY DEMANDED ME TO TRANSFER 77% OF SPGK

11  ASSETS BASED ON THE MOU.

12       Q.    TO WHOM DID HE WANT YOU TO TRANSFER

13  77% OF THE ASSETS OF SP ----

14       A.    ASCENTRA.

15       Q.    BACK TO ASCENTRA, OR TO ASCENTRA --

16  I AM SORRY, STRIKE THAT.  JUST TO MAKE THIS A

17  CLEAN QUESTION AND ANSWER, MR. MATSUURA DEMANDED

18  THAT YOU TRANSFER 77% OF SPGK, AND BY THAT SPGK

19  INC OR SPGK PTE?

20       A.    I BELIEVE IT WAS INC.

21       Q.    OF SPGK INC'S ASSETS TO ASCENTRA.

22  IS THAT AN ACCURATE STATEMENT?

23       A.    YES.  THAT WAS ONE OCCASION.

24       Q.    ONE OCCASION.  AND WHAT WAS YOUR

25  RESPONSE TO THAT -- DID YOU CALL IT A DEMAND OR A

57

1   REQUEST, I AM SORRY?

2          A.     SORRY, WHAT IS THE DIFFERENCE

3   BETWEEN THE TWO?

4          Q.     WOULD YOU HAVE CALLED IT A DEMAND?

5          A.     I THINK.  I DON'T KNOW.  SORRY,

6   I CANNOT CLARIFY THAT.  THE CLEAR DIFFERENCE

7   BETWEEN THE TWO WORDS, SO I DON'T KNOW.

8          Q.     THAT IS FAIR.  SO THAT WAS ONE

9   OCCASION.  WAS THAT OCCASION OF HIM REQUESTING

10  THAT YOU TRANSFER 77% -- I THINK THAT IS SPARKLING

11  (REFERRING TO WATER) DO YOU PREFER STILL?

12         A.     YES.

13         Q.     SO DID THIS REQUEST TO TRANSFER 77%

14  OF SPGK TO ASCENTRA OCCUR IN EARLY 2021?

15         A.     YES.

16         Q.     WHAT WAS YOUR RESPONSE TO

17  MR. MATSUURA WHEN HE MADE THAT REQUEST?

18         A.     I DECLINED.

19         Q.     WHY DID YOU DECLINE?

20         A.     BECAUSE I DON'T THINK THAT MOU IS

21  VALID OR BINDING.

22         Q.     DID HE SPECIFICALLY REFERENCE THE

23  MOU?

24         A.     YES.

25         Q.     SO THAT WAS ONE OCCASION.  YOU SAID

58

RYUNOSUKE YOSHIDA

1  THERE WAS ANOTHER OCCASION.

2        A.    YES.

3        Q.    WAS IT JUST TWO OCCASIONS YOU HAD

4  THIS CONTACT WITH MR. MATSUURA?

5        A.    CAN YOU CLARIFY YOUR QUESTION?

6        Q.    YOU SAID IN EARLY 2021 HE MADE SOME

7  THREATS TO YOU.  SO, ON THIS FIRST OCCASION HE

8  MADE A REQUEST TO HAVE 77% OF SPGK TRANSFERRED TO

9  ASCENTRA.  WHEN YOU DECLINED TO DO THAT, DID HE

10  MAKE ANY THREATS TO YOU FOR DECLINING TO DO THAT?

11        A.    I DON'T REMEMBER THE CHRONOLOGY,

12  BUT THERE WERE A LOT OF THINGS HAPPENING DURING

13  THAT PERIOD.

14        Q.    WHAT ELSE WAS HAPPENING DURING THAT

15  PERIOD?

16        A.    CAN YOU CLARIFY YOUR QUESTION?

17        Q.    I AM JUST ASKING YOU TO -- YOU SAID

18  A LOT OF OTHER THINGS WERE OCCURRING DURING THIS

19  PERIOD.  I JUST WANTED TO UNDERSTAND WHAT YOU MEAN

20  BY ALL THESE OTHER THINGS HAPPENING DURING THIS

21  PERIOD.

22        A.    HE DEMANDED TO MAKE -- I FORGOT THE

23  FIGURE, BUT MAYBE 15-18 MONTHS' OF SERVICE FEE TO

24  HIM AND ALL THE VENDORS.

25        Q.    YOU SAY "HE DEMANDED TO MAKE --

59

RYUNOSUKE YOSHIDA

1    I FORGOT THE FIGURE, BUT MAY BE 15-18 MONTHS' OF

2    SERVICE FEE TO HIM AND ALL THE VENDORS."  WHAT DO

3    YOU MEAN BY THAT?

4         A.    HE DEMANDED -- HE SAID HE -- SORRY,

5    CAN YOU CLARIFY YOUR QUESTION?  WHAT DO I MEAN BY

6    THAT?  SORRY, OKAY, HE DEMANDED SPGK -- I BELIEVE

7    IT WAS SPGK -- TO PAY THE VENDORS OF SPGK AND ALSO

8    ASCENTRA 15 MONTHS' WORTH OF SERVICE FEE.

9    I BELIEVE IT WAS 15.  IT COULD HAVE BEEN MORE OR

10   LESS.

11        Q.    OKAY.  WHY DID HE WANT SPGK TO PAY

12   THE VENDORS OF SPGK AND ASCENTRA 15 MONTHS' WORTH

13   OF THE SERVICE FEE?

14             MR. MORRIS:  OBJECTION TO THE FORM

15   OF THE QUESTION.

16        A.    HE MENTIONED THE COMPANY WAS IN --

17   SPGK WAS IN A CRITICAL STATE AND THAT THE VENDORS

18   NEEDED EMERGENCY FUNDING.

19   BY MR. MCDONALD:

20        Q.    LET US UNPACK THAT A LITTLE BIT.

21   HE MENTIONED THE COMPANY WAS IN -- SPGK WAS IN A

22   CRITICAL STATE.  WHAT DID YOU MEAN BY CRITICAL

23   STATE?

24             MR. MORRIS:  OBJECTION TO THE FORM

25   OF THE QUESTION.

RYUNOSUKE YOSHIDA

1    BY MR. MCDONALD:

2         Q.    STRIKE THAT.  DO YOU KNOW WHAT

3    MR. MATSUURA MEANT BY SPGK WAS IN A CRITICAL

4    STATE?

5         A.    SPGK IN LATE 2020 WAS FACING AN

6    ISSUE WITH -- A PAYMENT PROCESSING ISSUE, YES.

7         Q.    WHAT WAS THE PAYMENT PROCESSING

8    ISSUE THAT SPGK WAS FACING AT THE END OF 2020?

9         A.    THE CREDIT CARD PROCESSING, WHICH

10   WAS CHINA UNION PAY, WAS BLOCKING FOR TRANSACTIONS

11   TO GO THROUGH.

12        Q.    WHY WAS CHINA UNION PAY BLOCKING

13   TRANSACTIONS?

14        A.    I DON'T KNOW.

15        Q.    JUST SO WE CAN BE CLEAR, CHINA

16   UNION PAY WAS PROCESSING TRANSACTIONS IN THE PRC;

17   IS THAT CORRECT?

18        A.    YES.

19        Q.    AND WHAT IS CHINA UNION'S ROLE IN

20   THE PROCESSING OF TRANSACTIONS IN THE PRC?

21        A.    CHINA UNION PAY'S ROLE IN

22   PROCESSING THE PRC, CHINA UNION PAY'S ROLE WAS TO

23   PROCESS PAYMENTS THROUGH THEIR CHINA UNION PAY

24   CARDS AND TRANSFER THE FUNDS TO PLANET PAYMENT.

25        Q.    WERE YOU EVER INFORMED AT ANY POINT

                          61

RYUNOSUKE YOSHIDA

1   AS TO WHY CHINA UNION PAY WAS BLOCKING

2   TRANSACTIONS IN LATE 2020?

3         A.      I DON'T REMEMBER EXACTLY, BUT

4   I BELIEVE IT WAS RELATED TO THESE ARRESTS, THE 214

5   PEOPLE ARREST IN CHINA AND INVESTIGATIONS

6   FOLLOWING THAT.

7         Q.      THE ARRESTS YOU REFERRED TO

8   EARLIER?  AND THESE CRIMINAL PROSECUTIONS ARE

9   ONGOING?

10        A.      DO YOU MEAN NOW?

11        Q.      YES.

12        A.      I HAVE -- I DON'T KNOW.

13        Q.      YOU DON'T KNOW.  BACK TO YOUR

14  CONVERSATION WITH MR. MATSUURA IN WHICH HE

15  REQUESTED THAT PAYMENTS OF, YOU SAID, ROUGHLY 15

16  MONTHS BE MADE TO -- DID YOU SAY VENDORS OF SPGK

17  AND ASCENTRA?  I JUST WANT TO BE CLEAR.

18        A.      YES.

19        Q.      WHY DID HE WANT MONEY TO GO TO THE

20  VENDORS AT THAT POINT IN TIME?

21              MR. MORRIS:  OBJECTION TO THE FORM

22  OF THE QUESTION.

23        A.      I THINK IT IS -- WELL, HE SAID IT

24  WAS EMERGENCY FUNDING.

25  BY MR. MCDONALD:

62

RYUNOSUKE YOSHIDA

1        Q.     DID HE ELABORATE AS TO WHAT HE

2    MEANT BY EMERGENCY FUNDING?

3        A.     IF I RECALL CORRECTLY, I BELIEVE HE

4    WAS REFERRING TO THE SPGK'S PAYMENT PROCESSING

5    ISSUE.

6        Q.     AND HOW DID THAT -- STRIKE THAT.

7    DID HE SAY HOW SPGK'S PAYMENT PROCESSING ISSUE WAS

8    CREATING THE NEED FOR THIS EMERGENCY FUNDING TO

9    THE VENDORS?

10       A.     CAN YOU REPEAT YOUR QUESTION?

11       Q.     CERTAINLY.  DID HE SAY HOW SPGK'S

12   PAYMENT PROCESSING ISSUE -- THAT IS WHAT YOU

13   CALLED IT, YES?

14       A.     YES.

15       Q.     WAS CREATING THE NEED FOR THE

16   EMERGENCY FUNDING TO THE VENDORS?

17       A.     I DON'T REMEMBER.  I DON'T THINK

18   SO, BUT I DON'T REMEMBER.  I CANNOT BE CERTAIN.

19       Q.     DO YOU RECALL HOW MUCH MONEY HE WAS

20   DEMANDING TO BE PAID TO THE VENDORS?

21       A.     I CANNOT REMEMBER ON TOP OF MY

22   HEAD.

23       Q.     I THINK YOU SAID IT WAS 15 MONTHS

24   ROUGHLY, ABOUT FUNDING IS WHAT HE WAS ----

25       A.     I THINK SO.

63

RYUNOSUKE YOSHIDA

1          Q.     ---- SPEAKING.  OKAY.  WOULD THAT

2    HAVE BEEN MORE THAN $10 MILLION IN PAYMENTS?

3          A.     I DON'T REMEMBER.

4          Q.     MORE THAN 15 MILLION?

5          A.     SORRY, I DON'T REMEMBER ON TOP OF

6    MY HEAD.

7          Q.     OKAY.  WE WILL COME BACK TO THAT

8    LATER.  WHAT WAS YOUR REACTION TO MR. MATSUURA'S

9    REQUEST TO PAY 15 MONTHS TO THE VENDORS DURING

10   YOUR CONVERSATION IN EARLY 2021?

11         A.     I WAS SHOCKED.

12         Q.     WHY WERE YOU SHOCKED?

13         A.     BECAUSE I DID NOT UNDERSTAND WHAT

14   HE WAS SAYING.

15         Q.     DID YOU ASK HIM WHY HE WAS MAKING

16   THE REQUEST?

17         A.     I DON'T REMEMBER.

18         Q.     DID YOU AGREE TO MAKE THE PAYMENTS?

19         A.     NO.

20         Q.     DID YOU TELL HIM THAT YOU DID NOT

21   AGREE TO MAKE THE PAYMENTS?

22         A.     CAN YOU REPHRASE YOUR QUESTION?

23         Q.     CERTAINLY.  DID YOU TELL

24   MR. MATSUURA THAT YOU WOULD NOT MAKE THE PAYMENTS

25   HE WAS REQUESTING?

64

RYUNOSUKE YOSHIDA

1          A.    I DON'T REMEMBER.

2          Q.    DID MR. MATSUURA MAKE ANY THREATS

3    TO YOU DURING THAT CONVERSATION IN WHICH HE MADE

4    THE REQUEST FOR THE FUNDING TO THE VENDORS?

5          A.    I DON'T REMEMBER THE CHRONOLOGY.

6          Q.    YOU SAID HE MADE THREATS TO YOU?

7          A.    YES.

8          Q.    AND YOU DON'T RECALL IF IT IS A

9    CONNECTION WITH THE FIRST CONVERSATION OR THIS

10   CONVERSATION?

11         A.    I THINK SO.

12         Q.    OTHER THAN THESE TWO CONVERSATIONS

13   WE HAVE DISCUSSED THUS FAR, DID YOU HAVE ANY OTHER

14   CONVERSATIONS WITH MR. MATSUURA IN EARLY 2021 IN

15   WHICH HE MADE THREATS TO YOU?

16         A.    I DON'T REMEMBER.

17         Q.    DO YOU RECALL IF MR. MATSUURA OWNED

18   ANY SHARES IN SPGK?

19         A.    NO.

20         Q.    DID MR. MATSUURA OWN ANY SHARES IN

21   SPGK?

22         A.    SORRY?

23         Q.    DID MR. MATSUURA OWN ANY SHARES IN

24   SPGK?

25         A.    NO.

65

RYUNOSUKE YOSHIDA

1        Q.      DID MR. MATSUURA HOLD ANY DIRECTOR

2   OR OFFICER POSITIONS WITH SPGK?

3              MR. MORRIS:  OBJECTION TO THE FORM

4   OF THE QUESTION.  JUST WHAT TIME PERIOD?

5   BY MR. MCDONALD:

6        Q.      ANY TIME PERIOD?

7        A.      NO.

8        Q.      DID MR. MATSUURA TELL YOU WHY HE

9   WANTED VENDORS OF SPGK TO RECEIVE THESE PAYMENTS?

10       A.      NO, I DON'T THINK SO.

11       Q.      DO YOU HAVE SOME IDEA?

12       A.      I DON'T KNOW.  I'M NOT HIM.

13   I DON'T KNOW.

14       Q.      OKAY.  WE HAVE BEEN GOING FOR

15   ROUGHLY AN HOUR AND CHANGE.  WHY DON'T WE TAKE A

16   QUICK BREAK, IF YOU WANT TO USE THE REST ROOM, AND

17   THEN WE WILL RECONVENE IN ABOUT 10 MINUTES?

18              THE VIDEOGRAPHER:  WE ARE GOING OFF

19   THE RECORD.  THE TIME IS 10.43 A.M.

20     (A SHORT BREAK FROM 10.43 A.M. TO 11.07 A.M.)

21              THE VIDEOGRAPHER:  WE ARE BACK ON

22   THE RECORD.  THE TIME IS 11.07.

23   BY MR. MCDONALD:

24       Q.      MR. YOSHIDA, WE WERE JUST

25   DISCUSSING YOUR CONVERSATIONS WITH MR. MATSUURA,

66

RYUNOSUKE YOSHIDA

1  CORRECT?

2         A.    YES.

3         Q.    WE WERE ALSO PREVIOUSLY DISCUSSING

4  THE 98 ENTITIES THAT YOU WERE LOOKING TO TAKE CARE

5  OF THAT HAD BEEN SET UP AT PRC.  DO YOU RECALL IF

6  HEC WAS AT ALL INVOLVED WITH ESTABLISHING ANY OF

7  THESE 98 ENTITIES?

8         A.    I DON'T BELIEVE SO.

9         Q.    YOU DON'T THINK SO.  DO YOU KNOW

10  WHICH ENTITY WAS RESPONSIBLE FOR SETTING UP ANY OF

11  THESE ENTITIES, AND BY THAT THE 98 ENTITIES IN

12  PRC?

13         MR. MORRIS:  OBJECTION TO THE FORM

14  OF THE QUESTION.

15         A.    I CANNOT -- I DON'T KNOW.

16  BY MR. MCDONALD:

17         Q.    HAVE YOU HAD ANY RECENT CONTACT

18  WITH MR. HOMMA?

19         A.    YES.

20         Q.    HOW RECENT WAS YOUR CONTACT WITH

21  MR. HOMMA?

22         A.    A MONTH AGO, I THINK.

23  APPROXIMATELY A MONTH AGO.

24         Q.    AND BEFORE THAT -- BACK UP, SINCE

25  2021, HOW MANY TIMES HAVE YOU SPOKEN TO MR. HOMMA?

67

RYUNOSUKE YOSHIDA

1          A.     SORRY, CAN YOU REPEAT YOUR QUESTION

2   AGAIN.

3          Q.     SINCE EARLY 2021, HOW MANY TIMES

4   HAVE YOU SPOKEN WITH MR. HOMMA?

5          A.     I CANNOT REMEMBER THE EXACT NUMBER

6   OF TIMES BUT PROBABLY TEN.

7          Q.     TEN?

8          A.     I THINK.

9               MR. MORRIS:  SORRY, WHAT IS THE

10  NUMBER.

11         A.     TEN.

12  BY MR. MCDONALD:

13         Q.     HAVE YOU MET EACH OTHER IN PERSON

14  SINCE EARLY 2021?

15         A.     YES.

16         Q.     DO YOU REMEMBER THE LAST TIME YOU

17  MET WITH MR. HOMMA?

18         A.     IF I REMEMBER CORRECTLY, I BELIEVE

19  IT WAS MARCH OR APRIL MAYBE, AROUND THAT TIME THIS

20  YEAR.

21         Q.     OF THIS YEAR?

22         A.     YES.

23         Q.     DO YOU RECALL WHAT YOU DISCUSSED

24  DURING YOUR MEETING WITH MR. HOMMA?

25         A.     WE TALKED ABOUT -- WE BRIEFLY

68

RYUNOSUKE YOSHIDA

1   TALKED ABOUT MY STATUS.  WE ALSO TALKED ABOUT HIM

2   GOLFING.

3           Q.    HIM GOLFING?

4           A.    YES.

5           Q.    DO YOU RECALL WHERE THIS MEETING

6   TOOK PLACE?

7           A.    I BELIEVE IT WAS IN TOKYO.

8           Q.    DOES MR. HOMMA RESIDE IN TOKYO?

9           A.    I DON'T KNOW.

10          Q.    WHAT DID YOU DISCUSS WITH MR. HOMMA

11  ABOUT YOUR STATUS?

12          A.    DURING THE -- TRYING TO CLOSE, I

13  WANT TO -- SORRY, LET ME SAY THIS AGAIN.  I AM

14  CURRENTLY IN DISCUSSIONS WITH ASCENTRA AND

15  LIQUIDATORS OF -- HOW SHALL I SAY THIS?  SORRY,

16  LET ME REPHRASE THIS AGAIN.  I AM TRYING TO --

17  THERE IS A DISPUTE BETWEEN ASCENTRA LIQUIDATORS

18  AND ME.

19          Q.    AND YOU DISCUSSED WITH THAT WITH

20  MR. HOMMA?

21          A.    I DID NOT DISCUSS.  I THINK IT WAS

22  VERY BRIEF.

23          Q.    SORRY, DID YOU OR DID YOU NOT

24  DISCUSS THAT WITH MR. HOMMA?

25          A.    CAN YOU DEFINE DISCUSS?

69

RYUNOSUKE YOSHIDA

1          Q.     HAVE A CONVERSATION.

2          A.     YES.

3          Q.     WHAT WAS MR. HOMMA'S VIEW ON THE

4    DISPUTE WITH ASCENTRA?

5          A.     I DON'T THINK HE PARTICULARLY

6    COMMENTED ON IT.

7          Q.     DOES MR. HOMMA CURRENTLY HAVE ANY

8    SHAREHOLDINGS IN ASCENTRA?

9          A.     NO.

10         Q.     DOES MR. HOMMA CURRENTLY HAVE ANY

11   SHAREHOLDINGS ----

12         A.     I AM SORRY, CAN I GO BACK TO THE

13   QUESTION EARLIER?

14         Q.     ABSOLUTELY, PLEASE.

15         A.     DO YOU MEAN DIRECT OR INDIRECT OR

16   -- I AM SORRY, LET ME SAY THIS AGAIN.  NO.

17         Q.     WHAT YOU WERE SAYING IS MR. HOMMA

18   DOES NOT HAVE ANY DIRECT OR INDIRECT INTEREST IN

19   ASCENTRA CURRENTLY?

20         A.     YES.

21         Q.     DOES MR. HOMMA HAVE ANY DIRECT OR

22   INDIRECT INTEREST IN SPGK INC CURRENTLY?

23         A.     NO.

24         Q.     HAVE YOU HAD ANY RECENT

25   CONVERSATIONS WITH MR. MATTHEWS?

RYUNOSUKE YOSHIDA

1        A.    NO.

2        Q.    DO YOU RECALL THE LAST TIME YOU

3   SPOKE WITH MR. MATTHEWS?

4        A.    I BELIEVE IT WAS -- I CANNOT

5   REMEMBER THE EXACT DATE BUT SOME TIME DURING 2021,

6   MAYBE.  PROBABLY SUMMER OF 2021.

7        Q.    THAT WOULD HAVE BEEN FOLLOWING THE

8   OPENING OF THE PROCEEDINGS IN THE CAYMAN ISLANDS?

9        A.    YES, CAN YOU -- SORRY, CAN YOU

10  REPHRASE THE QUESTION AGAIN, SORRY?

11       Q.    YOU SAID YOU SPOKE WITH

12  MR. MATTHEWS.  YOU SAID SUMMER 2021, AND I WAS

13  JUST ASKING IF THAT WAS AFTER THE COMMENCEMENT OF

14  THE PROCEEDINGS INVOLVING ASCENTRA IN THE CAYMAN

15  ISLANDS?

16       A.    I CANNOT REMEMBER IF IT WAS BEFORE

17  OR AFTER, BUT DURING THAT TIME PERIOD.

18       Q.    DO YOU RECALL WHEN YOU SPOKE WHAT

19  YOU AND MR. MATTHEWS DISCUSSED AT THAT TIME?

20       A.    I WAS DISCUSSING ABOUT APPOINTING

21  -- NO, I WAS DISCUSSING ABOUT APPOINTING A --

22  SORRY, NO.  I WAS DISCUSSING WITH MR. MATTHEWS

23  ABOUT CHANGING THE LIQUIDATOR OF IRP AND ALSO

24  LIQUIDATING ASCENTRA.

25       Q.    LET US GO TO THE FIRST ONE.  WE

71

RYUNOSUKE YOSHIDA

1  WILL GET TO IRP IN A MINUTE.  WHAT WERE YOU

2  DISCUSSING WITH MR. MATTHEWS ABOUT CHANGING THE

3  LIQUIDATOR OF IRP?

4          A.    WHAT?

5          Q.    I AM GOING TO REPHRASE THAT.  YOU

6  SAID YOU DISCUSSED WITH MR. MATTHEWS, AMONG OTHER

7  THINGS, THE CHANGING OF THE LIQUIDATOR FOR IRP.

8  AM I CORRECT?

9          A.    YES.

10         Q.    AND WHAT I WANTED TO UNDERSTAND IS

11 WHAT YOU WERE DISCUSSING WITH HIM ABOUT THAT IN

12 PARTICULAR?

13         A.    I THINK I WAS TALKING ABOUT

14 CHANGING THE LIQUIDATOR OF IRP.

15         Q.    YOU WANTED TO -- DO YOU KNOW WHO

16 THE LIQUIDATOR IS FOR ASCENTRA HOLDINGS?

17         A.    YES.

18         Q.    WHO IS THAT?

19         A.    I BELIEVE IT IS MR. GRAHAM

20 ROBINSON.

21         Q.    WERE YOU DISCUSSING WITH

22 MR. MATTHEWS CHANGING THE LIQUIDATOR TO

23 MR. ROBINSON?

24         A.    CHANGING LIQUIDATOR OF WHICH

25 ENTITY?

72

RYUNOSUKE YOSHIDA

1          Q.      I AM SORRY, THANK YOU.  CHANGING

2    THE LIQUIDATOR OF IRP -- I DON'T RECALL WHO THAT

3    WAS -- TO MR. ROBINSON?

4          A.      I DON'T REMEMBER EXACTLY WHO IT

5    WAS.

6          Q.      DID YOU WANT MR. ROBINSON TO BECOME

7    THE LIQUIDATOR OF IRP?

8          A.      I DID NOT KNOW MR. ROBINSON WELL,

9    BUT I WANTED TO CHANGE THE LIQUIDATOR OF IRP.

10         Q.      AND WHY WAS THAT?

11         A.      YOSHIO MATSUURA WAS TRYING TO

12   CONTROL -- WELL, YES, HE WAS TRYING TO CONTROL

13   ASCENTRA BY HIMSELF AND HE WAS MAKING DEMANDS WITH

14   NO GROUNDS AND I BELIEVE THAT I SHOULD -- I WANTED

15   TO GET HIM NOT CONTROLLING ASCENTRA.

16         Q.      AND WHY WAS THAT?

17         A.      SORRY, CAN YOU -- WHY OR FOR WHICH

18   PART ARE YOU TALKING ABOUT?

19         Q.      WELL, YOU ARE SAYING "MATSUURA WAS

20   TRYING TO CONTROL -- WELL, YES, HE WAS TRYING TO

21   CONTROL ASCENTRA BY HIMSELF AND HE WAS MAKING

22   DEMANDS WITH NO GROUNDS AND I BELIEVE THAT I

23   SHOULD -- I WANTED TO GET HIM NOT CONTROLLING

24   ASCENTRA."  MY QUESTION IS WHY DID YOU WANT TO GET

25   HIM TO NOT CONTROL ASCENTRA?

73

RYUNOSUKE YOSHIDA

1           A.      BECAUSE HE WAS MAKING THESE DEMANDS

2    AND THREATS.   THE DEMANDS WITH NO GROUND AND

3    THREATS AGAINST ME.

4           Q.      AND THESE ARE THE DEMANDS AND

5    THREATS WE DISCUSSED EARLIER THIS MORNING; IS THAT

6    CORRECT?

7           A.      YES.

8           Q.      AND THESE ARE THE DEMANDS AND

9    THREATS HE MADE, YOU SAID AT THE BEGINNING OF

10   2021?

11          A.      YES.

12          Q.      AND YOU WERE DISCUSSING WITH

13   MR. MATTHEWS IN THE SUMMER OF 2021 ----

14          A.      SORRY, CAN I GO ----

15          Q.      I AM TRYING TO UNDERSTAND ----

16          A.      CAN I GO BACK A BIT?  WHEN YOU SAID

17   BEGINNING OF 2021, I AM APPROXIMATELY SAYING THE

18   FIRST HALF OF 2021.

19          Q.      SO THE FIRST HALF OF 2021.  BY THAT

20   YOU MEANT MR. MATSUURA MADE THESE THREATS AND

21   DEMANDS TO YOU DURING THE FIRST HALF OF 2021?

22          A.      APPROXIMATELY THE FIRST HALF.

23          Q.      THE FIRST FIVE, SIX MONTHS YOU ARE

24   SAYING?

25          A.      YES.  IT COULD HAVE STARTED, LIKE,

74

1   THE END OF THE PREVIOUS YEAR UNTIL, LIKE, THE

2   SUMMER.  SO THAT IS WHY I AM SAYING APPROXIMATELY.

3          Q.    SO BY IT COULD -- SORRY, BY "IT"

4   YOU MEAN THE THREATS AND DEMANDS FROM

5   MR. MATSUURA?

6          A.    YES.

7          Q.    YOU SAID AT THE END OF 2020

8   POSSIBLY HE STARTED MAKING THESE THREATS AND

9   DEMANDS?

10          A.    I CANNOT REMEMBER EXACTLY, BUT IT

11   COULD HAVE STARTED AROUND THEN.

12          Q.    DID MR. MATSUURA MAKE ANY OF THESE

13   THREATS OR DEMANDS AFTER ASCENTRA WAS PUT INTO THE

14   PROCEEDINGS IN THE CAYMAN ISLANDS?

15          A.    I DON'T ----

16          Q.    LET ME DEFINE IT.  ORIGINALLY THERE

17   WAS A PROVISIONAL LIQUIDATION, CORRECT?

18          A.    I DON'T UNDERSTANDS ALL THE LEGAL

19   TERMS.

20          Q.    THERE WAS A PROCEEDING.  WE WILL

21   JUST LEAVE IT AT PROCEEDING IN THE CAYMAN ISLANDS?

22          A.    RIGHT.

23          Q.    A PROCEEDING IN THE CAYMAN ISLANDS

24   IS OPEN, BEGUN, COMMENCED, UNDERSTOOD?

25          A.    THE CAYMAN ISLANDS FOR WHICH

75

RYUNOSUKE YOSHIDA

1   ENTITY?

2        Q.     ASCENTRA.

3        A.     OKAY, YES.

4        Q.     DO YOU REMEMBER APPROXIMATELY WHEN

5   THAT STARTED?

6        A.     IF I RECALL CORRECTLY, AND IF MY

7   UNDERSTANDING IS CORRECT, I BELIEVE IT WAS AROUND

8   SOME TIME BETWEEN MAY TO -- IT STARTED SOMEWHERE

9   MAYBE AROUND MAY OF 2021.  YES, I CANNOT BE EXACT.

10        Q.     AFTER THE COMMENCEMENT OF THOSE

11   PROCEEDINGS IN THE CAYMAN ISLANDS IN MAY OR SO OF

12   2021, DID MR. MATSUURA MAKE ANY THREATS OR DEMANDS

13   TO YOU AFTER THAT?

14        A.     I CANNOT REMEMBER EVERYTHING, BUT I

15   DON'T THINK SO.

16        Q.     YOU SAID THOUGH HE WAS TRYING TO

17   CONTROL ASCENTRA.  I THINK THAT WAS THE TERM YOU

18   USED, CONTROL ASCENTRA?

19        A.     YES.

20        Q.     WAS MR. MATSUURA ATTEMPTING TO

21   CONTROL ASCENTRA AFTER THE COMMENCEMENT OF THE

22   CAYMAN PROCEEDINGS?

23        A.     THE CAYMAN PROCEEDINGS OF

24   APPOINTING A LIQUIDATOR?

25        Q.     YES.

76

1          A.     I DON'T THINK SO.

2          Q.     SO WHY WERE YOU TRYING TO HAVE THE

3     LIQUIDATOR FOR IRP CHANGED?

4          A.     FROM MY UNDERSTANDING, THE CHANGE

5     OF LIQUIDATOR OF IRP STARTED FIRST AND THEN IT LED

6     TO ASCENTRA'S LIQUIDATION.  I MIGHT BE WRONG BUT,

7     YES.

8          Q.     BUT WHY DID YOU WANT TO CHANGE THE

9     LIQUIDATOR FOR IRP?

10          A.     THE PREVIOUS LIQUIDATOR WAS NOT

11     PARTICULARLY DOING ANY FUNCTIONS.

12          Q.     WHAT FUNCTIONS DO YOU THINK THE

13     PREVIOUS LIQUIDATOR SHOULD HAVE BEEN DOING?

14          A.     PROCESSING TO WIND DOWN THE

15     COMPANY.

16          Q.     DID YOU SPEAK WITH MR. MATTHEWS

17     ABOUT ANYTHING OTHER THAN CHANGING THE LIQUIDATOR

18     FOR IRP?

19          A.     I THINK THERE WERE -- I CANNOT

20     REMEMBER EVERYTHING I DISCUSSED WITH HIM, BUT

21     I DID TELL HIM MY CONCERNS ABOUT THE THREAT YOSHIO

22     WAS MAKING.

23          Q.     DID THE THREAT YOSHIO WAS MAKING

24     INVOLVE MR. MATTHEWS AS WELL?

25          A.     WHAT DO YOU MEAN BY THAT?

77

1            Q.     WAS MR. MATSUURA MAKING ANY THREATS

2    AGAINST MR. MATTHEWS?

3            A.     I DON'T KNOW.

4            Q.     SO THESE THREATS WERE SOLELY WITH

5    RESPECT TO YOU?

6            A.     YES, FROM MY UNDERSTANDING, YES.

7            Q.     DO YOU KNOW IF MR. MATSUURA EVER

8    WENT TO THE CHINESE AUTHORITIES ABOUT YOUR

9    INVOLVEMENT WITH SPGK?

10           A.     I DON'T KNOW.

11           Q.     TO BE CLEAR, YOU HAVE NOT HAD ANY

12   CONTACT WITH MR. MATSUURA SINCE SOME TIME IN MID

13   2021?

14           A.     YES.

15           Q.     HAVE YOU HAD ANY CONTACT WITH

16   MR. SANDERS SINCE MID 2021?

17           A.     I DON'T THINK SO.

18           Q.     HAVE YOU HAD ANY CONTACT WITH

19   MS. NAKANO SINCE MID 2021?

20           A.     I DON'T THINK SO.

21           Q.     WHEN YOU COMMUNICATE WITH PEOPLE DO

22   YOU USUALLY TEXT THEM, CALL THEM, WHATSAPP THEM?

23   WHAT IS YOUR USUAL MODE OF COMMUNICATION WITH

24   PEOPLE?

25                  MR. MORRIS:  OBJECTION TO THE FORM

78

RYUNOSUKE YOSHIDA

1    OF THE QUESTION.

2          A.     PEOPLE IN GENERAL?

3    BY MR. MCDONALD:

4          Q.     GENERALLY, YES.

5          A.     IT CAN BE A PHONE CALL.  IT CAN BE

6    A TEXT.  IT CAN BE E-MAIL.

7          Q.     ONE DOES NOT DEFAULT AS BEING THE

8    CHOICE OF COMMUNICATION OVER ANYTHING ELSE?

9          A.     I THINK IT DEPENDS.

10         Q.     DO YOU USE THE WHATSAPP TEXT?  IS

11   THAT ONE OF THE FUNCTIONS YOU USE?

12         A.     I ALSO USE WHATSAPP.

13         Q.     I AM GOING TO SHOW YOU WHAT HAS

14   BEEN MARKED AS EXHIBIT 1, WHICH IS YOUR

15   DECLARATION.

16         (EXHIBIT 1 MARKED FOR IDENTIFICATION)

17   BY MR. MCDONALD:

18         Q.     MR. YOSHIDA, YOU PREVIOUSLY STATED

19   THAT YOU HAD REVIEWED THIS IN THIS PREPARATION FOR

20   TODAY'S DEPOSITION.

21         A.     YES.

22         Q.     I WOULD LIKE TO TAKE YOU TO PAGE 12

23   OF THE DECLARATION.  I AM SORRY, I THINK YOU ARE

24   IN THE EXHIBITS THERE.

25         A.     OH!

79

RYUNOSUKE YOSHIDA

1        Q.      IF YOU GO PAGE 12, IS THAT YOUR

2   SIGNATURE?

3        A.      YES.

4        Q.      SO YOU SIGNED THIS?

5        A.      YES.

6        Q.      AND YOU AGREE THAT YOU SIGNED THIS

7   UNDER PENALTY OF PERJURY FOR THE LAWS OF THE

8   UNITED STATES?

9        A.      YES.

10       Q.      AND YOU UNDERSTAND YOU HAVE

11  SUBMITTED YOURSELF TO THE JURISDICTION OF THE US

12  COURTS WITH RESPECT TO PERJURY?

13       A.      YES.

14       Q.      OKAY.  LET US GO BACK TO THE VERY

15  BEGINNING.  IN PARAGRAPH 2, YOU SAY THAT YOU

16  "DECLARE HEREIN", THE FACTS, RIGHT, "ARE WITHIN MY

17  OWN KNOWLEDGE AND ARE TRUE", OKAY, "OR ARE TRUE TO

18  THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF",

19  THE FIRST ONE, "BEING DERIVED FROM THE INFORMATION

20  I HAVE OBTAINED PERSONALLY."  CAN YOU PLEASE

21  ELABORATE ON WHAT INFORMATION YOU HAVE OBTAINED

22  PERSONALLY IN ORDER TO WRITE THIS DECLARATION?

23       A.      I HAVE VARIOUS DOCUMENTS AND

24  INFORMATION SUCH AS E-MAILS, SUCH AS FILES UNDER

25  E-MAILS, PAST DOCUMENTS, ETC.

80

RYUNOSUKE YOSHIDA

1      Q.     AND YOU REVIEWED THOSE E-MAILS,

2  FILES AND DOCUMENTS IN ORDER TO PREPARE THIS

3  DECLARATION?

4      A.     YES.

5      Q.     WHERE DO YOU STORE THESE E-MAILS,

6  FILES AND DOCUMENTS?

7      A.     WE STORE IT WITH A THIRD PARTY

8  SERVICE PROVIDER.

9      Q.     AND WHO IS THAT?

10     A.     I BELIEVE IT IS CALLED -- SORRY,

11  I CANNOT REMEMBER THE NAME ON TOP OF MY HEAD.  IT

12  IS ON A PLATFORM CALLED RELATIVITY.

13     Q.     WITH A SERVICE PROVIDER?

14     A.     YES.

15     Q.     THE E-MAILS, FILES AND DOCUMENTS

16  YOU HAVE ON RELATIVITY, CAN YOU PLEASE TELL US FOR

17  WHICH CORPORATE ENTITIES YOU HAVE THIS

18  INFORMATION, AND BY THAT I MEAN DO YOU HAVE

19  INFORMATION RELATING TO ASCENTRA?  DO YOU HAVE

20  INFORMATION RELATING TO SPGK?  DO YOU HAVE

21  INFORMATION RELATING TO GROWTH TODAY?

22     A.     I ----

23            MR. MORRIS:  OBJECTION TO THE FORM

24  OF THE QUESTION.

25     A.     I BELIEVE IT IS PUT ALL IN ONE.

81

RYUNOSUKE YOSHIDA

1   BY MR. MCDONALD:

2          Q.     ALL IN ONE?

3          A.     YES.

4          Q.     DO YOU KNOW WHAT THE SOURCE OF ALL

5   THOSE E-MAILS FILES AND DOCUMENTS WERE?

6                 MR. MORRIS:  OBJECTION TO THE FORM

7   OF THE QUESTION.

8          A.     MY E-MAIL BOX, MY PHONE RECORDS,

9   ETC.

10  BY MR. MCDONALD:

11         Q.     CAN YOU PLEASE ELABORATE ON THE

12  ETC.?

13         A.     I THINK THERE IS, LIKE, A ONEDRIVE

14  FOLDER MAYBE.

15         Q.     AND THE ONE ----

16         A.     I CANNOT REMEMBER EVERYTHING, BUT

17  ----

18         Q.     I AM SORRY, I DID NOT MEAN TO

19  INTERRUPT.

20         A.     I CANNOT REMEMBER EVERYTHING, BUT,

21  YES, THOSE ARE THE THINGS I CAN REMEMBER ON THE

22  TOP OF MY HEAD.

23         Q.     DO YOU RECALL IF ANY SPECIFIC

24  DOCUMENT, E-MAIL OR FILE WAS REVIEWED BY YOU IN

25  ORDER TO PREPARE THIS DECLARATION?

RYUNOSUKE YOSHIDA

```
1            A.      CAN I CHECK?

2            Q.      YES.

3            A.      THERE ARE A LOT OF -- I WILL CHECK.

4    LET ME CHECK.  (PAUSE)  CAN YOU REPEAT YOUR

5    QUESTION AGAIN?

6            Q.      DO YOU RECALL IF ANY SPECIFIC

7    DOCUMENT, E-MAIL OR FILE WAS REVIEWED BY YOU IN

8    ORDER TO PREPARE THIS DECLARATION?

9            A.      DO I REMEMBER?

10           Q.      YES.

11           A.      SORRY, IS THAT A YES/NO QUESTION,

12   OR IS THAT ----

13           Q.      I AM ASKING YOU DO YOU REMEMBER,

14   RECALL EITHER WAY A SPECIFIC DOCUMENT, E-MAIL OR

15   FILE YOU REVIEWED ----

16           A.      YES, YES.

17           Q.      ---- TO ASSIST YOU IN THE

18   PREPARATION OF THIS DECLARATION?

19           A.      YES.

20           Q.      YOU DO REMEMBER?

21           A.      I DO REMEMBER.

22           Q.      SO WHAT DOCUMENTS, E-MAIL OR FILE

23   WERE REVIEWED BY YOU TO PREPARE THIS?

24           A.      ALL OF THE DOCUMENTS.

25           Q.      THAT ARE ATTACHED?
```

83

RYUNOSUKE YOSHIDA

```
1              A.      THAT ARE ATTACHED.

2              Q.      OKAY.  ANYTHING BEYOND THE

3    DOCUMENTS THAT ARE ATTACHED?

4              A.      CAN YOU -- SORRY, CAN YOU ASK ----

5              Q.      DID YOU REVIEW ANY OTHER E-MAIL,

6    FILE OR DOCUMENT ----

7              A.      NO.  SORRY, GO ON.

8              Q.      ---- IN CONNECTION WITH THE

9    PREPARATION OF THIS DECLARATION?

10             A.      NO.

11             Q.      I THINK I PROBABLY JUMPED OVER

12   SOMETHING THERE.  DID YOU PREPARE THIS

13   DECLARATION?

14             A.      I PREPARED WITH THE ASSISTANCE OF

15   MY COUNSEL.

16             Q.      OKAY.  DID YOU -- SO WHO PREPARED

17   THE FIRST DRAFT OF THIS?

18             A.      THE FIRST DRAFT WAS PREPARED BY MY

19   COUNSEL.

20             Q.      DID YOU HAVE ANY CORRECTIONS OR

21   EDITS TO THAT?

22             A.      YES, I MADE SOME COMMENTS AND

23   EDITS.

24             Q.      DID YOU READ IT BEFORE SIGNING?

25             A.      YES.
```

84

RYUNOSUKE YOSHIDA

```
 1              Q.     DO YOU HAVE ANY CHANGES YOU WOULD

 2   LIKE TO MAKE TO IT SINCE YOU SIGNED IT?

 3              A.     NO.

 4              Q.     SO THIS IS -- WE CAN TAKE THIS AS

 5   YOUR DIRECT TESTIMONY FOR PURPOSES OF THIS

 6   PROCEEDING?

 7              A.     YES.

 8              Q.     YOU CURRENTLY ALSO -- STRIKE THAT.

 9   DO YOU CURRENTLY OWN SHARES IN GROWTH TODAY?

10              A.     YES.

11              Q.     DO YOU DIRECTLY OWN THOSE SHARES?

12              A.     YES.

13              MR. MORRIS:  I AM SORRY, SHARES OF

14   WHAT COMPANY?

15   BY MR. MCDONALD:

16              Q.     GROWTH TODAY.

17              A.     YES.

18              Q.     DO YOU REMEMBER WHEN YOU ACQUIRED

19   THE SHARES IN GROWTH TODAY?

20              A.     IF I RECALL CORRECTLY, IT SHOULD

21   HAVE BEEN SOME TIME END OF 2018.  I THINK SO.

22              Q.     AND FROM WHOM DID YOU ACQUIRE THE

23   SHARES IN GROWTH TODAY?

24              A.     MR. MOTOHIKO HOMMA.

25              Q.     HOW MUCH DID YOU PAY FOR THE SHARES
```

85

RYUNOSUKE YOSHIDA

1   IN GROWTH TODAY?  SORRY, STRIKE THAT.  HOW MUCH

2   DID YOU PAY MR. HOMMA FOR HIS SHARES IN GROWTH

3   TODAY?

4          A.     A DOLLAR.  1 US DOLLAR.

5          Q.     ONE US DOLLAR?

6          A.     YES.

7          Q.     TO BE CLEAR, GROWTH TODAY OWNS SPGK

8   INC, CORRECT?

9          A.     SHANG PENG GAO KE INC. SEZC, YES.

10         Q.     SO MR. HOMMA SOLD SPGK EFFECTIVELY

11  TO YOU FOR ONE DOLLAR?

12         A.     YES.

13         Q.     DO YOU KNOW WHY MR. HOMMA WOULD

14  HAVE SOLD SPGK FOR ONE DOLLAR?

15         A.     I BELIEVE MR. HOMMA WAS ALSO VERY

16  CONCERNED ABOUT THE CRIMINAL AND CIVIL RISK OF THE

17  BUSINESS.  I THINK THE OTHER REASON IS BECAUSE HE

18  DID NOT WANT TO WORK WITH YOSHIO MATSUURA ANY

19  MORE.

20         Q.     I THINK WE BOTH AGREE THAT

21  MR. MATSUURA DID NOT HAVE ANY OWNERSHIP INTEREST

22  IN SPGK; IS THAT CORRECT?

23         A.     HE DID NOT, YES.

24         Q.     AND MR. MATSUURA DID NOT HOLD ANY

25  POSITION AT SPGK; IS THAT CORRECT?

86

RYUNOSUKE YOSHIDA

1        A.     YES.

2        Q.     OKAY.  DO YOU HAVE ANY OTHER

3   AGREEMENTS WITH MR. HOMMA TO PAY ANY AMOUNTS TO

4   HIM IN CONNECTION WITH SPGK?

5        A.     WHAT DO YOU MEAN OTHER AGREEMENTS?

6        Q.     YOU HAVE A SIDE AGREEMENT TO PAY

7   HIM ANYTHING -- A PERCENTAGE OF ANYTHING THAT IS

8   REALISED FROM SPGK?

9        A.     NO.

10        Q.     SO MR. HOMMA HAS NO INTEREST AT ALL

11   IN ANY OF THE FUNDS HELD IN SPGK?

12        A.     NO.

13        Q.     WAS MR. HOMMA AWARE AT THE TIME HE

14   SOLD SPGK FOR A DOLLAR THE AMOUNT OF FUNDS HELD IN

15   SPGK'S BANK ACCOUNTS?

16        A.     I DON'T KNOW.

17        Q.     SO HE WAS WILLING TO PART WITH SPGK

18   FOR A DOLLAR BECAUSE OF HIS CRIMINAL CONCERNS AND

19   YOU WERE WILLING TO BUY IT FOR A DOLLAR AND TAKE

20   ON THOSE RISKS?

21        A.     YES.

22        Q.

23             MR. MORRIS:  OBJECTION TO THE FORM

24   OF THE QUESTION.

25   BY MR. MCDONALD:

87

RYUNOSUKE YOSHIDA

1          Q.     WHEN YOU ACQUIRED SPGK -- STRIKE

2   THAT.  WHEN YOU ACQUIRED GROWTH TODAY, DID

3   MR. HOMMA GIVE YOU THE CORPORATE RECORDS OF GROWTH

4   TODAY AS PART OF THAT TRANSACTION?

5          A.     I DON'T REMEMBER.

6          Q.     WAS MR. HOMMA A DIRECTOR OF GROWTH

7   TODAY?

8          A.     I BELIEVE SO.

9          Q.     AND DID YOU THEN BECOME A DIRECTOR

10  OF GROWTH TODAY?

11         A.     YES.

12         Q.     DO YOU STILL OWN GROWTH TODAY?

13         A.     YES.

14         Q.     ARE YOU STILL ITS SOLE DIRECTOR?

15         A.     YES.

16         Q.     SO FROM 2018 TO PRESENT YOU HAVE

17  BEEN THE SOLE DIRECTOR AND SOLE SHAREHOLDER OF

18  GROWTH TODAY?

19         A.     YES.

20         Q.     DO YOU KNOW WHETHER OR NOT GROWTH

21  TODAY'S CORPORATE RECORDS ARE CONTAINED IN THE

22  FILES, E-MAILS AND EVERYTHING THAT YOU SPOKE ABOUT

23  THAT IS CURRENTLY HOUSED ON THIS RELATIVELY

24  DATABASE?

25         A.     I CANNOT REMEMBER.

88

RYUNOSUKE YOSHIDA

1          Q.     OKAY.  SINCE YOU OWN THE COMPANY,

2    WOULD IT BE REASONABLE TO ASSUME YOU HAVE ITS

3    RECORDS?

4          A.     YES.

5          Q.     YOU ALSO SAY YOU REVIEWED

6    INFORMATION FROM SPGK TO HELP PREPARE FOR THIS, SO

7    I HAVE THE SAME QUESTION.  BEYOND THE DOCUMENTS

8    THAT ARE ATTACHED TO YOUR DECLARATION, DID YOU

9    REVIEW ANY OTHER BOOKS, RECORDS, FILES OR ANY

10   INFORMATION FROM SPGK IN CONNECTION WITH THE

11   PREPARATION OF THIS DECLARATION?

12         A.     NO.

13         Q.     DO YOU HAVE ANY OF THE CORPORATE

14   RECORDS OF IRP?

15         A.     I THINK SO.

16         Q.     WHAT ABOUT ANY CORPORATE RECORDS

17   FOR HEC INTERNATIONAL?

18         A.     I DON'T KNOW.

19         Q.     YOU DON'T KNOW?

20         A.     I DON'T KNOW.

21         Q.     WHAT WAS YOUR POSITION WITH HEC

22   INTERNATIONAL?

23         A.     I BELIEVE I WAS A DIRECTOR BUT

24   I CANNOT BE SURE.  LIKE I SAID EARLIER, THERE WAS

25   MANY SUBSIDIARIES.

89

RYUNOSUKE YOSHIDA

```
 1              Q.    OKAY.  DO YOU RECALL WHO ELSE WAS A

 2   DIRECTOR OF HEC INTERNATIONAL WHEN YOU WERE A

 3   DIRECTOR?

 4              A.    NO.

 5              Q.    WAS MR. MATSUURA A DIRECTOR OF HEC

 6   INTERNATIONAL?

 7              A.    I DON'T KNOW.  I DON'T REMEMBER.

 8              Q.    DO YOU HAVE ANY OTHER CORPORATE

 9   RECORDS FOR IHEALTHSCIENCE?

10              A.    I DON'T KNOW.  I DON'T REMEMBER IF

11   I HAVE IT.

12              Q.    DID YOU HAVE A POSITION AT

13   IHEALTHSCIENCE?

14              A.    I BELIEVE I WAS A DIRECTOR.

15              Q.    DID YOU HOLD ANY OFFICER POSITIONS

16   WITH IHEALTHSCIENCE?

17              A.    I DON'T REMEMBER.

18              Q.    DO YOU HAVE ANY OF THE CORPORATE

19   RECORDS OF RADIAL IT?

20              A.    I DON'T REMEMBER.  I MAY HAVE BUT

21   I DON'T REMEMBER.

22              Q.    AND I KNOW YOU TESTIFIED ABOUT THIS

23   EARLIER AND PARDON ME THAT I DON'T REMEMBER, BUT

24   DID YOU SAY YOU WERE A DIRECTOR ALSO OF RADIAL IT?

25              A.    I COULD HAVE BEEN.  I THINK SO, BUT
```

90

RYUNOSUKE YOSHIDA

```
 1   I CANNOT BE VERY ACCURATE.  I DIDN'T CHECK.

 2         Q.    OKAY, THAT IS FINE.  WHAT IS -- DO

 3   YOU KNOW OF AN ENTITY CALLED TIRAWORKS?

 4         A.    YES.

 5         Q.    WHAT IS TIRAWORKS?

 6         A.    IT IS MY OWN COMPANY, I OWN.

 7         Q.    AND WHAT DOES TIRAWORKS DO?

 8         A.    PROVIDE CONSULTING AND MANAGEMENT

 9   SERVICES, MANAGEMENT CONSULTING SERVICES.

10         Q.    TO WHOM?

11         A.    IT WAS PROVIDING TO ASCENTRA.

12         Q.    IN WHAT TYPE OF A COMPANY IS

13   TIRAWORKS -- STRIKE THAT.  DO YOU KNOW UNDER WHAT

14   JURISDICTION TIRAWORKS WAS ORGANISED?

15         A.    HONG KONG.

16         Q.    HONG KONG.  WHAT WAS TYPE OF A

17   CORPORATION IS IT?  IS IT A LIMITED ----

18               MR. MORRIS:  OBJECTION.

19         A.    I BELIEVE IT IS A LIMITED COMPANY.

20   BY MR. MCDONALD:

21         Q.    IT IS A LIMITED COMPANY?

22         A.    YES.

23         Q.    ARE YOU ITS SOLE SHAREHOLDER?

24         A.    YES.

25         Q.    DID IT BILL ASCENTRA FOR ITS
```

91

RYUNOSUKE YOSHIDA

1    CONSULTING?

2          A.     CAN YOU REPEAT THE QUESTION?

3          Q.     YOU SAID PROVIDED CONSULTING

4    SERVICES TO ASCENTRA.

5          A.     YES.

6          Q.     AND IT BILLED ASCENTRA FOR THOSE

7    CONSULTING SERVICES?

8          A.     WHETHER IT BILLED?

9          Q.     BILLED.

10         A.     YES.

11         Q.     AND DO YOU RECALL ON AN AVERAGE

12   MONTHLY BASIS HOW MUCH TIRAWORKS WAS BILLING

13   ASCENTRA FOR THOSE SERVICES?

14         A.     IT CHANGED DEPENDING ON THE PERIOD,

15   SO I CANNOT REMEMBER EXACTLY.  MAYBE STARTING FROM

16   10,000.

17         Q.     PER MONTH?

18         A.     PER MONTH.

19         Q.     AND THEN GOING TO WHERE

20   APPROXIMATELY?

21         A.     MAYBE APPROXIMATELY -- I CANNOT BE

22   EXACT, BUT MAYBE 25,000.

23         Q.     AND OVER WHAT TIME PERIOD WAS

24   TIRAWORKS PROVIDING THESE CONSULTING SERVICES TO

25   ASCENTRA?

92

RYUNOSUKE YOSHIDA

1        A.      I CANNOT REMEMBER EXACTLY BUT

2   I THINK IT WAS FROM SOME TIME AROUND 2015 UNTIL

3   2021, MAYBE.  I CANNOT BE EXACT.

4        Q.      WHAT TYPES OF CONSULTING SERVICES

5   WAS TIRAWORKS PROVIDING TO ASCENTRA?

6        A.      IT WAS PROVIDING MANAGEMENT

7   CONSULTING SERVICES.

8        Q.      WHAT TYPE OF MANAGEMENT CONSULTING

9   SERVICES?

10       A.      CAN YOU CLARIFY?  WHAT DO YOU MEAN

11  BY WHAT TYPE, WHAT TYPE ----

12       Q.      I DON'T KNOW.  WERE YOU HELPING

13  WITH BUSINESS PLANS, MARKETING PLANS, CORPORATE

14  STRUCTURING.  I MEAN, I DON'T -- WHEN YOU ARE

15  TALKING ABOUT MANAGEMENT, IT IS A RATHER BROAD

16  CATEGORY.  I AM JUST TRYING TO SEE IF WE CAN

17  REFINE THAT A LITTLE BIT TO UNDERSTAND THE TYPES

18  OF SERVICES THAT TIRAWORKS WAS PROVIDING?

19       A.      IT WAS PROVIDING MANAGEMENT

20  CONSULTING FOR BUSINESS PLANNING.  WHAT ELSE?

21  ALSO -- MAYBE -- NO, MORE OF LIKE BUSINESS

22  MANAGEMENT DECISIONS AND IT WAS MY COMPENSATION

23  FOR MY DIRECTORSHIP ROLE AT ASCENTRA.

24       Q.      OKAY.  AND YOU SAY THIS WAS FROM

25  ROUGHLY 2015, 2016 ON?

93

1          A.     PROBABLY SOME TIME AROUND 2015.

2          Q.     2015.  YOU SAID YOU WERE APPOINTED

3    A DIRECTOR OF ASCENTRA ROUGHLY AROUND 2013; IS

4    THAT CORRECT?

5          A.     YES.

6          Q.     AT THE TIME WERE YOU STILL WORKING

7    FOR HOPEWILL?

8          A.     WHICH PERIOD ARE YOU TALKING ABOUT?

9          Q.     UNTIL 2013, WHEN YOU WERE APPOINTED

10   AS A DIRECTOR ----

11         A.     YES.

12         Q.     ---- WERE YOU STILL WORKING FOR

13   HOPEWILL?

14         A.     YES.

15         Q.     AT THE SAME TIME YOU WERE

16   CONSULTING TO ASCENTRA FOR HOPEWILL BUT ALSO NOW A

17   DIRECTOR OF ASCENTRA?

18         A.     YES.

19         Q.     HOW LONG WAS THAT OVERLAP BETWEEN

20   THOSE TWO POSITIONS?

21         A.     I CANNOT BE EXACT BUT MAYBE TWO

22   YEARS.

23         Q.     DO YOU RECALL WHAT YOUR

24   COMPENSATION WAS IN 2013 FOR BEING A DIRECTOR OF

25   ASCENTRA?

94

RYUNOSUKE YOSHIDA

```
 1          A.      HOPEWILL MARKETING & SERVICES WAS

 2  RECEIVING THE COMPENSATION FROM ASCENTRA.

 3          Q.      FOR YOUR SERVICES AS A DIRECTOR?

 4          A.      YES.

 5          Q.      OKAY.  AND THEN THEY WOULD PAY YOU

 6  A SALARY?

 7          A.      YES.

 8          Q.      OKAY.  AND THAT CHANGED TWO YEARS

 9  LATER?

10          A.      YES.

11          Q.      AND IS THAT WHY YOU FORMED

12  TIRAWORKS?

13          A.      YES.

14          Q.      SO YOU WERE NOT PAID A SEPARATE --

15  STRIKE THAT.  WHEN YOU FORMED TIRAWORKS, AND WERE

16  STILL A DIRECTOR IN ASCENTRA, WERE YOU PAID A

17  SEPARATE SALARY FROM ASCENTRA FOR BEING A

18  DIRECTOR?

19          A.      NO, I DON'T THINK SO.

20          Q.      I AM SORRY TO INTERRUPT.

21          A.      SORRY.

22          Q.      ANYTHING ELSE YOU WANT TO ADD TO

23  THAT?

24          A.      NO.

25          Q.      SO ASCENTRA WOULD PAY TIRAWORKS FOR
```

95

RYUNOSUKE YOSHIDA

1   YOUR SERVICES.  DID TIRAWORKS HAVE ANY OTHER

2   EMPLOYEES?

3          A.     SORRY, YOUR QUESTION IS WHETHER

4   TIRAWORKS HAD ANY OTHER EMPLOYEES?

5          Q.     YES?

6          A.     NO.

7          Q.     SO YOU WERE ITS SOLE SHAREHOLDER

8   AND SOLE EMPLOYEE?

9          A.     YES.

10         Q.     OKAY.  DID TIRAWORKS HAVE SEPARATE

11   BANK ACCOUNTS?

12         A.     WHAT DO YOU MEAN SEPARATE BANK

13   ACCOUNTS?

14         Q.     ACCOUNTS.  DID IT HAVE ITS OWN BANK

15   ACCOUNTS?

16         A.     YES.

17         Q.     WHERE DID IT BANK?

18         A.     HSBC.

19         Q.     HSBC.  DOES TIRAWORKS STILL HAVE

20   BANK ACCOUNTS AT HSBC?

21         A.     NO.

22         Q.     DOES TIRAWORKS STILL EXIST?

23         A.     YES.

24         Q.     DOES TIRAWORKS PROVIDE CONSULTING

25   SERVICES TO ANY OTHER ENTITIES CURRENTLY?

RYUNOSUKE YOSHIDA

1          A.    NO.   SORRY, GOING BACK, ARE YOU

2   TALKING ABOUT NOW?

3          Q.    YES.

4          A.    NO.

5          Q.    DID TIRAWORKS PROVIDE ANY

6   CONSULTING SERVICES TO SPGK?

7          A.    I DON'T THINK SO.  I CAN'T

8   REMEMBER.

9          Q.    MAYBE?

10         A.    I CAN'T REMEMBER.

11         Q.    WHEN YOU WERE APPOINTED TO THE

12  BOARD OF ASCENTRA, WERE YOU ASSIGNED A ROLE AS A

13  DIRECTOR?

14         A.    NO.

15         Q.    WAS THERE A SEPARATE AUDIT

16  COMMITTEE FOR THE BOARD?

17         A.    I WAS -- CAN YOU ASK YOUR QUESTION

18  AGAIN?

19         Q.    SURE.  IT MAYBE IT IS HELPFUL JUST

20  TO STEP BACK A LITTLE BIT.  PRIOR TO YOUR

21  APPOINTMENT AS A DIRECTOR OF ASCENTRA, HAD YOU

22  EVER BEEN A DIRECTOR OF A CORPORATION?

23         A.    HAVE I EVER ----

24         Q.    PRIOR TO YOUR APPOINTMENTS,

25  2013 ----

97

RYUNOSUKE YOSHIDA

1          A.     YES.

2          Q.     ---- AS A DIRECTOR OF ASCENTRA, DID

3    YOU HAVE ANY PRIOR EXPERIENCE ON BEING ON A BOARD

4    OF DIRECTORS?

5          A.     NO.

6          Q.     DID YOU UNDERSTAND THE DUTIES OF A

7    DIRECTOR OF A CAYMAN CORPORATION WHEN YOU WERE

8    APPOINTED AS A DIRECTOR OF ASCENTRA?

9          A.     YES.

10         Q.     HOW DID YOU COME TO GET THIS

11   KNOWLEDGE OF WHAT THE DUTIES OF A DIRECTOR OF A

12   CAYMAN CORPORATION WERE?

13         A.     SORRY, FOR A CAYMAN CORPORATION?

14         Q.     YES.

15         A.     SORRY, CAN YOU ASK YOUR QUESTION

16   AGAIN?

17         Q.     CERTAINLY.  DO YOU UNDERSTAND NOW

18   -- DID YOU UNDERSTAND AT THE TIME, AND I AM TAKING

19   YOU BACK TO 2013 WHEN YOU WERE FIRST APPOINTED,

20   THAT DIRECTORS OF A CORPORATION HAVE CERTAIN

21   DUTIES?  YOU UNDERSTOOD THAT?

22         A.     YES.

23         Q.     YOU ARE NODDING YOUR HEAD.  IS YOUR

24   ANSWER YES?

25         A.     YES, YES.

98

RYUNOSUKE YOSHIDA

1          Q.     AT THAT TIME, YES?

2          A.     YES.

3          Q.     WHAT I AM ASKING YOU IS HOW DID YOU

4    COME UNDERSTAND WHAT THOSE DUTIES WERE IN 2013?

5          A.     I WENT ONLINE TO GO LEARN ABOUT IT.

6          Q.     YOU WENT ONLINE?

7          A.     YES.

8          Q.     DO YOU RECALL WHAT THE SOURCE OF

9    THIS KNOWLEDGE WAS ONLINE?

10         A.     NO.

11         Q.     SITTING HERE TODAY, DO YOU STILL

12   UNDERSTAND WHAT THOSE DUTIES ARE AS A MEMBER OF

13   THE BOARD OF DIRECTORS OF A CORPORATION?

14         A.     YES.

15         Q.     CAN YOU TELL ME WHAT THOSE DUTIES

16   ARE?

17         A.     IF YOU CAN TELL ME WHICH DUTIES ARE

18   THERE, THEN I MIGHT BE ABLE TO REPLY.

19         Q.     GENERALLY, I MEAN, YOU HAVE SERVED

20   AS A DIRECTOR NOW FOR SEVERAL CORPORATIONS.

21         A.     YES.

22         Q.     AND IN FACT YOU HAVE BEEN A

23   DIRECTOR OF CORPORATIONS FOR TEN YEARS.  IS THAT

24   ACCURATE?

25         A.     YES.

99

RYUNOSUKE YOSHIDA

1        Q.      YOU HAVE COME TO UNDERSTAND WHAT IT

2   MEANS TO BE A DIRECTOR OF A CORPORATION, CORRECT?

3        A.      YES.

4        Q.      IN YOUR OWN WORDS, IF YOU COULD

5   JUST TELL ME WHAT YOU BELIEVE ARE THE DUTIES OF A

6   DIRECTOR OF CORPORATION?

7        A.      IT IS TO DO WHAT IS BEST FOR THE

8   COMPANY THAT I AM A DIRECTOR OF AND I AM

9   RESPONSIBLE FOR MAKING THE BEST BUSINESS DECISIONS

10   FOR THE SHAREHOLDERS.

11        Q.      ANYTHING ELSE?

12        A.      IF YOU CAN RAISE SOME THEMES, THEN

13   I ...

14        Q.      WOULD YOU SAY ONE OF YOUR DUTIES IS

15   TO NOT HAVE ANY SELF-DEALING WITH THE CORPORATION?

16        A.      NOT HAVE A SELF -- CAN YOU CLARIFY

17   SELF-DEALING?

18        Q.      IF YOU HAVE A RELATED TRANSACTION

19   IN WHICH YOU HAVE AN INTEREST?

20        A.      NO.

21        Q.      WHOSE INTEREST ARE YOU SUPPOSED TO

22   BE PROTECTING?

23        A.      THE COMPANY'S INTEREST.

24        Q.      DID ASCENTRA HAVE A GENERAL

25   COUNSEL?

RYUNOSUKE YOSHIDA

```
 1                    MR. MORRIS:  OBJECTION TO THE FORM

 2   OF THE QUESTION.

 3           A.    I BELIEVE IT CHANGED TIME TO TIME.

 4   BY MR. MCDONALD:

 5           Q.    OKAY.  WHEN YOU WERE FIRST

 6   APPOINTED IN 2013, DID ASCENTRA HAVE A GENERAL

 7   COUNSEL?

 8           A.    I THINK SO.

 9           Q.    DO YOU KNOW WHO THAT WAS?

10           A.    I CANNOT REMEMBER ON TOP OF MY

11   HEAD.

12           Q.    DO YOU KNOW SOMEONE NAMED

13   MR. WALSH?

14           A.    YES.

15           Q.    DO YOU REMEMBER WHETHER OR NOT HE

16   SERVED IN THAT ROLE AT ANY TIME AT ASCENTRA?

17           A.    I -- SORRY, YES, IN TERMS OF --

18   SORRY, CAN YOU ASK THE QUESTION AGAIN?

19           Q.    DO YOU KNOW WHETHER MR. WALSH

20   SERVED AT ANY TIME IN THE CAPACITY AS GENERAL

21   COUNSEL FOR ASCENTRA?

22           A.    YES.

23           Q.    DO YOU KNOW WHAT TIME PERIOD THAT

24   WAS?

25           A.    I CANNOT REMEMBER ON TOP OF MY HEAD
```

101

RYUNOSUKE YOSHIDA

1  BUT MAYBE SOME TIME BETWEEN 2016-2018 OR '19.

2          Q.     DID YOU EVER SPEAK WITH MR. WALSH

3  ABOUT YOUR DUTIES AS A DIRECTOR OF ASCENTRA?

4          A.     I DON'T REMEMBER.

5          Q.     DID MR. WALSH EVER DISCUSS THAT AT

6  A BOARD MEETING?

7          A.     I DON'T THINK SO.

8          Q.     SPEAKING OF BOARD MEETINGS, DO YOU

9  RECALL HOW FREQUENTLY THE COMPANY HELD BOARD

10  MEETINGS?

11         A.     I BELIEVE IT WAS DIFFERENT TIME TO

12  TIME.  SOME PERIOD THEY HAD BOARD MEETINGS EVERY

13  QUARTER.  SOME PERIOD THEY MAYBE HAD ONE OR LESS,

14  ONE MAYBE.  SORRY, I DON'T REMEMBER ON THE TOP OF

15  MY HEAD, BUT IT REALLY DEPENDED ON TIME TO TIME.

16         Q.     DO YOU RECALL IF ANY OF THE MAJOR

17  SHAREHOLDERS WOULD ALSO BE IN ATTENDANCE DURING A

18  BOARD MEETING?

19         A.     THEY -- I CANNOT BE EXACT, BUT

20  I RECALL BOARD MEETINGS WHERE THE SHAREHOLDERS

21  WERE NOT PRESENT.

22         Q.     DO YOU RECALL MEETINGS WHERE THE

23  SHAREHOLDERS WERE PRESENT?

24         A.     I CANNOT REMEMBER.

25         Q.     IS IT POSSIBLE THAT THE

                           102

1   SHAREHOLDERS DID ATTEND BOARD MEETINGS?

2        A.    CAN YOU REPEAT YOUR QUESTION?

3        Q.    IS IT POSSIBLE THAT SHAREHOLDERS

4   DID ATTEND BOARD OF DIRECTOR MEETINGS FOR

5   ASCENTRA?

6        A.    MAYBE.  DO YOU MIND IF I GO TO THE

7   BATHROOM AFTER YOUR NEXT QUESTION?

8        Q.    ABSOLUTELY.  ABSOLUTELY.  DID ANY

9   OF THE MAJOR SHAREHOLDERS DIRECT ONE OF THE

10  DIRECTORS ON HOW THEY SHOULD VOTE ON A PARTICULAR

11  MATTER?

12       A.    I DON'T THINK SO.

13       Q.    DID MR. MATSUURA EVER DIRECT YOU

14  PERSONALLY ON HOW YOU SHOULD VOTE ON A PARTICULAR

15  MATTER AT A BOARD MEETING?

16       A.    NO.

17       Q.    DID YOU EVER CONSULT WITH

18  MR. MATSUURA ABOUT MATTERS THAT WERE BEING

19  REVIEWED BY THE BOARD OF DIRECTORS?

20       A.    YES.

21             MR. MCDONALD:  WE WILL TAKE A SHORT

22  BREAK AND THEN WE WILL PICK THAT UP?

23       A.    THANK YOU.

24             THE VIDEOGRAPHER:  WE ARE GOING OFF

25  THE RECORD.  THE TIME IS 11.53.

103

RYUNOSUKE YOSHIDA

1        (A SHORT BREAK FROM 11.53 A.M. TO 12.00 P.M.)

2               THE VIDEOGRAPHER:  WE ARE BACK ON

3   THE RECORD.  THE TIME IS 12 P.M.

4   BY MR. MCDONALD:

5        Q.     MR. YOSHIDA, BEFORE WE TOOK OUR

6   BRIEF BREAK I HAD ASKED YOU WHETHER OR NOT YOU HAD

7   CONSULTED WITH MR. MATSUURA ABOUT MATTERS THAT

8   WERE BEING CONSIDERED BY THE ASCENTRA BOARD AND

9   YOU SAID YES.

10       A.     CAN YOU SAY THAT AGAIN, SORRY?

11       Q.     BEFORE THE BREAK I ASKED YOU DID

12  YOU EVER CONSULT WITH MR. MATSUURA ABOUT MATTERS

13  THAT WERE BEING REVIEWED BY THE BOARD OF DIRECTORS

14  AND YOU SAID YES.

15       A.     YES.

16       Q.     OKAY.  DO YOU RECALL WHAT MATTERS

17  YOU DISCUSSED WITH MR. MATSUURA THAT WERE BEING

18  CONSIDERED BY THE ASCENTRA BOARD?

19       A.     I DON'T REMEMBER EVERYTHING, BUT

20  ONE OF THE THINGS I CAN REMEMBER IS ABOUT A

21  COMPENSATION COMMITTEE BEING SET UP.  I GUESS

22  I DIDN'T CONSULT WITH HIM, I JUST TOLD HIM THERE

23  IS GOING TO BE A COMPENSATION COMMITTEE BEING SET

24  UP.  THAT IS ONE THING I CAN REMEMBER.  IT'S BEEN

25  A WHILE BACK, SO I CANNOT REALLY REMEMBER.

RYUNOSUKE YOSHIDA

1          Q.     THAT'S OKAY.  A COMPENSATION

2    COMMITTEE?

3          A.     YES.

4          Q.     BY THAT DO YOU MEAN A SEPARATE

5    COMPENSATION COMMITTEE OF THE BOARD OF DIRECTORS?

6          A.     YES.

7          Q.     OKAY.  AT THE TIME HOW MANY MEMBERS

8    OF THE BOARD OF DIRECTORS WERE THERE?

9          A.     I BELIEVE IT WAS FIVE.

10         Q.     DO YOU RECALL WHO WAS APPOINTED --

11   STRIKE THAT.  WAS A COMPENSATION COMMITTEE EVER

12   CREATED?

13         A.     YES.

14         Q.     DO YOU RECALL WHO SERVED ON THE

15   COMPENSATION COMMITTEE?

16         A.     IF I RECALL CORRECTLY, I BELIEVE IT

17   WAS ME, CHRIS MINER AND ONE MORE PERSON.  I CANNOT

18   REMEMBER WHICH ONE.  IT WAS EITHER HORI AKINORI OR

19   RYAN KOJIMA.  I BELIEVE IT IS HORI AKINORI, BUT

20   I CANNOT BE SURE.

21         Q.     WHAT WAS THE ROLE OF THE

22   COMPENSATION COMMITTEE?

23         A.     DECIDING COMPENSATION OF

24   EXECUTIVES.

25         Q.     DID ASCENTRA HAVE ANY EMPLOYEES AT

105

RYUNOSUKE YOSHIDA

1  THE TIME?

2          A.     ARE YOU REFERRING TO ASCENTRA

3  HOLDINGS INC OR ARE YOU REFERRING TO ITS

4  SUBSIDIARIES?

5          Q.     WE WILL START WITH ASCENTRA

6  HOLDINGS INC.

7          A.     I DON'T THINK SO.

8          Q.     DID IT HAVE ANY OFFICERS?

9          A.     MARTY MATTHEWS COULD HAVE BEEN A

10  PRESIDENT, BUT I CANNOT BE EXACT.

11          Q.     WHAT ABOUT ASCENTRA'S SUBSIDIARIES?

12          A.     CAN YOU BE SPECIFIC?

13          Q.     YOU SAID SUBSIDIARIES AND I AM JUST

14  ----

15          A.     CAN YOU SAY YOUR QUESTION AGAIN?

16          Q.     YES.  DO ASCENTRA'S SUBSIDIARIES?

17          A.     HAVE?

18          Q.     EMPLOYEES.

19          A.     YES.

20          Q.     THANK YOU.  ABOUT HOW MANY

21  EMPLOYEES DID THE ASCENTRA SUBSIDIARIES HAVE?  I'M

22  GOING -- YOU JOINED IN 2013.

23          A.     YES.

24          Q.     LET US TAKE THIS IN LITTLE CHUNKS

25  AT A TIME.  FROM LIKE 2013 TO ROUGHLY 2018, DO YOU

106

RYUNOSUKE YOSHIDA

1    RECALL ON AVERAGE HOW MANY EMPLOYEES THE ASCENTRA

2    SUBSIDIARIES HAD?

3          A.    IT CHANGED TIME TO TIME.  I BELIEVE

4    IT WAS MORE THAN 30, LESS THAN 100.  THAT WAS THE

5    RANGE.

6          Q.    OVER THAT PERIOD OF TIME?  SO

7    SOMETIMES IT WAS UP TO 100, SOMETIMES IT WAS DOWN

8    AS LOW AS 30, ROUGHLY?  ACCURATE?

9          A.    ROUGHLY, IT WAS AROUND THAT RANGE.

10         Q.    WOULD THE BOARD OF DIRECTORS OF

11   ASCENTRA HOLDINGS HAVE ANY INPUT ON THE

12   COMPENSATION OF THE EMPLOYEES AT THE SUBSIDIARY

13   LEVEL?  STRIKE THAT.  DID THE BOARD OF DIRECTORS

14   OF ASCENTRA HOLDINGS HAVE ANY INPUT DURING THAT

15   TIME PERIOD ON THE COMPENSATION OF THE EMPLOYEES

16   AT THE SUBSIDIARY LEVEL?

17         A.    I THINK SO.  EMPLOYEES EXECUTIVES

18   PROBABLY.

19         Q.    EXECUTIVES AT EACH OF THE

20   SUBSIDIARIES?

21         A.    SOME OF THE SUBSIDIARIES.

22         Q.    DO YOU RECALL WHETHER OR NOT THERE

23   WAS A SUBSIDIARY THAT HAD A SEPARATE COMPENSATION

24   SYSTEM THAT WAS NOT SUBJECT TO THE ASCENTRA

25   HOLDINGS DIRECTORS?

107

RYUNOSUKE YOSHIDA

1       A.      ARE YOU REFERRING -- SORRY, CAN YOU

2   SAY YOUR QUESTION AGAIN?

3       Q.      YOU SAID SOME OF THE SUBSIDIARIES.

4   WHAT I AM TRYING TO UNDERSTAND IS WAS THERE A

5   SUBSIDIARY OR SUBSIDIARIES WHOSE EXECUTIVES WERE

6   NOT SUBJECT TO THE DIRECTION OF ASCENTRA HOLDINGS

7   BOARD OF DIRECTORS FOR COMPENSATION PURPOSES?

8       A.      I BELIEVE IF MY UNDERSTANDING IS

9   CORRECT THE MAJOR EXECUTIVES OF ASCENTRA HOLDINGS

10  INC AND THE SUBSIDIARIES WERE DECIDED BY -- WERE

11  SUPPOSED TO BE DECIDED BY ASCENTRA HOLDINGS INC.

12      Q.      DURING THIS ENTIRE -- BACK TO YOUR

13  TERM AS DIRECTOR AT ASCENTRA HOLDINGS, YOU ALSO

14  BECAME, AS I THINK YOU PREVIOUS TESTIFIED, A

15  DIRECTOR AT SOME OF THE SUBSIDIARIES; IS THAT

16  CORRECT?

17      A.      YES.

18      Q.      WERE YOU SEPARATELY COMPENSATED FOR

19  THE DIRECTORSHIPS AT THE SUBSIDIARIES?

20      A.      NO, I DON'T THINK SO.

21      Q.      DO YOU RECALL ONE WAY OR THE OTHER?

22      A.      I DON'T THINK I RECEIVED ANYTHING.

23      Q.      OKAY.  DURING THE TIME THAT YOU

24  WERE A DIRECTOR OF ASCENTRA FROM 2013 UP UNTIL

25  2021, WAS ALL YOUR COMPENSATION PAID TO TIRAWORKS?

RYUNOSUKE YOSHIDA

1          MR. MORRIS:  I AM SORRY, WAS IT ALL

2   WHAT?

3          MR. MCDONALD:  PAID TO TIRAWORKS.

4          MR. MORRIS:  THANK YOU.

5      A.    I THINK SO.  I CANNOT BE ACCURATE

6   BUT I THINK SO.

7   BY MR. MCDONALD:

8      Q.    AND THERE CAME A TIME WHEN YOU ALSO

9   BECAME A DIRECTOR OF SPGK INC; IS THAT CORRECT?

10     A.    YES.

11     Q.    WERE YOU SEPARATELY COMPENSATED FOR

12  BEING A DIRECTOR OF SPGK INC?

13     A.    SEPARATELY COMPENSATED?

14         MR. MORRIS:  OBJECTION TO THE FORM

15  OF THE QUESTION.

16  BY MR. MCDONALD:

17     Q.    BY THAT I MEAN DID YOU RECEIVE

18  COMPENSATION FOR SERVING AS A DIRECTOR OF SPGK

19  INC?

20     A.    NOT FROM SPGK INC.

21     Q.    WHO PAID YOU THE COMPENSATION FOR

22  SERVING AS A DIRECTOR OF SPGK INC?

23     A.    SPGK PTE LIMITED.  I WAS AN

24  EMPLOYEE ON RECEIVING A SALARY FROM SPGK PTE

25  LIMITED.

RYUNOSUKE YOSHIDA

1          Q.     AN EMPLOYEE OF PTE ----

2                 THE COURT REPORTER:  I AM SORRY,

3    COULD YOU REPEAT THAT ANSWER?

4          A.     SORRY, OKAY.  YES, I WAS AN

5    EMPLOYEE OF SPGK PTE LIMITED FOR A PERIOD OF TIME.

6    BY MR. MCDONALD:

7          Q.     OKAY.  AND WHAT WAS YOUR ROLE OR

8    POSITION -- STRIKE THAT.  WHAT WAS YOUR POSITION

9    WITH SPGK PTE LIMITED?

10         A.     A DIRECTOR.

11         Q.     YOU WERE A DIRECTOR OF THAT AS

12   WELL?

13         A.     YES.

14         Q.     BECAUSE YOU SAID YOU WERE EMPLOYEE;

15   WHAT DO YOU MEAN BY EMPLOYEE?

16         A.     I WAS RECEIVING A SALARY.

17         Q.     FOR BEING A DIRECTOR?

18                MR. MORRIS:  OBJECTION TO THE FORM

19   OF THE QUESTION.

20         A.     FOR BEING A DIRECTOR AND DOING MY

21   WORK.

22   BY MR. MCDONALD:

23         Q.     AND WHAT WAS YOUR WORK AT

24   SPGK PTE LIMITED?

25         A.     MANAGING BANK RELATIONSHIPS, BANK

110

RYUNOSUKE YOSHIDA

1    ACCOUNTS AND ALSO ENGAGING SOME VENDORS.  I CANNOT

2    REMEMBER WHICH ONES I ENGAGED, BUT I REMEMBER

3    ENGAGING WITH -- SORRY, I CANNOT REMEMBER WHETHER

4    IF IT WAS SPGK PTE LIMITED OR SHANG PENG GAO KE

5    INC. SEZC, BUT I DID ENGAGE WITH OTHER VENDORS,

6    YES.

7            Q.     WHAT VENDORS DID YOU ENGAGE WITH?

8            A.     PR COMPANY IN CHINA, ACCOUNTING

9    FIRMS, A LITIGATION LAWYER IN THE PRC, ADVISOR --

10   SORRY, CAN I CLARIFY DO YOU HAVE ANY SPECIFIC

11   PERIOD WERE YOU ARE TALKING ABOUT?

12           Q.     SO WHEN DID YOU BECOME A DIRECTOR

13   OF SPGK PTE LIMITED?

14           A.     I BELIEVE IT WAS -- IS IT OKAY IF I

15   CHECK?

16           Q.     OF COURSE.  IF YOU COULD POINT TO

17   WHERE YOU ARE ----

18           A.     I BELIEVE IT WAS MAY 2019.  SORRY,

19   LET ME CHECK.  YES, MAY 2019, ITEM 7.

20           Q.     MAY 2019?

21           A.     I BELIEVE IT WAS AROUND THAT TIME.

22           Q.     WHAT PARAGRAPH WAS THAT?

23           A.     SEVEN.

24           Q.     PARAGRAPH 7.  DID YOU RECEIVE A

25   SEPARATE SALARY FOR BEING A DIRECTOR OF -- I THINK

1   YOU REFERRED TO IT, AND IT WILL PROBABLY BE EASIER

2   DOING THAT WITH SPGK SINGAPORE.

3        A.    PTE?

4        Q.    YES.

5        A.    CAN YOU CLARIFY WHEN YOU SAY

6   SEPARATE?

7        Q.    SO YOU WERE COMPENSATED -- I AM

8   JUST TRYING TO UNDERSTAND HOW MUCH YOU ARE GETTING

9   PAID AND FROM WHERE.  THAT IS PRETTY EASIER,

10  RIGHT?  SO YOU WERE A DIRECTOR OF ASCENTRA IN MAY

11  2019, CORRECT?

12       A.    YES.

13       Q.    AND YOU WERE RECEIVING ----

14       A.    MAY OF 2019, YES.

15       Q.    YOU WERE A DIRECTOR?

16       A.    YES.

17       Q.    OKAY.  AND YOU WERE RECEIVING

18  COMPENSATION ----

19       A.    I BELIEVE SO.  YES, I THINK SO.

20       Q.    ---- WHICH WAS GETTING PAID TO

21  TIRAWORKS FROM ASCENTRA FOR YOUR SERVICES?

22       A.    YES.

23       Q.    YOU ALSO BECAME A DIRECTOR OF THE

24  SPGK ENTITIES AS WELL?

25       A.    YES.

112

RYUNOSUKE YOSHIDA

1        Q.      BOTH CAYMAN AND SINGAPORE?

2        A.      YES.

3        Q.      WERE YOU COMPENSATED FOR THAT WORK?

4        A.      YES.

5        Q.      WAS THAT SEPARATE FROM THE

6   COMPENSATION PAID TO YOU FOR YOUR ROLE WITH

7   ASCENTRA?

8        A.      YES.

9        Q.      TO WHOM WERE THOSE FUNDS PAID?

10  WERE THEY PAID TO TIRAWORKS OR TO YOU PERSONALLY?

11       A.      TO ME PERSONALLY.

12       Q.      TO YOU PERSONALLY?

13       A.      YES.

14       Q.      DID YOU RECEIVE SEPARATE

15  COMPENSATION FOR YOUR DIRECTORSHIP AT CAYMAN AND

16  FOR SINGAPORE?

17       A.      CAN YOU SPECIFY ON A PERIOD AROUND

18  THAT TIME.

19       Q.      MAY 2019 UNTIL ----

20       A.      NO, I ONLY RECEIVED SALARY FROM THE

21  SINGAPORE ENTITY.

22       Q.      FROM THE SINGAPORE ENTITY?

23       A.      YES.

24       Q.      SO AT SPGK INC CAYMAN YOU DID NOT

25  RECEIVE ANY SALARY FOR SERVING AS A DIRECTOR

113

RYUNOSUKE YOSHIDA

1    THERE?

2            A.    I DON'T THINK SO.

3            Q.    OKAY.  THE SINGAPORE ENTITY, PTE,

4    HOW MUCH WERE YOU PAID BY SPGK PTE FOR YOUR

5    SERVICES AS A DIRECTOR?

6            A.    I CANNOT REMEMBER THE EXACT AMOUNT

7    BUT I THINK IT WAS AROUND BETWEEN 10,000 TO 20,000

8    SINGAPORE DOLLARS.

9            Q.    PER MONTH?

10           A.    PER MONTH.  I THINK IT WAS AROUND

11   THAT RANGE.  I CANNOT BE EXACT.

12           Q.    WERE YOU THE ONLY DIRECTOR OF SPGK

13   SINGAPORE?

14           A.    THERE WAS ANOTHER NOMINEE DIRECTOR.

15           Q.    AND WAS THE NOMINEE DIRECTOR

16   COMPENSATED AS WELL?

17           A.    I BELIEVE HE WAS COMPENSATED

18   ANNUALLY.

19           Q.    WAS THE NOMINEE DIRECTOR A

20   CONSULTANT?

21           A.    WHAT DO YOU MEAN BY THAT?

22           Q.    AN INDEPENDENT CONSULTANT NOT

23   EMPLOYED BY PTE?

24           A.    HE WAS NOT EMPLOYED.  INDEPENDENT.

25           Q.    OKAY.  THE EIGHT LIGHT YEARS ENTITY

114

RYUNOSUKE YOSHIDA

1    THAT YOU REFERENCED EARLY, WHEN DID WAS THAT

2    FOUNDED?

3           A.    I BELIEVE IT WAS AROUND 2021 OR 2,

4    PROBABLY 2, 2022.

5           Q.    IT WAS RECENTLY?

6           A.    VERY RECENTLY, YES.

7           Q.    LAST YEAR?

8           A.    SORRY?

9           Q.    LAST YEAR?

10          A.    LAST YEAR, YES.  PROBABLY, YES,

11   I THINK SO, BUT IT IS -- YES, VERY RECENT.

12          Q.    WHY DID YOU CHANGE FROM USING

13   TIRAWORKS TO USING EIGHT LIGHT YEAR?

14          A.    I HAD CONCERNS OVER RECEIVING FUNDS

15   FROM SPGK INTO A HONG KONG ENTITY.

16          Q.    BUT YOU LIVE IN HONG KONG; IS THAT

17   CORRECT?

18          A.    YES, BUT I STILL -- I DID NOT WANT

19   ANY FUNDS GOING IN THERE.

20          Q.    WHY?

21          A.    BECAUSE I AM CONCERNED OF MY

22   CRIMINAL AND PERSONAL RISKS.

23          Q.    SO DOES EIGHT MILE -- EIGHT LIGHT

24   YEARS -- IT DEFINITELY WAS AN EMINEM SLIP.

25                MR. MORRIS:  DEFINITELY 8 MILE.

115

RYUNOSUKE YOSHIDA

```
 1   BY MR. MCDONALD:
 2        Q.    (LAUGHTER) YOU SAID EIGHT LIGHT
 3   YEARS IN DUBAI?
 4        A.    YES.
 5        Q.    IT IS INCORPORATED IN DUBAI?
 6        A.    YES.
 7        Q.    DOES IT MAINTAIN ITS BANK ACCOUNTS
 8   IN DUBAI?
 9        A.    YES.
10        Q.    AND THE MONEY YOU WERE PAID FROM
11   SPGK IS TRANSFERRED INTO DUBAI?
12        A.    YES.
13        Q.    AND THAT IS ALSO WHERE YOUR
14   CONSULTANT IS LOCATED AS WELL, DUBAI?
15        A.    YES.
16        Q.    WHEN YOU WERE SERVING AS A DIRECTOR
17   OF ASCENTRA FROM 2013 TO 2021, DID YOU EVER
18   RECEIVE A BONUS IN ANY OF THOSE YEARS?
19        A.    I MAY HAVE.  I DON'T REMEMBER LIKE
20   THE EXACT AMOUNT, BUT I THINK I DID.
21        Q.    DO YOU RECALL ROUGHLY HOW MUCH THAT
22   BONUS -- FIRST OF ALL, WAS IT ONE BONUS OR MORE
23   THAN ONE BONUS?
24        A.    I THINK IT WAS EITHER BETWEEN ONE
25   TO TWO, PROBABLY.
```

RYUNOSUKE YOSHIDA

1        Q.     ONE TO TWO?

2        A.     I THINK SO.

3        Q.     ROUGHLY, DO YOU REMEMBER THE

4   AMOUNT, ROUND DOLLARS?

5        A.     I CANNOT REMEMBER THE EXACT AMOUNT

6   BUT I ASSUME IT IS SOMEWHERE AROUND 10,000 TO LIKE

7   30,000 US MAYBE.  I MIGHT BE WRONG, BUT YES.

8        Q.     PAID ONCE OR TWICE, ROUGHLY?

9        A.     MAYBE ONCE OR TWICE, I CANNOT

10   REMEMBER.

11        Q.     DID YOU RECEIVE ANY OTHER

12   COMPENSATION FOR YOUR SERVICES WITH ASCENTRA?

13        A.     I DON'T THINK SO.

14        Q.     PRIOR TO JOINING ASCENTRA, HAD YOU

15   ANY PRIOR EXPERIENCE WITH THE MULTILEVEL MARKETING

16   BUSINESS?

17        A.     NO.

18        Q.     DID YOU KNOW WHAT MULTILEVEL

19   MARKETING WAS BEFORE YOU JOINED ASCENTRA?

20        A.     DID I KNOW ABOUT IT?

21        Q.     YES.

22        A.     DID I KNOW ABOUT MULTILEVEL

23   MARKETING BUSINESS?

24        Q.     YES.

25        A.     I KNEW, YES.

117

RYUNOSUKE YOSHIDA

1      Q.     AND HOW DID YOU KNOW ABOUT

2   MULTILEVEL MARKETING?

3          A.     I HAVE SEEN IT ON THE NEWS.

4      Q.     AND WHAT DID YOU -- WHY WAS IT ON

5   THE NEWS?

6          A.     WELL, THERE ARE COMPANIES LIKE

7   AMWAY, OR THERE ARE COMPANIES LIKE ALL OF THESE

8   MLM COMPANIES, SO I WOULD KNOW SUCH BUSINESSES

9   EXIST.

10         Q.     AND WHAT IS YOUR GENERAL

11  UNDERSTANDING OF AN MLM BUSINESS?

12         A.     MLM BUSINESS IS A BUSINESS WHERE

13  THEY WOULD -- YOU CAN HAVE AFFILIATES WHO CAN

14  REFER PRODUCTS AND YOU CAN EARN A COMMISSION ON

15  MULTILEVELS, WHICH MEANS THE REFERRALS UP IN THE

16  LINE CAN ALSO RECEIVE A PART OF THE COMPENSATION

17  THAT COMES FROM BELOW.

18         Q.     BY REFERRALS UP IN THE LINE, WHAT

19  DO YOU MEAN?

20         A.     SO THERE IS ALWAYS A CHAIN OF

21  REFERRALS AND BASED ON THESE CHAIN OF REFERRALS

22  YOU CAN ACTUALLY EARN A REFERRAL FEE FROM YOUR

23  REFERRALS, REFERRALS, REFERRAL UP, UP.

24         Q.     SO THE MORE PEOPLE YOU GET INVOLVED

25  IN BUYING THE PRODUCT THE MORE MONEY YOU CAN MAKE?

118

RYUNOSUKE YOSHIDA

1        A.      CAN YOU SAY THAT AGAIN?

2        Q.      SO THE MORE PEOPLE YOU GET INVOLVED

3   WITH BUYING AND SELLING THE PRODUCT, THE MORE

4   MONEY YOU CAN MAKE, EFFECTIVELY?

5        A.      YES.

6        Q.      IN THE ASCENTRA/INTERUSH BUSINESS

7   MODEL, CAN YOU PLEASE EXPLAIN THE ROLES OF THE

8   VARIOUS PARTIES THAT WERE INVOLVED IN THE MLM

9   PROCESS, AND BY THAT I MEAN THERE WERE PEOPLE

10  CALLED ASSOCIATES, CORRECT?

11       A.      AFFILIATES.

12       Q.      AFFILIATES.  I MIS-SPOKE, PARDON

13  ME.  IT IS AFFILIATES.  COULD YOU EXPLAIN THE ROLE

14  OF AFFILIATES IN THE ASCENTRA/INTERUSH BUSINESS

15  MODEL?

16       A.      AFFILIATES CAN BECOME REFERRAL BY

17  REGISTERING AS AN AFFILIATE AND THEY CAN FIND

18  CUSTOMERS THAT WANTS TO BUY THE PRODUCT IT IS

19  REFERRING.  YOU CAN ALSO HAVE THEM BECOME

20  REGISTERED AFFILIATE AND -- SORRY, CAN YOU SAY

21  YOUR QUESTION AGAIN?

22       Q.      SURE.  I WAS TRYING TO UNDERSTAND,

23  AND I MIS-SPOKE, AND THANK YOU FOR CORRECTING ME,

24  I WANTED TO UNDERSTAND THE ROLE OF AFFILIATES.  BY

25  AFFILIATE WE DON'T MEAN AFFILIATE LIKE AN

119

RYUNOSUKE YOSHIDA

1   AFFILIATE COMPANY, THESE ARE PEOPLE WHO HAVE

2   REGISTERED, YOU SAID, WITH ASCENTRA?

3          A.     YES.  WITH HEC.

4          Q.     HEC.  THANK YOU FOR CLARIFYING

5   THAT.  I WAS ABOUT TO ASK YOU WHO THEY WOULD

6   REGISTER WITH.  SO THEY WOULD REGISTER WITH HEC

7   AND AS PART OF THAT THEY WERE THEN GIVEN THE

8   ABILITY TO BUY PRODUCT FROM HEC?

9          A.     NO.

10         Q.     SO WHAT DID REGISTRATION WITH HEC

11  GET AN AFFILIATE?

12         A.     THE RIGHT TO BECOME AN AFFILIATE.

13         Q.     AND WHAT BENEFITS WERE THERE TO

14  BECOMING AN AFFILIATE?

15         A.     BY REFERRING OTHER CUSTOMERS, YOU

16  CAN ACTUALLY EARN A COMMISSION.

17         Q.     SO THEY BECAME EFFECTIVELY

18  SALESPEOPLE FOR HEC?

19         A.     YES.

20         Q.     AND THE MORE PEOPLE THEY REFERRED

21  IN TO -- TO JUST BUY PRODUCT?

22         A.     YES.

23         Q.     IF THEY BROUGHT MORE PEOPLE IN TO

24  REGISTER AS AN AFFILIATE, WOULD THEY BE

25  COMPENSATED?

120

1          A.     SAY THAT ONE MORE TIME, SORRY?

2          Q.     SO IF THEY BROUGHT -- IF AN

3    AFFILIATE WAS ABLE TO ACCRUE MORE AFFILIATES,

4    WOULD THEY BE COMPENSATED FOR THAT?

5          A.     THEY DON'T GET PAID FOR RECRUITING

6    AFFILIATES.  THEY ONLY GET PAID WHEN THE

7    AFFILIATES THEY RECRUITED HAS SOLD PRODUCTS, OR

8    HAS BOUGHT PRODUCTS.

9          Q.     DO THEY THEMSELVES -- ARE THEY

10   THEMSELVES, THE AFFILIATE, REQUIRED TO BUY PRODUCT

11   AS PART OF THEIR RELATIONSHIP WITH HEC?

12         A.     THE AFFILIATES AT HEC DID BUY A

13   SUBSCRIPTION OF PRODUCTS.

14         Q.     AND WHAT IS A SUBSCRIPTION OF

15   PRODUCTS?

16         A.     THEY HAD TO BUY EITHER AN IT

17   PRODUCT, A HEALTH PRODUCT OR A BEAUTY PRODUCT.

18         Q.     WAS THAT FOR THEIR OWN PERSONAL

19   USE?

20         A.     YES.

21         Q.     WOULD THEY BUY PRODUCTS TO SELL TO

22   OTHERS?

23         A.     NO.

24         Q.     HOW WERE THEY COMPENSATED FOR

25   BUYING A PRODUCT?

121

RYUNOSUKE YOSHIDA

```
1                A.     HOW WERE THEY COMPENSATED FOR

2    BUYING A PRODUCT?

3                Q.     YES.

4                A.     SORRY, CAN YOU CLARIFY AGAIN?

5                Q.     START WITH WERE THEY COMPENSATED

6    FOR BUYING A PRODUCT?

7                A.     FOR WHOM TO BUY THE PRODUCT?

8                Q.     WAS AN AFFILIATE COMPENSATED FOR

9    BUYING A PRODUCT FROM HEC?

10               A.     WAS AN AFFILIATE COMPENSATED FROM

11   BUYING A PRODUCT -- FOR WHOM BUYING A PRODUCT FROM

12   HEC?  ANYBODY?

13               Q.     FOR ANYBODY?

14               A.     YES, YES.

15               Q.     WAS AN AFFILIATE SEPARATELY

16   COMPENSATED FOR HAVING MORE AFFILIATES RECRUITED?

17               A.     THEY WERE ----

18                      MR. MORRIS:  SORRY, FOR HAVING

19   WHAT?

20

21                      MR. MCDONALD:  MORE AFFILIATES

22   RECRUITED?

23                      MR. MORRIS:  THANK YOU.

24               A.     THEY WERE COMPENSATED FOR THE

25   PURCHASE OF THE REFERRALS, THE PEOPLE THAT THEY
```

122

RYUNOSUKE YOSHIDA

1    RECRUITED AND THE END USERS THAT BOUGHT IT.

2    BY MR. MCDONALD:

3         Q.     COULD YOU PLEASE DESCRIBE WHAT

4    I HAVE SEEN IS CALLED THE LOYALTY BONUS PROGRAMME?

5         A.     LOYALTY BONUS PROGRAMME WAS A

6    PROGRAMME TO REWARD AFFILIATES FOR THEIR LONG-TERM

7    CONTINUATION WITH THE COMPANY AS AN AFFILIATE.

8         Q.     SO WERE THERE BENCHMARKS FOR AN

9    AFFILIATE TO REACH AN ORDER TO EARN A LOYALTY

10   BONUS?

11        A.     IF I REMEMBER CORRECTLY, IT WAS

12   QUITE COMPLEX.  IF I REMEMBER CORRECTLY, THEY HAVE

13   TO SUBSCRIBE AND ACHIEVE A CERTAIN STATUS TO

14   MAINTAIN ITS LOYALTY POINTS, IF I AM CORRECT.  IT

15   HAS BEEN A WHILE.

16        Q.     SO STATUS, BY THAT DO YOU MEAN

17   LEVEL OF PURCHASES BY THEIR REFERRALS?

18        A.     LEVEL OF THEIR REFERRALS.  THEY ARE

19   BASED ON THEIR REFERRALS.

20        Q.     BASED ON THE REFERRALS, OVER A

21   PERIOD OF TIME?

22        A.     I THINK SO.  YES, I BELIEVE IT WAS

23   SOMETHING LIKE THAT.

24        Q.     DO YOU RECALL HOW THE AFFILIATES

25   WERE COMPENSATED?

123

RYUNOSUKE YOSHIDA

1          A.      WHAT DO YOU MEAN BY THAT?

2          Q.      WERE THEY SENT A CHEQUE?  WERE THEY

3     GIVEN A CREDIT?  WERE THEY WIRED MONEY?  THEY WERE

4     PAID MONEY FOR THIS, CORRECT?

5          A.      YES.

6          Q.      THEY WERE COMPENSATED.  I JUST WANT

7     TO UNDERSTAND HOW THEY WERE COMPENSATED.

8          A.      IT CHANGED DEPENDING ON THE PERIOD.

9          Q.      OKAY, LET US TAKE THE BEGINNING

10    WHEN YOU FIRST JOINED IN 2013-2015.

11         A.      I REMEMBER THERE WAS A PERIOD WHERE

12    THEY WERE USING CHEQUES.  I REMEMBER THERE WAS A

13    PERIOD THEY WERE USING E-WALLET, WHICH WIRED THE

14    FUNDS AND ALSO LOADED DEBIT CARDS.

15         Q.      AND THAT DEPENDED UPON THE

16    PARTICULAR PERIOD OF TIME WE ARE TALKING ABOUT?

17         A.      YES.

18         Q.      DO YOU RECALL WHICH ENTITY WAS

19    RESPONSIBLE FOR MAKING THESE PAYMENTS?  WAS IT

20    HEC?

21              MR. MORRIS:  OBJECTION TO THE FORM

22    OF THE QUESTION.

23         A.      WHAT OTHER OPTIONS ARE YOU RAISING

24    RIGHT NOW, LIKE WHEN YOU SAID ----

25    BY MR. MCDONALD:

124

RYUNOSUKE YOSHIDA

1       Q.      WHO WOULD PAY -- WHICH ENTITY, WAS

2  IT ASCENTRA?  WOULD ASCENTRA PAY THE COMMISSIONS

3  OR BONUSES TO THESE AFFILIATES?

4               MR. MORRIS:  I APOLOGISE, DO WE

5  HAVE A POINT IN TIME?  IS THIS AS INTERUSH?  IS IT

6  AS SPGK?  IS IT ----

7               MR. MCDONALD:  WHEN IT IS OF

8  INTERUSH OF ASCENTRA.

9               MR. MORRIS:  THANK YOU VERY MUCH.

10      A.      CAN YOU BE SPECIFIC ON WHICH

11 PAYMENTS YOU ARE TALKING ABOUT?

12 BY MR. MCDONALD:

13      Q.      ANY PAYMENTS TO AFFILIATES.

14      A.      IT DEPENDED ON THE PAYMENTS.

15      Q.      SO DIFFERENT ENTITIES WERE

16 RESPONSIBLE FOR DIFFERENT PAYMENTS TO THE

17 AFFILIATES?

18      A.      YES.

19      Q.      OKAY.  LET US UNPACK THAT A LITTLE

20 BIT, OKAY?  WHICH ENTITY WAS RESPONSIBLE FOR

21 MAKING LOYALTY BONUS PAYMENTS TO AFFILIATES?

22      A.      ASCENTRA HOLDINGS INC.

23      Q.      WHICH ENTITY WAS RESPONSIBLE FOR

24 MAKING ANY COMMISSION PAYMENTS TO AFFILIATES?

25      A.      DEPENDENT ON THE PERIOD, BUT

125

RYUNOSUKE YOSHIDA

1    I BELIEVE THE MAJORITY OF THE PERIOD WAS USED TO

2    BE HEC GLOBAL INC.

3            Q.     YOU SAY THE MAJORITY OF THE PERIOD?

4            A.     I THINK SO.

5            Q.     LET US DEFINE THIS PERIOD AND SO WE

6    ARE CLEAR.  WE ARE TALKING ABOUT -- I AM TAKING

7    YOU NOW FROM 2013 TO ROUGHLY 2018, SO DURING THAT

8    PERIOD OF TIME.

9            A.     I BELIEVE IT WAS BY HEC GLOBAL INC

10   IN THE US.  IT IS A US ENTITY.

11           Q.     2018 TO THE END OF 2020?

12           A.     WHO WAS RESPONSIBLE FOR THE

13   PAYMENT, RIGHT?

14           Q.     YES, SIR.

15           A.     IN TERMS OF WHO WAS RESPONSIBLE FOR

16   THE PAYMENT, IT WAS HEC INTERNATIONAL, SINGAPORE

17   BRANCH, FOR THE JAPANESE MARKET.  SORRY -- LET ME

18   CLARIFY THIS AGAIN.  IT DEPENDED ON THE MARKET AS

19   WELL AND IT DEPENDED ON THE PERIOD AS WELL.  SO IT

20   DEFERRED ACCORDING TO MARKET AND PERIOD, SO THERE

21   ARE SOME DISTINCTIONS THERE.  THE JAPANESE MARKET

22   WAS ORIGINALLY FROM HEC GLOBAL INC AND THEN IT

23   BECAME TO BE HEC.  IF I RECALL CORRECTLY, HEC

24   GLOBAL INC IN THE US AND THEN IT BECAME HEC

25   INTERNATIONAL, SINGAPORE BRANCH, AND THEN THE

126

RYUNOSUKE YOSHIDA

1   TAIWAN MARKET WAS HEC INTERNATIONAL COMPANY

2   LIMITED IN TAIWAN.  I THINK THAT WAS WHO WAS

3   RESPONSIBLE FOR THESE PAYMENTS.

4          Q.     WERE THESE PAYMENTS ALSO MADE TO

5   AFFILIATES IN THE PRC?

6          A.     WHICH ENTITIES ARE YOU TALKING

7   ABOUT?

8          Q.     I AM JUST SAYING DID AFFILIATES IN

9   THE PRC -- AGAIN WE WILL START WITH JUST THE 2013

10  TO THE 2018 TIME FRAME.  WERE THEY ELIGIBLE TO

11  EARN THESE COMMISSIONS AND BONUSES?

12         A.     2013-2018?

13         Q.     YES.

14         A.     FIRST OF ALL, I THINK I WOULD LIKE

15  TO MENTION THAT -- I AM A BIT CONFUSED.  CAN YOU

16  SAY YOUR QUESTION AGAIN?  I AM TRYING TO BREAK IT

17  DOWN AS WELL.

18         Q.     I AM TOO.  WE WILL TAKE IT IN

19  SMALLER BITES.  LET US DO 2013-2015.  PRC WERE

20  AFFILIATES IN THE PRC ELIGIBLE -- ABLE TO RECEIVE

21  COMMISSIONS, BONUSES, ETC., AS COMPENSATION?

22         A.     YES.

23         Q.     WERE THEY PAID THOSE COMMISSIONS

24  AND BONUSES?

25         A.     YES.  CAN I GO BACK TO THE QUESTION

127

RYUNOSUKE YOSHIDA

1    EARLIER, SORRY?  I AM GOING BACK ----

2              Q.     YOU CAN.

3              A.     REGARDING THE COMMISSION PAYMENTS,

4    IT IS VERY CONFUSING BECAUSE IT DEPENDS ON THE

5    PERIOD.

6              Q.     OKAY.

7              A.     BUT I SAID THE US ENTITY AND TAIWAN

8    ENTITY, AND THERE WAS A HONG KONG ENTITY, INTERUSH

9    LIMITED IN HONG KONG, WHO WAS ALSO PAYING FOR THE

10   COMMISSIONS FOR THE HONG KONG AFFILIATES.  THAT IS

11   THE CORRECTION I WANTED TO MAKE.

12             Q.     OF COURSE.  THAT IS FINE.  CAN WE

13   GO TO THE PRC NOW?

14             A.     CAN WE USE THE TERM HONG KONG AND

15   PRC SEPARATELY?

16             Q.     YES.  I AM GOING TO FOCUS JUST ON

17   THE PRC RIGHT NOW, IF THAT IS OKAY?

18             A.     YES.  THE DISTINCTION WHY I AM

19   MAKING IT IS BECAUSE INTERUSH USED TO HAVE A

20   BUSINESS IN HONG KONG, INTERUSH LIMITED, WHERE THE

21   MAINLAND PRC PEOPLE CAME TO HONG KONG AND SIGN UP.

22   SO THIS WAS NOT PRC, THIS WAS HONG KONG.

23             Q.     OKAY.  SO PEOPLE FROM THE PRC WOULD

24   PHYSICALLY GO TO HONG KONG TO REGISTER?

25             A.     YES.

RYUNOSUKE YOSHIDA

1        Q.      AND THERE CAME A TIME WHEN THAT

2  STOPPED?

3        A.      YES.

4        Q.      WAS THAT WHEN MR. MATTHEWS AND

5  OTHER STAFF OF INTERUSH WERE ARRESTED?

6        A.      I DON'T THINK SO.

7        Q.      DID IT HAPPEN -- DID THAT STOP

8  AFTER THAT?

9        A.      PEOPLE -- SORRY, CAN YOU SAY YOUR

10  QUESTION AGAIN?

11        Q.      CERTAINLY.  YOU REMEMBER THERE WAS

12  A TIME -- I BELIEVE YOU WERE A DIRECTOR THEN ----

13        A.      YES.

14        Q.      ---- OF INTERUSH?

15        A.      YES, HOLDINGS INC.

16        Q.      YES.  WHEN INTERUSH WAS RAIDED BY

17  THE HONG KONG POLICE?

18        A.      YES.

19        Q.      WERE YOU THERE WHEN THE OFFICES

20  WERE RAIDED?

21        A.      DO YOU MEAN AT THE OFFICE?

22        Q.      YES.

23        A.      NO.

24        Q.      WHERE WERE YOU THEN?

25        A.      I CANNOT REMEMBER.

129

RYUNOSUKE YOSHIDA

1     Q.     DO YOU REMEMBER ROUGHLY WHEN THAT

2   HAPPENED?

3     A.     I RECALL THERE WAS AN INVESTIGATION

4   THAT STARTED IN LATE 2013 AND THEN THERE WAS AN

5   OFFICIAL ARREST LATER IN THE YEAR, WHICH WAS 2015

6   I BELIEVE.  I BELIEVE IT IS IN MY DECLARATION.

7   MAY I CHECK?

8     Q.     YOU CAN, YES.  I CAN IMAGINE IT WAS

9   PRETTY TRAUMATIC, YOU WERE A DIRECTOR OF A COMPANY

10  THAT GOT RAIDED? (PAUSE)

11    A.     MAYBE IT IS NOT HERE.  NO, IT IS

12  HERE.  YES, LATE 2013 IS WHEN THE OFFICES WERE

13  RAIDED.

14    Q.     AND YOU ARE A DIRECTOR -- THAT IS

15  PARAGRAPH 19 OF YOUR DECLARATION YOU ARE REFERRING

16  TO?

17    A.     YES.  I AM LOOKING AT PARAGRAPH 19.

18    Q.     AND THE POLICE SEIZED THE COMPUTER

19  FROM IT AND BOOKS AND RECORDS?

20    A.     I BELIEVE SO.  I WAS NOT THERE SO

21  I CANNOT CONFIRM.

22    Q.     YOU BELIEVE SO?

23    A.     YES.

24    Q.     YOU BELIEVE SO.  WERE YOU TOLD THAT

25  THAT IS WHAT HAPPENED?

RYUNOSUKE YOSHIDA

1          A.     I WAS TOLD THAT IS WHAT HAPPENED.

2          Q.     DID THE POLICE ALSO THEN OBTAIN A

3    LIST OF AFFILIATES?

4               MR. MORRIS:  OBJECTION TO THE FORM

5    OF THE QUESTION.

6          A.     I THINK THEY DID.

7    BY MR. MCDONALD:

8          Q.     DID THEY RETURN THEM AT SOME POINT?

9    DID THE POLICE EVER RETURN THE COMPUTER EQUIPMENT

10   BACK TO ASCENTRA?

11         A.     I THINK THEY DID.  I CANNOT BE

12   ACCURATE, BUT I THINK THEY DID.

13         Q.     WAS THE INFORMATION CONCERNING WHO

14   THE AFFILIATES AND PRC WERE STILL CONTAINED ON

15   THAT EQUIPMENT WHEN IT WAS RETURNED?

16         A.     I DID NOT CHECK, SO I DON'T KNOW.

17         Q.     YOU DON'T KNOW.

18         A.     I DON'T KNOW.

19         Q.     YOU SAID ALSO HEC WAS INVOLVED WITH

20   COMPENSATING AFFILIATES.  WAS HEC AT ALL INVOLVED

21   WITH COMPENSATING AFFILIATES IN THE PRC?

22              MR. MORRIS:  OBJECTION TO THE FORM

23   OF THE QUESTION.

24         A.     NO.

25   BY MR. MCDONALD:

131

RYUNOSUKE YOSHIDA

1        Q.      EVER?

2        A.      I DON'T THINK SO.

3        Q.      AFTER MARTY'S ARREST IN 2013, DID

4    INDIVIDUALS FROM THE PRC CONTINUE TO COME TO HONG

5    KONG TO REGISTER TO BECOME AFFILIATES OF INTERUSH

6    OR ASCENTRA?

7        A.      THEY MAY HAVE CAME, BUT I THINK WE

8    WERE NOT ALLOWING THEM TO REGISTER.

9        Q.      WHY WAS THAT?

10       A.      BECAUSE WE WERE UNDER

11   INVESTIGATION.

12       Q.      AS A RESULT OF THAT INVESTIGATION

13   AND PROSECUTION, DID THE BOARD OF DIRECTORS OF

14   ASCENTRA DECIDE TO CHANGE THE NATURE OF THEIR

15   BUSINESS AS IT RELATED TO THE PRC?

16       A.      CAN YOU CLARIFY YOUR QUESTION?  CAN

17   YOU REPHRASE IT?

18       Q.      SO AFFILIATES COULD NO LONGER COME

19   INTO HONG KONG TO REGISTER.  DID ASCENTRA DECIDE

20   TO COME UP WITH A NEW BUSINESS MODEL WHICH WOULD

21   STILL ENABLE AFFILIATES TO PARTICIPATE IN THE

22   COMPANY?

23       A.      IT WAS NOT -- THE NEW BUSINESS

24   MODEL WAS NOT AFFILIATES BUT AGENTS.  SO I WANT TO

25   CLARIFY THAT POINT.  SO CAN YOU SAY YOUR QUESTION

                              132

RYUNOSUKE YOSHIDA

1    AGAIN?

2              Q.      THAT IS AN EXCELLENT POINT.  SO WAS

3    -- HOW ABOUT WE START WITH THAT.  FOLLOWING THE

4    ARREST AND THE INTERRUPTION OF THE BUSINESS AND

5    THE ABILITY TO RECRUIT AFFILIATES, WHAT DID

6    ASCENTRA'S BOARD OF DIRECTORS DECIDE WITH

7    RESPECT THE FUTURE OF THE COMPANY?

8                    MR. MORRIS:  OBJECTION TO THE FORM

9    OF THE QUESTION.

10             A.      THE BOARD OF ASCENTRA DECIDED THAT

11   IT REQUIRED A TOTALLY NEW SEPARATE COMPANY TO BE

12   ESTABLISHED WITH A NEW BUSINESS MODEL.

13   BY MR. MCDONALD:

14             Q.      IN ORDER TO CARRY ON THE ASCENTRA

15   BUSINESS?

16             A.      NO, BECAUSE IT WAS NOT ASCENTRA

17   BUSINESS.

18             Q.      I DON'T UNDERSTAND.  SO DID

19   ASCENTRA DECIDE TO DISSOLVE AT THAT POINT?

20             A.      ASCENTRA DECIDED TO CLOSE DOWN ITS

21   INTERUSH LIMITED BUSINESS.

22             Q.      AND CREATE A SEPARATE BUSINESS?

23                    MR. MORRIS:  OBJECTION TO THE FORM

24   OF THE QUESTION.

25             A.      CAN YOU SAY THAT AGAIN?

133

RYUNOSUKE YOSHIDA

```
 1   BY MR. MCDONALD:

 2        Q.     ASCENTRA DECIDED TO CLOSE DOWN ITS

 3   INTERUSH BUSINESS AND THEN YOU SAID ----

 4        A.     INTERUSH LIMITED BUSINESS IN HONG

 5   KONG.

 6        Q.     IN HONG KONG?

 7        A.     YES.

 8        Q.     AND DETERMINE TO DO WHAT?

 9        A.     TO DETERMINE TO SET UP A TOTALLY

10   SEPARATE INDEPENDENT COMPANY WITH A NEW BUSINESS

11   MODEL.

12        Q.     AND BY NEW BUSINESS MODEL WHAT DO

13   YOU MEAN?

14        A.     A BUSINESS MODEL THAT IS NOT

15   MULTILEVEL MARKETING, BECAUSE MULTILEVEL MARKETING

16   IS ILLEGAL IN THE PRC.  SO IT WAS A DIFFERENT

17   MODEL THAT WAS NOT MULTILEVEL MARKETING.

18        Q.     SO HOW WAS THE BUSINESS MODEL YOU

19   WERE DISCUSSING DIFFERENT THAN MULTILEVEL

20   MARKETING?

21        A.     I AM JUST DOUBLE-CHECKING, BUT YOU

22   ARE REFERRING TO SPGK?

23        Q.     I WILL GET THERE, BUT YES.

24        A.     CAN YOU REPHRASE YOUR QUESTION?

25        Q.     CERTAINLY.  THE ASCENTRA BOARD HAS
```

134

RYUNOSUKE YOSHIDA

1   MET, THEY HAVE DETERMINED TO SHUT DOWN

2   INTERNATIONAL LIMITED BUSINESS IN CHINA AND HONG

3   KONG ----

4          A.     IN HONG KONG.

5          Q.     ---- AND HAS DETERMINED THAT A NEW

6   BUSINESS MODEL WAS NEEDED?

7          A.     YES.

8          Q.     I AM ASKING YOU WHAT IS THE

9   DIFFERENCE IN THE NEW BUSINESS MODEL THAT THE

10  ASCENTRA BOARD CONSIDERED, HOW THAT IS DIFFERENT

11  THAN THE PRIOR MOM BUSINESS MODEL?

12         A.     SO, THE NEW BUSINESS MODEL WAS A

13  ONE-LEVEL REFERRALS BUSINESS MODEL.  SO YOU COULD

14  NOT RECEIVE MULTILEVEL COMMISSIONS.  IT WAS ONE

15  REFERRAL.

16         Q.     CAN YOU PLEASE ELABORATE?  I DON'T

17  UNDERSTAND WHAT YOU MEAN BY ONE REFERRAL.

18         A.     SO, FOR EXAMPLE, I REFER THE

19  PRODUCT OF SPGK OR THE NEW BUSINESS MODEL'S

20  PRODUCT TO A PERSON CALLED B AND THE PERSON B

21  BOUGHT IT, THEN I GET A REFERRAL FEE.  THAT IS ONE

22  LEVEL.

23         Q.     AND IF B THEN REFERS IT TO SOMEBODY

24  ELSE, DO YOU GET COMPENSATED BASED ON THAT

25  REFERRAL?

135

RYUNOSUKE YOSHIDA

1        A.      DO YOU MEAN ME OR DO YOU MEAN A?

2   I DON'T GET COMPENSATED.

3        Q.      YOU STILL GET A COMMISSION OR SOME

4   COMPENSATION FOR REFERRALS TO PERSONS TO BUY

5   PRODUCT?

6        A.      CAN YOU REPHRASE YOUR QUESTION?

7        Q.      SO THE INITIAL AGENT -- WE WILL

8   CALLED THEM AGENTS, NOT AFFILIATES.  NOW WE HAVE

9   GOT RID OF THE AFFILIATE NAME AND WE ARE NOW

10  CALLING THEM AGENTS.

11       A.      YES.

12       Q.      HOW DOES AN AGENT BECOME AN AGENT?

13       A.      AN AGENT BECOMES AN AGENT BY

14  REGISTERING AS AN AGENT WITH THE SPGK WEBSITE.

15       Q.      SO WE HAVE GONE WITH PHYSICALLY

16  REGISTERING IN HONG KONG TO DOING IT NOW ONLINE?

17       A.      I THINK IT IS A TOTALLY NEW

18  BUSINESS MODEL, SO I DON'T WANT TO DO THAT

19  COMPARISON, BUT I BELIEVE THAT THE AGENTS ACCESS

20  THE SPGK WEBSITE AND REGISTER.

21       Q.      WHICH COMPANY CREATED THE SPGK

22  WEBSITE?

23               MR. MORRIS:  OBJECTION TO THE FORM

24  OF THE QUESTION.

25       A.      WHICH COMPANY CREATED THE WEBSITE?

136

RYUNOSUKE YOSHIDA

```
 1   BY MR. MCDONALD:

 2        Q.     MMM-HMM.

 3        A.     CAN YOU DEFINE CREATED?

 4        Q.     DID SPGK HAVE AN IT DEPARTMENT?

 5        A.     NO.

 6        Q.     DID SPGK HAVE ENGINEERS?

 7        A.     NO.

 8        Q.     DID SPGK HAVE THE COMPUTER SYSTEMS

 9   TO MAINTAIN A WEBSITE?

10        A.     NO.

11        Q.     DID SPGK HAVE THE ABILITY TO

12   PROCESS ORDERS ON ITS ----

13             MR. MORRIS:  OBJECTION TO THE FORM

14   OF THE QUESTION.

15   BY MR. MCDONALD:

16        Q.     STRIKE THAT.  DID SPGK HAVE THE

17   ABILITY TO PROCESS AN ONLINE ORDER FOR PRODUCT?

18             MR. MORRIS:  OBJECTION TO THE FORM

19   OF THE QUESTION.

20        A.     WHETHER SPGK HAD THE ABILITY TO

21   PROCESS PAYMENTS?

22   BY MR. MCDONALD:

23        Q.     ORDERS.

24        A.     ORDERS.  IT DID.  SORRY, CAN WE GO

25   BACK TO THIS QUESTION?  CAN YOU REPHRASE THIS
```

137

```
1   QUESTION AGAIN?
2          Q.    WE CAN STRIKE THAT QUESTION.  SO
3   SPGK DID NOT HAVE AN IT DEPARTMENT?  IT DID NOT
4   HAVE THE COMPUTER SYSTEMS, IS THAT CORRECT?
5          A.    IT WAS OUTSOURCED.
6          Q.    OUTSOURCED?
7          A.    YES.
8          Q.    DO WHOM DID SPGK OUTSOURCE THESE
9   FUNCTIONS?
10         A.    TO EXIGO, TO PLANET PAYMENT AND
11  OTHER COMPANIES.
12               MR. MCDONALD:  JOHN, IS IT OKAY IF
13  WE BREAK AT 1.00 FOR YOU FOR LUNCH?
14               MR. MORRIS:  YES, THAT WOULD BE
15  PERFECT.
16               MR. MCDONALD:  OKAY.
17  BY MR. MCDONALD:
18         Q.    WE WERE TALKING ABOUT ----
19         A.    SORRY, CAN I CORRECT WHAT I SAID?
20         Q.    PLEASE.
21         A.    THE SUBSIDIARIES OF ASCENTRA
22  IS ALSO ONE OF THE (UNCLEAR).
23         Q.    WHICH ONE?
24         A.    RADIAL IT AND ALSO IHEALTHSCIENCE.
25         Q.    WHAT WAS RADIAL IT'S ROLE?
```

138

1          A.      RADIAL IT HAD -- THERE WAS AN

2    AGREEMENT SIGNED BETWEEN SPGK AND RADIAL IT AND

3    ALSO IHEALTHSCIENCE.  RADIAL IT'S ROLE WAS

4    LICENSING AND PROFESSIONAL SERVICES.  THERE COULD

5    HAVE BEEN ONE MORE.  SORRY, I CANNOT REMEMBER ON

6    THE TOP OF MY HEAD RIGHT NOW.

7          Q.      WHAT WAS BEING LICENSED BY

8    RADIAL IT?

9          A.      THE PRODUCTS.  THE IT PRODUCTS.

10         Q.      DO YOU RECALL THE PRICING THAT WAS

11   CONTAINED IN THAT AGREEMENT?

12         A.      I DON'T REMEMBER ON THE TOP OF MY

13   HEAD NOW.

14         Q.      WOULD COST PLUS 10% RING A BELL?

15         A.      FOR THE LICENSING AGREEMENT?

16         Q.      MMM-HMM, YES.

17         A.      CAN I -- IS THERE AN EXHIBIT HERE?

18   CAN I CHECK?

19         Q.      YOU CAN CHECK.  (PAUSE)

20   MR. YOSHIDA, I MUST CORRECT MYSELF.  IT WAS 10% OF

21   REVENUE THAT WAS OBTAINED, NOT 10% ----

22         A.      THAT IS WHAT I THOUGHT.

23         Q.      IT WAS 10% OF THE REVENUE?

24         A.      YES.

25         Q.      DO YOU RECALL THE PRICING FOR ANY

139

1   OF THE OTHER AGREEMENTS; FOR EXAMPLE,

2   IHEALTHSCIENCE?

3           A.      I DON'T THINK IT WAS MENTIONED IN

4   THE AGREEMENT BUT I CAN DOUBLE-CHECK.

5           Q.      PLEASE.

6           A.      MAY I DOUBLE-CHECK?

7           Q.      YOU MAY.  (PAUSE)

8           A.      I THINK BASED ON THIS AGREEMENT IT

9   SAYS MARKET PRICE DETERMINED BY PROVIDER IN GOOD

10  FAITH IN THE ORDINARY COURSE OF PROVIDER'S

11  BUSINESS.

12          Q.      WHAT WOULD THE MARKET PRICE BE?

13          A.      I BELIEVE IT WAS ACCOUNTED AS COST

14  PLUS SOMETHING, MARGIN PERCENT.

15          Q.      WHO SET THAT PRICING?

16          A.      I WASN'T INVOLVED IN THE PRICING,

17  SO I DON'T KNOW.

18          Q.      YOU WERE THE SOLE DIRECTOR OF SPGK,

19  WERE YOU NOT?

20          A.      I WAS THE SOLE DIRECTOR OF SPGK BUT

21  I THINK THIS IS FOR ASCENTRA TO DECIDE, HOW MUCH

22  MARGIN THEY ARE GOING TO PUT AND WHETHER I AGREE

23  OR NOT.

24          Q.      DID YOU AGREE TO A PERCENTAGE FOR

25  MARGIN?

140

RYUNOSUKE YOSHIDA

1          A.      I FOLLOWED WHAT WAS BEING DONE IN

2    THE PAST.

3          Q.      YOU FOLLOWED WHATEVER WAS THE

4    COURSE OF CONDUCT WITH ASCENTRA ON PRICING?

5          A.      I SAW -- I DID NOT REALLY --

6    I DIDN'T CHANGE OF THE PRICING IN PARTICULAR.

7          Q.      I JUST WANT TO GO THROUGH -- BEFORE

8    WE REALLY GET INTO SPGK AND ITS RELATIONSHIPS,

9    I JUST WANT TO CLARIFY A FEW THINGS ALONG THE WAY

10   HERE JUST SO WE UNDERSTAND THE SPGK ENTITIES

11   BECAUSE THERE ARE OBVIOUSLY MANY OF THEM.  WE HAVE

12   SPOKEN ABOUT SPGK INC, WHICH IS THE CAYMAN ISLANDS

13   ENTITY, CORRECT?

14         A.      YES.  SHANG PENG GAO KE INC. SEZC

15   IS THE CAYMAN ISLANDS.

16         Q.      I SEE, SEZC.

17         A.      YES.

18         Q.      THAT IS SPECIAL ECONOMIC ZONE

19   COMPANY ----

20         A.      YES.

21         Q.      SPGK LLC, DO YOU REMEMBER THAT

22   ENTITY?

23         A.      YES.

24         Q.      AND HOW DID THAT FIT INTO THE

25   CORPORATE STRUCTURE?

141

RYUNOSUKE YOSHIDA

1          A.     IT WAS OWNED -- I BELIEVE IT WAS

2     OWNED BY SHANG PENG GAO KE INC. SEZC.

3          Q.     A SUBSIDIARY?  A DIRECT SUBSIDIARY?

4          A.     YES.

5          Q.     OKAY.  THE PTE SINGAPORE ENTITY WAS

6     A DIRECT SUBSIDIARY AS WELL OF THE CAYMAN ENTITY?

7          A.     YES.

8          Q.     WAS THERE A SEPARATE SPGK CORPORATE

9     ENTITY TO BE A REPRESENTATIVE OFFICE IN CHINA?

10         A.     ARE YOU TALKING ABOUT -- WHICH

11    PERIOD ARE YOU TALKING ABOUT?

12         Q.     2016 TO 2020.

13         A.     2016 TO 2020.  I DON'T KNOW MUCH

14    PRIOR TO 2018, PRIOR TO ME BUYING THE SHARES OF

15    THE COMPANY, SO I DON'T KNOW.  THERE COULD HAVE

16    BEEN, BUT AT LEAST FROM MY KNOWLEDGE AFTER 2018 I

17    DON'T THINK THERE WAS ANY ENTITY.

18         Q.     OKAY.  AND DO YOU KNOW AN ENTITY

19    CALLED SPGK INTERNATIONAL?

20         A.     YES.

21         Q.     WHAT IS SPGK INTERNATIONAL?

22         A.     IT WAS A PAYMENT SERVICE PROVIDER

23    FOR SPGK INC. SEZC.

24         Q.     A PAYMENT SERVICE PROVIDER?

25         A.     YES.

142

1          Q.    AND WHAT WAS ITS ROLE IN THE SPGK

2   GROUP AS YOU CALL IT?

3          A.    TO PAY THESE COMMISSIONS AND

4   SERVICE FEES TO THE AGENTS.  SO SPGK INTERNATIONAL

5   FACILITATED PAYMENTS TO THE AGENTS.

6          Q.    TO BE CLEAR, HEC'S ROLE AT THIS

7   POINT IN TIME 2018 WAS FOCUSED SOLELY ON JAPAN AND

8   SINGAPORE AND ELSEWHERE?

9          A.    THINGS KEPT ON CHANGING DURING THAT

10  PERIOD SO I CANNOT BE EXACT, BUT AT LEAST THEY HAD

11  A STABLE BUSINESS IN JAPAN AND TAIWAN.

12         Q.    IN TAIWAN, HEC ALSO HAD A SUPPORT

13  SERVICE FACILITY; IS THAT CORRECT?

14         A.    CAN YOU DEFINE SUPPORT SERVICE

15  FACILITY?

16         Q.    I THINK IT WAS REFERRED TO -- THE

17  CALL CENTRE?

18         A.    YES.

19         Q.    AND DO YOU KNOW SOMEONE NAMED

20  JESSIE TSAI?

21         A.    YES.

22         Q.    THANK YOU FOR CORRECTING ME.

23  JESSIE TSAI, DO YOU KNOW JESSIE TSAI?

24         A.    YES.

25         Q.    WHAT WAS JESSIE'S ROLE WITH HEC?

143

RYUNOSUKE YOSHIDA

1          A.     I BELIEVE SHE WAS AN EMPLOYEE

2    THERE.

3          Q.     DO YOU KNOW WHAT HER ROLE WAS?

4          A.     I CANNOT REMEMBER.

5          Q.     WE HAVE DISCUSSED THE FACT THAT

6    SPGK DID NOT HAVE AN IT DEPARTMENT; IS THAT

7    CORRECT?

8          A.     IT WAS OUTSOURCED.

9          Q.     OUTSOURCED.  DID SPGK HAVE A HUMAN

10   RELATIONS DEPARTMENT -- HUMAN RESOURCES, I SHOULD

11   SAY?

12         A.     NO.

13         Q.     DID SPGK LEASE OR OWN ANY OFFICE

14   SPACE?

15         A.     IT DID -- ARE YOU TALKING ABOUT

16   SPGK INC. SEZC?  IT DID, YES.

17         Q.     WHERE?

18         A.     IN CAYMAN ISLANDS.

19         Q.     IN CAYMAN?

20         A.     YES, AND ALSO IN SINGAPORE FOR A

21   PERIOD OF TIME.

22         Q.     WHAT KIND OF OFFICE WAS IT IN

23   SINGAPORE, LIKE A LARGE OFFICE BUILDING?

24         A.     IT WAS A WEWORK OFFICE.

25         Q.     A WEWORK OFFICE?

144

RYUNOSUKE YOSHIDA

```
1          A.    YES.

2             Q.     DID SPGK HAVE ITS OWN PAYROLL

3    DEPARTMENT?

4             A.     IT OUTSOURCED TO A COMPANY OUTSIDE,

5    I BELIEVE.  I CANNOT BE EXACT, BUT I THINK IT IS

6    BAKER TILLY.

7             Q.     BAKER TILLY?

8             A.     YES, I BELIEVE SO.  I MIGHT BE

9    WRONG.

10            Q.     WHO HANDLED THE -- DO YOU KNOW WHO

11   OR WHICH ENTITY HANDLED THE ACCOUNTING SERVICES

12   FOR SPGK?

13            A.     CAN YOU DEFINE WHICH ENTITY?

14            Q.     WELL, LET US START WITH DID SPGK

15   HAVE ITS OWN ACCOUNTING DEPARTMENT?

16            A.     IT WAS OUTSOURCED.

17            Q.     TO WHOM?

18            A.     IT WAS A PART OF THE PROFESSIONAL

19   SERVICES AGREEMENT.  I BELIEVE, BASED ON THE

20   AGREEMENT, IT WAS RADIAL IT.

21            Q.     RADIAL IT.

22            A.     BUT WE DID ALSO HIRE BAKER TILLY.

23   WE ALSO WERE IN COMMUNICATIONS WITH EY AS WELL.

24            Q.    LET US START WITH BAKER TILLY.  DO

25   YOU RECALL WHEN BAKER TILLY WAS ENGAGED?
```

145

```
 1              A.     WHEN?

 2              Q.     YES.  WHAT YEAR?

 3              A.     SORRY, I CANNOT REMEMBER.

 4              Q.     DO YOU REMEMBER WHO WAS RESPONSIBLE

 5    FOR PAYING THEIR FEES?

 6              A.     SPGK PTE LIMITED HAS BEEN PAYING

 7    THE FEES, I BELIEVE.  I BELIEVE SPGK PTE LIMITED

 8    HAS BEEN PAYING THE FEES.

 9              Q.     DIRECTLY?

10              A.     YES.

11              Q.     WHAT ABOUT FOR ERNST & YOUNG'S?

12              A.     SPGK PTE LIMITED PAID FOR IT, IF I

13    REMEMBER CORRECTLY, YES.

14              Q.     DIRECTLY?

15              A.     I THINK SO, YES.

16              Q.     OKAY.  WHAT ABOUT LAWYERS, DID SPGK

17    HAVE AN IN-HOUSE LEGAL DEPARTMENT?

18              A.     NO.

19              Q.     DID SPGK ENGAGE OUTSIDE COUNSEL?

20              A.     YES.

21              Q.     WHO DID SPGK ENGAGE?

22              A.     KING & WOOD MALLESONS.  ANOTHER

23    LITIGATION LAWYER IN CHINA.

24              Q.     DO YOU RECALL THE NAME?

25              A.     HAI YING.
```

146

RYUNOSUKE YOSHIDA

1          Q.      ANY OTHER LAW FIRMS ENGAGED BY

2    SPGK?

3          A.      SORRY, CAN YOU SPECIFY THE PERIOD

4    FOR THIS QUESTION?

5          Q.      SURE, AND I WILL SPECIFY THE

6    JURISDICTION.  DO YOU RECALL IF SPGK ENGAGED A LAW

7    FIRM IN THE CAYMAN ISLANDS?

8          A.      SPGK ENGAGED A LAW FIRM IN CAYMAN

9    ISLANDS, YES.

10         Q.      MORE THAN ONE LAW FIRM?

11         A.      SORRY?

12         Q.      HOW MANY LAW FIRMS DID SPGK ENGAGE

13   IN THE CAYMAN ISLANDS?

14         A.      FROM THE TOP OF MY HEAD I THINK

15   IT'S ONE.

16         Q.      WHICH ONE?

17         A.      HARNEYS.

18         Q.      HARNEYS.  HOW LONG HAS HARNEYS BEEN

19   ENGAGED BY SPGK?

20         A.      TWO AND A HALF YEARS I BELIEVE.

21   I BELIEVE TWO AND A HALF YEARS.

22         Q.      SO THAT WOULD BE ROUGHLY SINCE THE

23   COMMENCEMENT OF THE LIQUIDATION PROCEEDINGS IN

24   CAYMAN FOR ASCENTRA?

25         A.      PRIOR TO THE COMMENCEMENT --

147

RYUNOSUKE YOSHIDA

1   SORRY ----

2          Q.    YOU ARE RIGHT, IT IS TWO YEAR, TWO

3   AND HALF YEARS.  IT WOULD BE BEFORE THE

4   COMMENCEMENT.

5          A.    EARLY 2021.

6          Q.    EARLY 2021?

7          A.    YES.

8          Q.    DO YOU RECALL WHAT ENTITY PAID

9   HARNEYS THEIR -- STRIKE THAT.  WAS HARNEYS PAID A

10  RETAINER IN EARLY 2020?

11         A.    CAN YOU DEFINE RETAINER?

12         Q.    AN ADVANCE PAYMENT FOR SERVICES.

13         A.    DEPOSIT?

14         Q.    YES.

15         A.    SORRY, I JUST DON'T KNOW THE

16  DIFFERENCE OF THE DEFINITION, SO I CANNOT BE

17  ACCURATE.

18         Q.    USING YOUR DEFINED TERM "A

19  DEPOSIT", WAS HARNEYS PAID A DEPOSIT?

20         A.    YES.

21         Q.    DO YOU RECALL WHICH ENTITY PAID

22  HARNEYS THE DEPOSIT?

23         A.    SHANG PENG GAO KE INC. SEZC.

24         Q.    THE CAYMAN PARENT PAID HARNEYS?

25         A.    WELL, THE ENGAGEMENT WAS SPGK

148

1    CAYMAN.

2           Q.    I AM JUST ASKING WHO ACTUALLY PAID

3    THE MONEY?

4           A.    OH!  FROM THE SPGK PTE LIMITED BANK

5    ACCOUNT.

6           Q.    OKAY.  DID SPGK ENGAGE ANY CAYMAN

7    COUNSEL PRIOR TO HARNEYS?  TO REFINE THAT A LITTLE

8    BIT, YOU WERE MADE DIRECTOR IN TO 2018?

9           A.    YES.

10          Q.    SO FOR THE PERIOD WHEN YOU WERE A

11   DIRECTOR, DID SPGK ENGAGE ANY OTHER LAW FIRMS IN

12   CAYMAN?

13          A.    NONE ADDITIONAL.  I DON'T KNOW WHAT

14   WAS ENGAGED PRIOR TO MY PURCHASE, BUT NONE

15   ADDITIONAL, EXCEPT FOR HARNEYS.

16          Q.    OKAY.  DID SPGK PREPARE FINANCIAL

17   STATEMENTS?

18          A.    SORRY, CAN I GO BACK TO THE EARLIER

19   QUESTION?

20          Q.    WHICH EARLIER QUESTION?

21          A.    ABOUT WHETHER ANY CAYMAN COUNSEL

22   WAS ENGAGED.

23          Q.    YES, PLEASE.

24          A.    SORRY, I JUST DON'T NO THE

25   DISTINCTION WHEN YOU SAY CAYMAN COUNSEL.  THAT IS

149

1  WHAT I AM STRUGGLING TRYING TO FIND OUT.  SO ----

2       Q.    LET US MAKE IT EASIER.  FOR

3  2018-2021, SO FAR THERE IS HAI YING, KWN AND

4  HARNEYS.

5       A.    YES, FOR THE GENERAL LEGAL, YES.

6       Q.    WERE THERE ANY OTHER FIRMS ENGAGED

7  BY SPGK DURING THIS PERIOD?

8       A.    SORRY, I DON'T REMEMBER EXACTLY,

9  BUT LET US SAY KATIE, WHO I BELIEVE YOU QUESTIONED

10  EARLIER.  DO WE COUNT THAT AS A LAWYER?  I DON'T

11  KNOW.  I DON'T KNOW THE DISTINCTION THERE.

12            MR. JOHNSTONE:  IT IS A LOADED

13  QUESTION.

14       A.    IT'S A LOADED QUESTION, BUT NICE.

15  I DON'T KNOW THE DISTINCTION THERE.

16            MR. JOHNSTONE:  THAT WAS RECENT.

17  BY MR. MCDONALD:

18       Q.    WE ARE JUST 2018-2021, PLEASE.

19       A.    I DON'T THINK SO.

20       Q.    OKAY, THAT IS FINE.  BACK TO THE

21  FINANCIAL STATEMENT QUESTION.  DID SPGK PREPARE

22  ITS OWN FINANCIAL STATEMENTS?

23            MR. MORRIS:  OBJECTION TO THE FORM

24  OF THE QUESTION.

25       A.    DID IT PREPARE ITS OWN FINANCE --

150

RYUNOSUKE YOSHIDA

1   WHAT DO YOU MEAN?

2   BY MR. MCDONALD:

3          Q.     FIRST OF ALL, DID SPGK HAVE

4   FINANCIAL STATEMENTS FOR THE PERIOD OF 2018-2021?

5          A.     I BELIEVE, YES, BUT UNAUDITED AND

6   NOT FINAL.

7          Q.     UNAUDITED AND NOT FINAL?

8          A.     YES.

9          Q.     THEY ARE STILL NOT FINAL?

10         A.     IT IS NOT FINAL, YES.

11         Q.     DOES SPGK PAY TAXES TO ANY

12  JURISDICTION?

13         A.     CLARIFICATION ON ENTITY?

14         Q.     SPGK INTERNATIONAL?

15         A.     IT WAS NOT CONTROLLED BY ME, SO

16  I PERSONALLY DON'T KNOW.

17         Q.     YOU DON'T KNOW, OKAY.

18         A.     I BELIEVE IT DID PAY IN THE US BUT

19  IT WAS -- I DON'T KNOW PERSONALLY.

20         Q.     AND IT FUNCTIONED TO PROCESS

21  PAYMENTS ONWARDS TO PTE?  IS THAT WHAT YOUR PRIOR

22  TESTIMONY WAS?

23         A.     YES.

24         Q.     OKAY.  WHAT ABOUT SPGK INC?

25         A.     NO.

151

RYUNOSUKE YOSHIDA

1          Q.     DID NOT PAY TAX?  DID IT FILE TAX

2    RETURNS ANYWHERE?

3          A.     NO, I DON'T THINK SO.

4          Q.     YOU ARE NOT AWARE OF ANY?

5          A.     I WAS NOT AWARE OF ANY.

6          Q.     OKAY.  SPGK PTE?

7          A.     SINGAPORE?

8          Q.     YES.

9          A.     YES.

10         Q.     DID THEY FILE TAX RETURNS IN

11   SINGAPORE?

12         A.     I TAXED -- IT PAID TAX.

13         Q.     IT PAID TAX TO THE SINGAPORE

14   GOVERNMENT?

15         A.     YES.

16         Q.     DID IT HAVE TO FILE A TAX RETURN IN

17   SINGAPORE?

18         A.     I'M NOT VERY, VERY FAMILIAR WITH

19   ACCOUNTING RELATED ASPECTS.  BUT IT DID PAY TAX.

20              MR. MORRIS:  HUGH, I AM GIVING YOU

21   A LOT OF LATITUDE HERE.  I AM NOT QUITE SURE I SEE

22   ANY CONNECTION BETWEEN THESE QUESTIONS AND I HOPE

23   THAT YOU ARE NOT USING THIS DEPOSITION TO FISH FOR

24   INFORMATION UNRELATED TO THE MATTERS PENDING

25   BEFORE THE COURT.

RYUNOSUKE YOSHIDA

1                    MR. MCDONALD:  OKAY, JOHN, THANK

2    YOU.

3    BY MR. MCDONALD:

4           Q.     SO THEY PAID TAXES?

5           A.     YES.

6           Q.     WERE THEY SALES TAXES?

7           A.     NO.

8           Q.     THE TAXES WERE BASED ON THE INCOME

9    OF PTE?

10          A.     PROFIT OF PTE?

11                  MR. MORRIS:  OBJECTION TO THE FORM

12   OF THE QUESTION.

13   BY MR. MCDONALD:

14          Q.     WAS SOME FORM EVER FILED WITH THE

15   SINGAPORE GOVERNMENT WITH REGARDS TO THE PROFITS

16   EARNED BY PTE?  I AM JUST TRYING TO -- I AM JUST

17   TRYING TO UNDERSTAND HOW YOU WOULD CALCULATE THIS

18   TAX AND PAY IT.  DO YOU KNOW HOW THAT IS DONE?

19          A.     SO SINGAPORE, THERE IS AN EXEMPTION

20   FOR FILING TAXES, PREPARING AUDITED REPORTS AND

21   FILING TAXES, IF IT IS UNDER A CERTAIN REVENUE AND

22   IT IS AN EXEMPTED COMPANY.

23          Q.     BUT YOU STILL HAVE TO PAY TAXES?

24          A.     YES.

25          Q.     WHAT ABOUT FOR SPGK LLC?

153

RYUNOSUKE YOSHIDA

1        A.     I BELIEVE IT IS DISSOLVED ALREADY,

2   SO I DON'T THINK.

3        Q.     PRIOR TO DISSOLUTION, DID SPGK LLC

4   FILE ANY TAX RETURNS?

5        A.     I WAS NOT FAMILIAR WITH THE TAX

6   FILING OF SPGK LLC.

7        Q.     DO YOU WANT TO TAKE A BREAK?  WE

8   ARE GOING TO TAKE A LUNCH BREAK.

9        A.     THANK YOU.

10           MR. MCDONALD:  JOHN, HOW MUCH TIME

11   DO YOU NEED FOR YOUR ----

12           MR. MORRIS:  I SHOULD BE CERTAINLY

13   GOOD TO GO, I GUESS, BY -- IT IS, WHAT, 1.05 YOUR

14   TIME?  CERTAINLY BY 1.45.  IF YOU WANTED TO TAKE

15   LONGER, THAT WILL BE FINE, BUT IF I COULD HAVE AT

16   LEAST 40 MINUTES THAT WOULD BE GOOD ENOUGH TO ME.

17           MR. MCDONALD:  WHY DON'T YOU JUST

18   PING EVERYBODY AND JUST LET US KNOW THAT YOU ARE

19   GOOD TO GO, AND WE CAN RECONVENE.

20           THE VIDEOGRAPHER:  WE ARE GOING OFF

21   THE RECORD.  THE TIME IS 1.06.

22      (A SHORT BREAK FROM 1.06 P.M. TO 1.54 P.M.)

23           THE VIDEOGRAPHER:  WE ARE BACK ON

24   THE RECORD.  THE TIME IS 1.54.

25   BY MR. MCDONALD:

154

RYUNOSUKE YOSHIDA

1         Q.    GOOD AFTERNOON, MR. YOSHIDA.

2         A.    GOOD AFTERNOON.

3         Q.    I KNOW WE CONCLUDED THE MORNING,

4 WELL, BEFORE THE BREAK FOR LUNCH, DISCUSSING TAX

5 AND FINANCES FOR SPGK.  I WOULD LIKE TO JUST GO

6 BACK FOR A MINUTE AND DISCUSS ASCENTRA'S

7 FINANCIALS, IF THAT IS OKAY?

8         A.    SURE.

9         Q.    AGAIN, YOU WERE A DIRECTOR OF

10 ASCENTRA FROM 2013-2021, CORRECT?

11        A.    YES.

12        Q.    ARE YOU STILL A DIRECTOR OF

13 ASCENTRA?

14        A.    ARE YOU ----

15        Q.    ARE YOU STILL A DIRECTOR OF

16 ASCENTRA?

17        A.    WHICH ENTITY ARE YOU TALKING ABOUT?

18        Q.    ASCENTRA HOLDINGS?

19        A.    INC.?

20        Q.    YES.

21        A.    I BELIEVE THAT I AM NOT BECAUSE OF

22 THE LIQUIDATOR, BUT I DON'T KNOW THE CLARIFICATION

23 THERE.

24        Q.    OKAY.  AS A MEMBER OF THE BOARD OF

25 DIRECTORS, DID YOU REVIEW THE FINANCIAL RESULTS

155

RYUNOSUKE YOSHIDA

1    FOR ASCENTRA ON A REGULAR BASIS?

2                    MR. MORRIS:   OBJECTION TO THE FORM

3    OF THE QUESTION.

4            A.      CAN YOU DEFINE REGULAR?

5    BY MR. MCDONALD:

6            Q.      MONTHLY, WEEKLY.   IN EFFECT, HOW

7    DID YOU AS A DIRECTOR KEEP A WATCH OVER THE

8    FINANCIAL SITUATION OF ASCENTRA DURING YOUR TERM

9    AS A DIRECTOR?

10           A.      I WAS -- IT ALSO DEPENDS ON THE

11   PERIOD.

12           Q.      WELL, PLEASE, IF IT MAKES IT EASIER

13   FOR YOU TO BREAK IT DOWN BY PERIOD TO ANSWER THE

14   QUESTION, PLEASE DO SO.

15           A.      I THINK IN THE EARLIER PERIODS,

16   FROM I BELIEVE 2013 TO 2017-ISH, THERE WAS A

17   RELATIVELY PERIODICAL MEETING WHERE WE SAW

18   HIGHLIGHTS OF THE FINANCIAL FIGURES.   IN THE LATER

19   YEARS, IT WAS -- I DID NOT SEE ALL THE DETAILED

20   FIGURES, BUT SOMETIMES THEY CAME SET AND THEN

21   I WOULD RECEIVE IT AND REVIEW IT.

22           Q.      BY PERIODICAL, DO YOU MEAN EVERY

23   MONTH, EVERY QUARTER?   JUST GIVE ME A SENSE OF

24   WHAT YOU MEAN BY PERIODICAL?

25           A.      EVERY QUARTER IN THIS SENSE, HAVING

156

RYUNOSUKE YOSHIDA

1   REGARDS TO THE PERIODS FROM 2013 TO 2000 AND --

2   I THINK IT IS SOMEWHERE BETWEEN 2013-'17.

3          Q.    DURING THAT PERIOD, DO YOU KNOW WHO

4   OR WHAT ENTITY WAS PREPARING THE FINANCIAL RESULTS

5   FOR YOUR REVIEW?

6          A.    THIS IS TALKING ABOUT ----

7                MR. MORRIS:  OBJECTION TO THE FORM

8   OF THE QUESTION.  I WILL LEAVE IT AT THAT.

9          A.    SORRY, CAN YOU REPEAT YOUR

10  QUESTION?

11  BY MR. MCDONALD:

12         Q.    SURE.  YOU ARE TALKING ABOUT THE

13  PERIOD OF 2013-2017, YOU REVIEWED ON AT LEAST A

14  QUARTERLY BASIS THE FINANCIAL RESULTS OF ASCENTRA?

15         A.    APPROXIMATELY, I THINK SO.

16         Q.    OKAY.  DURING THAT PERIOD I WAS

17  JUST WONDERING -- IT BE MORE THAN ONE PERSON OR

18  ENTITY -- WHO WAS PREPARING THESE FINANCIAL

19  REPORTS FOR YOU TO REVIEW BETWEEN 2013 AND 2017?

20         A.    IT WAS DIFFERENT DEPENDING ON THE

21  PERIOD.  SO THERE WAS I THINK JEFF BOSHEARS, WHO

22  WAS THE CFO IN THE EARLY DAYS.  THEN I BELIEVE

23  THERE WAS ALSO, IF I AM CORRECT, STEVE LEE ----

24         Q.    SORRY?

25         A.    STEVE LEE, WHO WAS ALSO PREPARING

157

RYUNOSUKE YOSHIDA

1    THE FINANCIALS, AND ALSO TED SANDERS WAS ALSO

2    PREPARING THE FINANCIALS.

3         Q.    WHEN YOU WOULD REVIEW THE

4    FINANCIALS PERIODICALLY, WAS THAT DURING A BOARD

5    MEETING?

6         A.    MANAGEMENT MEETING.

7         Q.    THERE WAS A MANAGEMENT MEETING?

8         A.    YES.

9         Q.    OKAY?

10         A.    PERIODICAL QUARTERLY MANAGEMENT

11    MEETING.

12         Q.    DID THAT INVOLVE BOTH MEMBERS OF

13    THE BOARD AND MEMBERS OF MANAGEMENT?

14         A.    ARE YOU TALKING ABOUT THE

15    MANAGEMENT MEETING?

16         Q.    YES.

17         A.    BOARD AND MANAGEMENT, YES.

18         Q.    WERE ANY MAJOR SHAREHOLDERS PRESENT

19    DURING THESE MEETINGS?

20              MR. MORRIS:  OBJECTION TO THE FORM

21    OF THE QUESTION.

22         A.    YES, I THINK SO.  YES, I THINK

23    THERE WERE.

24    BY MR. MCDONALD:

25         Q.    DID ASCENTRA FILE ANY TAX RETURNS

158

1   IN ANY JURISDICTIONS?

2               MR. MORRIS:  OBJECTION TO THE FORM

3   OF THE QUESTION.

4   BY MR. MCDONALD:

5        Q.    ASCENTRA HOLDINGS?

6        A.    ASCENTRA HOLDINGS INC?

7        Q.    YES, SIR.

8               MR. MORRIS:  OBJECTION TO THE FORM

9   OF THE QUESTION.

10       A.    I DON'T THINK SO, BUT I AM NOT

11  SURE.

12  BY MR. MCDONALD:

13       Q.    DID ASCENTRA HOLDINGS EVER FILE A

14  TAX RETURN IN THE UNITED STATES?

15       A.    I WAS NOT INVOLVED IN THE TAX

16  FILING AS MUCH, SO I CANNOT BE SURE.  I DON'T

17  KNOW.

18       Q.    WE DISCUSSED EARLIER THE CHANGE IN

19  THE ASCENTRA BUSINESS MODEL, RIGHT, AND YOU WERE

20  SWITCHING FROM WHAT WAS THE MLM, WHAT YOU CALL THE

21  MLM STRUCTURE, TO A NEW STRUCTURE WHERE YOU WERE

22  TRANSITIONING FROM AFFILIATES TO AGENTS; IS THAT

23  CORRECT?

24       A.    I DON'T KNOW IF IT IS A CHANGE OF

25  BUSINESS MODEL BECAUSE IT IS TWO DIFFERENT THINGS.

159

RYUNOSUKE YOSHIDA

```
 1              Q.     TWO DIFFERENT MODELS?

 2              A.     TWO DIFFERENT MODELS.

 3              Q.     OKAY.  AND YOU REFER TO THEM AS

 4    AGENTS?

 5              A.     YES.

 6              Q.     OKAY.

 7              A.     SORRY, CAN YOU DEFINE THE QUESTION?

 8              Q.     I WILL IN A SECOND, RIGHT NOW.

 9    I WAS JUST TRYING TO MAKE SURE WE WERE ON THE PAGE

10    AS TO WHAT YOU HAD BEEN TALKING ABOUT PREVIOUSLY.

11    HOW WERE ----

12              A.     CAN ASK YOU A QUESTION, SORRY?

13              Q.     YOU CAN ASK ME A QUESTION, OF

14    COURSE.

15              A.     WHEN YOU ASKED ME THEY WERE CALLED

16    AGENTS, WHAT WERE YOU REFERRING TO?

17              Q.     YOU HAD SAID THAT WHEN SPGK HAD ITS

18    BUSINESS MODEL, INDIVIDUALS THEY WERE WORKING WITH

19    WERE CALLED AGENTS?

20              A.     YES.

21              Q.     THANK YOU FOR CLARIFYING THAT.

22    I APPRECIATE THAT.  HOW DID SPGK GO ABOUT

23    IDENTIFYING WHO WOULD BE PROSPECTIVE AGENTS?

24                     MR. MORRIS:  OBJECTION TO THE FORM

25    OF THE QUESTION.
```

160

RYUNOSUKE YOSHIDA

```
 1              A.    CAN YOU CLARIFY YOUR QUESTION?
 2   BY MR. MCDONALD:
 3              Q.    SO IN YOUR DECLARATION YOU HAVE A
 4   PRESENTATION THAT YOU SAY MARTY MATTHEWS GAVE?
 5              A.    ABOUT?
 6              Q.    ABOUT THE TRANSITION TO SPGK.
 7              A.    YES.
 8              Q.    AND ----
 9              A.    I BELIEVE IT WAS MARTY MATTHEWS,
10   YES.
11              Q.    FIRST OF ALL, IF YOU TURN TO WHAT
12   IS YOUR EXHIBIT 3 ----
13              A.    YES.
14              Q.    ---- DO YOU REMEMBER WHERE YOU GOT
15   THIS FROM?
16              A.    I THINK IT WAS IN MY E-MAIL.
17              Q.    YOU HAD IT IN YOUR E-MAIL?
18              A.    YES.
19              Q.    OKAY.  DID YOU WORK ON THIS
20   PRESENTATION YOURSELF?
21              A.    NO.
22              Q.    DID YOU EDIT IT AT ALL?
23              A.    NO.
24              Q.    WERE YOU PRESENT WHEN THIS
25   PRESENTATION WAS GIVEN?
```

161

RYUNOSUKE YOSHIDA

```
 1              A.     I THINK SO.

 2              Q.     DO YOU KNOW WHERE THIS PRESENTATION

 3     WAS GIVEN?

 4              A.     I BELIEVE IT WAS IN KOREA, IN JEJU

 5     ISLAND.

 6              Q.     WAS IT DONE -- WERE THERE -- STRIKE

 7     THAT.  WERE PEOPLE INVITED TO ATTEND IN PERSON IN

 8     SOUTH KOREA?

 9              A.     WHICH PEOPLE ARE YOU TALKING ABOUT?

10              Q.     ANYBODY.  WERE ANY OF THE PRIOR

11     AFFILIATES INVITED TO ATTEND THIS MEETING IN SOUTH

12     KOREA?

13              A.     I THINK SO.

14              Q.     AND BY AFFILIATES, I MEAN

15     AFFILIATES THAT HAD BEEN PRIOR INTERUSH LIMITED'S

16     AFFILIATES; IS THAT CORRECT?

17              A.     YES, I BELIEVE SO.

18              Q.     IF YOU TURN TO PAGE 229, ON THE

19     BOTTOM OF THAT EXHIBIT, OR 234 OF 448 -- THERE ARE

20     SO MANY NUMBER OF THESE THINGS ----

21              A.     YES.

22              Q.     IT IS THE ONE THAT STARTS AT THE

23     TOP OF THE PAGE "AS YOU CAN SEE."

24              A.     YES.

25              Q.     DO YOU SEE THAT?
```

162

RYUNOSUKE YOSHIDA

1          A.     YES, I SEE THAT.

2          Q.     SO, IF YOU GO THREE BULLETS UP, IT

3   SAYS, "FOR ANY AFFILIATES WHO HOLDS 3 POSITIONS",

4   AND THOSE ARE PRIOR AFFILIATES WITH INTERUSH

5   LIMITED, CORRECT?

6          A.     CAN YOU ASK THE QUESTION AGAIN?

7          Q.     WHEN YOU ARE USING THE TERM

8   "AFFILIATE" OR THE TERM "AFFILIATE" IS BEING USED

9   HERE, THAT WOULD BE SOMEONE WHO WAS AN AFFILIATE

10  UNDER THE INTERUSH LIMITED PROGRAMME, CORRECT?

11         A.     I DON'T SEE THE WORD "AFFILIATE".

12         Q.     IT IS THE THIRD BULLET FROM THE

13  BOTTOM.  IT SAYS, "FOR ANY AFFILIATES."  I AM

14  HOPING WE ARE ON THE SAME PAGE.  ON THE BOTTOM

15  RIGHT, DOES IT SAY 229?

16         A.     YES.  "FOR ANY AFFILIATES WHO HOLD

17  3 POSITIONS", I BELIEVE SO.

18         Q.     YOU BELIEVE SO, YES?

19         A.     YES.

20         Q.     OKAY.  AND THERE IS THE ABILITY TO

21  COLLAPSE THREE POSITIONS INTO ONE SHANG PENG ROLE

22  IF YOU WISH, OR IT SAYS YOU CAN TRANSFER TWO OF

23  THE POSITIONS TO A SPOUSE OR AN ADULT CHILD.  DO

24  YOU SEE THAT AS WELL?

25         A.     YES.

163

RYUNOSUKE YOSHIDA

1          Q.      SO, EFFECTIVELY, AN AFFILIATE CAN

2    NOW BECOME AN AGENT FOR SHANG PENG.  IS THAT WHAT

3    IS MEANT HERE?

4          A.      I BELIEVE SO.

5          Q.      SO THE AFFILIATES THAT WERE INVITED

6    TO ATTEND IN SOUTH KOREA, THIS MEETING, WERE PRIOR

7    AFFILIATES OF WHAT WAS INTERUSH LIMITED?

8          A.      I BELIEVE SO.

9               MR. MORRIS:  OBJECTION TO THE FORM

10   OF THE QUESTION.

11   BY MR. MCDONALD:

12         Q.      CAN YOU, PLEASE, GO DOWN TO THE

13   BOTTOM BULLET POINT?

14         A.      YES.

15         Q.      IF YOU COULD JUST READ THAT OUT

16   LOUD, PLEASE?

17         A.      "PLUS, THE SHANG PENG GAO KE PARENT

18   COMPANY, WHICH HAS BEEN RENAMED ASCENTRA HOLDINGS,

19   INC., WILL CONTINUE TO PROVIDE THE PSP PROGRAM,

20   AND HONOR THE INTRODUCTION BONUS PROGRAM, AND THE

21   LOYAL BONUS PROGRAM."

22         Q.      SO YOU WERE PRESENTING, OR MARTY

23   WAS PRESENTING TO THE FORMER AFFILIATES THAT

24   ASCENTRA AS PARENT COMPANY OF SHANG PENG WOULD

25   CONTINUE TO PROVIDE THESE PROGRAMMES TO THE

                              164

                    RYUNOSUKE YOSHIDA

1    AFFILIATES WHO WERE NOW BECOMING AGENTS?

2         A.     I BELIEVE THIS IS A TYPO.

3    I BELIEVE THIS IS A TYPO.

4         Q.     HE MADE THIS PRESENTATION.  YOU

5    SAID THIS PRESENTATION WAS MADE?

6              MR. MORRIS:  OBJECTION.  PLEASE LET

7    HIM FINISH HIS ANSWER.

8         A.     I BELIEVE THIS IS A TYPO.  THIS

9    COULD HAVE BEEN THE FINAL DOCUMENT.  THERE COULD

10   HAVE BEEN A FINAL DOCUMENT EVEN MORE NEW, WHICH

11   I DID NOT RECEIVE, BUT THIS IS THE LAST DOCUMENT

12   I RECEIVED.

13   BY MR. MCDONALD:

14        Q.     AND WHEN YOU WERE AT THIS -- IS

15   THIS THE PRESENTATION YOU ATTENDED?

16        A.     YES.

17        Q.     AND YOU DON'T KNOW WHETHER OR NOT

18   HE ACTUALLY READ ALL OF THESE WORDS?

19        A.     I DON'T KNOW WHETHER THIS WAS THE

20   FINAL VERSION, BUT IT WAS CLOSER TO SOME WHAT --

21   WHAT THIS WAS.

22        Q.     BUT THIS IS THE VERSION YOU CHOSE

23   TO ATTACH TO YOUR DECLARATION?

24        A.     BECAUSE THAT WAS THE LAST VERSION

25   I HAD IN MY RECORD.

165

RYUNOSUKE YOSHIDA

1          Q.     DO YOU KNOW IF THERE WAS A LATER

2    VERSION OF THIS?

3          A.     THERE COULD HAVE BEEN.

4          Q.     WE WILL MARK THIS AS EXHIBIT 2.

5          (EXHIBIT 2 MARKED FOR IDENTIFICATION)

6    BY MR. MCDONALD:

7          Q.     I WILL SHOW YOU WHAT HAS BEEN

8    MARKED AS EXHIBIT 2.  IF YOU COULD TAKE A MOMENT

9    TO LOOK AT THAT.  (PAUSE) MY UNDERSTANDING IS YOU

10   ARE STILL READING, BUT I JUST WANT TO ASK YOU, DO

11   YOU RECOGNISE THIS E-MAIL?

12         A.     LET ME READ IT THROUGH.  THERE WAS

13   A LOT OF E-MAILS.

14         Q.     FINE.  (PAUSE)  MR. YOSHIDA ----

15         A.     SORRY, I'M NOT DONE YET.  I READ

16   THE FIRST E-MAIL AT THE BOTTOM, AND I AM GOING

17   BACK.

18         Q.     I AM GOING TO DIRECT YOU TO JUST

19   ONE PART OF IT, BUT I JUST WANT TO ASK YOU A FEW

20   PRELIMINARY QUESTIONS.

21         A.     SURE, BUT CAN I FINISH READING?

22         Q.     SURE.  (PAUSE)

23         A.     OKAY.

24         Q.     OKAY.  HAVE YOU EVER SEEN THIS

25   E-MAIL BEFORE, E-MAIL CHAIN?

RYUNOSUKE YOSHIDA

1          A.     I DON'T REMEMBER.  I DON'T

2     REMEMBER, BUT ----

3          Q.     DO YOU HAVE ANY DOUBT THAT YOU

4     RECEIVED IT?

5          A.     NO.

6          Q.     YOUR E-MAIL IS ----

7          A.     I DON'T THINK SO.

8          Q.     ---- RYU@TIRAWORKS.COM?

9          A.     YES.

10          Q.     I WOULD LIKE TO DIRECT YOU TO WHAT

11     IS -- IF YOU FLIP TO THE SECOND PAGE, SECOND

12     PHYSICAL PAGE, SECOND PHYSICAL PAGE AND THEN TURN

13     THAT OVER, LOOK BEHIND THAT, IT STARTS OUT -- AT

14     THE TOP OF THAT PAGE IS 2, "TO BE CLEARLY

15     SEPARATE", DO YOU SEE THAT?

16          A.     YES.

17          Q.     CAN YOU GO DOWN TO POINT 3?  DO YOU

18     SEE THAT, POINT 3, WHICH IS IN THE MIDDLE, SAYS,

19     "TOM POLLETTI CONFIRMS".  DO YOU SEE THAT?

20          A.     YES.

21          Q.     WHO IS TOM POLETTI?

22          A.     I BELIEVE HE WAS THE COUNSEL OF

23     ASCENTRA HOLDINGS INC. OR ONE OF THE -- MAYBE THE

24     SUBSIDIARIES OF ASCENTRA HOLDINGS INC.

25          Q.     OKAY.  SO, "TOM POLETTI CONFIRMS

167

1    KWN", THAT IS KING & WOOD MALLESONS, "POSITION AND

2    HE STATES THAT OWNERSHIP OF SP", DO YOU UNDERSTAND

3    THAT TO BE SHANG PENG IN THERE?

4          A.    I BELIEVE SO, YES.

5          Q.    "SHOULD REALLY BE IMMATERIAL.  MOST

6    NET FUNDS WOULD ULTIMATELY BE PAID THROUGH TO

7    ASCENTRA HOLDINGS, WHICH WE OWN AND CONTROL

8    ANYWAY."  DO YOU SEE THAT?

9          A.    YES.

10         Q.    "AND THIS IS THE ENTITY WHICH WE

11   WILL CONTINUE TO HAVE PUBLICLY LISTED IN THE

12   FUTURE."  DO YOU SEE THAT AS WELL?

13         A.    YES.

14         Q.    DID YOU DISAGREE WITH THIS

15   POSITION?

16         A.    I DISAGREE WITH THIS POSITION.

17         Q.    YOU DISAGREED, BUT DID YOU LET

18   ANYONE KNOW YOU DISAGREED WITH THIS POSITION AT

19   THAT TIME?

20         A.    ARE YOU TALKING ABOUT NOW, OR THEN?

21         Q.    THEN.

22         A.    I WAS DEFERRING -- I WAS

23   TRANSLATING THIS E-MAIL AND MY PURPOSE HERE DURING

24   THIS E-MAIL WAS TO TRANSLATE SO THAT THE

25   SHAREHOLDERS COULD COMMUNICATE.

168

RYUNOSUKE YOSHIDA

1          Q.      YOU WERE A DIRECTOR OF ASCENTRA

2     THEN?

3          A.      YES.

4          Q.      AND IT IS ASCENTRA -- AS YOU SAID

5     EARLIER, YOU SAID YOU WOULD BE LOOKING OUT FOR

6     ASCENTRA'S BEST INTEREST, CORRECT?

7          A.      YES.

8          Q.      AS A DIRECTOR OF ASCENTRA, DID YOU

9     DISAGREE WITH THIS POSITION?

10          A.      I THINK BACK THEN I HAD NOT MUCH

11     OPINION ON IT.  IT WAS A SHAREHOLDER DISCUSSION

12     FOR THE SHAREHOLDERS TO COME UP WITH A DIRECTION.

13     IF I AM WORKING FOR THE SHAREHOLDERS AND IF THE

14     SHAREHOLDERS ARE TRYING TO DECIDE WHAT IS BEST FOR

15     THE COMPANY, THEN I DID NOT THINK -- I JUST

16     REMAINED LOOKING AT THE DOCUMENT, THE E-MAIL

17     PROBABLY, AND SEE WHAT THEY DECIDE.

18          Q.      SO THE SHAREHOLDERS WANTED THIS TO

19     BE THE ARRANGEMENT GOING FORWARD?

20          A.      I DISAGREE WITH YOU BECAUSE

21     I BELIEVE MR. MATSUURA RIGHT BELOW THAT IS SAYING

22     THAT SHANG PENG'S PROFITS SHOULD BE LEFT IN SHANG

23     PENG.

24          Q.      CAN YOU READ THE BOTTOM -- THE NEXT

25     LINE DOWN BEGINS, "IT IS MORE IMPORTANT"?

169

RYUNOSUKE YOSHIDA

1          A.     "IT IS MORE IMPORTANT TO MAINTAIN A

2   FAIR TRANSACTION BY BETWEEN ASCENTRA AND SHANG

3   PENG."

4          Q.     THAT WAS -- YOUR OBLIGATION AT THE

5   TIME WAS TO MAKE SURE AS A DIRECTOR THAT IT WAS A

6   FAIR TRANSACTION FOR ASCENTRA?

7          A.     CAN YOU TELL ME WHAT WAS FAIR?

8          Q.     I DON'T KNOW.  YOU TELL ME WHAT WAS

9   FAIR?

10         A.     WELL, DURING THIS PERIOD THERE WERE

11  MANY IDEAS, MANY CONCEPTS FROM DIFFERENT PEOPLE,

12  SO YOU HAVE TO TELL ME WHICH CONCEPT YOU ARE

13  TALKING ABOUT.

14         Q.     WHY DON'T YOU PUT THAT ASIDE AND WE

15  CAN GO RIGHT TO THE NEXT EXHIBIT, WHICH WE WILL

16  MARK AS EXHIBIT 3?

17         (EXHIBIT 3 MARKED FOR IDENTIFICATION)

18  BY MR. MCDONALD:

19         Q.     I AM HANDING YOU WHAT HAS BEEN

20  MARKED AS EXHIBIT 3.  HAVE YOU EVER SEEN THAT

21  BEFORE?

22         A.     I BELIEVE SO.

23         Q.     IT IS SIGNED BY MR. HOMMA,

24  MR. MATSUURA AND MR. MATTHEWS; IS THAT CORRECT?

25         A.     YES.

RYUNOSUKE YOSHIDA

1          Q.      EACH OF WHOM AT THE TIME WERE

2     SHAREHOLDERS OF ASCENTRA?

3          A.      YES.

4          Q.      CORRECT.  AND IF YOU LOOK TO THE

5     FINANCIAL TERMS OF THE DISTRIBUTION AGREEMENT, DO

6     YOU SEE THAT?

7          A.      CAN YOU REFER ME TO THE PAGE?

8          Q.      IT WOULD BE -- AT THE TOP IT WOULD

9     SAY 3 OF 6, BUT IT WOULD BE THE SECOND PAGE OF THE

10    AGREEMENT.

11         A.      WHICH ITEM, SORRY?

12         Q.      FLIP IT OVER.

13         A.      THIS WAY?

14         Q.      YES.  NUMBER 4.

15         A.      YES.

16         Q.      IT SAYS AT 4A, "ASCENTRA TANGIBLE

17    PRODUCTS SOLD UNDER THE DISTRIBUTION AGREEMENT ARE

18    SOLD AT COST PLUS AN AGREED PERCENTAGE MARKUP AND

19    ASCENTRA SOFTWARE PRODUCTS ARE SOLD WITH AN AGREED

20    ROYALTY PERCENTAGE ON ALL SOFTWARE REVENUE."  DO

21    YOU SEE THAT?

22         A.      YES.

23         Q.      DO YOU KNOW IF THOSE AMOUNTS WERE

24    EVER AGREED BETWEEN ASCENTRA AND SHANG PENG?

25         A.      SORRY, I AM GOING TO READ IT.

171

RYUNOSUKE YOSHIDA

1    (PAUSE) CAN YOU REPEAT YOUR QUESTION AGAIN?

2           Q.     DO YOU KNOW IF THOSE AMOUNTS WERE

3    EVER AGREED BETWEEN ASCENTRA AND SHANG PENG?

4           A.     CAN YOU DEFINE ASCENTRA?

5           Q.     I AM SORRY?

6           A.     CAN YOU DEFINE ASCENTRA?

7           Q.     ASCENTRA IS DEFINED AT THE VERY

8    BEGINNING.  "... ASCENTRA HOLDINGS, INC ... CAN

9    IMPLEMENT AN EXCLUSIVE DISTRIBUTION AGREEMENT WITH

10   SHANG PENG GAO KE, INC ... ('SHANG PENG')."

11          A.     FROM MY RECOLLECTION, I DON'T

12   REMEMBER THAT I WAS INVOLVED IN THE DECISION OF

13   DECIDING THIS COST, "PLUS AN AGREED PERCENTAGE

14   MARKUP".  I BELIEVE THE DOCUMENT -- MAYBE WHAT IT

15   MIGHT BE REFERRING TO IS THE PRODUCT SUPPLY

16   AGREEMENT THAT IS SEPARATELY ATTACHED IN THE --

17   I BELIEVE IN THE DECLARATION, BUT THIS IS BETWEEN

18   IHEALTHSCIENCE AND SHANG PENG BUT NOT ASCENTRA

19   HOLDINGS INC.

20          Q.     TO YOUR KNOWLEDGE, IS THERE ANY

21   AGREEMENT BETWEEN ASCENTRA HOLDINGS INC AND SHANG

22   PENG GAO KE INC WHICH PERMITS SHANG PENG, OR

23   LICENSES AND PERMITS, TO CARRY ON ASCENTRA'S

24   BUSINESS?

25          MR. MORRIS:  OBJECTION TO THE FORM

172

1    OF THE QUESTION.

2         A.    CAN YOU REPEAT THE QUESTION, SORRY?

3    BY MR. MCDONALD:

4         Q.    ARE YOU AWARE OF ANY AGREEMENT

5    BETWEEN ASCENTRA HOLDINGS, AND I WILL CALL IT SPGK

6    INC, THAT PERMITS SPGK TO CONTINUE THE BUSINESS

7    AND SELL ASCENTRA PRODUCTS?

8         A.    ARE YOU TALKING ABOUT SIGNED

9    AGREEMENTS?

10        Q.    YES.

11        A.    NO, I DON'T THINK SO.

12             MR. MORRIS:  OBJECTION TO THE FORM

13   OF THE QUESTION.

14   BY MR. MCDONALD:

15        Q.    SO NO SUCH AGREEMENT EXISTS?

16        A.    NO VALID AGREEMENT EXISTS.

17        Q.    PUT THAT ASIDE.  I WILL SHOW YOU

18   WHAT HAS BEEN MARKED AS EXHIBIT 3.

19             MISS LEVINE:  EXHIBIT 4.

20             MR. MCDONALD:  4.  OKAY, EXHIBIT 4.

21   THANK YOU, BETH.  SHE IS KEEPING TABS ON ME, WHICH

22   I APPRECIATE.

23        (EXHIBIT 4 MARKED FOR IDENTIFICATION)

24   BY MR. MCDONALD:

25        Q.    I HAVE HANDED YOU WHAT HAS BEEN

173

1    MARKED AS EXHIBIT 4.   EARLIER WE HAD DISCUSSED

2    THAT MR. WALSH HAD SERVED IN A CAPACITY AS

3    EFFECTIVELY A GENERAL COUNSEL, IS THAT CORRECT?

4              A.    OF?

5              Q.    OF ASCENTRA.

6              A.    I BELIEVE SO.

7              Q.    AND MR. POLETTI HERE, YOU CAN HIS

8    E-MAIL IS @MANATT.  IS THAT CONSISTENT WITH YOUR

9    RECOLLECTION?

10             A.    YES.

11             Q.    AND DAVID HONG AND SHENGYING XIA.

12   WHO IS SHENGYING XIA, ON THE UPPER RIGHT, DO YOU

13   KNOW?

14             A.    THIS IS NOT MY E-MAIL, SO I DON'T

15   KNOW.

16             Q.    YOU DON'T KNOW.  IF DOWN, IT SAYS,

17   "DAVID, ONE MORE ITEM OF KEEN INTEREST TO THE

18   SHAREHOLDERS THAT I NEED KNW'S PROMPT HELP WITH."

19   DO YOU SEE IN THE FIRST SENTENCE THERE ----

20             A.    DO YOU MIND READING IT FOR ME?

21             Q.    I AM SORRY?

22             A.    DO YOU MIND READING IT FOR ME?

23             Q.    I WILL READ IT TO YOU.  "AS

24   I BELIEVE YOU ARE AWARE, THE COMPANY PREVIOUSLY

25   EXPLORED AN OVER-ARCHING LEGAL FRAMEWORK WHERE

174

RYUNOSUKE YOSHIDA

1    THEY 'SPIN OFF' OF THE CHINA BUSINESS TO SHANG

2    PENG IN THE FORM OF AN ASSET SALE TRANSACTION.

3    THIS PROVED DIFFICULT FOR A VARIETY OF REASONS,

4    INCLUDING DIFFICULTY IN ASCERTAINING AND AGREEING

5    UPON LIABILITIES TO BE TRANSFERRED AND SIGNIFICANT

6    RISKS OF MINORITY CREDITOR LITIGATION.

7    CONSEQUENTLY, WE HAVE BEEN PURSUING AN ALTERNATIVE

8    LEGAL FRAMEWORK, WHICH FRANKLY SEEMS LIKE A BETTER

9    ONE: AN EXCLUSIVE DISTRIBUTION AGREEMENT WHEREBY

10   ASCENTRA RETAINS ALL ASSETS AND LIABILITIES BUT

11   INSTEAD GIVES SHANG PENG EXCLUSIVE ACCESS TO ITS

12   CUSTOMER LIST AND DISTRIBUTION RIGHTS IN CHINA

13   UNDER THE NEW COMPLIANT BUSINESS MODEL KWN HAS

14   HELPED DEVELOP."  DO YOU SEE THAT?

15        A.    YES.

16        Q.    WERE YOU AWARE THAT THIS WAS BEING

17   CONTEMPLATED AT THIS TIME?

18        A.    CAN YOU DEFINE CONTEMPLATED?

19        Q.    BEING CONSIDERED BY ASCENTRA AT

20   THIS TIME?

21        A.    YES.

22        Q.    DID YOU HAVE DISCUSSIONS WITH

23   MR. WALSH ABOUT THIS CONSTRUCT, THAT IS ASCENTRA

24   RETAINING ALL THE ASSETS AND REALLY GIVING

25   DISTRIBUTION RIGHTS TO SHANG PENG?

175

RYUNOSUKE YOSHIDA

1          A.      CAN YOU SAY YOUR QUESTION AGAIN?

2          Q.      DID YOU HAVE DISCUSSIONS WITH

3    MR. WALSH ABOUT THIS CONSTRUCT, THAT IS ASCENTRA

4    RETAINING ALL THE ASSETS AND REALLY GIVING

5    DISTRIBUTIONS RIGHTS TO SHANG PENG?

6          A.      I DID NOT PERSONALLY TALK WITH TOM

7    WALSH ON THIS.

8          Q.      YOU DID NOT?

9          A.      I DID NOT.

10         Q.      DID YOU SPEAK TO ANY OTHER

11   DIRECTORS ABOUT THIS?

12         A.      I DON'T REMEMBER.

13         Q.      DO YOU KNOW IF ANY AGREEMENTS WERE

14   EXECUTED BETWEEN ASCENTRA AND SHANG PENG GIVING

15   SHANG PENG DISTRIBUTION RIGHTS FOR ASCENTRA

16   PRODUCTS?

17         A.      ARE YOU TALKING ABOUT THE EXCLUSIVE

18   DISTRIBUTION AGREEMENT?

19         Q.      WAS THERE AN EXCLUSIVE DISTRIBUTION

20   AGREEMENT?

21         A.      IT WAS NOT SIGNED.  CAN YOU

22   REPHRASE YOUR QUESTION, SORRY?

23         Q.      I THINK YOU HAVE JUST ANSWERED MY

24   QUESTION.  I HAD ASKED DO YOU KNOW IF ANY

25   AGREEMENTS WERE EXECUTED BETWEEN ASCENTRA AND

                        176

                  RYUNOSUKE YOSHIDA

1    SHANG PENG GIVING SHANG PENG DISTRIBUTION RIGHTS

2    FOR ASCENTRA PRODUCTS?

3          A.     I DON'T THINK SO.

4          Q.     YOU REFERENCED A DISTRIBUTION

5    AGREEMENT THAT YOU SAY WAS NOT SIGNED, THAT IS

6    CORRECT?

7          A.     YES.

8          Q.     DO YOU REMEMBER WHEN -- FIRST OF

9    ALL, DO YOU KNOW WHY THAT DISTRIBUTION AGREEMENT

10   WAS NOT SIGNED?

11         A.     I DON'T KNOW.

12         Q.     YOU DON'T KNOW?

13         A.     I DON'T KNOW.

14         Q.     AS A DIRECTOR, WERE YOU INFORMED AS

15   TO THE TERMS OF THE PROPOSED DISTRIBUTION

16   AGREEMENT?

17         A.     I BELIEVE, I REMEMBER, I RECALL

18   THAT WE HAD A DISCUSSION -- I HEARD A PRESENTATION

19   IN BALI.  I BELIEVE IT WAS BALI, IN INDONESIA,

20   EXPLAINING ABOUT THESE FRAMEWORKS.

21         Q.     IT WAS REALLY AS A RESULT OF THAT

22   MEETING THAT THE MEMORANDUM OF UNDERSTANDING THAT

23   WE PREVIOUSLY REVIEWED WAS EXECUTED, WAS IT NOT?

24         A.     I DON'T REMEMBER WHICH CAME FIRST.

25         Q.     THE MEETING IN BALI OR THE MOU?

177

RYUNOSUKE YOSHIDA

1         A.    YES.

2         Q.    THEY OCCURRED, RIGHT, AROUND THE

3    SAME TIME?

4         A.    I DON'T KNOW.

5         Q.    DO YOU RECALL WHAT MR. HOMMA

6    THOUGHT ABOUT SPINNING OFF THE ASCENTRA BUSINESS

7    TO SHANG PENG?

8              MR. MORRIS:  OBJECTION TO THE FORM

9    OF THE QUESTION.

10        A.    MR. HOMMA THOUGHT ABOUT -- SORRY,

11   CAN YOU SAY THAT AGAIN?

12   BY MR. MCDONALD:

13        Q.    DID YOU DISCUSS WITH MR. HOMMA THE

14   PROPOSED TRANSACTION WITH SHANG PENG, AND BY THAT

15   I MEAN THE PROPOSED DISTRIBUTION AGREEMENT BETWEEN

16   ASCENTRA AND SHANG PENG?

17        A.    I DON'T THINK I TALKED WITH HIM

18   PERSONALLY.

19        Q.    DID YOU SPEAK WITH MR. MATSUURA

20   ABOUT THE PROPOSED DISTRIBUTION AGREEMENT BETWEEN

21   ASCENTRA AND SHANG PENG?

22        A.    CAN I CLARIFY?  ARE YOU TALKING

23   ABOUT THIS PERIOD IN TIME?

24        Q.    YES, I AM.

25        A.    I MAY HAVE, BUT I DON'T THINK WE

178

RYUNOSUKE YOSHIDA

1    WENT IN DETAIL.

2           Q.    YOU MAY HAVE?  DO YOU RECALL

3    WHETHER OR NOT HE WAS IN FAVOUR OF HAVING A

4    DISTRIBUTION AGREEMENT WITH SHANG PENG?

5           A.    I BELIEVE HE WAS NOT IN FAVOUR OF

6    HAVING EXCLUSIVE -- LIKE A SIGNED DOCUMENT.

7           Q.    WHY?

8           A.    HIS POSITION WAS THAT SPGK AND

9    ASCENTRA ARE TWO TOTALLY DIFFERENT COMPANIES, AND

10   THE REASON WHY IT WAS TWO TOTALLY DIFFERENT

11   COMPANIES WAS BECAUSE KING & WOOD MALLESONS

12   ADVISED THAT IT HAS TO BE COMPLETELY SEPARATE, AND

13   WE COULD NOT LET THE RISK OF INTERUSH'S MLM

14   BUSINESS INFLUENCE THE BUSINESS OF SPGK.  SO THAT

15   IS WHY I BELIEVE HE WAS NOT KEEN TO SIGN THIS

16   DOCUMENT.

17          Q.    DO YOU RECALL SPGK RE-BRANDING

18   ASCENTRA PRODUCTS -- STRIKE THAT.  DO YOU RECALL

19   WHETHER SPGK RE-BRANDED ASCENTRA PRODUCTS FOR SALE

20   IN PRC?

21              MR. MORRIS:  OBJECTION TO THE FORM

22   OF THE QUESTION.

23          A.    CAN YOU REPEAT THAT QUESTION?  I AM

24   TRYING TO ----

25   BY MR. MCDONALD:

                         179

RYUNOSUKE YOSHIDA

1      Q.     IN 2016/2017, DO YOU RECALL WHETHER

2  SPGK TRIED TO RE-BRAND AS SHANG PENG ASCENTRA

3  PRODUCTS FOR SALE IN THE PRC?

4      A.     I WAS NOT INVOLVED IN THE

5  DISCUSSION OF RE-BRANDING ITSELF, BUT I BELIEVE

6  THAT THERE COULD HAVE BEEN SUCH A DISCUSSION.

7      Q.     AS A DIRECTOR OF ASCENTRA, WERE YOU

8  INVOLVED IN THOSE DISCUSSIONS?

9      A.     OF WHICH DISCUSSIONS?

10     Q.     THE RE-BRANDING OF ASCENTRA'S

11 PRODUCTS AS SHANG PENG PRODUCTS FOR SALE IN THE

12 PRC?

13     A.     SORRY, CAN YOU SAY AGAIN; I GOT

14 INTERRUPTED?

15     Q.     I AM SORRY.

16     A.     SORRY, SIR.

17     Q.     THAT IS FINE.  AS A DIRECTOR OF

18 ASCENTRA, WERE YOU INVOLVED IN THOSE DISCUSSIONS

19 AND YOU ASKED, OF WHICH DISCUSSIONS, AND YOU SAID

20 THE RE-BRANDING OF ASCENTRA'S PRODUCTS AS SHANG

21 PENG PRODUCTS FOR SALE IN THE PRC?

22     A.     I MIGHT HAVE BEEN.  I MIGHT HAVE

23 BEEN.  I MIGHT HAVE BEEN IN A MEETING WHERE IT WAS

24 PRESENTED, BUT I DON'T CLEARLY REMEMBER WHEN IT

25 WAS.

RYUNOSUKE YOSHIDA

1    Q.    BUT IT WAS A RE-BRANDING OF

2  ASCENTRA PRODUCT AS SHANG PENG PRODUCT FOR SALE;

3  IS THAT CORRECT?

4    A.    I THINK IT WAS RE-LABELLED AS SHANG

5  PENG PRODUCT.  THAT IS MY UNDERSTANDING.

6    Q.    DID SHANG PENG -- I AM GOING TO SAY

7  SPGK FOR NOW IF, THAT IS EASIER.  DID SPGK EVER

8  REGISTER ITS NAME FOR ITS PRODUCT TO BE SOLD IN

9  THE PRC?

10    A.    I BELIEVE SO.

11    Q.    YOU BELIEVE SO?

12    A.    YES.

13    Q.    FOR A PRODUCT?

14    A.    MAYBE.  I CANNOT REMEMBER CLEARLY.

15  I WAS NOT INVOLVED TO THE DAILY TRANSITION

16  PROCESS, SO I BELIEVE SO BUT I CANNOT BE ACCURATE.

17    Q.    DO YOU RECALL A TIME WHEN SHANG

18  PENG ABANDONED THE RE-BRANDING OR RE-LABELLING AND

19  RETURNED TO SELLING ASCENTRA PRODUCTS AS ASCENTRA

20  PRODUCTS INTO THE PRC?

21    A.    THERE WAS A PERIOD THAT -- YES,

22  I THINK THERE WAS A PERIOD THAT THAT HAPPENED.

23    Q.    DO YOU RECALL ABOUT WHAT TIME THAT

24  HAPPENED?

25    A.    SORRY, I CANNOT REMEMBER WHETHER IT

181

RYUNOSUKE YOSHIDA

1  WAS LABELLED UNDER SHANG PENG OR WHETHER IT WAS

2  LABELLED UNDER ASCENTRA, BUT IT WAS EITHER ONE

3  THAT WAS SOLD IN BOTH MARKETS -- I MEAN SOLD IN

4  CHINA FOR THE SPGK SIDE OF THE BUSINESS AND SOLD

5  IN ASCENTRA FOR ASCENTRA'S BUSINESS OR ATC'S

6  BUSINESS.  BUT I DON'T KNOW -- BUT IF I --

7  I CANNOT REMEMBER, BUT I THINK IT WAS PROBABLY

8  SOME TIME AROUND 2017-2021, SOMEWHERE BETWEEN

9  MAYBE.

10       Q.    OKAY.  AS PART OF THE MEMORANDUM OF

11 UNDERSTANDING FOLLOWING AROUND THE TIME OF THE

12 MEETING IN BALI, WAS YOUR UNDERSTANDING AS A

13 DIRECTOR OF ASCENTRA THAT MR. HOMMA WAS GOING TO

14 GIVE UP HIS INTEREST IN ASCENTRA IN EXCHANGE FOR

15 HIS INTEREST IN SPGK?

16       A.    NO.

17       Q.    CAN YOU GO BACK TO THE MEMORANDUM

18 OF UNDERSTANDING, PLEASE?

19       A.    YES.  SORRY, CAN YOU REPHRASE YOUR

20 QUESTION?  CAN YOU SAY YOUR QUESTION AGAIN?  I AM

21 TRYING TO PICK UP THE DETAILS.

22       Q.    SO, AS PART OF THE OVERALL

23 SHAREHOLDERS' INTENT, THEIR AGREEMENT, WAS IT YOUR

24 UNDERSTANDING AS AN ASCENTRA DIRECTOR THAT

25 MR. HOMMA WOULD BE GIVING UP HIS 23% OWNERSHIP

182

RYUNOSUKE YOSHIDA

1    INTEREST IN ASCENTRA IN EXCHANGE FOR A PERCENTAGE

2    OWNERSHIP, HIS 100% OWNERSHIP IN SPGK?

3         A.    NO.

4         Q.    THAT WAS NOT YOUR UNDERSTANDING?

5         A.    THAT WAS NOT MY UNDERSTANDING.

6         Q.    WHAT WAS YOUR UNDERSTANDING WITH

7    RESPECT TO MR. HOMMA AND HIS SHARES IN ASCENTRA AT

8    THAT TIME?

9              MR. MORRIS:  OBJECTION TO THE FORM

10   OF THE QUESTION.

11        A.    MY UNDERSTANDING WAS NOTHING WAS

12   FINALISED.

13   BY MR. MCDONALD:

14        Q.    I DID NOT ASK YOU IF IT WAS

15   FINALISED.  I AM ASKING WHETHER OR NOT IT WAS YOUR

16   UNDERSTANDING AT THAT TIME AS A DIRECTOR THAT THIS

17   WAS ----

18        A.    IT WAS NOT MY UNDERSTANDING.

19        Q.    IT WAS NOT?

20        A.    YES.

21        Q.    MR. HOMMA NEVER COMMITTED TO

22   TRANSFERRING HIS 23% OWNERSHIP INTEREST IN

23   ASCENTRA BACK TO THE COMPANY IN EXCHANGE FOR HIS

24   SHARES IN SHANG PENG?

25        A.    I DON'T THINK SO.

183

1          Q.      IN THE MOU, IF YOU LOOK UNDER

2    NUMBER 2, IT SAYS MR. HOMMA RELINQUISHES HIS

3    BENEFICIAL OWNERSHIP IN ASCENTRA.

4          A.      YES.

5          Q.      AND, MR. HOMMA WILL BE THE SOLE

6    OWNER OF GROWTH TODAY.  DO YOU SEE THAT?

7          A.      YES.

8          Q.      GROWTH TODAY, AS YOU KNOW, OWNS

9    SHANG PENG, SO EFFECTIVELY MR. HOMMA WAS GOING TO

10   BECOME THE SOLE OWNER OF SHANG PENG?

11              MR. MORRIS:  OBJECTION TO THE FORM

12   OF THE QUESTION.

13   BY MR. MCDONALD:

14         Q.      YES?

15         A.      YES.

16         Q.      SO MR. HOMMA AT THE TIME YOU SAW

17   THIS -- YOU HAVE SEEN THIS BEFORE?

18         A.      WELL, IF I CLARIFY MY UNDERSTANDING

19   IS THAT THIS MOU WAS NOT BINDING AND ALL THE

20   PARTIES DEEMED THIS MOU AS NOT BINDING.  ONE OF

21   THE COMMENTS THAT WAS IN MY E-MAIL, THAT WAS THIS

22   DOCUMENT WAS SENT, MENTIONED THAT IT WAS ALSO FOR

23   BANK BANGING PURPOSES, TO OPEN BANK ACCOUNTS,

24   BECAUSE THE TIME WAS LIMITED.  SO IT WAS A VERY

25   PRELIMINARY DOCUMENT PREPARED FOR A FRAMEWORK,


184

RYUNOSUKE YOSHIDA

```
 1   POSSIBLE FRAMEWORK AND ALSO FOR OPENING BANK

 2   ACCOUNT.

 3          Q.     SO THIS AGREEMENT WAS ----

 4          A.     IT IS NOT AN AGREE.

 5          Q.     WHAT IS THAT?

 6          A.     I DON'T THINK IT IS AN AGREEMENT.

 7   I THINK IT IS A MEMORANDUM OF UNDERSTANDING.

 8          Q.     IT IS SIGNED BY THE SHAREHOLDERS,

 9   IS IT NOT?

10          A.     WELL, EVERYBODY'S UNDERSTANDING WAS

11   IT WAS NOT BINDING.

12          Q.     WAS IT EVER DECLARED TO BE NOT

13   BINDING BY A COURT OF LAW?

14          A.     MY UNDERSTANDING, I HEARD FROM -- I

15   THINK I HAVE HEARD FROM ALL THE PARTIES THAT IT

16   WAS NOT BINDING.

17          Q.     SO IF IT WAS NOT BINDING ----

18          A.     SORRY, LET ME CLARIFY.  WHEN I SAY

19   ALL PARTIES, I AM TALKING ABOUT YOSHIO MATSUURA,

20   MOTOHIKO HOMMA AND MARTY MATTHEWS.

21          Q.     SO IF WE TEAR UP THE MEMORANDUM OF

22   UNDERSTANDING -- AGAIN, I GO BACK TO THE QUESTION

23   I ASKED EARLIER -- IS THERE IS ANOTHER AGREEMENT

24   PURSUANT TO WHICH SHANG PENG WAS AUTHORISED TO

25   SELL ASCENTRA PRODUCTS IN THE PRC?
```

185

RYUNOSUKE YOSHIDA

1              MR. MORRIS:  OBJECTION TO THE FORM

2    OF THE QUESTION.

3         A.    CAN YOU CLARIFY YOUR QUESTION?

4    BY MR. MCDONALD:

5         Q.    IF WE TEAR UP THE MOU, WHICH YOU

6    SAY WAS A NULLITY, RIGHT ----

7         A.    SORRY, I DON'T UNDERSTAND A

8    NULLITY.

9         Q.    OKAY.  IT WAS NOT EFFECTIVE.

10        A.    OKAY.

11        Q.    CAN YOU POINT TO A DOCUMENT THAT

12   GIVES SHANG PENG THE RIGHT TO SELL ASCENTRA

13   PRODUCT IN THE PRC?

14              MR. MORRIS:  OBJECTION TO THE FORM

15   OF THE QUESTION.

16        A.    ARE YOU TALKING ABOUT ASCENTRA

17   HOLDINGS INC?

18   BY MR. MCDONALD:

19        Q.    YES.

20        A.    I DON'T THINK THERE'S AN AGREEMENT

21   BETWEEN SHANG PENG -- SPGK AND ASCENTRA HOLDINGS

22   INC FOR PRODUCTS SUPPLIED, BUT THERE IS THE

23   PRODUCT SUPPLY AGREEMENT ----

24        Q.    THAT IS ALL I ASKED.  IS THERE AN

25   AGREEMENT BETWEEN ASCENTRA AND SPGK, AND YOUR

186

RYUNOSUKE YOSHIDA

1   ANSWER IS NO?

2          A.      SORRY, REPEAT THAT AGAIN.

3          Q.      MY QUESTION WAS IS THERE AN

4   AGREEMENT BETWEEN ASCENTRA HOLDINGS AND SPGK THAT

5   AUTHORISES SPGK TO SELL ASCENTRA PRODUCTS IN THE

6   PRC?

7                 MR. MORRIS:  OBJECTION TO THE FORM

8   OF THE QUESTION.

9          A.      I DON'T THINK SO.

10  BY MR. MCDONALD:  WE WILL LEAVE THAT ASIDE.

11  (PAUSE)

12      (EXHIBIT 5 MARKED FOR IDENTIFICATION)

13  BY MR. MCDONALD:

14         Q.      I WILL SHOW YOU WHAT HAS BEEN

15  MARKED AS EXHIBIT 5.

16         A.      YES.

17         Q.      YOU EARLIER REFERRED TO AN

18  EXCLUSIVE INTERNATIONAL DISTRIBUTOR AGREEMENT.  IS

19  THIS WHAT YOU WERE REFERRING TO?

20         A.      I BELIEVE SO UNLESS THERE WERE

21  OTHER VERSIONS OF IT, BUT, YES, I BELIEVE SO.

22         Q.      THIS IS WHAT YOU WERE REFERRING TO?

23         A.      I AM REFERRING TO THIS, THE NAME OF

24  THE AGREEMENT WITH THE EXCLUSIVE INTERNATIONAL

25  DISTRIBUTOR AGREEMENT, BUT I CANNOT CONFIRM

RYUNOSUKE YOSHIDA

1  WHETHER IT IS TOTALLY THE SAME DOCUMENT.

2        Q.    I UNDERSTAND.  DO YOU KNOW WHY THIS

3  AGREEMENT WAS NOT EXECUTED?

4        A.    MY UNDERSTANDING IS THAT THE

5  SHAREHOLDERS DID NOT COME TO AN AGREEMENT.

6        Q.    AN AGREEMENT ON WHAT?

7        A.    ON EXCLUSIVE INTERNATIONAL

8  DISTRIBUTOR AGREEMENT.

9        Q.    SO THE SHAREHOLDERS OF WHICH ENTITY

10  COULD NOT COME TO AN AGREEMENT ON THIS EXCLUSIVE

11  INTERNATIONAL DISTRIBUTOR AGREEMENT?

12        A.    I BELIEVE THE MAJOR SHAREHOLDERS

13  THAT WAS INVOLVED WAS THE SHAREHOLDER OF GROWTH

14  TODAY, MOTOHIKO HOMMA, AND ALSO THE TWO OTHER

15  HOLDERS OF ASCENTRA HOLDINGS INC, WHICH WAS MARTY

16  MATTHEWS AND YOSHIO MATSUURA.

17        Q.    AND THEY COULD NOT -- THEY DID NOT

18  AGREE ON THE TERMS?

19        A.    I DON'T THINK SO.

20        Q.    DO YOU RECALL WHAT TERMS THEY DID

21  NOT AGREE ON?

22        A.    I DON'T KNOW.

23        Q.    WERE YOU SHOWN A DRAFT OF THIS

24  AGREEMENT AS A DIRECTOR OF ASCENTRA?

25        A.    I BELIEVE I RECEIVED A DRAFT.

188

RYUNOSUKE YOSHIDA

1    Q.    DID YOU COMMENT ON THE DRAFT?

2    A.    NO.

3    Q.    DID YOU EXPRESS ANY CONCERN OVER

4  THE PRICING FOR ANY OF THE GOODS THAT WOULD BE

5  DISTRIBUTED PURSUANT TO THIS AGREEMENT?

6    A.    NO.

7    Q.    DID YOU DISCUSS THE TERMS OF ANY

8  PRICING FOR THE GOODS TO BE DISTRIBUTED PURSUANT

9  TO THIS AGREEMENT?

10    A.    I WAS NOT INVOLVED IN THAT

11  DISCUSSION.

12    Q.    AS A DIRECTOR OF ASCENTRA YOU WERE

13  NOT INVOLVED IN THAT DISCUSSION?

14    A.    NO.

15    Q.    WERE ANY OF THE DIRECTORS OF

16  ASCENTRA INVOLVED IN THAT DISCUSSION?

17    A.    I DON'T KNOW?

18    Q.    YOU DON'T KNOW?

19    A.    I DON'T KNOW.

20    Q.    YOU MENTIONED EARLIER THAT SPGK WAS

21  PURCHASING PRODUCT FROM VENDORS; IS THAT CORRECT?

22    A.    YES.

23    Q.    WHICH VENDORS WAS SPGK PURCHASING

24  PRODUCT FROM?

25    A.    I BELIEVE MAINLY IT WAS

189

RYUNOSUKE YOSHIDA

1    IHEALTHSCIENCE.

2         Q.    IHEALTHSCIENCE IS AN ASCENTRA

3    COMPANY?

4         A.    ASCENTRA SUBSIDIARY.

5         Q.    AND YOU WERE A DIRECTOR OF

6    IHEALTHSCIENCE, WERE YOU NOT?

7         A.    YES.

8         Q.    YOU WERE ALSO A DIRECTOR OF

9    ASCENTRA AT THAT TIME AS WELL?

10        A.    WHICH TIME ARE YOU TALKING ABOUT?

11        Q.    2017, 2018.

12        A.    I THINK IN 2018 THERE IS --

13   I RECALL THERE IS A PERIOD I WAS NOT A DIRECTOR

14   OF, BUT ...

15        Q.    DO YOU RECALL BEING INVOLVED IN ANY

16   OF THE DISCUSSIONS ABOUT THE PRICING OF THE GOODS

17   PURCHASED FROM IHEALTHSCIENCE?

18        A.    NO.

19        Q.    AS A DIRECTOR, DID YOU DO ANYTHING

20   TO ASSURE YOURSELF THAT ASCENTRA AND

21   IHEALTHSCIENCE WERE BEING PAID AND COMPENSATED

22   FAIRLY FOR THE PRODUCT BEING SOLD PURSUANT TO THAT

23   AGREEMENT?

24        A.    I DON'T THINK I DID DURING THAT

25   PERIOD.

RYUNOSUKE YOSHIDA

1          Q.      DID YOU EVER HEAR OF A COMPANY

2    CALLED EVER INNOVATION?

3          A.      YES.

4          Q.      DID SPGK HAVE AN AGREEMENT WITH

5    EVER INNOVATION?

6          A.      SORRY, I DON'T REMEMBER.  I MIGHT

7    HAVE.  IT HAS BEEN A WHILE.

8          Q.      DID EVER INNOVATION PROVIDE ANY

9    SERVICES TO SPGK?

10         A.      IF I AM CORRECT, THEY MAY HAVE

11   PROVIDED IT SUPPORT.

12         Q.      DID EVER INNOVATION MAINTAIN SPGK'S

13   WEBSITE?

14         A.      I THINK EXIGO DID.

15         Q.      EXIGO DID?

16         A.      I THINK SO.  I THINK IT WAS --

17   WELL, IT WAS MANAGED BY EVER INNOVATION, BUT

18   I THINK EXIGO WAS THE ONE THAT WAS RUNNING THE

19   WEBSITE OR PROVIDING THE SYSTEM FOR THE WEBSITE.

20         Q.      IS THERE AN AGREEMENT PURSUANT TO

21   WHICH SPGK WAS OBLIGATED TO REIMBURSE EVER

22   INNOVATION FOR ITS SERVICES?

23         A.      SORRY, ONCE AGAIN, I DON'T REMEMBER

24   IF THERE WAS AN AGREEMENT.

25         Q.      YOU DON'T?

191

RYUNOSUKE YOSHIDA

1        A.      I CANNOT REMEMBER.

2        Q.      OKAY.  DID YOU EVER HEAR OF A

3  COMPANY CALLED MELS ART?

4        A.      DO I KNOW A COMPANY CALLED MELS

5  ART?

6        Q.      YES.

7        A.      YES.

8        Q.      AND WHAT IS MELS ART?

9        A.      MELS ART IS A COMPANY IN JAPAN.

10       Q.      AND WHO IS IT OWNED BY?

11       A.      I CANNOT BE 100% ACCURATE, BUT

12  I BELIEVE IT IS OWNED BY KEN ISHIGURO(?).

13       Q.      DOES MR. MATSUURA HAVE AN OWNERSHIP

14  INTEREST IN IT?

15       A.      I DON'T THINK SO.

16       Q.      MR. ANDO?

17       A.      I DON'T THINK SO.  FROM THE BEST OF

18  MY KNOWLEDGE, I DON'T THINK SO.

19       Q.      DID MELS ART HAVE A CONTRACT WITH

20  SPGK?

21       A.      I DON'T THINK SO.

22       Q.      DID MELS ART HAVE A CONTRACT WITH

23  ASCENTRA?

24       A.      I BELIEVE ASCENTRA HOLDINGS INC.

25       Q.      WITH ASCENTRA HOLDINGS?

192

RYUNOSUKE YOSHIDA

1          A.      SORRY, I THINK IT HAD AN AGREEMENT

2    WITH ASCENTRA GROUP, ONE OF THE ENTITIES, BUT

3    I DON'T KNOW WHICH ENTITY IT WAS.

4          Q.      WHAT DID MELS ART DO?

5          A.      IT WAS PROVIDING SUPPORT ON

6    COMMISSION CALCULATION CHECKS, ART WORK, DESIGN.

7          Q.      THIS IS FOR THE PACKAGING?

8          A.      IT COULD HAVE BEEN FOR THE

9    PACKAGING.  IT COULD HAVE BEEN FOR THE WEBSITES.

10         Q.      WAS MELS ART ONE OF THE VENDORS

11   THAT MR. MATSUURA ASKED YOU TO MAKE A PAYMENT TO

12   AT THE END -- TOWARDS THE END OF ----

13         A.      YES.

14         Q.      IT WAS?

15         A.      YES.

16         Q.      DID YOU ASK MR. MATSUURA IF HE HAD

17   AN INTEREST IN MELS ART AT THE TIME HE WAS ASKING

18   YOU TO MAKE THAT PAYMENT?

19         A.      I DIDN'T ASK HIM.

20         Q.      OKAY.  DO YOU RECALL DISCUSSING

21   WITH MR. HOMMA THAT AS PART OF ANY DISTRIBUTION

22   AGREEMENT BETWEEN ASCENTRA AND SPGK THAT 77% OF

23   THE INCOME THAT WAS BEING EARNED WOULD BE

24   DISTRIBUTED TO ASCENTRA?

25         A.      NO.

193

RYUNOSUKE YOSHIDA

1          Q.    YOU DON'T RECALL HAVING THAT

2    DISCUSSION WITH HIM?

3          A.    NO.

4                MR. MORRIS:  OBJECTION TO THE FORM

5    OF THE QUESTION.

6          A.    CAN I JUST QUICKLY RUN TO THE

7    BATHROOM?

8                MR. MCDONALD:  WE CAN TAKE A

9    10-MINUTE BREAK, FIVE MINUTES, TEN MINUTES.

10         A.    FIVE MINUTES IS GOOD.

11               THE VIDEOGRAPHER:  WE ARE GOING OFF

12   THE RECORD.  THE TIME IS 2.50.

13      (A SHORT BREAK FROM 2.50 P.M. TO 3.01 P.M.)

14               THE VIDEOGRAPHER:  WE ARE BACK ON

15   THE RECORD.  THE TIME IS 3.01.

16        (EXHIBIT 6 MARKED FOR IDENTIFICATION)

17   BY MR. MCDONALD:

18         Q.    MR. YOSHIDA, I AM GOING TO SHOW YOU

19   WHAT HAS BEEN MARKED AS EXHIBIT 6. (PAUSE)

20         A.    OKAY.

21         Q.    DO YOU RECOGNISE THIS E-MAIL?

22         A.    I DON'T REMEMBER.

23         Q.    DO YOU HAVE ANY DOUBT THAT YOU

24   RECEIVED IT?

25         A.    NO.

                        194

                RYUNOSUKE YOSHIDA

1          Q.     IT IS ADDRESSED TO YOU,

2   RYU@TIRAWORKS?

3          A.     YES.

4          Q.     DO YOU REMEMBER A TIME WHEN THERE

5   WAS CONCERN OVER THE PERFORMANCE OF SPGK?

6          A.     YES.

7          Q.     AND YOU NOTICED AT THIS TIME THE

8   PEOPLE THAT ARE EXPRESSING CONCERN ARE ALL

9   ASCENTRA'S SHAREHOLDERS AND DIRECTORS; IS THAT

10  CORRECT?

11         A.     CAN YOU SAY THAT AGAIN?

12         Q.     THE PEOPLE THAT ARE ADDRESSING THIS

13  ISSUE ARE ASCENTRA'S SHAREHOLDERS OR DIRECTORS, IS

14  THAT CORRECT, OR OFFICERS, I BELIEVE MR. SANDERS

15  AT THE TIME?

16         A.     I THINK TED SANDERS IS USING HIS

17  SPGK E-MAIL AS WELL, SO I DON'T THINK IT IS ONLY

18  ASCENTRA, BUT SPGK AND ASCENTRA.

19         Q.     EXPRESSING CONCERN OVER THE

20  PERFORMANCE OF SPGK?

21         A.     YES.

22         Q.     IF YOU TURN TO THE VERY BACK, YOU

23  SEE MARTY IS EXPRESSING A NEED, SAYING, "WE CAN'T

24  JUST KEEP SLASHING OVERHEAD, MARKETING, AND

25  SUPPORT SERVICES AND EXPECT TO INCREASE REVENUES

195

RYUNOSUKE YOSHIDA

1  WITHOUT ANY NEW PRODUCTS TO PROMOTE."  DO YOU SEE

2  THAT?

3          A.    YES.

4          Q.    AT THE TIME MR. MATTHEWS WAS AN

5  EMPLOYEE OF ASCENTRA, CORRECT?

6          A.    I BELIEVE SO.

7          Q.    WAS MR. MATTHEWS EVER AN EMPLOYEE

8  OF SPGK?

9          A.    I DON'T THINK HE WAS AN EMPLOYEE.

10         Q.    WAS HE EVER A DIRECTOR OF SPGK?

11         A.    NO.

12         Q.    WAS HE EVER A SHAREHOLDER OF SPGK?

13         A.    NO.

14         Q.    IT SAYS, "WE NEED A GAME CHANGER

15  NOW."  DO YOU SEE THAT?  IF YOU FLIP UP A LITTLE

16  BIT TO THE SECOND PAGE, AND IT IS THE E-MAIL DOWN,

17  IT SAYS, "TIM AND TED, I THINK WE URGENTLY NEED

18  ANOTHER 'GAME CHANGER' FOR SPGK TO REVERSE

19  NEGATIVE MOMENTUM AND INCREASE NEW REGISTRATIONS

20  AND REACTIVATE EXISTING AGENTS WHO ARE IDLE."  DO

21  YOU SEE THAT?

22         A.    YES.

23         Q.    DO YOU RECALL HAVING OR WORKING ON

24  WHAT THEY HAVE CALLED IN QUOTES A "GAME CHANGER"

25  FOR SPGK?

RYUNOSUKE YOSHIDA

```
 1            A.     I DON'T REMEMBER THIS PARTICULAR
 2   E-MAIL, BUT ----
 3            Q.     AT THIS TIME PERIOD, WAS THERE A
 4   DISCUSSION ABOUT GETTING NEW PRODUCT TO SPGK TO
 5   SELL?
 6            A.     WHAT I REMEMBER FROM THIS PERIOD
 7   WAS THE REVENUE WAS DRAMATICALLY DROPPING, AND
 8   ALSO WE WERE HAVING ISSUES WITH COMMISSION SYSTEM
 9   WHERE OUR AGENTS WERE GAMING OUR SYSTEM, AND WE
10   WERE HAVING EXCESSIVE CASH OUT.  THIS IS WHAT
11   I RECALL FROM THIS PERIOD.
12            Q.     WHAT DID YOU MEAN BY GAMING THE
13   SYSTEM?
14            A.     THE AGENTS OF SPGK WERE -- THERE
15   WAS AN ISSUE IN THE COMMISSION CALCULATION SYSTEM
16   AND THE AGENTS COULD FOUND OUT HOW TO PLAY THE
17   GAME -- GAME THIS ISSUE TO ACTUALLY GET MORE PAY
18   OUTS THAN WHAT THEY ARE SUPPOSED TO.
19            Q.     WHO BECAME AWARE OF THIS ISSUE?
20            A.     I DON'T REMEMBER, BUT I THINK --
21   PEOPLE THAT WERE INVOLVED GOT AWARE OF IT,
22   I BELIEVE.  I THINK IT WAS AROUND THIS TIME.
23   I CANNOT BE 100% ACCURATE, BUT I THINK IT WAS
24   AROUND THIS TIME.
25            Q.     AND AT THIS TIME, WHICH IS
```

197

RYUNOSUKE YOSHIDA

1    I BELIEVE MARCH 2017?

2          A.     I THINK SO.  SORRY, I CANNOT BE

3    ACCURATE.

4          Q.     AND AT THAT TIME YOU WERE A

5    DIRECTOR OF ASCENTRA, CORRECT?

6          A.     YES, I BELIEVE SO.

7          Q.     BUT YOU WERE CONCERN ABOUT SPGK'S

8    AGENTS "GAMING THE SYSTEM"?

9          A.     WHETHER I WAS CONCERNED ABOUT IT --

10   WELL, I THINK IT IS NATURAL TO THINK THAT IF

11   SPGK'S REVENUE DROPPED AND ASCENTRA AS A VENDOR OF

12   SPGK, THEY WOULD AFFECT THE PERFORMANCES OF

13   ASCENTRA.  SO, YES.  IN THAT SENSE, YES.

14         Q.     DID SPGK HAVE AN INDEPENDENT

15   MANAGEMENT TEAM AT THIS TIME?

16         A.     DURING THIS TIME?  2017?  CAN YOU

17   DEFINE INDEPENDENT?

18         Q.     A SEPARATE AND APART MANAGEMENT

19   TEAM, THEIR OWN MANAGEMENT TEAM?

20         A.     I DON'T REMEMBER EXACTLY WHO WAS

21   RUNNING IT BUT I THINK THERE WAS SOME SUPPORT

22   PROVIDED BY ASCENTRA.

23         Q.     AT THIS TIME, DID SPGK HAVE ITS OWN

24   SEPARATE INDEPENDENT MANAGEMENT TEAM?

25         A.     I DON'T REMEMBER.

198

RYUNOSUKE YOSHIDA

1          Q.     DID SPGK AT THIS TIME HAVE ANY

2   OFFICERS?

3          A.     CAN I DOUBLE-CHECK THE RECORDS?

4          Q.     WHAT IS IT YOU ARE LOOKING AT?

5          A.     WELL, I'M JUST TRYING TO CHECK

6   WHETHER TED SANDERS WAS A DIRECTOR BACK THEN.

7          Q.     I DID NOT ASK FOR A DIRECTOR.

8   I ASKED DID THEY HAVE ANY OFFICERS.

9               MR. MORRIS:  OBJECTION TO THE FORM

10  OF THE QUESTION.

11         A.     MAYBE NOT.

12  BY MR. MCDONALD:

13         Q.     YOU DON'T RECALL WHETHER OR NOT

14  THEY DID?

15         A.     I CANNOT EXACTLY REMEMBER.

16      (EXHIBIT 7 MARKED FOR IDENTIFICATION)

17  BY MR. MCDONALD:

18         Q.     I WILL SHOW YOU WHAT HAS BEEN

19  MARKED AS EXHIBIT 7.  HAVE YOU SEEN THIS BEFORE?

20         A.     I HAVE SEEN IT RECENTLY, YES.

21         Q.     HOW RECENTLY?

22         A.     ARE YOU ASKING ME ABOUT THE FIRST

23  TIME I RECEIVE IT OR THE LAST TIME -- SORRY, THE

24  FIRST TIME I SAW IT OR THE LAST TIME I SAW IT?

25         Q.     LET US START WITH THE FIRST TIME

199

RYUNOSUKE YOSHIDA

1   YOU SAW IT.  WHEN WAS THE FIRST TIME YOU SAW THIS

2   AGREEMENT?

3           A.    I SAW IT IN A LETTER FROM

4   CAMPBELLS, AND IT WAS ATTACHED TO A LETTER FROM

5   CAMPBELLS.  I BELIEVE IT WAS 2021.

6           Q.    AND YOU WERE UNAWARE OF THE

7   EXISTENCE OF THIS AGREEMENT PRIOR THAT?

8           A.    I WAS NOT AWARE.

9           Q.    MR. HOMMA DID NOT MAKE YOU AWARE OF

10  THAT?

11          A.    NO.

12          Q.    AND MR. HOMMA, TO BE CLEAR, SOLD

13  GROWTH TODAY TO YOU FOR ONE DOLLAR?

14          A.    YES.

15          Q.    AND THIS WAS AN AGREEMENT THAT

16  GROWTH TODAY ENTERED INTO; IS THAT CORRECT?

17          A.    I BELIEVE SO.

18          Q.    ARE YOU AWARE OF ANY LEGAL

19  PROCEEDINGS OR ANY PROCEEDINGS THAT HAVE SOUGHT TO

20  INVALIDATE THIS AGREEMENT?

21          A.    CAN YOU REPHRASE THE QUESTION?

22          Q.    ARE YOU AWARE OF ANY LEGAL

23  PROCEEDINGS, ANYWHERE, THE GOAL OF WHICH WAS TO

24  INVALIDATE THIS AGREEMENT?

25          A.    NO.

200

RYUNOSUKE YOSHIDA

1        Q.      SO IN THIS AGREEMENT, IF WE LOOK AT

2    THE BOTTOM, IT IS DISCUSSING THE MEMORANDUM OF

3    UNDERSTANDING, "THE PARTIES HERETO ACKNOWLEDGE AND

4    AGREE THAT: (I) THE MEMORANDUM WAS NEVER LEGALLY

5    EFFECTED."  DO YOU SEE THAT?

6        A.      YES.

7        Q.      IF YOU TURN OVER THE PAGE, THE TOP

8    (IV), ABOVE 2, IT SAYS, "THE MEMORANDUM AND EACH

9    AND EVERY ORAL AND WRITTEN AGREEMENT RELATED TO

10   THE MATTERS SET FORTH THEREIN WERE AND ARE WITHOUT

11   FORCE AND EFFECT."  DO YOU SEE THAT?

12       A.      YES.

13       Q.      AND YOU PREVIOUSLY HAD DISCUSSED

14   OTHER AGREEMENTS THAT HAD BEEN ENTERED INTO

15   BETWEEN THE PARTIES CONCERNING IHEALTHSCIENCE,

16   RADIAL IT, I BELIEVE?

17       A.      YES.

18       Q.      IF YOU GO DOWN TO NUMBER 2 ----

19       A.      YES.

20       Q.      "EACH OF MOTO AND SHANG PENG SHALL

21   IRREVOCABLY CANCEL, SELL, CONVEY, ASSIGN, TRANSFER

22   AND DELIVER ALL ASSETS AND MONIES OF SHANG PENG TO

23   ASCENTRA, INCLUDING BUT NOT LIMITED TO ALL

24   INTELLECTUAL PROPERTY", ETC.  DO YOU SEE THAT?

25       A.      YES.

RYUNOSUKE YOSHIDA

1           Q.    DO YOU KNOW IF THE PARTIES EVER

2    ENTERED INTO ANOTHER AGREEMENT TO INVALIDATE THIS

3    AGREEMENT?

4                 MR. MORRIS:  OBJECTION TO THE FORM

5    OF THE QUESTION.

6           A.    NO.

7    BY MR. MCDONALD:

8           Q.    NO?

9           A.    NO.

10          Q.    PUT THAT ASIDE.  I WILL SHOW YOU

11   WHAT HAS BEEN MARKED AS EXHIBIT 8.

12          (EXHIBIT 8 MARKED FOR IDENTIFICATION)

13   BY MR. MCDONALD:

14          Q.     IF YOU START DOWN THE VERY BOTTOM,

15   DO YOU SEE THAT E-MAIL FROM TED SANDERS?

16          A.    YES.

17          Q.     DO YOU SEE THERE IT SAYS,

18   "HOMMA-SAN, ATTACHED IS AN AGREEMENT DRAFTED BY

19   TOM POLETTI", AND WE HAVE ALREADY ESTABLISHED YOU

20   KNOW WHO HE WAS; HE WAS ADVISING ASCENTRA,

21   CORRECT, "CANCELLING THE ORIGINAL MEMORANDUM OF

22   UNDERSTANDING BETWEEN ASCENTRA AND GROWTH TODAY

23   THAT WE DISCUSSED LAST NIGHT.  TO SUMMARIZE, THE

24   AGREEMENT BEGINS BY ACKNOWLEDGING THAT THE PURPOSE

25   OF THE MOU WAS TO ESTABLISH A SEPARATE BUSINESS

202

RYUNOSUKE YOSHIDA

1  FOR ASCENTRA'S CHINA BUSINESS AND REQUIRED

2  PAYMENTS BETWEEN THE TWO COMPANIES.  IT FURTHER

3  ACKNOWLEDGES THAT THE AGREEMENT WAS NOT FOLLOWED

4  AND THE OWNERSHIP STEPS WERE NEVER TAKEN.

5  THEREFORE, BOTH ASCENTRA AND GROWTH TODAY WISH TO

6  RETURN ALL ASSETS AS IF THE AGREEMENT HAD NOT

7  TAKEN PLACE.

8           "BOTH ASCENTRA AND GROWTH TODAY

9  AGREE THAT THE MOU WAS NOT LEGALLY COMPLETED; WAS

10  NOT LEGALLY BINDING.  HOMMA-SAN AND SPG AGREE TO

11  RETURN ALL TANGIBLE AND INTANGIBLE ASSETS.  BOTH

12  ASCENTRA AND SPGK AGREE TO COOPERATE AND TAKE

13  ACTIONS NECESSARY TO CANCEL THE MOU.  LET ME KNOW

14  OF (SIC) YOU REQUIRE A TRANSLATION.  IF NOT,

15  PLEASE SIGN THE AGREEMENT AND I WILL OBTAIN

16  MARTY'S SIGNATURE AS WELL."  DO YOU SEE THAT?

17       A.    YES.

18       Q.    WERE YOU EVER MADE AWARE THAT

19  MR. SANDERS AND ASCENTRA, WHO YOU WERE AT THAT

20  TIME A DIRECTOR OF, WAS OF THE POSITION THAT THE

21  MOU WAS NEVER EFFECTED?

22       A.    CAN YOU REPHRASE THE QUESTION?

23       Q.    AS A DIRECTOR OF ASCENTRA, WERE YOU

24  AWARE THAT THE MOU WAS NEVER AFFECTED -- THE

25  TRANSACTIONS CONTEMPLATED BY THE MOU WERE NEVER

203

RYUNOSUKE YOSHIDA

1  AFFECTED?

2          A.     CAN I CLARIFY?

3          Q.     WERE YOU AWARE AS A DIRECTOR ----

4          A.     CAN I CLARIFY?

5          Q.     YOU CAN CLARIFY.

6          A.     ARE YOU BASING IT ON THE

7  CANCELLATION AGREEMENT OR ARE YOU BASING IT ON ANY

8  OTHER?

9          Q.     I AM JUST ASKING YOU.  AS A

10  DIRECTOR OF ASCENTRA, WERE YOU AWARE OF THE

11  TRANSACTIONS THAT WERE CONTEMPLATED BY THE MOU

12  WERE NEVER AFFECTED?

13          MR. MORRIS:  OBJECTION TO THE FORM

14  OF THE QUESTION.

15          A.     SORRY, I DON'T UNDERSTANDS YOUR

16  QUESTION.  I AM TRYING TO UNDERSTAND IT.  CAN YOU

17  PUT IT SIMPLY?

18  BY MR. MCDONALD:

19          Q.     YES.  IN THE BOTTOM HERE, IT SAYS,

20  "THE CANCELLATION AGREEMENT FURTHER ACKNOWLEDGES

21  THAT THE AGREEMENT WAS NOT FOLLOWED AND THE

22  OWNERSHIP STEPS WERE NEVER TAKEN."  DO YOU SEE

23  THAT?  IT IS AT THE VERY BOTTOM OF THE FIRST PAGE.

24  AS A DIRECTOR OF ASCENTRA, WERE YOU AWARE THAT

25  THAT WAS THE CASE?

204

RYUNOSUKE YOSHIDA

1          A.      SORRY, CAN YOU TELL ME THE SENTENCE

2    AGAIN?  I JUST FOUND THE PARAGRAPH.

3          Q.      IT IS THE SECOND TO LAST SENTENCE,

4    "IT FURTHER ACKNOWLEDGES THAT THE AGREEMENT WAS

5    NOT FOLLOWED AND THE OWNERSHIP STEPS WERE NEVER

6    TAKEN."

7          A.      CAN YOU TELL ME WHAT THIS AGREEMENT

8    IS REFERRING TO?

9          Q.      IT ATTACHES AN AGREEMENT.  IT SAYS

10   ON TOP, AND IF YOU LOOK AT THE SUBJECT, "ASCENTRA/

11   SPGK CANCELLATION AGREEMENT".

12         A.      IT SAYS ----

13         Q.      THE AGREEMENT THAT IS REFERENCED

14   THERE IS THE MEMORANDUM OF UNDERSTANDING.

15         A.      OKAY.  MOU WAS NOT FOLLOWED AND THE

16   OWNERSHIP STEPS WERE NEVER TAKEN.  YOU ARE ASKING

17   ME IF THIS IS CORRECT OR NOT, RIGHT?

18         Q.      AS A DIRECTOR OF ASCENTRA, WERE YOU

19   MADE AWARE THAT THAT WAS THE CASE?

20              MR. MORRIS:  OBJECTION TO THE FORM

21   OF THE QUESTION.

22         A.      "[MOU] WAS NOT FOLLOWED AND

23   OWNERSHIP STEPS WERE NEVER TAKEN", I THINK THIS

24   STATEMENT IS CORRECT.  THE MOU WAS NOT FOLLOWED

25   AND THE OWNERSHIP STEPS WERE NEVER TAKEN.

RYUNOSUKE YOSHIDA

1    Q.     AND THE NEXT SENTENCE IS,

2  "THEREFORE, BOTH ASCENTRA AND GROWTH TODAY WISH TO

3  RETURN ALL ASSETS AS IF THE AGREEMENT HAD NOT

4  TAKEN PLACE."

5         A.     I DON'T KNOW ABOUT THIS.

6         Q.     IF YOU LOOK AT THE VERY TOP E-MAIL

7  FROM MR. HOMMA, IT IS TO MASAMI.  DO YOU

8  UNDERSTAND WHAT IS WRITTEN THERE?

9         A.     DO YOU WANT ME TO TRANSLATE?

10        Q.     CAN YOU PLEASE TRANSLATE?

11               MR. MORRIS:  ARE YOU REFERRING TO

12  THE APRIL 3RD E-MAIL AT 2.13 P.M.?  CAN YOU JUST

13  IDENTIFY THE E-MAIL SO I AM FOLLOWING ALONG?

14               MR. MCDONALD:  SURE.  THE TOP ONE

15  IS THE APRIL 4 E-MAIL AT 1.14 A.M.

16               MR. MORRIS:  THANK YOU VERY MUCH.

17        A.     IS IT THE TOP ONE?

18  BY MR. MCDONALD:

19        Q.     YES.

20        A.     "HI", I KIND OF TRANSLATE AS HI,

21  "I HAVE ATTACHED THE SIGNED DOCUMENTS AND I WILL

22  HAVE REPLY.  THANK YOU."

23        Q.     THAT WAS MR. HOMMA RETURNING THE

24  SIGNED DOCUMENT?

25        A.     I BELIEVE SO.  I DON'T HAVE THIS

206

RYUNOSUKE YOSHIDA

1   E-MAIL IN HAND.  IT IS NOT MY RECORD.

2       Q.    OKAY.  PUT THAT ASIDE.  WHEN WE

3   WERE PREVIOUSLY DISCUSSING THE MEMORANDUM OF

4   UNDERSTANDING, IF YOU RECALL I ASKED YOU IF THAT

5   DOCUMENT DID NOT EXIST, RIGHT?  WAS THERE A

6   SEPARATE SIGNED AGREEMENT BETWEEN ASCENTRA

7   HOLDINGS AND SPGK PURSUANT TO WHICH SPGK COULD

8   SELL AND DISTRIBUTE ASCENTRA PRODUCTS?  DO YOU

9   REMEMBER I ASKED YOU THAT QUESTION?

10      A.    YES.

11      Q.    THIS AGREEMENT EFFECTIVELY RETURNED

12  US TO THAT POSITION; IS THAT CORRECT?

13              MR. MORRIS:  OBJECTION TO THE FORM

14  OF THE QUESTION.

15      A.    NO.

16  BY MR. MCDONALD:

17      Q.    WHY DO YOU SAY NO?

18      A.    BECAUSE MY UNDERSTANDING OF THIS

19  DOCUMENT IS THAT IT IS NOT VALID.

20      Q.    SO IF THE MOU WAS NOT VALID AND

21  THIS AGREEMENT IS NOT VALID, THE BOTTOM LINE IS

22  THERE IS NO AGREEMENT; IS THAT CORRECT?

23      A.    YES.

24      Q.    OKAY.  YOU SAID THAT THE

25  CANCELLATION AGREEMENT WAS NOT VALID.  WHY DID YOU

                        207

RYUNOSUKE YOSHIDA

1    SAY THAT?

2          A.    I BELIEVE THERE ARE A COUPLE OF

3    REASONS WHY THE CANCELLATION AGREEMENT IS NOT

4    VALID.  I THINK, FIRST, I WOULD LIKE TO RAISE THAT

5    I NEVER RECEIVED THIS DOCUMENT.  I DID NOT KNOW

6    THE EXISTENCE OF THIS DOCUMENT.  SECOND, THIS

7    CANCELLATION DOCUMENT WAS NEVER -- SORRY, GOING

8    BACK TO THE FIRST POINT, I DID NOT RECEIVE IT FROM

9    TED SANDERS, NOR FROM MOTOHIKO HOMMA OR MARTY

10   MATTHEWS.  IF I KNEW THE EXISTENCE OF THIS

11   AGREEMENT, I WOULD NOT HAVE BOUGHT SPGK WHERE IT

12   HAD SO MUCH RISK, SO MUCH CRIMINAL AND PERSONAL

13   RISKS.  SECOND, BECAUSE I DID NOT -- WELL, I DID

14   NOT KNOW THE EXISTENCE OF THE AGREEMENT, PLUS

15   NOBODY REALLY PUT THIS IN ACTION AS WELL.  IF THIS

16   AGREEMENT WAS IN EXISTENCE, SOMEBODY SHOULD HAVE

17   TOLD ME AND CORRECTED ME.  THIRD, THIS DOCUMENT,

18   CANCELLATION AGREEMENT, FROM LOOKING AT THE FACTS,

19   THIS SEEMS TO BE SIGNED IN A PERIOD WHERE THERE

20   WAS A LOT OF SHAREHOLDER DISPUTES.  AND THIS

21   DOCUMENT WAS SIGNED WHEN MARTY MATTHEWS TOOK A

22   WRONG PROCEDURE IN THE ARTICLES OF ASSOCIATION OF

23   ASCENTRA AND IRP TO REMOVE DIRECTORS OF IRP AND

24   ALSO ASCENTRA.  MARTY MATTHEWS HIMSELF LATER

25   APOLOGISED AND ADMITTED WRONGDOING FOR THE

208

PROCEDURE HE TOOK TO REMOVE THE DIRECTORS. SO, CONSIDERING THAT MARTY MATTHEWS ADMITTED THIS WRONG PROCEDURE, AND THIS DOCUMENT WAS SIGNED IN THIS SPECIFIC PERIOD OF TIME, MAYBE INTENTIONALLY, I CANNOT BELIEVE TO THINK THAT THIS DOCUMENT IS VALID.

Q. SO MR. HOMMA DID NOT MAKE YOU AWARE OF THE EXISTENCE OF THIS AGREEMENT?

A. NO.

Q. DID MR. MATSUURA MAKE YOU AWARE OF THE EXISTENCE OF THIS AGREEMENT?

A. NO, AND I BELIEVE HE DID NOT KNOW.

Q. YOU BELIEVE MR. MATSUURA WAS NOT AWARE?

A. I THINK HE MENTIONED IT SOMEWHERE IN THE AFFIDAVIT, SOMEWHERE.

Q. MR. MATSUURA WAS AWARE OF THE EXISTENCE OF ----

A. WAS NOT AWARE OF THE EXISTENCE OF THIS AGREEMENT.

Q. YOU SAID IF YOU WERE AWARE OF THE EXISTENCE OF THIS AGREEMENT YOU WOULD NOT HAVE BOUGHT GROWTH TODAY?

A. YES.

Q. BUT YOU ALSO SAID THAT THE ONLY

1   AGREEMENT THAT WAS SIGNED BY THE SHAREHOLDERS, THE

2   MEMORANDUM OF UNDERSTANDING ITSELF WAS NOT

3   ENFORCEABLE?

4          A.    CAN YOU REPHRASE YOUR QUESTION?

5          Q.    YOU TESTIFIED THAT THE MEMORANDUM

6   OF UNDERSTANDING THAT THE CANCELLATION OF

7   AGREEMENT CANCELS WAS ITSELF NOT ENFORCEABLE?

8          A.    SORRY, I DON'T UNDERSTAND YOUR

9   QUESTION.  CAN YOU MAKE IT SIMPLER, BREAK IT DOWN,

10  PLEASE?

11         Q.    DID YOU OR DID YOU NOT TESTIFY THAT

12  THE MEMORANDUM -- IN YOUR VIEW, THE MEMORANDUM OF

13  UNDERSTANDING ----

14         A.    I HAVE IT HERE.

15         Q.    YOU HAVE IT?

16         A.    YES.

17         Q.    THE REMEMBER RANDOM OF

18  UNDERSTANDING WAS NOT ENFORCEABLE?

19         A.    I THINK I SAID IT WAS NOT BINDING.

20         Q.    NOT BINDING?

21         A.    YES.

22         Q.    IS THERE IS A DIFFERENCE BETWEEN

23  BINDING AND ENFORCEABLE IN YOUR MIND?

24         A.    I THINK THE WORD "BINDING" MAKES

25  MORE SENSE TO ME.

210

RYUNOSUKE YOSHIDA

1     Q.    SO IF THE MEMORANDUM OF

2  UNDERSTANDING WAS NOT BINDING, THE CANCELLATION

3  AGREEMENT THEN CANCELLED SOMETHING THAT WAS NOT

4  BINDING, HOW WOULD THAT IMPACT YOUR DECISION TO

5  BUY GROWTH TODAY?

6     A.    SORRY, I DON'T UNDERSTAND THE

7  QUESTION.

8     Q.    YOU TESTIFIED THAT IF YOU WERE

9  AWARE OF THE CANCELLATION AGREEMENT YOU WOULD NOT

10  HAVE BOUGHT GROWTH TODAY FOR A DOLLAR?

11     A.    OKAY, I GET WHAT YOU MEAN.  OKAY.

12     Q.    DO YOU UNDERSTAND?

13     A.    YES, I GET WHAT YOU MEAN.

14     Q.    I AM TRYING TO UNDERSTAND HOW THE

15  CANCELLATION OF AN AGREEMENT THAT YOU SAY WAS NOT

16  BINDING WOULD AT ALL AFFECT YOUR DECISION TO

17  PURCHASE GROWTH TODAY?

18          MR. MORRIS:  OBJECTION TO THE FORM

19  OF THE QUESTION.

20     A.    THEN LET ME CORRECT MYSELF.  PLEASE

21  ALLOW ME TO CORRECT MYSELF.  IF THE CANCELLATION

22  AGREEMENT WAS -- LET US SAY IF THE CANCELLATION

23  AGREEMENT WAS EFFECTIVE, AND IT CANCELLED SOME

24  EFFECTIVE AGREEMENT, THEN I WOULD HAVE NOT BOUGHT

25  IT.

211

RYUNOSUKE YOSHIDA

1  MR. MCDONALD:

2      Q.    BUT YOU TESTIFIED THAT YOU BELIEVED

3  THE MEMORANDUM OF UNDERSTANDING WAS NEVER BINDING?

4      A.    YES.  SO I JUST EXPLAINED JUST NOW

5  THAT IF THIS WAS THE SITUATION I WOULD HAVE NOT

6  BOUGHT IT.

7      Q.    I WILL SHOW YOU WHAT HAS BEEN

8  MARKED AS EXHIBIT 9.

9      (EXHIBIT 9 MARKED FOR IDENTIFICATION)

10  BY MR. MCDONALD:

11      Q.    HAVE YOU EVER SEEN THIS AGREEMENT

12  BEFORE?

13      A.    I BELIEVE I SAW IT WHEN IT CAME

14  WITH THE CAMPBELLS LETTER, WITH THE CANCELLATION

15  AGREEMENT.  THAT IS THE FIRST TIME I SAW IT.

16      Q.    THE FIRST TIME YOU SAW IT?

17      A.    YES.

18      Q.    DURING THIS PERIOD YOU WERE NO

19  LONGER ON THE BOARD OF DIRECTORS OF ASCENTRA; IS

20  THAT CORRECT?

21      A.    I DON'T KNOW, BECAUSE, LIKE I SAID

22  EARLIER, I THINK THE PROCEDURE WAS WRONG.

23      Q.    I AM JUST ASKING YOU.  WERE YOU OR

24  WERE YOU NOT A MEMBER OF THE BOARD OF DIRECTORS OF

25  ASCENTRA IN APRIL 2018?

212

RYUNOSUKE YOSHIDA

1          A.      I DON'T KNOW I THINK IS MY ANSWER.

2    FROM A LEGAL PERSPECTIVE, I DON'T KNOW.

3          Q.      I WILL MAKE IT EASIER ON YOU.  IF

4    YOU LOOK AT PARAGRAPH 5 OF YOUR DECLARATION, THAT

5    ANSWERS YOUR QUESTION, I THINK?

6          A.      OKAY.  SO I PROBABLY HAVE MADE A

7    MISTAKE.  I AGREE WITH YOU, I WAS NOT A DIRECTOR.

8          Q.      WHEN YOU REJOINED THE BOARD IN

9    DECEMBER OF 2018 ----

10         A.      YES.

11         Q.      ---- WERE YOU MADE AWARE OF ANY

12   AGREEMENTS ENTERED INTO BY ASCENTRA WHILE YOU WERE

13   OFF THE BOARD?

14         A.      NO.

15         Q.      DID YOU ASK IF THEY HAD ENTERED

16   INTO ANY AGREEMENTS WHILE YOU WERE OFF THE BOARD?

17         A.      NO, I DON'T THINK SO.

18         Q.      WERE YOU AWARE THAT AOS HAD BECOME

19   THE DISTRIBUTOR, AND BY AOS I MEAN ASIA OFFSHORE

20   SERVICES, OF ASCENTRA'S PRODUCTS?

21         A.      NO.

22         Q.      YOU WERE NOT MADE AWARE OF THAT?

23         A.      I WAS NOT MADE AWARE OF IT.

24         Q.      IF YOU LOOK AT THE VERY -- THIS

25   THING IS INITIALLED BY EVERYONE, AND IT IS SIGNED

213

RYUNOSUKE YOSHIDA

1    BY ASCENTRA HOLDINGS BY MR. MATTHEWS.  DO YOU SEE

2    THAT?

3            A.    YES.

4            Q.    AND MR. SANDERS BY ASIA OFFSHORE

5    SERVICES?  DO YOU SEE THAT?

6            A.    YES.

7        (EXHIBIT 10 MARKED FOR IDENTIFICATION)

8            Q.    I WILL SHOW YOU WHAT HAS BEEN

9    MARKED AS EXHIBIT 10.  MR. YOSHIDA, CAN YOU TURN

10   TO THE LAST PAGE, PLEASE?

11           A.    YES.

12           Q.    IS THAT YOUR SIGNATURE?

13           A.    YES.

14           Q.    AND IT IS DATED 15 DECEMBER 2018;

15   IS THAT CORRECT?

16           A.    YES.

17           Q.    AND ACCORDING TO YOUR DECLARATION

18   YOU RETURNED TO THE ASCENTRA BOARD ON 18 DECEMBER

19   2018; IS THAT CORRECT?

20           A.    YES.

21           Q.    AFTER PURCHASING GROWTH TODAY FROM

22   MR. HOMMA FOR A DOLLAR, JUST THREE DAYS PRIOR WHY

23   DID YOU RETURN TO THE BOARD OF ASCENTRA HOLDINGS?

24           A.    BECAUSE MOTOHIKO HOMMA DID NOT WANT

25   TO BE A DIRECTOR OF ASCENTRA HOLDINGS ANY MORE.

214

RYUNOSUKE YOSHIDA

1        Q.      YOU WERE NOW OWNER OF A SEPARATE

2    COMPANY.  WHY DID YOU RETURN TO THE BOARD OF

3    ASCENTRA HOLDINGS WHEN NOW YOU OWNED SPGK?

4        A.      SORRY, I DON'T UNDERSTAND YOUR

5    QUESTION.

6        Q.      ON DECEMBER 15TH, YOU PURCHASED

7    EFFECTIVELY SPGK; IS THAT CORRECT?

8        A.      YES.

9        Q.      GROWTH TODAY, AS WE HAVE

10   ESTABLISHED, OWNS SPGK INC, WHICH OWNS SPGK PTE?

11       A.      YES.

12       Q.      SO YOU BOUGHT ALL OF THOSE

13   COMPANIES ----

14       A.      ACTUALLY, SORRY, NO.  I DON'T THINK

15   SPGK PET WAS SET UP BACK THEN.

16       Q.      OKAY.  THANK YOU FOR CLARIFYING

17   THAT.  WE WILL GET TO THAT NEXT.  ON 15TH, YOU BUY

18   SPGK AND THEN ON THE 18TH YOU RETURN TO THE BOARD

19   OF ASCENTRA?

20       A.      YES.

21       Q.      WHY?

22       A.      MOTOHIKO HOMMA DID NOT WANT TO BE

23   ON THE BOARD OF DIRECTOR OF ASCENTRA ANY MORE AND

24   HE NOMINATED ME TO BECOME A DIRECTOR OF ASCENTRA.

25       Q.      SO YOU WERE GOING TO BE THE OWNER

215

RYUNOSUKE YOSHIDA

1   AND CONTROLLER OF SPGK ON THE ONE HAND AND THE

2   DIRECTOR OF ASCENTRA ON THE OTHER HAND?

3          A.     YES.

4          Q.     DIRECTOR OF BOTH ENTITIES?

5          A.     YES.

6          Q.     WERE YOU CONCERNED THAT THAT MIGHT

7   PRESENT ANY CONFLICTS OF INTEREST GIVEN THE

8   BUSINESS RELATIONSHIP BETWEEN THE PARTIES?

9          A.     I DON'T THINK SO.

10         Q.     WHY?

11         A.     BECAUSE THEY OPERATED IN DIFFERENT

12   MARKETS.

13         Q.     ASCENTRA HOLDINGS AND SPGK?

14         A.     YES.

15         Q.     I THINK WE HAVE ESTABLISHED THAT

16   SPGK SUBSIDIARIES WERE PROVIDING PRODUCT TO SPGK;

17   IS THAT CORRECT?

18         A.     YES.

19         Q.     AND ASCENTRA SUBSIDIARIES WERE

20   PROVIDING IT SUPPORT TO SPGK?

21         A.     YES.

22         Q.     AND ASCENTRA SUBSIDIARIES WERE

23   PROVIDING THE LICENSING FOR IT THAT WAS BEING SOLD

24   BY SPGK?

25         A.     YES.

216

RYUNOSUKE YOSHIDA

1        Q.     SO AGAIN BEING A DIRECTOR OF THE

2   COMPANY, THE PARENT COMPANY OF THE VENDORS OF

3   SPGK, YOU DID NOT VIEW THAT AS BEING A CONFLICT OF

4   INTEREST?

5        A.     NO.

6        Q.     MR. YOSHIDA, IF WE ASSUME FOR A

7   MOMENT THAT THE CANCELLATION AGREEMENT IS IN FACT

8   BINDING AND ENFORCEABLE, JUST ASSUME FOR THE

9   MOMENT THAT IT IS BINDING AND ENFORCEABLE, WOULD

10  THAT HAVE MEANT THAT SPGK WOULD HAVE HAD TO RETURN

11  ALL OF THE PRODUCTS AND LICENCES IT WAS GRANTED BY

12  ASCENTRA BACK TO ASCENTRA?

13             MR. MORRIS:  OBJECTION TO THE FORM

14  OF THE QUESTION.

15        A.     IS THAT BASIS THAT MOU IS ALSO

16  VALID?

17  BY MR. MCDONALD:

18        Q.     I AM JUST SAYING IF THE

19  CANCELLATION AGREEMENT IS NOT VALID.  I MEAN IS

20  VALID, I AM SORRY.

21             MR. MORRIS:  OBJECTION TO THE FORM

22  OF THE QUESTION.

23        A.     SORRY, CANCELLATION AGREEMENT ----

24  BY MR. MCDONALD:

25        Q.     IS VALID AND ENFORCEABLE?

217

RYUNOSUKE YOSHIDA

1          A.     I DON'T KNOW.

2          Q.     YOU DON'T KNOW?

3          A.     I DON'T KNOW BECAUSE IF THE MOU IS

4    NOT BINDING AND THE CANCELLATION AGREEMENT IS

5    ABOUT CANCELLING A NON-BINDING -- SORRY, IF THE

6    MOU IS NOT BINDING BUT THE CANCELLATION AGREEMENT

7    IS EFFECTIVE, I DON'T KNOW WHAT IT IS CANCELLING.

8          Q.     SO IF THE CANCELLATION AGREEMENT IS

9    BINDING, WOULD SPGK STILL HAVE THE SUPPORT OF EVER

10   INNOVATION FOR THE MAINTENANCE OF ITS WEBSITE?

11              MR. MORRIS:  OBJECTION TO THE FORM

12   OF THE QUESTION.

13         A.     IF THE CANCELLATION -- SORRY, CAN

14   YOU REPEAT?

15   BY MR. MCDONALD:

16         Q.     IF THE CANCELLATION AGREEMENT IS

17   BINDING, WOULD SPGK STILL HAVE THE SUPPORT OF EVER

18   INNOVATION FOR THE MAINTENANCE OF ITS WEBSITE?

19              MR. MORRIS:  OBJECTION TO THE FORM

20   OF THE QUESTION.

21         A.     I DON'T KNOW BECAUSE YOU HAVE NOT

22   TOLD ME WHETHER THE MOU IS BINDING, IF IT IS A

23   BINDING DOCUMENT OR NOT.

24              MR. MORRIS:  I APPRECIATED THE

25   HYPOTHETICALS WITH THE EXPERT WITNESS.  WE DON'T

218

RYUNOSUKE YOSHIDA

1   PARTICULARLY DO THIS WITH FACT WITNESSES,

2   ESPECIALLY FOR LEGAL CONCLUSIONS.

3                   MR. MCDONALD:  I AM JUST ASKING

4   WHAT HIS UNDERSTANDING WOULD BE AS A DIRECTOR.

5           A.    IF YOU CAN CLARIFY WHETHER THE MOU

6   IS ----

7                   MR. MORRIS:  OBJECTION TO THE FORM

8   OF THE QUESTION.

9           A.    ---- IN THIS HYPOTHETICAL SITUATION

10  BINDING OR NOT, THEN I MIGHT BE ABLE TO REPLY BUT

11  I ----

12  BY MR. MCDONALD:

13          Q.    THE CANCELLATION AGREEMENT PROVIDES

14  AS FOLLOWS, EXHIBIT 7, PAGE 2.  IN (IV), IT SAYS,

15  "THE MEMORANDUM", AND IT IS THE TOP OF THE NEXT

16  PAGE IF YOU FLIP THAT OVER, THAT IS THE VERY TOP

17  OF THAT PAGE, "AND EACH AND EVERY ORAL AND WRITTEN

18  AGREEMENT RELATED TO THE MATTERS SET FORTH THEREIN

19  WERE AND ARE WITHOUT FORCE AND EFFECT."  DO YOU

20  SEE THAT?

21          A.    YES.

22          Q.    AND THE AGREEMENTS YOU ATTACH TO

23  YOUR DECLARATION ARE EACH SIGNED IN 2017; IS THAT

24  NOT CORRECT?

25                  A.    SORRY, WHICH EXHIBIT ARE YOU

219

RYUNOSUKE YOSHIDA

1   REFERRING TO?

2          Q.     I AM SORRY?

3          A.     SORRY, WHICH DOCUMENT ARE YOU

4   REFERRING TO?

5          Q.     YOU ATTACHED THREE AGREEMENTS AS

6   EXHIBITS TO YOUR DECLARATION; IS THAT NOT CORRECT?

7          A.     WHICH THREE DOCUMENTS?

8          Q.     UNDER EXHIBIT 7, IF YOU LOOKED AT

9   TAB 7 ----

10         A.     YOU WERE TALKING ABOUT THE PRODUCT

11  SUPPLY AGREEMENT?

12         Q.     YES.

13         A.     THE LICENCE AGREEMENT?

14         Q.     YES.

15         A.     SORRY, WHAT WAS YOUR QUESTION?

16         Q.     THIS SAYS, "EVERY ORAL AND WRITTEN

17  AGREEMENT RELATED TO THE MATTERS SET FORTH THEREIN

18  WERE AND ARE WITHOUT FORCE AND EFFECT."

19         A.     I THINK YOU ARE ASKING ME A LEGAL

20  QUESTION WHICH IS VERY DIFFICULT FOR ME TO ANSWER.

21         Q.     YOU CAN PUT THAT ASIDE.  I WILL

22  SHOW YOU WHAT HAS BEEN MARKED AT EXHIBIT 11?

23         (EXHIBIT 11 MARKED FOR IDENTIFICATION)

24         A.     YES.

25                MR. MORRIS:  IS THERE A QUESTION

220

RYUNOSUKE YOSHIDA

1   PENDING?

2            MR. MCDONALD:  NO, NOT YET.  THERE

3   WILL BE IN ONE SECOND.  I WAS GIVING HIM A MOMENT

4   TO READ.

5            MR. MORRIS:  I APPRECIATE THAT.  I

6   JUST WANTED TO MAKE SURE I DID NOT MISS ANYTHING.

7            MR. MCDONALD:  THAT'S OKAY, JOHN.

8   YOU ARE GOOD.

9   BY MR. MCDONALD:

10           Q.    ARE YOU LOOKING AT EXHIBIT 11?

11           A.    I HAVE JUST A COUPLE OF PAGES.

12           Q.    THAT MIGHT HAVE BEEN MY BAD.  GIVE

13   ME THAT ONE BACK.  WHAT THE HECK WAS THAT?

14           A.    I THINK IT IS MY PACKAGE.  I JUST

15   PUT IT ON TOP OF EACH OTHER.

16           Q.    OKAY.  I THOUGHT I HAD GIVEN YOU

17   ONE THAT HAD TWO PAGES, AND I WAS QUITE CONFUSED.

18   (PAUSE)

19           A.    YES.

20           Q.    SO YOU WERE NOT ON THIS E-MAIL,

21   RIGHT, CORRECT?

22           A.    I DON'T BELIEVE SO.

23           Q.    IF WE START FROM THE BOTTOM, IT IS

24   MR. HOMMA INFORMING I BELIEVE MR. MATSUURA AND

25   I BELIEVE MARTY AND MISS NOKINO THAT HE HAS SOLD

221

RYUNOSUKE YOSHIDA

1   HIS SHARED TO YOU?

2          A.     YES.

3          Q.     AND THAT HE IS APPOINTING YOU TO

4   THE BOARD.  DO YOU SEE THAT?

5          A.     YES.

6          Q.     THE NEXT E-MAIL UP FROM

7   MR. MATSUURA SAYS, "UNDERSTOOD.  THANK YOU FOR

8   YOUR COOPERATION WITH REGARDS TO CHINA ----"

9          A.     SORRY, CAN I INTERRUPT YOU?

10         Q.     YOU MAY.  IS THAT NOT AN ACCURATE

11  TRANSLATION?

12         A.     NO, NO, NO.

13         Q.     OKAY.

14         A.     GOING BACK TO YOUR EARLIER

15  QUESTION, YOU MENTIONED ABOUT THE CONFLICT OF

16  INTEREST.

17         Q.     YES.

18         A.     I BELIEVE THAT THE SHAREHOLDERS

19  APPROVED ME TO BECOME A DIRECTOR.  SO I THINK IT

20  WAS THE SHAREHOLDERS TO DECIDE, THE SHAREHOLDERS

21  OF ASCENTRA TO DECIDE, WHETHER THERE WAS A CONCERN

22  OR NOT.  SO I JUST WANT TO ADD THAT ON.

23         Q.     I UNDERSTAND.  WE WILL GET INTO

24  THAT A LITTLE BIT LATER.

25         A.     I JUST WANTED TO MENTION THAT.

222

RYUNOSUKE YOSHIDA

1        Q.      I APPRECIATE THE CLARIFICATION, AND

2    WE WILL DISCUSS THAT IN A LITTLE BIT.

3        A.      THANK YOU.

4        Q.      OKAY.

5        A.      YES, YOU CAN CONTINUE.

6        Q.      THANK YOU.  THE MIDDLE E-MAIL FROM

7    MR. MATSUURA, AND IF THE TRANSLATION IS NOT

8    CORRECT, YOU CAN PLEASE CORRECT ME, BUT IT IS

9    TRANSLATED IN ENGLISH TO, "THANK YOU FOR YOUR

10   COOPERATION WITH REGARDS TO CHINA WHEN CHRIS MINER

11   ASKED FOR IT.  I AM RELIEVED THAT RYU HAS TAKEN

12   OVER."  RYU IS YOU, IS THAT CORRECT?  YOUR

13   NICKNAME IS RYU?

14       A.      YES, ANOTHER NAME, YES, OR THE

15   SHORT FORM OF MY NAME.

16       Q.      YES.  AND THERE IS AN ASTERISK,

17   "RYU'S APPOINTMENT TO THE DIRECTOR WAS APPROVED AT

18   THE DIRECTORS MEETING LAST DECEMBER."

19       A.      YES.

20       Q.      CHRIS MINER AT THIS POINT IN TIME,

21   WHAT WAS HIS ROLE WITH ASCENTRA?

22           MR. MORRIS:  OBJECTION TO THE FORM

23   OF THE QUESTION.

24   BY MR. MCDONALD:

25       Q.      STRIKE THAT.  DID CHRIS MINER AT

223

RYUNOSUKE YOSHIDA

```
 1    THIS TIME HAVE A ROLE AT ASCENTRA?

 2              A.     I DON'T EXACTLY REMEMBER, BECAUSE

 3    -- I DON'T REMEMBER.

 4              Q.     WAS CHRIS MINER EVER AN EMPLOYEE OF

 5    SPGK?

 6              A.     NO.

 7              Q.     WAS CHRIS MINER EVER A DIRECTOR OF

 8    SPGK?

 9              A.     NO.

10              Q.     WAS CHRIS MINER EVER A SHAREHOLDER

11    OF SPGK?

12              A.     NO.

13              Q.     MR. YOSHIDA, CAN I ASK YOU ABOUT AN

14    ENTITY CALLED SCUDERIA BIANCO?

15              A.     YES.

16              Q.     AM I PRONOUNCING THAT CORRECTLY?

17              A.     YES.

18              Q.     AND THAT IS THE FERRARI FORMULA 1

19    RACING TEAM, SCUDERIA?

20              A.     YES.

21              Q.     I HAD HEARD THAT BEFORE.  I LIKE F1

22    AND I WAS TRYING AT THE BACK OF MY MIND FIGURE OUT

23    WHERE THAT CAME FROM.  MR. MATSUURA WAS ALSO A FAN

24    OF FERRARI, WAS HE NOT?

25              A.     YES.
```

RYUNOSUKE YOSHIDA

1        Q.      IN FACT HIS FERRARI DEALER WAS

2    BEING APPOINTED TO ONE OF THE POSITIONS, MR. ANDO?

3    ARE YOU AWARE OF THAT?  MR. ANDO USED TO SELL

4    FERRARIS.

5        A.      I DON'T KNOW.

6        Q.      YOU DON'T KNOW?  OKAY.

7        A.      I DON'T KNOW.

8        Q.      WHO FORMED SCUDERIA BIANCO?

9        A.      I DID.

10       Q.      WHY DID YOU FORM IT?

11       A.      I FORMED IT TO PROVIDE CASH

12   MANAGEMENT SERVICES TO ASCENTRA AND SPGK.

13       Q.      DID YOU ENTER A FORMAL AGREEMENT

14   WITH ASCENTRA AND SPGK TO PROVIDE THOSE SERVICES?

15       A.      YES.

16       Q.      DID SCUDERIA BIANCO HAVE ANY

17   SHAREHOLDERS?

18       A.      YES.

19       Q.      AND WERE YOU THE SOLE SHAREHOLDER?

20       A.      YES.

21       Q.      WERE YOU THE SOLE OFFICER?

22       A.      YES.

23       Q.      AND THE SOLE DIRECTOR?

24       A.      NO.

25       Q.      WHO ELSE WAS A DIRECTOR?

225

RYUNOSUKE YOSHIDA

1              A.     A NOMINEE DIRECTOR.

2              Q.     AND WHO WAS THAT?

3              A.     I CANNOT REMEMBER THE NAME ON TOP

4    OF MY HEAD.

5              Q.     DO YOU RECALL THE LAWS OF WHAT

6    JURISDICTION SCUDERIA BIANCO WAS FORMED UNDER?

7              A.     SINGAPORE, IF I RECALL CORRECTLY.

8              Q.     TO BE A SINGAPORE COMPANY YOU HAVE

9    TO HAVE A NOMINEE DIRECTOR EACH TIME?

10             A.     YES.

11             Q.     AND THAT IS A LOCAL DIRECTOR?

12             A.     LOCAL RESIDENT DIRECTOR IS MY

13   UNDERSTANDING.

14             Q.     OKAY.  WAS MR. MATSUURA AT ALL

15   INVOLVED WITH THE FORMATION OF SCUDERIA BIANCO?

16             A.     NO.

17             Q.     WERE THERE ANY AGREEMENTS WITH HIM

18   WITH RESPECT TO SHARING OF ANY PROFITS?

19             A.     NO.

20             Q.     HOW WAS SCUDERIA BIANCO COMPENSATED

21   FOR PROVIDING ITS SERVICES?

22             A.     IF I RECALL CORRECTLY, IT WAS

23   SUPPOSED TO CHARGE -- IT WAS TO CHARGE I THINK 100

24   US DOLLARS PER EVERY TRANSACTION.

25             Q.     AND CAN YOU PLEASE DESCRIBE FOR US

226

1   HOW THE CASH MANAGEMENT SERVICES SCUDERIA BIANCO

2   WAS PROVIDING FUNCTIONED; THAT IT IS WHERE DID

3   MONEY COME FROM AND THEN HOW DID SCUDERIA KNOW

4   WHERE TO SEND THAT MONEY?

5                    MR. MORRIS:  OBJECTION TO THE FORM

6   OF THE QUESTION.

7            A.    CAN YOU BREAK THAT QUESTION DOWN?

8   BY MR. MCDONALD:

9            Q.    CERTAINLY.  YOU SAID SCUDERIA WAS

10  PROVIDING CASH MANAGEMENT SERVICES?

11           A.    YES.

12           Q.    CAN YOU LET ME KNOW -- PLEASE LET

13  US KNOW WHAT YOU MEAN BY CASH MANAGEMENT SERVICES?

14           A.    IT RECEIVED OR PAID ON BEHALF OF

15  ITS CLIENT.

16           Q.    SO IT RECEIVED FUNDS?

17           A.    YES.

18           Q.    ON BEHALF OF A CLIENT?

19           A.    YES.

20           Q.    AND ITS TWO CLIENTS WERE ASCENTRA

21  AND SPGK?

22           A.    YES.  I BELIEVE SO, YES.

23           Q.    AND THEN WHAT DID IT DO WITH THOSE

24  FUNDS?

25           A.    IT RECEIVED FOR ALL PAID FUNDS.

227

RYUNOSUKE YOSHIDA

1          Q.     SO THEN IT THEN PAYS THOSE FUNDS

2    ONWARDS ON BEHALF OF EITHER ASCENTRA OR SPGK?

3          A.     YES.

4          Q.     AND AT THE TIME SPGK ENTERED INTO

5    THIS AGREEMENT YOU WERE ALSO THE SHAREHOLDER AND

6    DIRECTOR OF SPGK AS WELL?

7          A.     YES.

8          Q.     PRIOR TO ENTERING INTO THIS

9    AGREEMENT, DID SPGK HAVE A CASH MANAGEMENT

10   AGREEMENT IN PLACE WITH ANY OTHER ENTITIES?

11         A.     SPGK INC AND SPGK PTE LIMITED, CAN

12   YOU SPECIFY THE ENTITY?

13         Q.     YES, LET US START WITH INC.

14         A.     CAN YOU REPEAT YOUR QUESTION AGAIN,

15   SORRY?

16         Q.     PRIOR TO ENTERING INTO THE

17   AGREEMENT BETWEEN SPGK INC AND SCUDERIA BIANCO,

18   DID SPGK INC HAVE ANY CASH MANAGEMENT AGREEMENTS

19   IN PLACE WITH OTHER ENTITIES?

20         A.     I DON'T THINK THERE WAS AN

21   AGREEMENT.

22         Q.     DID SPGK INC HAVE ANY CASH

23   MANAGEMENT ARRANGEMENTS WITH ANY OTHER ENTITIES?

24         A.     I THINK SPGK INTERNATIONAL WAS

25   PROCESSING PAYMENTS ON BEHALF OF SPGK INC.

                              228

                       RYUNOSUKE YOSHIDA

1        Q.      PRIOR TO THE ENTERING INTO THIS

2    AGREEMENT?

3        A.      I CANNOT REMEMBER THE CHRONOLOGY.

4        Q.      PRIOR TO ENTERING INTO AN AGREEMENT

5    WITH SCUDERIA BIANCO, DID ASCENTRA HAVE ANY CASH

6    MANAGEMENT RELATIONSHIPS OR AGREEMENTS IN PLACE

7    WITH OTHER PARTIES?

8        A.      I BELIEVE IT MAY HAVE HAD A CASH

9    MANAGEMENT SERVICE AGREEMENT WITH AOS.

10        Q.      ANY OTHER ENTITIES?

11        A.      PRIOR TO SIGNING AGREEMENT WITH

12    SCUDERIA BIANCO, I DON'T THINK SO, BUT I CANNOT

13    REMEMBER EVERYTHING.

14        Q.       LET US TALK ABOUT PLANET PAYMENT,

15    SHALL WE?

16        A.      SURE.

17        Q.      DID SCUDERIA BIANCO RECEIVE

18    TRANSFERS FROM PLANET PAYMENT ON BEHALF OF SPGK?

19        A.      NO.

20        Q.      THE FUNDS THAT WERE DEPOSITED --

21    LET US BACK UP A LITTLE BIT.  WHY DID ASCENTRA AND

22    SPGK USE PLANET PAYMENT TO PROCESS CHINA UNION PAY

23    TRANSFERS?

24        A.      CAN I CORRECT YOUR STATEMENT?

25        Q.      PLEASE.

229

RYUNOSUKE YOSHIDA

1          A.      I THINK SPGK USED PLANET PAYMENT TO

2   PROCESS CHINA UNION PAY PAYMENTS.

3          Q.      DO YOU KNOW IF INTERUSH/ASCENTRA

4   USED PLANET PAYMENT BEFORE SPGK?

5          A.      THEY MAY HAVE.  THEY MAY HAVE.

6          Q.      WHY WOULD SPGK USE PLANET PAYMENT

7   TO PROCESS CHINA UNION PAY TRANSACTIONS?

8          A.      CAN YOU CLARIFY YOUR QUESTION?

9   WHAT DO YOU MEAN WHY?

10         Q.      YOU HAVE CHINA UNION PAY AND PRC

11  TRANSFERRING FUNDS TO PLANET PAYMENT UNITED

12  STATES, CORRECT?

13         A.      YES.

14         Q.      TO THEN BE TRANSFERRED SOME PLACE

15  ELSE, IS THAT CORRECT?

16         A.      YES.

17         Q.      WHY WOULD YOU HAVE THE FUNDS GO

18  FROM PRC TO THE UNITED STATES?

19         A.      THEY WERE PROBABLY THE MOST

20  COMPETENT SERVICE PROVIDER FOR US.

21         Q.      DID YOU LOOK AT ANY OF ----

22         A.      FOR SPGK.

23         Q.      SORRY, I DID NOT MEAN TO CUT YOU

24  OFF.  I THOUGHT YOU WERE DONE.

25         A.      SORRY.

230

RYUNOSUKE YOSHIDA

1          Q.     PLEASE CONTINUE, FINISH YOUR

2    ANSWER.

3          A.     I BELIEVE PLANET PAYMENT WAS THE

4    MOST COMPETENT PAYMENT SERVICE PROVIDER FOR SPGK.

5          Q.     DID YOU INTERVIEW ANY OTHER OR

6    SPEAK WITH ANY OTHER SERVICE PROVIDERS OTHER THAN

7    PLANET PAYMENT?

8          A.     I HAVE.

9          Q.     WHEN YOU WERE A DIRECTOR OF SPGK,

10   DID YOU SPEAK TO ANY OTHER SERVICE PROVIDERS?

11         A.     I HAVE.

12         Q.     AND WHO ELSE DID YOU SPEAK WITH?

13         A.     I CANNOT REMEMBER THE NAMES, BUT

14   I DID SPEAK WITH PAYMENT PROCESSORS IN PRC AND

15   SINGAPORE, IF I RECALL CORRECTLY.

16         Q.     WHY DID YOU DECIDE NOT TO GO WITH

17   THOSE PROVIDERS?

18         A.     IF I REMEMBER CORRECTLY, IT WAS

19   DECISIONS ON CREDIBILITY, WHETHER THEY CAN PROCESS

20   DAILY SETTLEMENTS, FEES, ETC.

21         Q.     YOU SAID CREDIBILITY, WHAT DO YOU

22   MEAN BY CREDIBILITY?

23         A.     FOR EXAMPLE, THE BUSINESS SIZE OF

24   THESE PAYMENT PROCESSES AND ALSO WHICH BANKS THEY

25   WORKED FOR, WHAT KIND OF CLIENTS THEY HAD,

231

RYUNOSUKE YOSHIDA

1    I BELIEVE ARE PART OF CREDIBILITY.

2              Q.    OKAY.  DO YOU KNOW -- DID YOU EVER

3    MEET SOMEONE BY THE NAME OF PAUL LEVINE?

4              A.    YES.

5              Q.    DID YOU MEET HIM PERSONALLY?

6              A.    YES.

7              Q.    DO YOU RECALL WHEN YOU MET PAUL?

8              A.    I BELIEVE I MET HIM IN SOME TIME

9    LATE 2019.

10             Q.    DO YOU REMEMBER WHERE YOU MET HIM?

11             A.    TOKYO.

12             Q.    IN TOKYO?

13             A.    YES.

14             Q.    YOU MENTIONED EARLIER THAT

15   SPGK PTE LIMITED, THE SINGAPORE ENTITY YOU CREATED

16   WAS CREATED LATER.  CAN YOU PLEASE TELL ME WHEN

17   SPGK PTE WAS CREATED?

18             A.    CAN I DOUBLE-CHECK?

19             Q.    YES.

20             A.    I BELIEVE IT IS AROUND THE FIRST

21   HALF OF 2019, BUT LET ME DOUBLE-CHECK.

22                  MR. MORRIS:  HUGH, IF WE HAVE TIME

23   FOR A BREAK AT SOME POINT SOON I WOULD APPRECIATE

24   IT.

25                  MR. MCDONALD:  JOHN, YOU READ MY

232

RYUNOSUKE YOSHIDA

1   MIND.  I WAS WAITING ABOUT TWO MINUTES AND I WAS

2   GOING TO TAKE A BREAK.

3           MR. MORRIS:  PERFECT.  THANK YOU.

4   BY MR. MCDONALD:

5           Q.   IF YOU LOOK AT PARAGRAPH 7 ON PAGE

6   2?

7           A.   IT SHOULD BE AROUND THIS.

8           Q.   MAY 2019.

9           A.   OR MORE OR LESS.

10           Q.   MORE OR LESS?

11           A.   YES.

12           Q.   DID YOU FORM SPGK PTE?

13           A.   YES.

14           Q.   AND YOU FORMED IT AS A SUBSIDIARY

15   OF SPGK INC?

16           A.   YES.

17           Q.   A WHOLLY OWNED SUBSIDIARY?

18           A.   YES.

19           Q.   WERE YOU ITS SOLE DIRECTOR?

20           A.   NO.  SORRY, WHICH ENTITY?

21           Q.   YOU HAD TO HAVE A NOMINEE DIRECTOR

22   AT ALL?

23           A.   ARE YOU TALKING ABOUT

24   SPGK PTE LIMITED.

25           Q.   YES.

233

RYUNOSUKE YOSHIDA

1          A.      THEN I DID HAVE A NOMINEE DIRECTOR.

2          Q.      ALONG WITH YOURSELF?

3          A.      ALONG WITH ME.

4          Q.      WHY DID YOU FORM SPGK PTE?

5          A.      I BELIEVE IT WAS SOME TIME LATE

6    2018 OR EARLY 2019, I FOUND OUT THAT THE PLANET

7    PAYMENT PAYMENTS, WHICH I THOUGHT WAS BEING

8    RECEIVED BY SPGK INC OR ITS GROUP COMPANIES, WERE

9    ACTUALLY DEPOSITING INTO SPGK INTERNATIONAL, WHICH

10   I WAS NOT AWARE OF AND I WAS NOT TOLD.  SPGK

11   INTERNATIONAL WAS I BELIEVE OWNED, AND THE

12   DIRECTOR WAS TED SANDERS.  HE DID NOT INFORM ME OF

13   SUCH ACTION.  AS A DIRECTOR OF SPGK, I HAD TO

14   BRING THE FUNDS BACK FLOWING INTO SPGK INC GROUP

15   OF COMPANIES.

16         Q.      WHY DID YOU JUST HAVE SPGK INC OPEN

17   A BANK ACCOUNT?

18         A.      IT WAS NOT EASY TO OPEN A CAYMAN

19   BANK ACCOUNT, A CAYMAN ENTITY BANK ACCOUNTS THAT

20   WAS OPERATIONAL.

21         Q.      SO THAT IS WHY YOU FORMED SCUDERIA

22   BIANCO TO SERVE AS THE BANK ACCOUNT OF PTE?

23         A.      NO.

24         Q.      DID PTE HAVE ITS OWN BANK ACCOUNTS?

25         A.      YES.

RYUNOSUKE YOSHIDA

1        Q.      WHEN DID IT ESTABLISH THOSE BANK

2   ACCOUNTS?

3        A.      I VISITED SINGAPORE A COUPLE OF

4   TIMES AND MET WITH MANY BANKS, AND I OPENED

5   ACCOUNT, FINALLY OPENED AN ACCOUNT WITH -- SORRY

6   WHAT WAS THE QUESTION AGAIN?

7        Q.      DID PTE HAVE ITS OWN BANK ACCOUNTS?

8        A.      YES.

9        Q.      WHEN DID IT ESTABLISH THOSE

10  ACCOUNTS?

11       A.      SOME TIME IN 2019.

12              MR. MCDONALD:  WE CAN TAKE A SHORT

13  BREAK.

14              THE VIDEOGRAPHER:  WE ARE GOING OFF

15  THE RECORD.  THE TIME IS 4.02.

16     (A SHORT BREAK FROM 4.02 P.M. TO 4.29 P.M.)

17              THE VIDEOGRAPHER:  WE ARE BACK ON

18  THE RECORD.  THE TIME IS 4.29.

19  BY MR. MCDONALD:

20       Q.      MR. YOSHIDA, WHEN WE TOOK OUR BREAK

21  WE WERE DISCUSSING PLANET PAYMENT AND THE CHANGE

22  FROM SPGK INTERNATIONAL TO SPGK PTE, CORRECT?

23       A.      YES.

24       Q.      AND YOU HAD TESTIFIED I BELIEVE,

25  AND PLEASE CORRECT ME IF I AM WRONG, THAT YOU ARE

235

RYUNOSUKE YOSHIDA

1   NOT AWARE THAT SPGK INTERNATIONAL WAS PROCESSING

2   PLANET PAYMENT FUNDS?

3          A.     THAT IS CORRECT.

4          Q.     AT THE TIME YOU LEARNED THAT, YOU

5   WERE A DIRECTOR OF ASCENTRA STILL, CORRECT?

6          A.     I BELIEVE SO.

7          Q.     AND YOU WERE A DIRECTOR OF SPGK?

8          A.     I BELIEVE SO.

9          Q.     DURING THE QUARTERLY MANAGEMENT

10  MEETINGS YOU MENTIONED EARLIER, AS PART OF THOSE

11  REPORTS YOU RECEIVED FROM MANAGEMENT, WERE YOU

12  TOLD ABOUT THE FLOW OF FUNDS COMING INTO THE

13  COMPANY AND THEN GOING OUT TO PAY OBLIGATIONS OF

14  THE COMPANY?

15         A.     CAN YOU CLARIFY YOUR QUESTION?

16         Q.     SO YOU PREVIOUSLY TESTIFIED THAT AS

17  A DIRECTOR OF ASCENTRA, IN YOUR CAPACITY AS

18  DIRECTOR, YOU HAD QUARTERLY MANAGEMENT MEETINGS.

19  AM I STATING THAT CORRECTLY?

20         A.     IT DEPENDS ON THE PERIOD, BUT YES.

21         Q.     YES.  AND DURING THAT PERIOD YOU

22  WOULD REVIEW THE FINANCIAL RESULTS OF THE COMPANY?

23         A.     YES, I THINK SO.

24         Q.     THE AS PART OF ANY OF THOSE

25  PRESENTATIONS, WERE YOU TOLD ABOUT THE FLOW OF

236

RYUNOSUKE YOSHIDA

1    FUNDS INTO THE COMPANY'S ACCOUNTS AND OUT TO PAY

2    ITS OBLIGATIONS?

3            A.    CAN YOU SPECIFY A PERIOD?

4            Q.    2018.  EARLY 2019.

5            A.    I MIGHT HAVE, I DON'T REMEMBER.

6            Q.    YOU DON'T REMEMBER?

7            A.    I DON'T REMEMBER IN THAT PARTICULAR

8    PERIOD WHERE THERE WAS SUCH INFORMATION PROVIDED.

9            Q.    ARE YOU STILL IN POSSESSION OF ANY

10   OF THE QUARTERLY FINANCIAL PRESENTATIONS THAT WERE

11   MADE TO THE ASCENTRA BOARD?

12           A.    ARE YOU REFERRING TO THE ASCENTRA

13   BOARD MEETINGS?

14           Q.    YES.

15           A.    I BELIEVE SO.

16           Q.    HAVE YOU TURNED OVER TO THE

17   LIQUIDATORS ALL OF THE BOOKS AND RECORDS IN YOUR

18   POSSESSION RELATED TO ASCENTRA?

19               MR. MORRIS:  OBJECTION TO THE FORM

20   OF THE QUESTION.

21           A.    CAN YOU REPEAT YOUR QUESTION?

22   BY MR. MCDONALD:

23           Q.    HAVE YOU AS A FORMER DIRECTOR OF

24   ASCENTRA TURNED OVER TO THE LIQUIDATORS IN CAYMAN

25   ISLANDS ALL OF THE BOOKS AND RECORDS OF ASCENTRA

237

RYUNOSUKE YOSHIDA

1    IN YOUR POSSESSION?

2                    MR. MORRIS:  OBJECTION TO THE FORM

3    OF THE QUESTION.

4           A.    WHAT DOES RECORDS INCLUDE?

5    BY MR. MCDONALD:

6           Q.    ALL CORPORATE DOCUMENTS, ALL BOARD

7    PRESENTATIONS, ALL OF YOUR INFORMATION YOU

8    OBTAINED AS A DIRECTOR OF ASCENTRA?

9                    MR. MORRIS:  OBJECTION TO THE FORM

10   OF THE QUESTION.

11          A.    I BELIEVE EVERYTHING WAS

12   TRANSPARENT, SO I THINK HE WOULD HAVE HAD THE

13   INFORMATION.

14   BY MR. MCDONALD:

15          Q.    HAVE YOU PERSONALLY TURNED OVER TO

16   THE LIQUIDATORS APPOINTED IN ASCENTRA HOLDINGS INC

17   CAYMAN LIQUIDATION PROCEEDINGS ALL OF ASCENTRA'S

18   BOOKS, RECORDS, BOARD RESOLUTIONS, BOARD MINUTES,

19   EVERYTHING RELATED TO YOUR TIME AS A DIRECTOR OF

20   ASCENTRA?  HAVE YOU TURNED OVER THOSE DOCUMENTS TO

21   THE LIQUIDATORS?

22                   MR. MORRIS:  OBJECTION TO THE FORM

23   OF THE QUESTION.

24          A.    I DON'T THINK SO, BUT I DON'T

25   REMEMBER.  I DON'T EXACTLY REMEMBER.  I DON'T

238

RYUNOSUKE YOSHIDA

1   THINK SO.

2   BY MR. MCDONALD:

3           Q.      SO YOU MAY HAVE DOCUMENTS ON THIS

4   RELATIVITY DATABASE THAT YOU REFERRED TO EARLIER

5   THAT MAY BE ASCENTRA BOOKS AND RECORDS, OR MAY

6   CONSTITUTE ASCENTRA BOOKS AND RECORDS?

7           A.      I DON'T THINK SO BECAUSE I BELIEVE

8   ALL THE CORRESPONDENCE WAS TRANSPARENT AND HE HAS

9   CONTROL OVER THE E-MAILS, E-MAIL ACCOUNTS AS WELL.

10          Q.      WHAT DO YOU MEAN BY TRANSPARENT?

11          A.      I BELIEVE ALL THE BOOKS WERE

12  VIEWABLE BY BOTH SPGK -- FOR ASCENTRA, THE

13  LIQUIDATOR COULD HAVE OR I BELIEVE HAVE ALL THE

14  INFORMATION OF ASCENTRA RELATED STUFF.  I BELIEVE

15  SO.

16          Q.      WERE YOU EVER ASKED TO PROVIDE THE

17  LIQUIDATORS WITH ANY DOCUMENTS, BOOKS, RECORDS,

18  ANYTHING RELATED TO ASCENTRA TO THEM?

19          A.      I DON'T REMEMBER.

20          Q.      ARE YOU AWARE OF WHETHER OR NOT

21  YOUR COUNSEL WAS REQUESTED TO TURN OVER ALL THE

22  INFORMATION IN YOUR -- DOCUMENTS IN YOUR

23  POSSESSION RELATED TO ASCENTRA?

24                  MR. MORRIS:  OBJECTION TO THE

25  EXTENT THAT IT CALLS FOR COMMUNICATIONS BETWEEN

239

RYUNOSUKE YOSHIDA

1   CLIENT, AND I DIRECT HIM NOT TO ANSWER.  HE CAN

2   ANSWER OTHERWISE.

3   BY MR. MCDONALD:

4           Q.    I AM REFERRING TO COMMUNICATIONS

5   FROM THE LIQUIDATORS TO YOUR COUNSEL.  ARE YOU

6   AWARE ----

7               MR. MORRIS:  YOU ARE ASKING HIM

8   ABOUT WHETHER HIS -- I WILL LET YOU ASK THE

9   QUESTION.  GO AHEAD.

10          A.    I DON'T REMEMBER.

11  BY MR. MCDONALD:

12          Q.    YOU DON'T REMEMBER?

13          A.    I DON'T REMEMBER.

14          Q.    OKAY.

15      (EXHIBIT 12 MARKED FOR IDENTIFICATION)

16  BY MR. MCDONALD:

17          Q.    THIS IS EXHIBIT 12.  MR. YOSHIDA,

18  I HAVE HANDED YOU WHAT HAS BEEN MARKED AS EXHIBIT

19  12.  (PAUSE)

20          A.    OKAY.

21          Q.    DO YOU RECOGNISE THIS E-MAIL?

22          A.    I THINK SO.

23          Q.    YOU THINK SO?

24          A.    I THINK SO.

25          Q.    SO IS IT ACCURATE TO SAY THAT WHEN

RYUNOSUKE YOSHIDA

1   YOU LEARN THAT SPGK INTERNATIONAL WAS PROCESSING

2   THE PLANET PAYMENT FUNDS YOU REACHED OUT TO PLANET

3   PAYMENT DIRECTLY?

4           A.      I THINK SO.

5           Q.      WHAT IS THE DBS BANK?

6           A.      WHAT DO YOU MEAN WHAT IS THE DBS

7   BANK?

8           Q.      IT SAYS HE MENTIONED THAT YOU WANT

9   PLANET PAYMENT TO DEPOSIT IN DBS BANK.  WHAT IS

10  THAT?

11          A.      DBS BANK IS THE NAME OF A BANK.

12          Q.      AND WHERE IS THAT BANK LOCATED?

13          A.      SINGAPORE.

14          Q.      SINGAPORE.  IS THAT WHERE SPGK PTE

15  HAD ITS BANK ACCOUNT?

16          A.      YES.

17          Q.      IT SAYS HERE THAT "PAUL WOULD LIKE

18  TO MEET YOU TO ESTABLISH A COMFORT LEVEL AND

19  REPOIRE [SIC] , A FACE-TO-FACE KYC."  DO YOU SEE

20  THAT?

21          A.      YES.

22          Q.      THERE IS ALSO A REQUEST FOR KYC

23  INFORMATION ON SPGK PTE.  DID YOU PROVIDE THAT

24  INFORMATION TO PLANET PAYMENT?

25          A.      I DON'T REMEMBER EXACTLY, BUT

241

RYUNOSUKE YOSHIDA

21-11854-dsj   Doc 63-2   Filed 09/01/23   Entered 09/01/23 19:58:55   Exhibit 2
Pg 244 of 332

1   I MIGHT HAVE.

2           Q.    YOU MIGHT HAVE?

3           A.    I THINK I DID, BUT I CANNOT

4   REMEMBER.

5           Q.    OKAY.  YOU SEE THAT TED IS

6   EXPRESSING SOME CONCERN ABOUT THE LEVEL OF FUNDS

7   GOING THROUGH THE ACCOUNT.  DO YOU SEE THAT?

8           A.    YES.

9                 MR. MORRIS:  OBJECTION TO THE FORM

10  OF THE QUESTION.

11  BY MR. MCDONALD:

12          Q.    "PAUL ALSO MENTIONED THE JUMP IN

13  REVENUES AND GIVEN THE AMOUNT OF FUNDS THAT IT

14  WILL LIKELY CAUSE SCRUTINY AT THE BANK."  DID YOU

15  DO ANYTHING TO ADDRESS THAT SITUATION?

16                MR. MORRIS:  OBJECTION TO THE FORM

17  OF THE QUESTION.

18          A.    CAN YOU CLARIFY YOUR QUESTION?

19  BY MR. MCDONALD:

20          Q.    WELL, THERE WAS CONCERN THAT THE

21  AMOUNT OF FUNDS GIVEN -- THAT WERE GOING THROUGH

22  THE BANK COULD DRAW SCRUTINY AT DBS?

23          A.    YES.

24          Q.    BELOW, TED IS SAYING THAT YOU MAY

25  WANT TO GRADUALLY BUILD UP THE RELATIONSHIP, AND

242

RYUNOSUKE YOSHIDA

1   THAT IS IN BULLET POINT 1.  DID YOU DO THAT?  DID

2   YOU TAKE TED'S ADVICE?

3                   MR. MORRIS:  OBJECTION TO THE FORM

4   OF THE QUESTION.

5           A.    I DON'T THINK SO.

6   BY MR. MCDONALD:

7           Q.    NO?

8           A.    PROBABLY NOT.

9           Q.    THE LAST BULLET POINT SAYS, "WE

10  HAVE APPROXIMATELY $34 MILLION IN BOTW."  THAT IS

11  BANK OF THE WEST?

12          A.    I BELIEVE SO.

13          Q.    "I DO NOT RECOMMEND TRANSFERRING

14  THE BALANCE TO DBS.  INSTEAD, THE BALANCE SHOULD

15  BE REDUCED THROUGH COMMISSION PAYMENTS, EXPENSES,

16  ETC.  SOME OF THE FUNDS COULD ALSO BE SENT TO

17  GLOBAL FIDELITY."  DID YOU SEND FUNDS TO GLOBAL

18  FIDELITY?

19          A.    I DON'T THINK SO.

20                  MR. MORRIS:  OBJECTION TO THE FORM

21  OF THE QUESTION.

22  BY MR. MCDONALD:  MMM?

23          A.    I DON'T THINK SO.

24          Q.    DID YOU ASK TED TO SEND FUNDS TO

25  GLOBAL FIDELITY?

                            243

1          A.     I DON'T THINK SO.

2               MR. MORRIS:  OBJECTION TO THE FORM

3  OF THE QUESTION.

4  BY MR. MCDONALD:

5          Q.     DID YOU INSTRUCT TED TO USE ANY OF

6  THE MONEY IN THE BANK OF THE WEST TO PAY

7  COMMISSION PAYMENTS?

8          A.     I THINK SO.

9          Q.     OFF HAND, DO YOU KNOW IF THERE ARE

10  ANY COMMISSION PAYMENTS STILL DUE AND OWING FROM

11  SPGK TO ANY AGENTS?

12          A.     CURRENTLY?

13          Q.     CURRENTLY.

14          A.     YES.

15          Q.     HOW MUCH IS CURRENTLY OWED?

16          A.     IT HAS BEEN A WHILE, SO I DON'T

17  REMEMBER THE FIGURE.

18          Q.     ROUGHLY?

19          A.     MAYBE SOMEWHERE BETWEEN 20-40

20  MILLION US, MAYBE.  I CANNOT REMEMBER THE EXACT

21  FIGURE.

22               MR. MORRIS:  I DID NOT HEAR THAT

23  ANSWER.

24          A.     MAYBE SOMEWHERE BETWEEN 20-40

25  MILLION, APPROXIMATELY.  I DON'T REMEMBER THE

244

RYUNOSUKE YOSHIDA

1   EXACT FIGURE.

2                    MR. MORRIS:  THANK YOU.

3   BY MR. MCDONALD:

4           Q.    THAT IS STILL DUE AND OWING TO

5   AGENTS?

6           A.    YES, CORRECT.

7           Q.    WHOSE OBLIGATION -- STRIKE THAT.

8   WHICH ENTITY IS RESPONSIBLE FOR MAKING THOSE

9   PAYMENTS?

10                   MR. MORRIS:  OBJECTION TO THE FORM

11  OF THE QUESTION.

12          A.    SHANG PENG GAO KE INC. SEZC.

13  BY MR. MCDONALD:

14          Q.    THE CAYMAN ENTITY?

15          A.    YES.

16          Q.    WHY IS THE CAYMAN ENTITY

17  RESPONSIBLE FOR MAKING THOSE PAYMENTS?

18          A.    BECAUSE SPGK INC. HAS AGREEMENTS

19  WITH THESE AGENTS AND THIRD PARTY ENTITIES.

20          Q.    AND SPGK INC OWNS PTE, CORRECT?

21          A.    YES.

22          Q.    I THINK YOU PREVIOUSLY TESTIFIED

23  THAT THERE WAS A BANK ACCOUNT IN TAIWAN WITH AN

24  APPROXIMATE BALANCE OF 150 MILLION?

25          A.    MORE OR LESS.

245

RYUNOSUKE YOSHIDA

1          Q.     MORE OR LESS.  DO THOSE FUNDS

2    BELONG TO SPGK INC?

3          A.     INC, CAYMAN?

4          Q.     YES.

5          A.     YES.

6          Q.     THEY DO?

7          A.     YES.

8          Q.     WHY HASN'T SPGK INC. PAID THE

9    OUTSTANDING COMMISSIONS TO AGENTS?

10          A.     CAN YOU CLARIFY YOUR QUESTION?

11          Q.     SPGK INC YOU SAID IS OBLIGATED TO

12    MAKE THE PAYMENT OF COMMISSIONS -- I AM SORRY,

13    STRIKE THAT.  SPGK INC IS OBLIGATED TO PAY

14    COMMISSIONS TO ITS AGENTS?

15          A.     YES.

16          Q.     AND THE BANK ACCOUNT IN TAIWAN IS

17    IN THE NAME OF SPGK PTE OR SPGK INC.?

18          A.     SPGK PTE LIMITED.

19          Q.     WHICH IS OWNED BY SPGK INC.?

20          A.     YES.

21          Q.     MY QUESTION WAS IF SPGK PTE, THE

22    WHOLLY OWNED SUBSIDIARY OF SPGK INC, HAS $150

23    MILLION IN A TAIWAN BANK ACCOUNT, WHY HAS IT NOT

24    PAID THESE OUTSTANDING COMMISSIONS?

25          A.     BECAUSE IT IS A BUSINESS DECISION.


246

RYUNOSUKE YOSHIDA

1          Q.     SO YOU DECIDED NOT TO PAY THEM?

2          A.     NOT YET.

3          Q.     NOT YET?

4          A.     YES.

5          Q.     AND WHAT IS FACTORED INTO YOUR

6    BUSINESS DECISION TO NOT PAY THEM?

7          A.     THE ----

8                 MR. MORRIS:   OBJECTION TO THE FORM

9    OF THE QUESTION.

10         A.     THE CURRENT DISPUTE WITH ASCENTRA

11   AND LEGAL FEES INCURRED AND UNEXPECTED FEES THAT

12   MIGHT BE INCURRED.

13   BY MR. MCDONALD:

14         Q.     THE CURRENT DISPUTE OF ASCENTRA

15   OVER THE OWNERSHIP OF THE FUNDS?

16                MR. MORRIS:   OBJECTION TO THE FORM

17   OF THE QUESTION.

18         A.     CAN YOU CLARIFY FUNDS?

19   BY MR. MCDONALD:

20         Q.     WELL, YOU SAID THERE WAS A CURRENT

21   DISPUTE WITH ASCENTRA?

22         A.     YES.

23         Q.     AND WHAT IS THAT CURRENT DISPUTE?

24         A.     PLANET PAYMENT FUNDS, HTC

25   INTERNATIONAL FUNDS, ETC.

247

RYUNOSUKE YOSHIDA

1      Q.      SO THE PLANET PAYMENT FUNDS ARE IN

2  NEW YORK; IS THAT CORRECT?

3      A.      I BELIEVE SO.

4      Q.      THE ATC FUNDS ARE BEING DEALT WITH

5  IN THE FROM CAYMAN PROCEEDING, AND THESE ARE

6  SEPARATELY 150 MILLION IN FUNDS IN TAIWAN,

7  CORRECT?

8      A.      YES.

9      Q.      SO YOU DECIDED NOT TO USE THOSE

10  FUNDS TO PAY THE COMMISSIONS AT THIS TIME?

11      A.      YES.

12      Q.      YOU CAN PUT THAT ASIDE.

13      (EXHIBIT 13 MARKED FOR IDENTIFICATION)

14  BY MR. MCDONALD:

15      Q.      I WILL SHOW YOU WHAT HAS BEEN

16  MARKED AS 13.  (PAUSE) HAVE YOU SEEN THIS E-MAIL

17  BEFORE, MR. YOSHIDA?

18      A.      I THINK SO.

19      Q.      DO YOU HAVE ANY REASON TO DOUBT

20  THAT YOU RECEIVED IT?

21      A.      NO.

22      Q.      IF YOU COULD PLEASE START DOWN THE

23  BOTTOM, THE "DEAR PAUL", DO YOU SEE THAT?

24      A.      YES.

25      Q.      DO YOU RECALL MEETING MR. LEVINE IN

248

RYUNOSUKE YOSHIDA

1   HONG KONG?

2          A.    NO, I MET WITH HIM IN TOKYO.

3          Q.    TOKYO?

4          A.    YES.

5          Q.    DID YOU ONLY MEET MR. LEVINE ONCE?

6          A.    I MAY HAVE MET HIM MULTIPLE TIMES,

7   BUT I CANNOT REMEMBER.

8          Q.    CAN YOU FLIP TO THE NEXT PAGE, SO

9   THIS WOULD BE THE REVERSE SIDE OF THE FIRST PAGE?

10         A.    YES.

11         Q.    AT THE TOP OF THAT PAGE IT SAYS,

12  "THE CURRENT STATUS OF THE SPGK IS THAT IT IS A

13  SPINOFF FROM THE ASCENTRA GROUP."

14         A.    YES.

15         Q.    WHAT DID YOU MEAN BY SPIN OFF?

16         A.    IT WAS A BUSINESS WHERE THE AGENTS,

17  OR THE AFFILIATES OF ASCENTRA GROUP RE-SIGNED UP

18  WITH SPGK AND IT BECAME A NEW BUSINESS.

19         Q.    WHY DID YOU USE A CAP S IN SPIN

20  OFF?

21         A.    I THINK THAT IS A TYPO OR I THINK

22  IT IS WHILE I WAS TYPING.  I DON'T KNOW.

23         Q.    DO YOU UNDERSTAND WHAT A SPIN OFF

24  IS?

25         A.    THAT WAS MY UNDERSTANDING,

249

RYUNOSUKE YOSHIDA

1   SOMETHING IS KIND OF COMING OUT FROM AN ORIGINAL

2   SOURCE.

3        Q.    USUALLY TO THE SHAREHOLDERS, THE

4   EXISTING SHAREHOLDERS?

5        A.    SORRY, I DIDN'T USE IT IN THAT --

6   CAN YOU CLARIFY, PLEASE?

7        Q.    A SPIN OFF COLLOQUIALLY IS A SPIN

8   OFF OF ASSETS TO THE EXISTING SHAREHOLDERS OF A

9   CORPORATION?

10       A.

11            MR. MORRIS:  OBJECTION TO THE FORM

12  OF THE QUESTION, IF THAT IS A QUESTION.

13       A.    I DON'T THINK I USED IT IN TERMS OF

14  LIKE A BUSINESS.  IT WAS NOT ABOUT THE

15  SHAREHOLDING.  IT WAS MORE ABOUT A BUSINESS THAT

16  WAS CREATED.

17  BY MR. MCDONALD:

18       Q.    AND TO GO BACK TO YOUR EARLIER

19  ANSWER, YOU SAID THAT THE AFFILIATES WERE

20  TRANSFERRED TO BECOME AGENTS OF SPGK.  SO THE

21  AFFILIATES OF ASCENTRA MIGRATED TO SPGK TO BECOME

22  AGENTS?

23       A.    I DON'T THINK THAT IS CORRECT.

24       Q.    THEN I AM MISSTATING YOUR PRIOR

25  TESTIMONY.  CAN YOU PLEASE TELL ME WHAT YOU THINK

250

RYUNOSUKE YOSHIDA

1  THE TERM "SPIN OFF" MEANS HERE?

2          A.     SORRY, SPIN OFF?

3          Q.     YES.

4          A.     WELL, THEY RE-SIGNED UP.

5          Q.     RE-SIGNED UP?

6          A.     YES.

7          Q.     DID SPGK ACQUIRE THE AFFILIATE LIST

8  FROM ASCENTRA TO SOLICIT THEM TO RE-SIGN UP?

9          A.     CAN YOU CLARIFY YOUR QUESTION?

10         Q.     DID SPGK ACQUIRE THE AFFILIATE LIST

11 FROM ASCENTRA SO THAT THOSE AFFILIATE COULD

12 RE-SIGN UP AS AGENTS?

13         A.     CAN YOU BREAK YOUR QUESTION DOWN?

14 I BELIEVE THERE ARE TWO PARTS TO THAT.

15         Q.     I DON'T BELIEVE SO, BUT I WILL TRY

16 MY BEST.

17         A.     THANK YOU.

18         Q.     YOU SAID THAT THE AFFILIATES OF

19 ASCENTRA RE-SIGNED UP AS AGENTS OF SPGK?

20         A.     YES.

21         Q.     OKAY.  DID ASCENTRA SELL, TRANSFER,

22 SOME WAY OF GIVING TO SPGK ITS LIST OF AFFILIATES

23 SO THAT SPGK COULD HAVE THEM RE-SIGN UP AS AGENTS?

24         A.     I DON'T THINK SO.

25         Q.     HOW DID SPGK KNOW WHO TO APPROACH

251

RYUNOSUKE YOSHIDA

1   TO HAVE THEM RE-SIGN UP AS AGENTS?

2          A.     I BELIEVE, IF I RECALL CORRECTLY,

3   INTERUSH WAS WINDING ITS BUSINESS DOWN AND WITHIN

4   THE ANNOUNCEMENT THAT IT MADE IT CLARIFIED THAT

5   THERE WAS A NEW SEPARATE ENTITY THAT WAS BEING

6   FORMED, AND THEY COULD CLICK ON TO THE URL TO

7   RE-SIGN UP, OR SIGN UP.

8          Q.     I THINK AT THE VERY BEGINNING WHEN

9   WE WERE DISCUSSING THIS YOU TALKED ABOUT A MEETING

10  IN KOREA WHERE MR. MATTHEWS MADE A PRESENTATION

11  AT.

12         A.     YES.

13         Q.     AND YOU SAID THAT THE AFFILIATES

14  WERE INVITED TO ATTEND IN PERSON.

15         A.     YES.

16         Q.     SO THE AFFILIATES, WHO WERE THE

17  PRIOR AFFILIATES OF INTERUSH/ASCENTRA, WERE

18  INVITED PERSONALLY TO ATTEND THIS EVENT IN KOREA?

19         A.     YES, I THINK SO.

20         Q.     SO HOW DID SPGK KNOW WHO TO REACH

21  OUT TO WITHOUT THE INFORMATION FROM ASCENTRA?

22              MR. MORRIS:  OBJECTION TO THE FORM

23  OF THE QUESTION.

24         A.     WELL, I THINK INTERUSH WAS THE ONE

25  THAT INTRODUCED SPGK TO ITS AFFILIATES AND IT WAS

RYUNOSUKE YOSHIDA

1    NOT SPGK REACHING OUT.

2    BY MR. MCDONALD:

3          Q.    AND HOW WAS INTERUSH/ASCENTRA

4    COMPENSATED FOR INTRODUCING SPGK TO ITS

5    AFFILIATES?

6          A.    I DON'T KNOW.

7                MR. MORRIS:  OBJECTION TO THE FORM

8    OF THE QUESTION.

9    BY MR. MCDONALD:

10         Q.    WAS ASCENTRA EVER COMPENSATED FOR

11   INTRODUCING ITS AFFILIATES TO SPGK AS AGENTS TO

12   BECOME AGENTS?

13               MR. MORRIS:  OBJECTION TO THE FORM

14   OF THE QUESTION.

15         A.    TO THE BEST OF MY KNOWLEDGE, I

16   DON'T THINK IT WAS COMPENSATED BUT I CANNOT --

17   I DON'T HAVE CONCRETE FACT.

18   BY MR. MCDONALD:

19         Q.    YOU THINK IT WAS COMPENSATED?

20         A.    I DON'T THINK IT WAS CONTEMPT

21   SATED.

22         Q.    YOU DON'T THINK IT WAS COMPENSATED?

23         A.    NO.

24         Q.    OKAY.

25         A.    I THINK IT WAS A BUSINESS DECISION

RYUNOSUKE YOSHIDA

1  BY ASCENTRA OR INTERUSH TO INTRODUCE SPGK.

2        Q.    YOU ARE A DIRECTOR OF ASCENTRA AT

3  THIS TIME.

4        A.    YES.

5        Q.    DO YOU THINK IT IS A FAIR

6  TRANSACTION FOR A COMPANY TO EFFECTIVELY GIVE AWAY

7  ITS CUSTOMER LIST TO ANOTHER ENTITY WITHOUT

8  RECEIVING ANY COMPENSATION?

9              MR. MORRIS:  OBJECTION TO THE FORM

10  OF THE QUESTION.

11        A.    I BELIEVE ASCENTRA RECEIVED ITS

12  COMPENSATION THROUGH PRODUCT SUPPLYING AND OTHER

13  FORMS OF SERVICES IT PROVIDED.  SO I THINK IT CAN

14  BE CONSIDERED FAIR.

15  BY MR. MCDONALD:

16        Q.    WE HAVE ESTABLISHED THERE IS NO

17  AGREEMENT BETWEEN ASCENTRA HOLDINGS AND SPGK?

18              MR. MORRIS:  OBJECTION TO THE FORM

19  OF THE QUESTION.

20        A.    SORRY, CAN YOU ASK ME THE QUESTION

21  AGAIN?

22  BY MR. MCDONALD:

23        Q.    WE HAVE DISCUSSED THIS A FEW TIMES

24  AND I JUST WANTED TO CLARIFY TO MAKE SURE I DID

25  NOT MISS ANYTHING WHEN YOU SAID THIS EARLIER.

254

RYUNOSUKE YOSHIDA

1    I ASKED YOU EARLY ON IN THE DEPOSITION, IS THERE

2    AN AGREEMENT BETWEEN ASCENTRA HOLDINGS AND SPGK IN

3    EXISTENCE TODAY, ANY AGREEMENT?

4            A.    YES.

5            Q.    WHAT IS THAT AGREEMENT?

6            A.    SORRY, I DON'T THINK THERE IS AN

7    AGREEMENT.

8            Q.    YOU DON'T THINK THERE IS AN

9    AGREEMENT?

10           A.    THAT IS WHAT I WAS TRYING TO SAY.

11           Q.    OKAY.  I AM GRAD YOU CLARIFIED

12   THAT.  CAN WE BRIEFLY GO BACK TO YOUR NOW COFFEE'D

13   DECLARATION.  IF WE COULD GO BACK TO MARTY'S NOTES

14   OF HIS PRESENTATION THAT OCCURRED AT THIS MEETING

15   WE JUST DISCUSSED.

16                MS. LEVINE:  WHICH EXHIBIT IS THAT,

17   PLEASE?

18                MR. MCDONALD:  WAIT A SECOND.

19                MR. MORRIS:  EXHIBIT 3.

20                MR. MCDONALD:  IT IS EXHIBIT 3.

21   JOHN IS WAY AHEAD OF ME.

22   BY MR. MCDONALD:

23           Q.    LET US GO TO PAGE, WHAT IS DOWN IN

24   THE LOWER RIGHT-HAND CORNER, 222.

25           A.    YES.

RYUNOSUKE YOSHIDA

1    Q.    IT WILL BE THE SECOND FULL

2  PARAGRAPH DOWN.  IT SAYS, "THE FIRST THING YOU

3  SHOULD NOTE."  DO YOU SEE THAT?

4    A.    YES.

5    Q.    "IS THAT THE PRODUCTS OF SHANG PENG

6  ARE VERY SIMILAR TO ALL THE GREAT PRODUCTS YOU

7  HAVE COME TO RELY ON."  DO YOU SEE THAT?

8    A.    YES.

9    Q.    THIS WAS A PRESENTATION TO THE

10  PRIOR AFFILIATES OF INTERUSH AND ASCENTRA,

11  CORRECT?

12    A.    I BELIEVE SO.

13    Q.    IF YOU GO TO THAT ONE SPOT WHERE

14  THE PAGE IS LOWER 229, ON THAT BOTTOM BULLET POINT

15  YOU SAID THAT THERE WAS A TYPOGRAPHICAL ERROR.

16  JUST TO BE CLEAR ON THE RECORD, I WENT BACK AND

17  CHECKED, AND IT WAS NOT CLEAR FROM YOUR ANSWER

18  WHAT YOU WERE REFERRING TO AS BEING A

19  TYPOGRAPHICAL ERROR.

20    A.    I DON'T THINK SHANG PENG GAO KE AS

21  PARENT COMPANY HAS BEEN RENAMED AS ASCENTRA

22  HOLDINGS INC.  I THINK THAT IS FACTUALLY

23  INCORRECT.

24    Q.    IF THIS WAS A PRESENTATION THAT WAS

25  MADE TO THE EXISTING AFFILIATES, YOU ARE SAYING

256

RYUNOSUKE YOSHIDA

1   THE AFFILIATES WERE GIVEN MISINFORMATION ABOUT THE

2   COMPANIES?

3               MR. MORRIS:  OBJECTION TO THE FORM

4   OF THE QUESTION.  ASKED AND ANSWERED.

5         A.    POSSIBLY.

6   BY MR. MCDONALD:

7         Q.    OKAY.  IF YOU FLIP TO THE NEXT

8   PAGE ----

9         A.    CAN YOU SPECIFY WHICH PAGE?

10        Q.    230, DOWN THE BOTTOM CORNER.

11        A.    YES.

12        Q.    RIGHT ABOVE WHERE YOU HAVE THESE

13  THINGS IN PARENTHESIS, IT SAYS, "NOW I WOULD LIKE

14  TO TURN THIS PROGRAM OVER TO JESSIE TSAI."

15        A.    THERE IS A TYPO THERE TOO, YES.

16  THAT SAYS "TSIA", BUT IT IS TSAI.

17        Q.    TSAI.  I HAVE SEEN IT BOTH WAYS.

18  IS IT T-S-A-I OR T-S-I-A?

19        A.    T-S-A-I.

20        Q.    OH, T-S-A-I?

21        A.    YES.  IT IS NOT SUPPOSED TO BE I-A.

22        Q.    THAT IS FUNNY, I HAVE ALWAYS SEEN

23  IT I-A.  OKAY.  "VICE PRESIDENT OF SALES, TO

24  PROVIDE MORE INFORMATION ABOUT OUR WONDERFUL SHANG

25  PENG IT PRODUCTS!"  WHAT COMPANY WAS JESSIE TSAI

257

1    WORKING FOR AT THIS TIME?

2           A.     I BELIEVE SHE WAS AN EMPLOYEE OF

3    HEC INTERNATIONAL COMPANY LIMITED.

4           Q.     OKAY.  YOU CAN PUT THAT ASIDE.

5           (EXHIBIT 14 MARKED FOR IDENTIFICATION)

6    BY MR. MCDONALD:

7           Q.     MR. YOSHIDA, I HAVE HANDED YOU WHAT

8    HAS BEEN MARKED AS EXHIBIT 14.  I WOULD ASK IF YOU

9    COULD TAKE A MINUTE TO FAMILIARISE YOURSELF WITH

10   IT.  (PAUSE) MY QUESTION TO YOU WOULD BE ON THE

11   THIRD PAGE, WHICH IS BATES 2385 DOWN THE LOWER

12   RIGHT-HAND CORNER WHEN YOU ARE DONE REVIEWING.

13   (PAUSE)

14          A.     YES.

15          Q.     HAVE YOU EVER SEEN THIS E-MAIL

16   BEFORE?

17          A.     I THINK SO.  I DON'T EXACTLY

18   REMEMBER BUT I BELIEVE SO.

19          Q.     YOU HAVE NO DOUBT THAT YOU RECEIVED

20   IT?

21          A.     YES, I HAVE NO DOUBT.

22          Q.     OKAY.  ON PAGE 3, WHICH IS LOWER

23   RIGHT BATES "PLANET_002385, DO YOU SEE THAT?

24          A.     YES.

25          Q.     THERE IS A MIDDLE E-MAIL FROM YOU

                         258

                  RYUNOSUKE YOSHIDA

1    TO PAUL.  DO YOU SEE THAT?

2           A.    YES.

3           Q.    IT SAYS, "THANK YOU FOR YOUR

4    REPLY."  IT SAYS, "UPON SUCCESSION OF THE

5    BUSINESS, WE HAVE SETUP A SINGAPORE ENTITY TO

6    LOCATE SINGAPORE AS THE OPERATIONAL HEADQUARTER."

7    WHAT DID YOU MEAN BY SUCCESSION OF THE BUSINESS?

8           A.    I BOUGHT THE SHARES FROM --

9    I BELIEVE THIS IS REGARDING I BOUGHT THE SHARES

10   FROM MOTOHIKO HOMMA.

11          Q.    IT SAYS, "WE HAVE SETUP A SINGAPORE

12   ENTITY."  DO YOU SEE THAT?

13          A.    YES.

14          Q.    YOU BOUGHT YOUR SHARES FROM

15   MR. HOMMA BACK AT THE END OF 2018; IS THAT

16   CORRECT?

17          A.    I BELIEVE SO.

18          Q.    AND THE DATE AT THE TOP IS WHAT ON

19   THIS E-MAIL?

20          A.    SEPTEMBER 2019.

21          Q.    SO IT IS WELL AFTER YOU PURCHASED

22   THE SHARES.  SO, SUCCESSION OF THE BUSINESS, WHICH

23   BUSINESS ARE YOU TALKING ABOUT AT THIS POINT?

24          A.    SPGK.  GROWTH TODAY AND SPGK.

25          Q.    THAT YOU HAVE PURCHASED SPGK?

259

RYUNOSUKE YOSHIDA

1          A.     YES.

2          Q.     OKAY.  YOU CAN PUT THAT ASIDE.

3          (EXHIBIT 15 MARKED FOR IDENTIFICATION)

4     BY MR. MCDONALD:

5          Q.     I AM SHOWING YOU WHAT HAS BEEN

6     MARKED AS EXHIBIT 15.  I DON'T NEED YOU TO REALLY

7     REVIEW IT IN DEPTH.  ALL I ASK IS THAT YOU LOOK AT

8     PAGE 3, WHICH IS 2412.

9          A.     YES.

10         Q.     CAN YOU CONFIRM THAT THAT IS YOUR

11    SIGNATURE?

12         A.     YES.

13         Q.     AND YOU SIGNED THIS DOCUMENT?

14         A.     YES, I THINK SO.

15         Q.     ONE QUESTION FOR YOU.  AT THE TOP

16    PART YOU CHECKED THE BOX "NEW ACCOUNT"?

17         A.     CAN YOU SPECIFY WHERE?

18         Q.     RIGHT UNDER "MERCHANT PROCESSING

19    APPLICATION."

20         A.     YES.

21              MR. MORRIS:  I AM SORRY, I DID NOT

22    HEAR THAT.

23    BY MR. MCDONALD:

24         Q.     AT THE TOP OF THE DOCUMENT IT HAS

25    "MERCHANT PROCESSING APPLICATION" AND THEN IT HAS

260

RYUNOSUKE YOSHIDA

1   A CHECK NEXT TO "NEW ACCOUNT".

2          A.     CAN YOU TELL ME WHERE?  (PAUSE)

3   YES.

4          Q.     I THINK YOU HAD PREVIOUSLY

5   TESTIFIED THAT PLANET PAYMENT WAS ALREADY DOING

6   PROCESSING FOR SPGK FROM CHINA UNION PAY?

7                MR. MORRIS:  OBJECTION TO THE FORM

8   OF THE QUESTION.

9          A.     I THINK THIS IS FOR

10  SPGK PTE LIMITED, THEREFORE IT IS A NEW ACCOUNT.

11  MR. MCDONALD:

12         Q.     FOR PTE?

13         A.     YES.

14         Q.     WOULDN'T THAT BE AN EXISTING

15  ACCOUNT?

16                MR. MORRIS:  OBJECTION TO THE FORM

17  OF THE QUESTION.

18         A.     I THINK IT IS A NEW ENTITY, SO IT

19  SHOULD BE A NEW ACCOUNT.

20  BY MR. MCDONALD:

21         Q.     AND THAT WAS THE REASON YOU CHECKED

22  THAT BOX?

23         A.     I THINK THIS COULD HAVE BEEN

24  CHECKED BY PLANET PAYMENT.  I DON'T REMEMBER

25  WHETHER I CHECKED IT OR NOT.

RYUNOSUKE YOSHIDA

1          Q.     OKAY.

2          A.     I CANNOT REMEMBER.

3          Q.     PUT THAT ASIDE.

4          (EXHIBIT 16 MARKED FOR IDENTIFICATION)

5     BY MR. MCDONALD:

6          Q.     MR. YOSHIDA, I WILL SHOW YOU WHAT

7     HAS BEEN MARKED AS 16.

8          A.     OKAY.

9          Q.     MR. YOSHIDA, WHY DID YOU ADD AN

10    ADDITIONAL BANK IN TAIWAN TO RECEIVE FUNDING FROM

11    PLANET PAYMENT?

12         A.     BECAUSE THERE WAS A CONCERN THAT I

13    WAS -- SORRY, LET ME SAY THIS AGAIN.  WE HAVE

14    ALWAYS FACED ISSUES WITH BANKING AND THERE WERE

15    MULTIPLE TIMES WHEN ACCOUNTS WERE CLOSED, AND

16    I ALWAYS NEEDED BACK UPS AND ALSO MULTIPLE BACK

17    UPS TO MITIGATE THE RISK OF NOT HAVING A BANK

18    ACCOUNT.

19         Q.     YOU SAID THERE WERE MULTIPLE TIMES

20    WHERE BANK ACCOUNTS WERE CLOSED?

21         A.     WELL, I THINK THERE WAS ONCE, WHICH

22    WAS DBS.

23         Q.     THE DBS ACCOUNT?

24         A.     YES.  IT WAS EVENTUALLY CLOSED.

25         Q.     WHO WAS THE DEPOSITOR OF RECORD ON

262

RYUNOSUKE YOSHIDA

1    THE DBS ACCOUNT WHEN IT WAS CLOSED?

2          A.    WHO DEPOSITED INTO THE DBS?

3          Q.    YES?

4          A.    PLANET PAYMENT.

5          Q.    AND WHO OWNED THE DBS ACCOUNT WHEN

6    IT WAS CLOSED?

7          A.    SPGK PTE LIMITED.

8          Q.    DO YOU KNOW WHY IT WAS CLOSED?

9          A.    NO.

10         Q.    WAS NO EXPLANATION GIVEN TO YOU?

11         A.    NO.

12         Q.    NO?

13         A.    NO.

14         Q.    WHAT HAPPENED TO THE FUNDS IN THE

15   DBS ACCOUNT THAT WAS CLOSED?

16         A.    I CANNOT REMEMBER, BUT I WOULD

17   ASSUME I WOULD HAVE TRANSFERRED TO THE TAIWAN BANK

18   ACCOUNT.

19         Q.    DO YOU KNOW WHO CLOSED THE ACCOUNT?

20         A.    THE BANK.

21         Q.    DBS?

22         A.    YES.

23         Q.    AND CAN YOU TELL ME WHO WINNIE LO

24   IS?

25         A.    SHE WAS THE CONTROLLER OF ASCENTRA

263

RYUNOSUKE YOSHIDA

1    AND IHEALTHSCIENCE.

2         Q.    AND IHEALTHSCIENCE?

3         A.    YES.

4         Q.    PUT THAT ASIDE.

5         (EXHIBIT 17 MARKED FOR IDENTIFICATION)

6    BY MR. MCDONALD:

7         Q.    I WILL SHOW YOU WHAT IS MARKED AS

8    EXHIBIT 17.  (PAUSE)

9         A.    OKAY.

10        Q.    HAVE YOU SEEN THIS E-MAIL BEFORE?

11        A.    I THINK SO.

12        Q.    YOU THINK SO?  THERE IS NO DOUBT

13   YOU RECEIVED IT?

14        A.    NO.

15        Q.    IN THE BOTTOM E-MAIL MR. MATSUURA

16   IS REQUESTING THAT TED PREPARE CERTAIN FINANCIAL

17   STATEMENTS IN A CERTAIN WAY.  DO YOU SEE THAT, THE

18   BOTTOM E-MAIL?

19        A.    YES.

20        Q.    HE IS ASKING HIM TO "CALCULATE ON

21   THE BASIS THAT THERE IS NO FINANCIAL RELATIONSHIP

22   BETWEEN ASCENTRA AND SPGK."  DO YOU SEE THAT?

23        A.    YES.

24        Q.    IF YOU LOOK UP ABOVE, MR. SANDERS

25   TAKES ISSUE WITH THAT?

264

RYUNOSUKE YOSHIDA

1          A.     YES.

2          Q.     HE SAYS, "IN MY OPINION, TO EXCLUDE

3   SPGK FROM ASCENTRA'S RESULTS WOULD NOT ACCURATELY

4   REFLECT THE RESULTS OF ASCENTRA WHICH IS WHY SPGK

5   WAS INCLUDED IN ASCENTRA'S UNAUDITED FINANCIAL

6   STATEMENTS FOR 2018 AND 2019 PREPARED AT RYU'S

7   REQUEST A FEW WEEKS AGO.  I WOULD NOT BE OFFENDED

8   AND ENCOURAGE YOU TO SEEK THE OPINION OF AN

9   OUTSIDE ACCOUNTING FIRM FOR FURTHER CLARIFICATION

10  IF YOU SO DESIRE."  SO TWO QUESTIONS HERE.  FIRST,

11  YOU REQUESTED THAT MR. SANDERS PREPARE FINANCIAL

12  STATEMENTS FOR ASCENTRA FOR 2018 AND 2019.  IS

13  THAT TRUE?

14         A.     DO YOU HAVE THIS E-MAIL?

15         Q.     WHAT IS THAT?

16         A.     DO YOU HAVE THIS E-MAIL ----

17         Q.     NO.  I AM JUST READING FROM THIS

18  AND ASKING YOU IF THAT IS A TRUE STATEMENT.  YOU

19  SAY HE PREPARED THEM AT YOUR REQUEST.  (PAUSE)

20         A.     I HAVE TO CHECK THE E-MAIL OR ANY

21  FORMAL REQUEST I SENT, BUT I WOULD ASSUME SO,

22  BASED ON READING THIS E-MAIL.

23         Q.     ARE YOU AWARE WHETHER OR NOT

24  MR. MATSUURA SOUGHT THE OPINION OF AN OUTSIDE

25  ACCOUNTING FIRM FOR CLARIFICATION ON THIS ISSUE?

265

RYUNOSUKE YOSHIDA

1          A.     I DON'T KNOW.

2          Q.     YOU DON'T KNOW?

3          A.     I DON'T KNOW.

4          Q.     DID YOU EVER SEEK THE OPINION OF AN

5    OUTSIDE ACCOUNTING FIRM FOR FURTHER CLARIFICATION

6    ON THIS ISSUE?

7          A.     I DON'T THINK SO.

8          Q.     THE TOP LINE SAYS, "RESPECTFULLY,

9    I HAVE CONSIDERED THE POINTS IN YOUR EMAIL BUT

10   I REMAIN CONFIDENT THAT THE CORRECT ACCOUNTING

11   TREATMENT IS TO CONSOLIDATE SPGK'S RESULTS IN

12   ASCENTRA'S UNAUDITED FINANCIAL STATEMENTS AS A

13   SPECIAL PURPOSE ENTITY."  DO YOU SEE THAT?

14         A.     YES.

15         Q.     DO YOU KNOW WHAT A SPECIAL PURPOSE

16   ENTITY IS?

17         A.     I HAVE HAD A CONVERSATION WITH

18   MR. TED SANDERS REGARDING THIS AND HE MENTIONED

19   THAT, BASED ON ACCOUNTING TREATMENT FROM HIS

20   POINTS OF VIEW, SPGK IS CONSIDERED A SPECIAL

21   PURPOSE ENTITY BASED ON SEVERAL FACTORS, BUT IT IS

22   NOT LEGALLY -- IT IS NOT A LEGAL EFFECT, BUT IT IS

23   JUST AN ACCOUNTING TREATMENT.  THAT IS MY

24   UNDERSTANDING.

25         Q.     DID YOU EVER OBTAIN AN OPINION OF

266

RYUNOSUKE YOSHIDA

1    ACCOUNTANT CONCERNING WHETHER OR NOT SPGK SHOULD

2    BE TREATED AS A SPECIAL PURPOSE ENTITY?

3          A.    NO.

4          Q.    AND IT SAYS HERE THAT THE FINANCIAL

5    STATEMENTS THAT WAS PREPARED AT YOUR REQUEST HAD

6    SPGK'S RESULTS CONSOLIDATED WITH ASCENTRA.  IS

7    THAT CORRECT?  IT SAYS SPGK WAS INCLUDED IN

8    ASCENTRA'S UNAUDITED FINANCIAL STATEMENTS FOR 2018

9    AND 2019.

10         A.    I THINK HE IS REFERRING THAT I

11   REQUESTED TO EXCLUDE SPGK FROM ASCENTRA'S RESULTS.

12         Q.    NO, IF YOU LOOK DOWN BELOW,

13   "WEBDREAM" ----

14         A.    YES.

15         Q.    ---- IS MR. MATSUURA'S E-MAIL

16   ADDRESS, CORRECT?

17         A.    YES.

18         Q.    OKAY.

19         A.    I BELIEVE I REQUESTED HIM TO

20   EXCLUDE SPGK FROM ASCENTRA'S RESULTS, BECAUSE THAT

21   WAS MY VIEW.

22         Q.    WELL, IT SAYS UP HERE THIS IS

23   ADDRESSED TO MATSUURA SAN, AND TED IS SAYING THAT

24   HE PREPARED AT YOUR REQUEST FINANCIAL STATEMENTS

25   IN WHICH SPGK WAS INCLUDED IN ASCENTRA'S UNAUDITED

267

1    FINANCIAL STATEMENTS.

2         A.    I THINK THIS MIGHT BE A

3    GRAMMATICAL -- I THINK WE SHOULD CONFIRM THIS

4    REQUEST BECAUSE I BELIEVE I HAVE REQUESTED TO

5    EXCLUDE SPGK FROM ASCENTRA, BECAUSE THAT WAS MY

6    VIEW, BUT I CANNOT CONFIRM WITH JUST THIS E-MAIL.

7         Q.    IT WAS JUST YOUR VIEW?

8         A.    MR. MATSUURA AS WELL.

9         Q.    OKAY.

10              MR. MORRIS:  LET US GET MR. SANDERS

11   IN AND ASK HIM WHAT HE MEANT.  (LAUGHTER)

12        A.    I AGREE.  CAN I TAKE A QUICK

13   BATHROOM BREAK?

14              MR. MCDONALD:  OKAY.  WE ARE BACK

15   AT 5.30.

16        A.    HOW MUCH MORE TIME?

17              MR. MORRIS:  YES, HOW MUCH TIME DO

18   WE HAVE LEFT?

19              THE VIDEOGRAPHER:  WE HAVE BEEN ON

20   THE RECORD FOR 4 HOURS, 11 MINUTES.

21              MR. MCDONALD:  I AM SORRY?

22              THE VIDEOGRAPHER:  FOUR HOURS, 11

23   MINUTES.  SO 49 MINUTES LEFT.  I AM SORRY, SIX

24   HOURS, 11 MINUTES.  (LAUGHTER)

25              MR. MCDONALD:  I WAS, WOW, THE TIME

268

RYUNOSUKE YOSHIDA

1   REALLY DOES FLY, DOES IT NOT, NOW?  SO HOW MUCH

2   TIME IS THERE LEFT, 49 MINUTES?

3                   THE VIDEOGRAPHER:  FORTY-NINE

4   MINUTES, I AM SORRY.

5                   MR. MCDONALD:  OKAY.  LET US BREAK

6   UNTIL 5.30.

7                   THE WITNESS:  YES, THANK YOU.

8                   THE VIDEOGRAPHER:  WE ARE GOING OFF

9   THE RECORD.  THE TIME IS 5.20.

10      (A SHORT BREAK FROM 5.20 P.M. TO 5.36 P.M.)

11                  THE VIDEOGRAPHER:  WE ARE BACK ON

12   THE RECORD.  THE TIME IS 5.36.

13         (EXHIBIT 18 MARKED FOR IDENTIFICATION)

14   BY MR. MCDONALD:

15         Q.    I WILL SHOW YOU WHAT HAS BEEN

16   MARKED AS EXHIBIT 18.  (PAUSE)

17         A.    OKAY.

18         Q.    MR. YOSHIDA, HAVE YOU SEEN THESE

19   E-MAILS BEFORE?

20         A.    I BELIEVE SO.

21         Q.    ANY DOUBT THAT YOU RECEIVED IT OR

22   ANY OF THEM?

23         A.    NO.

24         Q.    LET US START AT THE VERY BACK.

25   JUST TO BE CLEAR, IT IS FROM MR. MATSUURA,

269

RYUNOSUKE YOSHIDA

1   WEBDREAM?

2           A.      YES.

3           Q.      TO GARY SMITH AT LOEB SMITH?

4           A.      YES.

5           Q.      WHO IS GARY SMITH REPRESENTING AT

6   THIS TIME?

7                   MR. MORRIS:  OBJECTION TO THE FORM

8   OF THE QUESTION.

9           A.      I BELIEVE IT WAS YOSHIO MATSUURA.

10  BY MR. MCDONALD:

11          Q.      IN THE MIDDLE OF THAT IT SAYS, "AS

12  YOU MIGHT ALREADY KNOW, I HAVE ACCEPTED

13  MR. YOSHIDA'S REQUEST TO RESIG", I THINK THAT

14  MEANS RESIGN.  IS THAT A BETTER TRANSLATION?

15          A.      I THINK SO, YES.

16          Q.      "AS DIRECTOR OF SPGK, AND REQUEST

17  YOU TRANSFER HIS GROWTH TODAY SHARES BACK IN

18  MARCH."  DO YOU SEE THAT?  THE DATE OF THIS E-MAIL

19  IS DECEMBER 11, 2020.

20          A.      SORRY, LET ME DOUBLE-CHECK.

21  (PAUSE) I THINK THERE IS A TRANSLATION MISTAKE IN

22  THIS ENGLISH.

23          Q.      OKAY.  AS FAR AS YOU ARE CONCERNED,

24  WHAT DOES THAT TRANSLATE TO?  THE JAPANESE

25  LANGUAGE ABOVE, "AS YOU MIGHT ALREADY KNOW"?

270

RYUNOSUKE YOSHIDA

1          MR. MORRIS:  OBJECTION TO THE FORM

2   OF THE QUESTION.

3          MR. MCDONALD:  HE SAID THERE WAS A

4   TRANSLATION ERROR.

5   BY MR. MCDONALD:  WHAT HAS BEEN MISTRANSLATED?

6       A.    SORRY, MAYBE IT IS NOT A

7   TRANSLATION ERROR, BUT IT DEPENDS ON HOW YOU

8   UNDERSTAND IT.  IT SAYS "SHARES BACK IN MARCH".

9   THIS IS SAYING MARCH LAST YEAR.  THAT IS WHAT IT

10  MEANS, NOT SHARES BACK, BUT MARCH LAST YEAR.

11  SHARES BACK IN MARCH.

12      Q.    OKAY.

13      A.    IS HOW IT IS SUPPOSED TO BE READ.

14      Q.    SO IN MARCH OF 2020 YOU MADE A

15  REQUEST TO TRANSFER YOUR SHARES OF GROWTH TODAY

16  BACK ----

17      A.    NO, NO, NO.

18      Q.    PLEASE TELL US WHAT YOU MEANT.

19  WHAT IS MEANT BY THIS?

20          MR. MORRIS:  OBJECTION TO THE FORM

21  OF THE QUESTION.

22      A.    IT IS SAYING -- I THINK IT IS

23  BETTER IF YOU REPLACE THE WORD "BACK" WITH LAST

24  YEAR MARCH.

25  BY MR. MCDONALD:

271

RYUNOSUKE YOSHIDA

1          Q.     SO REQUEST TO TRANSFER HIS GROWTH

2   TODAY SHARES?

3          A.     IN MARCH LAST YEAR.

4          Q.     TRANSFER TO WHOM?

5          MR. MORRIS:  OBJECTION TO THE FORM

6   OF THE QUESTION.

7          A.     SORRY, LET ME READ IT.  (PAUSE)

8   I THINK IT WAS NOT SPECIFIED DURING THIS PERIOD.

9   BY MR. MCDONALD:

10         Q.     DID YOU REQUEST -- DID YOU MAKE A

11  REQUEST TO MR. MATSUURA TO TRANSFER YOUR GROWTH

12  TODAY SHARES TO ANYONE?

13         A.     I DID NOT MAKE A REQUEST.

14  I INFORMED YOSHIO MATSUURA THAT I MAY WANT TO

15  LEAVE MY POSITION AS SHAREHOLDER AND DIRECTOR OF

16  SPGK.

17         Q.     AND WAS MR. MATSUURA A SHAREHOLDER

18  OR DIRECTOR OF SPGK?

19         A.     NO.

20         Q.     SO WHY DID YOU HAVE TO MAKE A

21  REQUEST TO HIM?

22         A.     I DON'T THINK I SAID REQUEST.

23  I SAID INFORM.

24         Q.     OKAY.  IS IT ACCURATELY TRANSLATED

25  THAT I HAVE ACCEPTED MR. YOSHIDA'S REQUEST?

272

RYUNOSUKE YOSHIDA

1          A.     I THINK IT SHOULD BE TRANSLATED AS

2    ACCEPTED HIS WILL, I THINK IS A BETTER

3    TRANSLATION.

4          Q.     OKAY.

5          A.     IT DOES NOT SAY REQUEST IN THE

6    JAPANESE.

7          Q.     THE NEXT AMERICAN LINE DOWN IS,

8    "BUT I TOLD HIM THE CONDITION IS TO SOLVE VARIOUS

9    ISSUES BEFORE HE RESIGN, AND TAKE RESPONSIBILITY

10   OF THE REMAINING ISSUES."  SO LET US START WITH

11   THE SOLVE VARIOUS ISSUES.  DO YOU KNOW WHAT

12   MR. MATSUURA MEANT THAT IT WAS A CONDITION FOR HIS

13   ACCEPTANCE OF YOUR RESIGNATION FOR YOU TO SOLVE

14   VARIOUS ISSUES?

15         A.     HE WANTED ME TO TAKE THE

16   RESPONSIBILITY TO SOLVE THE 214 PEOPLE'S ARREST IN

17   MAINLAND CHINA.

18         Q.     AND WHY DID HE WANT YOU TO RESOLVE

19   THOSE ISSUES?

20         A.     WHY DID HE WANT ME TO RESOLVE THOSE

21   ISSUES?  I THINK HE ----

22              MR. MORRIS:  I CANNOT HEAR YOU.

23         A.     SORRY.  THERE WAS SOME DISCUSSIONS

24   ABOUT SELLING MY SHARES TO SOMEBODY.  IT WAS NEVER

25   FINALISED.  BUT DECIDING WHO IT WAS, WE HAD TO --

                           273

                    RYUNOSUKE YOSHIDA

1   HE WANTED ME TO RESOLVE THIS CHINA CRIMINAL

2   INVESTIGATION.

3   BY MR. MCDONALD:

4            Q.    SO THAT YOU WOULD BE ABLE TO SELL

5   YOUR SHARES?

6            A.    THAT WAS THE CONDITION HE RAISED,

7   BUT IT WAS NOT MY UNDERSTANDING.

8            Q.    WHAT WAS YOUR UNDERSTANDING?

9                  MR. MORRIS:  OBJECTION TO THE FORM

10  OF THE QUESTION.

11           A.    I THINK IF THERE WAS A SUITABLE

12  PERSON TO SELL, THEN I COULD HAVE SOLD IT.

13  BY MR. MCDONALD:

14           Q.    COULD YOU HAVE SOLD IT BACK TO

15  MR. MATSUURA?

16                 MR. MORRIS:  OBJECTION TO THE FORM

17  OF THE QUESTION.

18           A.    CAN YOU CLARIFY?

19  BY MR. MCDONALD:

20           Q.    COULD YOU HAVE SOLD YOUR SHARES TO

21  MR. MATSUURA?

22           A.    I COULD HAVE SOLD MY SHARES TO

23  MR. MATSUURA.

24           Q.    IN FACT DIDN'T YOU DRAFT AN

25  AGREEMENT TO EFFECT JUST SUCH A THING?

274

RYUNOSUKE YOSHIDA

```
 1          A.      I DON'T THINK SO, BUT I CANNOT

 2   REMEMBER.

 3          (EXHIBIT 19 MARKED FOR IDENTIFICATION)

 4          Q.      I WILL SHOW YOU WHAT HAS BEEN

 5   MARKED AS EXHIBIT 19.

 6          A.      SURE.

 7          Q.      I WILL SHOW YOU WHAT HAS BEEN

 8   MARKED AS EXHIBIT 19.

 9          A.      I DON'T THINK I PREPARED THIS

10   DOCUMENT.

11                  MISS LEVINE:  JUST LET HIM ASK THE

12   QUESTIONS.

13          A.      OH, SORRY.

14   BY MR. MCDONALD:

15          Q.      THAT WAS MY QUESTION.  SO DO YOU

16   KNOW WHO PREPARED THIS DOCUMENT?

17          A.      OH, SORRY, UNDERSTOOD.  I DON'T

18   KNOW.

19          Q.      YOU JUST GOT USED TO MY QUESTIONS,

20   THAT IS OKAY.

21          A.      I DON'T KNOW.

22          Q.      YOU DON'T KNOW.  DO YOU KNOW WHEN

23   THIS WAS PREPARED?

24          A.      I CANNOT REMEMBER.

25          Q.      IT IS DATED BLANK 2020.  DO YOU SEE
```

275

RYUNOSUKE YOSHIDA

1    THAT ON TOP?

2          A.    YES.

3          Q.    AND IT PROVIDES FOR A TRANSFER OF

4    THE ONE SHARE OF CAPITAL TO MR. MATSUURA?

5          A.    BASED ON THIS DOCUMENT, I BELIEVE

6    THAT IS WHAT IT SAYS.

7          Q.    AND IT IS FOR A CONSIDERATION OF US

8    $1.  DO YOU SEE THAT?

9          A.    I SEE IT, YES.

10         Q.    WHICH IS THE SAME AMOUNT YOU PAID

11   FOR THE SHARE OF GROWTH TODAY; IS THAT CORRECT?

12         A.    YES.

13         Q.    DO YOU KNOW WHY MR. MATSUURA WANTED

14   TO BUY THE SHARE IN GROWTH TODAY?

15         A.    I ASSUME -- I DON'T KNOW.  I DON'T

16   KNOW.  I HAVE AN ASSUMPTION BUT I DON'T KNOW.

17         Q.    OKAY.  YOU HAVE AN ASSUMPTION?

18         A.    YES.

19         Q.    AND WHAT IS THAT?

20         A.    BECAUSE SPGK WAS MAKING A LOT OF

21   ----

22         Q.    I AM SORRY?

23         A.    BECAUSE SPGK WAS MAKING A LOT OF

24   MONEY.

25         Q.    AND MR. MATSUURA WANTED THAT MONEY?

276

RYUNOSUKE YOSHIDA

```
1           A.     THAT IS MY ASSUMPTION.

2           Q.     THAT IS YOUR ASSUMPTION?

3           A.     YES.

4           Q.     DID MR. MATSUURA EVER TELL YOU

5    THAT?

6           A.     I DON'T REMEMBER.

7           Q.     YOU CAN PUT THAT ASIDE.  MARK THIS

8    EXHIBIT 20.

9           (EXHIBIT 20 MARKED FOR IDENTIFICATION)

10              MR. MCDONALD:  CAN I ASK THE

11   VIDEOGRAPHER TO PLEASE GIVE ME AN INDICATION WHEN

12   WE HAVE 30 MINUTES LEFT?

13              THE VIDEOGRAPHER:  OF COURSE.

14              MR. MCDONALD:  THANK YOU.

15   BY MR. MCDONALD

16          Q.     MR. YOSHIDA, IN THE INTEREST OF

17   TIME, MY QUESTIONS ARE REALLY GOING TO BE FOCUSED

18   ON PAGE 2 OF THIS EXHIBIT AND PAGE 1, THE E-MAILS

19   ON PAGE 2 AND PAGE 1.  (PAUSE)

20          A.     MAY I KNOW WHAT YOUR QUESTION IS?

21          Q.     I AM SORRY?  ARE YOU READY?  ON

22   PAGE 2, YOU SEE THE E-MAIL FROM MASAMI.  IT SAYS,

23   "HI GARY."

24          A.     YES.

25          Q.     DO YOU SEE THAT?
```

277

RYUNOSUKE YOSHIDA

1        A.    YES.

2        Q.    IT SAYS, "THE LAST AUDITED

3  FINANCIAL STATEMENTS WE HAVE WERE FOR 2015."

4        A.    YES.

5        Q.    DO YOU KNOW IF THAT IS AN ACCURATE

6  STATEMENT FOR ASCENTRA'S FINANCIAL STATEMENTS?

7        A.    I THINK SO.

8        Q.    DO YOU KNOW WHY FINANCIALS WERE NOT

9  PREPARED FOR 2016 OR 2017?

10        A.    NO.

11              MR. MORRIS:  OBJECTION TO THE FORM

12  OF THE QUESTION.

13        A.    NO.

14  BY MR. MCDONALD:

15        Q.    AS A DIRECTOR OF ASCENTRA, DID YOU

16  RECEIVE ANY UNAUDITED FINANCIAL STATEMENTS FOR

17  2016 AND 2017?

18        A.    I DON'T REMEMBER.

19        Q.    LET US SEE.  DOWN THERE IT SAYS,

20  "IF YOU REQUIRE UNAUDITED FINANCIAL STATEMENTS FOR

21  2016, WE CAN PREPARE IT IN 2 WEEKS OR SO."  DO YOU

22  SEE THAT?

23        A.    YES.

24        Q.    WERE YOU WORKING WITH MASAMI TO GET

25  THOSE STATEMENTS PREPARED?

278

RYUNOSUKE YOSHIDA

```
 1              A.    I DON'T THINK SO.

 2              Q.    LOOK AT THE E-MAIL ABOVE, AND THAT

 3   IS FROM YOU?

 4              A.    YES.

 5              Q.    IT SAYS, "REGARDING THE

 6   RESTRUCTURING OF IRP HOLDINGS, WE WOULD LIKE TO

 7   PROCEED ON THE LIQUIDATION."  THAT IS THE

 8   LIQUIDATION OF IRP; IS THAT CORRECT?

 9              A.    I BELIEVE SO.

10              Q.    YOU BELIEVE SO.  "I AM CURRENTLY

11   PREPARING THE FOLLOWING:  1. PROFIT SHARE FROM

12   SPGK TO ASCENTRA; SPGK TO SHARE 10% MARGIN ON ALL

13   PROCUREMENT FROM ASCENTRA.  2. VALUATION OF

14   ASCENTRA.  3.  LIQUIDATION."  DO YOU SEE THAT?

15              A.    YES.

16              Q.    DID YOU PREPARE A VALUATION OF

17   ASCENTRA?

18              A.    NO.

19              Q.    WAS THE 10% PROCUREMENT ON ALL

20   PROCUREMENT FROM ASCENTRA EVER PAID TO ASCENTRA?

21              A.    NO.  SORRY, CAN I ASK AGAIN WHAT --

22   CAN YOU REPHRASE YOUR QUESTION?

23              Q.    YES.  IT SAYS, "SPGK TO SHARE 10%

24   MARGIN ON ALL PROCUREMENT FROM ASCENTRA."  DID

25   SPGK SHARE 10% OF ALL PROCUREMENT WITH ASCENTRA?
```

279

RYUNOSUKE YOSHIDA

1       A.      I DON'T KNOW IF IT'S 10%.

2       Q.      SO YOU DON'T KNOW?

3       A.      I DON'T KNOW IF IT'S 10%.

4       Q.      OKAY?

5       A.      OR WHETHER IF IT IS ON ALL

6   PROCUREMENT.

7       Q.      YOU DON'T KNOW?

8       A.      I DON'T KNOW.

9       Q.      AS A DIRECTOR OF ASCENTRA, HOW DID

10  YOU SATISFY YOURSELF THAT 10% WAS A FAIR

11  PERCENTAGE TO BE ALLOCATED TO ASCENTRA?

12      A.      I DON'T REMEMBER EXACTLY.

13      Q.      YOU DON'T REMEMBER?

14      A.      CAN YOU ASK YOUR QUESTION AGAIN?

15      Q.      AS A DIRECTOR OF ASCENTRA, HOW DID

16  YOU SATISFY YOURSELF THAT 10% WAS A FAIR

17  PERCENTAGE TO BE ALLOCATED TO ASCENTRA?

18      A.      I THINK -- I DON'T THINK THIS WAS

19  FINALISED, SO I DON'T EXACTLY KNOW, BUT I BELIEVE

20  THE ACTUAL MARGIN IN THE ACCOUNTING BOOKS COULD

21  HAVE BEEN AROUND THIS FIGURE.

22      Q.      IN THE ACCOUNTING BOOKS?

23      A.      YES.

24      Q.      WERE FUNDS ACTUALLY TRANSFERRED?

25      A.      I DON'T KNOW.

280

RYUNOSUKE YOSHIDA

1        Q.    COULD YOU PUT THAT ASIDE, PLEASE.

2        (EXHIBIT 21 MARKED FOR IDENTIFICATION)

3   BY MR. MCDONALD:

4        Q.    I WILL SHOW YOU WHAT HAS BEEN

5   MARKED AS EXHIBIT 21.

6        A.    SURE.

7        Q.    I DON'T KNOW IF THERE ARE TWO

8   E-MAILS HERE.  (PAUSE)

9        A.    OKAY.

10        Q.    LET US TURN TO THE BACK ONE.  IT IS

11   AN E-MAIL FROM YOU TO MR. MATSUURA?

12        A.    YES.

13        Q.    IN THIS E-MAIL YOU ARE ASKING FOR A

14   PAYMENT TO BE MADE TO YOU OF APPROXIMATELY $30

15   MILLION.  IS THIS ACCURATE?

16        A.    I BELIEVE SO.

17        Q.    WHY DID YOU WANT TO RECEIVE A

18   PAYMENT OF $30 MILLION?

19        A.    I BELIEVE DURING THIS PERIOD I WAS

20   THREATENED AND PUT IN A VERY DIFFICULT SITUATION

21   AND I WANTED TO GET OUT OF THE SITUATION.

22        Q.    ARE THESE THE THREATS THAT YOU

23   ALLUDED TO AT THE BEGINNING OF THIS DEPOSITION?

24        A.    I BELIEVE SO, YES, IF THE

25   CHRONOLOGY IS CORRECT.

RYUNOSUKE YOSHIDA

1        Q.      THESE THREATS WERE FROM

2   MR. MATSUURA?

3        A.      YES.

4        Q.      AND WHAT DID YOU WANT TO DO TO GET

5   OUT OF THE SITUATION?

6        A.      CAN YOU CLARIFY YOUR QUESTION?

7        Q.      YOU SAID "I WANTED TO GET OUT OF

8   THE SITUATION", AND I JUST WAS ASKING YOU WHAT YOU

9   MEANT BY "I WANTED TO GET OUT OF THE SITUATION"?

10       A.      I CONSIDERED SELLING THE SHARES OF

11  SPGK.

12       Q.      AND SO AS A RESOLUTION OF THAT

13  SITUATION THAT YOU ARE NOW REFERRING TO YOU WOULD

14  HAVE ACCEPTED $30 MILLION AT THAT TIME?

15       A.      AT THAT TIME?  SORRY, CAN YOU

16  CLARIFY YOUR QUESTION?

17       Q.      YES.  AT THAT TIME?

18       A.      YES.

19       Q.      YES.  IF YOU FLIP TO THE FIRST

20  E-MAIL, IT APPEARS MR. MATSUURA IS NOT VERY HAPPY

21  ABOUT THAT REQUEST.  HE SAYS, "$30MM IS OUTRAGEOUS

22  FOR SOMEONE WHO THREW UP IN THE MIDDLE OF A

23  PROJECT, HAS NOT DONE ANY WORK MOVING FORWARD

24  SINCE THE END OF LAST YEAR, AND WANTS TO QUIT."

25  DO YOU SEE THAT?

                        282

                RYUNOSUKE YOSHIDA

1          A.      SORRY, I WAS LOOKING AT THE

2    JAPANESE.   CAN YOU REPEAT?

3          Q.      IF YOU FLIP TO THE FIRST PAGE, THE

4    FIRST E-MAIL, IT APPEARS MR. MATSUURA IS NOT VERY

5    HAPPY ABOUT THE REQUEST.   HE SAYS, "$30MM IS

6    OUTRAGEOUS FOR SOMEONE WHO THREW UP IN THE MIDDLE

7    OF A PROJECT, HAS NOT DONE ANY WORK MOVING FORWARD

8    SINCE THE END OF LAST YEAR, AND WANTS TO QUIT."

9    DO YOU SEE THAT?

10         A.      YES.

11         Q.      IS THAT AN ACCURATE STATEMENT OF

12   MR. MATSUURA'S POSITION AT THAT TIME?

13              MR. MORRIS:   OBJECTION TO THE FORM

14   OF THE QUESTION.

15         A.      SORRY, CAN YOU REPEAT YOUR

16   QUESTION?

17   BY MR. MCDONALD:

18         Q.      IS THAT AN ACCURATE REFLECTION OF

19   MR. MATSUURA'S POSITION AT THAT TIME?

20              MR. MORRIS:   OBJECTION TO THE FORM

21   OF THE QUESTION.

22         A.      I BELIEVE SO IF HE -- I BELIEVE SO.

23   BY MR. MCDONALD:

24         Q.      DID YOU SPEAK WITH MR. MATSUURA

25   ABOUT THIS E-MAIL?

283

RYUNOSUKE YOSHIDA

```
 1              A.      I THINK SO.

 2              Q.      YOU THINK SO?

 3              A.      I THINK SO.

 4              Q.      AND WHAT DID YOU DISCUSS WITH

 5    MR. MATSUURA?

 6              A.      WHAT DID I DISCUSS ABOUT THIS

 7    EMAIL?  I THINK HE JUST MENTIONED THE SAME THING,

 8    WHAT IS STATED IN THE E-MAIL.

 9              Q.      HE REPEATED IT TO YOU OVER THE

10    PHONE?

11              A.      NOT WORD BY WORD.

12              Q.      NOT WORD BY WORD.  OKAY.  YOU HAVE

13    SAID THAT SPGK IS A SEPARATE COMPANY?

14              A.      YES.

15              Q.      WHY WOULD YOU HAVE TO GO TO

16    MR. MATSUURA TO GET HIS APPROVAL TO KEEP $30

17    MILLION WHEN YOU RESIGNED?

18                      MR. MORRIS:  OBJECTION TO THE FORM

19    OF THE QUESTION.

20              A.      I DON'T THINK I WAS GETTING HIS

21    APPROVAL, BUT I WAS TELLING HIM I WANTED TO LEAVE.

22    BY MR. MCDONALD:

23              Q.      AND WANTED TO KEEP $30 MILLION

24    WHILE YOU WERE LEAVING?

25              A.      YES.
```

284

RYUNOSUKE YOSHIDA

1        Q.      BUT YOU OWNED ALL THE SHARES IN

2   SPGK?

3        A.      YES.

4        Q.      IF YOU GO A COUPLE OF LINES DOWN,

5   IT SAYS, "AT LEAST THIS YEAR, THERE IS NO EFFORT

6   AS SALES ARE UP WITHOUT DOING ANYTHING TO TAKE

7   CARE OF MEMBERS."  DO YOU SEE THAT?

8        A.      YES.

9        Q.      DO YOU KNOW WHAT MR. MATSUURA MEANT

10  BY THAT STATEMENT?

11       A.      I THINK HE IS SAYING THAT -- I AM

12  SORRY, GIVE ME ONE SECOND.  (PAUSE) I THINK HE IS

13  SAYING THAT THE REVENUE HAS INCREASED WITHOUT MY

14  CONTRIBUTION.

15       Q.      DOWN TOWARDS THE END, MR. MATSUURA

16  SAYS, "I WILL BE TAKING TEMPORARY CUSTODY OF THE

17  COMPANY AT THE END OF 2020 AS IT IS VERY DIFFICULT

18  TO GET AN EP FOR ANDO."  BY COMPANY, WHICH COMPANY

19  WAS MR. MATSUURA REFERRING TO?

20              MR. MORRIS:  OBJECTION TO THE FORM

21  OF THE QUESTION.

22       A.      I BELIEVE HE IS REFERRING TO SPGK.

23  BY MR. MCDONALD:

24       Q.      DO YOU KNOW WHAT AN EP IS FOR ANDO?

25       A.      I THINK THAT IS A VISA, EMPLOYMENT

                          285

RYUNOSUKE YOSHIDA

1   PASS.

2          Q.     EMPLOYMENT PASS.  YOU CAN PUT THAT

3   ASIDE.

4          (EXHIBIT 22 MARKED FOR IDENTIFICATION)

5          Q.     I AM SHOWING YOU WHAT HAS BEEN

6   MARKED AS EXHIBIT 22.  EXHIBIT 22 IS ACTUALLY TWO

7   E-MAILS, ONE TO A WINNIE LO AND THEN ONE TO AN

8   EDGAR TAM.  THEY ARE EACH SIGNED, "BEST REGARDS,

9   LUKE".  THE FROM IS "AAA [A@TIRAWORKS.COM".  WAS

10  THAT ONE OF YOUR E-MAIL ADDRESSES AT THE TIME?

11         A.     YES.

12         Q.     DO YOU REMEMBER SENDING THESE

13  E-MAILS?

14         A.     CAN I READ IT THROUGH?

15         Q.     YOU MAY.  (PAUSE)

16                MR. MCDONALD:  CAN I ASK THE

17  VIDEOGRAPHER TO JUST LET ME KNOW WHEN 10 MINUTES

18  IS LEFT.

19                THE VIDEOGRAPHER:  OF COURSE.

20                MR. MCDONALD:  THANK YOU.

21                MR. MORRIS:  I AM SORRY, I DID NOT

22  HEAR YOU.

23                MR. MCDONALD:  I JUST ASKED FOR AN

24  INDICATION OF WHEN THERE IS 10 MINUTES LEFT, AND

25  AT THAT POINT WE ARE GOING TO JUST TAKE A BRIEF

286

RYUNOSUKE YOSHIDA

1   BREAK, IF THAT IS OKAY.  (PAUSE)

2   BY MR. MCDONALD:

3          Q.     YOU CAN TAKE MY REPRESENTATION; IT

4   IS THE SAME E-MAIL.  YOU RECALL SENDING THIS

5   E-MAIL?

6          A.     I BELIEVE SO.

7          Q.     IT APPEARS YOU WERE TROUBLED BY THE

8   FACT THAT MR. MATSUURA, AS YOU EARLIER TESTIFIED,

9   WAS SEEKING TO MAKE PAYMENTS TO VENDORS AND OTHER

10  INDIVIDUALS TOWARDS THE END OF -- STRIKE THAT.  HE

11  WAS LOOKING TO MAKE PAYMENTS TO VENDORS AND OTHER

12  INDIVIDUALS PRIOR TO ASCENTRA GOING INTO

13  LIQUIDATION?

14         A.     YES.

15         Q.     AND IN THE MIDDLE OF THE THIRD

16  PARAGRAPH DOWN IT SAYS, "IN REGARDS TO THE

17  SEVERANCE PAYMENT YOSHIO IS PROCEEDING WITH THE

18  VENDORS, HE IS PLANNING TO PAY MAJORITY OF THE

19  ASSETS OF THE COMPANY TO THE VENDORS."  DO YOU

20  KNOW WHAT COMPANY YOU WERE REFERRING -- DO YOU

21  RECALL WHAT COMPANY YOU WERE REFERRING TO THERE?

22         A.     CAN I KNOW WHICH PARAGRAPH YOU ARE

23  TALKING ABOUT?

24         Q.     IT IS THE THIRD DOWN FROM THE TOP.

25  IT SAYS, "IN REGARDS."  DO YOU SEE THAT?  IT

287

RYUNOSUKE YOSHIDA

```
1    BEGINS, "IN REGARDS."
2           A.     I BELIEVE THIS IS ASCENTRA GROUP.
3           Q.     ASCENTRA GROUP?
4           A.     YES.
5           Q.     AND THE PARAGRAPH UP ABOVE, YOU
6    SAY, "FIDUCIARY DUTY MEANS THAT THE DIRECTORS OWE
7    A RESPONSIBILITY TO RUN THE COMPANY WITH GOOD
8    FAITH AND IN THE BEST INTEREST OF THE COMPANY."
9           A.     YES.
10          Q.     SO YOU BELIEVE THAT YOSHIO, THE
11   LAST SENTENCE THERE, WOULD BE VIOLATING HIS
12   FIDUCIARY DUTY TO THE COMPANY BY MAKING ANY
13   PAYMENTS WITHOUT OBTAINING PROPER APPROVALS?
14          A.     I BELIEVE SO.
15          Q.     AND YOU WERE A DIRECTOR OF ASCENTRA
16   AT THIS TIME?
17          A.     YES, I THINK SO.
18          Q.     YOU WERE, OKAY.  THIS IS APRIL 5,
19   2021?
20          A.     I THINK SO.
21          Q.     IF YOU GO DOWN TWO PARAGRAPHS, IT
22   SAYS, "IF THE INDIVIDUALS OF THE VENDORS RECEIVED
23   5-35M USD EACH, AND IF THE SHAREHOLDERS ARGUE
24   WHETHER THE PAYMENT IS WITHIN THE BORDERS OF
25   COMMON SENSE AND REASONABLE, YOU MAY AGREE THAT IT
```

288

RYUNOSUKE YOSHIDA

1    IS NOT."  WERE YOU IMPLYING THERE THAT YOU DID NOT

2    BELIEVE IT WAS REASONABLE TO MAKE THESE PAYMENTS?

3         A.    I BELIEVE SO.

4         Q.    AT THE BEGINNING OF THE NEXT

5    PARAGRAPH YOU SAY, "WITHOUT PROPER JUSTIFICATION,

6    SUCH PAYMENTS COULD POTENTIALLY ATTRACT BOTH

7    CRIMINAL AND CIVIL LIABILITIES TO ALL PARTIES

8    INVOLVED."  WERE YOU ADVISED THAT MAKING THESE

9    PAYMENTS COULD RESULT IN CRIMINAL LIABILITIES TO

10   ANYONE THAT WAS INVOLVED IN MAKING THESE PAYMENTS?

11        A.    I DON'T THINK SO.

12        Q.    JUST YOUR IMPRESSION?

13        A.    I BELIEVE SO.

14             MR. MCDONALD:  CAN WE JUST TAKE A

15   QUICK 10-MINUTE BREAK?  I JUST WANT TO REGROUP,

16   AND THEN WE WILL GET BACK ON THE RECORD AND WRAP

17   UP.  THANK YOU.

18             THE VIDEOGRAPHER:  WE ARE GOING OFF

19   THE RECORD.  THE TIME IS 6.15.

20     (A SHORT BREAK FROM 6.15 P.M. TO 6.31 P.M.)

21             THE VIDEOGRAPHER:  WE ARE BACK ON

22   THE RECORD.  THE TIME IS 6.31.

23   BY MR. MCDONALD:

24        Q.    MR. YOSHIDA,I JUST HAVE TWO

25   QUESTIONS FOR YOU AND THEN MISS LEAHY HAS A

289

RYUNOSUKE YOSHIDA

1    QUESTION OR TWO, AND WE THEN WE WILL BE DONE.

2    I JUST WANT TO THANK YOU AGAIN FOR YOUR TIME

3    TODAY.  I KNOW IT HAS BEEN A LONG DAY, SO THANK

4    YOU.

5            A.    THANK YOU.

6            Q.    YOUR SPGK HAS MOVED IN THE US

7    BANKRUPTCY COURT TO LIFT THE RESTRAIN THAT HAS

8    BEEN IMPOSED ON THE PLANET PAYMENT FUNDS.  ARE YOU

9    AWARE OF THAT?

10            A.    I THINK SO.

11            Q.    IF THE COURT GRANTS THAT MOTION,

12    THAT IS LIFTS THE RESTRAINT ON THOSE FUNDS, WHERE

13    DO YOU INTEND TO HAVE THOSE FUNDS GO?

14                MR. MORRIS:  OBJECTION TO THE FORM

15    OF THE QUESTION.

16            A.    I BELIEVE I WOULD TRANSFER TO THE

17    SHANGHAI COMMERCIAL SAVINGS BANK IN TAIWAN.

18    BY MR. MCDONALD:

19            Q.    OKAY.

20                MR. MCDONALD:  THANK YOU.  I HAVE

21    NO FURTHER QUESTIONS.  I WILL PASS TO MISS LEAHY.

22                MR. MORRIS:  I AM SORRY, WHAT IS

23    HAPPENING?

24                MR. MCDONALD:  BLAIR LEAHY HAS TWO

25    QUESTIONS FOR HIM.

290

RYUNOSUKE YOSHIDA

1          MR. MORRIS:  OKAY.  I AM JUST GOING

2   TO OBJECT ON THE GROUNDS THAT, YOU KNOW, USUALLY

3   IT IS ONE LAWYER FOR EACH CLIENT WHO IS ASKING

4   QUESTIONS.  I AM NOT GOING TO PREVENT HER FROM

5   ASKING THEM, BUT I DO WANT TO PRESERVE THE RECORD

6   THAT WE OBJECT TO MULTIPLE LAWYERS QUESTIONING THE

7   WITNESS ON BEHALF OF THE SAME CLIENT.

8          MR. MCDONALD:  SO NOTED.

9          QUESTIONS BY MISS LEAHY

10  BY MISS LEAHY:

11      Q.    MR. YOSHIDA, I WILL BE VERY QUICK

12  INDEED.  JUST IN RELATION TO YOUR LAST ANSWER TO

13  MR. MCDONALD ----

14          MR. MORRIS:  GUYS, I AM HAVING

15  TROUBLE HEARING YOU.

16          MISS LEVINE:  PERHAPS YOU COULD

17  TRADE PLACES?

18          MR. MORRIS:  YES, MICROPHONE, OR

19  SOMETHING LIKE THAT.

20          MISS LEAHY:  LET ME JUST HOLD IT.

21  IS THAT BETTER?

22          THE COURT REPORTER:  THAT IS NOT AN

23  AMPLIFYING MIKE.

24          MISS LEAHY:  OH, OKAY.

25  BY MISS LEAHY:

291

RYUNOSUKE YOSHIDA

1          Q.     FIRST, A FOLLOW ON QUESTION FROM

2    YOUR LAST ANSWER TO MR. MCDONALD.  YOU SUGGESTED

3    THAT IF THE RESTRAINT WAS LIFTED THEN YOU WOULD

4    PROBABLY MOVE THE PLANET PAYMENT FUNDS TO THE

5    TAIWANESE BANK ACCOUNT.  I JUST WANTED TO ASK YOU

6    WHETHER AT THAT STAGE YOU WOULD ALSO THEN CAUSE

7    SPGK TO PAY THE COMMISSION PAYMENTS TO SPGK'S

8    AGENTS?

9          A.     I ----

10               MR. MORRIS:  OBJECTION TO THE FORM

11   OF THE QUESTION, BUT YOU CAN ANSWER.

12         A.     I MAY.

13   BY MISS LEAHY:

14         Q.     WHY MIGHTN'T YOU AFFECT THE

15   PAYMENTS AT THAT POINT IN TIME?

16         A.     BECAUSE, LIKE I SAID EARLIER, THERE

17   IS A LEGAL COST INCURRED AND DEPENDING ON THE

18   SITUATION I HAVE TO SEE WHAT TO DO.

19         Q.     BUT YOU SAID THAT THE COMMISSION

20   PAYMENTS TOTALLED BETWEEN 20 AND 40 MILLION, SO ON

21   ANY FOOTING THERE IS SUFFICIENT FUNDS IN THE

22   TAIWANESE BANK ACCOUNT ALREADY TO PAY THOSE

23   COMMISSION PAYMENTS AND HAVE A VERY SIGNIFICANT

24   SUM LEFT OVER.  HOW DO THE LEGAL FEES IN ANY WAY

25   PREVENT YOU FROM PAYING THE COMMISSION PAYMENTS?

RYUNOSUKE YOSHIDA

1           MR. MORRIS:  OBJECTION TO THE FORM

2    OF THE QUESTION.

3           A.    IT IS MY FIRST TIME GOING THROUGH

4    SUCH A CASE AND SUCH A SITUATION.  I CANNOT ASSUME

5    EVERY SINGLE SCENARIO, SO I WOULD HAVE TO THINK

6    ABOUT IT.

7    BY MISS LEAHY:

8           Q.    RIGHT.  IN YOUR ANSWERS TO SOME OF

9    MR. MCDONALD'S EARLIER QUESTIONS, YOU DISTINGUISH

10   BETWEEN COMMISSION PAYMENTS AND LOYALTY BONUS

11   PAYMENTS.  I WANT TO ASK YOU ABOUT LOYALTY BONUS

12   PAYMENTS.  YOU SAID THAT THEY WERE PAYABLE BY

13   ASCENTRA.  NOW, WERE THE SPGK AGENTS ELIGIBLE FOR

14   LOYALTY BONUS PAYMENTS?

15          MR. MORRIS:  OBJECTION TO THE FORM

16   OF THE QUESTION.

17          A.    THERE WERE FORMER SPGK AGENTS WHO

18   WERE PART OF INTERUSH.  THERE WERE PART OF SPGK

19   AGENTS WHO WERE ORIGINALLY INTERUSH AFFILIATES WHO

20   HELD THE LOYALTY BONUSES.

21   BY MISS LEAHY:

22          Q.    YES.  AND BY 2020, WERE YOU STILL

23   OR WAS ASCENTRA STILL PAYING LOYALTY BONUS

24   PAYMENTS TO ASCENTRA AFFILIATES?

25          A.    SORRY, CAN YOU REPEAT YOUR QUESTION

293

RYUNOSUKE YOSHIDA

1   AGAIN?

2          Q.    BY 2020, WAS ASCENTRA STILL PAYING

3   LOYALTY BONUS PAYMENTS TO ASCENTRA AFFILIATES?

4          A.    WHICH YEAR IS THAT FOR?

5          Q.    2020.

6          A.    WHICH YEAR'S PAYMENT IS THAT FOR?

7          Q.    HOW FREQUENTLY WERE THE PAYMENTS

8   MADE?

9          A.    ANNUALLY.

10          Q.    ANNUALLY.  SO IF IT WAS PAID IN

11   2020, PRESUMABLY THAT WOULD BE THE LOYALTY BONUS

12   PAYMENT FOR 2019; IS THAT CORRECT?

13                 MR. MORRIS:  OBJECTION TO THE FORM

14   OF THE QUESTION.

15          A.    I BELIEVE SO, BUT I WOULD HAVE TO

16   CONFIRM.

17   BY MISS LEAHY:

18          Q.    RIGHT.  THE LOYALTY BONUS PAYMENTS,

19   THE LAST ONES THAT WERE MADE BY ASCENTRA, WHAT

20   YEAR WAS THAT?

21          A.    I CANNOT REMEMBER ON THE TOP OF MY

22   HEAD.

23                 MR. MORRIS:  OBJECTION TO THE FORM

24   OF THE QUESTION.

25   BY MISS LEAHY:

294

RYUNOSUKE YOSHIDA

1          Q.     OKAY.  COULD YOU TAKE IT FROM ME

2    FOR NOW THAT IT WAS 2020?

3          A.     SORRY, CAN YOU SAY THAT AGAIN?

4          Q.     CAN YOU TAKE IT FROM ME FOR NOW

5    THAT THE LAST LOYALTY BONUS PAYMENTS THAT YOU

6    PREVIOUSLY SAID IN EVIDENCE WERE MADE WAS IN 2020,

7    RIGHT?  SO WHERE WERE THOSE PAYMENTS MADE FROM,

8    WHAT BANK ACCOUNTS?

9               MR. MORRIS:  OBJECTION TO THE FORM

10   OF THE QUESTION.

11         A.     SORRY, CAN YOU REPEAT YOUR QUESTION

12   AGAIN?

13   BY MISS LEAHY:

14         Q.     THE LOYALTY BONUS PAYMENTS THAT YOU

15   CLAIM WERE MADE IN 2020, I WOULD LIKE TO KNOW WHAT

16   BANK ACCOUNTS WERE USED TO AFFECT THOSE PAYMENTS?

17         A.     WHAT BANK ACCOUNTS WERE -- I THINK

18   IT WAS PAID FROM DOLLAR SMART AND THIS PAYMENT

19   SERVICE PROVIDER.

20         Q.     DOLLAR SMART IS WHOM, PLEASE?

21         A.     IS A PAYMENT SERVICE PROVIDER.

22         Q.     OKAY, AND WHAT ROLE DID IT HAVE IN

23   RELATION TO ASCENTRA?

24         A.     IT WAS A PAYMENT SERVICE PROVIDER.

25         Q.     RIGHT, AND SO IN RELATION TO

                              295

RYUNOSUKE YOSHIDA

1   PAYMENTS FROM WHERE?  HOW WAS IT PUT IN FUNDS TO

2   AFFECT PAYMENTS ON BEHALF OF ASCENTRA IS MY POINT?

3           A.     SORRY, REPEAT THE QUESTION AGAIN.

4           Q.     YOU SAID IT WAS A PAYMENT SERVICE

5   PROVIDER, RIGHT, SO IT IS A THIRD PARTY, RIGHT?

6           A.     YES.

7           Q.     OKAY.  IF IT WAS TO MAKE PAYMENTS

8   ON ASCENTRA'S BEHALF, SOMEBODY WOULD HAVE TO GIVE

9   IT THE MONEY TO MAKE THOSE PAYMENTS.  THAT IS

10  CORRECT, IS IT NOT?

11          A.     YES.

12          Q.     SO ASCENTRA NEVER HAD A BANK

13  ACCOUNT, SO ASCENTRA COULD NOT ITSELF TRANSFER

14  MONEY FROM A BANK ACCOUNT TO THE SERVICE

15  PROVIDERS.  SO WHOSE BANK ACCOUNT WAS USED TO PUT

16  THE SERVICE PROVIDER IN FUNDS?

17              MR. MORRIS:  OBJECTION TO THE FORM

18  OF THE QUESTION.

19          A.     I BELIEVE, I THINK, IT WAS SCUDERIA

20  BIANCO REMITTED THE FUNDS.

21          Q.     SO IF WE WERE TO REVIEW SCUDERIA

22  BIANCO'S BANK STATEMENTS WE WOULD BE ABLE TO FIND

23  THOSE REMITTANCES?

24          A.     MAYBE.  I DON'T KNOW.

25          Q.     YOU WERE A DIRECTOR OF THE ASCENTRA

296

1   AT THAT TIME, WERE YOU NOT?  IT IS 2020.

2          A.    YES.

3          Q.    YOU WERE A DIRECTOR IN 2020?

4          A.    YES.

5                MR. MORRIS:  OBJECTION TO THE FORM

6   OF THE QUESTION.  HOW MUCH TIME?

7   BY MISS LEAHY:

8          Q.    IS IT REALLY YOUR EVIDENCE TODAY

9   THAT YOU DON'T RECALL ----

10               MR. MORRIS:  CAN I HAVE A TIME

11  CHECK, PLEASE?

12               MISS LEAHY:  WE HAVE HAD IT, AND WE

13  WILL ADD ON A MINUTE FOR THAT.

14  BY MISS LEAHY:

15         Q.    IT IS REALLY YOUR EVIDENCE TODAY

16  THAT YOU DON'T RECALL WHICH BANK ACCOUNT THE FINAL

17  PAYMENTS -- THE FINAL LOYALTY BONUS PAYMENTS WERE

18  MADE FROM?

19               MR. MORRIS:  OBJECTION TO THE FORM

20  OF THE QUESTION.

21         A.    SORRY, SO YOU ARE SAYING DO

22  I REMEMBER WHICH BANK ACCOUNTS PAID IT?

23  BY MISS LEAHY:

24         Q.    YES.

25         A.    I THINK IT WAS -- IF I REMEMBER

297

RYUNOSUKE YOSHIDA

1   CORRECTLY, I THINK IT WAS PARTIALLY PAID FROM HEC

2   INTERNATIONAL TAIWAN, IT WAS PARTIALLY PAID FROM

3   HEC SINGAPORE AND PARTIALLY ALSO PAID FROM

4   SCUDERIA BIANCO.

5        Q.    AND IF YOU WERE NOW TO REVIEW THE

6   BANK STATEMENTS FOR THOSE THREE ENTITIES WOULD YOU

7   BE ABLE TO IDENTIFY THE PAYMENTS ON THOSE BANK

8   STATEMENTS?

9             MR. MORRIS:  OBJECTION TO THE FORM

10  OF THE QUESTION.

11       A.    I DON'T KNOW.  I CANNOT CONFIRM.

12  BY MISS LEAHY:

13       Q.    MR. YOSHIDA, IS IT STILL YOUR

14  POSITION THAT ASCENTRA IS NOT ENTITLED TO ANY

15  SHARE OF THE PROFITS THAT WERE MADE FROM THE PRC

16  BUSINESS?

17       A.    SORRY, CAN YOU REPEAT THE QUESTION?

18       Q.    IS IT YOUR POSITION -- DOES IT

19  REMAIN YOUR POSITION THAT ASCENTRA IS NOT ENTITLED

20  TO ANY SHARE OF THE PROFITS THAT HAVE BEEN MADE

21  FROM THE PRC BUSINESS?

22       A.    CAN YOU BREAK YOUR QUESTION DOWN?

23       Q.    ASCENTRA ENTITLED TO A SHARE OF THE

24  PROFITS FROM THE ASCENTRA BUSINESS, THAT IS WHAT

25  I AM ASKING ABOUT, YES?

298

RYUNOSUKE YOSHIDA

1          MR. MORRIS:  OBJECTION TO THE FORM

2    OF THE QUESTION.

3          A.     YOUR STATEMENT IS A BIT CONFUSING.

4    BY MISS LEAHY:

5          Q.     DO YOU KNOW WHAT I MEAN BY THE PRC

6    BUSINESS?  YOU HAVE BEEN TALKING ABOUT IT A LOT.

7    IT IS THE MONIES THAT HAVE COME IN THROUGH PLANET

8    PAYMENT, FOR EXAMPLE, WHICH YOU AS DIRECTOR OF

9    SPGK CLAIM ARE SPGK'S MONIES, OKAY?  IT IS THE

10   CONTEXT IN WHICH THIS DISCUSSION OR THIS

11   DEPOSITION IS OCCURRING, IS IT NOT?

12         MR. MORRIS:  TWO MORE QUESTIONS.

13         A.     I THINK YOUR STATEMENT IS NOT

14   REFLECTING WHAT I SAID.

15   BY MISS LEAHY:

16         Q.     RIGHT.  TAKE THE PP MONIES, THE

17   PLANET PAYMENT MONIES, YES?  DO YOU SAY THAT ONLY

18   SPGK IS ENTITLED TO THOSE MONIES?

19         MR. MORRIS:  OBJECTION TO THE FORM

20   OF THE QUESTION.

21         A.     WHICH SPGK ENTITY ARE YOU TALKING

22   ABOUT?

23   BY MISS LEAHY:

24         Q.     SPGK INC?

25         A.     CAYMAN?

299

RYUNOSUKE YOSHIDA

```
 1          Q.     YES.

 2          A.     YES.

 3          Q.     THAT IS YOUR POSITION?

 4          A.     YES.

 5          Q.     AND ASCENTRA IS NOT ENTITLED TO ANY

 6   PART OF THE FUNDS?

 7          A.     PAID IN FROM PLANET PAYMENT, RIGHT,

 8   THE INFLOW FROM PLANET PAYMENT?

 9              MR. MORRIS:  OBJECTION TO THE FORM

10   OF THE QUESTION.

11   BY MISS LEAHY:

12          Q.     THE MONIES SITTING IN THE PLANET

13   PAYMENT ACCOUNT AT THE MOMENT?  IT IS NOT A

14   DIFFICULT QUESTION?

15          A.     NO.  I AM TRYING TO UNDERSTAND YOUR

16   QUESTION.  I'M SO SORRY, I AM TRYING TO CLARIFY,

17   BECAUSE YOU ARE USING DIFFERENT TERMS.

18          Q.     I AM USING DIFFERENT TERMS, RIGHT?

19   I AM TRYING TO USE THE TERMS THAT YOU MIGHT -- YOU

20   DID NOT LIKE THE ORIGINAL TERMS.  YOU SEEM TO BE

21   HAPPY WITH PLANET PAYMENT AND THE FUNDS HELD BY

22   PLANET PAYMENT?

23              MR. MORRIS:  LAST QUESTION.

24              MS. LEAHY:  YOUR WITNESS IS SIMPLY

25   NOT ANSWERING, SO WE ARE GOING TO HAVE TO EXPAND
```

300

RYUNOSUKE YOSHIDA

1   UNTIL HE ACTUALLY ANSWERS THIS QUESTION.

2                 MR. MORRIS:  LAST QUESTION.

3   BY MISS LEAHY:

4         Q.    PLANET PAYMENT FUNDS, YES, IS IT

5   YOUR EVIDENCE, IS IT YOUR CASE, THAT ONLY SPGK

6   CAYMAN IS ENTITLED TO THOSE FUNDS?

7                 MR. MORRIS:  OBJECTION.  ASKED AND

8   ANSWERED.

9                 MS. LEAHY:  WELL, IF HE HAD, WE

10  WOULD NOT BE ----

11        A.    I THINK THE INCOME OF SPGK IS THE

12  FUNDS RECEIVED FROM PLANET PAYMENT.

13  LL.

14                MISS LEAHY:  VERY WELL.  THANK YOU,

15  MR. YOSHIDA.

16                MR. MORRIS:  THANK YOU.

17                THE VIDEOGRAPHER:  THIS CONCLUDES

18  THE DEPOSITION.  WE ARE GOING OFF THE RECORD.

19      (THE DEPOSITION CONCLUDED AT 6.44 P.M.)

20

21

22

23

24

25

301

RYUNOSUKE YOSHIDA

1                    CERTIFICATE OF WITNESS

2

3          I, RYUNOSUKE YOSHIDA, AM THE DEPONENT IN

4    THE FOREGOING DEPOSITION.  I HAVE READ THE

5    FOREGOING DEPOSITION AND, HAVING MADE SUCH CHANGES

6    AND CORRECTIONS AS I DESIRED, I CERTIFY THAT THE

7    TRANSCRIPT IS A TRUE AND ACCURATE RECORD OF MY

8    RESPONSES TO THE QUESTIONS PUT TO ME ON 10TH

9    AUGUST, 2023.

10

11

12

13

14

15   SIGNED  ...............................

16                    RYUNOSUKE YOSHIDA

17

18

19

20   DATED THIS ........ DAY OF ............... 2023

21

22

23

24

25

302

RYUNOSUKE YOSHIDA

1                    CERTIFICATE OF COURT REPORTER

2

3            I, AMY COLEY, ACCREDITED COURT REPORTER,

4    DO HEREBY CERTIFY THAT I TOOK THE STENOGRAPH NOTES

5    OF THE FOREGOING, AND THAT THE TRANSCRIPT THEREOF

6    IS A TRUE AND ACCURATE RECORD TRANSCRIBED TO THE

7    BEST OF MY SKILL AND ABILITY.

8

9            I FURTHER CERTIFY THAT I AM NEITHER

10   COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF

11   THE PARTIES TO THE ACTION IN WHICH THE DEPOSITION

12   WAS TAKEN AND THAT I AM NOT A RELATIVE OR EMPLOYEE

13   OF ANY ATTORNEY OR COUNSEL EMPLOYED BY THE PARTIES

14   HERETO, NOR FINANCIALLY OR OTHERWISE INTERESTED IN

15   THE OUTCOME OF THE ACTION.

16                    *Amy Coley*

20

21   SIGNED ..............................

22                    AMY COLEY

23

24

25

                              303

1           E R R A T A

2        (PLEASE MAKE ANY CORRECTIONS HERE,

3              NOT IN THE TRANSCRIPT)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RYUNOSUKE YOSHIDA

**$**

**$1 (1)**
276:8
**$10 (1)**
64:2
**$150 (1)**
246:22
**$30 (5)**
281:14,18;282:14;
284:16,23
**$30MM (2)**
282:21;283:5
**$34 (1)**
243:10

**@**

**@MANATT (1)**
174:8

**[**

**[A@TIRAWORKSCOM (1)**
286:9
**[MOU] (1)**
205:22
**[SIC] (5)**
32:20;39:17,19,
24;241:19

**A**

**AAA (1)**
286:9
**ABANDONED (1)**
181:18
**ABILITY (7)**
11:6;120:8;133:5;
137:11,17,20;163:20
**ABLE (7)**
99:18;121:3;
127:20;219:10;
274:4;296:22;298:7
**ABOVE (6)**
201:8;257:12;
264:24;270:25;
279:2;288:5
**ABSOLUTELY (3)**
70:14;103:8,8
**ACCEPTANCE (1)**
273:13
**ACCEPTED (4)**
270:12;272:25;
273:2;282:14
**ACCESS (2)**
136:19;175:11
**ACCOMMODATION (1)**
8:24
**ACCORDANCE (1)**
13:8
**ACCORDING (2)**

126:20;214:17
**ACCOUNT (36)**
17:15,17;18:2,5,
10;149:5;185:2;
234:17,19,22;235:5,
5;241:15;242:7;
245:23;246:16,23;
260:16;261:1,10,15,
19;262:18,23;263:1,
5,15,18,19;292:5,22;
296:13,14,15;
297:16;300:13
**ACCOUNTANT (1)**
267:1
**ACCOUNTED (1)**
140:13
**ACCOUNTING (12)**
111:8;145:11,15;
152:19;265:9,25;
266:5,10,19,23;
280:20,22
**ACCOUNTS (25)**
16:18,21;17:14;
87:15;96:11,13,14,
15,20;111:1;116:7;
184:23;234:19,24;
235:2,7,10;237:1;
239:9;262:15,20;
295:8,16,17;297:22
**ACCRUE (1)**
121:3
**ACCURATE (21)**
49:3;52:16,25;
57:22;91:1;99:24;
107:8;109:5;131:12;
148:17;181:16;
192:11;197:23;
198:3;222:10;
240:25;278:5;
281:15;283:11,18;
302:7
**ACCURATELY (2)**
265:3;272:24
**ACHIEVE (1)**
123:13
**ACKNOWLEDGE (1)**
201:3
**ACKNOWLEDGES (3)**
203:3;204:20;
205:4
**ACKNOWLEDGING (1)**
202:24
**ACQUIRE (3)**
85:22;251:7,10
**ACQUIRED (3)**
85:18;88:1,2
**ACTION (2)**
208:15;234:13
**ACTIONS (2)**
37:4;203:13
**ACTUAL (1)**
280:20
**ACTUALLY (11)**

38:11;118:22;
120:16;149:2;
165:18;197:17;
215:14;234:9;
280:24;286:6;301:1
**ADD (4)**
95:22;222:22;
262:9;297:13
**ADDITIONAL (3)**
149:13,15;262:10
**ADDRESS (2)**
242:15;267:16
**ADDRESSED (2)**
195:1;267:23
**ADDRESSES (1)**
286:10
**ADDRESSING (1)**
195:12
**ADMINISTRATION (2)**
24:18,22
**ADMITTED (2)**
208:25;209:2
**ADULT (1)**
163:23
**ADVANCE (3)**
16:23;47:12;
148:12
**ADVANCED (1)**
16:12
**ADVANCES (1)**
16:21
**ADVICE (2)**
27:23;243:2
**ADVISE (1)**
19:23
**ADVISED (2)**
179:12;289:8
**ADVISING (1)**
202:20
**ADVISOR (2)**
20:4;111:9
**ADVISORS (1)**
20:2
**ADVISORY (1)**
27:19
**AFFECT (5)**
198:12;211:16;
292:14;295:16;
296:2
**AFFECTED (3)**
203:24;204:1,12
**AFFIDAVIT (2)**
21:18;209:16
**AFFIDAVITS (6)**
21:5,6,7,9,14;22:6
**AFFILIATE (25)**
119:17,20,25,25;
120:1,11,12,14,24;
121:3,10;122:8,10,
15;123:7,9;136:9;
163:8,8,9,11;164:1;
251:7,10,11
**AFFILIATED (2)**

35:3,7
**AFFILIATES (64)**
118:13;119:11,12,
13,14,16,24;121:3,6,
7,12;122:16,21;
123:6,24;125:3,13,
17,21,24;127:5,8,20;
128:10;131:3,14,20,
21;132:5,18,21,24;
133:5;136:8;159:22;
162:11,14,15,16;
163:3,4,13,16;164:5,
7,23;165:1;249:17;
250:19,21;251:18,
22;252:13,16,17,25;
253:5,11;256:10,25;
257:1;293:19,24;
294:3
**AFTERNOON (2)**
155:1,2
**AGAIN (51)**
25:25;26:6;27:4;
37:6;41:3;68:2;
69:13,16;70:16;
71:10;83:5;97:18;
98:16;101:18;
104:10;106:15;
108:2;119:1,21;
122:4;126:18;127:9,
16;129:10;133:1,25;
138:1;155:9;163:6;
172:1;176:1;178:11;
180:13;182:20;
185:22;187:2;
191:23;195:11;
205:2;217:1;228:14;
235:6;254:21;
262:13;279:21;
280:14;290:2;294:1;
295:3,12;296:3
**AGAINST (3)**
13:15;74:3;78:2
**AGENT (11)**
36:22,23,23,24;
136:7,12,12,13,13,
14;164:2
**AGENTS (50)**
13:14,16,18;14:2,
5,5,13,17;16:13;
36:18,19;37:3,11,12;
45:2;132:24;136:8,
10,19;143:4,5;
159:22;160:4,16,19,
23;165:1;196:20;
197:9,14,16;198:8;
244:11;245:5,19;
246:9,14;249:16;
250:20,22;251:12,
19,23;252:1;253:11,
12;292:8;293:13,17,
19
**AGO (8)**
11:17;20:17,18,

19;54:23;67:22,23;
265:7
**AGREE (17)**
7:19;64:18,21;
80:6;86:20;140:22,
24;185:4;188:18,21;
201:4;203:9,10,12;
213:7;268:12;
288:25
**AGREED (5)**
171:18,19,24;
172:3,13
**AGREEING (1)**
175:4
**AGREEMENT (130)**
36:25;45:6;87:6;
139:2,11,15;140:4,8;
145:19,20;171:5,10,
17;172:9,16,21;
173:4,15,16;175:9;
176:18,20;177:5,9,
16;178:15,20;179:4;
182:23;185:3,6,23;
186:20,23,25;187:4,
18,24,25;188:3,5,6,8,
10,11,24;189:5,9;
190:23;191:4,20,24;
193:1,22;200:2,7,15,
20,24;201:1,9;202:2,
3,18,24;203:3,6,15;
204:7,20,21;205:4,7,
9,11,13;206:3;207:6,
11,21,22,25;208:3,
11,14,16,18;209:8,
11,20,22;210:1,7;
211:3,9,15,22,23,24;
212:11,15;217:7,19,
23;218:4,6,8,16;
219:13,18;220:11,
13,17;225:13;228:5,
9,10,17,21;229:2,4,9,
11;254:17;255:2,3,5,
7,9;274:25
**AGREEMENTS (16)**
36:17;87:3,5;
140:1;173:9;176:13,
25;201:14;213:12,
16;219:22;220:5;
226:17;228:18;
229:6;245:18
**AHEAD (3)**
7:22;240:9;255:21
**AKINORI (2)**
105:18,19
**ALERT (1)**
9:8
**ALLOCATED (2)**
280:11,17
**ALLOW (1)**
211:21
**ALLOWING (1)**
132:8
**ALLUDED (1)**

281:23

**ALONG (7)**
6:6;8:16;49:18;
141:9;206:13;234:2,
3

**ALTERNATIVE (1)**
175:7

**ALWAYS (6)**
15:14,22;118:20;
257:22;262:14,16

**AMERICAN (1)**
273:7

**AMONG (1)**
72:6

**AMOUNT (8)**
87:14;114:6;
116:20;117:4,5;
242:13,21;276:10

**AMOUNTS (3)**
87:3;171:23;172:2

**AMPLIFYING (1)**
291:23

**AMWAY (1)**
118:7

**AMY (2)**
3:15;5:14

**ANDO (5)**
192:16;225:2,3;
285:18,24

**ANDREW (3)**
3:10;6:4,4

**ANNOUNCEMENT (1)**
252:4

**ANNUALLY (3)**
114:18;294:9,10

**ANSWERED (4)**
51:5;176:23;
257:4;301:8

**AOS (8)**
53:14,18,19,20,21;
213:18,19;229:9

**APART (2)**
41:9;198:18

**APOLOGISE (2)**
47:12;125:4

**APOLOGISED (1)**
208:25

**APPEARANCES (1)**
5:17

**APPEARS (3)**
282:20;283:4;
287:7

**APPLICATION (2)**
260:19,25

**APPOINTED (14)**
26:5,11,13;41:5;
55:19;94:2,9;97:11;
98:8,19;101:6;
105:10;225:2;
238:16

**APPOINTING (4)**
71:20,21;76:24;
222:3

**APPOINTMENT (2)**
97:21;223:17

**APPOINTMENTS (1)**
97:24

**APPRECIATE (7)**
8:24;12:25;
160:22;173:22;
221:5;223:1;232:23

**APPRECIATED (1)**
218:24

**APPROACH (1)**
251:25

**APPROACHED (1)**
30:22

**APPROPRIATE (1)**
8:19

**APPROVAL (2)**
284:16,21

**APPROVALS (1)**
288:13

**APPROVED (2)**
222:19;223:17

**APPROXIMATE (1)**
245:24

**APPROXIMATELY (18)**
18:9,15;25:17;
26:3;41:7;43:16,17;
67:23;74:17,22;
75:2;76:4;92:20,21;
157:15;243:10;
244:25;281:14

**APRIL (5)**
68:19;206:12,15;
212:25;288:18

**AREA (2)**
19:14,18

**ARGUE (1)**
288:23

**AROUND (33)**
9:11,14;24:20;
34:24;41:7;43:15;
50:10;51:13,15,16;
54:9;68:19;75:11;
76:7,9;93:2;94:1,3;
107:9;111:21;
113:17;114:7,10;
115:3;117:6;178:2;
182:8,11;197:22,24;
232:20;233:7;
280:21

**ARRANGEMENT (1)**
169:19

**ARRANGEMENTS (1)**
228:23

**ARREST (5)**
62:5;130:5;132:3;
133:4;273:16

**ARRESTED (5)**
13:14,18;45:2,3;
129:5

**ARRESTING (4)**
15:17,20,21,24

**ARRESTS (2)**

62:4,7

**ART (11)**
42:17;192:3,5,8,9,
19,22;193:4,6,10,17

**ARTICLES (1)**
208:22

**ARTS (4)**
24:6,7,10,11

**ASCENTRA (357)**
5:4;25:20,23;26:2,
5,9,12,14,16,18;
27:9;30:12,18,21,23;
31:3,5,7,10,14,19;
36:5;39:3,3,5;40:25;
41:1,2,9,14,15,19;
42:20;44:4;48:1,3,9,
18,19;50:3;51:23;
52:5,10,14,18,21,24;
53:4,7;54:10;55:20;
57:14,15,15,21;
58:14;59:9;60:8,12;
62:17;69:14,17;70:4,
8,19;71:14,24;72:16;
73:13,15,21,24,25;
75:13;76:2,17,18,21;
81:19;91:11,25;92:4,
6,13,25;93:5,23;
94:3,16,17,25;95:2,
16,17,25;97:12,21;
98:2,8;100:24;101:6,
16,21;102:3;103:5;
104:8,18;105:25;
106:2,5,21;107:1,11,
14,24;108:6,9,11,13,
24;112:10,21;113:7;
116:17;117:12,14,
19;120:2;125:2,2,8,
22;131:10;132:6,14,
19;133:10,14,16,19,
20;134:2,25;135:10;
138:21;140:21;
141:4;147:24;
155:10,13,16,18;
156:1,8;157:14;
158:25;159:5,6,13,
19;164:18,24;
167:23,24;168:7;
169:1,4,8;170:2,6;
171:2,16,19,24;
172:3,4,6,7,8,18,21;
173:5,7;174:5;
175:10,19,23;176:3,
14,15,25;177:2;
178:6,16,21;179:9,
18,19;180:2,7,18;
181:2,19,19;182:2,5,
13,14,24;183:1,7,23;
184:3;185:25;
186:12,16,21,25;
187:4,5;188:15,24;
189:12,16;190:2,4,9,
20;192:23,24,25;
193:2,22,24;195:18,

18;196:5;198:5,11,
13,22;201:23;
202:20,22;203:5,8,
12,19,23;204:10,24;
205:18;206:2;207:6,
8;208:23,24;212:19,
25;213:12;214:1,18,
23,25;215:3,19,23,
24;216:2,13,19,22;
217:12,12;222:21;
223:21;224:1;
225:12,14;227:20;
228:2;229:5,21;
236:5,17;237:11,12,
18,24,25;238:8,16,
20;239:5,6,12,14,18,
23;247:10,14,21;
249:13,17;250:21;
251:8,11,19,21;
252:21;253:10;
254:1,2,11,17;255:2;
256:10,21;263:25;
264:22;265:4,12;
267:6;268:5;278:15;
279:12,13,14,17,20,
20,24,25;280:9,11,
15,17;287:12;288:2,
3,15;293:13,23,24;
294:2,3,19;295:23;
296:2,12,13,25;
298:14,19,23,24;
300:5

**ASCENTRA/ (1)**
205:10

<small>**ASCENTRA/INTERUSH (3)**</small>
48:9;119:6,14

**ASCENTRA'S (24)**
77:6;106:11,16;
133:6;155:6;169:6;
172:23;180:10,20;
182:5;195:9,13;
203:1;213:20;
238:17;265:3,5;
266:12;267:8,11,20,
25;278:6;296:8

**ASCERTAINING (1)**
175:4

**ASIA (3)**
25:14;213:19;
214:4

**ASIDE (15)**
31:25;170:14;
173:17;187:10;
202:10;207:2;
220:21;248:12;
258:4;260:2;262:3;
264:4;277:7;281:1;
286:3

**ASPECTS (1)**
152:19

**ASSET (1)**
175:2

**ASSETS (13)**

57:3,11,13,21;
175:10,24;176:4;
201:22;203:6,11;
206:3;250:8;287:19

**ASSIGN (1)**
201:21

**ASSIGNED (1)**
97:12

**ASSIST (4)**
16:13,24;27:17;
83:17

**ASSISTANCE (7)**
12:15,20;13:4,11;
28:25;29:2;84:14

**ASSISTING (9)**
13:1;15:25;16:1,7;
25:13;27:19;28:24;
29:2;44:22

**ASSOCIATE (3)**
24:6,7,11

**ASSOCIATES (1)**
119:10

**ASSOCIATION (1)**
208:22

**ASSUME (10)**
41:8,13;89:2;
117:6;217:6,8;
263:17;265:21;
276:15;293:4

**ASSUMPTION (4)**
276:16,17;277:1,2

**ASSURE (1)**
190:20

**ASTERISK (1)**
223:16

**ATC (1)**
248:4

**ATC'S (1)**
182:5

**ATTACH (2)**
165:23;219:22

**ATTACHED (9)**
83:25;84:1,3;89:8;
172:16;200:4;
202:18;206:21;
220:5

**ATTACHES (1)**
205:9

**ATTEMPTING (1)**
76:20

**ATTEND (9)**
22:22;23:18;
103:1,4;162:7,11;
164:6;252:14,18

**ATTENDANCE (1)**
102:17

**ATTENDED (1)**
165:15

**ATTORNEY (5)**
8:2;19:11,12,13,17

**ATTRACT (1)**
289:6

**AUDIO (1)**

51:7

**AUDIOS (1)**
51:1

**AUDIT (1)**
97:15

**AUDITED (2)**
153:20;278:2

**AUGUST (2)**
5:7;302:9

**AUTHORISED (1)**
185:24

**AUTHORISES (1)**
187:5

**AUTHORITIES (2)**
57:1;78:8

**AUTHORITY (1)**
56:22

**AVERAGE (2)**
92:11;107:1

**AWARE (36)**
87:13;152:4,5;
173:4;174:24;
175:16;197:19,21;
200:8,9,18,22;
203:18,24;204:3,10,
24;205:19;209:7,10,
14,17,19,21;211:9;
213:11,18,22,23;
225:3;234:10;236:1;
239:20;240:6;
265:23;290:9

**AWAY (1)**
254:6

## B

**BACHELOR (1)**
24:17

**BACK (67)**
11:1,3;16:16;26:7;
28:10;39:16;44:8;
48:10;57:15;62:13;
64:7;66:21;67:24;
70:12;74:16;80:14;
97:1,20;98:19;104:2,
25;108:12;127:25;
128:1;131:10;
137:25;149:18;
150:20;154:23;
155:6;166:17;
169:10;182:17;
183:23;185:22;
194:14;195:22;
199:6;208:8;215:15;
217:12;221:13;
222:14;224:22;
229:21;234:14;
235:17;250:18;
255:12,13;256:16;
259:15;262:16,16;
268:14;269:11,24;
270:17;271:8,10,11,
16,23;274:14;

281:10;289:16,21

**BACKGROUND (1)**
22:12

**BAD (1)**
221:12

**BAKER (5)**
145:6,7,22,24,25

**BALANCE (5)**
18:9,14;243:14,
14;245:24

**BALI (4)**
177:19,19,25;
182:12

**BANGING (1)**
184:23

**BANK (61)**
16:17,21;17:13,15,
16;18:2,4,7;87:15;
96:11,12,14,17,20;
110:25,25;116:7;
149:4;184:23,23;
185:1;234:17,19,19,
22,24;235:1,7;241:5,
7,9,11,11,12,15;
242:14,22;243:11;
244:6;245:23;
246:16,23;262:10,
17,20;263:17,20;
290:17;292:5,22;
295:8,16,17;296:12,
14,15,22;297:16,22;
298:6,7

**BANKING (1)**
262:14

**BANKRUPTCY (2)**
5:5;290:7

**BANKS (2)**
231:24;235:4

**BARRISTER (1)**
5:23

**BASED (14)**
12:11,12;57:11;
118:21;123:19,20;
135:24;140:8;
145:19;153:8;
265:22;266:19,21;
276:5

**BASIC (1)**
10:10

**BASICALLY (1)**
28:17

**BASING (2)**
204:6,7

**BASIS (5)**
92:12;156:1;
157:14;217:15;
264:21

**BATES (2)**
258:11,23

**BATHROOM (3)**
103:7;194:7;
268:13

**BEAUTY (1)**

121:17

**BECAME (10)**
52:19;54:13;
108:14;109:9;
112:23;120:17;
126:23,24;197:19;
249:18

**BECOME (23)**
31:4,7,9,13,18;
41:5;48:17;73:6;
88:9;111:12;119:16,
19;120:12;132:5;
136:12;164:2;
184:10;213:18;
215:24;222:19;
250:20,21;253:12

**BECOMES (1)**
136:13

**BECOMING (3)**
30:23;120:14;
165:1

**BEGINNING (8)**
74:9,17;80:15;
124:9;172:8;252:8;
281:23;289:4

**BEGINS (4)**
5:2;169:25;
202:24;288:1

**BEGUN (1)**
75:24

**BEHALF (9)**
28:22;227:14,18;
228:2,25;229:18;
291:7;296:2,8

**BEHIND (1)**
167:13

**BELIEF (1)**
80:18

**BELL (1)**
139:14

**BELONG (1)**
246:2

**BELOW (4)**
118:17;169:21;
242:24;267:12

**BENCHMARKS (1)**
123:8

**BENEFICIAL (1)**
184:3

**BENEFITS (1)**
120:13

**BESIDE (2)**
46:14;47:1

**BESIDES (2)**
29:16;40:17

**BEST (12)**
14:25;47:17;
80:18;100:7,9;169:6,
14;192:17;251:16;
253:15;286:8;288:8

**BETH (3)**
5:24,24;173:21

**BETTER (5)**

175:8;270:14;
271:23;273:2;
291:21

**BEYOND (4)**
29:6;50:3;84:2;
89:7

**BIANCO (14)**
224:14;225:8,16;
226:6,15,20;227:1;
228:17;229:5,12,17;
234:22;296:20;
298:4

**BIANCO'S (1)**
296:22

**BILL (1)**
91:25

**BILLED (3)**
92:6,8,9

**BILLING (1)**
92:12

**BINDING (25)**
58:21;184:19,20;
185:11,13,16,17;
203:10;210:19,20,
23,24;211:2,4,16;
212:3;217:8,9;218:4,
6,9,17,22,23;219:10

**BIT (21)**
16:3,12;18:24;
22:12;24:23;26:8;
28:12;41:4,23;
60:20;74:16;93:17;
97:20;125:20;
127:15;149:8;
196:16;222:24;
223:2;229:21;299:3

**BITES (1)**
127:19

**BLAIR (2)**
5:22;290:24

**BLANK (1)**
275:25

**BLOCKING (3)**
61:10,12;62:1

**BOARD (56)**
26:14,15;30:17;
31:5,7,10,13,18;
39:2;97:12,16;98:3;
99:13;102:6,8,9,12,
18,20;103:1,4,15,19;
104:8,13,18;105:5,8;
107:10,13;108:7;
132:13;133:6,10;
134:25;135:10;
155:24;158:4,13,17;
212:19,24;213:8,13,
16;214:18,23;215:2,
18,23;222:4;237:11,
13;238:6,18,18

**BONUS (20)**
116:18,22,22,23;
123:4,5,10;125:21;
164:20,21;293:10,

11,14,23;294:3,11,
18;295:5,14;297:17

**BONUSES (5)**
125:3;127:11,21,
24;293:20

**BOOKS (11)**
89:9;130:19;
237:17,25;238:18;
239:5,6,11,17;
280:20,22

**BORDERS (1)**
288:24

**BOSHEARS (1)**
157:21

**BOSS (2)**
28:23;29:3

**BOTH (14)**
28:8,9;86:20;
113:1;158:12;182:3;
203:5,8,11;206:2;
216:4;239:12;
257:17;289:6

**BOTTOM (15)**
162:19;163:13,14;
164:13;166:16;
169:24;201:2;
202:14;204:19,23;
207:21;221:23;
248:23;256:14;
257:10;264:15,18

**BOTW (1)**
243:10

**BOUGHT (12)**
121:8;123:1;
135:21;208:11;
209:23;211:10,24;
212:6;215:12;259:8,
9,14

**BOX (3)**
82:8;260:16;
261:22

**BRANCH (2)**
126:17,25

**BREAK (33)**
8:15,17;9:5;66:16,
20;103:22;104:1,6,
11;127:16;138:13;
154:7,8,22;155:4;
156:13;194:9,13;
210:9;227:7;232:23;
233:2;235:13,16,20;
251:13;268:13;
269:5,10;287:1;
289:15,20;298:22

**BREAKS (1)**
8:16

**BRIEF (3)**
69:22;104:6;
286:25

**BRIEFLY (3)**
47:7;68:25;255:12

**BRING (1)**
234:14

**BROAD (2)**
5:11;93:15
**BROUGHT (2)**
120:23;121:2
**BUILD (1)**
242:25
**BUILDING (1)**
144:23
**BULLET (5)**
163:12;164:13;
243:1,9;256:14
**BULLETS (1)**
163:2
**BUSINESS (89)**
12:21;13:4,10,11,
17;14:21;24:12,17,
22;31:23;33:24;
38:3,16,21;39:3,6,
14;44:15;86:17;
93:13,20,21;100:9;
117:16,23;118:11,
12,12;119:6,14;
128:20;132:15,20,
23;133:4,12,15,17,
21,22;134:3,4,10,12,
14,18;135:2,6,9,11,
12,13,19;136:18;
140:11;143:11;
159:19,25;160:18;
172:24;173:6;175:1,
13;178:6;179:14,14;
182:4,5,6;202:25;
203:1;216:8;231:23;
246:25;247:6;
249:16,18;250:14,
15;252:3;253:25;
259:5,7,22,23;
298:16,21,24;299:6
**BUSINESSES (1)**
118:8
**BUY (13)**
87:19;119:18;
120:8,21;121:10,12,
16,21;122:7;136:4;
211:5;215:17;
276:14
**BUYING (9)**
118:25;119:3;
121:25;122:2,6,9,11,
11;142:14

**C**

**CALCULATE (2)**
153:17;264:20
**CALCULATION (2)**
193:6;197:15
**CALL (19)**
9:4,11;10:5;30:11,
18,21;37:19;40:2;
54:25;55:1;56:9,10;
57:25;78:22;79:5;
143:2,17;159:20;

173:5
**CALLED (21)**
11:23;20:5;41:24;
42:12;58:4;63:13;
81:10,12;91:3;
119:10;123:4;
135:20;136:8;
142:19;160:15,19;
191:2;192:3,4;
196:24;224:14
**CALLING (1)**
136:10
**CALLS (2)**
10:1;239:25
**CAME (11)**
26:22;29:8;39:18;
109:8;128:21;129:1;
132:7;156:20;
177:24;212:13;
224:23
**CAMPBELLS (3)**
200:4,5;212:14
**CAN (256)**
6:9;7:9,13,21,24;
8:25;9:1;11:3;14:15;
15:18,19;16:22;
17:23;18:21;19:15;
20:14;21:6;24:22;
25:24;26:6;27:3;
28:4;30:21;31:8;
35:4,7;36:4,24;37:6;
38:17;41:3,21;
42:22;44:21;46:6,
10;47:19;48:4;
49:20;52:6;53:5,18;
54:24;55:11;59:5,
16;60:5;61:15;
63:10;64:22;68:1;
69:25;70:12;71:9,9;
73:17;74:14,16;79:5,
5,6;80:20;81:16;
82:11,21;83:1,4;
84:4,4;85:4;92:2;
93:10,16;97:17;
98:15;99:15,17;
100:12,16;101:18;
103:2;104:10,20,24;
106:12,15;108:1;
111:10;112:5;
113:17;118:13,13,
14,16,22,25;119:1,4,
7,16,17,19,20;
120:16;122:4;
125:10;127:15,25;
128:2,12,14;129:9;
130:8,8;132:16,16,
25;133:25;134:24;
135:16;136:6;137:3,
24,25;138:2,19;
139:17,18,19;140:4;
143:14;145:13;
147:3;148:11;
149:18;154:19;

156:4;157:9;160:7,
12,13;161:1;162:23;
163:6,22;164:1,12;
166:21;167:17;
169:24;170:7,15;
171:7;172:1,4,6,8;
173:2;174:7;175:18;
176:1,21;178:11,22;
179:23;180:13;
182:17,19,20;186:3,
11;194:6,8;195:11;
198:16;199:3;
200:21;203:22;
204:2,4,5,16;205:1,
7;206:10,12;210:4,9;
214:9;218:13;219:5;
220:21;222:9;223:5,
8;224:13;226:25;
227:7,12;228:11,14;
229:24;230:8;
231:19;232:16,18;
235:12;236:15;
237:3,21;240:1;
242:18;246:10;
247:18;248:12;
249:8;250:6,25;
251:9,13;254:13,20;
255:12;257:9;258:4;
260:2,10,17;261:2;
263:23;268:12;
274:18;277:7,10;
278:21;279:21,22;
280:14;282:6,15;
283:2,15;286:2,14,
16;287:3,22;289:14;
292:11;293:25;
295:3,4,11;297:10;
298:17,22
**CANADA (4)**
22:23,25;23:1,4
**CANCEL (2)**
201:21;203:13
**CANCELLATION (23)**
204:7,20;205:11;
207:25;208:3,7,18;
210:6;211:2,9,15,21,
22;212:14;217:7,19,
23;218:4,6,8,13,16;
219:13
**CANCELLED (2)**
211:3,23
**CANCELLING (3)**
202:21;218:5,7
**CANCELS (1)**
210:7
**CAP (1)**
249:19
**CAPABILITIES (1)**
31:22
**CAPACITY (4)**
9:23;101:20;
174:2;236:17
**CAPITAL (1)**

276:4
**CARD (1)**
61:9
**CARDS (2)**
61:24;124:14
**CARE (3)**
9:7;67:4;285:7
**CAREFUL (2)**
13:17;45:11
**CARRY (2)**
133:14;172:23
**CASE (7)**
5:6;9:9;21:22;
204:25;205:19;
293:4;301:5
**CASES (1)**
15:18
**CASH (10)**
197:10;225:11;
227:1,10,13;228:9,
18,22;229:5,8
**CATEGORY (1)**
93:16
**CAUSE (2)**
242:14;292:6
**CAYMAN (45)**
3:6,8;21:11,18;
33:7;71:8,14;75:14,
21,23,25;76:11,22,
23;98:7,12,13;113:1,
15,24;141:12,15;
142:6;144:18,19;
147:7,8,13,24;
148:24;149:1,6,12,
21,25;234:18,19;
237:24;238:17;
245:14,16;246:3;
248:5;299:25;301:6
**CENTRAL (2)**
23:13,15
**CENTRE (1)**
143:17
**CERTAIN (6)**
63:18;98:20;
123:13;153:21;
264:16,17
**CERTAINLY (11)**
26:7;27:5;37:7;
63:11;64:23;98:17;
129:11;134:25;
154:12,14;227:9
**CERTIFICATE (1)**
302:1
**CERTIFY (1)**
302:6
**CFO (2)**
52:19;157:22
**CHAIN (3)**
118:20,21;166:25
**CHANCERY (1)**
3:20
**CHANGE (12)**
7:9;48:15;66:15;

73:9;77:4,8;115:12;
132:14;141:6;
159:18,24;235:21
**CHANGED (7)**
48:5;77:3;92:14;
95:8;101:3;107:3;
124:8
**CHANGER (2)**
196:14,24
**CHANGER' (1)**
196:18
**CHANGES (2)**
85:1;302:5
**CHANGING (9)**
71:23;72:2,7,14,
22,24;73:1;77:17;
143:9
**CHARGE (2)**
226:23,23
**CHECK (14)**
83:1,3,4;91:1;
111:15,19;130:7;
131:16;139:18,19;
199:5;261:1;265:20;
297:11
**CHECKED (6)**
18:11;256:17;
260:16;261:21,24,25
**CHECKS (1)**
193:6
**CHEQUE (1)**
124:2
**CHEQUES (1)**
124:12
**CHERER (1)**
3:16
**CHIEF (2)**
52:20,23
**CHILD (1)**
163:23
**CHINA (37)**
13:25;14:4,7;15:2,
2,16,23;16:9;34:4,6,
9;61:10,12,15,19,21,
22,23;62:1,5;111:8;
135:2;142:9;146:23;
175:1,12;182:4;
203:1;222:8;223:10;
229:22;230:2,7,10;
261:6;273:17;274:1
**CHINESE (6)**
14:23;19:21,23;
56:22;57:1;78:8
**CHOICE (1)**
79:8
**CHOSE (1)**
165:22
**CHRIS (7)**
105:17;223:10,20,
25;224:4,7,10
**CHRONOLOGY (4)**
59:11;65:5;229:3;
281:25

**CHUNKS (1)**
106:24
**CHURCH (1)**
3:5
**CIVIL (8)**
13:10;14:20;19:3;
44:22,25;45:7;
86:16;289:7
**CLAIM (2)**
295:15;299:9
**CLARIFICATION (6)**
151:13;155:22;
223:1;265:9,25;
266:5
**CLARIFICATIONS (1)**
10:17
**CLARIFIED (3)**
16:5;252:4;255:11
**CLARIFY (39)**
14:15;19:15;
49:20;54:24;55:11;
58:6;59:5,16;60:5;
93:10;100:16;
111:10;112:5;122:4;
126:18;132:16,25;
141:9;161:1;178:22;
184:18;185:18;
186:3;204:2,4,5;
219:5;230:8;236:15;
242:18;246:10;
247:18;250:6;251:9;
254:24;274:18;
282:6,16;300:16
**CLARIFYING (4)**
20:20;120:4;
160:21;215:16
**CLARITY (1)**
14:19
**CLEAN (1)**
57:17
**CLEAR (13)**
10:23;33:10;58:6;
61:15;62:17;78:11;
86:7;126:6;143:6;
200:12;256:16,17;
269:25
**CLEAREST (1)**
14:19
**CLEARLY (4)**
31:15;167:14;
180:24;181:14
**CLICK (1)**
252:6
**CLIENT (7)**
8:2;26:24;227:15,
18;240:1;291:3,7
**CLIENTS (2)**
227:20;231:25
**CLOSE (5)**
13:4,11;69:12;
133:20;134:2
**CLOSED (10)**
12:18,20;262:15,

20,24;263:1,6,8,15,
19
**CLOSER (1)**
165:20
**CLOSING (4)**
12:20;14:21;
33:23;44:23
**CLOSURE (3)**
12:16,17,22
**COFFEE'D (1)**
255:12
**COLEY (2)**
3:15;5:15
**COLLAPSE (1)**
163:21
**COLLEAGUE (2)**
5:21;6:6
**COLLEAGUES (1)**
5:25
**COLLEGE (2)**
23:8,14
**COLLOQUIAL (1)**
28:8
**COLLOQUIALLY (1)**
250:7
**COMFORT (1)**
241:18
**COMING (2)**
236:12;250:1
**COMMENCED (1)**
75:24
**COMMENCEMENT (6)**
71:13;76:10,21;
147:23,25;148:4
**COMMENT (1)**
189:1
**COMMENTED (1)**
70:6
**COMMENTS (2)**
84:22;184:21
**COMMERCIAL (2)**
18:6;290:17
**COMMISSION (16)**
118:14;120:16;
125:24;128:3;136:3;
193:6;197:8,15;
243:15;244:7,10;
292:7,19,23,25;
293:10
**COMMISSIONS (12)**
125:2;127:11,21,
23;128:10;135:14;
143:3;246:9,12,14,
24;248:10
**COMMITTED (1)**
183:21
**COMMITTEE (8)**
97:16;104:21,23;
105:2,5,11,15,22
**COMMON (1)**
288:25
**COMMUNICATE (2)**
78:21;168:25

**COMMUNICATION (2)**
78:23;79:8
**COMMUNICATIONS (3)**
145:23;239:25;
240:4
**COMMUNITY (1)**
23:13
**COMPANIES (25)**
15:2;25:13;36:6,
17;38:2,4;41:20;
43:4,10,13;44:10;
52:24;53:4,7;118:6,
7,8;138:11;179:9,11;
203:2;215:13;234:8,
15;257:2
**COMPANY (77)**
12:18,23;25:9,10;
30:1;32:21,22,23,24;
33:4,9;35:20;36:4;
41:24;42:7,12;43:6;
48:12,15;54:17;
60:16,21;77:15;
85:14;89:1;91:6,12,
19,21;100:8;102:9;
111:8;120:1;123:7;
127:1;130:9;132:22;
133:7,11;134:10;
136:21,25;141:19;
142:15;145:4;
153:22;164:18,24;
169:15;174:24;
183:23;190:3;191:1;
192:3,4,9;215:2;
217:2,2;226:8;
236:13,14,22;254:6;
256:21;257:25;
258:3;284:13;
285:17,18,18;
287:19,20,21;288:7,
8,12
**COMPANY'S (2)**
100:23;237:1
**COMPARISON (1)**
136:19
**COMPENSATED (31)**
14:8,10;36:3;
108:18;109:11,13;
112:7;113:3;114:16,
17;120:25;121:4,24;
122:1,5,8,10,16,24;
123:25;124:6,7;
135:24;136:2;
190:21;226:20;
253:4,10,16,19,22
**COMPENSATING (2)**
131:20,21
**COMPENSATION (27)**
93:22;94:24;95:2;
104:21,23;105:1,5,
11,15,22,23;107:12,
15,23;108:7,25;
109:18,21;112:18;
113:6,15;117:12;

118:16;127:21;
136:4;254:8,12
**COMPETENT (2)**
230:20;231:4
**COMPLETED (1)**
203:9
**COMPLETELY (1)**
179:12
**COMPLEX (1)**
123:12
**COMPLIANCE (4)**
12:5,15;13:3;
19:23
**COMPLIANT (1)**
175:13
**COMPUTER (4)**
130:18;131:9;
137:8;138:4
**CONCEPT (1)**
170:12
**CONCEPTS (1)**
170:11
**CONCERN (9)**
189:3;195:5,8,19;
198:7;222:21;242:6,
20;262:12
**CONCERNED (6)**
14:20;86:16;
115:21;198:9;216:6;
270:23
**CONCERNING (3)**
131:13;201:15;
267:1
**CONCERNS (4)**
14:20;77:21;
87:18;115:14
**CONCLUDED (2)**
155:3;301:19
**CONCLUDES (1)**
301:17
**CONCLUSION (1)**
10:2
**CONCLUSIONS (1)**
219:2
**CONCRETE (1)**
253:17
**CONDITION (3)**
273:8,12;274:6
**CONDUCT (1)**
141:4
**CONFERENCE (1)**
9:10
**CONFIDENT (1)**
266:10
**CONFIRM (7)**
130:21;187:25;
260:10;268:3,6;
294:16;298:11
**CONFIRMS (2)**
167:19,25
**CONFLICT (2)**
217:3;222:15
**CONFLICTS (1)**

216:7
**CONFUSED (2)**
127:15;221:17
**CONFUSING (2)**
128:4;299:3
**CONNECTION (13)**
15:5,13;16:8;20:2;
21:18;27:12;49:22;
50:4;65:9;84:8;87:4;
89:10;152:22
**CONNECTIONS (2)**
27:22;28:2
**CONSEQUENTLY (1)**
175:7
**CONSIDERATION (1)**
276:7
**CONSIDERED (8)**
104:8,18;150:10;
175:19;254:14;
266:9,20;282:10
**CONSIDERING (1)**
209:2
**CONSISTENT (1)**
174:8
**CONSOLIDATE (1)**
266:11
**CONSOLIDATED (1)**
267:6
**CONSTITUTE (1)**
239:6
**CONSTRUCT (2)**
175:23;176:3
**CONSULT (4)**
7:25;103:17;
104:12,22
**CONSULTANT (9)**
11:23;12:3;15:11;
19:5;33:21;40:10;
114:20,22;116:14
**CONSULTED (1)**
104:7
**CONSULTING (21)**
25:9,10,11;27:8;
33:4,13,15,17;91:8,
9;92:1,3,7,24;93:4,7,
8,20;94:16;96:24;
97:6
**CONTACT (11)**
54:18;55:5,13,25;
56:2;59:4;67:17,20;
78:12,15,18
**CONTACTED (1)**
55:16
**CONTAINED (3)**
88:21;131:14;
139:11
**CONTEMPLATED (4)**
175:17,18;203:25;
204:11
**CONTEMPT (1)**
253:20
**CONTEXT (2)**
49:24;299:10

**CONTINUATION (1)**
123:7
**CONTINUE (7)**
132:4;164:19,25;
168:11;173:6;223:5;
231:1
**CONTRACT (3)**
46:8;192:19,22
**CONTRACTS (1)**
36:10
**CONTRACTUAL (2)**
45:20;46:5
**CONTRIBUTION (1)**
285:14
**CONTROL (11)**
35:10;73:12,12,20,
21,25;76:17,18,21;
168:7;239:9
**CONTROLLED (1)**
151:15
**CONTROLLER (2)**
216:1;263:25
**CONTROLLING (2)**
73:15,23
**CONTROLS (1)**
16:17
**CONVERSATION (7)**
62:14;64:10;65:3,
9,10;70:1;266:17
**CONVERSATIONS (4)**
65:12,14;66:25;
70:25
**CONVEY (1)**
201:21
**COOPERATE (1)**
203:12
**COOPERATION (2)**
222:8;223:10
**COPIES (1)**
7:6
**CORNER (3)**
255:24;257:10;
258:12
**CORPORATE (11)**
81:17;88:3,21;
89:13,16;90:8,18;
93:13;141:25;142:8;
238:6
**CORPORATION (12)**
35:20;91:17;
97:22;98:7,12,13,20;
99:13;100:2,6,15;
250:9
**CORPORATIONS (3)**
35:17;99:20,23
**CORRECTED (1)**
208:17
**CORRECTING (2)**
119:23;143:22
**CORRECTION (1)**
128:11
**CORRECTIONS (2)**
84:20;302:6

**CORRECTLY (20)**
13:15;43:14;
47:15;63:3;68:18;
76:6;85:20;105:16;
123:11,12;126:23;
146:13;224:16;
226:7,22;231:15,18;
236:19;252:2;298:1
**CORRESPONDENCE (1)**
239:8
**COST (6)**
16:24;139:14;
140:13;171:18;
172:13;292:17
**COSTS (2)**
14:17;16:14
**COUNSEL (33)**
5:16;7:1,7,19,20,
20,25;8:5;9:22,22;
10:4;11:13,16,22,22;
14:18;15:12;20:11,
12,16;84:15,19;
100:25;101:7,21;
146:19;149:7,21,25;
167:22;174:3;
239:21;240:5
**COUNT (1)**
150:10
**COUPLE (6)**
6:24;10:9;208:2;
221:11;235:3;285:4
**COURSE (9)**
8:5,11;111:16;
128:12;140:10;
141:4;160:14;
277:13;286:19
**COURSES (1)**
24:12
**COURT (14)**
3:13,19;5:5,14;
6:8;7:15;11:1;32:16;
110:2;152:25;
185:13;290:7,11;
291:22
**COURTS (1)**
80:12
**CREATE (1)**
133:22
**CREATED (8)**
105:12;136:21,25;
137:3;232:15,16,17;
250:16
**CREATING (2)**
63:8;15
**CREDIBILITY (4)**
231:19,21,22;
232:1
**CREDIT (2)**
61:9;124:3
**CREDITOR (1)**
175:6
**CRIMINAL (24)**
13:9,12;14:17,20;

15:12;18:20;19:2,3;
37:4,8,10,13,15;
44:22,25;45:5;62:8;
86:16;87:18;115:22;
208:12;274:1;289:7,
9
**CRITICAL (4)**
60:17,22,22;61:3
**CURRENT (8)**
18:9;32:8;39:16;
247:10,14,20,23;
249:12
**CURRENTLY (24)**
16:17;17:12,13,
17;18:5;32:9,11;
33:21;40:12,16,19;
69:14;70:7,10,19,22;
85:8,9;88:23;96:25;
244:12,13,15;279:10
**CURRICULUM (1)**
23:25
**CUSTODY (1)**
285:16
**CUSTOMER (2)**
175:12;254:7
**CUSTOMERS (3)**
37:2;119:18;
120:15
**CUT (1)**
230:23

**D**

**DAILY (5)**
33:23,25;38:9;
181:15;231:20
**DATABASE (2)**
88:24;239:4
**DATE (5)**
5:7;56:17;71:5;
259:18;270:18
**DATED (3)**
214:14;275:25;
302:20
**DAVID (3)**
20:5;174:11,17
**DAY (5)**
8:11;11:18,19;
290:3;302:20
**DAYS (2)**
157:22;214:22
**DBS (13)**
241:5,6,9,11;
242:22;243:14;
262:22,23;263:1,2,5,
15,21
**DEALER (1)**
225:1
**DEALT (1)**
248:4
**DEAR (1)**
248:23
**DEBIT (1)**

124:14
**DECEMBER (6)**
213:9;214:14,18;
215:6;223:18;
270:19
**DECIDE (10)**
132:14,19;133:6,
19;140:21;169:14,
17;222:20,21;231:16
**DECIDED (7)**
108:10,11;133:10,
20;134:2;247:1;
248:9
**DECIDING (3)**
105:23;172:13;
273:25
**DECISION (7)**
44:15;172:12;
211:4,16;246:25;
247:6;253:25
**DECISIONS (3)**
93:22;100:9;
231:19
**DECLARATION (24)**
21:3,17,20;79:15,
23;80:22;81:3;
82:25;83:8,18;84:9,
13;89:8,11;130:6,15;
161:3;165:23;
172:17;213:4;
214:17;219:23;
220:6;255:13
**DECLARATIONS (1)**
22:5
**DECLARE (1)**
80:16
**DECLARED (1)**
185:12
**DECLINE (1)**
58:19
**DECLINED (2)**
58:18;59:9
**DECLINING (1)**
59:10
**DEEMED (1)**
184:20
**DEFAULT (1)**
79:7
**DEFENCE (4)**
14:13,17;15:12;
16:24
**DEFERRED (1)**
126:20
**DEFERRING (1)**
168:22
**DEFINE (15)**
35:7;46:6;69:25;
75:16;126:5;137:3;
143:14;145:13;
148:11;156:4;160:7;
172:4,6;175:18;
198:17
**DEFINED (2)**

148:18;172:7
**DEFINITELY (2)**
115:24,25
**DEFINITION (1)**
148:16
**DEGREE (8)**
23:24;24:1,2,3,5,
14,19,22
**DELIA (5)**
22:23,25;23:1,23,
24
**DELIVER (1)**
201:22
**DEMAND (2)**
57:25;58:4
**DEMANDED (7)**
57:9,10,17;59:22,
25;60:4,6
**DEMANDING (2)**
57:2;63:20
**DEMANDS (11)**
73:13,22;74:1,2,4,
8,21;75:4,9,13;76:12
**DEPARTMENT (7)**
137:4;138:3;
144:6,10;145:3,15;
146:17
**DEPENDANT (1)**
51:2
**DEPENDED (5)**
102:15;124:15;
125:14;126:18,19
**DEPENDENT (1)**
125:25
**DEPENDING (5)**
57:6;92:14;124:8;
157:20;292:17
**DEPENDS (5)**
79:9;128:4;
156:10;236:20;
271:7
**DEPONENT (1)**
302:3
**DEPOSIT (5)**
148:13,19,19,22;
241:9
**DEPOSITED (2)**
229:20;263:2
**DEPOSITING (1)**
234:9
**DEPOSITION (18)**
5:3,9;8:6,11;
11:10,11,14;20:16;
22:4;79:20;152:23;
255:1;281:23;
299:11;301:18,19;
302:4,5
**DEPOSITOR (1)**
262:25
**DEPTH (1)**
260:7
**DERIVED (1)**
80:19

**DESCRIBE (2)**
123:3;226:25
**DESIGN (1)**
193:6
**DESIRE (1)**
265:10
**DESIRED (1)**
302:6
**DETAIL (3)**
17:20;20:10;179:1
**DETAILED (1)**
156:19
**DETAILS (1)**
182:21
**DETERMINE (2)**
134:8,9
**DETERMINED (3)**
135:1,5;140:9
**DEVELOP (1)**
175:14
**DIFFERENCE (5)**
58:2,6;135:9;
148:16;210:22
**DIFFERENT (20)**
17:20;43:21;57:5,
5;102:11;125:15,16;
134:16,19;135:10;
157:20;159:25;
160:1,2;170:11;
179:9,10;216:11;
300:17,18
**DIFFICULT (5)**
175:3;220:20;
281:20;285:17;
300:14
**DIFFICULTY (1)**
175:4
**DINE (1)**
6:1
**DIRECT (11)**
70:15,18,21;85:5;
103:9,13;142:3,6;
166:18;167:10;
240:1
**DIRECTION (2)**
108:6;169:12
**DIRECTLY (5)**
15:1;85:11;146:9,
14;241:3
**DIRECTOR (165)**
9:24;25:20,22;
26:1,5,8,12;30:23;
33:3;40:9,25;41:2,5,
9;42:3;43:18,20;
46:13,14,20,21,23;
47:1,2;48:23;49:1;
52:10;53:12,15;
54:17;55:19;66:1;
88:6,9,14,17;89:23;
90:2,3,5,14,24;94:3,
10,17,24;95:3,16,18;
97:13,21,22;98:2,7,
8,11;99:20,23;100:2,

6,8;102:3;103:4;
108:13,15,24;109:9,
12,18,22;110:10,11,
17,20;111:12,25;
112:10,15,23;
113:25;114:5,12,14,
15,19;116:16;
129:12;130:9,14;
140:18,20;149:8,11;
155:9,12,15;156:7,9;
169:1,8;170:5;
177:14;180:7,17;
182:13,24;183:16;
188:24;189:12;
190:5,8,13,19;
196:10;198:9;199:6,
7;203:20,23;204:3,
10,24;205:18;213:7;
214:25;215:23,24;
216:2,4;217:1;
219:4;222:19;
223:17;224:7;
225:23,25;226:1,9,
11,12;228:6;231:9;
233:19,21;234:1,12,
13;236:5,7,17,18;
237:23;238:8,19;
254:2;270:16;
272:15,18;278:15;
280:9,15;288:15;
296:25;297:3;299:8
**DIRECTORS (26)**
33:13;98:4,20;
99:13;103:10,19;
104:13;105:5,8;
107:10,13,25;108:7;
132:13;133:6;
155:25;176:11;
189:15;195:9,13;
208:23;209:1;
212:19,24;223:18;
288:6
**DIRECTORSHIP (2)**
93:23;113:15
**DIRECTORSHIPS (1)**
108:19
**DISAGREE (4)**
168:14,16;169:9,
20
**DISAGREED (2)**
168:17,18
**DISCUSS (12)**
22:11;69:10,21,24,
25;102:5;155:6;
178:13;189:7;223:2;
284:4,6
**DISCUSSED (17)**
30:17;37:8;65:13;
68:23;69:19;71:19;
72:6;74:5;77:20;
104:17;144:5;
159:18;174:1;
201:13;202:23;

254:23;255:15
**DISCUSSING (17)**
38:20;66:25;67:3;
71:20,21,22;72:2,11,
21;74:12;134:19;
155:4;193:20;201:2;
207:3;235:21;252:9
**DISCUSSION (10)**
169:11;177:18;
180:5,6;189:11,13,
16;194:2;197:4;
299:10
**DISCUSSIONS (9)**
69:14;175:22;
176:2;180:8,9,18,19;
190:16;273:23
**DISPUTE (6)**
69:17;70:4;
247:10,14,21,23
**DISPUTES (1)**
208:20
**DISSOLUTION (1)**
154:3
**DISSOLVE (1)**
133:19
**DISSOLVED (1)**
154:1
**DISTINCTION (5)**
12:25;128:18;
149:25;150:11,15
**DISTINCTIONS (1)**
126:21
**DISTINGUISH (1)**
293:9
**DISTRIBUTE (1)**
207:8
**DISTRIBUTED (3)**
189:5,8;193:24
**DISTRIBUTION (17)**
171:5,17;172:9;
175:9,12,25;176:15,
18,19;177:1,4,9,15;
178:15,20;179:4;
193:21
**DISTRIBUTIONS (1)**
176:5
**DISTRIBUTOR (5)**
187:18,25;188:8,
11;213:19
**DISTRICT (1)**
5:6
**DOCUMENT (32)**
82:24;83:7,14;
84:6;165:9,10,11;
169:16;172:14;
179:6,16;184:22,25;
186:11;188:1;
206:24;207:5,19;
208:5,6,7,17,21;
209:3,5;218:23;
220:3;260:13,24;
275:10,16;276:5
**DOCUMENTS (23)**

20:23;21:1,25;
22:3,9;29:7;80:23,
25;81:2,6,15;82:5;
83:22,24;84:3;89:7;
206:21;220:7;238:6,
20;239:3,17,22
**DOLLAR (13)**
86:4,4,5,11,14;
87:14,18,19;200:13;
211:10;214:22;
295:18,20
**DOLLARS (3)**
114:8;117:4;
226:24
**DONE (9)**
141:1;153:18;
162:6;166:15;
230:24;258:12;
282:23;283:7;290:1
**DOUBLE-CHECK (6)**
140:4,6;199:3;
232:18,21;270:20
**DOUBLE-CHECKING (1)**
134:21
**DOUBT (7)**
167:3;194:23;
248:19;258:19,21;
264:12;269:21
**DOWN (47)**
12:24;13:2,4,11,
17;18:18,23;19:24;
20:3;28:9;34:3,5,19;
37:23;44:9;77:14;
107:7;127:17;
133:20;134:2;135:1;
156:13;164:12;
167:17;169:25;
174:16;196:16;
201:18;202:14;
210:9;227:7;248:22;
251:13;252:3;
255:23;256:2;
257:10;258:11;
267:12;273:7;
278:19;285:4,15;
287:16,24;288:21;
298:22
**DRAFT (6)**
84:17,18;188:23,
25;189:1;274:24
**DRAFTED (1)**
202:18
**DRAMATICALLY (1)**
197:7
**DRAW (1)**
242:22
**DROPPED (1)**
198:11
**DROPPING (1)**
197:7
**DUBAI (11)**
12:12;15:12;19:6,
18;39:25;40:1;

116:3,5,8,11,14
**DUE (2)**
244:10;245:4
**DURING (40)**
8:5,11;11:21;21:2;
48:25;50:22;53:8;
56:16;59:12,14,18,
20;64:9;65:3;68:24;
69:12;71:5,17;
74:21;102:17;
107:14;108:12,23;
126:7;143:9;150:7;
156:8;157:3,16;
158:4,19;168:23;
170:10;190:24;
198:16;212:18;
236:9,21;272:8;
281:19
**DUTIES (10)**
98:6,11,21;99:4,
12,15,17;100:5,14;
102:3
**DUTY (2)**
288:6,12

**E**

**EARLIER (31)**
37:5,22;44:1;45:1;
49:21;62:8;70:13;
74:5;89:24;90:23;
128:1;149:18,20;
150:10;156:15;
159:18;169:5;174:1;
185:23;187:17;
189:20;212:22;
222:14;232:14;
236:10;239:4;
250:18;254:25;
287:8;292:16;293:9
**EARLY (23)**
55:1,3,6,15,25;
56:7,12,13,18;58:14;
59:6;64:10;65:14;
68:3,14;115:1;148:5,
6,10;157:22;234:6;
237:4;255:1
**EARN (5)**
118:14,22;120:16;
123:9;127:11
**EARNED (2)**
153:16;193:23
**EASIER (8)**
10:7;30:19;112:1,
9;150:2;156:12;
181:7;213:3
**EASY (1)**
234:18
**EC2 (1)**
5:11
**ECONOMIC (1)**
141:18
**EDGAR (1)**

286:8
**EDIT (1)**
161:22
**EDITS (2)**
84:21,23
**EDUCATED (2)**
22:14,20
**EFFECT (6)**
156:6;201:11;
219:19;220:18;
266:22;274:25
**EFFECTED (2)**
201:5;203:21
**EFFECTIVE (4)**
186:9;211:23,24;
218:7
**EFFECTIVELY (9)**
86:10;119:4;
120:17;164:1;174:3;
184:9;207:11;215:7;
254:6
**EFFORT (1)**
285:5
**EIGHT (17)**
26:3;32:13,15,16,
20;39:17,18,22,24;
40:1,2,3;114:25;
115:13,23,23;116:2
**EITHER (9)**
35:10;53:7;55:14;
83:14;105:18;
116:24;121:16;
182:2;228:2
**ELABORATE (9)**
36:14;38:7;41:21;
47:20;57:8;63:1;
80:21;82:11;135:16
**ELIGIBLE (3)**
127:10,20;293:13
**ELSE (13)**
29:15;40:3;50:2;
59:14;79:8;90:1;
93:20;95:22;100:11;
135:24;225:25;
230:15;231:12
**ELSEWHERE (1)**
143:8
**EMAIL (2)**
266:9;284:7
**E-MAIL (60)**
79:6;82:8,24;83:7,
14,22;84:5;161:16,
17;166:11,16,25,25;
167:6;168:23,24;
169:16;174:8,14;
184:21;194:21;
195:17;196:16;
197:2;202:15;206:6,
12,13,15;207:1;
221:20;222:6;223:6;
239:9;240:21;
248:16;258:15,25;
259:19;264:10,15,

18;265:14,16,20,22;
267:15;268:6;
270:18;277:22;
279:2;281:11,13;
282:20;283:4,25;
284:8;286:10;287:4,
5
**E-MAILS (14)**
80:24,25;81:1,5,
15;82:5;88:22;
166:13;239:9;
269:19;277:18;
281:8;286:7,13
**EMERGENCY (5)**
60:18;62:24;63:2,
8,16
**EMINEM (1)**
115:24
**EMPLOYED (6)**
32:9,12;40:1,3;
114:23,24
**EMPLOYEE (14)**
51:23;54:2;96:8;
109:24;110:1,5,14,
15;144:1;196:5,7,9;
224:4;258:2
**EMPLOYEES (14)**
44:4;46:12,15,19;
47:3;96:2,4;105:25;
106:18,21;107:1,12,
15,17
**EMPLOYMENT (3)**
40:17;285:25;
286:2
**ENABLE (1)**
132:21
**ENCOUNTER (1)**
29:25
**ENCOURAGE (1)**
265:8
**END (17)**
7:6;13:14;43:17;
61:8;75:1,7;85:21;
123:1;126:11;
193:12,12;259:15;
282:24;283:8;
285:15,17;287:10
**ENDED (2)**
13:16;48:7
**ENFORCEABLE (7)**
210:3,7,18,23;
217:8,9,25
**ENGAGE (7)**
111:5,7;146:19,
21;147:12;149:6,11
**ENGAGED (14)**
15:15,22;19:5,22;
25:12;111:2;145:25;
147:1,6,8,19;149:14,
22;150:6
**ENGAGEMENT (1)**
148:25
**ENGAGING (2)**

111:1,3
**ENGINEERS (1)**
137:6
**ENGLAND (1)**
5:23
**ENGLISH (5)**
10:11,13;23:21;
223:9;270:22
**ENOUGH (1)**
154:16
**ENTER (1)**
225:13
**ENTERED (6)**
200:16;201:14;
202:2;213:12,15;
228:4
**ENTERING (4)**
228:8,16;229:1,4
**ENTIRE (2)**
8:11;108:12
**ENTITIES (45)**
17:21;18:1;34:4,5,
7,13,16,21,25;35:1,2,
11;37:20,24;38:12,
15,19;44:1,14,23;
45:6,13,16,21;46:7;
53:1;54:9;67:4,7,11,
11;81:17;96:25;
112:24;125:15;
127:6;141:10;193:2;
216:4;228:10,19,23;
229:10;245:19;
298:6
**ENTITLED (6)**
298:14,19,23;
299:18;300:5;301:6
**ENTITY (59)**
17:21;18:1;33:7;
36:6;42:22;43:8;
67:10;72:25;76:1;
91:3;113:21,22;
114:3,25;115:15;
124:18;125:1,20,23;
126:10;128:7,8,8;
141:13,22;142:5,6,9,
17,18;145:11,13;
148:8,21;151:13;
155:17;157:4,18;
168:10;188:9;193:3;
224:14;228:12;
232:15;233:20;
234:19;245:8,14,16;
252:5;254:7;259:5,
12;261:18;266:13,
16,21;267:2;299:21
**EP (2)**
285:18,24
**EQUIPMENT (2)**
131:9,15
**EQUITY (1)**
35:10
**ERNST (1)**
146:11

**ERRATA (1)**
7:10
**ERROR (4)**
256:15,19;271:4,7
**ERRORS (1)**
7:3
**ESPECIALLY (1)**
219:2
**ESSEX (1)**
5:23
**ESTABLISH (4)**
202:25;235:1,9;
241:18
**ESTABLISHED (6)**
19:16;133:12;
202:19;215:10;
216:15;254:16
**ESTABLISHING (1)**
67:6
**ETC (9)**
29:3;80:25;82:9,
12;127:21;201:24;
231:20;243:16;
247:25
**EVEN (3)**
7:20;9:16;165:10
**EVENT (1)**
252:18
**EVENTUALLY (3)**
12:19;54:13;
262:24
**EVERYBODY (1)**
154:18
**EVERYBODY'S (1)**
185:10
**EVERYONE (1)**
213:25
**EVIDENCE (4)**
295:6;297:8,15;
301:5
**E-WALLET (1)**
124:13
**EXACT (17)**
56:17;68:5;71:5;
76:9;92:22;93:3;
94:21;102:19;
106:10;114:6,11;
116:20;117:5;
143:10;145:5;
244:20;245:1
**EXACTLY (26)**
25:16;29:13;30:2,
8,13;34:22;42:10;
43:2,2;48:24;49:2;
50:16;62:3;73:4;
75:10;92:15;93:1;
150:8;198:20;
199:15;224:2;
238:25;241:25;
258:17;280:12,19
**EXAMPLE (7)**
34:3;41:23;57:9;
135:18;140:1;

231:23;299:8
**EXCELLENT (2)**
29:19;133:2
**EXCEPT (1)**
149:15
**EXCESSIVE (1)**
197:10
**EXCHANGE (16)**
27:11,15,18,20,21,
24;28:3,7,14,18,21;
49:23;50:5;182:14;
183:1,23
**EXCLUDE (4)**
265:2;267:11,20;
268:5
**EXCLUSIVE (10)**
172:9;175:9,11;
176:17,19;179:6;
187:18,24;188:7,10
**EXECUTED (4)**
176:14,25;177:23;
188:3
**EXECUTIVES (5)**
105:24;107:17,19;
108:5,9
**EXEMPTED (1)**
153:22
**EXEMPTION (1)**
153:19
**EXHIBIT (62)**
79:14,16;139:17;
161:12;162:19;
166:4,5,8;170:15,16,
17,20;173:18,19,20,
23;174:1;187:12,15;
194:16,19;199:16,
19;202:11,12;212:8,
9;214:7,9;219:14,25;
220:8,22,23;221:10;
240:15,17,18;
248:13;255:16,19,
20;258:5,8;260:3,6;
262:4;264:5,8;
269:13,16;275:3,5,8;
277:8,9,18;281:2,5;
284:4,6,6
**EXHIBITS (4)**
22:6,7;79:24;
220:6
**EXIGO (4)**
138:10;191:14,15,
18
**EXIST (4)**
38:12;96:22;
118:9;207:5
**EXISTENCE (11)**
200:7;208:6,10,14,
16;209:8,11,18,19,
22;255:3
**EXISTING (5)**
196:20;250:4,8;
256:25;261:14
**EXISTS (2)**

173:15,16
**EX-KING (2)**
19:9;20:5
**EXPAND (2)**
25:13;300:25
**EXPECT (1)**
195:25
**EXPENSES (1)**
243:15
**EXPERIENCE (5)**
23:7;24:23;32:2;
98:3;117:15
**EXPERT (1)**
218:25
**EXPERTISE (3)**
19:8,14,18
**EXPLAIN (2)**
119:7,13
**EXPLAINED (1)**
212:4
**EXPLAINING (1)**
177:20
**EXPLANATION (1)**
263:10
**EXPLORED (1)**
174:25
**EXPRESS (1)**
189:3
**EXPRESSING (4)**
195:8,19,23;242:6
**EXTENT (4)**
7:8;10:1;45:10;
239:25
**EY (1)**
145:23

**F**

**F1 (1)**
224:21
**FACED (1)**
262:14
**FACE-TO-FACE (1)**
241:19
**FACILITATE (1)**
27:22
**FACILITATED (1)**
143:5
**FACILITATING (2)**
28:23;44:9
**FACILITY (2)**
143:13,15
**FACING (3)**
13:12;61:5,8
**FACT (9)**
37:8;99:22;144:5;
217:7;219:1;225:1;
253:17;274:24;
287:8
**FACTORED (1)**
247:5
**FACTORS (1)**
266:21

**FACTS (2)**
80:16;208:18
**FACTUALLY (1)**
256:22
**FAIR (10)**
43:24;58:8;170:2,
6,7,9;254:5,14;
280:10,16
**FAIRLY (1)**
190:22
**FAITH (2)**
140:10;288:8
**FAMILIAR (2)**
152:18;154:5
**FAMILIARISE (1)**
258:9
**FAN (1)**
224:23
**FANTASTIC (2)**
9:18,19
**FAR (3)**
65:13;150:3;
270:23
**FAVOUR (2)**
179:3,5
**FCC (1)**
39:23
**FCCO (4)**
32:20;39:17,19,24
**FEE (7)**
37:1;59:23;60:2,8,
13;118:22;135:21
**FEEL (2)**
8:17;14:20
**FEES (9)**
40:9;143:4;146:5,
7,8;231:20;247:11,
11;292:24
**FELT (1)**
56:20
**FERRARI (3)**
224:18,24;225:1
**FERRARIS (1)**
225:4
**FEW (5)**
6:24;141:9;
166:19;254:23;
265:7
**FIDELITY (3)**
243:17,18,25
**FIDUCIARY (2)**
288:6,12
**FIGURE (7)**
59:23;60:1;
224:22;244:17,21;
245:1;280:21
**FIGURES (2)**
156:18,20
**FILE (11)**
82:24;83:7,15,22;
84:6;152:1,10,16;
154:4;158:25;
159:13

**FILED (1)**
153:14
**FILES (7)**
80:24;81:2,6,15;
82:5;88:22;89:9
**FILING (4)**
153:20,21;154:6;
159:16
**FINAL (9)**
151:6,7,9,10;
165:9,10,20;297:16,
17
**FINALISED (4)**
183:12,15;273:25;
280:19
**FINALLY (1)**
235:5
**FINANCE (1)**
150:25
**FINANCES (1)**
155:5
**FINANCIAL (28)**
52:20,23;149:16;
150:21,22;151:4;
155:25;156:8,18;
157:4,14,18;171:5;
236:22;237:10;
264:16,21;265:5,11;
266:12;267:4,8,24;
268:1;278:3,6,16,20
**FINANCIALS (5)**
155:7;158:1,2,4;
278:8
**FIND (3)**
119:17;150:1;
296:22
**FINE (11)**
9:2,7;28:9;51:4,7;
91:2;128:12;150:20;
154:15;166:14;
180:17
**FINISH (3)**
165:7;166:21;
231:1
**FIRM (9)**
12:7;15:16,23;
147:7,8,10;265:9,25;
266:5
**FIRMS (9)**
20:2;32:4;34:2,3;
111:9;147:1,12;
149:11;150:6
**FIRST (64)**
6:25;26:19;29:11,
14,17,21,25;30:2,17,
22;40:24;48:6;49:7,
9,21;50:14;52:13,16;
54:2;56:14,14,15,16;
59:7;65:9;71:25;
74:18,19,21,22,23;
77:5;80:19;84:17,
18;98:19;101:5;
116:22;124:10;

127:14;151:3;
161:11;166:16;
174:19;177:8,24;
199:22,24,25;200:1;
204:23;208:4,8;
212:15,16;232:20;
249:9;256:2;265:10;
282:19;283:3,4;
292:1;293:3
**FIRSTHAND (1)**
13:19
**FISH (1)**
152:23
**FIT (1)**
141:24
**FIVE (7)**
25:17;30:10;32:2;
74:23;105:9;194:9,
10
**FLIP (8)**
167:11;171:12;
196:15;219:16;
249:8;257:7;282:19;
283:3
**FLOOR (2)**
3:3,17
**FLOW (2)**
236:12,25
**FLOWING (1)**
234:14
**FLUENT (2)**
10:10,13
**FLY (1)**
269:1
**FOCUS (1)**
128:16
**FOCUSED (2)**
143:7;277:17
**FOLDER (1)**
82:14
**FOLLOW (2)**
47:9;292:1
**FOLLOWED (8)**
141:1,3;203:3;
204:21;205:5,15,22,
24
**FOLLOWING (6)**
62:6;71:7;133:3;
182:11;206:13;
279:11
**FOLLOWS (1)**
219:14
**FOOTING (1)**
292:21
**FORCE (3)**
201:11;219:19;
220:18
**FOREGOING (2)**
302:4,5
**FORGOT (2)**
59:22;60:1
**FORM (113)**
7:21;9:25;22:17;

35:5,18;38:23;
45:23;51:25;55:9;
60:14,24;62:21;
66:3;67:13;78:25;
81:23;82:6;87:23;
101:1;109:14;
110:18;124:21;
131:4,22;133:8,23;
136:23;137:13,18;
150:23;153:11,14;
156:2;157:7;158:20;
159:2,8;160:24;
164:9;172:25;
173:12;175:2;178:8;
179:21;183:9;
184:11;186:1,14;
187:7;194:4;199:9;
202:4;204:13;
205:20;207:13;
211:18;217:13,21;
218:11,19;219:7;
223:15,22;225:10;
227:5;233:12;234:4;
237:19;238:2,9,22;
242:9,16;243:3,20;
244:2;245:10;247:8,
16;250:11;252:22;
253:7,13;254:9,18;
257:3;261:7,16;
270:7;271:1,20;
272:5;274:9,16;
278:11;283:13,20;
284:18;285:20;
290:14;292:10;
293:1,15;294:13,23;
295:9;296:17;297:5,
19;298:9;299:1,19;
300:9
**FORMAL (2)**
225:13;265:21
**FORMATION (2)**
39:23;226:15
**FORMED (9)**
38:13;95:11,15;
225:8,11;226:6;
233:14;234:21;
252:6
**FORMER (3)**
164:23;237:23;
293:17
**FORMS (1)**
254:13
**FORMULA (1)**
224:18
**FORTH (3)**
201:10;219:18;
220:17
**FORTY-NINE (1)**
269:3
**FORWARD (3)**
169:19;282:23;
283:7
**FOUND (3)**

197:16;205:2;
234:6
**FOUNDED (1)**
115:2
**FOUR (5)**
25:17;30:10;32:1;
56:14;268:22
**FRAME (2)**
51:14;127:10
**FRAMEWORK (4)**
174:25;175:8;
184:25;185:1
**FRAMEWORKS (1)**
177:20
**FRANKLY (1)**
175:8
**FREQUENTLY (2)**
102:9;294:7
**FRIENDS (1)**
47:24
**FULL (3)**
6:15;45:10;256:1
**FUNCTIONED (2)**
151:20;227:2
**FUNCTIONS (4)**
77:11,12;79:11;
138:9
**FUNDING (8)**
60:18;62:24;63:2,
8,16,24;65:4;262:10
**FUNDS (52)**
16:13;17:12;
61:24;87:11,14;
113:9;115:14,19;
124:14;168:6;
227:16,24,25;228:1;
229:20;230:11,17;
234:14;236:2,12;
237:1;241:2;242:6,
13,21;243:16,17,24;
246:1;247:15,18,24,
25;248:1,4,6,10;
263:14;280:24;
290:8,12,13;292:4,
21;296:1,16,20;
300:6,21;301:4,6,12
**FUNNY (1)**
257:22
**FURTHER (7)**
18:19;203:2;
204:20;205:4;265:9;
266:5;290:21
**FUTURE (2)**
133:7;168:12
**FZCO (2)**
32:15,18

**G**

**GAME (5)**
196:14,18,24;
197:17,17
**GAMING (3)**

197:9,12;198:8
**GAO (16)**
10:4;12:4;33:1,3;
45:9;53:13;86:9;
111:4;141:14;142:2;
148:23;164:17;
172:10,22;245:12;
256:20
**GARY (3)**
270:3,5;277:23
**GAVE (1)**
161:4
**GENERAL (8)**
24:10;79:2;
100:24;101:6,20;
118:10;150:5;174:3
**GENERALLY (2)**
79:4;99:19
**GIVEN (10)**
120:7;124:3;
161:25;162:3;216:7;
221:16;242:13,21;
257:1;263:10
**GIVES (2)**
175:11;186:12
**GIVING (8)**
152:20;175:24;
176:4,14;177:1;
182:25;221:3;
251:22
**GLAD (1)**
16:5
**GLOBAL (11)**
32:3;42:23,24;
54:13;126:2,9,22,24;
243:17,17,25
**GLOBALLY (1)**
31:23
**GOAL (1)**
200:23
**GOES (1)**
50:12
**GOLFING (2)**
69:2,3
**GOOD (13)**
5:1,19;6:13;29:20;
140:9;154:13,16,19;
155:1,2;194:10;
221:8;288:7
**GOODS (3)**
189:4,8;190:16
**GOVERNMENT (3)**
14:24;152:14;
153:15
**GRAD (1)**
255:11
**GRADUALLY (1)**
242:25
**GRADUATE (4)**
23:6,11;24:14,24
**GRAHAM (1)**
72:19
**GRAMMATICAL (1)**

268:3
**GRAND (1)**
3:6
**GRANTED (1)**
217:11
**GRANTS (1)**
290:11
**GREAT (5)**
7:11,18;9:17;10:9;
256:6
**GROUND (2)**
6:24;74:2
**GROUNDS (3)**
73:14,22;291:2
**GROUP (8)**
143:2;193:2;
234:8,14;249:13,17;
288:2,3
**GROUPS (1)**
36:5
**GROWTH (37)**
81:21;85:9,16,19,
23;86:1,2,7;88:2,3,6,
10,12,18,20;184:6,8;
188:13;200:13,16;
202:22;203:5,8;
206:2;209:23;211:5,
10,17;214:21;215:9;
259:24;270:17;
271:15;272:1,11;
276:11,14
**GUESS (4)**
9:4,10;104:21;
154:13
**GUYS (1)**
291:14

**H**

**HAI (2)**
146:25;150:3
**HALF (8)**
74:18,19,21,22;
147:20,21;148:3;
232:21
**HAND (4)**
207:1;216:1,2;
244:9
**HANDED (3)**
173:25;240:18;
258:7
**HANDING (1)**
170:19
**HANDLE (1)**
15:17
**HANDLED (2)**
145:10,11
**HAPPEN (2)**
7:5;129:7
**HAPPENED (7)**
13:20;130:2,25;
131:1;181:22,24;
263:14

**HAPPENING (4)**
59:12,14,20;
290:23
**HAPPY (4)**
10:25;282:20;
283:5;300:21
**HARBOUR (1)**
3:4
**HARNEY (2)**
3:2;6:5
**HARNEYS (12)**
11:23;147:17,18,
18;148:9,9,19,22,24;
149:7,15;150:4
**HEAD (15)**
17:11;46:25;
63:22;64:6;81:11;
82:22;98:23;101:11,
25;102:15;139:6,13;
147:14;226:4;
294:22
**HEADQUARTER (1)**
259:6
**HEALTH (1)**
121:17
**HEAR (10)**
8:25;9:1;50:20,24;
191:1;192:2;244:22;
260:22;273:22;
286:22
**HEARD (7)**
41:24;50:11;51:4;
177:18;185:14,15;
224:21
**HEARING (1)**
291:15
**HEC (41)**
21:9,10,19;42:21,
23;43:4,10,13;54:12,
13;67:6;89:17,21;
90:2,5;120:3,4,6,8,
10,18;121:11,12;
122:9,12;124:20;
126:2,9,16,22,23,23,
24;127:1;131:19,20;
143:12,25;258:3;
298:1,3
**HECK (1)**
221:13
**HEC'S (1)**
143:6
**HELD (7)**
52:4,14;87:11,14;
102:9;293:20;
300:21
**HELP (3)**
28:3;89:6;174:18
**HELPED (1)**
175:14
**HELPFUL (2)**
48:7;97:19
**HELPING (1)**
93:12

**HEREIN (1)**
80:16
**HERETO (1)**
201:3
**HI (4)**
5:19;206:20,20;
277:23
**HIGH (2)**
23:25;24:2
**HIGHLIGHTS (1)**
156:18
**HIMSELF (3)**
73:13,21;208:24
**HIRE (1)**
145:22
**HISTORY (1)**
24:23
**HOLD (11)**
28:10;40:16;
41:22;43:25;44:5;
53:6;66:1;86:24;
90:15;163:16;
291:20
**HOLDERS (1)**
188:15
**HOLDINGS (48)**
5:4;25:21;27:9,10;
28:19;41:16;48:10;
72:16;106:3,6;
107:11,14,25;108:6,
9,11,13;125:22;
129:15;155:18;
159:5,6,13;164:18;
167:23,24;168:7;
172:8,19,21;173:5;
186:17,21;187:4;
188:15;192:24,25;
207:7;214:1,23,25;
215:3;216:13;
238:16;254:17;
255:2;256:22;279:6
**HOLDS (1)**
163:3
**HOMMA (56)**
47:13,18,21;48:1;
50:8;67:18,21,25;
68:4,17,24;69:8,10,
20,24;70:7,10,17,21;
85:24;86:2,10,13,15;
87:3,10,13;88:3,6;
170:23;178:5,10,13;
182:13,25;183:7,21;
184:2,5,9,16;185:20;
188:14;193:21;
200:9,12;206:7,23;
208:9;209:7;214:22,
24;215:22;221:24;
259:10,15
**HOMMA'S (1)**
70:3
**HOMMA-SAN (1)**
202:18;203:10
**HONG (42)**

20:5;22:15,16,20;
23:2,14;24:13,14;
27:10,15,18,20;
28:18,21;31:23;
40:21,22;49:10,23;
50:5;91:15,16;
115:15,16;128:8,9,
10,14,20,21,22,24;
129:17;132:4,19;
134:4,6;135:2,4;
136:16;174:11;
249:1
**HONOR (1)**
164:20
**HOPE (2)**
12:19;152:22
**HOPEWILL (23)**
24:25;25:3,4,5,7,8;
26:24;27:2,7,8,16,
19,23;28:1,13,17;
30:10;31:25;49:15;
94:7,13,16;95:1
**HOPING (1)**
163:14
**HORI (2)**
105:18,19
**HOUR (1)**
66:15
**HOURS (3)**
268:20,22,24
**HOUSE (1)**
3:18
**HOUSED (1)**
88:23
**HSBC (3)**
96:18,19,20
**HTC (1)**
247:24
**HU (4)**
11:23,25;12:2,3
**HUGH (5)**
5:19,20;8:21;
152:20;232:22
**HUMAN (2)**
144:9,10
**HY1-1002 (1)**
3:7
**HYPOTHETICAL (1)**
219:9
**HYPOTHETICALS (1)**
218:25

**I**

**I-A (2)**
257:21,23
**IDEA (5)**
18:8;31:17;39:20,
21;66:11
**IDEAS (1)**
170:11
**IDENTIFICATION (22)**
79:16;166:5;

170:17;173:23;
187:12;194:16;
199:16;202:12;
212:9;214:7;220:23;
240:15;248:13;
258:5;260:3;262:4;
264:5;269:13;275:3;
277:9;281:2;286:4
**IDENTIFY (3)**
36:4;206:13;298:7
**IDENTIFYING (1)**
160:23
**IDLE (1)**
196:20
**IHEALTH (1)**
42:19
**IHEALTHSCIENCE (17)**
41:24;42:2;90:9,
13,16;138:24;139:3;
140:2;172:18;190:1,
2,6,17,21;201:15;
264:1,2
**ILLEGAL (2)**
14:1;134:16
**IMAGINE (1)**
130:8
**IMMATERIAL (1)**
168:5
**IMPACT (1)**
211:4
**IMPAIR (1)**
11:6
**IMPLEMENT (1)**
172:9
**IMPLICATES (1)**
8:1
**IMPLYING (1)**
289:1
**IMPORTANT (2)**
169:25;170:1
**IMPOSED (1)**
290:8
**IMPRESSION (1)**
289:12
**INC (98)**
5:4;10:4;12:4;
25:21;27:10;28:19;
33:1,4,5,18,22;34:1;
36:8,10;40:10,13;
41:16;42:24;45:9;
46:4,8,10,11,13,15;
48:10;53:13;54:13,
16;57:19,20;70:22;
86:8,9;106:3,6;
108:10,11;109:9,12,
19,20,22;111:5;
113:24;125:22;
126:2,9,22,24;
129:15;141:12,14;
142:2,23;144:16;
148:23;151:24;
155:19;159:6;
164:19;167:23,24;

172:8,10,19,21,22;
173:6;186:17,22;
188:15;192:24;
215:10;228:11,13,
17,18,22,25;233:15;
234:8,14,16;238:16;
245:12,18,20;246:2,
3,8,11,13,17,19,22;
256:22;299:24
**INCLUDE (1)**
238:4
**INCLUDED (3)**
265:5;267:7,25
**INCLUDING (1)**
175:4;201:23
**INCOME (3)**
153:8;193:23;
301:11
**INCORPORATED (1)**
116:5
**INCORRECT (1)**
256:23
**INCREASE (2)**
195:25;196:19
**INCREASED (1)**
285:13
**INC'S (1)**
57:21
**INCURRED (3)**
247:11,12;292:17
**INDEED (1)**
291:12
**INDEPENDENT (6)**
114:22,24;134:10;
198:14,17,24
**INDEPENDENTLY (1)**
22:3
**INDICATE (1)**
11:2
**INDICATION (2)**
277:11;286:24
**INDIRECT (3)**
70:15,18,22
**INDIVIDUALS (7)**
28:2;35:16;132:4;
160:18;287:10,12;
288:22
**INDONESIA (1)**
177:19
**INFLOW (1)**
300:8
**INFLUENCE (2)**
11:5;179:14
**INFORM (2)**
234:12;272:23
**INFORMATION (22)**
15:7;80:18,19,21,
24;81:18,19,20,21;
89:6,10;131:13;
152:24;237:8;238:7,
13;239:14,22;
241:23,24;252:21;
257:24

**INFORMED (3)**
61:25;177:14;
272:14
**INFORMING (1)**
221:24
**IN-HOUSE (1)**
146:17
**INITIAL (3)**
55:22,23;136:7
**INITIALLED (1)**
213:25
**INITIALLY (1)**
55:21
**INNOVATION (10)**
42:15;54:16;
191:2,5,8,12,17,22;
218:10,18
**INPUT (2)**
107:11,14
**INSTEAD (3)**
30:19;175:11;
243:14
**INSTRUCT (1)**
244:5
**INSTRUCTIONS (1)**
6:25
**INSULATE (1)**
18:19
**INTANGIBLE (1)**
203:11
**INTELLECTUAL (1)**
201:24
**INTEND (2)**
9:5;290:13
**INTENT (1)**
182:23
**INTENTIONALLY (1)**
209:4
**INTEREST (21)**
35:10;70:18,22;
86:21;87:10;100:19,
21,23;169:6;174:17;
182:14,15;183:1,22;
192:14;193:17;
216:7;217:4;222:16;
277:16;288:8
**INTERESTS (2)**
35:9,10
**INTERFACING (1)**
28:7
**INTERNATIONAL (27)**
21:10;53:15;
89:17,22;90:2,6;
126:16,25;127:1;
135:2;142:19,21;
143:4;151:14;
187:18,24;188:7,11;
228:24;234:9,11;
235:22;236:1;241:1;
247:25;258:3;298:2
**INTERRUPT (3)**
82:19;95:20;222:9
**INTERRUPTED (1)**

180:14
**INTERRUPTION (1)**
133:4
**INTERUSH (41)**
27:9,17;28:3,13,
19;29:16,21,22,24;
30:1,19;38:16,20;
39:13;49:19,23;
50:5;54:3,5;125:5,8;
128:8,19,20;129:5,
14,16;132:5;133:21;
134:3,4;162:15;
163:4,10;164:7;
252:3,24;254:1;
256:10;293:18,19
**INTERUSH/ASCENTRA (4)**
30:18;230:3;
252:17;253:3
**INTERUSH/WE (1)**
30:11
**INTERUSH'S (2)**
28:22;179:13
**INTERVIEW (1)**
231:5
**INTO (32)**
9:15;17:25;25:14;
37:20;41:23;51:1;
75:13;115:15;
116:11;132:19;
141:8,24;163:21;
181:20;200:16;
201:14;202:2;
213:12,16;222:23;
228:4,8,16;229:1,4;
234:9,14;236:12;
237:1;247:5;263:2;
287:12
**INTRODUCE (1)**
254:1
**INTRODUCED (1)**
252:25
**INTRODUCING (2)**
253:4,11
**INTRODUCTION (1)**
164:20
**INVALIDATE (3)**
200:20,24;202:2
**INVESTIGATED (1)**
15:3
**INVESTIGATION (5)**
14:24;130:3;
132:11,12;274:2
**INVESTIGATIONS (8)**
13:15;15:5,13;
16:8;37:13,16;45:4;
62:5
**INVITED (5)**
162:7,11;164:5;
252:14,18
**INVOLVE (3)**
37:10;77:24;
158:12
**INVOLVED (30)**

13:10;28:20;37:4,
13,15;38:9,10;45:16;
67:6;118:24;119:2,
8;131:19,20;140:16;
159:15;172:12;
180:4,8,18;181:15;
188:13;189:10,13,
16;190:15;197:21;
226:15;289:8,10

**INVOLVEMENT (1)**
78:9

**INVOLVING (1)**
71:14

**IRP (17)**
71:23;72:1,3,7,14;
73:2,7,9;77:3,5,9,18;
89:14;208:23,23;
279:6,8

**IRREVOCABLY (1)**
201:21

**ISHIGURO (1)**
192:12

**ISLAND (1)**
162:5

**ISLANDS (16)**
3:8;21:12;71:8,15;
75:14,21,23,25;
76:11;141:12,15;
144:18;147:7,9,13;
237:25

**ISSUE (14)**
51:9;61:6,6,8;
63:5,7,12;195:13;
197:15,17,19;
264:25;265:25;
266:6

**ISSUES (9)**
13:24;197:8;
262:14;273:9,10,11,
14,19,21

**ITEM (3)**
111:19;171:11;
174:17

**IV (2)**
201:8;219:14

## J

**JAPAN (3)**
143:7,11;192:9

**JAPANESE (7)**
10:12;25:13;
126:17,21;270:24;
273:6;283:2

**JEFF (2)**
6:1;157:21

**JEJU (1)**
162:4

**JESSIE (5)**
143:20,23,23;
257:14,25

**JESSIE'S (1)**
143:25

**JOHN (11)**
5:21;6:1;8:22;9:2;
50:25;138:12;153:1;
154:10;221:7;
232:25;255:21

**JOHNSTONE (5)**
3:10;6:4,5;150:12,
16

**JOINED (5)**
39:2;40:24;
106:22;117:19;
124:10

**JOINING (2)**
31:3;117:14

**JONES (1)**
5:25

**JUMP (1)**
242:12

**JUMPED (1)**
84:11

**JURISDICTION (6)**
39:24;80:11;
91:14;147:6;151:12;
226:6

**JURISDICTIONS (1)**
159:1

**JUSTIFICATION (1)**
289:5

## K

**KATIE (1)**
150:9

**KE (16)**
10:4;12:4;33:1,3;
45:9;53:13;86:9;
111:4;141:14;142:2;
148:23;164:17;
172:10,22;245:12;
256:20

**KEEN (2)**
174:17;179:15

**KEEP (4)**
156:7;195:24;
284:16,23

**KEEPING (1)**
173:21

**KEN (1)**
192:12

**KEPT (1)**
143:9

**KIND (4)**
144:22;206:20;
231:25;250:1

**KING (8)**
15:15,22;16:7,11;
19:17;146:22;168:1;
179:11

**KNEW (2)**
117:25;208:10

**KNOWLEDGE (11)**
13:19;14:25;
31:23;80:17,18;

98:11;99:9;142:16;
172:20;192:18;
253:15

**KNOWN (1)**
49:5

**KNW'S (1)**
174:18

**KOJIMA (1)**
105:19

**KONG (40)**
22:15,16,20;23:2,
14;24:13,14;27:10,
15,18,20;28:18,21;
31:24;40:21,22;
49:10,23;50:5;91:15,
16;115:15,16;128:8,
9,10,14,20,21,22,24;
129:17;132:5,19;
134:5,6;135:3,4;
136:16;249:1

**KOREA (6)**
162:4,8,12;164:6;
252:10,18

**KWN (3)**
150:3;168:1;
175:13

**KYC (2)**
241:19,22

## L

**LABELLED (2)**
182:1,2

**LANE (1)**
3:20

**LANGUAGE (2)**
10:12;270:25

**LARGE (1)**
144:23

**LARGEST (2)**
15:16,23

**LAST (30)**
18:13;54:21;
68:16;71:2;115:7,9,
10;165:11,24;
199:23,24;202:23;
205:3;214:10;
223:18;243:9;271:9,
10,23;272:3;278:2;
282:24;283:8;
288:11;291:12;
292:2;294:19;295:5;
300:23;301:2

**LATE (6)**
61:5;62:2;130:4,
12;232:9;234:5

**LATER (9)**
20:10;64:8;95:9;
130:5;156:18;166:1;
208:24;222:24;
232:16

**LATITUDE (1)**
152:21

**LAUGHTER (3)**
116:2;268:11,24

**LAW (16)**
12:7;13:8;15:16,
23;19:21,24;20:2;
34:2,3;147:1,6,8,10,
12;149:11;185:13

**LAWS (2)**
80:7;226:5

**LAWYER (8)**
12:10;19:10;20:6;
45:10;111:9;146:23;
150:10;291:3

**LAWYERS (2)**
146:16;291:6

**LEAHY (28)**
5:23;289:25;
290:21,24;291:9,10,
20,24,25;292:13;
293:7,21;294:17,25;
295:13;297:7,12,14,
23;298:12;299:4,15,
23;300:11,24;301:3,
9,14

**LEARN (2)**
99:5;241:1

**LEARNED (2)**
23:21;236:4

**LEASE (1)**
144:13

**LEAST (5)**
142:16;143:10;
154:16;157:13;
285:5

**LEAVE (5)**
75:21;157:8;
187:10;272:15;
284:21

**LEAVING (1)**
284:24

**LED (1)**
77:5

**LEE (2)**
157:23,25

**LEFT (8)**
169:22;268:18,23;
269:2;277:12;
286:18,24;292:24

**LEGAL (21)**
5:13,15;10:1;
16:14,24;19:21;
27:23;75:18;146:17;
150:5;174:25;175:8;
200:18,22;213:2;
219:2;220:19;
247:11;266:22;
292:17,24

**LEGALLY (4)**
201:4;203:9,10;
266:22

**LESS (8)**
18:16;60:10;
102:13;107:4;233:9,

10;245:25;246:1

**LETTER (3)**
200:3,4;212:14

**LEVEL (7)**
107:13,16;123:17,
18;135:22;241:18;
242:6

**LEVINE (9)**
5:24,24;173:19;
232:3;248:25;249:5;
255:16;275:11;
291:16

**LIABILITIES (5)**
19:4;175:5,10;
289:7,9

**LIABILITY (1)**
19:2

**LICENCE (1)**
220:13

**LICENCES (1)**
217:11

**LICENSED (1)**
139:7

**LICENSES (1)**
172:23

**LICENSING (3)**
139:4,15;216:23

**LIFT (1)**
290:7

**LIFTED (1)**
292:3

**LIFTS (1)**
290:12

**LIGHT (15)**
32:13,15,16,20;
39:17,18,19,22,24;
40:2,3;114:25;
115:13,23;116:2

**LIKELY (3)**
30:5,6;242:14

**LIMITED (37)**
18:3,4;25:1,6;
26:25;91:17,19,21;
109:23,25;110:5,9,
24;111:4,13;127:2;
128:9,20;133:21;
134:4;135:2;146:6,7,
12;149:4;163:5,10;
164:7;184:24;
201:23;228:11;
232:15;233:24;
246:18;258:3;
261:10;263:7

**LIMITED'S (1)**
162:15

**LINE (6)**
118:16,18;169:25;
207:21;266:8;273:7

**LINES (1)**
285:4

**LINGUISTIC (1)**
31:22

**LIQUIDATING (1)**

71:24

**LIQUIDATION (8)**
75:17;77:6;
147:23;238:17;
279:7,8,14;287:13

**LIQUIDATOR (19)**
71:23;72:3,7,14,
16,22,24;73:2,7,9;
76:24;77:3,5,9,10,
13,17;155:22;239:13

**LIQUIDATORS (9)**
5:22;69:15,17;
237:17,24;238:16,
21;239:17;240:5

**LIST (6)**
131:3;175:12;
251:7,10,22;254:7

**LISTED (8)**
27:10,14,18,20,24;
28:3,14;168:11

**LISTING (5)**
28:19;49:18,23;
50:4

**LITIGATION (5)**
12:5,14;111:9;
146:23;175:6

**LITTLE (20)**
16:12;17:20;
18:24;20:9;22:12;
24:23;26:8;39:18;
41:4,23;60:20;
93:17;97:20;106:24;
125:19;149:7;
196:15;222:24;
223:2;229:21

**LIVE (1)**
115:16

**LL (1)**
301:13

**LLC (4)**
141:21;153:25;
154:3,6

**LO (2)**
263:23;286:7

**LOADED (3)**
124:14;150:12,14

**LOCAL (2)**
13:8;226:11,12

**LOCATE (1)**
259:6

**LOCATED (4)**
20:7,8;116:14;
241:12

**LOEB (1)**
270:3

**LONDON (4)**
3:21;5:11;20:13,
21

**LONG (8)**
9:5,7;25:15,22;
30:9;94:19;147:18;
290:3

**LONGER (3)**

132:18;154:15;
212:19

**LONG-TERM (1)**
123:6

**LOOK (15)**
166:9;167:13;
171:4;184:1;201:1;
205:10;206:6;213:4,
24;230:21;233:5;
260:7;264:24;
267:12;279:2

**LOOKED (3)**
20:25;22:5;220:8

**LOOKING (9)**
67:4;130:17;
169:5,16;199:4;
208:18;221:10;
283:1;287:11

**LOT (11)**
13:9;18:1;59:12,
18;83:3;152:21;
166:13;208:20;
276:20,23;299:6

**LOUD (1)**
164:16

**LOW (1)**
107:8

**LOWER (4)**
255:24;256:14;
258:11,22

**LOYAL (1)**
164:21

**LOYALTY (16)**
123:4,5,9,14;
125:21;293:10,11,
14,20,23;294:3,11,
18;295:5,14;297:17

**LTD (1)**
3:16

**LUKE (1)**
6:21;286:9

**LUNCH (6)**
8:16;9:5,14;
138:13;154:8;155:4

---

## M

**MAGNA (2)**
5:13,15

**MAINLAND (5)**
34:4,6,8;128:21;
273:17

**MAINLY (1)**
189:25

**MAINTAIN (5)**
116:7;123:14;
137:9;170:1;191:12

**MAINTENANCE (2)**
218:10,18

**MAJOR (5)**
102:16;103:9;
108:9;158:18;
188:12

**MAJORITY (3)**
126:1,3;287:18

**MAKES (2)**
156:12;210:24

**MAKING (21)**
7:15;64:15;73:13,
21;74:1;75:8;77:22,
23;78:1;100:9;
124:19;125:21,24;
128:19;245:8,17;
276:20,23;288:12;
289:8,10

**MALLESONS (7)**
15:15,22;16:7,12;
146:22;168:1;
179:11

**MALLESONS'S (2)**
19:9;20:6

**MANAGE (1)**
36:18

**MANAGED (1)**
191:17

**MANAGEMENT (35)**
33:15,16,20;38:5,
8;40:9;91:8,9;93:6,8,
15,19,22;158:6,7,10,
13,15,17;198:15,18,
19,24;225:12;227:1,
10,13;228:9,18,23;
229:6,9;236:9,11,18

**MANAGING (2)**
33:4;110:25

**MANY (16)**
26:1;30:9;43:23;
53:1;67:25;68:3;
89:25;105:7;106:20;
107:1;141:11;
147:12;162:20;
170:11,11;235:4

**MARCH (10)**
68:19;198:1;
270:18;271:8,9,10,
11,14,24;272:3

**MARGIN (6)**
140:14,22,25;
279:12,24;280:20

**MARK (3)**
166:4;170:16;
277:7

**MARKED (45)**
79:14,16;166:5,8;
170:17,20;173:18,
23;174:1;187:12,15;
194:16,19;199:16,
19;202:11,12;212:8,
9;214:7,9;220:22,23;
240:15,18;248:13,
16;258:5,8;260:3,6;
262:4,7;264:5,7;
269:13,16;275:3,5,8;
277:9;281:2,5;286:4,
6

**MARKET (7)**

126:17,18,20,21;
127:1;140:9,12

**MARKETING (18)**
13:25;25:1,5;
26:25;32:3;34:14;
35:24;93:13;95:1;
117:15,19,23;118:2;
134:15,15,17,20;
195:24

**MARKETS (2)**
182:3;216:12

**MARKUP (2)**
171:18;172:14

**MARTEN (1)**
3:16

**MARTIN (1)**
49:4

**MARTY (13)**
49:5;106:9;161:4,
9;164:22;185:20;
188:15;195:23;
208:9,21,24;209:2;
221:25

**MARTY'S (3)**
132:3;203:16;
255:13

**MASAMI (5)**
53:24;54:1;206:7;
277:22;278:24

**MATSUURA (103)**
26:17,20,23;27:2,
6;29:9,12,16;30:5,
16,22;31:2;45:15;
47:6,23,24;49:18,22;
50:3;54:19,22;55:3,
6,14,19;56:19;57:17;
58:17;59:4;61:3;
62:14;64:24;65:2,14,
17,20,23;66:1,8,25;
73:11,19;74:20;75:5,
12;76:12,20;78:1,7,
12;86:18,21,24;90:5;
103:13,18;104:7,12,
17;169:21;170:24;
178:19;185:19;
193:11,16;209:10,
13,17;221:24;222:7;
223:7;224:23;
226:14;264:15;
265:24;267:23;
268:8;269:25;270:9;
272:11,14,17;
273:12;274:15,21,
23;276:4,13,25;
277:4;281:11;282:2,
20;283:4,24;284:5,
16;285:9,15,19;
287:8

**MATSUURA'S (4)**
64:8;267:15;
283:12,19

**MATTER (4)**

5:4,5;103:11,15

**MATTERS (10)**
37:9;10;103:18;
104:7,12,16;152:24;
201:10;219:18;
220:17

**MATTHEWS (32)**
49:5,8,17,25;50:4;
70:25;71:3,12,19,22;
72:2,6,22;74:13;
77:16,24;78:2;
106:9;129:4;161:4,
9;170:24;185:20;
188:16;196:4,7;
208:10,21,24;209:2;
214:1;252:10

**MAY (40)**
7:21;10:19;17:8;
45:5;52:18;53:14;
60:1;76:8,9,11;
90:20;111:18,19,20;
112:10,14;113:19;
116:19;130:7;132:7;
140:6,7;178:25;
179:2;191:10;
222:10;229:8;230:5,
5;233:8;239:3,5,5;
242:24;249:6;
272:14;277:20;
286:15;288:25;
292:12

**MAYBE (38)**
17:10;18:15;
30:14;49:3;51:18;
54:23;56:16;59:23;
68:19;71:6;76:9;
82:14;92:15,21,22;
93:3,21;94:21;97:9,
19;102:1,13,14;
103:6;117:7,9;
130:11;167:23;
172:14;181:14;
182:9;199:11;209:4;
244:19,20,24;271:6;
296:24

**MCDONALD (186)**
5:19,20;6:11,12;
8:22;9:1,13,18,20;
22:19;32:19;35:8,
21;39:1,7,10;46:1;
50:25;51:6,10,11;
52:3;55:12;60:19;
61:1;62:25;66:5,23;
67:16;68:12;79:3,
17;82:1,10;85:15;
87:25;91:20;101:4;
103:21;104:4;109:3,
7,16;110:6,22;116:1;
122:21;123:2;
124:25;125:7,12;
131:7,25;133:13;
134:1;137:1,15,22;
138:12,16,17;

150:17;151:2;153:1,
3,13;154:10,17,25;
156:5;157:11;
158:24;159:4,12;
161:2;164:11;
165:13;166:6;
170:18;173:3,14,20,
24;178:12;179:25;
183:13;184:13;
186:4,18;187:10,13;
194:8,17;199:12,17;
202:7,13;204:18;
206:14,18;207:16;
212:1,10;217:17,24;
218:15;219:3,12;
221:2,7,9;223:24;
227:8;232:25;233:4;
235:12,19;237:22;
238:5,14;239:2;
240:3,11,16;242:11,
19;243:6,22;244:4;
245:3,13;247:13,19;
248:14;250:17;
253:2,9,18;254:15,
22;255:18,20,22;
257:6;258:6;260:4,
23;261:11,20;262:5;
264:6;268:14,21,25;
269:5,14;270:10;
271:3,5,25;272:9;
274:3,13,19;275:14;
277:10,14,15;
278:14;281:3;
283:17,23;284:22;
285:23;286:16,20,
23;287:2;289:14,23;
290:18,20,24;291:8,
13;292:2

**MCDONALD'S (1)**
293:9

**MEAN (60)**
12:17,22;13:7;
14:2;15:19,21;23:8;
29:24;39:22;53:19,
20;59:19;60:3,5,22;
62:10;70:15;75:4;
77:25;81:18;82:18;
87:5;93:10,14;
96:12;99:19;105:4;
109:17;110:15;
114:21;118:19;
119:9,25;123:16;
124:1;129:21;
134:13;135:17;
136:1,1;151:1;
156:22,24;162:14;
178:15;182:3;
197:12;211:11,13;
213:19;217:19;
227:13;230:9,23;
231:22;239:10;
241:6;249:15;259:7;
299:5

**MEANS (8)**
7:19;39:19;100:2;
118:15;251:1;
270:14;271:10;
288:6

**MEANT (13)**
18:25;36:14;61:3;
63:2;74:20;164:3;
217:10;268:11;
271:18,19;273:12;
282:9;285:9

**MEDICATIONS (1)**
11:6

**MEET (11)**
11:11,15;26:19;
29:8;49:7;50:7,14;
232:3,5;241:18;
249:5

**MEETING (24)**
29:15,18,21;
68:24;69:5;102:6,
18;103:15;156:17;
158:5,6,7,11,15;
162:11;164:6;
177:22,25;180:23;
182:12;223:18;
248:25;252:9;
255:14

**MEETINGS (11)**
102:8,10,12,20,22;
103:1,4;158:19;
236:10,18;237:13

**MELS (10)**
42:17;192:3,4,8,9,
19,22;193:4,10,17

**MEMBER (8)**
31:5,7,10,13,18;
99:12;155:24;
212:24

**MEMBERS (4)**
105:7;158:12,13;
285:7

**MEMORANDUM (18)**
177:22;182:10,17;
185:7,21;201:2,4,8;
202:21;205:14;
207:3;210:2,5,12,12;
211:1;212:3;219:15

**MENTION (2)**
127:15;222:25

**MENTIONED (13)**
60:16,21;140:3;
184:22;189:20;
209:15;222:15;
232:14;236:10;
241:8;242:12;
266:18;284:7

**MERCHANT (2)**
260:18,25

**MESSAGES (1)**
55:2

**MET (30)**
11:13,17,18;20:11,

12,16;26:17;29:11;
47:22;48:6,8,16;
49:9,21,24;50:3,7;
51:12,23;52:7,13;
68:13,17;135:1;
232:7,8,10;235:4;
249:2,6

**MICROPHONE (1)**
291:18

**MID (4)**
43:18;78:12,16,19

**MIDDLE (7)**
167:18;223:6;
258:25;270:11;
282:22;283:6;
287:15

**MIGHT (22)**
11:6;53:16;77:6;
99:18;117:7;145:8;
172:15;180:22,22,
23;191:6;216:6;
219:10;221:12;
237:5;242:1,2;
247:12;268:2;
270:12,25;300:19

**MIGHTN'T (1)**
292:14

**MIGRATED (1)**
250:21

**MIKE (2)**
51:1;291:23

**MILE (2)**
115:23,25

**MILL (1)**
18:15

**MILLION (14)**
64:2,4;243:10;
244:20,25;245:24;
246:23;248:6;
281:15,18;282:14;
284:17,23;292:20

**MINA (2)**
3:11;6:6

**MIND (6)**
103:6;174:20,22;
210:23;224:22;
233:1

**MINER (7)**
105:17;223:10,20,
25;224:4,7,10

**MINIMISE (1)**
19:1

**MINORITY (1)**
175:6

**MINUTE (4)**
72:1;155:6;258:9;
297:13

**MINUTES (16)**
66:17;154:16;
194:9,9,10;233:1;
238:18;268:20,23,
23,24;269:2,4;
277:12;286:17,24

**MISHEARD (1)**
16:1

**MISINFORMATION (1)**
257:1

**MISPRONOUNCING (1)**
47:13

**MISS (32)**
3:11;5:24;173:19;
221:6,25;254:25;
275:11;289:25;
290:21;291:9,10,16,
20,24,25;292:13;
293:7,21;294:17,25;
295:13;297:7,12,14,
23;298:12;299:4,15,
23;300:11;301:3,14

**MIS-SPOKE (3)**
16:2;119:12,23

**MISSTATING (1)**
250:24

**MISTAKE (2)**
213:7;270:21

**MISTRANSCRIBED (1)**
7:8

**MISTRANSLATED (1)**
271:5

**MITIGATE (2)**
44:21;262:17

**MLM (7)**
118:8,11,12;
119:8;159:20,21;
179:13

**MMM (1)**
243:22

**MMM-HMM (2)**
137:2;139:16

**MODE (1)**
78:23

**MODEL (20)**
119:7,15;132:20,
24;133:12;134:11,
12,14,17,18;135:6,9,
11,12,13;136:18;
159:19,25;160:18;
175:13

**MODELS (2)**
160:1,2

**MODEL'S (1)**
135:19

**MOM (1)**
135:11

**MOMENT (5)**
166:8;217:7,9;
221:3;300:13

**MOMENTUM (1)**
196:19

**MONETARILY (1)**
14:12

**MONEY (15)**
62:19;63:19;
116:10;118:25;
119:4;124:3,4;
149:3;227:3,4;

244:6;276:24,25;
296:9,14

**MONIES (7)**
201:22;299:7,9,16,
17,18;300:12

**MONTH (8)**
40:14;67:22,23;
92:17,18;114:9,10;
156:23

**MONTHLY (2)**
92:12;156:6

**MONTHS (7)**
56:14,14,15;
62:16;63:23;64:9;
74:23

**MONTHS' (4)**
59:23;60:1,8,12

**MORE (48)**
17:20;18:15,24;
20:4,10;24:11;28:4,
12;29:2;41:4;48:17;
60:9;64:2,4;86:19;
93:21;105:17;107:4;
116:22;118:24,25;
119:2,3;120:20,23;
121:1,3;122:16,21;
139:5;147:10;
157:17;165:10;
169:25;170:1;
174:17;197:17;
210:25;214:25;
215:23;233:9,10;
245:25;246:1;
250:15;257:24;
268:16;299:12

**MORNING (8)**
5:1,20;6:13,14;
8:14,15;74:5;155:3

**MORRIS (158)**
6:1;8:21,23;9:3,
16,25;22:17;35:5,18;
38:23;39:5,8;45:23;
50:19,23;51:3,8,25;
55:9;60:14,24;
62:21;66:3;67:13;
68:9;78:25;81:23;
82:6;85:13;87:23;
91:18;101:1;109:1,4,
14;110:18;115:25;
122:18,23;124:21;
125:4,9;131:4,22;
133:8,23;136:23;
137:13,18;138:14;
150:23;152:20;
153:11;154:12;
156:2;157:7;158:20;
159:2,8;160:24;
164:9;165:6;172:25;
173:12;178:8;
179:21;183:9;
184:11;186:1,14;
187:7;194:4;199:9;
202:4;204:13;

205:20;206:11,16;
207:13;211:18;
217:13,21;218:11,
19,24;219:7;220:25;
221:5;223:22;227:5;
232:22;233:3;
237:19;238:2,9,22;
239:24;240:7;242:9,
16;243:3,20;244:2,
22;245:2,10;247:8,
16;250:11;252:22;
253:7,13;254:9,18;
255:19;257:3;
260:21;261:7,16;
268:10,17;270:7;
271:1,20;272:5;
273:22;274:9,16;
278:11;283:13,20;
284:18;285:20;
286:21;290:14,22;
291:1,14,18;292:10;
293:1,15;294:13,23;
295:9;296:17;297:5,
10,19;298:9;299:1,
12,19;300:9,23;
301:2,7,16

**MOST (3)**
168:5;230:19;
231:4

**MOTION (1)**
290:11

**MOTO (1)**
201:20

**MOTOHIKO (9)**
47:13;50:7;85:24;
185:20;188:14;
208:9;214:24;
215:22;259:10

**MOU (23)**
57:11;58:20,23;
177:25;184:1,19,20;
186:5;202:25;203:9,
13,21,24,25;204:11;
205:15,24;207:20;
217:15;218:3,6,22;
219:5

**MOVE (2)**
25:18;292:4

**MOVED (1)**
290:6

**MOVING (2)**
282:23;283:7

**MUCH (21)**
63:19;85:25;86:1;
92:12;112:8;114:4;
116:21;125:9;
140:21;142:13;
154:10;159:16;
169:10;206:16;
208:12,12;244:15;
268:16,17;269:1;
297:6

**MULTILEVEL (10)**

13:25;117:15,18,
22;118:2;134:15,15,
17,19;135:14

**MULTILEVELS (1)**
118:15

**MULTIPLE (6)**
45:3;249:6;
262:15,16,19;291:6

**MUST (1)**
139:20

**MYSELF (3)**
139:20;211:20,21

**N**

**NAKANO (3)**
53:24;54:1;78:19

**NAME (16)**
6:16,17;15:4,10;
50:12;81:11;136:9;
146:24;181:8;
187:23;223:14,15;
226:3;232:3;241:11;
246:17

**NAMED (3)**
53:24;101:12;
143:19

**NAMES (4)**
47:8,13;54:8;
231:13

**NATIVE (1)**
10:12

**NATURAL (2)**
45:4;198:10

**NATURE (1)**
132:14

**NECESSARY (1)**
203:13

**NEED (13)**
8:17;10:14,16;
12:20;13:10;63:8,
15;154:11;174:18;
195:23;196:14,17;
260:6

**NEEDED (3)**
60:18;135:6;
262:16

**NEGATIVE (1)**
196:19

**NERVOUS (1)**
16:3

**NET (1)**
168:6

**NEW (29)**
5:6;11:18;20:12,
16;132:20,23;
133:11,12;134:10,
12;135:5,9,12,19;
136:17;159:21;
165:10;175:13;
196:1,19;197:4;
248:2;249:18;252:5;
260:16;261:1,10,18,

19

**NEWS (2)**
118:3,5

**NEXT (13)**
6:1;103:7;169:24;
170:15;206:1;
215:17;219:15;
222:6;249:8;257:7;
261:1;273:7;289:4

**NICE (1)**
150:14

**NICKNAME (2)**
6:21;223:13

**NIGHT (1)**
202:23

**NINE (1)**
26:3

**NOBODY (1)**
208:15

**NODDING (1)**
98:23

**NOKINO (1)**
221:25

**NOMINATED (1)**
215:24

**NOMINEE (10)**
46:21,22;47:2;
114:14,15,19;226:1,
9;233:21;234:1

**NON-BINDING (1)**
218:5

**NONE (2)**
149:13,14

**NOR (1)**
208:9

**NOTE (1)**
256:3

**NOTED (1)**
291:8

**NOTES (1)**
255:13

**NOTICED (1)**
195:7

**NOTICES (1)**
14:23

**NULLITY (2)**
186:6,8

**NUMBER (8)**
5:3,6;68:5,10;
162:20;171:14;
184:2;201:18

**O**

**OATH (1)**
8:10

**OBJECT (3)**
7:21;291:2,6

**OBJECTION (110)**
9:25;22:17;35:5,
18;38:23;45:23;
51:25;55:9;60:14,
24;62:21;66:3;

67:13;78:25;81:23;
82:6;87:23;91:18;
101:1;109:14;
110:18;124:21;
131:4,22;133:8,23;
136:23;137:13,18;
150:23;153:11;
156:2;157:7;158:20;
159:2,8;160:24;
164:9;165:6;172:25;
173:12;178:8;
179:21;183:9;
184:11;186:1,14;
187:7;194:4;199:9;
202:4;204:13;
205:20;207:13;
211:18;217:13,21;
218:11,19;219:7;
223:22;227:5;
237:19;238:2,9,22;
239:24;242:9,16;
243:3,20;244:2;
245:10;247:8,16;
250:11;252:22;
253:7,13;254:9,18;
257:3;261:7,16;
270:7;271:1,20;
272:5;274:9,16;
278:11;283:13,20;
284:18;285:20;
290:14;292:10;
293:1,15;294:13,23;
295:9;296:17;297:5,
19;298:9;299:1,19;
300:9;301:7

**OBJECTIONS (1)**
7:18

**OBLIGATED (3)**
191:21;246:11,13

**OBLIGATION (2)**
170:4;245:7

**OBLIGATIONS (2)**
236:13;237:2

**OBTAIN (5)**
24:13,19;131:2;
203:15;266:25

**OBTAINED (5)**
24:21;80:20,21;
139:21;238:8

**OBTAINING (1)**
288:13

**OBVIOUSLY (1)**
141:11

**OCCASION (8)**
13:13;57:23,24;
58:9,9,25;59:1,7

**OCCASIONS (1)**
59:3

**OCCUR (1)**
58:14

**OCCURRED (2)**
178:2;255:14

**OCCURRING (2)**

59:18;299:11

**OFF (20)**
66:18;103:24;
154:20;178:6;
194:11;213:13,16;
230:24;235:14;
244:9;249:15,20,23;
250:7,8;251:1,2;
269:8;289:18;
301:18

**OFF' (1)**
175:1

**OFFENDED (1)**
265:7

**OFFERING (1)**
27:13

**OFFICE (7)**
129:21;142:9;
144:13,22,23,24,25

**OFFICER (5)**
52:20,23;66:2;
90:15;225:21

**OFFICERS (4)**
106:8;195:14;
199:2,8

**OFFICES (2)**
129:19;130:12

**OFFICIAL (2)**
7:14;130:5

**OFFSHORE (2)**
213:19;214:4

**OH! (2)**
79:25;149:4

**OLD (1)**
5:10

**ONCE (5)**
117:8,9;191:23;
249:5;262:21

**ONE (78)**
15:15,23;20:4;
28:4;43:9,13,19,20,
21;53:23;57:9,23,24;
58:8,25;71:25;79:7,
11;80:19;81:25;
82:2,15;86:5,11,14;
100:14;102:13,14;
103:9;104:20,24;
105:17,18;108:21;
116:22,23,24;117:1;
121:1;135:14,17,21;
138:22,23;139:5;
147:10,15,16;
157:17;162:22;
163:21;166:19;
167:23;174:17;
175:9;182:2;184:20;
191:18;193:2,10;
200:13;206:14,17;
216:1;221:3,13,17;
225:2;252:24;
256:13;260:15;
276:4;281:10;
285:12;286:7,7,10;

291:3

**ONEDRIVE (1)**
82:13

**ONE-LEVEL (1)**
135:13

**ONES (2)**
111:2;294:19

**ONGOING (5)**
37:9;39:3,6,13;
62:9

**ONLINE (5)**
99:5,6,9;136:16;
137:17

**ONLY (11)**
7:24;17:16;41:2;
113:20;114:12;
121:6;195:17;
209:25;249:5;
299:17;301:5

**ONTARIO (1)**
23:25

**ONWARDS (2)**
151:21;228:2

**OPEN (4)**
75:24;184:23;
234:16,18

**OPENED (2)**
235:4,5

**OPENING (2)**
71:8;185:1

**OPERATED (1)**
216:11

**OPERATION (1)**
33:23

**OPERATIONAL (2)**
234:20;259:6

**OPERATIONS (1)**
33:25

**OPINION (6)**
169:11;265:2,8,
24;266:4,25

**OPTIONS (1)**
124:23

**ORAL (3)**
201:9;219:17;
220:16

**ORDER (9)**
18:19;28:14;
80:22;81:2;82:25;
83:8;123:9;133:14;
137:17

**ORDERS (3)**
137:12,23,24

**ORDINARY (1)**
140:10

**ORGANISED (1)**
91:14

**ORGANISING (1)**
29:7

**ORIGINAL (3)**
202:21;250:1;
300:20

**ORIGINALLY (5)**

34:15,20;75:16;
126:22;293:19

**OTHERS (2)**
53:16;121:22

**OTHERWISE (2)**
8:4;240:2

**OUT (21)**
16:21;46:11;
48:16;150:1;164:15;
167:13;169:5;
197:10,16;224:22;
234:6;236:13;237:1;
241:2;250:1;252:21;
253:1;281:21;282:5,
7,9

**OUTRAGEOUS (2)**
282:21;283:6

**OUTS (1)**
197:18

**OUTSET (1)**
37:7

**OUTSIDE (5)**
145:4;146:19;
265:9,24;266:5

**OUTSOURCE (1)**
138:8

**OUTSOURCED (6)**
138:5,6;144:8,9;
145:4,16

**OUTSTANDING (2)**
246:9,24

**OVER (29)**
28:11;48:5,14,18;
79:8;84:11;92:23;
107:6;115:14;
123:20;156:7;
167:13;171:12;
189:3;195:5,19;
201:7;219:16;
223:12;237:16,24;
238:15,20;239:9,21;
247:15;257:14;
284:9;292:24

**OVERALL (1)**
182:22

**OVER-ARCHING (1)**
174:25

**OVERHEAD (1)**
195:24

**OVERLAP (2)**
49:3;94:19

**OWE (1)**
288:6

**OWED (1)**
244:15

**OWING (2)**
244:10;245:4

**OWN (25)**
12:9;35:9;46:7;
65:20,23;80:17;85:9,
11;88:12;89:1;91:6,
6;96:14;100:4;
121:18;144:13;

145:2,15;150:22,25;
168:7;198:19,23;
234:24;235:7

**OWNED (12)**
65:17;142:1,2;
192:10,12;215:3;
233:17;234:11;
246:19,22;263:5;
285:1

**OWNER (5)**
54:15;184:6,10;
215:1,25

**OWNERSHIP (16)**
37:19;86:21;
168:2;182:25;183:2,
2,22;184:3;192:13;
203:4;204:22;205:5,
16,23,25;247:15

**OWNS (5)**
86:7;184:8;
215:10,10;245:20

**P**

**PACHULSKI (1)**
5:25

**PACKAGE (1)**
221:14

**PACKAGING (2)**
193:7,9

**PAGE (37)**
7:10;79:22;80:1;
160:9;162:18,23;
163:14;167:11,12,
12,14;171:7,9;
196:16;201:7;
204:23;214:10;
219:14,16,17;233:5;
249:8,9,11;255:23;
256:14;257:8,9;
258:11,22;260:8;
277:18,18,19,19,22;
283:3

**PAGES (2)**
221:11,17

**PAID (44)**
40:13;63:20;
95:14,16;108:25;
109:3,21;112:9,20;
113:6,9,10;114:4;
116:10;117:8;121:5,
6;124:4;127:23;
146:12;148:8,9,19,
21,24;149:2;152:12,
13;153:4;168:6;
190:21;227:14,25;
246:8,24;276:10;
279:20;294:10;
295:18;297:22;
298:1,2,3;300:7

**PARAGRAPH (13)**
80:15;111:22,24;
130:15,17;205:2;

213:4;233:5;256:2;
287:16,22;288:5;
289:5

**PARAGRAPHS (1)**
288:21

**PARDON (2)**
90:23;119:12

**PARENT (6)**
33:9;148:24;
164:17,24;217:2;
256:21

**PARENTHESIS (1)**
257:13

**PART (22)**
19:24;20:24;
38:16,20;73:18;
87:17;88:4;118:16;
120:7;121:11;
145:18;166:19;
182:10,22;193:21;
232:1;236:10,24;
260:16;293:18,18;
300:6

**PARTIALLY (3)**
298:1,2,3

**PARTICIPATE (1)**
132:21

**PARTICULAR (7)**
72:12;103:10,14;
124:16;141:6;197:1;
237:7

**PARTICULARLY (3)**
70:5;77:11;219:1

**PARTIES (11)**
5:17;119:8;
184:20;185:15,19;
201:3,15;202:1;
216:8;229:7;289:7

**PARTS (2)**
13:1;251:14

**PARTY (13)**
34:8,12;35:1,13;
36:16;37:14,18;
38:18;43:25;44:6;
81:7;245:19;296:5

**PASS (3)**
286:1,2;290:21

**PAST (2)**
80:25;141:2

**PAUL (6)**
232:3,7;241:17;
242:12;248:23;
259:1

**PAUSE (26)**
83:4;130:10;
139:19;140:7;166:9,
14,22;172:1;187:11;
194:19;221:18;
240:19;248:16;
258:10,13;261:2;
264:8;265:19;
269:16;270:21;
272:7;277:19;281:8;

285:12;286:15;
287:1

**PAY (39)**
60:7,11;61:10,12,
16,23;62:1;64:9;
85:25;86:2;87:3,6;
95:5,25;125:1,2;
143:3;151:11,18;
152:1,19;153:18,23;
197:17;229:22;
230:2,7,10;236:13;
237:1;244:6;246:13;
247:1,6;248:10;
261:6;287:18;292:7,
22

**PAYABLE (1)**
293:12

**PAYING (11)**
14:16;35:25;36:7,
8;128:9;146:5,6,8;
292:25;293:23;
294:2

**PAYMENT (61)**
61:6,7,24;63:4,7,
12;126:13,16;
138:10;142:22,24;
148:12;193:11,18;
229:14,18,22;230:1,
4,6,11;231:3,4,7,14,
24;234:7;235:21;
236:2;241:2,3,9,24;
246:12;247:24;
248:1;261:5,24;
262:11;263:4;
281:14,18;287:17;
288:24;290:8;292:4;
294:6,12;295:18,21,
24;296:4;299:8,17;
300:7,8,13,21,22;
301:4,12

**PAYMENTS (60)**
61:23;62:15;64:2,
18,21,24;66:9;
124:19;125:11,13,
14,16,21,24;127:3,4;
128:3;137:21;143:5;
151:21;203:2;
228:25;230:2;234:7;
243:15;244:7,10;
245:9,17;287:9,11;
288:13;289:2,6,9,10;
292:7,15,20,23,25;
293:10,11,12,14,24;
294:3,7,18;295:5,7,
14,16;296:1,2,7,9;
297:17,17;298:7

**PAYROLL (1)**
145:2

**PAYS (1)**
228:1

**PAY'S (2)**
61:21,22

**PENALTY (1)**

80:7

**PENDING (2)**
152:24;221:1

**PENG (57)**
10:4;12:4;32:25;
33:3;45:9;53:13;
86:9;111:4;141:14;
142:2;148:23;
163:21;164:2,17,24;
168:3;169:23;170:3;
171:24;172:3,10,18,
22,22;175:2,11,25;
176:5,14,15;177:1,1;
178:7,14,16,21;
179:4;180:2,11,21;
181:2,5,6,18;182:1;
183:24;184:9,10;
185:24;186:12,21;
201:20,22;245:12;
256:5,20;257:25

**PENG' (1)**
172:10

**PENG'S (1)**
169:22

**PEOPLE (23)**
13:13;28:7;45:2;
62:5;78:21,24;79:2;
118:24;119:2,9;
120:1,20,23;122:25;
128:21,23;129:9;
162:7,9;170:11;
195:8,12;197:21

**PEOPLE'S (1)**
273:16

**PER (5)**
92:17,18;114:9,
10;226:24

**PERCENT (1)**
140:14

**PERCENTAGE (8)**
87:7;140:24;
171:18,20;172:13;
183:1;280:11,17

**PERFECT (2)**
138:15;233:3

**PERFORMANCE (2)**
195:5,20

**PERFORMANCES (1)**
198:12

**PERHAPS (1)**
291:16

**PERIOD (74)**
32:5;34:24;41:10,
13;43:12;48:4,23;
50:22;52:6;53:13;
54:10;57:6;59:13,15,
19,21;66:4,6;71:17;
92:14,23;94:8;
101:23;102:12,13;
107:6,15;110:5;
111:11;113:17;
123:21;124:8,11,13,
16;125:25;126:1,3,5,

8,19,20;128:5;
142:11;143:10;
144:21;147:3;
149:10;150:7;151:4;
156:11,13;157:3,13,
16,21;170:10;
178:23;181:21,22;
190:13,25;197:3,6,
11;208:19;209:4;
212:18;236:20,21;
237:3,8;272:8;
281:19

**PERIODICAL (4)**
156:17,22,24;
158:10

**PERIODICALLY (1)**
158:4

**PERIODS (2)**
156:15;157:1

**PERJURY (2)**
80:7,12

**PERMITS (3)**
172:22,23;173:6

**PERSON (9)**
53:24;68:13;
105:17;135:20,20;
157:17;162:7;
252:14;274:12

**PERSONAL (5)**
9:23;44:22;
115:22;121:18;
208:12

**PERSONALLY (16)**
14:19;28:20;45:8;
80:20,22;103:14;
113:10,11,12;
151:16,19;176:6;
178:18;232:5;
238:15;252:18

**PERSONS (1)**
136:4

**PERSPECTIVE (1)**
213:2

**PET (1)**
215:15

**PHONE (8)**
54:25;55:1,14;
56:9,10;79:5;82:8;
284:10

**PHRASED (1)**
10:22

**PHYSICAL (2)**
167:12,12

**PHYSICALLY (2)**
128:24;136:15

**PICK (2)**
103:22;182:21

**PILLSBURY (2)**
5:10,20

**PING (1)**
154:18

**PINTARELLI (1)**
5:21

**PITTMAN (2)**
5:10,21

**PLACE (8)**
3:4;69:6;203:7;
206:4;228:10,19;
229:6;230:14

**PLACES (1)**
291:17

**PLANET (35)**
61:24;138:10;
229:14,18,22;230:1,
4,6,11;231:3,7;
234:6;235:21;236:2;
241:2,2,9,24;247:24;
248:1;261:5,24;
262:11;263:4;290:8;
292:4;299:7,17;
300:7,8,12,21,22;
301:4,12

**PLANET_002385 (1)**
258:23

**PLANNING (3)**
9:14;93:20;287:18

**PLANS (2)**
93:13,13

**PLATFORM (1)**
81:12

**PLAY (1)**
197:16

**PLEASE (50)**
6:8,15;7:3;8:18;
10:18,22;21:6;36:14,
21;38:7;53:18;57:8;
70:14;80:20;81:16;
82:11;119:7;123:3;
135:16;138:20;
140:5;149:23;
150:18;156:12,14;
164:12,16;165:6;
182:18;203:15;
206:10;210:10;
211:20;214:10;
223:8;226:25;
227:12;229:25;
231:1;232:16;
235:25;248:22;
250:6,25;255:17;
271:18;277:11;
281:1;295:20;
297:11

**PLUGGED (1)**
50:25

**PLUS (6)**
139:14;140:14;
164:17;171:18;
172:13;208:14

**PM (14)**
104:1,3;154:22,
22;194:13,13;
206:12;235:16,16;
269:10,10;289:20,
20;301:19

**POINT (26)**

8:19;17:24;29:20;
61:25;62:20;111:16;
125:5;131:8;132:25;
133:2,19;143:7;
164:13;167:17,18;
186:11;208:8;
223:20;232:23;
243:1,9;256:14;
259:23;286:25;
292:15;296:2

**POINTS (3)**
123:14;266:9,20

**POLETTI (4)**
167:21,25;174:7;
202:19

**POLICE (4)**
129:17;130:18;
131:2,9

**POLLETTI (1)**
167:19

**POLYTECHNIC (1)**
23:14

**POSED (1)**
8:1

**POSITION (35)**
32:1;39:16;41:1,2;
42:1,4,8;43:3,25;
48:11,14;52:4,14;
53:14;54:4;86:25;
89:21;90:12;110:8,
8;168:1,15,16,18;
169:9;179:8;203:20;
207:12;272:15;
283:12,19;298:14,
18,19;300:3

**POSITIONS (16)**
40:16,17;41:8,14;
44:5;53:3,6,11;66:2;
90:15;94:20;163:3,
17,21,23;225:2

**POSSESSION (4)**
237:9,18;238:1;
239:23

**POSSIBLE (4)**
44:25;102:25;
103:3;185:1

**POSSIBLY (3)**
42:19;75:8;257:5

**POST (4)**
23:6,11;24:14,24

**POTENTIAL (4)**
18:20;45:7;49:18,
22

**POTENTIALLY (1)**
289:6

**PP (1)**
299:16

**PR (1)**
111:8

**PRACTICE (1)**
12:9

**PRC (49)**
13:20;14:4,6,14,

17;37:9;38:3,16,21;
39:4,7,14;44:2;
61:16,20,22;67:5,12;
111:9;127:5,9,19,20;
128:13,15,17,21,22,
23;131:14,21;132:4,
15;134:16;179:20;
180:3,12,21;181:9,
20;185:25;186:13;
187:6;230:10,18;
231:14;298:15,21;
299:5

**PRECISE (2)**
17:25;41:5

**PREFER (2)**
8:4;58:11

**PRELIMINARY (3)**
8:14;166:20;
184:25

**PREP (1)**
21:2

**PREPARATION (9)**
11:10,21;20:15,
24;22:3;79:19;
83:18;84:9;89:11

**PREPARE (16)**
11:11,13;28:18;
81:2;82:25;83:8,23;
84:12;89:6;149:16;
150:21,25;264:16;
265:11;278:21;
279:16

**PREPARED (13)**
84:14,16,18;
184:25;265:6,19;
267:5,24;275:9,16,
23;278:9,25

**PREPARING (7)**
20:11;153:20;
157:4,18,25;158:2;
279:11

**PRESENT (9)**
5:17;11:20,24;
88:16;102:21,23;
158:18;161:24;
216:7

**PRESENTATION (12)**
161:4,20,25;
162:2;165:4,5,15;
177:18;252:10;
255:14;256:9,24

**PRESENTATIONS (3)**
236:25;237:10;
238:7

**PRESENTED (1)**
180:24

**PRESENTING (2)**
164:22,23

**PRESERVE (1)**
291:5

**PRESERVED (1)**
7:19

**PRESIDENT (6)**

43:7,9,13,19;
106:10;257:23
**PRESUMABLY (1)**
294:11
**PRETTY (2)**
112:9;130:9
**PREVENT (2)**
291:4;292:25
**PREVIOUS (4)**
75:1;77:10,13;
108:14
**PREVIOUSLY (13)**
55:24;56:5;67:3;
79:18;160:10;
174:24;177:23;
201:13;207:3;
236:16;245:22;
261:4;295:6
**PRICE (2)**
140:9,12
**PRICING (9)**
139:10,25;140:15,
16;141:4,6;189:4,8;
190:16
**PRIOR (29)**
44:8;97:20,24;
98:3;117:14,15;
135:11;142:14,14;
147:25;149:7,14;
151:21;154:3;
162:10,15;163:4;
164:6;200:7;214:22;
228:8,16;229:1,4,11;
250:24;252:17;
256:10;287:12
**PRIVILEGE (1)**
8:2
**PROBABLY (24)**
28:11;31:1;43:18;
49:13;51:18;54:16;
55:1,21;56:17;68:6;
71:6;84:11;94:1;
107:18;112:1;115:4,
10;116:25;169:17;
182:7;213:6;230:19;
243:8;292:4
**PROCEDURE (4)**
208:22;209:1,3;
212:22
**PROCEED (2)**
6:9;279:7
**PROCEEDING (6)**
75:20,21,23;85:6;
248:5;287:17
**PROCEEDINGS (15)**
21:10,10,11,19;
71:8,14;75:14;76:11,
22,23;147:23;
200:19,19,23;238:17
**PROCESS (11)**
61:23;119:9;
137:12,17,21;
151:20;181:16;

229:22;230:2,7;
231:19
**PROCESSES (1)**
231:24
**PROCESSING (16)**
61:6,7,9,16,20,22;
63:4,7,12;77:14;
228:25;236:1;241:1;
260:18,25;261:6
**PROCESSORS (1)**
231:14
**PROCUREMENT (6)**
279:13,19,20,24,
25;280:6
**PRODUCT (36)**
37:2;118:25;
119:3,18;120:8,21;
121:10,17,17,17,25;
122:2,6,7,9,11,11;
135:19,20;136:5;
137:17;172:15;
181:2,2,5,8,13;
186:13,23;189:21,
24;190:22;197:4;
216:16;220:10;
254:12
**PRODUCTS (34)**
14:3,6;37:1;
118:14;121:7,8,13,
15,21;139:9,9;
171:17,19;173:7;
176:16;177:2;
179:18,19;180:3,11,
11,20,21;181:19,20;
185:25;186:22;
187:5;196:1;207:8;
213:20;217:11;
256:5,6
**PRODUCTS! (1)**
257:25
**PROFESSIONAL (2)**
139:4;145:18
**PROFIT (2)**
153:10;279:11
**PROFITS (6)**
153:15;169:22;
226:18;298:15,20,24
**PROGRAM (4)**
164:19,20,21;
257:14
**PROGRAMME (4)**
123:4,5,6;163:10
**PROGRAMMES (1)**
164:25
**PROJECT (2)**
282:23;283:7
**PROMOTE (1)**
196:1
**PROMPT (1)**
174:18
**PRONOUNCED (1)**
47:15
**PRONOUNCING (1)**

224:16
**PROPER (2)**
288:13;289:5
**PROPERTY (1)**
201:24
**PROPOSED (4)**
177:15;178:14,15,
20
**PROSECUTION (2)**
18:20;132:13
**PROSECUTIONS (1)**
62:8
**PROSPECTIVE (1)**
160:23
**PROTECTING (1)**
100:22
**PROVED (1)**
175:3
**PROVIDE (14)**
12:14;27:1,6;91:8;
96:24;97:5;164:19,
25;191:8;225:11,14;
239:16;241:23;
257:24
**PROVIDED (5)**
92:3;191:11;
198:22;237:8;
254:13
**PROVIDER (13)**
34:8;81:8,13;
140:9;142:22,24;
230:20;231:4;
295:19,21,24;296:5,
16
**PROVIDERS (12)**
35:14;36:7,9,11;
37:15;38:19;44:1,6;
231:6,10,17;296:15
**PROVIDER'S (1)**
140:10
**PROVIDES (2)**
219:13;276:3
**PROVIDING (33)**
12:4;13:3;27:8,17,
23;28:1,13,24;29:1,
5;30:11;32:25;
33:12,17,21;34:13;
35:23;40:13;44:13;
91:11;92:24;93:5,6,
18,19;191:19;193:5;
216:16,20,23;
226:21;227:2,10
**PROVISIONAL (1)**
75:17
**PSCJ (1)**
11:22
**PSP (1)**
164:19
**PTE (51)**
17:21;18:3,4;
33:10;46:10,17,18;
47:2;57:19;109:23,
24;110:1,5,9,24;

111:4,13;112:3;
114:3,4,23;142:5;
146:6,7,12;149:4;
151:21;152:6;153:9,
10,16;215:10;
228:11;232:15,17;
233:12,24;234:4,22,
24;235:7,22;241:14,
23;245:20;246:17,
18,21;261:10,12;
263:7
**PUBLIC (1)**
27:13
**PUBLICLY (1)**
168:11
**PURCHASE (3)**
122:25;149:14;
211:17
**PURCHASED (4)**
190:17;215:6;
259:21,25
**PURCHASES (1)**
123:17
**PURCHASING (3)**
189:21,23;214:21
**PURPOSE (6)**
168:23;202:24;
266:13,15,21;267:2
**PURPOSES (3)**
85:5;108:7;184:23
**PURSUANT (6)**
185:24;189:5,8;
190:22;191:20;
207:7
**PURSUING (1)**
175:7
**PUT (23)**
75:13;81:25;
140:22;170:14;
173:17;202:10;
204:17;207:2;
208:15;220:21;
221:15;248:12;
258:4;260:2;262:3;
264:4;277:7;281:1,
20;286:2;296:1,15;
302:8
**PYRAMID (3)**
13:22,24,25

**Q**

**QUALITY (2)**
3:18,19
**QUARTER (3)**
102:13;156:23,25
**QUARTERLY (5)**
157:14;158:10;
236:9,18;237:10
**QUICK (4)**
66:16;268:12;
289:15;291:11
**QUICKLY (1)**

194:6
**QUIT (2)**
282:24;283:8
**QUITE (3)**
123:12;152:21;
221:17
**QUOTES (1)**
196:24

**R**

**RACING (1)**
224:19
**RADIAL (14)**
42:6,9,19;90:19,
24;138:24,25;139:1,
2,3,8;145:20,21;
201:16
**RAIDED (4)**
129:16,20;130:10,
13
**RAISE (2)**
100:12;208:4
**RAISED (2)**
15:4;274:6
**RAISING (1)**
124:23
**RANDOM (1)**
210:17
**RANGE (3)**
107:5,9;114:11
**RATHER (1)**
93:15
**RE (1)**
5:4
**REACH (2)**
123:9;252:20
**REACHED (1)**
241:2
**REACHING (1)**
253:1
**REACTION (1)**
64:8
**REACTIVATE (1)**
196:20
**READ (17)**
7:2;11:1,2;84:24;
164:15;165:18;
166:12,15;169:24;
171:25;174:23;
221:4;232:25;
271:13;272:7;
286:14;302:4
**READING (6)**
166:10,21;174:20,
22;265:17,22
**READY (1)**
277:21
**REAL (1)**
35:13
**REALISED (1)**
87:8
**REALLY (15)**

7:24;102:15;
104:25;141:5,8;
168:5;175:24;176:4;
177:21;208:15;
260:6;269:1;277:17;
297:8,15
**RE-ASK (1)**
41:3
**REASON (4)**
86:17;179:10;
248:19;261:21
**REASONABLE (3)**
89:2;288:25;289:2
**REASONS (2)**
175:3;208:3
**RE-BRAND (1)**
180:2
**RE-BRANDED (1)**
179:19
**RE-BRANDING (6)**
179:17;180:5,10,
20;181:1,18
**RECALL (84)**
11:20;13:15;17:2;
21:1,24;29:11,15;
30:22;43:8;49:11;
50:2;53:10;54:21;
56:11;63:3,19;65:8,
17;67:5;68:23;69:5;
71:2,18;73:2;76:6;
82:23;83:6,14;
85:20;90:1;92:11;
94:23;99:8;102:9,16,
20,22;104:16;
105:10,14,16;107:1,
22;108:21;116:21;
123:24;124:18;
126:23;130:3;
139:10,25;145:25;
146:24;147:6;148:8,
21;177:17;178:5;
179:2,17,18;180:1;
181:17,23;188:20;
190:13,15;193:20;
194:1;196:23;
197:11;199:13;
207:4;226:5,7,22;
231:15;232:7;
248:25;252:2;287:4,
21;297:9,16
**RECEIVE (20)**
15:1;36:25;66:9;
109:17;111:24;
113:14,25;116:18;
117:11;118:16;
127:20;135:14;
156:21;165:11;
199:23;208:8;
229:17;262:10;
278:16;281:17
**RECEIVED (21)**
14:23;17:8;
108:22;113:20;

165:12;167:4;
188:25;194:24;
208:5;227:14,16,25;
234:8;236:11;
248:20;254:11;
258:19;264:13;
269:21;288:22;
301:12
**RECEIVING (9)**
17:2;40:8;95:2;
109:24;110:16;
112:13,17;115:14;
254:8
**RECENT (6)**
54:18;67:17,20;
70:24;115:11;
150:16
**RECENTLY (5)**
18:11;115:5,6;
199:20,21
**RECOGNISE (3)**
166:11;194:21;
240:21
**RECOLLECTION (3)**
18:13;172:11;
174:9
**RECOMMEND (1)**
243:13
**RECONVENE (2)**
66:17;154:19
**RECORD (26)**
5:2;6:16;7:14;
66:19,22;103:25;
104:3;154:21,24;
165:25;194:12,15;
207:1;235:15,18;
256:16;262:25;
268:20;269:9,12;
289:16,19,22;291:5;
301:18;302:7
**RECORDS (18)**
82:8;88:3,21;89:3,
9,14,16;90:9,19;
130:19;199:3;
237:17,25;238:4,18;
239:5,6,17
**RECRUIT (1)**
133:5
**RECRUITED (4)**
121:7;122:16,22;
123:1
**RECRUITING (1)**
121:5
**REDUCED (1)**
243:15
**REFER (7)**
37:1,18;42:22;
118:14;135:18;
160:3;171:7
**REFERENCE (1)**
58:22
**REFERENCED (4)**
44:1;115:1;177:4;

205:13
**REFERRAL (16)**
14:5;36:17,19,22,
23;37:1,3,10,12;
118:22,23;119:16;
135:15,17,21,25
**REFERRALS (15)**
14:9,11;118:15,18,
21,21,23,23;122:25;
123:17,18,19,20;
135:13;136:4
**REFERRED (7)**
37:4;62:7;112:1;
120:20;143:16;
187:17;239:4
**REFERRING (34)**
14:6;17:22;18:23;
29:17;32:5;41:10,
15;58:11;63:4;
106:2,3;108:1;
119:19;120:15;
130:15;134:22;
160:16;172:15;
187:19,22,23;205:8;
206:11;220:1,4;
237:12;240:4;
256:18;267:10;
282:13;285:19,22;
287:20,21
**REFERS (1)**
135:23
**REFINE (2)**
93:17;149:7
**REFLECT (1)**
265:4
**REFLECTING (1)**
299:14
**REFLECTION (1)**
283:18
**REGARD (2)**
6:25;8:23
**REGARDING (4)**
128:3;259:9;
266:18;279:5
**REGARDS (8)**
153:15;157:1;
222:8;223:10;286:8;
287:16,25;288:1
**REGISTER (10)**
36:24;120:6,6,24;
128:24;132:5,8,19;
136:20;181:8
**REGISTERED (2)**
119:20;120:2
**REGISTERING (3)**
119:17;136:14,16
**REGISTRATION (1)**
120:10
**REGISTRATIONS (1)**
196:19
**REGROUP (1)**
289:15
**REGULAR (2)**

156:1,4
**REIMBURSE (1)**
191:21
**REJOINED (1)**
213:8
**RE-LABELLED (1)**
181:4
**RE-LABELLING (1)**
181:18
**RELATED (19)**
12:5,15;13:3,24;
21:9;27:14;53:7;
62:4;100:18;132:15;
152:19;201:9;
219:18;220:17;
237:18;238:19;
239:14,18,23
**RELATING (3)**
81:19,20,21
**RELATION (3)**
291:12;295:23,25
**RELATIONS (1)**
144:10
**RELATIONSHIP (7)**
45:21;46:5;48:7;
121:11;216:8;
242:25;264:21
**RELATIONSHIPS (3)**
110:25;141:8;
229:6
**RELATIVELY (3)**
10:13;88:23;
156:17
**RELATIVITY (3)**
81:12,16;239:4
**RELAX (1)**
16:4
**RELIEVED (1)**
223:11
**RELINQUISHES (1)**
184:2
**RELY (1)**
256:7
**REMAIN (3)**
8:10;266:10;
298:19
**REMAINED (1)**
169:16
**REMAINING (1)**
273:10
**REMEMBER (170)**
16:15;17:5,6,10;
18:12;25:16;26:22;
29:13,20;30:2,8,13,
16;31:11,16;34:22;
42:10;43:2,12,14,22;
46:24;47:9;48:24;
50:6,16;52:13,15,17;
53:16;54:6;56:17;
59:11;62:3;63:17,18,
21;64:3,5,17;65:1,5,
16;68:5,16,18;71:5,
16;73:4;75:10;76:4,

14;77:20;81:11;
82:16,20,21;83:9,13,
20,21;85:18;88:5,25;
90:7,10,17,20,21,23;
92:15;93:1;97:8,10;
101:10,15,25;102:4,
14,24;104:19,20,24,
25;105:18;111:2,2,3;
114:6;116:19;117:3,
5,10;123:11,12;
124:11,12;129:11,
25;130:1;139:5,12;
141:21;144:4;146:3,
4,13;150:8;161:14;
167:1,2;172:12;
176:12;177:8,17,24;
180:24;181:14,25;
182:7;191:6,23;
192:1;194:22;195:4;
197:1,6,20;198:20,
25;199:15;207:9;
210:17;224:2,3;
226:3;229:3,13;
231:13,18;232:10;
237:5,6,7;238:25,25;
239:19;240:10,12,
13;241:25;242:4;
244:17,20,25;249:7;
258:18;261:24;
262:2;263:16;275:2,
24;277:6;278:18;
280:12,13;286:12;
294:21;297:22,25
**REMITTANCES (1)**
296:23
**REMITTED (1)**
296:20
**REMOVE (2)**
208:23;209:1
**RENAMED (2)**
164:18;256:21
**REPEAT (28)**
16:22;17:23;
20:14;25:24;27:3;
31:8;38:17;53:5;
63:10;68:1;83:4;
92:2;103:2;110:3;
157:9;172:1;173:2;
179:23;187:2;
218:14;228:14;
237:21;283:2,15;
293:25;295:11;
296:3;298:17
**REPEATED (1)**
284:9
**REPHRASE (17)**
10:23;15:19;
18:21;64:22;69:16;
71:10;72:5;132:17;
134:24;136:6;
137:25;176:22;
182:19;200:21;
203:22;210:4;

279:22

**REPLACE (1)**
271:23

**REPLY (4)**
99:18;206:22;
219:10;259:4

**REPOIRE (1)**
241:19

**REPORT (1)**
56:21

**REPORTER (8)**
3:13;5:14;6:8;
7:15;11:1;32:16;
110:2;291:22

**REPORTING (1)**
57:1

**REPORTS (4)**
13:22;153:20;
157:19;236:11

**REPRESENT (6)**
5:18,22;6:2,3,6;
10:3

**REPRESENTATION (1)**
287:3

**REPRESENTATIVE (1)**
142:9

**REPRESENTATIVES (1)**
14:3

**REPRESENTED (1)**
9:22

**REPRESENTING (2)**
9:23;270:5

**REQUEST (30)**
16:20,25;17:8;
58:1,13,17;59:8;
64:9,16;65:4;
241:22;265:7,19,21;
267:5,24;268:4;
270:13,16;271:15;
272:1,10,11,13,21,
22,25;273:5;282:21;
283:5

**REQUESTED (6)**
62:15;239:21;
265:11;267:11,19;
268:4

**REQUESTING (3)**
58:9;64:25;264:16

**REQUESTS (1)**
17:3

**REQUIRE (2)**
203:14;278:20

**REQUIRED (3)**
121:10;133:11;
203:1

**RESIDE (1)**
69:8

**RESIDENT (1)**
226:12

**RESIDING (1)**
40:20

**RESIG (1)**
270:13

**RESIGN (2)**
270:14;273:9

**RE-SIGN (5)**
251:8,12,23;252:1,
7

**RESIGNATION (1)**
273:13

**RESIGNED (1)**
284:17

**RE-SIGNED (4)**
249:17;251:4,5,19

**RESOLUTION (1)**
282:12

**RESOLUTIONS (1)**
238:18

**RESOLVE (3)**
273:18,20;274:1

**RESOURCES (1)**
144:10

**RESPECT (7)**
12:14;19:23;78:5;
80:12;133:7;183:7;
226:18

**RESPECTFULLY (1)**
266:8

**RESPONSE (2)**
57:25;58:16

**RESPONSES (1)**
302:8

**RESPONSIBILITY (3)**
273:9,16;288:7

**RESPONSIBLE (20)**
14:13,16;35:25;
36:6,8,18;37:23;
45:12;67:10;100:9;
124:19;125:16,20,
23;126:12,15;127:3;
146:4;245:8,17

**REST (1)**
66:16

**RESTATE (1)**
47:5

**RESTRAIN (1)**
290:7

**RESTRAINT (2)**
290:12;292:3

**RESTRUCTURING (1)**
279:6

**RESULT (3)**
132:12;177:21;
289:9

**RESULTS (10)**
155:25;157:4,14;
236:22;265:3,4;
266:11;267:6,11,20

**RETAINED (1)**
15:12

**RETAINER (2)**
148:10,11

**RETAINING (2)**
175:24;176:4

**RETAINS (1)**
175:10

**RETURN (12)**
7:4;131:8,9;
152:16;159:14;
203:6,11;206:3;
214:23;215:2,18;
217:10

**RETURNED (4)**
131:15;181:19;
207:11;214:18

**RETURNING (1)**
206:23

**RETURNS (4)**
152:2,10;154:4;
158:25

**REVENUE (7)**
139:21,23;153:21;
171:20;197:7;
198:11;285:13

**REVENUES (2)**
195:25;242:13

**REVERSE (2)**
196:18;249:9

**REVIEW (12)**
22:2;84:5;89:9;
155:25;156:21;
157:5,19;158:3;
236:22;260:7;
296:21;298:5

**REVIEWED (11)**
79:19;81:1;82:24;
83:7,15,23;89:5;
103:19;104:13;
157:13;177:23

**REVIEWING (1)**
258:12

**REWARD (1)**
123:6

**RID (1)**
136:9

**RIEGELS (2)**
3:2;6:5

**RIGHT (39)**
7:11;10:9;17:11;
19:17;46:25;51:14;
75:22;80:16;112:10;
120:12;124:24;
126:13;128:17;
139:6;148:2;159:19;
160:8;163:15;
169:21;170:15;
174:12;178:2;186:6,
12;205:17;207:5;
221:21;257:12;
258:23;260:18;
293:8;294:18;295:7,
25;296:5,5;299:16;
300:7,18

**RIGHT-HAND (2)**
255:24;258:12

**RIGHTS (5)**
175:12,25;176:5,
15;177:1

**RING (1)**

139:14

**RISK (8)**
44:22,25;45:7,11;
86:16;179:13;
208:12;262:17

**RISKS (8)**
13:10,12;19:4;
45:5;87:20;115:22;
175:6;208:13

**ROBINSON (5)**
72:20,23;73:3,6,8

**ROLE (24)**
46:14;48:3,5;
61:19,21,22;93:23;
97:12;101:16;
105:21;110:7;113:6;
119:13,24;138:25;
139:3;143:1,6,25;
144:3;163:21;
223:21;224:1;
295:22

**ROLES (2)**
52:17;119:7

**ROOM (1)**
66:16

**ROUGHLY (19)**
41:6;49:11;51:13;
54:11;62:15;63:24;
66:15;93:25;94:3;
106:25;107:8,9;
116:21;117:3,8;
126:7;130:1;147:22;
244:18

**ROUND (1)**
117:4

**ROYALTY (1)**
171:20

**RULES (1)**
6:24

**RUN (2)**
194:6;288:7

**RUNNING (3)**
14:21;191:18;
198:21

**RYAN (1)**
105:19

**RYU (3)**
223:11,12,13

**RYU@TIRAWORKS (1)**
195:2

**RYU@TIRAWORKSCOM (1)**
167:8

**RYUNOSUKE (6)**
5:3;6:10,17,18;
302:3,16

**RYU'S (2)**
223:17;265:6

---

**S**

---

**SAFELY (6)**
13:4,5,7,11;18:18,
22

**SALARY (7)**
95:6,17;109:24;
110:16;111:25;
113:20,25

**SALE (6)**
175:2;179:19;
180:3,11,21;181:2

**SALES (3)**
153:6;257:23;
285:6

**SALESPEOPLE (1)**
120:18

**SAME (14)**
43:20;46:17;50:9,
10;51:1;89:7;94:15;
163:14;178:3;188:1;
276:10;284:7;287:4;
291:7

**SAN (1)**
267:23

**SANDERS (21)**
50:12,15;51:13,17,
24;52:14;53:6;
78:16;158:1;195:14,
16;199:6;202:15;
203:19;208:9;214:4;
234:12;264:24;
265:11;266:18;
268:10

**SATED (1)**
253:21

**SATISFY (2)**
280:10,16

**SAVINGS (2)**
18:6;290:17

**SAW (11)**
141:5;156:17;
184:16;199:24,24;
200:1,1,3;212:13,15,
16

**SAYING (18)**
64:14;70:17;
73:19;74:17,24;
75:2;127:8;169:21;
195:23;217:18;
242:24;256:25;
267:23;271:9,22;
285:11,13;297:21

**SCENARIO (1)**
293:5

**SCHEDULE (1)**
9:15

**SCHOOL (8)**
22:22,23,25;23:1,
18,23,25;24:2

**SCRUTINY (2)**
242:14,22

**SCUDERIA (18)**
224:14,19;225:8,
16;226:6,15,20;
227:1,3,9;228:17;
229:5,12,17;234:21;
296:19,21;298:4

**SEAN (4)**
11:23,25;12:2,3
**SEATTLE (2)**
23:13,15,15;24:3
**SECOND (13)**
160:8;167:11,11,
12;171:9;196:16;
205:3;208:6,13;
221:3;255:18;256:1;
285:12
**SEEK (2)**
265:8;266:4
**SEEKING (2)**
19:1;287:9
**SEEM (1)**
300:20
**SEEMS (2)**
175:8;208:19
**SEIZED (1)**
130:18
**SELF (1)**
100:16
**SELF-DEALING (2)**
100:15,17
**SELL (12)**
121:21;173:7;
185:25;186:12;
187:5;197:5;201:21;
207:8;225:3;251:21;
274:4,12
**SELLING (8)**
13:23,24,25;14:3;
119:3;181:19;
273:24;282:10
**SEND (5)**
7:6,7;227:4;
243:17,24
**SENDING (2)**
286:12;287:4
**SENSE (5)**
156:23,25;198:13;
210:25;288:25
**SENT (4)**
124:2;184:22;
243:16;265:21
**SENTENCE (5)**
174:19;205:1,3;
206:1;288:11
**SEPARATE (30)**
34:25;45:20;46:4,
6,11;47:3;95:14,17;
96:10,12;97:15;
105:4;107:23;
111:25;112:6;113:5,
14;133:11,22;
134:10;142:8;
167:15;179:12;
198:18,24;202:25;
207:6;215:1;252:5;
284:13
**SEPARATELY (7)**
108:18;109:11,13;
122:15;128:15;

172:16;248:6
**SEPTEMBER (1)**
259:20
**SERVE (1)**
234:22
**SERVED (5)**
99:19;101:16,20;
105:14;174:2
**SERVICE (32)**
27:9;28:24;34:8;
36:7,16,17;37:14;
38:19;43:25;44:6;
59:23;60:2,8,13;
81:8,13;142:22,24;
143:4,13,14;229:9;
230:20;231:4,6,10;
295:19,21,24;296:4,
14,16
**SERVICES (62)**
5:13,15;12:13;
25:1,5;26:25;27:1,5,
16;28:13,15;29:4,5;
30:11;32:25;33:2,14,
15,17,21;34:12,14;
35:22,24;36:1,13,15;
40:13;91:9,9;92:4,7,
13,24;93:4,7,9,18;
95:1,3;96:1,25;97:6;
112:21;114:5;
117:12;139:4;
145:11,19;148:12;
191:9,22;195:25;
213:20;214:5;
225:12,14;226:21;
227:1,10,13;254:13
**SERVING (4)**
109:18,22;113:25;
116:16
**SET (15)**
38:2,4,6,15,20;
67:5;104:21,23;
134:9;140:15;
156:20;201:10;
215:15;219:18;
220:17
**SETTING (3)**
45:13,16;67:10
**SETTLEMENTS (1)**
231:20
**SETUP (2)**
259:5,11
**SEVEN (1)**
111:23
**SEVERAL (2)**
99:20;266:21
**SEVERANCE (1)**
287:17
**SEZC (12)**
10:4;12:4;53:13;
86:9;111:5;141:14,
16;142:2,23;144:16;
148:23;245:12
**SHALL (3)**

69:15;201:20;
229:15
**SHANG (58)**
10:4;12:3;32:25;
33:3;45:9;53:13;
86:9;111:4;141:14;
142:2;148:23;
163:21;164:2,17,24;
168:3;169:22,22;
170:2;171:24;172:3,
10,18,21,22;175:1,
11,25;176:5,14,15;
177:1,1;178:7,14,16,
21;179:4;180:2,11,
20;181:2,4,6,17;
182:1;183:24;184:9,
10;185:24;186:12,
21;201:20,22;
245:12;256:5,20;
257:24

'

**'SHANG (1)**
172:10

**S**

**SHANGHAI (2)**
18:6;290:17
**SHARE (10)**
276:4,11,14;
279:11,12,23,25;
298:15,20,23
**SHARED (1)**
222:1
**SHAREHOLDER (16)**
26:18;48:9,17,18;
88:17;91:23;96:7;
169:11;188:13;
196:12;208:20;
224:10;225:19;
228:5;272:15,17
**SHAREHOLDERS (30)**
100:10;102:17,20,
23;103:1,3,9;158:18;
168:25;169:12,13,
14,18;171:2;174:18;
185:8;188:5,9,12;
195:9,13;210:1;
222:18,20,20;
225:17;250:3,4,8;
288:23
**SHAREHOLDERS' (1)**
182:23
**SHAREHOLDING (1)**
250:15
**SHAREHOLDINGS (2)**
70:8,11
**SHARES (30)**
65:18,20,23;85:9,
11,13,19,23,25;86:2;
142:14;183:7,24;

259:8,9,14,22;
270:17;271:8,10,11,
15;272:2,12;273:24;
274:5,20,22;282:10;
285:1
**SHARING (1)**
226:18
**SHAW (2)**
5:10,21
**SHED (1)**
39:17
**SHENGYING (2)**
174:11,12
**SHOCKED (2)**
64:11,12
**SHORT (12)**
9:11;48:23;66:20;
103:21;104:1;
154:22;194:13;
223:15;235:12,16;
269:10;289:20
**SHOW (17)**
79:13;166:7;
173:17;187:14;
194:18;199:18;
202:10;212:7;214:8;
220:22;248:15;
262:6;264:7;269:15;
275:4,7;281:4
**SHOWING (2)**
260:5;286:5
**SHOWN (6)**
20:23;21:2,8,15,
25;188:23
**SHUT (1)**
135:1
**SIC (1)**
203:14
**SIDE (3)**
87:6;182:4;249:9
**SIGN (5)**
7:3;128:21;
179:15;203:15;
252:7
**SIGNATURE (4)**
80:2;203:16;
214:12;260:11
**SIGNED (23)**
80:4,6;85:2;139:2;
170:23;173:8;
176:21;177:5,10;
179:6;185:8;206:21,
24;207:6;208:19,21;
209:3;210:1;213:25;
219:23;260:13;
286:8;302:15
**SIGNIFICANT (2)**
175:5;292:23
**SIGNING (2)**
84:24;229:11
**SIMILAR (1)**
256:6
**SIMPLER (1)**

210:9
**SIMPLY (2)**
204:17;300:24
**SINGAPORE (32)**
17:21;112:2;
113:1,16,21,22;
114:3,8,13;126:16,
25;142:5;143:8;
144:20,23;152:7,11,
13,17;153:15,19;
226:7,8;231:15;
232:15;235:3;
241:13,14;259:5,6,
11;298:3
**SINGLE (1)**
293:5
**SITTING (2)**
99:11;300:12
**SITUATION (12)**
156:8;212:5;
219:9;242:15;
281:20,21;282:5,8,9,
13;292:18;293:4
**SIX (2)**
74:23;268:23
**SIZE (1)**
231:23
**SKILL (1)**
42:13
**SLASHING (1)**
195:24
**SLIP (1)**
115:24
**SMALLER (1)**
127:19
**SMART (2)**
295:18,20
**SMITH (3)**
270:3,3,5
**SOFTWARE (2)**
171:19,20
**SOLD (19)**
86:10,14;87:14;
121:7;171:17,18,19;
181:8;182:3,3,4;
190:22;200:12;
216:23;221:25;
274:12,14,20,22
**SOLE (14)**
88:14,17,17;
91:23;96:7,8;140:18,
20;184:5,10;225:19,
21,23;233:19
**SOLELY (5)**
38:3;40:6,25;78:4;
143:7
**SOLICIT (1)**
251:8
**SOLVE (4)**
273:8,11,13,16
**SOMEBODY (4)**
135:23;208:16;
273:24;296:8

**SOMEONE (11)**
16:23;26:11;
50:12;53:24;55:24;
101:12;143:19;
163:9;232:3;282:22;
283:6
**SOMETIMES (3)**
107:7,7;156:20
**SOMEWHERE (11)**
51:16,20,22;76:8;
117:6;157:2;182:8;
209:15,16;244:19,24
**SOON (1)**
232:23
**SORRY (169)**
12:24;13:23;
15:18;16:1,15;
20:25;21:20;22:24;
24:2;25:2,24;26:6;
27:3;28:8;32:14;
33:13;34:15;39:5;
42:20;46:4;47:4,20;
50:19;51:12;55:17;
57:16;58:1,2,5;60:4,
6;64:5;65:22;68:1,9;
69:13,15,23;70:12,
16;71:9,10,22;73:1,
17;74:14;75:3;
79:23;81:10;82:18;
83:11;84:4,7;85:13;
86:1;95:20,21;96:3;
97:1;98:13,15;
101:17,18;102:14;
104:10;108:1;109:1;
110:2,4;111:3,10,18;
115:8;119:20;121:1;
122:4,18;126:17;
128:1;129:9;137:24;
138:19;139:5;146:3;
147:3,11;148:1,15;
149:18,24;150:8;
157:9,24;160:7,12;
166:15;171:11,25;
172:5;173:2;174:21;
176:22;178:10;
180:13,15,16;
181:25;182:19;
185:18;186:7;187:2;
191:6,23;193:1;
198:2;199:23;
204:15;205:1;208:7;
210:8;211:6;215:4,
14;217:20,23;218:5,
13;219:25;220:2,3,
15;222:9;228:15;
230:23,25;233:20;
235:5;246:12;250:5;
251:2;254:20;255:6;
260:21;262:13;
268:21,23;269:4;
270:20;271:6;272:7;
273:23;275:13,17;
276:22;277:21;

279:21;282:15;
283:1,15;285:12;
286:21;290:22;
293:25;295:3,11;
296:3;297:21;
298:17;300:16
**SORT (1)**
36:5
**SOUGHT (2)**
200:19;265:24
**SOURCE (3)**
82:4;99:8;250:2
**SOUTH (4)**
3:5;162:8,11;
164:6
**SOUTHERN (1)**
5:5
**SP (2)**
57:13;168:2
**SPACE (1)**
144:14
**SPARKLING (1)**
58:10
**SPEAK (10)**
54:24;77:16;
102:2;176:10;
178:19;231:6,10,12,
14;283:24
**SPEAKING (6)**
28:8,10,21;51:2;
64:1;102:8
**SPECIAL (5)**
141:18;266:13,15,
20;267:2
**SPECIALISE (1)**
19:19
**SPECIALISED (1)**
19:20
**SPECIALITY (1)**
24:8
**SPECIFIC (7)**
82:23;83:6,14;
106:12;111:10;
125:10;209:4
**SPECIFICALLY (2)**
21:7;58:22
**SPECIFIED (1)**
272:8
**SPECIFY (9)**
48:4;52:6;113:17;
147:3,5;228:12;
237:3;257:9;260:17
**SPG (1)**
203:10
**SPGK (376)**
6:3,6,9;24:10;5,8;
12:14,16,18;13:1,9,
12,13,14;14:3,3,6,8,
10,12,16;15:3,14;
16:7,12;17:13,19,20,
21;18:1,1,3,18,19,
23;19:2,24;20:3;
33:18,22,24;34:1,13;

35:3,9,25;36:3,5,8,
10,24,25;37:19,23;
38:6,13;40:10,13;
44:5,9,13;45:1,2,6,
20;46:4,8,10,10,11,
13,15,17,18,18;47:2;
53:8,15;57:3,10,18,
18,19,21;58:14;59:8;
60:6,7,7,11,12,17,21;
61:3,5,8;62:16;
65:18,21,24;66:2,9;
70:22;78:9;81:20;
86:7,10,14,22,25;
87:4,8,11,14,17;
88:1;89:6,10;97:6;
109:9,12,18,20,22,
23,24;110:5,9,24;
111:4,13;112:2,24;
113:24;114:4,12;
115:15;116:11;
125:6;134:22;
135:19;136:14,20,
21;137:4,6,8,11,16,
20;138:3,8;139:2;
140:18,20;141:8,10,
12,21;142:8,19,21,
23;143:1,4;144:6,9,
13,16;145:2,12,14;
146:6,7,12,16,19,21;
147:2,6,8,12,19;
148:25;149:4,6,11,
16;150:7,21;151:3,
11,14,24;152:6;
153:25;154:3,6;
155:5;160:17,22;
161:6;173:5,6;179:8,
14,17,19;180:2;
181:7,7;182:4,15;
183:2;186:21,25;
187:4,5;189:20,23;
191:4,9,21;192:20;
193:22;195:5,17,18,
20;196:8,10,12,18,
25;197:4,14;198:12,
14,23;199:1;203:12;
205:11;207:7,7;
208:11;215:3,7,10,
10,15,18;216:1,13,
16,16,20,24;217:3,
10;218:9,17;224:5,8,
11;225:12,14;
227:21;228:2,4,6,9,
11,11,17,18,22,24,
25;229:18,22;230:1,
4,6,22;231:4,9;
232:15,17;233:12,
15,24;234:4,8,9,10,
13,14,16;235:22,22;
236:1,7;239:12;
241:1,14,23;244:11;
245:18,20;246:2,8,
11,13,17,17,18,19,
21,22;249:12,18;

250:20,21;251:7,10,
19,22,23,25;252:20,
25;253:1,4,11;254:1,
17;255:2;259:24,24,
25;261:6,10;263:7;
264:22;265:3,4;
266:20;267:1,7,11,
20,25;268:5;270:16;
272:16,18;276:20,
23;279:12,12,23,25;
282:11;284:13;
285:2,22;290:6;
292:7;293:13,17,18;
299:9,18,21,24;
301:5,11
**SPGK'S (15)**
16:17;17:12;37:2;
38:3;63:4,7,11;
87:15;191:12;198:7,
11;266:11;267:6;
292:7;299:9
**SPIN (8)**
175:1;249:15,19,
23;250:7,7;251:1,2
**SPINNING (1)**
178:6
**SPINOFF (1)**
249:13
**SPOKE (5)**
54:22;71:3,11,18;
88:22
**SPOKEN (3)**
67:25;68:4;141:12
**SPOT (1)**
256:13
**SPOUSE (1)**
163:23
**STABLE (1)**
143:11
**STAFF (1)**
129:5
**STAGE (1)**
292:6
**STAND (1)**
53:21
**STANG (1)**
5:25
**START (16)**
9:6;28:9;48:6;
106:5;122:5;127:9;
133:3;145:14,24;
199:25;202:14;
221:23;228:13;
248:22;269:24;
273:10
**STARTED (9)**
48:16,19;74:25;
75:8,11;76:5,8;77:5;
130:4
**STARTING (3)**
29:20;34:20;92:15
**STARTS (3)**
9:10;162:22;

167:13
**STATE (6)**
5:17;6:15;60:17,
22,23;61:4
**STATED (3)**
37:22;79:18;284:8
**STATEMENT (10)**
57:22;150:21;
205:24;229:24;
265:18;278:6;
283:11;285:10;
299:3,13
**STATEMENTS (19)**
149:17;150:22;
151:4;264:17;265:6,
12;266:12;267:5,8,
24;268:1;278:3,6,16,
20,25;296:22;298:6,
8
**STATES (6)**
5:5;80:8;159:14;
168:2;230:12,18
**STATING (1)**
236:19
**STATUS (5)**
69:1,11;123:13,
16;249:12
**STEP (1)**
97:20
**STEPS (6)**
203:4;204:22;
205:5,16,23,25
**STEVE (2)**
157:23,25
**STILL (31)**
7:22;13:16;49:14;
58:11;88:12,14;94:6,
12;95:16;96:19,22;
99:11;115:18;
131:14;132:21;
136:3;151:9;153:23;
155:12,15;166:10;
218:9,17;236:5;
237:9;244:10;245:4;
293:22,23;294:2;
298:13
**STOCK (9)**
27:10,15,20,21,24;
28:3,14,18,21
**STOP (1)**
129:7
**STOPPED (1)**
129:2
**STORE (2)**
81:5,7
**STREET (2)**
3:5;5:11
**STRIKE (30)**
14:22;17:13;29:4;
30:16;36:4;39:23;
40:25;42:20;48:15;
53:2;57:16;61:2;
63:6;85:8;86:1;88:1;

91:13;95:15;105:11;
107:13;110:8;
137:16;138:2;148:9;
162:6;179:18;
223:25;245:7;
246:13;287:10
**STRUCTURE (3)**
141:25;159:21,21
**STRUCTURING (1)**
93:14
**STRUGGLING (1)**
150:1
**STUDIES (3)**
23:12;24:14,24
**STUFF (3)**
8:14;12:6;239:14
**SUBJECT (3)**
107:24;108:6;
205:10
**SUBMITTED (2)**
21:18;80:11
**SUBSCRIBE (1)**
123:13
**SUBSCRIPTION (2)**
121:13,14
**SUBSIDIARIES (20)**
43:23;89:25;
106:4,11,13,16,21;
107:2,20,21;108:3,5,
10,15,19;138:21;
167:24;216:16,19,22
**SUBSIDIARY (11)**
107:12,16,23;
108:5;142:3,3,6;
190:4;233:14,17;
246:22
**SUCCESSION (3)**
259:4,7,22
**SUDDENLY (1)**
57:10
**SUFFICIENT (1)**
292:21
**SUGGESTED (1)**
292:2
**SUITABLE (1)**
274:11
**SUM (1)**
292:24
**SUMMARIZE (1)**
202:23
**SUMMER (4)**
71:6,12;74:13;
75:2
**SUPPLIED (1)**
186:22
**SUPPLY (3)**
172:15;186:23;
220:11
**SUPPLYING (1)**
254:12
**SUPPORT (15)**
12:4;34:14;35:24;
36:13,14;44:13;

143:12,14;191:11;
193:5;195:25;
198:21;216:20;
218:9,17
**SUPPOSED (6)**
100:21;108:11;
197:18;226:23;
257:21;271:13
**SURE (32)**
8:25;15:7;16:6;
22:13;30:20;33:19;
37:7;38:10,11;41:4;
47:11;51:7;89:24;
97:19;105:20;
119:22;147:5;
152:21;155:8;
157:12;159:11,16;
160:9;166:21,22;
170:5;206:14;221:6;
229:16;254:24;
275:6;281:6
**SUSPICION (1)**
13:22
**SWEAR (1)**
6:8
**SWITCHING (1)**
159:20
**SWORN (1)**
6:10
**SYSTEM (9)**
19:21;51:1;
107:24;191:19;
197:8,9,13,15;198:8
**SYSTEMS (2)**
137:8;138:4

---

## T

**TAB (1)**
220:9
**TABS (1)**
173:21
**TAIPEI (1)**
18:2
**TAIWAN (16)**
17:15;20:8,9;
127:1,2;128:7;
143:11,12;245:23;
246:16,23;248:6;
262:10;263:17;
290:17;298:2
**TAIWANESE (2)**
292:5,22
**TALK (5)**
11:9;28:11,18;
176:6;229:14
**TALKED (6)**
47:6;68:25;69:1,1;
178:17;252:9
**TALKING (39)**
8:5;18:18;54:9,11;
56:13;72:13;73:18;
93:15;94:8;97:2;

111:11;124:16;
125:11;126:6;127:6;
138:18;142:10,11;
144:15;155:17;
157:6,12;158:14;
160:10;162:9;
168:20;170:13;
173:8;176:17;
178:22;185:19;
186:16;190:10;
220:10;233:23;
259:23;287:23;
299:6,21
**TAM (1)**
286:8
**TANGIBLE (2)**
171:16;203:11
**TAX (14)**
152:1,1,10,12,13,
16,19;153:18;154:4,
5;155:4;158:25;
159:14,15
**TAXED (1)**
152:12
**TAXES (7)**
151:11;153:4,6,8,
20,21,23
**TEAM (5)**
198:15,19,19,24;
224:19
**TEAR (2)**
185:21;186:5
**TECHNOLOGICAL (1)**
51:9
**TED (15)**
50:12;158:1;
195:16;196:17;
199:6;202:15;208:9;
234:12;242:5,24;
243:24;244:5;
264:16;266:18;
267:23
**TED'S (1)**
243:2
**TELLING (1)**
284:21
**TEMPORARY (1)**
285:16
**TEN (5)**
68:6,7,11;99:23;
194:9
**TERM (9)**
18:22;76:17;
108:13;128:14;
148:18;156:8;163:7,
8;251:1
**TERMS (14)**
12:4;75:19;
101:17;126:15;
171:5;177:15;
188:18,20;189:7;
250:13;300:17,18,
19,20

**TESTIFIED (10)**
90:22;108:14;
210:5;211:8;212:2;
235:24;236:16;
245:22;261:5;287:8
**TESTIFY (2)**
11:7;210:11
**TESTIMONY (3)**
85:5;151:22;
250:25
**THEMES (1)**
100:12
**THEREFORE (3)**
203:5;206:2;
261:10
**THEREIN (3)**
201:10;219:18;
220:17
**THIRD (18)**
34:8,12;35:1,13;
36:16;37:14,18;
38:18;43:25;44:5;
81:7;163:12;208:17;
245:19;258:11;
287:15,24;296:5
**THOUGH (3)**
7:20;22:9;76:16
**THOUGHT (6)**
139:22;178:6,10;
221:16;230:24;
234:7
**THREAT (2)**
77:21,23
**THREATEN (2)**
56:6,8
**THREATENED (3)**
56:4,9;281:20
**THREATENING (1)**
56:20
**THREATS (18)**
59:7,10;65:2,6,15;
74:2,3,5,9,20;75:4,8,
13;76:12;78:1,4;
281:22;282:1
**THREE (9)**
30:14,15;56:14;
163:2,21;214:22;
220:5,7;298:6
**THREW (2)**
282:22;283:6
**THROUGHOUT (3)**
15:17,20,24
**THUS (1)**
65:13
**TILLY (5)**
145:6,7,22,24,25
**TIM (1)**
196:17
**TIMES (8)**
67:25;68:3,6;
235:4;249:6;254:23;
262:15,19
**TIRAWORKS (24)**

91:3,5,7,13,14;
92:12,24;93:5,18;
95:12,15,25;96:1,4,
10,19,22,24;97:5;
108:25;109:3;
112:21;113:10;
115:13
**TITLE (2)**
52:16;54:6
**TODAY (47)**
5:12,14;10:15;
11:7,12;20:11;
81:21;85:9,16,19,23;
86:1,3,7;88:2,4,7,10,
12,18;99:11;184:6,8;
188:14;200:13,16;
202:22;203:5,8;
206:2;209:23;211:5,
10,17;214:21;215:9;
255:3;259:24;
270:17;271:15;
272:2,12;276:11,14;
290:3;297:8,15
**TODAY'S (5)**
5:7;20:15;22:4;
79:20;88:21
**TOKYO (6)**
69:7,8;232:11,12;
249:2,3
**TOLD (9)**
104:22;130:24;
131:1;208:17;
218:22;234:10;
236:12,25;273:8
**TOM (5)**
167:19,21,25;
176:6;202:19
**TONGUE (1)**
46:18
**TOOK (5)**
69:6;104:5;
208:21;209:1;
235:20
**TOP (32)**
17:10;46:24;
63:21;64:5;81:11;
82:22;101:10,25;
102:14;139:6,12;
147:14;162:23;
167:14;171:8;201:7;
205:10;206:6,14,17;
219:15,16;221:15;
226:3;249:11;
259:18;260:15,24;
266:8;276:1;287:24;
294:21
**TOTALLED (1)**
292:20
**TOTALLY (6)**
133:11;134:9;
136:17;179:9,10;
188:1
**TOWARDS (4)**

38:3;193:12;
285:15;287:10
**TOWER (1)**
5:10
**TRADE (1)**
291:17
**TRANSACTION (8)**
88:4;100:18;
170:2,6;175:2;
178:14;226:24;
254:6
**TRANSACTIONS (8)**
61:10,13,16,20;
62:2;203:25;204:11;
230:7
**TRANSCRIPT (3)**
7:2,15;302:7
**TRANSCRIPTION (1)**
7:3
**TRANSCRIPTS (1)**
7:6
**TRANSFER (18)**
57:2,10,12,18;
58:10,13;61:24;
163:22;201:21;
251:21;270:17;
271:15;272:1,4,11;
276:3;290:16;
296:13
**TRANSFERRED (7)**
59:8;116:11;
175:5;230:14;
250:20;263:17;
280:24
**TRANSFERRING (3)**
183:22;230:11;
243:13
**TRANSFERS (2)**
229:18,23
**TRANSITION (2)**
161:6;181:15
**TRANSITIONING (1)**
159:22
**TRANSLATE (5)**
168:24;206:9,10,
20;270:24
**TRANSLATED (3)**
223:9;272:24;
273:1
**TRANSLATING (1)**
168:23
**TRANSLATION (10)**
29:3,6;203:14;
222:11;223:7;
270:14,21;271:4,7;
273:3
**TRANSLATOR (1)**
10:15
**TRANSPARENT (3)**
238:12;239:8,10
**TRAUMATIC (1)**
130:9
**TREATED (1)**

267:2
**TREATMENT (3)**
266:11,19,23
**TRIED (1)**
180:2
**TROUBLE (1)**
291:15
**TROUBLED (1)**
287:7
**TRUE (5)**
80:17,17;265:13,
18;302:7
**TRUSTWORTHY (1)**
31:24
**TRUTHFULLY (1)**
11:7
**TRY (6)**
8:13,18;9:15;
10:23;28:10;251:15
**TRYING (32)**
13:23;28:5;47:17;
69:12,16;73:11,12,
20,20;74:15;76:16;
77:2;93:16;108:4;
112:8;119:22;
127:16;150:1;
153:16,17;160:9;
169:14;179:24;
182:21;199:5;
204:16;211:14;
224:22;255:10;
300:15,16,19
**TSAI (7)**
143:20,23,23;
257:14,16,17,25
**T-S-A-I (3)**
257:18,19,20
**TSIA (1)**
257:16
**T-S-I-A (1)**
257:18
**TURN (9)**
161:11;162:18;
167:12;195:22;
201:7;214:9;239:21;
257:14;281:10
**TURNED (4)**
237:16,24;238:15,
20
**TWENTY (1)**
5:23
**TWICE (2)**
117:8,9
**TWISTER (1)**
46:18
**TWO (41)**
11:17;20:18,19;
27:22;30:14,15;
46:11;56:15;58:3,7;
59:3;65:12;94:20,
21;95:8;116:25;
117:1;147:20,21;
148:2,2;159:25;

160:1,2;163:22;
179:9,10;188:14;
203:2;221:17;
227:20;233:1;
251:14;265:10;
281:7;286:6;288:21;
289:24;290:1,24;
299:12
**TYPE (12)**
12:13;25:11;
28:25;33:2,16,20;
34:12;91:12,16;93:8,
11,11
**TYPES (5)**
28:12,15;35:22;
93:4,17
**TYPING (1)**
249:22
**TYPO (5)**
165:2,3,8;249:21;
257:15
**TYPOGRAPHICAL (2)**
256:15,19

---

**U**

**ULTIMATELY (1)**
168:6
**UNAUDITED (8)**
151:5,7;265:5;
266:12;267:8,25;
278:16,20
**UNAWARE (1)**
200:6
**UNCLEAR (1)**
138:22
**UNDER (17)**
8:10;11:5;14:24;
80:7,24;91:13;
132:10;153:21;
163:10;171:17;
175:13;182:1,2;
184:1;220:8;226:6;
260:18
**UNDERSTANDS (2)**
75:18;204:15
**UNDERSTOOD (4)**
75:24;98:21;
222:7;275:17
**UNEXPECTED (1)**
247:11
**UNION (12)**
61:10,12,16,21,22,
23;62:1;229:22;
230:2,7,10;261:6
**UNION'S (1)**
61:19
**UNITED (5)**
5:5;80:8;159:14;
230:11,18
**UNIVERSITY (1)**
23:14
**UNLESS (1)**

187:20
**UNPACK (2)**
60:20;125:19
**UNRELATED (1)**
152:24
**UP (54)**
12:23;26:7;38:2,4,
6,15,20;45:13,16;
47:9;67:5,10,24;
103:22;104:21,24;
107:7;108:24;
118:15,18,23,23;
128:21;132:20;
134:9;163:2;169:12;
182:14,21,25;
185:21;186:5;
196:15;215:15;
222:6;229:21;
242:25;249:17;
251:4,5,8,12,19,23;
252:1,7,7;264:24;
267:22;282:22;
283:6;285:6;288:5;
289:17
**UPON (4)**
51:2;124:15;
175:5;259:4
**UPPER (1)**
174:12
**UPS (2)**
262:16,17
**URGENTLY (1)**
196:17
**URL (1)**
252:6
**USD (1)**
288:23
**USE (15)**
18:17,22;66:16;
79:10,11,12;121:19;
128:14;229:22;
230:6;244:5;248:9;
249:19;250:5;
300:19
**USED (12)**
24:25;76:18;
126:1;128:19;163:8;
225:3;230:1,4;
250:13;275:19;
295:16;296:15
**USERS (1)**
123:1
**USING (10)**
115:12,13;124:12,
13;148:18;152:23;
163:7;195:16;
300:17,18
**USUAL (1)**
78:23
**USUALLY (3)**
78:22;250:3;291:2

---

**V**

**VALID (12)**
58:21;173:16;
207:19,20,21,25;
208:4;209:6;217:16,
19,20,25
**VALUATION (2)**
279:13,16
**VARIETY (1)**
175:3
**VARIOUS (6)**
13:21;80:23;
119:8;273:8,11,14
**VENDOR (1)**
198:11
**VENDORS (26)**
15:1;59:24;60:2,7,
12,17;62:16,20;63:9,
16,20;64:9;65:4;
66:9;111:1,5,7;
189:21,23;193:10;
217:2;287:9,11,18,
19;288:22
**VERBALLY (1)**
56:8
**VERSION (4)**
165:20,22,24;
166:2
**VERSIONS (1)**
187:21
**VICE (1)**
257:23
**VIDEO (1)**
7:13
**VIDEOGRAPHER (25)**
5:1,12;6:7;66:18,
21;103:24;104:2;
154:20,23;194:11,
14;255:14,17;
268:19,22;269:3,8,
11;277:11,13;
286:17,19;289:18,
21;301:17
**VIDEOTAPE (1)**
5:2
**VIEW (7)**
70:3;210:12;
217:3;266:20;
267:21;268:6,7
**VIEWABLE (1)**
239:12
**VINER (1)**
5:13
**VIOLATING (1)**
288:11
**VISA (1)**
285:25
**VISITED (1)**
235:3
**VOTE (2)**
103:10,14

## W

**WAIT (1)**
255:18
**WAITING (1)**
233:1
**WALSH (9)**
3:16;101:13,19;
102:2,5;174:2;
175:23;176:3,7
**WANTS (3)**
119:18;282:24;
283:8
**WASHINGTON (2)**
23:16,19
**WATCH (1)**
156:7
**WATER (1)**
58:11
**WAY (11)**
8:16;19:1;51:5;
83:14;108:21;141:9;
171:13;251:22;
255:21;264:17;
292:24
**WAYS (1)**
257:17
**WC2A (1)**
3:21
**WEAVE (1)**
8:18
**WEBDREAM (2)**
267:13;270:1
**WEBSITE (11)**
36:25;136:14,20,
22,25;137:9;191:13,
19,19;218:10,18
**WEBSITES (1)**
193:9
**WEEK (2)**
20:17,20
**WEEKLY (1)**
156:6
**WEEKS (5)**
11:17;20:18,19;
265:7;278:21
**WENDY (1)**
5:12
**WEST (2)**
243:11;244:6
**WESTWOOD (2)**
3:2;6:5
**WEWORK (2)**
144:24,25
**WHATSAPP (3)**
78:22;79:10,12
**WHATSOEVER (1)**
55:5
**WHEREBY (1)**
175:9
**WHOLLY (2)**
233:17;246:22

**WHOSE (4)**
100:21;108:5;
245:7;296:15
**WILLING (2)**
87:17,19
**WIND (7)**
13:2;18:23;19:24;
20:2;34:3;44:9;
77:14
**WINDING (5)**
13:17;34:5,19;
37:23;252:3
**WINNIE (2)**
263:23;286:7
**WINTHROP (2)**
5:10,20
**WIRED (2)**
124:3,13
**WISH (3)**
163:22;203:5;
206:2
**WITHIN (4)**
36:5;80:16;252:3;
288:24
**WITHOUT (10)**
196:1;201:10;
219:19;220:18;
252:21;254:7;285:6,
13;288:13;289:5
**WITNESS (8)**
6:2,8;7:2;218:25;
269:7;291:7;300:24;
302:1
**WITNESSES (1)**
219:1
**WONDERFUL (1)**
257:24
**WONDERING (1)**
157:17
**WOOD (10)**
15:15,22;16:7,11;
19:9,17;20:5;
146:22;168:1;
179:11
**WORD (8)**
13:24;163:11;
210:24;271:23;
284:11,11,12,12
**WORDS (5)**
10:22;18:17;58:7;
100:4;165:18
**WORK (15)**
7:10;9:15;19:22;
24:23,25;25:15;
48:1;86:18;110:21,
23;113:3;161:19;
193:6;282:23;283:7
**WORKED (6)**
15:2;28:2;52:24;
54:9;55:24;231:25
**WORKING (14)**
20:1;27:21;34:2,3,
18;49:17;54:12;

94:6,12;160:18;
169:13;196:23;
258:1;278:24
**WORTH (2)**
60:8,12
**WOUND (3)**
12:23,24;18:17
**WOW (1)**
268:25
**WRAP (1)**
289:16
**WRITE (1)**
80:22
**WRITTEN (4)**
201:9;206:8;
219:17;220:16
**WRONG (7)**
77:6;117:7;145:9;
208:22;209:3;
212:22;235:25
**WRONGDOING (1)**
208:25
**WU (2)**
3:11;6:6

## X

**XIA (2)**
174:11,12

## Y

**YEAR (19)**
68:20,21;75:1;
115:7,9,10,13;130:5;
146:2;148:2;271:9,
10,24;272:3;282:24;
283:8;285:5;294:4,
20
**YEARS (33)**
15:17,21,24;16:8;
25:17;26:1,3;30:9,
10,14,15;32:2,13,15,
17,20;39:17,19,23,
24;40:2,4;94:22;
95:8;99:23;114:25;
115:24;116:3,18;
147:20,21;148:3;
156:19
**YEAR'S (1)**
294:6
**YES/NO (1)**
83:11
**YESTERDAY (2)**
7:1;11:19
**YING (2)**
146:25;150:3
**YORK (5)**
5:6;11:18;20:12,
16;248:2
**YOSHIDA (30)**
5:3;6:10,13,17,18,
20;9:21;66:24;

79:18;104:5;139:20;
155:1;166:14;
194:18;214:9;217:6;
224:13;235:20;
240:17;248:17;
258:7;262:6,9;
269:18;277:16;
291:11;298:13;
301:15;302:3,16
**YOSHIDAI (1)**
289:24
**YOSHIDA'S (2)**
270:13;272:25
**YOSHIO (13)**
26:17;30:5;47:23;
73:11;77:21,23;
86:18;185:19;
188:16;270:9;
272:14;287:17;
288:10
**YOUNG'S (1)**
146:11

## Z

**ZIELH (1)**
5:25
**ZONE (1)**
141:18
**ZOOM (3)**
6:2;7:20;8:24

## 1

**1 (10)**
5:3;9:6;79:14,16;
86:4;224:18;243:1;
277:18,19;279:11
**1.00 (1)**
138:13
**1.05 (1)**
154:13
**1.06 (2)**
154:21,22
**1.14 (1)**
206:15
**1.15 (1)**
9:6
**1.30 (3)**
9:4,7,12
**1.45 (1)**
154:14
**1.54 (2)**
154:22,24
**10 (5)**
66:17;214:7,9;
286:17,24
**10% (12)**
139:14,20,21,23;
279:12,19,23,25;
280:1,3,10,16
**10,000 (3)**
92:16;114:7;117:6

**10.43 (2)**
66:19,20
**100 (3)**
107:4;7;226:23
**100% (4)**
49:2;183:2;
192:11;197:23
**103 (1)**
3:5
**10-MINUTE (2)**
194:9;289:15
**10TH (2)**
5:7;302:8
**11 (7)**
220:22,23;221:10;
268:20,22,24;270:19
**11.07 (2)**
66:20,22
**11.53 (2)**
103:25;104:1
**12 (6)**
79:22;80:1;104:3;
240:15,17,19
**12.00 (1)**
104:1
**12.30 (1)**
9:14
**12.45 (1)**
9:16
**13 (3)**
49:13;248:13,16
**14 (2)**
258:5,8
**15 (10)**
60:8,9,12;62:15;
63:23;64:4,9;
214:14;260:3,6
**150 (3)**
18:15;245:24;
248:6
**15-18 (2)**
59:23;60:1
**15TH (2)**
215:6,17
**16 (4)**
51:15,18;262:4,7
**17 (3)**
51:18;264:5,8
**18 (3)**
214:18;269:13,16
**18TH (1)**
215:18
**19 (6)**
102:1;130:15,17;
275:3,5,8
**1HP (1)**
3:21

## 2

**2 (17)**
80:15;115:3,4;
166:4,5,8;167:14;

184:2;201:8,18;
219:14;233:6;
277:18,19,22;
278:21;279:13
**2.13 (1)**
206:12
**2.30 (1)**
9:10
**2.50 (2)**
194:12,13
**20 (3)**
277:8,9;292:20
**20,000 (1)**
114:7
**2000 (1)**
157:1
**2012 (4)**
24:20,21;49:13;
54:11
**2012-13 (1)**
26:21
**2013 (23)**
31:1;41:6,7;48:18;
94:3,9,24;97:25;
98:19;99:4;101:6;
106:22,25;108:24;
116:17;126:7;127:9;
130:4,12;132:3;
156:16;157:1,19
**2013-'17 (1)**
157:2
**2013-2015 (2)**
124:10;127:19
**2013-2017 (1)**
157:13
**2013-2018 (1)**
127:12
**2013-2021 (1)**
155:10
**2014 (5)**
50:17,21;51:13,
15;52:8
**2014-2016 (1)**
51:20
**2015 (6)**
93:2,25;94:1,2;
130:5;278:3
**2016 (11)**
50:17,21;51:13,
19;52:8;93:25;
142:12,13;278:9,17,
21
**2016/2017 (1)**
180:1
**2016-2018 (1)**
102:1
**2017 (8)**
43:15;157:19;
190:11;198:1,16;
219:23;278:9,17
**2017-2021 (1)**
182:8
**2017-ISH (1)**

156:16
**2018 (22)**
85:21;88:16;
106:25;126:7,11;
127:10;142:14,16;
143:7;149:8;190:11,
12;212:25;213:9;
214:14,19;234:6;
237:4;259:15;265:6,
12;267:8
**2018-2021 (3)**
150:3,18;151:4
**2019 (18)**
13:14;111:18,19,
20;112:11,14;
113:19;232:9,21;
233:8;234:6;235:11;
237:4;259:20;265:6,
12;267:9;294:12
**2019-2021 (1)**
34:23
**2020 (21)**
61:5,8;62:2;75:7;
126:11;142:12,13;
148:10;270:19;
271:14;275:25;
285:17;293:22;
294:2,5,11;295:2,6,
15;297:1,3
**2021 (43)**
43:18;48:21;
54:11;55:1,3,6,15;
56:1,7,12,13,14,15,
18;58:14;59:6;
64:10;65:14;67:25;
68:3,14;71:5,6,12;
74:10,13,17,18,19,
21;76:9,12;78:13,16,
19;93:3;108:25;
115:3;116:17;148:5,
6;200:5;288:19
**2022 (1)**
115:4
**2023 (3)**
5:7;302:9,20
**20-40 (2)**
244:19,24
**21 (2)**
281:2,5
**21-11854 (1)**
5:6
**214 (4)**
13:13;45:2;62:4;
273:16
**22 (3)**
286:4,6,6
**222 (1)**
255:24
**229 (3)**
162:18;163:15;
256:14
**23% (2)**
182:25;183:22

**230 (1)**
257:10
**234 (1)**
162:19
**2385 (1)**
258:11
**2412 (1)**
260:8
**25 (1)**
5:10
**25,000 (1)**
92:22
**2ND (1)**
3:17

**3**

**3 (15)**
161:12;163:3,17;
167:17,18;170:16,
17,20;171:9;173:18;
255:19,20;258:22;
260:8;279:14
**3.01 (2)**
194:13,15
**30 (3)**
107:4,8;277:12
**30,000 (1)**
117:7
**3RD (2)**
3:3;206:12

**4**

**4 (8)**
171:14;173:19,20,
20,23;174:1;206:15;
268:20
**4.02 (2)**
235:15,16
**4.29 (2)**
235:16,18
**40 (2)**
154:16;292:20
**42 (1)**
5:10
**448 (1)**
162:19
**49 (2)**
268:23;269:2
**4A (1)**
171:16

**5**

**5 (4)**
187:12,15;213:4;
288:18
**5.20 (2)**
269:9,10
**5.30 (2)**
268:15;269:6
**5.36 (2)**

269:10,12
**50,000 (2)**
40:14,15
**5-35M (1)**
288:23

**6**

**6 (3)**
171:9;194:16,19
**6.15 (2)**
289:19,20
**6.31 (2)**
289:20,22
**6.44 (1)**
301:19
**6-9 (1)**
3:19

**7**

**7 (8)**
111:19,24;199:16,
19;219:14;220:8,9;
233:5
**77% (7)**
57:10,13,18;58:10,
13;59:8;193:22

**8**

**8 (3)**
115:25;202:11,12

**9**

**9 (2)**
212:8,9
**9.15 (1)**
5:8
**98 (17)**
34:7,10,13,15,21,
25;35:1,11;38:2;
44:1;45:6,13,21;
46:7;67:4,7,11