Robert J. Feinstein
Bradford J. Sandler
Jeffrey M. Dine
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone:     (212) 561-7700
Facsimile:     (212) 561-7777
E-Mail:        rfeinstein@pszjlaw.com
               bsandler@pszjlaw.com
               jdine@pszjlaw.com

*Counsel for Shang Peng Gao Ke Inc. SEZC and SPGK Pte Ltd*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Ascentra Holdings, Inc. (In Official Liquidation),<br><br>Debtor in a Foreign Proceeding. | Case No. 21-11854 (DSJ)<br><br>Chapter 15 |

**DECLARATION OF RYUNOSUKE YOSHIDA IN SUPPORT OF MOTION OF SHANG PENG GAO KE INC. SEZC AND SPGK PTE LTD. PURSUANT TO 11 U.S.C. § 1522(c) TO TERMINATE RESTRAINT**

I, Ryunosuke "Luke" Yoshida, declare as follows:

1.      I am the sole director of Shang Peng Gao Ke, Inc. SEZC ("SPGK Cayman") and SPGK Pte Ltd. ("SPGK Singapore" and, with SPGK Cayman, "SPGK"). I am authorized to make this declaration on behalf of SPGK and SPGK Singapore.

2.      Save where I indicate to the contrary, the facts and matters to which I declare herein are either within my own knowledge and are true, or are true to the best of my knowledge, information and belief, being derived from the information I have obtained personally or from SPGK, and from documents which I have reviewed.

3.      I submit this declaration in support of SPGK's motion to terminate the restraint imposed by order of this Court on funds of SPGK held at its credit card payment

EXHIBIT

1

processor, Planet Payment Inc. (the "SPGK Planet Payment Funds"). The SPGK Planet Payment Funds amount to approximately $72 million. A true and correct copy of a summary report for March 2023 of BMO Harris Bank, N.A. for the SPGK Planet Payment Funds, provided to SPGK through SPGK's counsel by Planet Payment, which shows the amount of the SPGK Planet Payment Funds, is attached hereto as **Exhibit 1**.

4.      I lay out the history of Ascentra Holdings, Inc, ("Ascentra") and SPGK in some detail because the details of Ascentra's history and the formation and operation of SPGK are important to understanding why the supposed Cancellation Agreement, on which the JOLs rely, was not ever an operative agreement, as it would contradict and negate the organizational separation of Ascentra and SPGK, which was important to Ascentra's principals in reducing the risk that they might face criminal inquiry or penalties in the People's Republic of China ("PRC").

5.      I was a director of Ascentra between 31 December 2013 and 30 March 2018, and I again held such office between 18 December 2018 and 1 June 2021.

6.      I have been a director of SPGK since 15 May 2019 and its sole director since 9 December 2019. I have beneficially owned 100% of the shares in SPGK through my wholly owned Cayman company Growth Today Inc ("Growth Today") since 15 December 2018.

7.      I have also been a director of SPGK Singapore (a wholly owned subsidiary of SPGK Cayman) since May 2019.

8.      I am therefore generally well-acquainted with the business of Ascentra and other companies within the Ascentra group, and with the business of the SPGK group (which includes SPGK, SPGK Singapore and SPGK LLC[1]). Consequently, I am also fully aware of the existence and nature of the business and the trading relationship between the Ascentra group and

---

[1]   A wholly owned subsidiary of SPGK that was de-registered on 3 March 2021.

2

the SPGK group.  The current corporate structure charts relating to both the Ascentra group and

the SPGK group are attached hereto as **Exhibit 2**.

**A.      The History Of The Interush Business**

        9.      The business known as "Interush," now Ascentra, was founded by Yoshio

Matsuura and Motohiko Homma around 2003.  The principal operating entity in around 2013

(when I first became involved with the Interush business) was Interush Inc (a U.S. entity

subsequently renamed HEC Global, Inc).

        10.      Interush was a multi-level marketing ("MLM") business and was originally

run from the United States but was aimed at the Japanese market.

        11.      The Interush business utilized a personal referral marketing introduction

strategy.  The people involved in this system of business operations were known as "Affiliates."

Affiliate activity was governed by Interush's policies and procedures (which were country-specific

and were designed to cater to the different policies and regulations that apply in the countries

within which it operates).

        12.      By way of a high-level explanation of how the business worked:  Affiliates

earned commissions based upon the amount of monthly subscription revenues earned by Interush

from consumers/customers and other Affiliates as a consequence of referrals generated by the

relevant Affiliates.  Affiliates could earn additional commissions based upon the subscription

revenues generated by "new" Affiliates where the "new" Affiliates had been introduced as a result

of referrals generated by the "original" Affiliates.

        13.      The Interush business launched its first cross-border e-commerce product

(in Japan) in 2004.

3

14.     Following on from this, Interush's Hong Kong operation, Interush Limited, was incorporated in Hong Kong on 29 September 2006 (although it did not commence business in Hong Kong until mid-2010).

15.     In 2007, Interush expanded its business operations to Taiwan. Its Taiwan business was operated from Taiwan by a local entity called Interush International Co., Ltd (subsequently renamed HEC International Co., Ltd.).

16.     Also in 2007, Interush Holdings Ltd (a Bermuda company) was incorporated and became the holding company for the Interush business. Interush Holdings Ltd was owned by Mr Matsuura and Mr Homma in equal shares through their respective nominee companies: South Asian Ventures Ltd ("SAV") and New South East Traders Ltd ("NSET") (both incorporated in the BVI).

17.     As noted above, in mid-2010, Interush's operations commenced in Hong Kong, and the Hong Kong business was operated by a Hong Kong entity called Interush Limited (although most of its customers were, in fact, located in mainland China). Hong Kong served as the base through which Interush coordinated recruitment and training of sales Affiliates in the PRC.

18.     In around July 2011, Martin Matthews became the President and CEO of Interush Holdings Ltd. I believe he was employed in the Interush business before that.

19.     In 2013, there was a significant increase in Affiliate recruitment activity in Hong Kong. On 6 November 2013, the Interush offices were raided by Hong Kong's Commercial Crimes Bureau ("CCB") based on a warrant which alleged violation of Hong Kong's Pyramid Selling Prohibition Ordinance. The CCB seized all computer equipment, books and records in the Hong Kong offices and arrested six individuals (including Mr Matthews). As a result, Interush

4

attracted unwanted media attention in Hong Kong, as the media reported that police had found evidence that Interush was using pyramid selling to recruit members.

20.     Due to this, Interush ceased recruiting additional Affiliates and holding large training sessions for its Affiliates in Hong Kong. Furthermore, Interush also repurposed its staff in Hong Kong to support the e-commerce business in Taiwan and provide local customer support to the centralized customer service centre in Taiwan. The Interush business continued, albeit somewhat reduced, and focused on MLM in Taiwan through HEC International Co Ltd ("HEC Taiwan") and in Japan through HEC and HEC Singapore.

21.     Shortly after the CCB's raid of Interush's offices in Hong Kong, Interush's banks suspended operations of its bank accounts in view of the police investigation. The Hong Kong Court issued a Restraint Order on 9 April 2015 prohibiting Interush[2] from dealing with its property in Hong Kong.

22.     Over time, in part to prepare for a hoped-for public listing on the Hong Kong Stock Exchange, Interush Holdings Ltd and its subsidiaries, and ultimately its beneficial owners, recapitalized the business and revised the entities' ownership structure such that, ultimately a new Cayman parent company, Interush Holdings Inc, which later changed its name to Ascentra Holdings Inc (Ascentra, as defined above) was formed and became the sole shareholder of Interush Holdings Ltd.

23.     The ultimate shareholding structure of Ascentra was as follows:

a.   IR-P: 58.50% of the shares;

b.   INTL: 30.64% of the shares; and

---

[2]     Interush Limited and Interush (Singapore) Pte Limited.

5

    c.  Three management members / related parties (Ryosuke Kojima,

        Jeffrey Boshears and Alex Oliva): 10.86% of the shares.

24.    Taking into account beneficial ownership of these entities, the principal shareholders of Ascentra are:

    a.  Yoshio Matsuura: 22.98%

    b.  Motohiko Homma and then myself: 22.98%

    c.  Martin Matthews: 21.59%

    d.  Mari Matthews: 21.59%

25.    On 31 March 2015, Mr Matthews (following on from his arrest in November 2013 referred to at paragraph 19 above) was charged with money laundering by the Hong Kong authorities (although Mr Matthews was later – in May 2017 – acquitted of that charge), and the plan for the IPO was seriously hindered.

26.    In June 2015, Mr Matthews was placed on administrative leave as CEO and Chairman of Interush Holdings Ltd in order to allow him time to address the charges against him.

27.    Due to various reasons including the CCB's investigation, the risks facing the Interush business in Hong Kong (where, as noted above, a large number of its customers were located in the PRC, where MLM businesses are illegal), negative press and Mr Matthews being charged with money laundering, Interush decided to:

    a.  rebrand its business and change the name "Interush" to "Ascentra." The businesses in Taiwan and Japan were renamed as "HEC," and various other entities were renamed in a similar fashion;

    b.  suspend the operation of its business in Hong Kong; and

6

  c. supply products to a new separate entity – SPGK – which was established[3] as a separate e-commerce marketing business that was focused on the PRC market. SPGK was not part of the Ascentra group and was a wholesale purchaser of Ascentra's products. SPGK then sold these products to its customers in the PRC. This allowed the Interush/Ascentra business to de-risk its business by no longer selling directly to the PRC market, where Ascentra's MLM business model is illegal.

**B.** **Establishment of SPGK**

  28. As stated in paragraph 27 above, Interush/Ascentra decided it would no longer operate in Hong Kong (which had been focused on the PRC market since late 2015). However, it continued to operate in other countries, such as Taiwan and Japan.

  29. King & Wood Mallesons China ("KWM," a PRC law firm) assisted in the establishment of SPGK and the development of its business model. SPGK was established as an e-commerce marketing company focused on the PRC market. Attached hereto as **Exhibit 3** is a true and correct copy of a script for Mr Matthews' presentation at a pre-launch event for SPGK in August 2016. The presentation emphasizes that SPGK was identified to associates as a wholly separate company from Ascentra.

  30. As a new business (with an untested model) operating in a new market, KWM could not guarantee that SPGK would be fully compliant with all relevant PRC laws. Accordingly, there were legal and financial risks for SPGK as well as its owners and controllers.

---

[3] SPGK was incorporated on 14 June 2016.

DOCS_NY:47723.5 78263/001

31.    SPGK commenced business in the PRC in or around October 2016. At this
time, the shares in SPGK were wholly owned by Growth Today, which company was (at that time)
owned and controlled by Mr Homma.

32.    Around the time SPGK commenced operations in the PRC (in 2016),
Interush Limited issued an announcement (a true and correct copy of which is attached as
**Exhibit 4** to existing affiliates of Interush which stated that:

> Interush International, LLC subsidiary company which offered products in Hong
> Kong, Macau and the PRC, is ending its operations and ceasing to provide support
> to customers in these markets. As such we must cancel our affiliate agreements
> with you and terminate our relationship as of October 1 2016.
>
> However, we are pleased to advise that we have identified a dynamic company,
> Shang Peng Gao Ke, Inc. ("Shang Peng") which will enable you to continue
> earning an income through a business which has very similar IT and Health
> products and customer support within China.
>
> Shang Peng is a unique e-commerce marketing company whose exclusive IT and
> Health products are developed in the USA and available in Hong Kong and
> Macau, plus the PRC market through cross-border e-commerce. Starting on
> September 7th, you will have the opportunity to join this company at no cost, and
> work towards your financial goals. I have been working with this company to
> ensure a smooth transition and make this process as easy as possible for you.
>
> . . . .
>
> Along with this transition, Ascentra Holdings, Inc. will continue to honor the
> Loyalty Bonus program to current Interush qualifiers, as well as offer an Annual
> RSP Bonus program, and honor the legacy Introduction Bonus program formerly
> provided by Interush for your tenure with Interush.
>
> You are invited to join Shang Peng at no cost. The company will use a formula
> based on your experience at your legacy position with Interush to transition you
> to their business. We recommend that you complete the transition as soon as
> possible. Interush will cease supporting customers in Hong Kong, Macau and the
> PRC as of October 1, 2016, with final commission payment to follow in October.

33.    This announcement makes clear that SPGK was identified as a separate
business to take over operations from Interush (rather than form part of Interush's operations), and
that alongside the option to transition over to SPGK, Interush would continue to honour its legacy

8

bonus program. However, for those who signed up with SPGK, Interush/Ascentra offered to provide some unspecified form of continuity with the loyalty bonus program for those affiliates.

34.    SPGK's business model differed from Ascentra's in that SPGK was not an MLM business. Instead, SPGK purchased products (such as IT products and health products) from Ascentra and third parties. Consumers could then purchase these products from SPGK through the SPGK website[4] and, depending on the product purchased, the relevant product would either be made available for download or would be physically delivered to the customer.

35.    SPGK also operated a referral program where users could refer other potential purchasers to SPGK and earn a percentage of any sales revenue generated by such a referral. Additionally, users could become service providers and work for one of SPGK's independent third-party service provider companies in the PRC, with the user being engaged through a service agreement.

36.    The products sold by SPGK were supplied by third party entities (the "Vendors") (beauty and health products) or licensed by Ascentra's subsidiary (IT products). The Vendors were contracted to Ascentra, but their fees for providing products to SPGK (via Ascentra) were paid directly to them by SPGK using SPGK's funds through cash management entities.

37.    In around December 2018, Mr. Homma transferred his shares in Growth Today to me (he also transferred his shares in IR-P to Lequios Holdings Ltd[5] in around November 2020).

38.    Payments made by customers for products purchased from SPGK through its website were processed through China UnionPay and collected by Planet Payment, a credit card

---

[4]    https://www.spgk.com/en/ (no longer online). SPGK was the contracting principal for all sales to customers and agents/affiliates purchasing products through SPGK's website. The website ceased operating in March 2021.

[5] A BVI company which I also own and control.

9

payment processor based in the United States. SPGK was the contracting party and vendor for all purchases facilitated by SPGK's website.

39.    All payments received by China UnionPay were collected by Planet Payment. As a result, SPGK is considered the "merchant" for payments processed by Planet Payment.

40.    On or about September 29, 2019, I executed, on behalf of SPGK Singapore, a Merchant Processing Application with Planet Payment (the "PP Agreement"). A true and correct copy of the PP Agreement is attached hereto as **Exhibit 5**.

41.    Ascentra is unmentioned in the PP Agreement as it is entirely irrelevant to the funds received and transferred pursuant to the PP Agreement.

42.    I am aware that the Joint Liquidators have put forward a document titled "Memorandum of Understanding" and a document labeled "Cancellation Agreement and Acknowledgement" (the "Cancellation Agreement") according to which, they contend, SPGK is obligated to transfer all of its assets, including the SPGK Planet Payment Funds, to Ascentra. I was not aware of the Cancellation Agreement at the time of its purported execution. At that time, April 2018, I had been removed from the board of Ascentra, and Mr Matthews had assumed control of the Company, to the exclusion of me and other stakeholders. Mr Matthews removed me as a director on 30 March 2018.

**C.    The MOU**

43.    It was common ground among all relevant parties (Yoshio Matsuura, Motohiko Homma, Martin Matthews, Ted Sanders and myself) that the MOU was not in fact intended to be legally binding. As a matter of fact, in around May 2021, I received an email from Mr Matthews stating that he had confirmed with Tom Poletti (counsel for Ascentra at Manatt

10

Phelps & Phillips, LLP) that the MOU was not binding. A true and copy of the email from Mr Matthews is attached hereto as **Exhibit 6**.

44.    As far as I am aware, no subsequent binding contract giving contractual effect to the terms of the MOU was ever put in place.

45.    Moreover, in February 2017, SPGK entered into various binding contracts with Ascentra group companies to formalize, on a contractual basis, their business relationships through which: (i) SPGK agreed to purchase physical products from Ascentra group companies; (ii) SPGK agreed to pay royalties for the license it had obtained from Ascentra group companies for the use of their IT products; and (iii) SPGK agreed to pay for services to be provided by Ascentra group companies, including (but not limited to):

a.  a Product Supply Agreement between iHealthScience LLC, Hong Kong Branch and SPGK;

b.  a License Agreement between Radial IT Systems Ltd ("Radial IT") and SPGK;

c.  a Customer Services Support Agreement between Radial IT and SPGK; and

d.  a Professional Services Agreement between Radial IT and SPGK.

True and correct copies of these agreements are attached hereto as **Exhibit 7**.

11

**D.     The Supposed Cancellation Agreement**

46.     I should emphasize that I was not aware of the existence of the supposed Cancellation Agreement until I received a copy of Campbells' letter of 20 August 2021.[6] A copy of that letter is attached hereto as **Exhibit 8**.

47.     I can state that the purported obligation in the Cancellation Agreement for SPGK to transfer its assets and business to Ascentra was never undertaken in any respect, and Ascentra has never sought to enforce such an obligation.  The business relationship between Ascentra and SPGK did not change after April 2018.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed June 30, 2023

_____
Ryunosuke Yoshida

---

[6]     In the letter, it was stated that the Mr. Robinson (who was then only the voluntary liquidator of Ascentra) was still considering the scope and effect of the Cancellation Agreement and fully reserves his position and all of his rights in relation to the same.

12

# EXHIBIT 1



Generated By: 30080689_DBARRY
Generated On: 04/04/23 11:33:15 AM EST
Date Range: 03/01/23 to 03/31/23

**PLANET PAYMENT SOLUTIONS LLC -** ████**338 USD (HARRIS - DDA)**

Date: 03/31/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|

No Data Available

Date: 03/30/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|

No Data Available

**PLANET PAYMENT SOLUTIONS LLC -** ▮**338 USD (HARRIS - DDA)**

Date: 03/29/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

Date: 03/28/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

**PLANET PAYMENT SOLUTIONS LLC - █████338 USD (HARRIS - DDA)**

Date: 03/27/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|

No Data Available

Date: 03/24/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|

No Data Available

**PLANET PAYMENT SOLUTIONS LLC -** ███**338 USD (HARRIS - DDA)**

Date: 03/23/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

Date: 03/22/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

**PLANET PAYMENT SOLUTIONS LLC** ███338 USD (HARRIS - DDA)

Date: 03/21/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

Date: 03/20/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

**PLANET PAYMENT SOLUTIONS LLC - ███ 338 USD (HARRIS - DDA)**

Date: 03/17/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

Date: 03/16/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

**PLANET PAYMENT SOLUTIONS LLC** ▮▮▮338 USD (HARRIS - DDA)

**Date: 03/15/23**

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

**Date: 03/14/23**

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

**PLANET PAYMENT SOLUTIONS LLC - ███ 338 USD (HARRIS - DDA)**

Date: 03/13/23

| Balances | Totals | |
|---|---|---|
| Opening Ledger Balance | | $72,062,284.86 |
| Opening Available Balance | | $72,062,284.86 |
| Closing Ledger Balance | | $72,062,284.86 |
| Closing Available Balance | | $72,062,284.86 |
| 1 Day Float | | $0.00 |
| 2 or More Days Float | | $0.00 |

| Summary Totals | Totals | |
|---|---|---|
| Total Credits | | $0.00 (0) |
| Total Debits | | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | | No Data Available | | |

Date: 03/10/23

| Balances | Totals | |
|---|---|---|
| Opening Ledger Balance | | $72,062,284.86 |
| Opening Available Balance | | $72,062,284.86 |
| Closing Ledger Balance | | $72,062,284.86 |
| Closing Available Balance | | $72,062,284.86 |
| 1 Day Float | | $0.00 |
| 2 or More Days Float | | $0.00 |

| Summary Totals | Totals | |
|---|---|---|
| Total Credits | | $0.00 (0) |
| Total Debits | | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | | No Data Available | | |

**PLANET PAYMENT SOLUTIONS LLC** ████ 338 USD (HARRIS - DDA)

Date: 03/09/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | No Data Available | | | | |

Date: 03/08/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | No Data Available | | | | |

**PLANET PAYMENT SOLUTIONS LLC - ███338 USD (HARRIS - DDA)**

Date: 03/07/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

Date: 03/06/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

**PLANET PAYMENT SOLUTIONS LLC - ▮▮▮338 USD (HARRIS - DDA)**

Date: 03/03/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

Date: 03/02/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|
| | | | | No Data Available | | | |

**PLANET PAYMENT SOLUTIONS LLC** ████ **338 USD (HARRIS - DDA)**

Date: 03/01/23

| Balances | Totals |
|---|---|
| Opening Ledger Balance | $72,062,284.86 |
| Opening Available Balance | $72,062,284.86 |
| Closing Ledger Balance | $72,062,284.86 |
| Closing Available Balance | $72,062,284.86 |
| 1 Day Float | $0.00 |
| 2 or More Days Float | $0.00 |

| Summary Totals | Totals |
|---|---|
| Total Credits | $0.00 (0) |
| Total Debits | $0.00 (0) |

| Date | Transaction Description | Debit | Credit | Availability | Bank Ref | Cust Ref | Transaction Details |
|---|---|---|---|---|---|---|---|

No Data Available

# EXHIBIT 2

**Appendix 1 – Ascentra Group**

Ascentra Org Chart



21-11854-dsj   Doc 44-2   Filed 06/30/23   Entered 06/30/23 15:47:18   Pg 3 of 3
Company Structure Dec 2022_ from ex RY-2
Page 120 of 448
FSD2021-0318

Exhibit 2-

2022-12-19



# SPGK + Scuderia Bianco





Theodore Sanders

Shang Peng Gao Ke International California

Ryunosuke Yoshida — 100% — Scuderia Bianco Ltd Singapore

Ryu & 1 Nominee Director

100%

Growth Today Limited Cayman                Ryu

Shang Peng Gao Ke Inc SEZC Cayman                Ryu

SPGK Pte Ltd Singapore

Ryu & 1 Nominee Director

**Legend**
Red – Directors
Grey - Shareholding

2022-12-19

**115**

Page 120 of 448

FSD2021-0318

# EXHIBIT 3

21-11854-dsj   Doc 63-3   Filed 09/01/23   Entered 09/01/23 19:58:55   Exhibit 2-1
Pg 30 of 111

21-11854-dsj   Doc 44-3   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit 3 -
Script for Matthews Presentation_8_2016   Pg 2 of 11
Page 226 of 448

FSD2021-0318                                                                      2022-12-19


**Shang Peng Gao Ke**
尚朋高科™

## Shang Peng Gao Ke Pre-Launch Event – Marty's Presentation

Good evening everyone,
I am so pleased that you are all here to join us in this very special, pre-launch event.

As you know Interush has had very strong growth in the PRC market over the past several years and you are all to be congratulated on the teams you have established and supported.

It has not been easy to establish new Affiliates and Product Subscribers from the PRC. Based on the laws and regulations we all needed to comply with, this required an interested individual to exit the PRC to learn all the financial details and if they were interested in our business, they had to register while outside of the PRC.

At Interush we have always sought the very best legal advice we could obtain for how to operate our business. And based on our experience over the past years, it became clear that to help ensure our company's long term success in the PRC and to support our objective of having an IPO and being a publicly-listed company, that we had to make strategic shift in our business model.

We want this organization to be able to grow to its' full potential to provide each of you, a much greater opportunity and also to be strong for many, many years to come, and that the work we do now, will also provide for your children, and for my children in their future lives too.

These are the reasons we have spent the past two years developing a new business model that will allow our products to be openly promoted and sold in the PRC, and also that new sales representatives can also be established within the PRC, and provide all the upside potential you are looking for in a business!

~~This meant that we could no longer operate as an off-shore Network Marketing company. This meant we needed to create a unique new business model that provided all the upside income potential of a Network Marketing company.~~

An opportunity where anyone who had the desire and commitment, could through their own ability and with the support of a team, advance to one of the senior consultant levels, and earn a very significant income.

And we also wanted to provide a better opportunity for the thousands of PRC people, whose goal it is to simply be able to earn an additional 1,000 RMB, to 10,000 RMB, or more each

FSD2021-0318                    Page 227 of 448                    2022-12-19

month, in addition to their regular employment, to be able to provide a much better quality of
life for them and their family.

Ladies and Gentlemen, I am very pleased to tell you that the dream we all share ~~for this company~~ to have this type of long-term stability and future, and to provide the ability for
people to achieve all of their personal financial goals, will start on September 1st, in just 12
days!

The name of this new company, reflects exactly who we are:
Shang Peng Gao Ke!

Starting on September 1st, all of you will have the opportunity to join this company with your
team and continue to develop your financial dreams.

The first thing you should note is that the products of Shang Peng are very similar to all the
great products you have come to rely on only they have been upgraded wherever possible, and
they all have a new brand name on them. They all have the Shang Peng company name, and
they all have a new individual product name too.

~~The IRIS Applications Suite, will now be the (Astris) Applications Set.~~

Shang Peng has an excellent set of cloud-based software applications, under the name of
(AIRRIA) which will allow you to continue to communicate very efficiently and professionally
over the Internet.

As of September 1st, Phytter will no longer be available, however you will receive the new
Shang Peng applications called  Qio (Chee-O) Voip, and QioVoip Mobile.

Phytter Dock will be replaced by Cloud Safe, and all your online content will be transferred over
to your Cloud Safe account.

Meet 3 will be replaced by WeMeet 3 Videoconferencing.

Webcast will be replaced by the 'Presenter' Video broadcast Application.

VeMail will be Video eMail

Academy will be replaced by English Tutor

Expo will be replaced by Creator

Print will be replaced by Designer

Webrush will be replaced by Blogger

Studio will be replaced by Photo Album

FSD2021-0318                          **Page 228 of 448**                          2022-12-19

And (AIRRIA) will continue to offer Grand Prix Racing from iRacing.com.

.

In addition, the eComm Application is being replaced by a very special new eCommerce Marketing System called 'Interduce' to promote all the products and the income opportunities. You will learn lots more about this fabulous new Automated Marketing Application very soon.

I am also very pleased with Shang Peng's Nutrition and Skin Care Health Products.

~~iHealth Science will become~~ The new Shang Peng Health brand will feature DefendsX which is like our #1 Nutrition product is Fortris10. The 'X' in DefendsX is the roman numeral for 10.

Shang Peng has a new energy drink called Innergy which is the same formula as our Zenrise Energy Drink. Innergy comes in two different packets and boxes.

Shang Peng's Protein Drink is called Nirish, and this is just like Nerush, in the same two very popular flavors of Berry and Vanilla.

And, in just a few minutes, you will learn about Shang Peng's fabulous new Skin Care products under the exclusive brand name of Annovae!

I want you to know Shang Peng has have even more New Nutrition Products and IT Services already in their final development stage, however these are being held for a little while, until you become very familiar with all the product changes and additions all being releasing on September 1st. When Shang Peng releases these new products in a few months, they will create additional waves of excitement to further expand your product marketing and your teams.

As a company, Shang Peng Gao Ke represents a new specialty marketing niche in cross-border online e-commerce product marketing in the PRC.

