## EXCLUSIVE INTERNATIONAL DISTRIBUTOR AGREEMENT

This International Distributor Agreement ("*Agreement*") is made as of this 4th day of April, 2018 to be effective as of April 1, 2018 (the "*Effective Date*"), by and between Ascentra Holdings, Inc., a Cayman Islands corporation ("*Company*"), on the one hand, and Asian Offshore Services, a Cayman Islands corporation ("*Distributor*")

### RECITALS

A.  Company is engaged in the sale of products and services through a personal marketing referral program and has developed an offshore e-commerce and onshore consultant support services business model as respects the sale of products and services into the People's Republic of China ("*PRC*") (collectively, the "*Business*").

B.  The parties desire that Company appoint Distributor as the exclusive distributor of certain Company products in the PRC, subject to and in accordance with the terms and conditions of this Agreement.

C.  WHEREAS, Company and Distributor desire to enter into and maintain certain cross-company support agreements as of the Effective Date to support the operations of Distributor in the PRC (the "*Support Agreements*"), all as more fully described and set forth on Exhibit A.

D.  The parties desire that in exchange for granting of the exclusive distribution rights hereunder, Distributor will pay Company the monies set forth herein as well as the initial sum of $5,000.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**1. APPOINTMENT.**

1.1  Appointment.

(a)  Further to the terms and conditions set forth herein subject to Distributor's compliance with the terms and conditions of this Agreement, Company appoints Distributor, and Distributor accepts such appointment, as the independent exclusive distributor of the products listed in Exhibit B ("*Company Products*") in and limited to the PRC ("*Territory*"). Subject to Distributor's compliance with the terms and conditions of this Agreement, during the term of this Agreement, Company will not appoint another distributor of the Company Products in the Territory.

1.2  Territory Limitations.

(a)  Distributor will distribute the Company Products in the Territory for resale to end user customers in the Territory, only. Distributor will not engage sales staff, establish warehouses or other distribution centers for the Company Products outside of the Territory, with the exception of Distributor's third-party logistics center located in Hong Kong for the exclusive support of Distributor's distribution of the Company Products in the Territory. Distributor will advertise, promote and solicit orders for the Company Products via e-commerce websites located outside of the Territory and third-party websites hosted inside the Territory; and Distributor may advertise the Company Products in media that is distributed both within and outside of the Territory.

(b)  For a period of five years from the Effective Date, neither the Distributor shall directly or indirectly enter into any business similar to the Business or any other business conducted by Company in any jurisdiction in which Company does business; similarly, during such period, Company shall not directly or indirectly engage in any Business activities in the Territory.

1.3  Company's Reserved Rights. Company reserves the right, from time to time, and without obligation or liability to Distributor of any kind, to: (i) change the Company Products and (ii) add to or delete from the list of the Company Products specified in Exhibit B. Company will provide Distributor with at least thirty (30) days' notice of any of the changes described in the foregoing clauses (i) and (ii).

320047575.1

EXHIBIT 9

1.4   License.

(a) Subject to Distributor's compliance with the terms and conditions of this Agreement, Company grants to Distributor a non-exclusive, non-transferable license to (i) use, offer to sell, and sell Company Products to be distributed in the Territory, and (ii) use Company's list of PRC affiliates in the Territory. It is understood and agreed that Distributor shall not in any way or for any purpose, directly or indirectly, use the trade names, trademarks, logos and designations in or associated with the Company Products, as specified in Exhibit B ("*Marks*").

(b) It is understood and agreed that Distributor shall be entitled to distribute Company Products in the Territory under Distributor's proprietary brand names only. Distributor shall indemnify and hold Company harmless from any loss incurred by Company in connection with any claim of trademark, trade name or similar proprietary information breach as a result of the distribution of Company Products under such Distributor proprietary brand names.

2.   **DISTRIBUTOR'S OBLIGATIONS.**

2.1   Promotion. Distributor will use its best efforts to market, promote, advertise and distribute the Company Products in accordance with Company's policies, as announced from time to time. Distributor will obtain Company's prior approval of any promotional or advertising materials relating to the Company Products utilizing any Mark before publishing or distributing such materials.

2.2   Distributor Personnel; Subdistributors.

(a) Distributor will maintain sufficient technical and sales personnel having the knowledge and skills necessary to: (i) inform customers about the features and capabilities of the Company Products and, to the extent necessary, competitive products; and (ii) otherwise perform its obligations under this Agreement. Distributor will, at its expense, comply with Company's minimum training requirements for distributors of the Company Products.

