# °planet

ClientServices@planetpayment.com

| MERCHANT PROCESSING APPLICATION |
|---|
| ✓ New Account    __ Additional Location for Existing Account    __ Contract Update |
| Sales Office Name: PPS                              Sales Office #: _____ |
| Sales Rep Name: Ray Rafaty                     Sales Rep #: _____  Merchant Referral Source _____ |

### BUSINESS INFORMATION

| Legal Name of Business or Corporate Owner | DBA (Doing Business As) Name |
|---|---|
| SPGK Pte. Ltd. | SPGK |

| Billing Address | Location Address |
|---|---|
| 600 North Bridge Road #05-01 | Unit 910-912, 9/F, Tower 2, Silvercord, 30 Canton Road, Tsim Sha Tsui |

| City | State/Province | Zip/Postal Code | City | State/Province | Zip/Postal Code |
|---|---|---|---|---|---|
| Singapore | | | Hong Kong | | |

| Business Phone | Business Fax Number | Customer Service Phone | Federal Tax ID Number |
|---|---|---|---|
| +85221584063 | | +864001202908 | |

| Contact Name / Office Manager | Contact Phone Number | Contact E-Mail Address | Website Address www. |
|---|---|---|---|
| Luke Yoshida | +85293531111 | luke@spgk.com | www.shangpenggaoke.cn |

### BUSINESS DESCRIPTION

| Business Processing Category | __Retail  __Restaurant  __MO/TO  ✓Internet  __Other  Travel Related?  __Yes  ✓No |
|---|---|
| Type of Ownership | Sole Proprietorship    Partnership    LLC    Corporation – Type _____    Non-Profit |

| Transaction Type by Card Type | Accept Y/N | Manually Keyed | Phone/Mail Order | Internet | Card Swipe | Average Ticket | High Ticket | Ave Monthly Volume | High Monthly Volume |
|---|---|---|---|---|---|---|---|---|---|
| UnionPay | Y | 0.00% | 0.00% | 100.00% | 0.00% | $150.00 | $2,000.00 | $20,000,000.00 | $23,000,000.00 |
| AMEX | N | 0.00% | 0.00% | 0.00% | 0.00% | $ | $ | $ | $ |
| JCB | N | 0.00% | 0.00% | 0.00% | 0.00% | $ | $ | $ | $ |

Describe type of Business: Distribution of Healthcare, Beauty & Digital Products
Years in Business: 5 yrs
Number of Business Locations: 2
Are all locations in the US and/or Canada?  __Yes  ✓No
Describe Goods/Services Sold: Digital & Hormonal Foods
VISA MCC: _____  MasterCard MCC: _____

Are Goods/Services Delivered at Time of Sale?  __Yes  ✓No
If no, Number of Days until Delivered: _____ Days
Average Percentage of Sales Returned: _____ %
Number of Days Items may be Returned for Credit: _____ Days

Seasonal Merchant?  __Yes  ✓No    J F M A M J J A S O N D
If yes, indicate active months:      _ _ _ _ _ _ _ _ _ _ _ _

### PROCESSING DESCRIPTION

Process JCB currently or previously?  __Yes  ✓No        Process Visa/MasterCard currently or previously  __Yes  ✓No
Process UnionPay currently or previously?  ✓Yes  __No    Process AMEX currently or previously?  __Yes  ✓No
Process Discover currently or previously?  __Yes  ✓No
If YES, Current Processor Name: Planet        Are the most recent Processor Statements attached?  ✓Yes  __No
Have Merchant or Ownership/Principals ever been terminated from accepting credit/debit cards for this business or any other business?  __Yes  __No
If YES, reason for termination: _____

### FULFILLMENT CENTER
Does your company use a fulfillment Center?  ✓Yes  __No
If Yes: Fulfillment Center Name: V-Logic
Fulfillment Center Address/ Phone # +85231023060

### MERCHANT SERVICER
Does anyone outside of your company have access to the credit card or bank account information of your customers?  __Yes  ✓No
If Yes:
Name: _____
Address: _____ Phone # _____
Service provided: _____

### E-COMMERCE
Does your company sell some/all products via Internet?  ✓Yes  __No
If Yes:
URL www. shangpenggaoke.cn _____ (if different than above)
Is the website through which they are sold active?  ✓Yes  __No
Is a Privacy Policy and Return Policy clearly stated?  ✓Yes  __No

### PCI COMPLIANCE
Does your company store the credit card or bank account information of your customers?  __Yes  ✓No
Is your company currently PCI compliant?  ✓Yes  __No
If Yes: Assessor contracted for PCI _____
If required and No, expected as of date of compliance _____

### PRINCIPALS/BENEFICIAL OWNERS
Principal/Beneficial Owner #1 Name:
First: Ryunosuke            Middle Initial: ____ Last: Yoshida              SSN: _____ %Ownership 100
Title: Director                        DOB: 1989/4/25

Home Address: Unit 703, 7/F, Block B, Harbourfront Horizon, 8 Hung Luen Road, Hung Hom           City: Hong Kong

Home Phone: _____  DL#/State*: _____  Email Address: luke@spgk.com

Ver. 201802

CONFIDENTIAL

EXHIBIT 15

PLANET_002410

| Principal/Beneficial Owner #2 Name: | | | |
|---|---|---|---|
| First: | Middle Initial: ___ Last: | SSN: | %Ownership |
| Title: | DOB: | | |
| Home Address: | | City: | |
| Home Phone: | DL#/State*: | Email Address: | |

| Principal/Beneficial Owner #3 Name: | | | |
|---|---|---|---|
| First: | Middle Initial: ___ Last: | SSN: | %Ownership |
| Title: | DOB: | | |
| Home Address: | | City: | |
| Home Phone: | DL#/State*: | Email Address: | |

| Principal/Beneficial Owner #4 Name: | | | |
|---|---|---|---|
| First: | Middle Initial: ___ Last: | SSN: | %Ownership |
| Title: | DOB: | | |
| Home Address: | | City: | |
| Home Phone: | DL#/State*: | Email Address: | |

| Controlling Position/Beneficial Owner Name: | | | |
|---|---|---|---|
| First: Ryunosuke | Middle Initial: ___ Last: Yoshida | SSN: | Controlling Interest [✓] Yes [ ] No |
| Title: Director | DOB: 1989/4/26 | | |
| Home Address: Unit 703, 7/F, Block B, Harbourfront Horizon, 8 Hung Luen Road, Hung Hom | | City: Hong Kong | |
| Home Phone: | DL#/State*: | Email Address: luke@spgk.com | |

**SETTLEMENT INFORMATION – ATTACH VOIDED BUSINESS CHECK & Copy of Drivers License or other form of Government Issued Identification**

| Bank Name | DBS Bank Ltd | Name on Bank Account | SPGK Pte. Ltd. |
|---|---|---|---|
| ABA/Routing # | DBSSSGSG | DDA Number | 0720129318 |

**MERCHANT SITE SURVEY (Completed by Sales Representatives)**

| LOCATION | [ ] Mall [ ] Strip Mall [✓] Office Building [ ] Residence [ ] Other: | AREA [ ] Industrial [ ] Commercial [ ] Residential |
|---|---|---|
| Is exterior signage consistent with application? | [✓] Yes [ ] No | Does inventory/merchandise appear consistent with application? [✓] Yes [ ] No |
| Photos taken [ ] Yes [ ] No Included with application [ ] Yes [ ] No | | If Photos Not taken, was site personally visited by S/A Signor [ ] Yes [ ] No |
| S/A Signature: * | | Date: |

* By his/her signature, the S/A is certifying that he/she has visited the location and the information herein set forth is true and correct.

