Exhibit 4

令和　4　年 登簿第　40　号

認　　　証

YUNOSUKE YOSHIDA　は，本公証人の面前で，別添文書に署名した。

よって，これを認証する。

　　　令和　4　年　12　月　19　日，本公証人役場において
　　札幌市中央区北１条西４丁目2番地2　札幌ノースプラザ6階

　　　　札　幌　法　務　局　所　属

　　公　証　人　　野口幹大 
　　　 Notary
　　　　　　　NOGUCHI　Mikio

　　　　　　　　証　　　　　明

　　　上記署名は，札幌法務局所属公証人の署名に相違ないものであり，かつ，その押印は，
真実のものであることを証明する。
　　　令和　4　年　12　月　19　日



　　札　幌　法　務　局　長

---

APOSTILLE

(Convention de La Haye du 5 octobre 1961)

1. Country：JAPAN

   This public document

2. has been signed by　　NOGUCHI　Mikio

3. acting in the capacity of Notary of the Sapporo Legal Affairs Bureau

4. bears the seal/stamp of　　NOGUCHI　Mikio, NOTARY

　　　　　　　　　　　　Certified

5. at Tokyo　　　　　　　　　　6.　　December　19,　2022

7. by the Ministry of Foreign Affairs

8. **22 -**　No 100135

9. Seal/stamp:　　　　　　　　　10.　Signature





**HAMAMOTO Hiroki**

For the Minister for Foreign Affairs

Made on behalf of Shang Peng Gao Ke, Inc. SEZC
Second Affidavit of Ryunosuke Yoshida
Exhibit RY-2
Date Sworn:    December 2022
Date Filed:    December 2022

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 318 OF 2021 (DDJ)**

**IN THE MATTER OF THE COMPANIES ACT (2021 REVISION)**

**AND IN THE MATTER OF HEC INTERNATIONAL, LTD. (IN OFFICIAL LIQUIDATION)**

---

**SECOND AFFIDAVIT OF RYUNOSUKE YOSHIDA**

---

I, Ryunosuke Yoshida, of Room 1035, Unit 1001, 10/F, Mira Place Tower A, 132 Nathan Road, Tsim Sha Tsui, Hong Kong **MAKE OATH AND SAY AS FOLLOWS:**

**INTRODUCTION**

1      I am the same Ryunosuke Yoshida who made an Affidavit in these proceedings on 1 August 2022 (**Yoshida 1**). I make this Second Affidavit on the same basis as Yoshida 1 and I am duly authorized to swear this Second Affidavit on behalf of Shang Peng Gao Ke, Inc. SEZC (**SPGK** or **the Appellant**) and SPGK Pte Ltd (**SPGK Singapore**) (together, **SPGK Parties**).

2      Save where I indicate to the contrary, the facts and matters to which I depose herein are either within my own knowledge and are true, or are true to the best of my knowledge, information and belief, being derived from the information I have obtained personally or from the SPGK Parties' legal advisers and other representatives, and from documents which I have reviewed. Where I refer to information that has been provided to me by others I clearly state the source of that information and belief.

3      There is now produced and shown to me and marked Exhibit **RY-2** a paginated bundle of documents with which I am familiar and to which I will refer in this Second Affidavit.

1

Unless otherwise stated, reference to page numbers are references to page numbers of Exhibit **RY-2**.

4   I make this Second Affidavit in support of the Appellant's Summons dated 16 December 2022 (the **Summons**) appealing against the decision of the Official Liquidator (the **OL**) of the Company made on or before 11 November 2022 (the **Decision**) to reject the Proof of Debt dated 22 July 2022 and lodged with the OL by the SPGK Parties (the **Proof of Debt**), pursuant to Companies Winding Up Rules, 2018 (**CWR**) Order 16, rule 17.

5   A copy of the Proof of Debt is at pages 1 to 93. The Proof of Debt concerns the sum of US$25,800,000 (hereafter referred to as the **HEC Funds**) which was transferred by two entities, Scuderia Bianco Pte Ltd (**SB**) and SPGK International, on behalf of the Appellant, to HEC International, Ltd (**HEC**).

6   On 11 November 2022, Notice of Rejection of Proof of Debt (in the appropriate form) containing the Decision was served by the OL on attorneys for the SPGK Parties pursuant to and in accordance with Order 16, Rule 6 of the Companies Winding Up Rules 2018. A copy of this Notice is at pages 94 to 97.

7   The Notice (at paragraph 5) explains that the OL's reasons for rejecting the Proof of Debt were:

(a)   **Reason 1:** The obligation to make the loyalty payment rested with Ascentra (HEC's parent), not the SPGK Parties, and no meaningful explanation was provided as to why the SPGK Parties would have provided the funds;

(b)   **Reason 2:** The transfers to HEC and which constituted the HEC Funds (the **Transfers**) were made by SPGK International and SB not the SPGK Parties and no documents have been produced to support the SPGK Parties' claim that the transfers were made on their behalf;

(c)   **Reason 3:** Prior to the liquidation, the OL alleged that I had used the funds deposited in the Company's account with United Overseas Bank (**UOB**) to make payments unrelated to the Loyalty Bonus (inconsistently, so it said by the OL, with the SPGK Parties' claim that the Transfers were made for the sole purpose of paying the

2

Loyalty Bonus);

(d)   **Reason 4:** I sent a letter dated 23 February 2021 to Theodore Sanders (**Mr Sanders**) (who was (and remains) the sole shareholder and director of SPGK International) confirming that sums held by SPGK International were held for the benefit of Ascentra;

(e)   **Reason 5:** The OL's enquiries support the conclusion that the monies transferred by SPGK International were (ultimately) transferred on behalf of Ascentra;

(f)   **Reason 6:** it is alleged that I did not take any steps to remit the HEC Funds to SPGK and/or SPGK Singapore in the nine-month period between the Transfers being made and the commencement of the Company's liquidation, even though it was in my power to do so. Instead, it is contended, that I agreed with Mr Robinson (who was the voluntary liquidator of Ascentra at the time) in June and July 2021 that he would transfer the money held in the Company's UOB account to Ascentra's liquidation account. The OL further avers that I agreed to do so without any conditions or reservations and was in the process of arranging that transfer until, as it is further alleged, I abruptly and inexplicably changed my position on 22 July 2021.

8     By its summons dated 16 December 2022, the Appellant has appealed the OL's Decision to reject the Proof of Debt. The Appeal is only being pursued by SPGK on the basis that it is clear that the claim is that of SPGK's. The Appellant seeks orders that:

(a)   The OL's Decision be set aside;

(b)   The Appellant's claim be reinstated and admitted to proof in HEC's liquidation in the sum of US$25,800,00; and

(c)   The issue of whether or not the Appellant's claim is proprietary in nature be determined as part of the appeal. Alternatively, that permission be granted pursuant to section 99 of the Companies Act (2022) to pursue such a determination as against the Company in separate proceedings.

9     In this affidavit, I set out SPGK's response to each of the OL's reasons for rejecting the

3

Proof of Debt. In addition to the responses, the further grounds relied upon by the Appellant in support of the Summons can be summarised as follows:

(a)     The Decision was made prematurely; and

(b)     There is additional evidence to support the claim contained in the Proof of Debt and more particularly, the additional evidence serves to support the proprietary nature of the SPGK's claim to funds held by the OL (purportedly) for and on behalf of HEC.

10      Before I set out the responses to the reasons for rejection and my evidence in support of the further grounds of appeal, to assist the court I set out the relevant background below.

**BACKGROUND**

**Introduction**

11      I was a director of Ascentra between 31 December 2013 and 30 March 2018, and I again held such office between 18 December 2018 and 1 June 2021. HEC[1] is wholly owned by Ascentra.

12      I was a director of HEC from around 2017 to 27 September 2021 and a director and president of HEC's branch in Singapore (**HEC Singapore**)[2] from 5 September 2017 to 27 September 2021.

13      I have been a director of SPGK since 15 May 2019, and its sole director since 9 December 2019. I have beneficially owned 100% of the shares in SPGK through my wholly owned Cayman company Growth Today Inc (**Growth Today**) since 15 December 2018.

14      I have also been a director of SPGK Singapore (a wholly owned subsidiary of SPGK) since May 2019.

15      Copies of the Registers of Directors of Ascentra and SPGK are at pages 98 to 100. Copies

---

[1] Former names of HEC include Radial IT Systems, Ltd, Ascentra Technology, Ltd and Interush Technology, Ltd.

[2] HEC International Ltd, Singapore Branch. Former names of the Singapore branch include HEC International LLC Singapore Branch and Interush International LLC, Singapore Branch.

4

of the Registers of Members of SPGK and Growth Today are at pages 101 to 106. Copies of SPGK Singapore's and HEC Singapore's business profiles are at pages 107 to 113. I do not have a copy of the current Register of Directors of HEC.

