# Exhibit 5



IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

FSD NO. 318 OF 2021 (DDJ)

IN THE MATTER OF THE COMPANIES ACT (2023 REVISION)
AND IN THE MATTER OF HEC INTERNATIONAL, LTD (IN OFFICIAL LIQUIDATION)

| | |
|---|---|
| **Appearances:** | Mr Stephen Atherton KC of Counsel, Mr Andrew Johnstone, Ms Jessica Williams, Ms Caitlin Murdock and Ms Sarah Sussman for Shang Peng Gao Ke Inc SEZC |
| | Ms Blair Leahy KC, Mr Guy Cowan, Ms Nienke Lillington and Ms Katie Logan for the official liquidator of HEC International Ltd |
| **Before:** | The Hon. Justice David Doyle |
| **Heard:** | 23 June 2023 |
| **Draft Judgment Circulated:** | 5 July 2023 |
| **Judgment delivered:** | 10 July 2023 |

## HEADNOTE

*Consideration of an issue in respect of an appeal against a decision on a proof of debt and whether a Quistclose trust claim should be permitted to proceed in the liquidation or separately or not at all*

## JUDGMENT

### Introduction

1. By consent order made on 20 March 2023 it was ordered that paragraph 2(a) of the Summons of Shang Peng Gao Ke Inc SEZC a company incorporated under the laws of the Cayman Islands ("SPGK") dated 16 December 2022 (the "Summons") be determined as a standalone issue.

2. SPGK is appealing against the rejection of SPGK's proof of debt lodged on and dated 22 July 2022 (the "Appeal"). It seeks in the Summons an order in paragraph 1(a) that the rejection of SPGK's proof of debt by notice dated 11 November 2022 be set aside and in paragraph 1(b) that SPGK's claim be reinstated and admitted to proof in the liquidation of HEC International Ltd (in Official Liquidation) (the "Company") in the sum of US$25,800,000.00.

3. Paragraph 2 (a) of the Summons reads as follows:

   "2   It be directed that:
   
   (a)   The issue of whether or not the Appellant's claim is proprietary in nature:
   
   (i)   Be determined as part of the Appeal; alternatively,
   
   (ii)  The Appellant be granted permission (pursuant to s.97 of the Companies Act (2022 Revision)) to pursue such determination as against the Company in separate proceedings with liberty to apply to have such proceedings conjoined with and to be heard together with the Appeal."

4. The time estimate for the hearing of the Appeal is 5 days.

5. SPGK's proprietary claim has come before the court in a somewhat unusual way. If it had a proprietary claim the orthodox way would be to seek leave pursuant to section 97 (1) of the

*230710 In the matter of HEC International, Ltd (in Official Liquidation) – Judgment – FSD 318 of 2021 (DDJ)*

Page 2 of 18

       Companies Act ("section 97") to commence substantive proceedings to seek to confirm its existence and to enforce it. Instead it appears to have raised it in the context of a proof of debt as a purported creditor. If it has justifiable proprietary claims it is not as an alleged creditor but claims as an alleged beneficial owner of property held by the Company. The parties by their joint written submissions dated 10 March 2023 nevertheless persuaded me that I should devote some scarce court time to deal with the issue that had been raised in this unusual way. I will therefore, albeit with some reluctance, deal with the issue as raised in the present context.

6.     It is SPGK's position that the sum of US$ 23.6 million (the "HEC Funds") is beneficially owned by SPGK. SPGK says that in a 13-day period during January 2021, monies that were beneficially owned by SPGK, were transferred to a bank account (in the name of the Singapore branch office of HEC International, Ltd (the "Company" or "HEC"),) with United Overseas Bank ("UOB") in Singapore (the "HEC Account"). Such sum was subsequently transferred to the Company's liquidation account by the official liquidator.

7.     SPGK says that US$25.8 million was transferred to the HEC Account for the specific purpose of enabling the Company, on behalf of Ascentra Holdings Inc ("Ascentra"), to discharge a liability owed by Ascentra to HEC Singapore's affiliates (undefined in Mr Atherton's skeleton argument). However, that liability, says SPGK, was subsequently discharged from another source of funds. SPGK says having not been used for the purpose for which the monies were transferred to the HEC Account, the Company is now obliged to return the HEC Funds to SPGK. SPGK is in effect asserting a proprietary claim to the HEC Funds.

