

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street | New York, NY 10019-6131 | tel 212.858.1000 | fax 212.858.1500

John A. Pintarelli
tel: +1.212.858.1213
john.pintarelli@pillsburylaw.com

October 18, 2023

<u>**Via ECF**</u>

Honorable David S. Jones
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Courtroom 701
New York, NY 10004-1408

> **Re:** **In re Ascentra Holdings, Inc. (In Official Liquidation), Case No. 21-11854:**
> **Letter Regarding Decision of the Court of Appeal of the Republic of Singapore**

To the Honorable David S. Jones:

We represent Graham Robinson and Ivy Chua Suk Lin, the duly appointed joint official liquidators and foreign representatives (the "**Foreign Representatives**") of Ascentra Holdings, Inc. ("**Ascentra**"), a company in official liquidation under a Supervision Order made by the Grand Court of the Cayman Islands. As the Court is aware, SPGK filed a motion to terminate the Recognition Order because the Cayman Proceeding it is not a foreign proceeding.

The motion largely relies on a non-final binding decision by the High Court for the Republic of Singapore (the "**High Court**") that denied the Foreign Representatives' application for recognition of the Cayman Proceeding because it did not qualify as a foreign proceeding under Singapore law. *See* ECF No. 37 at 20-28. On October 18, 2023, the Court of Appeal of the Republic of Singapore ("**Court of Appeal**") reversed the High Court's decision,[1] ruling that "Ascentra's Cayman Liquidation qualifies as a 'foreign proceeding'" under Singapore law, having concluded that it (a) is a collective proceeding, (b) is being conducted under a law relating to insolvency or adjustment of debt and (c) has as its purpose the liquidation of Ascentra. *See* Ex. A at 65.

Respectfully submitted,

*/s/ John A. Pintarelli*
John A. Pintarelli
Partner

---

[1] A copy of the Court of Appeal's decision is attached as **<u>Exhibit A</u>**.

## **Exhibit A**

Decision of Court of Appeal of the Republic of Singapore

**IN THE COURT OF APPEAL OF THE REPUBLIC OF SINGAPORE**

**[2023] SGCA 32**

Court of Appeal / Civil Appeal No 23 of 2022

Between

(1) Ascentra Holdings, Inc (in official liquidation)
(2) Chua Suk Lin Ivy
(3) Graham Robinson

… *Appellants*

And

SPGK Pte Ltd

… *Respondent*

In the matter of Originating Summons No 16 of 2022

Between

(1) Ascentra Holdings, Inc (In Official Liquidation)
(2) Graham Robinson
(3) Chua Suk Lin Ivy

… *Applicants*

And

SPGK Pte Ltd

… *Non-party*

# JUDGMENT

[Insolvency Law — Cross-border insolvency — Recognition of foreign insolvency proceedings — Recognition of foreign solvent liquidation proceedings]

This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.

**Ascentra Holdings, Inc (in official liquidation) and others**
v
**SPGK Pte Ltd**

**[2023] SGCA 32**

Court of Appeal — Civil Appeal No 23 of 2022
Sundaresh Menon CJ, Steven Chong JCA and Belinda Ang Saw Ean JCA
3 August 2023

18 October 2023                                                    Judgment reserved.

**Sundaresh Menon CJ (delivering the judgment of the court):**

**Introduction**

1        This appeal arises from the decision of a High Court judge (the "Judge") in HC/OS 16/2022 ("OS 16"), which considered whether a voluntary liquidation qualified as a "foreign proceeding" within the meaning of Art 2(*h*) of the Third Schedule to the Insolvency, Restructuring and Dissolution Act 2018 (2020 Rev Ed) (the "IRDA"). The Third Schedule of the IRDA sets out Singapore's adapted enactment of the Model Law on Cross-Border Insolvency, that was developed by the United Nations Commission on International Trade Law (the "UNCITRAL Model Law"). For convenience, we refer to Singapore's adaptation of the UNCITRAL Model Law as the "SG Model Law".

2        The present appeal raises the important question of whether the SG Model Law encompasses within its ambit foreign insolvency, restructuring or

liquidation proceedings concerning solvent companies. This question must be determined having regard to a range of considerations, including: (a) any modifications which Parliament made to the UNCITRAL Model Law when enacting it as the SG Model Law, and Parliament's intent in making any such modifications; (b) the approaches adopted by courts in other jurisdictions when interpreting the UNCITRAL Model Law or the corresponding provisions in those jurisdictions; and (c) the broader practical implications that would follow if we were to decide that proceedings involving solvent companies do fall within the scope of the SG Model Law.

**Facts**

*The parties*

3      We begin by recounting the facts. The first appellant is Ascentra Holdings, Inc (in official liquidation) ("Ascentra"). Prior to its liquidation, Ascentra was in the business of selling health and beauty products as well as computer communications software in Hong Kong, Taiwan and Singapore (*Re Ascentra Holdings, Inc (in official liquidation) and others (SPGK Pte Ltd, non-party)* [2023] SGHC 82 ("GD") at [5]).

4      The second and third appellants are Ms Chua Suk Lin Ivy ("Ms Chua") and Mr Graham Robinson ("Mr Robinson") respectively. They are the joint official liquidators of Ascentra appointed by the Grand Court of the Cayman Islands (the "Cayman Grand Court") and we refer to them collectively as the "Liquidators" (GD at [6]).

5      The respondent is SPGK Pte Ltd, a company incorporated in Singapore, and a wholly-owned subsidiary of Shang Peng Gao Ke, Inc ("SPGK Cayman"), a company incorporated in the Cayman Islands. The appellants maintain that

Ascentra has potential claims against the respondent, SPGK Cayman as well as another company incorporated in Singapore, Scuderia Bianco Pte Ltd ("Scuderia Bianco") (GD at [8]). In particular, it is alleged that SPGK Cayman owes certain sums of money to Ascentra, some of which is held by the respondent and Scuderia Bianco.

**Background to the dispute**

*Ascentra's liquidation*

6        Ascentra's ultimate beneficial shareholders are seven natural persons. From sometime in 2018, a number of disputes arose between these shareholders over the strategic direction of Ascentra's business (GD at [10]–[11]). On 1 June 2021, Ascentra's shareholders resolved to place it in voluntary liquidation and to appoint Mr Robinson as the "voluntary liquidator". On 2 June 2021, Ascentra filed with the Cayman Islands Registrar of Companies, the documents that were required under the Companies Act (2021 Revision) (Cayman Islands) (the "Cayman Act") to initiate its voluntary liquidation. Ascentra's voluntary liquidation is deemed to have commenced on 2 June 2021.

7        Pursuant to s 124(1) of the Cayman Act and O 15 r 1 of the Cayman Islands Companies Winding Up Rules 2018 (the "Cayman CWR"), Ascentra's directors were required to file a declaration of solvency no later than 28 days after the voluntary liquidation had commenced (that is, by 30 June 2021), failing which the liquidator was required to apply to the Cayman Grand Court for an order that the voluntary liquidation continue under the supervision of the court. As Ascentra's directors failed to file the declaration for undisclosed reasons, Mr Robinson duly presented a petition to the Cayman Grand Court on 2 July 2021 for the liquidation to proceed under court supervision (GD at [12]–[13]).

8        On 17 September 2021, the Cayman Grand Court allowed Mr Robinson's petition and ordered, among other things, that:

(a)        the liquidation of Ascentra be continued under the supervision of the Cayman Grand Court pursuant to s 124 of the Cayman Act (the "Supervision Order"); and

(b)        Mr Robinson and Ms Chua be appointed as the joint official liquidators of Ascentra.

*Ascentra's solvency*

9        On 23 September 2021, the Liquidators filed a certificate in the Cayman Grand Court as to Ascentra's solvency in the following terms:

> **JOINT OFFICIAL LIQUIDATORS' CERTIFICATE**
>
> Ascentra Holdings, Inc – In Official Liquidation (the "Company")
>
> ...
>
> TAKE NOTICE that the Joint Official Liquidators hereby certify that they have determined that the above-named Company should be treated as **solvent**, for the purposes of section 110(4) of the [Cayman Act] and [Cayman CWR] Orders 8 and 9.
>
> AND FURTHER TAKE NOTICE that the Joint Official Liquidators may change their determination from time to time in the light of changes of relevant circumstances and/or their assessment of the Company's financial position.
>
> [emphasis in original]

10        On 14 October 2021, in a letter addressed to Ascentra's shareholders, Mr Robinson similarly stated that the Liquidators had determined that Ascentra was solvent.

*The application in OS 16*

11     On 6 January 2022, the appellants filed OS 16 pursuant to Art 15 of the SG Model Law, seeking the following orders (GD at [15]):

> (a)     an order recognising Ascentra's liquidation in the Cayman Islands ("Ascentra's Cayman Liquidation") in Singapore and, by our courts, as a "foreign main proceeding" within the meaning of Art 2(*f*) of the SG Model Law;

> (b)     an order recognising the Liquidators as "foreign representatives" of Ascentra within the meaning of Art 2(*i*) of the SG Model Law; and

> (c)     an order granting the Liquidators such powers in relation to Ascentra's property and assets "as are available to a liquidator under Singapore insolvency law".

It is evident that the Liquidators seek these powers with a view to pursuing possible claims against the respondent and/or Scuderia Bianco. The Liquidators' application is resisted by the respondent (GD at [7]–[9]).

**The decision below**

12     The Judge considered that the only issue arising in OS 16 was whether Ascentra's Cayman Liquidation had its basis in a law relating to insolvency within the meaning of Art 2(*h*) of the SG Model Law. The Judge held that Art 2(*h*) of the SG Model Law had to be interpreted purposively pursuant to s 9A of the Interpretation Act 1965 (2020 Rev Ed) (the "IA"), and applying the approach to interpretation that was formulated in *Tan Cheng Bock v Attorney-General* [2017] 2 SLR 850 ("*Tan Cheng Bock*") at [37] (the "Purposive Approach"). Specifically, the Judge took the view that the critical words within

Art 2(*h*) of the SG Model Law that he had to interpret were "law relating to insolvency": see GD at [24] and [28].

13      For convenience, we set out Art 2(*h*) of the SG Model Law here:

> **Article 2. Definitions**
>
> For the purposes of this Law —
>
> …
>
> (*h*) "foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation;

14      The Judge first *separately* interpreted the words "insolvency", "law" and "relating to" and proceeded in the following manner:

> (a)      The proper characterisation of a "foreign proceeding" under Art 2(*h*) of the Model Law would take into account the law of the foreign state. However, there was no material difference between the concept of insolvency under Cayman law as opposed to Singapore law, given the similarity in the language of s 125(2)(*c*) of the IRDA and its analogue, s 93(c) of the Cayman Act. In any event, as the test for insolvency under Cayman law had not been proved, it was presumed that the test for insolvency under Cayman law was the same as that under Singapore law. Accordingly, "insolvency" for the purposes of Art 2(*h*) of the SG Model Law referred to a company's inability to pay debts which had already fallen due or which will fall due within the reasonably near future, following the position set out by this court in *Sun Electric Power Pte Ltd v RCMA Asia Pte Ltd (formerly known as Tong Teik Pte Ltd)* [2021] 2 SLR 478 at [56], [65] and [66] (GD at [45]–[52]).

(b)      For the purposes of Art 2(*h*) of the SG Model Law, "law" encompassed both legislation and judge-made law, and would include the Cayman Act (GD at [55]–[56]).

(c)      The appellants' submission that a law "relating to" insolvency is simply one that is contained within a statute that deals generally with the subject matter of insolvency was rejected. Such an approach subordinated substance to form as any type of proceeding, no matter how far removed that proceeding was from any connection to insolvency, would fall within the scope of Art 2(*h*) of the SG Model Law as long as it was commenced under a provision contained within a statute that also dealt generally with insolvency (GD at [58]–[63]).

15     The Judge then considered the phrase "under a law relating to insolvency" as a whole and held that the ordinary meaning of that phrase must refer to a body of rules, whether statutory or judge-made, which governs a company that is insolvent. This includes a company which apprehends becoming unable to pay its debts as they fall due in the reasonably near future, and therefore can be said to be in severe financial distress in the present (GD at [64]). The Judge further observed that such an interpretation was consistent with and confirmed by the underlying purpose of the UNCITRAL Model Law (GD at [72]–[79]), as well as the preparatory records and documents relating to the UNCITRAL Model Law such as: (a) various reports and papers of the UNCITRAL Working Group on Insolvency Law (the "Working Group"); (b) *Cross-Border Insolvency: Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency*, 30th Sess, UN Doc A/CN.9/442 (1997) (the "1997 Guide"); and (c) *UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation*, UN Sales No E.05.V.10 (2013) (the "2013 Guide") (GD at [81]–[99]).

