

PACHULSKI
STANG
ZIEHL &
JONES

780 Third Avenue, 34th Floor
New York, New York 10017-2024
**Tel. 212.561.7700**
Fax: 212.561.7777

March 8, 2024

John A. Morris
212.561.7760
jmorris@pszjlaw.com

**VIA EMAIL AND ECF**

The Honorable David S. Jones
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004-1408

> **Re:    In re Ascentra Holdings, Inc., Case No. 21-11854 (DSJ)**

Dear Judge Jones:

We represent interested parties Shang Peng Gao Ke, Inc. SEZC and SPGK Pte. Ltd. (together, "SPGK"). We write pursuant to Your Honor's Chambers' Rules and Local Rule 7007-1(b) to request a discovery conference in connection with the parties' dispute concerning the unjustified refusal of Graham Robinson ("Mr. Robinson"), one of the Joint Official Liquidators (the "JOLs") of debtor-in-a-foreign-proceeding Ascentra Holdings, Inc. ("Ascentra") to provide any deposition testimony relating to the Restraint Termination Motion (defined below) topics (topics six through nine) listed in the Amended Notice of Deposition (the "Deposition Notice") attached hereto as **Exhibit A**.

SPGK submits that (i) pursuant to Rule 37(a)(3)(B)(i) of the Federal Rules of Civil Procedure (the "Federal Rules"), Mr. Robinson should be compelled to provide deposition testimony on these topics; (ii) if SPGK is required to make a motion to compel, SPGK should be awarded its reasonable expenses relating to that motion, including attorneys' fees pursuant to Federal Rule 37(a)(5)(a); and (iii) if Mr. Robinson continues to refuse to answer questions concerning topics six through nine, Ascentra should be precluded from offering any evidence concerning those topics at any evidentiary hearing concerning the Restraint Termination Motion.

**Background**

On February 29, 2024, in accordance with this Court's *Memorandum Decision and Order Denying Foreign Representatives' Application to Preclude Proposed Deposition* (the "Discovery Order") [ECF No. 80] dated December 5, 2023, SPGK conducted the deposition of Ascentra pursuant to Federal Rule 30(b)(6) in connection with its pending motions to terminate the recognition order (the "Dismissal Motion") and to terminate the restraint (the "Restraint Termination Motion" and collectively with the Dismissal Motion, the "Motions") of certain funds

The Honorable David S. Jones
March 8, 2024
Page 2

(the "<u>Planet Payment Funds</u>").[1]  Mr. Robinson testified as Ascentra's designee.  The first five 30(b)(6) topics relate to the Dismissal Motion, and as noted above, topics six through nine relate to the Restraint Termination Motion.  *See* **<u>Exhibit A</u>**.

## **<u>The Discovery Dispute</u>**

During Mr. Robinson's deposition, the transcript of which (the "<u>Robinson Transcript</u>") is attached hereto as **<u>Exhibit B</u>**, counsel for SPGK marked as Robinson Exhibit 8 a letter from Ascentra's counsel to this Court dated October 11, 2023 [ECF No. 77] attaching an Amended Writ of Summons (the "<u>Complaint</u>") filed against SPGK and related entities in the Cayman Grand Court.  Thereafter, Ascentra's counsel instructed Mr. Robinson not to answer ***any*** questions about the facts set out therein on the grounds that there is a pending proceeding, *see, e.g., id.* at 124:19-127:9, and on the grounds of attorney-client privilege, *see, e.g.*, *id.* at 130:2-131:5.

Indeed, Ascentra's counsel instructed the witness on all of SPGK's questions regarding each of deposition topics six through nine:

> Q.  Look at topic 6.  Can you identify for me the documents that the foreign representatives contend support their assertion that they can establish a likelihood of success on the merits with respect to their contractual basis for entitlement to the Planet Payment funds?
>
> Mr. McDonald:  Objection.  I direct the witness not to answer on the basis of a pending proceeding.
>
> Q.  Are you going follow counsel's advice?
>
> A.  Yes.
>
> Q.  Can you turn the page, please, to number 7.  Can you describe for me all facts that the foreign representatives contend support their assertion that they can establish a likelihood of success on the merits with respect to a contractual basis for entitlement to the Planet Payment funds?
>
> Mr. McDonald:  The same objection.  The same direction.  Also calls for divulging attorney-client communications.
>
> Q.  You are going to follow counsel's advise?
>
> A.  Yes.

*Id*. at 128:12-129:15.

> Q.  Looking at topic number 8, can you please tell me all of the documents that the foreign representatives contend support their assertion that they can establish

---

[1] Pursuant to this Court's Second Order Modifying Motions Deadlines and Setting Discovery Deadlines and Hearing Date [ECF No. 76], SPGK's replies in further support of the Motions must be filed two weeks after the completion of the 30(b)(6) deposition of Ascentra.  SPGK submits that in light of Ascentra's failure to fully provide deposition testimony on February 29th, the deposition of Ascentra is not "complete."

The Honorable David S. Jones
March 8, 2024
Page 3

> a likelihood of success on the merits with respect to an equitable basis for entitlement to the Planet Payment funds.
>
> Mr. McDonald:  The same objection.  The same direction.

*Id*. at 130:2-10.

> Q.  Number 9.  Can you please share with us the facts that the foreign representatives contend support their assertion that they can establish a likelihood of success on the merits with respect to an equitable basis for entitlement to the Planet Payment funds?
>
> Mr. McDonald:  The same objection.  The same direction.
>
> Q.  Are you going to follow counsel's advice?
>
> A.  Yes.

*Id*. at 131:6-17.

> Thereafter, counsel engaged in the following colloquy:
>
> Mr. Morris:  Hold it.  Before we go off the record.  Are you going to direct him not to answer any question that concerns any allegation or assertion that's set forth in the complaint?
>
> Mr. McDonald:  Yes.
>
> Mr. Morris:  And if you are given those directions, do you intend to follow them?
>
> The Witness:  Yes. . . .
>
> Mr. Morris:  I have no further questions.  You know, subject to the reservation of rights that I made early on about either seeking a preclusion order or motion to compel. But I don't want to waste anybody's time here.

*Id*. at 134:8-18; 136:10-15.

Consistent with its reservation of rights at the deposition, SPGK now seeks this Court's intervention in connection with Ascentra's blanket refusal to provide deposition testimony relevant to the Restraint Termination Motion.

## **Basis for Relief Requested**

SPGK is entitled to testimony on the deposition topics relating to the Restraint Termination Motion so that it can litigate, among other things, Ascentra's likelihood of success on the merits. Notwithstanding this, as detailed above, Ascentra's counsel instructed Mr. Robinson not to answer questions relating to the facts and documents supporting Ascentra's contractual and equitable claims to the Planet Payment Funds because there is now an action (filed **after** the Restraint Termination Motion, and based largely on the deposition of SPGK taken in this contested matter)

The Honorable David S. Jones
March 8, 2024
Page 4

pending in the Cayman Grand Court. But as this Court held in the Discovery Order, "the pending proceeding rule applies to preclude discovery that is sought pursuant to Bankruptcy Rule 2004. . . . Therefore, because SPGK seeks discovery under Rules 7026 and 7030 rather than Rule 2004, **the pending proceeding rule is inapplicable here**." Discovery Order at 32-33 (emphasis added). As this Court stated: "where, as here, discovery is sought pursuant to Rules 7026 and 7030 instead of Rule 2004, the fairness concerns that drive the pending proceeding rule are not implicated, and the rule need not **(and does not)** apply." *Id*. at 33-34 (emphasis added).

Further, during the December 21, 2023 status conference, the Court directly addressed Ascentra's purported privilege concerns:

> I think more commonly what I see, and what I think avoids a possible real privilege and work product leaking back out through a client, is if you just ask about the facts and issues.

Transcript of December 21, 2023 status conference (attached hereto as **Exhibit C**) at 34:3-6.

Hewing closely to the Court's guidelines, SPGK asked only about facts and documents that Ascenta believes support its contention that it likely to succeed on the merits of its contractual and equitable claims to the Planet Payment funds.

The JOLs cannot use the pendency of the Cayman litigation as a sword to seek relief and a shield to protect them from having to meet the likelihood of success standard required by Chapter 15 to justify the restraint. To the extent that Mr. Robinson was instructed not to testify about facts and issues relating to the entitlement to the Planet Payment Funds (as opposed to information truly protected by the attorney client privilege and the work product doctrine), he should be compelled to provide deposition testimony on those facts and issues. To the extent that he does not provide deposition testimony on the basis of privilege or otherwise, Ascentra should be precluded from testifying or offering documents on those topics at the evidentiary hearing on the Restraint Termination Motion.

## Good Faith Effort to Resolve

On March 5, 2024, prior to requesting this conference, and in accordance with Local Rule 7007-1(a), the undersigned contacted opposing counsel by email in an attempt to confer regarding this discovery dispute. On March 7, 2024, I received a response to my email in which opposing counsel indicated that the JOLs are opposed to the relief that SPGK seeks. Accordingly, we respectfully request that this Court set a conference on this matter and adjourn the response deadline for the reply in support of the Restraint Termination Motion.

Respectfully,

*/s/ John A. Morris*
John A. Morris

The Honorable David S. Jones
March 8, 2024
Page 5

cc:     Hugh M. McDonald, Esq. (via email)
        John A. Pintarelli, Esq. (via email)

# EXHIBIT A

John A. Morris, Esq.
Beth E. Levine, Esq.
Jeffrey M. Dine, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777
*Counsel for Shang Peng Gao Ke Inc. SEZC and SPGK Pte Ltd*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                              :
In re                                                         :        Case No. 21-11854-dsj
                                                              :
ASCENTRA HOLDINGS, INC.                                       :        Chapter 15
(in Official Liquidation),[1]                                 :
                                                              :
                    Debtor in a foreign proceeding.           :
---------------------------------------------------------------x

## AMENDED NOTICE OF DEPOSITION OF ASCENTRA HOLDINGS, INC.

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, made applicable herein pursuant to Rule 9014 of the Federal Rules of Bankruptcy

Procedure, interested parties  Shang Peng Gao Ke Inc. SEZC and SPGK Pte Ltd (together,

"SPGK"), will take the testimony upon oral examination of Ascentra Holdings, Inc. ("Debtor")

in connection with SPGK's Motion Pursuant to 11 U.S.C. §§ 1517(d) and 1520(c) for an Order

Terminating the Recognition Order (ECF No. 37) by the person(s) most qualified to testify on

the Debtor's behalf with respect to the subject matters described in **Exhibit A** hereto,

commencing at 9:30 a.m. on February 29, 2024.

---

[1]    The Debtor's company registration number is 283719.  The Debtor's registered office is c/o JTC (Cayman) Ltd.,
        94 Solaris Avenue, Second Floor, Camana Bay, PO Box 30745, Grand Cayman, Cayman Islands, KY1-1203.

The deposition will take place at the offices of Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue 34th Floor, New York, NY 10017, or at such other place as may be agreed by the parties. The deposition by oral examination will be taken before a notary public or an officer authorized by law to administer oaths upon oral examination and will be recorded by a certified court reporter by stenographic method including the use of real-time or otherwise, and/or by audio or video recording, and may be conducted by videoconference service.

Dated: January 30, 2024          PACHULSKI STANG ZIEHL & JONES LLP

*/s/ John A. Morris*
John A. Morris, Esq.
Beth E. Levine, Esq.
Jeffrey M. Dine, Esq.
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:  (212) 561-7700
Facsimile:   (212) 561-7777
Email: jmorris@pszjlaw.com
         blevine@pszjlaw.com
         jdine@pszjlaw.com

*Counsel to Shang Peng Gao Ke Inc. SEZC
and SPGK Pte Ltd*

## EXHIBIT A  TO THE NOTICE OF DEPOSITION OF ASCENTRA HOLDINGS, INC.

## DEFINITIONS

1.      "Ascentra" means debtor in a foreign proceeding Ascentra Holdings, Inc.

2.      "Cayman Proceeding" means the proceeding in the Grand Court of the Cayman Islands, *In the matter of Ascentra Holdings, Inc (in voluntary liquidatio*n), FSD NO. 189 of 2021-DDJ.

3.      "Concerning" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

4.      Foreign Representatives" means Graham Robinson and Ivy Chua Suk Lin, the duly appointed joint official liquidators and foreign representatives of Ascentra Holdings, Inc.

5.      "JOLs" means the Joint Official Liquidators of Ascentra.

6.      "Proof of Debt" means any proof of debt provided by a purported Creditor to the JOLs or filed in the Cayman Proceeding.

7.      The "Recognition Date" is the date of the Order Granting Recognition and Relief in Aid of a Foreign Main Proceeding pursuant to Sections 1504, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code in this case (ECF No. 22), December 6, 2021.

## AMENDED TOPICS

### *Proceeding Termination Motion:*

1.  Whether Ascentra ever changed the Certificate of Solvency filed in the Cayman Proceeding on September 23, 2021.

2.  (a) The number of creditors of Ascentra existing at date of commencement of the liquidation and the aggregate amount of its obligations to those creditors;

(b) whether any obligation of Ascentra to any creditor existing as of the date commencement of liquidation has not been paid in the ordinary course; and

(c) whether there are any obligations of Ascentra to any creditors that existed as of the commencement of the liquidation that have not been paid in full as of the date of the deposition, and reasons therefor.

3. Financial distress of Ascentra, as set out in the JOLs' letter to the Bankruptcy Court dated September 20, 2023 (ECF# 71).

4. (a) The Proofs of Debt requested by the JOLs or asserted by or on behalf of any purported creditor after the Recognition Date, or any objection by the JOLs to any Proof of Debt;

(b) whether the admission of any unadjudicated Proof of Debt would render Ascentra insolvent or of doubtful solvency; and

(c) whether the JOLs have put an estimate on any contingent claim asserted in any proof of debt.

5. Any application for sanction or other request for relief, formal or informal, made in the Cayman Proceeding by any purported creditor after the Recognition Date

### *Restraint Termination Motion:*

6. The documents that the Foreign Representatives contend support their assertion that they can establish a likelihood of success on the merits with respect to a contractual basis for entitlement to the Planet Payment Funds, *see Foreign Representatives' Objection to Motion of Shang Peng Gao Ke Inc. SEZC and SPGK PTE Ltd. Pursuant to 11 U.S.C § 1522(c) to Terminate Restraint* [Docket No. 62] (the "Restraint Termination Opposition") at 27, as the term "Planet Payment Funds" is defined therein.

7.  The facts that the Foreign Representatives contend support their assertion that they can establish a likelihood of success on the merits with respect to a contractual basis for entitlement to the Planet Payment Funds.  *See id*.

8.  The documents that the Foreign Representatives contend support their assertion that they can establish a likelihood of success on the merits with respect to an equitable basis for entitlement to the Planet Payment Funds.  *See id*.

9.  The facts that the Foreign Representatives contend support their assertion that they can establish a likelihood of success on the merits with respect to an equitable basis for entitlement to the Planet Payment Funds.  *See id*.

# EXHIBIT B

**Page 1**

```
 1   IN THE UNITED STATES BANKRUPTCY COURT
 2   FOR THE SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------x
 4   In re
 5   ASCENTRA HOLDINGS, INC. (In Official
 6   Liquidation),                Chapter 15
 7                        Case No.21-11854(DSJ)
 8
 9           Debtor in a
10           Foreign Proceeding.
11   ------------------------------------x
12
13
14           VIDEOTAPED 30(b)(6) DEPOSITION
15                        OF
16           ASCENTRA HOLDINGS, INC.
17     By:   GRAHAM ROBINSON, Corporate Representative
18                  New York, New York
19              Thursday, February 29, 2024
20
21
22
23
24   Reported by:
     Frank J. Bas, RPR, CRR
25   Job No. J10806182
```

**Page 2**

```
 1
 2
 3              February 29, 2024
 4               9:38 a.m. EST
 5
 6      Videotaped 30(b)(6) Deposition of ASCENTRA
 7   HOLDINGS, INC., by GRAHAM ROBINSON, Corporate
 8   Representative, held at the offices of Pachulski Stang
 9   Ziehl & Jones, 780 Third Avenue, New York, New York,
10   before Frank J. Bas, a Registered Professional
11   Reporter, Certified Realtime Reporter, and Notary
12   Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   A P P E A R A N C E S :
 2
 3   PILLSBURY WINTHROP SHAW PITTMAN LLP
     Attorneys for Petitioners
 4      31 West 52nd Street
        New York, New York 10019
 5
 6   BY:  HUGH M. McDONALD, ESQ.
          (hugh.mcdonald@pillsburylaw.com)
 7          JOHN A. PINTARELLI, ESQ.
          (john.pintarelli@pillsburylaw.com)
 8
 9   CAMPBELLS LLP
     JOLs Cayman Islands Counsel
10      Floor 4, Willow House, Cricket Square
        Grand Cayman KY1-9010
11      Cayman Islands
12   BY:  GUY COWAN, ESQ.
          (gcowan@campbellslegal.com)
13
          KATIE LOGAN, ESQ.(Via Zoom)
14        (klogan@campbellslegal.com)
15
16   BLAIR LEAHY KC (Via Zoom)
     For Joint Liquidators of Ascentra Holdings
17      20 Essex St. Chambers
        London, England, United Kingdom
18        (bleahy@twentyessex.com)
19
20
21
22
23
24
25
```

**Page 4**

```
 1   A P P E A R A N C E S :
 2
     PACHULSKI STANG ZIEHL JONES LLP
 3   Attorneys for SPGK Pte. Ltd.
        780 Third Avenue, 34th Floor
 4      New York, New York 10017
 5   BY:  JOHN A. MORRIS, ESQ.
          BETH E. LEVINE, ESQ.
 6          JEFFREY DINE, ESQ.
          (jmorris@pszjlaw.com)
 7          (blevine@pszjlaw.com)
          (jdine@pszjlaw.com)
 8
 9
10   HARNEY WESTWOOD & RIEGELS
        3rd Floor, Harbour Place
11      103 South Church Street
        Grand Cayman
12      PO Box 10240 KY1-1002
        Cayman Islands
13
     BY:  CAITLIN MURDOCK, ESQ.
14        (caitlin.murdock@harneys.com)
15
     ALSO PRESENT:
16   DMITRY ZVONKOV, Videographer
     RYUNOSUKE "LUKE" YOSHIDA
17
18   (APPEARING VIA ZOOM):
19   NIENKE LILLINGTON, Campbells
     SUI HUNG YEUNG, Harneys
20   ALIANA DODDS, Campbells
     MINNA WU, Harneys
21   KELSEY SABINE, Harneys
22
23
                      - o0o -
24
25
```



Page 5

1              G. ROBINSON
2        THE VIDEOGRAPHER:  We are on the
3    record.  Today's date is February 29,
4    2024.  The time on the video is
5    9:38 a.m.
6        This is video 1 in the deposition
7    of Graham Robinson In Re Ascentra
8    Holdings, Inc., in the U.S. Bankruptcy
9    Court, Southern District of New York.
10   Case No. 21-11854(DSJ).
11       This deposition is taking place at
12   780 Third Avenue, New York, New York.
13   The videographer is Dmitry Zvonkov, the
14   court reporter is Frank Bas, both with
15   Esquire.
16       Will counsel please identify
17   themselves for the record.
18       MR. MORRIS:  John Morris, Pachulski
19   Stang Ziehl & Jones, for SPGK.
20       THE COURT REPORTER:  Just the main
21   players, that's fine.
22       MR. McDONALD:  Hugh McDonald,
23   Pillsbury Winthrop, for the witness,
24   Mr. Robinson.
25       THE VIDEOGRAPHER:  Will the

Page 6

1              G. ROBINSON
2    reporter please swear in the witness.
3              — — —
4
5    GRAHAM ROBINSON,
6    called as a witness, having been first duly
7    sworn by a Notary Public, was examined and
8    testified
9    as follows:
10   EXAMINATION BY
11   MR. MORRIS:
12       Q.  Good morning, Mr. Robinson.
13       A.  Good morning.
14       Q.  My name is John Morris.  I'm an
15   attorney at Pachulski Stang Ziehl & Jones, and
16   we represent SPGK in connection with the
17   Ascentra Chapter 15 proceeding.  Thank you
18   very much for coming to New York.
19       Do you understand that we're here
20   for your deposition today?
21       A.  Yes.
22       Q.  And have you ever been deposed
23   before, sir?
24       A.  Yes.
25       Q.  How many times?

Page 7

1              G. ROBINSON
2        A.  Once.
3        Q.  And how long ago was that?
4        A.  Good question.  I would say 2018.
5        Q.  And was it in a personal capacity
6    or in a professional capacity?
7        A.  Professional capacity.
8        Q.  Was it in the United States or was
9    it elsewhere?
10       A.  In the United States.
11       Q.  Okay.  So I don't know how much of
12   that you remember, it's six years ago, but
13   really general ground rules:
14       I'm not here to trick you.  I'm
15   going to ask you a series of questions.  It's
16   very important that you allow me to complete
17   my question before you begin your answer.
18       Is that fair?
19       A.  Understood.
20       Q.  And it's very important for me to
21   allow you to complete your answer before I
22   begin the next question.  And if I fail to do
23   that, will you let me know?
24       A.  Yes.
25       Q.  If at any time I ask a question

Page 8

1              G. ROBINSON
2    that you don't understand, will you let me
3    know that, too?
4        A.  Okay.
5        Q.  Okay.  If you need a break at any
6    time, feel free to let me know that, as long
7    as a question is not pending.
8        Is that fair?
9        A.  Understood.
10       Q.  Okay.
11       MR. McDONALD:  John, just before we
12   go on, it's not his personal deposition.
13   He's here as the foreign representative
14   of Ascentra.  You've noticed this --
15       MR. PINTARELLI:  Somebody's device
16   is on so it's echoing.  Is the Zoom
17   connected too?
18       (Pause in proceedings.)
19       MR. MORRIS:  I agree.  He's not
20   here in his individual -- as a personal
21   deposition.  He's here as a
22   representative of the estate.
23       MR. McDONALD:  Correct.  You've
24   noticed this as a 30(b)(6).  And he's
25   here as the foreign representative, as a



GRAHAM ROBINSON  30(b)(6)                          February 29, 2024
In Re Ascentra Holdings Inc.                               9–12

Page 9

1          G. ROBINSON
2     representative of the Ascentra Holdings
3     estate.
4          THE COURT REPORTER:  Can we go off
5     the record?
6          MR. MORRIS:  I think we should.
7          THE VIDEOGRAPHER:  Are we going off
8     the record?
9          THE COURT REPORTER:  Yes.
10          THE VIDEOGRAPHER:  This ends
11     media 1.  We're going off the record at
12     9:42.
13          (Pause in proceedings.)
14          THE VIDEOGRAPHER:  This begins
15     media 2.  On the record at 9:46.
16   BY MR. MORRIS:
17     Q.   Okay.  Back on the record.
18          Mr. Robinson, you serve as one of
19   the joint official liquidators for an entity
20   called Ascentra Holdings, Inc., is that
21   correct?
22     A.   Yes.
23     Q.   Okay.  When did you become a
24   liquidator of that entity?
25     A.   A voluntary liquidator or official

Page 10

1          G. ROBINSON
2   liquidator?
3     Q.   Let's start with voluntary.
4     A.   That was the 1st of June 2021, I
5   believe.
6     Q.   And you became the official
7   liquidator in September?
8     A.   17th of September 2021.
9     Q.   Okay.  How did you come to be
10   the voluntary liquidator for Ascentra
11   Holdings, Inc.?
12     A.   I was appointed via the shareholder
13   resolutions.
14     Q.   And do you recall who the
15   shareholders were?
16     A.   Of Ascentra Holdings?
17     Q.   Yes, sir.
18     A.   I do, yes.
19     Q.   And who were they at the time that
20   you were appointed?
21     A.   I am slightly uncertain whether
22   under Cayman law you would be entitled to know
23   who the shareholders of Ascentra are.
24     Q.   Are you not going to tell me?
25     A.   I'm happy to tell you.  But I've

Page 11

1          G. ROBINSON
2   got --
3          MR. McDONALD:  Can we --
4          MR. PINTARELLI:  Graham, it's okay
5     to answer.  All of the information is
6     public.  It's in the public filing in
7     the U.S., verified petitions, so it's
8     okay.
9          THE WITNESS:  It's in the public
10     filing, okay.
11     Q.   Before you answer I want to make
12   something really clear here.
13     A.   Yes.
14     Q.   So I am going to ask questions, and
15   from time to time Mr. McDonald might object.
16     A.   Understood.
17     Q.   And when he objects, sometimes he's
18   objecting because he's trying to preserve the
19   record because he thinks there's something
20   improper about the question from an
21   evidentiary point of view.  That gives me the
22   opportunity to either correct the question, if
23   I agree with him, or say I don't really care,
24   for whatever reason in my head, and you'll
25   answer the question.

Page 12

1          G. ROBINSON
2          He may also from time to time
3   specifically direct you not to answer a
4   question, and he and I will discuss why he's
5   doing that so I understand the basis for it.
6   If he doesn't direct you not to answer a
7   question -- and, you know, Mr. MacDonald will
8   give you the ultimate advice -- but as a
9   general matter, if he doesn't direct you not
10   to answer, you should answer the question.
11   Okay?
12          MR. MORRIS:  Is that fair, Hugh?
13          MR. McDONALD:  And to the extent
14     that you believe that your answer may
15     implicate the attorney-client privilege,
16     please let us know, and then we can
17     consult.  Okay?
18          MR. MORRIS:  Yes.
19     Q.   To be very clear, if in your head
20   you think the divulging -- you know, answering
21   a question will violate a duty or a law or an
22   obligation on your part, we'll take a break,
23   and you can consult with Mr. MacDonald and
24   we'll figure out how to go forward.  Okay?
25     A.   Okay.  Yes.



Page 13

1              G. ROBINSON
2      Q.   All right?
3          So let's go back to where I was.
4  Do you recall who the shareholders were who
5  appointed you as the voluntary liquidator?
6      A.   Of Ascentra Holdings?
7      Q.   Yes.  Sir.
8      A.   IR-P Holdings Limited.  INTL Media.
9  And the other shareholders are Jeffrey
10  Boshears.
11          Ryan -- I can't remember Ryan's
12  name.  It begins with K.
13          And Alex Olivia.  Or Oliva.  Oliva.
14      Q.   Do you know who the principal was
15  of IR-P who appointed you on behalf of that
16  entity?
17      A.   The liquidator of IR-P Holdings.
18      Q.   And what's that person's name?
19      A.   That person's name is me.
20      Q.   And when did you become the
21  liquidator of IR-P?
22      A.   I became the liquidator of --
23  voluntary liquidator of IR-P Holdings on the
24  28th of May 2021.
25      Q.   And so as the liquidator of IR-P,

Page 14

1              G. ROBINSON
2  you voted as that entity in its capacity as a
3  contributory to Ascentra Holdings, Inc. to
4  appoint you as the voluntary liquidator of
5  that company, is that right?
6      A.   Yes.
7      Q.   Do you know who the principal was
8  at -- I think you said INTL?
9      A.   (Nodding head affirmatively.)
10      Q.   -- who acted to appoint you the
11  voluntary liquidator of Ascentra Holdings,
12  Inc.?
13      A.   I do.  That was Marty Matthews.
14      THE COURT REPORTER:  Can you spell
15  the name?
16      THE WITNESS:  Marty.  It's Martin
17  Matthews, but he goes as Marty.
18  M-A-R-T-Y.
19      Q.   And how did it come to be; can you
20  recall the circumstances under which you
21  became the voluntary liquidator of Ascentra
22  Holdings, Inc.?  Do you recall who approached
23  you?
24      A.   I was approached by Campbells
25  attorneys in the Cayman Islands.

Page 15

1              G. ROBINSON
2      Q.   And did you have an understanding
3  at that time as to who Campbells represented?
4      A.   Yes.
5      Q.   And what was your understanding as
6  to who Campbells represented at the time they
7  approached you about the possibility of
8  serving as the voluntary liquidator?
9      A.   They represented, I believe, or
10  acted for Marty Matthews.
11      Q.   And who at Campbells first
12  approached you about this potential
13  engagement?
14      A.   Guy Cowan.
15      Q.   And do you recall what Mr. Cowan
16  told you about the potential engagement?
17      MR. McDONALD:  Objection.
18      A.   I would say that the conversations
19  I had with Guy Cowan would be privileged.
20      Q.   At the time that he approached you
21  had you been appointed --
22      A.   No.
23      Q.   -- in any capacity?
24      MR. McDONALD:  Let him finish the
25  question.

Page 16

1              G. ROBINSON
2      THE WITNESS:  Sorry.
3      Q.   At the time that he approached you
4  about the possibility of serving, is it your
5  contention that there was some type of
6  privilege relationship?
7      MR. McDONALD:  John, I've given you
8  a lot of latitude here.  We have
9  specific topics on the 30(b)(6).  He's
10  not here, again, in his personal
11  capacity.  He's here as the
12  representative to answer questions
13  concerning specific topics, not the
14  circumstances surrounding his
15  appointment.
16      MR. MORRIS:  Okay.
17      MR. McDONALD:  I've given you a lot
18  of latitude up until now, but you're
19  going beyond the scope of this
20  deposition.
21      MR. MORRIS:  Okay.  Is it your
22  position that I'm not allowed to ask any
23  questions unless they specifically
24  relate to the topics?
25      MR. McDONALD:  Yes.  We have

Page 17

G. ROBINSON

1      specific enumerated topics.  We've gone
2      over this with the Court.  Our objection
3      to four of them still stands, and we'll
4      deal with them when you get to them.
5      But I've given you a lot of latitude.
6      Again, he is not here in his individual
7      personal capacity.
8          MR. MORRIS:  I appreciate that.
9      And I am going to tell you our position
10     is that the 30(b)(6) topics are the
11     topics in which he had an affirmative
12     obligation to educate himself.  It
13     doesn't mean that I'm not allowed to ask
14     any question.  I've never in my life
15     heard in a 30(b)(6) deposition that I
16     can't ask a question.  Because otherwise
17     I would have had to put in the topic
18     "Background," how were you appointed.
19     Like, I might as well have put in my
20     outline.
21         But that's our position.  I have
22     heard your position.  I am going to ask
23     my questions, and you can feel free to
24     direct him not to answer any time you

Page 18

G. ROBINSON

1      want.
2          Is that fair?
3          MR. McDONALD:  Fair.
4          MR. MORRIS:  Okay.
5  DIR  Q.   Do you recall what Mr. Cowan told
6      you initially when he approached you about the
7      possibility of serving as the voluntary
8      liquidator of Ascentra?
9          MR. McDONALD:  Objection.
10         Direct the witness not to answer.
11     Q.   Are you going to follow your
12     counsel's advice?
13     A.   Yes.
14     Q.   Okay.  How long in advance of your
15     acceptance of the appointment did Mr. Cowan
16     approach you?
17         MR. McDONALD:  Objection to form.
18     A.   So when -- you're asking me when I
19     was first approached by Campbells prior to me
20     being appointed?
21     Q.   Yes, sir.
22     A.   This is from memory.  I would say
23     it would be in some period of time in 2020.
24  DIR  Q.   Okay.  Were you engaged by anybody

Page 19

G. ROBINSON

1      to do any work with respect to Ascentra prior
2      to the time you accepted the appointment of
3      voluntary liquidator on or about June 1, 2021?
4          MR. McDONALD:  Objection.
5          Direct the witness not to answer.
6      Q.   Are you going to follow your
7      counsel's advice?
8      A.   Yes.
9      Q.   Did you ever do any work on behalf
10     of Ascentra prior to June 1, 2021?
11     A.   No.
12  DIR  Q.   Did you have any relationship with
13     any of Ascentra's principals prior to the time
14     you accepted the appointment on June 1, 2021?
15         MR. McDONALD:  Objection.
16         Direct the witness not to answer.
17     Q.   Are you going to follow your
18     counsel's advice?
19     A.   Yes.
20     Q.   Did your work as the voluntary
21     liquidator of IR-P concern Ascentra in any way
22     prior to June 1, 2021?
23         MR. McDONALD:  Objection to form.
24     A.   You're going to have to rephrase

Page 20

G. ROBINSON

1      that question.  It doesn't make sense.
2      Q.   Okay.  I think you mentioned -- you
3      mentioned that you became the voluntary
4      liquidator of IR-P on May 28, 2021.
5      A.   Okay.
6      Q.   In your capacity as the voluntary
7      liquidator of that entity, did you do anything
8      that concerned Ascentra before you accepted
9      the appointment as Ascentra's voluntary
10     liquidator?
11         MR. McDONALD:  Objection to form.
12     Q.   And this is where you can answer.
13     If you understand.  If you don't, I can try
14     again.
15     A.   No.
16     Q.   Okay.  Do you know when --
17     withdrawn.
18         Has Ascentra -- withdrawn.
19         Is Ascentra a holding company?
20         MR. McDONALD:  Objection to form.
21         MR. MORRIS:  Withdrawn.
22     Q.   Do you understand what a holding
23     company is, sir?
24     A.   Yes.



