

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street | New York, NY 10019-6131 | tel 212.858.1000 | fax 212.858.1500

John A. Pintarelli
tel: +1.212.858.1213
john.pintarelli@pillsburylaw.com

March 13, 2024

<u>**Via ECF**</u>

Honorable David S. Jones
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Courtroom 701
New York, NY 10004-1408

> **Re:  In re Ascentra Holdings, Inc. (In Official Liquidation), Case No. 21-11854:**
> **Letter Brief Regarding SPGK Request for Discovery Conference**

To the Honorable David S. Jones:

    In accordance with the Court's *Memorandum Endorsed Order* [ECF No. 88], the JOLs[1] hereby submit this letter brief in response to SPGK's March 8 Letter requesting a discovery conference in connection with certain disputed deposition topics (the "**Disputed Deposition Topics**") listed in SPGK's Deposition Notice, and Mr. Robinson's justified and supported reasons for not being able to answer questions in relation thereto as a result of, among other things, sealing orders of the Grand Court in the Cayman Proceeding (the "**Sealing Orders**"),[2] privilege concerns, and Cayman law.

    For the reasons set forth herein, SPGK is not entitled to deposition testimony regarding topics six through nine of the Deposition Notice relating to the merits of the claims asserted in the Cayman Proceeding, nor is SPGK entitled to discovery into proofs of debt pending in the Cayman Proceeding. SPGK's request for a discovery conference and for leave to file a motion to compel should be denied, as well as SPGK's inappropriate request for an order precluding Ascentra from offering responsive evidence at the hearing on the Restraint Termination Motion.

---

[1]  Capitalized terms used but not defined herein have the meanings ascribed to them in the March 8, 2024 letter (the "**March 8 Letter**") filed by Shang Peng Gao Ke Inc. SEZC and SPGK Pte Ltd [ECF No. 86].

[2]  The Grand Court agreed to make the Sealing Orders at the request of the JOLs in order to keep the information contained in the reports confidential from litigation targets, including SPGK.

Hon. David S. Jones
March 13, 2024
Page 2

## Background

As previewed at the status conference before this Court held on December 21, 2023 (the "**Status Conference**"), the JOLs objected to the inclusion of topics relating to the merits of the claims asserted in the Cayman Proceeding on the basis of (1) the pending merits proceeding in the Cayman Islands, (2) SPGK already having access to the facts and documents it is seeking by virtue of the JOLs' objection to the Restraint Termination Motion in this proceeding and the Amended Statement of Claim in the Cayman Proceeding, (3) attorney-client privilege and the work product doctrine, and (4) the discovery SPGK seeks with respect to the underlying merits of the Cayman Proceeding being an issue for the Grand Court in the Cayman Islands (rather than this Court) to ultimately decide.

At the Status Conference, the Court expressed its own concerns:[3]

> I've ruled that there's not a categorical bar on a deposition here, and you're entitled to take one. ***But I've also noted that there's a number of, I think, valid and fair objections to at least the way you've gone about that.*** And that's the process you're going on and discussing.
>
> ***I will say wording questions to a 30(b)(6) witness about tell me all of your contentions in the upcoming case, trial, hearing, and the basis for that, is an uncomfortable formulation to me.***
>
> *. . . **I will say, if it's defined as tell me why you're going to win your separate lawsuit pending in the Cayman Islands – that doesn't sound too – that sounds privilege invasive to me***. . .

Dec. 21, 2023, Hr'g. Trans. at 33:19-34:2; 34:15-35:3 (emphasis added).

Following the Status Conference, on December 22, 2023, SPGK and the other defendants joined issue in the Cayman Proceeding and filed and served their Defence and Counterclaim. A copy of the Defence and Counterclaim is attached as **Exhibit B**.[4] As set forth therein, SPGK denies many material facts and, for the first time, is seeking in excess of $148 million as part of its counterclaim. SPGK also asserts for the first time that there was an unwritten "Understanding" over payments to be made for the sale of Ascentra's products and the payment of costs and expenses of the Ascentra group.

On February 2, 2024, Ascentra filed its Reply and Defence to Counterclaim (the "**Reply**"). A copy of the Reply is attached as **Exhibit C**. On March 8, 2024, the defendants filed their Reply

---

[3] After the Status Conference, although the parties met and conferred by email in good faith, a resolution was not reached regarding the Disputed Deposition Topics, with each party reserving their right to make their objections and preserve their rights on the record at the deposition.

[4] A copy of the Amended Writ of Summons and Amended Statement of Claim is also attached as **Exhibit A** for the Court's convenience.

Hon. David S. Jones
March 13, 2024
Page 3

to Defence to Counterclaim (the **"RDC"**). A copy of the RDC is attached as **Exhibit D**. Pleadings have now closed and the parties are seeking to agree a timetable to trial.

**The Deposition of Ascentra Holdings, Inc.**

1.  Proofs of Debt[5]

As the JOLs noted at the Status Conference and in many prior submissions to the Court, the existence or non-existence of creditors and proofs of debt is irrelevant to the legal question of whether the Court should recognize a Cayman solvent official liquidation as a foreign proceeding. Consistent with the status reports that have been filed with the Court, Mr. Robinson confirmed that proofs of debt have been solicited from certain creditors and received by the JOLs. However, Mr. Robinson was unable to discuss the details of such proofs of debt and the approaches being considered to address such claims.

Mr. Robinson made clear on multiple occasions that he was not refusing to answer a question, but that he could not as a result of the orders on the basis of which the JOLs' First Report and Second Report were sealed (*i.e.*, the Sealing Orders):

> Q. Okay. Has Ascentra Holdings, Inc. made any reserve on account of these claims?
>
> A. I'm uncertain if I can answer that because that refers to the ongoing incoming receipts and payments of the liquidation of the estate, and that's within the court reports, and that court report is sealed.
>
> ***
>
> Q. Are you going to refuse to answer that question?
>
> A. I can't answer that question because it's based in the reports and those reports are sealed.
>
> ***
>
> A. I wouldn't – I'm not refusing to answer your question. I can't answer your question. . . That's a big difference.

Robinson Dep. Trans. at 86:18-87:2, 87:14-18; 109:19-23.

Counsel to the JOLs also made clear that both the Sealing Orders and Cayman law prohibited responses to certain questions relating to the Disputed Deposition Topics:

---

[5]  In the March 5, 2024 email that SPGK's counsel references at the end of its March 8 Letter, SPGK asserts that Mr. Robinson refused to testify about information that is subject to sealing orders issued by the Grand Court.  As noted below, copies of such orders and the applicable provisions of Cayman law have been provided to SPGK.

Hon. David S. Jones
March 13, 2024
Page 4

>    Mr. McDonald: I'm going to object. Those proofs of debt are still
>    confidential and the nature of those claims and the nature of the
>    disagreement over those claims and the negotiation of those claims are
>    sealed [ ] as part of the report to the court.

<div align="center">***</div>

>    Mr. McDonald: . . . There is, within the Cayman Islands, the Companies
>    Act, as well as in the rules, a restriction on who can inspect proofs of debt,
>    and the discussion of those proofs of debt are contained in a report that are
>    subject to a court order sealing them.

*Id.*, 97:16-23; 101:13-19. Copies of the Sealing Orders have been provided to SPGK and are attached as **Exhibits E and F**, respectively.

As such, there was not a "blanket refusal" to provide deposition testimony relevant to the Restraint Termination Motion. Instead, answering questions in relation to proofs of debt submitted in the Cayman Proceeding, the aggregate value of claims asserted against the Ascentra estate, the sufficiency of assets of the estate to satisfy such claims and the like, would have been a violation of the Sealing Orders and, as an officer of the court, Mr. Robinson was and remains bound by orders of the Grand Court.

Moreover, under Cayman law, the testimony sought by SPGK is specifically precluded from disclosure. Order 16, r. 8 of the Companies Winding Up Rules, which deals with a party's entitlement to inspect proofs of debt, states:

> (1) Subject to sub-rule (2), any proof of debt (including the supporting
>     documentation, any further and better particulars and any correspondence
>     relating to its adjudication) may be inspected by or on behalf of –
>
>     (a) any creditor whose proof of debt has been admitted in whole or in part;
>         or
>     (b) any contributory of the company.
>
> (2) In the case of a creditor whom the company owes a duty of confidentiality, the
>     official liquidator shall not allow his proof of debt to be inspected by another
>     creditor or contributory without first –
>
>     (a) obtaining his written consent; or
>     (b) obtaining a direction of the Court pursuant to section 4 of the
>         Confidential Information Disclosure Law, 2016.

A copy of Order 16, r. 8 of the Companies Winding Up Rules is attached as **Exhibit G**.

Hon. David S. Jones
March 13, 2024
Page 5

The contents of proofs of debt and the JOLs' analysis are even more irrelevant than the existence of such documents. SPGK has not and cannot demonstrate any probative value to any testimony concerning such proofs of debt. Any attempt to compel this testimony is nothing short of harassment.

2. <u>The Merits of the Cayman Proceeding</u>

SPGK asserts it is entitled to testimony on the Disputed Deposition Topics so that it can litigate Ascentra's likelihood of success on the merits on the continuation of the permanent injunction imposed by this Court. As noted in Ascentra's pleadings filed with the Court since the outset of this Chapter 15 case, there is a dispute over the ownership of the Planet Payment Funds, which SPGK has repeatedly acknowledged. *See* ECF No. 60; ECF No. 71 at 2. SPGK reserved for itself the right to commence a proceeding anywhere outside the U.S. to challenge the JOLs' claim to the funds, but never exercised such right. SPGK further confirmed the irreparable harm that would result if the funds were moved from the U.S. -- a fact re-confirmed by Mr. Yoshida's testimony that he would move the funds out of the U.S. if the permanent injunction was lifted. *See* ECF No. 64 at 11. Indeed, the Court acknowledged that irreparable harm would result if the funds were removed from U.S. jurisdiction. *See* ECF No. 62, Exhibit 1, Nov. 1, 2021, Hr'g Trans. at 19:14-16 ("I do think that the potentially irretrievable transfer out of the U.S. of assets that you claim an entitlement to would satisfy the irreparable harm clause.").

Disregarding its own failure to commence a proceeding to determine ownership of the Planet Payment Funds, SPGK filed the Restraint Termination Motion complaining that the JOLs never brought an action to determine ownership of the funds and then complained when such an action was commenced. Not only has SPGK answered the claim filed in the Cayman Proceeding (denying many material facts), SPGK is asserting a counterclaim of over $148 million.[6] As pleadings in the Cayman Proceedings have now closed, the parties or (in the absence of their agreement) the Grand Court will establish a schedule for discovery and pre-trial matters. SPGK's desire to "test" the basis for the continuation of the permanent injunction is nothing more than an attempt to take discovery before a discovery schedule is set and discovery is able to proceed under the rules and procedures of the Cayman Islands.

The pendency of the Cayman Proceeding puts the proverbial exclamation point on the Court's initial basis for imposing the permanent injunction on the Planet Payment Funds:

> I wanted to make clear orally on the record, in a way that I think doesn't need to be reflected in the order, that in the alternative, I would consider this an appropriate order to enter based on the Court's inherent authority to preserve its jurisdiction and ensure efficient advocacy or adjudication of the Chapter 15 petition and the dispute before the Court. So to the extent

---

[6] Neither SPGK nor Mr. Yoshida have ever previously asserted (or even foreshadowed) a creditor claim against Ascentra. Nor did Mr. Yoshida include this amount as a debt, or otherwise, in his sworn statement of affairs that he delivered to the JOLs at the outset of the Ascentra liquidation.

Hon. David S. Jones
March 13, 2024
Page 6

> anyone ever questions whether the PI standard was adequately met to justify
> this order, that would be my alternative rationale.

Nov. 1, 2021, Hr'g Trans. at 20:12-20.

This Court has been and continues to be asked to aid the Grand Court by preserving assets that will be administered in the Cayman Islands. The continued preservation of the status quo in the U.S. pending a resolution of the litigation over the Planet Payment Funds in the Cayman Islands is necessary for this Court to fulfill its role as a court sitting in ancillary jurisdiction. The discovery and relief sought by SPGK would convert this Court into the plenary court, thereby supplanting the Grand Court's jurisdiction – which has been SPGK's goal all along. However, a court sitting in ancillary jurisdiction should not be deciding the merits of claims pending in a foreign jurisdiction. *See, e.g.*, *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005) (extending comity to the foreign bankruptcy proceeding and rejecting bank's attempt to collect disputed funds in which it was contractually obligated to use such funds to pay down the same debt that was the subject of the foreign bankruptcy proceeding); *In re National Bank of Anguilla (Private Banking Trust) Ltd.*, 580 B.R. 64, 92-103 (Bankr. S.D.N.Y. 2018) (comity warranted stay of adversary proceedings involving the same parties and issues as in the pending foreign litigation regarding, among other things, the litigants' proprietary interests to certain deposits); *In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 112, 115-16 (Bankr. S.D.N.Y. 2012) (extending comity to allow the foreign court to resolve property ownership disputes of certain funds in an account held by a respondent in the U.S.); *Ole Media Mgmt., L.P. v. EMI April Music, Inc.*, 2013 U.S. Dist. LEXIS 82073 at *6 (S.D.N.Y. June 11, 2013) ("A court has the inherent power to dismiss or stay an action based upon the pendency of a related proceeding in a foreign jurisdiction."); *Nat'l Union Fire Ins. Co. v. Kozeny*, 115 F. Supp. 2d 1243, 1248 (D. CO. 2000) ("It is desirable for discovery to take place in a single forum under the supervision of a single court. Otherwise, the parties may be forced to produce the same discovery in different jurisdictions and may be subject to contradictory discovery rulings.").

As Chief Judge Glenn noted in the *Cozumel Caribe* case, "The Second Circuit has frequently underscored the importance of judicial deference to foreign bankruptcy proceedings." 482 B.R. at 114 (*quoting In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 624 (Bankr. S.D.N.Y. 2010)).[7]

In addition, many of the "facts" and "documents" SPGK seeks are referenced in the JOLs' objection to the Restraint Termination Motion, which relies almost exclusively on Mr. Yoshida's testimony and his deposition exhibits. Additional facts and documents are set forth in the Amended Statement of Claim filed by Ascentra in the Cayman Proceeding, which claim SPGK has received and answered. Any additional facts, documents, and theories that will be used in connection with any motion practice and/or trial in the Cayman Proceeding are all clearly privileged. SPGK's preclusion request is thus baseless and unwarranted. The Second Circuit has held that harsh

---

[7]  SPGK, a Cayman company, has not asserted that there is any procedural unfairness in having to litigate the entitlement to the Planet Payment Funds in the Cayman Islands. To the contrary, as noted above, not only has SPGK answered the JOLs' claim, SPGK is seeking an affirmative recovery of over $148 million.

Hon. David S. Jones
March 13, 2024
Page 7

sanctions, such as preclusion orders, are to be imposed only in extreme situations. *See Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir.2009); *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir.1988) ("The harshest sanctions available are preclusion of evidence and dismissal of the action."). Moreover, this is not the type of circumstance under which evidence preclusion under FRCP 37(b)(2) is appropriate. *See e.g., Update Art*, 843 F.2d at 72-73 (preclusion order granted where a disobedient party unjustifiably failed to comply with an order compelling discovery); *Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc.*, 295 F.R.D. 1, 14 (E.D.N.Y. 2013) (preclusion of evidence warranted due to protracted history of discovery violations and evasions). Here, the JOLs have complied with the Court's Discovery Order, and regarding the Disputed Deposition Topics, the JOLs assert valid objections to the deposition testimony sought by SPGK on the grounds of the Sealing Orders, privilege concerns, and Cayman law.

Finally, SPGK argues that the action in the Cayman Proceeding was filed *after* the Restraint Termination Motion was filed to somehow justify its entitlement to testimony about the merits of the claims in the Cayman Proceeding. However, the timing of the commencement of the Cayman Proceeding is irrelevant and does not justify the discovery being sought. Moreover, SPGK has never commenced an action in this Court or any other court outside the U.S. to resolve its claim to the Planet Payment Funds. Finally, as has been made clear by SPGK's line of questioning, SPGK is improperly trying to litigate the merits of the Cayman Proceeding before this Court and invade the attorney/client privilege.

## Conclusion

For the reasons stated, the relief sought by SPGK in the March 8 Letter should be denied in its entirety.

Respectfully submitted,

*/s/ John A. Pintarelli*
John A. Pintarelli
Partner

# EXHIBIT A



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO.: FSD 300 of 2023 (RPJ)

IN THE MATTER OF THE COMPANIES ACT (2023 REVISION)

BETWEEN:

ASCENTRA HOLDINGS, INC. (IN OFFICIAL LIQUIDATION)

Plaintiff

-and-

(1)  RYUNOSUKE YOSHIDA

(2)  SHANG PENG GAO KE, INC. SEZC

(3)  SPGK PTE LTD

(4)  GROWTH TODAY INC.

(5)  SCUDERIA BIANCO PTE LTD

Defendants

---

**AMENDED WRIT OF SUMMONS**

---

TO:

1)  Ryunosuke Yoshida, of Room 1035, Unit 1001, 10/F, Mira Place Tower A, 132 Nathan Road, Tsim
Sha Tsui, Hong Kong;

This Writ was issued by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Campbells LLP,
Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

2)  Shang Peng Gao Ke, Inc. SEZC, of Harneys Fiduciary (Cayman) Limited, P.O. Box 10240, 4th Floor, Harbour Place, 103 South Church Street, George Town, KY1-1002, McGrath Tonner Corporate Services Limited, Genesis Building, 5th Floor, Genesis Close, George Town, PO Box 446, KY1-1106, Grand Cayman, Cayman Islands;

3)  SPGK Pte Ltd, of 600 North Bridge Road #05-01 Parkview Square Singapore (188778);

4)  Growth Today Inc., of Harneys Fiduciary (Cayman) Limited, P.O. Box 10240, 4th Floor, Harbour Place, 103 South Church Street, George Town, KY1-1002, Grand Cayman, McGrath Tonner Corporate Services Limited, Genesis Building, 5th Floor, Genesis Close, PO Box 446, Grand Cayman, KY1-1106, Cayman Islands; and

5)  Scuderia Bianco Pte Ltd, of 600 North Bridge Road #05-01 Parkview Square Singapore (188778).


**THIS WRIT OF SUMMONS** has been issued against you by the above-named Plaintiffs in respect of the claim set out on the next page.

Within 14 days after the service of this Writ on you, counting the day of service, you must either satisfy the claim or return to the Court Office, P.O. Box 495G, George Town, Grand Cayman, the accompanying Acknowledgment of Service stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgment within the time stated, or if you return the Acknowledgment without stating therein an intention to contest the proceedings, the Plaintiff may proceed with the action and judgment may be entered against you forthwith without further notice.


Issued this 4th day of October 2023.
Amended this 10th day of October 2023.


**NOTE** - This Writ may not be served later than 4 calendar months (or, if leave is required to effect service out of the jurisdiction, 6 months) beginning with the date of issue unless renewed by order of the Court.


**IMPORTANT**

Directions for Acknowledgment of Service are given with the accompanying form.


This Writ was amended this 10th day of October 2023, pursuant to O. 20 r. 1 of the Grand Court Rules (2023 Revision).


**This Writ** was issued by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Campbells LLP, Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

CAUSE NO.: ~~No.~~ FSD 300 of 2023 (RPJ)

**IN THE MATTER OF THE COMPANIES ACT (2023 REVISION)**

**BETWEEN:**

**ASCENTRA HOLDINGS, INC. (IN OFFICIAL LIQUIDATION)**

**Plaintiff**

**-and-**

**(1)  RYUNOSUKE YOSHIDA**

**(2)  SHANG PENG GAO KE, INC. SEZC**

**(3)  SPGK PTE LTD**

**(4)  GROWTH TODAY INC.**

**(5)  SCUDERIA BIANCO PTE LTD**

**Defendants**

------------------------------------------------

**AMENDED STATEMENT OF CLAIM**

------------------------------------------------

**A.    PARTIES**

1.    The Plaintiff, Ascentra Holdings, Inc. (in official liquidation) (the "**Company**"), is an exempted company incorporated under the laws of the Cayman Islands on 20 December 2013. It entered voluntary liquidation on 1 June 2021 and official liquidation on 17 September 2021.

Page 1 of 19

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

2.      Between 1 June and 17 September 2021, Graham Robinson ("**Mr Robinson**") was the Company's voluntary liquidator. Since 17 September 2017, he and Ivy Chua Suk Lin have acted and continue to act as the Company's joint official liquidators (the "**JOLs**").

3.      The Company holds 100% of the issued shares in HEC International, Ltd (in Official Liquidation) ("**HEC**"). HEC is an exempted company incorporated under the laws of the Cayman Islands on 5 December 2013. It entered voluntary liquidation on 29 September 2021 and official liquidation on 7 December 2021. Between 29 September 2021 and 7 December 2021, Mr Robinson was HEC's voluntary liquidator. Since 7 December 2021, he has been and continues to be HEC's official liquidator.

4.      Prior to its liquidation, the Company – through its subsidiaries, including HEC – operated a cross-border e-commerce business selling beauty and health products and computer software to the Asian market through multi-level marketing (the "**Business**"). In particular, products were sold through an online platform to individuals (the "**Affiliates**") who had signed up to on-sell them to customers based in Asia.

5.      The First Defendant, Ryunosuke Yoshida ("**Mr Yoshida**") was the Company's director from 31 December 2013 until 30 March 2018, and again from 18 December 2018 until 17 September 2021, alternatively, 1 June 2021. He was also HEC's sole director from 8 December 2017 until HEC was placed into official liquidation on 7 December 2021.

6.      The Second Defendant, Shang Peng Gao Ke, Inc. SEZC, ("**SPGK Cayman**") was incorporated on 14 June 2016 for the purpose of conducting the Company's Business in the People's Republic of China (the "**PRC Business**").

7.      The Third Defendant, SPGK Pte Ltd, ("**SPGK Singapore**") was incorporated on 2 May 2019 and is SPGK Cayman's wholly-owned subsidiary.