There are currently over 720 million online users in the PRC, representing over 49% of the entire population, with a projected further annual growth rate of 5%. This is driven by a rapidly growing class of office workers and over 500 million 'Middle-Class' adults; plus 75 million 'Upper-Middle Class' adults; and 15 million 'Affluent' adults.

And over the next 10 years, experts are projecting that the 'Upper Middle Class', those with household earnings of 106,000 to 230,000 RMB per year, will grow to 5 times what it is today to 400 million adults; and, there will be over 70 million 'affluent' adults with household earnings over 230,000 RMB.

These Upper-Middle Class and Affluent Adult Consumers are generally well-educated and they are driven to have the best of everything possible. As a result, online marketing has grown extremely fast in the PRC market over the past few years to become the largest single e-commerce market in the world.

In the PRC there was an estimated annual ecommerce market turn-over of 3.8 trillion yuan in
2015; led by mega-companies like Tmall, JD.com, Suning, VIPShop and Gome.

However, while these highly-impressive e-commerce companies excel at providing convenient
online shopping from a very broad selection of product categories, these corporate giants are
understandably unable to provide true, individual customer information, attention and on-
going product support in two very large product categories where this level of personal support
is vital; information technology applications and health science products.

Shang Peng Gao Ke is a unique e-commerce marketing company whose exclusive products are
developed in the USA, specifically for the PRC market and available for cross-border e-
commerce. Shang Peng will thrive by providing individual customer interaction through
personal product introduction, product demonstration, product training and ongoing customer
service.

Shang Peng will be unique from other global e-commerce marketers by providing all this special
attention through the personalized support of local Shang Peng Agents,  backed by
independent service providers in China that understand local language and culture.

Shang Peng products are all distributed either online, or shipped by courier from a third party
distribution facility. ~~within PRC or from Hong Kong.~~

Supporting this unique Personalized eCommerce Product Marketing, is a new structure you all
will be invited to transition into, at no cost whatsoever.

The entry level are called an 'eMA' for 'eCommerce Marketing Agent.
Anyone who is 18 years and older and a permanent resident of the PRC, may register as an
eMA, without having to leave the PRC, by simply completing an online registration form, and
there is 'NO' registration fee at all!

eMA's are encouraged to purchase all the Shang Peng products at special discounted wholesale
cost for their own personal use and family use. And they are trained and encouraged to use
Shang Peng's ~~new~~ automated marketing system called 'Interduce' to introduce consumers to
our ecommerce products. When a consumer purchases a product online, Shang Peng will pay
the eMA a single level retail sales commission of 25%.

In addition, every time an eMA helps another individual register as an eMA who becomes a
(Asterix Applications Set) subscriber, the eMA will receive a special one-time New Subscriber
Bonus of ($25 USD=180 RMB).

Each one of these personally referred eMA's is called an 'Arm', and there is no limit to the
number of Arms an eMA can start and help develop into big strong Arms.

FSD2021-0318                    Page 230 of 448                    2022-12-19

(Create a motion graphic showing Arms being added to a central oval, and as Arms are being added, initial Arms are growing wider and longer)

Similar to what you have been previously accustomed to, eMA's will be paid their single level commissions through the same ProPay Debit Card. ~~Account they have already established.~~

~~Something new is that~~ All Shang Peng Products ~~will~~ have an SV points amount assigned to each of them. SV is short for Sales Value.
The (AIRRIA) Monthly Subscription SV points are 100 SV.
And all the Shang Peng Health products, the Nutrition Products and the Skin Care Products also have SV points assigned to them.

An eMA is credited with SV points from all products they purchase for their own personal use, and also for the products purchased online, by all the consumers personally referred by the eMA.

To qualify for all Consumer Sales Commissions and the New Subscriber Bonus, an eMA must maintain a minimum of 125 SV points from personal and personally referred consumer purchases.

Now once an eMA has at least 1,000 SV points in a single month, from their own product purchases; and from their personally referred consumer purchases; plus all the SV points from all the products purchased by other personally referred eMA's and Consumers that result from their initial referrals, they will be asked to register for a very special new Agent Support role.

In the Agent Support Role, the eMA's do what they just naturally do, and that is help the consumers and the eMA's they personally refer better understand our products and our ecommerce referral marketing business.

In the past Affiliates were paid Team Bonuses only for IT Product purchases by other Affiliates, and only when based on the sales of their weakest team.

In Shang Peng, the Agent Support representatives, are paid an hourly salary to support all the eMA's in their Arms. And the more SV points credited each month from Consumer and Agent product purchases of whom they support, the more weekly hours an AS rep will be paid for this support.

The very important ~~new~~ aspect to this support, is that Shang Peng is providing a very comprehensive Product and Business Training program, so all AS reps have very clear understanding about our products and business, which keeps growing as they advance as an AS.

So no more Team Bonuses, a Shang Peng AS is paid hourly fees as a part-time employee, providing just a few hours of support each week to the eMA's in their Arms.

FSD2021-0318                     Page 231 of 448                     2022-12-19

Let me show you how the AS will advance as the SV from all the product purchases in by
Consumers and eMA's whom they support in the Arms increases... now don't worry about
understanding all of this the first time you hear this, we will repeat this information again
tomorrow morning in the training session.

The first rank of AS is an Associate, so we call these an ASA.
At just 1,000 SV Points in the prior month, an ASA1 will be paid 130 RMB, each week for just
one hour of support to their team. This means over the 4 weeks, they will be paid a total of 520
RMB for just 4 total hours of support.

The second rank is an ASA2, and once their team grows to 2,500 SV Points in the prior month,
their hourly pay will increase to 210 RMB an hour, for 1½ hours each week, for a total of 1,260
RMB per for just 6 hours of support during the entire 4 weeks.

Now here is the rest of the ranks for the ASA rank, all the way to being paid 310 RMB per hour,
for 3 hours a week, 4 weeks a month, for a total salary of 3,720 RMB.

(Graphic)

| SV Points | ASA Rank | Hourly Wage | Hours/Week | Hours/4Weeks | Monthly Salary |
|---|---|---|---|---|---|
| 1,000 | ASA1 | 130 RMB | 1.0 Hr/Wk | 4 Hr/4 Wk | 520 RMB |
| 2,500 | ASA2 | 210 RMB | 1.5 Hr/Wk | 6 Hr/4 Wk | 1,260 RMB |
| 4,000 | ASA3 | 245 RMB | 2.0 Hr/Wk | 8 Hr/4 Wk | 1,960 RMB |
| 6,000 | ASA4 | 285 RMB | 2.5 Hr/Wk | 10 Hr/4 Wk | 2,850 RMB |
| 8,000 | ASA5 | 310 RMB | 3.0 Hr/Wk | 12 Hr/4 Wk | 3,720 RMB |

Now the more and better support an ASA provides their team, the more Consumer and eMA
product purchases, so their team is credited with more SV Points, and as these increase to
achieve higher SV ratings, the ASA is paid even higher hourly wages and are paid even more
hours per week... this is a beautiful system that keeps helping an AS to grow as an Agent
Support Representative and this helps them provide better and better support, which will
continue to help their Arms and Team grow!

The more SV points earned by their Team, the more people they support and the more hourly
support is needed by the Agent Support representative each week; and the higher their level of
training and experience, so they are paid more and more on an hourly basis as their experience
and knowledge of the products and the SV in their group continues to grow.

(Create a circular graphic that keeps winding further and further outward)

The next Rank for an AS is an ASE,  Agent Support Executive

(Graphic)

| SV Points | ASA Rank | Hourly Wage | Hours/Week | Hours/4Weeks | Monthly Salary |
|---|---|---|---|---|---|
| 12,000 | ASE1 | 390 RMB | 3.5 Hr/Wk | 14 Hr/4 Wk | 5,460 RMB |
| 16,000 | ASE2 | 455 RMB | 4.0 Hr/Wk | 16 Hr/4 Wk | 7,280 RMB |

FSD2021-0318    **Page 232 of 448**    2022-12-19

| 20,000 | ASE3 | 500 RMB | 4.5 Hr/Wk | 20 Hr/4 Wk | 9,000 RMB |
| 24,000 | ASE4 | 545 RMB | 5.0 Hr/Wk | 22 Hr/4 Wk | 10,900 RMB |
| 28,000 | ASE5 | 580 RMB | 5.5 Hr/Wk | 24 Hr/4 Wk | 12,760 RMB |

The next rank for an AS is as an ASM, Agent Support Manager
(Graphic)

| SV Points | ASA Rank | Hourly Wage | Hours/Week | Hours/4Weeks | Monthly Salary |
|---|---|---|---|---|---|
| 36,000 | ASM1 | 680 RMB | 6.0 Hr/Wk | 24 Hr/4 Wk | 16,320 RMB |
| 44,000 | ASM2 | 745 RMB | 6.5 Hr/Wk | 26 Hr/4 Wk | 19,370 RMB |
| 52,000 | ASM3 | 795 RMB | 7.0 Hr/Wk | 28 Hr/4 Wk | 22,260 RMB |
| 60,000 | ASM4 | 830 RMB | 7.5 Hr/Wk | 30 Hr/4 Wk | 24,900 RMB |
| 68,000 | ASM5 | 855 RMB | 8.0 Hr/Wk | 32 Hr/4 Wk | 27,360 RMB |

The next rank for an AS is as an ASD, Agent Support Director
(Graphic)

| SV Points | ASA Rank | Hourly Wage | Hours/Week | Hours/4Weeks | Monthly Salary |
|---|---|---|---|---|---|
| 80,000 | ASD1 | 865 RMB | 9.0 Hr/Wk | 36 Hr/4 Wk | 31,140 RMB |
| 100,000 | ASD2 | 955 RMB | 10.0 Hr/Wk | 40 Hr/4 Wk | 38,200 RMB |
| 125,000 | ASD3 | 1,070 RMB | 11.0 Hr/Wk | 44 Hr/4 Wk | 47,080 RMB |
| 150,000 | ASD4 | 1,155 RMB | 12.0 Hr/Wk | 48 Hr/4 Wk | 55,440 RMB |
| 175,000 | ASD5 | 1,325 RMB | 12.0 Hr/Wk | 48 Hr/4 Wk | 63,600 RMB |

Once an Agent Support representative grows their Team's total Consumer and eMA SV from all products to 200,000 SV, they are invited by the company to become a BMC, or Business Marketing Consultant. ~~This is similar to the role performed by our current Silver and Gold Affiliates.~~

Shang Peng will assist the BMC to establish their own Marketing Consulting Company in the PRC, and we will help them with all the administrative functions so they can focus on supporting all the AS Representatives they have been engaged to service.

The role of a BMC is to...(to be completed)

A BMC is paid a Service Fee and additional Performance Bonus on all the SV Points from all Consumer and eMA product purchases, from all e-commerce products sold by the eMA and AS Representatives they have been engaged to service.

(Show Performance Bonus Chart)
Business Marketing Consultant – Monthly Income Potential
        Total SV    Performance Bonus    Income

FSD2021-0318                         Page 233 of 448                         2022-12-19

| (All Products) | Rate | in USD |
|---|---|---|
| 0 – 200,000 | 5.5% | $ 11,000 |
| 200,000 – 400,000 | 3.5% | $  7,000 |
| 400,000 – 600,000 | 2.5% | $  5,000 |
| 600,000 – 800,000 | 1.5% | $  3,000 |
| 800,000 – 1,000,000 | 0.5% | $  1,000 |
| | Total | $ 27,000 USD |

* 40% of GSV Line Limiter     * 60% Arms 2+ Balance

Once the total SV from all products sold by the eMAs and the ASRs which a BMC has been engaged to service grows to 500,000 SV, they are invited by the company to become a MRC, or Master Representative Consultant. ~~This is similar to the role performed by our current Platinum Affiliates.~~

Shang Peng will continue to assist the MRC with all the administrative functions of their own Marketing Consulting Company, so they can continue focus on supporting all the AS Representative in their company.

The role of an MRC is to inspire, supervise and confirm all the AS Representatives in their Company to work at their very best. Shang Peng will ensure that the MRCs tracks and calculates and pays the MRC for all the hourly wages earned by all the eligible AS Representatives in their Company, and the MRC's company completes the monthly part-time hourly wages payments to all the Agent Support Representatives.

Shang Peng will pay a service fee that will include the hourly wages owed to the Agent Support Representatives working for the MRC.

A MRC is paid a Service Fee and Additional Performance Bonus on all the SV Points from all Consumer and eMA product purchases, from all e-commerce products sold by all their part-time employees and the eMAs they support.

(Show Performance Bonus Chart)

Master Representative Consultant – Monthly Income Potential

| Total Company SV (All Products) | Performance Bonus Rate | Income in USD |
|---|---|---|
| 0 – 500,000 | 5.5% | $ 27,500 |
| 500,000 – 750,000 | 2.0% | $  5,000 |
| 750,000 – 1,000,000 | 1.5% | $  3,750 |
| 1,000,000 – 1,250,000 | 1.0% | $  2,500 |
| 1,250,000 – 1,500,000 | 0.5% | $  1,250 |
| | Total | $ 40,000 USD |

* 40% of GSV Line Limiter     * 60% Arms 2+ Balance

FSD2021-0318                    **Page 234 of 448**                    2022-12-19

As you can see, the MRC can earn a very significant monthly Service Fee as a Master Representative Consultant.

Now as I said, we will spend more time on this tomorrow, however to quickly summarize:

- PRC Individuals may Register Online in the PRC, to be an eMA, at no cost.

- eMA's buy products at wholesale cost for own use, and earn a single level product sales commission on purchases by Consumers whom they personally introduce through the new automated marketing system.

- Once an eMA's personally referred eMA and Consumer Group has 1,000 SV Points, they are invited to become at Agent Support Representative, where as part-time employees, they are paid more each hour and can be paid for more hours each week, as the size of the group they support grows.

- Once an Agent Support Representative's group they support achieves an SV of 200,000 SV per month, they may be invited to become a BMC and be a paid Marketing Consultant.

- Once a BMC's group they support reaches 500,000 SV per month, they may be invited to become a MRC and be a paid as a Master Representative Consultant.

- For any Affiliates who hold 3 Positions, you can collapse all 3 positions into one Shang Peng role if you wish, or you may transfer two of the positions to a spouse, or an adult child, or a parent, or a business, but you cannot transfer to another Affiliate. These need to have a separate owner and separate Tax ID.

  I suggest you complete this transition ASAP, as starting in September each Tax ID may only have one role. If you do not do this in September you will not be paid for this additional position for sales in September, however you do have up to 12 months to complete this, before the potential role is deleted.

- In addition, Shang Peng will also provide a 2% Consultants Share Bonus to qualified BMC and MRC Consultants based on all the SV from the entire PRC market.

- Plus, the Shang Peng Gao Ke parent company, which has been renamed Ascentra Holdings, Inc., will continue to provide the PSP Program, and honor the Introduction Bonus Program, and the Loyalty Bonus Program.

Now as I said, the transition to Shang Peng will commence on September 1, and we will use a formula based on your prior legacy sales to calculate what the position within our business would be for each individual, and this will be the rank they will start at on September 1st. This is why there can be no further new registrations in Interush after the applications received by Monday August 22nd.

Later on, I will tell you all about a very special Shang Peng Public Relations program we have planned, but here is a sneak preview! (show new SP race car).

Shang Peng will also have it's own Consultant's Conference this year in Bali, and we will tell you more about this shortly.

And yes, Shang Peng will also have Recognition Pins, and not only will you keep the valuable legacy pins that have already been awarded to you, we will be distributing your Shang Peng Recognition Pins to you as well.

Please don't be concerned about the transition to Shang Peng, you will soon see it is much easier to understand, and Shang Peng will provide you the opportunity to earn the same, or even more than you have previously earned, or even could earn.

Thank you very much for being here this weekend, and for joining us on the exciting next journey that will eliminate all the barriers you have previously faced and provide each of you a much greater opportunity today, tomorrow and for years and years to come.

Now I would like to turn this program over to Jessie Tsia, Vice President of Sales, to provide more information about our wonderful Shang Peng IT Products!

(For second presentation)

(Zinc and Color Inlays) Shang Peng Pin - this is gifted at first event, then purchased online.

(Bronze)  Associate/Executive Pin - this is gifted at first event, then purchased online.

(Silver) Manager/Director Pin - this is awarded

(Silver and Ruby)  BMC Pin - this is awarded

(Gold and Diamond) MRC Pin - this is awarded

# EXHIBIT 4

FSD2021-0318                                                    2022-12-19

Page 236 of 448
Private & Confidential

Date: [DATE] 2016

Dear [INSERT],

Announcing an Excellent Opportunity to Transition from
Interush International, LLC to the Shang Peng Gao Ke, Inc.
eCommerce Marketing Opportunity
Interush International LLC から Shang Peng Gao Ke,Inc. E コマースマーケ
ティングへの移行に当たっての素晴らしい機会

This letter is to formally inform you that Interush International, LLC subsidiary company which
offered products in Hong Kong, Macau and the PRC, is ending its operations and ceasing to provide
support to customers in these markets. As such, we must cancel our affiliate agreements with you
and terminate our relationship as of October 1, 2016.
こちらのレターは、公式文書として、香港、マカオ、中国において商品を提供してきた
Interush International LLC 子会社が、これらの市場における運営を停止し、カスタマーサポ
ートの提供も停止することを発表するものになります。上記の通り、あなたとのアフィリ
エイト契約を解約し、2016 年 10 月 1 日から我々の関係を解消することとなります。

However, we are pleased to advise that we have identified a dynamic company, Shang Peng Gao Ke,
Inc. ("Shang Peng") which will enable you to continue earning an income through a business which
has very similar IT and Health products and customer support within China.
ですが、この度 Shang Peng Gao Ke Inc.というダイナミックな会社を我々が特定しました。
あなたは引き続き似た IT・健康商品・カスタマーサポートを中国で提供しているこの会社の元で事業を
行い、収入を稼ぐことができます。

Shang Peng is a unique e-commerce marketing company whose exclusive IT and Health products
are developed in the USA and available in Hong Kong and Macau, plus the PRC market through
cross-border e-commerce. Starting on September 7th, you will have the opportunity to join this
company at no cost, and work towards your financial goals. I have been working with this company
to ensure a smooth transition and make this process as easy as possible for you.
Shang Peng は大変ユニークな E コマースマーケティング会社です。彼らの IT 及び健康商品
は独占的に米国にて開発され、香港、マカオ、中国にてクロスボーダーE コマースという
形で提供されております。9 月 7 日より、あなたはこちらの会社に無償で参画することがで
き、引き続きあなたの財務上のゴールに向かって取り組んでいただけます。私は
Interush International LLC はこちらの会社とスムーズな移行が行えるように、そしてあなた
方の移行ができるだけ容易になるように取り組んできました。

I would also recommend that you continue to purchase your IRIS IT Applications and Health
products in September from Interush as before. Please also proceed to register with Shang Peng as
soon as possible, so that you will receive full communications and be able to transition along with
your friends, family and associates, and be able to purchase and promote similar products from
Shang Peng, as of October 1, 2016.
また、9 月までは以前と同様に IRIS IT アプリケーション及び健康商品をインターラッシュ
よりご購入されることをお勧めします。早急に Shang Peng での登録に進まれてください。
そしたら、纏まった発表内容があなたに届き、あなたのお友達、ご家族、仕事仲間と共に

移行を行うことができ、2016 年 10 月 1 日から似た商品アメリカで開発された Shang pangs ブランドのＩＴ関連商品、健康商品、画期的なコンセプトを持つ化粧品を Shang Peng よりご購入できます。、そして販売していくことができます。

Please review the online referral e-commerce products marketing opportunity and associated part-time support and full-time leadership development opportunities which Shang Peng offers. I think you will be very pleased with this transition opportunity and the long-term income potential.

Shang Peng が提供するオンラインリファーラル E コマース商品マーケティング機会及び関連するパートタイムサポート・フルタイムのリーダーシップ開発機会に関してご確認ください。この移行機会と長期的な報酬ポテンシャルにあなたも喜んでいただけるとおもいます。

The company's consumer marketing and support is provided in the PRC by a coordinated group of independent highly-experienced and specially-trained sales and business management consultants who work on an after sales support and service arrangement for Shang Peng. The independent business management consultants each employ and supervise the training of a large contingent of customer service agents. In addition, a national team of independent sales management consultants focus consumer marketing strategies and product benefits to independent, registered and commissioned Marketing Agents.

会社の消費者マーケティング及びサポートは中国国内で、独立した経験豊富で特別にトレーニングを受けたビジネスマネージメントコンサルタントが提供します。彼らは Shang Peng のアフターセールスサポートとサービス手配に取り組みます。独立したビジネスマネージメントコンサルタントはそれぞれ多くのカスタマーサービスエージェントを雇用します。また、国家規模の独立セールスマネージメントコンサルタント達は消費者マーケティング戦略に取り組み、登録済みの独立マーケティングエージェントに向けて戦略や、商品のベネフィットなどを発信します。

Along with this transition, Ascentra Holdings, Inc. will continue to honor the Loyalty Bonus program to current Interush qualifiers, as well as offer an Annual RSP Bonus program, and honor the legacy Introduction Bonus program formerly provided by Interush for your tenure with Interush.

こちらの移行に伴い、Ascentra Holdings, Inc がインターラッシュ資格者に対してインターラッシュが提供していたロイヤルティボーナスプログラム、そして年次 RSP ボーナスプログラム、過去のイントロダクションボーナスの義務を引き継ぐことになります。

You are invited to join Shang Peng at no cost. The company will use a formula based on your experience at your legacy position with Interush to transition you to their business. We recommend that you complete the transition as soon as possible. Interush will cease supporting customers in Hong Kong, Macau and the PRC as of October 1, 2016, with final commission payment to follow in October.

あなたは無償で Shang Peng に参加することができます。会社は一つの方程式を使い、あなたの以前のインターラッシュでのポジションを元に、Shang Peng のビジネス内で配置させていただきます。我々としては早急に移行を完了するようにお勧めします。インターラッシュは 2016 年 10 月 1 日より香港、マカオ、中国におけるカスタマーサポートの提供を停止し、最後のコミッション支払いは追って 10 月に行われます。

To register with Shang Peng as of October 7, 2016, please visit:_____

Shang Peng に登録するためには、2016 年 10 月 7 日までに、こちらにアクセスください：

_____

For more information about Shang Peng, visit: www.ShangPengGaoKe.cn

更に詳細をご希望でしたら、こちらにアクセスください：www.ShangPengGaoKe.cn

We wish you all the best in your future endeavours.
皆様のこれからのご発展を祈願しております。


Yours Sincerely,
Martin J. Matthews
Director,
Interush International, LLC
マーティ・マシューズ

ダイレクター

Interush International LLC


**Disclaimer:** *Shang Peng Gao Ke Inc. is a separate and unrelated company from Interush International, LLC. By registering with Shang Peng Gao Ke Inc., you hereby specifically agree and acknowledge in no event shall Interush International LLC or Shang Peng Gao Ke Inc. be held liable for lost profits, lost sales, lost business, lost opportunity, lost or wasted time or any special, incidental or consequential damages arising out of or with respect to the transition, and past income performance shall not be treated as an indication or guarantee of future income performance in any event.*
*免責事項: Shang Peng Gao Ke, Inc は Interush International, LLC とは別の、無関係の会社です。Shang Peng Gao Ke, Inc にて登録することにより、あなたの利益、売り上げ、事業、機会、時間の損失及び移行に伴うその他候害に対する損失、そして過去の収入の実績は将来的な収入の保証にはなりません。ならないことを理解し、Interush International LLC またはおよび Shang Peng Gao Ke Inc はこの損害に対して責任は追及できないということを同意しているものであると認めます。*

# EXHIBIT 5

21-11854-dsj    Doc 63-3    Filed 09/01/23    Entered 09/01/23 19:58:55    Exhibit 2-1
Pg 45 of 111

21-11854-dsj    Doc 44-5    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit 5 -
Agreement between Planet Payment and SPGK Singapore    Pg 2 of 13

# °planet

ClientServices@planetpayment.com

## MERCHANT PROCESSING APPLICATION

✓ New Account    __ Additional Location for Existing Account    __ Contract Update

Sales Office Name: PPS    Sales Office #: _____

Sales Rep Name: Ray Rafaty    Sales Rep #: ___    Merchant Referral Source _____

### BUSINESS INFORMATION

| Legal Name of Business or Corporate Owner<br>SPGK Pte. Ltd. | DBA (Doing Business As) Name<br>SPGK | | |
|---|---|---|---|
| Billing Address<br>600 North Bridge Road #05-01 | Location Address<br>Unit 910-912, 9/F, Tower 2, Silvercord, 30 Canton Road, Tsim Sha Tsui | | |
| City<br>Singapore | State/Province | Zip/Postal Code | City<br>Hong Kong | State/Province | Zip/Postal Code |

| City<br>Singapore | State/Province | Zip/Postal Code | City<br>Hong Kong | State/Province | Zip/Postal Code |
|---|---|---|---|---|---|
| Business Phone<br>+85221584063 | Business Fax Number | | Customer Service Phone<br>+864001202908 | Federal Tax ID Number | |
| Contact Name / Office Manager<br>Luke Yoshida | Contact Phone Number<br>+85293531111 | Contact E-Mail Address<br>luke@spgk.com | | Website Address www.<br>www.shangpenggaoke.cn | |

### BUSINESS DESCRIPTION

| Business Processing Category | __ Retail    __ Restaurant    __ MO/TO    ✓ Internet    __ Other        Travel Related?    __ Yes  ✓ No | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Type of Ownership | Sole Proprietorship        Partnership        LLC        Corporation -- Type        Non-Profit | | | | | | | |

| Transaction Type by Card Type | Accept Y/N | Manually Keyed | Phone/Mail Order | Internet | Card Swipe | Average Ticket | High Ticket | Ave Monthly Volume | High Monthly Volume |
|---|---|---|---|---|---|---|---|---|---|
| UnionPay | Y | 0.00% % | 0.00% % | 100.00% % | 0.00% % | $ 150.00 | $ 2,000.00 | $ 20,000,000.00 | $ 23,000,000.00 |
| AMEX | N | 0.00% % | 0.00% % | 0.00% % | 0.00% % | $ | $ | $ | $ |
| JCB | N | 0.00% % | 0.00% % | 0.00% % | 0.00% % | $ | $ | $ | $ |

| Describe type of Business  Distribution of Healthcare, Beauty & Digital Products | Are Goods/Services Delivered at Time of Sale?    __ Yes   ✓ No |
|---|---|
| Years in Business: 5 yrs | If no, Number of Days until Delivered: _____ Days |
| Number of Business Locations: 2 | Average Percentage of Sales Returned: _____ % |
| Are all locations in the US and/or Canada? __ Yes   ✓ No | Number of Days Items may be Returned for Credit: _____ Days |
| Describe Goods/Services Sold: Beauty & Digital Products | Seasonal Merchant? __ Yes  ✓ No    J F M A M J J A S O N D |
| VISA MCC: _____  MasterCard MCC: _____ | If yes, indicate active months: __ __ __ __ __ __ __ __ __ __ __ __ |