(b) Distributor shall be entitled to distribute the Company Products directly or through subdistributors and other third-party intermediaries (collectively "*Subdistributors*"); provided, that the Distributor shall ensure that each Subdistributor acknowledges in writing, adheres to, and does not perform any act inconsistent with, the terms and conditions of this Agreement. The Distributor shall ensure that all Subdistributors cease distribution of Company Products upon termination of this Agreement.

2.3   Import and Export Requirements. The Distributor shall, at its own expense, pay all import and export licenses and permits, customs charges and duty fees, if any, and shall take all other actions, if any, required to accomplish the export and import of the Company Products purchased by the Distributor. The Distributor shall not export, directly or indirectly, any Company Products or related information without first obtaining all required licenses and approvals from the appropriate government agencies.

2.4   Support. Distributor will provide prompt and comprehensive pre-sales and post-sales support services for the Company Products to Distributor's customers in the Territory.

2.5   Business Conduct. Distributor will: (i) conduct business in a manner that reflects favorably at all times on the Company Products and the good name, goodwill and reputation of Company; (ii) make no false or misleading representations or advertisements with regard to Company or the Company Products; and (iii) make no representations, warranties or guarantees to customers or to the trade with respect to the specifications, features or capabilities of the Company Products that are inconsistent with the literature distributed by Company or that are inconsistent or in violation of applicable law, regulation or regulatory approvals related to the Company Products.

2.6   Feedback by Distributor. The Distributor shall provide the Company with prompt written notification of any comments or complaints about the Company Products that are made by purchasers, and of any problems with the Company Products or their use that the Distributor becomes aware of. Such written notification shall be the property of Company, and shall be considered to be part of Company's Confidential Information.

2.7  No Competitive Products; No Unauthorized Products. During the term of this Agreement, Distributor will not represent, promote, sell, offer to sell, or distribute any products that Company, in its sole discretion, deems to be competitive with the Company Products. During the term of this Agreement, unless only to the extent the Company provides its prior written consent, Distributor will not represent, promote, sell, offer to sell, or distribute any products other than Company Products.

## 3. ORDERING.

3.1  Orders. Distributor may purchase the Company Products by submitting written purchase orders to Company. Each such purchase order must refer to this Agreement and must, at a minimum, specify the type, quantity and requested delivery date of the Company Products (collectively, "*Ordering Information*").

3.2  Order Acceptance. All purchase orders for the Company Products submitted by Distributor will be subject to acceptance in writing by Company by sales confirmation and will not be binding until the earlier of such acceptance or shipment, and, in the case of acceptance by shipment, only as to the portion of the sales confirmation actually shipped. Except for Ordering Information, any terms and conditions in any purchase order that are inconsistent with or in addition to the terms and conditions of this Agreement are hereby rejected by Company and will be deemed null and of no effect, even if Company accepts or acknowledges such purchase order with a sales confirmation. Company shall make reasonable efforts to fill all purchase orders requesting delivery under lead times, but shall not be in breach of this Agreement if it is unable despite such efforts to deliver within such requested times (provided delivery shall meet the applicable lead time requirement herein).

3.3  Order Cancellation by Company. Company may cancel any purchase order accepted by Company, or refuse or delay shipment of the Company Products pursuant to it, if Distributor: (i) fails to make any payment as provided in this Agreement or under the payment terms set forth in any invoice or otherwise agreed to by Company and Distributor; (ii) otherwise fails to comply with the terms and conditions of this Agreement. Any such cancellation, refusal or delay by Company does not constitute a termination of this Agreement or breach of this Agreement by Company.

## 4. PRICES AND PAYMENT.

4.1  Merchandise Pricing. The prices for the Company Products purchased, other than Company Products which are software products, shall be equal to Company's standard cost for each Company Product, as determined by Company in good faith and in the ordinary course of Company's business, in all respects consistent with Company's accounting policies and with past practice, inclusive of any and all markup to the Company's standard cost, and all costs of freight associated with delivery of the Company Products to their destination. Upon any material change in Company Provider's standard costs, it will communicate such change in writing to Distributor, and the affected Company Product prices will be adjusted for all purchase orders placed subsequent to the date of such notice.

4.2  Payment Terms.

(a)  All payments due hereunder will be due 10 days prior to ship date.

(b)  All payments will be made in U.S. dollars, free of any currency controls or other restrictions. All amounts not paid when due will accrue interest at the lower of 1.0% per month or the highest rate permissible by applicable law. Distributor will promptly reimburse Company for all reasonable costs and expenses (including reasonable attorneys' fees) incurred by Company in connection with collecting any overdue amounts.