**CERTIFICATION & AGREEMENT**

By signing below, the Merchant named above: (1) certifies that all information and documents submitted in connection with this Application are correct to the best of your knowledge; (2) authorizes the Acquirer to receive credit reports as occasioned from time to time and any other information regarding undersigned or its principals, proprietors or partners from third parties, to verify any information provided on the application; (3) have read, agreed to, and acknowledges receipt of the document entitled "Planet Payment Merchant Services Agreement," all of which is incorporated herein and deemed a part hereof by reference, and agrees to be bound by the terms and conditions thereof (such document, together with this Application, the "Agreement."); (4) agrees that Merchant and each transaction submitted to the Acquirer will be bound by the terms and conditions in the Agreement; and (5) agrees that Merchant will submit transactions to the Acquirer only in accordance with the information in this Application and will immediately notify the Acquirer in writing if any information in this Application changes. The Agreement will become effective only when signed by the Acquirer and Merchant; Merchant acknowledges that the Acquirer shall rely on the representations and warranties set forth in this Application.

In WITNESS WHEREOF, the parties hereto executed this Agreement as of this day 29/09/2019

Ver. 201802

CONFIDENTIAL

PLANET_002411

Merchant By _____  Merchant By _____
(Merchant Principal or Corporate Officer Signature)  (Merchant Principal or Corporate Officer Signature)

RYUNOSUKE YOSHIDA                              _____
(Print Name)                                    (Print Name)

Date  29/09/2019                                Date _____

Accepted by Planet Payment Solutions, LLC
By _____
_____ Date _____
(Print Name)

**PERSONAL GUARANTY**

In consideration of the Acquirer's acceptance of this Agreement, the undersigned Guarantor (jointly and severally if more than one) unconditionally guarantees the performance of all obligations of Merchant to the Acquirer under the Agreement, and payment of all sums due hereunder, and in the event of default, hereby waives notice of default and agrees to indemnify the Acquirer for all funds due from Merchant pursuant to the terms of the Agreement. Guarantor waives any and all rights of subrogation, reimbursement or indemnity derived from Merchant, and further waives any and all rights or defenses arising by reason of any modification or change in the terms of the Agreement whatsoever, including, without limitation, the renewal, extension, acceleration, or other change in the time any payment or other performance hereunder is due, and / or any change in any interest or discount rate or fee hereunder. Guarantor confirms that Guarantor, collectively or individually, is a party to the Agreement, and unconditionally and specifically authorizes the Acquirer, or its authorized agent, to debit any overdue fees, costs, chargeback's, fines, fees, penalties, expenses or obligations under the Agreement and / or any contractual relationship with the Acquirer from any personal checking account or other account owned or controlled by Guarantor, and further to report any default hereunder on Guarantor's personal Credit Bureau Report. Guarantor agrees to pay all costs and expenses of whatever nature, including attorneys' fees and other legal expenses, incurred by or on behalf of the Acquirer in connection with the enforcement of this Guaranty.

X_____           X_____
Signature, Principal or Corporate Officer    Title    Date           Signature, Principal or Corporate Officer    Title    Date
Print Name _____   Print Name _____

Ver. 201802

CONFIDENTIAL                                    PLANET_002412

**PLANET PAYMENT MERCHANT SERVICES AGREEMENT**

In consideration of the mutual promises and covenants contained in this Agreement, the parties agree as follows:

**Parties:** The parties to this Agreement are Planet Payment Solutions, LLC, whose address is 670 Long Beach Boulevard, Long Beach, New York 11561 (called "Acquirer"), and the applicant submitting the signed Merchant Processing Application incorporated herein and deemed part hereof by reference (called "Merchant");

1. **Alternative Payment Services Provided by Bank:** Acquirer has available to its Merchant customers, the following services which enable Merchants to accept alternative methods of payment from their customers: Authorization, processing, transaction data capture, and payment transmittals to Merchants resulting from customers making payment with Approved Cards. For the purposes of this Agreement, the following definitions apply unless the context otherwise requires:

    (a) **AMEX:** shall mean American Express Travel Related Services Company, Inc., American Express Payment Services Limited and its subsidiaries and affiliates;

    (b) **Approved Card(s):** Credit cards bearing the logo of JCB, UnionPay or AMEX that the Merchant has elected to accept and Acquirer has agreed to process under the terms and conditions of this Agreement.

    (c) **Authorization:** shall mean the process of submitting a request via Acquirer to the Card Association or issuer of an Approved Card, in the manner required under this Agreement, to obtain approval to charge such Card for the amount of a sale under a specific Transaction and "Authorized" shall mean only that such issuer has granted such approval.

    (d) **Cardholder:** Holder of one or more Approved Cards.

    (e) **Card Association:** JCB International Credit Card Co., Ltd., and its subsidiaries and affiliates, China UnionPay Co., Ltd, and its subsidiaries and affiliates and American Express Travel Related Services Company, Inc., American Express Payment Services Limited and its subsidiaries and affiliates.

    (f) **UnionPay:** shall mean cards issued by China UnionPay Co., Ltd, and its subsidiaries and affiliates.

    (g) **E-Commerce Merchant:** Merchant which offers its goods and services for sale or lease and accepts payment using an Approved Card by means of the Internet.

    (h) **JCB:** shall mean JCB International Credit Card Co., Ltd., and its subsidiaries and affiliates;

    (i) **Personally Identifiable Information or PII:** any information relating to an identified or identifiable natural person, whether or not otherwise publicly available, which is supplied by such person, including but not limited to name, address, telephone number, any identification number relating to such person and all information relating to, or which is on their Approved Card and which relates to such person or their Approved Card.

    (j) **Transaction:** Acceptance of an Approved Card for goods sold and/or leased or services provided to Cardholder by Merchant in accordance with the terms of this Agreement.

    (k) **Sales Draft:** Written document evidencing the Transaction for which Merchant seeks payment through the services of Acquirer, in accordance with this Agreement. The form of sales draft used by Merchant shall be a form approved by Acquirer.

2. **Participation by Merchant:** Merchant is in the business of selling and/or leasing goods and/or providing services to its customers of the type described in the Merchant Processing Application signed by the Merchant. To better serve those customers, Merchant has requested and Acquirer has agreed to permit Merchant's participation in Acquirer's card processing programs and services.

    (a) Without the prior written consent of Acquirer, Merchant is not authorized to process Transactions for payment for any other type of goods or services. Acquirer reserves the right to establish certain limits on volume of daily, weekly and monthly transactions and dollar limits per Transaction which Merchant may process. Failure to follow these limits, which may be amended from time to time, will be a default under this Agreement.

    (b) Merchant shall only use a method of fulfillment for the sale/lease of goods or the providing of services disclosed to and approved by Acquirer, including using only approved methods of delivery.

    (c) Merchant utilizing a fulfillment center for the purpose of providing goods or other services to a customer must promptly provide in writing (letter or email), the name, address, phone number, contact person, type of goods, shipping and return service or method used with that fulfillment center. The Acquirer will confirm with the fulfillment center, Merchant is a legitimate customer of the fulfillment center and the product, shipping and return service enabled. The Acquirer has the right to disqualify the use of the fulfillment center if it finds discrepancies in the information provided by Merchant and the information obtained from the fulfillment center or the financial condition of the fulfillment center is deemed unacceptable to the Acquirer.