16    I am therefore well acquainted with the business of Ascentra and other companies within the Ascentra group (including HEC and HEC Singapore) and with the business of the SPGK group (which includes SPGK, SPGK Singapore and SPGK LLC[3]). Consequently, I am also fully aware of the existence and nature of the business and the trading relationship between the Ascentra group of companies and the SPGK group of companies. The current corporate structure charts relating to both the Ascentra group of companies and the SPGK group companies are at page 114 and page 115 (respectively).

**The history of the Interush business**

17    The business known as "Interush" was founded by Yoshio Matsuura (**Mr Matsuura**) and Motohiko Homma (**Mr Homma**) in around 2003. The principal operating entity in around 2013 (when I first became involved with the Interush business) was Interush Inc (a US entity subsequently renamed HEC Global, Inc).

18    Interush was a multi-level marketing (**MLM**) business and was originally run from the US (but aimed at the Japanese market).

19    The Interush business utilized a personal referral marketing introduction strategy. The people involved in this system of business operations were known as "Affiliates". Affiliate activity was governed by Interush's policies and procedures (which are country-specific and are designed to cater for the different policies and regulations that apply in the countries within which it operates).

20    By way of a high level explanation of how the business worked - Affiliates earned commissions based upon the amount of monthly subscription revenues earned by Interush from consumers/customers and other Affiliates as a consequence of referrals generated by the relevant Affiliates. Affiliates could earn additional commissions based upon the subscription revenues generated by "new" Affiliates where the "new" Affiliates

---

[3] A wholly owned subsidiary of SPGK was been de-registered on 3 March 2021.

have been introduced as a result of referrals generated by the "original" Affiliates.

21    The Interush business launched its first cross-border e-commerce product (in Japan) in 2004.

22    Following on from this, Interush's Hong Kong operation - Interush Limited - was incorporated in Hong Kong on 29 September 2006 (although it did not commence business in Hong Kong until mid-2010).

23    In 2007, Interush expanded its business operations to Taiwan. Its Taiwan business was operated from Taiwan by a local entity called Interush International Co., Ltd (subsequently renamed HEC International Co., Ltd.).

24    Also, in 2007 Interush Holdings Ltd (a Bermuda company) was incorporated and became the holding company for the Interush business. Interush Holdings Ltd was owned by Mr Matsuura and Mr Homma in equal shares through their respective nominee companies: South Asian Ventures Ltd (**SAV**) and New South East Traders Ltd (**NSET**) (both incorporated in the BVI).

25    As noted above, in mid-2010, Interush's operations commenced in Hong Kong. As mentioned at paragraph 22 above, the Hong Kong business was operated by a Hong Kong entity called Interush Limited (although most of its customers were, in fact, located in mainland China). Hong Kong served as the base through which Interush coordinated recruitment and training of sales Affiliates in the PRC.

26    In around July 2011, Martin Matthews (**Mr Matthews**) became the President and CEO of the business of Interush Holdings Ltd. I believe he was employed in the Interush business before that.

27    There was a plan to list one of the Interush businesses on one of the major international stock exchanges. As a consequence of this plan and to incentivize the Affiliates, a bonus program was introduced in 2010 called the "Phantom Stock Option Bonus Program" (**PSOP**). The PSOP was a benefit plan intended to give Affiliates the benefits of a stock option in relation to what might also be referred to as "shadow stock" as opposed to "phantom stock". It was intended that members who continued to purchase Interush's

6

IRIS online tools would be entitled to cumulative points. Based on their cumulative points, members could exercise their corresponding number of Phantom Stock Options and receive bonuses, upon the listing of the Interush business and based upon the value of that stock upon listing. The calculation of bonus would then be determined based on the share market price after the public listing.

28      Under the PSOP, Phantom Stock Options would be awarded to eligible Affiliates, and such Phantom Stock Options could then be exercised for a cash settlement payment upon:

(a)      the closing of an IPO of one of the Interush group companies raising at least US$100,000,000;

(b)      receipt of a written notice from the Affiliates exercising the phantom options; and

(c)      satisfaction of all other applicable conditions.

29      The intention of PSOP was to reward Affiliates who had shown a long term commitment to the Interush business. Copies of the Terms of Phantom Stock Option Agreement and Amendment No.1 to Phantom Stock Option Agreement are at pages 116 to 122. A Summary of the Phantom Stock Option Bonus Program with English Translations is also exhibited at pages 123 to 127.

30      In 2013, there was a significant increase in Affiliate recruitment activity in Hong Kong. On 6 November 2013 the Interush offices were raided by Hong Kong's Commercial Crimes Bureau (**CCB**) based on a warrant which alleged violation of the Pyramid Selling Prohibition Ordinance. The CCB seized all computer equipment, books and records in the Hong Kong offices and arrested six individuals (including Mr Matthews). As a result, Interush attracted unwanted media attention in Hong Kong (the media reported that police had found evidence that Interush was using pyramid selling to recruit members).

31      Due to this, Interush ceased recruiting additional Affiliates and holding large training sessions for its Affiliates in Hong Kong. Furthermore, Interush also repurposed its staff in Hong Kong to support the e-Commerce business in Taiwan and provide local customer support to the centralized customer service centre in Taiwan. The Interush business continued, albeit somewhat reduced, and focused on MLM in Taiwan through HEC

7

International Co Ltd (**HEC Taiwan**), and Japan through HEC and HEC Singapore.

32    Shortly following the CCB's raid of Interush's offices in Hong Kong, Interush's banks suspended operations of its bank accounts in view of the police investigation. Eventually the Hong Kong Court issued a Restraint Order on 9 April 2015 prohibiting Interush[4] from dealing with its property in Hong Kong. At the time the bank accounts were frozen they were in credit in the aggregate amount of approximately US$30 million. A copy of the Restraint Order is at pages 128 to 139.

33    Despite the CCB investigation, Interush continued to prepare for public listing (with the intention of listing on the Hong Kong Stock Exchange (**HKEX**), being the highest potential market during that period) as the Hong Kong authorities had not closed down Interush's operations in Hong Kong. On 30 December 2013, Interush Holdings Ltd and its subsidiaries completed a recapitalization programme, which involved:

(a)    the formation of a new Cayman parent company, Interush Holdings Inc, which later changed its name to Ascentra Holdings Inc (Ascentra, as defined above) which became the sole shareholder of Interush Holdings Ltd;

(b)    the formation of another Cayman company, IR-P Holdings Ltd (**IR-P**) with INTL Media Holdings LLC (a nominee company of Mr Matthews) (**INTL**) being allotted 982,000 ordinary shares in IR-P;

(c)    IR-P acquiring NSET's and SAV's shares in Interush Holdings Ltd in return for the issue of 1,800,000 Preferred Shares in IR-P (each) to NSET and SAV;

(d)    IR-P swapping its shares in Interush Holdings Ltd for shares in Ascentra;

(e)    the issuance of further shares by Ascentra to INTL and three members of management / related parties (Ryosuke Kojima, Jeffrey Boshears and Alex Oliva[5]);

(f)    the contribution of intellectual property / intangible assets used in the Interush

---

[4] Interush Limited and Interush (Singapore) Pte Limited.
[5] Ryosuke Kojima was a director and CTO of Ascentra, Jeffrey Boshears was a CFO and Assistant Secretary of Ascentra; and Alex Oliva was a Chief Information Officer of Ascentra.

8

group business by the two existing shareholders of the Interush business (Mr Matsuura and Mr Homma); and

(g)    Mr Matsuura and Mr Homma each receiving approximately US$30 million in cash and approximately US$18 million worth of Preferred Shares in IR-P through their respective ownership of NSET and SAV.

34    Copies of (i) the Stock Purchase Agreement dated 30 December 2013; (ii) two Promissory Notes issued to SAV; and (iii) written board resolutions passed by IR-P on 30 and 31 December 2013 are at pages 140 to 174.

35    As a result of the recapitalisation, the shareholding structure of Ascentra was as follows:

(a)    IR-P: 58.50% of the shares;

(b)    INTL: 30.64% of the shares; and

(c)    Three management members / related parties (Ryosuke Kojima, Jeffrey Boshears and Alex Oliva) 0.86% of the shares.

36    On 23 July 2014, Mr Matthews transferred his ordinary shares in IR-P to INTL. Since then and until around August 2020, the shareholding of IR-P was as follows:

(a)    NSET: 39.28% (Preferred Shares);

(b)    SAV: 39.28% (Preferred Shares); and

(c)    INTL: 21.43% (Ordinary Shares).

37    In December 2014, to continue the preparation for the proposed IPO and to create a more definitive timeframe for the PSOP, Interush implemented a replacement program for the PSOP which was subsequently referred to as the "Loyalty Bonus Program" (**Loyalty Bonus Program**). A copy of the Loyalty Bonus Program (document titled PSOB Replacement Program) is at pages 175 to 190.