8.     SPGK refers to Ascentra in December 2014 implementing what became known as a Loyalty Bonus Program. The amount of loyalty bonus payable by Ascentra to eligible affiliates for the year 2020 was initially estimated to be more than US$30,000,000. As Ascentra did not have sufficient funds to honour that liability, Mr Yoshida (stated to be the sole director and sole ultimate beneficial shareholder of SPGK) decided that SPGK would provide the necessary funding to HEC, by way of a loan, for the specific purpose of paying the loyalty bonus on Ascentra's behalf.

9.     SPGK says that on 7 January 2021 Mr Matsuura gave instructions (to which it is said Mr Yoshida was fully aware and agreed to) to transfer US$25.8 million (which is said represented the proceeds of SPGK's business operations in the PRC) to HEC for the purpose of enabling Ascentra to make

10. payment in respect of the loyalty bonus. The transfers were made on 8, 11, 13, 14 and 20 January 2021.

10. SPGK says that after it caused the US$25.8 million to be transferred to the HEC Account issues arose in relation to the making of payments of the loyalty bonus from the HEC Account to the relevant affiliates' bank accounts in Japan. As a result, the US$25.8 million transferred to the HEC Account was not used to pay the loyalty bonus and the relevant liabilities were ultimately paid using other SPGK funds from other sources and through other channels.

11. The Liquidator has launched a powerful attack against the existence of a *Quistclose* trust stressing that in law the mere fact that the payer has paid the money to the recipient to use it in a particular way is not of itself enough (paragraph 17 Norris J in *Bieber v Teathers* [2012] EWHC 190 (Ch)). I note the Board's warning in *Prickly Bay* [2022] 1 WLR 2087 at 29 that there is no substitute for the judgment of Lord Millett in *Twinsectra* [2002] 2 AC 164 – there is a risk that summarised statements lose the subtlety of the original text. I have revisited Lord Millett's judgment and in the interests of brevity do not set out large chunky quotes from it here but have full regard to it. Some relatively short extracts should suffice for present purposes. Lord Millett summarises the position in refreshingly simple terms at paragraph 68:

> "Money advanced by loan normally becomes the property of the borrower. He is free to apply the money as he chooses, and save to the extent to which he may have taken security for repayment the lender takes the risk of the borrower's insolvency. But it is well established that a loan to a borrower for a specific purpose where the borrower is not free to apply the money for any other purpose gives rise to fiduciary obligations on the part of the borrower which a court of equity will enforce …"

And at paragraph 73:

> "A *Quistclose* trust does not necessarily arise merely because money is paid for a particular purpose …"

And at paragraph 74:

> "The question in every case is whether the parties intended the money to be at the free disposal of the recipient …"

12. The Liquidator says that, on the authorities, it must be clear from the express terms of the transaction (properly construed) or must be objectively ascertained from the circumstances of the transaction that the mutual intention of the payer and recipient (and the essence of their bargain) is that the funds transferred should not be part of the general assets of the recipient but should be used exclusively to effect particular identified payments.

13. The Liquidator for the purposes of the hearing proceeds on the hypothesis that the SPGK monies were the source of payments and that the payments were loans from SPGK to HEC (or Ascentra).

14. Nevertheless, the Liquidator raises powerful points against the existence of a *Quistclose* trust including:

    (1) there is no documentation which shows the terms and/or basis on which (a) the payments were made; and (b) the payments were to be returned to SPGK;

    (2) the only inference that can be drawn from the entries in respect of the payments on the various banking documents provided by SPGK is that the funds transferred from SPGK International and Scuderia Bianco were at HEC's/HEC Singapore's free disposal;

    (3) the UOB Funds were not segregated, but rather were comingled with pre-existing funds in HEC Singapore's UOB Accounts: the statements for the UOB Accounts show that over US$500k was already in the UOB Accounts at the time of the first transfer from SPGK International on 8 January 2021;

    (4) it is quite clear that Mr Yoshida, the controlling mind of SPGK and sole director of HEC, did not consider that the transferred funds were held on trust for SPGK (for example see paragraph 75 (4) a – c of the Liquidator's skeleton argument);

    (5) SPGK and SPGK Singapore were themselves unable to identify the alleged beneficiary of the UOB Funds, as the claim articulated in correspondence and in the proof of debt was made on behalf of SPGK and SPGK Singapore on an "and/or" basis.