16    As to the relevant case law, the Judge observed as follows:

(a)    The Court of Appeal in *United Securities Sdn Bhd (in receivership and liquidation) and another v United Overseas Bank Ltd* [2021] 2 SLR 950 ("*United Securities*") had implicitly affirmed in *obiter* that the relevant foreign law under Art 2(*h*) of the SG Model Law must be one which deals with or addresses insolvency or severe financial distress (GD at [107]).

(b)    Under the bankruptcy law of the United States (the "US"), chiefly as reflected in *Re Betcorp Limited (in liquidation)* 400 BR 266 (Nevada US Bankruptcy Court, 2009) ("*Re Betcorp*"), the requirement that a "foreign proceeding" be commenced under a law relating to insolvency or the adjustment of debts does not require the company to be either insolvent or contemplating the adjustment of debt (GD at [124]). In the absence of direct evidence as to what Parliament intended, it could not be said that by adopting the words "adjustment of debt" from Chapter 15 of the Bankruptcy Code 11 USC (US) (1978) (the "US Bankruptcy Code") in Art 2(*h*) of the SG Model Law, Parliament thereby intended to endorse the prevailing position under US bankruptcy law (GD at [116]–[117]). Moreover, the US approach has been criticised and should not be followed (GD at [132]–[142]). To the extent that the position under Australian law is similar to US bankruptcy law, it should likewise not be followed (GD at [153]–[159]).

(c)    It was held in the decision of the High Court of England and Wales in *Re Sturgeon Central Asia Balanced Fund Ltd (in liquidation) (No 2); Carter v Bailey and another (as foreign representatives of Sturgeon Central Asia Balanced Fund Ltd)* [2020] EWHC 123 (Ch)

("*Re Sturgeon*") that it would be contrary to the UNCITRAL Model Law's purpose and object to enlarge its scope by interpreting "foreign proceeding" as including proceedings concerning solvent companies and proceedings which may be expected to result in the payment of all creditors in full and produce a surplus for members. *Re Sturgeon* is not an outlier among English cases and should be followed in Singapore (GD at [130] and [143]–[152]).

17     The Judge accordingly held that Ascentra's Cayman Liquidation is not a "foreign proceeding" within the meaning of Art 2(*h*) of the SG Model Law, because the legislative "track" under which Ascentra's liquidation was commenced (that is, s 116(c), which provides that a company may be voluntarily wound up if the company so resolves by special resolution, read with s 124 of the Cayman Act) does not and cannot apply to a company that is insolvent or in severe financial distress (GD at [161] and [165]). The Judge also noted, in any event, that Ascentra is solvent.

**The parties' cases on appeal**

*The appellants' case*

18     In relation to the ordinary meaning of Art 2(*h*) of the SG Model Law, the appellants argue that the Judge erred in the approach he took in interpreting Art 2(*h*). By isolating the word "insolvency" and equating its meaning in Art 2(*h*) with that under s 125(2)(*c*) of the IRDA, he failed to appreciate that the collection of words "law relating to insolvency or adjustment of debt" is framed broadly and should therefore be interpreted broadly, such that while it would include laws dealing with various issues that arise in a situation where a company is or might be unable to pay its debts, it should not be *confined* to this.

19     Following from this, the appellants submit that the Judge took an unduly narrow approach by focusing on the specific provisions of the Cayman Act under which Ascentra's Cayman Liquidation is being conducted (which we will refer to, for convenience, as the "Narrow Approach"). Instead, the correct inquiry is whether Part V of the Cayman Act on "Winding up of Companies and Associations", which contains those specific provisions as well as other provisions that also cover insolvent companies, is, as a whole, a law relating to insolvency (we refer to this as the "Broad Approach"). The appellants contend that Part V of the Cayman Act (as a whole) is a law relating to insolvency because it contains all the provisions necessary to wind up any company in the Cayman Islands. The appellants thus submit that Ascentra's Cayman Liquidation, which was conducted pursuant to provisions contained in Part V of the Cayman Act, falls within the ambit of Art 2(*h*) of the SG Model Law and should therefore be recognised in Singapore as a foreign main proceeding.

20     Relatedly, the appellants submit that the SG Model Law and the extrinsic materials do not impose any requirement for an applicant company to be either insolvent or in severe financial distress for a proceeding involving that company to be regarded as taking place under a "law relating to insolvency" within the meaning of Art 2(*h*) of the SG Model Law. On the contrary, it is evident from the preparatory material surrounding the UNCITRAL Model Law that the words "law relating to insolvency" were not intended to confine the application of the recognition regime to insolvent or severely financially distressed companies. In oral submissions, counsel for the appellants, Mr Lee Eng Beng SC ("Mr Lee") also emphasised that the words "or adjustment of debt" were adopted from the US Bankruptcy Code into Art 2(*h*) of the SG Model Law and that this was done to allow the Singapore courts to recognise proceedings akin to those under Chapter 11 of the US Bankruptcy Code (these

being corporate reorganisations) which are not limited to insolvent companies. The appellants thus argue that the Judge erred in holding that Ascentra's Cayman Liquidation was not a "foreign proceeding" under Art 2(*h*) of the SG Model Law on account of Ascentra's apparent solvency.

21     The appellants further highlight that allowing the recognition of proceedings involving solvent companies is consistent with the weight of the authorities in the US, the United Kingdom ("UK") (with the exception of *Re Sturgeon*), Australia and New Zealand. In this regard, the appellants submit that *Re Sturgeon* should not be followed because: (a) it is an outlier even among English cases; (b) in any event, the English cases should be approached with some caution due to differences between the legislative regimes in the UK and Singapore; and (c) the position under US bankruptcy law should be preferred given that Parliament had adopted the definition of "foreign proceeding" in Art 2(*h*) of the SG Model Law from the US Bankruptcy Code and further, because the preponderance of authorities in various jurisdictions have adopted the US position.

22     In addition, the appellants also submit that the introduction of a requirement of insolvency or severe financial distress would introduce significant uncertainty and complexity into the recognition process and undermine the purpose of the SG Model Law. This is said to follow from the need that would then arise for our court to determine the precise requirements as to insolvency under a foreign law. Mr Lee also suggested in his oral submissions that the threshold for recognition should be a light one, given that the court retains the power to make the order subject to suitable terms, thus enabling the court to avoid any overreach.

*The respondent's case*

23    The respondent, on the other hand, submits that Ascentra's Cayman Liquidation does not satisfy the definitional requirements in Art 2(*h*) of the SG Model Law because it is not a proceeding under a law relating to insolvency, and also because its purpose is not to secure the liquidation of the company within the meaning of Art 2(*h*). To that end, counsel for the respondent, Mr Balakrishnan Ashok Kumar ("Mr Kumar"), makes the following submissions:

(a)    A "foreign proceeding" under Art 2(*h*) refers only to proceedings involving companies that are insolvent or in severe financial distress. This is confirmed by the context and purpose underlying the SG Model Law, as gleaned from the preamble of the SG Model Law as well as extrinsic material such as the 1997 Guide, the 2013 Guide and the corresponding working papers of the Working Group.

(b)    The *UNCITRAL Legislative Guide on Insolvency Law* (2004) (the "Legislative Guide") confirms that the UNCITRAL Model Law was intended to be limited to proceedings involving debtors that are unable to meet their debts as they fall due and hence to be confined to insolvent liquidations.

(c)    *Re Sturgeon* was correctly decided by the UK court and is not an outlier among English cases. Moreover, the principles that were applied in *Re Sturgeon* are aligned with the preparatory material pertaining to the UNCITRAL Model Law. The purported concerns over the difficulties which the recognising court would allegedly face in determining the financial status of the company concerned in the relevant foreign proceeding are unfounded, because the recognising

court would typically rely on the foreign court's assessment. In any case, it would be obvious in most cases when a company is solvent.

(d)     *Re Betcorp* should not be followed as it was wrongly decided and has been criticised. Moreover, in many of the cases where *Re Betcorp* was applied, the recognising court had nonetheless gone on to consider whether the company involved in the relevant foreign proceeding was insolvent or in financial distress. Indeed, even the US courts have acknowledged that the insolvency or financial distress of a company is a relevant consideration in determining whether recognition should be granted.

(e)     The approach suggested by the appellants would "open [the] floodgates for recognition and assistance applications", allow solvent companies to take advantage of the SG Model Law even where its purpose is not engaged, and create potentially absurd outcomes under the SG Model Law.

24     Mr Kumar accordingly contends that Ascentra's Cayman Liquidation, which is being conducted under a "track for solvent companies" and involves a company that has been solvent at all material times, cannot be regarded as a "foreign proceeding" within the meaning of Art 2(*h*) of the SG Model Law, and ought not to be recognised under the SG Model Law.

25     The respondent also submits in any event that the Singapore court does not have the requisite jurisdiction to hear and determine the application for recognition of Ascentra's Cayman Liquidation pursuant to Art 4(2)(*a*)(ii) of the SG Model Law, because Ascentra allegedly has no property in Singapore. Finally, the respondent argues that even if Ascentra's Cayman Liquidation was

to be recognised under the SG Model Law, the discretionary reliefs sought by the appellants ought not be granted, or in any event, any order made by the court should be circumscribed by the imposition of suitable conditions.

**General principles and issues to be determined**

26     To situate the specific issues arising for our consideration in the proper context, it is apposite to first set out the relevant provisions of the SG Model Law governing the recognition of foreign proceedings in Singapore.

27     Pursuant to Art 15(1) of the SG Model Law, a foreign representative may apply to the court for recognition of the foreign proceeding in which the foreign representative has been appointed. Article 17(1) of the SG Model Law further stipulates circumstances in which a foreign proceeding must be recognised:

> **Article 17. Decision to recognise a foreign proceeding**
>
> 1. Subject to Article 6, a proceeding must be recognised if —
>
>> (*a*)  it is a foreign proceeding within the meaning of Article 2(*h*);
>>
>> (*b*)  the person or body applying for recognition is a foreign representative within the meaning of Article 2(*i*);
>>
>> (*c*)  the application meets the requirements of Article 15(2) and (3); and
>>
>> (*d*)  the application has been submitted to the Court mentioned in Article 4.

28     We set out again Art 2(*h*) of the SG Model Law, which defines a "foreign proceeding" in the following terms:

> **Article 2. Definitions**
>
> For the purposes of this Law —
>
> …

> (*h*) "foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation;

29     It seems to us that Art 2(*h*) of the SG Model Law prescribes at least five different and cumulative requirements for a proceeding to qualify as a "foreign proceeding" (see also *United Securities* at [53]):

(a)     First, that proceeding must be collective in nature.

(b)     Second, that proceeding must be a judicial or administrative proceeding in a foreign State.

(c)     Third, that proceeding must be conducted under a law relating to insolvency or adjustment of debt.

(d)     Fourth, the property and affairs of the debtor company must be subject to control or supervision by a foreign court in that proceeding.

(e)     Fifth, that proceeding must be for the purpose of reorganisation or liquidation.

While the Judge proceeded on the basis that only the third requirement was in issue, the respondent takes the position before us that the first and fifth requirements are also unsatisfied.

30     Finally, pursuant to Art 4(2)(*a*)(ii) of the SG Model Law, the General Division of the High Court in Singapore will have jurisdiction to recognise foreign proceedings under Art 17(1) if the company in question has property situated in Singapore.

31    In the light of the parties' submissions and the foregoing statutory provisions, the following issues arise for our consideration:

(a)    whether Ascentra's Cayman Liquidation is being conducted "under a law relating to insolvency or adjustment of debt" under Art 2(*h*) of the SG Model Law;

(b)    whether Ascentra's Cayman Liquidation is a collective proceeding under Art 2(*h*) of the SG Model Law;

(c)    whether Ascentra's Cayman Liquidation is being conducted "for the purpose of liquidation or reorganisation" under Art 2(*h*) of the SG Model Law; and

(d)    whether the Singapore courts have jurisdiction to recognise Ascentra's Cayman Liquidation under Art 4(2)(*a*)(ii) of the SG Model Law.