GRAHAM ROBINSON  30(b)(6)                    February 29, 2024
In Re Ascentra Holdings Inc.                          21–24

Page 21

1           G. ROBINSON
2      Q.  What's your understanding of a
3  holding company?
4      A.  A holding company is a, what I
5  would say is the top co. of a group structure,
6  and underneath will be numerous entities, and
7  the shareholding flows eventually to the top
8  co.
9      Q.  Is it your understanding that
10  Ascentra was a holding company?
11      A.  I considered it a holding co., yes.
12      Q.  And it had certain entities that it
13  directly or indirectly owned that -- conducted
14  the operations of the Ascentra enterprise, is
15  that fair?
16      A.  Yes.
17      Q.  Okay.  I am going to use the phrase
18  "Ascentra" to refer to the whole enterprise;
19  not just Ascentra Holdings, Inc., but also to
20  its direct and indirect affiliates who carried
21  out the operations.
22         Is that fair?
23      A.  Yes.
24      Q.  And if I want to refer specifically
25  to the entity that filed the Chapter 15

Page 22

1           G. ROBINSON
2  proceeding in New York, I'll say "Ascentra
3  Holdings, Inc."
4      A.  Okay.
5      Q.  That's the distinction that I am
6  making.
7      A.  Okay.  Yes.
8      Q.  So with that distinction, do you --
9  is Ascentra engaged in any operations today?
10      A.  (No response.)
11         MR. MORRIS:  Withdrawn.
12      Q.  As of today is Ascentra engaged in
13  any operations other than those that are
14  attendant to its liquidation?
15         MR. McDONALD:  Objection to form.
16      A.  No.
17      Q.  Okay.  Do you know when Ascentra
18  ceased operating as a commercial entity?
19         MR. McDONALD:  Objection to form.
20      A.  My understanding is early 2021.
21  DIR  Q.  Do you know whether Ascentra
22  Holdings, Inc. -- withdrawn.
23         Prior to that time, do you know
24  whether Ascentra Holdings, Inc. conducted
25  business in its own name or whether business

Page 23

1           G. ROBINSON
2  was conducted exclusively through the names of
3  the direct and indirect subsidiaries?
4         MR. McDONALD:  Objection.
5         I direct the witness not to answer.
6         (Reporter requests clarification.)
7      Q.  Are you going to follow counsel's
8  advice?
9      A.  Yes.
10      Q.  Okay.  Do you serve as a liquidator
11  for any entity that was directly or indirectly
12  controlled by Ascentra Holdings, Inc.?
13      A.  Yes.
14      Q.  Can you identify each entity?
15      A.  I am currently the official
16  liquidator of HEC International Limited.
17         I was the voluntary liquidator of
18  Interush (Singapore), which is now closed and
19  been dissolved.
20         And I believe I am the liquidator
21  of -- at the HEC International (Taiwan)
22  company.
23      Q.  Did you become -- apologies.
24         Was that in an official capacity or
25  as a voluntary liquidator?

Page 24

1           G. ROBINSON
2         MR. McDONALD:  Objection to form.
3      A.  For which entity?  Sorry.
4      Q.  Fair.  Let's take them one at a
5  time.
6      A.  Okay.
7      Q.  I think you said HGC?
8         MR. McDONALD:  HEC, I believe.
9      Q.  Did you ever serve as an official
10  liquidator for that entity?
11      A.  HEC International I was the
12  voluntary liquidator, and now I'm the official
13  liquidator.
14      Q.  And did that happen after you
15  became the official liquidator of Ascentra
16  Holdings, Inc. or before?
17      A.  After.
18      Q.  The same question with respect to
19  Interush (Singapore).  Before --
20         Withdrawn.  One question at a time.
21         Did you become -- did you ever
22  become an official liquidator of Interush
23  (Singapore)?
24      A.  No.
25      Q.  Did you serve as the voluntary

Page 25

1           G. ROBINSON
2   liquidator of that entity?
3       A.   Yes.
4       Q.   And were you appointed voluntary
5   liquidator of that entity before or after you
6   became the official liquidator of Ascentra
7   Holdings, Inc.?
8       A.   After.
9       Q.   And then I think the last one was
10  the Taiwan entity, is that right?
11      A.   Correct.
12      Q.   Were you ever appointed the
13  official liquidator of that entity?
14      A.   I'm not trying to be difficult on
15  the question. The Taiwanese liquidation
16  process is a very unusual and complicated one.
17  I would say it was -- it would be considered
18  as like an official liquidation, is how I
19  would look at it. Yes.
20      Q.   I appreciate that. I am going to
21  confess to having no familiarity with Taiwan
22  insolvency proceedings.
23      A.   I am still struggling, yes.
24      Q.   Did that occur after you were
25  appointed the official liquidator in the

Page 26

1           G. ROBINSON
2   Ascentra Holdings, Inc. case?
3       A.   After.
4       Q.   Did the same people who appointed
5   you as the voluntary liquidator of Ascentra
6   Holdings, Inc. also appoint you as the
7   voluntary liquidator of the three entities you
8   just identified?
9           MR. McDONALD:  Objection to form.
10          MR. MORRIS:  Withdrawn.
11      Q.   Did the same people and entities
12  that you identified earlier as having
13  appointed you as the voluntary liquidator of
14  Ascentra Holdings, Inc. also appoint you as
15  the voluntary liquidator of the three entities
16  you just identified?
17      A.   No.
18      Q.   Who first appointed you the
19  voluntary liquidator of International Limited?
20          MR. McDONALD:  Objection to form.
21      Q.   If you recall.
22      A.   So say the question again?
23      Q.   You know what?  It's okay.  I'm
24  just going to move on.
25          Are any of the three entities you

Page 27

1           G. ROBINSON
2   just identified subject to a liquidation
3   proceeding in the Cayman Islands?
4       A.   Yes.
5       Q.   Which one?
6       A.   HEC International.
7       Q.   And in your capacity as the
8   official liquidator of that entity have you
9   declared that entity to be solvent, insolvent
10  or doubtful solvency?
11      A.   Solvent.
12      Q.   Do you recall when that entity was
13  placed into liquidation under the court
14  supervision of the Cayman Islands?
15      A.   7th of December 2021.
16          THE COURT REPORTER:  Can you say
17  the date again?
18          THE WITNESS:  7th of December 2021.
19          MR. MORRIS:  Okay.  I am going to
20  mark as Robinson exhibit 1 the amended
21  notice of deposition.
22          (Robinson Exhibit 1, Amended Notice
23  of Deposition of Ascentra Holdings, Inc.
24  was marked for identification.)
25  BY MR. MORRIS:

Page 28

1           G. ROBINSON
2       Q.   Mr. Robinson, do you have exhibit 1
3   in front of you?
4       A.   Yes.
5       Q.   Okay.  Have you seen this before?
6       A.   I believe I have, yes.
7       Q.   Do you know what it is?
8       A.   I'm reading the title.  It says
9   Amended Notice of Deposition of Ascentra
10  Holdings, Inc.
11      Q.   Okay.  And if you can turn to --
12  the pages aren't numbered, but I think it's
13  the third page of the document, at the bottom
14  you'll see a heading "Amended Topics" --
15      A.   Yes.
16      Q.   -- that go on through the rest of
17  the document.
18      A.   Okay.
19      Q.   Have you seen those topics before?
20      A.   Yes.
21      Q.   And when did you see them for the
22  first time, if you recall?
23      A.   I don't -- from memory I couldn't
24  give you a specific date.  I know SPGK filed
25  its motion to terminate the recognition at the



Page 29

1         G. ROBINSON
2  end of June 2023, so it's going to be sometime
3  after that.  And I couldn't give you a
4  specific date.  I'm sorry.
5         Q.   Subject to whatever objections or
6  directions you received from counsel, are you
7  otherwise prepared to answer questions on the
8  topics set forth in exhibit 1?
9         A.   Yes.
10        Q.   Okay.  Did you do anything to
11  prepare for today's deposition?
12        A.   I did, yes.
13        Q.   What did you do?
14        A.   I met with my counsel yesterday in
15  New York.  And I also reviewed and kind of
16  refreshed my memory on past documents.  And
17  specific documents would be the status reports
18  filed in the Chapter 15 process; the two joint
19  official liquidator reports that have been
20  filed in the Cayman courts; my deposition --
21  not deposition.  My declaration that I filed
22  regarding the application for Chapter 15 back
23  in October 2021.
24         I reviewed the, our objection to
25  the motion to remove the restraint, which is

Page 30

1         G. ROBINSON
2  dated September 23.
3         And I also reviewed the amended
4  written statement of the claim that Ascentra
5  has filed against SPGK in the Cayman courts,
6  which is dated 11th of October 2023.
7         And I also looked at some old
8  financial kind of Excel spreadsheet documents
9  that we received from the company when we got
10  appointed.
11        Q.   What Excel spreadsheet documents
12  are you referring to?
13        A.   These are documents that we
14  obtained that -- at the beginning of your
15  appointment from Whinney, who was the account
16  manager, that does set out a summary of
17  creditors of Ascentra.
18        Q.   And did you rely on that Excel
19  spreadsheet to identify Ascentra Holdings,
20  Inc.'s creditors?
21        A.   It was one of the documents that
22  we -- we used.
23        Q.   Do you recall any other documents
24  that you reviewed in connection with your
25  preparation for today's deposition?

Page 31

1         G. ROBINSON
2         A.   Not -- no, not specific documents.
3         Q.   Did you speak with anybody who is
4  or purports to be a creditor in connection
5  with your preparation for today's deposition?
6         MR. McDONALD:  Objection to form.
7         A.   No.
8         Q.   Did you speak with anybody who is
9  or who claims to be a contributory to Ascentra
10  Holdings, Inc. in connection with the
11  preparation of your deposition?
12        A.   No.
13        Q.   Have you spoken with anybody, with
14  any person or entity, who represents --
15  withdrawn.
16         Going back to June 1, when you were
17  appointed the voluntary liquidator, and
18  thinking about the people who appointed you or
19  appointed you on behalf of corporate entities,
20  have you spoken with any of those people in
21  connection with today's deposition?
22        A.   No.
23        Q.   What do you do for a living, sir?
24        A.   I am an insolvency practitioner.
25        Q.   And do you work for a company?

Page 32

1         G. ROBINSON
2         A.   Yes.
3         Q.   What company do you work for?
4         A.   That is Crowe, which is C-R-O-W-E,
5  Cayman Limited.
6         Q.   And do you have a role or a title
7  or a position at Crowe Cayman Limited?
8         A.   Director.
9         Q.   When did you become a director at
10  Crowe?
11        A.   That was November 2019.
12        Q.   How long have you been affiliated
13  with Crowe?
14        A.   Since that date.
15        Q.   What does it mean to be an
16  insolvency practitioner?
17        A.   How long have you got?
18         What does it mean to be an
19  insolvency practitioner?
20        Q.   Mm-hmm.
21         THE COURT REPORTER:  "Yes"?
22  BY MR. MORRIS:
23        Q.   Yes.
24        A.   I am appointed official liquidator
25  or voluntary liquidator of Cayman entities.  I



Page 33

1              G. ROBINSON
2  also potentially assist companies with
3  financial matters.
4        Q.   And how long have you been an
5  insolvency practitioner?  When did you first
6  become one?
7        A.   Well, are you asking me when I
8  became licensed or when I -- how long have I
9  worked in insolvency matters?
10       Q.   We'll get to the license in a
11  moment.
12       A.   Okay.
13       Q.   When did you first start working in
14  the insolvency space?
15       A.   In 1993.
16       Q.   Can you describe for me generally
17  your educational background?
18       A.   Yes.  I'm obviously English, so
19  I've got O levels, A levels, and a degree.
20  And I also have accountancy qualifications,
21  but I'm not a chartered accountant.  And I
22  also have an insolvency qualification, formal
23  insolvency qualification, from the U.K.
24       Q.   So you're a chartered accountant?
25       A.   I am not a chartered accountant,

Page 34

1              G. ROBINSON
2  no.  I have accountancy qualifications, but I
3  am not a chartered accountant.
4        Q.   Okay.
5        THE COURT REPORTER:  Did you say O
6  level and A level?
7        THE WITNESS:  Yes.  O level and
8  then A level, yes.
9        Q.   And you have a license?
10       A.   I've got a -- yes, I have a
11  U.K. license through the Insolvency
12  Practitioners Association in the U.K.
13       Q.   When did you get that?
14       A.   I passed my qualification in 2000.
15  I got my license in 2008.
16       Q.   What does one need to do to obtain
17  a license?
18       A.   Short answer, certain amount of
19  hours worked and some exams that you need to
20  pass.
21       Q.   So is it fair to say that you
22  worked in the insolvency space for about 15
23  years before you obtained your license?
24       A.   Seven and eight is 15, yes.
25       Q.   Exactly.

Page 35

1              G. ROBINSON
2        Q.   Who were you employed by before you
3  joined Crowe in 2019?  Can you give me -- let
4  me back up.
5        From 1993, give me an overview of
6  your professional history and affiliations.
7        A.   I initially worked for a company
8  called Casson Beckman & Partners in
9  Manchester.
10       I left them and went to PwC,
11  PricewaterhouseCoopers.
12       I then left PricewaterhouseCoopers
13  and went to a company called RPG.
14       After RPGK I went to PKF.  After
15  PKF I went to Kroll, which is K-R-O-L-L.
16       I left Kroll in 2009 and went to
17  the Cayman Islands, where in the Cayman
18  Islands I worked for Robinson & Hunter until
19  2012.
20       I then went back to the U.K. in
21  2012.  I worked for myself and I also worked
22  for a company called BB Financial Services.
23       In 2014 I went back to the Cayman
24  Islands.  I then worked for Chris Johnson
25  Associates up until I started work for Crowe

Page 36

1              G. ROBINSON
2  Cayman Limited.
3        Q.   Okay.  When did you receive your
4  first appointment as an official liquidator in
5  the Cayman Islands?
6        A.   That would be two thousand and --
7  it's going to be late 2009 or early 2010.
8        Q.   Can you give me an estimate of how
9  many times you've been appointed an official
10  liquidator by the Cayman courts?
11       A.   Ten to 15.
12       Q.   And does that include the several
13  that you have mentioned today?
14       MR. McDONALD:  Objection to form.
15       A.   Yes.
16       Q.   Have you ever been appointed a
17  liquidator in any jurisdiction other than the
18  United Kingdom or the Cayman Islands?
19       A.   Well, the companies we referred to
20  today would be Singapore and Taiwan.  No.
21       Q.   Prior to this case have you ever
22  been involved in a Chapter 15 proceeding in
23  the United States?
24       A.   No.
25       Q.   I want to see if we can just make



Page 37

1           G. ROBINSON
2   sure that we have an understanding of kind of
3   where we started earlier with respect to the
4   corporate organization.  And I'm going to
5   just --
6           MR. MORRIS:  Let's mark as exhibit
7       2 a portion of a document that was filed
8       in the Chapter 7 -- Chapter 15
9       proceeding at Docket No. 77.  It's just
10      an organizational chart that I am going
11      to be focused on.
12          THE WITNESS:  Okay.
13          (Robinson Exhibit 2, Organizational
14      chart was marked for identification.)
15  BY MR. MORRIS:
16      Q.   I am going to represent to you that
17  we actually copied this from a filing I think
18  that originated in the Cayman Islands but that
19  was filed in New York.  I think it was part of
20  the complaint that was filed in the Cayman
21  Islands.
22          Have you seen this organizational
23  chart before?
24      A.   Yes.
25      Q.   And did you personally, in your

Page 38

1           G. ROBINSON
2   capacity as the official liquidator of
3   Ascentra Holdings, Inc., authorize it to be
4   filed on behalf of that entity?
5           MR. McDONALD:  Objection to form.
6       A.   Filed in which proceeding?
7       Q.   In the Cayman Islands.
8       A.   Yes.
9       Q.   And did you also authorize it to be
10  filed in the Chapter 15 proceeding in
11  New York?
12      A.   Yes.
13      Q.   To the best of your knowledge, is
14  this corporate organizational chart accurate?
15      A.   There is one error on this chart.
16      Q.   Can you just point that out to me,
17  please?
18      A.   The -- the shareholding in IR-P for
19  INTL Media has changed since this document has
20  been filed.
21      Q.   So I think you're referring to the
22  box that's below Martin Matthews and Mari
23  Matthews, is that right?
24      A.   Correct.  Yes.
25      Q.   Okay.  And can you describe for me

Page 39

1           G. ROBINSON
2   your understanding of what has changed?
3       A.   Basically, Mari Matthews holds her
4   50 percent shares in a separate entity.
5       Q.   Okay.  But she still now, instead
6   of directly, indirectly owns 50 percent of
7   International Media Holdings Inc. --
8   International Media Holdings, LLC; is that
9   your understanding?
10          MR. McDONALD:  Objection to form.
11      A.   She -- she doesn't own any -- she's
12  not a shareholder of INTL Media anymore.  But
13  she's a shareholder in her own right of IR-P
14  Holdings.
15      Q.   Okay.
16      A.   Through a separate entity to INTL.
17      Q.   Are there any other changes that
18  you're aware of?
19      A.   No.  That looks -- that looks okay.
20      Q.   Okay.  So now, just to make sure I
21  understood what you said earlier, if we look
22  at the chart, you'll see Ascentra Holdings,
23  Inc. is a Cayman Islands entity there; and
24  above that there are three shareholders, three
25  direct shareholders:  IR-P Holdings Inc.,

Page 40

1           G. ROBINSON
2   International Media Holdings, LLC, and then a
3   box called "Management and Related Parties."
4           Do I have that right?
5       A.   Yes.
6       Q.   And are those the people and the
7   entities that appointed you as the voluntary
8   liquidator back in June of 2021?
9       A.   Yeah.  I was appointed through the
10  shareholder resolutions.  Yes.
11      Q.   Yes.  And IR-P Holdings, Inc.
12  (Cayman Islands), that's one that you
13  mentioned earlier is in liquidation, is that
14  right?
15      A.   Yes.
16      Q.   And that's a solvent -- that's
17  subject to a solvency certificate, is that
18  right?
19          MR. McDONALD:  Objection to form.
20      A.   Yes.
21      Q.   Interush I think you said has been
22  dissolved, is that right?
23      A.   Interush -- sorry.  Interush
24  (Singapore), yes.
25      Q.   Yes.  Sorry for the ambiguity.  Let



Page 41

1           G. ROBINSON
2  me ask the question again.
3           Interush Singapore has been
4  dissolved, is that right?
5     A.   Yes.
6     Q.   Okay.  And HEC International
7  Company Limited in Taiwan, that's also subject
8  to liquidation, correct?
9     A.   Yes.
10    Q.   Okay.  HEC International Limited
11  Cayman Islands, that's also subject to
12  judicially supervised liquidation proceedings
13  in the Cayman Islands, right?
14    A.   Yes.
15    Q.   And you serve as the official
16  liquidator of that entity?
17    A.   Yes.
18    Q.   And that entity is also subject to
19  a solvency certificate, correct?
20        MR. McDONALD:  Object to the form.
21    A.   Yes.
22    Q.   I think there's a statement in
23  documents somewhere that HEC International,
24  Limited Singapore branch has stopped doing
25  business.

Page 42

1           G. ROBINSON
2          Is my recollection about that
3  correct?
4        MR. McDONALD:  Object to the form.
5     A.   That is correct.
6     Q.   Is that entity the subject of any
7  liquidation proceeding or has it simply ceased
8  doing business?
9     A.   It's not -- it's not in a
10  liquidation process.  And that branch has been
11  closed.
12    Q.   So am I right that all of the
13  entities that are directly beneath Ascentra
14  Holdings, Inc. Cayman Islands served as
15  operating companies of Ascentra Holdings,
16  Inc. before it ceased to do business in
17  early 2021?
18        MR. McDONALD:  Objection to form.
19    A.   They -- they -- I would -- they
20  were part -- they were part of the group and I
21  am sure at some time over the years --
22        (Reporter requests clarification.)
23    A.   Those entities underneath Ascentra
24  are part of the group, yes.  And they've all
25  been part of the operational business of

Page 43

1           G. ROBINSON
2  Ascentra over the years in one way, shape or
3  form.
4     Q.   On the lower left-hand corner of
5  this organizational chart there's four
6  entities under the name Ted Sanders.
7        Do you see that?
8     A.   Yes.
9     Q.   Do you have an understanding of who
10  Mr. Sanders is?
11    A.   Yes.
12    Q.   What's your understanding of who
13  Mr. Sanders is in relation to this
14  organizational chart?
15    A.   Mr. Sanders was the former CFO of
16  Ascentra.
17    Q.   Did he ever serve as a director, to
18  the best of your knowledge?
19    A.   Of Ascentra?
20    Q.   Let me ask a better question.
21        Do you know whether Mr. Sanders
22  ever served as a director of Ascentra
23  Holdings, Inc.?
24    A.   No.
25    Q.   Do you know if Mr. Sanders ever

Page 44

1           G. ROBINSON
2  served as a director -- withdrawn.
3        I am going to refer to the one,
4  two, three, four, five, six -- seven entities
5  below the Ascentra Holdings, Inc. box as
6  "Ascentra's subsidiaries."
7        Is that fair?
8     A.   Okay.
9     Q.   Do you know whether Mr. Sanders
10  ever served as the director of any of
11  Ascentra's subsidiaries?
12    A.   From my memory, no.
13    Q.   Do you know what period of time
14  Mr. Sanders served as the CFO of Ascentra?
15    A.   I know it was -- I don't know the
16  exact start date.  I know he was involved from
17  2018 up until his resignation in May 2021, and
18  that he could possibly be involved in the
19  group before April 2018.  Sorry, I can't fully
20  recall.
21    Q.   Do you know, did he serve as the
22  CFO of Ascentra Holdings, Inc.?
23    A.   Of Ascentra.
24    Q.   And when you use the phrase
25  "Ascentra" in the context of Mr. Sanders'



GRAHAM ROBINSON  30(b)(6)                                    February 29, 2024
In Re Ascentra Holdings Inc.                                          45—48

Page 45

1           G. ROBINSON
2 role, what do you mean?
3           MR. McDONALD:  Object to the form.
4       A.   Can you just explain the question
5 better for me, please?
6       Q.   Yes.  I'll try again.
7           You've got Ascentra Holdings,
8 Inc. and then you've got the seven
9 subsidiaries.  Right?
10      A.   Mm-hmm.  Yes.
11      Q.   Okay.  Let's take them separately.
12          Do you know whether Mr. Sanders
13 ever served as the CFO of any of the seven
14 subsidiaries?
15          MR. McDONALD:  Objection to form.
16      A.   In my view, Mr. Ted Sanders was the
17 CFO of Ascentra group, and that included
18 Ascentra Holdings, all the subsidiaries, and
19 also SPGK.
20          MR. McDONALD:  John, you're going
21      way off topic here.  Can you please
22      explain how any of this line of
23      questioning relates to any of the topics
24      that are set forth in the deposition
25      notice?

Page 46

1           G. ROBINSON
2           MR. MORRIS:  I will tell you that
3 it goes to, number 1, the likelihood of
4 success on the merits and the
5 relationship of these entities.  And
6 number 2, it's background.
7           And if you want to direct him not
8 to answer, you're free to do that at any
9 time.  I don't think this stuff is
10 controversial, but you'll defend your
11 witness as you wish.
12          MR. McDONALD:  It goes to number 1,
13 the certificate of solvency?
14          MR. MORRIS:  No, the last four.
15 The last four questions.  Likelihood of
16 success on the merits and facts relating
17 thereto.
18          MR. McDONALD:  Again, we're giving
19 you some latitude, but it's going to be
20 very limited.
21          MR. MORRIS:  You'll do what you do,
22 and I'll do what I do, and we'll do it
23 respectfully.
24          MR. McDONALD:  Okay.
25      Q.   Do you know whether Ascentra ever

Page 47

1           G. ROBINSON
2 had a direct or indirect ownership interest in
3 any of the four entities under Mr. Sanders'
4 name?
5           MR. McDONALD:  Objection to form.
6       A.   The two entities at the bottom
7 there, AOS Property Ventures, and they
8 obviously -- it's got formerly known as
9 Interush, Inc., and then there's also Interush
10 International, they may have been set over the
11 side of the structure at one time, but I can't
12 recall from memory.
13      Q.   Okay.  Is it fair to say that this
14 chart doesn't depict any direct or indirect
15 relationship between any of the four entities
16 under Mr. Sanders' names and any of the
17 Ascentra Holdings entities, is that fair?
18          MR. McDONALD:  Objection to form.
19      A.   Just say that again for me, please?
20      Q.   Yeah.  I am talking specifically
21 now of ownership.
22      A.   Okay.
23      Q.   Okay.  Do you have any reason to
24 believe, as you sit here today, that Ascentra
25 Holdings, Inc. or any of its subsidiaries ever

Page 48

1           G. ROBINSON
2 had a direct or indirect ownership interest in
3 any of the four entities under Mr. Sanders'
4 name?
5           MR. McDONALD:  Objection; form.
6       A.   Like I said, they might have had
7 some ownership of these two at one time
8 previously, but I don't believe they had any
9 direct or indirect of Asian Offshore Services
10 and SPGK International.
11      Q.   And what's the basis for that
12 belief?
13      A.   Just -- just from I know the names
14 Interush, and I believe that they might --
15 just from memory -- they might have been part
16 of a bigger group structure that Ascentra had
17 prior to -- prior to 2016.
18      Q.   Are you aware of any facts
19 concerning either how, when or why they would
20 have ceased to have an ownership interest in
21 those two entities at the bottom of the
22 left-hand corner?
23          MR. McDONALD:  Objection to form.
24      A.   I do have a memory that they --
25 that Ted could have -- Ted Sanders, sorry,



Page 49

1           G. ROBINSON
2   could have purchased those companies from
3   Ascentra.
4       Q.   Do you have any understanding or
5   memory as to when that may have happened?
6       A.   No.  I've got no memory.
7       Q.   In the upper left-hand portion of
8   the document you've got Mr. Yoshida, is that
9   right?
10      A.   Yes.
11      Q.   And then below him you've got two
12  entities, Scuderia Bianco Limited --
13      A.   Yes.
14      Q.   -- and Lequios Holdings?  Lequios?
15      A.   Lequios?
16      Q.   I'll go with your --
17      A.   I'm not good at any of those fancy
18  words.
19      Q.   And then there's also a third
20  entity called Growth Today Inc.
21           Do I have that right?
22      A.   Yes.  I see them.
23      Q.   Okay.  Do you know if Ascentra
24  Holdings, Inc. or any of its subsidiaries ever
25  had a direct or indirect ownership interest in

Page 50

1           G. ROBINSON
2   Scuderia Bianco Limited?
3           MR. McDONALD:  Objection to form.
4       A.   No.
5       Q.   Okay.  Do you know if Ascentra
6   Holdings, Inc. or any of its subsidiaries ever
7   had a direct or indirect ownership interest in
8   Lequios Holdings?
9       A.   No.
10      Q.   Do you know if Ascentra Holdings,
11  Inc. or any of its subsidiaries ever had a
12  direct or indirect ownership interest in
13  Growth Today Inc.?
14          MR. McDONALD:  Objection to form.
15      A.   Just so I'm clear, what do you mean
16  by "direct or indirect ownership"?
17      Q.   That they were -- that they held
18  shares in, that they held equity, that they
19  were a contributory, either in their own name
20  or through another entity or person that they
21  controlled.
22          MR. McDONALD:  I'm going to object
23      and direct the witness not to answer.
24      The ownership and interrelationship of
25      these entities is subject to the

Page 51

1           G. ROBINSON
2   proceeding in the Cayman Islands, and
3   SPGK has answered that complaint, we
4   have responded.  And to the extent that
5   there is any interrelationship between
6   these entities, which we allege there
7   is, will be dealt with in connection
8   with those proceedings.
9           MR. MORRIS:  I'm not asking if
10      there's a relationship between the two.
11      I'm asking a very narrow question.  Let
12      me just ask -- let me just ask --
13          MR. McDONALD:  Can you just
14      rephrase that question, please?
15          MR. MORRIS:  Yes, I appreciate
16      that.
17  BY MR. MORRIS:
18      Q.   To the best of your knowledge, sir,
19  has Ascentra Holdings, Inc. or any of its
20  subsidiaries ever had a direct or indirect
21  ownership interest in Growth Today Inc.?
22      A.   What do you mean by "ownership
23  interest"?
24  DIR Q.   That they -- that they were an
25  owner of that entity.  That they held some

Page 52

1           G. ROBINSON
2   portion -- all or some portion of the shares.
3       A.   Shares.
4           MR. McDONALD:  Objection.
5       I direct the witness not to answer.
6           MR. MORRIS:  What's the basis for
7       the direction?  Just so the record's
8       clear.
9           MR. McDONALD:  That is a subject to
10      the litigation in the Cayman Islands,
11      and as we have stated to the Court, we
12      are not litigating the Cayman proceeding
13      here as part of this 30(b)(6).
14          MR. MORRIS:  You've made that
15      argument.  I just want to make my
16      record.
17          MR. McDONALD:  I just want to be
18      perfectly clear.
19          MR. MORRIS:  I appreciate that.
20          MR. McDONALD:  The
21      interrelationship between Growth Today,
22      its ultimate switch in ownership and the
23      relationship between its prior principal
24      and the principals of Ascentra are being
25      litigated in the Cayman Islands.



Page 53

```
1          G. ROBINSON
2     MR. MORRIS:  So this is my
3  opportunity -- because I want to make my
4  record, too -- this is my opportunity to
5  inquire as to the facts that relate to
6  the likelihood of success on the merits
7  in New York.  And I appreciate your
8  argument, and I know you made it to the
9  New York court and here we are.
10    So I believe that the answer to
11  this question goes to the likelihood of
12  success of the merits, which is why I am
13  asking it, to be clear.
14    And with that, if you are going to
15  direct him not to answer, we'll just
16  move on.
17    MR. McDONALD:  I am directing him
18  not to answer.
19    MR. MORRIS:  Okay.  I am just going
20  to reserve my right, for all of the
21  questions that you direct him not to
22  answer, to either seek -- because I want
23  to be clear -- to seek a preclusion
24  order in New York from Ascentra offering
25  any evidence that would have been
```

Page 54

```
1          G. ROBINSON
2  responsive to these questions in the
3  New York proceeding, or to compel
4  further deposition.
5     So those are the two things that
6  I'm reserving my right for, and we'll
7  just go forward.
8     MR. McDONALD:  And the judge made
9  it very clear that if you're inquiring
10  into the success of the Cayman
11  proceeding, that is privileged and that
12  goes beyond the scope of this
13  deposition.  He made that crystal clear
14  at the last hearing, and we reserve our
15  rights as well.
16    MR. MORRIS:  Okay.  I don't think
17  he said anything about privilege.
18    MR. McDONALD:  He did.
19    MR. MORRIS:  I don't think he said
20  anything about privilege, but okay.
21    MR. McDONALD:  John, he did.  He
22  said if the question is basically do you
23  think you're going to win Cayman, and
24  all of these are going to go to that, he said
25  that's privileged.  He was very clear.
```

Page 55

```
1          G. ROBINSON
2  BY MR. MORRIS:
3  DIR  Q.  Sir, do you know if Ascentra
4  Holdings, Inc. or any of its subsidiaries ever
5  had a contract with Growth Today Inc. or any
6  of its subsidiaries?
7        MR. McDONALD:  Objection.
8     I direct the witness not to answer.
9     Q.  Are you going to follow your
10  counsel's advice?
11    A.  Yes.
12    Q.  Do you know if Ascentra Holdings,
13  Inc. or any of its subsidiaries ever commenced
14  legal proceeding to enforce any agreement that
15  it contended it had with Growth Today or any
16  of its subsidiaries?
17        MR. McDONALD:  Objection to form.
18    A.  Just repeat the question, please?
19    Q.  Yes, I appreciate that.  I could do
20  better.
21        Prior to the commencement of the
22  Ascentra Holdings, Inc. Cayman Islands
23  liquidation proceeding, are you aware of any
24  enforcement action that Ascentra Holdings,
25  Inc. or any of its subsidiaries took against
```

Page 56

```
1          G. ROBINSON
2  Growth Today Inc. or any of its subsidiaries
3  with respect to any contract?
4     A.  No.
5     Q.  Okay.  Thank you.
6        Do you know if Ascentra Holdings,
7  Inc., as distinguished from the subsidiaries,
8  do you know if Ascentra Holdings, Inc. ever
9  provided any goods or services to Growth Today
10  Inc. or any of Growth Today Inc.'s
11  subsidiaries?
12        MR. McDONALD:  Objection to form.
13    A.  Just say the question again,
14  please?
15    Q.  Sure.  Do you know whether Ascentra
16  Holdings, Inc. -- withdrawn.
17        Prior to the commencement of the
18  Cayman Islands liquidation proceedings do you
19  know whether Ascentra Holdings, Inc. ever
20  provided goods and services to Growth Today
21  Inc. or any of the three subsidiaries listed
22  underneath it in this organizational chart?
23    A.  And you're asking me for
24  specifically Ascentra Holdings, Inc., or --
25    Q.  Correct.
```



Page 57

1           G. ROBINSON
2     A.  -- or not the Ascentra group?
3     Q.  Exactly.
4           MR. McDONALD:  Objection to form.
5     A.  Then the answer is no.
6  DIR  Q.  Okay.  Do you know if Growth Today
7  or any of the entities beneath Growth Today
8  ever paid money to a third party for the
9  benefit of Ascentra Holdings, Inc. or any of
10 its subsidiaries?
11          MR. McDONALD:  Objection.
12     I direct the witness not to answer.
13          MR. MORRIS:  Can I ask him if he
14     knows the answer to the question?  I'm
15     going to ask him the question, and then
16     you can decide.
17 DIR  Q.  Without divulging the answer to the
18 question, just yes or no, do you know whether
19 Growth Today Inc. or any of the three entities
20 beneath it ever paid any third party for the
21 benefit of Ascentra Holdings, Inc. or any of
22 its subsidiaries?  Just yes or no.
23          MR. McDONALD:  I'm still going to
24     direct him not to answer.
25          MR. MORRIS:  You're not even going

Page 58

1           G. ROBINSON
2  to let me know if he knows the answer to
3  the question?
4           MR. McDONALD:  Yes.
5           MR. MORRIS:  Okay.
6     Q.  Are you going to follow counsel's
7  advice?
8     A.  Yes.
9           MR. McDONALD:  John, when you come
10     to an appropriate point, can we take a
11     break?
12          MR. MORRIS:  Yes.  Now would be
13     great.
14          MR. McDONALD:  Is that okay?
15          MR. MORRIS:  Yes.  So we agree he's
16     under oath.
17          MR. McDONALD:  Yes.
18          MR. MORRIS:  No communication with
19     the witness while the deposition
20     continues.  But I'm happy to take a
21     break.
22          MR. McDONALD:  Thank you.
23          MR. MORRIS:  You bet.
24          THE VIDEOGRAPHER:  This ends
25     unit 2.  We're off the record at 10:44.