8.      The Fourth Defendant, Growth Today Inc. ("**Growth Today**") is the registered owner of SPGK Cayman's entire issued share capital.

9.      At the time of SPGK Cayman's incorporation in 2016, the entire issued share capital of Growth Today was held by Motohiko Homma ("**Mr Homma**"). At the time, he was one of the three major ultimate beneficial owners of the Company. The other two were Yoshio Matsuura ("**Mr Matsuura**") and Martin (Marty) Matthews ("**Mr Matthews**") (the three collectively referred to herein as the "**Major Shareholders**".)

Page 2 of 19

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

10.   On 15 December 2018, Mr Yoshida acquired Mr Homma's shareholding in Growth Today for the consideration of US$1.00, pursuant to a share and purchase agreement between him and Mr Homma.

11.   The Fifth Defendant, Scuderia Bianco Pte Ltd, ("**Scuderia Bianco**") was incorporated by Mr Yoshida on the same day as SPGK Singapore; 2 May 2019. Scuderia Bianco provided cash management services to the Company and HEC.

12.   Mr Yoshida is the sole shareholder and a director of Scuderia Bianco.

**B.       BACKGROUND**

**B.1.     Start of the Business, Plan to IPO and Reorganisation**

13.   Mr Matsuura and Mr Homma entered into business in about 2004, after which Interush Limited, a Hong Kong corporation, was incorporated in 2006, although no business was conducted from Interush Limited until 2010.

14.   In 2007, Interush Holdings, Ltd. ("**Interush**"), a Bermuda company, was incorporated, and functioned as the holding company of the business until 2013. Between 2004 and 2013, Interush's ultimate beneficial owners were Mr Matsuura and Mr Homma in equal shares.

15.   In about January 2010, Mr Matthews became a full-time employee of Interush. He was initially a marketing consultant, but was appointed as the Company's Chief Executive Officer ("**CEO**") and President from approximately July 2014.

16.   From around 2011, Mr Matthews, Mr Matsuura and Mr Homma started to plan an initial public offering of Interush's shares on the Hong Kong Stock Exchange. In accordance with that plan:

16.1   on 20 December 2013, the Company was incorporated[1] with the intention that its shares (as opposed to Interush's shares) would be offered on the Hong Kong Stock Exchange, and Mr Matthews became its initial director;

16.2   on 20 December 2013, IR-P Holdings ("**IR-P**") (a Cayman Islands exempted company) was incorporated to be an intermediary holding company between the Company and the Major Shareholders;

---

[1] The Company was incorporated under its former name, Interush Holdings, Inc. The Company changed its name to Ascentra Holdings, Inc. on 1 June 2016.

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

16.3    on 31 December 2013, four additional directors were appointed: Mr Yoshida, Ryosuke (Ryan) Kojima, Chris Miner and Akinori Hori. A copy of the Company's Register of Directors and Officers, from 2013 to date, is appended to this Statement of Claim at **Appendix 1**; and

16.4    on 31 December 2013, Mr Matsuura and Mr Homma transferred their entire share capital in Interush to the Company.

(collectively, the "**Reorganisation**").

17.    On 20 May 2013, Mr Matthews acquired ordinary shares in IR-P. Mr Matsuura and Mr Homma became indirect holders of preferred shares in IR-P through their companies, South Asia Ventures, Ltd ("**SAV**") and New South East Traders, Ltd ("**NSET**"), respectively. Both SAV and NSET are British Virgin Islands companies. On 23 July 2014, Mr Matthews transferred his shares in IR-P to INTL Media Holdings, LLC ("**INTL**"), a Delaware company of which Mr Matthews was the sole shareholder at the time.

18.    On 24 December 2013, Mr Matthews acquired ordinary shares in the Company directly, which ordinary shares were subsequently transferred to INTL on 24 July 2014.

19.    On 31 December 2013, IR-P acquired preferred shares in the Company.

20.    Since 2021 the shares in INTL have been indirectly held by Marty Matthews and Mari Matthews (Mr Matthews' former spouse) in equal parts.

21.    Following the Reorganisation, the Company operated the Business with the assistance of its subsidiaries, including HEC. A structure chart is appended to this Statement of Claim as **Appendix 2**.

22.    The main operating subsidiaries at that time, and their respective roles within the Group were as follows:

22.1    HEC: the entity through which most of the Company's Business was being conducted, together with its branch office, HEC International Ltd, Singapore Branch ("**HEC Singapore**");

22.2    HEC International Co Ltd (a Taiwanese entity); and

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

22.3   iHealthScience LLC, Hong Kong Branch ("**iHealthScience**"): the entity supplying the physical products for the Business. iHealthScience is a branch office of iHealthScience LLC, a Delaware company which is in turn a subsidiary of HEC.

**B.2.   Hong Kong Proceedings and Plan to Carve-Out PRC Business**

23.   On 6 November 2013 Hong Kong's Commercial Crimes Bureau ("**CCB**") raided Interush's office in Hong Kong pursuant to a warrant which alleged a violation of the Pyramid Schemes Prohibition Ordinance. Thereafter:

23.1   In 2014, the Hong Kong authorities alleged that the Company's intended IPO was unlawful. These allegations resulted in negative publicity about the Company, Mr Matthews and Mr Matsuura;

23.2   on 31 March 2015, the Hong Kong authorities charged Mr Matthews with offences contrary to the Organised and Serious Crime Ordinance, essentially relating to money laundering (the "**Hong Kong Proceedings**"). Mr Matsuura was not charged with any offence; and

23.3   in June 2015, Mr Matthews resigned as CEO and President of the Company. However, Mr Matthews remained a (non-voting) director of the Company, and continued to be involved in its management.

24.   At the time of the CCB's raid, the Company (through its subsidiaries) earnt about 80% of its revenues through Affiliates resident in the PRC.

25.   In about August 2015, the Company's directors were advised that the Business's multi-level marketing method of operating in the PRC contravened PRC law.

26.   On 21 August 2015, the Company's board resolved that it would no longer accept new business or new applications to become an Affiliate in the PRC until such time as a legally compliant business model could be implemented. The board further resolved to restructure the Company and rebrand it to preserve its business and to insulate it from the adverse effects of the Hong Kong Proceedings.

27.   On 30 May 2016, in an attempt to rid itself of the negative publicity received, the Company's board resolved to rebrand the Company's non-PRC business under the new name, Ascentra,

Page 5 of 19

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

and to incorporate a new company to conduct the Company's PRC Business. The proposed new company was referred to internally as "*Shang Peng*".

**B.3.   SPGK Cayman's Incorporation and Subsequent Negotiations**

28.   In accordance with the board's resolution on 30 May 2016:

    28.1   the Company's name was changed from Interush Holdings, Inc to Ascentra Holdings, Inc on 1 June 2016; and

    28.2   on 14 June 2016, SPGK Cayman was incorporated, and Mr Homma became its sole director.

29.   In June 2016, Mr Homma indirectly held about 23% of the Company's issued share capital.

30.   At the time of SPGK Cayman's incorporation, the Major Shareholders' intention was that, in exchange for conducting the PRC Business, SPGK Cayman (which was indirectly wholly owned by Mr Homma) would (i) account for 77% of the income it generated to the Company; and (ii) Mr Homma would relinquish his (indirect) ownership stake in the Company (the "**Arrangement**").

31.   The Arrangement's purpose was to maintain the economic benefit to all three Major Shareholders of the Company continuing to operate its PRC Business, and the existing management structure and control, but to do so under separate legal ownership.

32.   Some of the key terms of the Arrangement were memorialized in a memorandum of understanding dated 15 November 2016 (the "**MOU**"). In particular, clause 3 recorded the Major Shareholders' intention that SPGK Cayman and Ascentra would enter into an Exclusive Distribution Agreement which would confer rights on SPGK Cayman to use the Company's PRC Affiliates list (the "**PRC Affiliates List**"), to sell its products and software, and receive support from the Company and its subsidiaries. At the same time, the Company would retain all of its liabilities.

33.   By an Exclusive International Distributor Agreement dated 1 October 2016, Ascentra and SPGK Cayman agreed that SPGK Cayman would become the exclusive distributor of certain of Ascentra's products in the PRC. The agreement was stated to be "*in exchange for the Shares*", which referred to Mr Homma's proposed transfer of his shares in IR-P to the Company (for cancellation), as well as SPGK Cayman's compliance with the (other) conditions set out in the

Page 6 of 19

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

agreement. The agreement provided for a monthly "*True-Up*" on the basis of SPGK Cayman's and the Company's respective Operating Income Before Taxes, with 77% of the income to be distributed to Ascentra. This agreement was signed by on behalf of SPGK Cayman, but was not signed by Ascentra.

34.    During a period of negotiations between the Major Shareholders from 2016 until about March 2018, a number of documents were drawn up to give effect to the Arrangement: a holders' agreement in respect of SPGK Cayman's shareholding, a holder's agreement in respect of the Company's and IR-P's shareholdings, a share transfer agreement in respect of Mr Homma's shareholding in IR-P, an exclusive distribution agreement and a share cancellation agreement (collectively, the "**Draft Agreements**").

35.    The overriding purpose of the Draft Agreements was to ensure that the management control of the Company and the economic interests of the Majority Shareholders that existed prior to the incorporation of SPGK Cayman would be maintained in the day-to-day control of the Company, SPGK Cayman and SPGK Cayman's affiliates (the "**SPGK Group**"), and for Mr Homma's indirect shareholding in IR-P to be transferred to the Company for cancellation.

36.    The Draft Agreements were never executed.

37.    However, the following agreements were executed:

37.1    a Professional Service Agreement dated 1 October 2016 and signed by SPGK Cayman and HEC[2] on 17 February 2017, by which SPGK Cayman and HEC agreed that HEC would provide SPGK Cayman with corporate management services (including: overseeing operations, management, executive, human resources, legal, compliance, contract management functions, product development, manufacturing, delivery and fulfilment support services, administrative services and management of the accounting department), bookkeeping, accounting, tax and finance support services, promotional and product marketing services, IT Business System support services (i.e. all back-office IT systems) and technical support services in relation to e-commerce, web hosting and websites. The services were to be billed by HEC on a monthly basis at cost, without markup;

---

[2] The Customer Services Support Agreement was in HEC's previous name: Radial IT Systems, Ltd.

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

37.2 a Product Supply Agreement dated 1 October 2016 and signed by iHealthScience and SPGK Cayman on 17 and 28 February 2017 respectively, by which SPGK Cayman and iHealthScience agreed that iHealthScience would sell and SPGK Cayman would buy products at market price (to be determined by iHealthScience in good faith); and

37.3 a Customer Services Support Agreement dated 1 October 2016 and signed by SPGK Cayman and HEC[3] on 24 February 2017, by which SPGK Cayman and HEC agreed that HEC would provide SPGK Cayman with customer support services and promotional and product marketing services in support of the PRC Business and the Affiliates. The services were to be billed on a monthly basis at cost, without markup.

38. Thereafter, SPGK Cayman formally operated the Business in the PRC on the Company's behalf. SPGK Cayman did not employ its own staff and neither received revenue nor paid expenses. Instead, the Company's PRC Business continued to be conducted by the same employees and services companies as previously. The PRC Business also continued to be operated by the same management team as it had been previously. As to this, Mr Matsuura continued to participate in the day-to-day management of the PRC Business, and the Company's Chief Financial Officer ("**CFO**"), Mr Theodore Sanders ("**Mr Sanders**"), was appointed a director of SPGK Cayman on 1 February 2017.

39. In May 2017, Mr Matthews was acquitted of all charges in the Hong Kong Proceedings, and the prosecuting authorities were ordered to pay his costs of the proceedings.

40. On 3 April 2018, SPGK Cayman, Mr Homma and the Company executed a Cancellation Agreement and Acknowledgement (the "**Cancellation Agreement**"). The Cancellation Agreement included provisions that:

40.1 confirmed that the MOU was never legally effected, was not legally binding and that no action was taken to effect any of the required actions described therein;

40.2 confirmed that each and every oral and written agreement related to the matters in the MOU were and are without force and effect; and

40.3 required Mr Homma and SPGK Cayman to irrevocably cancel, sell, convey, assign, transfer and deliver all assets and monies of SPGK Cayman to the Company, including but not

---

[3] In its former name of Radial IT Systems, Ltd.

Page 8 of 19

Filed by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

**FSD2023-0300**                    **Page 10 of 33**                    **2023-10-11**

limited to all intellectual property (including the SPGK Cayman proprietary brand names), inventory, customer lists, monies, and accounts receivable, free and clear of all charges, claims, interests, conditions, equitable interests, liens, options, pledges, security interests, rights of first refusal, encumbrances or restrictions of any kind.

41.   No steps were taken to give effect to the Cancellation Agreement.

**B.4.   Fall-Out between the Major Shareholders**

42.   Following the commencement of the Hong Kong Proceedings and Mr Matthews' subsequent acquittal, the relationship between the Major Shareholders deteriorated. The disputes were mostly concerned with the management of the Company and Mr Matthews' role in it.

43.   The dispute continued after Mr Matthews was acquitted of any wrongdoing in the Hong Kong Proceedings. In 2018, Mr Matthews briefly sought to (and did) gain control of the Company by removing Messrs. Homma and Matsuura as directors of IR-P between 23 Feburary 2018 and 15 May 2018, and using his control of IR-P to remove Messrs. Homma, Matsuura and Yoshida as directors of the Company on 30 March 2018.

44.   Shortly thereafter, by a share and purchase agreement dated 15 December 2018, Mr Homma agreed to transfer all of the issued shares in Growth Today to Mr Yoshida in exchange for US$1.

45.   On 18 December 2018, Mr Homma resigned as a director of the Company and of IR-P, and Mr Yoshida was reappointed as a director of the Company, and appointed as a director of IR-P.

46.    On 15 May 2019, Mr Yoshida became a director of SPGK Cayman.

47.   On 13 August 2019, IR-P entered voluntary liquidation and David Lloyd ("**Mr Lloyd**") was appointed as its voluntary liquidator. Mr Lloyd remained IR-P's voluntary liquidator until 28 May 2021, when he was replaced by Mr Robinson pursuant to a resolution of IR-P's shareholders. Mr Robinson was IR-P's voluntary liquidator from 28 May 2021 until 29 March 2022, at which point he was appointed as IR-P's official liquidator pursuant to a supervision order.

48.   In August 2020, NSET (a company legally owned by Mr Homma) transferred its shares in IR-P to Lequios Holdings Ltd ("**Lequios**") (a British Virgin Islands company legally owned by Mr Yoshida).

Filed by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

49. The Company's share capital remains directly owned by IR-P, INTL and a group of individuals: Ryosuke (Ryan) Kojima, Jeffrey Boshears and Alex Oliva. The Register of Members of IR-P and the Company are appended as **Appendix 3**.

50. On 1 June 2021, the Company entered voluntary liquidation and Mr Robinson was appointed as its voluntary liquidator.

51. Pursuant to a supervision order dated 17 September 2021 (the "**Supervision Order**"), the Company entered official liquidation and the JOLs were appointed as its joint official liquidators.

52. On 29 September 2021, HEC entered voluntary liquidation and Mr Robinson was appointed as its voluntary liquidator.

53. Pursuant to a supervision order dated 7 December 2021, HEC entered official liquidation and Mr Robinson was appointed as its official liquidator.

54. On 9 January 2023 Mr Yoshida wrote to the registered office of HEC and purported to resign as a director of HEC and as director of HEC Singapore.

**C.   CASH MANAGEMENT**

55. From late 2016, or alternatively from early 2017, Mr Sanders acted as CFO of the Company.

56. Two companies wholly owned by Mr Sanders, Asian Offshore Services ("**AOS**") and SPGK International Ltd ("**SPGK International**") (together referred to as the "**Sanders Companies**"), were used as pass-through vehicles for receipts and payments for the Business.

57. SPGK International and AOS provided cash management services to the Company and HEC. In particular, SPGK International and AOS received revenues and paid liabilities on the Company's behalf, and remitted revenue to HEC Singapore's bank accounts with United Overseas Bank ("**UOB**") to enable HEC to discharge the liabilities of the Ascentra group of companies.

58. As regards revenue received by SPGK International, the Company's Affiliates used credit cards to make payments for the Company's products. Those payments were processed by Planet Payment Solutions LLC ("**Planet Payment**") pursuant to terms of a contract between Planet Payment and SPGK International dated 12 October 2018, and remitted to SPGK International.

59. In early 2019, Mr Yoshida and Mr Matsuura decided to remove the Sanders Companies from their involvement in the Business, at least insofar as it related to Affiliates resident in the PRC.

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

60.    As a result of that decision, both SPGK Singapore and Scuderia Bianco were incorporated on 2 May 2019. The purpose of both companies was to provide cash management services in relation to the PRC Business in place of SPGK International. As to that:

60.1    in September 2019, Scuderia Bianco opened a bank account with Shanghai Commercial and Savings Bank in Taiwan ("**SCSB**"), and SPGK Singapore opened a bank account with DBS Bank in Singapore;

60.2    by a Business Services Agreement dated 1 June 2019, the Company and Scuderia Bianco agreed that Scuderia Bianco would provide marketing, business-consulting and cash management services to the Company and its subsidiaries, including HEC;

60.3    by a Business Services Agreement dated 1 December 2019, SPGK Singapore and Scuderia Bianco agreed that Scuderia Bianco would provide marketing, business-consulting and cash management services to SPGK Singapore; and

60.4    SPGK Singapore entered into a credit card processing contract (referred to as a Merchant Services Agreement) with Planet Payment in place of SPGK International on 29 September 2019 (the "**PP Contract**").

61.    As at the date on which the Company's liquidation commenced:

61.1    funds totalling approximately US$163 million were held by SCSB in account no 27108000458517 in the name of SPGK Singapore (the "**SCSB Funds**");

61.2    funds totalling approximately US$15 million were held by SCSB in account no 27108000459953 in the name of Scuderia Bianco (the "**SB Funds**");

61.3    funds totalling approximately US$24 million (the "**UOB Funds**") were held in HEC's US$ account numbered 4519037313 with UOB (the "**UOB Account**"); and

61.4    funds totalling approximately US$71 million were held in an account with BMO Harris Bank (account number 374-533-8) in the name of Planet Payment (the "**PP Funds**") pursuant to the terms of the PP Contract.

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

**D.    TRUST CLAIMS**

62.    Any interest held by SPGK Cayman, SPGK Singapore and Scuderia Bianco in the PP Funds, the SCSB Funds and the SB Funds (together, the "**Funds**") is held by said entities on trust for the Company:

62.1    In conducting the PRC Business and the cash management on its behalf, SPGK Cayman, SPGK Singapore and Scuderia Bianco have been acting as the Company's agent.

62.2    Further or alternatively, in their relationships with external parties, the Company was the undisclosed principal of SPGK Cayman, SPGK Singapore and Scuderia Bianco.

62.3    Further, in conducting the PRC Business and cash management services on its behalf, SPGK Cayman, SPGK Singapore and Scuderia Bianco have been acting as the Company's fiduciary.

62.4    Further or alternatively, SPGK Cayman held the various assets, including the PRC Affiliates List, that enabled it to conduct the PRC Business on trust for the Company.

63.    These relationships can be inferred from the following:

63.1    The assets enabling the conduct of the PRC Business were transferred at a time when the Major Shareholders were still negotiating the scope, terms and nature of the future relationship between the Company and SPGK Cayman, as well as between themselves.

63.2    At the time of the transfers, the Major Shareholders intended the PRC Business to continue to be conducted for the benefit of the Company. This can be inferred from the following facts and matters:

63.2.1    the fact that it would be commercially absurd for Messrs Matsuura and Matthews to transfer by far the most valuable portion of the Business for no or minimal consideration to SPGK Cayman;

63.2.2    the fact that SPGK Cayman continued to benefit for the various services arrangements and employee support and that the Company continued to incur and discharge all liabilities;

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

63.2.3   the fact that Mr Yoshida had no interest (legal or otherwise) in SPGK Cayman between 2016 and 2018 and from the fact that Mr Homma sold the shares in Growth Today to Mr Yoshida for the nominal sum of US$1;

63.2.4   Mr Matsuura's agreement that the shares in Growth Today be transferred by Mr Homma to Mr Yoshida, in circumstances where the PRC Business constituted the most valuable part of the group's Business; and

63.2.5   the common management structure between SPGK Cayman and Ascentra. Without prejudice to the generality of the foregoing, Mr Matsuura was involved in the management of SPGK Cayman's business, SPGK Singapore's business and the Companys' business, and Mr Yoshida, SPGK Cayman, SPGK Singapore and Scuderia Bianco acted on Mr Matsuura's instructions.

64.   Furthermore, a resulting trust is presumed in favour of the Company from the lack of consideration.

65.   In particular, the introduction of SPGK Singapore and Scuderia Bianco to facilitate cash management in 2019 did not change the essential relationship between the Company on the one hand and SPGK Cayman on the other:

65.1   If SPGK Cayman was the Company's agent, fiduciary and trustee, then SPGK Singapore and Scuderia Bianco either acted as agent and fiduciary on SPGK Cayman's behalf or on the Company's behalf.

65.2   If SPGK Singapore and Scuderia Bianco did not act as agent or fiduciary, then they are nevertheless liable as if they were a trustee on the basis that they received the Company's assets on notice and without providing good consideration and not in good faith.

66.   Further, SPGK Singapore and Scuderia Bianco were aware of the circumstances when SPGK Singapore entered into the PP Contract, and when they received monies from Plant Payment (which monies make up the SCSB Funds and SB Funds), because Mr Yoshida's state of mind is to be attributed to them and he knew that SPGK Cayman was operating the PRC Business for and on behalf of the Company.