### PROCESSING DESCRIPTION

Process JCB currently or previously? ___ Yes  ✓ No    Process Visa/MasterCard currently or previously? ___ Yes  ✓ No
Process UnionPay currently or previously? ✓ Yes  ___ No    Process AMEX currently or previously? ___ Yes  ✓ No
Process Discover currently or previously? ___ Yes  ✓ No
If YES, Current Processor Name: _____    Are the most recent Processor Statements attached? ✓ Yes  ___ No
Have Merchant or Ownership/Principals ever been terminated from accepting credit/debit cards for this business or any other business? ___ Yes  ___ No
If YES, reason for termination: _____

| FULFILLMENT CENTER | MERCHANT SERVICER |
|---|---|
| Does your company use a fulfillment Center? ✓ Yes ___ No | Does anyone outside of your company have access to the credit card or bank account information of your customers?    __ Yes  ✓ No |
| If Yes: Fulfillment Center Name: V-Logic | If Yes: |
|  | Name: _____ |
| Fulfillment Center Address/ Phone # +85231023088 | Address: _____    Phone # _____ |
|  | Service provided: _____ |

| E-COMMERCE | PCI COMPLIANCE |
|---|---|
| Does your company sell some/all products via internet? ✓ Yes  ___ No | Does your company store the credit card or bank account information of your customers? ___ Yes  ✓ No |
| If Yes: | Is your company currently PCI compliant? ✓ Yes  ___ No |
| URL www.shangpenggaoke.cn  (if different than above) | If Yes: Assessor contracted for PCI _____ |
| Is the website through which they are sold active? ✓ Yes  ___ No | If required and No, expected as of date of compliance _____ |
| Is a Privacy Policy and Return Policy clearly stated? ✓ Yes  ___ No | |

### PRINCIPALS/BENEFICIAL OWNERS

Principal/Beneficial Owner #1 Name:
First: Ryunosuke    Middle Initial: ___    Last: Yoshida    SSN: _____    %Ownership 100

Title: Director    DOB: 1989/4/25 _____

Home Address: Unit 703, 7/F, Block B, Harbourfront Horizon, 8 Hung Luen Road, Hung Hom    City: Hong Kong

Home Phone: _____    DL#/State*: _____    Email Address: luke@spgk.com

Ver. 201802

**Principal/Beneficial Owner #2 Name:**
First: _____ Middle Initial: ___ Last: _____ SSN: _____ %Ownership _____
Title: _____ DOB: _____
Home Address: _____ City: _____
Home Phone: _____ DL#/State*: _____ Email Address: _____

**Principal/Beneficial Owner #3 Name:**
First: _____ Middle Initial: ___ Last: _____ SSN: _____ %Ownership _____
Title: _____ DOB: _____
Home Address: _____ City: _____
Home Phone: _____ DL#/State*: _____ Email Address: _____

**Principal/Beneficial Owner #4 Name:**
First: _____ Middle Initial: ___ Last: _____ SSN: _____ %Ownership _____
Title: _____ DOB: _____
Home Address: _____ City: _____
Home Phone: _____ DL#/State*: _____ Email Address: _____

**Controlling Position/Beneficial Owner Name:**
First: Ryunosuke  Middle Initial: ___ Last: Yoshida  SSN: _____ Controlling Interest [✓] Yes [ ] No
Title: Director  DOB: 1989/4/25
Home Address: Unit 703, 7/F, Block B, Harbourfront Horizon, 8 Hung Luen Road, Hung Hom  City: Hong Kong
Home Phone: _____ DL#/State*: _____ Email Address: luke@spgk.com

**SETTLEMENT INFORMATION – ATTACH VOIDED BUSINESS CHECK & Copy of Drivers License or other form of Government Issued Identification**

| Bank Name | DBS Bank Ltd | Name on Bank Account | SPGK Pte. Ltd. |
|---|---|---|---|
| ABA/Routing # | DBSSSGSG | DDA Number | 0720129318 |

**MERCHANT SITE SURVEY (Completed by Sales Representatives):**

LOCATION    [ ] Mall [ ] Strip Mall [✓] Office Building [ ] Residence [ ] Other: ____    AREA    [ ] Industrial [ ] Commercial [ ] Residential

Is exterior signage consistent with application?    [■] Yes [ ] No        Does Inventory/merchandise appear consistent with application? [■] Yes [ ] No

Photos taken    [ ] Yes [ ] No included with application    [ ] Yes [ ] No        If Photos Not taken, was site personally visited by S/A Signor [ ] Yes [ ] No

S/A Signature: * _____        Date: _____

* By his/her signature, the S/A is certifying that he/she has visited the location and the information herein set forth is true and correct.

**CERTIFICATION & AGREEMENT**

By signing below, the Merchant named above: (1) certifies that all information and documents submitted in connection with this Application are correct to the best of your knowledge; (2) authorizes the Acquirer to receive credit reports as occasioned from time to time and any other information regarding undersigned or its principals, proprietors or partners from third parties, to verify any information provided on the application; (3) have read, agreed to, and acknowledges receipt of the document entitled "Planet Payment Merchant Services Agreement," all of which is incorporated herein and deemed a part hereof by reference, and agrees to be bound by the terms and conditions thereof (such document, together with this Application, the "Agreement."); (4) agrees that Merchant and each transaction submitted to the Acquirer will be bound by the terms and conditions in the Agreement; and (5) agrees that Merchant will submit transactions to the Acquirer only in accordance with the information in this Application and will immediately notify the Acquirer in writing if any information in this Application changes. The Agreement will become effective only when signed by the Acquirer and Merchant. Merchant acknowledges that the Acquirer shall rely on the representations and warranties set forth in this Application

In WITNESS WHEREOF, the parties hereto executed this Agreement as of this day 29/09/2019

Ver. 201802

Merchant By _____     Merchant By _____
  (Merchant Principal or Corporate Officer Signature)      (Merchant Principal or Corporate Officer Signature)

RYUNOSUKE YOSHIDA
  (Print Name)              (Print Name)

Date 29/09/2019           Date _____

Accepted by Planet Payment Solutions, LLC

By _____

_____ Date _____
  (Print Name)

## PERSONAL GUARANTY

In consideration of the Acquirer's acceptance of this Agreement, the undersigned Guarantor (jointly and severally if more than one) unconditionally guarantees the performance of all obligations of Merchant to the Acquirer under the Agreement, and payment of all sums due hereunder, and in the event of default, hereby waives notice, of default and agrees to indemnify the Acquirer for all funds due from Merchant pursuant to the terms of the Agreement. Guarantor waives any and all rights of subrogation, reimbursement or indemnity derived from Merchant, and further waives any and all rights or defenses arising by reason of any modification or change in the terms of the Agreement whatsoever, including, without limitation, the renewal, extension, acceleration, or other change in the time any payment or other performance hereunder is due, and / or any change in any interest or discount rate or fee hereunder. Guarantor confirms that Guarantor, collectively or individually, is a party to the Agreement, and unconditionally and specifically authorizes the Acquirer, or its authorized agent, to debit any overdue fees, costs, chargeback's, fines, fees, penalties, expenses or obligations under the Agreement and / or any contractual relationship with the Acquirer from any personal checking account or other account owned or controlled by Guarantor, and further to report any default hereunder on Guarantor's personal Credit Bureau Report. Guarantor agrees to pay all costs and expenses of whatever nature, including attorneys' fees and other legal expenses, incurred by or on behalf of the Acquirer in connection with the enforcement of this Guaranty.

X_____    X_____
 Signature, Principal or Corporate Officer  Title  Date   Signature, Principal or Corporate Officer  Title  Date

Print Name             Print Name

Ver. 201802

21-11854-dsj   Doc 63-3   Filed 09/01/23   Entered 09/01/23 19:58:55   Exhibit 2-1
Pg 48 of 111

21-11854-dsj   Doc 44-5   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit 5 -
Agreement between Planet Payment and SPGK Singapore   Pg 5 of 13

## PLANET PAYMENT MERCHANT SERVICES AGREEMENT

In consideration of the mutual promises and covenants contained in this Agreement, the parties agree as follows:

Parties: The parties to this Agreement are Planet Payment Solutions, LLC., whose address is 670 Long Beach Boulevard, Long Beach, New York 11561 (called "Acquirer"), and the applicant submitting the signed Merchant Processing Application incorporated herein and deemed part hereof by reference (called "Merchant");

1. **Alternative Payment Services Provided by Bank**: Acquirer has available to its Merchant customers, the following services which enable Merchants to accept alternative methods of payment from their customers: Authorization, processing, transaction data capture, and payment transmittals to Merchants resulting from customers making payment with Approved Cards. For the purposes of this Agreement, the following definitions apply unless the context otherwise requires:

   (a) **AMEX** shall mean: American Express Travel Related Services Company, Inc., American Express Payment Services Limited and its subsidiaries and affiliates;

   (b) **Approved Card(s)**: Credit cards bearing the logo of JCB, UnionPay or AMEX that the Merchant has elected to accept and Acquirer has agreed to process under the terms and conditions of this Agreement.

   (c) **Authorization** shall mean the process of submitting a request via Acquirer to the Card Association or issuer of an Approved Card, in the manner required under this Agreement, to obtain approval to charge such Card for the amount of a sale under a specific Transaction and "Authorized" shall mean only that such issuer has granted such approval.

   (d) **Cardholder**: Holder of one or more Approved Cards.

   (e) **Card Association**: JCB International Credit Card Co., Ltd., and its subsidiaries and affiliates, China UnionPay Co., Ltd, and its subsidiaries and affiliates and American Express Travel Related Services Company, Inc., American Express Payment Services Limited and its subsidiaries and affiliates.

   (f) **UnionPay** shall mean cards issued by China UnionPay Co., Ltd. and its subsidiaries and affiliates.

   (g) **E-Commerce Merchant**: Merchant which offers its goods and services for sale or lease and accepts payment using an Approved Card by means of the Internet.

   (h) **JCB** shall mean JCB International Credit Card Co., Ltd., and its subsidiaries and affiliates.

   (i) **Personally Identifiable Information or PII**: any information relating to an identified or identifiable natural person, whether or not otherwise publicly available, which is supplied by such person, including but not limited to name, address, telephone number, any identification number relating to such person and all information relating to, or which is on their Approved Card and which relating to such person or their Approved Card.

   (j) **Transaction**: Acceptance of an Approved Card for payment for goods sold and/or leased of services provided to Cardholder by Merchant in accordance with the terms of this Agreement.

   (k) **Sales Draft**: Written document evidencing the Transaction for which Merchant seeks payment through the services of Acquirer, in accordance with this Agreement. The form of sales draft used by Merchant shall be a form approved by Acquirer.

2. **Participation by Merchant**: Merchant is in the business of selling and/or leasing goods and/or providing services to its customers of the type described in the Merchant Processing Application signed by the Merchant. To better serve those customers, Merchant has requested and Acquirer has agreed to permit Merchant's participation in Acquirer's card processing programs and services.

   (a) Without the prior written consent of Acquirer, Merchant is not authorized to process Transactions for payment for any other type of goods or services. Acquirer reserves the right to establish certain limits on volume of daily, weekly and monthly transactions and dollar limits that Transaction which Merchant may process. Failure to follow these limits, which may be amended from time to time, will be a default under this Agreement.

   (b) Merchant shall only use a method of fulfillment for the sale/lease of goods or the providing of services disclosed to and approved by Acquirer, including using only approved methods of delivery.

   (c) Merchant utilizing a fulfillment center for the purpose of providing goods or other services to a customer must promptly provide in writing (letter or email), the name, address, phone number, contact person, type of goods, shipping and return service or method used with that fulfillment center. The Acquirer will confirm with the fulfillment center, Merchant is a legitimate customer of the fulfillment center and the product, shipping and return service enabled. The Acquirer has the right to disqualify the use of the fulfillment center if it finds discrepancies in the information provided by Merchant and the information obtained from the fulfillment center or the financial condition of the fulfillment center is deemed unacceptable to the Acquirer.

   (d) The Merchant must promptly report the use of any Merchant Servicer, defined as any entity that is not a member of a Card Association but has a direct relationship with a Merchant, and which has needs to cardholder data and perform such services such as gateway, fraud scrubbing, loyalty programs, etc. Bank is required by Card Association regulations to register the Merchant Servicer with Card Association and ensure that the Merchant Servicer is documented compliant with the Payment Card Industry requirements.

   (e) Without prior written permission from Acquirer, Merchant shall not have a Merchant processing relationship with any other provider for the processing of Approved Cards for the business described in the Merchant Processing Application during the term of this Agreement and any extension or renewals thereof. If Merchant fails to comply with this provision, Merchant agrees to pay Acquirer, within 10 days of non-compliance, a liquidated damages sum equal to 1% of the remaining processing volume. For the purpose of this clause, the "remaining processing volume" shall be determined by multiplying the number of months remaining in the term by the greater of: (i) the average monthly gross dollar volume processed by Acquirer on behalf of Merchant over the twelve calendar months preceding the Merchant's breach of this provision or, in the event that Merchant has been processing for less than twelve months, then the average monthly gross dollar volume processed by Merchant from the inception of the Merchant Agreement to the breach of this provision; OR, (ii) the Average Monthly Volume specified in the Merchant Processing Application, and then multiplying the product of that calculation by 1%. Merchant and Acquirer agree that the damages suffered by Acquirer as a result of non-compliance with this provision are difficult to calculate with precision. For that reason, the parties agree that the liquidated damages should be computed as set forth herein. Any exceptions to this exclusive arrangement must be approved by Acquirer in writing.

3. **Merchant Operating Account**: Prior to accepting any Approved Cards, Merchant shall establish a demand deposit account at a financial institution approved by Acquirer through which fees, charges, and credits due in accordance with this Agreement may be processed (called "Operating Account"). Merchant authorizes Acquirer to debit all fees and charges from the Operating Account, monthly or at times deemed appropriate by Acquirer through the ACH Banking Network or by a manual debit of the account. Merchant shall maintain this Operating Account throughout the term of this Agreement and any extensions or renewals thereof. Merchant shall, at all times, maintain sufficient funds in this Operating Account to ensure that all fees, charges and costs provided for under this Agreement are paid, including any reserve requirements set by Acquirer in accordance with paragraph 4 below. Only the person(s) signing this Agreement on behalf of Merchant shall be authorized to make any changes to the Operating Account. Any changes to the account or changes of the account shall be reported promptly to the Acquirer in writing and must be approved in writing by Acquirer. If required by Acquirer or any financial institution where the Operating Account is maintained, Merchant agrees to sign any other additional documents to authorize ACH transactions. Merchant agrees to be bound by the operating rules of the National Automated Clearing House Association (NACHA). Merchant waives any claims for loss or damage arising out of any charges or debits to the Operating Account against any other designated financial institution where the account is maintained. Merchant hereby grants a security interest in the Operating Account and/or any substitute account now and in the future and all proceeds thereof to Acquirer to secure all fees, costs and charges due in accordance with this Agreement.

21-11854-dsj    Doc 63-3    Filed 09/01/23    Entered 09/01/23 19:58:55    Exhibit 2-1
Pg 49 of 111

21-11854-dsj    Doc 44-5    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit 5 -
Agreement between Planet Payment and SPGK Singapore    Pg 6 of 13

4,  **Point-of-Sale (POS) Equipment**: In processing Transactions, Merchant shall utilize only Point-of-Sale Equipment (terminals, printers, pin pads and scan readers) ("POS Equipment") or Point-of-Sale Software Program and related equipment ("POS Software") installed or approved by Acquirer subject to the following additional terms:

   (a)  For equipment rented to Merchant, Acquirer may install all POS Equipment utilizing POS Equipment installers selected by Acquirer; or, at the sole option of Acquirer, Acquirer may provide POS Software through a software vendor selected by Acquirer.

   (b)  The POS Equipment and/or POS Software to be provided or installed shall conform to the types of services selected by Merchant and approved by Acquirer.

   (c)  Merchant will provide, at Merchant's expense, suitable electric power and telephone services necessary to operate the POS Equipment and will bear the expense of alterations made to Merchant's premises required to locate the POS Equipment in a location suitable for proper operation. If Acquirer elects to provide POS Software, Merchant shall also provide suitable computer terminals, computer hardware, and its own Internet Service Provider, if required by Acquirer, necessary to operate the software.

   (d)  Merchant shall permit telephone equipment installers and POS Equipment installers to enter its premises for the purpose of installation, replacement, retrofitting, inspection, relocation, disconnection, removal, repair or maintenance of telephone lines and equipment, POS Equipment and POS Software.

   (e)  Merchant shall provide the information required by the Merchant Processing Application provided to Merchant and shall promptly notify Acquirer of any changes in this information.

   (f)  Merchant shall not remove any POS Equipment or POS Software from its original place of installation (other than to a telephone company installed jack located within the Merchant's premises where the POS Equipment or POS Software was originally installed) or permit any modification, addition or repair to any POS Equipment or POS Software without prior written consent of Acquirer. Any authorized relocation of POS Equipment or POS Software following installation will be at Merchant's expense.

   (g)  Merchant acknowledges that the installation of the POS Equipment is subject to (1) the availability of telephone lines and equipment terminals and related equipment; (2) the cooperation of Merchant, the electric and telephone companies; and (3) the availability of Acquirer's POS Equipment installer. Acquirer will have no liability to Merchant if any installation is delayed or cannot be completed for reasons not caused by the act or neglect of Acquirer, and in such cases the liability of Acquirer shall be limited to a waiver of fees due under this Agreement during the period of delay.

   (h)  All POS Software shall be installed and operated in accordance with the instructions provided by Acquirer or Acquirer's software vendor. Acquirer is not responsible for any interruption in service caused by the failure of Merchant's computer terminals, hardware, and, if applicable, its Internet Service Provider.

5,  **Documenting Approved Transactions**: Each Transaction shall be reflected on Sales Drafts supplied or approved by Acquirer and shall contain the following information:

   (a)  Name of Merchant and Merchant number designated by Acquirer;
   (b)  The Approved Card number, validation date and/or expiration date of the card, if one appears on the card;
   (c)  The selling price, together with applicable taxes, other charges, gratuities and the total amount of the Transaction;
   (d)  Signature of Cardholder or authorized user, date of the Transaction and Transaction approval number for the Transaction;
   (e)  Such additional information which may from time to time be required by Acquirer and/or the relevant Card Association.

Merchant agrees to deliver to its customer in each Transaction a true and completed copy of the Sales Draft. Merchant agrees not to transmit a Sales Draft to Acquirer (electronically or otherwise) until such time as Merchant has performed its obligations to the Cardholder in connection with each Transaction which obligations include, but are not limited to, delivery of the goods and/or services to the Cardholder. Merchant shall also examine each card presented, or use one or more Approved Card security features, including personal identification numbers or signature, if applicable, before completing any Transaction.

6.  **Authorization for Approved Card Transactions**: Merchant may obtain approval of Transactions as follows;

   (a)  **Electronically Transmitted Transactions**: Merchant shall submit each Transaction for specific Authorization from Acquirer's Authorization Center. Acquirer shall Authorize or decline a Transaction transmitted for Authorization and shall capture and process for Merchant the information relating to the Transaction. The information to be transmitted by Merchant through the terminal or POS Software shall include, but not be limited to the information required on a Sales Draft, excepting only the description of the goods and services provided, and the Cardholder's signature. Merchant agrees to include any additional information necessary for Acquirer to comply with all legal requirements for billing Cardholder or may, from time to time, be required by Acquirer and/or the relevant Card Association.

   (b)  **Dial-Up Authorization**: In the event that a terminal is inoperable at the time of an Authorization request, Transactions for Approved Cards may be Authorized by using the appropriate dial-up facility. In that case, the Transaction shall be entered into the terminal or software application later that day as a forced sale/ticket provided the approval number is also entered. If Authorization is granted, Merchant will obtain a manual imprint of the Approved Card and an authorized signature and will enter the approval number on the Sales Draft.

   (c)  **Phone Capture Transactions**: Acquirer will only accept phone capture Transactions utilizing Approved Cards. Merchant must call Acquirer's Authorization Center or, as otherwise directed by Acquirer, before completion of all phone capture Transactions. If Authorization is granted, Merchant will indicate the approval number on the Sales Draft. Merchant shall not use two or more Sales Drafts or Approved Cards in a single Transaction to avoid required Authorization calls, or make multiple Authorization requests for a single Transaction to determine the maximum credit remaining available on a particular Approved Card.

9.  **Mail-Order, Telephone, Internet and/or Pre-Authorized Order Transactions**: The following additional requirements apply to Merchant, if Merchant is selling or leasing goods or providing services to its retail customers by mail-order, telephone, Internet or pre-authorized electronic recurring order Approved Card Transactions;

   (a)  **Merchant's Chargeback Risk**: Merchant agrees that all Approved Card Transactions involving a mail-order, telephone, Internet or pre-authorized electronic recurring order or payment are at Merchant's risk. For any Transaction of this type, Merchant warrants that the person whose name appears on the Sales Draft as Cardholder is the person making the purchase. A charge back to Merchant's Operating Account will be made without prior notice when a Sales Draft was issued pursuant to a mail order, telephone, Internet or pre-authorized electronic recurring order or payment in which the Cardholder neither participated in nor authorized, regardless of whether or not an authorization was obtained by Merchant.

   (b)  **Transaction Receipt Data Requirements**: The Transaction receipt to be delivered to a Cardholder by an E–Commerce Merchant or for a mail order or telephone order Transaction must include the following:

   - The Merchant name must be recognizable to the Cardholder, such as:
     (i)  Merchant doing business as ("dba"),
     (ii)  Merchant Universal Resource Locator ("URL"),
     (iii)  The Merchant name used in the Transaction Clearing Record.
   - Customer service number(s) for goods or services delivered domestically or internationally;
   - The Terms and Conditions of restricted sales;
   - If offered, the exact date a free trial period ends

21-11854-dsj   Doc 63-3   Filed 09/01/23   Entered 09/01/23 19:58:55   Exhibit 2-1
Pg 50 of 111

21-11854-dsj   Doc 44-5   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit 5 -
Agreement between Planet Payment and SPGK Singapore   Pg 7 of 13

(c)  Delivery of Transaction Receipt to Cardholder. Merchant must provide a completed copy of the Transaction Receipt to the Cardholder. An E-Commerce Merchant may deliver the Transaction Receipt in either of the following formats:

- Electronic (e-mail or fax)
- Paper (handwritten or terminal generated)

An Electronic Commerce Merchant must not transmit the Account Number to the Cardholder.

(d)  Web Site Requirements for E-Commerce Merchants. A web site operated by an E-Commerce Merchant must contain all of the following information:

(1)  Complete description of the services offered;
(2)  Return merchandise and refund policy which includes the communication of the return policy during the order process and the requirement that the Cardholder must be allowed to select a "click to accept" option or other affirmative button to acknowledge the policy;
(3)  Terms and conditions must be displayed either:
  (i)  On the same screen view as the checkout screen used to present the total purchase amount; or
  (ii)  Within the sequence of web pages the Cardholder accesses during the checkout process.
(4)  Customer service contact including e-mail address or telephone number;
(5)  Transaction currency;
(6)  Export or legal restrictions;
(7)  Delivery policy;
(8)  Consumer data privacy policy;
(9)  The security method offered for transmission of payment data such as Secure Sockets Layer or 3-D Secure;
(10)  Address of the Merchant Outlet's Permanent Establishment, including the Merchant Outlet country must be displayed;
  (i)  On the same screen view as the checkout screen used to present the total purchase amount; or
  (ii)  Within the sequence of Web pages the Cardholder accesses during the checkout process.

(e)  Merchant further agrees to follow these additional procedures in processing these types of Transactions:

(1)  All such Transactions must be electronically Authorized and, in addition to the information required in paragraph 7 above, shall also show an Authorization code (when Authorization is required); must show 'customer address and address verification; and in lieu of Cardholder's signature shall show mail order (MO), telephone order (TO), Internet (IO) or pre-authorized order (PO) on the signature line.

(2)  If Merchant accepts a pre-authorized recurring order, the Cardholder shall execute and deliver to Merchant a written request for this pre-authorization. This written request shall be maintained by Merchant and made available upon request to Acquirer. Merchant shall not deliver goods or perform services covered by a pre-authorization order after receiving notification that the pre-authorization is cancelled or that the card covering the pre-authorization is not to be honored.

(3)  All Transactions shall be processed only after services have been rendered and/or goods shipped.

(4)  For all MO/TO, IO or PO Transactions, Merchant shall verify Cardholder's address from the Card Association network, using AVS verification (if available) and Merchant shall transmit a ticket/invoice number in order to qualify for the relevant interchange rate.

10.  Data Security: Merchant must comply with the following data security requirements:

(a)  PCI Compliance. The Card Associations have implemented a program to ensure the protection of Cardholder data, whether processed or stored,

through a program of validation and compliance. Known as the Payment Card Industry Data Security Standards ("PCI") information about the program and specific requirements can be obtained at www.visa.com/cisp. Merchant must implement and maintain all of the security requirements, as specified in the PCI. The PCI program is comprised of 12 major requirements:

(1)  Install and maintain a working network firewall to protect data accessible via the Internet.
(2)  Keep security patches up to date.
(3)  Encrypt stored data.
(4)  Encrypt data sent across networks.
(5)  Use and regularly update anti-virus software.
(6)  Restrict access to data by business "need to know".
(7)  Assign a unique ID to each person with computer access to data.
(8)  Don't use vendor supplied defaults for system passwords and other security parameters.
(9)  Track access data by unique ID.
(10)  Regularly test security systems and process.
(11)  Maintain a policy that addresses information security for employees and contractors.
(12)  Restrict physical access to cardholder information.

(b)  Merchant Services. Immediately notify the Card Association, through Acquirer, of the use of a Merchant Servicer;

(c)  Merchant Servicer Compliance. Ensure the Merchant Servicer implements and maintains all of the security requirements, as specified in the PCI program.

(d)  Data Compromise. Immediately notify Acquirer of a data compromise.

(e)  Disclosure and Storage of Personally Identifiable Information.
(1)  A Merchant must not disclose any Personally Identifiable Information or other information regarding a specific Transaction (collectively "Transaction Information") to third parties other than to Merchant Servicer, the Acquirer, or an agent of Acquirer for the sole purpose of:
  (i)  Assisting the Merchant in completing the Transaction or;
  (ii)  as specifically required by law;
(2)  Merchant may only disclose PII to other third parties, approved by the Card Association, for the sole purpose of:
  (i)  Supporting a loyalty program or;
  (ii)  Providing fraud control services.
(3)  Merchant must store all material containing PII or imprints (such as Sales Drafts, Transaction receipts, car rental agreements and carbons) in an area limited to selected personnel and;
  (i)  Render all PII data unreadable prior to discarding;
  (ii)  The Merchant must not retain or store full contents of any track on the magnetic stripe of an Approved Card subsequent to Authorization of a Transaction;
  (iii)  The Merchant must not retain or store Card Verification Value 2 data subsequent to Authorization of a Transaction;
  (iv)  The Merchant must not request the Card Verification Value 2 data on any paper form.
(4)  The sale or disclosure of databases containing PII, or other Transaction Information to third parties is prohibited.