4.3  Defective Company Products. Claims for defective or non-conforming Company Products shall be made within 30 days after delivery to Distributor. Company shall promptly either replace or correct defects of any goods not conforming to the foregoing warranties, without expense to Distributor, when notified of such nonconformity by Company. Except for the indemnification obligations of the parties set forth herein, this Section 4.4 shall be the sole remedy of Distributor for breach of warranty by Company.

4.4  Taxes. Company's prices are exclusive of all sales, use, value-added, withholding and other taxes or duties. Distributor will pay all taxes and duties assessed in connection with this Agreement and its

320047575.1                                        3

performance, except for taxes payable on Company's net income. Distributor will promptly reimburse Company for any and all taxes or duties that Company may be required to pay on Distributor's behalf in connection with this Agreement or its performance. Distributor will provide Company with appropriate resale certificate numbers and other documentation satisfactory to the applicable taxing authorities to substantiate any claim of exemption from any taxes or duties. If Distributor pays any withholding taxes based on the payments made by Distributor to Company hereunder, Distributor will furnish Company with written documentation of all such tax payments, including receipts and other customary documentation, as required by Company to claim foreign tax credits.

4.5   No Setoff. Distributor may not setoff against Company's invoices amounts that Distributor claims are due to it under this Agreement or otherwise.

4.6   Definitions. As used in Sections 4.8-4.13, the following terms shall have the meanings indicated:

"Affiliates" with respect to any Person shall mean any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person. For the purposes of this definition, "control," when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Financial Statements" means for any period, statements of income and a balance sheet for such period, all of which will be correct and complete in all material respects and will fairly reflect the financial condition of Distributor at the date shown and the results of its operations for the period then ended and will be prepared in accordance with GAAP consistently applied.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time.

"Operating Income Before Taxes" shall mean the operating income before taxes of Distributor, and each of its subsidiaries, if any, as the case may be, as of the date of calculation, each as determined on a consolidated basis, as the case may be, in accordance with GAAP consistently applied from the date hereof.

"Person" shall mean an individual, partnership, venture, unincorporated association, organization, syndicate, corporation, limited liability company, or other entity, trust, trustee, executor, administrator or other legal or personal representative or any government or any agency or political subdivision thereof.

4.7   Monthly True-Up. Within twenty-five (25) days after the end of each calendar month, Distributor shall deliver to the Company Financial Statements for the prior month completed, all in reasonable detail and certified by the principal financial or accounting officer of such party, provided that such financial statements need not to be audited and need not contain the notes required by GAAP. The sum of Distributor's aggregate consolidated Operating Income Before Taxes for the month completed ("*Distributor's Monthly IBT*") shall be calculated. Distributor shall pay to the Company such amount as is equal to ninety five percent (95%) of Distributor's Monthly IBT as the fee for the distribution rights granted hereunder (such monthly payment shall be known as the "*Monthly True-Up*").

4.8   Inspection. Distributor shall allow the Company, at the Company's expense, the opportunity to visit and inspect its properties, to examine its books of account and records and to discuss its affairs, finances and accounts with its officers, each such opportunity shall be at reasonable times during normal business hours as may be requested by the Company from time to time.

4.9   Disputes. The Company may dispute the Distributor's Financial Statements by sending a written notice (a "*Dispute Notice*") to Distributor within thirty (30) days of the delivery of such Financial Statements. The Dispute Notice shall identify each disputed item on dispute and set forth in reasonable detail the basis for such dispute. In the event of such a dispute, each party shall attempt, in good faith, to reconcile their differences, parties and shall be evidenced by a writing signed by each of Company and Distributor, including, as appropriate, revised Financial Statements ("*Revised Financial Statements*") reflecting such resolution. If each party is unable to reach such resolution within thirty (30) days after delivery of the Dispute Notice then the parties shall promptly submit any remaining disputed items for final binding resolution to any independent

accounting firm mutually acceptable to each of Distributor and Company (which accounting firm has not, within the prior sixty (60) months, provided services to either Distributor, Company or any Affiliate of either of them). If Distributor and Company are unable to agree upon an independent accounting firm, an independent accounting firm selected by Distributor (which accounting firm has not, within the prior sixty (60) months, provided services to Distributor or any of its Affiliates) and an independent accounting firm selected by Company (which accounting firm has not, within the prior sixty (60) months, provided services to Company or any of its Affiliates) shall select an independent accounting firm that has not, within the prior sixty (60) months, provided services to either Distributor, Company or any Affiliate of either of them. Such independent accounting firm mutually agreed upon by each of Distributor and Company or by the procedure referenced in the immediately preceding sentence, as the case may be, is hereinafter referred to as the "*Independent Accounting Firm*." If any remaining disputed items are submitted to an Independent Accounting Firm for resolution (A) each party will furnish to the Independent Accounting Firm such workpapers and other documents and information relating to the remaining disputed items as the Independent Accounting Firm may request and as are available to such party, and each party will be afforded the opportunity to present to the Independent Accounting Firm any material relating to the disputed items and to discuss the resolution of the disputed items with the Independent Accounting Firm; (B) each party will use its good faith commercially reasonable efforts to cooperate so that the disputed items can be resolved within forty-five (45) days of submission of the disputed items to the Independent Accounting Firm; (C) the determination by the Independent Accounting Firm, as set forth in a written notice to each of Distributor and Company (which written notice shall include, as appropriate, Revised Financial Statements, shall be final, binding and conclusive on the parties; and (D) the fees and disbursements of the Independent Accounting Firm shall be allocated equally between each Distributor and Company.