    (d) The Merchant must promptly report the use of any Merchant Servicer, defined as any entity that is not a member of a Card Association but has a direct relationship with a Merchant, and which has access to cardholder data and performs such services such as gateway, fraud scrubbing, loyalty programs, etc. Bank is required by Card Association regulations to register the Merchant Servicer with Card Association and ensure that the Merchant Servicer is documented compliant with the Payment Card Industry requirements.

    (e) Without prior written permission from Acquirer, Merchant shall not have a Merchant processing relationship with any other provider for the processing of Approved Cards for the business described in the Merchant Processing Application during the term of this Agreement and any extension or renewals thereof. If Merchant fails to comply with this provision, Merchant agrees to pay Acquirer, within 10 days of non-compliance, a liquidated damages sum equal to 1% of the remaining processing volume. For the purpose of this clause, the "remaining processing volume" shall be determined by multiplying the number of months remaining in the term by the greater of : (i) the average monthly gross dollar volume processed by Acquirer on behalf of Merchant over the twelve calendar months preceding the Merchant's breach of this provision or, in the event that Merchant has been processing for less than twelve months, then the average monthly gross dollar volume processed by Merchant from the inception of the Merchant Agreement to the breach of this provision; OR, (ii) the Average Monthly Volume specified in the Merchant Processing Application, and then multiplying the product of that calculation by 1%. Merchant and Acquirer agree that the damages suffered by Acquirer as a result of non-compliance with this provision are difficult to calculate with precision. For that reason, the parties agree that the liquidated damages should be computed as set forth herein. Any exceptions to this exclusive arrangement must be approved by Acquirer in writing.

3. **Merchant Operating Account:** Prior to accepting any Approved Cards, Merchant shall establish a demand deposit account in a financial institution approved by Acquirer through which fees, charges, and credits due in accordance with this Agreement may be processed (called "Operating Account"). Merchant authorizes Acquirer to debit all fees and charges from the Operating Account, monthly or at times deemed appropriate by Acquirer through the ACH Banking Network or by a manual debit of the account. Merchant shall maintain this Operating Account throughout the term of this Agreement and any extensions or renewals thereof. Merchant shall, at all times, maintain sufficient funds in this Operating Account to ensure that all fees, charges and costs provided for under this Agreement are paid, including any reserve requirements set by Acquirer in accordance with paragraph 4 below. Only the person(s) signing this Agreement on behalf of Merchant shall be authorized to make any changes to the Operating Account. Any changes to the account or changes of the account shall be reported promptly to the Acquirer in writing and must be approved in writing by Acquirer. If required by Acquirer or any financial institution where the Operating Account is maintained, Merchant agrees to sign any other additional documents to authorize ACH transactions. Merchant agrees to be bound by the operating rules of the National Automated Clearing House Association (NACHA). Merchant waives any claims for loss or damage arising out of any charges or debits to the Operating Account against any other designated financial institution where the account is maintained. Merchant hereby grants a security interest in the Operating Account and/or any substitute account now and in the future and all proceeds thereof to Acquirer to secure all fees, costs and charges due in accordance with this Agreement.

Ver. 201802

4. **Point-of-Sale (POS) Equipment:** In processing Transactions, Merchant shall utilize only Point-of-Sale Equipment (terminals, printers, pin-pads and scan readers) ("POS Equipment") or Point-of-Sale Software Program and related equipment ("POS Software") installed or approved by Acquirer subject to the following additional terms:

   (a) For equipment rented by Acquirer to Merchant, Acquirer may install all POS Equipment utilizing POS Equipment installers selected by Acquirer; or, at the sole option of Acquirer, Acquirer may provide POS Software through a software vendor selected by Acquirer.

   (b) The POS Equipment and/or POS Software to be provided or installed shall conform to the types of services selected by Merchant and approved by Acquirer.

   (c) Merchant will provide, at Merchant's expense, suitable electric power and telephone services necessary to operate the POS Equipment and will bear the expense of alterations made to Merchant's premises required to locate the POS Equipment in a location suitable for proper operation. If Acquirer elects to provide POS Software, Merchant shall also provide suitable computer terminals, computer hardware, and its own Internet Service Provider, if required by Acquirer, necessary to operate the software.

   (d) Merchant shall permit telephone equipment installers and POS Equipment installers to enter its premises for the purpose of installation, replacement, retrofitting, inspection, relocation, disconnection, removal, repair or maintenance of telephone lines and equipment, POS Equipment and POS Software.

   (e) Merchant shall provide the information required by the Merchant Processing Application provided to Merchant, and shall promptly notify Acquirer of any changes in this information.

   (f) Merchant shall not remove any POS Equipment or POS Software from its original place of installation (other than to a telephone company installed jack located within the Merchant's premises where the POS Equipment or POS Software was originally installed) or permit any modification, addition or repair to any POS Equipment or POS Software without prior written consent of Acquirer. Any authorized relocation of POS Equipment or POS Software following installation will be at Merchant's expense.

   (g) Merchant acknowledges that the installation of the POS Equipment is subject to (1) the availability of telephone lines and equipment terminals and related equipment; (2) the cooperation of Merchant, the electric and telephone companies; and (3) the availability of Acquirer's POS Equipment installer. Acquirer will have no liability to Merchant if any installation is delayed or cannot be completed for reasons not caused by the act or neglect of Acquirer, and in such cases the liability of Acquirer shall be limited to a waiver of fees due under this Agreement during the period of delay.

   (h) All POS Software shall be installed and operated in accordance with the instructions provided by Acquirer or Acquirer's software vendor. Acquirer is not responsible for any interruption in service caused by the failure of Merchant's computer terminals, hardware, and, if applicable, its Internet Service Provider.

5. **Documenting Approved Transactions:** Each Transaction shall be reflected on Sales Drafts supplied or approved by Acquirer and shall contain the following information:

   (a) Name of Merchant and Merchant number designated by Acquirer;
   (b) The Approved Card number, validation date and/or expiration date of the card, if one appears on the card;
   (c) The selling price, together with applicable taxes, other charges, gratuities and the total amount of the Transaction;
   (d) Signature of Cardholder or authorized user, date of the Transaction and Transaction approval number for the Transaction;
   (e) Such additional information which may from time to time is required by Acquirer and/or the relevant Card Association.

Merchant agrees to deliver to its customer in each Transaction a true and completed copy of the Sales Draft. Merchant agrees not to transmit a Sales Draft to Acquirer (electronically or otherwise) until such time as Merchant has performed its obligations to the Cardholder in connection with each Transaction which obligations include, but are not limited to, delivery of the goods and/or services to the Cardholder. Merchant shall also examine each card presented, or use one or more Approved Card security features, including personal identification numbers or signature, if applicable, before completing any Transaction.

6. **Authorization for Approved Card Transactions:** Merchant may obtain approval of Transactions as follows:

   (a) **Electronically Transmitted Transactions:** Merchant shall submit each Transaction for specific Authorization from Acquirer's Authorization Center. Acquirer shall Authorize or decline a Transaction transmitted for Authorization and shall capture and process for Merchant the information relating to the Transaction. The information to be transmitted by Merchant through the terminal or POS Software shall include, but not be limited to the information required on a Sales Draft, excepting only the description of the goods and services provided, and the Cardholder's signature. Merchant agrees to include any additional information necessary for Acquirer to comply with all legal requirements for billing Cardholder, or may, from time to time, be required by Acquirer and/or the relevant Card Association.