38    Similar to the PSOP, the Loyalty Bonus Program was a reward plan to provide annual cash bonus payments to eligible Affiliates based on the net revenues of Interush, providing

9

recognition to eligible Affiliates for their loyalty and accomplishments prior to the completion of the proposed IPO.

39    The Loyalty Bonus Program was stated to be effective as at 31 December 2014 with the "bonus pool" commencing on 31 December 2014 and operating through to the fiscal year ending 31 December 2020 (**Bonus Pool Period**).

40    The annual bonus payment was to be delivered to the eligible Affiliates no later than 31 March of the fiscal year following the applicable Bonus Pool Period (see paragraph 7 at page 180).

41    On 31 March 2015, Mr Matthews (following on from his arrest in November 2013 referred to at paragraph 30 above) was charged with money laundering by the Hong Kong authorities (although Mr Matthews was later - in May 2017 - acquitted of that charge) and the plan for the IPO was seriously hindered.

42    In June 2015, Mr Matthews was placed on administrative leave as CEO and Chairman of Interush Holdings Ltd to allow him time to address the charges against him.

43    In November 2015 an Information Memorandum was prepared[6] to provide an overview of the Interush business as at November 2015 and the status of the plans for the IPO. A copy of this is at pages 191 to 220.

44    By around November 2015, Interush had approximately 61,000 Affiliates and over 115,000 monthly subscribers to its various online products.

45    Due to various reasons including the CCB's investigation, the risks facing the Interush business in Hong Kong (where, as noted above, a large number of its customers were located in the PRC, where MLM businesses are illegal), negative press and Mr Matthews being charged with money laundering, Interush decided to:

(a)    rebrand its business and change the name "Interush" to "Ascentra". The businesses in Taiwan and Japan were renamed as "HEC" and various other entities

---

[6] I understand this was prepared by external parties (Marshall Stevens, Noble Financial and Freeman Consulting) on Interush's instructions.

were renamed in a similar fashion;

(b)   suspend the operation of its business in Hong Kong;

(c)   supply products to a new separate entity - SPGK – which was established[7] as a separate e-commerce marketing business that was focused on the PRC market. SPGK was not part of the Ascentra group and was a wholesale purchaser of Ascentra's products. SPGK then sold these products to its customers in the PRC. This allowed the Interush/Ascentra business to de-risk its business by no longer selling directly to the PRC market where its MLM business model is illegal.

**Establishment of SPGK**

46   As stated in paragraph 45 above, Interush/Ascentra decided it would no longer operate in Hong Kong (which had been focused on the PRC market since late 2015). However, it continued to operate in other countries such as, Taiwan and Japan.

47   King & Wood Mallesons China (**KWM**) (a PRC law firm) assisted in the establishment of SPGK and the development of its business model. SPGK was established as an e-commerce marketing company focused on the PRC market. Exhibited at pages 221 to 230 is a script for Mr Matthews' presentation at a pre-launch event for SPGK in August 2016.

48   As a new business (with an untested model) operating in a new market, KWM could not guarantee that SPGK would be fully compliant with all relevant PRC laws. Accordingly, there were legal and financial risks for SPGK as well as its owners and controllers.

49   SPGK commenced business in the PRC in or around October 2016. At this time, the shares in SPGK were wholly owned by Growth Today, which company was (at that time) owned and controlled by Mr Homma. Although, Mr Homma was the ultimate beneficial owner of SPGK upon its incorporation, he did not want to be a director of SPGK due to the legal and financial risks summarised above. Mr Matsuura took the same view and he also declined to be a director of SPGK. Given the attitudes of Mr Homma and Mr Matsuura, the operations of SPGK were initially handled by an individual called Jessie Tsai who was

---

[7] SPGK was incorporated on 14 June 2016.

based in Taiwan. An individual called Ernest Wilcock was the sole director of SPGK from the time of its incorporation.

50    Around the time SPGK commenced operations in the PRC (in 2016), Interush Limited issued an announcement (pages 231 to 233) to existing affiliates of Interush which stated that:

> *"Interush International, LLC subsidiary company which offered products in Hong Kong, Macau and the PRC, is ending its operations and ceasing to provide support to customers in these markets. As such we must cancel our affiliate agreements with you and terminate our relationship as of October 1 2016.*

> *However, we are pleased to advise that we have identified a dynamic company, Shang Peng Gao Ke, Inc. ("Shang Peng") which will enable you to continue earning an income through a business which has very similar IT and Health products and customer support within China.*

> *Shang Peng is a unique e-commerce marketing company whose exclusive IT and Health products are developed in the USA and available in Hong Kong and Macau, plus the PRC market through cross-border e-commerce. Starting on September 7th, you will have the opportunity to join this company at no cost, and work towards your financial goals. I have been working with this company to ensure a smooth transition and make this process as easy as possible for you.*

> *…*

> *Along with this transition, Ascentra Holdings, Inc. will continue to honor the Loyalty Bonus program to current Interush qualifiers, as well as offer an Annual RSP Bonus program, and honor the legacy Introduction Bonus program formerly provided by Interush for your tenure with Interush.*

> *You are invited to join Shang Peng at no cost. The company will use a formula based on your experience at your legacy position with Interush to transition you to their business. We recommend that you complete the transition as soon as possible. Interush will cease supporting customers in Hong Kong, Macau and the PRC as of*

12

*October 1, 2016, with final commission payment to follow in October."*

51    This announcement makes clear that SPGK was identified as a separate business to take over operations from Interush (rather than form part of Interush's operations), and that alongside the option to transition over to SPGK, Interush would continue to honour its legacy bonus program. However, for those who signed up with SPGK, Interush/Ascentra offered to provide some unspecified form of continuity with the loyalty bonus program for those affiliates.

52    SPGK's business model differed to Ascentra's in that SPGK was not a MLM business. Instead SPGK purchased products (such as IT products and health products) from Ascentra and third parties. Consumers could then purchase these products from SPGK through the SPGK website[8] and, depending on the product purchased, the relevant product would either be made available for download or would be physically delivered to the customer.

53    SPGK also operated a referral program where users could refer other potential purchasers to SPGK and earn a percentage of any sales revenue generated by such a referral. Additionally, users could become service providers and work as a service provider for one of SPGK's independent third party service provider companies in the PRC, with the user being engaged through a service agreement.

54    The products sold by SPGK were supplied by third party entities (the **Vendors**) (beauty and health products) or licensed by Ascentra's subsidiary (IT products). The Vendors were and are contracted to Ascentra, but their fees for providing products to SPGK (via Ascentra) were paid directly to them by SPGK using SPGK's funds through cash management entities.

55    By the time SPGK was established, Mr Homma was growing increasingly concerned about his continued involvement with Ascentra as he had, for many years prior, received various threats from Affiliates (threatening legal proceedings and to disclose his personal

---

[8] https://www.spgk.com/en/ SPGK was the contracting principal for all sales to customers and agents/affiliates purchasing products through SPGK's website. The website ceased operating in March 2021.

13

information online such as his residential address) due to his association with the business. I also understand his relationship with Mr Matsuura had become strained. Mr Homma therefore decided he no longer wished to take any further part in the businesses of Ascentra or SPGK given the past difficulties he had experienced and the CCB investigation into Interush's business. Accordingly, in around December 2018, Mr Homma transferred his shares in Growth Today to me (he also transferred his shares in IR-P to Lequios Holdings Ltd[9] in around November 2020).

**Ascentra's banking and cash management arrangements**

56      Because of CCB's investigation and with Mr Matthews facing criminal charges in Hong Kong (and also the Restraint Order in force), Ascentra did not have an operational bank account and was unable to open a new bank account. Instead Ascentra used third party cash management service providers (i.e., Asian Offshore Services (**AOS**)[10] and later Scuderia Bianco Pte Ltd (**SB**)[11]) to receive and make payments on its behalf. I understand that these entities existed only for the purposes of opening bank accounts and managing funds on behalf of Ascentra and latterly SPGK. A copy of the Business Services Agreement between Ascentra and SB dated 1 June 2019 is at pages 234 to 244. I understand that there was no equivalent agreement as between Ascentra and AOS but there is a similar agreement as between SPGK Singapore and SB dated 1 December 2019 (see pages 29 to 39).

**SPGK's banking and cash management arrangements**

57      SPGK also used third party cash management service providers.

58      Payments made by customers for products purchased from SPGK through its website were processed through China UnionPay and collected by Planet Payment, a payment processor based in the US.

---

[9] A BVI company which I also own and control.
[10] A Cayman entity owned and controlled by Mr Sanders.
[11] A Singapore company incorporated in May 2019 that I own and control. The SPGK Parties also used SB for cash management services.