*230710 In the matter of HEC International, Ltd (in Official Liquidation) – Judgment – FSD 318 of 2021 (DDJ)*

15. The Liquidator says that there is no evidence of any intention to create a trust and this is fatal to SPGK's *Quistclose* trust case.

16. The Liquidator adds that there are numerous other difficulties with SPGK's case. For example there is no credible evidence that the payments were made as loans for the alleged purpose of making loyalty bonus payments. Mr Yoshida has failed to give a credible explanation for why the loyalty payments which were thought to be in excess of US$25m and which he claims he tried to pay were reduced months later to just over US$7m.

17. The Liquidator says that overall, the evidence that has so far been presented is so lacking or inconsistent with SPGK's case that on any view, SPGK's case does not meet the threshold test.

18. Moreover, the Liquidator's position is that there is no credible evidence that SPGK's monies were the source of the payments but he is prepared for the purposes of this aspect of the case to proceed on the hypothesis that they were. The Liquidator at paragraph 79 (1) to (7) of his skeleton argument gives some of the reasons why SPGK's case that its monies were the source of the payments lacks substance.

19. The Liquidator adds that SPGK International's accounts were consolidated with those of Ascentra and were treated as Ascentra's assets (and not SPGK's assets).

**Determination**

20. I now turn to my determination of the main issues presently before the court.

*Is leave required?*

21. With all the engaging forensic skill he could muster Mr Atherton maintained that his client did not need leave pursuant to section 97. He referred to *Re Exchange Securities & Commodities Ltd* [1983] BCLC 186 and *Re BCCI (No 4)* [1994] 1 BCLC 419 and in effect submitted that the court did not need to grant leave and the court should simply permit the proprietary claim to be conveniently decided in the course of the winding up via the appeal rather than by way of separate action. It appears in *Re Exchange Securities & Commodities* the liquidator was, presumably

*230710 In the matter of HEC International, Ltd (in Official Liquidation) – Judgment – FSD 318 of 2021 (DDJ)*

Page 6 of 18

because he was satisfied that there were genuinely arguable claims, content to take a neutral stance. In *BCCI* Jonathan Parker J dealt with arguments based on *Re Exchange Securities & Commodities Ltd* and stated at page 426:

> "Mr Millett relies on that authority as indicating that the court is concerned on an application under s130 to conduct some investigation into the merits of the claim and he points to specific passages in the judgment which I have read as supporting that contention. For my part, however, it does not appear to me that Mervyn Davies J was undertaking any such investigation. It appears to me that the learned judge on that occasion was doing no more than acknowledging that if, on the face of the matter as it appeared to the court, there was no claim or no claim worth entertaining, then plainly the application could not proceed because to grant leave in such circumstances would be a complete waste of time and expense to all concerned. But I do not take the learned judge to have gone any further than that. Indeed, it does seem to me from the way in which the learned judge expressed himself that he regarded the question to be decided on a s 130 application as essentially whether the proposed claim should more appropriately be pursued in separate proceedings or in the course of the winding up and, as the learned judge approached the matter in that case as I see it, that was the issue to which he was directing his attention. Of course if, as I have said, on the face of the matter there was no arguable claim then, indeed, that would have been the end of it. But I do not read that authority as supporting the contention that, on the hearing of an application under s 130 the court *must* – and I emphasise *must* – conduct some investigation into the merits of the allegations which are sought to be put forward."

22. The point is somewhat academic as in my judgment whether the court allows a claim to proceed and be dealt with "in the course of the winding up" or grants leave for separate substantive legal proceedings to be commenced it must first be satisfied, at the very least, that there is an arguable claim. It is to that question that I now turn.