**Whether Ascentra's Cayman Liquidation is being conducted under a law relating to insolvency or adjustment of debt**

32    Before we set out our analysis on the first issue, we make two preliminary observations on the approach taken by the Judge towards interpreting Art 2(*h*) of the SG Model Law. First, we note that the Judge focused on the interpretation of the words "under a law relating to insolvency", and largely excluded consideration of the words "adjustment of debt". With respect, we disagree with this approach. For reasons we explain in greater detail below, we are satisfied that the inclusion of the words "or adjustment of debt" in Art 2(*h*) sheds significant light on Parliament's intention with regard to the ambit of Art 2(*h*) at least in the context of the SG Model Law. The phrase "under a law relating to insolvency or adjustment of debt" must therefore be interpreted as a collective whole.

33     Second, both the Judge and the parties dealt, in considerable detail, with the question of whether the Narrow Approach or Broad Approach should be adopted in Singapore, that is to say whether the phrase "law relating to insolvency" in Art 2(*h*) of the SG Model Law refers narrowly to the specific provision(s) under which the foreign proceeding is conducted or more broadly to the general statutory regime or part of the relevant legislation containing those specific provision(s) in addition to others. The key difference between the Narrow Approach and the Broad Approach is that with the latter, it will suffice that the relevant proceeding is conducted under a law which *contains* provisions relating to insolvency or adjustment of debt, even if the specific provisions governing the relevant proceeding do not deal with insolvency or adjustment of debt. Conversely, in the former, the specific provisions pursuant to which the relevant proceeding is being conducted must relate to insolvency or adjustment of debt.

34     In practical terms, the difference between the Broad Approach and the Narrow Approach may be reduced to a more fundamental inquiry: whether the Singapore Parliament intended that the words "under a law relating to insolvency or adjustment of debt" in Art 2(*h*) of the SG Model Law should be limited to laws that are applicable *only* to companies in insolvency or severe financial distress. The point is significant because there is nothing in either the UNCITRAL Model Law or the SG Model Law that expressly defines the recognition regime by reference to the solvency status of the company in question. Instead, the recognition regime is drafted in terms that accord recognition to foreign proceedings by reference to a number of defining characteristics of those proceedings, including the laws under which they are being conducted. If the narrow view were adopted, the consequence would be

to confine the recognition regime in Singapore to insolvent and/or severely financially distressed companies to the exclusion of solvent companies.

35     This seems somewhat counter-intuitive for two related reasons: first, if that was the intention, it would have been far easier and clearer to achieve that intention by making the solvency status of the company a necessary criterion; and second, the choice of the words "law relating to" seems deliberate and their purport is broad especially when seen in the light of the fact that in many legislative regimes, including ours, and that which applies in the Cayman Islands, laws relating to insolvency will frequently include or overlap with laws relating to the dissolution of companies that may not be insolvent.

36     In that light, we first summarise our conclusion on this issue. In our judgment, Art 2(*h*) of the SG Model Law should be interpreted broadly to include within its ambit foreign proceedings concerning companies that are neither insolvent nor in severe financial distress. We arrive at this conclusion for a number of reasons:

> (a)     First, it is evident from the ordinary meaning of the relevant provisions of the SG Model Law that there is no express requirement for a company to be insolvent or in severe financial distress for a proceeding concerning that company to be recognised as a foreign proceeding under the SG Model Law. This is made demonstrably clear by the inclusion of the words "or adjustment of debt" in Art 2(*h*) as well as the statutory presumption of insolvency in Art 31. Significantly, there is no reference at all in Art 2(*h*) to the solvency status of the company in question. In our judgment, one is driven to the conclusion that the solvency status of the company is not a relevant consideration both as a matter of the plain

interpretation of Art 2(*h*), as well as by the correct application of the Purposive Approach.

(b)     Second, even if we were to ignore the words "or adjustment of debt" in Art 2(*h*) and assume that Parliament had adopted the UNCITRAL Model Law in its original form, we are not satisfied that the drafters of the UNCITRAL Model Law intended to *exclude* solvent companies from the scope of the UNCITRAL Model Law for the purposes of recognition. The Judge considered that the Broad Approach would undermine the purpose of the UNCITRAL Model Law by bringing proceedings concerning solvent companies within its scope, and accordingly interpreted the phrase "under a law relating to insolvency" as referring to a body of rules which governs a company that is insolvent or in severe financial distress. On that basis, the Judge held that Ascentra's Cayman Liquidation was not a "foreign proceeding" within the meaning of Art 2(*h*) because the specific provisions under which it was commenced are not provisions that apply to companies that are either insolvent or in severe financial distress. Further, he considered that Ascentra is solvent, which was accepted by the Liquidators (GD at [16]–[19] and [161]–[168]). On the last point, although the appellants submitted in their Supplemental Case that Ascentra was *prima facie* insolvent when the Cayman Grand Court granted the Supervision Order, Mr Lee did not pursue this argument in oral submissions. Even accepting that Ascentra is solvent, it is not at all clear to us how *extending* the scope of Art 2(*h*) to cover proceedings involving solvent companies would undermine the purpose of the SG Model Law.

(c)     Third, we are satisfied that Art 2(*h*) should be interpreted in a way that is broadly harmonious with the approaches adopted in other jurisdictions. The weight of the authorities in other jurisdictions favours the interpretation we take, which would enable the recognition of proceedings concerning solvent companies as foreign main proceedings.

(d)     Fourth, the practical concerns that the respondent submits would arise from allowing the recognition of proceedings concerning solvent companies may be easily dealt with.

We elaborate on each of these points.

### Whether the scope of Art 2(h) extends to solvent companies

*The ordinary meaning of Art 2(h)*

37     We begin our analysis with the ordinary meaning of Art 2(*h*) of the SG Model Law. At the outset, we reiterate that there is nothing in the SG Model Law, whether in Art 2(*h*) or elsewhere, which encompasses a specific requirement that a particular proceeding must involve a company that is insolvent or in severe financial distress to qualify as a "foreign proceeding" within the meaning of Art 2(*h*). On the contrary, Art 2(*h*) has been drafted broadly to refer to proceedings conducted under laws *relating to* insolvency or adjustment of debt (as opposed to, for instance, proceedings conducted under laws that are *applicable only to* companies that are insolvent or in severe financial distress).

38     Further, in considering the terms of Art 2(*h*) of the SG Model Law, it is relevant to consider the UNCITRAL publication, *UNCITRAL Model Law on Cross-Border Insolvency: The Judicial Perspective*, UN Sales No 23.V.I (2022) ("*The Judicial Perspective*"), which discusses the UNCITRAL Model Law

from a judge's perspective with the aim of providing general guidance on the issues that a judge might need to consider in a given case, based on the intentions of the drafters of the UNCITRAL Model Law and the experiences of those who have used it in practice (*The Judicial Perspective* at para 3). The authors of *The Judicial Perspective* expressly recognise that where States have amended the UNCITRAL Model Law to suit local circumstances, different approaches might be required if a judge concludes that the omission or modification of a particular article from the text as enacted necessitates such a course (*The Judicial Perspective* at para 1).

39      In ascertaining Parliament's intention with regard to the ambit of Art 2(*h*) of the SG Model Law, it is therefore imperative to note that the UNCITRAL Model Law was not adopted in Singapore without modification. In particular, Art 2(*a*) of the UNCITRAL Model Law, which corresponds to Art 2(*h*) of the SG Model Law, defines a "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, *pursuant to a law relating to insolvency* in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation" [emphasis added]. When Parliament adopted the UNCITRAL Model Law in the Third Schedule to the IRDA as the SG Model Law, it added the words "or adjustment of debt" to the definition of "foreign proceeding" in Art 2(*h*). What is significant is that s 101(23) of the US Bankruptcy Code, which is the analogue of Art 2(*h*) of the SG Model Law, contains the same additional words "or adjustment of debt". The appellants referred us to a working draft of the Companies (Amendment) Bill 2017, which indicates that Art 2(*h*) of the SG Model Law was adapted from s 101(23) of the US Bankruptcy Code, and this was not seriously disputed.

40    In this regard, we note that the phrase "adjustment of debt" appears in various provisions within Chapter 11 of the US Bankruptcy Code. The purposes of Chapter 11 include: (a) the preservation of going concerns and the maximisation of property available to satisfy creditors (see *Bank of America National Trust and Savings Association v 203 North LaSalle Street Partnership* 526 US 434 at 453); and (b) restructuring a business's finances so that it may continue to operate, pay its creditors and produce a return for its stockholders (see *In re The Bible Speaks* 65 BR 415 (Massachusetts US Bankruptcy Court, 1986) at 425). It is thus apparent, and the respondent does not dispute, that the inclusion of the words "adjustment of debt" in Art 2(*h*) of the SG Model Law permits the recognition of foreign proceedings involving: (a) the restructuring of a company's debts; and/or (b) the reorganisation of a company's affairs through schemes of arrangement: see Neil Hannan, *Cross-Border Insolvency: The Enactment and Interpretation of the UNCITRAL Model Law* (Springer, 2017) at p 65; Gerard McCormack & Wan Wai Yee, "The UNCITRAL Model Law on Cross-Border Insolvency Comes of Age: New Times or New Paradigms?" (2019) 54(2) Texas International Law Journal 273 at 289; and Look Chan Ho, "Recognising an Australian Solvent Liquidation under the UNCITRAL Model Law: *In re Betcorp*" (October 2009) Norton Journal of Bankruptcy Law and Practice ("Look's Article"). Neither of these situations is necessarily limited to insolvent companies, as we explain in the paragraphs that follow. In our judgment, it may also be inferred from Parliament's deliberate modification of Art 2(*a*) of the UNCITRAL Model Law in accordance with s 101(23) of the US Bankruptcy Code that Parliament intended to bring within the ambit of the SG Model Law proceedings that are recognisable under the provisions of US law that correspond to the SG Model Law, specifically Chapter 15 of the US Bankruptcy Code.

41      In sum, we are satisfied that the words "or adjustment of debt" were included in Art 2(*h*) of the SG Model Law to enable the Singapore courts to recognise under the SG Model Law:

> (a)     proceedings in foreign jurisdictions that are akin to schemes of arrangement commenced under Singapore law and/or reorganisations commenced under Chapter 11 of the US Bankruptcy Code; and

> (b)     proceedings recognisable under Chapter 15 of the US Bankruptcy Code (which sets out the US' adaptation of the UNCITRAL Model Law).

42      This is significant because neither of the categories of proceedings set out in the previous paragraph requires the subject company to be insolvent or in severe financial distress as a prerequisite for commencement. Schemes of arrangement may be commenced in Singapore under either Part 5 of the IRDA or Part 7 of the Companies Act 1967 (2020 Rev Ed) (the "SG Companies Act"). In relation to the former, s 63(1) of the IRDA provides that Part 5 will apply where there is a compromise or arrangement between the company and its creditors or any class of those creditors. In relation to the latter, under ss 210(1) and 210(2) of the SG Companies Act, the court has the power to order a meeting where a compromise or arrangement is proposed, upon the application of: (a) the liquidator (in the case of a company being wound up); or (b) the company or any creditor, member or holder of units of shares of the company (in any other case). There is nothing in Part 5 of the IRDA or Part 7 of the SG Companies Act that requires the subject company to be insolvent or in severe financial distress before the court may grant relief in aid of any scheme of arrangement or compromise contemplated in respect of the subject company. Indeed, in holding that the *pari passu* principle should *not* be extended to

schemes which do not concern an insolvent company, this court recognised in *Hitachi Plant Engineering & Construction Co Ltd and another v Eltraco International Pte Ltd and another appeal* [2003] 4 SLR(R) 384 at [85] that there are a myriad of situations in which schemes of arrangement could be deployed in the corporate restructuring of *solvent* companies, for instance, to reorganise the share capital of a company or in the reconstruction or merger of a group of companies.

43      Similarly, corporate reorganisations in the US may be commenced under Chapter 11 of the US Bankruptcy Code in respect of solvent companies (see *In re Integrated Telecom Express, Inc* 384 F.3d 108 (3rd Cir, 2004) ("*Re Integrated Telecom*") at 121). Section 1121 of the US Bankruptcy Code, which prescribes who may file a plan under Chapter 11, does not impose any requirement as to the insolvency or severe financial distress of an applicant. Likewise, s 109 of the US Bankruptcy Code, which prescribes the criteria to qualify as a debtor under Chapter 11, does not include any requirement of insolvency or severe financial distress.