Page 59

1           G. ROBINSON
2     (Recess taken.)
3           THE VIDEOGRAPHER:  This begins
4  unit 3.  We're on the record at 10:56.
5           MR. MORRIS:  I am going to mark as
6  the next exhibit, which I think is
7  number 3, Robinson number 3, a document
8  that was previously marked as Hernandez
9  exhibit 5.  And it's entitled Joint
10 Official Liquidators' Certificate.
11     (Robinson Exhibit 3, CWR Form
12 Number 13, Joint Official Liquidators'
13 Certificate was marked for
14 identification.)
15 BY MR. MORRIS:
16     Q.  All right, sir.  Do you have
17 Robinson exhibit 3 in front of you?
18     A.  Yes.
19     Q.  Okay.  Do you know what that is?
20     A.  Yes.
21     Q.  And what is this document?
22     A.  This is the Joint Official
23 Liquidators' Certificate of Determination of
24 Solvency for Ascentra Holdings, Inc.
25     Q.  And in this document it says that

Page 60

1           G. ROBINSON
2  the joint official liquidators, quote, "hereby
3  certify that they have determined that the
4  above-named company should be treated as
5  solvent."
6           Did I read that correctly?
7     A.  Yes.
8     Q.  How did you make that
9  determination?
10     A.  So when we -- when we are appointed
11 official liquidators, one of our duties is to
12 just analyze the books and records that we
13 have in our possession.  I spoke to
14 stakeholders, management, former officers of
15 the company.  Reviewed financial information
16 in our possession.  And we make a
17 determination on whether the -- the company is
18 solvent.  And that's also discussed in
19 consultation with our attorneys.
20           And then we make a decision that we
21 should -- whether we should -- what
22 determination we should file.
23           And after that initial review, in
24 consultation, the decision was taken to file a
25 certificate of solvency.



Page 61

1           G. ROBINSON
2       Q.   You used the phrase "stakeholders."
3       Do you recall which stakeholders
4   you communicated with with respect to the
5   decision to identify Ascentra Holdings,
6   Inc. as solvent?
7           MR. McDONALD:  Objection to form.
8       I think there's confusion.  I think
9       you're saying -- did you "stakeholders"
10      or "stockholders"?
11          MR. MORRIS:  I heard him say
12      "stakeholders."
13          MR. McDONALD:  Okay.
14          MR. MORRIS:  Let me try again.
15          MR. McDONALD:  It just came across
16      as stockholders or stakeholders.  I
17      wasn't sure which you were going with.
18          MR. MORRIS:  I'll try again.
19      Q.   Did you speak with any stakeholders
20  in connection with your determination to
21  declare Ascentra Holdings, Inc. to be solvent?
22          MR. McDONALD:  Objection to the
23      form.
24      A.   When I say the word "stakeholder,"
25  I am talking about numerous parties involved

Page 62

1           G. ROBINSON
2   in the affairs of the company.
3       Q.   Okay.  Can you identify those
4   parties who were involved in the affairs of
5   the company?
6       A.   That I spoke to?
7       Q.   Yes.
8       A.   On the process, okay.  Yes.
9           That would be employees of the
10  group.  It would have been Ted Sanders.  It
11  was also, I believe, from memory, that I also
12  had communications with Luke Ryu.  Marty
13  Matthews.  And that would be it.
14          Did I say staff?
15      Q.   You said employees.
16      A.   Employees, okay.  Yes.
17      Q.   Do you remember the names of any of
18  the employees?
19      A.   Communication on that would have
20  been with Whinney.
21      Q.   Okay.  Out of the people that you
22  just identified, did any of them disagree with
23  the determination that you ultimately made
24  that Ascentra Holdings, Inc. is solvent?
25          MR. McDONALD:  Objection to form.

Page 63

1           G. ROBINSON
2       A.   No.
3       Q.   You mentioned "books and records."
4           Do you recall, and I appreciate
5   it's been some time, do you recall what books
6   and records you reviewed and relied upon to
7   reach your determination that Ascentra
8   Holdings, Inc. is solvent?
9       A.   It would have been through
10  communication and discussions with the
11  stakeholders and with the financial
12  information that we were provided to --
13  provided with by Whinney.
14      Q.   Among that information, was there a
15  general ledger, if you recall?
16      A.   We were aware of the -- the assets
17  of the group and what pertained to the assets
18  of the Ascentra group.
19      Q.   Did the determination of solvency
20  take into account not just assets but
21  liabilities?
22      A.   Yes.
23      Q.   Is there a particular test that you
24  utilized to determine that Ascentra Holdings,
25  Inc. is solvent?

Page 64

1           G. ROBINSON
2           MR. McDONALD:  Objection to form.
3       A.   There is no -- there is no specific
4   test that official liquidators undertake when
5   he's determining solvency.  It's the joint
6   official liquidators' opinion.
7       Q.   Do you know whether Ascentra
8   Holdings, Inc. maintained financial statements
9   for itself and its subsidiaries?
10      A.   Yes.  There are -- there are.  Yep.
11      Q.   And would those financial
12  statements include balance sheets?
13          MR. McDONALD:  Object to the form.
14      A.   Yes.
15      Q.   What other financial statements are
16  you -- do you have in mind when you think back
17  to what you reviewed in connection with this
18  analysis?
19      A.   Yeah, okay.
20          MR. McDONALD:  Let him finish the
21      question.
22      A.   Say the question again?  Sorry.
23      Q.   Okay.  Did you review financial
24  statements in connection with your analysis of
25  solvency?



GRAHAM ROBINSON  30(b)(6)                                    February 29, 2024
In Re Ascentra Holdings Inc.                                           65–68

Page 65

1         G. ROBINSON
2         A.  So when we got -- when we appointed
3    and we were reviewing the books and records in
4    our possession -- so when you say "financial
5    statements," there were no audited statements
6    for the recent period leading up to the
7    liquidation.  There were management accounts
8    and financial summaries and bank statements
9    and Excel spreadsheets showing balances at
10   bank and assets and stuff that is very basic.
11   It wasn't complicated.  It was easy to look
12   at, easy to assess.  And we deemed, after
13   reviewing those kind of financials, that the
14   company -- that Ascentra should be deemed
15   solvent.
16        Q.  Thank you very much.
17           Do you recall whether Ascentra
18   Holdings, Inc. reported their financial
19   statements on a consolidated basis with their
20   subsidiaries?
21           MR. McDONALD:  Objection to form.
22        A.  We have seen draft financial
23   statements and previous signed financial
24   statements where the accounts are
25   consolidated, yes.

Page 66

1         G. ROBINSON
2         Q.  Do you know the last period for
3    which Ascentra Holdings, Inc. received audited
4    financial statements?
5         A.  I'm not a hundred percent, but I
6    think it could be either 2017 maybe or 2018.
7    But that's from memory.  Sorry.
8         Q.  Do you recall if Ascentra Holdings,
9    Inc. prepared its financial statements on a
10   calendar-year basis, or was there some other
11   time period that they utilized?  Or
12   year-basis, fiscal year?
13        A.  Again, from memory I think the
14   financial year-end was December, but I
15   don't -- I don't fully recall.  I'm sorry.
16        Q.  Do you remember the name of
17   Ascentra's outside auditors for the period of
18   time that audited financial statements were
19   completed?
20        A.  I don't recall the name, no.
21        Q.  In your capacity as Ascentra's
22   joint official liquidator did you ever speak
23   with Ascentra's outside auditors?
24        A.  There were no outside auditors
25   appointed at the time of my appointment.

Page 67

1         G. ROBINSON
2         Q.  Okay.  In your review of the
3    records did you see anything that would have
4    reflected any disagreement between Ascentra
5    Holdings, Inc. and the last outside auditor
6    that it did have?
7            MR. McDONALD:  Objection to form.
8         A.  I can't from memory remember if
9    there was any statements in the last signed
10   audited statements from the auditor
11   questioning anything, how the accounts were --
12   were shown.
13        Q.  Okay.  And I think you testified
14   that your recollection is the last audited
15   financial statements were for either 2018 or
16   2019.
17           Do I have that right?
18           MR. McDONALD:  Objection.
19        Q.  Or was it '17 and '18?
20        A.  You're talking about --
21        Q.  Audited.
22        A.  -- today?
23        Q.  Mm-hmm.
24        A.  Yeah, probably seven -- maybe 2017.
25        Q.  Are you aware of any reason why

Page 68

1         G. ROBINSON
2    audited financial statements were not
3    completed for any period after the last one?
4         A.  I would say from the financials it
5    would be how -- how the account should be
6    recorded, and all the parties involved, how
7    they wanted the account to be shown.
8         Q.  Okay.  I think you said you are an
9    accountant, is that right?
10        A.  I have accountant qualifications.
11        Q.  Do you know whether Ascentra's
12   books and records were maintained under GAAP
13   accounting or, I guess, IFRS?
14        A.  I do not know.
15        Q.  You don't know.
16           MR. McDONALD:  John, just to be
17   clear, when you say "Ascentra" you mean
18   Ascentra Holdings or Ascentra group?
19           MR. MORRIS:  I appreciate that.
20   Ascentra Holdings, Inc.  Yes.
21           MR. McDONALD:  Okay.
22        Q.  And the same question then for any
23   of the subsidiaries.
24           Do you know if --
25           MR. McDONALD:  Ascentra group.  You



Page 69

1          G. ROBINSON
2     distinguished between Ascentra and
3     Ascentra Holdings.  So just to be
4     precise.
5          MR. MORRIS:  Okay.
6          Q.  You have never withdrawn the
7     certificate that's been marked as Robinson
8     exhibit 3, correct?
9          A.  Correct.
10         Q.  Okay.  As an experienced and
11    licensed insolvency practitioner, can you
12    share with me your understanding of the
13    circumstances that would require you to either
14    withdraw or amend this certificate?
15         MR. McDONALD:  To the extent you
16         can answer that without divulging
17         attorney-client privilege, please
18         answer.
19         A.  Just say the question again?
20    Sorry.
21         Q.  Just as a Cayman Islands insolvency
22    practitioner can you tell me your
23    understanding of the circumstances that would
24    require you to withdraw, amend or modify the
25    certificate?

Page 70

1          G. ROBINSON
2          A.  This is a general question, not
3     related to Ascentra?
4          Q.  Correct.
5          A.  That would be, as an officer of the
6     court and you've got a duty to monitor the
7     solvency during a lifecycle of the
8     liquidation, you would look and check
9     constantly on asset values and liability
10    values.  And if those change.
11         Q.  So is it fair to say that they
12    haven't changed in a manner in which it caused
13    you to withdraw the solvency certificate?
14         MR. McDONALD:  Objection to form.
15         A.  Since I filed this in September
16    2021 there's nothing that's come into my
17    possession or been filed by the parties that
18    has made me determine my solvency
19    determination should change.
20         Q.  Okay, thank you.
21         MR. MORRIS:  We'll mark as the next
22    exhibit, it will be Robinson number 4.
23    It's one of your earlier declarations.
24         (Robinson Exhibit 4, Declaration of
25         Graham Robinson was marked for

Page 71

1          G. ROBINSON
2     identification.)
3          Q.  Mr. Robinson, do you see this is a
4     declaration that was submitted to the Court in
5     New York back in October 2021?
6          A.  Yes.
7          Q.  Okay.  And do you recall this
8     particular declaration?
9          A.  Yes.
10         Q.  And do you recall reviewing it
11    before it was filed with the court?
12         A.  Yes.
13         Q.  And did you have an opportunity to
14    make comments and changes to the declaration?
15         A.  I did, yes.
16         Q.  Okay.  Let's go to paragraph 18.
17    And if you could just read that to yourself
18    for the moment.
19         (The witness complied.)
20         A.  Okay.
21         Q.  Was it your understanding at the
22    time you signed this that that statement was
23    true and accurate?
24         A.  Yes.
25         Q.  Do you believe it's true and

Page 72

1          G. ROBINSON
2     accurate today?
3          A.  Yes.
4          Q.  Just one little wrinkle here.
5          It's a statement that's made as of
6     December 31, 2021, but the document is
7     prepared in October 2021.
8          Is this kind of a forward-looking
9     statement?
10         A.  Yeah, I would say that we probably
11    forecast what expenses were likely to incur up
12    to the end of the year, yes.
13         Q.  Was it also true as of the date you
14    filed the application in the Cayman Islands
15    court for supervision of the liquidation; was
16    this statement true at that time as well?
17         MR. McDONALD:  Objection to form.
18         MR. MORRIS:  Withdrawn.
19         Q.  The liquidation was commenced
20    officially in --
21         A.  17th of September.
22         Q.  September 17th.
23         If we changed "December 31, 2021"
24    to September 17, 2021, would the statement in
25    paragraph 18 be accurate?

Page 73

1                G. ROBINSON
2        A.  Accurate in what way?
3        Q.  Would there be any modification to
4  this statement if you just took it and turned
5  it back, you know, ten weeks, to the date of
6  commencement?
7        A.  So -- okay.  So you're saying
8  Ascentra's main liabilities as of 17th of
9  September, 2021, basically?
10       Q.  Correct.  Mm-hmm.
11       A.  Yes.
12       Q.  Okay.  And when you use the term
13  "main liabilities" there, are you aware of
14  any liabilities that Ascentra had as of
15  September 17, 2021 other than the costs that
16  were going to be incurred by the liquidators
17  and certain ordinary course operating
18  expenses?  Were there any other liabilities
19  that you can recall?
20       A.  At the time, are you talking about
21  17th of September, or are you talking about
22  the day of this declaration?
23       Q.  September 17.
24       A.  Okay.  So just state the question
25  again, please?

Page 74

1                G. ROBINSON
2        Q.  Sure.  When you use the phrase
3  "main liabilities" -- actually, let's do this
4  in pieces.
5            Are you aware of any other -- any
6  liabilities as of December 31, 2021 other than
7  the costs incurred by the liquidators and
8  certain ordinary course operating expenses for
9  storage and maintenance of Ascentra's
10  information?
11       A.  I think the key sentence there
12  would be "Ascentra may have other contingent
13  liabilities that my team and are I
14  investigating."
15       Q.  Okay.  I appreciate that and I want
16  to separate, you know, stuff that may be
17  subject to investigation from what you knew,
18  what was -- you know, what was on the books
19  and records, what you knew at the time.  Okay?
20            So with that distinction, were
21  there any liabilities that you're aware of
22  that existed as of the end of 2021 other than
23  the ones that are described here?
24            Any non-contingent liabilities.
25  How about that?

Page 75

1                G. ROBINSON
2        A.  That's a difficult question to
3  answer because what I think you're asking me
4  is did other creditors come about after the
5  31st of December 2021 that weren't potentially
6  contingent at that time or I was totally
7  unaware of at that time.
8            I can't recall.  Because as part of
9  the liquidation process, I've been dealing
10  with creditor -- previous creditors and
11  potential creditors through the whole
12  liquidation process.
13       Q.  Go back to exhibit 1, which was the
14  30(b)(6) notice.  And if you can turn I think
15  to the third page, at the bottom it says
16  "Amended Topics."
17       A.  Okay.
18       Q.  And 2(a) asks about the number of
19  creditors existing as of the date of
20  commencement.
21            Let me just modify that a tiny bit,
22  in light of what you just said.
23            Do you recall whether Ascentra had
24  any non -- any creditors who held
25  non-contingent claims, right, who you agree

Page 76

1                G. ROBINSON
2  they had a claim, as of the date of
3  commencement?  Did they have any such
4  creditors?
5            MR. McDONALD:  Objection to form.
6        A.  Yes.
7        Q.  Okay.  Do you recall how many
8  creditors they had that fell into that very
9  specific category of non-contingent claims?
10            MR. McDONALD:  Objection to form.
11       A.  I struggle for the exact number,
12  but you are looking, I would say, at ten, 12.
13  Ten to 12, maybe.
14       Q.  Okay.  So to the best of your
15  recollection, on the date of commencement
16  Ascentra Holdings, Inc. had approximately ten
17  to 12 creditors who held undisputed claims, is
18  that fair?
19       A.  Exactly the day of appointment you
20  don't know if they're going to be -- if they
21  may be still disputed until you've reviewed.
22  So ...
23       Q.  So when you referred to the ten or
24  12, were those ten or 12 disputed claims,
25  undisputed claims or a mix?



Page 77

1        G. ROBINSON
2        A.   We were provided with that list
3   when we got appointed, and then we reviewed
4   and analyzed it, and if they were not
5   disputed, they would have been paid.
6        Q.   Okay.  And as a total group, how
7   many disputed, undisputed or contingent claims
8   existed, to the best of your knowledge, on the
9   date of commencement?
10        MR. McDONALD:  Objection to form.
11        A.   Again, you don't know which ones
12   are disputed when you get appointed.
13        Q.   And that's why I am trying to say I
14   don't really care whether it's disputed or
15   undisputed or contingent.
16        How many claims existed, to the
17   best of your knowledge, on the commencement
18   date, irrespective of whether they were
19   contingent or disputed claims?
20        A.   So on top of the ten to 12 is --
21        Q.   Mm-hmm.
22        A.   I would say maybe another ten.
23        Q.   Okay.  So somewhere between 20 and
24   22 claims in total, which included undisputed
25   claims, disputed claims and contingent claims.

Page 78

1        G. ROBINSON
2        Is that fair?
3        MR. McDONALD:  Objection to form.
4        A.   I would say okay, yes.
5        Q.   Do you know the aggregate value of
6   those claims?
7        MR. McDONALD:  Objection to form.
8        A.   Which -- do you want to break it
9   down?
10        Q.   Sure.
11        A.   Are you asking for the full amount?
12        Q.   Let's start with the full amount.
13        MR. MORRIS:  Withdrawn.  Let me ask
14   a different question.
15        Q.   As of the commencement date, what
16   did Ascentra's books and records show as their
17   obligations owing to creditors?
18        MR. McDONALD:  Objection to form.
19        A.   I think from memory it was over
20   20 million U.S. dollars.  That is for
21   creditors and other potential creditors.
22        Q.   Right.  And was there any creditor,
23   to the best of your recollection, who held a
24   claim, whether it was disputed or not, that
25   was more than a million dollars?

Page 79

1        G. ROBINSON
2        MR. MORRIS:  Withdrawn.
3        Q.   What was the biggest claim?
4        MR. McDONALD:  Objection to form.
5        A.   If you exclude the monies that are
6   due to the members on the commissions, the
7   biggest creditor claim was -- for a service
8   provider was approximately 3.9 million.
9        Q.   Do you know whether under the
10   Cayman Companies Act a solvent entity
11   liquidating under court supervision is
12   required to pay creditors within 12 months?
13        MR. McDONALD:  Objection to form.
14        A.   Sorry, say again.
15        Q.   Do you know whether under the
16   Cayman Companies Act a solvent entity
17   operating under court supervision is required
18   to pay its debts within 12 months?
19        MR. McDONALD:  Objection to form.
20        Q.   You can answer.
21        A.   Under court supervision, no.
22        Q.   Is that a rule that applies outside
23   of court?
24        MR. McDONALD:  Objection to form.
25        A.   For a voluntary liquidation --

Page 80

1        G. ROBINSON
2   well, a director, if he signs a declaration of
3   solvency, he's swearing in the declaration
4   that all the debts of the company will be paid
5   off in full within 12 months.
6        Q.   That's what I am asking.
7        Did that happen in this case?
8        A.   No.
9        Q.   So which debts were not paid in
10   full within 12 months?
11        MR. McDONALD:  Objection to form.
12        A.   Within 12 -- in the first 12
13   months?
14        Q.   Mm-hmm.
15        A.   I don't know from memory.  As I
16   said, there's no requirement for debts to be
17   paid, all creditors to be paid in 12 months.
18        Like I said before, and I'll repeat
19   again, we've been dealing with creditors for
20   the full -- through the whole liquidation
21   process, and some have been paid, some have
22   been agreed and paid, and we have probably
23   some creditors that we have not verified and
24   paid.
25        Q.   Has Ascentra paid all creditors in



Page 81

1        G. ROBINSON
2   full who hold undisputed claims?
3        MR. McDONALD: Objection to form.
4     A.  Yes.
5     Q.  And is the only reason the
6   remaining creditors haven't been paid in full
7   is because there's a dispute as to either the
8   validity or the amount of their claim?
9        MR. McDONALD: Objection to form.
10    A.  Yes, the verification -- I would
11  say that the verification -- sorry.  The
12  verification of the process of agreeing the
13  claims is still ongoing.
14    Q.  How many claims are subject to
15  dispute today?
16    A.  Seven.
17    Q.  Are those seven claims held by
18  seven different people and entities, or does
19  one or more entity own one or more of those
20  disputed claims?
21        MR. McDONALD: John, just to
22        interject.  There are reports filed with
23        the Cayman court, and we're kind of
24        cutting close to a line here.
25        To the extent generally you can

Page 82

1        G. ROBINSON
2   answer.
3        But the court has sealed these
4   reports, and they remain subject to
5   court seal.  So I'm just trying to keep
6   that in mind here so that the witness
7   isn't divulging information that is
8   currently subject to a court order under
9   seal.
10        MR. MORRIS: Okay.  I appreciate
11        that --
12        MR. McDONALD: In generality, yes.
13        MR. MORRIS: I have no knowledge of
14        any of that.  And you'll instruct him
15        not to answer if you think it's your
16        responsibility to do that.
17        MR. McDONALD: Right.  I just
18        wanted to make you aware of that, and
19        that may be an objection or a direction
20        at some point.
21        MR. MORRIS: Okay.
22        MR. McDONALD: Okay?
23        MR. MORRIS: Can we have the
24        question read back, please?
25        (Requested portion of the record

Page 83

1        G. ROBINSON
2   read back.)
3     A.  Seven separate entities.
4     Q.  Okay.  So is it fair to say that
5   Ascentra Holdings, Inc. has paid all creditors
6   in full except for the seven entities who hold
7   one disputed claim each?
8        MR. McDONALD: Objection to form.
9     A.  Yes.
10  DIR  Q.  Does the Ascentra Holdings estate
11  have sufficient assets to pay those disputed
12  claims in full if the holders of those claims
13  prevail on their position that their claims
14  are valid?
15        MR. McDONALD: We're getting into
16        the -- that line, and I'm going to
17        object and direct the witness not to
18        answer.
19        MR. MORRIS: I just want to be
20        really clear.  I'm just asking for a
21        yes-or-no answer here.
22  DIR  Q.  Does the state -- does the estate
23  have the sufficient assets to satisfy those
24  contingent claims if they are ultimately
25  deemed to be valid in the amounts that the

Page 84

1        G. ROBINSON
2   claim-holders contend?
3        MR. McDONALD: Again I'm going to
4        object and direct the witness not to
5        answer.
6     Q.  Are you going to follow counsel's
7   advice?
8     A.  Yes.
9     Q.  Okay.
10        MR. McDONALD: And, again, the
11        basis of that is that it's requesting
12        information that is currently under seal
13        with the Cayman court by court order.
14  REQ      MR. MORRIS: I would request a copy
15        of that court order in due course.
16  BY MR. MORRIS:
17  DIR  Q.  Can you tell me the aggregate value
18  of the claims that are being asserted against
19  the Ascentra Holdings, Inc. entity by the
20  seven claim-holders?
21        MR. McDONALD: Again I am going to
22        object and direct the witness not to
23        answer.
24        MR. MORRIS: And is that also
25        because there's a court order that would



Page 85

1        G. ROBINSON
2   preclude him from answering?
3        MR. McDONALD:  There's a court
4   order that has sealed that information
5   that is contained in a report, yes.  It
6   would be requiring him to divulge
7   information that is currently under
8   seal.  And we will happily send you that
9   order.
10       MR. MORRIS:  Okay.
11  BY MR. MORRIS:
12  DIR  Q.  Can you identify for me the holders
13  of the seven disputed claims?
14       MR. McDONALD:  Objection.
15       I direct the witness not to answer.
16       Q.  Are you going to follow counsel's
17  advice?
18       A.  Yes.
19       Q.  Can you tell me the value of any of
20  the disputed claims?
21       MR. McDONALD:  I think that's been
22       answered already.
23       MR. MORRIS:  If you are objecting
24       as asked and answered, that's fine.  I
25       don't believe it was.  So I'll ask for

Page 86

1        G. ROBINSON
2   an answer.
3        A.  I believe I've answered that
4   question.
5        Q.  Okay.  Can you tell me again?
6        A.  3.9 million.
7        Q.  Oh, I -- so that's the answer to
8   the question of the largest claim, right?
9   That's what I understood.
10       A.  Yeah.
11       Q.  Okay.  Is that a disputed claim or
12  an undisputed claim?
13       A.  Again, we discussed this and
14  answered it was a disputed claim.
15       Q.  So that has not been paid, is that
16  fair?
17       A.  Yes.
18       Q.  Okay.  Has Ascentra Holdings, Inc.
19  made any reserve on account of these claims?
20       MR. McDONALD:  Objection to the
21       form.
22       A.  I'm uncertain if I can answer that
23  because that refers to the ongoing incoming
24  receipts and payments of the liquidation of
25  the estate, and that's within the court

Page 87

1        G. ROBINSON
2   reports, and that court report is sealed.
3        Q.  So I want to be really clear what I
4   am asking here.
5        Do you understand what a reserve
6   is?
7        A.  In what way?
8        Q.  Has Ascentra Holdings, Inc. set
9   money aside for the specific purpose of
10  satisfying these disputed claims at some point
11  in the future?  Just yes or no.
12       A.  I'm going to refer you to my last
13  answer.
14       Q.  Are you going to refuse to answer
15  that question?
16       A.  I can't answer that question
17  because it's based in the reports and those
18  reports are sealed.
19       So I'm not refusing to answer the
20  question.
21       Q.  You believe you have an obligation
22  not to disclose whether or not a reserve has
23  been established.
24       Do I understand that correctly?
25       A.  I'm an officer of the court in the

Page 88

1        G. ROBINSON
2   Cayman Islands.  My report's been filed with
3   the court, and the court has sealed it.  I'm
4   an officer of the court.  I follow what the
5   court has done.
6        Q.  Okay.  I just wanted to make sure.
7        Certain persons and entities have
8   made claims in the liquidation by way of proof
9   of debt, is that right?
10       MR. McDONALD:  Objection to form.
11       A.  Yes.
12       Q.  How many proofs of debt have been
13  filed?
14       MR. McDONALD:  Objection to form.
15       A.  Eight, I believe.
16       MR. MORRIS:  I'll mark as the next
17       exhibit, exhibit 5, Robinson 5, the
18       report that was filed with the
19       bankruptcy court in New York.
20       (Robinson Exhibit 5, letter to the
21       Court, dated December 29, 2023 was
22       marked for identification.)
23  BY MR. MORRIS:
24       Q.  You could take a quick look at it,
25  or take as long as you need to look at it.  My

Page 89

1          G. ROBINSON
2   first question for you is whether you have
3   seen this before?
4          A.   Yes, I've seen this document
5   before.
6          Q.   Okay.  And did you see it before it
7   was filed?
8          A.   Yes.
9          Q.   And so you were aware that it was
10  being filed on behalf of the joint official
11  liquidators in the Ascentra Chapter 15 case,
12  right?
13         A.   Yes.
14         Q.   Okay.  If you could go to I guess
15  the last substantive page, page 4.
16         A.   Okay.
17         Q.   So directing your recollection to
18  the middle of the page, underneath the heading
19  "Additional Actions Undertaken By the
20  Liquidators," your counsel informed the court
21  in New York, quote, "The liquidators continue
22  to correspond with potential creditors and
23  parties who have made claims in the
24  liquidation by proof of debt."
25         Have I read that first sentence

Page 90

1          G. ROBINSON
2   correctly?
3          A.   Yes.
4          Q.   Okay.  The phrase "potential
5   creditors," are those creditors who hold
6   contingent or disputed claims?
7          A.   The two referred to here are the
8   seven I listed before, yes.  Part of the
9   seven.  Yes.
10         Q.   Okay.  So the potential creditors
11  are seven, and there's two of whom that are
12  referred to in the second sentence, is that
13  fair?
14         A.   Yes.
15         Q.   Okay.  So if there are seven
16  potential creditors -- I think you mentioned
17  that there are eight proofs of debt that were
18  filed?
19         Do I have that right?
20         A.   From memory, yes.
21         Q.   And is that because one of the
22  proofs of debt was resolved?
23         A.   Yes.
24         Q.   And that proof of debt that was
25  resolved was paid in full, correct?

Page 91

1          G. ROBINSON
2          MR. McDONALD:  Objection to form.
3          A.   The proof of debt that was approved
4   by the liquidator has been paid, yes.
5          Q.   In full.  So again --
6          MR. McDONALD:  Objection to form.
7          Q.   So again, the only thing that is
8   outstanding today are the seven disputed
9   claims, is that fair?
10         MR. McDONALD:  Objection to form.
11         A.   In the Ascentra liquidation?
12         Q.   Yes, sir.
13         A.   Those seven, yes, and the members'
14  commissions that remain payable, yes.
15         Q.   Are the members' commissions
16  obligations of the company or are they part of
17  the members' equity?
18         MR. McDONALD:  Objection to form.
19         A.   (No response.)
20         MR. MORRIS:  Withdrawn.
21         Q.   When you use the phrase "members'
22  commission," what are you referring to?
23         A.   This -- this is the commissions
24  that are due to the -- to the members that
25  sold products on behalf of the Ascentra group.

Page 92

1          G. ROBINSON
2          Q.   And are those commissions subject
3   to the proof-of-debt process?
4          A.   Not at this stage.
5          Q.   Why not?
6          A.   No -- no -- no member has written
7   to the liquidators.
8          Q.   So as of today no claim has been
9   made for the payment of a member's commission,
10  is that fair?
11         A.   In the Ascentra liquidation?
12         Q.   Yes, sir.
13         A.   No.
14         Q.   That's not fair?
15         A.   Sorry.  No, they have not
16  submitted ...
17         Q.   Have members made claims for
18  commissions in any other liquidation that's
19  related to Ascentra Holdings, Inc.?
20         A.   No.
21         Q.   Would you have an obligation as the
22  joint official liquidator to pay the member
23  claim if you believe today that the claim was
24  valid?
25         MR. McDONALD:  Objection to form.




Page 93

1          G. ROBINSON
2     A.  Say the question again?  Sorry.
3     Q.  In your capacity as a joint
4  official liquidator, would you be duty-bound
5  to pay the commissions if you concluded that
6  they were a due and valid obligation of the
7  Ascentra Holdings, Inc. company?
8          MR. McDONALD:  Objection to form.
9     A.  If we've gone through the
10  verification process and we believed they were
11  due and payable, then they would be paid as
12  part of the liquidation process.
13     Q.  And did you, in your capacity as
14  the joint official liquidator, undertake a
15  review of whether any membership commissions
16  were due by Ascentra Holdings, Inc.?
17     A.  Yes.
18     Q.  And have you concluded that no
19  membership commissions are due by Ascentra
20  Holdings, Inc.?
21          MR. McDONALD:  Objection to form.
22     A.  Say the question again?
23     Q.  Have you concluded that Ascentra
24  Holdings, Inc. doesn't owe any membership
25  commissions?

Page 94

1          G. ROBINSON
2     A.  I have not concluded that, no.
3     Q.  You're still reviewing it?
4     A.  The review process of the
5  commissions has not been finalized.
6     Q.  Okay.  But no member has made a
7  claim for commission, correct?
8     A.  No member has made a claim for
9  commission in the Ascentra liquidation,
10  correct.
11     Q.  Okay.  Has any member made a claim
12  for commission in any other liquidation that
13  you are involved with?
14     A.  No.
15     Q.  Other than the seven disputed
16  claims or proofs of debt that you've
17  identified, are you aware of any other
18  contingent obligation that Ascentra Holdings,
19  Inc. has?
20          MR. McDONALD:  Objection to form.
21     A.  No.
22     Q.  Looking down, still staying with
23  the same report --
24     A.  Okay.
25     Q.  -- towards the end it says, quote,

Page 95

1          G. ROBINSON
2  "The liquidators also received three
3  additional proofs of debt from Mr. Sanders on
4  November 10, 2023, which have not been
5  adjudicated yet."
6          Have I read that correctly?
7     A.  You have.
8     Q.  And are those three proofs of debt
9  among the eight that you identified earlier?
10     A.  Yes.
11     Q.  Okay.  Does Mr. Sanders have any
12  other proofs of debt -- withdrawn.
13          Have any proofs of debt been filed
14  on Mr. Sanders' behalf other than those three?
15     A.  No.
16     Q.  And are those three proofs of debt,
17  are they filed on behalf of different entities
18  that are either owned or controlled by
19  Mr. Sanders, to the best of your knowledge?
20     A.  Yes.
21     Q.  So that among -- when you said
22  earlier that there were seven different
23  claim-holders or potential claim-holders,
24  three of them were affiliated with
25  Mr. Sanders, right?

Page 96

1          G. ROBINSON
2     A.  Yes.
3     Q.  Okay.  Of the other four, is there
4  any affiliation between the holders of those
5  potential claims?
6     A.  No.
7     Q.  So you've got Mr. Sanders plus four
8  other folks who collectively hold seven
9  disputed claims, correct?
10     A.  Yes.
11     Q.  Okay.  Can you describe for me the
12  nature of the three proofs of debt that were
13  filed on behalf of Mr. Sanders?
14          MR. McDONALD:  Objection to form.
15          To the extent you can disclose
16  that.
17     A.  No, we probably -- I probably
18  discussed the proof of debts with my Cayman
19  counsel, so I would say those discussions are
20  privileged.
21     Q.  But you've discussed it with
22  somebody representing Mr. Sanders, right?
23     A.  My attorneys have spoken to
24  Mr. Sanders' attorneys.
25     Q.  Okay.  So focussing on those



GRAHAM ROBINSON  30(b)(6)                    February 29, 2024
In Re Ascentra Holdings Inc.                              97–100

Page 97

1          G. ROBINSON
2  discussions, do you know what the nature of
3  Mr. Sanders' claim is?
4          Have you read the proofs of debt
5  that were filed on behalf of Mr. Sanders?
6      A.  Yes.
7      Q.  Do you have an understanding as to
8  the nature of the claim?
9      A.  He claims he's owed money.
10     Q.  Does he state why he believes he's
11  owed money?
12     A.  He does.
13  DIR  Q.  Does he cite to any contract that
14  he believes he's entitled to recover damages
15  for, for breach?
16         MR. McDONALD:  I'm going to object.
17     Those proofs of debt are still
18     confidential and the nature of those
19     claims and the nature of the
20     disagreement over those claims and the
21     negotiation of those claims are sealed
22     under -- as part of the report to the
23     court.
24         MR. MORRIS:  So you're not going to
25     let him tell me if there's a contract

Page 98

1          G. ROBINSON
2  claim or a tort claim?
3         MR. McDONALD:  No.
4      Q.  Do you dispute Mr. Sanders' claims?
5      A.  The verification process is still
6  ongoing.  So ...
7      Q.  You haven't agreed to pay the
8  claims, is that fair?
9      A.  The verification process is still
10  ongoing.
11     Q.  Do you dispute the validity of the
12  claims or the amount of the claims?
13     A.  The verification process is still
14  ongoing.
15     Q.  Can you describe for me what the
16  verification process is?
17     A.  We review the proof of debts and
18  make an assessment on whether it's valid or
19  invalid.
20     Q.  And when did he file the proofs of
21  debt?
22         MR. McDONALD:  Objection to form.
23     A.  I believe we received them in early
24  November 2023.
25     Q.  And are the proofs of debt filed

Page 99

1          G. ROBINSON
2  with the court, or are they just given to you
3  in your capacity as the joint official
4  liquidator?
5      A.  Just to me.
6      Q.  Okay.  So these are documents that
7  have not been filed with the court, correct?
8      A.  There's no requirement to file
9  proof of debts separately into the Cayman
10  court.
11     Q.  I appreciate that there's no
12  requirement.  I'm just asking you if it
13  happened.
14         To the best of your knowledge, were
15  Mr. Sanders' proofs of debt filed with the
16  Cayman court?
17     A.  No.
18     Q.  Okay.  Can you share with me
19  anything about the nature of the claims that
20  were delivered to you but not filed with the
21  Cayman court?
22     A.  Say that question again?  Sorry.
23     Q.  Can you tell me the amount of any
24  of the three claims that were given to you but
25  not filed with the court?