67.   Further:

Filed by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

67.1  Growth Today holds its shareholding in SPGK Cayman on trust for the Company, alternatively Mr Yoshida holds his shareholding in Growth Today on trust for the Company. This can be inferred from:

67.1.1  the facts and matters set out in paragraph 63 above;

67.1.2  the circumstances surrounding the incorporation of SPGK Cayman, in particular the Major Shareholders' shared intention to continue to conduct the PRC Business for the benefit of the Company;

67.1.3  the purported transfer of the shares in Growth Today to Mr Yoshida for US$1;

67.1.4  Mr Homma's email dated 5 February 2019 to Mr Matsuura, Mr Matthews and Masaki Nakano, in which he stated that the sales proceeds from the sale of his shares in Growth Today "*will be provided to Ascentra*";

67.1.5  Mr Yoshida's request to Mr Matsuura in early 2020 that he be permitted to "*step down as leader of SPGK*" as recorded in his his email to Mr Matsuura dated 31 December 2020;

67.1.6  a draft written resolution of the directors of SPGK Cayman providing for the transfer of one share in the capital of SPGK Cayman, being the total issued share capital of that company, from Growth Today to Mr Matsuura for the consideration of US$1; and

67.1.7  Mr Yoshida's statement in his email to Mr Matsuura dated 31 December 2020 that his "*appointment as President of HEC and SPGK was triggered by Mr Matsuura's request to me*" and his request in the same email to Mr Matsuura that he receive a "*severance pay*" equivalent to 20% of "*SPGK's after-tax profit for FY2020*".

67.2  SPGK Singapore and Scuderia Bianco are SPGK Cayman's agents, fiduciaries and trustees. The relationship of agent, fiduciary or trustee between SPGK Singapore and Scuderia Bianco and SPGK Cayman arises from the arrangements entered into between them, and can be inferred from the surrounding circumstances, in particular their conduct of cash management in relation to the PRC Business.

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

**E.    UNJUST ENRICHMENT**

68.    In the alternative, SPGK Cayman, SPGK Singapore and Scuderia Bianco have been unjustly enriched by the assets that enabled the operation of the PRC Business which they received in anticipation of the Draft Agreements that, in the event, were not entered into.

69.    The Company has a proprietary entitlement to the sums that SPGK Cayman and SPGK Singapore and Scuderia Bianco have generated.

70.    In the alternative, SPGK Cayman, SPGK Singapore and Scuderia Bianco are liable to account for the profits they made or, in the further alternative, liable to pay to the Company the value of the benefit they received, i.e. US$273 million.

71.    In the further alternative, SPGK Cayman is liable to account for 77% of its income to the Company i.e. US$210,210,000, on the basis that it was  the Majority Shareholders' intention that 77% of SPGK Cayman's operating income would be reimbursed to Ascentra and Mr Homma's (now Mr Yoshida's) indirect shareholding in the Company would be forfeited.

**F.    BREACH OF DUTY AND KNOWING RECEIPT**

72.    Further or alternatively to the relief claimed above, the Company seeks personal relief against Mr Yosida for breach of duty and proprietary and personal relief against SPGK Cayman, Scuderia Bianco and SPGK Singapore for knowing receipt of trust property.

73.    Mr Yoshida was a director of the Company from 31 December 2013 until 30 March 2018 and again from 18 December 2018 until 17 September 2021, alternatively, 1 June 2021.

74.    At all material times prior to 1 June 2021 when the Company entered voluntary liquidation, Mr Yoshida owed the Company fiduciary duties at common law and/or in equity, including duties (the "**General Duties**"):

74.1   to act in good faith and in the best interests of the Company;

74.2   to exercise his powers only for proper purposes and not for any collateral purpose;

Page 15 of 19

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

74.3    not to misappropriate, misapply, divert or misuse the Company's funds, assets or opportunities;

74.4    to exercise independent judgment; and

74.5    to avoid situations in which he had, or could have, a direct or indirect interest that conflicted, or might conflict, with the interests of the company.

75.    Mr Yoshida continued to owe the Company the General Duties (i) after the Company entered voluntary liquidation and (ii) after the Supervision Order was made.

76.    Further or alternatively, Mr Yoshida owed a fiduciary duty to the Company, alternatively he was a constructive trustee liable to account to the Company as if he owed such a fiduciary duty, after the commencement of the voluntary liquidation and/or after the Supervision Order was made in respect of:

76.1    any property of the Company that remained in his possession or under his control;

76.2    any property of the Company that was in the possession of or under the control of a corporate entity over which he was able to exercise control, including SPGK Cayman, SPGK Singapore and Scuderia Bianco;

76.3    any property of the Company in respect of which he had otherwise taken stewardship either directly or indirectly; and/or

76.4    any property of the Company in respect of which he had asserted a beneficial interest adverse to the rights of the Company.

77.    Further or alternatively, at all times following the voluntary liquidation of the Company, Mr Yoshida owed fiduciary duties or a duty under common law to the Company to account to the Company for (i) his stewardship of the Company and its assets prior to the commencement of the voluntary liquidation; and (ii) his stewardship of any assets that remained, directly or indirectly, in his possession, custody or control and duty to deliver up and/or cause to be delivered up such assets to the Company.

78.    In breach of the General Duties and/or in breach of the duties pleaded in paragraphs 74, 75 and/or 75 above, Mr Yoshida:

Page 16 of 19

Filed by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

78.1   preferred his interests and/or the interests of SPGK Cayman, SPGK Singapore and Scuderia Bianco over the interests of the Company;

78.2   asserted that the Funds were beneficially owned by SPGK Cayman and/or SPGK Singapore;

78.3   failed and/or refused to deliver up and/or procure the delivery up of the SCSB Funds to the Company or the JOLs;

78.4   failed and/or refused to deliver up and/or procure the delivery up of the SB Funds to the Company or the JOLs; and/or

78.5   failed and/or refused to direct or cause SPGK Cayman and/or SPGK Singapore to direct Plant Payment to release the PP Funds to the Company and the JOLs.

79.   As a consequence of Mr Yoshida's breaches of duty as aforesaid, the Company has suffered loss in the total amount of the SB Funds, the SCSB Funds and the PP Funds. Mr Yoshida is accordingly liable to pay the Company equitable compensation in the amount of US$273 million.

80.   Further or alternatively, Mr Yosida is liable to account to the Company as a fiduciary and/or as constructive trustee for the SB Funds, the SCSB Funds and the PP Funds.

81.   Further or alternatively, SPGK Cayman and/or Scuderia Bianco and/or SPGK Singapore have received trust property which belongs to the Company namely, the SB Funds and the SCSB Funds. None of these entities were bona fide purchasers for value. Further or alternatively, it would be unconscionable for these entities to retain a beneficial interest in the Funds. They were aware of the circumstances when they received the SCSB Funds and the SB Funds, and when SPGK Singapore replaced SPGK International as the contracting party with Planet Payment, because Mr Yoshida's state of mind is to be attributed to them and he knew that SPGK Cayman was operating the PRC Business for and on behalf of the Company.

82.   Accordingly, the Company seeks and is entitled to the following relief:

82.1   An order that SPGK Singapore deliver up the SCSB Funds to the Company.

82.2   An order that Scuderia Bianco deliver up the SB Funds to the Company.

Filed by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

82.3   An order that Mr Yoshida and SPGK Cayman direct SPGK Singapore to deliver up the SCSB Funds to the Company and direct Scuderia Bianco to deliver up the SB Funds to the Company.

82.4   An order that Mr Yoshida, SPGK Cayman and SPGK Singapore direct Plant Payment to pay the PP Funds to the Company.

82.5   In the alternative to the restoration of the Funds, an order that (i) Mr Yoshida pay, or (ii) Mr Yoshida, Scuderia Bianco, SPGK Cayman and SPGK International pay, the Company an amount equivalent to the Funds, together with interest on said amount at such rate and in such amounts as the Court thinks fit.

82.6   An order that Mr Yoshida, SPGK Cayman, SPGK Singapore and Scuderia Bianco account to the Company for all monies received by each of them from SPGK International and Plant Payment.

82.7   An order that (i) Mr Yoshida, or (ii) Mr Yoshida, SPGK Cayman, SPGK Singapore and Scuderia Bianco pay all monies held to have been received by them and all profits held to have been made by them on the taking of that account, together with interest on said amount at such rate and in such amounts as the Court thinks fit.

82.8   Such further or other relief as the Court thinks fit.


**AND THE PLAINTIFF CLAIMS:**

1.   A declaration that SPGK Singapore and Scuderia Bianco hold the SCSB Funds and the SB Funds (respectively) on trust for the Company.

2.   A declaration that SPGK Singapore's interest in and rights in respect of the PP Funds are held on trust for the Company.

3.   An order that Mr Yoshida, SPGK Singapore, and SPGK Cayman direct Planet Payment to transfer the PP Funds, alternatively 77% of the PP Funds, to the Company.

4.   An order that SPGK Singapore deliver up the SCSB Funds, alternatively 77% of the SCSB Funds, to the Company.

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

5.    An order that Scuderia Bianco deliver up the SB Funds, alternatively 77% of the SB Funds, to the Company.

6.    An order that Mr Yoshida and SPGK Cayman direct SPGK Singapore to deliver up the SCSB Funds, alternatively 77% of the SCSB Funds, to the Company.

7.    An order that Mr Yoshida directs Scuderia Bianco to deliver up the SB Funds, alternatively 77% of the SB Funds, to the Company

8.    An order that Mr Yoshida effects the transfers of the PP Funds, the SCSB Funds and the SB Funds, alternatively 77% of said Funds, to the Company by SPGK Cayman, SPGK Singapore and Scuderia Bianco (respectively).

9.    In the alternative to the restoration of the Funds, an order that (i) Mr Yoshida pay, or (ii) Mr Yoshida, Scuderia Bianco, SPGK Cayman, and SPGK International, do pay the Company an amount equivalent to the Funds or such other amount as the Court thinks fit, together with interest on said amount at such rate and in such amounts as the Court thinks fit.

10.    An order that SPGK Cayman, SPGK Singapore and Scuderia Bianco account for their profits to the Company.

11.    An order that Mr Yoshida, SPGK Cayman, SPGK Singapore and Scuderia Bianco account to the Company for all monies received by each of them from SPGK International and Planet Payment.

12.    An order that (i) Mr Yoshida, or (ii) Mr Yoshida, SPGK Cayman, SPGK Singapore and Scuderia Bianco pay to the Company all monies held to have been received by them and all profits held to have been made by them on the taking of such accounts, together with interest on said amount at such rate and in such amounts as the Court thinks fit.

13.    Further or alternatively:

    a.    A declaration that Growth Today holds its shareholding in SPGK Cayman on trust for the Company, and that SPGK Singapore and Scuderia Bianco are SPGK Cayman's agents, fiduciaries and trustees.

    b.    An order that Growth Today transfers its shareholding in SPGK Cayman to the Company.

    c.    An order that Mr Yoshida effects the transfer of Growth Today's shareholding to the Company.

14.    In the alternative to the relief claimed above, US$273 million in restitution.

Page 19 of 19

Filed by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

15.    Interest whether or not compounded, on all sums found to be due to the Company at such rates as the Court thinks fit pursuant to the Court's equitable jurisdiction and/or section 34 of the Judicature Act (2021 Revision).

16.    Such further or other relief as may be just.

17.    Costs.

*Campbells LLP*

**CAMPBELLS LLP**

**4 October 2023**

**Amended 10 October 2023**

Amended this 10th day of October 2023, pursuant to O. 20 r. 3 of the Grand Court Rules (2023 Revision).

~~This Writ~~ was issued by Ascentra Holdings, Inc. (in Official Liquidation) whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GXC/NLI/KXL).

Page 20 of 19

Filed by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

**APPENDIX 1 – COMPANY'S REGISTER OF DIRECTORS AND OFFICERS**

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

REGISTER OF DIRECTORS AND OFFICERS FOR:

**Ascentra Holdings, Inc.**                                                                    CR 283719

| Name | Address | Office Held | Appointment Effective Date | Resignation Effective Date | Notification of Appointment | Notification of Resignation |
|------|---------|-------------|----------------------------|----------------------------|-----------------------------|------------------------------|
| Chris Miner | 3008 Rivoli, Newport Beach, California, United States 92660 | DIRECTOR | 31-Dec-13 | 06-Mar-17 | 29-Jan-14 | 16-Mar-17 |
| Akinori Hori | Flat B, 1/F, No. 44 Coastline, Discovery Bay, N.T., Hong Kong | DIRECTOR | 31-Dec-13 | 16-Aug-15 | 29-Jan-14 | 14-Oct-16 |
| Ryunosuke Hori | 7 Fl, Flat F, Maple Mansion, Taikoo Shing, Hong Kong | DIRECTOR | 31-Dec-13 | 07-Feb-14 | 29-Jan-14 | 07-Feb-14 |
| Ryosuke Kojima | 313 St Vincent, Irvine, California, United States 92618 | DIRECTOR | 31-Dec-13 | 12-Jan-17 | 29-Jan-14 | 13-Feb-17 |
| Martin Matthews | 479 Morning Canyon Rd, Corona DL Mar California United States 92625 | DIRECTOR | 24-Dec-13 | 10-Nov-18 | 27-Dec-13 | 19-Nov-18 |
| Mourant Ozannes Cayman Secretaries Limited | P.O. Box 1348 94 Solaris Avenue, Camana Bay, Grand Cayman Cayman Islands KY1-1108 | SECRETARY | 24-Dec-13 | 29-Dec-15 | 27-Dec-13 | 17-Feb-16 |
| Ryunosuke Yoshida | 7 Fl, Flat F, Maple Mansion, Taikoo Shing, Hong Kong - | DIRECTOR | 07-Feb-14 | 30-Mar-18 | 07-Feb-14 | 03-Apr-18 |
| Martin Matthews | 479 Morning Canyon Rd, Corona DL Mar, California, United States 92625 | PRESIDENT | 25-Jul-14 | 14-May-15 | 25-Aug-14 | 14-Oct-16 |
| Martin Matthews | 479 Morning Canyon Rd, Corona DL Mar, California, United States 92625 | CHIEF EXECUTIVE OFFICER | 25-Jul-14 | 14-May-15 | 25-Aug-14 | 14-Oct-16 |
| Jeffrey Boshears | 2332 Baypointe Dr, Newport Beach, California, United States 92660 | CHIEF FINANCIAL OFFICER | 25-Jul-14 | 15-May-15 | 25-Aug-14 | 14-Oct-16 |
| Jeffrey Boshears | 2332 Baypointe Dr, Newport Beach, California, United States 92660 | ASSISTANT SECRETARY | 25-Jul-14 | 15-May-15 | 25-Aug-14 | 14-Oct-16 |
| Ryosuke Kojima | 313 St Vincent, Irvine, California, United States 92618 | CHIEF TECHNOLOGY OFFICER | 25-Jul-14 | 12-Jan-17 | 25-Aug-14 | 13-Feb-17 |
| Alex Oliva | 3741 Brilliant Place, Los Angeles, California, United States 90065 | CHIEF INFORMATION OFFICER | 25-Jul-14 | 05-Oct-16 | 25-Aug-14 | 14-Oct-16 |
| Takanori Meguro | 4 Chome-1-1, 16F, Taishido Setagaya Tokyo Japan 154-0004 | DIRECTOR | 14-Sep-17 | 08-Dec-17 | 02-Oct-17 | 10-Jan-18 |
| Christopher M Miner | PO Box 2026 Newport Beach, California USA 92659 | DIRECTOR | 07-Mar-18 | 17-Apr-18 | 08-Mar-18 | 25-Apr-18 |
| Motohiko Homma | Room 4529, Four Seasons Place 8 Finance Street Hong Kong | DIRECTOR | 11-Apr-18 | 18-Dec-18 | 16-Apr-18 | 27-Dec-18 |
| Yoshida Matsuura | The Harbour View Place Suite 5705 1 Austin Road West Hong Kong | DIRECTOR | 11-Apr-18 | | 16-Apr-18 | |
| Timothy Ashcroft | 1 Park Plaza Suite 800 Irvine CA 92614 U.S.A. | PRESIDENT | 12-Jan-17 | 07-Aug-17 | 13-Feb-17 | 02-Oct-17 |
| Yoshio Matsuura | The Harbour View Place, Suite 5705 1 Austin Road West, Kowloon Hong Kong | DIRECTOR | 28-Mar-18 | 30-Mar-18 | 29-Mar-18 | 03-Apr-18 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Motohiko Homma | Room 4529, Four Seasons Place, 8 Finance Street Hong Kong | DIRECTOR | 28-Mar-18 | 30-Mar-18 | 29-Mar-18 | 03-Apr-18 |
| Yoshida Matsuura | The Harbour View Place Suite 5705 1 Austin Road West Hong Kong | CHAIRMAN | 01-Jun-18 | | 14-Jun-18 | |
| Ryunosuke Yoshida | 1212, 12th Floor China Resources Building 16 Harbour Road Wanchai Hong Kong | DIRECTOR | 18-Dec-18 | 01-Jun-21 | 27-Dec-18 | 02-Jun-21 |

CERTIFIED TO BE A TRUE COPY OF THE ORIGINAL

Name: Yun Sheng

For and on behalf of
Hermes Corporate Services Ltd.
P.O. Box 31493, George Town
Grand Cayman KY1-1206
Cayman Islands

Date: 10 Jun 2021





## APPENDIX 2 – STRUCTURE CHART

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).



Notes:

*1. IR-P Holdings Inc.

– in Voluntary Liquidation as of 28 May 2021
– in Official Liquidation as of 29 March 2022

*2. Ascentra Holdings Inc.

– in Voluntary Liquidation as of 1 June 2021
– in Official Liquidation as of 17 September 2021

*3. HEC International Ltd.

– in Voluntary Liquidation as of 27 September 2021
– in Official Liquidation as of 7 December 2021

*4. Interush Singapore

– dissolved as of 3 January 2023

*5. HEC International Co., Ltd.(Taiwan)

– in Liquidation as of 31 March 2023

*6. HEC International, Ltd. Singapore Branch – ceased to carry on business as of 7 December 2021

**APPENDIX 3 - REGISTER OF MEMBERS OF IR-P AND THE COMPANY**

**Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

<div style="border:1px solid black">

## REGISTER OF MEMBERS OF
## IR-P HOLDINGS, INC. (IN VOLUNTARY LIQUIDATION)

</div>

**Company Information**

| Co. Registration No: 283718 |
| --- |
| **Registered Office:** c/o Bell Rock Corporate Services Limited, 2454 Centennial Towers, West Bay Road, West Bay, Grand Cayman KY1-1303, Cayman Islands |

**Share Capital**

| Class | Currency | Capital | Number of Shares Authorized | Nominal Value per Share | Number of Shares Issued |
| --- | --- | --- | --- | --- | --- |
| Ordinary | USD | 46,400.00 | 46,400,000 | 0.001 | 982,000 |
| Preferred | USD | 3,600.00 | 3,600,000 | 0.001 | 3,600,000 |

**Register of Members**

| Certificate Number | Name and Address | Date Entered as Member | Date Ceased to be a Member | Notes | Amount Paid | Balance held |
| --- | --- | --- | --- | --- | --- | --- |
| 0 | **Mourant Ozannes Cayman Nominees Limited**<br><br>c/o Mourant Ozannes Corporate Services (Cayman) Limited, 94 Solaris Avenue, Camana Bay, PO Box 1348, Grand Cayman KY1-1108, Cayman Islands | 20 Dec 2013 | 24 Dec 2013 | **20 Dec 2013:** Allotment of 1.0 Ordinary Share(s) for USD0.001 / share to Mourant Ozannes Cayman Nominees Limited<br><br>**24 Dec 2013**: Transfer of 1.0 Ordinary share(s) from Mourant Ozannes Cayman Nominees Limited to Mr Martin J Matthews for the total consideration of USD0.001 | Fully Paid | 0.00 |
| 0 | **Martin J Matthews**<br><br>479 Morning Canyon Rd, Corona DL Mar, California 92625, United States | 24 Dec 2013 | 23 Jul 2014 | **24 Dec 2013**: Transfer of 1.0 Ordinary share(s) from Mourant Ozannes Cayman Nominees Limited to Mr Martin J Matthews for the total consideration of USD0.001<br><br>24 Dec 2013: Allotment of 981999.0 Ordinary share(s) for USD0.001 / share to Mr Martin J Matthews<br><br>**23 Jul 2014**: transfer of 982000.0 Ordinary share(s) from Mr Martin J Matthews to INTL Media Holdings, LLC for the total consideration of USD0.001 | Fully Paid | 0.00 |

CONFIDENTIAL

Updated: 07 December 2020

| Certificate Number | Name and Address | Date Entered as Member | Date Ceased to be a Member | Notes | Amount Paid | Balance held |
|---|---|---|---|---|---|---|
| 1 | **INTL Media Holdings, LLC** 2711 Centerville Road, Suite 400, Wilmington DE 19808, United States | 23 Jul 2014 | | **23 Jul 2014**: Transfer of 98200.00 Ordinary share(s) from Mr Martin J Matthews to INTL Media Holdings, LLC for the total consideration of USD0.001 | Fully Paid | 982,000.00 |
| 0 | **New South East Traders, Ltd.** Pease Estate, Road Town Tortola, Virgin Islands, British | 30 Dec 2013 | 03 Nov 2020 | **30 Dec 2013**: Allotment of 1,800,000.0 Preferred shares for USD0.001 / share to New South East Traders, Ltd. 03 Nov 2020: transfer of 1,800,000 Preferred shares from New South East Traders, Ltd. to Lequios Holdings Limited for valuable consideration. | Fully Paid | 0.00 |
| 0 | **South Asia Ventures Ltd.** Pease Estate, Road Town, Tortola, Virgin Islands, British | 30 Dec 2013 | | **30 Dec 2013**: Allotment of 1,800,000.0 Preferred shares for valuable to South Asia Ventures Ltd. | Fully Paid | 1,800,000.00 |
| 0 | **Lequios Holdings Limited** c/o Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands | 03 Nov 2020 | | **03 Nov 2020**: Transfer of 1,800,000 Preferred shares from New South East Traders, Ltd. to Lequios Holdings Limited for valuable consideration. | Fully Paid | 1,800,000.00 |

| Name | Number and Class of Shares Held | |
|---|---|---|
| INTL Media Holdings, LLC | 982,000.00 | Ordinary |
| South Asia Ventures, Ltd. | 1,800,000.00 | Preferred |
| Lequios Holdings Limited | 1,800,000.00 | Preferred |