(f)  Merchant shall take appropriate technical and organizational security measures against unauthorized or unlawful processing of Cardholder PII and against accidental loss or destruction of, or damage to, Cardholder information while it is in the possession or under the control of Merchant, in accordance with reasonable industry standards, PCI, applicable law and any requirements of Acquirer;

(g)  Merchant shall ensure that its employees, agents and sub-contractors are aware of and comply with the provisions of this section.

11.  Prohibited Transactions: Merchant shall not do any of the following with respect to any Transaction submitted for Authorization and settlement to Acquirer:

21-11854-dsj    Doc 63-3    Filed 09/01/23    Entered 09/01/23 19:58:55    Exhibit 2-1
Pg 51 of 111

21-11854-dsj    Doc 44-5    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit 5 -
Agreement between Planet Payment and SPGK Singapore    Pg 8 of 13

(a)  Require Cardholders to provide personal information such as phone number, address, or a driver's license for identification as a condition for honoring an Approved Card;

(b)  Extend credit for or defer the time of payment of the total cash price in any Transaction;

(c)  Honor an Approved Card except in a Transaction where a total cash price is due and payable;

(d)  Make any special charge to or extract any special agreement or security from any Cardholder in connection with any Transaction;

(e)  Transmit or accept for payment any Sales Draft for a Transaction which was not originated as a result of a direct Transaction between Merchant and a Cardholder for the sale or lease of goods or the performance of services;

(f)  Use Merchant's own Approved Card, or one to which Merchant has access, to process a Transaction for the purpose of obtaining credit for Merchant's own benefit;

(g)  Redeposit a previously charged back Transaction, regardless of whether Cardholder consents;

(h)  Process or return credit without sufficient balance in Merchant's Operating Account to fund the Transaction;

(i)  Use the POS Equipment or POS Software and any data received thereon for any other purpose except for determining whether or not Merchant should accept cards in connection with a current sale or lease of goods or services;

(j)  Use the POS Equipment or POS Software and data received thereon for credit inquiry purposes or any other purpose not authorized by this Agreement;

(k)  Draw or convey any inference concerning a person's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living when any card is processed as non-accepted;

(l)  Disclose any information obtained through the POS Equipment or POS Software to any person except for necessary disclosures permitted by this Agreement;

(m)  Attempt to process a Transaction which violates the dollar limits established by Acquirer as part of this Agreement, if any; or

(n)  Process a Transaction for the purpose of providing security or cash deposit for use in obtaining new or additional credit;

(o)  Accept payment from a Cardholder for the purpose of depositing funds to the Cardholder's account;

(p)  Process a credit transaction without having completed a previous sale Transaction with the same Cardholder;

(q)  Accept Cardholder payments for previous Approved Card charges incurred at Merchant location;

(r)  Require a Cardholder to complete a postcard or similar device that includes the Cardholder's Account Number, Card expiration date, signature or any other Card account data in plain view when mailed;

(s)  Add any tax to Transactions, unless applicable law expressly requires that a Merchant be permitted to impose a tax. Any tax amount, if allowed, must be included in the Transaction amount and not collected separately;

(t)  Request for use an account number for any purpose other than as payment for its goods or services;

(u)  Disburse funds in the form of travelers cheques, if the sole purpose is to allow the Cardholder to make a cash purchase of goods or services from the Merchant;

(v)  Disburse funds in the form of cash, unless Merchant is dispensing funds in the form of traveler's cheques or foreign currency. In this case, the Transaction amount is limited to the value of the travelers' cheques or foreign currency plus any fee or commission charged to the Merchant;

(w)  Submit a Sales Draft that the Merchant knows, or should have known, to be either fraudulent or not authorized by the Cardholder;

(x)  Abrogate responsibility for employees while employees are in Merchant's employ;

(y)  Accept Approved Cards for the purchase of Scrip;

(z)  Accept Approved Cards for a Manual Cash Disbursement; (aa) Sales Draft. A Merchant must not deposit a Sales Draft until:

--The Transaction has been completed
--The goods purchased have been shipped or provided
--The specified service has been performed
--Merchant obtains Cardholder consent for recurring Transactions.

12.  **Daily Reconciliation of Transactions:**

(a)  Electronically Transmitted Transactions: Merchant shall initiate and submit to Acquirer one or more summary Transactions for each Merchant terminal or POS software application each 24-hour period. If Merchant fails to settle or closes its terminal or POS software application within a 24-hour period, Merchant will be responsible for any fees, costs or amounts caused by such late presentment. Acquirer will credit to Merchant's Operating Account an amount equal to the reconciled summary Transaction total of all Merchants' totals since the previous credit including any adjustment, if necessary. If Merchant fails to initiate and reconcile a summary Transaction for any day, Acquirer will not grant a credit for that day unless the terminal is set up for an "auto settle" procedure.

(b)  Phone Capture Transactions: For all Transactions processed using phone capture Authorization, Acquirer will pay Merchant through a credit to Merchant's Operating Account.

13.  **Adjustments and Returns:** Merchant will maintain a fair exchange and return policy and make adjustments with respect to goods and services sold and/or leased to its customers whenever appropriate. In the event that goods are returned, or any services are terminated or cancelled, or any price is adjusted on a Transaction, Merchant will prepare and transmit a credit or return Transaction, either electronically or by paper, for the amount of the adjustment as a deduction from the total amount of Sales Drafts transmitted that day. In the event the amount of credit or return transactions exceeds the amount of Sales Draft Transactions, Acquirer shall charge Merchant's Operating Account for the excess. Merchant shall make no cash refunds on Approved Card Transactions and shall handle all credit adjustments as provided in this paragraph. Sales Drafts for any Transaction for which no refund or return will be given must be conspicuously marked as a "final sale" and "no returns" on the customer's copy of the Sales Draft at the time of the Transaction. If Merchant has a no-cash refund policy, in store credit only, that policy must appear on the Sales Draft. All Merchants must follow Card Association reservation/no-show policy. All Merchants must notify Cardholders in writing of this policy on all advance reservations. The Cardholder must be notified of the exact number of days required for reservation-deposit refunds. A Merchant not following Card Association reservation/no-show policy may receive a charge back to its Operating Account for failing regulation violations.

14.  **Charge Backs:** Acquirer shall be authorized to charge back to Merchant any Transaction yet specified throughout this Agreement and/or under any of the following circumstances:

(a)  No specific prior Authorization of the Transaction was obtained from Acquirer's Authorization Center, or the approval number, given to indicate the Authorization, does not appear on all paper Sales Drafts nor in the electronic transmittal which is maintained by Acquirer.

(b)  The Transaction was based on a pre-authorization form and the Approved Card on which the approved authorization was based has been cancelled and Merchant was so notified.

(c)  The Transaction was conducted as a mail order, telephone order, Internet order, pre-authorized electronic recurring order or any similar order in which the Approved Card is not physically present at Merchant's premises.

(d)  The Approved Card giving rise to the Transaction has been cancelled and prior to, or at the time of, the Transaction, Merchant has received or receives notice of the cancellation through the electronic terminal, in writing or otherwise.

(e)  The Approved Card had expired prior to the date of the Transaction or the date of Transaction was prior to the validation date, if any, indicated on the Approved Card.

(f)  The Sales Draft does not contain the authorized signature that appears in the authorized signature panel of the Approved Card; the signature on the card signature panel is different than that on the Sales Draft; the signature is a different name; or no signature appears on the Sales Draft's signature line;

(g)  No Sales Draft was used to record the Transaction; a form of Sales Draft not approved by the Acquirer was used and/or the Sales Draft does not contain the required information required in paragraphs 7 and 8 above.

21-11854-dsj   Doc 63-3   Filed 09/01/23   Entered 09/01/23 19:58:55   Exhibit 2-1
Pg 52 of 111

21-11854-dsj   Doc 44-5   Filed 06/30/23   Entered 06/30/23 15:47:18   Exhibit 5 -
Agreement between Planet Payment and SPGK Singapore   Pg 9 of 13

(h)  The Sales Draft represents a Transaction on which Acquirer has received a complaint from or on behalf of a Cardholder stating that there is an unresolved dispute between Merchant and Cardholder;

(i)  The Cardholder makes a written complaint to Acquirer that the Cardholder did not make or authorize the Transaction;

(j)  A setoff or counterclaim of any kind exists in favor of any Cardholder against Merchant that may be asserted in defense of an action to enforce payment against the Cardholder in a Transaction;

(k)  The Sales Draft represents a Transaction that was made at or by a Merchant other than the Merchant named in this Agreement;

(l)  Merchant fails to make an impression of an Approved Card that was not electronically read by the terminal of the POS Software application;

(m)  The Transaction otherwise violates the terms of this Agreement or any other Card Association rules and regulations; or

(n)  A charge back is initiated by a Cardholder's issuing bank.

In any such case, Acquirer shall not be obligated to accept a Transaction for deposit to Merchant's Operating Account. If Acquirer has credited Merchant's Operating Account for a Transaction involving any of the circumstances indicated above, or any other circumstances indicated in this Agreement, Merchant agrees that Acquirer may charge back the amount of the Transaction without prior notification to Merchant. Merchant agrees to pay the amount due upon demand. In addition, Acquirer may debit Merchant's Operating Account and/or Reserve Account, adjust credits due to Merchant, or utilize any method appropriate under the terms of Merchant's deposit and payment arrangements with Acquirer to charge back the amount of any Transaction. Merchant hereby grants to Acquirer a security interest in all goods returned by a Cardholder to secure the amount of the charge back until paid in full by Merchant.

15.  **Retention of Original Sales Drafts and Copies:** Merchant shall retain the original Sales Draft for a period of not less than three hundred and sixty (360) days from the date of the Transaction. Additionally, Merchant shall retain either the original Sales Draft or legible microfilm copy for a total period of seven (7) years from the date of the Transaction. At Acquirer's request, Merchant shall provide the original Sales Draft to Acquirer, or if no longer available, a legible copy within five (5) business days of receipt of a request therefor. If Merchant fails to provide the Sales Draft within five (5) business days, or if no Sales Draft was used to record the Transaction, Acquirer may, if it has not already elected to do so in accordance with paragraph 11; charge back to Merchant the amount of the Transaction. Any Sales Draft which does not contain the information required in accordance with this Agreement shall also be subject to charge back, if the Acquirer has not already elected to do so in accordance with paragraph 11, if the Cardholder continues to dispute the validity of the charge after Acquirer has presented the Merchant's evidence of validity of the charge to the Cardholder. If all retrieval requests must also be provided to Bank within five (5) business days of receipt of a request. Failure to meet required time frames will result in Merchant losing any charge back rebuttal rights for non-receipt of an item by a card issuing bank which may be available to Merchant in accordance with applicable Card Association's rules and regulations. Acquirer's right to charge back a Sales Draft which does not contain subject to and/or contingent upon any rights Merchant may have to rebut a chargeback under the Card Association's rules and regulations and Acquirer reserves the right to process a chargeback to Merchant at any time in accordance with this Agreement and regardless of any rebuttal and/or appeal process being utilized by Merchant. In the event that Merchant is successful in rebutting and/or appealing a chargeback and the chargeback is credited through the system, Acquirer will credit the chargeback to Merchant.

16.  **Recovery of Cards:** Merchant will use its best efforts to reasonably and peaceably recover and retain any Approved Card for which Merchant receives notification of cancellation, restriction, theft, or counterfeiting. This notice may be given electronically through the terminal, as instructed by Acquirer's Authorization Center by any means or by listing on any cancelled card list, or a restricted card list. Merchant shall also take reasonable steps to recover a card which it has reasonable grounds to believe is counterfeit, fraudulent or stolen.

17.  **Customer Complaints:** Under applicable law or regulation, Merchant and Acquirer may be subject to claims and defenses arising out of any Transaction. The amount of liability in connection with any claim or defense may be fixed by applicable law or regulation as of a specified point in time. Accordingly, Merchant agrees to maintain in writing with respect to each claim or defense asserted by an

Approved Cardholder involving a Transaction for which Merchant has received notice the following information:

(a)  The Cardholder's name;
(b)  The Approved Card number;
(c)  The date and time the Cardholder asserted the claim or defense;
(d)  The nature of the claim or defense; and
(e)  The action which Merchant took in an attempt to resolve the dispute.

Merchant shall furnish Acquirer with this information upon request.

18.  **Confidentiality:** Merchant shall treat all information received as a result of the services provided under this Agreement as confidential. Merchant shall prevent the disclosure of this information except for necessity disclosures to affected customers, to Acquirer and to Card Associations.

19.  **Card Association Requirements:** Merchant shall comply with all bylaws, rules and regulations of the Card Association. In particular but without limitation:

(a)  Merchant shall promptly pay penalties assessed by any Card Association for Merchant's failure to comply with Card Association's requirements. Acquirer reserves the right to require and/or increase any reserve requirement to recover any penalties whether already assessed or to be assessed in the future.

(b)  Merchant will prominently display at its place of business Approved Card emblems and other promotional material and literature provided by Acquirer. Subject to the written consent of Acquirer and upon such conditions as authorized by Acquirer, Merchant may use Approved Card service marks or design marks in its own advertisement and promotional materials. At Acquirer's request, Merchant shall provide to Acquirer copies of all marketing materials used in Merchant's business.

20.  **Compliance with Applicable Law:** Merchant shall comply with all present and future federal and state laws and regulations pertaining to the services provided under this Agreement including, without limitation, the Federal Fair Credit Reporting Act, the Federal Truth-in-Lending Act, the Electronic Fund Transfers Act and the Federal Equal Credit Opportunity Act, as amended.

21.  **Limitation on Acquirer's Liability:** Acquirer shall not be liable to Merchant, Merchant's customers or any third party for any of the following:

(a)  For any loss or liability resulting from the denial of credit to any person or Merchant's retention of any card or any attempt to do so;

(b)  Any downgraded Transaction based upon Card Association's rules and regulations for any defective or faulty POS Equipment or POS Software regardless if owned by Acquirer or Merchant;

(c)  The unavailability of services caused by the termination of Acquirer's contracts with POS Equipment or POS Software vendors, processors or installers, whether terminated by Bank, or any other person for any reason;

(d)  Interruption or termination of any services caused by any reason except for Acquirer's failure to use due care in selecting POS Equipment Installers and Servicer or POS Software vendors; and in such cases, Acquirer's liability shall be limited to a waiver of fees due under this Agreement, Acquirer will have no liability to Merchant if the POS Equipment is owned by Merchant, unless Merchant's equipment is covered by Acquirer's maintenance contract. In that event, Acquirer's liability will be limited in accordance with these paragraphs.

THE ACQUIRER SHALL NOT BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES TO MERCHANT OR TO ANY THIRD PARTY IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE SERVICES TO BE PERFORMED BY ACQUIRER PURSUANT TO THIS AGREEMENT. MERCHANT ACKNOWLEDGES THAT ACQUIRER HAS PROVIDED NO WARRANTIES, EITHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO ANY POS EQUIPMENT OR POS SOFTWARE PROVIDED UNDER THIS AGREEMENT AND ACQUIRER'S SOLE LIABILITY CONCERNING ANY POS EQUIPMENT OR POS SOFTWARE SHALL BE IN ACCORDANCE WITH THIS PARAGRAPH AND PARAGRAPH 6(G).

Ver. 201801

21-11854-dsj    Doc 63-3    Filed 09/01/23    Entered 09/01/23 19:58:55    Exhibit 2-1
Pg 53 of 111

21-11854-dsj    Doc 44-5    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit 5 -
Agreement between Planet Payment and SPGK Singapore    Pg 10 of 13

22. **Indemnification:** Merchant agrees to indemnify and hold Acquirer harmless from any and all losses, claims, damages, liabilities and expenses, including attorney's fees and costs (whether or not an attorney is an employee of Acquirer or Acquirer's affiliates arising out of any of the following:

(a)  Merchant's failure to comply with any provision contained in this Agreement and/or any amendment thereto;

(b)  Merchant's failure to comply with the Merchant Operating Guide and any amendments thereto;

(c)  Merchant's failure to comply with the bylaws, rules and regulations of any Card Association;

(d)  Merchant's failure to comply with any applicable law, rule or regulation;

(e)  The criminal act, fraud or dishonesty of Merchant or Merchant's employees, licensees, successors, agents and/or assigns;

(f)  The theft of or damage or destruction to any POS Equipment or POS Software; or

(g)  Unauthorized and/or prohibited Transactions.

23. **Guarantors:** As a condition of this Agreement, Acquirer may require the unlimited personal guaranties of selected principals of Merchant. The personal guaranty(s) shall secure all obligations owed to Acquirer by Merchant under this Agreement. Acquirer reserves the right to require additional guaranties at any time in the future as a condition for processing or underwriting Transactions in accordance with this Agreement. Merchant shall not be authorized to process any Transactions until all personal guaranties are provided to the satisfaction of Acquirer.

24. **Credit Investigation and Bank Auditing:** Merchant authorizes Acquirer and Acquirer's agents to, from time to time, investigate the background and personal credit history of any of the principals and employees associated with Merchant's business and to obtain a business report on Merchant's business from Dunn & Bradstreet or any company providing a similar service. Acquirer may terminate this Agreement if the information received in any investigation is unsatisfactory to Acquirer. Acquirer may also audit from time to time, Merchant's compliance with the terms of this Agreement. Merchant shall provide all information requested by Acquirer necessary to complete the audit. Upon Acquirer's request, Merchant shall provide financial statements for Merchant and personal financial statements for all guarantors. By signing below, Merchant certifies that all information provided to Acquirer by Merchant and/or any guarantor is true and correct.

25. **Term & Termination:**

(a)  This Agreement shall become effective when signed by all parties and, unless sooner terminated, shall remain in effect for a term of two years. This Agreement shall renew automatically for successive terms of one year each, unless Merchant provides written notice of termination to Acquirer at least 90 days prior to the end of the then current term. All obligations of Merchant incurred or existing under this Agreement as of the date of termination shall survive such termination including, without limitation, all obligations, warranties and agreements with respect to sales and credit Transactions presented to Acquirer before termination.

(b)  In the event that this Agreement is terminated by Merchant without cause or as a result of account dormancy as determined by Acquirer, prior to the expiration date of this Agreement, Merchant will be charged an early termination fee. Merchant and Acquirer agree that the damages suffered by Acquirer as a result of non-compliance with this provision are difficult to calculate with precision. For that reason, the parties agree that the liquidated damages shall be computed as set forth herein. If Merchant terminates this Agreement early, Merchant agrees to pay Acquirer, within 10 days of such termination, a liquidated damages sum equal to 3% of the remaining processing volume. For the purpose of this clause; the

"remaining processing volume" shall be determined by multiplying the number of months remaining in the term by the greater of: (i) the average monthly gross dollar volume processed by Acquirer on behalf of Merchant over the twelve calendar months preceding the Merchant's breach of this provision or, in the event that Merchant has been processing for less than twelve months, then the average monthly gross dollar volume processed by Merchant from the inception of the Merchant Agreement to the breach of this provision, OR (ii) the Average Monthly Volume specified in the Merchant Processing Application, and then multiplying the product of that

calculation by 3%. For the avoidance of doubt, in the event that Acquirer is entitled to claim liquidated damages under both this section and under section 2(c) above, with respect to the same acts or omissions of Merchant then Acquirer shall not be entitled to recover damages twice with respect to such acts or omissions.

(c)  Acquirer may voluntarily terminate this Agreement at any time, with or without cause, upon thirty (30) days' written notice to the Merchant at the addresses set forth above. In addition, Acquirer may terminate this Agreement without notice to Merchant under the following circumstances:

(1)  Any information obtained by Acquirer through a credit investigation is unsatisfactory to Acquirer;

(2)  Any criminal act or act of fraud or dishonesty is committed by Merchant, its employees, licensees, successors, agents, and/or assigns;

(3)  Charge backs in excess of Card Association's monitoring guidelines, or that reach a level that Acquirer, in their sole discretion, determine is excessive;

(4)  Breach of this Agreement by Merchant;

(5)  Bankruptcy, insolvency or receivership proceedings are started by or against Merchant or any guarantor;

(6)  Merchant fails to pay all amounts due to Acquirer in accordance with this Agreement, or any other Agreement between the parties, within thirty (30) days;

(7)  Merchant fails to maintain sufficient funds in Merchant's Operating Account and/or Reserve Account to cover all amounts owed by Merchant under this Agreement;

(8)  Merchant's percentage of error Transactions or retrieval requests is excessive in the opinion of Acquirer;

(9)  There is a material adverse change in the financial condition of Merchant in the determination of Acquirer;

(10)  Merchant exceeds the volume limitations established by Acquirer as part of this Agreement;

(11)  Merchant changes the types of goods or services provided to its customers without the prior consent of Acquirer;

(12)  There is a change in the volume, character or method of Merchant's Transactions that is not satisfactory to Acquirer;

(13)  There is a change in the volume, character or method of chargebacks that is unsatisfactory to Acquirer and/or

(14)  There is a change in structure or ownership of Merchant by any means or manner, including, but not limited to, a change in stock ownership, member interest, partnership interest, a change by merger or reorganization or a change of name.

(d)  Acquirer may selectively terminate one or more of Merchant's approved locations without terminating the entire Merchant Agreement. In lieu of immediately terminating Merchant, Acquirer may suspend Merchant's authorization to process transactions or place Merchant's transaction into suspense. This will allow Merchant to continue to process Transactions with its customers but the funds for payment to Merchant are held and not transmitted to Merchant. The suspension of processing or real time processing shall remain in place, once instituted, until Acquirer is satisfied that the issue or problem leading to such action has been satisfactorily resolved. In the event that the issue or problem is not satisfactorily resolved, Acquirer may terminate this Agreement. In the event of termination, all obligations of Merchant incurred or existing under this Agreement shall survive the termination. In the event of termination, unless otherwise agreed by the parties, Merchant shall promptly return all POS Equipment and/or POS Software to Acquirer, depending upon which party leased or provided such applications to Merchant. If Merchant fails to return the POS Equipment or POS Software to Acquirer, Acquirer shall have the right to charge Merchant for the replacement value of the equipment or software.

(e)  As a result of this agreement being terminated by Merchant or Acquirer, Acquirer shall have the right, and may be obligated, to place Merchant on the MATCH list (Member Alert to Control High Risk Merchants) for violations of Card Association rules, to include but, are not limited to: Violation of Merchant Contract, excessive chargebacks or credits, account data compromise, laundering, excessive fraud, merchant conviction for fraud or theft and bankruptcy.

26. **Enforcement of This Agreement**: Acquirer shall have the right to take legal action against Merchant to enforce any provision in this Agreement whether the Agreement is terminated or not. In that event, Merchant shall also be responsible for payment of the cost and attorney's fees incurred by Acquirer whether suit is commenced or not, including any costs and attorney's fees that may be incurred to enforce any award, order and/or judgment obtained.

27. **Setoff**: In addition to any other legal, equitable right or remedy available to it in accordance with this Agreement or by law, Acquirer may set off any amounts due to Acquirer under this Agreement against any property of Merchant in Acquirer's possession or control.

28. **Governing Law and Jurisdiction**: The Agreement and all rights and obligations hereunder, including but not limited to matters of construction, validity and performance, shall be governed by and construed in accordance with the laws of the State of Delaware. Each party to the Agreement submits to the exclusive jurisdiction of the state and federal courts of the State of Delaware, and waives any jurisdictional, venue, or inconvenient forum objections to such courts.

29. **Amendments to This Agreement**: From time to time Acquirer may amend this Agreement as follows:

   (a) Amendment to Approved Cards and/or Services. Acquirer may amend or delete Approved Cards or services approved for processing in accordance with this Agreement. Acquirer shall notify Merchant in writing of any additions or deletions of any Approved Cards or services. With respect to any cards or services added to this Agreement, all provisions of this Agreement shall apply to those additional cards and services. Acquirer shall notify Merchant of the fees to be charged for processing the additional cards and services. Acceptance by Merchant of an additional card as payment for a Transaction or use of a new service after Acquirer has sent Merchant appropriate notice shall constitute Merchant's agreement to accept additional cards and services under the terms of this Agreement and the fees or charges relating to these additions.

   (b) Amendment to Fees and Charges. Acquirer may periodically review and adjust all rates, fees and charges set forth on the Merchant Processing Application. Acquirer will provide written notice of all new rate, fees and charges to be imposed under this Agreement; except, however, Acquirer may change the rates, fees and charges without prior written notice if the annual volume or average ticket sales do not meet the Merchant's annual projections. If notice is required, the written notice shall be part of the Merchant's Monthly Statement/Bill. Merchant may terminate this Agreement upon at least 30 days' prior written notice to the other parties if Acquirer amends Merchant Processing Application pursuant to this section to increase rates, fees, or charges Merchant pays hereunder, except fees or rates that result from a pass-through from a Card Association. All new rates, fees and charges will become effective for the next month immediately following the month in which the notice appeared on Merchant's Monthly Statement/Bill unless Merchant has terminated this Agreement in accordance with this section.

   (c) Amendment to Other Terms and Conditions. Acquirer may also from time to time amend other provisions of this Agreement. Unless otherwise specifically provided elsewhere in this Agreement, notice of changes in this Agreement will be in writing and may be made part of Merchant's Monthly Statement/Bill. If notice is given on the Monthly Statement/Bill, the changes to the Agreement will become effective for the next month immediately following the month in which notice appeared on the Merchant's Monthly Statement/Bill. If a separate notice is sent, the changes to the Agreement will go into effect thirty (30) days after notice is sent by regular mail to the address specified above for Merchant or a different address provided to Acquirer by Merchant.

30. **Assignment**: This Agreement may not be assigned by Merchant without the prior written consent of Acquirer. Acquirer may assign this Agreement without limitation. Assignment of this Agreement by Acquirer shall relieve Acquirer of any further obligations under this Agreement.

30. **Representations**: Merchant makes the following representations to Acquirer, which are true now and will be true at all times in the future:

   (a) The execution, delivery and performance of this Agreement has been duly authorized in accordance with Merchant's organizational documents, and will not violate or create a default under law, Merchant's organizational documents or any contract or other agreement binding on or affecting Merchant;

   (b) Merchant is in compliance with all applicable federal, state and local laws and regulations pertaining to the Merchant's business, including all licensing requirements;

   (c) Merchant is in good standing and shall maintain its business organization in good standing in accordance with all laws and regulations;

   (d) This Agreement constitutes a legal, valid and binding obligation of Merchant; and

   (e) Merchant shall not engage in any unlawful activity or process transactions for any unlawful activity by its customers.