    4.10    True-Up Payments. Each Monthly True-Up referenced above, if any, shall be paid and payable by the Distributor in full on or before three (3) Business Days after the Financial Statements are delivered (such date, the "*True-Up Payment Date*"). In the event that any amounts due under this Section 4 shall not be paid on or before the True-Up Payment Date, such amounts shall bear interest, calculated from the True-Up Payment Date until such amounts are paid, at a rate per annum equal to five percent (5.0%), calculated and payable monthly, compounded monthly.

4.11    Interested Party Transactions. For purposes of determining any Monthly True-Up payable, each of the parties agree that all transactions between Distributor and its Affiliates (each an "*Interested Party Transaction*"), shall be at cost or shall be adjusted to be upon fair and reasonable terms no less favorable to either party than would be obtained in a comparable arm's-length transaction with an unaffiliated third person, in each case such that the Company is held harmless from any negative effect that the entry into such Interested Party Transaction has on the calculation of any Monthly True-Up.

5.    **SHIPMENT AND DELIVERY.**

5.1    Delivery Terms and Conditions.

    (a)    Company shall use commercially reasonable efforts to deliver all orders within the applicable lead times required by this agreement. Company fulfils its obligation to deliver the Products when the Products have been made available to the Distributor as set forth below. Company shall send the Distributor documents related to the Company Products within 10 days after delivery of Company Products and at the Distributor's address set out in herein.

    (b)    Unless otherwise clearly specified in the Agreement, Company shall ship all orders on a freight prepaid basis, DDP (Destination), where title and risk of loss shall pass to Distributor. Company shall arrange the loading of Company Products, and the Company Products shall be packed in a manner reasonably acceptable to the parties. Unless otherwise expressly provided herein, the Company Products shall be packed in manner adequate to protect the Company Products. The Company hereby declares it has received all information regarding the Company Products necessary to arrange insurance coverage.

5.2    Delivery Schedule. Company will use its commercially reasonable efforts to meet the delivery dates specified in Company's written acceptance of Distributor's sales confirmations, but Company reserves the right to cancel or delay shipment of the Company Products if Distributor fails to make any payment as

provided in this Agreement or otherwise fails to comply with the terms and conditions of this Agreement. Company will not be liable to Distributor or to any other party for any delay in the delivery of the Company Products.

## 6. SERVICES TO BE PROVIDED.

6.1 Services. Company shall render to Distributor call center support; customer service support; executive, management, administrative IT, fulfillment, and logistics support (collectively, the "*Services*") further to the Support Agreements described in Exhibit A.

6.2 Use of Affiliates and Third Parties. Nothing herein shall be deemed to restrict Company from utilizing Affiliates or third parties to assist Company in performing the Services, provided, however, that such Affiliates or third parties shall be subject to the same restrictions as are imposed on Company hereunder, and provided further that Distributor shall retain the right to monitor the activities of such Affiliates or third parties to the extent necessary to protect its reputation and to monitor and control the use and quality of such Services. "Affiliate" means any corporation, firm, partnership, limited liability company or other entity, whether de jure or de facto, that directly or indirectly owns, is owned by, or is under common ownership with a Party to the extent of at least fifty percent (50%) of the equity having the power to vote on or direct the affairs of the entity and any person, firm, partnership, corporation, limited liability company or other entity actually controlled by, controlling, or under common control with a Party; provided, however, that the term "Affiliate" shall not include either Party.