   (b) **Dial-Up Authorization:** In the event that a terminal is inoperable at the time of an Authorization request, Transactions for Approved Cards may be Authorized by using the appropriate dial-up facility. In that case, the Transaction shall be entered into the terminal or software application later that day as a forced sale/ticket provided the approval number is also entered. If Authorization is granted, Merchant will obtain a manual imprint of the Approved Card and an authorized signature and will enter the approval number on the Sales Draft.

   (c) **Phone Capture Transactions:** Acquirer will only accept phone capture Transactions utilizing Approved Cards. Merchant must call Acquirer's Authorization Center or, as otherwise directed by Acquirer, before completion of all phone capture Transactions. If Authorization is granted, Merchant will indicate the approval number on the Sales Draft. Merchant shall not use two or more Sales Drafts or Approved Cards in a single Transaction to avoid required Authorization calls, or make multiple Authorization requests for a single Transaction to determine the maximum credit remaining available on a particular Approved Card.

9. **Mail-Order, Telephone, Internet and/or Pre-Authorized Order Transactions:** The following additional requirements apply to Merchant, if Merchant is selling or leasing goods or providing services to its retail customers by mail-order, telephone, Internet or pre-authorized electronic recurring order Approved Card Transactions:

   (a) **Merchant's Chargeback Risk:** Merchant agrees that all Approved Card Transactions involving a mail-order, telephone, Internet or pre-authorized electronic recurring order or payment are at Merchant's risk. For any Transaction of this type, Merchant warrants that the person whose name appears on the Sales Draft as Cardholder is the person making the purchase. A charge back to Merchant's Operating Account will be made without prior notice when a Sales Draft was issued pursuant to a mail order, telephone, Internet or pre-authorized electronic recurring order or payment in which the Cardholder neither participated in nor authorized, regardless of whether or not an authorization was obtained by Merchant.

   (b) **Transaction Receipt Data Requirements:** The Transaction receipt to be delivered to a Cardholder by an E-Commerce Merchant or for a mail-order or telephone order Transaction must include the following:

   - The Merchant name must be recognizable to the Cardholder, such as:
     (i) Merchant doing business as ("dbn"),
     (ii) Merchant Universal Resource Locator ("URL"),
     (iii) The Merchant name used in the Transaction Clearing Record.

   - Customer service number(s) for goods or services delivered domestically or internationally;

   - The Terms and Conditions of restricted sales;

   - If offered, the exact date a free trial period ends

Ver. 201802

(c) **Delivery of Transaction Receipt to Cardholder.** Merchant must provide a completed copy of the Transaction Receipt to the Cardholder. An E-Commerce Merchant may deliver the Transaction Receipt in either of the following formats:

- Electronic (e-mail or fax)
- Paper (handwritten or terminal generated)

An Electronic Commerce Merchant must not transmit the Account Number to the Cardholder.

(d) **Web Site Requirements for E-Commerce Merchants.** A web site operated by an E-Commerce Merchant must contain all of the following information:

(1) Complete description of the services offered;
(2) Return merchandise and refund policy, which includes the communication of the return policy during the order process and the requirement that the cardholder must be allowed to select a "click to accept" option or other affirmative button to acknowledge the policy;
(3) Terms and conditions must be displayed either:
    (i) On the same screen view as the checkout screen used to present the total purchase amount; or
    (ii) Within the sequence of web pages the Cardholder accesses during the checkout process.
(4) Customer service contact including e-mail address or telephone number;
(5) Transaction currency;
(6) Export or legal restrictions;
(7) Delivery policy;
(8) Consumer data privacy policy;
(9) The security method offered for transmission of payment data such as Secure Sockets Layer or 3-D Secure;
(10) Address of the Merchant Outlet's Permanent Establishment, including the Merchant Outlet country must be displayed;
    (i) On the same screen view as the checkout screen used to present the total purchase amount; or
    (ii) Within the sequence of Web pages the Cardholder accesses during the checkout process.

(e) Merchant further agrees to follow these additional procedures in processing these types of Transactions:

(1) All such Transactions must be electronically Authorized and, in addition to the information required in paragraph 7 above, shall also show an Authorization code (when Authorization is required), must show customer address and address verification, and in lieu of Cardholder's signature shall show mail order (MO), telephone order (TO), Internet (IO) or pre-authorized order (PO) on the signature line.

(2) If Merchant accepts a pre-authorized recurring order, the Cardholder shall execute and deliver to Merchant a written request for this pre-authorization. This written request shall be maintained by Merchant and made available upon request to Acquirer. Merchant shall not deliver goods or perform services covered by a pre-authorization order after receiving notification that the pre-authorization is cancelled or that the card covering the pre-authorization is not to be honored.

(3) All Transactions shall be processed only after services have been rendered and/or goods shipped.

(4) For all MO/TO, IO or PO Transactions, Merchant shall verify Cardholder's address from the Card Association network, using AVS verification (if available) and Merchant shall transmit a ticket/invoice number in order to qualify for the relevant interchange rate.

10. **Data Security:** Merchant must comply with the following data security requirements:

(a) PCI Compliance. The Card Associations have implemented a program to ensure the protection of Cardholder data, whether processed or stored, through a program of validation and compliance, known as the Payment Card Industry Data Security Standards ("PCI"). Information about the program and specific requirements can be obtained at www.visa.com/cisp. Merchant must implement and maintain all of the security requirements, as specified in the PCI. The PCI program is comprised of 12 major requirements:

(1) Install and maintain a working network firewall to protect data accessible via the Internet.
(2) Keep security patches up to date.
(3) Encrypt stored data.
(4) Encrypt data sent across networks.
(5) Use and regularly update anti-virus software.
(6) Restrict access to data by business "need to know".
(7) Assign a unique ID to each person with computer access to data.
(8) Don't use vendor-supplied defaults for system passwords and other security parameters.
(9) Track access data by unique ID.
(10) Regularly test security systems and process.
(11) Maintain a policy that addresses information security for employees and contractors.
(12) Restrict physical access to cardholder information.

(b) **Merchant Servicers.** Immediately notify the Card Association, through Acquirer, of the use of a Merchant Servicer;

(c) **Merchant Servicer Compliance.** Ensure the Merchant Servicer implements and maintains all of the security requirements, as specified in the PCI program.

(d) **Data Compromise.** Immediately notify Acquirer of a data compromise.

(e) **Disclosure and Storage of Personally Identifiable Information.**
(1) A Merchant must not disclose any Personally Identifiable Information or other information regarding a specific Transaction (collectively "Transaction Information") to third parties other than to Merchant Servicer, the Acquirer, or an agent of Acquirer for the sole purpose of:
    (i) Assisting the Merchant in completing the Transaction or;
    (ii) as specifically required by law;
(2) Merchant may only disclose PII to other third parties, approved by the Card Association, for the sole purpose of:
    (i) Supporting a loyalty program or;
    (ii) Providing fraud control services.
(3) Merchant must store all material containing PII or imprints (such as Sales Drafts, Transaction receipts, car rental agreements and carbons) in an area limited to selected personnel and;
    (i) Render all PII data unreadable prior to discarding;
    (ii) The Merchant must not retain or store full contents of any track on the magnetic stripe of an Approved Card subsequent to Authorization of a Transaction;
    (iii) The Merchant must not retain or store Card Verification Value 2 data subsequent to Authorization of a Transaction;
    (iv) The Merchant must not request the Card Verification Value 2 data on any paper form,
(4) The sale or disclosure of databases containing PII, or other Transaction Information to third parties is prohibited.