14

59      Payments made to agents were made by SPGK through international payment processors such as International Payout Systems Inc (*iPayout*) or Osiris, using SPGK's funds received by way of payment for products it had sold, the proceeds of which sales had been collected on its behalf by from Planet Payment.

60      In November 2016, SPGK LLC (a wholly owned subsidiary of SPGK) opened a bank account with Global Fidelity Bank in the Cayman Islands and started receiving payments into that account in respect of the proceeds of sales generated by SPGK from its business operations in the PRC. The proceeds of such sales were collected by Planet Payment and paid by it into SPGK LLC's account with Global Fidelity Bank from November 2017 to December 2018.

61      Mr Sanders was appointed as a director of SPGK on 1 February 2017 in place of Ernest Wilcock. I understand this was because Ernest Wilcock did not have a passport and therefore could not satisfy bank account opening identity requirements. Mr Sanders (who did have a passport) was therefore appointed as a director of SPGK in order to enable it to open a bank account.

62      In January 2019, I discovered that unbeknown to Mr Matsuura, Mr Homma and myself, Mr Sanders had opened a bank account with Bank of the West ("*BOTW*") in October or November 2018 (in the United States) in the name of a Californian company he had incorporated with the name "SPGK International". I understand this company was owned and controlled solely by him

63      Without consulting Mr Homma, Mr Matsuura or me, from January 2019 Mr Sanders instructed Planet Payment to transfer the funds generated by SPGK to SPGK International's BOTW account. Paragraph 3.8 of a report prepared by AlixPartners dated 1 August 2022 (*Alix 1*) at pages 245 to 267 confirms that on an analysis of the fund flows, SPGK International (using its BOTW account) appears to have replaced SPGK LLC (using its Global Fidelity account) as the cash management recipient of the website and mobile application revenue from Planet Payment from January 2019 to November 2019. 96% of funds received by SPGK International during this period came from SPGK's website and mobile application revenue – US $59 million (see table 1 at page 249).

64      Thereafter and since around January 2019, Planet Payment remitted all revenue received
        by it on behalf of SPGK (such revenue having been generated by the sales of products by
        SPGK) to the bank accounts held by SPGK International and AOS with BOTW in the US
        (**BOTW Accounts**). Commissions due to Affiliates were then sent by SPGK International to
        another third party entity, by the name of iPayout, for onward transmission to SPGK's
        Affiliates/agents.

65      I discovered the existence of SPGK International purely by chance. Winnie Lo (a member
        of the accounting staff employed by the Hong Kong branch of iHealthScience LLC (a
        Delaware company and an indirect subsidiary of Ascentra) asked me about SPGK
        International, and having never heard of it, I contacted Masami Nakano (**Ms Nakano**),
        who was one of the first employees of Interush Inc (acting as a translator and executive
        assistant for Mr Matsuura and Mr Homma). Ms Nakano explained that SPGK International
        was an entity set up by Mr Sanders for the purpose of opening a new bank account, which
        bank account was to be used as the main account for SPGK. I asked Ms Nakano about the
        shareholder and board composition of SPGK International, but she did not know their
        identities. Ms Nakano agreed to follow up with Mr Sanders on my behalf. A copy of my
        email exchanges with Ms Nakano together with English translations are at pages 268 to
        273.

66      Over the next couple of weeks, I came to understand that Mr Sanders was the sole
        director and shareholder of SPGK International. There being no subsidiary/parent
        relationship between SPGK and SPGK International, the receipt of funds belonging to
        SPGK (SPGK International was receiving all of the payments from Planet Payment which
        represented the proceeds of sales generated by SPGK from its business in the PRC), was
        in my view, not only irregular but deceptive as Mr Matsuura, Mr Homma and I had not
        been informed of the new arrangement. Notwithstanding that I had been the sole
        shareholder of Growth Today since 15 December 2018, I was never consulted or informed
        by Mr Sanders (who at that time was a director of SPGK) about this arrangement that he
        had unilaterally put in place.

67      I raised the issue with Mr Matsuura and he was furious. We decided to request from Mr
        Sanders, copies of the statements for all of the bank accounts of the entities controlled

by him, including AOS and SPGK International.

68    Subsequently, there was a meeting in the United States between Mr Matsuura, Mr Homma, Mr Sanders, Ms Nakano and myself in April 2019. During the meeting, Mr Sanders accessed the online bank accounts of AOS and SPGK International to allow us to review the balances and the transaction details. Mr Sanders also gave notice that he was resigning as a director of SPGK and terminating his service with Ascentra as its CFO. After further discussion, however, it was agreed that Mr Sanders would remain in his positions with SPGK and Ascentra in order to allow time to find suitable replacements (he formally resigned as a director of SPGK in December 2019).

69    The discussion between Mr Matsuura, Mr Homma, Mr Sanders, Ms Nakano and myself about SPGK International continued for a considerable period after the meeting in April 2019.

70    On 15 May 2019, I was appointed as a director of SPGK and began to put in place more efficient structures and make plans for its future operations.

71    In May 2019, I established two companies in Singapore: SPGK Singapore as a wholly owned subsidiary of SPGK, and SB which is wholly owned by myself. I have been a director of SPGK Singapore and SB since their inception. SPGK Singapore and SB were incorporated to replace AOS and SPGK International and to ensure that Mr Sanders could no longer control SPGK's revenues. SPGK Singapore's function was to operate a bank account, provide cash management services, administer payments and collect revenues for and on behalf of SPGK. SB had a similar function except it also provided cash management services to Ascentra Group (for a commission and on a commercial basis).

72    In late July 2019, in an attempt to resolve the issues with Mr Sanders, Mr Matsuura and I arranged a 3-day trip to the US to meet with him. During the first two days, I met with Mr Sanders on my own to discuss the banking issues amongst other things (Mr Matsuura does not speak English). We had agreed that Mr Matsuura would meet with Mr Sanders on the third day once the details had been discussed between me and Mr Sanders at length, in order to reach a final agreement. However, on the third day, Mr Sanders decided not to meet with Mr Matsuura. Mr Matsuura subsequently informed Mr Sanders

that I would be taking over SPGK International and asked him to coordinate with me in relation to the transfer of control. The relevant email exchange is at pages 274 to 277.

73    Notwithstanding those discussions I did not take over SPGK International because doing so would potentially have exposed me to tax liabilities in the US (an issue also encountered by Mr Sanders). I had at that time already set up SPGK Singapore and SB and was arranging to set up bank accounts for both entities, so there was no need for the continued involvement of SPGK International. However, purely for convenience, I decided that Mr Sanders and SPGK International could continue to receive the funds in respect of proceeds of sales generated by SPGK's business from Planet Payment until the bank account in the name of SPGK Singapore to receive those funds had been established.

74    I also planned to use SB to replace AOS and therefore through SB, process payments for Ascentra and SPGK, but decided – again for convenience – that AOS should remain in place until SB could completely take over AOS's role in this regard.

75    By September 2019, I was able to set up a bank account with DBS Bank in Singapore in the name of SPGK Singapore (the **DBS Account**). Subsequently, I also established a bank account in the name of SB with Shanghai Commercial and Savings Bank in Taiwan (**SCSB**). At around the same time, I contacted Planet Payment to request that from then on, the funds it received in respect of proceeds of sale generated from SPGK's business in the PRC be transferred to the DBS Account. For this purpose, on 29 September 2019, SPGK Singapore entered into an agreement with Planet Payment (the **PP Agreement**). A copy of this agreement is at pages 40 to 51.

76    When Mr Sanders learned of the new arrangements I had put in place, he told me not to send all the funds held by Planet Payment to the DBS Account. His reasons for this were that: (i) DBS Bank may have issues if it suddenly received a significant amount of funds; (ii) the Ascentra group of companies had previously encountered issues with its bank account in Singapore; and (iii) iPayout would need to receive funds from a US account and not from a bank account in Singapore (which I subsequently found out to be untrue). Copies of the relevant email exchanges are at pages 278 to 282.

77    Therefore, it was decided that:

(a)    the funds generated from the sales through SPGK's website (which made up the majority of SPGK's revenue) would be transferred to the DBS Account, while the funds generated from the sales made via SPGK's mobile application would continue to be transferred to SPGK International;

(b)    SPGK International would not transfer the balances standing to the credit of the BOTW account to SPGK Singapore, but instead would use those funds to settle commission payments and other expenses owed and payable by SPGK.

78    As such, SPGK continued to make payments through SPGK International and the BOTW account (with the intention that this practice was to continue at least until SPGK Singapore and/or SB could completely take over the role).

79    Furthermore, when SPGK International did not have sufficient funds in its BOTW account to make payments in respect of liabilities payable by SPGK, SPGK Singapore would remit additional funds, on behalf of SPGK, to SPGK International to enable it to be able to make those payments (see Alix 1 at [3.11] at page 250). The funds transferred by SPGK Singapore to SPGK International were funds to which SPGK was beneficially entitled.