*The required threshold*

23. The required threshold has been well covered in the judgment of Parker J in *Re the Wimbledon Fund spc (in Official Liquidation)* (FSD unreported judgment 7 January 2019). Is there a genuinely arguable case? Is there a serious/substantial/real issue to be tried? A serious issue to be tried means

*230710 In the matter of HEC International, Ltd (in Official Liquidation) – Judgment – FSD 318 of 2021 (DDJ)*

that there has to be a real as opposed to a fanciful prospect of such on the claim. This is the same as the test for summary judgment. A realistic claim is one that carries some degree of conviction. This means that it must be more than merely arguable. In reaching its conclusion the court must not conduct a mini-trial. As has been emphasised in the cases (see for example paragraph 15 of *King v Stiefel* [2021] EWHC 1045 (Comm)) this does not mean that the court must take at face value and without analysis everything which a claimant says in his statements before the court. In some cases it may be clear that there is no real substance in factual assertions made, particularly if contradicted by contemporaneous documents, or I would add not supported by contemporaneous documents. I bear all these points firmly in mind when considering Mr Yoshida's unsupported self-serving generalised statements (especially those at paragraph 92 of his second affidavit).

24.  Mr Atherton, relying on a number of authorities specified at footnote 27 on page 9 of his skeleton argument dated 16 June 2023, stresses that where what the applicant is claiming from the company is in reality no more than its own property, leave to proceed should be granted as a matter of course. That assumes, of course, that there is a genuinely arguable claim and it is to that issue that I now turn.

*Has SPGK met the required threshold?*

25.  SPGK's proprietary claim did not get off to a good start. The monies were not paid into a segregated account. The evidence reveals that the account into which the monies were paid already had US$500,000 in it. Things do not get any better for SPGK as the bank statements show significant sums being paid out not for loyalty bonuses and other sums being paid in over and above the monies Mr Yoshida said were exclusively for loyalty payments.

26.  As Lady Arden (delivering the judgment of the Board) said in *Prickly Bay Waterside Ltd v British American Insurance Company Ltd* [2022] 1 WLR 2087 at paragraph 42 under a *Quistclose* trust the subject matter of the trust will normally be segregated from other assets of the recipient. The Board recognised however "that segregation is not always required but it is conspicuous by its absence. The absence of a provision for segregation is a powerful factor which indicates there is no *Quistclose* trust." I also note Mr Atherton's reliance on *Kingate Global Fund Ltd v Knightsbridge (USD) Fund Limited* [2009] Bda LR 59 (Court of Appeal of Bermuda).

27. The evidence in the case before me does not go anywhere near establishing that there was an express requirement upon HEC that it should keep the monies it received from SPGK separate from its other funds. Indeed the evidence clearly shows that the monies were at the free disposal of HEC. The bank statements reveal many occasions when there were payments out of the account not for loyalty bonus purposes.

28. It is plain in this case that the monies were not subject to a *Quistclose* trust.

29. The evidence does not present an arguable case on the terms and circumstances of the payments of the monies that the intention of the parties supported the creation of a *Quistclose* trust. Lady Arden at paragraph 37 in *Prickly Bay* states in effect that the court can take into account events and documents which postdate the date on which the *Quistclose* trust was said to be created:

    "On the other hand, the court may decide that little weight should be given to such matters. As indicated by Webster JA (Ag), little if any weight can be given to what parties say was the nature of the transaction at a subsequent point in time."

30. Briggs LJ (as he then was) in *Bellis v Challinor* [2015] EWCA Civ 59 referred to *Barclays Bank v Quistclose Investments Ltd* [1970] AC 567 and the authoritative analysis of Lord Millett in *Twinsectra v Yardly* [2002] 2 AC 164 and stated:

    "57. There must be an intention to create a trust on the part of the transferor. This is an objective question. It means that the transferor must have intended to enter into arrangements which, viewed objectively, have the effect in law of creating a trust: see *Twinsectra* at paragraph 71.

    58. In this respect, *Quistclose*-type trusts are no different from any other trusts. In particular, they are not presumed to exist unless a contrary intention be proved, as in the case of the traditional type of resulting trust where a person makes a gratuitous transfer of property to an apparent stranger.