44      As the US Bankruptcy Court observed in *In re Johns-Manville Corporation* 36 BR 727 (SD New York US Bankruptcy Court, 1984) at 736 and 741, the drafters of the US Bankruptcy Code envisioned that a financially beleaguered debtor with real debt and real creditors should not be required to wait until the economic situation is beyond repair in order to file a reorganisation petition. The reorganisation provisions of the US Bankruptcy Code were thus drafted with the aim of *liquidation avoidance* by granting ready, albeit not unfettered, access to Chapter 11. Indeed, it would make little sense to allow companies recourse to reorganisation only when they are already insolvent or in such severe financial distress as to be virtually insolvent. At the same time, we recognise that Chapter 11 petitions filed by financially healthy

companies with no reason to seek rehabilitation or reorganisation may be rejected by the US courts (see *Re Integrated Telecom* at 121). Chapter 11 was designed with the object of affording a rehabilitative platform and that, therefore, operates as a constraint on when it may be resorted to. But the critical point for our purposes is that this regime is not restricted to insolvent companies or those in severe financial distress.

45     As for proceedings that may be recognised under Chapter 15 of the US Bankruptcy Code, it is instructive to examine the authorities in which recognition of foreign proceedings was sought under that chapter. *Re Betcorp* involved an Australian company, Betcorp Limited ("Betcorp"), which was liquidated by its shareholders. Betcorp's liquidators applied successfully for the recognition of Betcorp's voluntary liquidation in Australia as a foreign proceeding under Chapter 15 of the US Bankruptcy Code, the US Bankruptcy Court holding that Betcorp's voluntary liquidation was a "foreign proceeding" within the meaning of s 101(23) of the US Bankruptcy Code. Importantly, the court held that the requirement that Betcorp's liquidation be authorised or conducted under a law related to insolvency or the adjustment of debt did not entail that Betcorp had either to be insolvent or already contemplating invoking the provisions of Australian law to adjust any debts (*Re Betcorp* at 282). To much the same effect, the US Bankruptcy Court in *In re ABC Learning Centres Ltd* 445 BR 318 (Delaware US Bankruptcy Court, 2010) ("*Re ABC Learning Centres*") and *In re Manley Toys Limited* 580 BR 632 (New Jersey US Bankruptcy Court, 2018) ("*Re Manley Toys*") granted recognition in respect of foreign proceedings without considering whether the companies involved in those proceedings were either insolvent or in severe financial distress.

46     Given what we have said at [40] above and in the light of the discussion at [42]–[45], it may be inferred that the addition of the words "or adjustment of

debt" to the definition of "foreign proceeding" in Art 2(*h*) of the SG Model Law was meant to empower the Singapore courts to recognise as foreign proceedings under the SG Model Law, proceedings concerning a company that were conducted under a foreign law relating to insolvency or adjustment of debt, even if that company was solvent.

47     In seeking to construe the provision purposively, the Judge had regard to certain extraneous materials to ascertain the purpose of Art 2(*h*) of the SG Model Law, to which we will turn shortly. We do not disagree with the Judge that pursuant to s 252(2) of the IRDA, in interpreting provisions of the SG Model Law, regard may be had to documents forming part of the record pertaining to the preparation of the UNCITRAL Model Law, as well as the 1997 Guide. Furthermore, the 2013 Guide may be considered where the 1997 Guide is silent and to the extent that there is no conflict with the 1997 Guide (see *Re Zetta Jet Pte Ltd and others (Asia Aviation Holdings Pte Ltd, intervener)* [2019] 4 SLR 1343 ("*Re Zetta*") at [37]). However, in construing the extraneous material, it is incumbent on the court to do so in the light of the fact that Parliament did not adopt the UNCITRAL Model Law in its original form but added the words "or adjustment of debt" to Art 2(*h*) of the SG Model Law. It seems clear that these words were intended to enable the recognition of certain types of foreign proceedings, including those that do not require that the company be insolvent or in severe financial distress. To the extent that the words "or adjustment of debt" were not considered in the material referred to by the Judge, we think, with respect, that he fell into error. As was noted in *Tan Cheng Bock* at [35], [43] and [54(c)(ii)], the legislative purpose of a statute should ordinarily be gleaned from the text itself, which has primacy over any extraneous material. The key textual amendment that was deliberately made by Parliament when it adopted the UNCITRAL Model Law considerably

diminishes the weight of the other extraneous material that was relied on by the Judge. In any event, for the reasons we set out below at [55]–[68], we do not think the extraneous material demonstrates that it would undermine the purpose or object of the UNCITRAL Model Law to extend its scope to proceedings involving solvent companies.

48    This conclusion is also consistent with the presumption of insolvency under Art 31 of the SG Model Law, which provides that:

> In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a proceeding under Singapore insolvency law, proof that the debtor is unable to pay its debts within the meaning given to the expression under Singapore insolvency law.

If it were a pre-requisite for recognition that the company involved must be insolvent, then Art 31 of the SG Model Law, which presumes the insolvency of a company upon the recognition of a proceeding involving that company as a foreign main proceeding, would be largely superfluous.

*The Judge's application of the Purposive Approach*

49    We turn to consider how the Judge applied the Purposive Approach when he set out to interpret Art 2(*h*) of the SG Model Law. The Judge examined various academic commentaries and the preparatory material pertaining to the UNCITRAL Model Law (GD at [72]–[76] and [81]–[98]), on the basis of which he concluded that the underlying purpose of the UNCITRAL Model Law is to "empower a recognising court to extend recognition to a foreign proceeding the subject of which is a company that is insolvent or in severe financial distress". In line with this, the Judge considered that the words "under a law relating to insolvency" contemplate a law that prescribes a process applicable to a company that is either insolvent or in severe financial distress (GD at [99]). Thus far, we

have no real difficulty with the Judge's analysis and his conclusion that when the UNCITRAL Model Law was prepared, its primary purpose was to lay down a framework for the co-ordinated cross-border management of proceedings involving insolvent companies. But the Judge then held that the intent of the UNCITRAL Model Law was therefore to *exclude* from its scope the liquidation of solvent companies, and further that it would be *contrary to the underlying purpose of the UNCITRAL Model Law* to grant recognition of foreign proceedings concerning companies which are neither insolvent nor in severe financial distress. We do not follow this part of the Judge's analysis.

50     Simply put, it does not seem to us to follow from the primary purpose of the UNCITRAL Model Law being to prescribe a co-ordinated regime for proceedings involving insolvent companies, that this must therefore exclude such proceedings where they concern solvent companies; or that to extend the operation of the UNCITRAL Model Law to solvent companies would be contrary to or would otherwise undermine its primary purpose.

51     The Purposive Approach is enshrined in s 9A(1) of the IA and contemplates that in the interpretation of a written law, an interpretation that would promote the purpose or object underlying the written law shall be *preferred* over one that would not. To that end, the Purposive Approach requires the court to ascertain the possible interpretations of the relevant provision and to *compare* the possible interpretations against the purposes or objects of the relevant statute. We have explained at [37]–[48] above that *at least* in the context of the SG Model Law, the legislative purpose of that law was not as narrow as the Judge framed it. But even in the context of the UNCITRAL Model Law, the Purposive Approach does not yield the conclusion that the Judge arrived at because the Broad Approach does not seem to us to undermine the primary purpose of that instrument.

52      To put it another way, the present case does not require the court to choose between two interpretations of Art 2(*h*) which are incompatible or mutually exclusive, in the sense that one interpretation would further the underlying legislative purpose or object while the other would undermine that. Even in relation to the SG Model Law, it is uncontroversial that it is *primarily* intended to be applicable to insolvent or financially distressed companies. That much is clear from paras (*c*) and (*e*) of the preamble, which state that the purposes of the SG Model Law include the provision of effective mechanisms for dealing with cases of cross-border insolvency so as to promote:

    (a)    the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor"; and

    (b)    the "facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment".

53      And it is common ground among all parties that a proceeding concerning an insolvent company would, assuming the other conditions are met, be recognised as a foreign proceeding. But what then of solvent companies? In our judgment, extending the ambit of the UNCITRAL Model Law beyond its primary purpose of providing for the co-ordinated cross-border management of proceedings concerning insolvent companies to encompass such proceedings concerning solvent companies would equally advance its primary purpose, while conferring some additional advantages that are consistent with the broader goal of securing a co-ordinated approach to the liquidation of companies with transnational operations. We explain this in the next section where we consider the extraneous material that the Judge relied on.

54     In sum, we do not think the Purposive Approach leads us to the conclusion that the Judge arrived at because:

> (a)     the addition of the words "or adjustment of debt" positively suggests a Parliamentary object to extend the SG Model Law to proceedings concerning solvent companies; and

> (b)     even aside from this, extending the SG Model Law to such proceedings would not be contrary to or undermine the primary legislative object of facilitating the co-ordination of cross-border insolvencies.

## *Whether solvent companies are excluded under the UNCITRAL Model Law*

55     As we have noted, based on the preparatory material pertaining to the purpose of the UNCITRAL Model Law, the Judge concluded that the intent of the UNCITRAL Model Law was to "exclude the liquidation of solvent companies from [its] scope" and instead it was to "empower a recognising court to extend recognition to a foreign proceeding the subject of which is a company that is insolvent or in severe financial distress" (see GD at [79] and [99]). We examine the following portions of the preparatory material, the 1997 Guide and the 2013 Guide which seem to lend the strongest support to the Judge's conclusion.

56     First, the 1997 Guide explains that the word "insolvency" as used in the title of the UNCITRAL Model Law refers to "various types of collective proceedings against insolvent debtors" (at para 51). This was elaborated upon in the 2013 Guide at para 48, which states:

> Acknowledging that different jurisdictions might have different notions of what falls within the term 'insolvency proceedings', the [UNCITRAL] Model Law does not define the term

'insolvency'. However, as used in the Model Law, *the word 'insolvency' refers to various types of collective proceedings commenced with respect to debtors that are in severe financial distress or insolvent*. The reason is that the [UNCITRAL] Model Law covers proceedings concerning different types of debtors and, among those proceedings, deals with proceedings aimed at liquidating or reorganizing the debtor as a commercial entity. *A judicial or administrative proceeding to wind up a solvent entity where the goal is to dissolve the entity and other foreign proceedings not falling within [Art 2(a)] are not insolvency proceedings falling within the scope of the Model Law*. Where a proceeding serves several purposes, including the winding up of a solvent entity, *it falls under [Art 2(a) of the UNCITRAL Model Law] only if the debtor is insolvent or in severe financial distress*. [emphasis added]

57     The 1997 Guide (at para 68) and the 2013 Guide (at para 63) further explain that, by specifying the required characteristics of a "foreign proceeding", Art 2(*a*) of the UNCITRAL Model Law serves to limit the law's scope of application. The 2013 Guide also states that the term "insolvency" in Art 2(*a*) is used to describe, on a broad level, "proceedings involving debtors that are in severe financial distress or insolvent", and that the focus of the UNCITRAL Model Law is upon such debtors and the laws that address the financial distress of those debtors (see the 2013 Guide at paras 65 and 67). Specifically in relation to the phrase "law relating to insolvency", the 2013 Guide explains at para 73 that:

This formulation is used in the [UNCITRAL] Model Law to acknowledge the fact that liquidation and reorganization might be conducted under law that is not labelled as insolvency law (e.g. company law), but which nevertheless deals with or addresses insolvency or severe financial distress. The purpose was to find a description that was sufficiently broad to encompass a range of insolvency rules irrespective of the type of statute or law in which they might be contained and irrespective of whether the law that contained the rules related exclusively to insolvency. *A simple proceeding for a solvent legal entity that does not seek to restructure the financial affairs of the entity, but rather to dissolve its legal status, is likely not pursuant to a law relating to insolvency or severe financial distress*. [emphasis added]

58     The upshot of the extracts that we have reproduced in the preceding paragraphs is that the UNCITRAL Model Law, as originally contemplated by its drafters, was undeniably intended to be focused primarily on companies that are either insolvent or in severe financial distress. It is thus unsurprising that the 1997 Guide and the 2013 Guide explain, in that context, that for the purposes of Art 2(*a*) of the UNCITRAL Model Law, proceedings pursuant to a "law relating to insolvency" generally do not include proceedings concerning solvent companies. That was very likely the view at the time the UNCITRAL Model Law was drafted. It is also almost certainly the case that the need for a co-ordinated approach arose acutely in the context of insolvent companies.

59     That said, we do not think that the preparatory material, the 1997 Guide and the 2013 Guide go so far as to suggest that expanding the ambit of the UNICTRAL Model Law to include solvent companies would *undermine* the purpose of the UNCITRAL Model Law. Nor does the preparatory material suggest that the processes available under the provisions of the UNCITRAL Model Law were intended to be *excluded* from their application to solvent companies.