Page 100

1          G. ROBINSON
2         MR. McDONALD:  Again, that
3     information is subject to the seal
4     order.
5         MR. MORRIS:  But it wasn't filed
6     with the court, right?
7         MR. McDONALD:  The report
8     discussing the claims has been filed
9     with the court.  The claims have been
10     received by the liquidator.
11         MR. MORRIS:  And that's all I'm
12     asking about, is the claims -- I don't
13     care about any report filed with the
14     court.
15         So let me ask the question again.
16         MR. McDONALD:  So --
17         MR. MORRIS:  Let me ask the
18     question again.
19         MR. McDONALD:  Okay.
20  DIR  Q.  The claims that were given to you
21  but not filed with the Court, can you tell me
22  what the amount of those claims are?
23         MR. McDONALD:  I object.
24     Direct the witness not to answer.
25     The inspection of those proofs of



Page 101

1        G. ROBINSON
2   debt to creditors and
3   contributories and are to be kept
4   confidential.  The discussion of those
5   are contained in a report that is filed
6   with the court and is subject to seal.
7        MR. MORRIS:  Just help me
8   understand, Hugh.  Is there an order
9   that was entered in this case that
10  you're relying upon, or is it a Cayman
11  Islands law?
12       MR. McDONALD:  It's a combination
13  of both.  There is, within the Cayman
14  Islands, the Companies Act, as well as
15  in the rules, a restriction on who can
16  inspect proofs of debt, and the
17  discussion of those proofs of debt are
18  contained in a report that are subject
19  to a court order sealing them.
20       And so --
21       MR. MORRIS:  Okay.  To be clear I'm
22  not asking about that report.
23       MR. McDONALD:  I understand that.
24  But the contents of those proofs of debt
25  are discussed in a report that is

Page 102

1        G. ROBINSON
2   subject to a seal.
3        MR. MORRIS:  Okay.  And you guys
4   will follow up with the identity of the
5   order that you're relying on and the
6   law, right?
7        MR. McDONALD:  Mm-hmm.
8        MR. MORRIS:  Okay.
9   BY MR. MORRIS:
10       Q.  Is there a deadline for the filing
11  of proofs of debt in this case, in the Cayman
12  Islands?
13       A.  No.
14       Q.  Based on your review of the
15  records, do you have any reason to believe --
16  withdrawn.
17       Based on your work as a joint
18  official liquidator, do you have any
19  expectation that any additional proofs of debt
20  are likely to be filed?
21       MR. McDONALD:  Objection to form.
22       A.  Specifically to the Ascentra --
23       Q.  Yes.
24       A.  -- liquidation?
25       I'm hopeful there's no other proof

Page 103

1        G. ROBINSON
2   of debts, yes.
3        Q.  Okay.  And do you have any
4   reason -- do you have any expectation that
5   they will be filed?  Is it more than a hope?
6   But based on your work, has anybody -- you
7   know, do you have any expectation --
8        MR. McDONALD:  Wait for him to
9   finish.
10       Q.  Okay.  Do you have any reason to
11  believe that somebody's going to file further
12  proofs of debt?  In the Ascentra Holdings,
13  Inc. case.
14       A.  Just from experience of being a
15  joint official liquidator, you expect
16  in restructuring for 30-odd years, you expect
17  the unexpected.
18       Q.  Okay.  Other than that, do you have
19  any reason to expect that any additional
20  proofs of debt will be filed in the Ascentra
21  Holdings, Inc. case?
22       A.  No.
23       Q.  Thank you.
24       MR. MORRIS:  Let's mark as the next
25       exhibit another report that was given to

Page 104

1        G. ROBINSON
2   the court in New York.
3        THE WITNESS:  Can we just do a
4   five-minute toilet break?
5        MR. MORRIS:  Sure, you bet.
6        THE VIDEOGRAPHER:  This ends
7   unit 3.  We're off the record at 11:52.
8        (Recess taken.)
9        THE VIDEOGRAPHER:  This begins
10  unit 4.  We're on the record at 12:03.
11       (Robinson Exhibit 6, Letter to the
12       Court dated June 30, 2023 was marked for
13       identification.)
14  BY MR. MORRIS:
15       Q.  All right.  Mr. Robinson, you have
16  in front of you what has been marked as
17  Robinson exhibit 6.  It's another document
18  that was filed with the court.
19       Have you taken a moment to look
20  at it?
21       A.  Yes.
22       Q.  Okay.  And you saw it before it was
23  filed, is that right?
24       A.  Yes.
25       Q.  Okay.  Directing your attention to

Page 105

G. ROBINSON

1  the second paragraph on the first page,
2  there's a statement in there that says, quote,
3  "As a result of various shareholder disputes,
4  on June 1, 2021 Ascentra was placed into
5  voluntary liquidation in the Cayman Islands by
6  its shareholders."
7      Have I read that correctly?
8      A.  Yes.
9      Q.  And is that accurate, to the best
10 of your knowledge?
11     A.  To the best of my knowledge, yes.
12     Q.  Okay.  Are you aware of any reason
13 that Ascentra was placed in voluntary
14 liquidation other than various shareholder
15 disputes?
16     A.  No.
17     Q.  Thank you.
18     And if you can go to the second
19 page on the back of the document.  The end of
20 the middle paragraph says, quote, "Further,
21 the liquidators have corresponded with various
22 potential creditors of Ascentra and requested
23 proofs of debt to be submitted."
24     Did I read that correctly?

Page 106

G. ROBINSON

1      A.  Which paragraph is that?
2      Q.  It's the middle one that begins "In
3  the Cayman proceeding."
4      A.  Okay.
5      Q.  So now I'm looking at the last
6  sentence that begins "Further --
7      A.  Oh, "Further." I see it.  Sorry.
8  I see it.
9      Q.  That's okay.  Are you with me now?
10 Take a moment to read it.
11     A.  Okay, yes.
12     Q.  And so this is dated in June.
13 Would this have been part of the process of
14 soliciting the proofs of debt that resulted
15 in, I guess, the ones that we talked about
16 earlier?
17     A.  Yeah, these -- these relate to the
18 creditors we discussed previously.  Yes.
19     Q.  Okay.  And under what
20 circumstances, if you recall, did you request
21 that proofs of debt be submitted?  Like, why
22 do you do that?
23     MR. McDONALD:  Objection to form.
24     A.  Well, the official liquidator has

Page 107

G. ROBINSON

1  got a pretty simple function, and that is to
2  get in the assets, realize the assets, and
3  then distribute the assets to the creditors.
4      And one of my jobs as a joint
5  official liquidator is to approve creditor
6  claims, and that's in a quasi-judicial way as
7  an officer of the court.  So that's what we
8  do.
9      Q.  So is it fair to say that you
10 request a proof of debt if somebody comes to
11 you and says the entity that's being
12 liquidated owes them money, and then you say,
13 well, send me a proof of debt and we'll figure
14 it out?
15     A.  Yeah, there's no right or wrong way
16 of how a proof is received or not received or
17 how you agree a claim.  But yeah, one way
18 would be, if someone came to you and requested
19 a claim they were owed money, you would enter
20 correspondence and you could request they
21 submit a formal proof of debt.
22     Q.  Okay.  And this is the process that
23 led to the seven remaining proofs of debt,
24 correct?  That are disputed.

Page 108

G. ROBINSON

1      MR. McDONALD:  Objection to form.
2      A.  Yeah, creditors can come to you,
3  and you can go to potential creditors as well.
4      Q.  Okay.  How many proofs of debt did
5  the joint official liquidators request, as
6  opposed to how many proofs -- let's just start
7  with there.
8      How many did you request be filed?
9      A.  How many proof of debts did the
10 joint official liquidators of Ascentra request
11 from potential creditors?
12     Q.  Mm-hmm.
13     A.  I don't know the exact number from
14 memory.  Out of the eight that we received,
15 from memory I would say we requested six.
16     Q.  And would they include Mr. Sanders'
17 three?
18     A.  Yes.
19     Q.  Why did you request Mr. Sanders to
20 file proofs of debt?
21     A.  I don't -- SPGK and the defendants,
22 all the defendants are not an admitted
23 creditor in the liquidation, and you are not
24 entitled to that information.



GRAHAM ROBINSON  30(b)(6)
In Re Ascentra Holdings Inc.

February 29, 2024
109–112

Page 109

G. ROBINSON
1
2      THE COURT REPORTER:  Can you just
3  repeat that?  All of defendants are
4  not ...
5      A.  An admitted creditor in the
6  liquidation under Cayman law.
7      Q.  So you believe you have a duty not
8  to tell me the answer to the question because
9  in your view SPGK is not entitled to receive
10  it under Cayman law, is that right?
11      A.  Say that again?  Sorry.
12      Q.  I just want to make sure that I
13  understand.  I don't mean to be contentious at
14  all.
15          You're refusing to answer my
16  question because SPGK is not a creditor in the
17  Ascentra Holdings, Inc. bankruptcy, is that
18  right?
19      A.  I wouldn't -- I'm not refusing to
20  answer your question.  I can't answer your
21  question.
22      Q.  Okay.  That's --
23      A.  That's a big difference.
24      Q.  Well, you're refusing because you
25  believe you have an obligation not to disclose

Page 110

G. ROBINSON
1
2  it.  Is that fair?
3      A.  Under Cayman law -- you are not an
4  admitted creditor, and you're not entitled to
5  that information under Cayman law.
6      Q.  Okay.  So let me just ask you, as
7  an experienced insolvency practitioner in the
8  Cayman Islands and one licensed to serve as a
9  liquidator, do you have any ability to share
10  this information -- withdrawn.
11          I understand your position that
12  SPGK has no right to the information.  My
13  question for you:  Is there anything that
14  prohibits you from disclosing the information?
15          MR. McDONALD:  Objection to form.
16      A.  I think I'll just refer you to my
17  previous answer.
18      Q.  And I'm trying to parse that
19  through.
20          I understand that you believe that
21  under Cayman law -- and I don't mean to be
22  contentious --
23      A.  That's okay.
24      Q.  -- that under Cayman law SPGK has
25  no right to know anything about the subject

Page 111

G. ROBINSON
1
2  matters that we're talking about.
3          Is that fair?
4      A.  Yeah.  You're not an admitted
5  creditor.
6      Q.  Okay.  Let's start with what's an
7  admitted creditor?
8      A.  A creditor that the claim has been
9  admitted by the joint official liquidators.
10      Q.  Meaning that it's no longer
11  disputed?
12      A.  Yes.  It's admitted.
13      Q.  So Mr. Sanders is not an admitted
14  creditor, is that right?
15      A.  Correct.
16          MR. McDONALD:  Objection to form.
17      Q.  So I appreciate what you're saying,
18  and now I am going to ask you a different
19  question.
20          Even though they don't have the
21  right to the information, is there any legal
22  prohibition, to the best of your knowledge,
23  that would prohibit you from disclosing it?
24      A.  Just say the question again?
25  Sorry.

Page 112

G. ROBINSON
1
2      Q.  Is there any legal impediment, you
3  know, is there any legal prohibition that
4  prevents you from disclosing the information,
5  or it's just that SPGK has no right to
6  receive it?
7      A.  SPGK has no right to receive it.
8      Q.  I understand.  But is there any --
9  do you have a legal duty not to disclose it,
10  or is it just that they have no right to
11  receive it?
12          Do you understand the distinction
13  that I'm making?
14          MR. McDONALD:  Yeah, I'm going to
15  object.  I think as I discussed earlier,
16  the information concerning the proofs of
17  debt is contained in reports that have
18  been filed with the court that are
19  subject to seal.
20          So is there a legal impediment?
21  Yes.  He's an officer of the court, and
22  he's bound by the orders of the court.
23          MR. MORRIS:  So is there any
24  information at all that you are willing
25  to let him testify to other than the

GRAHAM ROBINSON  30(b)(6)                                    February 29, 2024
In Re Ascentra Holdings Inc.                                         113–116

Page 113

G. ROBINSON
1       number of outstanding disputed claims?
2
3           MR. McDONALD:  As to the nature and
4   identity and basis for the claims and
5   the nature of any disputes over the
6   claims?  No.  He's not going to be able
7   to testify.
8           MR. MORRIS:  And is that because
9   the information was filed with the
10  court, or is there something else that
11  prohibits it?
12          MR. McDONALD:  It's a combination
13  of the statute rules and orders of the
14  court that prohibit him from disclosing
15  that information.
16          MR. MORRIS:  Okay.
17      Q.   Okay.  We're going to go to topic 5
18  on the 30(b)(6) list, which was exhibit 1, and
19  that relates to applications for sanction.
20          Can you tell me what an application
21  for sanction is, in the context of a Cayman
22  Islands liquidation proceeding?
23      A.   Well, so to answer your question
24  for me as a joint official liquidator,
25  basically our powers are split between powers

Page 114

G. ROBINSON
1
2   that we need the court sanction for and powers
3   that we don't need sanction for.
4           So ultimately we -- if there are
5   certain things that we need to do as part of
6   the liquidation process, then we would, with
7   our counsel, we would make applications to the
8   courts.
9       Q.   So there are certain things that
10  you may want to do that you need court
11  permission for, is that fair?
12      A.   Yes.
13      Q.   Okay.  Do creditors and the
14  liquidation of a solvent entity have any
15  ability to apply for sanction?
16      A.   They have no ability to apply for
17  sanction.
18      Q.   Okay.  And so then is it fair to
19  say that no creditor or potential creditor of
20  Ascentra Holdings, Inc. has ever applied for
21  sanction in that case?
22      A.   Sorry.  Just say that again?
23      Q.   Is it fair to say then that no
24  creditor or potential creditor has applied
25  for sanction of the Ascentra Holdings,

Page 115

G. ROBINSON
1       Inc. proceedings in the Cayman Islands?
2
3           MR. McDONALD:  Objection to form.
4       A.   No creditor or potential creditor
5   has applied for sanction, yes.
6       Q.   Okay.  Is it your understanding as
7   a licensed insolvency practitioner that
8   creditors and potential creditors of an
9   insolvent company or a company of doubtful
10  insolvency have the ability to apply for
11  sanction?
12          MR. McDONALD:  Objection.  That's
13      calling for a legal conclusion.
14      Q.   Okay.  Subject to that objection
15  you can answer.
16      A.   Just repeat the question for me,
17  please?
18      Q.   Sure.  As a licensed insolvency
19  practitioner in the Cayman Islands, do
20  creditors or potential creditors of insolvent
21  companies or companies of doubtful insolvency,
22  do they have a right to apply for sanction?
23          MR. McDONALD:  Objection; calls for
24      a legal conclusion.
25      Q.   You can answer.

Page 116

G. ROBINSON
1
2       A.   Yes.
3       Q.   Okay.  Do you know whether any
4   potential creditor -- withdrawn.
5           Do you know whether any creditor or
6   potential creditor -- withdrawn.
7           Is the Ascentra Holdings, Inc. case
8   pending before a particular bankruptcy --
9   withdrawn.
10          Is the Ascentra Holdings, Inc. case
11  pending before a particular judge in the
12  Cayman Islands?
13      A.   Yes.
14      Q.   And what's the name of the judge?
15      A.   Doyle.
16      Q.   Doyle.  Can I refer to him as Judge
17  Doyle, or is it Justice Doyle?
18          MR. COWAN:  Mr. Justice Doyle.
19          MR. MORRIS:  Mr. Justice Doyle.
20      Q.   To the best of your knowledge,
21  since the case was commenced has any creditor
22  or potential creditor appeared before
23  Mr. Justice Doyle?
24      A.   In the Ascentra liquidation?
25      Q.   Yes.



GRAHAM ROBINSON  30(b)(6)                     February 29, 2024
In Re Ascentra Holdings Inc.                         117–120

Page 117

1            G. ROBINSON
2      A.   Yes.
3      Q.   Okay.  Can you identify the
4  creditor or potential creditor who appeared
5  before Mr. Justice Doyle in the Ascentra
6  bankruptcy case?
7      A.   Your defendants.
8      Q.   Okay.  Is there any other creditor
9  or potential creditor -- withdrawn.
10         When you refer to my defendants
11  you're referring to my clients who are the
12  defendants in the complaint that was filed on
13  your behalf in the Cayman Islands, is that
14  right?
15     A.   That's the party that I'm
16  referring to, if you said they have been in
17  front -- they have appeared in the sanction,
18  then yes.
19     Q.   Other than my clients, is there any
20  other creditor or potential creditor who has
21  ever appeared before Mr. Justice Doyle in the
22  Ascentra Holdings, Inc. liquidation case?
23     A.   No.
24     Q.   Do you have access to the documents
25  that are filed with the court in the Cayman

Page 118

1            G. ROBINSON
2  Islands?
3      A.   Only through my Cayman attorneys.
4      Q.   And is it one of your
5  responsibilities to be at least generally
6  familiar with the documents that are filed in
7  the Cayman court in connection with the
8  Ascentra Holdings, Inc. bankruptcy?
9      A.   Yes.
10     Q.   Okay.  And in carrying out that
11  responsibility, are you aware of any
12  document that was filed in the Ascentra
13  Holdings, Inc. liquidation case by a creditor
14  or potential creditor other than my clients?
15     A.   No.
16     Q.   Thank you.  Have my clients
17  appeared in the Cayman case of Ascentra
18  Holdings, Inc. in any capacity other than as
19  defendants in the lawsuit that was commenced
20  against them?
21         MR. McDONALD:  Objection to form.
22     A.   When you say "the lawsuit," are
23  you referring to the one that we filed on the
24  11th of October 2023?
25     Q.   Yes, sir.

Page 119

1            G. ROBINSON
2      A.   So have they appeared in something
3  else?
4      Q.   Correct.
5      A.   Yes.
6      Q.   Do you have an understanding of
7  what -- in what capacity they appeared before
8  Mr. Justice Doyle other than as a defendant in
9  that lawsuit?
10     A.   Say that again?  Sorry.
11     Q.   It's okay.  My clients have the
12  information.
13         MR. MORRIS:  Let's move along.
14  We've got -- the next document is
15  what?  7?
16         THE COURT REPORTER:  Yes.
17         MR. MORRIS:  It's going to be the
18  foreign representatives' objection to
19  the motion to terminate the restraint.
20         THE WITNESS:  Okay.
21         (Robinson Exhibit 7, Foreign
22  Representatives' Objection to Motion of
23  SPGK to Terminate Restraint was marked
24  for identification.)
25         MR. McDONALD:  I'm sorry, this was

Page 120

1            G. ROBINSON
2  7 you said?
3         MR. MORRIS:  Yes.
4         THE COURT REPORTER:  Yes.
5  BY MR. MORRIS:
6      Q.   I'll just mark it to identify it,
7  but I don't know that I am going to ask you
8  any questions in hindsight.
9         Is this the objection that was
10  filed on your behalf in New York with respect
11  to SPGK's motion to terminate the restraint on
12  the Planet Payment funds?
13         (The witness reviews document.)
14     A.   Yes.
15     Q.   Okay.  And if you turn to just
16  page 27, I guess I'll ask one question.
17     A.   Twenty-seven.  Okay.
18     Q.   In the middle of the page, under
19  "Likelihood of Success on the Merits," you'll
20  see there's a statement, "Second," quote, "as
21  to the liquidators' claim to the Planet
22  Payment Funds as set forth in detail above,
23  the contractual and equitable bases remain and
24  indeed are stronger following Mr. Yoshida's
25  deposition."



Page 121

1            G. ROBINSON
2      Do you see that?
3      A.   Where does it start?
4      Q.   The word "Second" begins at the end
5   of about the fifth line down.
6      A.   Yes.
7      Q.   So I'm just focused on that
8   particular sentence.
9      A.   Okay.
10      Q.   And do you understand that SPGK has
11   asked the bankruptcy court in New York to lift
12   the restriction on the funds that originated
13   at Planet Payment?
14      A.   Yes.
15      Q.   And do you understand that your
16   counsel on your behalf has opposed that motion
17   saying that they have a legal and equitable
18   right to the Planet Payment money?
19      A.   Yes.
20      Q.   Okay.  And do you understand that
21   topics 6 through 9 of the 30(b)(6) topics are
22   intended to cover the documents and facts
23   concerning your position as to the legal and
24   equitable bases to the claim to the money?
25      A.   I've read paragraph 6 to 9.

Page 122

1            G. ROBINSON
2      Q.   Okay.
3      MR. MORRIS:  Let's now mark as the
4   next exhibit, which I guess is 9 --
5      THE COURT REPORTER:  8.
6      MR. McDONALD:  8.
7      MR. MORRIS:  8.  Thank you.
8      -- a report to the Court dated
9   October 11.
10      (Robinson Exhibit 8, Letter to the
11   Court dated October 11, 2023 was marked
12   for identification.)
13   BY MR. MORRIS:
14      Q.   Were you aware that this letter was
15   sent to the court in New York in October 2023?
16      A.   Yes.
17      Q.   Okay.  And so did you authorize
18   your counsel to give the judge in New York a
19   copy of the pleading, the amended pleading
20   that was filed in the Cayman Islands?
21      A.   Yes.
22   DIR  Q.   And was the purpose of providing
23   that to the Court so that the Court would see
24   the contractual and equitable claims that the
25   Ascentra Holdings, Inc. company was asserting

Page 123

1            G. ROBINSON
2   against the Planet Payment money?
3      MR. McDONALD:  Objection.
4      Q.   You can answer.
5      MR. McDONALD:  It calls for the
6   disclosure of attorney-client
7   communication.
8      MR. MORRIS:  I'm not asking for
9   anything about any communication.  I'm
10   asking for --
11      MR. McDONALD:  You're asking why.
12   That was done in consultation with
13   counsel.
14      MR. MORRIS:  Are you directing him
15   not to answer?
16      MR. McDONALD:  I am directing him
17   not to answer.
18      MR. MORRIS:  So if he was in front
19   of the judge today and the judge said,
20   "Why did you send me this," you would
21   say, "I can't tell you"?
22      You would direct him not to answer
23   because --
24      MR. McDONALD:  It's an obligation
25   of a foreign representative to apprise

Page 124

1            G. ROBINSON
2   the court of any developments in the
3   foreign jurisdiction, and we have done
4   so.  That is set forth in Chapter 15.
5      Q.   Is it your understanding that the
6   complaint sets forth contractual and equitable
7   bases for Ascentra Holdings, Inc. claim to the
8   Planet Payment money?
9      MR. McDONALD:  Objection to form.
10      A.   Say the question again, please?
11      Q.   Is it your understanding that the
12   complaint that was filed in the Cayman Islands
13   sets forth the contractual and equitable bases
14   for Ascentra Holdings, Inc.'s claim to the
15   Planet Payment funds?
16      A.   The facts and documents that
17   support our claim are set out in this amended
18   complaint.
19   DIR  Q.   Okay.  I just have a few questions
20   about that.  If we can go to paragraph 37.
21      Paragraph 37 identifies three
22   specific agreements.
23      Do I have that right?
24      MR. McDONALD:  I am going to object
25   and direct the witness not to answer.



Page 125

1    G. ROBINSON
2    We're not taking a deposition in the
3    Cayman proceeding here.  Your client has
4    answered, asserted defenses and a
5    counterclaim.  We have responded.  The
6    matter is taking place in the Cayman
7    Islands.
8        MR. MORRIS:  We don't need the
9    speech.  We understand it.  You could
10   just direct him not to answer on the
11   account -- on account that there's a
12   pending proceeding.
13       MR. McDONALD:  I'm directing him
14   not to answer on account there's a
15   pending proceeding.
16       MR. MORRIS:  Okay.  But I am going
17   to ask my questions anyway, and we'll
18   make the record.  Is that fair?
19       MR. McDONALD:  That's fine.
20       MR. MORRIS:  Okay.
21  DIR  Q.  Does paragraph 37 set forth --
22   identify three particular documents that were
23   executed by SPGK Cayman?
24       MR. McDONALD:  The same
25       instruction.

Page 126

1        G. ROBINSON
2    Q.  Are you going to follow counsel's
3    advice?
4    A.  Yes.
5   DIR  Q.  Okay.  Are these documents relevant
6    to Ascentra Holdings, Inc.'s claim to the
7    Planet Payment funds?
8        MR. McDONALD:  Objection.  The same
9    direction.
10   Q.  Are you going to follow counsel's
11   advice?
12   A.  Yes.
13  DIR  Q.  Have you personally reviewed these
14   three documents?
15       MR. McDONALD:  Objection.  The same
16   direction.
17   Q.  Are you going to follow counsel's
18   advice?
19   A.  Yes.
20  DIR  Q.  Do you know why these three
21   documents are cited in this complaint?
22       MR. McDONALD:  The same objection.
23   The same direction.
24   Q.  Are you going to follow counsel's
25   advice?

Page 127

1        G. ROBINSON
2    A.  Yes.
3   DIR  Q.  Do you know whether the legal
4    and equitable bases for Ascentra Holdings,
5    Inc. claim to the Planet Payment funds are set
6    forth anywhere other than this document and
7    exhibit 7?
8        MR. McDONALD:  The same objection.
9    The same direction.
10       MR. MORRIS:  So we can't even find
11   out if there's another place to look?
12       MR. McDONALD:  As I said, your
13   client has submitted defenses.  We have
14   responded to those.  There will be a
15   hearing in the Caymans where additional
16   evidence will be adduced and presented
17   to the Court.  So he's not testifying
18   about that.  That's all privileged, as
19   to whether or not there will be anything
20   else forthcoming in this matter.
21       MR. MORRIS:  Like I said, we'll
22   either do the preclusion order or we'll
23   do the follow-up.  But I appreciate
24   that.
25       Can we take a break?

Page 128

1        G. ROBINSON
2        MR. McDONALD:  Sure.
3        THE VIDEOGRAPHER:  This ends
4    unit 4.  We're off the record at 12:32.
5        (Recess taken.)
6        THE VIDEOGRAPHER:  This begins
7    unit 5.  We're on the record at 12:44.
8   BY MR. MORRIS:
9    Q.  Mr. Robinson, can you grab exhibit
10   number 1, please.
11   A.  Okay.
12  DIR  Q.  Look at topic 6.
13       Can you identify for me the
14   documents that the foreign representatives
15   contend support their assertion that they can
16   establish a likelihood of success on the
17   merits with respect to their contractual basis
18   for entitlement to the Planet Payment funds?
19       MR. McDONALD:  Objection.
20       I direct the witness not to answer
21   on the basis of a pending proceeding.
22   Q.  Are you going to follow counsel's
23   advice?
24   A.  Yes.
25  DIR  Q.  Can you turn the page, please, to



Page 129

1        G. ROBINSON
2   number 7.
3        Can you describe for me all facts
4   that the foreign representatives contend
5   support their assertion that they can
6   establish a likelihood of success on the
7   merits with respect to a contractual basis for
8   entitlement to the Planet Payment funds?
9        MR. McDONALD:  The same objection.
10   The same direction.
11        Also calls for divulging
12   attorney-client communications.
13        Q.  You are going to follow counsel's
14   advice?
15        A.  Yes.
16        MR. MORRIS:  To be clear, I'm not
17   asking for any attorney-client
18   privileged communications.  I'm just
19   asking for facts.
20        MR. McDONALD:  Understood.
21        MR. MORRIS:  Okay.  So I want to
22   just --
23        MR. McDONALD:  The same objection.
24   The same direction.
25        MR. MORRIS:  Okay.

Page 130

1        G. ROBINSON
2   DIR  Q.  Looking at topic number 8, can you
3   please tell me all of the documents that the
4   foreign representatives contend support their
5   assertion that they can establish a likelihood
6   of success on the merits with respect to an
7   equitable basis for entitlement to the Planet
8   Payment funds?
9        MR. McDONALD:  The same objection.
10   The same direction.
11        MR. MORRIS:  Does that include
12   attorney-client privilege or just the
13   pending-proceeding objection?
14        MR. McDONALD:  You said you're not
15   asking for any attorney-client
16   privileged information.
17        MR. MORRIS:  Correct.
18        MR. McDONALD:  So I'm just going
19   with the same objection, the same
20   direction.
21        MR. MORRIS:  Thank you.
22        MR. McDONALD:  And to the extent it
23   does call for divulging attorney-client
24   privilege, as I said before ...
25        MR. MORRIS:  But, again, I'm just

Page 131

1        G. ROBINSON
2   asking for documents.
3        Q.  Number 9.  Can you please -- are
4   you going to follow counsel's advice?
5        A.  Yes.
6   DIR  Q.  Number 9.  Can you please share
7   with us the facts that the foreign
8   representatives contend support their
9   assertion that they can establish a likelihood
10   of success on the merits with respect to an
11   equitable basis for entitlement to the Planet
12   Payment funds?
13        MR. McDONALD:  The same objection.
14   The same direction.
15        Q.  Are you going to follow counsel's
16   advice?
17        A.  Yes.
18   DIR  Q.  Do you know if Ascentra Holdings,
19   Inc. ever had a contract with Planet Payment
20   for any purpose?
21        MR. McDONALD:  Objection; the same
22   direction.
23        Q.  Are you going to follow counsel's
24   advice?
25        A.  Yes.

Page 132

1        G. ROBINSON
2   DIR  Q.  Do you know whether any subsidiary
3   of Ascentra Holdings, Inc. ever had a contract
4   of any kind with Planet Payment?
5        MR. McDONALD:  The same direction.
6   The same objection.  The same direction.
7        Q.  Are you going to follow counsel's
8   advice?
9        A.  Yes.
10   DIR  Q.  Does Ascentra Holdings, Inc. rely
11   upon the cancellation agreement to support its
12   claim to the Planet Payment funds?
13        MR. McDONALD:  The same objection.
14   The same direction.
15        Q.  Are you going to follow counsel's
16   advice?
17        A.  Yes.
18   DIR  Q.  Do you understand what the
19   cancellation is agreement -- withdrawn.
20        Do you understand what the
21   cancellation agreement is that I referred to?
22        MR. McDONALD:  The same
23   direction -- the same objection.  The
24   same direction.
25        MR. MORRIS:  All right.  I'll show



Page 133

1         G. ROBINSON
2     it to him just so there's no ambiguity.
3         Let's mark as the next exhibit --
4         What is it, number 9?
5         THE COURT REPORTER:  Yes, sir.
6         MR. MORRIS:  -- the cancellation
7     agreement.
8         (Robinson Exhibit 9, Exhibit E to
9         declaration of Graham Robinson was
10        marked for identification.)
11    Q.   Have you seen this document
12    before, sir?
13    A.   Yes.
14    Q.   And do you recall that this
15    document was attached as an exhibit to one of
16    the declarations that was filed on your behalf
17    in the Ascentra Holdings, Inc. Chapter 15
18    matter?
19    A.   Yes.
20    DIR Q.   Okay.  Does Ascentra Holdings,
21    Inc. rely on this document in any way to
22    support its contention that it's likely to
23    succeed on the merits of its claim to the
24    Planet Payment funds?
25        MR. McDONALD:  The same objection.

Page 134

1         G. ROBINSON
2     The same direction.
3     Q.   Are you going to follow counsel's
4     advice?
5     A.   Yes.
6         MR. MORRIS:  Let's take one more
7     short break.
8         Hold it.  Before we go off the
9     record.
10        Are you going to direct him not to
11    answer any question that concerns any
12    allegation or assertion that's set forth
13    in the complaint?
14        MR. McDONALD:  Yes.
15        MR. MORRIS:  And if you are given
16    those directions, do you intend to
17    follow them?
18        THE WITNESS:  Yes.
19        MR. MORRIS:  Would you direct him
20    not to answer any question relating to
21    any allegation or contention set forth
22    in the objection that was filed on
23    behalf of Ascentra Holdings that was
24    marked as one of the earlier exhibits?
25        MR. McDONALD:  Yes.

Page 135

1         G. ROBINSON
2         MR. MORRIS:  And would you follow
3     counsel's advice in that regard?
4         THE WITNESS:  Yes.
5         MR. MORRIS:  Okay.  Now let's go
6     off the record, and we may just be done.
7         MR. McDONALD:  Okay.
8         THE VIDEOGRAPHER:  This ends
9     unit 5.  We're off the record at 12:51.
10        (Pause in proceedings.)
11        THE VIDEOGRAPHER:  This begins
12    unit 6.  We're on the record at 12:56.
13        MR. MORRIS:  Okay.  Just a couple
14    of more questions I think.  In light of
15    the instructions that you've been given,
16    I don't want to waste people's time
17    here.
18    BY MR. MORRIS:
19    DIR Q.   Can you tell me what relief
20    Ascentra Holdings, Inc. is seeking against
21    SPGK in the Cayman Islands?
22        MR. McDONALD:  The same objection.
23    The same direction.
24    Q.   Are you going to follow counsel's
25    advice?