**CONFIDENTIAL**

Updated: 07 December 2020

2023-10-11

2023-10-11

Page 31 of 33

Page 31 of 33

FSD2023-0300

FSD2023-0300

**BELL ROCK GROUP**

2023-10-11

## Register of Members: **Ascentra Holdings, Inc.**

Company Number: **283719**

| MEMBER NAME & ADDRESS | DATE BECAME A MEMBER | RESOLUTION (ISSUE/ TRANSFER OF SHARES) | SOURCE OF SHARES | # OF SHARES ACQUIRED | CLASS OF SHARES | AMOUNT PAID | CERT # | # OF SHARES DISPOSSESSED | DISPOSSESSION METHOD | DATE OF DISPOSSESSION | TOTAL SHARE-HOLDING |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Jeffrey Lee Boshears** <br><br> 17 Del Carlo, Irvine CA 92606, USA | 12 Feb 2014 | | Subscription | 200,000 | Ordinary | Full | 002 | | Subscription | | 200,000 |
| | 15 Aug 2015 | | Subscription | 150,000 | Ordinary | Full | 013 | | Subscription | | 150,000 |
| **BALANCE OF SHARES** | | | | | | | | | | | **350,000** |
| **INTL Media Holding, LLC** <br><br> 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, USA | 24 July 2014 | | Subscription | 2,400,000 | Ordinary | Full | None | | Subscription | | 2,400,000 |
| **BALANCE OF SHARES** | | | | | | | | | | | **2,400,000** |
| **Ryosuke Kojima** <br><br> 31 Secret Garden, Irvine CA 92620, USA | 12 Feb 2014 | | Subscription | 400,000 | Ordinary | Full | 005 | | Subscription | | 400,000 |
| **BALANCE OF SHARES** | | | | | | | | | | | **400,000** |
| **Alex Oliva** <br><br> 3741 Brilliant Place, Los Angeles CA 90065, USA | 12 Feb 2014 | | Subscription | 50,000 | Ordinary | Full | 006 | | Subscription | | |
| | 24 July 2014 | | Subscription | 50,000 | Ordinary | | 014 | | Subscription | | |

Bell Rock Group Financial Services Limited
Centennial Towers, Suite 205C
2454 West Bay Road
Grand Cayman KY1-1303
CAYMAN ISLAND

CONFIDENTIAL
Printed on 14 July 2020

**BELL ROCK GROUP**

| BALANCE OF SHARES | | | | | | | | | | 100,000 |
|---|---|---|---|---|---|---|---|---|---|---|
| **IR-P Holdings, Inc.** <br><br> c/o Bell Rock Group Financial Services Limited, Centennial Place, 205c, 2454 West Bay Road, Grand Cayman, KY1-1303, Cayman Islands | 12 Feb 2014 | | Subscription | 4,582,000 | Preferred | | P-001 | | Subscription | 4,582,000 |
| BALANCE OF SHARES | | | | | | | | | | 4,582,000 |

## Share Capital

| CLASS | CURRENCY | AUTHORISED CAPITAL | NUMBER OF SHARES AUTHORISED | PAR VALUE | NUMBER OF SHARES ISSUED | VOTING RIGHTS – CONDITIONAL OR UNCONDITIONAL |
|---|---|---|---|---|---|---|
| Ordinary | USD | $50,000 | 45,418,000 | 0.001 | 3,250,000 | Unconditional |
| Preferred | USD | As above | 4,582,000 | 0.001 | 4,582,000 | Conditional |

| Registered Office: | Bell Rock Group Financial Services Limited, Centennial Towers, 205c, 2454 West Bay Road, Grand Cayman, KY1-1303, Cayman Islands | |
|---|---|---|
| Incorporation Date: | 20 December 2013 | |
| Company Registration Number: | 283719 | |
| Date of Execution of Memorandum of Association | 20 December 2013 | A&R 12 June 2018 |
| Date of Filing of Memorandum of Association | 20 December 2013 | A&R 12 June 2018 |
| Nature of Business | Headquarters Business | |
| Financial Year End | 31 December | |

CONFIDENTIAL
Printed on 14 July 2020

Bell Rock Group Financial Services Limited
Centennial Towers, Suite 205C
2454 West Bay Road
Grand Cayman KY1-1303
CAYMAN ISLAND

FSD2023-0300

2023-10-11

Page 33 of 33

# EXHIBIT B



**D COURT OF THE CAYMAN ISLANDS**

**RVICES DIVISION**

                                              **CAUSE NO.: FSD 300 of 2023 (RPJ)**

**R OF THE COMPANIES ACT (2023 REVISION)**

BETWEEN:

                    ASCENTRA HOLDINGS, INC. (IN OFFICIAL LIQUIDATION)

                                                                    <u>**Plaintiff**</u>

                                            -and-

                              **(1) RYUNOSUKE YOSHIDA**

                          **(2) SHANG PENG GAO KE, INC. SEZC**

                                   **(3) SPGK PTE LTD**

                                **(4) GROWTH TODAY INC.**

                             **(5) SCUDERIA BIANCO PTE LTD**

                                                                <u>**Defendants**</u>

───────────────────────────────────────────

**DEFENCE AND COUNTERCLAIM OF THE 1ST TO 5TH DEFENDANTS**

───────────────────────────────────────────

**<u>DEFENCE</u>**

1.      In this Defence and Counterclaim, unless otherwise stated:

(a)     References to numbered paragraphs are to the corresponding paragraphs in
        the Amended Statement of Claim dated 10 October 2023 (**"ASOC"**).

(b)     The Defendants adopt, without any admission whatsoever, the abbreviations,
        heading (and sub-headings) and nomenclature used in the ASOC.

2.      This Defence and Counterclaim is filed and served without prejudice to the Defendants'
        right to seek further and better particulars of the ASOC and/or to apply for striking out
        the ASOC for (*inter alia*) want of essential particulars, and pending the Plaintiff's
        provision of such particulars, discovery and/or interrogatories.

A.    **PARTIES**

3.    Paragraphs 1 to 3 are admitted, save that "2017" in the second sentence of paragraph 2 should read "2021" instead.

4.    Paragraph 4 is not admitted and the definition of "Business" is expressly denied.  The Defendants aver that:

(a)    The business known as "Interush" was founded by Mr Matsuura and Mr Homma in about 2003.  Interush was a multi-level marketing (**"MLM"**) business and was originally run from the US (but aimed at the Japanese market).

(b)    The Interush business (through Interush Inc, which was later renamed as HEC Global Inc) launched its first cloud-based Internet productivity and communication application (in Japan) in 2004.  Interush's Hong Kong operation – Interush Limited (now inactive) – commenced business in Hong Kong in mid-2010.

(c)    In 2013, the offices of Interush Limited were raided by CCB based on a warrant which alleged violation of the Pyramid Schemes Prohibition Ordinance (Cap 617) (**"Ordinance"**).  In about March 2015 Mr Matthews (President and CEO of Interush Holdings Ltd) was charged in Hong Kong with money laundering.

(d)    PRC legislation on anti-pyramid selling including Article 224 of the *Criminal Law* (currently Article 222 of the *Criminal Law*) and the *Prohibition of Pyramid Selling* outlawed structures which had more than two levels of commission. Interush's MLM business including its business conducted through Hong Kong with PRC customers had more than two levels of commission.  Further, sales by Interush of intangible assets did not qualify for a direct selling licence in the PRC. From at least around April 2014 onwards, the Company obtained PRC legal advice confirming that the Interush business would be unable to operate compliantly under its existing model in the PRC.

(e)    Due to at least the matters set out in (c) and (d) above and associated negative publicity Interush:

2

(i)     rebranded its business and changed the name "Interush" to "Ascentra". The businesses in Taiwan and Japan were renamed as "HEC" and various other entities were renamed in a similar fashion;

(ii)    suspended the operation of its business in Hong Kong; and

(iii)   commenced the supply of products to a new separate entity – SPGK Cayman – which was established as a separate e-commerce marketing business that was focused on the PRC market.

(f)  SPGK Cayman was an entirely new, separate and independent business. In particular it was:

(i)     Owned and managed independently of the Company (and hence not part of the Ascentra group);

(ii)    A wholesale purchaser of the Company's products (which were resold by SPGK Cayman, in the PRC);

(iii)   Principal (and not an agent) in its dealings both with the Company and with purchasers of its products;

(iv)    Entitled to receive for its own account all revenues (and hence profits) from its own sales;

(v)     Under no obligation to segregate or otherwise account for any revenues from its own sales; and

(vi)    Liable to pay the Company or its subsidiaries under the terms (and only under the terms) of the arms' length commercial agreements entered into between them.

(g)  SPGK Cayman's business in the PRC was established to be a cross-border e-commerce sales business that engaged local third-party service providers, providing after sales support.  These were paid based on their experience and

capabilities in providing after sales and support to other customers, rather than engaging in MLM or any multiple levels of commission.

(h)   The purpose and effect of these arrangements was to avoid the Company falling foul of the MLM laws in the PRC and to de-risk the Company, its subsidiaries and the individuals involved in them from falling foul of Hong Kong or PRC laws or regulation. Neither the Company, HEC nor Interush Limited (the former operational entity of the Hong Kong business) carried on any business in PRC thereafter whether through SPGK Cayman or otherwise.

5.   Paragraph 5 is admitted save that (a) no admission is made as to "17 September 2021, alternatively, 1 June 2021" (due to a dispute regarding the validity of, and the circumstances giving rise to, Mr Yoshida's removal as director of the Company), and (b) Mr Yoshida's directorship of HEC was from around 2017 to 27 September 2021.

6.   The date of incorporation of SPGK Cayman is admitted. Save as aforesaid, paragraph 4 above is repeated and paragraph 6 is denied.

7.   Paragraphs 7 to 10 are admitted, save that, in paragraph 10, it should have been "Share Purchase Agreement" rather than "share and purchase agreement".

8.   Paragraph 11 is admitted save that the Defendants aver that Scuderia Bianco was setup to replace AOS's functions, and provided cash management services to the Company and SPGK Cayman. The Defendants further refer to paragraph 41 below.

9.   Paragraph 12 is admitted save that Scuderia Bianco has a director additional to Mr Yoshida.

B.   **BACKGROUND**

**B.1.   Start of the Business, Plan to IPO and Reorganisation**

10.   Paragraph 13 is admitted. The Defendants repeat and rely on paragraphs 4(a) and 4(b) above.

11.    Paragraph 14 is admitted save that it is not admitted that Mr Matsuura's and Mr Homma's respective ultimate shareholdings in Interush between 2004 and 2013 were equal, as the same is beyond the Defendants' knowledge.

12.    Paragraph 15 is not admitted as the terms of Mr Matthews' employment is beyond the Defendants' knowledge.

13.    As to paragraph 16:

    (a)    It is admitted that there was a plan for an initial public offering of Interush's shares on the Hong Kong Stock Exchange, however it is not admitted that Mr Matthews, Mr Matsuura and Mr Homma started the plan from around 2011 (this being outside of the Defendants' knowledge).

    (b)    As to paragraph 16.1:

        (i)    It is admitted that the Company was incorporated on 20 December 2013.

        (ii)   It is averred that Mr Matthews became a director of the Company on 24 December 2013.

    (c)    Sub-paragraph 16.2 is admitted.

    (d)    As to sub-paragraph 16.3, it is admitted that Ryosuke (Ryan) Kojima, Chris Miner and Akinori Hori were appointed as directors of the Company on 31 December 2013.  In relation to Mr Yoshida, it is admitted that Mr Yoshida was appointed as a director on 31 December 2013, although initially his name was incorrectly stated as "Ryunosuke Hori".  This mistake was subsequently rectified on 7 February 2014.

    (e)    Sub-paragraph 16.4 is admitted.  On or around 30 December 2013, Interush and its subsidiaries completed a recapitalization programme, which involved (among other things):

        (i)    The formation of the Company, which became Interush's sole shareholder.

(ii)    The formation of IR-P with Mr Matthews being allotted 982,000 ordinary shares in IR-P, which were subsequently transferred to his nominee company INTL on 23 July 2014.

(iii)   IR-P acquiring NSET's and SAV's shares in Interush in return for the issue of 1,800,000 Preferred Shares in IR-P (each) to NSET and SAV.

(iv)    IR-P swapping its shares in Interush for shares in the Company.

(v)     The issuance of further shares by the Company to INTL and three members of management / related parties (Ryosuke Kojima, Jeffrey Boshears and Alex Oliva).

(vi)    The contribution of intellectual property / intangible assets used in the Interush group business by Mr Matsuura and Mr Homma.

(vii)   Mr Matsuura and Mr Homma each receiving approximately US$30 million in cash and approximately US$18 million worth of Preferred Shares in IR-P through their respective ownership of NSET and SAV.

(f)     The definition of "Reorganisation" is specifically not admitted, and is in any event, inapt given the preceding sub-paragraph.

(g)     Save as aforesaid, paragraph 16 is not admitted.

14.     Paragraphs 17 and 18 are not admitted pending discovery and the disclosure of records evidencing the shareholdings of each entity referred to.  It is averred that Mr Matthews only became a member of IR-P on 24 December 2013.

15.     Paragraph 19 is not admitted.  The Defendants aver that IR-P acquired shares in the Company on 12 February 2014.

16.     Paragraph 20 is not admitted as the shareholding of INTL is outside of the Defendants' knowledge.

17.    Paragraph 21 is not admitted as the definition of "Reorganisation" is not admitted, and the definition of "Business" is denied, as aforesaid. The Defendants repeat paragraph 4 above and paragraph 18 below.

18.    As to paragraph 22:

(a)    The term "Group" is not defined and the following is pleaded on the assumption that it refers to the Company and its subsidiaries collectively.

(b)    As to paragraph 22.1, it is denied that HEC was at that time the entity through which most of the Company's Business was being conducted.  The Defendants aver that:

(i)    Interush Inc (subsequently renamed as HEC Global Inc) and Interush International Co., Ltd (subsequently renamed as HEC International Co., Ltd) were the operational entities for the Interush business in Japan and Taiwan respectively.

(ii)   However, since the markets in Japan and Taiwan were saturated and very competitive, and in view of the drop in revenue, a decision was made by the Company to close down the Interush business in Japan and Taiwan in around April / May 2020.

(iii)  Moreover, HEC Singapore was not the entity that conducted the Interush business at that time; it was only after HEC Global Inc had been sold to AOS in or about 2017 that the Company used HEC Singapore as the entity to conduct the Interush business in Japan.

(c)    As to sub-paragraph 22.3, the Defendants aver that whilst iHealthScience's functions initially included procurement of products, it later on performed additional functions for the Group, including (but not limited to) accounting and logistics. As stated above, the Hong Kong branch of the Interush business was operated by Interush Limited with support from Interush Inc.

(d)    Save as aforesaid, paragraph 22 is admitted.

**B.2.**     **Hong Kong Proceedings and Plan to Carve-Out PRC Business**

19.     As to paragraph 23:

(a)     It is admitted that on 6 November 2013 the CCB raided Interush Limited's offices in Hong Kong pursuant to a warrant which alleged a violation of the Ordinance.

(b)     Sub-paragraph 23.1 is not admitted (being outside the Defendants' knowledge) save that it is admitted that there was negative publicity.

(c)     Sub-paragraph 23.2 is admitted.

(d)     As to sub-paragraph 23.3, it is admitted that in June 2015, Mr Matthews resigned as CEO and President of the Company, and remained a (non-voting) director of the Company, but aver that (i) he had been paid a severance payment for his resignation as CEO and President, and (ii) his involvement in the Company's management as non-voting Director was substantially and significantly less than before.

(e)     As a result of and/or following the CCB's raid and the Hong Kong Proceedings, four of Interush's bank accounts held by various Interush subsidiaries with Hang Seng Bank, Bank of America, ICBC, Fubon Bank and Bank of East Asia were frozen or subject to a restraint order. These issues with Interush's accounts meant it was difficult for Interush and its subsidiaries to maintain a bank account.

(f)     Save as aforesaid, paragraph 23 is not admitted.

20.     Paragraph 24 is not admitted.

21.     Paragraph 25 is not admitted.  For the reasons pleaded at paragraph 4(d) above the Defendants aver that the Company's management should have known before August 2015 that operating MLM in the PRC was illegal.

22.     Paragraph 26 is not admitted save to the extent averred at paragraph 4 above.

23.   As to paragraph 27:

(a)   The Defendants deny that the Company's board resolved to rebrand the Company's non-PRC business under the new name, Ascentra, simply *"in an attempt to rid itself of the negative publicity received"*.  The Defendants repeat and rely on paragraph 4 above.

(b)   Save as is consistent with paragraph 4 above, paragraph 27 is not admitted.

**B.3.   SPGK Cayman's Incorporation and Subsequent Negotiations**

24.   Paragraph 28 is not admitted save to the extent consistent with paragraph 4 above.

25.   Paragraph 29 is admitted.

26.   Paragraphs 30 and 31 are denied.  The Defendants aver that:

(a)   At the time of SPGK Cayman's incorporation, the Major Shareholders did not have the intention, nor did they enter into (or execute any agreement or document to bring about) the Arrangement, as alleged in paragraph 30 (or at all).  The Defendants aver that, at that time, the Major Shareholders did not have a clear common intent (alternatively no common intent beyond the matters set out in paragraph 4), let alone that alleged in paragraph 30.

(b)   Paragraph 4 is repeated.

(c)   As a new business (with an untested model) operating in a new market, there were legal and financial risks for SPGK Cayman as well as its owners and controllers including risks:

(i)   of criminal liability and potential jail sentences for directors;

(ii)   of bank accounts being frozen;

(iii)   of negative and damaging publicity (for example in the form of Chinese TV news reports and social media) in particular in relation to suggestions that Interush had become SPGK;

(iv)    agents facing criminal liability and agent backlash (for example in the form of lawsuits/legal action);

(v)    business and regulatory risks including changes in PRC regulation regarding importing tangible products, product registration, PRC taxes etc.

(d)    In fact, although Mr Homma was SPGK Cayman's ultimate beneficial owner upon its incorporation, he did not want to be a director due to such legal and financial risks, and Mr Matsuura also took the same view and he also declined to be a director.

(e)    Given the attitudes of both Mr Homma and Mr Matsuura, SPGK Cayman's operations were initially handled by a Jessie Tsai who was based in Taiwan.

(f)    Another individual, Ernest Wilcock, was SPGK Cayman's sole director from 5 September 2016.  He was recommended by Mr Matthews, but was not substantively involved in SPGK Cayman's business, and was removed as a director a few months later because of his failure to renew his passport (which was required to progress certain banking arrangements).  Mr Sanders then became SPGK Cayman's sole director.

(g)    Further, by the time SPGK Cayman was established, Mr Homma was growing increasingly concerned about his continued involvement with the Company as he had, for many years prior, received various threats from its affiliates (threatening legal proceedings and to disclose his personal information online such as his residential address) due to his association with the Interush business.  Moreover, his relationship with Mr Matsuura had become strained.

(h)    Mr Homma therefore decided he no longer wished to take any further part in the businesses of either the Company or SPGK Cayman given the past difficulties he had experienced and the CCB investigation into the Interush business.

(i)     Accordingly, in around December 2018, Mr Homma transferred his shares in Growth Today to Mr Yoshida (and also transferred his shares in IR-P to Lequios Holdings Ltd in around November 2020).

(j)     The Defendants further refer to paragraph 27 below.

27.     Paragraph 32 is not admitted:

(a)     The Defendants repeat and rely on paragraph 26 above.

(b)     The MOU was a document created for the purposes of setting up a bank account for SPGK Cayman in the US.  The MOU was not, and the parties intended that it was not, a legally binding document.

(c)     Following the execution of the MOU, the parties did not enter into any contract to implement any of its terms, nor was it given effect by conduct or otherwise.

(d)     SPGK Cayman entered into the contracts pleaded to at paragraph 32 below.

(e)     The Company did not supply its PRC Affiliate List to SPGK Cayman due (among other things) to PRC data protection law (which outlawed the direct transfer of personally identifiable information in the PRC Affiliate List to SPGK Cayman without first obtaining explicit consent from every single individual concerned).

(f)     Interush Limited issued an announcement to existing affiliates of Interush inviting them to join SPGK Cayman. Such announcement was in the best interests of the Company since SPGK Cayman would provide future customers for the Company under the wholesale supply arrangements pleaded below. Affiliates who wished to join SPGK were required to (and did) acknowledge that:

(i)     SPGK and Interush were completely separate and independent companies;

(ii)    Past income performance at Interush did not guarantee future income performance;

(iii)   They must cease all Interush related activities after joining SPGK; and

(iv)   They would abide by the SPGK agent agreement and customer order agreement.

(g)   In October 2016 (when the Company ceased the operation of the Business in Hong Kong), approximately 86,500 active agents joined SPGK Cayman. By December 2020, and as a result of Mr Yoshida's hard work and skill, the number of active agents had risen to approximately 576,205, and SPGK Cayman's profitability rose commensurately. In particular:

(i)   Mr Yoshida hosted special events for agents and gave presentations where new products and concepts were discussed;

(ii)   Mr Yoshida arranged training for agents;

(iii)   Mr Yoshida implemented awards and recognition for agents;

(iv)   Mr Yoshida created new product concepts including the *Social Opportunity Platform* which was a social media platform for agents to share their daily work and products and had a chat application for agents and customers to communicate with each other; and

(v)   Mr Yoshida can speak Mandarin Chinese and Cantonese Chinese and he regularly communicated personally with top Chinese agents in their local dialect.