31. **Written Notice**: All notices and other communications required or permitted under this Agreement shall be in writing and will be deemed delivered upon delivery or refusal of receipt when sent by overnight courier or sent via facsimile and the sender obtains a fax confirmation receipt, and upon mailing when sent first class mail, postage prepaid, addressed as follows: (i) If to Merchant: At the facsimile number or address provided as the billing address and to the contact listed on the Merchant Application; and (ii) If to Planet Payment: Planet Payment Solutions, LLC, 670 Long Beach Blvd., Long Beach, NY 11561, Attn: General Counsel, Facsimile (516) 670-3520.

32. **Effective Date**: This Agreement shall become effective only when signed by both parties and shall remain in effect until or unless terminated in accordance with the terms of this Agreement.

Ver. 201801

By signing below, the parties agree to the terms of this Agreement. If Merchant is a corporation, its proper corporate officers sign. This Agreement may be signed in one or more counterparts and all signed Agreements shall be considered as one.

Agreed to and accepted on: 29/09/2019

PLANET PAYMENT SOLUTIONS, LLC
670 Long Beach Boulevard
Long Beach, NY 11561

By: _____
    Authorized Representative

Name & Title: _____
    **Bob Bendriss**
    **Risk & Underwriting Manager**
    **Planet**
    **100 Commons Blvd, Suite 200**
    **New Castle, DE 19720**

MERCHANT:

By: _____
    Authorized Representative

Name & Title: RYUNOSUKE YOSHIDA
    Director

Ver. 201801

21-11854-dsj    Doc 63-3    Filed 09/01/23    Entered 09/01/23 19:58:55    Exhibit 2-1
Pg 56 of 111

21-11854-dsj    Doc 44-5    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit 5 -
Agreement between Planet Payment and SPGK Singapore    Pg 13 of 13

## SCHEDULE A
### Planet Payment Solutions, LLC Merchant Processing Agreement

**Merchant DBA Name:** SPGK

Location 1 of 1

| Start Up Fees | |
|---|---|
| Application Fee | Waived |
| Reprogramming Fee | N/A |
| | |

| Discount/Interchange Rate | | |
|---|---|---|
| JCB Discount Rate | | N/A |
| CUP Discount Rate | | 3.25% |
| AMEX Dues and assessments | | Pass thru |
| AMEX Discount Assessment | | N/A |
| Minimum Monthly Discount | | $0.00 |

| ACH Reject Fee | $25.00 |
|---|---|
| Online Merchant View (if requested) | $0.00 |
| Paper Statement Fee | N/A |
| Virtual Terminal Fee | N/A |
| Internal Gateway Fee | N/A |
| Help Desk Calls | N/A |

| Billed Annual Fee | N/A |
|---|---|

| Transaction Fees | |
|---|---|
| JCB Transaction Fee | N/A |
| CUP Transaction Fee | $0.15 |
| AMEX Transaction Fee | N/A |
| Gateway Transaction Fee | $0.10 |
| Address Verification Transaction Fee | N/A |

| Other Fees | |
|---|---|
| Chargeback Fee | $15.00 |
| PCI Security Fee | $6.95 |
| Non-Compliance PCI Security Fee | $49.95 |
| Retrieval Request Fee | $8.00 |
| Per batch Processing Fee | $0.00 |

### Currency Selection

_____ Check the box to select all currencies to be accepted for American Express Transactions.

___ Australian Dollar    AUD
___ Euro    EUR
___ Canadian Dollar    CAD
___ Hong Kong Dollar    HKD
___ New Zealand Dollar    NZD
___ Swedish Krona    SEK
___ Thai Baht    THB
___ UK Pound Sterling    GBP
___ U.S. Dollar    USD
___ Danish Krone    DKK
___ Japanese Yen    JPY
___ Norwegian Krone    NOK

_____ Check the box to select all currencies to be accepted for UnionPay Transactions

___ U.S. Dollar    USD
___ Renminbi/Yuan    CNY
___ Hong Kong Dollar    HKD

_____ Check the box to select all currencies to be accepted for JCB Transactions

___ U.S. Dollar    USD
___ Japanese Yen    JPY

Ver. 20180J

# EXHIBIT 6

| From: | Marty Matthews |
|---|---|
| To: | Ryu Yoshida |
| Subject: | Fw: Shang Peng MOU signed |
| Date: | 05 May 2021 5:52:13 AM |

Ryu,

I found this in my email that confirms from Tom Poletti, the documents author, that the MOU is not binding.

Tom is one of the most respected attorneys in California and he does not like Yoshio. Similarly, Yoshio fears Toms' integrity.

We need to proceed with the IR-P liquidator change, then Crowe and I can force the same liquidator to take charge of Ascentra, so it is fairly dissolved to pay all liabilities and share the remains among shareholders.

Marty

Marty Matthews
208-309-2780

**From:** Poletti, Thomas <TPoletti@manatt.com>
**Sent:** Tuesday, February 6, 2018 10:40 AM
**To:** Martin Matthews <martinjmatthews@outlook.com>
**Subject:** Re: Shang Peng MOU signed

I agree that there is no language that creates a binding agreement. It is the framework for a future agreement

Thomas Poletti
Partner

Manatt, Phelps & Phillips, LLP
Park Tower
695 Town Center Drive, 14th Floor
Costa Mesa, CA 92626
D (714) 371-2501   F (714) 371-2551

TPoletti@manatt.com<mailto:TPoletti@manatt.com>
Manatt.com<http://Manatt.com>

On Feb 6, 2018, at 10:26 AM, Martin Matthews
<martinjmatthews@outlook.com<mailto:martinjmatthews@outlook.com>> wrote:

Tom,

Here is the MOU document.

The opening statement says these are terms for the legal framework by which Ascentra "CAN" implement an Exclusive Distribution Agreement.

I also do not see any language that the MOU is binding..?

Thanks for reviewing this for me, I have a call with them tonight.

Marty

21-11854-dsj    Doc 63-3    Filed 09/01/23    Entered 09/01/23 19:58:55    Exhibit 2-1
Pg 60 of 111

21-11854-dsj    Doc 44-7    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit  7 -
Agreements between Radial IT and SPGK    Pg 1 of 39

# EXHIBIT 7

## PRODUCT SUPPLY AGREEMENT

This PRODUCT SUPPLY AGREEMENT (this "Agreement") is effective as of October 1, 2016 ("Effective Date") by and between iHealthScience LLC, Hong Kong Branch ("Provider"), the Hong Kong branch of a Delaware limited liability company located at Room 301, 3rd Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong, and Shang Peng Gao Ke, Inc. ("Company", and collectively with Provider "the Parties"), a corporation incorporated or organized under the laws of the Cayman Islands and located at 5th Floor, Genesis Building, Genesis Close, PO Box 446, Grand Cayman KY1-1106, Cayman Islands. This Agreement includes any and all Schedules, Addenda, Exhibits, and Attachments hereto, and any references to this Agreement shall include any Schedule, Addenda, Exhibit and Attachment.

## RECITALS

A.      Provider is a distributor of certain goods and is interested in selling such goods to Company, and Company is the purchaser of such goods and Company is interested in purchasing such goods from Provider.

B.      As of the Effective Date, by Provider agreed to provide said goods to Company for compensation, all as more particularly set forth herein.

C.      The Parties now wish to memorialize and clarify the terms of that agreement, as set forth herein.

## TERMS OF AGREEMENT

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**Section 1.    Purchase and Sale**

(a)      Subject to the terms and conditions set forth in this Agreement, Provider agrees to provide and sell to Company the Products set forth on and further defined in *Exhibit A* (the "Products").

(b)      During the Term of this Agreement, Provider shall sell to Company, and Company shall purchase from Provider, the Products on the terms set forth herein. Not later than the end of each calendar month during the Term of this Agreement, Company shall submit in good faith a non-binding, rolling six-month forecast (the "Forecast") for the quantity of each Product it expects to purchase during each month of the applicable six-month forecast period. Provider shall make reasonable efforts to fill all Purchase Orders ("POs") for any Product that exceed those reflected in the applicable Forecast, but shall not be in breach of this Agreement if it is unable, despite such efforts, to fill such excess orders. Provider is not obligated and shall also not be in breach of this Agreement if it is unable, despite reasonable efforts, to fill any PO for reasons attributable to any third-party supplier of Products. Should Provider no longer offer any Product listed in *Exhibit A* during the Term of this Agreement (the "Discontinued Product"), Provider shall offer a replacement or successor product (the "Replacement Product") to Company, if any exists. Any Replacement Product offered to and accepted by the Company shall be deemed a "Product" for all purposes hereunder, and shall be sold in accordance with all pricing and other terms set forth herein.

(c)      All POs will be placed in a manner consistent with the practices of the Parties during the twelve (12) months immediately preceding the date of this Agreement. Provider shall make reasonable efforts to fill all POs requesting delivery under lead times, but shall not be in breach of this Agreement if it is unable despite

Product Supply Agreement

such efforts to deliver within such requested times (provided delivery shall meet the applicable lead time requirement herein).

(d)    Provider shall not withhold acceptance of any PO that is consistent with the terms and conditions of this Agreement and consistent with the most recent Forecast. No pre-printed terms of any PO shall be of any force or effect, and in the event of a conflict between the terms of the PO and this Agreement, the terms of this Agreement shall control. Any provisions of any acknowledgement or invoice issued by Provider that are in addition to or inconsistent with the terms of a PO are hereby rejected by Company and will be null and void unless specifically accepted by Company in writing.

**Section 2.    Term.** Subject to the terms and conditions of this Agreement, the Term of this Agreement (the "Term") shall be as set forth in *Exhibit A*.

**Section 3.    Products Pricing and Payment.**

3.1    The prices for the Products purchased shall be the market price determined by Provider in good faith and in the ordinary course of Provider's business, in all respects consistent with commercially practicable business PLUS all costs of freight associated with delivery of the Products to their destination. Upon any material change in Provider's product prices, it will communicate such change in writing to Company, and the affected Product prices will be adjusted for all POs placed subsequent to the date of such notice.

3.2    Company will pay Provider within 30 days from Company's receipt of an invoice properly submitted hereunder (which shall not be submitted prior to shipment of Products).

**Section 4.    Warranty.**

4.1    Provider warrants that the Products will conform to all specifications, descriptions, samples and quality standards that applied to the Products during the twelve-month period preceding the date of this Agreement, or any standard specifications, descriptions, samples and quality standards set forth by Provider for future-developed or modified products (collectively, the "Specifications").

4.2    Claims for defective or non-conforming Products shall be made within 30 days after delivery to Company. Provider shall promptly either replace or correct defects of any goods not conforming to the foregoing warranties, without expense to Company, when notified of such nonconformity by Company. Except for the indemnification obligations of the Parties set forth herein, this Section 4.2 shall be the sole remedy of Company for breach of warranty by Provider.

**Section 5.    Delivery.** Provider shall make all deliveries of the Product in compliance with the delivery terms and conditions set forth in *Exhibit B* (the "Delivery Terms").

**Section 6.    Indemnity.**

6.1    Upon notice and demand from Company, Provider shall promptly assume full responsibility for the defense, at Provider's expense, of any claim, demand, proceeding or action that may be brought (or threatened to be brought) against Company or its agents, successors, assigns, parents, subsidiaries or affiliates (collectively, "Company Indemnified Persons") alleging any of the following (collectively, "Covered Company Claims"): (a) violation or infringement of any patent, trademark or copyright or of any other intellectual property rights of any third parties arising out of the sale or use of any Product under the terms of this Agreement, except to the extent arising due to the use of any design, specification, software, system, method, service offering, trademark or logo that is unique to or specified by Company or due to the use of any Products in combination with products or services of the Company not supplied by Provider;

2

Product Supply Agreement

FSD2021-0318                        Page 22 of 365                        2023-04-24

(b) any loss or damage arising out of or resulting from any manufacturing defect in any Product or any breach of any warranty made by Provider in this Agreement in connection with any Product; or (c) Provider's acts or omissions in connection with the supply of any Product. Provider further agrees to indemnify and save harmless the Company Indemnified Persons from any and all costs, expenses, losses, royalties, profits, and damages (including reasonable court costs and attorneys' fees) (collectively, "Damages") resulting from any Covered Company Claim, including any settlement that complies with the terms of this Agreement. A Company Indemnified Person may be represented by and actively participate through its own counsel in any such suit or proceeding at its own expense. The indemnification obligations under this paragraph shall survive the termination of this Agreement and shall continue for as long as the statute of limitations applicable to any potential Covered Company Claim remains unexpired.

6.2     Upon notice and demand from Provider, Company shall promptly assume full responsibility for the defense, at Company's expense, of any claim, demand, proceeding or action that may be brought (or threatened to be brought) against Provider or its agents, successors, assigns, parents, subsidiaries or affiliates (collectively, "Provider Indemnified Persons" and, together with Company Indemnified Persons, "Indemnified Persons") alleging any of the following (collectively, "Covered Provider Claims" and, together with Covered Company Claims, "Covered Claims"): (a) violation of any laws of the People's Republic of China (the "PRC") arising out of the offer or sale of the Products by Company or the Company's operations in the PRC; or (b) Company's acts or omissions in connection with the performance of Company's obligations under this Agreement. Company further agrees to indemnify and save harmless the Provider Indemnified Persons from any and all Damages resulting from any Covered Provider Claim, including any settlement that complies with the terms of this Agreement. A Provider Indemnified Person may be represented by and actively participate through its own counsel in any such suit or proceeding at its own expense. The indemnification obligations under this paragraph shall survive the termination of this Agreement and shall continue for as long as the statute of limitations applicable to any potential Covered Provider Claim remains unexpired.

6.3     The party responsible for indemnification (an "Indemnifying Party") will provide the above indemnity even if Damages are due, or alleged to be due, in part to any Indemnified Person's concurrent negligence or other fault, breach of contract or warranty, or strict liability without regard to fault; *provided, however*, that an Indemnifying Party's contractual obligation of indemnification shall not extend to the percentage of the Indemnified Person's Damages or injuries or the settlement amount attributable to the Indemnified Person's negligence or other fault, breach of contract or warranty, or to strict liability imposed upon an Indemnified Person as a matter of law.

6.4     In the event of an incurrence of any Covered Claim, the Indemnified Person(s) shall: (a) promptly notify the Indemnifying Party of such Covered Claim, (b) reasonably cooperate, at the Indemnifying Party's expense, with the Indemnifying Party in the defense thereof, and (c) not settle any Covered Claim without the Indemnifying Party's consent which will not be unreasonably withheld or delayed. The Indemnifying Party shall keep the Indemnified Persons informed at all times as to the status of its efforts and consult with the Indemnified Persons(s) (or their counsel) concerning its efforts, with respect to the defense of such Covered Claim; and, the Indemnifying Party shall not settle any Covered Claim without the applicable Indemnified Person's prior written consent, which shall not be unreasonably withheld or delayed. Such consent shall be given to any settlement that includes an unconditional release of the Indemnified Person(s), requires no payment, action or forbearance on the part of the indemnified Person(s), and includes no admission of fault on the part of the Indemnified Person(s). Notwithstanding the foregoing, the Indemnified Person(s) reserves the right, in its sole discretion, to assume its own defense (at the Indemnifying Party's expense) with respect to any Covered Claim to the extent the Indemnifying Party fails to timely and adequately undertake the defense of a Covered Claim or a conflict of interest arises that, in the reasonable and good faith judgment of the Indemnified Person(s), compromises the Indemnifying Party's ability to adequately represent the interests of the Indemnified Person(s).

3

Product Supply Agreement

**Section 7.     Limitation of Liability.** NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INDIRECT OR PUNITIVE DAMAGE OR ANY DAMAGES FOR LOST REVENUES OR PROFITS FOR ANY REASON WHATSOEVER, WHETHER OR NOT THE LIKELIHOOD OR CERTAINTY OF SUCH DAMAGES WAS KNOWN OR SHOULD HAVE BEEN KNOWN. EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; PROVIDED THAT THE FOREGOING SHALL NOT LIMIT THE INDEMNIFICATION OBLIGATIONS OF EITHER PARTY IN RESPECT OF DAMAGES OWED TO THIRD PARTIES.

**Section 8.     Termination.**

8.1      Either party may terminate this Agreement (and any outstanding PO) in the event of a material breach of this Agreement by the other party which remains uncured for thirty (30) days after written notice of breach is given to the breaching party.

8.2      Either party may immediately terminate this Agreement (and any outstanding PO) by giving written notice to the other party if: (a) the other party is insolvent or has a petition brought by or against it under the insolvency laws of any jurisdiction; (b) the other party makes an assignment for the benefit of creditors; or (c) a receiver, trustee or similar agent is appointed with respect to any property or business of Company.

8.3      Any purchases of the Products after the termination or expiration of this Agreement shall not be, and shall not be deemed to be, an extension of the Term of this Agreement.

**Section 9.     General**

9.1      *Survival of Terms.* Regardless of the circumstances of termination or expiration of this Agreement, the provisions of <u>Section 4</u> ("Warranty"), <u>Section 5</u> ("Delivery"), <u>Section 6</u> ("Indemnity"), <u>Section 7</u> ("Limitation of Liability"), and <u>Section 9</u> ("General") will survive the termination or expiration and continue according to their terms.

9.2      *Confidentiality.*

(a)      Any confidential information that is disclosed by one party (a "disclosing party") to the other (a "recipient") in connection with this Agreement ("<u>Confidential Information</u>") shall be kept confidential pursuant to the terms of this <u>Section 9.2</u>. Any marketing plans, product specifications, formulations, or other trade secrets or proprietary information of the disclosing party, whether oral, visual or written, shall constitute Confidential Information even if not marked as such. The terms and conditions of this Agreement shall be deemed to be Confidential Information.

(b)      No recipient shall use Confidential Information except as necessary to perform its obligations under this Agreement nor shall any recipient disclose or provide the Confidential Information to any third party without the express prior written consent of the disclosing party in each instance. This Section 9.2(b) imposes no obligation of confidentiality upon a recipient with respect to any information that can be shown by written records: (i) is or becomes publicly known or publicly available or otherwise in the public domain through no act of the recipient or its affiliates; (ii) is already known to, or in the possession of, the recipient or its affiliates at the time of the disclosure; or (iii) is rightfully received by the recipient from a third party without a duty of confidentiality to the disclosing party; (iv) is independently developed by the recipient, outside the course of this Agreement, without use of or reliance upon Confidential Information; or (v) is required to be disclosed by law or regulation, including by order of a court or governmental agency; *provided, however,* that in such a case, the recipient will make all reasonable efforts to notify the disclosing party of such order in sufficient time for the disclosing party to seek a protective order or other appropriate relief. Each party acknowledges and agrees that all Confidential Information is the sole property of the

4

disclosing party. The obligations under this Section 9.2(b) shall survive any expiration or termination of this Agreement for a period of three (3) years thereafter.

(c)    This Section 9.2 is in addition to, and shall not limit, any separate obligations of confidentiality arising under any other agreement between Company and Provider and/or their affiliates.

9.3    _Records._ Provider shall maintain accurate and legible records in English and shall grant Company and any representatives access to and copies of, any information reasonably requested by Company with respect to Provider's performance under this Agreement (including quality programs and test documentation) for five years after the expiration or termination of this Agreement or such longer times as may be required by applicable law.

9.4    _Remedies._ The rights or remedies of the Parties are not exclusive, and either party shall be entitled alternatively or cumulatively, subject to the other provisions of this Agreement, to Damages for breach, to an order requiring specific performance, or to any other remedy available at law or in equity.

9.5    _Independent Contractors._ The Parties are each independent contractors and neither party is an employee, agent, representative, partner, or joint venturer of the other or has any authority to assume or create any obligation or liability of any kind on behalf of the other.

9.6    _Governing Law._

(a)    The interpretation and construction of this Agreement, and all matters relating to this Agreement, will be governed by the laws of the Cayman Islands.

(b)    COMPANY IRREVOCABLY WAIVES ITS RIGHTS TO TRIAL BY JURY OF ANY CAUSE OR ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION OR OTHER PROCEEDING WITH RESPECT TO ANY MATTER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR ANY PORTION OF THIS AGREEMENT, WHETHER BASED UPON CONTRACTUAL, STATUTORY, TORTIOUS OR OTHER THEORIES OF LIABILITY. COMPANY REPRESENTS THAT IT HAS CONSULTED WITH COUNSEL REGARDING THE MEANING AND EFFECT OF THE FOREGOING WAIVER OF ITS JURY TRIAL RIGHT.

9.7    _Notices._ Any notice required or permitted by this Agreement shall be in writing, in English and delivered by overnight commercial courier (such as FedEx) providing proof of delivery, addressed as set forth on the first page of this Agreement (or to such other addresses as may be designated by notice from one party to the other).

9.8    _Severability._ If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any Person or circumstance is held invalid, illegal or unenforceable in any respect by a tribunal of competent jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision of this Agreement (or the remaining portion thereof) or the application of such provision to any other Persons or circumstances.

9.9    _Waiver._ Except as otherwise provided in this Agreement, any failure of any party to comply with any obligation, covenant, agreement or condition in this Agreement may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition will not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

5

9.10    *No Third-Party Beneficiary.* Each party to this Agreement intends that this Agreement will not benefit or create any right or cause of action in or on behalf of any Person other than the Parties to this Agreement.

9.11    *Assignment.* This Agreement may not be assigned, by operation of law or otherwise by Company in whole or in part without the express, written permission of Provider (a merger or stock sale shall be deemed to constitute an assignment for purposes of this restriction). Any attempt to assign this Agreement will be null and void. Notwithstanding the foregoing, either party may assign this Agreement without consent to an affiliate or to a purchaser of all or substantially all of such party's assets to which this Agreement relates.

9.12    *Entire Agreement.* This Agreement and any related Schedules, Addenda, Exhibits and Attachments, as so designated, set forth the entire agreement and understanding of the Parties relating to the subject matter contained herein, and merges all prior discussions and agreements, both oral and written, between the Parties. Each party agrees that use of pre-printed forms, including email, purchase orders, acknowledgements or invoices, is for convenience only and all pre-printed terms and conditions stated thereon, except as specifically set forth in this Agreement, are void and of no effect. Unless expressly amended by Schedule, the terms and conditions of this Agreement shall prevail. No amendment or modification to this Agreement shall be valid unless set forth in writing and signed by authorized representatives of both Parties.

9.13    *Interpretation.* The headings and section references contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes," "including" or similar expressions are used in this Agreement, they will be understood to be followed by the words "without limitation". The term "Person" means any individual, trustee, firm, corporation, partnership, limited liability company, trust, joint venture, bank, government authority, trust or other organization or entity. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

9.14    *Counterparts; Delivery by Facsimile or E-Mail.* This Agreement may be executed in one or more counterparts, all of which taken together will constitute one instrument. Any signature page delivered via facsimile or e-mail shall be binding to the same extent as an original signature page.

9.15    *No Use of Affiliates for Prohibited Actions.* Each party shall not direct, authorize or permit any of its affiliates to take any action that would be prohibited if taken by such party, and any such action by an affiliate of such party shall be deemed a breach of this Agreement on the part of such party. For purposes of this Agreement, an "affiliate" of either party is any person or entity that controls, is controlled by or is under common control with such party.

[Signature Page Follows]

6

Product Supply Agreement

9.16    *Force Majeure*. Neither party shall be deemed to be in breach hereof or liable to to the other in any manner on account of any delay in delivery or other performance to the extent caused by any contingency beyond such party's reasonable control, including without limitation, fire; flood; riot; hostilities; strikes or other labor disputes; freight embargoes; shortage of labor; acts of God or of a public enemy; or the effect of any existing or future laws, acts or regulations of any applicable federal, state or local government.  A party claiming force majeure shall provide prompt written notice to the other party of the event and use all commercially reasonable efforts to mitigate the impact of the force majeure event and to resume performance as promptly as practicable.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date(s) indicated below and effective as of the Effective Date.

COMPANY                                PROVIDER

Shang Peng Gao Ke, Inc.                iHealthScience LLC

By:                                    By:
Printed Name: Theodore R Sanders, Jr.  Printed Name: Chris Miller
Title: Director                        Title: Manager
Date:    7/28/17                       Date:    02/17/2017

7

21-11854-dsj    Doc 63-3    Filed 09/01/23    Entered 09/01/23 19:58:55    Exhibit 2-1
Pg 68 of 111

21-11854-dsj    Doc 44-7    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit  7 -
Agreements between Radial IT and SPGK    Pg 9 of 39

## **EXHIBIT A**

### LIST AND DESCRIPTION OF PRODUCTS

**Description of Products:** "Products" shall mean any product supplied by Provider to Company during the Term.

**Term of Agreement**: Subject to the terms and conditions of this Agreement, the "Term" shall commence on the Effective Date and continue until five (5) years thereafter, unless the Term is extended in a writing signed by authorized representatives of both Parties.

Product Supply Agreement – Exhibit A

## EXHIBIT B

### DELIVERY TERMS AND CONDITIONS

*Delivery Terms*:

Provider shall use commercially reasonable efforts to deliver all orders within the applicable lead times required by this Agreement. Provider fulfils its obligation to deliver the Products when the Products have been made available to the Company as set forth below. Provider shall send the Company documents related to the Products within 10 days after delivery of Products and at the Company's address set out in herein.

*Shipping*:

Unless otherwise clearly specified in the Agreement, Provider shall ship all orders on a freight prepaid basis, DDP (Destination), where title and risk of loss shall pass to Company. Provider shall arrange the loading of Products, and the Products shall be packed in a manner reasonably acceptable to the parties. Unless otherwise expressly provided herein, the Products shall be packed in manner adequate to protect the Products. The Company hereby declares it has received all information regarding the Products necessary to arrange insurance coverage.

Product Supply Agreement – Exhibit B

## LICENSE AGREEMENT

This LICENSE AGREEMENT (the "Agreement") is made and entered into as of October 1, 2016 (the "Effective Date") by and between Radial IT Systems, Ltd., a Cayman Islands company ("Licensor"), and Shang Peng Gao Ke, Inc., a Cayman Islands company ("Licensee"). Each of the signatories hereto is individually, a "Party" and collectively, the "Parties."

### RECITALS

A.    Licensor and Licensee are in the business of marketing various software applications, tangible products and related services by means of online sales.

B.    As of the Effective Date, Licensor agreed to license to Licensee the Licensed Materials (as defined below) for compensation as set forth in Exhibit B attached hereto.

B.    The Parties now wish to memorialize and clarify the terms of that agreement, as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.    Definitions. As used herein, the following words, phrases, or terms in this Agreement shall have the following meanings:

1.1    "Affiliates" mean any corporation or legal entity which is controlled by, controls, or is under common control of a Party. For this purpose, the meaning of the word "control" shall include, without limitation, direct or indirect ownership of more than fifty percent (50%) of the voting shares of interest of such corporation or legal entity.

1.2    "Business" means the marketing business, the business of providing cloud-based internet productivity and communications applications and related services, and the business of providing tangible consumer products and services in the People's Republic of China ("PRC") and to PRC customers and users.