6.3 Payments. Except as otherwise agreed by the parties, in exchange for performing the Services and all other obligations under the terms of this Agreement, Subsidiary shall be reimbursed by Distributor for:

(a) all amounts paid by Subsidiary further to Section 6.2 if Company subcontracts with Affiliates or third parties to perform Services, the Costs so incurred by Company will be billed to Distributor at the same rate charged to Company by such Affiliate or third parties, without additional mark-up, unless otherwise agreed to by Distributor; and

(b) the Costs Company incurs in performing the Services (collectively all such Costs are referred to as the "*Reimbursed Amount*"). "Costs" means Company's ordinary and necessary costs incurred by Company in the performance of Services under this Agreement including, without limitation: costs of personnel providing Services including, but not limited to, employee salaries, travel expenses, professional fees and other costs. It being understood that if Subsidiary subcontracts with Affiliates or third parties to perform Services, the Costs so incurred by Subsidiary will be billed to Shang Peng at the same rate charged to Subsidiary by such Affiliate or third parties, without additional mark-up, unless otherwise agreed to by Shang Peng.

6.4 Payment Terms. Payments and any other amounts payable hereunder shall be calculated monthly and shall be paid to Company no later than the due date for payment of the payments and any other amounts payable hereunder but no later than on or prior to the last day of each calendar quarter.

## 7. REPRESENTATIONS AND WARRANTIES OF COMPANY.
Company hereby represents and warrants to Distributor as follows:

(a) Company is a company duly organized, validly existing and in good standing under the laws of the Cayman Islands, and has all requisite power and authority to conduct its business as it is presently being conducted, to own and lease its properties and assets and to execute and deliver this Agreement.

(b) The execution and delivery of this Agreement by Company and the performance by Company of its obligations hereunder have been authorized by all necessary action on the part of Company and its Board of Directors and shareholders. This Agreement executed and delivered by Company constitutes a valid and binding obligation of Company, enforceable against it in accordance with its terms, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar laws, now or hereafter in effect, relating to or limiting creditors' rights generally and (b) general principles of equity (whether considered in an action in equity or at law) (the "*Enforceability Exceptions*").

320047575.1                                                      6

(c) The execution, delivery and performance by Company of this Agreement and the documents delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Company or (b) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Company is a party.

(d) There is no claim, action, suit, proceeding or governmental investigation ("Action") of any nature pending or, to Company's knowledge, threatened against or by Company relating to or that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**8. REPRESENTATIONS AND WARRANTIES OF DISTRIBUTOR.** Distributor hereby represents and warrants, jointly and severally, to Company as follows:

(a) Each of Distributor is a company duly organized, validly existing and in good standing under the laws of the Cayman Islands and has all requisite power and authority to conduct its business as it is presently being conducted, to own and lease its properties and assets and to execute and deliver this Agreement.

(b) The execution and delivery of this Agreement by Distributor and the performance by each of Distributor of its obligations hereunder have been authorized by all necessary action on the part of Distributors and their respective Board of Directors and shareholders. This Agreement executed and delivered by Distributor constitutes a valid and binding obligation of each of Distributor enforceable against each in accordance with its terms, except as such enforceability may be limited by the Enforceability Exceptions. Distributor (a) is not in receivership or dissolution, (b) has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature, (c) has not been adjudicated a bankrupt or filed a petition in voluntary bankruptcy or a petition or answer seeking reorganization or an arrangement with creditors under the bankruptcy laws of any jurisdiction and no such petition has been filed against Distributor (d) to the best of Distributor's knowledge, none of the foregoing is pending or threatened and (e) has the resources and is in the financial condition to carry out all of the terms and conditions of this Agreement and all of the other agreements and transactions contemplated herein.

(c) The execution, delivery and performance by Distributor of this Agreement and the documents delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Distributor or (b) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which any of Distributor is a party.

(d) There is no Action of any nature pending or of Distributor knowledge, threatened against or by any of Distributor relating to or that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**9. WARRANTY.** COMPANY MAKES NO WARRANTIES OR REPRESENTATIONS TO DISTRIBUTOR OR TO ANY OTHER PARTY REGARDING ANY COMPANY PRODUCTS OR SERVICES PROVIDED BY COMPANY. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, COMPANY DISCLAIMS ALL WARRANTIES AND REPRESENTATIONS, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. DISTRIBUTOR WILL NOT MAKE ANY WARRANTIES OR REPRESENTATIONS IN COMPANY'S NAME OR ON COMPANY'S BEHALF.

**10. TERM AND TERMINATION.**

10.1 Term. This Agreement commences as of the Effective Date and, unless terminated earlier in accordance with the terms of this Agreement, will remain in effect for a term of ten (10) years thereafter. At

the end of such ten (10) year term, this Agreement will automatically expire unless the parties mutually agree in writing to renew this Agreement at least thirty (30) days prior to such automatic expiration.

10.2    Termination For Convenience. Either party may terminate this Agreement for any reason or for no reason by providing the other party with at least thirty (30) days prior notice.