(f) Merchant shall take appropriate technical and organizational security measures against unauthorized or unlawful processing of Cardholder PII and against accidental loss or destruction of, or damage to, Cardholder information while it is in the possession or under the control of Merchant, in accordance with reasonable industry standards, PCI, applicable law and any requirements of Acquirer.

(g) Merchant shall ensure that its employees, agents and sub-contractors are aware of and comply with the provisions of this section.

11. **Prohibited Transactions:** Merchant shall not do any of the following with respect to any Transaction submitted for Authorization and settlement to Acquirer:

Ver. 201801

CONFIDENTIAL

PLANET_002415

(a) Require Cardholders to provide personal information such as phone number, address, or a driver's license for identification as a condition for honoring an Approved Card;
(b) Extend credit for or defer the time of payment of the total cash price in any Transaction;
(c) Honor an Approved Card except in a Transaction where a total cash price is due and payable;
(d) Make any special charge to or extract any special agreement or security from any Cardholder in connection with any Transaction;
(e) Transmit or accept for payment any Sales Draft for a Transaction which was not originated as a result of a direct Transaction between Merchant and a Cardholder for the sale or lease of goods or the performance of services;
(f) Use Merchant's own Approved Card, or one to which Merchant has access, to process a Transaction for the purpose of obtaining credit for Merchant's own benefit;
(g) Redeposit a previously charged back Transaction, regardless of whether Cardholder consents;
(h) Process or return credit without sufficient balance in Merchant's Operating Account to fund the Transaction;
(i) Use the POS Equipment or POS Software and any data received thereon for any other purpose except for determining whether or not Merchant should accept cards in connection with a current sale or lease of goods or services;
(j) Use the POS Equipment or POS Software and data received thereon for credit inquiry purposes or any other purpose not authorized by this Agreement;
(k) Draw or convey any inference concerning a person's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living when any card is processed as non-accepted;
(l) Disclose any information obtained through the POS Equipment or POS Software to any person except for necessary disclosures permitted by this Agreement;
(m) Attempt to process a Transaction which violates the dollar limits established by Acquirer as part of this Agreement, if any; or
(n) Process a Transaction for the purpose of providing security or cash deposit for use in obtaining new or additional cards;
(o) Accept payment from a Cardholder for the purpose of depositing funds to the Cardholder's account;
(p) Process a credit transaction without having completed a previous sale Transaction with the same Cardholder;
(q) Accept Cardholder payments for previous Approved Card charges incurred at Merchant location;
(r) Require a Cardholder to complete a postcard or similar device that includes the Cardholder's Account Number, Card expiration date, signature, or any other Card account data in plain view when mailed;
(s) Add any tax to transactions, unless applicable law expressly requires that a Merchant be permitted to impose a tax. Any tax amount, if allowed, must be included in the transaction amount and not collected separately;
(t) Request or use an account number for any purpose other than as payment for its goods or services;
(u) Disburse funds in the form of travelers cheques, if the sole purpose is to allow the Cardholder to make a cash purchase of goods or services from the Merchant;
(v) Disburse funds in the form of cash, unless Merchant is dispensing funds in the form of traveler's cheques or foreign currency. In this case, the Transaction amount is limited to the value of the travelers' cheques or foreign currency plus any fee or commission charged to the Merchant;
(w) Submit a Sales Draft that the Merchant knows, or should have known, to be either fraudulent or not authorized by the Cardholder;
(x) Abrogate responsibility for employees while employees are in Merchant's employ;
(y) Accept Approved Cards for the purchase of Scrip;
(z) Accept Approved Cards for a Manual Cash Disbursement, (aa) Sales Draft. A Merchant must not deposit a Sales Draft until;
--The Transaction has been completed
--The goods purchased have been shipped or provided
--The specified service has been performed
--Merchant obtains Cardholder consent for recurring Transactions.

12. **Daily Reconciliation of Transactions:**
(a) Electronically Transmitted Transactions: Merchant shall initiate and submit to Acquirer one or more summary Transactions for each Merchant terminal or POS software application each 24-hour period. If Merchant fails to settle or close its terminal or POS software application within a 24-hour period, Merchant will be responsible for any fees, costs or amounts caused by such late presentment. Acquirer will credit to Merchant's Operating Account an amount equal to the reconciled summary Transaction total of all Merchants' totals since the previous credit including any adjustment, if necessary. If Merchant fails to initiate and reconcile a summary Transaction for any day, Acquirer will not grant a credit for that day unless the terminal is set up for an "auto settle" procedure.
(b) Phone Capture Transactions: For all Transactions processed using phone capture Authorization, Acquirer will pay Merchant through a credit to Merchant's Operating Account.

13. Adjustments and Returns: Merchant will maintain a fair exchange and return policy and make adjustments with respect to goods and services sold and/or leased to its customers whenever appropriate. In the event that goods are returned, or any services are terminated or cancelled, or any price is adjusted on a Transaction, Merchant will prepare and transmit a credit or return Transaction, either electronically or by paper, for the amount of the adjustment as a deduction from the total amount of Sales Drafts transmitted that day. In the event the amount of credit or return transactions exceeds the amount of Sales Draft Transactions, Acquirer shall charge Merchant's Operating Account for the excess. Merchant shall make no cash refunds on Approved Card Transactions and shall handle all credit adjustments as provided in this paragraph. Sales Drafts for any Transaction for which no refund or return will be given must be conspicuously marked as a "final sale" and "no returns" on the customer's copy of the Sales Draft at the time of the Transaction. If Merchant has a no-cash refund policy, in store credit only, that policy must appear on the Sales Draft. All Merchants must follow Card Association reservation/no-show policy. All Merchants must notify Cardholders in writing of this policy on all advance reservations. The Cardholder must be notified of the exact number of days required for reservation deposit refunds. A Merchant not following Card Association reservation/no-show policy may receive a charge back to its Operating Account for lodging regulation violations.

14. Charge-Backs: Acquirer shall be authorized to charge back to Merchant any Transactions as specified throughout this Agreement and/or under any of the following circumstances:

(a) No specific prior Authorization of the Transaction was obtained from Acquirer's Authorization Center, or the approval number, given to indicate the Authorization, does not appear on all paper Sales Drafts or in the electronic transmittal which is maintained by Acquirer.
(b) The Transaction was based on a pre-authorization form and the Approved Card on which the approved authorization was based has been cancelled and Merchant was so notified.
(c) The Transaction was conducted as a mail order, telephone order, Internet order, pre-authorized electronic recurring order or any similar order in which the Approved Card is not physically present at Merchant's premises.
(d) The Approved Card giving rise to the Transaction has been cancelled and prior to, or at the time of, the Transaction, Merchant has received or receives notice of the cancellation through the electronic terminal, in writing or otherwise.
(e) The Approved Card had expired prior to the date of the Transaction or the date of Transaction was prior to the validation date, if any, indicated on the Approved Card.
(f) The Sales Draft does not contain the authorized signature that appears in the authorized signature panel of the Approved Card; the signature on the card signature panel is different than that on the Sales Draft; the signature is a different name; or no signature appears on the Sales Draft's signature line.
(g) No Sales Draft was used to record the Transaction; a form of Sales Draft not approved by the Acquirer was used and/or the Sales Draft does not contain the required information required in paragraphs 7 and 8 above.