80    On 9 December 2019, Mr Sanders formally resigned as a director of SPGK. However, he remained as a director of SPGK International which continued to receive payments on behalf of SPGK from Planet Payment from time to time (in particular payments to i-Payout in respect of commissions payable to SPGK's Affiliates - as described above).

81    Since November 2018, SPGK International has received *circa* US$230 million from Planet Payment being funds generated from SPGK's business in the PRC (see Alix 1 at [3.10] at page 250). It is not alleged, nor could it be, that SPGK International has any beneficial interest in these funds.

**LOYALTY BONUS & HEC**

82    As explained at paragraph 50 above, Affiliates of Ascentra/Interush were informed by Ascentra that if they signed up with SPGK they could do so at no cost and that their legacy position with Interush would be taken into account as part of any transition. In addition, in order to calculate the revenues forming part of the loyalty bonus program, shortly after

19

SPGK was launched a decision was made by the management of Ascentra and SPGK, that the calculation of the loyalty bonus would include SPGK's revenue. My understanding is that as a result, the revenues of Ascentra, HEC (and various other companies connected with Ascentra) and SPGK were used solely for the purpose of determining the amount of loyalty bonus payments of Ascentra. My recollection is that while there is no strict requirement to do this, it was done in order to ensure that the Affiliates did not complain about lower bonus payments which could potentially impact on both the businesses of Ascentra and SPGK.

**Loyalty bonus in the earlier years (2014 – 2018)**

83      The loyalty bonus was calculated annually on a fiscal year basis from the year ending 31 December 2014 to 31 December 2020.

84      I understand that payments of the loyalty bonus for the first five years were as follows (see pages 283 to 292 an email chain with the following figures):

(a)      First bonus year: 2014 (to be paid in 2015): US$13,720,856.7;

(b)      Second bonus year: 2015 (to be paid in 2016): US$93,726.10;

(c)      Third bonus year: 2016 (to be paid in 2017): US$3,558,363;

(d)      Fourth bonus year: 2017 (to be paid in 2018): no increment and therefore no bonus payable; and

(e)      Fifth bonus year: 2018 (to be paid in 2019): no increment and therefore no bonus payable.

85      These payments were not very substantial, and I believe that payments were almost all made from HEC's bank account with UOB on behalf of Ascentra as Ascentra did not have an operating bank account. The source of the funds in the period 2014 to 2018 was, I understand, revenue generated by the Interush/ Ascentra group of companies.

86      The loyalty bonus pool would first be calculated based on the revenues generated in Japan, Taiwan and the PRC. James Koshimoto of Ever Innovation would then consolidate

the figures and come up with the amount that was payable to each Affiliate/agent. The process was quite complicated because it was necessary to identify the Affiliates/agents who qualified for the loyalty bonus. Some of them may have left, others may not have been eligible to receive the loyalty bonus.

87    In the 2017 and 2018 years (as evidenced above) there appeared to be no loyalty bonus payable (as the business did not make sufficient revenue).

88    I understand that, in or around 2016 and 2017, Mr Matsuura and Mr Homma had each personally (via their respective SPVs) made a US$5 million loan to Ascentra[12] as the businesses of Ascentra/HEC were not doing well. Copies of the relevant promissory notes in respect of these loans are at pages 293 to 317.

**Loyalty bonus in the later years (2019-2020)**

89    In 2017, the businesses of Ascentra/HEC were not doing well, and their revenues were declining. Mr Matsuura asked me to become the president of HEC in the hope that someone younger, with fresh ideas could revitalise and save the businesses. Since my appointment as the president of HEC I took various steps to achieve this (including making business presentations in Japan and Taiwan, and taking active steps regarding the management of HEC). However, the markets in Japan and Taiwan were saturated and very competitive. In view of the drop in revenue, a decision was made to close down the business in around April/May 2020.

90    The amount of loyalty bonus payable by Ascentra for the year 2020 was initially estimated to be more than US$30,000,000. Exhibited at page 318 is a LINE[13] message from Winnie Lo, from around January 2021, which says that the approximate figure (for the loyalty bonus] was $33,854,192.89.

91    On 13 January 2021, the figure was calculated as follows (see management meeting minutes at pages 319 to 324):

    *A: 15% of revenue in final year (2020): $92,696,688.47;*

---

[12] The loans were originally made to IR-P, and later were assigned and assumed by Ascentra.
[13] "LINE" is an instant messaging application.

*B: 10% of highest revenue (2019): $18,241,456.70;*

*C: difference (A-B): Bonus pool: $74,455,231.77;*

*Actual bonus amount: $33,854,193.89 (excluding cancellations and penalties). However, this amount was still to be adjusted.*

92    As Ascentra did not have sufficient funds to pay its loyalty bonus obligation, Mr Matsuura and I agreed in January 2021 that SPGK would provide the necessary funding to HEC, as a loan, for a specific purpose, namely for HEC to pay the loyalty bonus on Ascentra's behalf. The decision was heavily influenced by Mr Matsuura. I did not raise any objection because Mr Matsuura assured me that any sum paid by SPGK on behalf of Ascentra would be treated as a loan and be repayable by HEC (see paragraph 93 below). Indeed any discharge of obligations owed by Ascentra by HEC from funds advanced by SPGK was by way of loan.

93    This has been confirmed by Mr Matsuura throughout the years on various occasions. For example:

(a)    In a LINE chat group message between Mr Matsuura, Ms Nakano and myself, in which we were discussing matters related to an upcoming meeting with Mr Sanders (as referred to in paragraph 72 above), we agreed that the issue of how the loan that was to be repaid by HEC to SPGK should be documented should be raised with Mr Sanders. On 17 July 2019 Mr Matsuura stated, "*Including Winnie, to document that HEC owes the 14M debt of HEC against SPGK*" (translated from Japanese). Mr Matsuura stated that this debt will be written off later in the event that HEC and Ascentra were liquidated or alternatively, repaid to SPGK when Ascentra was in funds, in the sum of US$13.1 million. The relevant messages with English translations are at pages 325 to 328.

(b)    Further down the same LINE chat, on 17 July 2019, Mr Matsuura reiterated that SPGK lent money to HEC, and these companies were not subsidiaries of each other, "*…it is dangerous to associate Ascentra with SPGK. SPGK is now a company providing loans to HEC, and there is no parent-subsidiary relationship between the two*" (at page 327).

(c)     On 28 February 2020, in a LINE chat group between various members including Ms Nakano and Mr Matsuura and me[14], Mr Matsuura again explained the relationship between Ascentra/HEC and SPGK, and the calculation of the Loyalty Bonus:

*"1. Ascentra is a merchandise supplier that distributes products to HEC. There is no equity relationship between Ascentra and SPGK; they are separate companies, and their only connection is that Ascentra distributes products to SPGK.*

*2. Chinese sales are also calculated in total and are borne and paid by Ascentra, considering the loyalty bonus that has been carried on from the past.*

*Chinese sales are not included because RSPs and share bonuses are calculated annually. The unit costs of products purchased from Ascentra in the Chinese market are included, as they are Ascentra's sales."*

(Translated from Japanese)

The relevant messages with English translations are at pages 329 to 336.

(d)     On 23 April 2020, Mr Matsuura provided an explanation of the relationship between SPGK and HEC (and Ascentra) in a LINE chat group message which included me. When explaining the calculation of the loyalty bonus, Mr Matsuura stated that:

*"SPGK is a company that has no relationship with Interush. It is a new and unrelated company, and SPGK is just a customer who buys Ascentra products. SPGK cannot split profits with HEC (Interush) which is an MLM. That would be illegal under Chinese law. The cost of goods purchased from SPGK is included in Ascentra because goods are purchased from Ascentra."*

*"...since the loyalty bonus was promised to be based on revenue, this will be*

---

[14] Participants included various management members of Ascentra including Mr Matsuura, myself, Ms Nakano, Edgar Tam, James Koshimoto, Katsuyuki Tashiro, Koichiro Ando, Risa Chung, KC Wu, Nini Lin and Winnie Lo.

23

*calculated based on the company's excess expenses until the end of the loyalties."*

(Translated from Japanese)

The relevant messages with English translations are at pages 337 to 361.

(e)    On 13 June 2020, in the same LINE group chat referred to in (c) above where I was discussing with Mr Matsuura matters relating to Ascentra's valuation, Mr Matsuura said that he checked with Mr Sanders that, "*Ascentra has a debt of 14 million dollars owed to SPGK a year and a half ago*" (as translated by Ms Nakano on 14 June 2020). The relevant messages with English translations are at pages 362 to 363.