*230710 In the matter of HEC International, Ltd (in Official Liquidation) – Judgment – FSD 318 of 2021 (DDJ)*

Page 9 of 18

**FSD2021-0318**   **Page 9 of 18**   **2023-07-10**

59. A person creates a trust by his words or conduct, not by his innermost thoughts. His subjective intentions are, as Lord Millett said, irrelevant. In the *Twinsectra* case, a *Quistclose* trust was established despite the transferor having no subjective intention to create a trust. But the objectivity principle works both ways. A person who does subjectively intend to create a trust may fail to do so if his words and conduct, viewed objectively, fall short of what is required. As with the interpretation of contracts, this process of interpretation is often called the ascertainment of objective intention. In the contractual context the court is looking for the objective common intention, whereas in the trust context the search is for the objective intention of the alleged settlor.

60. Usually, the question whether the essential restrictions upon the transferee's use of the property have been imposed (so as to create a trust) turns upon the true construction of the words used by the transferor. But where, as in *Twinsectra* and indeed the present case, the transferor says or writes nothing but responds to an invitation to transfer the property on terms, then it is the true construction of the invitation which is likely to be decisive."

31. Patten LJ in *Raymond Bieber & others v Teathers Limited (in liquidation)* [2012] EWCA Civ 1466 stated:

"13. It is convenient at this stage to summarise the necessary conditions for the imposition of a *Quistclose* type trust of the kind alleged. The name is of course derived from the decision of the House of Lords in *Barclays Bank Ltd v Quistclose Investments* [1970] AC 567 where a company in serious financial difficulties negotiated a loan from Barclays of some £209,000 in order to meet an ordinary share dividend. The payment of the dividend was a pre-requisite to the company obtaining a much larger loan from another third party. The bank agreed to provide the dividend loan on the express terms (imposed in a letter from the bank) that the money should only be used to meet the dividend due. The bank credited a specific dividend account with the amount of the loan but, before the dividend was paid, the company was placed into voluntary liquidation. The bank sought repayment

of the money in the account on the basis that it had been held on a trust which had failed and was, as a consequence, now held on a resulting trust in the bank's favour. The House of Lords (applying a number of earlier authorities) held that money advanced for a specific purpose (such as the payment of a particular debt) was impressed with a trust for that purpose and did not become part of the debtor's estate. The trust continued to subsist until the monies had been applied in accordance with the purpose for which they were lent.

14. These principles were reviewed by the House of Lords in *Twinsectra Ltd v Yardley* [2002] AC 164 and the judge directed himself in accordance with the following summary of the law:

"16. First the question in every case is whether the payer and the recipient intended that the money passing between them was to be at the free disposal of the recipient: Re Goldcorp Exchange [1995] 1 AC 74 and Twinsectra at 74.

17. Second, the mere fact that the payer has paid the money to the recipient for the recipient to use it in a particular way is not of itself enough. The recipient may have represented or warranted that he intends to use it in a particular way or have promised to use it in a particular way. Such an arrangement would give rise to personal obligations but would not of itself necessarily create fiduciary obligations or a trust: *Twinsectra* at [73].

18. So, thirdly, it must be clear from the express terms of the transaction (properly construed) or must be objectively ascertained from the circumstances of the transaction that the mutual intention of payer and recipient (and the essence of their bargain) is that the funds transferred should not be part of the general assets of the recipient but should be used *exclusively* to effect particular identified payments, so that if the money cannot be so used then it is to be returned to the payer: Toovey v Milne (1819) 2 B&A 683 and Quistclose Investments at 580B.

*230710 In the matter of HEC International, Ltd (in Official Liquidation) – Judgment – FSD 318 of 2021 (DDJ)*

Page 11 of 18

19. Fourth, the mechanism by which this is achieved is a trust giving rise to fiduciary obligations on the part of the recipient which a court of equity will enforce: Twinsectra at [69]. Equity intervenes because it is unconscionable for the recipient to obtain money on terms as to its application and then to disregard the terms on which he received it from a payer who had placed trust and confidence in the recipient to ensure the proper application of the money paid: Twinsectra at [76].