60     We are fortified in this view by the observations in *The Judicial Perspective* regarding the interpretation of the phrase "pursuant to a law relating to insolvency" in the 2013 Guide. At paras 83–85, the authors of *The Judicial Perspective* set out the different approaches that have been taken towards interpreting the phrase "law relating to insolvency". By then, *Re Stanford International Bank Ltd and another* [2010] 3 WLR 941 ("*Re Stanford (CA)*") and *Re Betcorp* had been decided and in these decisions, the courts in the UK and the US had held that the UNCITRAL Model Law could apply to solvent companies. The authors, having noted the developments in case law, observed at para 86:

> Following consideration and discussion of this issue in UNCITRAL Working Group V (Insolvency Law) and the Commission, the [2013 Guide] clarifies that the word 'insolvency', as used in the [UNCITRAL Model Law], refers to various types of collective proceedings commenced with respect to debtors that are in severe financial distress or insolvent. A judicial or administrative proceeding to wind up a solvent entity where the goal is to dissolve the entity and other foreign proceedings not falling within [Art 2(*a*) of the UNCITRAL Model Law] are not insolvency proceedings within the scope of the [UNCITRAL Model Law]. Where a type of proceeding serves several purposes, including the winding up of a solvent entity, it falls under [Art 2(*a*) of the UNCITRAL Model Law] only if the debtor is insolvent or in severe financial distress.

In making this observation, the authors also referred to para 48 of the 2013 Guide (which has been reproduced above at [56]). That is significant because, having acknowledged the different approaches that had been and may be taken to the interpretation of a "law relating to insolvency", the authors do not suggest that the position in *Re Betcorp* and *Re Stanford* is contrary to or otherwise undermines the underlying purpose of the UNCITRAL Model Law. There is also no suggestion that proceedings concerning solvent companies are positively to be *excluded* from the scope of the UNCITRAL Model Law.

61     Further, in the *Report of Working Group V (Insolvency Law) on the work of its thirty-ninth session*, UNCITRAL, 44th Sess, UN Doc A/CN.9/715 (2010), the Working Group noted that Art 2(*a*) of the UNCITRAL Model Law had "given rise to diverse interpretation in case law", and the question was raised as to whether the Working Group should clarify the definition of certain elements in Art 2(*a*). Specifically in response to the question of whether there was a need to define the requirement of the insolvency of the debtor, it was said that this was unnecessary as such a requirement "would flow from the terms 'pursuant to a law relating to insolvency'". The Working Group then stated at para 19:

> With respect to the need of providing a definition for the terms 'pursuant to a law relating to insolvency', it was felt that

difficulties in judicial interpretations of those terms had resulted from equating terminology of legislation of different jurisdictions. It was noted that *the Working Group did not aim for unification of insolvency laws*, but to provide clarity on concepts in the Model Law. In that respect, it was said that *it would be impossible to further detail the definition of a 'foreign proceeding' that would still capture all domestic proceedings*. It was further noted that the notion of 'a law relating to insolvency' already provided the desirable degree of flexibility. … [emphasis added]

62     The reluctance of the Working Group to expressly prescribe a requirement of insolvency or severe financial distress in Art 2(*a*) of the UNCITRAL Model Law, despite being cognisant of the differing interpretations of Art 2(*a*) by various courts in different countries, reinforces our conclusion that extending the recognition regime under the UNCITRAL Model Law to proceedings concerning solvent companies is neither inconsistent nor incompatible with the primary purpose of the UNCITRAL Model Law.

63     We note in this regard that Mr Kumar accepted at the hearing before us that there is nothing in the preparatory material which suggests that solvent proceedings were meant to be *excluded* from the ambit of the UNCITRAL Model Law, much less that the purposes of the UNCITRAL Model Law would be undermined by the inclusion of such proceedings within its scope. We are therefore satisfied that even if the words "or adjustment of debt" were not added to Art 2(*h*) of the SG Model Law, and Art 2(*a*) of the UNCITRAL Model Law was adopted in its original form, it would not be contrary to the purpose of the UNCITRAL Model Law to extend its scope to include solvent companies.

64     We would venture further to say that the Broad Approach and consequently, interpreting Art 2(*h*) of the SG Model Law as encompassing solvent proceedings within its ambit, is consistent with the overall purpose of the UNCITRAL Model Law. The UNCITRAL Model Law is designed to

provide a harmonised approach to the treatment of cross-border insolvency proceedings in national legal systems, to facilitate co-operation between courts and office holders involved in the same insolvency across different jurisdictions, to provide for the recognition of proceedings (and the consequences of such recognition), and to afford direct access by foreign representatives of such companies to the courts of the enacting state (*Goode on Principles of Corporate Insolvency Law* (Kristin van Zwieten gen ed) (Sweet & Maxwell, 5th Ed, 2018) ("*Goode on Insolvency Law*") at para 16-16; see also 1997 Guide at paras 1–3 and 2013 Guide at paras 1–3). To this end, one of the four key principles underlying the UNCITRAL Model Law is the co-operation and co-ordination principle, which obliges courts and insolvency representatives to communicate and co-operate in order to ensure that the debtor's insolvency estate is administered fairly and efficiently, with a view to maximising benefits to creditors (*The Judicial Perspective* at para 14(d)). It appears to us, as the Judge noted (GD at [78]), that at least one of the fundamental objects of the UNCITRAL Model Law is to prevent creditors from rushing to satisfy their claims against a debtor company in a particular jurisdiction in order to gain an advantage over other creditors. This in turn ensures a sensible and orderly dissolution of a company or facilitates the successful rehabilitation of the company, as the case may be.

65      While the concerns mentioned above arise predominantly in the context of an insolvent company whose assets are insufficient to satisfy the claims of all its creditors in full, solvent regimes and insolvent regimes are seldom mutually exclusive. A company undergoing a solvent, voluntary liquidation may subsequently need to come under the court's supervision should it transpire that the company is insolvent. In such circumstances, the relevant legislation may provide for mechanisms to facilitate the transition between solvent and

insolvent regimes. For instance, pursuant to s 496(1)(a) of the Australian Corporations Act 2001 (Cth) (the "Australian Corporations Act"), where a liquidator is of the opinion that a company will not be able to pay or provide for the payment of its debts in full in accordance with the declaration of solvency filed by the company's directors pursuant to s 494, the liquidator must, among other things, apply for the company to be wound up in insolvency. Relatedly, s 467B allows the court to order the winding up of a company even if the company is already being wound up voluntarily. Conversely, s 482 empowers the court to terminate a winding up. Indeed, it was against this backdrop that the court in *Re Betcorp* considered that companies had "the statutory ability to shift among various forms of dissolution given changing circumstances" under the Australian Corporations Act (see *Re Betcorp* at 279 and 282). To similar effect, s 124(1) of the Cayman Act and O 15 r 1 of the Cayman CWR oblige a liquidator to apply for an order that the solvent, voluntary liquidation of a company continues under the Cayman Grand Court's supervision if the directors of the company fail to sign a declaration of solvency (see [7] above). In our judgment, the possibility of movement between solvent and insolvent regimes provides further support for adopting the Broad Approach. In view of the possibility that a proceeding concerning a solvent company might transition into one dealing with an insolvent entity, that proceeding should be regarded as one being conducted under a law relating to insolvency or adjustment of debt as long as the relevant law contains provisions dealing with insolvency or adjustment of debt.

66     Furthermore, it bears reiterating a proceeding must satisfy other requirements to qualify as a foreign proceeding within the meaning of Art 2(*h*) of the SG Model Law. In our judgment, the purposes of the UNCITRAL Model Law identified above, in particular, to ensure the co-ordinated and orderly

dissolution or successful rehabilitation of a company, would be engaged in respect of a proceeding which satisfies these other requirements, even if the company in question is solvent. Specifically, Art 2(*h*) requires among other things that: (a) the proceeding in question must be collective in nature, which as we elaborate below at [104], means that the proceeding must involve all creditors of the debtor generally and deal with substantially all of the debtor's assets and liabilities; (b) the property and affairs of the debtor must be subject to the foreign court's control or supervision; and (c) the overall purpose of the proceeding must be the reorganisation or liquidation of a company. The sum effect of these requirements is to exclude from the scope of the SG Model Law certain types of private liquidations or restructurings commenced by individual creditors in respect of only part of company's assets, simple proceedings such as striking a company off the register, and proceedings pertaining to the investigation of misappropriated corporate funds (see [105] below). Quite clearly, in such proceedings, the need for co-operation and co-ordination between creditors, office holders and courts in different jurisdictions simply does not arise.

67     Conversely, where a proceeding involves all the creditors of a company and its assets and liabilities for the purpose of the company's reorganisation or liquidation, and the company's property and affairs are placed under the foreign court's control or supervision, the importance of co-operation and co-ordination between the different stakeholders becomes paramount in securing an orderly dissolution and/or the successful rehabilitation of the company. Put simply, where the other requirements of Art 2(*h*) are satisfied, it seems to us that the rationale for according recognition of foreign proceedings would be engaged, at least to some degree, regardless of the solvency of the company in question. This is all the more so where the overall status of a company with transnational

operations may be solvent, while its branches may not be solvent within particular jurisdictions.

68    For these reasons, we are satisfied that adopting the Broad Approach, and in consequence interpreting Art 2(*h*) of the SG Model Law as encompassing solvent proceedings in its ambit, would not contradict or undermine the underlying object of the UNCITRAL Model Law. On the contrary, such an approach coheres with the purposes of the UNCITRAL Model Law which we have identified at [64] above.

### *The prevailing approach to the interpretation of the UNCITRAL Model Law*

69    A further factor that militates in favour of interpreting Art 2(*h*) of the SG Model Law as including proceedings concerning solvent companies is the desire to ensure that our interpretation of Art 2(*h*) of the SG Model Law is broadly harmonious with the approaches taken in other jurisdictions. Article 8 of the SG Model Law mandates that in the interpretation of the SG Model Law, regard is to be had to its international origin and the need to promote uniformity in its application and the observance of good faith. In this regard, the court in *Re Zetta* noted at [38] that as far as possible, Singapore courts ought to attempt to "tack as closely as possible to the general interpretive trends taken in other jurisdictions that apply the Model Law in its various enactments". It is noteworthy that in the majority of cases across various jurisdictions, courts have held that the scope of their respective adaptations of the UNCITRAL Model Law includes proceedings involving solvent companies. We set out the position in the US, the UK, Australia and New Zealand.

*The position in the US*

70      We first consider the position in the United States. The equivalent of Art 2(*h*) of the SG Model Law in the US is s 101(23) of the US Bankruptcy Code, which provides:

> The term 'foreign proceeding' means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

71      The position in the US is encapsulated in the landmark decision in *Re Betcorp*, to which we have referred, and which concerned an application for recognition of Betcorp's voluntary liquidation in Australia as a foreign proceeding under Chapter 15 of the US Bankruptcy Code. The US court held that there was no requirement for a company to be insolvent or contemplating the adjustment of any debts in order for a proceeding concerning that company to be regarded as being conducted under a law related to insolvency or the adjustment of debts. In particular, the court noted that the Australian Corporations Act "regulates the whole of the corporate life-cycle of an Australian corporation", and that several sub-parts of Chapter 5 of the Australian Corporations Act (on External Administration) contain provisions that deal with corporate insolvency and allow for the adjustment of debts (*Re Betcorp* at 282). These facts, coupled with "the statutory ability to shift among various forms of dissolution given changing circumstances", led the court to conclude that the Australian Corporations Act was a law related to insolvency or the adjustment of debt. On this basis, the US court held that Betcorp's voluntary winding up, which was conducted under the Australian Corporations Act, was a proceeding conducted under a law relating to insolvency or adjustment of debt for the purposes of s 101(23) of the US Bankruptcy Code:

see *Re Betcorp* at 281–282). In other words, the position in the US is that the requirement that a proceeding be conducted under a law relating to insolvency or adjustment of debt would be satisfied as long as the law in question that contained the specific provision under which the proceeding was conducted also contains provisions dealing with insolvency or the adjustment of debt, even if those provisions are not implicated in the case at hand. This is what we have referred to above as the Broad Approach.