Page 136

1         G. ROBINSON
2     A.   Yes.
3     DIR Q.   Are you seeking anything other than
4     the recovery of money from SPGK?
5         MR. McDONALD:  The same objection.
6     The same direction.
7     Q.   Are you going to follow counsel's
8     advice?
9     A.   Yes.
10        MR. MORRIS:  I have no further
11    questions.  You know, subject to the
12    reservation of rights that I made early
13    on about either seeking a preclusion
14    order or motion to compel.  But I don't
15    want to waste anybody's time here.
16    So --
17        MR. McDONALD:  We appreciate that.
18        MR. MORRIS:  -- I'm done for the
19    day.
20        MR. McDONALD:  Okay.
21        THE VIDEOGRAPHER:  This is the
22    videographer.
23    Will anyone be ordering the video?
24        MR. McDONALD:  No.
25        MR. MORRIS:  Yes, we will.



Page 137

1        G. ROBINSON
2        THE VIDEOGRAPHER:  Okay.  This
3     concludes today's proceedings.  The
4     total number of video units was 6.
5     We're off the record at 12:58.
6        ---
7        (Time noted:  12:58 p.m. EST)
8
9     _____
10              GRAHAM ROBINSON
11
12   Sworn and subscribed to before
13   me this _____day
14   of _____, 2024,
15   in the jurisdiction aforesaid.
16
17   _____
18              NOTARY PUBLIC
19
20
21
22
23
24
25

Page 138

1        C E R T I F I C A T E
2   STATE OF NEW YORK      )
3   COUNTY OF NEW YORK     )
4        I, FRANK J. BAS, a Certified Shorthand Reporter
5   and Notary Public within and for the State of New
6   York, do hereby certify:
7        That the witness whose testimony is hereinbefore
8   set forth, was duly sworn by me and that such
9   testimony given by the witness was taken down
10   stenographically by me and then transcribed.
11        I further certify that I am not related by blood
12   or marriage to any of the parties in this matter and
13   that I am in no way interested in the outcome of this
14   matter.
15        That any copy of this transcript obtained from a
16   source other than the court reporting firm, including
17   from co-counsel, is uncertified and may not be used at
18   trial.
19        IN WITNESS WHEREOF, I have hereunto set my hand
20   this 29th day of February, 2024.
21
          _Frank Bas_
22        FRANK J. BAS, RPR, CRR
23
24
25

Page 139

1   --------------- I N D E X ----------------------
2   WITNESS        EXAMINATION BY            PAGE
3   G. ROBINSON    MR. MORRIS                  6
4   --------------- EXHIBITS-------------------------
    ROBINSON                                  PAGE
5
    Robinson Exhibit 1, Amended Notice of      27
6   Deposition of Ascentra Holdings, Inc.
7   Robinson Exhibit 2, Organizational chart   37
8   Robinson Exhibit 3, CWR Form Number 13,    59
    Joint Official Liquidators' Certificate
9
    Robinson Exhibit 4, Declaration of Graham  70
10  Robinson
11  Robinson Exhibit 5, Letter to the Court,   88
    dated December 29, 2023
12
    Robinson Exhibit 6, Letter to the Court   104
13  dated June 30, 2023
14  Robinson Exhibit 7, Foreign               119
    Representatives' Objection to Motion of
15  SPGK to Terminate Restraint
16  Robinson Exhibit 8, Letter to the Court   122
    dated October 11, 2023
17
    Robinson Exhibit 9, Exhibit E to          133
18  declaration of Graham Robinson
19
20
21
22
23
24
25

Page 140

1   --------------- I N D E X (Continued) ---------------
2   DIRECTIONS NOT TO ANSWER
3   Page   Line   Page   Line   Page   Line
4   18      6      97    13     131     6
    18     25     100    20     131    18
5   19     13     122    22     132     2
    22     21     124    19     132    10
6   51     24     125    21     132    18
    55      3     126     5     133    20
7   57      6     126    13     135    19
    57     17     126    20     136     3
8   83     10     127     3
    83     22     128    12
9   84     17     128    25
    85     12     130     2
10
11
    REQUESTS
12
    Page   Line
13
    84      14
14
15
16
17
18
19
20
21
22
23
24
25



GRAHAM ROBINSON  30(b)(6)                                February 29, 2024
In Re Ascentra Holdings Inc.                                     141—143

**Page 141**

1       DEPOSITION ERRATA SHEET
2    Our Assignment No. J10806182
     Case Caption:  In re Ascentra Holdings, Inc.
3
        DECLARATION UNDER PENALTY OF PERJURY
4       I declare under penalty of perjury that I have
     read the entire transcript of my deposition taken in
5    the above-captioned matter or the same has been read
     to me, and the same is true and accurate, save and
6    except for changes and/or corrections, if any, as
     indicated by me on the DEPOSITION ERRATA SHEET
7    hereof, with the understanding that I offer these
     changes as if still under oath.
8        Signed on the _____ day of _____
     20___.
9    _____
10           GRAHAM ROBINSON
11
12       Subscribed and sworn to on the ____ day of
13   _____ 20 ____ before me.
14
15   _____
16   Notary Public, in and for the State of
17   _____.
18
19
20
21
22
23
24
25

**Page 142**

1    DEPOSITION ERRATA PAGE
2    Page No.____ Line No. _____ Change to:_____
3    _____
4    Reason for change:_____
5    Page No.____ Line No. _____ Change to:_____
6    _____
7    Reason for change:_____
8    Page No.____ Line No. _____ Change to:_____
9    _____
10   Reason for change:_____
11   Page No.____ Line No. _____ Change to:_____
12   _____
13   Reason for change:_____
14   Page No.____ Line No. _____ Change to:_____
15   _____
16   Reason for change:_____
17   Page No.____ Line No. _____ Change to:_____
18   _____
19   Reason for change:_____
20   Page No.____ Line No. _____ Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24           GRAHAM ROBINSON
25

**Page 143**

1    DEPOSITION ERRATA PAGE
2    Page No.____ Line No. _____ Change to:_____
3    _____
4    Reason for change: _____
5    Page No.____ Line No. _____ Change to:_____
6    _____
7    Reason for change:_____
8    Page No.____ Line No. _____ Change to:_____
9    _____
10   Reason for change:_____
11   Page No.____ Line No. _____ Change to:_____
12   _____
13   Reason for change:_____
14   Page No.____ Line No. _____ Change to:_____
15   _____
16   Reason for change:_____
17   Page No.____ Line No. _____ Change to:_____
18   _____
19   Reason for change:_____
20   Page No.____ Line No. _____ Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25           GRAHAM ROBINSON



# EXHIBIT C

1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - -x

5

6   In the Matter of:

7   ASCENTRA HOLDINGS, INC. AND GRAHAM          Main Case No.

8   ROBINSON AND IVY CHUA,                      21-11854-dsj

9          Debtor.

10

11   - - - - - - - - - - - - - - - - - - - -x

12

13               United States Bankruptcy Court

14               One Bowling Green

15               New York, New York

16

17               December 21, 2023

18               2:29 PM

19

20

21   B E F O R E:

22   HON. DAVID S. JONES

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KS

2

Case conference

Transcribed by:  Sharona Shapiro

eScribers, LLC

7227 North 16th Street, Suite #207

Phoenix, AZ 85020

(800) 257-0885

operations@escribers.net

3

```
1
2   A P P E A R A N C E S:
3   PILLSBURY WINTHROP SHAW PITTMAN LLP
4         Attorneys for Foreign Representatives
5         31 West 52nd Street
6         29th Floor
7         New York, NY 10019
8
9   BY:   JOHN A. PINTARELLI, ESQ.
10        HUGH M. MCDONALD, ESQ.
11
12
13  PACHULSKI STANG ZIEHL JONES LLP
14        Attorneys for Shang Peng Gao Ke Inc.  (SPGK)
15        780 Third Avenue
16        34th Floor
17        New York, NY 10017
18
19  BY:   JOHN A. MORRIS, ESQ.
20        JEFFREY DINE, ESQ.
21        BETH E. LEVINE, ESQ.
22
23
24
25
```

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

4

```
 1                      P R O C E E D I N G S

 2           THE CLERK:  All rise.

 3           THE COURT:  Good afternoon, everybody.  Please be

 4   seated.

 5           MR. PINTARELLI:  Good afternoon.

 6           MR. MCDONALD:  Good afternoon, Your Honor.

 7           THE COURT:  Okay.  So hello.  We're here for a

 8   conference in the Ascentra Holdings matter, and everyone looks

 9   ready to go.  I haven't heard anything since my ruling, so I'm

10   eager to hear what conversations have happened and what you all

11   are looking to accomplish first.

12           Who wants to lead us off?  Oh, just state your

13   appearances, when you get up to speak, for your side.  No, go

14   ahead.  That's fine.

15           MR. PINTARELLI:  So Your Honor, John Pintarelli,

16   Pillsbury Winthrop Shaw Pittman, on behalf of the foreign

17   representatives.  I'm here with my colleague Hugh McDonald.

18           And Your Honor, so we're here because, in your

19   decision and order that you entered at ECF number 80, you

20   requested that we schedule a general case status conference.

21   I'll be honest, we probably should have reached out to

22   chambers.  We weren't aware if you wanted a case conference

23   with regard to the issues as between Ascentra and SPGK or a

24   general --

25           THE COURT:  Okay.  Well --
```

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

5

1        MR. PINTARELLI:  -- overall conference with regard

2    to --

3        THE COURT:  Really, I'll take both.  I think there's

4    some events starting to move in the foreign main proceeding

5    that you can update me on.  I'd be interested in that.  But I

6    realized, when I reread my decision, I had a couple of

7    conclusions sentences.

8        MR. PINTARELLI:  Yep.

9        THE COURT:  One was meet and confer and figure out

10    next steps, and the other is, at a minimum, let's gather for a

11    conference in the latter half of December.  I was assuming we

12    would touch on discovery issues during that, and then any other

13    general update is welcome.

14        MR. PINTARELLI:  So and we will -- so what I'll do

15    is -- so we did have a meet-and-confer yesterday with counsel.

16        THE COURT:  Um-hum.

17        MR. PINTARELLI:  They did provide us with a revised

18    list of topics that was reduced or narrowed.  But I will defer

19    to my colleague on issues related to the SPGK issues.

20        THE COURT:  Okay.

21        MR. PINTARELLI:  And Your Honor, if that's okay, then

22    what I'll do is I'll turn it over to --

23        THE COURT:  Yeah, you can go in whichever sequence you

24    want.  If there's anything you want to say, I would guess it

25    wouldn't take long, about just general foreign main proceeding

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

6

1 status that you want to update me on, that's fine.

2      MR. PINTARELLI: Sure.

3      THE COURT: But there may not be. Whatever you want

4 to do.

5      MR. PINTARELLI: Well, I'll give you a general

6 overview of two things I have -- of both. What we've done,

7 because Your Honor referred to that you didn't -- that there

8 was not much going on in the Chapter 15.

9      THE COURT: Had not been. I know you've launched a --

10 whatever the right term is --

11      MR. PINTARELLI: So I'm going to discuss --

12      THE COURT: -- in Cayman law.

13      MR. PINTARELLI: I'm going to discuss what we've

14 actually done.

15      THE COURT: Yeah.

16      MR. PINTARELLI: So Your Honor, immediately after we

17 got main recognition back in 2020/'21, we served discovery

18 requests immediately upon Planet Payment which was the credit

19 card payment processor for the Ascentra group.

20      And it took us about six months to get those documents

21 in. In the interim, we served discovery requests on Ever

22 Innovation Inc, EII, which was basically a back office provider

23 for Ascentra and its affiliates.

24      And Your Honor, the result -- and that took us even

25 longer than the initial six months. And those document

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

7

1   requests, along with two others that we've served so far on

2   Xsigo Systems and i-payout -- actually, to tell you the truth,

3   Your Honor, I don't even think we served one on Xsigo; they

4   just voluntarily turned over documents, certain documents.

5   Those all have to do with the liquidator's investigation of

6   potential claims.  And the subpoenas that were served were

7   under 1521(a)(4), which was the additional assistance Your

8   Honor provided us in the recognition order.

9         And Your Honor, as a result of those discovery

10   requests and document requests, the liquidators have received

11   more than nine million pages worth of documents, not all of

12   them in English, as you can imagine, because a big chunk of

13   this business was out of Asia.  They've been reviewing those

14   documents, and ultimately it resulted in the summons that was

15   filed against SPGK down in the Cayman Islands on October 11th.

16         And Your Honor, I just want to bring to your attention

17   that that writ was filed after the JOLs received sanction from

18   the presiding judge, Judge Justice Doyle, to actually bring and

19   file that writ of claim against SPGK.  And SPGK's initial

20   defense to that summons is due to be filed tomorrow, is my

21   understanding.

22         And then, Your Honor, the other thing that the JOLs

23   have been preoccupied with is working on winding up Ascentra's

24   subsidiaries.  And there's two of note.  One of them is HEC

25   International, which is in official liquidation in the Cayman

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

8

1    Islands.  There was no Chapter 15 filed on that case.  The JOLs

2    did make the determination, the initial determination, that

3    that is a solvent liquidation.  And in that case, the

4    liquidators, on behalf of Ascentra, have been embroiled in

5    litigation with SPGK in that case as well as a purported

6    creditor.  And the JOLs and Ascentra prevailed on the initial

7    litigation, and that is currently on appeal to the appellate

8    court in the Cayman Islands.

9            The second thing that the JOLs have been doing is

10   winding up a subsidiary of HEC International, iHealthSciences

11   (ph.), which is a Delaware company.

12           And then finally, Your Honor, more recently, the JOLs

13   have also negotiated the escrow of money, disputed monies that

14   are here in the US.  And the other party that is laying claim

15   to those funds, or laying claim to asserting a claim against

16   Ascentra, has filed proofs of debt in the Cayman Islands for

17   the same amount of the funds that are being held.

18           And quite honestly, Your Honor, I'm only bringing this

19   up to you today because I only became aware of these proofs of

20   debt this morning when I was speaking with Graham Robinson in

21   preparation for the hearing today.  And basically, the JOLs and

22   their counsel are in discussions with the other party and their

23   Cayman counsel.

24           And I can disclose the name of the party because it's

25   a U.S. person.  He's a former executive of the Ascentra group.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

9

1   His name is Ted Sanders (ph.).  And there is no presumption of

2   confidentiality with respect to a U.S. citizen.  And they --

3          THE COURT:  As a matter of Cayman law, right?

4          MR. PINTARELLI:  As a matter of Cayman law.  And these

5   claims were only recently lodged in the Cayman Islands.  We

6   knew that there was a dispute.  The money was put into an

7   escrow account.  And the reason why it was put into an escrow

8   account, and we haven't come to Your Honor to transfer those

9   monies down to the Cayman Islands, is because there are certain

10  potential tax issues.  So we wanted to walk through all those

11  issues first and adjudicate the claims.  And there's no harm in

12  keeping those funds --

13         THE COURT:  Right.

14         MR. PINTARELLI:  -- in the U.S. for now.  So that's

15  where we're at in the main proceeding and in the Chapter 15.

16         THE COURT:  Okay.  Thanks.

17         MR. PINTARELLI:  Thank you.

18         THE COURT:  If you want to just turn it over to --

19         MR. PINTARELLI:  And I'll answer any questions you

20  have.

21         THE COURT:  No, I don't.  That was a helpful recap,

22  and I think it covered the topics I could think of asking about

23  and then some others as well.  So thank you.

24         MR. PINTARELLI:  Thank you.  I'll turn it over to --

25         THE COURT:  And we can turn it over to Mr. McDonald, I

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

1  guess, for the discovery-focused conversation.

2          MR. PINTARELLI:  Thank you.

3          MR. MCDONALD:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. MCDONALD:  For the record, Hugh McDonald,

6  Pillsbury Winthrop Shaw Pittman, on behalf of the foreign

7  representatives.

8          First, Your Honor, I just want to say it's great to be

9  back in front of you live.  It's so much nicer than being on a

10  little Zoom box.

11          THE COURT:  It is.  It is.  Yes, I started in February

12  '21, so I got sworn into this job from my living room, and I

13  didn't see any humans for quite a while.  It's nice to be back.

14  Anyway, thanks.

15          MR. MCDONALD:  But is this Judge Lane's old courtroom?

16          THE COURT:  Yes.

17          MR. MCDONALD:  I'm trying to remember.  It is?  Okay.

18  It's been awhile.

19          THE COURT:  And before that -- you can't read it from

20  there, but I'm holding up a stapler that says Judge Beatty

21  courtroom.  So it's a historic venue.

22          MR. MCDONALD:  Just going way back in the day, Your

23  Honor, up on seven here, there weren't any courtrooms and that

24  was back in the --

25          THE COURT:  Yeah, they kind of carved this out.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

11

1              MR. MCDONALD:  Carved it out.  In fact, Frank Conrad,

2    who came down from Vermont, he and his clerks actually built a

3    bench in one of the rooms because he was so sick of being

4    shuttled around from all those different courtrooms.

5              THE COURT:  Oh, that's funny.

6              MR. MCDONALD:  It is funny.

7              THE COURT:  It seems like a very Vermonter thing to

8    do.

9              Okay.  Anyway, let's get down to focus on the --

10             MR. MCDONALD:  Sure.

11             THE COURT:  -- issues, though.  Go ahead.

12             MR. MCDONALD:  Thank you, Your Honor.  Your Honor, we

13   did have a meet-and-confer, as Mr. Pintarelli alluded to, and

14   they have pared down the list of topics and they've added some.

15   So I want to deal with that.  And then there's some other

16   matters we want to discuss with the Court.

17             First of all, Your Honor, at least certain of the

18   topics are still a bit broad.  Specifically, there's a number

19   three topic which is a bit broader than what was in the

20   subpoena.  And one of the things is to talk -- they want

21   testimony about any reasons why the liquidators have not paid

22   in full a creditor's claim.  And so the fact that a creditor

23   hasn't been paid is fine; we can discuss that.  I think that's

24   okay.  And the other topics, in and of themselves, are

25   generally okay, but I'll get into that a little bit more.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

12

1          The other thing too is some of the topics sort of lack

2     a fundamental understanding of Cayman law, and we discussed

3     that with counsel.  For example, they asked for appearances by

4     creditors.  Though in the U.S., when you have a proceeding, a

5     creditor can file a notice of appearance and therefore get

6     notice of what's going on.  It's different in the Cayman

7     Islands.

8          A creditor can come into the courtroom and make an

9     application for something.  But that is very different than

10    filing an appearance, because I think, as we've noted in our

11    papers, access to the court files in Cayman are restricted to

12    just contributories and creditors themselves.

13         So simply showing up and making a demand doesn't

14    actually get you access unless you can prove you're a creditor

15    or a contributory.  So there's no real concept of appearance.

16    So we're going to work with them to see kind of what they're

17    really getting at here.

18         THE COURT:  Okay.

19         MR. MCDONALD:  I think generally what they're

20    generally trying to find out --

21         THE COURT:  So that  sentence tells me -- let me just

22    step back more broadly.  Is it fair to say -- I think you said

23    the meet-and-confer was yesterday.

24         MR. MCDONALD:  Yeah.

25         THE COURT:  And you're describing, sort of, ongoing

21-11854-dsj   Doc 86   Filed 03/08/24   Entered 03/08/24 13:21:13   Main Document
Pg 62 of 114
**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

13

1   conversations is my takeaway; is that right?

2          MR. MCDONALD:  That's right, Your Honor.  And I think

3   we need to pare them down a little bit.  What I'd like to talk

4   about, though, Your Honor, specifically, is they added four

5   topics that were not in the original 30(b)(6) subpoena.

6          THE COURT:  Um-hum.

7          MR. MCDONALD:  And there are --

8          THE COURT:  And I'm sorry, let me -- before you do

9   that, let me just -- help me understand where this is going.

10  This helps me frame my thoughts as I listen to you.

11         MR. MCDONALD:  Yes.

12         THE COURT:  So are you going to be asking me -- you're

13  basically going to --

14         MR. MCDONALD:  I think --

15         THE COURT:  You want to emerge with an update given to

16  me, plus maybe information that there are ongoing discussions

17  so stay tuned, plus maybe get some interim rulings and guidance

18  on what you see as problematic topics?

19         MR. MCDONALD:  Exactly that, Your Honor.

20         THE COURT:  Okay.  Fair.  So I'm with you.  Go ahead.

21         MR. MCDONALD:  And we're still willing to talk to them

22  about trying to figure out what topics, because it seems what

23  they're trying to get to is, one, is there still a certificate

24  of solvency on file?  The answer is yes.  We've stated it in

25  our papers.  If that changes, Your Honor, under Cayman law, the

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

14

1   liquidators are required to file a change -- a notice,

2   certificate of change, either to a doubtful solvency or an

3   insolvency.

4           THE COURT:  And is that publicly available?

5           MR. MCDONALD:  That would be publicly available, Your

6   Honor.

7           MR. PINTARELLI:  I'm sorry, Your Honor, to interrupt.

8   Certainly creditors and contributories can get it on the

9   docket.  SPGK might be entitled to it through its owner --

10          THE COURT:  Right.

11          MR. PINTARELLI:  -- who I'll colloquially referred to

12  as Luke, if that's okay with counsel, because as a former

13  director of Ascentra --

14          THE COURT:  Right.

15          MR. PINTARELLI:  -- or as a director of Ascentra, he

16  has access to certain files in the court record.

17          THE COURT:  Right.  I understand you need a certain

18  status --

19          MR. PINTARELLI:  Yes.

20          THE COURT:  -- with respect to the --

21          MR. PINTARELLI:  Yes.

22          THE COURT:  -- I guess, whatever the debtor or

23  liquidating entity.  And you're saying the principal has it.

24          MR. PINTARELLI:  I will represent to you, Your Honor,

25  if we change it, we will send it to SPGK and notify them.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

15

```
 1            THE COURT:  Yeah, that's helpful.  I mean, one way or
 2    another, I want --
 3            MR. PINTARELLI:  Yeah.
 4            THE COURT:  -- obviously SPGK to have that
 5    information.
 6            MR. MCDONALD:  But also more importantly, Your
 7    Honor --
 8            THE COURT:  And promptly.
 9            MR. MCDONALD:  -- under Chapter 15, we would have to
10    notify the Court of a change --
11            THE COURT:  Right.
12            MR. MCDONALD:  -- in the proceeding.  So the Court
13    would become aware of it.  We would obviously have to let you
14    know, as well.
15            THE COURT:  I said that word "promptly" softly.  That
16    matters.  And I want these folks to not be in the dark for any
17    appreciable time.
18            MR. MCDONALD:  I mean, right now, Your Honor, there
19    has been a change.  So with respect to the other topics, I
20    think what they're really trying to get to is whether or not
21    there were creditors, are currently creditors, and whether or
22    not proofs of debt have been filed.
23            I think, as Mr. Pintarelli informed the Court, we have
24    had proofs of debt filed.  As we stated in our last status
25    report to the Court, the liquidators have solicited proofs of
```

1   debt from certain creditors, but that's generally where things

2   stand with regard to creditor status and the Caymans.

3          Obviously, much of the determination of proof of

4   debt -- I mean, of solvency, Your Honor, revolves around

5   actually getting back all of the assets of Ascentra, which is

6   one of the underlying purposes of this Chapter 15 case, is to

7   investigate and recover assets here.

8          THE COURT:  Okay.

9          MR. MCDONALD:  Your Honor, I'd like to talk -- so

10  again, status on that, we will continue to work with them on

11  the topics to get them in line.  If we do have an impasse on

12  them, obviously we'll alert chambers and try and work with

13  that.

14         THE COURT:  Okay.  That's fine.  I don't want to just

15  blurt things out that may complicate your conversation, so I'll

16  just absorb what you're telling me for now, and then I'll hear

17  from the other side and we'll see what we can do.

18         MR. MCDONALD:  Yeah.  And we commit to the other side

19  to continuing to work on those topics.

20         THE COURT:  Okay.

21         MR. MCDONALD:  There were four topics added, Your

22  Honor, that were not in the 30(b)(6) subpoena and were not the

23  subject of Your Honor's decision.  And they relate to facts --

24         THE COURT:  I'm sorry, what?

25         MR. MCDONALD:  -- facts and documents concerning the

21-11854-dsj   Doc 86   Filed 03/08/24   Entered 03/08/24 13:21:13   Main Document
Pg 66 of 114
ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA

17

1    underlying claim against SPGK to ownership of the Planet

2    Payment funds.  And they couch it as the success on the merits.

3    But as the Court is aware, there is now a pending proceeding --

4           THE COURT:  Right.

5           MR. MCDONALD:  -- in Cayman over those very funds that

6    has been sanctioned by the Cayman court to be commenced by the

7    liquidators.

8           So the other issue with respect to it, Your Honor, is

9    Mr. Robinson is a liquidator, an official liquidator.  He is a

10   court-appointed officer, and he functions very much as a

11   trustee.  He's not a fact witness, would not be a fact witness

12   in these proceedings.

13          What Mr. Robinson has done, with the assistance of his

14   counsel, both Cayman and U.S. counsel, is to obtain as many

15   records as possible and then figure out what claims exist, like

16   any trustee would in America.

17          Whatever facts would support a claim, or whatever

18   documents are going to be relied upon presently, are set forth

19   in two documents, the claim itself that has been filed in the

20   Cayman Islands, which Mr. Pintarelli alluded to; their defenses

21   are due tomorrow.  And so obviously they are reviewing those

22   facts and will be responding.

23          And the other is, Your Honor, in our objection to the

24   motion to lift the restraint.  And Your Honor can see from our

25   objection, much of what we are relying upon are documents from

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

18

1  SPGK, or that we've gotten from either EEI or from Planet

2  Payment, and the testimony of Mr. Yoshida.  Mr. Robinson is not

3  a fact witness.  He's not relied upon.  He has not submitted a

4  declaration in connection with those proceedings.

5          THE COURT:  Can I --

6          MR. MCDONALD:  So --

7          THE COURT:  You told me you were going to tell me

8  about four added topics, and --

9          MR. MCDONALD:  So it's --

10          THE COURT:  -- then the first was facts about the

11  underlying claim versus SPGK, and then you segued into talking

12  to me about Mr. Robinson's status and sources of documents.

13          MR. MCDONALD:  So Your Honor --

14          THE COURT:  So how does that fit?

15          MR. MCDONALD:  -- yeah, let me clarify that, because

16  they broke out the topics because we've asserted both -- we've

17  asserted claims based on contract and equity.

18          THE COURT:  Um-hum.

19          MR. MCDONALD:  And so they wanted all facts to support

20  a claim for contract or documents to support a claim for breach

21  of the contract claim.  And then the same thing for the

22  equitable claims.  Okay.

23          THE COURT:  Is that two topics?

24          MR. MCDONALD:  Four all together, because it's two for

25  contracts, two for --

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

19

1          THE COURT:  Okay.  Two by two, okay.

2          MR. MCDONALD:  So it's documents --

3          THE COURT:  So that's the full list of topics.

4          MR. MCDONALD:  Right.

5          THE COURT:  I've got it.  I'm going to say it right

6    back to you to make sure I actually am correct that I have it.

7    So you've got two topics or sets of inquiries regarding seeking

8    information supporting contract-based claims, and two added

9    topics -- what you've just added topics seeking information

10   about claims based on equity, right?

11         MR. MCDONALD:  That is correct.

12         THE COURT:  Your adversary is standing, which may --

13         MR. MORRIS:  Just, if it would be helpful, we can give

14   you the document, if we're going to go through this one by one.

15         THE COURT:  Oh, sure.

16         MR. MORRIS:  It's two pages long.

17         THE COURT:  Am I going to end up doing that or --

18         MR. MCDONALD:  I'd rather just handle it right now for

19   just --

20         THE COURT:  Okay.  You know what?  Let's take --

21         MR. MCDONALD:  It doesn't change anything.

22         THE COURT:  I'll hear the overview.  You can hand it

23   up to me --

24         MR. MCDONALD:  Yeah, there shouldn't be any

25   guessing --

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

20

1            THE COURT:  -- when you're up, which will be in a

2    minute.

3            MR. MCDONALD:  -- to what it is we're asking for.

4            THE COURT:  No, but I think that clarification --

5            MR. MCDONALD:  It's right here.

6            THE COURT:  I think that -- thank you.  I think that

7    clarification does me for now.  And then you can -- so now I

8    know that overview, and you can just carry on telling me --

9    making your point about the -- I think you were talking about

10   the sources of information on which you're relying, which were

11   documents from sources other than your client plus testimony of

12   Mr. Yoshida, right?

13           MR. MCDONALD:  That's correct, Your Honor.

14           THE COURT:  Okay.

15           MR. MCDONALD:  And any documents, any facts, anything

16   else that was considered, was done so under the attorney-client

17   privilege or as part of the attorney work product.  And so we

18   could have Mr. Robinson read the statement of claim, which are

19   the facts he's relying upon in the Cayman Islands.  I don't see

20   why we would need to waste everyone's time doing that because

21   that makes no sense.

22           THE COURT:  Right.  But so let me ask --

23           MR. MCDONALD:  And to inquire beyond that is going to

24   immediately go into the attorney-client privilege or work

25   product.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

21

1          THE COURT:  Right.

2          MR. MCDONALD:  Just like any trustee.  In the United

3   States, Your Honor, a trustee commences an action.  The trustee

4   is not testifying about the factual underpinnings of the

5   underlying claim.  And that's what they're effectively asking

6   him to do here.

7          THE COURT:  Okay.  Well, look, what I'm envisioning --

8   first off, my ruling involved a lot of work just to answer what

9   I ultimately decided was really a simple question put to me,

10  which was, is there a blanket ban on a deposition of this

11  person?  And I held no.  And that left open a wide array of

12  issues.  Thus, the instruction to meet and confer.  It seems

13  like the meet and confer process is ongoing.

14          You're starting to pre-argue for me why, I guess, I

15  should be trimming scope.  I'm not sure if that's ripe or not,

16  given ongoing discussions.  But we can -- I'll let you just --

17  I'm hoping that what you're telling me -- I'm happy to take all

18  background, and then I'm just trying to figure out where we're

19  going, which I think is going to be urging me to push back and

20  cabin things, but we'll see.

21          MR. MCDONALD:  Well, Your Honor, your decision only

22  related to the specific topics that were set forth in the

23  30(b)(6).

24          THE COURT:  Right, so you're wanting me to --

25          MR. MCDONALD:  And those were the original --

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

22

1           THE COURT:  -- address the topics now.

2           MR. MCDONALD:  So there are new topics they want to go

3    into.  These four topics are new.  They were not in the

4    30(b)(6).

5           THE COURT:  Right.  I'll just say I didn't rule on any

6    particular topic, even of the prior topics.  I just said you --

7           MR. MCDONALD:  I just wanted to be clear.  We

8    weren't --

9           THE COURT:  Right.

10          MR. MCDONALD:  So the original 30(b)(6) related to

11   what I would call recognition issues.

12          THE COURT:  Right.

13          MR. MCDONALD:  And didn't really get into the

14   termination of the restraint.  And these are topics to get into

15   the restraint issue.

16          THE COURT:  Okay.

17          MR. MCDONALD:  Despite there's the pending proceeding

18   in Cayman on the topic.

19          Your Honor, there's one other matter, before turning

20   over the podium, that we wanted to discuss with the Court, in

21   addition to the issues with regard to the discovery.  Your

22   Honor, as you noted in your opinion, it appears that SPGK is

23   shifting its argument.

24          So its original motion to terminate the recognition

25   was based upon an accusation that there was no basis for

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

23

1   recognition at the time the Court granted it.  And they went

2   beyond that.  They actually said that parties misled the Court.

3   And as you know, we take great offense to those statements.  We

4   don't think they're at all correct.  We have never and will

5   never mislead this Court.

6          So as you noted in your opinion, Your Honor, they seem

7   to be shifting to an argument that the bases for recognition

8   have ceased to exist, which is the other alternative basis to

9   terminate recognition.  And I think Your Honor noted that, in

10  the event that they come up with a new argument or propose new

11  arguments in their reply, the foreign representatives would be

12  given the opportunity to submit a surreply.

13         Now, Your Honor, there have been some intervening

14  events, unrelated to this case but related to this case, that

15  we wanted to bring to the Court's attention.  If there is a new

16  argument in there, prior to filing a surreply, we would like to

17  reserve the right to seek to depose Mr. Andrew Johnstone of the

18  Harneys firm.  In the event there are no new arguments, we do

19  reserve the right to cross-examine him at the ultimate hearing.

20         Now, why Mr. Johnstone?  Why Mr. Johnstone?  Mr.

21  Johnstone is with the Harneys firm.  The Harneys firm in Cayman

22  Islands represents SPGK.  It represents them in pending

23  litigation as well.  But Mr. Johnstone has also submitted to

24  this Court two declarations in support of the relief that SPGK

25  is seeking.

24

1         Now, in the Pioneer Merger case, Your Honor, that is

2    also pending in front of Your Honor, one of Mr. Johnstone's

3    partners, a Ben Hobden, has submitted a declaration to this

4    Court in support of recognition of that proceeding.

5         The Pioneer Merger, like Ascentra, is an official

6    liquidation.  It is a solid official liquidation.  And Mr.

7    Hobden's declaration, at the Harneys firm, contains many of the

8    same statements that SPGK says misled this Court.

9         For example, he says that creditors will be treated

10   fairly and equally, on a pari passu basis, and that it's a

11   collective proceeding in Cayman, quite the contrary of what has

12   been put forth by SPGK in these proceedings, and a bit

13   troubling that the same firm would be taking the opposite

14   position.

15        THE COURT:  So sorry, so are you wanting to depose a

16   lawyer who represents SPGK in Cayman, and the basis you're

17   advancing is that a partner of that lawyer in another case has

18   taken inconsistent positions?

19        MR. MCDONALD:  Well, Mr. Johnstone is lead counsel to

20   Pioneer Merger, Your Honor.  He just didn't submit the

21   declaration.  He had Mr. Hobden submit the declaration.  But in

22   the Cayman proceeding, Mr. Johnstone is Pioneer's lead counsel.