28.   Paragraph 33 is not admitted, save that the Defendants admit the existence of a draft Exclusive International Distributor Agreement dated 1 October 2016 between the Company and SPGK Cayman, which was never signed or agreed to by or on behalf of the Company. The matters set out in that document, including the suggestion that "77% of the income [was] to be distributed to Ascentra" was just one among many ideas / proposals brainstormed between Mr Matsuura, Mr Homma and Mr Matthews at the time.  The Defendants also repeat paragraph 26 above. Signatures appended to the 1 October 2016 draft were appended in or about January 2018 although a further draft was circulated between Mr Homma, Mr Sanders and Masami Nakano dated 27 March 2018.

29.  As to paragraph 34:

(a)  "During a period of negotiations between the Major Shareholders from 2016 until about March 2018" is vague and does not contain sufficient particulars and is therefore not admitted.

(b)  The existence of the Draft Agreements is admitted.

(c)  Save as aforesaid, paragraph 34 is denied.

30.  Paragraph 35 is denied. The Defendants aver:

(a)  The parties never agreed to the terms of the Draft Agreements, nor did the parties agree that the "overriding purpose" of the Draft Agreements was as pleaded in paragraph 35.

(b)  As the Plaintiff admits at paragraph 36, the Draft Agreements remained at all material times in draft, without being entered into by the parties.  As such, the Defendants deny that any, let alone a number of, documents were drawn up to give effect to the Arrangement.

(c)  It is specifically denied that the Draft Agreements' overriding purpose was to ensure that the management control of the Company and the economic interests of the Majority Shareholders that existed prior to the incorporation of SPGK Cayman would be maintained in the day-to-day control of the Company or the SPGK Group, and for Mr Homma's indirect shareholding in IR-P to be transferred to the Company for cancellation.

(d)  The Defendants reiterate that SPGK Cayman's business was and had always, since inception, been entirely separate and distinct from, and did not in any way represent or succeed / carry on, any part of the Business / PRC Business (if any, which the Defendants do not admit).

31.  Paragraph 36 is admitted.

32.   Paragraph 37 is admitted.  If and insofar as necessary, the Defendants rely on the entirety of each of the agreements for its full terms and effect.  The Defendants further aver that:

(a)   The reason the services supplied pursuant to the Agreements described at paragraphs 37.1 and 37.3 were to be billed on a monthly basis at cost, without markup was because HEC had back-to-back agreements for the provision by HEC Global Inc and HEC International Co., Ltd to SPGK Cayman of identical services as those respectively covered by the two Agreements. Those back-to-back agreements each provided for an 8% markup, such that HEC was but a mere contracting intermediary, not actually providing any service itself and passing the mark-ups directly on to SPGK Cayman.

(b)   Paragraph 37.2 is admitted.  As the Plaintiff admits, under this Product Supply Agreement, SPGK Cayman was obliged to buy products at market price (to be determined by iHealthScience in good faith).

(c)   In addition to those three agreements, HEC and SPGK Cayman also entered into (*inter alia*) a License Agreement dated 1 October 2016, under which HEC licensed to SPGK Cayman (*inter alia*) its software, applications and intellectual property rights related to the marketing business, the business of providing cloud-based internet productivity and communications applications and related services, and the business of providing tangible consumer products and services in the PRC and to PRC customers and users. As consideration for HEC licensing the Licensed Materials, SPGK Cayman paid a royalty equal to 10% of its gross revenues on the Licensed Materials (as particularised in Exhibit A to the License Agreement).

(d)   Overall, as evidenced by all the above agreements, SPGK Cayman dealt with each Ascentra group company at arm's length and on commercial terms with the purpose and effect of ensuring genuine independence from the Company.

33.   As to paragraph 38:

(a)    The Defendants repeat paragraphs 4, and 26 above.

(b)    The Defendants admit that SPGK Cayman did not employ its own staff, but aver that the actual execution of the bulk of SPGK Cayman's business was outsourced to be handled by local third-party service providers in the PRC. SPGK Cayman remained at all material times a  contracting party to all of its customers and all of its third-party service providers; all of its customers paid for its products to it direct; and it paid all of its third-party service providers for all of their services provided to it, and in respect of its outsourced business functions.

(c)    The Defendants admit that Mr Matsuura participated as a high-level / general advisor for SPGK Cayman's PRC business only, deferring all major business decisions to Messrs Yoshida and Homma, and that Mr Sanders was appointed a director of SPGK Cayman on 1 February 2017.

(d)    Save as aforesaid, paragraph 38 is denied.

34.    Paragraph 39 is admitted. The funds that were frozen as a result of the Hong Kong Proceedings (as referred to in paragraph 19(e) above) were unfrozen but by this stage irreparable reputational damage had been incurred.

35.    As to paragraph 40, the Defendants aver that:

(a)    Mr Matthews purportedly signed the Cancellation Agreement on the Company's behalf on 3 April 2018, in an attempt to regain control over the Company, and to transfer SPGK Cayman's business and assets to the Company (thereby standing to personally benefit as indirect majority shareholder of the Company), after he had learned that Mr Matsuura and Mr Homma were considering transferring their shares in IR-P to Mr Yoshida.  This was in addition to, and in the same vein as, paragraphs 42 and 43.

(b)    Mr Matthews had not discussed or raised the Cancellation Agreement with Mr Matsuura prior to signing it (purportedly on the Company's behalf), because he knew that Mr Matsuura would not agree to sign a document which purportedly

operated to transfer SPGK Cayman's business and assets to the Company when SPGK Cayman was, and was intended and supposed to be, entirely separate from the Company.

(c)     In the circumstances it is denied that Mr Matthews had authority to sign the Cancellation Agreement on behalf of the Company nor was the Cancellation Agreement subsequently ratified.

(d)     Mr Matthews repeatedly asserted to Mr Homma that he had received legal advice that in view of the amendments being planned in the PRC requiring authorisation for e-commerce products, if no measures were taken to obtain authorisation from the Chinese authorities for SPGK Cayman's products, there would be a massive legal risk.

(e)     Relying upon Mr Matthews assertion and believing that he had to do everything in his power to avoid SPGK Cayman's independent PRC business being conducted in an illegal manner and himself (as sole owner of SPGK Cayman) being subject to risk from action taken by the Chinese authorities, Mr Homma signed the Cancellation Agreement.

(f)     Mr Homma signed an English version of the agreement without having read or having been provided with a Japanese translation. Mr Homma does not speak or read English. Mr Homma signed the agreement on the condition (to which Mr Matthews and Mr Sanders (as SPGK Cayman's director) agreed) that the Cancellation Agreement would not be valid or take effect unless Mr Homma subsequently gave his consent. In effect the Cancellation Agreement was to be held in escrow pending Mr Homma's consent.

(g)     Mr Homma (who received a Japanese translation on 11 April 2018) never gave his consent and the Cancellation Agreement never came into force (and/or was never released from escrow).

(h)     Sub-paragraphs 40.1 to 40.3 are admitted.

(i)     Save as aforesaid, paragraph 40 is not admitted.

36.     In the premises and in light of paragraph 34 above, paragraph 41 is admitted.

**B.4.     Fall-Out between the Major Shareholders**

37.     Paragraphs 42 and 43 are admitted.  The Defendants repeat paragraph 35 above, and further aver that:

(a)     Mr Matthews attempted to gain control of the Company by:

(i)     removing Mr Matsuura and Mr Homma as directors of IR-P;

(ii)     amending the Articles of Association of the Company; and

(iii)     removing Mr Yoshida as director of the Company.

(b)     At a meeting between Mr Matsuura, Mr Homma and Mr Matthews on 17 April 2018, Mr Matsuura threatened to sue Mr Matthews for breach of the shareholders' agreement in relation to IR-P.

(c)     Mr Matthews backed down and apologised.

(d)     Messrs Matsuura and Homma were reappointed as directors of IR-P on 15 May 2018.  On 10 November 2018, Mr Matthews resigned as a director of both IR-P and the Company.

38.     Paragraphs 44 and 45 are admitted.  As to which:

(a)     The Defendants repeat paragraph 26 above.

(b)     Mr Homma agreed to transfer all of the issued shares in Growth Today to Mr Yoshida in exchange for US$1 because:

(i)     He did not want to continue being an indirect owner of SPGK Cayman, where he had assumed / carried significant risks from regulatory authorities and from dissatisfied agents; and

(ii)     Mr Yoshida was entitled to an ownership stake at effectively no monetary cost in light of the risks he was assuming.

39.    Paragraphs 46 to 54 and Appendix 3 to the ASOC are admitted, save that "purported to" in paragraph 54 is denied.

**C.    CASH MANAGEMENT**

40.    Paragraph 55 is admitted.

41.    As to paragraphs 56 and 57:

(a)    It is denied that SPGK International was used as a pass-through vehicle for receipts and payments for the Business, or provided cash management services to the Company or HEC.  SPGK International was set up without any knowledge, let alone approval of SPGK Cayman's shareholder.

(b)    The Defendants deny that SPGK International received revenues and paid liabilities on the Company's behalf, or remitted the Company's revenue to HEC Singapore's bank accounts with UOB, to enable HEC to discharge the liabilities of the Ascentra group of companies.

(c)    SPGK International provided cash management services to SPGK Cayman only.

(d)    In so far as SPGK International remitted SPGK Cayman's revenue for the purposes (*inter alia*) of discharging and paying the Company's liabilities for and on behalf of the Company such payments were, and were to be treated as, loans from SPGK Cayman to the Company. Further particulars are given in the Counterclaim.

(e)    Mr Yoshida, Mr Homma and Mr Matsuura only became aware of the existence of SPGK International in around January 2019.

(f)    It is denied that AOS received revenues and paid liabilities on the Company's behalf, or remitted the Company's revenue to HEC Singapore's bank accounts with UOB to enable HEC to discharge the liabilities of the Ascentra group of companies.

(g)     Save as set out below, AOS received and handled funds belonging to SPGK and not the Company. Payments made by AOS in discharge of the liabilities of the Company or its subsidiaries were and are treated as loans from SPGK to the Company.

(h)     AOS received approximately US$13 million from the Company (**"BlackTower Funds"**) which was held by AOS on trust for, and was to be repaid to, the Company, pursuant to the Asset Purchase Agreement between AOS, the Company and others dated 27 December 2017.

(i)     Save as aforesaid, paragraphs 56 and 57 are not admitted.

42.   Paragraph 58 is denied.  SPGK Cayman's agents / customers used credit cards to make payments for SPGK Cayman's products which SPGK Cayman had purchased wholesale and at arms' length from the Company and other third parties.  The Defendants were unaware, at the relevant times, that:

(a)     From around November 2017, Mr Sanders caused all payments due from Planet Payment to SPGK Cayman to be made to SPGK LLC's bank account with Bank of the West (**BOTW**); and

(b)     Those payments were then remitted to SPGK International from January 2019 onwards pursuant to a contract between Planet Payment and SPGK International dated 12 October 2018.

43.   Paragraph 59 is admitted save that the decision was not in relation to "the Business" as defined by the Claimants, but in relation to SPGK Cayman's business. That decision was made because Mr Yoshida and Mr Matsuura suspected that Mr Sanders had been working with Mr Matthews in relation to the removal of Mr Matsuura and Mr Homma as directors of IR-P and Mr Yoshida as director of the Company, and changing the Articles of Association of the Company respectively, and because Mr Sanders had been uncooperative in disclosing the details of the funds held by AOS and SPGK International.

44.   As to paragraph 60:

(a)   The Defendants admit that SPGK Singapore and Scuderia Bianco were incorporated on 2 May 2019.

(b)   Scuderia Bianco was established to provide cash management services in place of AOS, whilst SPGK Singapore was established to provide cash management services in place of SPGK International.  The only funds of the Company managed by Scuderia Bianco were the approximately US$5 million which was part of the BlackTower Funds. It was also intended that SPGK Singapore would become the main operating entity for the business of SPGK Cayman, however this plan was disrupted by the Covid pandemic.

(c)   The agreements pleased at paragraph 60.1 to 60.4 are admitted. Save as aforesaid, paragraph 60 is denied.

45.   Paragraph 61 is admitted.

**D.   TRUST CLAIM**

46.   Paragraph 62 is denied.  The Defendants:

(a)   Say that the plea is inconsistent with the agreements pleaded at paragraph 37 of the ASOC.

(b)   In relation to sub-paragraph 62.1, repeat paragraphs 4, and 26 above, and aver that:

(i)    SPGK Cayman has not at any time conducted the PRC Business (if any, which the Defendants do not admit) nor provided any cash management, whether on the Company's behalf or otherwise, or acted as its agent, whether as alleged or at all.

(ii)   Neither SPGK Singapore nor Scuderia Bianco has at any time provided any cash management (or conducted the PRC Business (if any, which the Defendants do not admit)) on the Company's behalf, nor acted as its agent.

(iii)   Both SPGK Singapore and Scuderia Bianco have at all material times managed funds transferred or paid from or on behalf of SPGK Cayman only (except for the funds received from the BlackTower Funds)

(iv)   Such payments include payments made to discharge expenses and liabilities of the Company and/or any Ascentra group companies which payments were and are treated as loans from SPGK Cayman to the Company. Scuderia Bianco entered into a Business Services Agreement with the Company on 1 June 2019 to facilitate payments made to discharge the Company's liabilities.

(c)   Sub-paragraph 62.2, and 62.3 and 62.4 are denied. In any event the ASOC does not plead sufficient facts or particulars to support any of the allegations.

(d)   Sub-paragraphs 62.4 is denied. No particulars of any assets are given. It is denied that SPGK was given or held the PRC Affiliates list. Paragraph 27(e) above is repeated.

47.   Paragraph 63 is denied.  In particular:

(a)   Sub-paragraph 63.2.1 is denied.  The Defendants repeat paragraphs 4, and 26 above. The imperative was for the Company to cease its PRC business (through its operation in Hong Kong). By entering into the arrangements pleaded above the Company benefited from continued sales (on commercial terms) to a company which was not tainted by the matters set out at paragraph 4 above and which was (which the Company was not) prepared to take the legal and financial risks associated with an untested business model in the PRC. The Company is put to proof of the PRC portion of the Interush business being of any, let alone substantial value, at the time the arrangements were entered into.

(b)   Sub-paragraph 63.2.2 is denied.  The Company never had (let alone continued to) incurred or discharged any liabilities of SPGK Cayman. SPGK Cayman paid for the various services arrangements and employee support.

(c)   As to sub-paragraphs 63.2.3 and 63.2.4, the Defendants:

(i)     aver that the allegation (which the Defendants do not admit) that Mr Yoshida had no interest (legal or otherwise) in SPGK Cayman between 2016 and 2018 is irrelevant.

(ii)    repeat paragraphs 4, 26 and 38 and sub-paragraph (a) above.

(iii)   Save as aforesaid, sub-paragraphs 63.2.3 and 63.2.4 are denied.

(d)    Sub-paragraph 63.2.5 is denied:

(i)     There was no common management structure between SPGK Cayman and the Company.

(ii)    Mr Matsuura was not involved in the management of, but was only an advisor to Mr Yoshida in respect of, SPGK Cayman's business.

(iii)   None of Mr Yoshida, SPGK Cayman, SPGK Singapore and Scuderia Bianco acted on Mr Matsuura's instructions. Pending further particulars of the ASOC it is denied that any such instructions were ever given. It is admitted that Mr Matsuura gave advice.   The Defendants repeat paragraph 33(c) above.   Mr Yoshida made all the major business decisions in regard to each of SPGK Cayman, SPGK Singapore and Scuderia Bianco.

48.   Paragraph 64 is denied. Without prejudice to that denial:

(a)    The plea is wrong in law.

(b)    The plea is wholly unparticularised.

(c)    Save in respect of the PRC Affiliates List, no assets as the subject of the alleged resulting trust are identified.

(d)    The PRC Affiliates list was not transferred to SPGK Cayman and cannot form the basis for a claim in resulting trust.

(e)     The plea is inconsistent with the Company having entered into the agreements pleaded at paragraph 37 of the ASOC.

49.     Paragraph 65 is denied. Without prejudice to that denial:

(a)     The introduction of SPGK Singapore and Scuderia Bianco to facilitate cash management in 2019 did not change the essential relationship between the Company on the one hand and SPGK Cayman on the other, because they had always been separate, independent businesses which were never part of each other (and, in particular, SPGK Cayman was never part of the Ascentra group of companies).

(b)     Sub-paragraph 65.1 is denied. SPGK Cayman was never the Company's agent, fiduciary or trustee.

(c)     Sub-paragraph 65.2 is also denied.  The Defendants repeat 46(b)(ii) above and aver that neither SPGK Singapore nor Scuderia Bianco had ever received any of the Company's assets, let alone on notice and/or without providing good consideration and/or not in good faith.

(d)     The plea of lack of good faith is tantamount to a plea of bad faith. It is a requirement of a pleading that full particulars of an allegation of bad faith are made. None have been pleaded and the allegation is scandalous.

(e)     The plea is inconsistent with the agreements pleaded at paragraph 37 of the ASOC.

50.     Paragraph 66 is denied.  The Defendants repeat paragraphs 4, and 26 above. In particular:

(a)     No particulars have been given of the allegation regarding Mr Yoshida's state of mind (which is denied).

(b)     Payments made by customers for SPGK Cayman's products and services were processed through China UnionPay and collected by Planet Payment, as a result of which SPGK Cayman had the entire beneficial interest in all those payments.

51.    As to paragraph 67:

(a)    Sub-paragraph 67.1 is denied. The matters set out in sub-paragraphs 67.1.1 to 67.1.7 do not support the allegation as a matter of law.

(b)    Sub-paragraph 67.1.1 is denied.  The Defendants repeat paragraphs 26, 38 and 47 above.

(c)    Sub-paragraph 67.1.2 is denied.  The Defendants repeat paragraphs 4, and 24 to 36 above. Save in so far as the same may arise from those paragraphs and if (which is denied) relevant at all, the Major Shareholders had no shared intention to continue to conduct the PRC Business (if any, which the Defendants do not admit) for the Company's benefit, whether through SPGK Cayman or otherwise, and whether as alleged or at all.

(d)    Sub-paragraph 67.1.3 is denied.  The Defendants repeat paragraphs 26 and 38 above.

(e)    If, which is not admitted, sub-paragraph 67.1.4 is true then such an arrangement was a private matter between the individuals stated to which the Defendants were not privy. It can have no bearing on the fiduciary or any other obligations of any Defendant.

(f)    Sub-paragraph 67.1.5 is admitted. The request was made shortly after a mass arrest of the SPGK Cayman agents in the PRC.

(g)    As to sub-paragraph 67.1.6, the Defendants admit the existence of the draft written resolution. Mr Matsuura prepared the document unilaterally and without any consultation let alone agreement with anyone else beforehand. The draft was not, in the event, signed, agreed to, or passed. A transfer to Mr Matsuura would, in any event, have been inconsistent with the Company's claim.

(h)    As to sub-paragraph 67.1.7, Mr Matsuura was seeking to persuade Mr Yoshida to transfer to him personally the shares of Growth Today in circumstances

where Mr Yoshida was himself concerned about the risks arising from SPGK Cayman's continued business in the PRC.  In light of this, and after due consideration, Mr Yoshida proposed a "severance pay" equivalent to 20% of "SPGK's after-tax profit for FY2020" in an attempt to negotiate an exit (i.e. a transfer of the shares in Growth Today to Mr Matsuura and stepping down as director of the Company and HEC). A transfer to Mr Matsuura would in any event have been inconsistent with the Company's claim.

(i)     Sub-paragraph 67.2 is denied. Without prejudice to that denial, it is wholly unparticularised, does not disclose a cause of action, fails to plead any relevant knowledge on the part of Mr Yoshida (and hence any other Defendant) and is inconsistent with paragraph 37 of the ASOC.

(j)     Save as aforesaid, paragraph 67 is denied.

**E.     UNJUST ENRICHMENT**

52.     Paragraph 68 is denied.  The Defendants repeat paragraphs 4 and 26 above.  In the premises, none of SPGK Cayman, SPGK Singapore and Scuderia Bianco has been unjustly enriched by any asset of the Company, there was never any operation of the PRC Business by SPGK Cayman (or SPGK Singapore or Scuderia Bianco), and no asset of the Company was received by any of them in anticipation of the Draft Agreements that, in the event, were not entered into.

53.     In the premises, paragraphs 69 to 71, each of which is also devoid of particulars (and respecting which paragraph 2 above is repeated), are denied.

**F.     BREACH OF DUTY AND KNOWING RECEIPT**

54.     Paragraph 72 is noted but the Company's entitlement to seek any relief pleaded therein, or indeed any relief at all, is denied.

55.     In the premises, paragraphs 73 to 77 are irrelevant.  Without prejudice to this:

(a)     Paragraph 73 is admitted.

(b)    Paragraph 74 is admitted as setting out general legal propositions.

(c)    It is admitted that Mr Yoshida owed to the Company the duties arising as a matter of law in respect of his directorship. Save as aforesaid, paragraphs 75 to 77 are not admitted.  In particular, the Defendants do not admit (i) that there was or is any such property as described in any of sub-paragraphs 76.1 to 76.4, or (ii) the references to Mr Yoshida's alleged "stewardship" in sub-paragraphs (i) and (ii) of paragraph 77, which are vague and unparticularised.

56.    Paragraph 78 is denied as being devoid of all necessary particulars, in respect of which paragraph 2 above is repeated.  Without prejudice to this, the Defendants aver that the Funds were and remain beneficially owned by SPGK Cayman, and to that extent only sub-paragraph 78.2 is admitted.  In the premises, the Defendants deny that Mr Yoshida owed any of the obligations upon which each of sub-paragraphs 78.3 to 78.5 is premised, and accordingly, whilst admitting each of the refusals set out in sub-paragraphs 78.3 to 78.5, also deny each of those sub-paragraphs.

57.    In the premises, paragraphs 79 to 81 are denied; the Defendants aver that the total amount of the Funds was and is not US$273 million but only US$249 million.  Without prejudice to this, it is in particular denied that:

(a)    SPGK Cayman and/or Scuderia Bianco and/or SPGK Singapore were not *bona fide* purchasers for value (such allegation being in any event inconsistent with the agreements pleaded at paragraph 37 of the ASOC).