1.3    "Confidential Material" means any information which is confidential in nature, that is designated or identified as confidential by a Party or by any of its Affiliates, or that has not been voluntarily disclosed or made available to the general public, and that is furnished by or on behalf of such Party or any of its Affiliates (collectively, the "Disclosing Party") to the other Party or to any of its Affiliates (collectively, the "Receiving Party"), whether such information is or has been conveyed verbally or in written or other tangible form, and whether such information is acquired directly or indirectly such as in the course of discussions or other investigations by the Receiving Party. Confidential Material shall not include information that: (a) was known by the Receiving Party without obligation of confidentiality prior to disclosure thereof by the other Party; (b) was in or entered the public domain through no fault of the Receiving Party; (c) is disclosed to the Receiving Party by a third party legally entitled to make such disclosure without violation of any

License Agreement (Radial IT Systems to SPGKI)

obligation of confidentiality; (d) is required to be disclosed by applicable laws or regulations (but in such event, only to the extent required to be disclosed, and provided that the Disclosing Party is given the opportunity to review and redact the Agreement prior to disclosure); or (e) is independently developed by the Receiving Party without reference to any Confidential Material of the other Party.

1.4    "Intellectual Property Rights" mean: (a) copyright, patents, database rights and rights in trademarks, designs, know-how and confidential information (whether registered or not); (b) applications for registration and the right to apply for registration for any of these rights; and (c) all other intellectual property rights and equivalents or similar forms of protection existing anywhere in the world.

1.5    "Licensed Materials" means the trademarks, software, technology and other Intellectual Property Rights set forth on Exhibit A attached hereto, and with respect to any software or applications shall include all related user documentation as well as later authorized or released versions of such program or documentation, and with respect to any tangible consumer products shall include all related user guides, instructions and training manuals as well as later authorized or released versions thereof.  All updates and modifications to the Licensed Materials shall constitute "Licensed Materials" subject to this Agreement and be promptly provided to Licensee.

2.    License.

2.1    Grant of License.  Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee during the Term an exclusive, royalty-bearing, non-transferable right and license to use, copy, use, modify, manufacture, have manufactured, sell, distribute, and advertise and otherwise exploit the Licensed Materials in connection with Licensee's Business.

2.2    Restrictions. Only those licenses expressly set forth in this Agreement are granted. All licenses granted by Licensor to Licensee under this Agreement are personal to Licensee and are subject to the following further limitations:

(a)    Except as expressly authorized in this Agreement or by applicable law, Licensee agrees (i) it will not otherwise reproduce, assign, transfer, lease, rent or distribute any Licensed Materials; and (ii) it will not remove, efface or obscure any copyright notices, logos or other proprietary notices or legends included in any Licensed Materials.

(b)    Except as expressly authorized in this Agreement or by applicable law, (i) Licensee is not granted any sublicense rights and (ii) no other licenses are granted under this Agreement, whether by implication, estoppel, course of conduct, or otherwise.

(c)    Any modifications, improvements or derivative works of any part of the Licensed Materials shall be owned solely and exclusively by Licensor and shall constitute "Licensed Materials" for purposes of this Agreement.

2.3    Delivery.  Within a commercially reasonable period of time following the execution of this Agreement and from time to time during the Term, Licensor shall deliver to Licensee, on the terms and conditions specified herein, the Licensed Materials necessary for Licensee to exercise its license rights in accordance herewith.

License Agreement (Radial IT Systems to SPGKI)

2

FSD2021-0318                          **Page 31 of 365**                          2023-04-24

3.    Schedule of Compensation. In consideration of Licensor's grant of the license pursuant to Section 2 above, Licensee shall pay Licensor the compensation in the form and manner as more particularly described on the "Schedule of Compensation" attached as Exhibit B hereto and incorporated herein by reference.

4.    Tax Withholding. The Parties acknowledge and agree that Licensee shall be responsible to calculate, withhold, and submit all applicable withholding taxes. Licensor shall be responsible for providing sufficient information to Licensee to facilitate such calculation.

5.    Ownership.

    5.1    General. Licensor retains exclusive right, title and interests in and to the Licensed Materials, related documentation and any other proprietary Licensor technology and materials delivered to Licensee pursuant to this Agreement.

    5.2    No Transfer of Ownership. Nothing in this Agreement is intended to transfer any Intellectual Property Rights from Licensor to Licensee. If Licensee is ever inadvertently or erroneously held or deemed to be the owner of any such Intellectual Property Rights, Licensee agrees to assign and hereby irrevocably assigns to Licensor all such interests as of the Effective Date, and agrees to execute all documents to implement and confirm the letter and intent of this Section 5.2.

6.    Term and Termination.

    6.1    Term. The term (the "Term") of this Agreement shall commence as of the Effective Date and shall continue until terminated in accordance with Section 6.2 below.

    6.2    Termination. The Agreement may terminate in the following circumstances:

        (a)    Termination Upon Notice or Mutual Agreement. This Agreement may be terminated by either Party, with or without cause, upon thirty (30) days' prior written notice to the other Party. In addition, this Agreement may be terminated upon mutual agreement of the Parties.

        (b)    Material Breach. In the event of a material breach by either Party, the non-breaching Party may terminate this Agreement upon written notice to the breaching Party if such breach is not corrected within thirty (30) calendar days after written notice is received by the breaching Party for the subject breach.

        (c)    Bankruptcy or Insolvency. Either Party may terminate this Agreement if the other Party files a petition in bankruptcy or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or discontinues or dissolves its business, or if a receiver is appointed for such Party or for such Party's business and such event is not discharged within thirty (30) days.

    6.3    Effect of Termination.

        (a)    Upon termination of this Agreement, Licensee shall promptly cease all use of the Licensed Materials.

License Agreement (Radial IT Systems to SPGK)

3

FSD2021-0318                          Page 32 of 365                          2023-04-24

(b)     Termination of this Agreement for any reason shall not release either Party from any liability which, at the time of such termination, has already accrued to the other Party or which is attributable to a period prior to such termination nor preclude either Party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this Agreement.

(c)     The Parties' obligations under this Agreement, which by their nature would continue beyond the termination of this Agreement, shall survive the termination of this Agreement. Specifically, the following Sections of this Agreement shall survive any termination of this Agreement: Sections 5 (Ownership), 6.3 (Effect of Termination), 8 (Limitation of Liability), 9 (Indemnification), 10 (Confidential Material) and applicable provisions in 11 (Miscellaneous).

7.     Representations, Warranties and Obligations of Parties.

7.1     Mutual. Each Party represents and warrants to the other Party that: (a) it has the authority, corporate and otherwise, to enter into this Agreement and to perform its obligations in accordance with the terms hereof; and (b) there are no actions, suits, proceedings, or material claims or investigations pending or threatened against it in any court, or by or before any federal, state, municipal, or other governmental department, commission, board, bureau, agency, or other instrumentality, domestic or foreign, or before any arbitrator of any kind, that, if adversely determined, could adversely affect its ability to satisfy its obligations hereunder.

7.2     Licensor Authority. Licensor represents and warrants that it has the right and power to grant the licenses granted herein and that there are no other agreements with any other party in conflict herewith. Licensor further represents and warrants that to the best of its knowledge, all rights licensed hereunder do not infringe any valid right of any third party.

7.3     Support of Licensee's Business. Licensee shall be solely responsible for the manufacture, production, sale, and distribution of the Licensed Products in the PRC and will bear all related costs associated therewith. Licensor shall not in any way, directly or indirectly, engage or support the manufacture, production, sale, and distribution of the Licensed Products in the PRC, except as may be expressly provided pursuant to written agreements between the Parties providing for Licensor and/or its affiliates to support Licensee's Business.

7.4     Quality Control. The Licensed Products shall be of a high quality which is at least equal to comparable products previously manufactured and marketed by Licensee for the Business and comparable products previously manufactured and marketed by Licensor outside of the PRC. If the quality of a class of the Licensed Products falls below such standard, or standards as previously approved by Licensor, Licensee shall use its best efforts to restore such quality. In the event that Licensee has not taken appropriate steps to restore such quality within thirty (30) days after notification by Licensor, Licensor shall have the right to terminate this Agreement

7.5     WARRANTY DISCLAIMER. LICENSEE HEREBY ACKNOWLEDGES THAT OTHER THAN THE EXPRESS WARRANTIES SET FORTH HEREIN, THE LICENSED MATERIALS ARE PROVIDED TO LICENSEE "AS IS" AND LICENSOR MAKES NO WARRANTIES TO LICENSEE, EXPRESS, STATUTORY, IMPLIED, OR OTHERWISE, AND LICENSOR SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES AND

License Agreement (Radial IT Systems to SPGKI)

4

FSD2021-0318                              Page 33 of 365                              2023-04-24

CONDITIONS OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A
PARTICULAR PURPOSE.

8.      Limitation of Liability.

        8.1     WITH THE EXCEPTION OF BREACHES OF SECTIONS 5 (OWNERSHIP), 9
(INDEMNIFICATION), AND 10 (CONFIDENTIAL MATERIAL), NEITHER PARTY NOR
ANY OF THEIR RESPECTIVE AFFILIATES SHALL BE LIABLE TO THE OTHER PARTY
FOR INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES
UNDER THIS AGREEMENT, INCLUDING INDIRECT, INCIDENTAL, PUNITIVE,
SPECIAL OR CONSEQUENTIAL DAMAGES, REGARDLESS OF THE THEORY OF
LIABILITY (INCLUDING NEGLIGENCE).

        8.2     WITH THE EXCEPTION OF BREACHES DESCRIBED IN SECTION 8.1
ABOVE, IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY UNDER
THIS AGREEMENT TO THE OTHER PARTY OR ANY THIRD PARTY, WHETHER IN
CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR ANY OTHER
LEGAL THEORY, EXCEED THE ROYALTIES PAID BY LICENSEE TO LICENSOR IN THE
FOUR (4) CALENDAR QUARTERS IMMEDIATELY PRECEDING THE CALENDAR
QUARTER IN WHICH THE SUBJECT CLAIM ARISES.

        8.3     THE LIMITATIONS IN SECTIONS 8.1 AND 8.2 ABOVE APPLY EVEN IF A
PARTY HAS BEEN ADVISED BEFOREHAND OF THE POSSIBILITY OF SUCH DAMAGES
OR FOR A CLAIM ANY THIRD PARTY, AND NOTWITHSTANDING THE FAILURE OF
THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

9.      Indemnification.

        9.1     General.  Each Party (the "Indemnifying Party") shall indemnify the other Party
and its shareholders, members, officers, directors, agents, employees and assigns (each, an
"Indemnified Party") and undertake to defend and hold the Indemnified Party harmless from and
against any claims, demands, suits, causes of action, losses, penalties, obligations, liabilities,
damages, and expenses (including court costs, reasonable attorneys' fees, interest expenses and
amounts paid in compromise or settlement) ("Claims") claimed by any third party related to,
caused by, arising from or on account of the Indemnifying Party's material breach of any covenant,
representation, warranty, provision or agreement of the Indemnifying Party contained in this
Agreement.

        9.2     Indemnification Procedures.  If an Indemnified Party determines that it is entitled
to indemnification under this Section 9, such Indemnified Party shall promptly notify the
Indemnifying Party promptly and in writing of the Claim brought against such party, but in no
event more than ten (10) business days after the party has received notice of such Claim and
provide all reasonably necessary or useful information, assistance and authority to settle and/or
defend any such claim or action. The selection of counsel, the conduct of the defense of any
lawsuit, arbitration, or other proceeding, and any settlement shall solely be within the
Indemnifying Party's control, provided that the Indemnified Party shall have the right to participate
in the defense of such Claim using counsel of its choice, at its expense. No settlement that would

License Agreement (Radial IT Systems to SPGKI)

5

impose any costs or expense upon the Indemnified Party shall be made without such party's prior written consent.

10.   Confidential Material.

10.1   General. After Confidential Material is disclosed, the Receiving Party shall not use Disclosing Party's Confidential Material for any purpose other than to exercise or perform its rights or obligations under this Agreement. Receiving Party shall not, without the prior written consent of Disclosing Party, copy or otherwise reproduce Disclosing Party's Confidential Material, or disclose, disseminate or otherwise communicate, in whole or in part, Disclosing Party's Confidential Material to any third party except to Affiliates, officers, directors, employees or advisors (including, but not limited to tax and legal representatives) of Receiving Party who need to know the Confidential Material and who will have undertaken to treat the Confidential Material as confidential in accordance with the provisions of this Section 10. Receiving Party further agrees that it shall safeguard Disclosing Party's Confidential Material from disclosure and, use commercially reasonable efforts to ensure non-disclosure, which efforts shall be commensurate with those Receiving Party uses to protect the confidentiality of its own Confidential Material. In the event that Receiving Party becomes compelled by law or order of court or administrative body to disclose any Disclosing Party's Confidential Material, Receiving Party shall be entitled to disclose such Confidential Material provided that: (a) Receiving Party provides Disclosing Party with prompt prior written notice of such requirements to allow Disclosing Party to take any necessary action to safeguard the Confidential Material; and (b) if required to do so, Receiving Party shall furnish only that portion of Disclosing Party's Confidential Material which is legally required to be disclosed and shall exercise its commercially reasonable efforts to obtain assurances that Confidential Material will be treated in confidence.

10.2   Remedies. Receiving Party acknowledges and agrees that Disclosing Party may be irreparably injured by a breach of this Agreement and that Disclosing Party may be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any action instituted in any court having subject matter jurisdiction, in addition to any other remedy to which Disclosing Party may be entitled at law or in equity in the event of any breach of the provisions hereof. Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement, but shall be in addition to all other remedies available at law or in equity.

10.3   Return of Confidential Material. Upon the Disclosing Party's request and, in any event, when this Agreement has terminated, the Receiving Party will promptly return to the Disclosing Party or destroy, except for one copy of Disclosing Party's Confidential Material, which may be  retained for evidence purposes only: (a) all Confidential Material that has been supplied by the Disclosing Party and is in the Receiving Party's possession or control; and (b) all analyses, studies, or other materials, or part thereof, that were created by the Receiving Party and that are based on or contain Confidential Material of the Disclosing Party.

10.4   Ownership. Except as otherwise provided in this Agreement, nothing in this Section 10 is to be construed as granting Receiving Party any title, ownership, license or other right or

License Agreement (Radial IT Systems to SPGK!)

6

FSD2021-0318                      Page 35 of 365                      2023-04-24

interest in any of Disclosing Party's Confidential Material, or to any Intellectual Property Rights of the Disclosing Party embodied therein.

11.   Miscellaneous.

11.1   Governing Law.  This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the Cayman Islands, and without reference to its principles of conflicts of law.  This Agreement shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is expressly excluded.

11.2   Nature of Relationship; Agency.  Each Party is and for all purposes shall be deemed to be an independent contractor with respect to the performance of its obligations and duties under this Agreement.  Nothing in this Agreement shall constitute or create a joint venture, partnership, agency or any other similar arrangement between the Parties whatsoever.  Neither Party shall have the authority to assume or create obligations on behalf of the other Party, and neither Party shall take any action that has the effect of creating the appearance of its having such authority.  This Agreement shall not be deemed to constitute either Party to be the agent of the other Party.

11.3   No Obligation to Bring or Defend Legal Actions.  Neither Party shall have any obligation hereunder to bring any claim or action against any third party for infringement or misappropriation of any of the intellectual property rights licensed hereunder, or to defend any claim or action brought by a third party with respect to any such intellectual property rights (including, without limitation, a claim or action with respect to the validity or enforceability of any such rights).

11.4   Notices.   All notices, demands, consents, approvals, requests or other communications which any of the Parties to this Agreement may desire or be required to give hereunder (collectively, "Notices") will be in writing and will be given by (a) personal delivery, (b) facsimile transmission, (c) electronic mail or (d) delivery to Federal Express or another internationally recognized overnight courier service, fees prepaid, addressed as follows:

> If to Licensor:    Radial IT Systems, Ltd.
>                    Samson & McGrath Corporate Services
>                    5th Floor, Genesis Building
>                    PO 446 GT, KY1-1106
>                    George Town, Grand Cayman
>                    Cayman Islands
>                    Attention:  The Directors
>
> If to Licensee:    Shang Peng Gao Ke, Inc.
>                    Samson & McGrath Corporate Services
>                    5th Floor, Genesis Building
>                    PO 446 GT, KY1-1106
>                    George Town, Grand Cayman
>                    Cayman Islands
>                    Attention:  The Directors

License Agreement (Radial IT Systems to SPGKI)

7

Either Party hereto may designate another addressee (and/or change its address) for Notices hereunder by a Notice given pursuant to this Section 11.4. A Notice sent in compliance with the provisions of this Section 11.4 will be deemed given on the date delivered personally or sent by facsimile or electronic mail or, if sent by courier, five (5) business days following delivery to the courier service.

11.5    Successors and Assigns; Assignment. This Agreement will be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns. Neither this Agreement nor any right hereunder may be assigned by either Party (by operation of law or otherwise) without the prior written consent of the other Party; provided, however, this Agreement and the rights hereunder may be assigned by Licensor to any third party upon thirty (30) days' written notice to Licensee. Any assignment by a Party in violation of this Section 11.5 shall be null and void.

11.6    Government Approval. Licensee agrees to submit copies of this Agreement to any governmental agency in any country in which Licensee conducts the Business and approval of a license agreement is necessary, and Licensee agrees to promptly prosecute any such application diligently. This Agreement shall only become effective in such country or countries upon receipt of appropriate approval from the applicable governmental agency.

11.7    Entire Agreement. This Agreement (including the exhibits hereto, which are made a part of this Agreement by this reference) sets forth the entire agreement between the Parties relating to the subject matter hereof and all prior agreements relative thereto which are not contained herein are terminated. Amendments, variations, modifications or changes herein may be made effective and binding upon the Parties by, and only by, a written agreement duly executed by each Party, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any Party.

11.8    Severability. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

11.9    Force Majeure. If performance of this Agreement, or any obligation hereunder (other than the obligation to pay) is prevented, restricted, or interfered with by any act or condition whatsoever beyond the reasonable control of the affected Party, the Party so affected, upon giving prompt notice to the non-affected Party, will be excused from such performance to the extent of such prevention, restriction, or interference.

License Agreement (Radial IT Systems to SPGK)

8

11.11   Waivers.  The failure at any time of any Party to require performance by any other Party of any responsibility or obligation provided for in this Agreement shall in no way affect the full right to require such performance at any time thereafter, nor shall the waiver by either Party of a breach of any provision of this Agreement by the other Party constitute a waiver of any succeeding breach of the same or any other obligation itself.

11.12   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute but one and the same agreement.

*[Signature Page Follows]*

License Agreement (Radial IT Systems to SPGK1)

9

IN WITNESS WHEREOF, the parties have duly executed this License Agreement by their duly authorized representatives as of the date(s) indicated below and effective as of the Effective Date.

**LICENSOR:**

RADIAL IT SYSTEMS, LTD.,
a Cayman Islands company

By: _____
Name: Timothy Ashcroft
Title: Director
Date: February 17, 2017

**LICENSEE:**

SHANG PENG GAO KE, INC.,
a Cayman Islands company

By: _____
Name: Theodore R. Sanders, Jr.
Title: Director
Date: February 17, 2017

[SIGNATURE PAGE TO LICENSE AGREEMENT]

License Agreement (Radial IT Systems to SPGKI)

## Exhibit A

## LICENSED MATERIALS

1.    All software and applications known as IRIS outside of the PRC (including all technology known as Phytter outside the PRC)

2.    All software and applications known as B88C outside of the PRC

3.    All software and applications designed, developed and/or owned by Licensor

4.    eCommerce platform technology

5.    All Intellectual Property Rights in any way related to the training program system that Licensor or its affiliates have developed or will develop for the Business

6.    All Intellectual Property Rights in any way related to marketing, customer tracking, sales tracking, compensation planning and compensation calculation Licensor or its affiliates have developed or will develop for the Business

7.    All Intellectual Property Rights in any way related to the Business

License Agreement (Radial IT Systems to SPGKI)

FSD2021-0318                        Page 40 of 365                        2023-04-24

## Exhibit B

### SCHEDULE OF COMPENSATION

In consideration for the rights granted by Licensor to Licensee pursuant to this Agreement, Licensee will compensate Licensor as follows:

8.     Royalty.   Licensee shall pay Licensor a royalty equal to ten percent (10%) of Licensee's gross revenues on the Licensed Materials in connection with Licensee's Business (the "Royalties").

9.     Payments and Reports.  Royalties for each calendar month shall be due and payable by Licensee to Licensor within thirty (30) days after the close of such calendar month.  Royalty reports setting forth the Royalty calculation shall be included with such payments.

10.     Audit Rights of Royalty Payments.  Licensor shall have the right, at Licensor's expense, to have an independent auditor mutually agreed upon by Licensor and Licensee audit Licensee's gross revenues and Royalty amounts on an annual basis.  If such audit reveals any underpayment of Royalties in an amount greater than five percent (5%) of actual Royalties due for any calendar year, Licensee shall promptly pay the reasonable costs of such audit in addition to an amount equal to the underpayment.  Such audit shall be preceded by at least thirty (30) days' advance written notice and shall be performed during normal business hours of Licensee by the auditor.  The auditor shall have access to only those books and records of Licensee which are reasonably necessary to determine the relevant Royalties due hereunder.  Such audit rights shall continue for one (1) year following the termination of this Agreement.

11.     Tax Withholding.  As provided in Section 4 of the Agreement, Licensee will be responsible for calculating, withholding and submitting applicable withholding taxes on the Royalties to the applicable tax authorities.

License Agreement (Radial IT Systems to SPGK)

FSD2021-0318                    Page 41 of 365                    2023-04-24

## CUSTOMER SERVICES SUPPORT AGREEMENT

This CUSTOMER SERVICES SUPPORT AGREEMENT (the "Agreement") is made and entered into as of October 1, 2016 by and between Shang Peng Gao Ke, Inc., a Cayman Islands company (the "Company"), and Radial IT Systems, Ltd., a Cayman Islands company ("Consultant"). The Company and Consultant are individually a "Party" and collectively the "Parties."

### RECITALS

A.    As of the Effective Date, the Consultant agreed to provide certain services to the Company for compensation, all as more particularly set forth on Exhibit A attached hereto.

B.    The Parties now wish to memorialize and clarify the terms of that agreement, as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.    Consulting Services.  Subject to the terms and conditions set forth herein, Consultant shall perform, or contract with vendors to perform, certain services for the Company as set forth in Section 1 of Exhibit A to this Agreement (the "Services").

2.    Compensation and Payment Terms.  In consideration for the Consultant's performance of the Services, the Company shall pay the Consultant fees as more particularly described in Section 2 of Exhibit A attached hereto, except as otherwise agreed to between the Parties.

3.    Effective Date.  The effective date of this Agreement is the date first stated hereinabove (the "Effective Date").

4.    Tax Withholding.  If applicable, the Consultant will be responsible for calculating, withholding, and submitting all applicable withholding taxes to the applicable tax authorities.  The Company shall be responsible for providing sufficient information to the Consultant to facilitate such calculation.  The Consultant will provide any necessary withholding certificate to the Company within a mutually agreed upon reasonable time period.

5.    VAT Taxes.  If applicable, the Company will be responsible for calculating and including VAT taxes on the invoice, collecting VAT taxes from the Consultant, and remitting VAT taxes to the applicable tax authorities.

FSD2021-0318                                                                                  2023-04-24

6.      Indemnification.

        6.1.    Indemnification.  Each Party (the "Indemnifying Party") shall indemnify
the other Party, its shareholders, present and future officers, directors, agents, employees, and
assigns (each, an "Indemnified Party"), and undertake to defend and hold each Indemnified Party
harmless from and against any claim, demand, suits, cause of action, losses, penalties,
obligations, liabilities, damages, and expenses (including court costs, reasonable attorneys' fees,
interest expenses and amounts paid in compromise or settlement) ("Claims") claimed by any
person or entity related to, caused by, arising from or on account of the Indemnifying Party's
failure to comply with any covenant, provision or agreement of the Indemnifying Party contained
in this Agreement.

        6.2.    Indemnification Procedures.  If an Indemnified Party determines that it is
entitled to indemnification under this Section 6, the Indemnified Party shall notify the
Indemnifying Party promptly and in writing of the Claim brought against the Indemnified Party,
but in no event more than ten (10) days after the Indemnified Party has received notice of such
Claim.  The selection of counsel, the conduct of the defense of any lawsuit, arbitration, or other
proceeding, and any settlement shall be within the Indemnifying Party's control, provided that
the Indemnified Party shall have the right to participate in the defense of such Claim using
counsel of its choice, at its expense.  No settlement that would impose any costs or expense upon
the Indemnified Party shall be made without the Indemnified Party's prior written consent.

7.      Confidential Material.

        7.1     General.  After Confidential Material is disclosed by a Party (the
"Disclosing Party"), the Party receiving such Confidential Material (the "Receiving Party") shall
not use Disclosing Party's Confidential Material for any purpose other than to exercise or
perform its rights or obligations under this Agreement.  Receiving Party shall not, without the
prior written consent of Disclosing Party, copy or otherwise reproduce Disclosing Party's
Confidential Material, or disclose, disseminate or otherwise communicate, in whole or in part,
Disclosing Party's Confidential Material to any third party except to the officers, directors,
employees or advisors (including, but not limited to tax and legal advisors) of Receiving Party
who need to know the Confidential Material and who have undertaken to treat the Confidential
Material as confidential in accordance with the provisions of this Section 7 or are otherwise
subject to confidentiality obligations with respect to such Confidential Material.  Receiving Party
further agrees that it shall safeguard Disclosing Party's Confidential Material from disclosure
and, use commercially reasonable efforts to ensure non-disclosure, which efforts shall be
commensurate with those Receiving Party uses to protect the confidentiality of its own
Confidential Material.  In the event that Receiving Party becomes compelled by law or order of
court or administrative body to disclose any Disclosing Party's Confidential Material, Receiving
Party shall be entitled to disclose such Confidential Material provided that: (a) Receiving Party
provides Disclosing Party with prompt prior written notice of such requirements to allow
Disclosing Party to take any necessary action to safeguard the Confidential Material; and (b)
Receiving Party shall furnish only that portion of Disclosing Party's Confidential Material which
is legally required to be disclosed and shall exercise its commercially reasonable efforts to obtain
assurances that Confidential Material will be treated in confidence.  "Confidential Material"
means information that is confidential in nature, that is designated or identified as confidential by

Customer Services Support Agreement (Radial IT Systems to              2
SPGK)

21-11854-dsj    Doc 63-3    Filed 09/01/23    Entered 09/01/23 19:58:55    Exhibit 2-1
Pg 84 of 111


21-11854-dsj    Doc 44-7    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit 7 -
Agreements between Radial IT and SPGK    Pg 25 of 39
FSD2021-0318                              Page 43 of 365                              2023-04-24

the Disclosing Party or that has not been voluntarily disclosed or made available to the general public by the Disclosing Party, or any information that is or was received in confidence by the Disclosing Party from any other person or entity, which is furnished by or on behalf of any Disclosing Party to the Receiving Party, whether such information is or has been conveyed verbally or in written or other tangible form, and whether such information is acquired directly or indirectly such as in the course of discussions or other investigations by the Receiving Party. Disclosing Party's Confidential Material shall not include information that: (i) was known by the Receiving Party without obligation of confidentiality prior to disclosure thereof by the Disclosing Party; (ii) was in or entered the public domain through no fault of the Receiving Party; (iii) is disclosed to the Receiving Party by a third party legally entitled to make such disclosure without violation of any obligation of confidentiality; or (iv) is independently developed by the Receiving Party without reference to Disclosing Party's Confidential Material.