10.3    Termination For Cause. Either party may terminate this Agreement, at any time, if the other party breaches any material term of this Agreement and fails to cure that breach within thirty (30) days after notice thereof from the non-breaching party. Company may also terminate this Agreement, at any time, if: (i) Distributor breaches any of its obligations under this Agreement and fails to cure that breach within ten (10) days after notice thereof from Company; (ii) Distributor becomes the subject of a voluntary or involuntary petition in bankruptcy or proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors; (iii) Distributor is unable to perform any of its obligations under this Agreement for fifteen (15) days due to a force majeure event; or (iv) Distributor is merged or consolidated, sells all or substantially all of its assets, or is subject to any substantial change in management or control other than further to an acquisition of Distributor by Company (a *"Company Acquisition"*).

10.4    Effect of Termination.

(a)    In the event of a termination further to Sections 10.2 or 10.3 (other than further to a Company Acquisition) prior to that date which is 10 years from the date of this Agreement, Distributor shall be required to deliver to Company Financial Statements described in Section 4.7 for any interim period and shall be required to deliver to Company no later than three (3) business days after the delivery of such Financial Statements an amount equal to 95% of the Operating Income Before Taxes of Distributor that remains unpaid for said interim period; this Section shall survive and termination or amendment of this Agreement in any and all circumstances except in the event of a Company Acquisition.

(b)    Upon the termination or expiration of this Agreement: (i) Company may, at its option, repurchase any or all the Company Products then in Distributor's possession at prices not greater than the prices paid by Distributor for the Company Products; (ii) the due dates of all outstanding invoices to Distributor for the Company Products will automatically be accelerated so they become due and payable on the date of termination or expiration, even if longer terms had been provided previously; (iii) all sales confirmations or portions thereof remaining undelivered on the date of termination or expiration will automatically be canceled; (iv) each party will promptly return to the other party all Confidential Information of the other party in its possession or control, and will provide the other party with a certification, signed by one of its officers, certifying the return of all such Confidential Information; and (v) Distributor will cease using the Marks and promoting and advertising the Company Product and will sell all assets including intellectual property, trademarks, licenses, URLs, websites, etc. used in the business to the Company for $1.

10.5    No Expectation of Damages. DISTRIBUTOR WAIVES ANY RIGHTS IT MAY HAVE TO RECEIVE ANY COMPENSATION OR INDEMNITY UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT, OTHER THAN AS EXPRESSLY PROVIDED IN THIS AGREEMENT. Distributor acknowledges that it has no expectation and has received no assurances that any investment by Distributor in the promotion of the Company Products will be recovered or recouped or that Distributor will obtain any anticipated amount of profits by virtue of this Agreement.

10.6    Survival. The rights and obligations of the parties under Sections 1.4(b), 4.7, 4.8, 4.9, 4.10, 4.11, 7, 8, 9, 10, 11, 12, 13 and 14 will survive the termination or expiration of this Agreement.

**11.    CONFIDENTIALITY.**

11.1    Definition. *"Confidential Information"* means: (i) any non-public information of a party, including, without limitation, any information relating to a party's current and planned products and services, designs, finances, accounts, procurement requirements, manufacturing, customer lists, business forecasts and marketing plans; (ii) any other information of a party that is disclosed in writing and is conspicuously designated as "Confidential" at the time of disclosure or that is disclosed orally, is identified as "Confidential" at the time of disclosure, and is summarized in a writing sent by the disclosing party to the receiving party within thirty (30) days of any such disclosure; and (iii) the specific terms and pricing set forth in this Agreement.

11.2    Exclusions. The obligations in Section 11.3 will not apply to the extent any information: (i) is or becomes generally known to the public through no fault of or breach of this Agreement by the receiving party; (ii) was rightfully in the receiving party's possession at the time of disclosure, without an obligation of confidentiality; (iii) is independently developed by the receiving party without use of the disclosing party's Confidential Information; or (iv) is rightfully obtained by the receiving party from a third party without restriction on use or disclosure.

11.3    Obligations. Each party will not use the other party's Confidential Information, except as necessary for the performance of this Agreement, and will not disclose such Confidential Information to any third party, except to those of its employees and subcontractors that need to know such Confidential Information for the performance of this Agreement. Each party will use all reasonable efforts to maintain the confidentiality of all of the other party's Confidential Information in its possession or control, but in no event less than the efforts that it ordinarily uses with respect to its own confidential information of similar nature and importance. The foregoing obligations will not restrict either party from disclosing the other party's Confidential Information or the terms and conditions of this Agreement: (i) pursuant to the order or requirement of a court, administrative agency, or other governmental body, provided that the party required to make such a disclosure gives reasonable notice to the other party to enable it to contest such order or requirement; (ii) on a confidential basis to its legal or professional financial advisors; (iii) as required under applicable securities regulations; or (iv) on a confidential basis to present or future providers of venture capital and/or potential private investors in or acquirers of such party.