Ver. 201801

CONFIDENTIAL

PLANET_002416

(h) The Sales Draft represents a Transaction on which Acquirer has received a complaint from or on behalf of a Cardholder stating that there is an unresolved dispute between Merchant and Cardholder;

(i) The Cardholder makes a written complaint to Acquirer that the Cardholder did not make or authorize the Transaction;

(j) A setoff or counterclaim of any kind exists in favor of any Cardholder against Merchant that may be asserted in defense of an action to enforce payment against the Cardholder in a Transaction;

(k) The Sales Draft represents a Transaction that was made at or by a Merchant other than the Merchant named in this Agreement;

(l) Merchant fails to make an impression of an Approved Card that was not electronically read by the terminal or the POS Software application;

(m) The Transaction otherwise violates the terms of this Agreement or any other Card Association rules and regulations; or

(n) A charge back is initiated by a Cardholder's issuing bank.

In any such case, Acquirer shall not be obligated to accept a Transaction for deposit to Merchant's Operating Account. If Acquirer has credited Merchant's Operating Account for a Transaction involving any of the circumstances indicated above, or any other circumstances indicated in this Agreement, Merchant agrees that Acquirer may charge back the amount of the Transaction without prior notification to Merchant. Merchant agrees to pay the amount due upon demand. In addition, Acquirer may debit Merchant's Operating Account and/or Reserve Account, adjust credits due to Merchant, or utilize any method appropriate under the terms of Merchant's deposit and payment arrangements with Acquirer to charge back the amount of any Transaction. Merchant hereby grants to Acquirer a security interest in all goods returned by a Cardholder to secure the amount of the charge back until paid in full by Merchant.

15. **Retention of Original Sales Drafts and Copies**: Merchant shall retain the original Sales Draft for a period of not less than three hundred and sixty (360) days from the date of the Transaction. Additionally, Merchant shall retain either the original Sales Draft or a legible microfilm copy for a total period of seven (7) years from the date of the Transaction. At Acquirer's request, Merchant shall provide the original Sales Draft to Acquirer, or if no longer available, a legible copy within five (5) business days of receipt of a request from Acquirer. If Merchant fails to provide the Sales Draft within five (5) business days, or if no Sales Draft was used to record the Transaction, Acquirer may, if it has not already elected to do so in accordance with paragraph 11, charge back to Merchant the amount of the Transaction. Any Sales Draft which does not contain the information required in accordance with this Agreement shall also be subject to charge back, if the Acquirer has not already elected to do so in accordance with paragraph 11, if the Cardholder continues to dispute the validity of the charge after Acquirer has presented the Merchant's evidence of validity of the charge to the Cardholder. All retrieval requests must also be provided to Bank within five (5) business days of receipt of a request. Failure to meet required time frames will result in Merchant losing any charge back rebuttal claims for non-request of an item by a card issuing bank which may be available to Merchant in accordance with applicable Card Association's rules and regulations. Acquirer's right to charge back a Transaction to Merchant is not subject to, and/or contingent upon any rights Merchant may have to rebut a chargeback under the Card Association's rules and regulations and Acquirer reserves the right to process a chargeback to Merchant at any time in accordance with this Agreement and regardless of any rebuttal and/or appeal process being utilized by Merchant. In the event that Merchant is successful in rebutting and/or appealing a chargeback and the chargeback is credited through the system, Acquirer will credit the chargeback to Merchant.

16. **Recovery of Cards**: Merchant will use its best efforts to reasonably and peaceably recover and retain any Approved Card for which Merchant receives notification of cancellation, restriction, theft or counterfeiting. This notice may be given electronically through the terminal, as instructed by Acquirer's Authorization Center by any means or by listing on any cancelled card list, or a restricted card list. Merchant shall also take reasonable steps to recover a card which it has reasonable grounds to believe is counterfeit, fraudulent or stolen.

17. **Customer Complaints**: Under applicable law or regulation, Merchant, and Acquirer may be subject to claims and defenses arising out of any Transaction. The amount of liability in connection with any claim or defense may be fixed by applicable law or regulation as of a specific point in time. Accordingly, Merchant agrees to maintain in writing with respect to each claim or defense asserted by an Approved Cardholder involving a Transaction for which Merchant has received notice the following information:

(a) The Cardholder's name;
(b) The Approved Card number;
(c) The date and time the Cardholder asserted the claim or defense;
(d) The nature of the claim or defense; and
(e) The action which Merchant took in an attempt to resolve the dispute.

Merchant shall furnish Acquirer with this information upon request.

18. **Confidentiality**: Merchant shall treat all information received as a result of the services provided under this Agreement as confidential. Merchant shall prevent the disclosure of this information except for necessary disclosures to affected customers, to Acquirer and to Card Associations.

19. **Card Association Requirements**: Merchant shall comply with all bylaws, rules and regulations of the Card Association. In particular but without limitation:

(a) Merchant shall promptly pay penalties assessed by any Card Association for Merchant's failure to comply with Card Association's requirements. Acquirer reserves the right to require and/or increase any reserve requirement to cover any penalties whether already assessed or to be assessed in the future.

(b) Merchant will prominently display at its place of business Approved Card emblems and other promotional material and literature provided by Acquirer. Subject to the prior written consent of Acquirer and upon such conditions as authorized by Acquirer, Merchant may use Approved Card service marks or design marks in its own advertisement and promotional materials. At Acquirer's request, Merchant shall provide to Acquirer copies of all marketing materials used in Merchant's business.

20. **Compliance with Applicable Law**: Merchant shall comply with all present and future federal and state laws and regulations pertaining to the services provided under this Agreement including, without limitation, the Federal Fair Credit Reporting Act, the Federal Truth-in-Lending Act, the Electronic Fund Transfers Act and the Federal Equal Credit Opportunity Act, as amended.

21. **Limitation on Acquirer's Liability**: Acquirer shall not be liable to Merchant, Merchant's customers or any third party for any of the following:

(a) For any loss or liability resulting from the denial of credit to any person or Merchant's retention of any card or any attempt to do so;

(b) Any downgraded Transaction based upon Card Association's rules and regulations for any defective or faulty POS Equipment or POS Software regardless if owned by Acquirer or Merchant;

(c) The unavailability of services caused by the termination of Acquirer's contracts with POS Equipment or POS Software vendors, processors or installers, whether terminated by Bank, or any other person for any reason;

(d) Interruption or termination of any services caused by any reason except for Acquirer's failure to use due care in selecting POS Equipment Installers and Servicer, or POS Software vendors; and in such cases, Acquirer's liability shall be limited to a waiver of fees due under this Agreement. Acquirer will have no liability to Merchant if the POS Equipment is owned by Merchant, unless Merchant's equipment is covered by Acquirer's maintenance contract. In that event, Acquirer's liability will be limited in accordance with these paragraphs.

THE ACQUIRER SHALL NOT BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES TO MERCHANT OR TO ANY THIRD PARTY IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE SERVICES TO BE PERFORMED BY ACQUIRER PURSUANT TO THIS AGREEMENT. MERCHANT ACKNOWLEDGES THAT ACQUIRER HAS PROVIDED NO WARRANTIES, EITHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO ANY POS EQUIPMENT OR POS SOFTWARE PROVIDED UNDER THIS AGREEMENT AND ACQUIRER'S SOLE LIABILITY CONCERNING ANY POS EQUIPMENT OR POS SOFTWARE SHALL BE IN ACCORDANCE WITH THIS PARAGRAPH AND PARAGRAPH 6(G).