(f)    On 7 October 2020, in the same LINE group chat, Mr Matsuura instructed me and Ms Nakano to ask Mr Sanders to "*generate the actual fund amount from SPGK to HEC so far. It should be about 14M two years ago. We'll have HEC repay as much as possible.*" (as translated by Ms Nakano). It has, therefore, always been Mr Matsuura's position that there was a debt owed by Ascentra to SPGK, and that such debt should be repaid. The relevant messages with English translations are at pages 364 to 365.

(g)    On 3 December 2020, Mr Matsuura emailed Mr Sanders (see pages 366 to 370) and gave instructions regarding the preparation of financial statements for each of Ascentra and SPGK which included:

(i)    The financial statements should be calculated on the basis that there is no financial relationship between Ascentra and SPGK.

(ii)    The amount that SPGK has been covering/paying for HEC should be treated as debt payable. The financial statement should reflect that Ascentra (HEC) received a large loan from SPGK.

94    From my perspective, I considered it to be in SPGK's interest to advance the funds to Ascentra to minimise potential disruption to SPGK's own business. It was not in SPGK's interest for an entity in the Ascentra group of companies to not be able to meet its

liabilities as this could result in that entity no longer being able to supply SPGK with the products and services it required to supply its customers. Further, from my perspective as director of SPGK, I was concerned that if Ascentra couldn't or didn't pay its loyalty bonus this could result in disaffected Affiliates which itself risked adverse publicity or consequences for SPGK's own business.

95    The decision to pay the loyalty bonus from HEC's UOB account in Singapore (with the account number 4519037313 (**HEC Account**)) was made between Mr Matsuura and me but at Mr Matsuura's suggestion. On 7 January 2021, Mr Matsuura gave instructions (in a LINE chat group between himself, me, Ms Nakano and Winnie Lo) on how to pay off the loans owed to himself and Mr Homma using the funds in SPGK International's account with BOTW, and that after paying off the loans the remaining balance in that account was to be transferred to the HEC Account for the purpose of making the loyalty bonus payment:

> *"After repaying to loans to Moto and myself from SPGK BOW, transfer the remaining funds to HEC UOB, and after adding the deficits from elsewhere, let's pay out the loyalty bonus."*

> *(Translated from Japanese)*

Winnie Lo therefore processed the loan repayment and arranged for the HEC Funds to be transferred to HEC on behalf of SPGK for the purpose of payment of the loyalty bonus (in accordance with Mr Matsuura's instructions). The relevant messages with English translations are at pages 371 to 372. At pages 373 to 378 are the board resolutions of Ascentra (signed by Mr Matsuura and me) about these repayments.

96    As described at paragraphs 90 and 91 above, the final bonus payment for 2020 had not been determined in early January 2021 but was expected to be approximately US\$\$33,854,193.89. Pending determination of the final figure but in anticipation of payment of the loyalty bonus, Winnie Lo transferred the HEC Funds.

97    Winnie Lo transferred the HEC Funds to the HEC Account in the following manner:

(a)    On 8 January 2021, US\$5,000,000 was transferred from SPGK International

25

utilising funds derived from SPGK's PRC business (pages 52 to 53);

(b)   On 11 January 2021, US$5,000,000 was transferred from SPGK International utilising funds derived from SPGK's PRC business (pages 54 to 55);

(c)   On 11 January 2021, US$800,000 was transferred from SB utilising funds derived from SPGK's PRC business (pages 56 to 58);

(d)   On 13 January 2021, US$5,000,000 was transferred from SB utilising funds derived from SPGK's PRC business (pages 59 to 61);

(e)   On 14 January 2021, US$5,000,000 was transferred from SB utilising funds derived from SPGK's PRC business (pages 63 to 65); and

(f)   On 20 January 2021, US$5,000,000 was transferred from SB utilising funds derived from SPGK's PRC business (pages 67 to 68).

**Purpose for which HEC Funds transferred failed**

98   After SPGK caused the HEC Funds to be transferred to the HEC Account (as reflected in the management meeting minutes dated 13 January 2021 at pages 319 to 324), there were issues in making payments from the HEC account to the Affiliates' bank accounts in Japan. The meeting minutes reflect that I was speaking to iPayout to see if they could help with remittances. As can be seen from the email chain at pages 142 to 150, HEC had started to reach out to iPayout in October 2020 to provide the necessary KYC documents for HEC Singapore in respect of iPayout in order to make the Loyalty Bonus payments to HEC's affiliates in Japan.

99   I received multiple notifications from the accounting staff regarding the issues in making payments from the HEC account to the Affiliates' bank accounts:

(a)   on 14 January 2021, I received a LINE message from Winnie that UOB was questioning why there were still transactions with HEC while the HEC business had already closed down (page 392);

(b)   on 20 January 2021, due to the difficulties faced with the recipient banks, Winnie

asked me if the Loyalty Bonus could be paid through iPayout. I believed that would be the better option and suggested that I will raise this again in management meetings. See page 393 for the relevant LINE messages;

(c)    on 27 January 2021, Winnie further messaged me to say that regarding the recipient banks so far there was no rejection from the Taiwan banks but the Japan banks always rejected the transactions due to "internal policy" (page 394)- this message chain also shows this was in relation to the loyalty bonus.

100    As a result, I proposed to use iPayout instead of HEC due to the challenges we faced with the recipient banks. It was agreed with my proposal in the meeting, and that the Loyalty Bonus would not be paid from the HEC Account. The team then started to work on making remittances via iPayout. A copy of the relevant email chain is at pages 383 to 391.

101    The Loyalty Bonus was therefore paid using other SPGK funds and through other channels, including through iPayout. For this purpose, in February 2021, HEC and iPayout conducted test payments to some Taiwanese and Japanese customers (see email chain at pages 395 to 403).

102    In addition, Ascentra subsequently decided to reduce the amount of loyalty bonus payable and therefore the actual amount payable for the loyalty bonus was smaller than originally estimated.

103    For the purpose of paying the Loyalty Bonus through iPayout, SB made various transfers to iPayout using the funds it had received from SPGK Singapore, which were SPGK monies:

(a)    On 19 February 2021, SB transferred US$2,000,000 to SPGK International which in turn transferred the sum to iPayout (pages 70 to 71);

(b)    On 15 March 2021, SB transferred US$3,272,147.45 to Dollarsmart Global Pte Ltd, an entity receiving the funds on behalf of iPayout (**Dollarsmart**) (pages 74 to 75);

(c)    On 25 March 2021, SB transferred US$661,404.55 to Dollarsmart (pages 84 to 85); and

(d)    On 9 April 2021, SB transferred US$455,575.35 to Dollarsmart (pages 89 to 90).

27

104    I am advised by the Appellant's attorneys and verily believe that, once the purpose for which the HEC Funds were transferred to the HEC Account failed or was no longer required, HEC came under and remains under an obligation to return the HEC Funds to SPGK. SPGK therefore has a proprietary claim against HEC for and in respect of the HEC Funds. Further or alternatively, SPGK maintains a personal claim against HEC for the restitution of the HEC Funds.

**AlixPartners**

105    SPGK has instructed AlixPartners to review the ledgers to analyse the accounting treatment concerning the HEC Funds. On 15 December 2022 AlixPartners produced a memorandum addressing the relevant accounting treatment (**Alix 2**). A copy of Alix 2 is exhibited at pages 379 to 382. AlixPartners has found that such payments made from SPGK International and SB to HEC were booked as receivable balances due from HEC and Ascentra, to SPGK. This is consistent with SPGK's understanding that the HEC Funds are loans from SPGK to Ascentra.

106    Alix 1 and Alix 2 demonstrate that the above funds held by SPGK International and SB were derived from SPGK's PRC business. The OL has had a copy of Alix 1 since 1 August 2022 and has not disputed any of the contents of Alix 1 or explained how funds generated from sales made by SPGK are beneficially owned by any entity other than SPGK.

**RESPONSE TO OL'S REASONS FOR REJECTION OF PROOF OF DEBT**

**Reason 1: no explanation was provided as to why SPGK would have provided the funds to HEC**

107    The explanation for providing HEC with the funds is set out at above (see paragraph 94 in particular).

108    For completeness I set the key points here.

109    Firstly, after SPGK was established Ascentra's Affiliates were informed that they could sign

28

up with SPGK and that if they did so their previous experience with Ascentra would be taken into account (see paragraph 50 above). Some of SPGK's affiliates/agents therefore retained an interest in Ascentra's loyalty bonus program, and if Ascentra could not discharge its obligations, there was a concern there would be a flow-on impact to SPGK's business if complaints were made. Therefore it was in SPGK's interest to assist Ascentra when it didn't have the funds to meet its obligations to Affiliates, by advancing funds by way of loan to HEC (whose bank account was used for the purpose of making payments to Affiliates as Ascentra did not have a bank account – see paragraph 85 above). This would mitigate the risk of agent backlash and as a director of SPGK I was comfortable with facilitating the Transfers as I expected the funds would be repaid in the future.