20. Fifth, such a trust is akin to a "retention of title" clause, enabling the recipient to have recourse to the payer's money for the particular purpose specified but without entrenching on the payer's property rights more than necessary to enable the purpose to be achieved. It is not as such a "purpose" trust of which the recipient is a trustee, the beneficial interest in the money reverting to the payer if the purpose is incapable of achievement. It is a resulting trust in favour of the payer with a mandate granted to the recipient to apply the money paid for the purpose stated. The key feature of the arrangement is that the recipient is precluded from misapplying the money paid to him. The recipient has no beneficial interest in the money: generally the beneficial interest remains vested in the payer subject only to the recipient's power to apply the money in accordance with the stated purpose. If the stated purpose cannot be achieved then the mandate ceases to be effective, the recipient simply holds the money paid on resulting trust for the payer, and the recipient must repay it: Twinsectra at [81], [87], [92] and [100].

21. Sixth, the subjective intentions of payer and recipient as to the creation of a trust are irrelevant. If the properly construed terms upon which (or the objectively ascertained circumstances in which) payer and recipient enter into an arrangement have the effect of creating a trust, then it is not necessary that either payer or recipient should intend to create a trust: it is sufficient that they intend to enter into the relevant arrangement: Twinsectra at [71].

22. Seventh, the particular purpose must be specified in terms which enable a court to say whether a given application of the money does or does not fall within its terms; Twinsectra at [16].

23. It is in my judgment implicit in the doctrine so described in the authorities that the specified purpose is fulfilled by and at the time of the application of the money. The payer, the recipient and the ultimate beneficiary of the payment (that is, the person who benefits from the application by the recipient of the money for the particular purpose) need to know whether property has passed."

15. Both sides accepted this as an accurate statement of the relevant principles. I would only add by way of emphasis that in deciding whether particular arrangements involve the creation of a trust and with it the retention by the paying party of beneficial control of the monies, proper account needs to be taken of the structure of the arrangements and the contractual mechanisms involved. As Lord Millett stressed in *Twinsectra* (at [73]) and the judge repeated in [17] of his own judgment, payments are routinely made in advance for particular goods and services but do not constitute trust monies in the recipient's hands. It is therefore necessary to be satisfied not merely that the money when paid was not at the free disposal of the payee but that, objectively examined, the contractual or other arrangements properly construed were intended to provide for the preservation of the payor's rights and the control of the use of the money through the medium of a trust. Critically this involves the court being satisfied that the intention of the parties was that the monies transferred by the investors should not become the absolute property of Teathers (subject only to a contractual restraint on their disposal) but should continue to belong beneficially to the investors unless and until the conditions attached to their release were complied with. Although directed to a slightly different context, it is worth recalling what Mason J said in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41, 97:

"That contractual and fiduciary relationships may co-exist between the same parties has never been doubted. Indeed, the existence of a basic contractual relationship has in many situations provided a foundation for the erection of a fiduciary relationship. In these situations it is the contractual foundation which is

*230710 In the matter of HEC International, Ltd (in Official Liquidation) – Judgment – FSD 318 of 2021 (DDJ)*

Page 13 of 18

> all important because it is the contract that regulates the basic rights and liabilities of the parties. The fiduciary relationship, if it is to exist at all, must accommodate itself to the terms of the contract so that it is consistent with, and conforms to, them. The fiduciary relationship cannot be superimposed upon the contract in such a way as to alter the operation which the contract was intended to have according to its true construction"."

32. Mr Yoshida in his second affidavit sworn on 19 December 2022 at paragraph 92 states:

> "As Ascentra did not have sufficient funds to pay its loyalty bonus obligation, Mr Matsuura and I agreed in January 2021 that SPGK would provide the necessary funding to HEC, as a loan, for a specific purpose, namely for HEC to pay the loyalty bonus on Ascentra's behalf. The decision was heavily influenced by Mr Matsuura. I did not raise any objection because Mr Matsuura assured me that any sum paid by SPGK on behalf of Ascentra would be treated as a loan and be repayable by HEC (see paragraph 93 below). Indeed any discharge of obligations owed by Ascentra by HEC from funds advanced by SPGK was by way of loan."

33. Mr Yoshida then in seven sub-paragraphs to paragraph 93 gives what he says are examples whereby Mr Matsuura has confirmed the position "throughout the years on various occasions". I have considered these examples and the underlying evidence. I do not accept that Mr Matsuura or HEC have confirmed that the funds were transferred subject to a common intention that they only be used for a specific purpose namely payment of the loyalty bonuses. The monies appear to have been at the free disposal of HEC.