72     *Re Betcorp* has attracted a degree of academic criticism. In *Cross-Border Insolvency* (Richard Sheldon QC gen ed) (Bloomsbury Publishing, 4th Ed, 2015) ("*Sheldon on Cross-Border Insolvency*"), it is noted at para 3.35 that although the members' voluntary winding up in *Re Betcorp* was initiated under a body of law which included provisions for an insolvent liquidation, "that coincidence does not necessarily justify bringing within the UNCITRAL Model Law's scheme of recognition and assistance a proceeding in relation to a solvent company, the purpose of which includes the return of a surplus to members". Importantly, however, this is qualified by the observation that:

> *Unless some specific modification is made to the UNCITRAL Model Law,* it is arguable that there is no obvious justification for allowing creditors' rights to be restrained by recognising a solvent liquidation as a foreign proceeding. [emphasis added]

73     As an example of such a modification, the authors refer to s 101(23) in the context of Chapter 15 of the US Bankruptcy Code, which "modifies the UNCITRAL Model Law to enable recognition of a solvent scheme of arrangement". In a similar vein, and as we have explained above at [37]–[46], the addition of the words "or adjustment of debt" to Art 2(*h*) of the SG Model Law was a deliberate modification of Art 2(*a*) of the UNCITRAL Model Law, which was meant to extend the scope of the SG Model Law to solvent companies.

74     The respondent also relies on the critique of *Re Betcorp* in Look's Article, where it is suggested that the decision in *Re Betcorp* is open to question for a number of reasons. Those pertinent to the present appeal may be summarised as follows:

(a)     The US Bankruptcy Court relied on the Australian version of the UNCITRAL Model Law to conclude that a members' voluntary winding up was a "foreign proceeding" for the purposes of Chapter 15 of the US Bankruptcy Code. However, the US court appears to have overlooked the legislative history behind Australia's adaptation of the UNCITRAL Model Law. In particular, the Commonwealth of Australia, Parliament, *Cross-Border Insolvency: Corporate Law Economic Reform Program Proposals for Reform Paper No 8* (Discussion Paper, 2002) ("the CLERP Paper") expressly states that the scope of the UNCITRAL Model Law as implemented in Australia would not extend to a members' voluntary winding up or a winding up by a court on just and equitable grounds as such proceedings may not be insolvency-related.

(b)     The US Bankruptcy Court also considered that Australia's Parliament viewed a voluntary winding up as a proceeding that is conducted under a law relating to insolvency under Australia's version of the UNCITRAL Model Law. The US Bankruptcy Court had relied on the explanatory memorandum (the "Explanatory Memorandum") accompanying the Cross-Border Insolvency Bill 2008 (Cth), which enacted the UNCITRAL Model Law in Australia. The Explanatory Memorandum identified "Chapter 5 (other than Parts 5.2 and 5.4A)" of the Australian Corporations Act as a law relating to insolvency. The US Bankruptcy Court thought it significant that Part 5.5 of Chapter 5 of the Australian Corporations Act, which governed the voluntary winding up

of a company, was not excluded from the description of laws relating to insolvency in the Explanatory Memorandum. However, it failed to appreciate the distinction between a members' voluntary winding up (which is generally a solvent liquidation) and a creditors' voluntary winding up (which is generally an insolvent liquidation). The fact that both forms of winding up are contained in Part 5.5 of Chapter 5 of the Australian Corporations Act, which was identified as a "law relating to insolvency", did not necessarily mean that a members' voluntary liquidation would fall within the ambit of Australia's version of the UNCITRAL Model Law.

(c)     Recognising a foreign members' voluntary liquidation could entail an automatic stay on all litigation against the company. Yet, it is difficult to see why a proceeding primarily aimed at conferring benefit on shareholders should have the effect of impeding creditors from enforcing their rights against the company through litigation.

75     In relation to the first two criticisms noted at [74(a)] and [74(b)] above, we accept that the US Bankruptcy Court in *Re Betcorp* may not have fully appreciated the legislative history behind Australia's adoption of the UNCITRAL Model Law. However, as the Judge pointed out, the question before the US court in *Re Betcorp* was whether Betcorp's voluntary liquidation was a "foreign proceeding" within the meaning of s 101(23) of the US Bankruptcy Code (GD at [139]). That is a question reserved for the recognising court which will determine this in accordance with its own application of the UNCITRAL Model Law. The US court is not bound by the way in which the foreign proceeding is characterised under Australian law (see *Re Agrokor DD and in the matter of the Cross-Border Insolvency Regulations 2006* [2017] All ER (D) 83 (Nov) ("*Re Agrokor*") at [34]). Furthermore, apart from Australia's

adoption of the UNCITRAL Model Law and the Explanatory Memorandum, there was another key pillar underlying the US court's conclusion that Betcorp's voluntary liquidation was conducted under a law relating to insolvency or adjustment of debt. That was the fact that several sub-parts of Chapter 5 of the Australian Corporations Act contain provisions that deal with corporate insolvency and also allow for the adjustment of debt. Further, these also contemplated the possibility of shifting among various pathways to dissolution in the light of changing circumstances (see above at [71]). Therefore, even if the US court had misunderstood the Australian legislature's intentions with regard to Australia's version of the UNCITRAL Model Law, that is not an adequate reason not to adopt the approach in *Re Betcorp*. As to the suggestion that the court in *Re Betcorp* may have misunderstood the legislative intention behind Australia's enactment of the UNCITRAL Model Law, we note that this is not how at least one Australian court has approached the question (see [90]–[91] below).

76     As to the third criticism at [74(c)] above, such concerns may be adequately managed through the recognising court granting recognition subject to conditions. We address this point in more detail below at [96].

77     We now consider other decisions of the US Bankruptcy Court. In *Re ABC Learning Centres*, the boards of an Australian Company ("ABC Learning") and its wholly-owned subsidiary ("ABC Holdings") resolved that the companies were likely to become insolvent and should enter voluntary administration pursuant to the Australian Corporations Act. Petitions were filed before the US Bankruptcy Court seeking recognition of the voluntary administration proceedings, which were subsequently converted by the creditors of the companies into liquidation proceedings. Endorsing *Re Betcorp*, the US court held that the liquidations of ABC Learning and ABC Holdings

were authorised or conducted under a law related to insolvency or the adjustment of debts for the purposes of s 101(23) of the US Bankruptcy Code, as numerous subsections within the Australian Corporations Act address corporate insolvency and the adjustment of corporate debt (see *Re ABC Learning Centres* at 331). Importantly, in determining that the Australian Corporations Act was a law related to insolvency or the adjustment of debts, the court did not consider the companies' solvency or financial status.

78     In *Re Manley Toys*, a Hong Kong company entered into voluntary liquidation in Hong Kong in the face of ongoing litigation, including a pending sanctions motion in a US court in connection with a judgment debt owed by the company, and alleged declining sales. The voluntary liquidation was commenced under the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap 32) (HK) (the "CWMPO"), which both parties' experts on Hong Kong insolvency law agreed set forth the framework for liquidating a company. The US Bankruptcy Court determined that the voluntary liquidation was conducted under a law related to insolvency or adjustment of debts (see *Re Manley Toys* at 638 and 643). As was the case in *Re Betcorp* and *Re ABC Learning Centres*, the solvency status of the company was not a relevant consideration in the court's decision that the Hong Kong proceeding was conducted under a law related to insolvency or adjustment of debts.

79     The respondent relies on *In re Global Cord Blood Corporation* 2022 WL 17478530 (SD New York US Bankruptcy Court) ("*Re Global Cord*"), to contend that even though the court in that case adopted the Broad Approach, the decision illustrates that courts in the US would nonetheless consider whether a foreign proceeding concerns an insolvent or severely financially distressed company in determining whether to grant recognition under Chapter 15 of the US Bankruptcy Code. In our judgment, the respondent's reliance on *Re Global*

*Cord* is misplaced. The US Bankruptcy Court accepted that the relevant Cayman proceeding was brought under the "just and equitable" ground for winding up with the purpose of preventing corporate misconduct, and not under the insolvency provisions of the Cayman Act (*Re Global Cord* at 3 and 12). It then went on to conclude that the Cayman proceeding was not a "foreign proceeding" as was required for Chapter 15 recognition because the Cayman proceeding was neither collective nor for the purpose of reorganisation or liquidation within the meaning of s 101(23) of the US Bankruptcy Code (*Re Global Cord* at 8–9 and 12–13).

80      What is material is that notwithstanding that the Cayman proceeding was not brought under the insolvency provisions of the Cayman Act, the US Bankruptcy Court in *Re Global Cord* opined that the Cayman Act satisfied the definitional requirement of a "law relating to insolvency or adjustment of debt". Importantly, the court's observation that the purpose of Chapter 15 was to assist foreign courts dealing with "insolvency" was made in the limited context of explaining the case law's focus on the role and impact of creditors in determining whether a proceeding is "collective". The court did not, however, hold that the solvency status of a company would bear on its decision to grant recognition under Chapter 15. The court in fact expressly affirmed the decision in *Re Betcorp*, observing (at 9):

> The relevant test is not whether the currently pending proceeding concerns insolvency or adjustment of [debt], or even whether the current proceeding in some sense relates to those objectives, but rather whether the proceeding is being brought under a 'law' that 'relat[es] to' insolvency or adjustment of debt. Further, section 101(23) is to be 'broadly construed.' ... This guidance counsels against an unduly grudging application of this flexibly worded test by narrowly examining whether the specific subsections of the governing Cayman statutory scheme that are presently being applied redress insolvency or creditor rights.

81     On the court's observation that the foreign proceeding was neither "collective" nor "for the purpose of reorganization or liquidation" as the law requires, it was found on the facts of the case that the Cayman proceeding fell outside the range of matters that Chapter 15 was designed to address. In delineating the limits of this range of matters, the court should examine all the criteria spelt out in the relevant provision – in our context, Art 2(*h*) of the SG Model Law – without being fixated on the solvency status of the relevant company.

*The position in the UK*

82     The UK equivalent of Art 2(*h*) of the SG Model Law is Art 2(i) of Schedule 1 to The Cross-Border Insolvency Regulations 2006 (SI 2006 No 1030) (UK) (respectively, "Art 2(i) of the UK Model Law" and the "CBIR"), which defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation[.]

83     In *Re Stanford International Bank Ltd and others* [2009] EWHC 1441 (Ch) ("*Re Stanford (HC)*"), a company ("SIB") was liquidated by the court in Antigua and Barbuda pursuant to s 300 of the International Business Corporations Act (Cap 222) (Antigua and Barbuda) (the "IBCA"), and liquidators were appointed pursuant to ss 304–306 of the IBCA. Section 300 of the IBCA pertained to the liquidation and dissolution of companies under the supervision of the court where the company had failed to comply with regulatory requirements. Lewison J found that the liquidators of SIB were appointed pursuant to a law relating to insolvency, notwithstanding that

insolvency did not feature as a ground under s 300 of the IBCA. In particular, he observed at [94]:

> It is, in my judgment, clear from the court's order and the judgment of [the court in Antigua and Barbuda] that it was not basing the order on section 300 alone. It made the order because, having considered the evidence, it concluded that it was just and equitable that SIB be wound up. *An important part of the evidence was that SIB was insolvent and could not be reorganised via the receivership.* In my judgment at least one of the reasons why [the judge in Antigua and Barbuda] made the order that he did was that *he was satisfied that SIB was insolvent.* [emphasis added]

84     On appeal in *Re Stanford (CA)*, the Court of Appeal ("EWCA") came to the same conclusion as Lewison J albeit for slightly different reasons. The EWCA held that for the purposes of the definition of "foreign proceeding" under the Art 2(i) of the UK Model Law, it was necessary to start by identifying the law under which the relevant proceedings had been brought and was being pursued, before considering whether that law related to insolvency and whether in the light of the other factors to which the definition referred, the proceeding could be regarded as being brought "pursuant" to that law (*Re Stanford (CA)* at [24], *per* Sir Andrew Morritt C). Applying this approach, the EWCA identified Part IV of the IBCA as the law under which SIB's liquidation proceedings had been brought, and held that Part IV *was* a law relating to insolvency because it "provided for the winding up of corporations incorporated in Antigua for the purpose of carrying on an international trade or business on just and equitable grounds, which included insolvency, as well as infringements of regulatory requirements" (*Re Stanford (CA)* at [15]). A key point to note is that in *Re Stanford (CA)*, the insolvency of the company was not taken into account in determining whether the company's liquidation was conducted under a law relating to insolvency. Instead, the focus was on whether insolvency was *one of the grounds* for winding up within Part IV of the IBCA.