23        THE COURT:  Okay.  Well, look, I think you're trying

24   to -- I mean, my pragmatic sense, and my sense that focuses on

25   what's immediately before me, says you're raising this in the

21-11854-dsj   Doc 86   Filed 03/08/24   Entered 03/08/24 13:21:13   Main Document
Pg 74 of 114
ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA

25

1   context of saying, if there's new topics raised in reply,

2   you're reserving a right to seek leave to file a surreply.  And

3   as part of that, you may well want to depose the witness who

4   is -- is it Mr. Gladstone?

5           MR. MCDONALD:  Johnstone.

6           THE COURT:  Johnstone.  I --

7           MR. MCDONALD:  Andrew Johnstone.  Who I can give you

8   copies --

9           THE COURT:  Okay.

10          MR. MCDONALD:  -- of the declarations --

11          THE COURT:  Thanks.

12          MR. MCDONALD:  -- he has submitted here, Your Honor.

13          THE COURT:  No, it's fine.

14          MR. MCDONALD:  All right.

15          THE COURT:  So you want to -- look, it seems to me

16  those are all issues I can and should decide once the reply is

17  filed, and you can see if your fears and expectations are

18  realized, and then you can talk, and maybe you'll have

19  agreement and maybe you won't.  And if necessary, you can come

20  back to me then.  I mean, I think you probably -- I'm going to

21  guess you want to just plant the seed now, and that's fine.

22  Consider the message received.  But I don't think I need to do

23  anything at this point.

24          MR. MCDONALD:  Well, Your Honor, when we read Mr.

25  Hobden's declaration -- and I have a copy of it, if the Court

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

26

1   wishes a copy of it, or if the Court wishes just to look in the

2   file for it.  It's disturbing to us that the Harneys firm would

3   be advocating, on behalf of SPGK, a completely opposite --

4           THE COURT:  Right.

5           MR. MCDONALD:  -- conclusion in front of this Court

6   about the nature of a Cayman proceeding.

7           THE COURT:  I've got it.  Well, look, I think the fact

8   that you're aware of it and raising it tells me that I'll be

9   reading about this in briefing one way or another.  And we'll

10  see if that requires a deposition or not, I think.

11          MR. MCDONALD:  I think it might go beyond that, Your

12  Honor.  I mean, we're getting into their -- so by the way,

13  their expert, supposed expert, Ms. Pearson, is a former Harneys

14  partner --

15          THE COURT:  Okay.

16          MR. MCDONALD:  -- who actually -- so this is very

17  much, from our perspective, a demonstration of bad faith in the

18  bringing of this motion to terminate the recognition, when

19  their own firm, their own Cayman counsel, is taking opposite

20  positions in front of Your Honor, and urging opposite positions

21  in front of Your Honor, on the very same issue they're asking

22  you to decide.  And so --

23          THE COURT:  Okay.  Well, look, let me -- I think

24  I'll -- I mean, I'll just stick to my I-should-take-it-as-it-

25  comes reaction.  So I think you're spelling out issues and

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

27

1   problems you see, and concerns you've got, and I think they

2   all -- I think that's for at least another step down the road

3   after we resolve immediate discovery processes, followed by the

4   filing of a reply.  And sooner or later, I would think we might

5   want to get to an actual hearing on the motion that's been

6   kicking around for a long time.  Okay?

7         MR. MCDONALD:  Okay.

8         THE COURT:  But I note your concerns.  So do you have

9   any -- are you asking me to make any particular --

10        MR. MCDONALD:  With respect to --

11        THE COURT:  -- narrowing rulings --

12        MR. MCDONALD:  Yes, Your --

13        THE COURT:  -- quashing rulings on the spot today?

14        MR. MCDONALD:  It would be helpful.  I mean, so the

15   additional topics with respect to the underlying claim against

16   SPGK we don't think are appropriate.  And we think they have

17   the facts.  We've cited to the documents.  And there's nothing

18   more.  Anything else beyond that, as I said, is going to be

19   privileged.  And I think it's a collective waste of our time

20   and energy for them to be able to go into that area.

21        More importantly, Your Honor, there is a proceeding

22   pending in the Cayman Islands.  Whatever discovery they want to

23   take with respect to the underlying merits, that's for that

24   Court to decide.  Here, what this Court has to decide --

25   because if Your Honor remembers, at the very beginning of this

21-11854-dsj   Doc 86   Filed 03/08/24   Entered 03/08/24 13:21:13   Main Document
Pg 77 of 114
**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

28

1   case, when you granted recognition and granted the restraint,

2   you looked at the restraint from two perspectives.  One is as,

3   just generally, equitably, as sitting as a judge in a Chapter

4   15 proceeding and an ancillary proceeding, is it appropriate to

5   grant that restraint?  And you said yes.

6        You said, but moreover, given the fact that SPGK, at

7   the time, even conceded there would be irreparable harm if the

8   funds left the country, and now have affirmed to us that, if

9   you lift the restraint they are leaving the country, coupled

10   with the pendency of the action down in Cayman, I think we have

11   more than adequately demonstrated that there is irreparable

12   harm here in the event, and there is --

13        THE COURT:  All right.  Well, look, you're -- I

14   mean --

15        MR. MCDONALD:  -- dispute over the funds.  I don't

16   think it's appropriate for them to be able to then take

17   discovery into that.

18        THE COURT:  All right.  Let me hear from your

19   adversary.  I mean, I'll just say, I think a lot of this is

20   really foreshadowing.  And the most important procedural thing

21   I've heard is there's an ongoing meet-and-confer process

22   underway, which I think should be pursued and brought to an end

23   point so that the case can actually proceed.

24        But we'll see.  Let's hear from your adversary.

25        MR. MCDONALD:  Thank you, Your Honor.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

29

1          THE COURT:  Yep.

2          MR. MORRIS:  Good afternoon, Your Honor.

3          THE COURT:  Good afternoon.

4          MR. MORRIS:  John Morris, Pachulski Stang Ziehl &

5    Jones, for SPGK.

6          I guess I'll address the issues in the order that they

7    have been presented.  We did, in fact, after some very lengthy

8    briefing, consider very carefully Your Honor's ruling.  The

9    fact of the matter is the issue of the restraint on the funds,

10   and the burden that Ascentra has to prove that they're likely

11   to succeed on the merits, was fully addressed in the papers

12   that were submitted to the Court.

13         While certainly at the time the 30(b)(6) topics were

14   issued back in August they weren't included, this particular

15   issue concerning discovery on likelihood of success of the

16   merits was front and center, and it was part and parcel of

17   everything that we told the Court.  I think it's adequately

18   addressed in your Court's decision.  I don't think there's any

19   surprise that we're seeking discovery on the area, since it's a

20   topic that is an element of the charge.

21         And we understand that Mr. Robinson may not have

22   personal knowledge.  We're not here serving an individual

23   subpoena.  We're here serving a 30(b)(6)subpoena.  And Mr.

24   Robinson may or may not be the witness they want to call.  It

25   doesn't matter who it is.  It doesn't matter if the person has

21-11854-dsj   Doc 86   Filed 03/08/24   Entered 03/08/24 13:21:13   Main Document
Pg 79 of 114
**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

30

1   relevant knowledge.  What we're entitled to inquire is what

2   facts are going to be presented to this Court to prove a

3   likelihood of success on the merits, both as to contract and as

4   to equity.  What documents is a Ascentra going to rely upon to

5   try to meet that burden?  And what I --

6          THE COURT:  Isn't that 30(b)(6) an oral testimonial

7   version of a contention interrogatory?

8          MR. MORRIS:  Perhaps?  I mean, whether we --

9          THE COURT:  Is that factual in nature?  I mean, and

10  how is that not privileged?  How is that not work product to

11  ask -- you're asking a principal to explain what totality of

12  evidence an adversary party is going to be --

13         MR. MORRIS:  I'm not asking --

14         THE COURT:  -- present through counsel.

15         MR. MORRIS:  I'm not asking for any work product.  I'm

16  not asking for any attorney-client privileged communications.

17  I am asking for facts and documents, neither of which are ever

18  privileged.  And I have a right to know, my client has a right

19  to know, before we have a trial on the merits here, what are

20  the facts you're relying upon?  What documents are you relying

21  upon?  This isn't trial by ambush.  I don't have to wait until

22  a hearing to understand what the evidence is that the other

23  side believes they have against me.

24         They did the same thing with my client.  They asked

25  them up, down, and sideways.  You hear them say, over and over

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

31

1   again, that they're relying on the deposition of my client.

2   You know what they asked him?  What facts; they asked him about

3   facts.  They asked him about contentions.  What did you do?

4   What did you say?  What did you hear?  He's a fact witness.

5   But we're really just asking for the same thing now from our

6   adversary, right, in the form of a 30(b)(6) witness, because

7   they don't have a fact witness, right?  That's not my fault.

8   That's not my client's fault.  If we had a fact witness, we'd

9   probably do that too.

10          But I don't see how they get to just hide the ball

11  until we get to trial.  And that's really what they're trying

12  to do.  And they'll say, no, it's referred to in the complaint.

13  Well, two things.

14          Number one, then they will be precluded from offering

15  any factual evidence that's not in the complaint.  They will be

16  precluded from relying on any document that's not in the

17  complaint.  That's one part, right?  Because they're saying,

18  oh, just look at the complaint because that says it all.  Well,

19  if it says it all, it better say all of it.  And we shouldn't

20  be forced to find out at trial that there's stuff not in the

21  complaint that they're now relying upon.  So that's one concern

22  that I have.

23          The other concern is, don't I get to just challenge

24  any of these facts in a deposition?  You do that all the time,

25  right?  Somebody sues somebody else, and the first thing you do

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

32

1   when you take -- when you're a defendant, and you take the

2   deposition of the plaintiff, is you put the complaint in front

3   of them and say let me test your allegations.  How are you

4   going to succeed here?  What's the basis for your claim?

5           And we're doing that now, not in the context of the

6   merits of the claim, but in the context of likelihood of

7   success on the merits, because that's the burden of proof.

8   That's --

9           THE COURT:  On the --

10          MR. MCDONALD:  -- the element here, right?  On the

11  restraint, right?  How are you going to succeed in prevailing

12  on your claim against SPGK?  Why are you likely to succeed?

13  And they can put in their complaint that today is Sunday, but

14  don't I have the right to ask him, I understand that that's

15  your allegation, but are you aware that today is the day after

16  Wednesday?  What's the basis for your allegation that today is

17  Sunday?  Don't I have the right to test the allegations?  Don't

18  I have the right to find out whether the facts that they're

19  alleging are credible, whether they're based in fact?

20          That's what we're getting at, Your Honor.  And I think

21  that this is really pretty elementary at the end of the day.

22  It's helpful to have the complaint, but I don't see why --

23  right, this is not a motion to dismiss.  The Court isn't going

24  to be accepting the allegations as true for purposes of

25  deciding our motion to lift the restraint on the cash.  Right?

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

33

1   Not a motion to dismiss, doesn't have to be accepted as true.

2   So I just want the opportunity to test the allegations that

3   they're making against my client to see --

4           THE COURT:  Right.  I --

5           MR. MORRIS:  -- whether or not they can meet their

6   burden of proof.

7           THE COURT:  Look, I think -- I mean, is Mr. McDonald

8   right, just procedurally, that you had a meet-and-confer

9   conversation yesterday and you're going to have further

10  conversations?

11          MR. MORRIS:  We did.  We'd be delighted to.  I would

12  really love to avoid more letter writing and --

13          THE COURT:  Right.  I mean --

14          MR. MORRIS:  -- and motion practice.

15          THE COURT:  Because I mean, the way our local rules

16  work, and logic tells me I should let that process play out

17  some before making definitive rulings.

18          Let me just say, I will tell you, I think -- I mean,

19  I've ruled there's not a categorical bar on a deposition here,

20  and you're entitled to take one.  But I've also noted that

21  there's a number of, I think, valid and fair objections to at

22  least the way you've gone about that.  And that's the process

23  you're going on and discussing.

24          I will say wording questions to a 30(b)(6) witness

25  about tell me all of your contentions in the upcoming case,

21-11854-dsj   Doc 86   Filed 03/08/24   Entered 03/08/24 13:21:13   Main Document
Pg 83 of 114
ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA

34

1  trial, hearing, and the basis for that, is an uncomfortable

2  formulation to me.  I would let you develop it if you want to

3  pursue it that way.  I think more commonly what I see, and what

4  I think avoids a possible real privilege and work product

5  leaking back out through a client, is if you just ask about the

6  facts and issues.

7          MR. MORRIS:  Exactly.  That's all I intend --

8          THE COURT:  What are the facts --

9          MR. MORRIS:  -- to do.

10         THE COURT:   Okay.  So that's fine.

11         MR. MORRIS:  That's exactly what I intend to do.

12         THE COURT:  So your wording before got me --

13         MR. MORRIS:  Yeah.

14         THE COURT:  -- a little flummoxed about how we were

15  framing your questioning.  But if you're pursuing factual

16  questions, then let's let you figure out --

17         MR. MORRIS:  Right.

18         THE COURT:  -- what the topics are.  I will say, if

19  it's defined as tell me why you're going to win your separate

20  lawsuit pending in the Cayman Islands --

21         MR. MORRIS:  Yeah.

22         THE COURT:  -- that doesn't sound too --

23         MR. MORRIS:  I would not be doing that.

24         THE COURT:  Yeah, that that sounds privilege

25  invasive --

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

35

1        MR. MORRIS:  Yep.

2        THE COURT:  -- to me, subject to your right to argue

3    otherwise, because we're here with no new written submissions.

4        MR. MORRIS:  Right.

5        THE COURT:  Okay.  So what would you like to emerge

6    with today?

7        MR. MORRIS:  And so I just -- I do want to give the

8    Court comfort that when the Court expressed -- I'll even use

9    the word some concern over the scope of the topics that we had

10   before, those didn't relate to the restraint.  Those related

11   only to the Cayman proceeding.

12       And I appreciate counsel is really not taking issue

13   with the reformulation.  I think there's been an acknowledgment

14   that what we did is curtail those considerably.  There may be

15   some tweaks that we have to work out, and I'm happy to do that.

16       So I think we should -- I think, if we could, we'll

17   take the balance of the year, maybe have another phone call,

18   maybe exchange writings.  However we do -- we'll see if we can

19   get to an agreement on acceptable 30(b)(6) topics by the end of

20   the year.  And if we can't, well, I guess we'll have to come

21   back to the Court for a decision.

22       THE COURT:  That's great.  I mean, I would say keep

23   working.

24       MR. MORRIS:  Yeah.

25       THE COURT:  I'll tell you --

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

36

```
 1              MR. MORRIS:  Yep.

 2              THE COURT:  -- I'm going to be away a little bit.  The

 3   staff's going to be away.

 4              MR. MORRIS:  Yep.

 5              THE COURT:  My next hearing date is January 3.  Today

 6   is December --

 7              MR. MORRIS:  Great.

 8              THE COURT:  -- 21st.  I could arrange to see you

 9   earlier, but I don't think you need me.  And I don't want to.

10   I see you're shaking your head no.  That's fine.  But so

11   anytime on the far side of January 3, if a meet-and-confer

12   process is played out, and you want to see me and you make

13   written requests, I stand ready.  And I would want written

14   requests before you get together so that I can come in knowing

15   what the issues are.  Hopefully they'll be sharpened by then.

16              MR. MORRIS:  Sure.

17              THE COURT:  In a really ideal world, you'll reach

18   agreement.

19              MR. MORRIS:  Right.

20              THE COURT:  And then you won't have to come in.

21              MR. MORRIS:  Right.  So --

22              THE COURT:  I will say, I commented, and you looked

23   receptive and appreciative when I commented that I would think

24   the movant would want to get their long-pending motion actually

25   heard.  So we have to get through this process.
```

21-11854-dsj   Doc 86   Filed 03/08/24   Entered 03/08/24 13:21:13   Main Document
Pg 86 of 114
**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

37

1          MR. MORRIS:  We do.

2          THE COURT:  And so both sides can influence that,

3    including on the movant's side, by being reasonable and

4    constructive and fair minded.  And then we'll hopefully sharpen

5    the issues and get it heard, get it argued.

6          MR. MORRIS:  Okay.  All right.  And I appreciate that,

7    Your Honor.  I just want to move on then to the other issue

8    just because --

9          THE COURT:  Sure.

10          MR. MORRIS:  -- I can't let it go unanswered, about

11    Harneys and the deeply troubling -- the allegedly deeply

12    troubling concept of a law firm representing multiple clients

13    whose interests might not be completely aligned.

14          It happens.  I'll just say it happens, and I don't

15    really care.  What I do hope is that we avoid a frolic and

16    detour that requires me to now learn what's happening in other

17    unrelated cases.  At the end of the day, law firms represent

18    multiple clients.  And if the issue of law has not been

19    settled, I think we have an ethical duty to advocate for our

20    clients vigorously and zealously.

21          And the issue before the Court that we're pressing

22    here is that a solvent entity who is engaged in a foreign

23    proceeding, that doesn't really have any role for creditors and

24    doesn't benefit creditors, that that's an issue that hasn't

25    been decided.  It's why it's before this Court right now.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

38

1          And I find nothing unusual, offensive, troubling,

2    unethical about a law firm representing multiple clients who

3    may want to take different positions.  And I just really will

4    resist very firmly --

5          THE COURT:  Okay.

6          MR. MORRIS:  -- any attempt to take a deposition --

7          THE COURT:  That's --

8          MR. MORRIS:  -- on that issue.

9          THE COURT:  I think you've each articulated --

10         MR. MORRIS:  Yeah.

11         THE COURT:  -- the positions that people articulate in

12   this situation.  And I think I can just --

13         MR. MORRIS:  Yep.

14         THE COURT:  I mean, I'd like to sort of leave it there

15   and then --

16         MR. MORRIS:  Me too.

17         THE COURT:  -- see where we are at an appropriate

18   time, which I think is not yet.  But when you finish up, I'll

19   give Mr. McDonald an opportunity to say anything if he

20   absolutely feels the need.  But otherwise we can leave it at

21   that.

22         Okay.  So I asked, and I didn't really emerge with a

23   clear answer of what exactly you want me to do today.  Maybe

24   the answer is nothing --

25         MR. MORRIS:  Nothing.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

39

1          THE COURT:  -- and it's just a conference and an

2     update.

3          MR. MORRIS:  It was a status conference.  But I do

4     want to raise one more issue --

5          THE COURT:  Sure.

6          MR. MORRIS:  -- and see if Your Honor has a view.  And

7     if not, we may have to get into more motion practice.  We've

8     had a meet-and-confer.  We've actually exchanged writings.

9     We've actually exchanged citations to case law.  If it had to

10    be briefed, I think we could do it quickly and easily.

11         But the issue concerns, Your Honor, the secret nature

12    of the joint official liquidator's investigation.  As Your

13    Honor knows and has -- as we've acknowledged, in the

14    recognition order, which is at docket 22, at paragraph 6, Your

15    Honor gave the liquidators the authority to issue subpoenas.

16    And we understand that.

17         But what Your Honor also did is give them authority to

18    issue subpoenas "in accordance with applicable procedural

19    rules".  And they're not following those.  They're not giving

20    any notice.  They're not telling -- this is just an

21    investigation that's being done in secret that a debtor in the

22    United States under Chapter 11 could never do.  They're not

23    telling us, right, we've actually --

24         THE COURT:  These are rule 2004 subpoenas?

25         MR. MORRIS:  Yeah.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

40

1        MR. MCDONALD:  No.  No, Your Honor.  They're --

2        THE COURT:  Whoa, I got a really excited reaction.

3        MR. MORRIS:  I don't know what they are because we

4    haven't seen it.

5        THE COURT:  Hang on a second.  Just clarify this, Mr.

6    McDonald.  What are they?

7        MR. MCDONALD:  They're 1521(a)(4) subpoenas that Your

8    Honor authorized us to issue.

9        THE COURT:  Okay.

10        MR. MORRIS:  Okay.  And so --

11        THE COURT:  Thanks.

12        MR. MORRIS:  And so we've heard the admission, in the

13    initial presentation, that some of these subpoenas -- and I

14    don't know if there are others, but were served on Planet

15    Payment, EII, i-payout.  It wasn't clear if Xsigo had received

16    a subpoena.  We're hearing about this for the first time today.

17    We don't know what is the scope of the subpoenas.  Instead,

18    we've been told, up until today --

19        THE COURT:  Can I jump in?

20        MR. MORRIS:  -- that --

21        THE COURT:  My thought --

22        MR. MORRIS:  -- that they will --

23        THE COURT:  Yeah, let me just jump in.

24        MR. MORRIS:  If I could just -- okay.

25        THE COURT:  I have an immediate thought --

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

41

1          MR. MORRIS:  Yeah.

2          THE COURT:  -- which is, typically the recipient of a

3    subpoena is the directly affected party and has an entitlement

4    to object, at least in most procedural contexts I know.  It

5    sounds like that's not SPGK.  If SPGK is affected and learns of

6    these subpoenas, which you're saying you do, then I guess you

7    would need to object and come to me, if you want, and explain

8    to me why SPGK is an appropriate party entitled to object, or

9    you need to enlist the subpoena recipient, I would think.

10          MR. MORRIS:  Correct.  And that's really the problem.

11   That's the rub is that we don't have the opportunity to do

12   that.  Instead, we're told by Ascentra that they'll let us know

13   if they think the subpoena implicates us.  And yet we just

14   learned today for the first time that three, perhaps four

15   different -- I guess we knew about Planet Payment.  We just

16   learned that these subpoenas were issued.  They were issued for

17   the purpose of obtaining information against my client.  And

18   the fruit of those subpoenas was used to create and support the

19   document that was filed in the Cayman Islands.

20          Obviously, it impacted my client.  We had no notice of

21   it.  They refused to tell us what they got.  They refused to

22   tell us what they sought.  And that's the concern that we have.

23   And we think that that violates the very rule that Your Honor

24   was just paraphrasing.

25          THE COURT:  Right.  Okay.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

42

1          MR. MORRIS:  Right?  And that's really -- so I guess

2    either --

3          THE COURT:  Have you asked for a copy --

4          MR. MORRIS:  We've asked for everything.

5          THE COURT:  -- a copy of the production set?

6          MR. MORRIS:  Yep.  Won't get it.  They'll let us know

7    if it impacts us.  And they've just admitted here today that it

8    did impact us.  And they're still refusing to give it to us.

9    And so I would like to avoid more motion practice.  If the

10   Court has some guidance to say, if you're serving subpoenas

11   where are you going to use the fruits of it to sue SPGK, you

12   have to turn that over.  And if not, if we have to brief it,

13   we'll brief it.

14         THE COURT:  I can't just make a ruling on the spot

15   because I don't know the answer.  I haven't received any

16   written submissions in advance.  So I would say that is an

17   appropriate meet-and-confer topic for you all.  And if you need

18   to come to me with a dispute, so be it.

19         I mean, I literally do not know what the -- I guess

20   it's 1521 procedural requirements are for notice to affected

21   parties or in what circumstance SPGK would have entitlement to

22   come in or not.

23         I will say, as a general matter, I think you

24   referenced no trial by ambush.  And I do hope -- I certainly

25   agree, as a broad matter, with the no trial by ambush concept.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

43

1  To the extent discovery rights exist, they need to be met.  And

2  to the extent one has a discretionary call, whether it be

3  grudging or more open, I always appreciate more openness.  So I

4  can just say that.  Maybe that's a slight thumb on the scale of

5  use in your conversations.  But beyond that, I can't make any

6  particular ruling.

7       MR. MORRIS:  I appreciate that, Your Honor.  So why

8  don't we do this?  Let's continue to confer.  And sometime in

9  the first week of January, I suspect, if there's an issue or

10  two or three that we're unable to agree upon, perhaps we could

11  just -- and I don't want to do ten-page letters.  These are

12  pretty narrow issues.  We'd like them heard and adjudicated as

13  quickly as possible so that we actually can get on the business

14  of litigating these motions.

15       THE COURT:  Okay.  Fair.  Do you want to emerge --

16  well, I can make myself available on short notice.  My thought

17  would be to just sit tight and then, if and when you need me,

18  let you contact us and get seen quickly.  If both parties would

19  rather, I could hold a date now.  But I'll just tell you, I can

20  get you in on short notice, so that's probably better.

21       MR. MORRIS:  Yeah, I would rather you enjoy the

22  holiday.  Don't worry about us.

23       THE COURT:  Okay.  It won't ruin my holiday but --

24       MR. MORRIS:  We'll call you if we need you.

25       THE COURT:  Okay.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

44

1          MR. MORRIS:  Hopefully we won't.  And if we do,

2    hopefully it'll be on a very narrow set of issues.

3          THE COURT:  Okay.  That's fair.  Let me just give Mr.

4    Pintarelli or Mr. McDonald a chance to say anything further if

5    they want.

6          MR. MCDONALD:  Your Honor, for the record, Hugh

7    MacDonald, Pillsbury Winthrop Shaw Pittman, on behalf of the

8    foreign representatives.

9          Your Honor, a couple of points.  The 30(b)(6) subpoena

10   was served after both motions had been filed, after we deposed

11   their witness who submitted a declaration, a former officer and

12   director, who submitted a declaration in support of one of

13   those.  We marked over twenty-five exhibits at that deposition.

14   They have them.  They didn't include any of those topics in

15   that 30(b)(6).  We wanted the Court to be aware of that.

16          THE COURT:  Okay.

17          MR. MCDONALD:  And they knew -- they timed it

18   perfectly because they knew we were filing our papers only days

19   later.  So it was a little bit of sandbagging going on here,

20   Your Honor.  Just a little bit.

21          THE COURT:  All right.  I'm --

22          MR. MCDONALD:  So really --

23          THE COURT:  I --

24          MR. MCDONALD:  You know --

25          THE COURT:  No, I mean, that's --

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

45

1        MR. MCDONALD:  It's getting old.  That's so bad.

2        MR. MORRIS:  I'm -- yeah.

3        THE COURT:  I'm just going to say there's sputtering

4    at the other table, and I would consider this sort of a tit for

5    tat, maybe without the -- maybe unilaterally imposed.  But

6    okay.  But I hear you.

7        MR. MCDONALD:  Yes, Your Honor.  With respect to the

8    preclusion statements, these are -- there are ongoing

9    proceedings in the Cayman Islands.

10       THE COURT:  All right.  What do you mean?  Remind me

11   what you mean by that.

12       MR. MCDONALD:  Counsel said that if Mr. Robinson does

13   not answer questions about facts or documents, beyond simply

14   the pleadings before this Court and before the Cayman court,

15   the foreign representative should be precluded from introducing

16   anything at the hearing.

17       Your Honor, there are ongoing proceedings in the

18   Cayman Islands, ongoing.  There will be discovery in the Cayman

19   Islands.  We don't know what's going to be produced.  We don't

20   know what the parties are going to exchange.  And we don't know

21   what's going to come up in those proceedings.  They will be

22   aware of it as much as we're going to become aware of it.  But

23   it's not going to happen today.  It's not going to happen in

24   January.  And by the time we eventually do get to a hearing,

25   things may change in the context of that proceeding.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

46

1        So I think it's inappropriate to preclude the foreign

2   representatives from introducing something at trial that right

3   now they may be considering or may not be considering.  But

4   that's clearly privileged and that's clearly work product.

5        THE COURT:  Right, the trial being the -- whatever the

6   right term is, I'll just say the Ascentra in liquidation

7   proceedings, in Cayman, proceeding against SPGK, pending in the

8   Cayman court, right?

9        MR. MCDONALD:  Yes.

10       THE COURT:  Okay.

11       MR. MCDONALD:  This idea that they want to challenge

12  facts, a trustee in the United States would never be subject to

13  this.  Whatever a trustee in a case obtains from third parties,

14  they do the same thing a liquidator does, comes in, looks at

15  the books and records, figures out if there are any claims,

16  works with their counsel to come up with those claims, files

17  those claims.  There may be actual fact witnesses.  There may

18  not be fact witnesses.  It just may be a books and records

19  situation like a preference or a fraudulent transfer.

20       But you're not allowed to, like, go after the trustee

21  and say, well, you don't have any personal knowledge about

22  that, do you?  Or why did you claim that that fact was more

23  important than this fact?  Or what does that fact show us?

24  That's what they want to do.  And we're --

25       THE COURT:  All right.  Look --

21-11854-dsj   Doc 86   Filed 03/08/24   Entered 03/08/24 13:21:13   Main Document
Pg 96 of 114
**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

47

1        MR. MCDONALD:  We have a serious problem with that.

2        THE COURT:  No, I understand the concern you would

3    have about that.  And again, that's a topic for the meet-and-

4    confer.  I mean, I would encourage pursuing that.  And let's

5    just bring it to a head and figure out what we're going to do.

6        MR. MCDONALD:  Your Honor, finally, I would submit

7    that since SPGK conceded to this Court that there would be

8    irreparable harm, conceded to this Court already that there is

9    a dispute over the ownership of these funds, and indeed, there

10   is a pending dispute with Cayman Islands over these funds, it's

11   really, I think, SPGK's burden to come forward and demonstrate

12   that something has changed that changes the situation that

13   they've already conceded existed.

14       THE COURT:  Can I ask, to put a fine point on that,

15   they did not object to those findings and the entry of an order

16   at that time.  I mean, does that exactly equal concession, or

17   did they --

18       MR. MCDONALD:  It's a concession, Your Honor.  It's a

19   permanent injunction.

20       THE COURT:  Or is it a waiver?

21       MR. MCDONALD:  It's probably both, because they were

22   present at the hearing.  A permanent injunction was imposed.

23       MR. PINTARELLI:  If I may, Your Honor.  Not only that,

24   but they provided language for the order --

25       THE COURT:  No, I remember the order, yes.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

48

1          MR. PINTARELLI:  -- that we negotiated.  It was

2    negotiated language in that order.  And the basis for -- and

3    the language that they wanted was that they were -- the stay

4    was lifted, to the extent that they could bring a clean --

5          THE COURT:  Wait, wait, wait, don't pollute my brain

6    with negotiated language I haven't seen.  But I don't want to

7    get into this now because I'm not going to issue any ruling.

8    I'm just musing, in light of the repeated use of the word

9    conceded and whether that's accurate.  And I think really, I

10   suspect I'll be hearing argument about that later.  And that's

11   fine.  And I'm not going to do anything with argument about it

12   now, so I'd rather --

13         MR. PINTARELLI:  Understood.

14         THE COURT:  -- leave it alone.

15         MR. PINTARELLI:  Okay.  All right.

16         MR. MCDONALD:  Your Honor, with respect to Mr.

17   Hobden's declaration --

18         THE COURT:  Yes.

19         MR. MCDONALD:  -- this is not advocacy.  This is an

20   expert of foreign law coming in to prove a matter of foreign

21   law to this Court, to have this Court recognize a foreign

22   proceeding.  And they are presenting evidence to you about the

23   nature of the Cayman proceedings.  And it doesn't matter if

24   it's a Pioneer or Ascentra proceeding.  They are both official

25   liquidations and they are both of solvent entities.

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

49

1          And the point we're making is someone has come before

2    this Court and made a statement.  I'll just read this one.  "In

3    my experience, Cayman Island liquidation proceedings are fair

4    and equitable insofar as all creditors and interest holders

5    have the opportunity to be heard by the Grand Court and no

6    creditors will be prejudiced on the sole basis that they are

7    foreign based.  All creditors are treated equally regardless of

8    where they're domiciled."

9          It later goes on to state that Cayman proceedings are

10   a collective proceeding.  That is the complete, diametrical

11   opposite statement that another Harneys partner is advocating

12   in this proceeding.  And this is not a matter of saying I get

13   to advocate on behalf of my client.

14        THE COURT:  Right.  I hear you.  Look, let me -- I'm

15   giving you a little bit of runway to at least get out the

16   essence of your position.  It's a position that's going to be

17   argued later.  I'll deal with it later as needed.  I take your

18   point.

19        And look, for what it's worth, this Court is very

20   familiar with Chapter 15 proceedings in aid of liquidation

21   proceedings in the Cayman Islands.  I will say that the Global

22   Cord Blood situation that was before me was unusual.  And it

23   had facets that were not common.  And it is very common for

24   Chapter 15 proceedings tied to Cayman main proceedings to go

25   forward here with absolutely no batting of eyes or anything

21-11854-dsj   Doc 86   Filed 03/08/24   Entered 03/08/24 13:21:13   Main Document
Pg 99 of 114
**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

50

1   being seen as being amiss.  So I'll make that general

2   observation and probably stop talking because I'll just create

3   problems.

4         MR. MCDONALD:  Can I just comment briefly on the --

5         THE COURT:  Sure.

6         MR. MCDONALD:  -- the discovery issue.  As Mr.

7   Pintarelli informed the Court, we have issued subpoenas under

8   the power granted to us.  Generally, those subpoenas are not

9   filed.  There's no notice.  That is just done.  The SPGK team

10  was aware of the Planet Payment subpoena.  They never made a

11  demand in this court.  They never said that -- they never filed

12  anything about it.  And that was clearly aimed at figuring out

13  who has ownership of those funds.

14        The additional subpoenas that have been issued,

15  especially the EII one, precluded any claim or any motion

16  practice dealing with SPGK.  That was really to get to the back

17  office operations of Ascentra to figure out everything about

18  the assets and liabilities of Ascentra.

19        Going forward -- and I think, Your Honor, in your

20  decision -- I will always mispronounce this name, Viacao --

21  Viacao decision --

22        THE COURT:  Right.

23        MR. MCDONALD: -- that you distinguished.  There is a

24  quote from your opinion here.  It says, "Regardless of whether

25  it did or did not have a theoretical entitlement to seek

21-11854-dsj   Doc 86   Filed 03/08/24   Entered 03/08/24 13:21:13   Main Document
Pg 100 of 114
**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

51

1  discovery, because the party's status as a mere discovery

2  target" -- and Your Honor quotes -- "is not cause for allowing

3  the type of discovery that essentially amounts to a broad

4  intrusion into the foreign representative's investigative

5  pursuits".  This is on page 17 of Your Honor's opinion.

6         So we would submit, Your Honor, to the extent there

7  are ongoing investigations, that is within the purview of

8  assets and liabilities of Ascentra, SPGK is not entitled to

9  find out about all that or get those documents.  That is

10  outside the scope of what's at issue here.  If it relates to

11  them, but not everything relates to SPGK.