(b)    It would be unconscionable for these entities to retain a beneficial interest in the Funds. It is denied that SPGK Cayman was operating the PRC Business for and on behalf of the Company, and that Mr Yoshida knew the same (no particulars of such allegation of knowledge having been pleaded).

58.    Paragraph 82 is noted but the Defendants deny that the Plaintiff is entitled to any relief, whether as pleaded or at all.

59.    Further, by reason of the matters pleaded herein, the Defendants deny that any of them are liable to the Plaintiff, and that the Plaintiff is entitled to any remedy or relief, whether as claimed in the ASOC or any relief at all.

60.    Alternatively, if, which is denied, the Defendants or any of them are liable to the Plaintiff in any way, the Defendants are entitled to and will set off against such liability so much of the sum awarded by way of counterclaim herein as shall be sufficient to extinguish or diminish it.

61.    Article 178 of the Company's Articles of Associated provides that:

> *Every Director or officer of the Company shall be indemnified out of the assets of the Company against any liability incurred by him as a result of any act or failure to act in carrying out his functions other than such liability (if any) that he may incur by his own actual fraud or wilful default. No such Director or officer shall be liable to the Company for any loss or damage in carrying out his functions unless that liability arises through the actual fraud or wilful default of such Director or officer. References in this Article to actual fraud or wilful default mean a finding to such effect by a competent court in relation to the conduct of the relevant party.*

in which circumstances the claim against the First Defendant is circular and bound to fail.

62.    Save as expressly admitted otherwise here in this Defence and Counterclaim, each and every allegation contained in the ASOC is denied as if the same were set out here in this Defence and Counterclaim and traversed *seriatim*.

## **COUNTERCLAIM**

**G.     RELATIONSHIP BETWEEN THE COMPANY AND SPGK CAYMAN**

63.    The Defendants repeat the Defence hereinabove in its entirety by way of counterclaim.

64.    As pleaded in paragraphs 4, 27(d) and 32 above:

(a)     SPGK Cayman was an arms-length wholesale purchaser of the Company's products and services;

(b)     The Company received full consideration from SPGK Cayman for the products and services it provided on an arms-length basis;

(c)     Pursuant to this arrangement, SPGK Cayman entered into various binding contracts with Ascentra group companies to formalise contractually their arms-length business relationships; and

(d)     SPGK Cayman dealt with each Ascentra group company at arm's length and on commercial terms to ensure complete independence from the Company.

65.     To facilitate the provision of products and services to SPGK Cayman (and also the operation of its own businesses), the Company and its group companies also engaged the services of various third-party service providers, and entered into various contracts with them:

(a)     A Services Agreement dated 1 February 2017 between the Company and Ever Innovation Inc (**Ever Innovation**) (as amended by an Addendum dated 11 December 2019), by which Ever Innovation agreed to provide various services including (but not limited to) software product development services and IT business system support services. SPGK Cayman's website was hosted by a server in Singapore which was managed by Ever Innovation;

(b)     A Service Agreement dated 5 June 2018 between iHealthScience and V-Logic Limited, a logistics service provider (**V-Logic**) (as amended by an Addendum dated 10 March 2020), by which V-Logic agreed to provide logistics support services. Physical products ordered by customers in the PRC on SPGK Cayman's websites were delivered using V-Logic's services;

(c)     The health and beauty products that SPGK Cayman sold on its website were sourced by iHealthScience from Ever Skill Co Ltd (a Japanese company) (**Ever Skill**);

(d)    A Master Consulting Services Agreement dated 11 August 2014 between HEC and Mels Art Co., Ltd (a Japanese company) (***Mels Art***) (as amended by an Amendment dated 1 June 2017), pursuant to which Mels Art agreed to provide website design, marketing and related consulting services. SPGK Cayman's website was designed by Mels Art.

## H.    CASH MANAGEMENT OF SPGK CAYMAN

### H.1.    Receipt of revenues

66.    The Defendants repeat paragraph 50 above.  Unbeknown to Mr Matsuura, Mr Homma and Mr Yoshida:

(a)    From around November 2017, Mr Sanders caused all payments due from Planet Payment to SPGK Cayman to be made instead to SPGK LLC's bank account with Bank of the West (***BOTW***);

(b)    Mr Sanders opened a bank account with BOTW in October or November 2018 (in the US) in the name of SPGK International; and

(c)    Mr Sanders instructed Planet Payment to transfer the funds generated by SPGK Cayman to SPGK International's BOTW account from January 2019 onwards. Since around January 2019 to November 2019, Planet Payment remitted all revenue received by it on behalf of SPGK Cayman to SPGK International.

67.    Upon discovery of the matters pleaded in paragraph 66 above, Mr Yoshida (in his capacity as a director of SPGK Cayman) decided that:

(a)    The funds generated from the sales through SPGK Cayman's website, which made up the majority of SPGK Cayman's revenue, would be transferred to SPGK Singapore's bank account with DBS Bank in Singapore, while the funds generated from the sales made *via* SPGK Cayman's mobile application would continue to be transferred to SPGK International; and

(b)    SPGK International would not transfer the balances standing to the credit of its BOTW account to SPGK Singapore, but instead would use those funds to settle commission payments and other expenses owed and payable by SPGK Cayman.

**H.2.    Payment of expenses**

68.    In around early 2017, Mr Sanders decided to use AOS as a service provider to assist with processing payments from SPGK Cayman to local service providers in the PRC.  For this purpose, SPGK LLC and AOS entered into a Consulting Services Agreement dated 31 March 2017, pursuant to which AOS would provide cash management services to SPGK LLC.

69.    In or around April 2017, Mr Sanders began using AOS to process payments on behalf of SPGK Cayman.  From May 2017, AOS would occasionally receive funds from SPGK Cayman and SPGK LLC (and subsequently, SPGK International) and make payments to various entities on behalf of SPGK Cayman.

70.    Subsequently, after the discovery of Mr Sanders' actions as set out in paragraph 66 above, as pleaded at paragraph 67(a) SPGK Singapore and Scuderia Bianco set up their bank accounts with DBS Bank in Singapore and Shanghai Commercial and Savings Bank in Taiwan respectively.  SPGK Singapore and Scuderia Bianco also began to make payments to various entities on behalf of SPGK Cayman. In this connection, SPGK Singapore and Scuderia Bianco entered into Consulting Services Agreement dated 1 December 2019, pursuant to which Scuderia Bianco agreed to provide various services (including cash management services) to SPGK Singapore.

**I.    PAYMENT OF THE COMPANY'S LIABILITIES AND EXPENSES**

71.    As a result of the CCB's investigation and subsequently the Hong Kong Proceedings, since around November 2013, the Company and its group companies did not have an operational bank account and were unable to open a new operational bank account.

72.    However, the Company and its group companies continued to incur liabilities and expenses payable to third-party service providers.

73.    Pursuant to the agreements set out in paragraphs 32(c) above, SPGK Cayman is liable to pay the Company's subsidiaries for the products and services they provided.

74.    Therefore, with a view to ensuring the smooth operation of SPGK Cayman's business in circumstances where the Company and its group companies were its sole products suppliers and had engaged the services of various third-party service providers, there existed an agreement or understanding between the Company and SPGK Cayman from around February 2017 onwards (at the latest) that:

(a)    SPGK Cayman would settle expenses and liabilities incurred by the Company and its group companies in the ordinary course of their respective businesses for and on behalf of them;

(b)    Each of those payments made by SPGK Cayman was to be treated as a loan from SPGK Cayman to the Company; and

(c)    The amount of each of such loan was to be set off against any and all sums payable by SPGK Cayman to any of the Company and its group companies,

(the **_Understanding_**).

75.    Pursuant to the Understanding, SPGK Cayman settled expenses and liabilities incurred by the Company and its group companies as set out below, all of the following funds having been generated from SPGK Cayman's business in the PRC:

(a)    From around May 2017 onwards, AOS made various payments to settle expenses and liabilities incurred by the Company and its group companies using the funds transferred from SPGK International and SPGK Singapore;

(b)    From around March 2019 onwards, SPGK International made various payments to settle expenses and liabilities incurred by the Company and its group companies using the funds transferred from Planet Payment and SPGK Singapore;

(c)    From around February 2020 onwards, SPGK Singapore made various payments to settle expenses and liabilities incurred by the Company and its group companies using the funds transferred from Planet Payment; and

(d)    From around March 2020 onwards, Scuderia Bianco made various payments to settle expenses and liabilities incurred by the Company and its group companies using the funds transferred from SPGK Singapore. In this connection, the Company and Scuderia Bianco entered into a Business Services Agreement dated 1 June 2019, pursuant to which Scuderia Bianco agreed to provide various services (including cash management services) to the Company.

76.    To the best of the Defendants' knowledge and belief, from June 2016 to date:

(a)    Payments totalling US$395,434,440.61 were made to settle expenses and liabilities incurred by the Company and its group companies using the funds generated from SPGK Cayman's business in the PRC, as aforesaid.

(b)    The SPGK group had expenses payable to the Ascentra group totalling US$247,059,501.68.

77.    In the premises, pursuant to the Understanding the net amount payable to SPGK Cayman from the Company is US$148,374,978.93.

78.    The Defendants do not have access to the complete financial and accounting records of all the relevant entities during the relevant period (in particular AOS and SPGK International, controlled by Mr Sanders), the figures pleaded in this Counterclaim are calculated based on the information and documents presently available to the Defendants, who reserve the right to amend those figures pending discovery, interrogatories and provision of further and better particulars.

**AND THE DEFENDANTS COUNTERCLAIM:**

1.    The said sum of US$148,374,978.93;

2.    In the alternative, an account of all dealings between the Defendants and the Claimant (or the Claimant's subsidiaries for the account of the Claimant) and an order

that the balance found due on payment of that account be paid to the Defendants (or to the Company as the case may be).

3.      Interest whether or not compounded, on all sums found to be due to the Defendants or any of them at such rates as the Court thinks fit pursuant to the Court's equitable jurisdiction and/or section 34 of the Judicature Act (2021 Revision);

4.      Costs;

5.      Further or other relief.

**Harney Westwood & Riegels**

22 December 2023

# EXHIBIT C



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

<div align="right">

**CAUSE NO.: FSD 300 OF 2023 (RPJ)**
</div>

IN THE MATTER OF THE COMPANIES ACT (2023 REVISION)

BETWEEN:

<div align="center">

**ASCENTRA HOLDINGS, INC. (IN OFFICIAL LIQUIDATION)**
</div>

<div align="right">

<u>**Plaintiff**</u>
</div>

<div align="center">

**-and-**

**(1)  RYUNOSUKE YOSHIDA**
**(2)  SHANG PENG GAO KE, INC. SEZC**
**(3)  SPGK PTE LTD**
**(4)  GROWTH TODAY INC.**
**(5)  SCUDERIA BIANCO PTE LTD**
</div>

<div align="right">

<u>**Defendants**</u>
</div>

---

<div align="center">

**REPLY AND DEFENCE TO COUNTERCLAIM**
</div>

---

1. In this Reply and Defence to Counterclaim:

    1.1  unless otherwise stated, references to paragraphs are to the numbered paragraphs of the Defendants' Defence and Counterclaim dated 22 December 2023;

    1.2  to the extent that the Plaintiff does not plead to each and every allegation contained in the Defence, such allegations are not admitted and the Defendants are required to prove the allegations;

<div align="right">1</div>

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

1.3    the Plaintiff adopts, without any admission whatsoever, the abbreviations, headings and sub-headings used by the Defendants in the Defence and Counterclaim; and

1.4    the Plaintiff does not admit that any summary, extract or quotation of any document referred to in the Defence and Counterclaim is accurate or sufficient. It refers to and relies upon the entirety of the documents themselves for their full terms, meaning and true effect.

<u>**REPLY TO THE DEFENDANTS' DEFENCE**</u>

**A.  PARTIES**

2.    As to paragraph 3, it is admitted that Ivy Chua Suk Lin and Mr Robinson have acted as the Company's JOLs since 17 September 2021 and that the second sentence of paragraph 2 of the ASOC should be read accordingly.

3.    Sub-paragraph 4(a) is admitted. It is further averred that the PRC Business was initially an MLM business. However, it was re-modelled in 2016 to ensure legal compliance with PRC laws. Paragraphs 25 to 26 of the ASOC are repeated.

4.    It is admitted that Interush, Inc. was renamed HEC Global, Inc. on 7 December 2016. Otherwise, paragraph 4(b) is not admitted. It is further averred that HEC Global, Inc. changed its name to AOS Property Ventures, Inc. on 9 July 2018.

5.    Save that the allegations contained in the warrant are not admitted, sub-paragraph 4(c) is otherwise admitted.

6.    As to sub-paragraphs 4(e) to (h):

6.1    The Company suspended the operation of the PRC Business in 2015 for the reasons pleaded in paragraphs 25 and 26 of the ASOC. Thereafter the PRC Business was re-modelled from an MLM business in accordance with legal advice.

6.2    On 30 May 2016, in an attempt to rid itself of the negative publicity received, the Company's board resolved to rebrand the Company's non-PRC business under the new name, Ascentra, and to incorporate a new company to conduct the Company's PRC Business. The proposed new company was referred to internally as *"Shang Peng".*

6.3    Thereafter, the Company's name was changed from Interush Holdings, Inc to Ascentra Holdings, Inc on 1 June 2016 and the trading subsidiaries operating the Business in Taiwan

2

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

and Japan were renamed "HEC". The Company also caused SPGK Cayman to be incorporated to conduct the PRC Business as re-modelled on its behalf.

6.4     It was the intention of the Major Shareholders that SPGK Cayman would formally operate the PRC Business as re-modelled in 2016 for the benefit of the Company and said business was so operated by SPGK Cayman for the benefit of the Company.

6.5     Paragraph 38 of the ASOC is repeated.

6.6     None of the Defendants have ever made any payment to the Company or its subsidiaries for products supplied to the PRC Business.

6.7     None of the Defendants were entitled to retain the receipts or profits of sales made in the PRC for their own account.

6.8     The expenses incurred by SPGK Cayman were discharged from receipts from sales in the PRC (the "**PRC Receipts**").

6.9     No legally binding agreement was reached between the Major Shareholders in relation to the separation of the PRC Business from Ascentra. Consequently, at all material times, Growth Today held its shareholding in SPGK Cayman on trust for the Company, alternatively Mr Homma, and subsequently Mr Yoshida, held their shareholding in Growth Today on trust for the Company.

6.10    Save as aforesaid, sub-paragraphs 4(e) to (h) are denied.

7.    The Plaintiff pleads to paragraph 8 in its appropriate context at section C, below.

**B.    BACKGROUND**

**B.1. Start of the Business, Plan to IPO and Reorganisation**

8.    Sub-paragraph 13(b)(ii) is admitted.

9.    Sub-paragraphs 13(e)(i) to 13(e)(iii), and 13(e)(v) are admitted.

10.    The second sentence of paragraph 14 is admitted.

11.    Sub-paragraph 18(a) is noted. The term "Group" refers to Ascentra and its subsidiaries collectively. The "Group" is also referred to as "the Ascentra Group".

12.    As to sub-paragraphs 18(b)(i) to (iii):

12.1    Sub-paragraph 18(b)(i) is admitted.

3

12.2    It is admitted that the parts of the Business operated in Japan and Taiwan were closed in or around April / May 2020. It is averred that thereafter the sole focus of the Ascentra Group was on the PRC Business which was and continued to be profitable and had demonstrated potential for further growth. HEC Singapore was involved in the operation of the PRC Business, and in particular in the payment of expenses related to said business.

12.3    Sub-paragraph 18(b)(iii) is not admitted.

13.    Sub-paragraph 18(c) is admitted. It is further averred that iHealthScience provided marketing, operational and financial management services for the PRC Business as conducted by SPGK Cayman.

**B.2. Hong Kong Proceedings and Plan to Carve-Out PRC Business**

14.    The Plaintiff is unable to plead to the last sentence of sub-paragraph 19(e) which is vague and does not contain sufficient particulars.

**B.3. SPGK Cayman's Incorporation and Subsequent Negotiations**

15.    Sub-paragraph 26(a) is denied. Paragraphs 30 and 31 of the ASOC and paragraph 6 above are repeated.

16.    As to sub-paragraph 26(c):

16.1    The Plaintiff repeats and relies on paragraph 6 above.

16.2    Save as aforesaid, sub-paragraph 26(c) is not admitted.

17.    Save that it is denied that Mr Homma has ever been the ultimate beneficial owner of SPGK Cayman, sub-paragraph 26(d) is otherwise not admitted. Mr Homma was merely the legal owner of Growth Today from incorporation until he transferred his shares in Growth Today to Mr Yoshida. Paragraph 6.9 above is repeated.

18.    Sub-paragraph 26(e) is vague and does not contain sufficient particulars. Without prejudice to the foregoing, it is admitted that Jessie Tsai was based in Taiwan and was involved with the operations of the PRC Business following the incorporation of SPGK Cayman. Otherwise, sub-paragraph 26(e) is not admitted.

4

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

19. As to sub-paragraph 26(f):

  19.1    It is admitted that Mr Wilcock was the sole director of SPGK Cayman from 5 September 2016 until 1 February 2017, and that he had been recommended for that role by Mr Matthews.

  19.2    It is admitted that Mr Sanders became the sole director of SPGK Cayman following Mr Wilcock's resignation.

  19.3    Otherwise, sub-paragraph 26(f) is not admitted.

20. Sub-paragraphs 26(g) to (i) are vague and prolix and contain irrelevant background. Without prejudice to the foregoing, the Plaintiff pleads to those sub-paragraphs as follows:

  20.1    Paragraphs 42 to 46 and 48 of the ASOC are repeated.

  20.2    Save as aforesaid, sub-paragraphs 26(g) to (i) are not admitted.

21. As to sub-paragraphs 27(b) to (c):

  21.1    The first sentence of paragraph 27(b) is not admitted.

  21.2    It is averred that the MOU memorialised a potential legal and economic transfer of the PRC Business from the Company to SPGK Cayman and the consequent transfer of the beneficial ownership of SPGK Cayman to Mr Homma. No such transfers occurred on the terms of the MOU or otherwise. The Major Shareholders were unable to reach agreement, and ultimately Mr Matthews was advised that a formal separation of the ownership of the Company and SPGK Cayman was unnecessary.

  21.3    Save as aforesaid, sub-paragraphs 27(b) to (c) are admitted.

22. The Plaintiff pleads to sub-paragraph 27(d) in its appropriate context below.

23. As to paragraph 27(e) to (f):

  23.1    SPGK Cayman continued the Company's PRC Business (as re-modelled) with the same employees and same management and continued to work with Affiliates listed on the PRC Affiliates List.

  23.2    Mr Matthews organized a meeting of the Affiliates listed on the PRC Affiliates List which was promoted as a Shang Peng Gao Ke Pre-Launch event, and took place on 20 August 2016 in Jeju, South Korea.

  23.3    At that meeting Mr Matthews informed the Affiliates that the Company was SPGK Cayman's parent company, in stating that: "*Shang Peng Gao Ke parent company, which has*

5

been renamed Ascentra Holdings, Inc., will continue to provide the [Profit Sharing Plan] Program, and honor the Introduction Bonus Program, and the Loyalty Bonus Program", as recorded in Mr Matthews' speaking note for the meeting on 20 August 2016. The Plaintiff will rely upon Mr Matthews' speaking note for its full terms and effect.

23.4   It is averred there were a number of other events arranged by the Company aimed at Affiliates (including the most successful Affiliates, who were referred to as Leaders), and notices published by the Company, to encourage the Affiliates listed on the PRC Affiliated List to continue to be involved in the PRC Business as operated by SPGK Cayman.

23.5   It is accordingly denied, if alleged, that SPGK Cayman did not use the Company's PRC Affiliate List.

23.6   In the premises, whether a copy of the PRC Affiliate List was transferred electronically or otherwise to SPGK Cayman is irrelevant. In any event, given that SPGK Cayman was operated by the Ascentra Group, it is denied, if it is alleged, that SPGK Cayman did not have access to a physical copy of the PRC Affiliate List.

23.7   Save as aforesaid, paragraph 27(f) is not admitted.

24. As to sub-paragraph 27(g), it is denied that so-called "*active agents*" joined SPGK Cayman "*as a result of Mr Yoshida's hard work and skill*". The growth in the number of so-called "*active agents*" in the PRC Business came about as a result of the success of that business itself. At all material times, Mr Yoshida acted as representative of the Company and his involvement in the business carried on by SPGK Cayman was subject to the supervision of the management of the Company and in particular Mr Matthews (for a period of time) and Mr Matsuura. Overall, the day-to-day activities of the PRC Business as conducted by SPGK Cayman were undertaken by third parties or employees of the Ascentra Group. Mr Yoshida was only one such employee.

25. Paragraph 30(d) is denied. Paragraph 6 above is repeated.

26. As to sub-paragraphs 32(a) to 32(d):

26.1   The existence of the "back-to-back" agreements pleaded in paragraph 32(a) is not admitted.

26.2   The "back-to-back" agreements if they existed, the various agreements pleaded in paragraph 37 of the ASOC and the other agreements pleaded in paragraph 32 of the Defence were entered into at a time when the Major Shareholders were considering a formal separation of the ownership of SPGK Cayman and the Company in accordance with the terms of the MOU. As such they were intended to reflect an arms-length commercial relationship between SPGK Cayman and the Ascentra Group. However, no formal separation occurred. Paragraph 6.9 above is repeated. As a consequence, the parties did

6

not conduct themselves in accordance with the terms of the pleaded agreements. In particular, as above pleaded SPGK Cayman did not make any payments pursuant to terms of said agreements for the products and services supplied.

26.3    The existence of the License Agreement pleaded in paragraph 32(c) is admitted.

26.4    In the premises, paragraph 32(d) is denied.

27. As to sub-paragraph 33(b):

27.1    Some of the operations of the PRC Business were undertaken by local providers in the PRC, at all times subject to the supervision of the management of the Company either directly or indirectly through the employees of affiliated entities of the Company.