7.2    Return of Confidential Material. Upon the Disclosing Party's request and, in any event when this Agreement has terminated, the Receiving Party will promptly return to the Disclosing Party or destroy, except for one copy of Disclosing Party's Confidential Material, which may be retained for evidence purposes only: (a) all Confidential Material that has been supplied by the Disclosing Party and is in the Receiving Party's possession or control; and (b) all analyses, studies, or other materials, or part thereof, that were created by the Receiving Party and that are based on or contain Confidential Material of the Disclosing Party.

7.3    Remedies. Receiving Party acknowledges and agrees that Disclosing Party may be irreparably injured by a breach of this Section 7 and that Disclosing Party may be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court to prevent breaches of this Section 7 and to enforce specifically the terms and provisions hereof in any action instituted in any court having subject matter jurisdiction, in addition to any other remedy to which Disclosing Party may be entitled at law or in equity.

7.4    Ownership. Except as otherwise provided in this Agreement, nothing in this Section 7 is to be construed as granting Receiving Party any title, ownership, license or other right or interest in any of Disclosing Party's Confidential Material, or to any intellectual property rights of the Disclosing Party embodied therein.

8.    Term and Termination.

8.1.    Term. The term (the "Term") of this Agreement shall commence as of the Effective Date and shall continue until terminated in accordance with Section 8.2 below.

8.2.    Termination. The Agreement may terminate in the following circumstances:

(a)    Termination Upon Notice or Mutual Agreement. This Agreement may be terminated by either Party, with or without cause, upon thirty (30) days' prior written notice to the other Party. In addition, this Agreement may be terminated upon mutual agreement of the Parties.

Customer Services Support Agreement (Radial IT Systems to          3
SPGKI)

FSD2021-0318                           Page 44 of 365                           2023-04-24

(b)      Material Breach.  In the event of a material breach by either Party, the non- breaching Party may terminate this Agreement upon written notice to the breaching Party if such breach is not corrected within thirty (30) calendar days after written notice is received by the breaching Party for the subject breach.

(c)      Bankruptcy or Insolvency.  Either Party may terminate this Agreement if the other Party files a petition in bankruptcy or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or discontinues or dissolves its business, or if a receiver is appointed for such Party or for such Party's business and such event is not discharged within thirty (30) days.

8.3      Effect of Termination.

(a)      Termination of this Agreement for any reason shall not release either Party from any liability which, at the time of such termination, has already accrued to the other Party or which is attributable to a period prior to such termination nor preclude either Party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this Agreement.

(b)      The Parties' obligations under this Agreement, which by their nature would continue beyond the termination of this Agreement, shall survive the termination of this Agreement. Specifically, the following Sections of this Agreement shall survive any termination of this Agreement:  Sections 6 (Indemnification), 7 (Confidential Material), 8.3 (Effect of Termination), and applicable provisions in 9 (Miscellaneous).

9.      Miscellaneous.

9.1.      Governing Law.  This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and without reference to its principles of conflicts of law.

9.2.      Notices.  All notices, demands, consents, approvals, requests or other communications which any of the Parties to this Agreement may desire or be required to give hereunder (collectively, "Notices") will be in writing and will be given by (a) personal delivery, (b) facsimile transmission, (c) electronic mail or (d) delivery to Federal Express or another internationally recognized overnight courier service, fees prepaid, addressed as follows:

>
> If to the Company:
> Shang Peng Gao Ke, Inc.
> Samson & McGrath Corporate Services
> 5th Floor, Genesis Building
> PO 446 GT, KY1-1106
> George Town, Grand Cayman
> Cayman Islands
> Attention:  The Directors

Customer Services Support Agreement (Radial IT Systems to SPGK)                    4

If to the Consultant:
Radial IT Systems, Ltd.
Samson & McGrath Corporate Services
5th Floor, Genesis Building
PO 446 GT, KY1-1106
George Town, Grand Cayman
Cayman Islands
Attention:  The Directors

Either Party may designate another addressee (and/or change its address) for Notices hereunder by a Notice given pursuant to this Section 9.2.  A Notice sent in compliance with the provisions of this Section 9.2 will be deemed given on the date delivered personally or sent by facsimile or electronic mail or, if sent by courier, five (5) business days following delivery to the courier service.

9.3.    Successors and Assigns; Assignment.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns. Neither this Agreement nor any right hereunder may be assigned by either Party (by operation of law or otherwise) without the prior written consent of the other Party.

9.4.    Entire Agreement; Amendment.  This Agreement (including the exhibits hereto, which are made a part of this Agreement by this reference) sets forth the entire agreement between the Parties relating to the subject matter hereof and all prior agreements relative thereto which are not contained herein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the Parties by, and only by, a written agreement duly executed by each Party, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any Party.

9.5.    Remedies.  Consultant acknowledges and agrees that the Company may be irreparably injured by a breach of this Agreement and that they may be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any action instituted in any court having subject matter jurisdiction, in addition to any other remedy to which the Company may be entitled at law or in equity in the event of any breach of the provisions hereof.  Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement, but shall be in addition to all other remedies available at law or in equity.

9.6.    Severability.  If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

FSD2021-0318                        **Page 46 of 365**                          2023-04-24

9.7.    Force Majeure.  If performance of this Agreement, or any obligation hereunder (other than the obligation to pay) is prevented, restricted, or interfered with by any act or condition whatsoever beyond the reasonable control of the affected Party, the Party so affected, upon giving prompt notice to the non-affected Party, will be excused from such performance to the extent of such prevention, restriction, or interference.

9.8.    Waivers.  The failure at any time of any Party to require performance by any other Party of any responsibility or obligation provided for in this Agreement shall in no way affect the full right to require such performance at any time thereafter, nor shall the waiver by either Party of a breach of any provision of this Agreement by the other Party constitute a waiver of any succeeding breach of the same or any other obligation itself.

9.9.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute but one and the same agreement.

*[Signature Page Follows]*

Customer Services Support Agreement (Radial IT Systems to                6
SPGKI)

IN WITNESS WHEREOF, the parties have duly executed this Customer Services Support Agreement by their duly authorized representatives as of the date(s) indicated below and effective as of the Effective Date.

**COMPANY:**

SHANG PENG GAO KE, INC.,
a Cayman Islands company

By:_____

Name: Theodore R. Sanders, Jr.
Title: Director
Date:  February 24, 2017


**CONSULTANT:**

RADIAL IT SYSTEMS, LTD.,
a Cayman Islands company

By:_____

Name: Timothy Ashcroft
Title: Director
Date:  February 24, 2017


[SIGNATURE PAGE TO SERVICE AGREEMENT]

FSD2021-0318                           Page 48 of 365                           2023-04-24

## EXHIBIT A

## SCHEDULE OF SERVICES

2.      Scope of Work; Services.  All Services performed hereunder shall be in support of the Business of the Company or the Business of the Company's affiliates.  All Services covered by this Agreement shall be performed in Taiwan by personnel of Consultant or personnel of a vendor or subcontractor of Consultant acceptable to the Company and professionally qualified to perform the Services involved.  In the event the covered services are performed at a business location outside of Taiwan or any other personnel, the Consultant will promptly notify the Company but in any event at least thirty (30) days prior to such performance.  Subject to the terms and conditions of this Agreement, the Consultant shall provide, or contract with vendors to provide, the following Services to the Company and its affiliates during the Term:

        (a)      Customer Support Services.  The Consultant's customer support team and/or vendors will provide certain customer support services, including, but not limited to, customer relationship management, processing of customer enrollments, subscriptions and payments, and help desk support.

        (b)      Marketing support services:  provide marketing support services, including, but not limited to, promotional and product marketing services.

3.      Billing and Compensation

        (a)      Services.  The Services described above shall be billed on a monthly basis at Consultant's cost, with no markup thereon.  For billing purposes, to the extent the Services are performed by the personnel of a vendor or subcontractor of Consultant, costs shall include the Consultant's independent contractor and other vendor costs necessary to provide the services, without any markup thereon.

        (b)      Method of Cost Calculation.  Allocation of costs for Services specific to the Company and its affiliates will be based upon actual costs multiplied by the percentage of time spent performing the Services.

        (c)      Renegotiation of Method of Cost Calculation.  The method of cost calculation stated herein may be renegotiated from time to time if extraordinary and external business circumstances arise during the year, or both the Consultant and the Company agree to adjust the calculation method, with the renegotiation and the terms to be on an arm's length basis.

        (d)      Out-of-Pocket Expenses.  Reimbursement of any out-of-pocket expenses, including but not limited to, travel and supplies costs, will be billed by the Consultant to the Company on the monthly invoice at cost.  For the avoidance of doubt, independent contractor or other similar vendor costs shall be included as "costs" under Section 2(a) above.

        (e)      Settlement of Invoices.  Invoices shall be paid in full and settled within 30 days from the invoice date, or as otherwise agreed upon by the Parties.

Customer Services Support Agreement (Radial IT Systems to SPGKI)                           A-1

21-11854-dsj    Doc 63-3    Filed 09/01/23    Entered 09/01/23 19:58:55    Exhibit 2-1
Pg 90 of 111

21-11854-dsj    Doc 44-7    Filed 06/30/23    Entered 06/30/23 15:47:18    Exhibit  7 -
Agreements between Radial IT and SPGK    Pg 31 of 39
Page 49 of 365

## PROFESSIONAL SERVICES AGREEMENT

This PROFESSIONAL SERVICES AGREEMENT (the "Agreement") is made and entered into as of October 1, 2016 by and between Shang Peng Gao Ke, Inc., a Cayman Islands company (the "Company"), and Radial IT Systems, Ltd., a Cayman Islands company ("Consultant"). The Company and Consultant are individually a "Party" and collectively the "Parties."

### RECITALS

A.      As of the Effective Date, the Consultant agreed to provide certain services to the Company for compensation, all as more particularly set forth on Exhibit A attached hereto.

B.      The Parties now wish to memorialize and clarify the terms of that agreement, as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.      Consulting Services. Subject to the terms and conditions set forth herein, Consultant shall perform, or contract with vendors to perform, certain services for the Company as set forth in Section 1 of Exhibit A to this Agreement (the "Services").

2.      Compensation and Payment Terms. In consideration for the Consultant's performance of the Services, the Company shall pay the Consultant fees as more particularly described in Section 2 of Exhibit A attached hereto, except as otherwise agreed to between the Parties.

3.      Effective Date. The effective date of this Agreement is the date first mentioned hereinabove (the "Effective Date").

4.      Tax Withholding. If applicable, the Consultant will be responsible for calculating, withholding, and submitting all applicable withholding taxes to the applicable tax authorities. The Company shall be responsible for providing sufficient information to the Consultant to facilitate such calculation. The Consultant will provide any necessary withholding certificate to the Company within a mutually agreed upon reasonable time period.

5.      VAT Taxes. If applicable, the Company will be responsible for calculating and including VAT taxes on the invoice, collecting VAT taxes from the Consultant, and remitting VAT taxes to the applicable tax authorities.

6.      Indemnification.

        6.1.    Indemnification. Each Party (the "Indemnifying Party") shall indemnify
the other Party, its shareholders, present and future officers, directors, agents, employees, and
assigns (each, an "Indemnified Party"), and undertake to defend and hold each Indemnified Party
harmless from and against any claim, demand, suits, cause of action, losses, penalties,
obligations, liabilities, damages, and expenses (including court costs, reasonable attorneys' fees,
interest expenses and amounts paid in compromise or settlement) ("Claims") claimed by any
person or entity related to, caused by, arising from or on account of the Indemnifying Party's
failure to comply with any covenant, provision or agreement of the Indemnifying Party contained
in this Agreement.

        6.2.    Indemnification Procedures. If an Indemnified Party determines that it is
entitled to indemnification under this Section 6, the Indemnified Party shall notify the
Indemnifying Party promptly and in writing of the Claim brought against the Indemnified Party,
but in no event more than ten (10) days after the Indemnified Party has received notice of such
Claim. The selection of counsel, the conduct of the defense of any lawsuit, arbitration, or other
proceeding, and any settlement shall be within the Indemnifying Party's control, provided that
the Indemnified Party shall have the right to participate in the defense of such Claim using
counsel of its choice, at its expense. No settlement that would impose any costs or expense upon
the Indemnified Party shall be made without the Indemnified Party's prior written consent.

7.      Confidential Material.

        7.1     General. After Confidential Material is disclosed by a Party (the
"Disclosing Party"), the Party receiving such Confidential Material (the "Receiving Party") shall
not use Disclosing Party's Confidential Material for any purpose other than to exercise or
perform its rights or obligations under this Agreement. Receiving Party shall not, without the
prior written consent of Disclosing Party, copy or otherwise reproduce Disclosing Party's
Confidential Material, or disclose, disseminate or otherwise communicate, in whole or in part,
Disclosing Party's Confidential Material to any third party except to the officers, directors,
employees or advisors (including, but not limited to tax and legal advisors) of Receiving Party
who need to know the Confidential Material and who have undertaken to treat the Confidential
Material as confidential in accordance with the provisions of this Section 7 or are otherwise
subject to confidentiality obligations with respect to such Confidential Material. Receiving Party
further agrees that it shall safeguard Disclosing Party's Confidential Material from disclosure
and, use commercially reasonable efforts to ensure non-disclosure, which efforts shall be
commensurate with those Receiving Party uses to protect the confidentiality of its own
Confidential Material. In the event that Receiving Party becomes compelled by law or order of
court or administrative body to disclose any Disclosing Party's Confidential Material, Receiving
Party shall be entitled to disclose such Confidential Material provided that: (a) Receiving Party
provides Disclosing Party with prompt prior written notice of such requirements to allow
Disclosing Party to take any necessary action to safeguard the Confidential Material; and (b)
Receiving Party shall furnish only that portion of Disclosing Party's Confidential Material which
is legally required to be disclosed and shall exercise its commercially reasonable efforts to obtain
assurances that Confidential Material will be treated in confidence. "Confidential Material"
means information that is confidential in nature, that is designated or identified as confidential by

Professional Services Agreement (Radial IT Systems to                    2
SPGKI)

the Disclosing Party or that has not been voluntarily disclosed or made available to the general public by the Disclosing Party, or any information that is or was received in confidence by the Disclosing Party from any other person or entity, which is furnished by or on behalf of any Disclosing Party to the Receiving Party, whether such information is or has been conveyed verbally or in written or other tangible form, and whether such information is acquired directly or indirectly such as in the course of discussions or other investigations by the Receiving Party. Disclosing Party's Confidential Material shall not include information that: (i) was known by the Receiving Party without obligation of confidentiality prior to disclosure thereof by the Disclosing Party; (ii) was in or entered the public domain through no fault of the Receiving Party; (iii) is disclosed to the Receiving Party by a third party legally entitled to make such disclosure without violation of any obligation of confidentiality; or (iv) is independently developed by the Receiving Party without reference to Disclosing Party's Confidential Material.

7.2    Return of Confidential Material.  Upon the Disclosing Party's request and, in any event when this Agreement has terminated, the Receiving Party will promptly return to the Disclosing Party or destroy, except for one copy of Disclosing Party's Confidential Material, which may be retained for evidence purposes only: (a) all Confidential Material that has been supplied by the Disclosing Party and is in the Receiving Party's possession or control; and (b) all analyses, studies, or other materials, or part thereof, that were created by the Receiving Party and that are based on or contain Confidential Material of the Disclosing Party.

7.3    Remedies.  Receiving Party acknowledges and agrees that Disclosing Party may be irreparably injured by a breach of this Section 7 and that Disclosing Party may be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court to prevent breaches of this Section 7 and to enforce specifically the terms and provisions hereof in any action instituted in any court having subject matter jurisdiction, in addition to any other remedy to which Disclosing Party may be entitled at law or in equity.

7.4    Ownership.  Except as otherwise provided in this Agreement, nothing in this Section 7 is to be construed as granting Receiving Party any title, ownership, license or other right or interest in any of Disclosing Party's Confidential Material, or to any intellectual property rights of the Disclosing Party embodied therein.

8.    Term and Termination.

8.1.    Term.  The term (the "Term") of this Agreement shall commence as of the Effective Date and shall continue until terminated in accordance with Section 8.2 below.

8.2.    Termination.  The Agreement may terminate in the following circumstances:

(a)    Termination Upon Notice or Mutual Agreement.  This Agreement may be terminated by either Party, with or without cause, upon thirty (30) days' prior written notice to the other Party.  In addition, this Agreement may be terminated upon mutual agreement of the Parties.

Professional Services Agreement (Radial IT Systems to
SPGKI)

3

FSD2021-0318                    Page 52 of 365                    2023-04-24

    (b)   <u>Material Breach</u>. In the event of a material breach by either Party, the non- breaching Party may terminate this Agreement upon written notice to the breaching Party if such breach is not corrected within thirty (30) calendar days after written notice is received by the breaching Party for the subject breach.

    (c)   <u>Bankruptcy or Insolvency</u>. Either Party may terminate this Agreement if the other Party files a petition in bankruptcy or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or discontinues or dissolves its business, or if a receiver is appointed for such Party or for such Party's business and such event is not discharged within thirty (30) days.

    8.3   <u>Effect of Termination</u>.

    (a)   Termination of this Agreement for any reason shall not release either Party from any liability which, at the time of such termination, has already accrued to the other Party or which is attributable to a period prior to such termination nor preclude either Party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this Agreement.

    (b)   The Parties' obligations under this Agreement, which by their nature would continue beyond the termination of this Agreement, shall survive the termination of this Agreement. Specifically, the following Sections of this Agreement shall survive any termination of this Agreement: <u>Sections</u> 6 (Indemnification), 7 (Confidential Material), <u>8.3</u> (Effect of Termination), and applicable provisions in 9 (Miscellaneous).

    9.   <u>Miscellaneous</u>.

    9.1.   <u>Governing Law</u>. This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and without reference to its principles of conflicts of law.

    9.2.   <u>Notices</u>. All notices, demands, consents, approvals, requests or other communications which any of the Parties to this Agreement may desire or be required to give hereunder (collectively, "<u>Notices</u>") will be in writing and will be given by (a) personal delivery, (b) facsimile transmission, (c) electronic mail or (d) delivery to Federal Express or another internationally recognized overnight courier service, fees prepaid, addressed as follows:

        If to the Company:
        Shang Peng Gao Ke, Inc.
        Samson & McGrath Corporate Services
        5th Floor, Genesis Building
        PO 446 GT, KY1-1106
        George Town, Grand Cayman
        Cayman Islands
        Attention: The Directors

Professional Services Agreement (Radial IT Systems to SPGKI)      4

FSD2021-0318 2023-04-24

             If to the Consultant:
             Radial IT Systems, Ltd.
             Samson & McGrath Corporate Services
             5th Floor, Genesis Building
             PO 446 GT, KY1-1106
             George Town, Grand Cayman
             Cayman Islands
             Attention:  The Directors

       Either Party may designate another addressee (and/or change its address) for Notices hereunder by a Notice given pursuant to this <u>Section 9.2</u>.  A Notice sent in compliance with the provisions of this <u>Section 9.2</u> will be deemed given on the date delivered personally or sent by facsimile or electronic mail or, if sent by courier, five (5) business days following delivery to the courier service.

       9.3.    <u>Successors and Assigns; Assignment</u>.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.  Neither this Agreement nor any right hereunder may be assigned by either Party (by operation of law or otherwise) without the prior written consent of the other Party.

       9.4.    <u>Entire Agreement; Amendment</u>.  This Agreement (including the exhibits hereto, which are made a part of this Agreement by this reference) sets forth the entire agreement between the Parties relating to the subject matter hereof and all prior agreements relative thereto which are not contained herein are terminated.  Amendments, variations, modifications or changes herein may be made effective and binding upon the Parties by, and only by, a written agreement duly executed by each Party, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any Party.

       9.5.    <u>Remedies</u>.  Consultant acknowledges and agrees that the Company may be irreparably injured by a breach of this Agreement and that they may be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any action instituted in any court having subject matter jurisdiction, in addition to any other remedy to which the Company may be entitled at law or in equity in the event of any breach of the provisions hereof.  Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement, but shall be in addition to all other remedies available at law or in equity.

       9.6.    <u>Severability</u>.  If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

Professional Services Agreement (Radial IT Systems to SPGKI)        5

9.7.    <u>Force Majeure</u>.  If performance of this Agreement, or any obligation hereunder (other than the obligation to pay) is prevented, restricted, or interfered with by any act or condition whatsoever beyond the reasonable control of the affected Party, the Party so affected, upon giving prompt notice to the non-affected Party, will be excused from such performance to the extent of such prevention, restriction, or interference.

9.8.    <u>Waivers</u>.  The failure at any time of any Party to require performance by any other Party of any responsibility or obligation provided for in this Agreement shall in no way affect the full right to require such performance at any time thereafter, nor shall the waiver by either Party of a breach of any provision of this Agreement by the other Party constitute a waiver of any succeeding breach of the same or any other obligation itself.

9.9.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute but one and the same agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have duly executed this Professional Services Agreement by their duly authorized representatives as of the date(s) indicated below and effective as of the Effective Date.

**COMPANY:**

SHANG PENG GAO KE, INC.,
a Cayman Islands company

By:_____
Name: Theodore R. Sanders, Jr.
Title: Director
Date: February 17, 2017

**CONSULTANT:**

RADIAL IT SYSTEMS, LTD.,
a Cayman Islands company

By:_____
Name: Timothy Ashcroft
Title: Director
Date: February 17, 2017

[SIGNATURE PAGE TO PROFESSIONAL SERVICES AGREEMENT]

Professional Services Agreement (Radial IT Systems to
SPGKI)

FSD2021-0318                          **Page 56 of 365**                          2023-04-24

**EXHIBIT A**

**SCHEDULE OF SERVICES**

1.    Scope of Work; Services.  All Services performed hereunder shall be in support of the Business of the Company or the Business of the Company's affiliates.  All Services covered by this Agreement shall be performed in California by personnel of Consultant or personnel of a vendor or subcontractor of Consultant acceptable to the Company and professionally qualified to perform the Services involved.  In the event the covered services are performed at a business location outside of California or any other personnel, the Consultant will promptly notify the Company but in any event at least thirty (30) days prior to such performance.  Subject to the terms and conditions of this Agreement, the Consultant shall provide, or contract with vendors to provide, the following Services to the Company and its affiliates during the Term:

(a)    Corporate management services:  oversee operations, management, executive, human resources, legal, compliance, contract management functions; product development, manufacturing, delivery and fulfillment support services; provide administrative services; manage the accounting department.

(b)    Bookkeeping, accounting, tax and finance support services:  provide certain bookkeeping, accounting, tax and finance support services, including, but not limited to, treasury and banking management, accounting information systems management, bookkeeping, month-end closing and reconciliation assistance, and audit support.

(c)    Marketing support services:  provide marketing support services, including, but not limited to, promotional and product marketing services.

(d)    IT Business System support services:  support and operate all back-office IT systems, including but not limited to the Exigo system and training system; monitor, evaluate and recommend training and marketing support services for the Company's client (and/or the affiliates thereof) to pursue; monitor and review consulting services performed by consultant personnel under contracts with the Company's client (and/or the affiliates thereof); review, evaluate and process invoices, invoice substantiation, time of performance and services performed by consultant personnel under contracts with the Company's client (and/or the affiliates thereof); monitor and report work performed and wages and/or salaries properly due and owing pursuant to the consultant contracts held by the Company's client (and/or the affiliates thereof); process e-commerce product orders for delivery and fulfillment; monitor, calculate and recommend payment amounts and payment methods of all forms of compensation as may be owed by the Company's client (and/or the affiliates thereof) to customers, referral agents and contracted consulting and customer service providers.

(e)    Technical support services:  provide technical support services related to e-commerce, web hosting and websites of the Company's client (and/or the affiliates thereof) as well as the websites utilized by customers, referral agents, contracted consulting and customer service providers and employees thereof; provide support services related to web content changes and system upgrades and modifications.

Professional Services Agreement (Radial IT Systems to                     A-1
SPGKI)

2.   <u>Billing and Compensation</u>

(a)   <u>Services</u>.  The Services described above shall be billed on a monthly basis at Consultant's cost, at no markup.  For billing purposes, "costs" shall include payroll and benefits, overhead and other expenses (including independent contractor and other vendor costs necessary to provide the services).

(b)   <u>Method of Cost Calculation</u>.  Calculation of costs for Services specific to the Company will be based upon actual costs multiplied by the percentage of time spent performing the Services, as agreed by the Parties.

(c)   <u>Renegotiation Method of Cost Calculation</u>.  The method of cost calculation stated herein may be renegotiated from time to time if extraordinary and external business circumstances arise during the year, or both the Consultant and the Company agree to adjust the calculation method, with the renegotiation and the terms to be on an arm's length basis.

(d)   <u>Out-of-Pocket Expenses</u>.  Reimbursement of any out-of-pocket expenses incurred by Consultant personnel, including but not limited to, travel and supplies costs incurred by Consultant personnel, will be billed by the Consultant to the Company on the monthly invoice at cost.  For the avoidance of doubt, independent contractor or other similar vendor costs shall be included in "costs" under <u>Section 2(a)</u> above and do not constitute "out-of-pocket expenses" under this <u>Section 2(d)</u>.

3.   <u>Settlement of Invoices</u>.  Invoices shall be paid in full and settled within 30 days from the invoice date, or as otherwise agreed upon by the Parties.

Professional Services Agreement (Radial IT Systems to
SPGKI)                                              A-2

# EXHIBIT 8

FSD2021-0318     Page 434 of 448     2022-12-19

# Campbells

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

D +1 345 914 5876
T +1 345 949 2648
F +1 345 949 8613
E gcowan@campbellslegal.com

Our Ref: GC/KL/19800-35377

CAYMAN | BVI | HONG KONG

**By Email**

Harneys Westwood & Riegels
3rd Floor, Harbour Place
103 South Church Street
PO Box 10240,
Grand Cayman KY1-1002
Cayman Islands

Attn: Jessica Williams, James Eggleton and Andrew
Johnstone

20 August 2021

Dear Sirs,

**Ascentra Holdings, Inc. (in Voluntary Liquidation) ("Ascentra" or "AHI")**

Thank you for your letter dated 29 July 2021. We adopt the definitions in our letters dated 8 June, 28 June, and 27 July 2021.

As a prefatory point, we apologise for the delay in responding to your letter of 29 July 2021. As will be apparent from our comments below, the VL has been considering a number of different issues and documents that he has received over the last few weeks and which are relevant to the matters in hand.