**12.    INDEMNITIES.**

12.1    Company Indemnity. Company will defend or settle any action brought against Distributor to the extent that it is based upon a third-party claim that a Company Product, as provided by Company to Distributor under this Agreement, infringes any United States patent or any copyright or misappropriates any trade secret (except if such claim is as a result of Section 1.4(b)), and will pay any costs and damages made in settlement or awarded against Distributor in final judgment resulting from any such claim, provided that Distributor: (i) gives Company prompt notice of any such claim; (ii) gives Company sole control of the defense and any related settlement of any such claim; and (iii) gives Company, at Company's expense, all reasonable information, assistance and authority in connection with the foregoing. Company will not be bound by any settlement or compromise that Distributor enters into without Company's express prior consent.

12.2    Indemnity Exclusions. Company will have no obligation under Sections 12.1 for any claim of infringement or misappropriation to the extent that it results from: (i) the combination, operation or use of a Company Product with or in equipment, products, or processes not provided by Company; (ii) modifications to a Company Product not made by or for Company; (iii) Distributor's failure to use updated or modified Company Products provided by Company; (iv) Distributor's use or distribution of a Company Product other than in accordance with this Agreement or (v) any claim further to the provisions of Section 1.4(b). The foregoing clauses (i) to (v) are referred to collectively as "*Indemnity Exclusions*".

12.3    Limitation. THE FOREGOING PROVISIONS OF THIS SECTION 10 SET FORTH COMPANY'S SOLE AND EXCLUSIVE LIABILITY AND DISTRIBUTOR'S SOLE AND EXCLUSIVE REMEDY FOR ANY CLAIMS OF INFRINGEMENT OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS OR PROPRIETARY RIGHTS OF ANY KIND.

12.4    Distributor Indemnity. Distributor will defend or settle, indemnify and hold Company harmless from any liability, damages and expenses (including court costs and reasonable attorneys' fees) arising out of or resulting from any third-party claim based on or otherwise attributable to: (i) Distributor's gross negligence or intentional misconduct; (ii) any misrepresentations made by Distributor with respect to Company or the Company Products; (iii) an Indemnity Exclusion or (iv) a claim made pursuant to the provisions of Section 1.4(b).

**13.    LIABILITY.**

13.1    Exclusion of Certain Damages. IN NO EVENT WILL COMPANY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT

LIMITED TO, LOST PROFITS OR REVENUE, LOSS OF USE, LOST BUSINESS OPPORTUNITIES OR LOSS OF GOODWILL), OR FOR THE COSTS OF PROCURING SUBSTITUTE PRODUCTS, ARISING OUT OF. RELATING TO OR IN CONNECTION WITH THIS AGREEMENT OR THE USE OR PERFORMANCE OF ANY COMPANY PRODUCTS OR SERVICES PROVIDED BY COMPANY, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED UPON CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, WHETHER OR NOT COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. THE PARTIES HAVE AGREED THAT THESE LIMITATIONS WILL SURVIVE AND APPLY EVEN IF ANY LIMITED REMEDY SPECIFIED IN THIS AGREEMENT IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

13.2  Total Liability.  COMPANY'S TOTAL LIABILITY TO DISTRIBUTOR UNDER THIS AGREEMENT, FROM ALL CAUSES OF ACTION AND UNDER ALL THEORIES OF LIABILITY, WILL BE LIMITED TO THE PAYMENTS ACTUALLY RECEIVED FROM DISTRIBUTOR UNDER THIS AGREEMENT DURING THE SIX (6) MONTH PERIOD PRECEDING THE DATE A CLAIM FOR LIABILITY ARISES HEREUNDER.

13.3  Basis of Bargain.  The parties expressly acknowledge and agree that Company has set its prices and entered into this Agreement in reliance upon the limitations of liability specified herein, which allocate the risk between Company and Distributor and form an essential basis of the bargain between the parties.

**14.  GENERAL.**

14.1  Assignment.  Neither party may not assign or transfer this Agreement, in whole or in part, by operation of law or otherwise, without the other's express prior consent. Any attempt to assign or transfer this Agreement, without such consent, will be null and of no effect. Subject to the foregoing, this Agreement will bind and inure to the benefit of each party's permitted successors and assigns.

14.2  Governing Law and Jurisdiction.  This Agreement will be governed by and construed in accordance with the laws of the Cayman Islands, excluding its conflict of laws principles.