Ver. 20180.1

22. **Indemnification:** Merchant agrees to indemnify and hold Acquirer harmless from any and all losses, claims, damages, liabilities and expenses, including attorney's fees and costs (whether or not an attorney is an employee of Acquirer or Acquirer's affiliates arising out of any of the following:
   (a) Merchant's failure to comply with any provision contained in this Agreement and/or any amendment thereto;
   (b) Merchant's failure to comply with the Merchant Operating Guide and any amendments thereto;
   (c) Merchant's failure to comply with the bylaws, rules and regulations of any Card Association;
   (d) Merchant's failure to comply with any applicable law, rule or regulation;
   (e) The criminal act, fraud or dishonesty of Merchant or Merchant's employees, licensees, successors, agents and/or assigns;
   (f) The theft of or damage or destruction to any POS Equipment or POS Software; or
   (g) Unauthorized and/or prohibited Transactions.

23. **Guarantors:** As a condition of this Agreement, Acquirer may require the unlimited personal guaranties of selected principals of Merchant. The personal guaranty(s) shall secure all obligations owed to Acquirer by Merchant under this Agreement. Acquirer reserves the right to require additional guaranties at any time in the future as a condition for processing or underwriting Transactions in accordance with this Agreement. Merchant shall not be authorized to process any Transactions until all personal guaranties are provided to the satisfaction of Acquirer.

24. **Credit Investigation and Bank Auditing:** Merchant authorizes Acquirer and Acquirer's agents to, from time to time, investigate the background and personal credit history of any of the principals and employees associated with Merchant's business and to obtain a business report on Merchant's business from Dunn & Bradstreet or any company providing a similar service. Acquirer may terminate this Agreement if the information received in any investigation is unsatisfactory to Acquirer. Acquirer may also audit from time to time, Merchant's compliance with the terms of this Agreement. Merchant shall provide all information requested by Acquirer necessary to complete the audit. Upon Acquirer's request, Merchant shall provide financial statements for Merchant and personal financial statements for all guarantors. By signing below, Merchant certifies that all information provided to Acquirer by Merchant and/or any guarantor is true and correct.

25. **Term & Termination:**
   (a) This Agreement shall become effective when signed by all parties and, unless sooner terminated, shall remain in effect for a term of two years. This Agreement shall renew automatically for successive terms of one year each, unless Merchant provides written notice of termination to Acquirer at least 90 days prior to the end of the then current term. All obligations of Merchant incurred or existing under this Agreement as of the date of termination shall survive such termination including, without limitation, all obligations, warranties and agreements with respect to sales and credit Transactions presented to Acquirer before termination.
   (b) In the event that this Agreement is terminated by Merchant without cause or as a result of account dormancy as determined by Acquirer, prior to the expiration date of this Agreement, Merchant will be charged an early termination fee. Merchant and Acquirer agree that the damages suffered by Acquirer as a result of non-compliance with this provision are difficult to calculate with precision. For that reason, the parties agree that the liquidated damages shall be computed as set forth herein. If Merchant terminates this Agreement early, Merchant agrees to pay Acquirer, within 10 days of such termination, a liquidated damages sum equal to 3% of the remaining processing volume. For the purpose of this clause, the "remaining processing volume" shall be determined by multiplying the number of months remaining in the term by the greater of: (i) the average monthly gross dollar volume processed by Acquirer on behalf of Merchant over the twelve calendar months preceding the Merchant's breach of this provision or, in the event that Merchant has been processing for less than twelve months, then the average monthly gross dollar volume processed by Merchant from the inception of the Merchant Agreement to the breach of this provision; OR (ii) the Average Monthly Volume specified in the Merchant Processing Application, and then multiplying the product of that

calculation by 3%. For the avoidance of doubt, in the event that Acquirer is entitled to claim liquidated damages under both this section and under section 2(c) above, with respect to the same acts or omissions of Merchant then Acquirer shall not be entitled to recover damages twice with respect to such acts or omissions.

   (c) Acquirer may voluntarily terminate this Agreement at any time, with or without cause, upon thirty (30) days' written notice to the Merchant at the addresses set forth above. In addition, Acquirer may terminate this Agreement without notice to Merchant under the following circumstances:
   (1) Any information obtained by Acquirer through a credit investigation is unsatisfactory to Acquirer;
   (2) Any criminal act or act of fraud or dishonesty is committed by Merchant, its employees, licensees, successors, agents, and/or assigns;
   (3) Charge backs in excess of Card Association's monitoring guidelines, or that reach a level that Acquirer, in their sole discretion, determine is excessive;
   (4) Breach of this Agreement by Merchant;
   (5) Bankruptcy, insolvency or receivership proceedings are started by or against Merchant or any guarantor;
   (6) Merchant fails to pay all amounts due to Acquirer in accordance with this Agreement, or any other Agreement between the parties, within thirty (30) days;
   (7) Merchant fails to maintain sufficient funds in Merchant's Operating Account and/or Reserve Account to cover all amounts owed by Merchant under this Agreement;
   (8) Merchant's percentage of error Transactions or retrieval requests is excessive in the opinion of Acquirer;
   (9) There is a material adverse change in the financial condition of Merchant in the determination of Acquirer;
   (10) Merchant exceeds the volume limitations established by Acquirer as part of this Agreement;
   (11) Merchant changes the types of goods or services provided to its customers without the prior consent of Acquirer;
   (12) There is a change in the volume, character or method of Merchant's Transactions that is not satisfactory to Acquirer;
   (13) There is a change in the volume, character or method of chargebacks that is unsatisfactory to Acquirer; and/or
   (14) There is a change in structure or ownership of Merchant by any means or manner, including, but not limited to, a change in stock ownership, member interest, partnership interest, a change by merger or reorganization or a change of name.

   (d) Acquirer may selectively terminate one or more of Merchant's approved locations without terminating the entire Merchant Agreement. In lieu of immediately terminating Merchant, Acquirer may suspend Merchant's authorization to process transactions or place Merchant's transaction into suspense. This will allow Merchant to continue to process Transactions with its customers but the funds for payment to Merchant are held and not transmitted to Merchant. The suspension of processing or real time processing shall remain in place, once instituted, until Acquirer is satisfied that the issue or problem leading to such action has been satisfactorily resolved. In the event that the issue or problem is not satisfactorily resolved, Acquirer may terminate this Agreement. In the event of termination, all obligations of Merchant incurred or existing under this Agreement shall survive the termination. In the event of termination, unless otherwise agreed by the parties, Merchant shall promptly return all POS Equipment and/or POS Software to Acquirer, depending upon which party leased or provided such applications to Merchant. If Merchant fails to return the POS Equipment or POS Software to Acquirer, Acquirer shall have the right to charge Merchant for the replacement value of the equipment or software.

   (e) As a result of this agreement being terminated by Merchant or Acquirer, Acquirer shall have the right, and may be obligated, to place Merchant on the MATCH list (Member Alert to Control High Risk Merchants) for violations of Card Association rules, to include but are not limited to: Violation of Merchant Contract, excessive chargebacks or credits, account data compromise, laundering, excessive fraud, merchant conviction for fraud or theft and bankruptcy.

Ver. 20180.1

CONFIDENTIAL

PLANET_002418

26. **Enforcement of This Agreement:** Acquirer shall have the right to take legal action against Merchant to enforce any provision in this Agreement whether the Agreement is terminated or not. In that event, Merchant shall also be responsible for payment of the cost and attorney's fees incurred by Acquirer whether suit is commenced or not, including any costs and attorney's fees that may be incurred to enforce any award, order and/or judgment obtained.

27. **Setoff:** In addition to any other legal, equitable right or remedy available to it in accordance with this Agreement or by law, Acquirer may set off any amounts due to Acquirer under this Agreement against any property of Merchant in Acquirer's possession or control.