110    Secondly, it was not in SPGK's interest for either Ascentra or HEC to not be able to meet its obligations as SPGK relied on Ascentra group entities to provide SPGK with the goods and services it used in its business.  In other words, it would damage SPGK's business if a key supplier exited the supply chain (for example due to being wound up for liquidity issues).

111    Thirdly, Mr Matsuura held a lot of influence in relation to the business dealings and was the driving force behind the proposal to advance the HEC Funds – although I agreed with his approach as I understood it was a loan that would be repaid.

112    In any event, it is not clear to me why a reason needs to be provided as to why a party would advance a loan to another entity or why this is a basis for rejecting the proof of debt and/or a proprietary claim to the funds.

**Reason 2: The transfers were made by SPGK International and Scuderia Bianco not the SPGK Parties**

113    Paragraph 5.2 of the Notice of Rejection of the Proof of debt states:

> "The Transfers were made by SPGK International and Scuderia Bianco, not by the SPGK Parties, and no documents have been produced to support the SPGK Parties' claim that the Transfers were made for or on their behalf."

114    The only available evidence as to the origin of funds in the SB and SPGK International

accounts is contained within Alix 1 and Alix 1 demonstrates that the funds originated from SPGK's business in the PRC. As I have explained above, SB and SPGK International performed no function other than cash management services on behalf of the entities who provided those funds to them.

115    Firstly, in relation to SPGK International, the Alix 1 provides:

(a)    That between 1 January 2019 and 31 May 2021, SPGK International received total incoming funds of approximately USD $381million. The breakdown of the funds received is:[15]

   i.    Planet Payment - $230 million;

   ii.    SPGK Singapore - $145 million;

   iii.    SPGK LLC - $6.2 million; and

   iv.    $60k interest income.

This data clearly shows that all of SPGK International's funds (except for the minor amount of $60k of interest income) came from an SPGK group source (Planet Payment received its funds from SPGK's PRC sales). It follows that the funds held by SPGK International were SPGK's funds.

(b)    SPGK International did not have sufficient funds to meet its outflow payments and SPGK Singapore provided the amount ($145 million) to cover the funding shortfall.[16] This data shows that an SPGK entity provided funding to allow SPGK International to meet its obligations for outgoing payments.

(c)    During the period June 2019 to January 2021 SPGK International paid USD $21 million to HEC entities.

116    The relevance of this information (and the entire Alix 1) is that it supports the evidence outlined in this affidavit above that:

---

[15] Alix 1 at 3.10.
[16] Alix 1 at 3.11.

(a)     SPGK derived revenue in the PRC which Planet Payment processed;

(b)     From about January 2019, the revenues processed by Planet Payment were diverted to SPGK International;

(c)     The funds held by SPGK International were held on behalf of the SPGK group – since all funds except the interest income came from SPGK sources;

(d)     SPGK International used some of the funds belonging to SPGK (provided by SPGK Singapore) to make payments to HEC.

117     Secondly, in relation to SB, Alix 1 states:

> "Between 10 September 2019 and 31 December 2021, SB received total incoming funds of approximately USD 379m, including USD 374m from SPGK Singapore and USD 5m from BlackTower Financial Management. SB appears to have been a passthrough vehicle that received approximately USD 374m from SPGK Singapore, from which it made outflow payments to various parties."

This evidences that SB was a cash management vehicle and approximately 99% of its funds were derived from the SPGK Group.

118     Due to the lack of available records to clearly trace the origin of the HEC Funds, I have sought expert accounting evidence to substantiate SPGK's various claims to the funds it has derived. Whilst Alix 1 was prepared for the purpose of the BOTW Funds Proceedings, it contains highly relevant information to this appeal. I have also obtained Alix 2 to specifically analyse the accounting treatment of the HEC Funds.

119     All available evidence shows that the funds were generated by SPGK. There is no explanation from the OL as to why SPGK is not, despite generating these sums from sales, the beneficial owner of these funds. The role of SB and SPGK International in relation to SPGK has been set out in this affidavit and clearly establishes these to be cash management entities, largely albeit not exclusively dealing with SPGK funds.

120     In summary my evidence shows that practically all of SPGK International and SB's funds during the relevant period came from SPGK entities and was therefore SPGK's property

31

(as these were cash management vehicles). The HEC Funds were then transferred to HEC from those sources by way of loan for the specific purpose of paying the loyalty bonus payments, as explained above, and which SPGK expected to be used for that purpose and to be repaid.

**Summary of evidence**

121    As set out in preceding paragraphs of this affidavit and in Alix 1 and Alix 2:

(a)    SPGK provided funding to Ascentra entities through SB and SPGK International to assist it to meet its liabilities. SPGK recorded these payments in its books as "trade receivables", "due from AHI" or "due from affiliated companies" which clearly show the nature of the payment was a loan which was expected to be repaid[17] — (see paragraph 105 above);

(b)    Alix 2[18] shows the transfer of the HEC Funds (described at paragraph 96 above) were booked as receivable balances due from HEC and Ascentra (to SPGK) — consistent with SPGK's understanding that the HEC Funds are loans from SPGK to Ascentra (paragraph 105 above);

(c)    The LINE chat records involving Mr Matsuura described above demonstrate that it was his position that SPGK had loaned monies to HEC for the specified purpose of enabling HEC to discharge an obligation of Ascentra (i.e., the loyalty bonus payment) and it was expected that the loans would be repaid.

(d)    Given:

(i)    Alix 1 and Alix 2 clearly show the HEC funds flowed from Planet Payment (sourced from SPGK's business in the PRC) then ended up in the HEC Account via SPGK International and SB; and

(ii)    the fact that the position of key parties (including Mr Matsuura and myself)

---

[17] See also 2.10 – 2.11 of Alix 2 which evidences that accounting for the funds in this manner shows a general expectation that the money transferred to HEC would be repaid.
[18] See section 2 (and specifically 2.9).

32

was that funds sourced from SPGK paid to HEC were loans (with the exception of payments to Vendors),

it is apparent that the HEC Funds were loans to HEC for a specified purpose and HEC is liable to repay these.

(e)   The email from Mr Matsuura of 7 January 2021 (just one day before the first payment of HEC Funds), is contemporaneous evidence that funds in SPGK accounts (the precise account did not appear to be a concern) would be used to cover the loyalty bonus.

122   At paragraph 5.2.3 of the Notice of Rejection the OL states:

*"By filing the Proof of Debt on behalf of SPGK "and/or" SPGK Singapore, the SPGK Parties impliedly concede that they themselves are unsure as to whether the Funds which are the subject of the Transfers were paid by or on behalf of SPGK or SPGK Singapore."*

123   SPGK is the entity ultimately entitled to the HEC Funds.

124   SPGK Singapore was incorporated to perform the functions as described in paragraph 71 above (i.e., to operate a bank account in Singapore and perform cash management services etc). It made payments to Vendors for the purchase of products on behalf of SPGK and received proceeds from sales made by SPGK on its behalf. SPGK Singapore is essentially a conduit for SPGK and thus any funds that flowed through SPGK Singapore were SPGK's property. As a director of SPKG Singapore (and there being only one other nominee director) I acknowledge on behalf of SPGK Singapore that it has no ownership entitlement to the HEC Funds. SPGK Singapore was named in the Proof of Debt as it had physically paid funds to SPGK International (as set out at paragraph 115 above, Alix 1 shows $145 million was transferred from SPGK Singapore to SPGK International between 1 January 2019 and 31 May 2021 and this covered the Ascentra group's shortfall in its outflow payments).

**Reason 3: Prior to the liquidation Mr Yoshida used the funds in the Company's UOB account to make payments unrelated to the Loyalty Bonus**

33

125    I do not believe that the OL is correct in his assertion, to my knowledge all transfers and payments made from the HEC Account from 18 January 2021 up to the appointment of the OLs were made by Ms Nakano, who was the person in possession of the HEC Account banking device at that time. I was not responsible for the payments. I only got the HEC Account banking device in around May 2021. The only transfer I made was the transfer of a sum of US$528,978.30 on 18 October 2021 to MelsArt as per the request of the OL.

**Reason 4: Mr Yoshida sent a letter dated 23 February 2021 to Mr Sanders confirming that sums held by SPGK International were held for the benefit of Ascentra**

126    At paragraph 5.4 of the Notice of Rejection the OL states:

*"Mr Yoshida sent a letter dated 23 February 2021 to Theodore Sanders ("**Mr Sanders**") (who was (and remains) the sole shareholder and director of SPGK International) confirming that sums held by SPGK International were held for the benefit of Ascentra."*

127    The evidence in my First Affidavit in the BOTW Funds proceedings was that at the material times I understood SPGK International was holding the funds in the BOTW Account on behalf of SPGK and that such sums would be returned to SPGK. I have never accepted or agreed that the funds were held for the benefit of Ascentra, and I do not consider the letter of 23 February 2021 could reasonably be interpreted that way.