34. Mr Yoshida in his third affidavit sworn on 24 April 2023 seeks to respond to the evidence of the Liquidator and I note the contents of that very weak and unpersuasive response.

35. Moreover the way in which the alleged proprietary claim has been advanced does not fill me with confidence that it is a genuine arguable claim. As Ms Leahy put it in a persuasively understated way, it seems to have been "something of an afterthought". The first reference to it seems to come in a letter dated 22 July 2021 from Harneys (the then attorneys for Mr Yoshida) to Campbells. On page 2:

*230710 In the matter of HEC International, Ltd (in Official Liquidation) – Judgment – FSD 318 of 2021 (DDJ)*

Page 14 of 18

> "Returning to the voluntary liquidator's request that our client transfer the funds held by HEC Singapore to the liquidation account, these funds are also beneficially owned by SPGK. In a 13 day period in January 2021, US$25.8 million of funds beneficially owned by SPGK was transferred to the HEC International account. The purpose of this transfer was to discharge a liability owed by Ascentra to HEC Singapore's affiliates. However, SPGK subsequently discharged Ascentra's liability from another source of funds. HEC Singapore is therefore obliged to return the US$25.8 million to SPGK.
>
> In his capacity as director HEC Singapore, our client does not have a current intention to transfer the balance of funds held by HEC International to SPGK. He considers it appropriate for your client to have an opportunity to articulate the basis (if any) on which he makes claim to these funds."

36. Campbells responded by letter dated 27 July 2021:

> "HEC Singapore is an indirect subsidiary of Ascentra, and the VL's position is that the US$24,141,156,46 held by HEC International LLC Singapore Branch ("HEC Singapore") in a United Overseas Bank (the "UOB Funds") account is held for the benefit of Ascentra. Moreover, we note that your client has been working with the VL to close the HEC Singapore account and transfer the UOB Funds to the liquidation estate for some time. As recently as 19 July 2021, your client emailed the VL about the UOB Funds, stating that *"the SGD balance 29,580.04 SGD is approximately 21,692.08 USD. Should I leave this SGD remaining in this account and send the USD to the liquidation account?"*.
>
> It is clear from the relevant correspondence that your client has, at least since the commencement of the liquidation, been of the view that the UOB Funds belong to Ascentra and his sudden and unexplained *volte-face* in this regard is curious ..."

37. Mr Yoshida signed a statement of affairs for Ascentra Holdings Inc dated 9 November 2021 and in the summary of unsecured assets listed US$24,326,963.30 as "Cash in HEC International Inc Singapore Branch (UOB Bank) ... [footnote] 3 subject to a proprietary claim on behalf of SPGK." Mr Yoshida also included in the column "name of creditor", "SPGK Pte Ltd" [that is the Singapore

entity] and, in the column "amount of debt (US$)", "25,800,000" adding under the heading "Particulars of how the debt was incurred" the words "These sums are subject to a proprietary claim articulated on behalf of SPGK. They were transferred by SPGK to the HEC International account and, SPGK claims, ought now be returned to SPGK."

38. Mr Yoshida in his capacity as "Director of SPGK and SPGK International" signed the proof of debt on 22 July 2022 but he did not seem sure of who had the "proprietary" claim. He stated the claimant as "Shang Peng Gao Ke, inc. SEZC (SPGK) (Cayman company registration number: 312457) and/or SPGK Pte. Ltd (SPGK Singapore) (Singapore company registration number 2019139772)." (my underlining)

39. Mr Atherton, doing his best to persuade the court on plainly inadequate evidence, in effect says this is not one of those cases where for example there is a trust deed or other single piece of documentary evidence that supports the claim. In effect he says we must put together various pieces of the evidential jigsaw. Asked to refer to his best piece of contemporaneous evidence in support of the claim Mr Atherton initially wanted to take me to the Alix Reports. I stressed the word "contemporaneous" and the best Mr Atherton could come up with was an electronic message dated 7 January 2021 to "Winnie":

> "Please use SPGK BOTW to pay off Matsuura and Homma's loan, and then move the rest of the balance to HEC UOB. If you still don't have enough to cover the loyalty bonus payment, move more funds from other accounts."