85     In *Re Agrokor*, a court in Croatia ordered the extraordinary administration of a company incorporated in Croatia ("Agrokor DD"), under the Law on Extraordinary Administration Proceeding in Companies of Systemic Importance for the Republic of Croatia (the "Extraordinary Administration Law"). The High Court of England and Wales held that the Extraordinary Administration Law was a law relating to insolvency for the purposes of the CBIR (*Re Agrokor* at [77]). In particular, having examined the relevant case law in the US, the UK and Australia, the court observed (at [63] and [73]):

> 63.     From these authorities and guides to interpretation, it is clear that the requirement that the law under which the proceeding is brought be 'an insolvency law' is satisfied *if insolvency is one of the grounds on which the proceeding can be commenced, even if (as in Re Betcorp) insolvency could not actually be demonstrated, and there was another basis for commencing the proceeding.* The matter is obviously all the clearer if insolvency can indeed be demonstrated.
>
> ...
>
> 73.     It is clear that the test applied [by the courts in Belgrade and Montenegro] for a law relating to insolvency is whether under the law concerned there must necessarily be insolvency shown in relation to all the companies concerned. That is far from the test applied in the 'common law' cases discussed above, where it was accepted that a law could be a law relating to insolvency if insolvency was one of the grounds on which a proceeding could be brought. Indeed, in [*Re Betcorp*], the evidence was that the company subject to members' voluntary winding up was in fact solvent. But insolvency would have been a basis for such a winding up, as it was in [*Re Stanford*]. In my judgment I should not reject the wider approach of those common law cases in favour of the narrower one adopted by the courts of Belgrade and Montenegro. ...
>
> [emphasis in original omitted; emphasis added in italics]

86     Nevertheless, the court also considered that the extraordinary administration of Agrokor DD could only be commenced on grounds of insolvency or impending insolvency, whether proved or deemed (at [68]), and

that there was evidence that Agrokor DD was in a state of serious financial distress (at [69]).

87     It appears to us, based on these cases, that to this point, the position in the UK with respect to the interpretation of Art 2(i) of the UK Model Law is broadly aligned with the US position. It is true that in these cases, the courts have also considered the insolvency and/or financially distressed state of the relevant companies. However, it seems to us that the most that can be said is that where the proceedings can be opened on multiple grounds, only some of which relate to insolvency, the proceedings would nonetheless *clearly* fall within the scope of the UK Model Law if they were opened on an insolvency-related ground or where an anticipation of insolvency might have influenced the decision to open proceedings on some other ground (see *Goode on Insolvency Law* at para 16-29). It is also apparent that in these cases, the inquiry into the solvency of the company was not a necessary step in coming to a decision on whether to accord recognition to the "foreign proceeding" under Art 2(i) of the UK Model Law.

88     Against the weight of these cases, the High Court in *Re Sturgeon* declined to follow the US position. In *Re Sturgeon*, a solvent Bermuda-registered company ("Sturgeon Ltd") was wound up in Bermuda on the just and equitable ground under s 161(g) of the Bermuda Companies Act 1981 (the "Bermuda Companies Act"). Notably, s 161(e) of the Bermuda Companies Act provided that a company may be wound up if it is unable to pay its debts (see *Re Sturgeon* at [9]). The liquidators obtained an *ex parte* order recognising the Bermudan liquidation in the UK, and the applicant, a former director of the company, applied to terminate the recognition order. An issue which the High Court had to determine was whether the solvent liquidation of Sturgeon Ltd on the just and equitable ground was a "foreign proceeding" within the meaning of

Art 2(i) of the UK Model Law. After undertaking a review of the Working Group's reports and preparatory papers, the High Court answered that question in the negative. In arriving at that conclusion, the court observed that the Working Group's reports were focused on "the need to recognise and provide relief upon recognition of foreign proceedings, that concerned debtors that either could not pay their debts or were struggling to pay their debts and seeking to reorganise" (*Re Sturgeon* at [70]). It was therefore thought to be contrary to the purpose and object of the UNCITRAL Model Law to interpret "foreign proceeding" as including proceedings that concerned solvent companies and proceedings that have the purpose of producing a return to members and not creditors (*Re Sturgeon* at [117]). The court criticised *Re Betcorp* as having made a wrong turn by recognising as a foreign proceeding the liquidation of a company which was neither insolvent nor in severe financial distress (see *Re Sturgeon* at [121]).

89     With respect, we do not agree with the criticisms levelled in *Re Sturgeon* against *Re Betcorp*. We accept, as we have already said, that the UNCITRAL Model Law was *primarily focused* on companies that are insolvent or in severe financial distress and was not drafted to deal specifically with solvent companies. However, as we explained above at [55]–[63], we do not think that it would be *contrary* to the purpose and object of the UNCITRAL Model Law to extend the scope of the UNCITRAL Model Law to proceedings concerning solvent companies. Indeed, as we have also explained at [64]–[68] above and as we will explain at [97] below, there are good reasons for construing the UNCITRAL Model Law as having this effect both as a matter of principle and practicality.

*The position in Australia*

90     The position in Australia is also aligned with the position in the US. In *Re Chow Cho Poon (Private) Ltd* (2011) 80 NSWLR 507 (SC, NSW), a Singapore-incorporated company ("CCP") was ordered to be wound up pursuant to s 254(1)(*i*) of the Singapore Companies Act (Cap 50, 2006 Rev Ed) (the "Companies Act 2006") on the just and equitable ground. The Supreme Court of New South Wales ("NSWSC") acknowledged at [40] that intuitively, the Singapore winding-up proceeding was not a proceeding "pursuant to a law relating to insolvency" as it was not the inability of CCP to pay its debts as they fell due that constituted the ground on which the Singapore court ordered that the company be wound up. Nevertheless, the NSWSC, endorsing the approaches taken in *Re Stanford (HC)*, *Re Stanford (CA)*, *Re ABC Learning Centres* and *Re Betcorp*, went on to observe at [51]:

> These English and American decisions point to a clear basis on which *the whole of the Singapore Companies Act or, at the least, the whole of its winding up provisions might be classified as 'a law relating to insolvency',* even though the particular winding up was ordered on the just and equitable ground alone and, so far as this court has been told, without any finding (express or implied) of insolvency. [emphasis added]

91     The NSWSC accordingly found that the winding up of CCP in Singapore was a "foreign proceeding" under Art 2(*a*) of sch 1 to the Australian Cross-Border Insolvency Act 2008 (Cth) (which is *in pari materia* with Art 2(i) of the UK Model Law), without giving further consideration to whether CCP was in fact insolvent or in financial distress.

*The position in New Zealand*

92     So too is the position in New Zealand broadly consistent with the US position in that the solvent status of a company does not exclude proceedings

concerning that company from the scope of the Insolvency (Cross-Border) Act 2006 (NZ) (the "NZ Cross-Border Insolvency Act"). In *ANZ National Bank Ltd v Sheahan and Lock* [2013] 1 NZLR 674 ("*ANZ National Bank*"), several Australian companies were placed into liquidation by creditors' resolutions. The liquidation in Australia produced a surplus after all the creditors had been paid, meaning that the Australian companies were solvent. The liquidators subsequently applied under the NZ Cross-Border Insolvency Act for an order that an employee of a bank which had financed the Australian companies attend for examination and produce documents on matters relating to the Australian companies. The bank opposed the application, arguing that the NZ Cross-Border Insolvency Act was not intended for use by foreign representatives of a solvent company. This submission was rejected by the Auckland High Court, which observed at [104]:

> … [W]hile the administration of the Australian liquidations happens to have produced a surplus, it remains appropriate to characterise the regime as a 'collective … proceeding … pursuant to a law relating to insolvency'. … The purpose [of a winding up] is 'to ensure that an orderly regime is imposed upon all interested parties to that none of them individually may enhance his position by exploiting some fortuitous circumstance which may yield an unfair advantage …'

### *Practical concerns*

93     Finally, we address the practical concerns that may arise if proceedings concerning solvent companies were included within the scope of the SG Model Law pursuant to the Broad Approach. This was alluded to by the Judge and by the respondent.

94     The Judge observed that the Broad Approach "subordinates substance entirely to form" because under the Broad Approach, any type of proceeding, no matter how far removed it may be from any connection to insolvency, would

be a proceeding under a law relating to insolvency within the meaning of Art 2(*h*) of the SG Model Law simply because that proceeding is commenced under a provision which happens to be found in a statute which deals generally with insolvency. The Judge raised as an example an applicant who has secured relief under s 216(2)(*c*) of the Companies Act 2006 to commence civil proceedings in the name of and on behalf of the company, noting the absurdity of categorising such a proceeding as a "foreign proceeding" under Art 2(*h*) simply because the Companies Act 2006 also contained provisions dealing with corporate insolvency (see the GD at [59]–[61]). In our judgment, the Judge's concerns are adequately addressed by the safeguards present in the other elements of Art 2(*h*). As the Judge noted at [62], and as was accepted by counsel for the respondent during the hearing before us, proceedings conducted under s 216 of the Companies Act 2006 would not be collective proceedings within the meaning of Art 2(*h*) of the SG Model Law since such proceedings do not deal with all of the company's creditors collectively. We elaborate below at [102]–[107] on the requirement that the foreign proceeding must be collective and whether Ascentra's Cayman Liquidation counts as such a proceeding. Aside from this, we reiterate the point we have made at [29] above that there are at least five criteria that must be met for a proceeding to come within Art 2(*h*). Accordingly, the concern that any type of proceeding, no matter how disconnected it may be from insolvency, may be brought into the ambit of Art 2(*h*) seems to us to be somewhat overstated.

95     Relatedly, the respondent submits that adopting the Broad Approach "open[s] [the] floodgates for recognition and assistance applications", which would allow solvent companies to take advantage of the SG Model Law and create absurd outcomes. In particular, it is suggested that:

(a)     The Broad Approach would result in an automatic moratorium being granted to solvent companies if proceedings concerning such companies are recognised as foreign main proceedings (see Art 20(1) of the SG Model Law). However, there is no justification for providing a moratorium to a solvent company, especially when doing so would afford the company a shield against litigation that they would not otherwise be entitled to.

(b)     The recognition of a foreign proceeding as a foreign main proceeding would give rise to a presumption of insolvency under Art 31 of the SG Model Law. This may lead to the absurd outcome where a solvent company is presumed to be insolvent for the purpose of commencing secondary proceedings under Singapore insolvency law, and would allow the solvent company to sidestep legislative requirements that would otherwise apply to it.

96      In our view, the policy concerns raised by the respondent are overstated. In relation to the risk of a moratorium being granted to a solvent company, Art 20(6) of the SG Model Law expressly provides that the court may, on the application of the foreign representative or a person affected by the moratorium, or of its own motion, modify or terminate such stay and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the court thinks fit. It is thus clear that the Singapore courts may recognise a foreign proceeding as a foreign main proceeding without an accompanying moratorium necessarily being maintained. This would prevent the legitimate claims of creditors against a solvent company from being unfairly stymied. As to the respondent's argument regarding the presumption of insolvency, this can be dealt with quickly. The presumption of insolvency in Art 31 of the SG Model Law is expressly qualified by the words "[i]n the absence of evidence to the

contrary". It is therefore inconceivable that a company which has been proved to be solvent would nonetheless be able to invoke the presumption of insolvency under Art 31 of the SG Model Law.

97     On the contrary, we agree with the appellants' submission that imposing a requirement that the subject company must be either insolvent or in severe financial distress may introduce some measure of complexity at the recognition stage. Assuming for the moment that the Judge was correct in holding that recognition would only be granted to foreign proceedings involving insolvent companies, and "insolvency" is to be determined having regard to the law of the foreign State in which the foreign proceeding was commenced (see the GD at [48]), that would require the Singapore court to determine whether the subject company is insolvent or in severe financial distress under the law of the foreign State. In other words, the applicant for recognition must be prepared, at the time of presentation of the petition for recognition, to prove the insolvency or severe financial distress of the subject company under the relevant foreign law. This may require that in contested cases, evidence be adduced not only as to the financial status of the company but conceivably as to foreign law (see *Pacific Recreation Pte Ltd v S Y Technology Inc and another appeal* [2008] 2 SLR(R) 491 at [54]). In our view, introducing such requirements at the recognition stage would be undesirable. On this, we agree with Mr Lee's suggestion that a light threshold should be imposed for recognition, which can then be tempered by granting recognition or relief subject to the imposition of appropriate conditions.

### Conclusion on the first issue

98     We are therefore satisfied that there is no requirement under the SG Model Law for a company to be insolvent or in severe financial distress before a proceeding concerning that company may be recognised as a foreign

proceeding under the SG Model Law. For this reason, we agree with the appellants that the approach taken in *Re Betcorp* towards the interpretation of the words "law relating to insolvency or adjustment of debt" (*ie*, the Broad Approach) should be adopted in Singapore. Interpreting Art 2(*h*) of the SG Model Law in that manner better coheres with its ordinary meaning and reflects Parliament's intention to include proceedings concerning solvent companies within the scope of the SG Model Law. We are also satisfied that such an interpretation does not undermine, and is indeed consistent with, the overall purpose of the UNCITRAL Model Law.