12         THE COURT:  Right.

13         MR. MCDONALD:  As Mr. Pintarelli informed this Court,

14  we have located additional assets, have gotten them by use of

15  discovery devices, and we have some funds in escrow, and we

16  will decide how to deal with that in the future.

17         THE COURT:  Okay.  I got it.  Look, I think we're -- I

18  had in mind you would stand up for a few brief punchy

19  rejoinders to what we've heard, because you already went first

20  and your adversary went second.  And you've been up for some

21  time.  I think I have your points.

22         And again, I'm just going to emerge with telling you

23  to continue talking and then come to me when you need.  I

24  guess, since you've said a lot, I'll give your adversary an

25  opportunity, if there's anything you really need to get into,

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

52

1   although I think that everything is just, as I said, being teed

2   up for future discussion.

3          MR. MORRIS:  I think enough has been said today, Your

4   Honor.  I'll just reserve my rights, and we'll deal with it.

5   Hopefully we'll chat in the next few days.

6          THE COURT:  Great.

7          MR. MORRIS:  If we can come to an agreement, great.

8   If not, we'll present those issues in a formal way to Your

9   Honor.

10         THE COURT:  Okay.  I stand ready.  I do encourage you

11  to actually push to get this motion heard.  I mean, I guess

12  it's really movant's interest maybe more than mine.  But I also

13  get itchy if something's pending and just procedurally bogged

14  down.  So let's try to get it --

15         MR. PINTARELLI:  Your Honor, we --

16         MR. MORRIS:  I will say that, if we had just done the

17  deposition in September, in accordance with the time line on

18  the topics that have been noticed, we would have been ready.

19  Maybe the trial would have been over at this point.

20         THE COURT:  I --

21         MR. MORRIS:  Instead, we spent, like, three months on

22  whether or not we can have a deposition in a contested matter.

23         THE COURT:  No, look, I understand.  I will say -- I

24  should just say -- I'll just leave it at that.  I'm not going

25  to lay blame any particular place.  I think there's been so

**ASCENTRA HOLDINGS, INC. AND GRAHAM ROBINSON AND IVY CHUA**

53

1  much back and forth contention that it's just taken time.

2  That's lamentable.

3      MR. MCDONALD:  And we've committed to also working

4  with them to find a mutually agreeable date and format for any

5  deposition that takes place.

6      THE COURT:  Right.

7      MR. MCDONALD:  It's obviously going to be in the new

8  year at this juncture as well.  So we're going to --

9      THE COURT:  Right.  Fair enough.

10      MR. MCDONALD:  All right?

11      THE COURT:  Okay.  Well, thanks very much.  Enjoy your

12  holidays.

13      MR. PINTARELLI:  Thank you.

14      MR. MCDONALD:  You as well, Your Honor.

15      THE COURT:  It's sincerely nice to see you in person.

16      MR. MCDONALD:  Enjoy your time off as well.

17      THE COURT:  Thanks.  And we're adjourned.

18      MR. MORRIS:  Thank you.

19      (Whereupon these proceedings were concluded at 3:30 PM)

20

21

22

23

24

25

54

1

2                    C E R T I F I C A T I O N

3

4  I, Sharona Shapiro, certify that the foregoing transcript is a

5  true and accurate record of the proceedings.

6

7

8  _Sharona Shapiro_

9  _____

10  Sharona Shapiro (CET-492)

11  AAERT Certified Electronic Transcriber

12

13  eScribers

14  7227 North 16th Street, Suite #207

15  Phoenix, AZ 85020

16

17  Date:  December 27, 2023

18

19

20

21

22

23

24

25

## A

**able (2)**
27:20;28:16
**absolutely (2)**
38:20;49:25
**absorb (1)**
16:16
**acceptable (1)**
35:19
**accepted (1)**
33:1
**accepting (1)**
32:24
**access (3)**
12:11,14;14:16
**accomplish (1)**
4:11
**accordance (2)**
39:18;52:17
**account (2)**
9:7,8
**accurate (1)**
48:9
**accusation (1)**
22:25
**acknowledged (1)**
39:13
**acknowledgment (1)**
35:13
**action (2)**
21:3;28:10
**actual (2)**
27:5;46:17
**actually (16)**
6:14;7:2,18;11:2;
12:14;16:5;19:6;23:2;
26:16;28:23;36:24;
39:8,9,23;43:13;
52:11
**added (6)**
11:14;13:4;16:21;
18:8;19:8,9
**addition (1)**
22:21
**additional (4)**
7:7;27:15;50:14;
51:14
**address (2)**
22:1;29:6
**addressed (2)**
29:11,18
**adequately (2)**
28:11;29:17
**adjourned (1)**
53:17
**adjudicate (1)**
9:11
**adjudicated (1)**
43:12
**admission (1)**
40:12

**admitted (1)**
42:7
**advance (1)**
42:16
**advancing (1)**
24:17
**adversary (7)**
19:12;28:19,24;
30:12;31:6;51:20,24
**advocacy (1)**
48:19
**advocate (2)**
37:19;49:13
**advocating (2)**
26:3;49:11
**affected (2)**
41:3,5;42:20
**affiliates (1)**
6:23
**affirmed (1)**
28:8
**afternoon (7)**
4:3,5,6;10:3,4;29:2,
3
**again (4)**
16:10;31:1;47:3;
51:22
**against (10)**
7:15,19;8:15;17:1;
27:15;30:23;32:12;
33:3;41:17;46:7
**agree (2)**
42:25;43:10
**agreeable (1)**
53:4
**agreement (4)**
25:19;35:19;36:18;
52:7
**ahead (3)**
4:14;11:11;13:20
**aid (1)**
49:20
**aimed (1)**
50:12
**alert (1)**
16:12
**aligned (1)**
37:13
**allegation (2)**
32:15,16
**allegations (4)**
32:3,17,24;33:2
**allegedly (1)**
37:11
**alleging (1)**
32:19
**allowed (1)**
46:20
**allowing (1)**
51:2
**alluded (2)**
11:13;17:20
**alone (1)**

48:14
**along (1)**
7:1
**alternative (1)**
23:8
**although (1)**
52:1
**always (2)**
43:3;50:20
**ambush (3)**
30:21;42:24,25
**America (1)**
17:16
**amiss (1)**
50:1
**amount (1)**
8:17
**amounts (1)**
51:3
**ancillary (1)**
28:4
**Andrew (2)**
23:17;25:7
**appeal (1)**
8:7
**appearance (3)**
12:5,10,15
**appearances (2)**
4:13;12:3
**appears (1)**
22:22
**appellate (1)**
8:7
**applicable (1)**
39:18
**application (1)**
12:9
**appreciable (1)**
15:17
**appreciate (4)**
35:12;37:6;43:3,7
**appreciative (1)**
36:23
**appropriate (6)**
27:16;28:4,16;
38:17;41:8;42:17
**area (2)**
27:20;29:19
**argue (1)**
35:2
**argued (2)**
37:5;49:17
**argument (6)**
22:23;23:7,10,16;
48:10,11
**arguments (2)**
23:11,18
**around (3)**
11:4;16:4;27:6
**arrange (1)**
36:8
**array (1)**
21:11

**articulate (1)**
38:11
**articulated (1)**
38:9
**Ascentra (20)**
4:8,23;6:19,23;8:4,
6,16,25;14:13,15;
16:5;24:5;29:10;30:4;
41:12;46:6;48:24;
50:17,18;51:8
**Ascentra's (1)**
7:23
**Asia (1)**
7:13
**asserted (2)**
18:16,17
**asserting (1)**
8:15
**assets (5)**
16:5,7;50:18;51:8,
14
**assistance (2)**
7:7;17:13
**assuming (1)**
5:11
**attempt (1)**
38:6
**attention (2)**
7:16;23:15
**attorney (1)**
20:17
**attorney-client (3)**
20:16,24;30:16
**August (1)**
29:14
**authority (2)**
39:15,17
**authorized (1)**
40:8
**available (3)**
14:4,5;43:16
**avoid (3)**
33:12;37:15;42:9
**avoids (1)**
34:4
**aware (10)**
4:22;8:19;15:13;
17:3;26:8;32:15;
44:15;45:22,22;50:10
**away (2)**
36:2,3
**awhile (1)**
10:18

## B

**back (16)**
6:17,22;10:9,13,22,
24;12:22;16:5;19:6;
21:19;25:20;29:14;
34:5;35:21;50:16;
53:1
**background (1)**

21:18
**bad (2)**
26:17;45:1
**balance (1)**
35:17
**ball (1)**
31:10
**ban (1)**
21:10
**bar (1)**
33:19
**based (5)**
18:17;19:10;22:25;
32:19;49:7
**bases (1)**
23:7
**basically (3)**
6:22;8:21;13:13
**basis (9)**
22:25;23:8;24:10,
16;32:4,16;34:1;48:2;
49:6
**batting (1)**
49:25
**Beatty (1)**
10:20
**became (1)**
8:19
**become (2)**
15:13;45:22
**beginning (1)**
27:25
**behalf (6)**
4:16;8:4;10:6;26:3;
44:7;49:13
**believes (1)**
30:23
**Ben (1)**
24:3
**bench (1)**
11:3
**benefit (1)**
37:24
**better (2)**
31:19;43:20
**beyond (6)**
20:23;23:2;26:11;
27:18;43:5;45:13
**big (1)**
7:12
**bit (7)**
11:18,19,25;13:3;
24:12;36:2;44:19,20;
49:15
**blame (1)**
52:25
**blanket (1)**
21:10
**Blood (1)**
49:22
**blurt (1)**
16:15
**bogged (1)**

21-11854-dsj   Doc 86   Filed 03/08/24   Entered 03/08/24 13:21:13   Main Document
In the Matter of: ASCENTRA HOLDINGS, INC.                    Pg 105 of 114

December 21, 2023

52:13
**books (2)**
46:15,18
**both (11)**
5:3;6:6;17:14;
18:16;30:3;37:2;
43:18;44:10;47:21;
48:24,25
**box (1)**
10:10
**brain (1)**
48:5
**breach (1)**
18:20
**brief (3)**
42:12,13;51:18
**briefed (1)**
39:10
**briefing (2)**
26:9;29:8
**briefly (1)**
50:4
**bring (5)**
7:16,18;23:15;47:5;
48:4
**bringing (2)**
8:18;26:18
**broad (3)**
11:18;42:25;51:3
**broader (1)**
11:19
**broadly (1)**
12:22
**broke (1)**
18:16
**brought (1)**
28:22
**built (1)**
11:2
**burden (5)**
29:10;30:5;32:7;
33:6;47:11
**business (2)**
7:13;43:13

**C**

**cabin (1)**
21:20
**call (5)**
22:11;29:24;35:17;
43:2,24
**came (1)**
11:2
**can (40)**
5:5,23;7:12;8:24;
9:25;11:23;12:5,8,14;
14:8;16:17;17:24;
18:5;19:13,22;20:7,8;
21:16;25:7,16,17,18,
19;28:23;32:13;33:5;
35:18;36:14;37:2;
38:12,20;40:19;43:4,

13,16,19;47:14;50:4;
52:7,22
**card (1)**
6:19
**care (1)**
37:15
**carefully (1)**
29:8
**carry (1)**
20:8
**carved (2)**
10:25;11:1
**case (15)**
4:20,22;8:1,3,5;
16:6;23:14,14;24:1,
17;28:1,23;33:25;
39:9;46:13
**cases (1)**
37:17
**cash (1)**
32:25
**categorical (1)**
33:19
**cause (1)**
51:2
**Cayman (43)**
6:12;7:15,25;8:8,
16,23;9:3,4,5,9;12:2,
6,11;13:25;17:5,6,14,
20;20:19;22:18;
23:21;24:11,16,22;
26:6,19;27:22;28:10;
34:20;35:11;41:19;
45:9,14,18,18;46:7,8;
47:10;48:23;49:3,9,
21,24
**Caymans (1)**
16:2
**ceased (1)**
23:8
**center (1)**
29:16
**certain (6)**
7:4,9;9;11:17;
14:16,17;16:1
**Certainly (3)**
14:8;29:13;42:24
**certificate (2)**
13:23;14:2
**challenge (2)**
31:23;46:11
**chambers (2)**
4:22;16:12
**chance (1)**
44:4
**change (7)**
14:1,2,25;15:10,19;
19:21;45:25
**changed (1)**
47:12
**changes (2)**
13:25;47:12
**Chapter (9)**

6:8;8:1;9:15;15:9;
16:6;28:3;39:22;
49:20,24
**charge (1)**
29:20
**chat (1)**
52:5
**chunk (1)**
7:12
**circumstance (1)**
42:21
**citations (1)**
39:9
**cited (1)**
27:17
**citizen (1)**
9:2
**claim (20)**
7:19;8:14,15,15;
11:22;17:1,17,19;
18:11,20,20,21;20:18;
21:5;27:15;32:4,6,12;
46:22;50:15
**claims (11)**
7:6;9:5,11;17:15;
18:17,22;19:8,10;
46:15,16,17
**clarification (2)**
20:4,7
**clarify (2)**
18:15;40:5
**clean (1)**
48:4
**clear (3)**
22:7;38:23;40:15
**clearly (3)**
46:4,4;50:12
**CLERK (1)**
4:2
**clerks (1)**
11:2
**client (9)**
20:11;30:18,24;
31:1;33:3;34:5;41:17,
20;49:13
**clients (4)**
37:12,18,20;38:2
**client's (1)**
31:8
**colleague (2)**
4:17;5:19
**collective (3)**
24:11;27:19;49:10
**colloquially (1)**
14:11
**comfort (1)**
35:8
**coming (1)**
48:20
**commenced (1)**
17:6
**commences (1)**
21:3

**comment (1)**
50:4
**commented (2)**
36:22,23
**commit (1)**
16:18
**committed (1)**
53:3
**common (2)**
49:23,23
**commonly (1)**
34:3
**communications (1)**
30:16
**company (1)**
8:11
**complaint (8)**
31:12,15,17,18,21;
32:2,13,22
**complete (1)**
49:10
**completely (2)**
26:3;37:13
**complicate (1)**
16:15
**conceded (5)**
28:7;47:7,8,13;48:9
**concept (3)**
12:15;37:12;42:25
**concern (5)**
31:21,23;35:9;
41:22;47:2
**concerning (2)**
16:25;29:15
**concerns (3)**
27:1,8;39:11
**concession (2)**
47:16,18
**concluded (1)**
53:19
**conclusion (1)**
26:5
**conclusions (1)**
5:7
**confer (5)**
5:9;21:12,13;43:8;
47:4
**conference (7)**
4:8,20,22;5:1,11;
39:1,3
**confidentiality (1)**
9:2
**connection (1)**
18:4
**Conrad (1)**
11:1
**Consider (3)**
25:22;29:8;45:4
**considerably (1)**
35:14
**considered (1)**
20:16
**considering (2)**

46:3,3
**constructive (1)**
37:4
**contact (1)**
43:18
**contains (1)**
24:7
**contention (2)**
30:7;53:1
**contentions (2)**
31:3;33:25
**contested (1)**
52:22
**context (4)**
25:1;32:5,6;45:25
**contexts (1)**
41:4
**continue (3)**
16:10;43:8;51:23
**continuing (1)**
16:19
**contract (4)**
18:17,20,21;30:3
**contract-based (1)**
19:8
**contracts (1)**
18:25
**contrary (1)**
24:11
**contributories (2)**
12:12;14:8
**contributory (1)**
12:15
**conversation (3)**
10:1;16:15;33:9
**conversations (4)**
4:10;13:1;33:10;
43:5
**copies (1)**
25:8
**copy (4)**
25:25;26:1;42:3,5
**Cord (1)**
49:22
**couch (1)**
17:2
**counsel (14)**
5:15;8:22,23;12:3;
14:12;17:14,14;
24:19,22;26:19;
30:14;35:12;45:12;
46:16
**country (2)**
28:8,9
**couple (2)**
5:6;44:9
**coupled (1)**
28:9
**COURT (224)**
4:3,7,25;5:3,9,16,
20,23;6:3,9,12;15:8;8;
9:3,13,16,18,21,25;
10:4,11,16,19,25;

11:5,7,11,16;12:11,
18,21,25;13:6,8,12,
15,20;14:4,10,14,16,
17,20,22;15:1,4,8,10,
11,12,15,23,25;16:8,
14,20,24;17:3,4,6;
18:5,7,10,14,18,23;
19:1,3,5,12,15,17,20,
22;20:1,4,6,14,22;
21:1,7,24;22:1,5,9,12,
16,20;23:1,2,5,24;
24:4,8,15,23;25:6,9,
11,13,15,25;26:1,4,5,
7,15,23;27:8,11,13,
24,24;28:13,18;29:1,
3,12,17;30:2,6,9,14;
32:9,23;33:4,7,13,15;
34:8,10,12,14,18,22,
24;35:2,5,8,8,21,22,
25;36:2,5,8,17,20,22;
37:2,9,21,25;38:5,7,9,
11,14,17;39:1,5,24;
40:2,5,9,11,19,21,23,
25;41:2,25;42:3,5,10,
14;43:15,23,25;44:3,
15,16,21,23,25;45:3,
10,14,14;46:5,8,10,
25;47:2,7,8,14,20,25;
48:5,14,18,21,21;
49:2,5,14,19;50:5,7,
11,22;51:12,13,17;
52:6,10,20,23;53:6,9,
11,15,17
**court-appointed (1)**
    17:10
**courtroom (3)**
    10:15,21;12:8
**courtrooms (2)**
    10:23;11:4
**Court's (2)**
    23:15;29:18
**covered (1)**
    9:22
**create (2)**
    41:18;50:2
**credible (1)**
    32:19
**credit (1)**
    6:18
**creditor (6)**
    8:6;11:22;12:5,8,
    14;16:2
**creditors (12)**
    12:4,12;14:8;15:21,
    21;16:1;24:9;37:23,
    24;49:4,6,7
**creditor's (1)**
    11:22
**cross-examine (1)**
    23:19
**currently (2)**
    8:7;15:21
**curtail (1)**

    35:14

## D

**dark (1)**
    15:16
**date (3)**
    36:5;43:19;53:4
**day (4)**
    10:22;32:15,21;
    37:17
**days (2)**
    44:18;52:5
**deal (4)**
    11:15;49:17;51:16;
    52:4
**dealing (1)**
    50:16
**debt (6)**
    8:16,20;15:22,24;
    16:1,4
**debtor (2)**
    14:22;39:21
**December (2)**
    5:11;36:6
**decide (5)**
    25:16;26:22;27:24,
    24;51:16
**decided (2)**
    21:9;37:25
**deciding (1)**
    32:25
**decision (8)**
    4:19;5:6;16:23;
    21:21;29:18;35:21;
    50:20,21
**declaration (9)**
    18:4;24:3,7,21,21;
    25:25;44:11,12;48:17
**declarations (2)**
    23:24;25:10
**deeply (1)**
    37:11,11
**defendant (1)**
    32:1
**defense (1)**
    7:20
**defenses (1)**
    17:20
**defer (1)**
    5:18
**defined (1)**
    34:19
**definitive (1)**
    33:17
**Delaware (1)**
    8:11
**delighted (1)**
    33:11
**demand (2)**
    12:13;50:11
**demonstrate (1)**
    47:11

**demonstrated (1)**
    28:11
**demonstration (1)**
    26:17
**depose (3)**
    23:17;24:15;25:3
**deposed (1)**
    44:10
**deposition (11)**
    21:10;26:10;31:1,
    24;32:2;33:19;38:6;
    44:13;52:17,22;53:5
**describing (1)**
    12:25
**Despite (1)**
    22:17
**determination (3)**
    8:2,2;16:3
**detour (1)**
    37:16
**develop (1)**
    34:2
**devices (1)**
    51:15
**diametrical (1)**
    49:10
**different (5)**
    11:4;12:6,9;38:3;
    41:15
**directly (1)**
    41:3
**director (3)**
    14:13,15;44:12
**disclose (1)**
    8:24
**discovery (17)**
    5:12;6:17,21;7:9;
    22:21;27:3,22;28:17;
    29:15,19;43:1;45:18;
    50:6;51:1,1,3,15
**discovery-focused (1)**
    10:1
**discretionary (1)**
    43:2
**discuss (5)**
    6:11,13;11:16,23;
    22:20
**discussed (1)**
    12:2
**discussing (1)**
    33:23
**discussion (1)**
    52:2
**discussions (3)**
    8:22;13:16;21:16
**dismiss (2)**
    32:23;33:1
**dispute (5)**
    9:6;28:15;42:18;
    47:9,10
**disputed (1)**
    8:13
**distinguished (1)**

    50:23
**disturbing (1)**
    26:2
**docket (2)**
    14:9;39:14
**document (5)**
    6:25;7:10;19:14;
    31:16;41:19
**documents (20)**
    6:20;7:4,4,11,14;
    16:25;17:18,19,25;
    18:12,20;19:2;20:11,
    15;27:17;30:4,17,20;
    45:13;51:9
**domiciled (1)**
    49:8
**done (7)**
    6:6,14;17:13;20:16;
    39:21;50:9;52:16
**doubtful (1)**
    14:2
**down (10)**
    7:15;9:9;11:2,9,14;
    13:3;27:2;28:10;
    30:25;52:14
**Doyle (1)**
    7:18
**due (2)**
    7:20;17:21
**during (1)**
    5:12
**duty (1)**
    37:19

## E

**eager (1)**
    4:10
**earlier (1)**
    36:9
**easily (1)**
    39:10
**ECF (1)**
    4:19
**EEI (1)**
    18:1
**effectively (1)**
    21:5
**EII (3)**
    6:22;40:15;50:15
**either (3)**
    14:2;18:1;42:2
**element (2)**
    29:20;32:10
**elementary (1)**
    32:21
**else (3)**
    20:16;27:18;31:25
**embroiled (1)**
    8:4
**emerge (3)**
    13:15;35:5;38:22;
    43:15;51:22

**encourage (2)**
    47:4;52:10
**end (5)**
    19:17;28:22;32:21;
    35:19;37:17
**energy (1)**
    27:20
**engaged (1)**
    37:22
**English (1)**
    7:12
**enjoy (3)**
    43:21;53:11,16
**enlist (1)**
    41:9
**enough (2)**
    52:3;53:9
**entered (1)**
    4:19
**entities (1)**
    48:25
**entitled (5)**
    14:9;30:1;33:20;
    41:8;51:8
**entitlement (3)**
    41:3;42:21;50:25
**entity (2)**
    14:23;37:22
**entry (1)**
    47:15
**envisioning (1)**
    21:7
**equal (1)**
    47:16
**equally (2)**
    24:10;49:7
**equitable (2)**
    18:22;49:4
**equitably (1)**
    28:3
**equity (3)**
    18:17;19:10;30:4
**escrow (4)**
    8:13;9:7,7;51:15
**especially (1)**
    50:15
**essence (1)**
    49:16
**essentially (1)**
    51:3
**ethical (1)**
    37:19
**even (5)**
    6:24;7:3;22:6;28:7;
    35:8
**event (3)**
    23:10,18;28:12
**events (2)**
    5:4;23:14
**eventually (1)**
    45:24
**everybody (1)**
    4:3

**everyone (1)**
4:8
**everyone's (1)**
20:20
**evidence (4)**
30:12,22;31:15;
48:22
**Exactly (5)**
13:19;34:7,11;
38:23;47:16
**example (2)**
12:3;24:9
**exchange (2)**
35:18;45:20
**exchanged (2)**
39:8,9
**excited (1)**
40:2
**executive (1)**
8:25
**exhibits (1)**
44:13
**exist (3)**
17:15;23:8;43:1
**existed (1)**
47:13
**expectations (1)**
25:17
**experience (1)**
49:3
**expert (3)**
26:13,13;48:20
**explain (2)**
30:11;41:7
**expressed (1)**
35:8
**extent (4)**
43:1,2;48:4;51:6
**eyes (1)**
49:25

**F**

**facets (1)**
49:23
**fact (18)**
11:1,22;17:11,11;
18:3;26:7;28:6;29:7,
9;31:4,7,8;32:19;
46:17,18,22,23,23
**facts (20)**
16:23,25;17:17,22;
18:10,19;20:15,19;
27:17;30:2,17,20;
31:2,3,24;32:18;34:6,
8;45:13;46:12
**factual (4)**
21:4;30:9;31:15;
34:15
**fair (8)**
12:22;13:20;33:21;
37:4;43:15;44:3;49:3;
53:9

**fairly (1)**
24:10
**faith (1)**
26:17
**familiar (1)**
49:20
**far (2)**
7:1;36:11
**fault (2)**
31:7,8
**fears (1)**
25:17
**February (1)**
10:11
**feels (1)**
38:20
**few (2)**
51:18;52:5
**figure (7)**
5:9;13:22;17:15;
21:18;34:16;47:5;
50:17
**figures (1)**
46:15
**figuring (1)**
50:12
**file (6)**
7:19;12:5;13:24;
14:1;25:2;26:2
**filed (13)**
7:15,17,20;8:1,16;
15:22,24;17:19;
25:17;41:19;44:10;
50:9,11
**files (3)**
12:11;14:16;46:16
**filing (4)**
12:10;23:16;27:4;
44:18
**finally (2)**
8:12;47:6
**find (6)**
12:20;31:20;32:18;
38:1;51:9;53:4
**findings (1)**
47:15
**fine (10)**
4:14;6:1;11:23;
16:14;25:13,21;
34:10;36:10;47:14;
48:11
**finish (1)**
38:18
**firm (9)**
23:18,21,21;24:7,
13;26:2,19;37:12;
38:2
**firmly (1)**
38:4
**firms (1)**
37:17
**first (11)**
4:11;9:11;10:8;

11:17;18:10;21:8;
31:25;40:16;41:14;
43:9;51:19
**fit (1)**
18:14
**flummoxed (1)**
34:14
**focus (1)**
11:9
**focuses (1)**
24:24
**folks (1)**
15:16
**followed (1)**
27:3
**following (1)**
39:19
**forced (1)**
31:20
**foreign (14)**
4:16;5:4,25;10:6;
23:11;37:22;44:8;
45:15;46:1;48:20,20,
21;49:7;51:4
**foreshadowing (1)**
28:20
**form (1)**
31:6
**formal (1)**
52:8
**format (1)**
53:4
**former (4)**
8:25;14:12;26:13;
44:11
**formulation (1)**
34:2
**forth (4)**
17:18;21:22;24:12;
53:1
**forward (3)**
47:11;49:25;50:19
**four (6)**
13:4;16:21;18:8,24;
22:3;41:14
**frame (1)**
13:10
**framing (1)**
34:15
**Frank (1)**
11:1
**fraudulent (1)**
46:19
**frolic (1)**
37:15
**front (7)**
10:9;24:2;26:5,20,
21;29:16;32:2
**fruit (1)**
41:18
**fruits (1)**
42:11
**full (2)**

11:22;19:3
**fully (1)**
29:11
**functions (1)**
17:10
**fundamental (1)**
12:2
**funds (12)**
8:15,17;9:12;17:2,
5;28:8,15;29:9;47:9,
10;50:13;51:15
**funny (2)**
11:5,6
**further (2)**
33:9;44:4
**future (2)**
51:16;52:2

**G**

**gather (1)**
5:10
**gave (1)**
39:15
**general (7)**
4:20,24;5:13,25;
6:5;42:23;50:1
**generally (6)**
11:25;12:19,20;
16:1;28:3;50:8
**given (4)**
13:15;21:16;23:12;
28:6
**giving (2)**
39:19;49:15
**Gladstone (1)**
25:4
**Global (1)**
49:21
**goes (1)**
49:9
**Good (7)**
4:3,5,6;10:3,4;29:2,
3
**Graham (1)**
8:20
**Grand (1)**
49:5
**grant (1)**
28:5
**granted (4)**
23:1;28:1,1;50:8
**great (6)**
10:8;23:3;35:22;
36:7;52:6,7
**group (2)**
6:19;8:25
**grudging (1)**
43:3
**guess (13)**
5:24;10:1;14:22;
21:14;25:21;29:6;
35:20;41:6,15;42:1,

19;51:24;52:11
**guessing (1)**
19:25
**guidance (2)**
13:17;42:10

**H**

**half (1)**
5:11
**hand (1)**
19:22
**handle (1)**
19:18
**Hang (1)**
40:5
**happen (2)**
45:23,23
**happened (1)**
4:10
**happening (1)**
37:16
**happens (2)**
37:14,14
**happy (2)**
21:17;35:15
**harm (4)**
9:11;28:7,12;47:8
**Harneys (8)**
23:18,21,21;24:7;
26:2,13;37:11;49:11
**head (2)**
36:10;47:5
**hear (9)**
4:10;16:16;19:22;
28:18,24;30:25;31:4;
45:6;49:14
**heard (9)**
4:9;28:21;36:25;
37:5;40:12;43:12;
49:5;51:19;52:11
**hearing (11)**
8:21;23:19;27:5;
30:22;34:1;36:5;
40:16;45:16,24;
47:22;48:10
**HEC (2)**
7:24;8:10
**held (2)**
8:17;21:11
**hello (1)**
4:7
**help (1)**
13:9
**helpful (5)**
9:21;15:1;19:13;
27:14;32:22
**helps (1)**
13:10
**hide (1)**
31:10
**historic (1)**
10:21

21-11854-dsj    Doc 86    Filed 03/08/24    Entered 03/08/24 13:21:13    Main Document
In the Matter of: ASCENTRA HOLDINGS, INC.    Pg 108 of 114

December 21, 2023

**Hobden (2)**
24:3,21
**Hobden's (3)**
24:7;25:25;48:17
**hold (1)**
43:19
**holders (1)**
49:4
**holding (1)**
10:20
**Holdings (1)**
4:8
**holiday (2)**
43:22,23
**holidays (1)**
53:12
**honest (1)**
4:21
**honestly (1)**
8:18
**Honor (84)**
4:6,15,18;5:21;6:7,
16,24;7:3,8,9,16,22;
8:12,18;9:8;10:3,8,
23;11:12,12,17;13:2,
4,19,25;14:6,7,24;
15:7,18;16:4,9,22;
17:8,23,24;18:13;
20:13;21:3,21;22:19,
22;23:6,9,13;24:1,2,
20;25:12,24;26:12,20,
21;27:21,25;28:25;
29:2;32:20;37:7;39:6,
11,13,15,17;40:1,8;
41:23;43:7;44:6,9,20;
45:7,17;47:6,18,23;
48:16;50:19;51:2,6;
52:4,9,15;53:14
**Honor's (3)**
16:23;29:8;51:5
**hope (2)**
37:15;42:24
**Hopefully (5)**
36:15;37:4;44:1,2;
52:5
**hoping (1)**
21:17
**Hugh (3)**
4:17;10:5;44:6
**humans (1)**
10:13

**I**

**idea (1)**
46:11
**ideal (1)**
36:17
**iHealthSciences (1)**
8:10
**imagine (1)**
7:12
**immediate (2)**

27:3;40:25
**immediately (4)**
6:16,18;20:24;
24:25
**impact (1)**
42:8
**impacted (1)**
41:20
**impacts (1)**
42:7
**impasse (1)**
16:11
**implicates (1)**
41:13
**important (2)**
28:20;46:23
**importantly (2)**
15:6;27:21
**imposed (2)**
45:5;47:22
**inappropriate (1)**
46:1
**Inc (1)**
6:22
**include (1)**
44:14
**included (1)**
29:14
**including (1)**
37:3
**inconsistent (1)**
24:18
**indeed (1)**
47:9
**individual (1)**
29:22
**influence (1)**
37:2
**information (6)**
13:16;15:5;19:8,9;
20:10;41:17
**informed (3)**
15:23;50:7;51:13
**initial (5)**
6:25;7:19;8:2,6;
40:13
**injunction (2)**
47:19,22
**Innovation (1)**
6:22
**inquire (2)**
20:23;30:1
**inquiries (1)**
19:7
**insofar (1)**
49:4
**insolvency (1)**
14:3
**Instead (3)**
40:17;41:12;52:21
**instruction (1)**
21:12
**intend (2)**

34:7,11
**interest (2)**
49:4;52:12
**interested (1)**
5:5
**interests (1)**
37:13
**interim (2)**
6:21;13:17
**International (2)**
7:25;8:10
**interrogatory (1)**
30:7
**interrupt (1)**
14:7
**intervening (1)**
23:13
**into (17)**
9:6,7;10:12;11:25;
12:8;18:11;20:24;
22:3,13,14;26:12;
27:20;28:17;39:7;
48:7;51:4,25
**introducing (2)**
45:15;46:2
**intrusion (1)**
51:4
**invasive (1)**
34:25
**investigate (1)**
16:7
**investigation (3)**
7:5;39:12,21
**investigations (1)**
51:7
**investigative (1)**
51:4
**involved (1)**
21:8
**i-payout (2)**
7:2;40:15
**irreparable (3)**
28:7,11;47:8
**I-should-take-it-as-it- (1)**
26:24
**Island (1)**
49:3
**Islands (18)**
7:15;8:1,8,16;9:5,9;
12:7;17:20;20:19;
23:22;27:22;34:20;
41:19;45:9,18,19;
47:10;49:21
**issue (20)**
17:8;22:15;26:21;
29:9,15;35:12;37:7,
18,21,24;38:8;39:4,
11,15,18;40:8;43:9;
48:7;50:6;51:10
**issued (5)**
29:14;41:16,16;
50:7,14
**issues (19)**

4:23;5:12,19,19;
9:10,11;11:11;21:12;
22:11,21;25:16;
26:25;29:6;34:6;
36:15;37:5;43:12;
44:2;52:8
**itchy (1)**
52:13

**J**

**January (4)**
36:5,11;43:9;45:24
**job (1)**
10:12
**John (2)**
4:15;29:4
**Johnstone (10)**
23:17,20,20,21,23;
24:19,22;25:5,6,7
**Johnstone's (1)**
24:2
**joint (1)**
39:12
**JOLs (7)**
7:17,22;8:1,6,9,12,
21
**Jones (1)**
29:5
**Judge (5)**
7:18,18;10:15,20;
28:3
**jump (2)**
40:19,23
**juncture (1)**
53:8
**Justice (1)**
7:18