27.2    Paragraph 6 above is repeated.

27.3    Payments were made by customers of the PRC Business by credit card.

27.4    Planet Payment collected the PRC Receipts.

27.5    Prior to 2019, the PRC Receipts were paid by Planet Payment to SPGK International. Thereafter, some of the PRC Receipts were paid by Planet Payment to SPGK Singapore.

27.6    The PRC Receipts were used to pay for the expenses of the PRC Business and the Ascentra Group generally.

27.7    Save as aforesaid, sub-paragraph 33(b) is denied.

28. It is denied that Mr Matsuura was merely a "*high-level / general advisor*" to SPGK Cayman, or that he (or the Company) deferred "*all major business decisions to Messrs Yoshida and Homma*" as pleaded in sub-paragraph 33(c). At all material times prior to May 2018, Mr Matthews and Mr Matsuura (from time-to-time with input from Mr Homma) together made all major business decisions in relation to SPGK Cayman and the PRC Business, and at all material times thereafter, Mr Matsuura made all major business decisions in relation to SPGK Cayman and the PRC Business.

29. The second sentence of paragraph 34 is not admitted and its relevance is denied.

30. As to sub-paragraphs 35(a) to (g):

30.1    Paragraph 6 above is repeated.

30.2    The Cancellation Agreement was completed at a time when Mr Matthews believed that Mr Mr Matsuura and Mr Yoshida were taking steps to seek to remove the Company's interest in the PRC Business for no consideration.

30.3    Mr Matthews obtained legal advice in relation to the Cancellation Agreement from the Company's outside legal counsel, Mr Tom Poletti.

7

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

30.4    Before the Cancellation Agreement was entered into, (i) Mr Matsuura and Mr Homma were removed as directors of IR-P and (ii) the shareholders of the Company passed a unanimous resolution to amend the Company's Articles of Association.

30.5    Save as aforesaid, sub-paragraphs 35(a) to (g) are not admitted.

## B.4. Fall-Out Between the Major Shareholders

31.  As to sub-paragraphs 37(a) to (c):

31.1    The Plaintiff repeats paragraph 30 above. Mr Matthews sought to gain control of the Company, as he felt it necessary to protect his personal rights, the rights of minority shareholders generally, and to protect the stability of the PRC Business for all the management team and staff, as well as all the leaders and agents of the PRC Business.

31.2    Mr Matsuura and Mr Homma were removed as directors of IR-P by a written resolution pursuant to s. 128(e) of IR-P's articles of association, signed by Mr Matthews as "*Director and Nominator*" on 19 February 2018.

31.3    The Company's Articles of Association were amended during a meeting of the Board of Directors of the Company on 30 March 2018, at which Mr Matthews and Chris Miner ("**Mr Miner**") (both acting directors) were present and voting.

31.4    Mr Yoshida was removed as a director of the Company on 30 March 2018 by a Directors Resolution dated 30 March 2018, signed by Mr Matthews and Mr Miner.

31.5    Save as aforesaid, sub-paragraphs 37(a) to (c) are not admitted.

32.  Sub-paragraph 37(d) is admitted.

33.  Sub-paragraph 38(b)(ii) is denied:

33.1    Paragraph 6.9 above is repeated.

33.2    Mr Homma transferred the shares in Growth Today to Mr Yoshida at Mr Matsuura's request. Mr Matsuura intended that Mr Yoshida would hold the shares as nominee not as beneficial owner.

33.3    Mr Yoshida was remunerated for the services he provided to SPGK Cayman and the PRC Business by the Ascentra Group.

8

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

#### C.  CASH MANAGEMENT

34. The establishment of SPGK International to receive the PRC Receipts was a matter for the Company not for SPGK Cayman or Growth Today. The relevance of the second sentence of sub-paragraph 41(a) is accordingly denied. In any event, the Company was and remains the beneficial owner of SPGK Cayman.

35. Sub-paragraph 41(c) is denied. SPGK International provided cash management services to Ascentra and the Ascentra Group.

36. As to sub-paragraphs 41(d), (f) and (g), the particulars of the alleged understanding given in the counterclaim are insufficient. In any event, it is denied that there was an agreement or understanding that the PRC Receipts used to pay the Company's liabilities were to be treated as loans from SPGK Cayman to the Company. Paragraph 6 above is repeated.

37. As to paragraph 41(h), the existence of the Asset Purchase Agreement, dated 27 December 2017, between AOS and the Company, is admitted. The Plaintiff will rely on said agreement for its true terms and effect.

38. The second sentence of paragraph 42 is denied. The agents / customers of the PRC Business used credit cards to make payments for products supplied by the Ascentra Group. SPGK Cayman did not make any payments to the Ascentra Group for products supplied to the agents / customers of the PRC Business.

39. As to the third sentence of paragraph 42 and its sub-paragraphs:

39.1    No admissions are made as to the Defendants' state of knowledge.

39.2    It is denied that any payments were due from Planet Payment to SPGK Cayman. Paragraph 6 above is repeated.

39.3    It is admitted that Planet Payment paid (at least part of) the PRC Receipts to SPGK International from around January 2019, and it is averred Planet Payment also paid some of the PRC Receipts to SPGK Singapore.

39.4    The existence of a Merchant Processing Agreement between SPGK International and Planet Payment, dated 12 October 2018, is admitted.

39.5    Otherwise, the third sentence of paragraph 42 and its sub-paragraphs are not admitted.

40. The second sentence of sub-paragraph 44(b) is denied. All PRC Receipts received by Scuderia Bianco were held by Scuderia Bianco on trust for the Company.

9

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

FSD2023-0300                           Page 9 of 16                           2024-02-02

41. The third sentence of sub-paragraph 44(b) is vague and lacks sufficient particulars. It is not admitted.

**D.      TRUST CLAIM**

42. Sub-paragraph 46(a) is denied. Paragraph 26.2 above is repeated.

43. Sub-paragraph 46(b) is denied. Section C of the ASOC and paragraphs 6, 27, 35 and 38 to 40 above are repeated. The Plaintiff also refers to and relies upon:

   43.1   the Business Services Agreement dated 1 June 2019 pursuant to which Scuderia Bianco agreed to provide cash management services to the Company;

   43.2   the Defendants' pleat at paragraph 44(b); and

   43.3   paragraphs 56 and 71 of Mr Yoshida's Second Affidavit (in FSD No. 318 of 2021) dated 16 December 2022, and paragraph 98(a) of Mr Yoshida's Third Affidavit (in FSD No. 318 of 2021) dated 24 April 2023.

44. The second sentence of sub-paragraph 46(d) is denied. Paragraph 23 above is repeated.

45. The third and fourth sentences of sub-paragraph 47(a) are denied. Paragraphs 26 to 41 of the ASOC and paragraphs 6, 21, 23, 24 and 26.2 above are repeated.

46. Sub-paragraphs 47(d)(i) to (iii) are denied. Paragraph 38 of the ASOC and paragraph 28 above is repeated.

47. Sub-paragraphs 48(a) to (d) are denied. Paragraphs 61, 66, 67 and 78 of the ASOC and paragraphs 23 and 26.2 above are repeated. The Plaintiff also relies upon paragraph 52 below.

48. It is admitted that the introduction of SPGK Singapore and Scuderia Bianco in 2019 did not change the essential relationship between the Company on the one hand and SPGK Cayman on the other. Otherwise, sub-paragraph 49(a) is denied. Paragraph 65 of the ASOC and paragraph 6 above are repeated.

49. The second sentence of sub-paragraph 49(c) is denied. Paragraph 61 of the ASOC and Paragraph 23 above are repeated. The Plaintiff also relies upon paragraph 52 below.

10

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

50. Sub-paragraph 49(d) is not understood. Without prejudice to the foregoing, it is denied that the allegation of lack of good faith has not been properly pleaded. The Plaintiff also relies upon paragraph 78 of the ASOC and paragraph 52 below.

51. Paragraph 49(e) is denied. Paragraph 26.2 above is repeated.

52. Sub-paragraph 50(a) is denied. Without prejudice to that denial, at all material times Mr Yoshida knew that: (i) the PRC Business was formally operated by SPGK Cayman on behalf of the Company; (ii) he did not beneficially own the shares in Growth Today; and (iii) none of the Defendants were entitled to receive any part of the PRC Receipts for their own account. Mr Yoshida's knowledge is to be attributed to SPGK Singapore, SPGK Cayman and Scuderia Bianco.

53. Sub-paragraph 50(b) is denied. Paragraph 6 above is repeated.

54. Sub-paragraph 51(h) is denied:

    54.1    Mr Yoshida did not consider himself to be the beneficial owner of the shares in Growth Today. Mr Yoshida was seeking to leverage the fact that the shares in Growth Today were legally held in his name, and that a substantial portion of the PRC Receipts were accordingly under his ostensible control, to obtain a substantial "*severance pay*" from the Company.

    54.2    The mooted transfer of the shares in Growth Today to Mr Matsuura had it occurred would not have been inconsistent with the Company's claim. To the extent that Mr Matsuura had thereafter asserted any beneficial interest in the shares, the Company would have had an equivalent claim against Mr Matsuura accordingly.

55. The second sentence of sub-paragraph 51(i) is denied. Without prejudice to the generality of the foregoing, paragraph 67.2 of the ASOC is not inconsistent with paragraph 37 of the ASOC. Paragraph 26.2 above is repeated.

**E.    UNJUST ENRICHMENT**

**F.    BREACH OF DUTY AND KNOWING RECEIPT**

56. As to paragraph 61, it is denied that the claim against the First Defendant is circular or bound to fail. Article 178 of the Company's Articles of Association does not cover liability arising "*through the actual fraud or willful default of such Director or officer*". Mr Yoshida's actions constitute actual fraud or willful default on his part. As pleaded in the ASOC:

11

56.1    Mr Yoshida knew and knows that the PRC Receipts belong to the Company and Mr Yoshida knew and knows that he has no beneficial interest in the shares in Growth Today;

56.2    nevertheless, Mr Yoshida maintains that (i) the Defendants are entitled to retain the PRC Receipts and has refused to pay them over to the Company, and (ii) that he is beneficially entitled to the shares in Growth Today.

## DEFENCE TO COUNTERCLAIM

### G. RELATIONSHIP BETWEEN THE COMPANY AND SPGK CAYMAN

57. The Plaintiff repeats the matters stated in the ASOC and this Reply.

58. As to paragraph 64, this appears to be a summary of the Defendants' case as set out in paragraphs 4, 27(d) and 32 of the Defence. It is denied for the reasons pleaded above in response to those paragraphs.

59. As to paragraph 65:

59.1    To facilitate the operation of the Business, including the PRC Business, the Company caused its affiliated entities and certain third parties to provide various services to SPGK Cayman. The Company further repeats and relies on the matters pleaded in paragraph 6 above.

59.2    It is admitted that the Company entered into the contracts pleaded in the sub-paragraphs of paragraph 65.

59.3    The first sentence of paragraph 65(a) is admitted. The Services Agreement was executed by Mr Ashcroft on behalf of the Company and Masami Nakano ("**Ms Nakano**") on behalf of Ever Innovation. The Addendum was executed by Mr Yoshida on behalf of the Company, and Ms Nakano on behalf of Ever Innovation.

59.4    Ever Innovation is a company purportedly wholly owned by Ms Nakano, the personal assistant to Mr Matsuura. Ever Innovation provided services solely to Ascentra and its affiliated entities including SPGK Cayman.

59.5    Ever Innovation invoiced the Company for the services provided pursuant to the Services Agreement and the Services Agreement as amended by the Addendum.

12

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

59.6    Paragraph 65(b) is admitted. The services which V-Logic agreed to provide pursuant to the Service Agreement are specifically listed in Schedule A to the Service Agreement (and in the Addendum) and may be generally described as "*logistic support services*".

59.7    V-logic invoiced HEC Singapore for the services provided pursuant to the Service Agreement and its invoices were paid by Scuderia Bianco and AOS on behalf of iHealthScience.

59.8    Paragraph 65(c) is admitted. iHealthScience placed orders for health and beauty products with Ever Skill Co Ltd. Ever Skill Co Ltd invoiced the Company for the orders placed by iHealthScience.

59.9    Save that the services which Mels Art agreed to provide pursuant to the Master Consulting Agreement are listed in Exhibit "A" to that agreement, the first sentence of paragraph 65(d) is admitted.

59.10   Mels Art invoiced HEC Singapore for its services. Payment of the invoices was made variously by Scuderia Bianco and HEC Singapore out of the PRC Receipts.

59.11   Save as aforesaid, paragraph 65 is not admitted.

## H.  CASH MANAGEMENT OF SPGK CAYMAN

### H.1. Receipt of revenues

60. As to paragraph 66:

60.1    Section C of the ASOC and paragraphs 6, 27, 35 and 38 to 40 above are repeated.

60.2    As to sub-paragraph 66(b), it is admitted that SPGK International held a bank account with BOTW. Otherwise sub-paragraph 66(b) is not admitted.

60.3    Save as aforesaid, paragraph 66 is denied.

61. Paragraph 67 is denied. Without prejudice to the foregoing, it was Mr Matsuura's decision that:

61.1    The majority of future PRC Receipts would be transferred to SPGK Singapore's bank account and that the balance would continue to be remitted to SPGK International.

61.2    SPGK International could use the monies in its bank account to discharge expenses associated with the PRC Business.

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

**H.2. Payment of expenses**

62. As to paragraphs 68 and 69:

62.1    It is admitted that SPGK LLC and AOS entered into a Consulting Services Agreement dated 31 March 2017, pursuant to which AOS agreed to provide cash management services to SPGK LLC.

62.2    Mr Sanders, in his capacity as CEO of the Company, used AOS and SPGK International to pay expenses associated with the PRC Business.

62.3    No admissions are made as to whether Mr Sanders used SPGK LLC to pay expenses associated with the PRC Business.

62.4    The Company was the beneficial owner of any and all monies paid to AOS by SPGK International.

62.5    The Company was the beneficial owner of all monies paid by Planet Payment to SPGK LLC and SPGK International.

62.6    Otherwise, paragraphs 68 and 69 are denied.

63. As to paragraph 70:

63.1    It is admitted that SPGK Singapore and Scuderia Bianco maintain bank accounts with Shanghai Commercial and Savings Bank in Taiwan. It is averred that those bank accounts were opened for the purpose of removing Mr Sanders' control of the PRC Receipts.

63.2    It is admitted that SPGK Singapore and Scuderia Bianco entered into a Consulting Services Agreement dated 1 December 2019, pursuant to which Scuderia Bianco agreed to provide various services (incl. cash management services) to SPGK Singapore, and which agreement was executed on behalf of both companies by Mr Yoshida.

63.3    It is denied that any of the PRC Receipts paid to the Defendants were beneficially owned by the Defendants or any one of them.

63.4    It is admitted that SPGK Singapore made payments from the PRC Receipts to HEC and to discharge certain expenses related to the PRC Business.

63.5    Save as aforesaid, paragraph 70 is denied.

14

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

**I.    PAYMENT OF THE COMPANY'S LIABILITIES AND EXPENSES**

64.    Paragraph 71 is vague and lacks sufficient particulars. Without prejudice to the foregoing, it is denied that the Ascentra Group did not have access to operational bank accounts. As pleaded in paragraphs 56 and 57 of the ASOC, the Ascentra Group was able to use the bank accounts of both SPGK International and AOS.

65.    Paragraph 72 is embarrassing for want of particularity and is accordingly not admitted. Without prejudice to the foregoing, it is averred that the Ascentra Group paid expenses in relation to the Business, including the PRC Business.

66.    Paragraph 73 is denied. Paragraph 27 above is repeated. Insofar as SPGK Cayman remains liable to the Company's subsidiaries under the pleaded agreements, it has not discharged that liability in any event.

67.    Paragraph 74 is vague and lacks sufficient particularisation. In any event, the alleged "*Understanding*" is denied. Paragraph 6 above is repeated.

68.    As to paragraph 75:

68.1    There was no "*Understanding*" as alleged. Paragraph 67 above is repeated.

68.2    The Company was the beneficial owner of all PRC Receipts paid to SPGK International, SPGK Singapore and Scuderia Bianco.

68.3    All payments made by SPGK International, SPGK Singapore and Scuderia Bianco on behalf of the Company or its subsidiaries were made using monies beneficially owned by the Company.

68.4    It is denied insofar as it is alleged that any monies paid to SPGK International or Scuderia Bianco by SPGK Singapore belonged beneficially to SPGK Cayman or any of the Defendants.

68.5    It is admitted that the Company entered into a Business Services Agreement dated 1 June 2019 pursuant to which Scuderia Bianco agreed to provide cash management services to the Company.

68.6    Save as aforesaid, paragraph 75 is denied.

15

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

69. Paragraphs 76 and 77 are denied. The PRC Receipts were beneficially owned by the Company. Further there was no "*Understanding*" between SPGK Cayman and the Plaintiff as alleged. If contrary to the foregoing, such an "*Understanding*" existed, the Defendants are put to strict proof as to the amount that is said to be due to SPGK Cayman.

70. The Defendants' entitlement to the relief pleaded, or any other relief, is denied.

71. Save as expressly admitted otherwise here in this Defence to Counterclaim, each and every allegation contained in the Counterclaim is denied as if the same were set out here in this Defence and traversed *seriatim*.

_____

Campbells LLP

Attorneys for Ascentra Holdings, Inc. (in Official Liquidation)

**2 February 2024**

16

This **REPLY AND DEFENCE TO COUNTERCLAIM was Filed** by Campbells LLP, attorneys for Ascentra Holdings, Inc. (in Official Liquidation), whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010, Cayman Islands (GCX/NLI/KXL).

# EXHIBIT D



**COURT OF THE CAYMAN ISLANDS**

**VICES DIVISION**

<div align="right">

**CAUSE NO.: FSD 300 of 2023 (RPJ)**

</div>

**IN THE MATTER OF THE COMPANIES ACT (2023 REVISION)**

**BETWEEN:**

<div align="center">

**ASCENTRA HOLDINGS, INC. (IN OFFICIAL LIQUIDATION)**

</div>

<div align="right">

**Plaintiff**

</div>

<div align="center">

**-and-**

**(1) RYUNOSUKE YOSHIDA**

**(2) SHANG PENG GAO KE, INC. SEZC**

**(3) SPGK PTE LTD**

**(4) GROWTH TODAY INC.**

**(5) SCUDERIA BIANCO PTE LTD**

</div>

<div align="right">

**Defendants**

</div>

_____

<div align="center">

**THE 1ST TO 5TH DEFENDANTS' REPLY TO DEFENCE TO COUNTERCLAIM**

</div>

_____

1.      In this Reply to Defence to Counterclaim, unless otherwise stated:

   (a)   References to numbered paragraphs are to the corresponding paragraphs in the Reply
         and Defence to Counterclaim dated 2 February 2024 (**"RDC"**).

   (b)   The Defendants adopt the abbreviations and nomenclature used in their Defence and
         Counterclaim dated 22 December 2023 (**"DCC"**) and (where appropriate, and without
         any admission whatsoever) the RDC.

2.      This Reply to Defence to Counterclaim is filed and served without prejudice to the Defendants'
        right to seek further and better particulars of the ASOC and/or RDC, and/or to apply for striking
        out the ASOC and/or RDC, and pending provision of such particulars.

3.      Save insofar as the same consists of admissions and save as set out herein, the Defendants join
        issue with the Plaintiff on each and every allegation in the RDC.

4.      As to paragraph 6 (incorporated by paragraphs 57, 59.1 and 60.1):

(a)     Sub-paragraphs 6.4 and 6.9 are denied.  The Defendants repeat paragraphs 26 (particularly sub-paragraph 26(a)), 30(d) and 51 of the DCC.  The Defendants aver that it was the Major Shareholders' intention that Ascentra's subsidiaries would become product and service suppliers to SPGK Cayman. This intent is evidenced by the execution, implementation and performance of the agreements referred to in paragraph 37 of the ASOC and paragraph 32 of the DCC.

(b)     Sub-paragraph 6.6 is denied.  The Defendants repeat paragraphs 32 and 71 to 75 of the DCC, and further aver that the Defendants have made payments and/or provided consideration to the Ascentra Group for the products/services supplied.

(c)     Sub-paragraph 6.7 is vague and unparticularised and is denied.

(d)     As to sub-paragraph 6.8, if and insofar as the Plaintiff seeks to suggest that the so-called "PRC Receipts" were receipts of, or resulting from, the PRC Business (of the Company, as opposed to SPGK Cayman's own business in the PRC, separate from, independent of, and unrelated to, the Company), the same is denied.  The rest of this Reply to Defence to Counterclaim should be read subject to this.

5.      Paragraph 12.2 is denied. The Defendants aver:

(a)     That the Defendants did not plead that the Japan and Taiwan operations closed in or around April / May 2020. The Defendants instead pleaded (at paragraph 18(b)(ii) of the DCC) that in April / May 2020 a *decision* was made by the Company to close down these parts of the Interush business. The Defendants further aver that the Interush business in Japan and Taiwan was closed in or around late April 2021.

(b)     The Defendants deny that *"after April / May 2020, the sole focus of the Ascentra Group was on the PRC Business"* and aver that:

(i)     The Ascentra Group's focus after April / May 2020 was on closing down the Interush business in Japan and Taiwan; and

(ii)    While the Ascentra Group was closing down the Interush business in Japan and Taiwan, it continued to supply products and services to the SPGK Group in the ordinary course of business.

2

6.      As to paragraph 23 (incorporated by paragraph 57):

(a)      Sub-paragraph 23.1 is denied.  The Defendants repeat paragraphs 4, 27(e) and (f), 30(d), 35(b), 46(d), 48 and 49(a) of the DCC.

(b)      Sub-paragraphs 23.2 to 23.4 are denied.  The Defendants repeat paragraphs 27, 46(d) and 48 of the DCC and further aver that:

(i)      Before the meeting, Mr Matthews was aware that SPGK Cayman would be a totally separate company from the Company (and Interush), and had been advised to highlight (among other things) that SPGK Cayman was a totally new company with no corporate connection to the Company (or Interush) or its associated companies, and with separate ownership and directors.