**The BOW Funds**

The VL strenuously denies any suggestion that he has acted in any way improperly, or that he is attempting to assume control of funds to which Ascentra is not entitled or in respect of which he is unable or unwilling to articulate the legal basis for such entitlement. We set out the VL's position in that regard below. Before doing so, however, we address your assertion that SPGK has any right or entitlement, as a matter of law, to the BOW Funds.

As you have acknowledged, SPGK's claim to the BOW Funds is based solely on the fact that the Recipient Bank Account (as such term is defined in the Deed of Mutual Release dated 5 May 2021 (the **"Deed"**)) is an account purportedly owned by SPGK; indeed paragraph 4(a) of your letter dated 29 July 2021 confirms that *"SPGK's legal entitlement to the Bank of the West funds derives from Clause 3.1(ii) of the Deed of Mutual Release dated 5 May 2021"*. However, the Recipient Bank Account is not, in fact, an account owned by SPGK

The Cayman Islands firm known as "Campbells" converted from a firm to a Cayman Islands limited liability partnership known as "Campbells LLP" on 25 February 2021.

but (as can be seen from Schedule 2 to the Deed) an account held by another company, Scuderia Bianco Ltd. Your letter of 18 June 2021 confirms that Scuderia Bianco Ltd is a Singapore incorporated company which *"is unrelated to SPGK and Ascentra"*. Accordingly, clause 3.1(ii) of the Deed provides no basis in law to support the assertion that SPGK has any entitlement to or interest in the BOW Funds.

The VL considers that a claim issued pursuant to clause 3.1(ii) of the Deed could only properly be brought by or on behalf of Scuderia Bianco Ltd, as the owner of the Recipient Bank Account, although for the reasons set out below the VL's position is that any such claim would be both entirely misconceived and unsustainable. However, clause 15 of the Deed expressly provides that the *"Deed is not enforceable by or on behalf of any person who is not a Party to it"*. Accordingly, in circumstances where Scuderia Bianco Ltd is not a party to the Deed, the VL considers there to be no legal basis on which either SPGK or Scuderia Bianco Ltd could be said to have any interest in the BOW Funds.

Further, or in the alternative, and strictly without prejudice to the above, the VL considers that, for a number of reasons, the BOW Funds belong to Ascentra in any event. First, he has been advised by Mr Sanders and Mr Matthews that this is the case. The VL considers that the views of both Mr Sanders (as Ascentra's Chief Financial Officer until his resignation in January 2021, and as the owner and sole director of SPGK International) and Mr Matthews (as one of Ascentra's founders, as its former president and as the individual who was primarily responsible for establishing SPGK in the first place) must be given very significant weight in this regard. Further, and as detailed below, the other director of Ascentra, Mr Yoshio Matsuura, has also confirmed in writing that the BOW Funds belong to Ascentra.

In addition, the position articulated by Messrs. Sanders and Matthews (and by Mr Matsuura) appears to be supported, very clearly, by the provisions of the Deed, to which reference is made in your letter. For example:

a) Recital D of the Deed refers to the underlying obligation of Asian Offshore Services (**"AOS"**) to repay the BOW Funds <u>to Ascentra</u> pursuant to an Asset Purchase Agreement (the **"APA"**) entered into in April 2018. Clause 2 of the Letter of Intent dated 8 December 2017 (which is expressly incorporated into the APA) is unambiguous in that regard;

b) Recital D of the Deed goes on to state that *"AOS was obliged <u>to remit the remainder of the Net Cash to AHI</u> on 4 April 2021... <u>however at the express request of AHI did not remit funds on or before that date</u>. As additional consideration for the Deed of Release, <u>AOS will pay the excess $830,352.92 held at BlackTower Financial Management Group to AHI</u>..."* [emphasis added];

c) Recital E of the Deed provides that *"TS has, <u>at the request of AHI,</u> been using AOS's and SPGK's[1] Bank of the West accounts... <u>to pay vendors and corporate credit cards on behalf of AHI [and] has previously provided AHI statements to these accounts</u>... As part of the terms of this Deed of Release AOS shall (i) remit the balance of funds <u>held on behalf of AHI</u> **to the account of AHI detailed in Schedule 2 hereto**..."* [emphasis added];

d) Recital I of the Deed provides that *"The Parties wish to document their agreements that (i) <u>AOS and/or SPGK holds the [BOW] Funds on trust for the benefit of AHI and to the order of AHI</u> and <u>will remit the [BOW] Funds to AHI</u> within ten calendar days of the date of the Deed..."* [emphasis added];

---

[1] It is important to note that references to "SPGK" in the Deed are references to SPGK International.

e) Clause 3.1(i) of the Deed provides that *"AOS and/or SPGK hold the [BOW] Funds... on trust for the benefit of AHI and to the order of AHI..."* [emphasis added]; and

f) each of clauses 4.1 to 4.4 of the Deed (erroneously numbered 1.1 to 1.4) provide for mutual releases to be given conditional *inter alia* upon *"the transfer to AHI of the [BOW] Funds"* [emphasis added].

Having regard to the above, and to the information provided to him by Messrs. Sanders and Matthews, the VL considers that the irrefutable understanding of each of the Parties when they executed the Deed was that:

1) the BOW Funds were held on trust for the benefit of Ascentra;
2) the BOW Funds were held to the order of Ascentra; and
3) the BOW Funds were to be remitted to an account owned and controlled by Ascentra.

It is also important to note that, prior to requesting that Mr Sanders remit the BOW Funds to the liquidation account, the VL was also provided with an email exchange between Mr Damien Magee (on behalf of Mr Sanders), Harneys and Loeb Smith (as attorneys for Mr Matsuura), a copy of which is enclosed. We note, from Loeb Smith's email of 27 May 2021, that:

1) there was a complete breakdown in the functioning of the Board of Ascentra;
2) Mr Matsuura's position was that Mr Yoshida *"had, and continues to have, no actual or ostensible authority to sign the Deed of Release on behalf of [Ascentra]"*;
3) the bank account set out in Schedule 2 of the Deed was not, in fact, an account owned by Ascentra (as suggested in Recital E of the Deed) but an account owned by Scuderia Bianco Ltd and controlled solely by your client. Moreover, Mr Matsuura asserted that he had not had an opportunity to review or approve the Deed *"and in fact, had he done so, he would have immediately raise objection to [Mr Sanders] wiring the monies held in the bank account with BlackTower Financial Management Group to the bank account of Mr. Yoshida's company in Taiwan set out in Schedule 2 of the Deed and defined therein as the "Recipient Bank Account"*; and
4) Loeb Smith's email then continues:

> *"Clause 3.1 i. of the Deed states that your clients (words underlined for emphasis) 'hold the funds held in an account with BlackTower Financial Management Group in the Cayman Islands on trust for the benefit of AHI and to the order of AHI...' However, without any express authority from the Directors acting as a Board of AHI, the TS Parties have seen fit to transfer over US$5.168 million to the bank account of a company which is solely owned and controlled by Mr Yoshida and which is in no way affiliated with AHI. What is the justification for the TS Parties taking such action and proposing to take further actions based on the unilateral instructions of Mr Yoshida?!"*

Mr Magee responded to Loeb Smith's email on 31 May 2021 to which Mr Johnstone, Mr Eggleton and Ms Williams of Harneys were all copied. In that email, Mr Magee stated as follows:

> *"In light of the conflicting instructions received from Yoshio Matsuura and Ryunosuke Yoshida, the TS Parties will not be remitting any further funds at this*

*time. The funds totaling USD10,994,954.04 held in the noted accounts with Bank of the West in California, USA, will remain in such accounts until the TS Parties receive such written instructions as they deem appropriate or alternatively of course a Court Order. Notwithstanding the aforesaid, the TS Parties reserve the right to make a Court application for directions should they deem such a course of action necessary and the TS Parties will deduct the costs of any such application, on an indemnity basis, from the noted funds so held".*

Accordingly, the VL's request for the BOW Funds to be remitted to the liquidation estate was made in the context of:

a) the lack of any contractual basis to support a claim by SPGK (and/or Scuderia Bianco Ltd) in relation to the BOW Funds;

b) the unequivocal advice received by Messrs. Matthews and Sanders that the BOW Funds are, and always have been, owned beneficially by Ascentra;

c) the unambiguous wording of the Deed, which provides that the BOW Funds were held on trust for the benefit of Ascentra and held to the order of Ascentra, and contemplates that they were to be remitted to an account held by Ascentra (and not to SPGK);

d) Mr Matsuura's explicit support for that position, and his vehement objection to the BOW Funds being remitted to the Recipient Bank Account (as defined in the Deed) in circumstances where that account is not, in fact, an account held by Ascentra; and

e) Mr Sanders'/AOS's stated position that the BOW Funds would not be remitted unless express instructions were received from the board of Ascentra which, prior to the commencement of the liquidation, was impossible in circumstances where the relationship between the directors had broken down completely and where contradictory instructions were being given by each director.

In light of the above, the VL considered (and considers) that the BOW Funds constitute an asset of Ascentra and form part of the liquidation estate. As such, it would be entirely inappropriate (and contrary to his duty to collect in and protect the assets of Ascentra) for the BOW Funds to be remitted to SPGK, a third party outside of his control, at this juncture.

**The Memorandum of Understanding**

Further, or in the alternative to the above, the VL has now been provided with documents which call into question SPGK's right and/or entitlement to the majority (or to any) of the assets which it is currently holding and/or over which it is asserting claims.

We refer to the undated but signed Memorandum of Understanding (the **"MOU"**), referred to in your letter dated 18 June 2021. Whilst the VL reserves his position with regard to the scope and effect of the MOU, he has also been provided with a copy of a Cancellation Agreement and Acknowledgement dated 3 April 2018 (the **"Cancellation Agreement"**) and executed by Ascentra, SPGK and Motohiko Homma (who wholly owned Growth Today Inc., which in turn wholly owned SPGK, prior to the share purchase agreement entered into between your client and Mr Homma on 15 December 2018). A copy of the Cancellation Agreement is enclosed herewith and you will note that:

a) pursuant to clause 1 of the same, the parties acknowledge and agreed inter alia that the MOU was never legally effected and was in no way legally binding;

FSD2021-0318                           Page 438 of 448                           2022-12-19

b)  pursuant to clause 2 of the same, SPGK agreed inter alia to *"irrevocably cancel, sell, convey, assign, transfer and deliver all assets and monies of Shang Peng to Ascentra, including but not limited to all intellectual property (including the Shan Peng proprietary brand names), inventory, customer lists, monies, and accounts receivable, free and clear of all charges, claims, interests, conditions, equitable interests, liens, pledges, security interests..."*; and

c)  clause 2 of the Cancellation Agreement also provides that *"regardless of the future success or failure of any of the parties hereto or its successors or assigns, no future attempt will be made by any party to take any action contrary to the matters set forth herein"*.

The VL has also been provided with a copy of an International Distribution Agreement (the **"IDA"**) dated 4 April 2018 with an effective date of 1 April 2018. The IDA was executed by Ascentra and AOS and provides, inter alia, that AOS was to be the exclusive distributor of certain of Ascentra's products and intellectual property in the PRC.

The VL is still considering the scope and effect of the Cancellation Agreement and the IDA, and fully reserves his position and all of his rights in relation to the same. Prima facie, however, these documents do of course raise very significant questions about SPGK's business and affairs generally, and SPGK's interest in and entitlement to inter alia the Funds, the BOW Funds and the funds held by Planet Payment (all of which, for the avoidance of doubt, the VL maintains are assets of Ascentra and, with the exception of the BOW Funds, should be returned to Ascentra forthwith).

**Next steps in relation to the BOW Funds**

In light of the above, we would invite your client to confirm that SPGK's claim over the BOW Funds is withdrawn or, alternatively, to set out in detail the basis on which SPGK asserts that it is entitled to the BOW Funds having regard to the aforegoing and, in particular, the fact that the Recipient Bank Account is not an account of SPGK, the wording of the Deed, the comments from and position of Mr Matsuura, the comments of and position of Messrs. Sanders and Matthews and the provisions of the Cancellation Agreement. It would also be helpful to obtain your client's substantive explanation as to why and on what basis the Scuderia Bianco Ltd bank account details were provided for use in the Deed (unless your client now accepts that the Scuderia Bianco Ltd account is in fact an account owned beneficially by Ascentra) and, indeed, why Ascentra was a party to the Deed at all.

To the extent that your client/SPGK continues to maintain its claim over the BOW Funds, the VL proposes to seek an order/directions from the Court that the BOW Funds properly constitute an asset of Ascentra and form part of the liquidation estate (and, if necessary, to pay the BOW Funds into Court pending that application). That would allow evidence to be given by all relevant parties and, if necessary, the attendance of such parties for examination and cross-examination. Please note, however, that should such an application be necessary, the VL must expressly reserve his right to seek the costs of doing so from your client.

The VL is keen to emphasise that he has no desire to deprive SPGK of the BOW Funds if it is properly established in due course that SPGK is lawfully entitled to them. As such, the VL has instructed us to provide you with confirmation that (A) the BOW Funds continue to remain in escrow; (B) none of the BOW Funds have been spent or utilized to date; and (C) until such time as SPGK's claim is withdrawn (or the Court has given directions regarding the BOW Funds) none of the BOW Funds will be spent, utilised or disbursed without giving your client at least 14 days' notice of the same.

FSD2021-0318                    **Page 439 of 448**                    2022-12-19

**Other allegations raised in your letter of 29 July 2021**

At this stage, we do not propose to address the other points raised in your letter of 29 July 2021 in significant detail. However, dealing with your numbered paragraphs in turn, we would make the following observations/comments:

1) We disagree; your letter of 18 June 2021 asserted that there is no contractual link between Ascentra and SPGK: *"SPGK is not a part of the Ascentra Group and as noted above, there are to the best of our client's knowledge no written contractual arrangements between SPGK and Ascentra."*

2) We consider your comments to be disingenuous. The VL has repeatedly asked your client, as a director of both SPGK and Ascentra, to provide a comprehensive explanation of the scope and nature of the existing financial relationship between those two entities and to identify what sums are owed by each party to the other. Your client has hitherto been unwilling to do so, for reasons that remain unclear, but that is information that should be within your client's knowledge. We deal with this further below.

3) Without prejudice to the VL's position generally, please can you provide us with all relevant contractual documentation relating to the payments identified in paragraph 3(b)(ii) of your letter, along with the financial records and statements evidencing the same.

4) **(a)** We have already addressed the issue of the BOW Funds above.

    **(b)** As regards the UOB Funds, your letter simply repeats what was said in your letter of 22 July 2021. Notably, you have not provided any response to the requests in our letter of 27 June 2021 for:

    i)    full details regarding the US$25.8 million of funds, purportedly beneficially owned by SPGK, which were transferred to the HEC Singapore account in January 2021; and
    ii)   full details of the liability apparently owed by Ascentra to HEC Singapore's affiliates in the sum of US$25.8 million.

    Please can you now provide us with a substantive response to the above requests.

    **(b)(i)** We fundamentally disagree with your comments regarding your client's change of position in relation to the UOB Funds. It is self-evident from the relevant correspondence that your client (1) fully agreed that the UOB Funds are assets of Ascentra; and (2) plainly intended to close the HEC Singapore account and transfer the UOB Funds to the liquidation estate. In addition to the email exchange enclosed with our previous letter, we enclose a further email exchange between your client and the VL, from which you will note:

    a.    on 18 June 2021, the VL emailed your client to ask:

        *"any update on the transfer of signature on the HEC Singapore bank account. I think once you have full authority we should instruct the bank to close the account and transfer the 24m to the liquidation account in Cayman. This will help protect the funds. Is*

FSD2021-0318                    Page 440 of 448                    2022-12-19

    *this bank account used to pay any suppliers or receive any income?";*

b.  on the same day, your client responded as follows:

    *"In regards to your questions please find my response below:*

    *1. Just for clarification I am the signer of this account already, I am changing the authoriser on internet banking. I have sent an request to UOB Bank to change the authoriser couple of days ago. I think they would need one week to process this application. There after I would need to apply for a internet banking device token to process the payment. This may also take some time.*

    *I have previously asked UOB Bank whether they can process remittance by paper application and they told me I cannot unless I go to the counter. Unfortunately I cannot go to Singapore immediately so appreciate if you can give me some time for me to go through above procedure and remit 24M USD to the liquidation account."*

c.  on 23 June 2021, your client emailed the VL to say:

    *"I received confirmation from UOB Bank that the application was processed successfully. I am waiting to collect the bank token from the bank.*

    *I will check on the procedure to close the account as well";* and

d.  following a request for an update from the VL on 30 June 2021, your client responded on the same day as follows:

    *"In regards to the HEC bank account in Singapore, I am currently arranging the internet banking token to be shipped from our Singapore service office agent to Hong Kong. Once I receive this token, I will be able to process payments. I will proceed with account closure once this is complete.*

    *I would also like to bring to your attention that HEC Taiwan has multiple bank accounts in Taiwan to close. Would you like to close these accounts as well?"*

Additional email exchanges between the VL and your client confirm the position. For example, we enclose:

e.  an email exchange between your client and the VL dated 8 July 2021. In that exchange, the VL commented as follows:

FSD2021-0318                           Page 441 of 448                           2022-12-19

> *"It is important that we aim to transfer the funds held by Planet Payment and UOB to the liquidation account as soon as possible.*
>
> *Ted has been liaising with Planet Payment and will probably need your assistance to authorize the transfer to the SPGK Bank of West account.*
>
> *Any update on the closure of the UOB account? ".*

In response, your client replied:

> *"I believe Harneys is in contact with Campbells regarding the Planet Payment issue. I would like to defer this to Harneys to discuss.*
>
> *The UOB Bank token has arrived in Hong Kong and I will be picking it up tomorrow, so I expect the payment can be made next week. I will also follow up on the closure of this bank account";* and

f.  an email from your client to the VL dated 14 July 2021 in which your client stated:

> *"Can I have the bank details of the liquidation account to process payment? And should I leave some balance in the UOB account as suggested below? If so, let me know the amount."*

It is both notable and telling that the suggestion that the UOB Funds are beneficially owned by SPGK (which is denied by the VL) was not mentioned at any point until your letter of 22 July 2021 (and has still not been adequately explained).

**(b)(ii)** We enclose an email received from your Mr Eggleton dated 10 June 2021 in which Mr Eggleton stated:

> *"The authoriser/signatory for HEC International Singapore's UOB Bank account is still Masami Nakano. Prior to Graham's appointment our client sent an application to UOB Bank to remove Ms Nakano as authoriser/signatory and add himself instead. The application is still pending. Our client has not completed that change yet, given Graham's appointment. However, our client considers that it would be beneficial to remove Ms Nakano as authoriser/signatory, on the basis that she is a vendor to the company. Please can you raise this with Graham and let us know if he needs our client to take any further steps. We are happy to ask our client to provide any relevant communications, as required".*

In response, Campbells, on behalf of the VL, requested that the VL be appointed as the sole signatory to the HEC Singapore account under cover of an email dated 10 June 2021:

> *"Please can your client urgently make the necessary arrangements to remove Ms Nakano as authorizer/signatory for this account and have Graham added as the sole signatory in her place? Please let us know what you will need from Graham to have this done."*

Mr Eggleton replied under cover of email dated 11 June 2021, as follows:

> *"Please can you let us know whether, in the first instance, Graham is happy for Luke to be appointed as signatory. We are instructed that is the fastest solution, in terms of removing Ms Nakano.* **Graham can then replace Luke in turn, subsequently.** *Please let us know."* [emphasis added]

In reliance on that assurance, and on the basis and understanding that your client would then close the HEC Singapore account and remit all funds to the liquidation estate (as evidenced by the email exchange between your client and the VL referred to above) the VL agreed to your client being appointed as the sole signatory to the account. Having then been appointed as the sole signatory to the HEC Singapore account, your client raised, for the very first time, a claim over the entirety of the UOB Funds and is refusing to remit the UOB Funds as promised.

It should, therefore, be entirely apparent from the above why the VL is troubled by your client's change of position. Put simply, your client's conduct prior to 22 July 2021 appears to have been a deliberate attempt to allow him to take control of funds which would otherwise now be under the control of the VL and in which your client now asserts an interest.

The VL accordingly reserves all of his rights.

5) The VL maintains that the businesses of SPGK and Ascentra are effectively one and the same and, moreover, that they have always been treated as such. The VL's understanding is that there are numerous financial statements and/or documents which confirm this and we enclose, by way of example, a financial update dated November 2018 and a daily cash report dated 2 January 2019 (sent inter alios to your client) which clearly evidence this.

The VL also notes, for example, that Ascentra was a party to the Deed (which would not be necessary if Ascentra had no interest in the BOW Funds) and that the recitals to the Cancellation Agreement state that SPGK *"was formed for the sole purpose of operating Ascentra's business operations in the PRC as a stand-alone entity"*.

Having regard to the above, the VL would repeat what was said in our previous letter, namely, that as a director of Ascentra at the relevant time, your client owed duties to Ascentra, including without limitation a duty to ensure that all of its assets were (and are) protected and accounted for, and a duty not to allow entities under his control to profit from Ascentra's business at Ascentra's expense. That duty is particularly relevant in relation to the BOW Funds, given that your client executed the Deed on behalf of both SPGK and Ascentra, and given that SPGK is now asserting a claim to those funds. It is also relevant in circumstances where the provisions of the Cancellation Agreement expressly (1) provide that all of SPGK's assets were to be returned to Ascentra; and (2) prohibit SPGK from pursuing claims against Ascentra in respect of those assets. Notwithstanding the terms of the Cancellation Agreement and the IDA, however, your client continues to assert inter alia that

the Funds, the monies held by Planet Payment and/or the BOW Funds are all assets of SPGK rather than Ascentra.

6) See our comments above.

7) We disagree. Whilst your client has provided the VL with helpful background information about the relationship between SPGK and Ascentra, he has not explained adequately, or at all, matters such as:

    i. how the Funds have been generated and on what basis SPGK came to hold and control the Funds;

    ii. who is liable to pay the PRC Commission payments, and the basis on which that such liability arose; and

    iii. as set out above, how the liability apparently owed by Ascentra to HEC Singapore's affiliates in the sum of US$25.8 million arose, why and on what basis US$25.8 million was transferred from SPGK to the HEC International account and how that US$25.8m came to be owned beneficially by SPGK.

Nor has your client provided the VL with any substantive information about the nature of the existing financial relationship between SPGK and Ascentra or any information about SPGK's role within the Ascentra group. In that regard, the VL notes your client's position (repeated throughout your letter of 29 July 2021 and also raised in previous correspondence) that the scope and nature of the relationship between SGPK and Ascentra, along with questions about what amounts are due and owing to Ascentra from SPGK, are matters that the VL alone must determine. For example:

- *"We look forward to receiving your quantification of the amount payable by SPGK Cayman to Ascentra at your earliest convenience. We would therefore be grateful if you could set out the voluntary liquidator's position in this regard by close of business next Wednesday 14 July 2021"* (final paragraph of your letter dated 8 July 2021);

- *"It is for your client to articulate, on behalf of Ascentra, what he considers to be the amounts (if any) that are owed by SPGK. Our client is prepared to work amicably and transparently with your client in order that he has all of the information that he requires in order to formulate the basis and quantum of Ascentra's claim"* (paragraph 2(c) of your letter dated 18 June 2021);

- *"the burden of articulating and establishing the nature and scope of the relationship between Ascentra and SPGK, is on Ascentra, at least in respect of those funds held by SPGK or third parties on its behalf to which Ascentra claims to be entitled"* (paragraph 2 of your letter dated 29 July 2021);

- *"the issue of whether Ascentra is ultimately entitled to all or part of the Bank of the West funds, will depend on the nature and scope of any relationship ultimately established as existing between Ascentra and SPGK and/or their respective subsidiaries"* (paragraph 4(a) of your letter dated 29 July 2021); and

- *"the issue of whether Ascentra is entitled to all or part of the funds held by HEC Singapore, will depend on the nature and scope of any relationship*

*ultimately established as existing between Ascentra and SPGK and/or their respective subsidiaries"* (paragraph 4(a) of your letter dated 29 July 2021).

As we have articulated above, the suggestion that your client does not have any information or understanding about the nature and scope of the relationship between SGPK and Ascentra is simply not credible in circumstances where he was, until 1 June 2021 at least, a director of both entities. Moreover, the VL has been provided with an invoice from Loeb Smith (in that firm's capacity as Ascentra's Cayman attorneys at the relevant time) and, without waiving or intending to waive privilege, we enclose an extract of the same herewith. You will note the following time entries:

- 28 February 2020: Considering structuring options for dealing with the relationship between SPGK, IR-P, Ascentra, BVI companies and the distributions from IR-P of the preferred shares it holds in Ascentra, and reviewing the documents re: the distribution agreement. Drafting structure chart to set out propose structure of restructuring and advising on the propose steps in the structure.

- 29 February 2020: Advising Ryu on the valuation issues applicable in the restructuring.

- 11 March 2020: Updating structure chart and advising on how to achieve the removal of SPGK from any ongoing relationship with Ascentra.

It is apparent from the same that your client has now been considering the relationship between SPGK and Ascentra (and how to separate the business of SPGK from Ascentra) for more than a year.

The VL can only infer that your client is unwilling (rather than unable) to provide a comprehensive explanation of the nature and scope of the relationship between SPGK and Ascentra, and your client's repeated assertion that he has been *"entirely transparent at all times"* (as per your letter of 29 July 2021) must be viewed in that context.

8) See our comments above.

**Supervision application**

As you are aware, the VL did not receive a statutory declaration of solvency either from your client or from Mr Matsuura. As you will also be aware, the VL is therefore required to apply to the Court for an order that the liquidation continue under the supervision of the Court. Accordingly, on 2 July 2021 the VL presented a petition to the Court (the **"Supervision Application"**) seeking orders that (1) the Company's liquidation continues under the supervision of the Court; (2) that the VL be appointed as joint official liquidator of the Company together with his colleague Ivy Chau of Crowe (HK) CPA Limited; (3) that the joint official liquidators' proposed engagement of Campbells as their Cayman Islands attorneys be sanctioned; and (4) other consequential orders.

The Court has listed the Supervision Application to be heard at 10am on 28 September 2021 and notice of the Supervision Application has now been given to all creditors and shareholders of Ascentra. In circumstances where no objection to the appointment of the VL (and Ms Chau) as joint official liquidators has been received from any such party to date, the VL intends to write to the Court towards the end of next

FSD2021-0318                          Page 445 of 448                          2022-12-19

week to invite the Honourable Judge to consider dealing with the Supervision Application administratively in order to minimise costs to the liquidation estate. In circumstances where your client is an indirect shareholder of IR-P we enclose, as a courtesy only, a copy of the Supervision Application for your records. A copy will also be sent to Mr Matsuura on the same basis.

We look forward to hearing from you.

Yours faithfully,

Campbells

**Campbells LLP**
Enc.