14.3  Compliance with Law.  Distributor will have and maintain all permits and licenses required by any governmental unit or agency and will comply with all applicable laws and regulations, including United States export laws, in performing its this Agreement and with respect to the Company Products. If this Agreement or any transaction or act contemplated herein is legally required to be approved, registered, notified or recorded with or by any government agency in the Territory, Distributor will assume all such obligations and will indemnify and hold harmless Company from any liability or expenses (including reasonable attorneys' fees and costs) from any failure by Distributor to so comply.

14.5  Nonexclusive Remedy.  Except as expressly set forth in this Agreement, the exercise by either party of any of its remedies under this Agreement will be without prejudice to its other remedies under this Agreement or otherwise.

14.6  English Language.  The original of this Agreement has been written in English, and that version will govern. Distributor waives any rights it may have under any applicable law to have this Agreement written in any other language. Any versions of this Agreement in any other language will be for accommodation only and will not be binding upon either party.

14.7  Notices.  All notices, approvals, consents and other communications required or permitted under this Agreement will be in writing and delivered by confirmed facsimile transmission, by courier or overnight delivery service with written verification of receipt, or by registered or certified mail, return receipt requested, postage prepaid, and, in each instance, will be deemed given upon receipt. All such notices, approvals, consents and other communications will be sent to the addresses set forth above or to such other address as may be specified by either party to the other party in accordance with this Section.

14.8  Force Majeure.  Neither party will be responsible for any failure or delay in its performance under this Agreement (except for any payment obligations) due to causes beyond its reasonable control, including, but

not limited to, labor disputes, strikes, lockouts, shortages of or inability to obtain energy, raw materials or supplies, war, terrorism, riot, or acts of God.

14.9 Relationship of the Parties. The parties are independent contractors and this Agreement will not establish any relationship of partnership, joint venture, employment, franchise or agency between the parties. Neither party will have the power to bind the other party or to incur any obligations on its behalf, without the other party's prior consent.

14.10 Waiver; Severability. The failure by either party to enforce any provision of this Agreement will not constitute a waiver of future enforcement of that or any other provision. If for any reason a court of competent jurisdiction finds any provision of this Agreement invalid or unenforceable, that provision of the Agreement will be enforced to the maximum extent permissible and the other provisions of this Agreement will remain in full force and effect.

14.11 Equitable Relief. Distributor acknowledges that any breach of its obligations under this Agreement with respect to the proprietary rights or Confidential Information of Company will cause Company irreparable injury and significant injury for which there are inadequate remedies at law. Accordingly, Company will be entitled to obtain immediate equitable relief to enjoin any such breach, in addition to all other rights and remedies that it may have under this Agreement, at law or otherwise.

14.12 Entire Agreement; Counterparts. This Agreement, including all exhibits hereto, constitutes the complete and exclusive understanding and agreement between the parties regarding its subject matter and supersedes all prior or contemporaneous agreements or understandings, whether written or oral, relating to its subject matter. Any waiver, modification or amendment of any provision of this Agreement will be effective only if in writing and signed by duly authorized representatives of each party. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date(s) indicated below and effective as of the Effective Date.

| **ASIAN OFFSHORE SERVICES:** | **ASCENTRA HOLDINGS, INC.:** |
|---|---|
| By: *(signature)* | By: *(signature)* |
| Name: Theodore Sanders | Name: Martin J. Matthews |
| Title: Director | Title: Director |
| Date: April 4, 2018 | Date: April 4, 2018 |
| Witness By: *(signature)* | |

## Exhibit A
## SUPPORT AGREEMENTS

- License Agreement between Radial IT Systems, Ltd. and Shang Peng Gao Ke, Inc.

- HEC International Co., Ltd. (Taiwan) Customer Service Support Agreement, consisting of the following back-to-back agreements:

    i. Customer Services Support Agreement between HEC International Co., Ltd. and Radial IT Systems, Ltd.; and
    ii. Customer Services Support Agreement between Radial IT Systems, Ltd. and Asian Offshore Services

- HEC Global, Inc. (Calif) Professional Services Agreement, consisting of the following back-to-back agreements:

    i. Professional Services Agreement between HEC Global, Inc. and Radial IT Systems, Ltd.; and
    ii. Professional Services Agreement between Radial IT Systems, Ltd. and Asian Offshore Services

- Product Supply Agreement between iHealthScience, LLC and Asian Offshore Services

**Forms of these Support Agreements are attached to this <u>Exhibit A</u>**

320047575.1

**Exhibit B**

**COMPANY PRODUCTS AND MARKS**

I.  **Company Products**

   a. [To be identified and inserted]

II. **Company Marks**

   a. [To be identified and inserted]

320047575.1