28. **Governing Law and Jurisdiction:** The Agreement and all rights and obligations hereunder, including but not limited to matters of construction, validity and performance, shall be governed by and construed in accordance with the laws of the State of Delaware. Each party to the Agreement submits to the exclusive jurisdiction of the state and federal courts of the State of Delaware, and waives any jurisdictional, venue, or inconvenient forum objections to such courts.

29. **Amendments to This Agreement:** From time to time Acquirer may amend this Agreement as follows:

    (a) *Amendment to Approved Cards and/or Services:* Acquirer may amend or delete Approved Cards or services approved for processing in accordance with this Agreement. Acquirer shall notify Merchant in writing of any additions or deletions of any Approved Cards or services. With respect to any cards or services added to this Agreement, all provisions of this Agreement shall apply to these additional cards and services. Acquirer shall notify Merchant of the fees to be charged for processing the additional cards and services. Acceptance by Merchant of an additional card as payment for a Transaction or use of a new service after Acquirer has sent Merchant appropriate notice shall constitute Merchant's agreement to accept additional cards and services under the terms of this Agreement and the fees or charges relating to these additions;

    (b) *Amendment to Fees and Charges:* Acquirer may periodically review and adjust all rates, fees and charges set forth on the Merchant Processing Application. Acquirer will provide written notice of all new rate, fees and charges to be imposed under this Agreement, except, however, Acquirer may change the rates, fees and charges without prior written notice if the annual volume or average ticket sales do not meet the Merchant's annual projections. If notice is required, the written notice shall be part of the Merchant's Monthly Statement/Bill. Merchant may terminate this Agreement upon at least 30 days' prior written notice to the other parties if Acquirer amends Merchant Processing Application pursuant to this section to increase rates, fees, or charges Merchant pays hereunder, except fees or rates that result from a pass through from a Card Association. All new rates, fees and charges will become effective for the next month immediately following the month in which the notice appeared on Merchant's Monthly Statement/Bill unless Merchant has terminated this Agreement in accordance with this section.

    (c) *Amendment to Other Terms and Conditions.* Acquirer may also from time to time amend other provisions of this Agreement. Unless otherwise specifically provided elsewhere in this Agreement, notice of changes in this Agreement will be in writing and may be made part of Merchant's Monthly Statement/Bill. If notice is given on the Monthly Statement/Bill, the changes to the Agreement will become effective for the next month immediately following the month in which notice appeared on the Merchant's Monthly Statement/Bill. If a separate notice is sent, the changes to the Agreement will go into effect thirty (30) days after notice is sent by regular mail, to the address specified above for Merchant or a different address provided to Acquirer by Merchant.

30. **Assignment:** This Agreement may not be assigned by Merchant without the prior written consent of Acquirer. Acquirer may assign this Agreement without limitation. Assignment of this Agreement by Acquirer shall relieve Acquirer of any further obligations under this Agreement.

30. **Representations:** Merchant makes the following representations to Acquirer, which are true now and will be true at all times in the future:

    (a) The execution, delivery and performance of this Agreement has been duly authorized in accordance with Merchant's organizational documents, and will not violate or create a default under law, Merchant's organizational documents or any contract or other agreement binding on or affecting Merchant;

    (b) Merchant is in compliance with all applicable federal, state and local laws and regulations pertaining to the Merchant's business, including all licensing requirements;

    (c) Merchant is in good standing and shall maintain its business organization in good standing in accordance with all applicable laws and regulations;

    (d) This Agreement constitutes a legal, valid and binding obligation of Merchant; and

    (e) Merchant shall not engage in any unlawful activity or process transactions for any unlawful activity by its customers.

31. **Written Notice:** All notices and other communications required or permitted under this Agreement shall be in writing and will be deemed delivered upon delivery or refusal of receipt when sent by overnight courier or sent via facsimile and the sender obtains a fax confirmation receipt, and upon mailing when sent first class mail, postage prepaid, addressed as follows: (i) If to Merchant: At the facsimile number or address provided as the billing address and to the contact listed on the Merchant Application; and (ii) If to Planet Payment: Planet Payment Solutions, LLC, 670 Long Beach Blvd., Long Beach, NY 11561, Attn: General Counsel, Facsimile (516) 670-3520.

32. **Effective Date:** This Agreement shall become effective only when signed by both parties and shall remain in effect until or unless terminated in accordance with the terms of this Agreement.

Ver. 201801

CONFIDENTIAL

PLANET_002419

By signing below, the parties agree to the terms of this Agreement. If Merchant is a corporation, its proper corporate officers sign. This Agreement may be signed in one or more counterparts and all signed Agreements shall be considered as one.

Agreed to and accepted on: 29/09/2019

| PLANET PAYMENT SOLUTIONS, LLC | MERCHANT: |
|---|---|
| 670 Long Beach Boulevard | |
| Long Beach, NY 11561 | |
| By: _[signature]_ | By: _[signature]_ |
| Authorized Representative | Authorized Representative |
| Name & Title: Bob Bendriss | Name & Title: RYUNOSUKE YOSHIDA |
| Risk & Underwriting Manager | Director |
| Planet | |
| 100 Commons Blvd, Suite 200 | |
| New Castle, DE 19720 | |

Ver. 201801

CONFIDENTIAL

PLANET_002420

## SCHEDULE A
Planet Payment Solutions, LLC Merchant Processing Agreement

Merchant DBA Name: SPGK

Location 1 of 1

| Start Up Fees | |
|---|---|
| Application Fee | Waived |
| Reprogramming Fee | N/A |

| Discount/Interchange Rate | |
|---|---|
| JCB Discount Rate | N/A |
| CUP Discount Rate | 3.25% |
| AMEX Dues and assessments | Pass thru |
| AMEX Discount Assessment | N/A |
| Minimum Monthly Discount | $0.00 |

| | |
|---|---|
| ACH Reject Fee | $25.00 |
| Online Merchant View (if requested) | $0.00 |
| Paper Statement Fee | N/A |
| Virtual Terminal Fee | N/A |
| Internet Gateway Fee | N/A |
| Help Desk Calls | N/A |

| | |
|---|---|
| Billed Annual Fee | N/A |

| Transaction Fees | |
|---|---|
| JCB Transaction Fee | N/A |
| CUP Transaction Fee | $0.15 |
| AMEX Transaction Fee | N/A |
| Gateway Transaction Fee | $0.10 |
| Address Verification Transaction Fee | N/A |

| Other Fees | |
|---|---|
| Chargeback Fee | $15.00 |
| PCI Security Fee | $6.95 |
| Non-Compliance PCI Security Fee | $49.95 |
| Retrieval Request Fee | $8.00 |
| Per batch Processing Fee | $0.00 |

### Currency Selection

____ Check the box to select all currencies to be accepted for American Express Transactions:
- ___ Australian Dollar AUD
- ___ Euro EUR
- ___ Canadian Dollar CAD
- ___ Hong Kong Dollar HKD
- ___ New Zealand Dollar NZD
- ___ Swedish Krona SEK
- ___ Thai Baht THB
- ___ UK Pound Sterling GBP
- ___ U.S. Dollar USD
- ___ Danish Krone DKK
- ___ Japanese Yen JPY
- ___ Norwegian Krone NOK

____ Check the box to select all currencies to be accepted for UnionPay Transactions
- ___ U.S. Dollar USD
- ___ Renminbi/Yuan CNY
- ___ Hong Kong Dollar HKD

____ Check the box to select all currencies to be accepted for JCB Transactions
- ___ U.S. Dollar USD
- ___ Japanese Yen JPY

Ver. 201801

CONFIDENTIAL          PLANET_002421