128    In any event, I do not consider that the "sums" held as at 23 February 2021 by SPGK International to be relevant to the proof of debt or to be a valid reason for its rejection. This is because by 23 February 2021, $10 million of the HEC Funds had already been transferred out of SPGK International to the HEC Account. Any funds in SPGK International's account following the transfer dates (8 and 11 January 2021) may be relevant to a wider dispute between the parties but should not impact the Proof of Debt. The letter of 23 February 2021 did not say that all sums ever held by SPGK International were for the benefit of Ascentra.

**Reason 5: The OL's enquiries support the conclusion that the monies transferred by SPGK International were (ultimately) transferred on behalf of Ascentra**

129    SPGK and its attorneys are not privy to what enquiries the OL's have made, nor the outcome of those enquiries that support the conclusion that the monies transferred by SPGK International were (ultimately) transferred on behalf of Ascentra. Nor have they been provided with any documentary or other evidence which might serve to explain HEC's entitlement to retain the HEC Funds in the face of the claim made to the HEC Funds by SPGK. This reason for rejecting the proof of debt is therefore vague and therefore I am unable to meaningfully rebut the assertion without details of the enquiries he has conducted. On the contrary, all evidence available to me and indeed my personal view as director of SPGK is that the transfers made by SPGK to HEC were transfers of funds beneficially owned by SPGK and that the transfers were made on SPGKs behalf. The OL has not provided me with a reason for rejecting this evidence or conclusion.

**Reason 6: Mr Yoshida agreed with Mr Robinson that he would transfer the money held in the Company's UOB account to HEC's liquidation account**

130    The OL and previously the Voluntary Liquidator (**VL**) asserted on several occasions that my agreement to transfer the funds to HEC's liquidation account meant that I considered the funds to "belong" to HEC.[19] I have never stated or expressed that the HEC Funds belong to HEC. I do not have a detailed understanding of insolvency law or procedure and at the time the VL made the request, the SPGK Parties had not taken any legal advice concerning the HEC Funds and I was simply trying to cooperate with a formal request (and I was not aware if there would be any repercussions if I refused the request). I did not consider that complying with the request meant I was relinquishing (on SPGK's behalf) its entitlement to the HEC Funds.

131    When I retained Harneys on behalf of SPGK and SPGK Singapore and explained the SPGK Parties' position, they wrote to the VL care of his attorneys and explained SPGK's position as regards the source and ownership of the HEC Funds. I do not consider that this reason provides any substantial basis for denying SPGK's entitlement to the HEC Funds.

132    In any event an agreement to transfer funds to the liquidation account did not determine

---

[19] Please see letters from Campbells to Harneys dated 27 July 2021 at pages 425 to 428, 20 August 2021 pages 429 to 440, 25 February 2022 pages 441 to 443, 29 August 2022 pages 412 to 413, 11 November 2022 pages 421 to 424.

35

the ownership of those funds or defeat any personal or proprietary claim SPGK had.

**FURTHER GROUNDS OF APPEAL**

133    In addition to my responses to the specific reasons advanced by the OL for the rejection of the Proof of Debt and the Decision, SPGK has the following additional grounds:

(a)    The OLs decision was made prematurely; and

(b)    There is additional evidence to support SPGK's proprietary and/or personal claim.

134    The OL has been on notice since at least 18 June 2021 (see letter at pages 404 to 406) that it is SPGK's position that SPGK is not a part of the Ascentra group of companies.

135    The OL has also been on notice since at least 22 July 2021 (see letter at pages 22 to 24) that the purpose of the transfer of the HEC Funds was to discharge a liability owed by Ascentra to HEC Singapore's affiliates.

136    On 29 September 2021, HEC went into voluntary liquidation and Graham Robinson was appointed as VL.

137    On 13 October 2021, the VL requested that the signatory authority in respect of HEC's bank accounts be transferred to the VL.

138    The VL subsequently was given control of the bank accounts of HEC and on 10 February 2022, Harneys on behalf of SPGK wrote to Campbells (attorneys for the VL) stating (see pages 407 to 409):

> "... the JOLs [of Ascentra] and Mr Robinson are aware that SPGK/SPGK Singapore assert claims to [the HEC Funds]...
>
> Since these funds, to which SPGK/SPGK Singapore assert proprietary claims, are within the control of the JOLs and Mr Robinson, our client considers Mr Robinson and the JOLs to be constructive trustees for and liable to account to SPGK/SPGK Singapore if they choose to deal with these funds in the absence of a court order."

139    On 22 July 2022 Harneys wrote to Campbells stating (see pages 410 to 411):

> "Given that the UOB Funds originated from the revenues generated from SPGK's business in the PRC and collected by Planet Payment, the prima facie position must be that those funds (including the UOB [HEC] Funds) belong to SPGK and/or SPGK Singapore.

> As stated in our letters of 22 and 29 July 2021, the UOB Funds were transferred back to SPGK/SPGK Singapore as the beneficial owners. They were not and as such SPGK/SPGK Singapore has a proprietary claim over the UOB Funds which should properly be held by the OL on trust for SPGK/SPGK Singapore.

> ....

> Without prejudice to our positions as set out above (particularly in relation to SPGK/SPGK Singapore's proprietary claim to the UOB Funds), we enclose herewith as requested a proof of debt submitted by SPGK/SPGK Singapore in relation to their proprietary claim over the UOB Funds. To avoid unnecessary time and costs, we request the OL's confirmation that he will without adjudicating on the proof of debt submitted pending the parties' discussion on the most appropriate venue to resolve the proprietary claim.

> Since it is not seriously disputed that SPGK/SPGK Singapore appears to be the main creditor of HEC, withholding the adjudication of the proof of debt should not cause any prejudice to the liquidation of HEC."

140    Attached to this letter was the proof of debt.

141    On 29 August 2022, the OL formally rejected SPGK/SPGK Singapore's proprietary claim to the HEC Funds (see pages 412 to 413).

142    On 27 September 2022, by letter from Campbells the OL requested further documentation by 11 October 2022 in support of the proof of debt (see pages 414 to 415).

143    On 6 October 2022, Harneys responded to Campbells' letter stating (see page 416):

> "We are in the process of taking instructions from our clients regarding the matters raised in your letter of 27 September 2022, however we are unlikely to be

37

> in a position to provide a substantive response by the deadline set. Given this, we request that our client be provided until the end of October to respond and that before this time the OL does not:
>
> a) Deal with the UOB Funds in HEC's liquidation, in respect of which a proprietary claim is maintained by our client; or
>
> b) Proceed to adjudicate our clients' proof of debt.
>
> Please confirm whether your client is agreeable to the extension sought."

144    On 10 October 2022, Campbells wrote to Harneys agreeing to an extension until 18 October 2022 to provide the information (see pages 417 to 418).

145    On 18 October 2022, Harneys responded stating the deadline was unrealistic in the circumstances and requesting the OL to reconsider the timeframe provided (see pages 419 to 420). Harneys requested that the OL refrain from adjudicating on the proof of debt until it had supplied the requested information.

146    On 11 November 2022 the OL rejected the proof of debt (see pages 421 to 424). The OL stated in his notice of rejection that he is not satisfied that the SPGK Parties are creditors of the Company in respect of the Funds.

147    It has been a significant exercise preparing this affidavit, reviewing the historical data, collating records and engaging AlixPartners. Allowing the further time requested would not have prejudiced the OL and may have avoided the need for an appeal.

148    Based on the above, the Decision is premature. It was appropriate to allow the SPGK Parties more time to provide further evidence. SPGK has now adduced additional documentary evidence in support of the Proof of Debt and its claim.

**FURTHER DIRECTIONS FOR THE APPEAL**

149    It may be necessary for the proper determination of all the issues surrounding the HEC Funds for the Court to give further directions on the conduct of this appeal.

150    In any event, I am advised that the directions sought in the summons dated 16 December 2022, in respect of which this Affidavit is filed and served are an appropriate procedural basis upon which the appeal against the rejection of the proof of debt may be progressed.

**CONCLUSION**

151    In the circumstances, I respectfully request that the Court allows the appeal as sought by the Appellant in the Summons. In order for the appeal to be properly determined, I also invite the Court to give the directions requested in the Summons for the further conduct of the appeal.

SWORN by the within named                    )
Ryunosuke Yoshida this 19 day of December    )
2022                                         )
at                                           )
                                             )
                                                    _____
                                                    Ryunosuke Yoshida

BEFORE ME:

_____
A COMMISSIONER TO ADMINISTER OATHS/NOTARY PUBLIC



My appointment a notary does not expire
Noguchi Mikio

39