40. Mr Atherton also referred to the evidence of Mr Yoshida.

41. The documentation provided in support of the claim is woefully inadequate and a lot of it contradicts and is inconsistent with the position that Mr Yoshida unconvincingly attempts to persuade the court to accept, albeit only on a prima facie basis. The evidence before the court smacks of Mr Yoshida attempting to invent a proprietary claim.

42. I accept that the authorities (see for example Newey LJ in *Kireeva v Bedzhamov* [2023] Ch 45 at paragraph 34) indicate that a court is not usually in a position to resolve conflicting statements on affidavit evidence without first having the benefit of the cross-examination of witnesses. The

*230710 In the matter of HEC International, Ltd (in Official Liquidation) – Judgment – FSD 318 of 2021 (DDJ)*

Page 16 of 18

position seems slightly different when in effect considering the summary judgment test where the court does not need to take at face value and without analysis everything which Mr Yoshida says. In any event in the particular circumstances of this case I find Mr Yoshida's evidence extremely difficult to accept and it is not supported by the documentation he seeks to rely upon. Frankly I find Mr Yoshida's evidence on the issue of a *Quistclose* trust manifestly incredible. It is clear that there is no real substance to his factual assertions made without the support of documentation or other evidence. The documentation does not support his invented story. Indeed it contradicts it. If this was a genuine claim it should have been relatively easy to advance it with cogent evidence in support. The documentary evidence presented by SPGK in support of its purported claim was far from convincing.

43. I fully appreciate that commercial life is not always simple but even a good complicated case should be capable of being advanced in a clear, convincing and consistent way. SPGK has not done that in this case. Its *Quistclose* trust claim is hopeless. Even the considerable skill and eloquence of Mr Atherton could not in this case turn a sow's ear into a silk purse. I can well see why SPGK was reluctant to go too far into the merits or otherwise of its claim stressing at paragraph 43 of its skeleton that:

> "In hearing an application to proceed, the Court is not required to, nor should it, investigate the merits of the claim."

44. The wording relied upon which in *BDO Cayman Limited v Ardent Harmony Fund Incorporated* (Ramsay-Hale J, 9 November 2020) fell from the lips of Ramsay-Hale J as she then was: "In undertaking this initial threshold inquiry the Court 'is not required to investigate the merits of the underlying dispute, beyond satisfying itself that there is a genuine arguable claim': see *Cosco Bulk Carrier Co Ltd v Armada Shipping SA* [2011] EWHC 216 Ch, paragraph 48".

45. In this case, having investigated the merits of the underlying dispute insofar as is appropriate, I am simply not satisfied that SPGK has a genuinely arguable claim.

46. I accept that the hurdle Mr Yoshida has to jump is a low one, but I must at least be satisfied that there is a genuinely arguable case and I am not so satisfied.

47. Having considered all the evidence placed before the court and all the arguments so forcefully and persistently put by Mr Atherton on behalf of SPGK I remain totally unconvinced that there is a genuinely arguable claim. The proprietary claim is hopeless and I do not give leave for more time and money to be wasted on advancing it. The Liquidator should not be bothered with this futile claim which has no reasonable prospect of success on the evidence and arguments presented to this court.

48. In the words of the previously decided cases (see for example Parker J in *Wimbledon Fund*) there is no arguable case, the claim is not worth entertaining, there is no real or serious issue to be tried. The claim, for the reasons persuasively put forward by the Liquidator and reinforced by Ms Leahy's powerful and persuasive submissions, is simply not credible. It is so bad that it would be a waste of resources to permit it to proceed. I therefore refuse permission under section 97 of the Companies Act. SPGK does not have permission to advance its proprietary claim against the Company either as part of the appeal proceedings or in separate proceedings. Moreover the stay of the remainder of the Summons should now be lifted.

*Costs*

49. I am minded to make an order of costs against SPGK such costs to be taxed on the standard basis in default of agreement. If not agreed concise written submissions (no more than 5 pages) should be filed within 14 days from the delivery of this judgment and I will decide any issues as to costs on paper.

**Order**

50. The attorneys should let me have within 5 days of the delivery of this judgment a draft order reflecting the determinations contained in this judgment.

*David Doyle*

---

**THE HONOURABLE JUSTICE DAVID DOYLE**
**JUDGE OF THE GRAND COURT**