99     To reiterate, under the Broad Approach, the requirement that a proceeding be conducted "under a law relating to insolvency or adjustment of debt" within the meaning of Art 2(*h*) will be satisfied as long as the law or the relevant part of the law under which the relevant proceeding is conducted includes provisions dealing with the insolvency of a company or the adjustment of its debts. It will generally be irrelevant that the company concerned in the relevant proceeding is not insolvent or in severe financial distress.

100     We turn to consider whether Ascentra's Cayman Liquidation is a proceeding being conducted under a law relating to insolvency or adjustment of debt for the purposes of Art 2(*h*) of the SG Model Law. Ascentra's Cayman Liquidation had begun as a voluntary winding up commenced pursuant to a shareholders' resolution, the requirements of which are prescribed by s 116(c) of the Cayman Act. That provides that a company may be wound up voluntarily if it so resolves by special resolution. Ascentra's Cayman Liquidation was subsequently brought under the supervision of the Cayman Grand Court pursuant to s 124(1) of the Cayman Act (see [8] above).

101    Both ss 116(c) and 124(1) of the Cayman Act are contained within Part V of the Cayman Act, titled "Winding up of Companies and Associations". Part V of the Cayman Act also contains other provisions that indisputably deal with the insolvency or adjustment of debt of a company. For instance, s 92 of the Cayman Act sets out the circumstances in which a company may be wound up by the court, which includes the situation where the company is unable to pay its debts (see s 92(d) of the Cayman Act). The Cayman Act also contains provisions dealing with arrangements and reconstructions. Section 86 of the Cayman Act provides that the company may compromise with its creditors and members, while s 87 of the Cayman Act sets out provisions for facilitating the reconstruction and amalgamation of companies. Applying the approach set out at [98] and [99] above, we are satisfied that the Cayman Act is a law relating to insolvency or adjustment of debt. It follows that Ascentra's Cayman Liquidation, which is being conducted pursuant to provisions of the Cayman Act, is a proceeding being conducted under a law relating to insolvency or adjustment of debt for the purposes of Art 2(*h*) of the SG Model Law.

**Whether Ascentra's Cayman Liquidation is a collective proceeding**

102    The next issue is whether Ascentra's Cayman Liquidation is a collective proceeding within the meaning of Art 2(*h*) of the SG Model Law. Before the Judge, the parties accepted and proceeded on the basis that the Cayman proceeding was a collective proceeding. It is therefore not surprising that this point was not pursued by the respondent in its written submissions. However, during the hearing before us, Mr Kumar took a different stance and informed us that the respondent was not prepared to concede that Ascentra's Cayman Liquidation is a collective proceeding. Mr Lee did not object to Mr Kumar's withdrawal of his earlier concession.

103    The respondent's argument in this regard is contingent on its argument that Parliament did not intend for the SG Model Law to extend to proceedings involving solvent companies. However, for the reasons we have explained at [37]–[46] above, it is clear to us that Parliament had in fact modified Art 2(*h*) the SG Model Law to include proceedings concerning solvent companies within the scope of the SG Model Law.

104    In any event, the respondent has not pointed to any authority or material which suggests that a proceeding such as the present is not a collective proceeding for the purposes of the UNCITRAL Model Law just because it concerns a solvent company. The relevant principles and authorities concerning the requirement of a proceeding being collective were set out by this court in *United Securities* at [55]–[62] and may be summarised as follows:

> (a)    For a proceeding to be collective, it must concern *all* creditors of the debtor generally, in contrast to, for instance, one that is instigated at the request, and for the benefit, of a single secured creditor (*Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law* (Look Chan Ho gen ed) (Globe Law and Business Publishing, 4th Ed, 2017) at p 178).

> (b)    In evaluating whether a proceeding is collective, a key consideration is whether substantially all of the assets and liabilities of the debtor are dealt with in the proceeding, subject to local priorities and statutory exceptions, and to local exclusions relating to the rights of secured creditors (2013 Guide, part two at para 70).

105    In *Re Betcorp*, the US Bankruptcy Court similarly observed that a collective proceeding is one which considers the rights and obligations of *all*

*creditors*. On that basis, the US court held that the voluntary liquidation of Betcorp in Australia was a collective proceeding (*Re Betcorp* at 281). *Re Betcorp* may be contrasted with *Re Global Cord*, where the Cayman Grand Court appointed Joint Provisional Liquidators ("JPLs") as fiduciaries to, among other things, investigate and potentially recover allegedly misappropriated corporate funds. The JPLs sought recognition of the proceedings under Chapter 15 of the US Bankruptcy Code. The US court refused recognition, finding that the Cayman proceeding was not a collective proceeding because it did not involve all of the creditors of the company, which is the "main definitional hallmark" of a collective proceeding within meaning of s 101(23) of the US Bankruptcy Code (*Re Global Cord* at 7–9).

106     Applying these principles to the present case, we are satisfied that Ascentra's Cayman Liquidation is a collective proceeding within the meaning of Art 2(*h*) of the SG Model Law. Ascentra's Cayman Liquidation is subject to various provisions in the Cayman Act that are concerned generally with the rights of *all* of Ascentra's creditors. For instance, ss 140(1) and 140(2) of the Cayman Act provide:

> **Distribution of the company's property**
>
> 140. (1) Subject to subsection (2), the property of the company shall be applied in satisfaction of its liabilities *pari passu* and subject thereto shall be distributed amongst the members according to their rights and interests in the company.
>
> (2) The collection in and application of the property of the company referred to in subsection (1) is without prejudice to and after taking into account and giving effect to the rights of preferred and secured creditors and to any agreement between the company and any creditors that the claims of such creditors shall be subordinated or otherwise deferred to the claims of any other creditors and to any contractual rights of set-off or netting of claims between the company and any person or persons (including without limitation any bilateral or any multi-lateral set-off or netting arrangements between the company and any

person or persons) and subject to any agreement between the company and any person or persons to waive or limit the same.

107    Moreover, the Liquidators were appointed by the Cayman Grand Court as the joint official liquidators of Ascentra. In this connection, ss 110(1)(*a*) and 110(1)(*b*) of the Cayman Act prescribe that the function of an official liquidator is to: (a) collect, realise and distribute the assets of the company to its creditors and, if there is a surplus, to the persons entitled to it; and (b) report to the company's creditors and contributories upon the affairs of the company and the manner in which it has been wound up. In the premises, we are satisfied that the voluntary liquidation of Ascentra is one which concerns all of Ascentra's creditors generally and therefore qualifies as a collective proceeding under Art 2(*h*) of the SG Model Law.

## Whether Ascentra's Cayman Liquidation is being conducted for the purpose of reorganisation or liquidation

108    We deal next with the respondent's contention that Ascentra's Cayman Liquidation is not being conducted for the purpose of reorganisation or liquidation within the meaning of Art 2(*h*) of the SG Model Law. The respondent chiefly relies on para 35 of part one of the Legislative Guide (which is a document intended by the UNCITRAL to be used as a reference by national authorities and legislative bodies when preparing or reviewing laws and regulations which address the financial difficulty of debtors):

> 35.    There are a number of legal and economic justifications for liquidation. Broadly speaking, it can be argued that a commercial business that is unable to compete in a market economy should be removed from the marketplace. A principal identifying mark of an uncompetitive business is one that satisfies one of the tests of insolvency, that is, it is unable to meet its mature debts as they become due or its debts exceed its assets. More specifically, the need for liquidation proceedings can be viewed as addressing inter-creditor problems (when an insolvent debtor's assets are insufficient to

> meet the claims of all creditors it will be in a creditor's own best interests to take action to recover its claim before other creditors can take similar action) and as a disciplinary force that is an essential element of a sustainable debtor-creditor relationship. …

On this basis, the respondent argues that "liquidation" within the meaning of the UNCITRAL Model Law was intended to refer to *insolvent* liquidation, and Ascentra's solvent liquidation therefore did not satisfy this requirement.

109    For the reasons set out at [37]–[99] above, we have concluded that the SG Model Law extends to the recognition of foreign proceedings concerning solvent companies. That being the case, interpreting the word "liquidation" in Art 2(*h*) as being limited to insolvent liquidations, as the respondent suggests, would be incompatible with our conclusion.

110    In any event, we do not accept the respondent's submission that the passage from the Legislative Guide that we have reproduced above shows that the UNCITRAL Model Law was intended to be limited to proceedings concerning *insolvent* liquidations. The passage in the Legislative Guide relied upon by the respondent states that *one of* the justifications for liquidating a company is its inability to compete in a market economy, which is evidenced by its insolvency. As the appellants rightly point out, that passage does not deal specifically with the UNCITRAL Model Law, let alone state that the word "liquidation" in Art 2(*a*) of the UNCITRAL Model Law was intended to refer only to insolvent liquidations.

111    In the premises, we hold that Ascentra's Cayman Liquidation was conducted for the purpose of liquidation within the meaning of Art 2(*h*) of the SG Model Law.

**Whether the Singapore courts have jurisdiction to recognise Ascentra's Cayman Liquidation**

112     Finally, we turn to consider whether the Singapore courts have jurisdiction to recognise Ascentra's Cayman Liquidation. Pursuant to Art 4(2)(*a*)(ii) of the SG Model Law, such jurisdiction will be established if the debtor has property situated in Singapore. Section 2(1) of the IRDA defines "property" broadly as: (a) money, goods, things in action, land and every description of property, wherever situated; and (b) obligations and every description of interest, whether present or future or vested or contingent, arising out of or incidental to property.

113     The appellants submit that the following constitute property situated in Singapore within the meaning of Art 4(2)(*a*)(ii) of the SG Model Law: (a) legal and/or equitable claims against the respondent and Scuderia Bianco; (b) retainer fees paid to its solicitors; and (c) shares in a Singapore-incorporated company, Interush (Singapore) Pte Ltd ("Interush"), which are held by Ascentra. The respondent does not dispute that Ascentra holds shares in Interush, nor that such shares constitute property situated in Singapore. Indeed, the respondent appears to have conceded in its submissions in the proceedings below that Ascentra's shares in Interush constitute property for the purposes of Art 4(2)(*a*)(ii) of the SG Model Law. That alone suffices to found jurisdiction in Singapore to recognise Ascentra's Cayman Liquidation under Art 17 of the SG Model Law. In the circumstances, it is unnecessary for us to determine whether Ascentra's legal and/or equitable claims against the respondent and Scuderia Bianco and/or the legal fees paid by Ascentra to its solicitors also constitute property within the meaning of Art 4(2)(*a*)(ii) of the SG Model Law.

**Conclusion**

114    For these reasons, we are satisfied that Ascentra's Cayman Liquidation qualifies as a "foreign proceeding" within the meaning of Art 2(*h*) of the SG Model Law. In particular, we are satisfied that Ascentra's Cayman Liquidation: (a) is a collective proceeding; (b) is being conducted under a law relating to insolvency or adjustment of debt; and (c) has as its purpose the liquidation of Ascentra. In addition, we are satisfied that we have jurisdiction to recognise Ascentra's Cayman Liquidation pursuant to Art 4(2)(*a*)(ii) of the SG Model Law.

115    As we have found the requirements for recognition under Art 17 of the SG Model Law to be fulfilled, we are obliged to recognise Ascentra's Cayman Liquidation as a foreign main proceeding in Singapore under Art 17 of the SG Model Law (see [27] above). We therefore allow the present appeal. However, we will hear the parties on the question of whether the recognition of Ascentra's Cayman Liquidation should be made subject to any conditions and give permission to the parties to make submissions on this within 14 days of the date of this judgment if they wish to seek the imposition of any conditions. If this is sought by either party, then the other party shall have 14 days to respond.

116    We award costs to the appellants fixed at $60,000 (inclusive of disbursements), this reflecting the position of both parties in their costs

submissions as to the appropriate quantum of costs. The usual consequential orders are to apply.

Sundaresh Menon
Chief Justice

Steven Chong
Justice of the Court of Appeal

Belinda Ang Saw Ean
Justice of the Court of Appeal

Lee Eng Beng SC and Yeo En Fei Walter (Rajah & Tann Singapore LLP) (instructed), Han Guangyuan Keith and Angela Phoon Yan Ling (Oon & Bazul LLP) for the appellants; Balakrishnan Ashok Kumar, Gloria Chan Hui En, Stanley Tan Sing Yee and Shreya Prakash (BlackOak LLC) for the respondent.

_____

Certified True Copy

Senior Manager
Office of the Chief Justice
Supreme Court Singapore