**K**

**keep (1)**
35:22
**keeping (1)**
9:12
**kicking (1)**
27:6
**kind (2)**
10:25;12:16
**knew (4)**
9:6;41:15;44:17,18
**knowing (1)**
36:14
**knowledge (3)**
29:22;30:1;46:21
**knows (1)**
39:13

**L**

**lack (1)**
12:1
**lamentable (1)**

53:2
**Lane's (1)**
10:15
**language (4)**
47:24;48:2,3,6
**last (1)**
15:24
**later (6)**
27:4;44:19;48:10;
49:9,17,17
**latter (1)**
5:11
**launched (1)**
6:9
**law (12)**
6:12;9:3,4;12:2;
13:25;37:12,17,18;
38:2;39:9;48:20,21
**lawsuit (1)**
34:20
**lawyer (2)**
24:16,17
**lay (1)**
52:25
**laying (2)**
8:14,15
**lead (3)**
4:12;24:19,22
**leaking (1)**
34:5
**learn (1)**
37:16
**learned (2)**
41:14,16
**learns (1)**
41:5
**least (5)**
11:17;27:2;33:22;
41:4;49:15
**leave (5)**
25:2;38:14,20;
48:14;52:24
**leaving (1)**
28:9
**left (2)**
21:11;28:8
**lengthy (1)**
29:7
**letter (1)**
33:12
**letters (1)**
43:11
**liabilities (2)**
50:18;51:8
**lift (3)**
17:24;28:9;32:25
**lifted (1)**
48:4
**light (1)**
48:8
**likelihood (1)**
29:15;30:3;32:6
**likely (2)**

21-11854-dsj    Doc 86    Filed 03/08/24    Entered 03/08/24 13:21:13    Main Document
In the Matter of: ASCENTRA HOLDINGS, INC.                    Pg 109 of 114

December 21, 2023

29:10;32:12
**line (2)**
  16:11;52:17
**liquidating (1)**
  14:23
**liquidation (7)**
  7:25;8:3;24:6,6;
  46:6;49:3,20
**liquidations (1)**
  48:25
**liquidator (3)**
  17:9,9;46:14
**liquidators (7)**
  7:10;8:4;11:21;
  14:1;15:25;17:7;
  39:15
**liquidator's (2)**
  7:5;39:12
**list (3)**
  5:18;11:14;19:3
**listen (1)**
  13:10
**literally (1)**
  42:19
**litigating (1)**
  43:14
**litigation (3)**
  8:5,7;23:23
**little (8)**
  10:10;11:25;13:3;
  34:14;36:2;44:19,20;
  49:15
**live (1)**
  10:9
**living (1)**
  10:12
**local (1)**
  33:15
**located (1)**
  51:14
**lodged (1)**
  9:5
**logic (1)**
  33:16
**long (3)**
  5:25;19:16;27:6
**longer (1)**
  6:25
**long-pending (1)**
  36:24
**look (14)**
  21:7;24:23;25:15;
  26:1,7,23;28:13;
  31:18;33:7;46:25;
  49:14,19;51:17;52:23
**looked (2)**
  28:2;36:22
**looking (1)**
  4:11
**looks (2)**
  4:8;46:14
**lot (3)**
  21:8;28:19;51:24

**love (1)**
  33:12
**Luke (1)**
  14:12

**M**

**MacDonald (1)**
  44:7
**main (5)**
  5:4,25;6:17;9:15;
  49:24
**makes (1)**
  20:21
**making (5)**
  12:13;20:9;33:3,17;
  49:1
**many (2)**
  17:14;24:7
**marked (1)**
  44:13
**matter (13)**
  4:8;9:3,4;22:19;
  29:9,25,25;42:23,25;
  48:20,23;49:12;52:22
**matters (2)**
  11:16;15:16
**may (17)**
  6:3;16:15;19:12;
  25:3;29:21,24,24;
  35:14;38:3;39:7;
  45:25;46:3,3,17,17,
  18;47:23
**maybe (12)**
  13:16,17;25:18,19;
  35:17,18;38:23;43:4;
  45:5,5;52:12,19
**MCDONALD (103)**
  4:6,17;9:25;10:3,5,
  5,15,17,22;11:1,6,10,
  12;12:19,24;13:2,7,
  11,14,19,21;14:5;
  15:6,9,12,18;16:9,18,
  21,25;17:5;18:6,9,13,
  15,19,24;19:2,4,11,
  18,21,24;20:3,5,13,
  15,23;21:2,21,25;
  22:2,7,10,13,17;
  24:19;25:5,7,10,12,
  14,24;26:5,11,16;
  27:7,10,12,14;28:15,
  25;32:10;33:7;38:19;
  40:1,6,7;44:4,6,17,22,
  24;45:1,7,12;46:9,11;
  47:1,6,18,21;48:16,
  19;50:4,6,23;51:13;
  53:3,7,10,14,16
**mean (25)**
  15:1,18;16:4;24:24;
  25:20;26:12,24;
  27:14;28:14,19;30:8,
  9;33:7,13,15,18;
  35:22;38:14;42:19;

44:25;45:10,11;47:4,
16;52:11
**meet (5)**
  5:9;21:12,13;30:5;
  33:5
**meet-and- (1)**
  47:3
**meet-and-confer (8)**
  5:15;11:13;12:23;
  28:21;33:8;36:11;
  39:8;42:17
**mere (1)**
  51:1
**Merger (3)**
  24:1,5,20
**merits (8)**
  17:2;27:23;29:11,
  16;30:3,19;32:6,7
**message (1)**
  25:22
**met (1)**
  43:1
**might (4)**
  14:9;26:11;27:4;
  37:13
**million (1)**
  7:11
**mind (1)**
  51:18
**minded (1)**
  37:4
**mine (1)**
  52:12
**minimum (1)**
  5:10
**minute (1)**
  20:2
**mislead (1)**
  23:5
**misled (1)**
  23:2;24:8
**mispronounce (1)**
  50:20
**money (2)**
  8:13;9:6
**monies (2)**
  8:13;9:9
**months (3)**
  6:20,25;52:21
**more (17)**
  7:11;8:12;11:25;
  12:22;15:6;27:18,21;
  28:11;33:12;34:3;
  39:4,7;42:9;43:3,3;
  46:22;52:12
**moreover (1)**
  28:6
**morning (1)**
  8:20
**MORRIS (61)**
  19:13,16;29:2,4,4;
  30:8,13,15;33:5,11,
  14;34:7,9,11,13,17,

21,23;35:1,4,7,24;
36:1,4,7,16,19,21;
37:1,6,10;38:6,8,10,
13,16,25;39:3,6,25;
40:3,10,12,20,22,24;
41:1,10;42:1,4,6;43:7,
21,24;44:1;45:2;52:3,
7,16,21;53:18
**most (2)**
  28:20;41:4
**motion (13)**
  17:24;22:24;26:18;
  27:5;32:23,25;33:1,
  14;36:24;39:7;42:9;
  50:15;52:11
**motions (2)**
  43:14;44:10
**movant (1)**
  36:24
**movant's (2)**
  37:3;52:12
**move (2)**
  5:4;37:7
**much (5)**
  6:8;10:9;16:3;
  17:10,25;26:17;
  45:22;53:1,11
**multiple (3)**
  37:12,18;38:2
**musing (1)**
  48:8
**mutually (1)**
  53:4
**myself (1)**
  43:16

**N**

**name (3)**
  8:24;9:1;50:20
**narrow (2)**
  43:12;44:2
**narrowed (1)**
  5:18
**narrowing (1)**
  27:11
**nature (4)**
  26:6;30:9;39:11;
  48:23
**necessary (1)**
  25:19
**need (14)**
  13:3;14:17;20:20;
  25:22;36:9;38:20;
  41:7,9;42:17;43:1,17,
  24;51:23,25
**needed (1)**
  49:17
**negotiated (4)**
  8:13;48:1,2,6
**neither (1)**
  30:17
**new (9)**

22:2,3;23:10,10,15,
18;25:1;35:3;53:7
**next (3)**
  5:10;36:5;52:5
**nice (2)**
  10:13;53:15
**nicer (1)**
  10:9
**nine (1)**
  7:11
**note (2)**
  7:24;27:8
**noted (6)**
  12:10;22:22;23:6,9;
  33:20
**notice (9)**
  12:5,6;14:1;39:20;
  41:20;42:20;43:16,
  20;50:9
**noticed (1)**
  52:18
**notify (2)**
  14:25;15:10
**number (4)**
  4:19;11:18;31:14;
  33:21

**O**

**object (4)**
  41:4,7,8;47:15
**objection (2)**
  17:23,25
**objections (1)**
  33:21
**observation (1)**
  50:2
**obtain (1)**
  17:14
**obtaining (1)**
  41:17
**obtains (1)**
  46:13
**obviously (7)**
  15:4,13;16:3,12;
  17:21;41:20;53:7
**October (1)**
  7:15
**off (3)**
  4:12;21:8;53:16
**offense (1)**
  23:3
**offensive (1)**
  38:1
**offering (1)**
  31:14
**office (2)**
  6:22;50:17
**officer (2)**
  17:10;44:11
**official (6)**
  7:25;17:9;24:5,6;
  39:12;48:24

21-11854-dsj    Doc 86    Filed 03/08/24    Entered 03/08/24 13:21:13    Main Document
In the Matter of: ASCENTRA HOLDINGS, INC.    Pg 110 of 114

December 21, 2023

**old (2)**
10:15;45:1
**once (1)**
25:16
**One (23)**
5:9;7:3,24;11:3,20;
13:23;15:1;16:6;
19:14,14;22:19;24:2;
26:9;28:2;31:14,17,
21;33:20;39:4;43:2;
44:12;49:2;50:15
**ongoing (9)**
12:25;13:16;21:13,
16;28:21;45:8,17,18;
51:7
**only (7)**
8:18,19;9:5;21:21;
35:11;44:18;47:23
**open (2)**
21:11;43:3
**openness (1)**
43:3
**operations (1)**
50:17
**opinion (4)**
22:22;23:6;50:24;
51:5
**opportunity (6)**
23:12;33:2;38:19;
41:11;49:5;51:25
**opposite (5)**
24:13;26:3,19,20;
49:11
**oral (1)**
30:6
**order (8)**
4:19;7:8;29:6;
39:14;47:15,24,25;
48:2
**original (4)**
13:5;21:25;22:10,
24
**others (3)**
7:1;9:23;40:14
**otherwise (2)**
35:3;38:20
**out (25)**
4:21;5:9;7:13;
10:25;11:1;12:20;
13:22;16:15;17:15;
18:16;21:18;26:25;
31:20;32:18;33:16;
34:5,16;35:15;36:12;
46:15;47:5;49:15;
50:12,17;51:9
**outside (1)**
51:10
**over (16)**
5:22;7:4;9:18,24,
25;17:5;22:20;28:15;
30:25,25;35:9;42:12;
44:13;47:9,10;52:19
**overall (1)**

5:1
**overview (3)**
6:6;19:22;20:8
**own (2)**
26:19,19
**owner (1)**
14:9
**ownership (3)**
17:1;47:9;50:13

**P**

**Pachulski (1)**
29:4
**page (1)**
51:5
**pages (2)**
7:11;19:16
**paid (2)**
11:21,23
**papers (4)**
12:11;13:25;29:11;
44:18
**paragraph (1)**
39:14
**paraphrasing (1)**
41:24
**parcel (1)**
29:16
**pare (1)**
13:3
**pared (1)**
11:14
**pari (1)**
24:10
**part (4)**
20:17;25:3;29:16;
31:17
**particular (5)**
22:6;27:9;29:14;
43:6;52:25
**parties (5)**
23:2;42:21;43:18;
45:20;46:13
**partner (3)**
24:17;26:14;49:11
**partners (1)**
24:3
**party (6)**
8:14,22,24;30:12;
41:3,8
**party's (1)**
51:1
**passu (1)**
24:10
**Payment (7)**
6:18,19;17:2;18:2;
40:15;41:15;50:10
**Pearson (1)**
26:13
**pendency (1)**
28:10
**pending (9)**

17:3;22:17;23:22;
24:2;27:22;34:20;
46:7;47:10;52:13
**people (1)**
38:11
**perfectly (1)**
44:18
**Perhaps (3)**
30:8;41:14;43:10
**permanent (2)**
47:19,22
**person (4)**
8:25;21:11;29:25;
53:15
**personal (2)**
29:22;46:21
**perspective (1)**
26:17
**perspectives (1)**
28:2
**ph (2)**
8:11;9:1
**phone (1)**
35:17
**Pillsbury (3)**
4:16;10:6;44:7
**PINTARELLI (38)**
4:5,15,15;5:1,8,14,
17,21;6:2,5,11,13,16;
9:4,14,17,19,24;10:2;
11:13;14:7,11,15,19,
21,24;15:3,23;17:20;
44:4;47:23;48:1,1,13,
15;50:7;51:13;52:15;
53:13
**Pioneer (4)**
24:1,5,20;48:24
**Pioneer's (1)**
24:22
**Pittman (3)**
4:16;10:6;44:7
**place (2)**
52:25;53:5
**plaintiff (1)**
32:2
**Planet (6)**
6:18;17:1;18:1;
40:14;41:15;50:10
**plant (1)**
25:21
**play (1)**
33:16
**played (1)**
36:12
**pleadings (1)**
45:14
**Please (1)**
4:3
**plus (3)**
13:16,17;20:11
**PM (1)**
53:19
**podium (1)**

22:20
**point (7)**
20:9;25:23;28:23;
47:14;49:1,18;52:19
**points (2)**
44:9;51:21
**pollute (1)**
48:5
**position (3)**
24:14;49:16,16
**positions (5)**
24:18;26:20,20;
38:3,11
**possible (3)**
17:15;34:4;43:13
**potential (2)**
7:6;9:10
**power (1)**
50:8
**practice (4)**
33:14;39:7;42:9;
50:16
**pragmatic (1)**
24:24
**pre-argue (1)**
21:14
**preclude (1)**
46:1
**precluded (4)**
31:14,16;45:15;
50:15
**preclusion (1)**
45:8
**preference (1)**
46:19
**prejudiced (1)**
49:6
**preoccupied (1)**
7:23
**preparation (1)**
8:21
**present (3)**
30:14;47:22;52:8
**presentation (1)**
40:13
**presented (2)**
29:7;30:2
**presenting (1)**
48:22
**presently (1)**
17:18
**presiding (1)**
7:18
**pressing (1)**
37:21
**presumption (1)**
9:1
**pretty (2)**
32:21;43:12
**prevailed (1)**
8:6
**prevailing (1)**
32:11

**principal (2)**
14:23;30:11
**prior (2)**
22:6;23:16
**privilege (4)**
20:17,24;34:4,24
**privileged (5)**
27:19;30:10,16,18;
46:4
**probably (6)**
4:21;25:20;31:9;
43:20;47:21;50:2
**problem (2)**
41:10;47:1
**problematic (1)**
13:18
**problems (2)**
27:1;50:3
**procedural (2)**
28:20;39:18;41:4;
42:20
**procedurally (2)**
33:8;52:13
**proceed (1)**
28:23
**proceeding (22)**
5:4,25;9:15;12:4;
15:12;17:3;22:17;
24:4,11,22;26:6;
27:21;28:4,4;35:11;
37:23;45:25;46:7;
48:22,24;49:10,12
**proceedings (15)**
17:12;18:4;24:12;
45:9,17,21;46:7;
48:23;49:3,9,20,21,
24,24;53:19
**process (6)**
21:13;28:21;33:16,
22;36:12,25
**processes (1)**
27:3
**processor (1)**
6:19
**produced (1)**
45:19
**product (6)**
20:17,25;30:10,15;
34:4;46:4
**production (1)**
42:5
**promptly (2)**
15:8,15
**proof (3)**
16:3;32:7;33:6
**proofs (5)**
8:16,19;15:22,24,
25
**propose (1)**
23:10
**prove (4)**
12:14;29:10;30:2;
48:20

**provide (1)**
5:17
**provided (2)**
7:8;47:24
**provider (1)**
6:22
**publicly (2)**
14:4,5
**punchy (1)**
51:18
**purported (1)**
8:5
**purpose (1)**
41:17
**purposes (2)**
16:6;32:24
**pursue (1)**
34:3
**pursued (1)**
28:22
**pursuing (2)**
34:15;47:4
**pursuits (1)**
51:5
**purview (1)**
51:7
**push (2)**
21:19;52:11
**put (3)**
9:6,7;21:9;24:12;
32:2,13;47:14

**Q**

**quashing (1)**
27:13
**quickly (3)**
39:10;43:13,18
**quite (3)**
8:18;10:13;24:11
**quote (1)**
50:24
**quotes (1)**
51:2

**R**

**raise (1)**
39:4
**raised (1)**
25:1
**raising (2)**
24:25;26:8
**rather (4)**
19:18;43:19,21;
48:12
**reach (1)**
36:17
**reached (1)**
4:21
**reaction (2)**
26:25;40:2
**read (4)**

10:19;20:18;25:24;
49:2
**reading (1)**
26:9
**ready (4)**
4:9;36:13;52:10,18
**real (2)**
12:15;34:4
**realized (2)**
5:6;25:18
**Really (25)**
5:3;12:17;15:20;
21:9;22:13;28:20;
31:5,11;32:21;33:12;
35:12;36:17;37:15,
23;38:3,22;40:2;
41:10;42:1;44:22;
47:11;48:9;50:16;
51:25;52:12
**reason (1)**
9:7
**reasonable (1)**
37:3
**reasons (1)**
11:21
**recap (1)**
9:21
**received (5)**
7:10,17;25:22;
40:15;42:15
**recently (2)**
8:12;9:5
**receptive (1)**
36:23
**recipient (2)**
41:2,9
**recognition (11)**
6:17;7:8;22:11,24;
23:1,7,9;24:4;26:18;
28:1;39:14
**recognize (1)**
48:21
**record (3)**
10:5;14:16;44:6
**records (3)**
17:15;46:15,18
**recover (1)**
16:7
**reduced (1)**
5:18
**referenced (1)**
42:24
**referred (3)**
6:7;14:11;31:12
**reformulation (1)**
35:13
**refused (2)**
41:21,21
**refusing (1)**
42:8
**regard (4)**
4:23;5:1;16:2;
22:21

**regarding (1)**
19:7
**regardless (2)**
49:7;50:24
**rejoinders (1)**
51:19
**relate (2)**
16:23;35:10
**related (5)**
5:19;21:22;22:10;
23:14;35:10
**relates (2)**
51:10,11
**relevant (1)**
30:1
**relied (2)**
17:18;18:3
**relief (1)**
23:24
**rely (1)**
30:4
**relying (8)**
17:25;20:10,19;
30:20,20;31:1,16,21
**remember (2)**
10:17;47:25
**remembers (1)**
27:25
**Remind (1)**
45:10
**repeated (1)**
48:8
**reply (4)**
23:11;25:1,16;27:4
**report (1)**
15:25
**represent (2)**
14:24;37:17
**representative (1)**
45:15
**representatives (5)**
4:17;10:7;23:11;
44:8;46:2
**representative's (1)**
51:4
**representing (2)**
37:12;38:2
**represents (3)**
23:22,22;24:16
**requested (1)**
4:20
**requests (7)**
6:18,21;7:1,10,10;
36:13,14
**required (1)**
14:1
**requirements (1)**
42:20
**requires (2)**
26:10;37:16
**reread (1)**
5:6
**reserve (3)**

23:17,19;52:4
**reserving (1)**
25:2
**resist (1)**
38:4
**resolve (1)**
27:3
**respect (9)**
9:2;14:20;15:19;
17:8;27:10,15,23;
45:7;48:16
**responding (1)**
17:22
**restraint (11)**
17:24;22:14,15;
28:1,2,5,9;29:9;32:11,
25;35:10
**restricted (1)**
12:11
**result (2)**
6:24;7:9
**resulted (1)**
7:14
**reviewing (2)**
7:13;17:21
**revised (1)**
5:17
**revolves (1)**
16:4
**right (70)**
6:10;9:3,13;13:1,2;
14:10,14,17;15:11,18;
17:4;19:4,5,10,18;
20:5,12,22;21:1,24;
22:5,9,12;23:17,19;
25:2,14;26:4;28:13,
18;30:18,18;31:6,7,
17,25;32:10,11,14,17,
18,23,25;33:4,8,13;
34:17;35:2,4;36:19,
21;37:6,25;39:23;
41:25;42:1;44:21;
45:10;46:2,5,6,8,25;
48:15;49:14;50:22;
51:12;53:6,9,10
**rights (2)**
43:1;52:4
**ripe (1)**
21:15
**rise (1)**
4:2
**road (1)**
27:2
**Robinson (8)**
8:20;17:9,13;18:2;
20:18;29:21,24;45:12
**Robinson's (1)**
18:12
**role (1)**
37:23
**room (1)**
10:12
**rooms (1)**

11:3
**rub (1)**
41:11
**ruin (1)**
43:23
**rule (3)**
22:5;39:24;41:23
**ruled (1)**
33:19
**rules (2)**
33:15;39:19
**ruling (6)**
4:9;21:8;29:8;
42:14;43:6;48:7
**rulings (4)**
13:17;27:11,13;
33:17
**runway (1)**
49:15

**S**

**same (8)**
8:17;18:21;24:8,13;
26:21;30:24;31:5;
46:14
**sanction (1)**
7:17
**sanctioned (1)**
17:6
**sandbagging (1)**
44:19
**Sanders (1)**
9:1
**saying (5)**
14:23;25:1;31:17;
41:6;49:12
**scale (1)**
43:4
**schedule (1)**
4:20
**scope (4)**
21:15;35:9;40:17;
51:10
**seated (1)**
4:4
**second (3)**
8:9;40:5;51:20
**secret (2)**
39:11,21
**seed (1)**
25:21
**seek (3)**
23:17;25:2;50:25
**seeking (4)**
19:7,9;23:25;29:19
**seem (1)**
23:6
**seems (4)**
11:7;13:22;21:12;
25:15
**segued (1)**
18:11

21-11854-dsj    Doc 86    Filed 03/08/24    Entered 03/08/24 13:21:13    Main Document
In the Matter of: ASCENTRA HOLDINGS, INC.    Pg 112 of 114

December 21, 2023

**send (1)**
14:25

**sense (3)**
20:21;24:24,24

**sentence (1)**
12:21

**sentences (1)**
5:7

**separate (1)**
34:19

**September (1)**
52:17

**sequence (1)**
5:23

**serious (1)**
47:1

**served (7)**
6:17,21;7:1,3,6;
40:14;44:10

**serving (3)**
29:22,23;42:10

**set (4)**
17:18;21:22;42:5;
44:2

**sets (1)**
19:7

**settled (1)**
37:19

**seven (1)**
10:23

**shaking (1)**
36:10

**sharpen (1)**
37:4

**sharpened (1)**
36:15

**Shaw (3)**
4:16;10:6;44:7

**shifting (2)**
22:23;23:7

**short (2)**
43:16,20

**show (1)**
46:23

**showing (1)**
12:13

**shuttled (1)**
11:4

**sick (1)**
11:3

**side (6)**
4:13;16:17,18;
30:23;36:11;37:3

**sides (1)**
37:2

**sideways (1)**
30:25

**simple (1)**
21:9

**simply (2)**
12:13;45:13

**sincerely (1)**
53:15

**sit (1)**
43:17

**sitting (1)**
28:3

**situation (4)**
38:12;46:19;47:12;
49:22

**six (2)**
6:20,25

**slight (1)**
43:4

**softly (1)**
15:15

**sole (1)**
49:6

**solicited (1)**
15:25

**solid (1)**
24:6

**solvency (3)**
13:24;14:2;16:4

**solvent (3)**
8:3;37:22;48:25

**somebody (2)**
31:25,25

**someone (1)**
49:1

**something's (1)**
52:13

**sometime (1)**
43:8

**sooner (1)**
27:4

**sorry (4)**
13:8;14:7;16:24;
24:15

**sort (4)**
12:1,25;38:14;45:4

**sought (1)**
41:22

**sound (1)**
34:22

**sounds (2)**
34:24;41:5

**sources (3)**
18:12;20:10,11

**speak (1)**
4:13

**speaking (1)**
8:20

**specific (1)**
21:22

**Specifically (2)**
11:18;13:4

**spelling (1)**
26:25

**spent (1)**
52:21

**SPGK (33)**
4:23;5:19;7:15,19;
8:5;14:9,25;15:4;
17:1;18:1,11;22:22;
23:22,24;24:8,12,16;

26:3;27:16;28:6;29:5;
32:12;41:5,5,8;42:11,
21;46:7;47:7;50:9,16;
51:8,11

**SPGK's (2)**
7:19;47:11

**spot (2)**
27:13;42:14

**sputtering (1)**
45:3

**staff's (1)**
36:3

**stand (4)**
16:2;36:13;51:18;
52:10

**standing (1)**
19:12

**Stang (1)**
29:4

**stapler (1)**
10:20

**started (1)**
10:11

**starting (2)**
5:4;21:14

**state (2)**
4:12;49:9

**stated (2)**
13:24;15:24

**statement (3)**
20:18;49:2,11

**statements (3)**
23:3;24:8;45:8

**States (3)**
21:3;39:22;46:12

**status (9)**
4:20;6:1;14:18;
15:24;16:2,10;18:12;
39:3;51:1

**stay (2)**
13:17;48:3

**step (2)**
12:22;27:2

**steps (1)**
5:10

**stick (1)**
26:24

**still (4)**
11:18;13:21,23;
42:8

**stop (1)**
50:2

**stuff (1)**
31:20

**subject (3)**
16:23;35:2;46:12

**submissions (2)**
35:3;42:16

**submit (5)**
23:12;24:20,21;
47:6;51:6

**submitted (7)**
18:3;23:23;24:3;

25:12;29:12;44:11,12

**subpoena (10)**
11:20;13:5;16:22;
29:23;40:16;41:3,9,
13;44:9;50:10

**subpoenas (14)**
7:6;39:15,18,24;
40:7,13,17;41:6,16,
18;42:10;50:7,8,14

**subsidiaries (1)**
7:24

**subsidiary (1)**
8:10

**succeed (4)**
29:11;32:4,11,12

**success (4)**
17:2;29:15;30:3;
32:7

**sue (1)**
42:11

**sues (1)**
31:25

**summons (2)**
7:14,20

**Sunday (2)**
32:13,17

**support (7)**
17:17;18:19,20;
23:24;24:4;41:18;
44:12

**supporting (1)**
19:8

**supposed (1)**
26:13

**Sure (9)**
6:2;11:10;19:6,15;
21:15;36:16;37:9;
39:5;50:5

**surprise (1)**
29:19

**surreply (3)**
23:12,16;25:2

**suspect (2)**
43:9;48:10

**sworn (1)**
10:12

**Systems (1)**
7:2

**T**

**table (1)**
45:4

**takeaway (1)**
13:1

**talk (5)**
11:20;13:3,21;16:9;
25:18

**talking (4)**
18:11;20:9;50:2;
51:23

**target (1)**
51:2

**tat (1)**
45:5

**tax (1)**
9:10

**team (1)**
50:9

**Ted (1)**
9:1

**teed (1)**
52:1

**telling (6)**
16:16;20:8;21:17;
39:20,23;51:22

**tells (3)**
12:21;26:8;33:16

**ten-page (1)**
43:11

**term (2)**
6:10;46:6

**terminate (3)**
22:24;23:9;26:18

**termination (1)**
22:14

**test (3)**
32:3,17;33:2

**testifying (1)**
21:4

**testimonial (1)**
30:6

**testimony (3)**
11:21;18:2;20:11

**Thanks (6)**
9:16;10:14;25:11;
40:11;53:11,17

**theoretical (1)**
50:25

**therefore (1)**
12:5

**third (1)**
46:13

**though (3)**
11:11;12:4;13:4

**thought (3)**
40:21,25;43:16

**thoughts (1)**
13:10

**three (4)**
11:19;41:14;43:10;
52:21

**thumb (1)**
43:4

**Thus (1)**
21:12

**tied (1)**
49:24

**tight (1)**
43:17

**timed (1)**
44:17

**tit (1)**
45:4

**today (15)**
8:19,21;27:13;

32:13,15,16;35:6;
36:5;38:23;40:16,18;
41:14;42:7;45:23;
52:3
**together (2)**
18:24;36:14
**told (4)**
18:7;29:17;40:18;
41:12
**tomorrow (2)**
7:20;17:21
**took (2)**
6:20,24
**topic (6)**
11:19;22:6,18;
29:20;42:17;47:3
**topics (34)**
5:18;9:22;11:14,18,
24;12:1;13:5,18,22;
15:19;16:11,19,21;
18:8,16,23;19:3,7,9,9;
21:22;22:1,2,3,6,14;
25:1;27:15;29:13;
34:18;35:9,19;44:14;
52:18
**totality (1)**
30:11
**touch (1)**
5:12
**transfer (2)**
9:8;46:19
**treated (2)**
24:9;49:7
**trial (10)**
30:19,21;31:11,20;
34:1;42:24,25;46:2,5;
52:19
**trimming (1)**
21:15
**troubling (4)**
24:13;37:11,12;
38:1
**true (2)**
32:24;33:1
**trustee (8)**
17:11,16;21:2,3,3;
46:12,13,20
**truth (1)**
7:2
**try (3)**
16:12;30:5;52:14
**trying (8)**
10:17;12:20;13:22,
23;15:20;21:18;
24:23;31:11
**tuned (1)**
13:17
**turn (5)**
5:22;9:18,24,25;
42:12
**turned (1)**
7:4
**turning (1)**

22:19
**tweaks (1)**
35:15
**twenty-five (1)**
44:13
**two (16)**
6:6;7:1,24;17:19;
18:23,24,25;19:1,1,7,
8,16;23:24;28:2;
31:13;43:10
**type (1)**
51:3
**typically (1)**
41:2

**U**

**ultimate (1)**
23:19
**ultimately (2)**
7:14;21:9
**Um-hum (3)**
5:16;13:6;18:18
**unable (1)**
43:10
**unanswered (1)**
37:10
**uncomfortable (1)**
34:1
**under (6)**
7:7;13:25;15:9;
20:16;39:22;50:7
**underlying (6)**
16:6;17:1;18:11;
21:5;27:15,23
**underpinnings (1)**
21:4
**Understood (1)**
48:13
**underway (1)**
28:22
**unethical (1)**
38:2
**unilaterally (1)**
45:5
**United (3)**
21:2;39:22;46:12
**unless (1)**
12:14
**unrelated (2)**
23:14;37:17
**unusual (2)**
38:1;49:22
**up (19)**
4:13;7:23;8:10,19;
10:20,23;12:13;
19:17,23;20:1;23:10;
30:25;38:18;40:18;
45:21;46:16;51:18,
20;52:2
**upcoming (1)**
33:25
**update (5)**

5:5,13;6:1;13:15;
39:2
**upon (11)**
6:18;17:18,25;18:3;
20:19;22:25;30:4,20,
21;31:21;43:10
**urging (2)**
21:19;26:20
**use (5)**
35:8;42:11;43:5;
48:8;51:14
**used (1)**
41:18

**V**

**valid (1)**
33:21
**venue (1)**
10:21
**Vermont (1)**
11:2
**Vermonter (1)**
11:7
**version (1)**
30:7
**versus (1)**
18:11
**Viacao (2)**
50:20,21
**view (1)**
39:6
**vigorously (1)**
37:20
**violates (1)**
41:23
**voluntarily (1)**
7:4

**W**

**wait (4)**
30:21;48:5,5,5
**waiver (1)**
47:20
**walk (1)**
9:10
**wants (1)**
4:12
**waste (2)**
20:20;27:19
**way (8)**
10:22;15:1;26:9,12;
33:15,22;34:3;52:8
**Wednesday (1)**
32:16
**week (1)**
43:9
**welcome (1)**
5:13
**weren't (4)**
4:22;10:23;22:8;
29:14

**what's (8)**
12:6;24:25;32:4,16;
37:16;45:19,21;51:10
**Whereupon (1)**
53:19
**whichever (1)**
5:23
**Whoa (1)**
40:2
**whose (1)**
37:13
**wide (1)**
21:11
**willing (1)**
13:21
**win (1)**
34:19
**winding (2)**
7:23;8:10
**Winthrop (3)**
4:16;10:6;44:7
**wishes (2)**
26:1,1
**within (1)**
51:7
**without (1)**
45:5
**witness (8)**
17:11,11;18:3;25:3;
29:24;31:4,6,7,8;
33:24;44:11
**witnesses (2)**
46:17,18
**word (3)**
15:15;35:9;48:8
**wording (2)**
33:24;34:12
**work (13)**
12:16;16:10,12,19;
20:17,24;21:8;30:10,
15;33:16;34:4;35:15;
46:4
**working (3)**
7:23;35:23;53:3
**works (1)**
46:16
**world (1)**
36:17
**worry (1)**
43:22
**worth (2)**
7:11;49:19
**writ (2)**
7:17,19
**writing (1)**
33:12
**writings (2)**
35:18;39:8
**written (4)**
35:3;36:13,13;
42:16

**X**

**Xsigo (3)**
7:2,3;40:15

**Y**

**year (3)**
35:17,20;53:8
**Yep (7)**
5:8;29:1;35:1;36:1,
4;38:13;42:6
**yesterday (3)**
5:15;12:23;33:9
**Yoshida (2)**
18:2;20:12

**Z**

**zealously (1)**
37:20
**Ziehl (1)**
29:4
**Zoom (1)**
10:10

**1**

**11 (1)**
39:22
**11th (1)**
7:15
**15 (8)**
6:8;8:1;9:15;15:9;
16:6;28:4;49:20,24
**1521 (1)**
42:20
**1521a4 (2)**
7:7;40:7
**17 (1)**
51:5

**2**

**2004 (1)**
39:24
**2020/'21 (1)**
6:17
**21 (1)**
10:12
**21st (1)**
36:8
**22 (1)**
39:14

**3**

**3 (2)**
36:5,11
**3:30 (1)**
53:19
**30b6 (12)**

December 21, 2023

13:5;16:22;21:23;
22:4,10;29:13;30:6;
31:6;33:24;35:19;
44:9,15

**30b6subpoena (1)**
  29:23

---

**6**

**6 (1)**
  39:14

---

**8**

**80 (1)**
  4:19