(ii)      The *"speaking note"* referred to in paragraph 23.3 was a draft document and was not the final message conveyed to attendees of the meeting, namely that SPGK Cayman and the Company (and Interush) are separate.

(c)      Sub-paragraph 23.4 is vague and unparticularised and is denied. The Defendants further aver that any communications from the Company to the Affiliates would be based on the premise that SPGK Cayman and the Company (and Interush) are separate.

(d)      Sub-paragraphs 23.5 and 23.6 are denied.

7.      Paragraph 24 (incorporated by paragraph 57) is denied.

8.      Paragraph 26.2 (incorporated by paragraph 57) is denied.  Paragraphs 64 and 68 to 70 of the DCC are repeated. The Defendants further aver that:

(a)      The parties conducted themselves in accordance with the agreements pleaded at paragraph 37 of the ASOC as well as the back-to-back agreements pleaded at paragraph 32 of the DCC, which (as admitted by the Plaintiff), were intended to reflect an arms-length commercial arrangement between SPGK Cayman and the Ascentra Group;

(b)      As pleaded at paragraph 4(b) above, the SPGK Group did make payments and/or provide consideration pursuant to the agreements;

(c)      The parties did not conduct themselves in accordance with the MOU;

(d)    As there was no "formal" connection between the Ascentra Group and SPGK Cayman there was no need or basis for a *"formal separation"*, whether as alleged or otherwise; and

(e)    In the premises, the Ascentra Group and the SPGK Group have always been separate and this separation is evidenced by the parties' conduct, including but not limited to, the entry into and implementation of, the agreements pleaded at paragraph 37 of the ASOC and paragraph 32 of the DCC.

9.    Paragraphs 34 and 38 (incorporated by paragraph 57) are denied and the Defendants repeat paragraph 8 above and paragraphs 64 and 66 to 70 of the DCC.

10.    As to paragraph 54 (incorporated by paragraph 57):

(a)    Sub-paragraph 54.1 is not understood and is in any event denied. The Defendants aver that:

(i)    Mr Yoshida has been, and considered himself to be, the sole beneficial owner of the shares in Growth Today, and it is not understood why or how the Plaintiff is alleging that he did not so consider himself; and

(ii)    If which is denied *"Mr Yoshida was seeking to leverage the fact that the shares in Growth Today were legally held in his name, and that a substantial portion of the PRC Receipts were accordingly under his ostensible control, to obtain a substantial "severance pay" from the Company"*, such fact is not inconsistent with his sole beneficial ownership of the shares in Growth Today. Accordingly the relevance of this allegation is not understood.

(b)    Paragraph 54.2 is noted but it is denied that, in that scenario, the Company would have had an equivalent claim against Mr Matsuura, whether as alleged or at all. The relevance of this allegation is not understood.

11.    Paragraph 56 (incorporated by paragraph 57), is denied. It is denied that the case of *"actual fraud or willful default on [Mr Yoshida's] part"* is properly pleaded. None of the matters pleaded in sub-paragraphs 56.1 and 56.2, whether independently or taken together, is capable of supporting, or supports, such a plea. In any event, the Defendants deny sub-paragraph 56.1 and aver that:

(a)     The PRC Receipts do not belong, and have never belonged, to the Company;

(b)     Mr Yoshida has, and has had, sole beneficial interest in the shares in Growth Today; and

(c)     In the premises, the facts pleaded in paragraph 56.2 (save the word *"nevertheless"* and its connotation that Mr Yoshida is wrong so to maintain, and, in doing so, thereby commits *"actual fraud or willful default"*) are admitted but their relevance is denied.

12.    As to paragraph 59:

(a)     The first sentence of sub-paragraph 59.1 is denied.  The Defendants repeat paragraphs 4 and 33(b) of the DCC.

(b)     Paragraph 59.4 is not admitted. It is not within the Defendants' knowledge whether or not Ever Innovation provided services to any other business or entity outside of the Ascentra Group or SPGK Cayman. The Defendants deny that the Company's *"affiliated entities"* includes SPGK Cayman and repeat paragraphs 65(a) and 71 to 75 of the DCC.

13.    As to paragraph 62:

(a)     Sub-paragraph 62.2 is denied.  The Defendants repeat paragraph 41 of the DCC.

(b)     Sub-paragraphs 62.4 and 62.5 are denied.  The Defendants repeat paragraphs 41 and 66 of the DCC.

14.    As to paragraph 68, sub-paragraphs 68.2 and 68.3 are denied.   The Defendants repeat paragraphs 50(b) and 56 of the DCC, and aver that:

(a)     SPGK Cayman was the beneficial owner of all PRC Receipts paid to SPGK International, SPGK Singapore and Scuderia Bianco; and

(b)     All payments made by SPGK International, SPGK Singapore and Scuderia Bianco on behalf of the Company or its subsidiaries were made using monies beneficially owned by SPGK Cayman.

**Harney Westwood & Riegels**

8 March 2024

# EXHIBIT E



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION                                    FSD NO. 189 OF 2021 (DDJ)


IN THE MATTER OF THE COMPANIES ACT (2022 REVISION)

AND IN THE MATTER OF ASCENTRA HOLDINGS, INC. (IN OFFICIAL LIQUIDATION)


**Before The Honourable Justice David Doyle**

**In Chambers**

---
### ORDER
---

**UPON** the application of Graham Robinson and Ivy Chua Suk Lin as the joint official liquidators (the "**JOLs**") of Ascentra Holdings, Inc. (in Official Liquidation) (the "**Company**") by their summons dated 28 October 2022 (the "**Summons**")

**AND UPON** reading the Sixth Affidavit of Graham Robinson sworn on 28 October 2022 and Exhibit GR-6

**AND UPON** the Court being satisfied that the application is suitable to be disposed of on the papers without the need for an oral hearing

**IT IS ORDERED that:**

1    The JOLs' remuneration of ███████ incurred during the period from 17 September 2021 to 31 August 2022 is approved and shall be paid from the liquidation estate.


This **Order** is filed by Campbells LLP, Attorneys-at-law for the JOLs, whose address for service is Floor 4, Willow House, Cricket Square, PO Box 884, George Town, Grand Cayman KY1-1103.

2       The First Report of the JOLs dated 14 September 2022 (the "**First Report**"), the Addendum to the First Report dated 14 October 2022 (the "**Addendum**"), the Summons, any affidavits and exhibits filed in support of the Summons, and any correspondence with the Court which relates to the Summons, the First Report and/or the Addendum shall be sealed, subject to further orders, until such time as the liquidation of the Company has concluded.

3       The JOLs' costs of and incidental to this application shall be paid from the assets of the Company as an expense of the Official Liquidation.

Dated the   31  day of October 2022

Filed the   31  day of October 2022

*David Doyle*

_____

**The Honourable Justice David Doyle**
**JUDGE OF THE GRAND COURT**

2

This **Order** is filed by Campbells LLP, Attorneys-at-law for the JOLs, whose address for service is Floor 4, Willow House, Cricket Square, PO Box 884, George Town, Grand Cayman KY1-1103.

# EXHIBIT F



**COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**                        **FSD NO. 189 OF 2021 (DDJ)**

IN THE MATTER OF THE COMPANIES ACT (2023 REVISION)

AND IN THE MATTER OF ASCENTRA HOLDINGS, INC. (IN OFFICIAL LIQUIDATION)

Before The Honourable Justice David Doyle

In Chambers

---

### ORDER

---

**UPON** the application of Graham Robinson and Ivy Chua Suk Lin as the joint official liquidators (the "**JOLs**") of Ascentra Holdings, Inc. (in Official Liquidation) (the "**Company**") by their summons dated 13 February 2024 (the "**Summons**")

**AND UPON** reading the Eighth Affidavit of Graham Robinson sworn on 13 February 2024 and Exhibit GR-8

**AND UPON** the Court being satisfied that the application is suitable to be disposed of on the papers without the need for an oral hearing

**IT IS ORDERED that:**

1    The JOLs' remuneration of ▮▮▮▮▮▮ ncurred during the period from 1 September 2022 to 30 September 2023 is approved and shall be paid from the liquidation estate.

2    Subject to any further order, the Second Report of the JOLs dated 20 November 2023 (the "**Second Report**"), the Summons, any affidavits and exhibits filed in support of the Summons, and any correspondence with the Court which relates to the Summons and/or the Second Report shall be sealed until such time as the liquidation of the Company has concluded.

---

This **Order** is filed by Campbells LLP, Attorneys-at-law for the JOLs, whose address for service is Floor 4, Willow House, Cricket Square, PO Box 884, George Town, Grand Cayman KY1-1103.

2868411-1

3        The JOLs' costs of and incidental to this application shall be paid from the assets of the Company as an expense of the Official Liquidation.

Dated the 16 day of February 2024

Filed the 16 day of February 2024

*David Doyle*

_____

**The Honourable Justice David Doyle
JUDGE OF THE GRAND COURT**

2

This **Order** is filed by Campbells LLP, Attorneys-at-law for the JOLs, whose address for service is Floor 4, Willow House, Cricket Square, PO Box 884, George Town, Grand Cayman KY1-1103.

2868411-1

# EXHIBIT G

## ORDER 16

### PROOF OF DEBTS IN OFFICIAL LIQUIDATION

### PART I: PROCEDURE FOR PROVING

**Introduction (O. 16, r. 1)**

**1.** (1)   Where a solvent company is being wound up by the Court, the official liquidator shall pay the debts owing to its creditors in the ordinary course and in the currency of the obligation as if the company were still carrying on business.

(2)   Where a company which is insolvent or of doubtful solvency is being wound up by the Court, a person claiming to be a creditor of the company and wishing to recover his debt must (subject to Rule 7) submit his claim in writing to the official liquidator and is referred to as "proving" for his debt and the document by which he seeks to establish his claim is referred to as his "proof" or "proof of debt".

(3)   The official liquidator of a solvent company which is being wound up by the Court may require a creditor to submit a proof of debt if there is a doubt or dispute about the existence of the debt or the amount owing to the creditor.

(4)   It is the duty of the official liquidator to adjudicate the creditors' claims, for which purpose he acts in a quasi-judicial capacity.

**Form and Content of Proof (O. 16, r. 2)**

**2.** (1)   A proof of debt shall be in CWR Form No 24 or such other form or forms as the official liquidator may prescribe having regard to the nature of the claims against the company.

(2)   The official liquidator may prescribe different forms of proof of debt for use by different classes of creditor.

(3)   The following matters shall be stated in a creditor's proof of debt –

(a)   the creditor's name and address;

(b)   the total amount of his claim as at the date on which the company went into liquidation;

(c)   whether or not the claim includes interest and, if so, the basis upon which the creditor claims to be entitled to interest;

(d)   particulars of how and when the debt was incurred by the company; and

(e)     particulars of the security held by the creditor, the value which he puts on the security and the basis of his valuation..

(4)    Copies of all the documents evidencing the existence and amount of the debt must be annexed to the proof of debt.

(5)    The official liquidator may require the creditor to submit further and better particulars of his claim, including additional supporting documents.

(6)    The person signing the proof of debt (other than the creditor himself) must state his name, contact details and the basis upon which he is authorised to act on behalf of the creditor.

(7)    The official liquidator may require that a proof of debt be verified by affidavit.

**Supply of proof of debt forms (O. 16, r. 3)**

**3.**    (1)    Subject to Rule 7, proof of debt forms shall be sent by the official liquidator to every person who appears to him to be a creditor of the company.

(2)    Subject to Rule 7, proof of debt forms shall be sent to every person to whom the official liquidator sends notice of the first meeting of creditors in accordance with Order 8, rule 4.

**Cost of proving (O. 16, r. 4)**

**4.**    (1)    Every creditor bears his costs of proving his own debt, including the cost of responding to the official liquidator's requirement that he provide further and better particulars of his claim.

(2)    Nothing in this Rule shall prevent a creditor from claiming his costs of proving pursuant to the terms of a contract which is enforceable against the company.

(3)    The official liquidator's cost of adjudicating the proofs of debt is paid out of the assets as an expense of the liquidation.

**Withdrawal and variation of proof (O. 16, r. 5)**

**5.**    (1)    A creditor's proof may at any time, by agreement between himself and the liquidator, be withdrawn or varied as to the amount claimed.

**Admission and rejection of proof (O. 16, r. 6)**

**6.**   (1)   A proof may be admitted for dividend either for the whole amount claimed by the creditor, or for part of that amount.

(2)   Where the official liquidator has admitted a creditor's proof in full, he shall notify the creditor of this fact in CWR Form No 25.

(3)   Where the official liquidator has rejected the creditor's proof or admitted it only in part, he shall notify the creditor in CWR Form No 26, including –

(a)   a statement of the official liquidator's reasons for rejecting the whole or part of the claim; and

(b)   a statement of the creditor's right to apply to the Court for the official liquidator's decision to be reversed or varied.

**Admission without proof of debt (O. 16, r. 7)**

**7.**   (1)   This Rule applies to a company which has carried on a deposit taking business as a licensed bank.

(2)   All of the company's depositors to whom periodic statements of account were sent by the company shall be admitted to proof in respect of the amounts recorded due to them without requiring them to lodge proofs of debt unless the official liquidator has reason to believe that the company's deposit taking records are unreliable.

(3)   Where the official liquidator has admitted a depositor to proof without requiring him to submit a proof of debt, he shall send notice in CWR Form No 27 informing the depositor of this fact.

**Inspection of Proofs of Debts (O. 16, r. 8)**

**8.**   (1)   Subject to sub-rule (2), any proof of debt (including the supporting documentation, any further and better particulars and any correspondence relating to its adjudication) may be inspected by or on behalf of –

(a)   any creditor whose proof of debt has been admitted in whole or in part; or

(b)   any contributory of the company.

(2)   In the case of a creditor to whom the company owes a duty of confidentiality, the official liquidator shall not allow his proof of debt to be inspected by another creditor or contributory without first –

(a)      obtaining his written consent; or

(b)      obtaining a direction of the Court pursuant to section 4 of the Confidential Information Disclosure Law, 2016

## PART II: QUANTIFICATION OF CLAIM

### Enforcement of Subordination, Set-Off (or Non Set-Off) and Netting Agreements (O. 16, r. 9)

**9.**    (1)    Any agreement made between the company and a creditor prior to the commencement of the winding up that the claims of such creditor be subordinated or otherwise deferred to the claims of any other creditors (referred to in this Order as a "subordination agreement") are binding on the company in liquidation and shall be enforced by the official liquidator.

    (2)    Any contractual right of set-off or non set-off or netting arrangement agreed between the company and any creditor prior to the commencement of the liquidation (including both bilateral and multi-lateral set-off or netting arrangements) (referred to in this Order as a "set-off agreement", "non set-off agreement" and "netting agreement") are binding upon the company in liquidation and shall be enforced by the official liquidator.

### Mutual credit and set-off (O. 16, r. 10)

**10.**    (1)    This Rule applies where, before the commencement of the liquidation, the company has not concluded any set-off, non set-off or netting agreement with the creditor.

    (2)    If there have been mutual credits, mutual debts or other mutual dealings (other than a set-off or not set-off or netting agreement) between the company and the creditor, an account shall be taken of what is due from each party to the other in respect of the mutual dealings, and the sums due from one party shall be set off against the sums due from the other.

    (3)    Sums due from the company to another party shall not be included in the account taken under sub-rule (2) if that other party had actual notice at the time they became due that a winding up petition had been presented and was pending against the company.

    (4)    Only the balance (if any) of the account is provable in the liquidation. Alternatively, (as the case may be) the amount shall be paid to the official liquidator.

**Pre-liquidation Interest on Debts (O. 16, r. 11)**

**11.**   (1)   A creditor who has a contractual right to claim interest against an insolvent company  may prove for the amount of the interest accrued up to the date of the commencement  of the liquidation.

     (2)   A creditor having a contractual right to interest as against an insolvent company shall  not be entitled to prove for any interest accrued after the commencement of the liquidation.

**Post-liquidation Interest on Debts (O. 16, r. 12)**

**12.**   (1)   This Rule applies to every official liquidation of a company which lasts more than six months.

     (2)   Any surplus remaining after payment of the debts proved in the liquidation shall,  before being applied for any other purpose, be applied in paying interest on those debts in respect of the period during which they have been outstanding since the commencement of the liquidation pursuant to section 149 of the Law.

     (3)   The rate of interest payable under this Rule is the greater of –

          (a)   the contractual rate; or

          (b)   the prescribed rate under the Judgment Debts (Rates of Interest) Rules.

     (4)   The liquidator shall not pay interest under this Rule to any creditor whose claim to interest would amount to less than $500.

**Determination of the currency of the liquidation (O. 16, r. 13)**

**13.**   (1)   In the case of a solvent liquidation, the creditors are entitled and the official liquidator  is required to pay the company's debts in the currency of the obligation.

     (2)   In the case of an insolvent liquidation, a company's liabilities shall be translated into  the functional currency of the company (referred to in this Rule as the "currency of the liquidation") at the mid-market exchange rates prevailing –

          (a)   on the date of the commencement of the voluntary liquidation; or

          (b)   the date on which the winding up order was made,

     (referred to in this Rule as the "applicable exchange rate").

(3)     The official liquidator shall determine the currency of the liquidation in accordance with section 150(3) of the Law within 28 days of the date of his appointment and his determination shall be final and binding upon the company's creditors for all purposes.

(4)     The official liquidator's determination shall be certified in CWR Form No 28 and the certificate shall be filed in Court.

(5)     When a creditor proves for his debt in a currency other than the currency of the liquidation, the amount claimed shall be translated into the currency of the liquidation at the applicable exchange rate.

(6)     A creditor shall not be entitled to claim against an insolvent company in liquidation  any compensation for exchange losses resulting from changes in the market exchange rate occurring during the period between the date on which the winding up order was made and the date on which the dividend is paid.

## Payments of a periodical nature (O. 16, r. 14)

**14.**   (1)     In the case of rent and other payments of a periodical nature, the creditor may prove for any unpaid amount accrued up to the date when the winding up order is made.

(2)     Unless the official liquidator continues to pay the rent or other payments accruing due after the date on which the winding up order is made as an expense of the liquidation, the creditor's claim in respect of amounts accruing after the date on which the winding up order is made shall be limited to a claim for damages for breach of contract.

(3)     In calculating the amount of damages, the official liquidator shall assume that the creditor has taken all such steps as may be reasonable to mitigate his loss and shall apply a discount for accelerated payment using the rate of interest prescribed by the Judgment Debts (Rates of Interest) Rules.

## Debts payable at a future date (O. 16, r. 15)

**15.**   (1)     A creditor may prove for a debt of which payment was not yet due on the date when the company went into liquidation.

(2)     If the dividend becomes payable before the date on which the debt would have fallen due, the amount of the dividend shall be discounted for accelerated payment using the rate of interest prescribed by the Judgment Debts (Rates of Interest) Rules.

## Contingent claims (O. 16, r. 16)

**16.**   (1)     The official liquidator shall estimate the value of any debt which, by reason of its being subject to any contingency or for any other reason, does not bear a certain value.

94

(2)     The official liquidator may revise any estimate previously made, if he thinks fit by reference to any change of circumstances or to information becoming available to him.

(3)     Where the official liquidator has put an estimate upon a contingent claim or a debt the amount of which is subject to a contingency, he shall notify the creditor of this fact in CWR Form No 29, stating –

   (a)     the basis upon which this estimate has been made;

   (b)     the fact that the creditor may submit a varied proof of debt, having regard to changed circumstances;

   (c)     the fact that the official liquidator may vary his estimate, having regard to changed circumstances; and

   (d)     the official liquidator's agreement to extend generally the creditor's time for applying to the Court pursuant to Rule 18.


## PART III: APPEAL AGAINST REJECTION OF PROOF


### Introduction (O. 16, r. 17)

**17.**   If a creditor is dissatisfied with the official liquidator's decision with respect to his proof (including any decision on the question of priority), he may appeal to the Court for the decision to be reversed or varied.


### Application to Court (O. 16, r. 18)

**18.**     (1)     An appeal to the Court under Rule 17 shall be made within 21 days of the date upon which he received the official liquidator's notification under Rule 6.

   (2)     Every appeal under this Rule shall be made by summons in CWR Form No 30 and shall be served on the official liquidator.

   (3)     Every appeal under this Rule shall be supported by an affidavit and Order 11, rule 4(2) shall apply.

   (4)     Order 11, rule 3 shall apply to the hearing of every appeal under this Rule.

   (5)     An appeal under this Rule shall be treated as a *de novo* adjudication of the creditor's proof and the creditor may rely upon additional evidence in support of his claim, notwithstanding that he failed to make such evidence available to the official liquidator.

**19.**    [No order]

## PART IV: EXPUNGING ADMITTED CLAIMS

### Introduction (O. 16, r. 20)

**20.**    (1)    The Court may expunge a proof which has been admitted or reduce the amount in respect of which it has been admitted.

   (2)    The official liquidator may apply to expunge a proof on the ground that it appears, on the basis of information not available to the official liquidator at the time of his adjudication of the proof, that it ought not to have been admitted or ought to have been admitted for a lesser amount.

   (3)    A contributory or creditor who is dissatisfied with the official liquidator's decision to admit the whole or part of a creditor's proof for an amount exceeding $100,000 (or its equivalent in the currency of the liquidation) or 5% of the company's total liabilities (whichever is the less) may apply to expunge the proof on the ground that it should not have been admitted.

### Application to Court (O. 16, r. 21)

**21.**    (1)    An application to expunge a proof of debt shall be made by summons in CWR Form No 31 and shall be served on the creditor and, if made under Rule 20(3) of this Order, shall also be served on the official liquidator.

   (2)    An application under this Rule must be made promptly and, in any event, not later than the date upon which a dividend has been paid in respect of it.

   (3)    Every application under this Rule shall be supported by an affidavit and Order 11, rule 4(2) shall apply.