Robert J. Feinstein
Bradford J. Sandler
John A. Morris
Beth E. Levine
Jeffrey M. Dine
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone:     (212) 561-7700
Facsimile:      (212) 561-7777
E-Mail:          rfeinstein@pszjlaw.com
                     bsandler@pszjlaw.com
                     jmorris@pszjlaw.com
                     blevine@pszjlaw.com
                     jdine@pszjlaw.com

*Counsel for Shang Peng Gao Ke Inc. SEZC and SPGK Pte Ltd*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>ASCENTRA HOLDINGS, INC. (in Official Liquidation),<br><br>Debtor in a<br>Foreign Proceeding.[1] | Case No. 21-11854-dsj<br><br>Chapter 15 |

**REPLY DECLARATION OF JEFFREY M. DINE IN FURTHER SUPPORT**
**OF MOTION OF SHANG PENG GAO KE INC. SEZC**
**AND SPGK PTE LTD. PURSUANT TO 11 U.S.C. §§ 1517(d)**
**AND 1520(c) FOR AN ORDER TERMINATING THE RECOGNITION ORDER**

I, Jeffrey M. Dine, declare as follows:

1.       I am an attorney with the law firm of Pachulski Stang Ziehl & Jones LLP

("PSZJ"), with offices located at 780 Third Avenue, 34th Floor, New York, New York 10017, and

with other offices in Texas, California, and Delaware.

---

[1]      The Debtor's company registration number is 283719.  The Debtor's registered office is c/o JTC (Cayman) Ltd., 94 Solaris Avenue, Second Floor, Camana Bay, PO Box 30745, Grand Cayman, Cayman Islands, KY1-1203.

2.      PSZJ is counsel to Shang Peng Gao Ke Inc. SEZC ("SPGK Cayman") and SPGK Pte Ltd ("SPGK Singapore", and together with SPGK Cayman, "SPGK") in the above-captioned chapter 15 case.

3.      I am duly admitted to practice law in, among other places, the State of New York and the United States District Court for the Southern District of New York.

4.      I submit this reply declaration in further support of the *Motion of Shang Peng Gao Ke Inc. SEZC and SPGK Pte Ltd. Pursuant to 11 U.S.C. §§ 1517(d) and 1520(c) for an Order Terminating the Recognition Order* (the "Motion").

5.      A copy of the transcript of the deposition of Graham Robinson, taken February 29, 2024, is attached as **Exhibit 1**.

6.      A copy of the JOLS' *Fourth Letter to Court re Status Report* [ECF No. 82] (December 29, 2023), is attached hereto as **Exhibit 2**.

7.      A copy of the transcript of the deposition of Alexander Gray Henderson, taken September 28, 2023, is attached as **Exhibit 3**.

8.      A copy of the Judgment of the Court of Appeal of the Republic of Singapore in Civil Appeal No. 23 of 2022 is attached hereto as **Exhibit 4**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 14, 2023
        New York, New York

                                        */s/ Jeffrey M. Dine*
                                        Jeffrey M. Dine

# EXHIBIT 1

## Page 1

```
1    IN THE UNITED STATES BANKRUPTCY COURT
2    FOR THE SOUTHERN DISTRICT OF NEW YORK
3    -------------------------------------x
4    In re
5    ASCENTRA HOLDINGS, INC. (In Official
6    Liquidation),              Chapter 15
7                       Case No.21-11854(DSJ)
8
9          Debtor in a
10         Foreign Proceeding.
11   -------------------------------------x
12
13
14         VIDEOTAPED 30(b)(6) DEPOSITION
15                      OF
16            ASCENTRA HOLDINGS, INC.
17     By:  GRAHAM ROBINSON, Corporate Representative
18              New York, New York
19            Thursday, February 29, 2024
20
21
22
23
24   Reported by:
     Frank J. Bas, RPR, CRR
25   Job No. J10806182
```

## Page 2

```
1
2
3                    February 29, 2024
4                    9:38 a.m. EST
5
6          Videotaped 30(b)(6) Deposition of ASCENTRA
7    HOLDINGS, INC., by GRAHAM ROBINSON, Corporate
8    Representative, held at the offices of Pachulski Stang
9    Ziehl & Jones, 780 Third Avenue, New York, New York,
10   before Frank J. Bas, a Registered Professional
11   Reporter, Certified Realtime Reporter, and Notary
12   Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1    A P P E A R A N C E S :
2
3    PILLSBURY WINTHROP SHAW PITTMAN LLP
     Attorneys for Petitioners
4        31 West 52nd Street
         New York, New York 10019
5
6    BY:  HUGH M. McDONALD, ESQ.
         (hugh.mcdonald@pillsburylaw.com)
7        JOHN A. PINTARELLI, ESQ.
         (john.pintarelli@pillsburylaw.com)
8
9    CAMPBELLS LLP
     JOLs Cayman Islands Counsel
10       Floor 4, Willow House, Cricket Square
         Grand Cayman KY1-9010
11       Cayman Islands
12   BY:  GUY COWAN, ESQ.
         (gcowan@campbellslegal.com)
13
         KATIE LOGAN, ESQ.(Via Zoom)
14       (klogan@campbellslegal.com)
15
16   BLAIR LEAHY KC (Via Zoom)
     For Joint Liquidators of Ascentra Holdings
17       20 Essex St. Chambers
         London, England, United Kingdom
18       (bleahy@twentyessex.com)
19
20
21
22
23
24
25
```

## Page 4

```
1    A P P E A R A N C E S :
2
     PACHULSKI STANG ZIEHL JONES LLP
3    Attorneys for SPGK Pte. Ltd.
         780 Third Avenue, 34th Floor
4        New York, New York 10017
5    BY:  JOHN A. MORRIS, ESQ.
         BETH E. LEVINE, ESQ.
6        JEFFREY DINE, ESQ.
         (jmorris@pszjlaw.com)
7        (blevine@pszjlaw.com)
         (jdine@pszjlaw.com)
8
9
10   HARNEY WESTWOOD & RIEGELS
         3rd Floor, Harbour Place
11       103 South Church Street
         Grand Cayman
12       PO Box 10240 KY1-1002
         Cayman Islands
13
     BY:  CAITLIN MURDOCK, ESQ.
14       (caitlin.murdock@harneys.com)
15
     ALSO PRESENT:
16   DMITRY ZVONKOV, Videographer
     RYUNOSUKE "LUKE" YOSHIDA
17
18   (APPEARING VIA ZOOM):
19   NIENKE LILLINGTON, Campbells
     SUI HUNG YEUNG, Harneys
20   ALIANA DODDS, Campbells
     MINNA WU, Harneys
21   KELSEY SABINE, Harneys
22
23
                          - o0o -
24
25
```



Page 5

1        G. ROBINSON
2        THE VIDEOGRAPHER:  We are on the
3   record.  Today's date is February 29,
4   2024.  The time on the video is
5   9:38 a.m.
6        This is video 1 in the deposition
7   of Graham Robinson In Re Ascentra
8   Holdings, Inc., in the U.S. Bankruptcy
9   Court, Southern District of New York.
10  Case No. 21-11854(DSJ).
11       This deposition is taking place at
12  780 Third Avenue, New York, New York.
13  The videographer is Dmitry Zvonkov, the
14  court reporter is Frank Bas, both with
15  Esquire.
16       Will counsel please identify
17  themselves for the record.
18       MR. MORRIS:  John Morris, Pachulski
19  Stang Ziehl & Jones, for SPGK.
20       THE COURT REPORTER:  Just the main
21  players, that's fine.
22       MR. McDONALD:  Hugh McDonald,
23  Pillsbury Winthrop, for the witness,
24  Mr. Robinson.
25       THE VIDEOGRAPHER:  Will the

Page 6

1        G. ROBINSON
2        reporter please swear in the witness.
3             — — —
4
5   GRAHAM ROBINSON,
6   called as a witness, having been first duly
7   sworn by a Notary Public, was examined and
8   testified
9   as follows:
10  EXAMINATION BY
11  MR. MORRIS:
12       Q.  Good morning, Mr. Robinson.
13       A.  Good morning.
14       Q.  My name is John Morris.  I'm an
15  attorney at Pachulski Stang Ziehl & Jones, and
16  we represent SPGK in connection with the
17  Ascentra Chapter 15 proceeding.  Thank you
18  very much for coming to New York.
19       Do you understand that we're here
20  for your deposition today?
21       A.  Yes.
22       Q.  And have you ever been deposed
23  before, sir?
24       A.  Yes.
25       Q.  How many times?

Page 7

1        G. ROBINSON
2        A.  Once.
3        Q.  And how long ago was that?
4        A.  Good question.  I would say 2018.
5        Q.  And was it in a personal capacity
6   or in a professional capacity?
7        A.  Professional capacity.
8        Q.  Was it in the United States or was
9   it elsewhere?
10       A.  In the United States.
11       Q.  Okay.  So I don't know how much of
12  that you remember, it's six years ago, but
13  really general ground rules:
14       I'm not here to trick you.  I'm
15  going to ask you a series of questions.  It's
16  very important that you allow me to complete
17  my question before you begin your answer.
18       Is that fair?
19       A.  Understood.
20       Q.  And it's very important for me to
21  allow you to complete your answer before I
22  begin the next question.  And if I fail to do
23  that, will you let me know?
24       A.  Yes.
25       Q.  If at any time I ask a question

Page 8

1        G. ROBINSON
2   that you don't understand, will you let me
3   know that, too?
4        A.  Okay.
5        Q.  Okay.  If you need a break at any
6   time, feel free to let me know that, as long
7   as a question is not pending.
8        Is that fair?
9        A.  Understood.
10       Q.  Okay.
11       MR. McDONALD:  John, just before we
12  go on, it's not his personal deposition.
13  He's here as the foreign representative
14  of Ascentra.  You've noticed this --
15       MR. PINTARELLI:  Somebody's device
16  is on so it's echoing.  Is the Zoom
17  connected too?
18       (Pause in proceedings.)
19       MR. MORRIS:  I agree.  He's not
20  here in his individual -- as a personal
21  deposition.  He's here as a
22  representative of the estate.
23       MR. McDONALD:  Correct.  You've
24  noticed this as a 30(b)(6).  And he's
25  here as the foreign representative, as a

Page 9

```
1            G. ROBINSON
2    representative of the Ascentra Holdings
3    estate.
4         THE COURT REPORTER:  Can we go off
5    the record?
6         MR. MORRIS:  I think we should.
7         THE VIDEOGRAPHER:  Are we going off
8    the record?
9         THE COURT REPORTER:  Yes.
10        THE VIDEOGRAPHER:  This ends
11   media 1.  We're going off the record at
12   9:42.
13        (Pause in proceedings.)
14        THE VIDEOGRAPHER:  This begins
15   media 2.  On the record at 9:46.
16   BY MR. MORRIS:
17   Q.   Okay.  Back on the record.
18        Mr. Robinson, you serve as one of
19   the joint official liquidators for an entity
20   called Ascentra Holdings, Inc., is that
21   correct?
22   A.   Yes.
23   Q.   Okay.  When did you become a
24   liquidator of that entity?
25   A.   A voluntary liquidator or official
```

Page 10

```
1            G. ROBINSON
2    liquidator?
3    Q.   Let's start with voluntary.
4    A.   That was the 1st of June 2021, I
5    believe.
6    Q.   And you became the official
7    liquidator in September?
8    A.   17th of September 2021.
9    Q.   Okay.  How did you come to be
10   the voluntary liquidator for Ascentra
11   Holdings, Inc.?
12   A.   I was appointed via the shareholder
13   resolutions.
14   Q.   And do you recall who the
15   shareholders were?
16   A.   Of Ascentra Holdings?
17   Q.   Yes, sir.
18   A.   I do, yes.
19   Q.   And who were they at the time that
20   you were appointed?
21   A.   I am slightly uncertain whether
22   under Cayman law you would be entitled to know
23   who the shareholders of Ascentra are.
24   Q.   Are you not going to tell me?
25   A.   I'm happy to tell you.  But I've
```

Page 11

```
1            G. ROBINSON
2    got --
3         MR. McDONALD:  Can we --
4         MR. PINTARELLI:  Graham, it's okay
5    to answer.  All of the information is
6    public.  It's in the public filing in
7    the U.S., verified petitions, so it's
8    okay.
9         THE WITNESS:  It's in the public
10   filing, okay.
11   Q.   Before you answer I want to make
12   something really clear here.
13   A.   Yes.
14   Q.   So I am going to ask questions, and
15   from time to time Mr. McDonald might object.
16   A.   Understood.
17   Q.   And when he objects, sometimes he's
18   objecting because he's trying to preserve the
19   record because he thinks there's something
20   improper about the question from an
21   evidentiary point of view.  That gives me the
22   opportunity to either correct the question, if
23   I agree with him, or say I don't really care,
24   for whatever reason in my head, and you'll
25   answer the question.
```

Page 12

```
1            G. ROBINSON
2         He may also from time to time
3    specifically direct you not to answer a
4    question, and he and I will discuss why he's
5    doing that so I understand the basis for it.
6    If he doesn't direct you not to answer a
7    question -- and, you know, Mr. MacDonald will
8    give you the ultimate advice -- but as a
9    general matter, if he doesn't direct you not
10   to answer, you should answer the question.
11   Okay?
12        MR. MORRIS:  Is that fair, Hugh?
13        MR. McDONALD:  And to the extent
14        that you believe that your answer may
15        implicate the attorney-client privilege,
16        please let us know, and then we can
17        consult.  Okay?
18        MR. MORRIS:  Yes.
19   Q.   To be very clear, if in your head
20   you think the divulging -- you know, answering
21   a question will violate a duty or a law or an
22   obligation on your part, we'll take a break,
23   and you can consult with Mr. MacDonald and
24   we'll figure out how to go forward.  Okay?
25   A.   Okay.  Yes.
```



Page 13

1          G. ROBINSON
2     Q.   All right?
3          So let's go back to where I was.
4  Do you recall who the shareholders were who
5  appointed you as the voluntary liquidator?
6     A.   Of Ascentra Holdings?
7     Q.   Yes.  Sir.
8     A.   IR-P Holdings Limited.  INTL Media.
9  And the other shareholders are Jeffrey
10  Boshears.
11         Ryan -- I can't remember Ryan's
12  name.  It begins with K.
13         And Alex Olivia.  Or Oliva.  Oliva.
14     Q.   Do you know who the principal was
15  of IR-P who appointed you on behalf of that
16  entity?
17     A.   The liquidator of IR-P Holdings.
18     Q.   And what's that person's name?
19     A.   That person's name is me.
20     Q.   And when did you become the
21  liquidator of IR-P?
22     A.   I became the liquidator of --
23  voluntary liquidator of IR-P Holdings on the
24  28th of May 2021.
25     Q.   And so as the liquidator of IR-P,

Page 14

1          G. ROBINSON
2  you voted as that entity in its capacity as a
3  contributory to Ascentra Holdings, Inc. to
4  appoint you as the voluntary liquidator of
5  that company, is that right?
6     A.   Yes.
7     Q.   Do you know who the principal was
8  at -- I think you said INTL?
9     A.   (Nodding head affirmatively.)
10     Q.   -- who acted to appoint you the
11  voluntary liquidator of Ascentra Holdings,
12  Inc.?
13     A.   I do.  That was Marty Matthews.
14         THE COURT REPORTER:  Can you spell
15     the name?
16         THE WITNESS:  Marty.  It's Martin
17     Matthews, but he goes as Marty.
18     M-A-R-T-Y.
19     Q.   And how did it come to be; can you
20  recall the circumstances under which you
21  became the voluntary liquidator of Ascentra
22  Holdings, Inc.?  Do you recall who approached
23  you?
24     A.   I was approached by Campbells
25  attorneys in the Cayman Islands.

Page 15

1          G. ROBINSON
2     Q.   And did you have an understanding
3  at that time as to who Campbells represented?
4     A.   Yes.
5     Q.   And what was your understanding as
6  to who Campbells represented at the time they
7  approached you about the possibility of
8  serving as the voluntary liquidator?
9     A.   They represented, I believe, or
10  acted for Marty Matthews.
11     Q.   And who at Campbells first
12  approached you about this potential
13  engagement?
14     A.   Guy Cowan.
15     Q.   And do you recall what Mr. Cowan
16  told you about the potential engagement?
17         MR. McDONALD:  Objection.
18     A.   I would say that the conversations
19  I had with Guy Cowan would be privileged.
20     Q.   At the time that he approached you
21  had you been appointed --
22     A.   No.
23     Q.   -- in any capacity?
24         MR. McDONALD:  Let him finish the
25     question.

Page 16

1          G. ROBINSON
2     THE WITNESS:  Sorry.
3     Q.   At the time that he approached you
4  about the possibility of serving, is it your
5  contention that there was some type of
6  privilege relationship?
7         MR. McDONALD:  John, I've given you
8     a lot of latitude here.  We have
9     specific topics on the 30(b)(6).  He's
10     not here, again, in his personal
11     capacity.  He's here as the
12     representative to answer questions
13     concerning specific topics, not the
14     circumstances surrounding his
15     appointment.
16         MR. MORRIS:  Okay.
17         MR. McDONALD:  I've given you a lot
18     of latitude up until now, but you're
19     going beyond the scope of this
20     deposition.
21         MR. MORRIS:  Okay.  Is it your
22     position that I'm not allowed to ask any
23     questions unless they specifically
24     relate to the topics?
25         MR. McDONALD:  Yes.  We have



Page 17

1          G. ROBINSON
2   specific enumerated topics.  We've gone
3   over this with the Court.  Our objection
4   to four of them still stands, and we'll
5   deal with them when you get to them.
6   But I've given you a lot of latitude.
7   Again, he is not here in his individual
8   personal capacity.
9          MR. MORRIS:  I appreciate that.
10  And I am going to tell you our position
11  is that the 30(b)(6) topics are the
12  topics in which he had an affirmative
13  obligation to educate himself.  It
14  doesn't mean that I'm not allowed to ask
15  any question.  I've never in my life
16  heard in a 30(b)(6) deposition that I
17  can't ask a question.  Because otherwise
18  I would have had to put in the topic
19  "Background," how were you appointed.
20  Like, I might as well have put in my
21  outline.
22         But that's our position.  I have
23  heard your position.  I am going to ask
24  my questions, and you can feel free to
25  direct him not to answer any time you

Page 18

1          G. ROBINSON
2   want.
3          Is that fair?
4          MR. McDONALD:  Fair.
5          MR. MORRIS:  Okay.
6   DIR  Q.   Do you recall what Mr. Cowan told
7   you initially when he approached you about the
8   possibility of serving as the voluntary
9   liquidator of Ascentra?
10         MR. McDONALD:  Objection.
11         Direct the witness not to answer.
12     Q.   Are you going to follow your
13  counsel's advice?
14     A.   Yes.
15     Q.   Okay.  How long in advance of your
16  acceptance of the appointment did Mr. Cowan
17  approach you?
18         MR. McDONALD:  Objection to form.
19     A.   So when -- you're asking me when I
20  was first approached by Campbells prior to me
21  being appointed?
22     Q.   Yes, sir.
23     A.   This is from memory.  I would say
24  it would be in some period of time in 2020.
25  DIR  Q.   Okay.  Were you engaged by anybody

Page 19

1          G. ROBINSON
2   to do any work with respect to Ascentra prior
3   to the time you accepted the appointment of
4   voluntary liquidator on or about June 1, 2021?
5          MR. McDONALD:  Objection.
6          Direct the witness not to answer.
7      Q.   Are you going to follow your
8   counsel's advice?
9      A.   Yes.
10     Q.   Did you ever do any work on behalf
11  of Ascentra prior to June 1, 2021?
12     A.   No.
13  DIR  Q.   Did you have any relationship with
14  any of Ascentra's principals prior to the time
15  you accepted the appointment on June 1, 2021?
16         MR. McDONALD:  Objection.
17         Direct the witness not to answer.
18     Q.   Are you going to follow your
19  counsel's advice?
20     A.   Yes.
21     Q.   Did your work as the voluntary
22  liquidator of IR-P concern Ascentra in any way
23  prior to June 1, 2021?
24         MR. McDONALD:  Objection to form.
25     A.   You're going to have to rephrase

Page 20

1          G. ROBINSON
2   that question.  It doesn't make sense.
3      Q.   Okay.  I think you mentioned -- you
4   mentioned that you became the voluntary
5   liquidator of IR-P on May 28, 2021.
6      A.   Okay.
7      Q.   In your capacity as the voluntary
8   liquidator of that entity, did you do anything
9   that concerned Ascentra before you accepted
10  the appointment as Ascentra's voluntary
11  liquidator?
12         MR. McDONALD:  Objection to form.
13     Q.   And this is where you can answer.
14  If you understand.  If you don't, I can try
15  again.
16     A.   No.
17     Q.   Okay.  Do you know when --
18  withdrawn.
19         Has Ascentra -- withdrawn.
20         Is Ascentra a holding company?
21         MR. McDONALD:  Objection to form.
22         MR. MORRIS:  Withdrawn.
23     Q.   Do you understand what a holding
24  company is, sir?
25     A.   Yes.

Page 21

1         G. ROBINSON
2      Q.   What's your understanding of a
3   holding company?
4      A.   A holding company is a, what I
5   would say is the top co. of a group structure,
6   and underneath will be numerous entities, and
7   the shareholding flows eventually to the top
8   co.
9      Q.   Is it your understanding that
10  Ascentra was a holding company?
11     A.   I considered it a holding co., yes.
12     Q.   And it had certain entities that it
13  directly or indirectly owned that -- conducted
14  the operations of the Ascentra enterprise, is
15  that fair?
16     A.   Yes.
17     Q.   Okay.  I am going to use the phrase
18  "Ascentra" to refer to the whole enterprise;
19  not just Ascentra Holdings, Inc., but also to
20  its direct and indirect affiliates who carried
21  out the operations.
22          Is that fair?
23     A.   Yes.
24     Q.   And if I want to refer specifically
25  to the entity that filed the Chapter 15

Page 22

1         G. ROBINSON
2   proceeding in New York, I'll say "Ascentra
3   Holdings, Inc."
4      A.   Okay.
5      Q.   That's the distinction that I am
6   making.
7      A.   Okay.  Yes.
8      Q.   So with that distinction, do you --
9   is Ascentra engaged in any operations today?
10     A.   (No response.)
11         MR. MORRIS:  Withdrawn.
12     Q.   As of today is Ascentra engaged in
13  any operations other than those that are
14  attendant to its liquidation?
15         MR. McDONALD:  Objection to form.
16     A.   No.
17     Q.   Okay.  Do you know when Ascentra
18  ceased operating as a commercial entity?
19         MR. McDONALD:  Objection to form.
20     A.   My understanding is early 2021.
21  DIR Q.   Do you know whether Ascentra
22  Holdings, Inc. -- withdrawn.
23          Prior to that time, do you know
24  whether Ascentra Holdings, Inc. conducted
25  business in its own name or whether business

Page 23

1         G. ROBINSON
2   was conducted exclusively through the names of
3   the direct and indirect subsidiaries?
4         MR. McDONALD:  Objection.
5          I direct the witness not to answer.
6          (Reporter requests clarification.)
7      Q.   Are you going to follow counsel's
8   advice?
9      A.   Yes.
10     Q.   Okay.  Do you serve as a liquidator
11  for any entity that was directly or indirectly
12  controlled by Ascentra Holdings, Inc.?
13     A.   Yes.
14     Q.   Can you identify each entity?
15     A.   I am currently the official
16  liquidator of HEC International Limited.
17          I was the voluntary liquidator of
18  Interush (Singapore), which is now closed and
19  been dissolved.
20          And I believe I am the liquidator
21  of -- at the HEC International (Taiwan)
22  company.
23     Q.   Did you become -- apologies.
24          Was that in an official capacity or
25  as a voluntary liquidator?

Page 24

1         G. ROBINSON
2         MR. McDONALD:  Objection to form.
3      A.   For which entity?  Sorry.
4      Q.   Fair.  Let's take them one at a
5   time.
6      A.   Okay.
7      Q.   I think you said HGC?
8         MR. McDONALD:  HEC, I believe.
9      Q.   Did you ever serve as an official
10  liquidator for that entity?
11     A.   HEC International I was the
12  voluntary liquidator, and now I'm the official
13  liquidator.
14     Q.   And did that happen after you
15  became the official liquidator of Ascentra
16  Holdings, Inc. or before?
17     A.   After.
18     Q.   The same question with respect to
19  Interush (Singapore).  Before --
20          Withdrawn.  One question at a time.
21          Did you become -- did you ever
22  become an official liquidator of Interush
23  (Singapore)?
24     A.   No.
25     Q.   Did you serve as the voluntary



Page 25

1    G. ROBINSON
2  liquidator of that entity?
3      A.  Yes.
4      Q.  And were you appointed voluntary
5  liquidator of that entity before or after you
6  became the official liquidator of Ascentra
7  Holdings, Inc.?
8      A.  After.
9      Q.  And then I think the last one was
10  the Taiwan entity, is that right?
11      A.  Correct.
12      Q.  Were you ever appointed the
13  official liquidator of that entity?
14      A.  I'm not trying to be difficult on
15  the question.  The Taiwanese liquidation
16  process is a very unusual and complicated one.
17  I would say it was -- it would be considered
18  as like an official liquidation, is how I
19  would look at it.  Yes.
20      Q.  I appreciate that.  I am going to
21  confess to having no familiarity with Taiwan
22  insolvency proceedings.
23      A.  I am still struggling, yes.
24      Q.  Did that occur after you were
25  appointed the official liquidator in the

Page 26

1      G. ROBINSON
2  Ascentra Holdings, Inc. case?
3      A.  After.
4      Q.  Did the same people who appointed
5  you as the voluntary liquidator of Ascentra
6  Holdings, Inc. also appoint you as the
7  voluntary liquidator of the three entities you
8  just identified?
9      MR. McDONALD:  Objection to form.
10      MR. MORRIS:  Withdrawn.
11      Q.  Did the same people and entities
12  that you identified earlier as having
13  appointed you as the voluntary liquidator of
14  Ascentra Holdings, Inc. also appoint you as
15  the voluntary liquidator of the three entities
16  you just identified?
17      A.  No.
18      Q.  Who first appointed you the
19  voluntary liquidator of International Limited?
20      MR. McDONALD:  Objection to form.
21      Q.  If you recall.
22      A.  So say the question again?
23      Q.  You know what?  It's okay.  I'm
24  just going to move on.
25      Are any of the three entities you

Page 27

1      G. ROBINSON
2  just identified subject to a liquidation
3  proceeding in the Cayman Islands?
4      A.  Yes.
5      Q.  Which one?
6      A.  HEC International.
7      Q.  And in your capacity as the
8  official liquidator of that entity have you
9  declared that entity to be solvent, insolvent
10  or doubtful solvency?
11      A.  Solvent.
12      Q.  Do you recall when that entity was
13  placed into liquidation under the court
14  supervision of the Cayman Islands?
15      A.  7th of December 2021.
16      THE COURT REPORTER:  Can you say
17  the date again?
18      THE WITNESS:  7th of December 2021.
19      MR. MORRIS:  Okay.  I am going to
20  mark as Robinson exhibit 1 the amended
21  notice of deposition.
22      (Robinson Exhibit 1, Amended Notice
23  of Deposition of Ascentra Holdings, Inc.
24  was marked for identification.)
25  BY MR. MORRIS:

Page 28

1      G. ROBINSON
2      Q.  Mr. Robinson, do you have exhibit 1
3  in front of you?
4      A.  Yes.
5      Q.  Okay.  Have you seen this before?
6      A.  I believe I have, yes.
7      Q.  Do you know what it is?
8      A.  I'm reading the title.  It says
9  Amended Notice of Deposition of Ascentra
10  Holdings, Inc.
11      Q.  Okay.  And if you can turn to --
12  the pages aren't numbered, but I think it's
13  the third page of the document, at the bottom
14  you'll see a heading "Amended Topics" --
15      A.  Yes.
16      Q.  -- that go on through the rest of
17  the document.
18      A.  Okay.
19      Q.  Have you seen those topics before?
20      A.  Yes.
21      Q.  And when did you see them for the
22  first time, if you recall?
23      A.  I don't -- from memory I couldn't
24  give you a specific date.  I know SPGK filed
25  its motion to terminate the recognition at the

Page 29

1      G. ROBINSON
2  end of June 2023, so it's going to be sometime
3  after that.  And I couldn't give you a
4  specific date.  I'm sorry.
5      Q.  Subject to whatever objections or
6  directions you received from counsel, are you
7  otherwise prepared to answer questions on the
8  topics set forth in exhibit 1?
9      A.  Yes.
10     Q.  Okay.  Did you do anything to
11  prepare for today's deposition?
12     A.  I did, yes.
13     Q.  What did you do?
14     A.  I met with my counsel yesterday in
15  New York.  And I also reviewed and kind of
16  refreshed my memory on past documents.  And
17  specific documents would be the status reports
18  filed in the Chapter 15 process; the two joint
19  official liquidator reports that have been
20  filed in the Cayman courts; my deposition --
21  not deposition.  My declaration that I filed
22  regarding the application for Chapter 15 back
23  in October 2021.
24      I reviewed the, our objection to
25  the motion to remove the restraint, which is

Page 30

1      G. ROBINSON
2  dated September 23.
3      And I also reviewed the amended
4  written statement of the claim that Ascentra
5  has filed against SPGK in the Cayman courts,
6  which is dated 11th of October 2023.
7      And I also looked at some old
8  financial kind of Excel spreadsheet documents
9  that we received from the company when we got
10  appointed.
11     Q.  What Excel spreadsheet documents
12  are you referring to?
13     A.  These are documents that we
14  obtained that -- at the beginning of your
15  appointment from Whinney, who was the account
16  manager, that does set out a summary of
17  creditors of Ascentra.
18     Q.  And did you rely on that Excel
19  spreadsheet to identify Ascentra Holdings,
20  Inc.'s creditors?
21     A.  It was one of the documents that
22  we -- we used.
23     Q.  Do you recall any other documents
24  that you reviewed in connection with your
25  preparation for today's deposition?

Page 31

1      G. ROBINSON
2      A.  Not -- no, not specific documents.
3      Q.  Did you speak with anybody who is
4  or purports to be a creditor in connection
5  with your preparation for today's deposition?
6      MR. McDONALD:  Objection to form.
7      A.  No.
8      Q.  Did you speak with anybody who is
9  or who claims to be a contributory to Ascentra
10  Holdings, Inc. in connection with the
11  preparation of your deposition?
12     A.  No.
13     Q.  Have you spoken with anybody, with
14  any person or entity, who represents --
15  withdrawn.
16      Going back to June 1, when you were
17  appointed the voluntary liquidator, and
18  thinking about the people who appointed you or
19  appointed you on behalf of corporate entities,
20  have you spoken with any of those people in
21  connection with today's deposition?
22     A.  No.
23     Q.  What do you do for a living, sir?
24     A.  I am an insolvency practitioner.
25     Q.  And do you work for a company?

Page 32

1      G. ROBINSON
2      A.  Yes.
3      Q.  What company do you work for?
4      A.  That is Crowe, which is C-R-O-W-E,
5  Cayman Limited.
6      Q.  And do you have a role or a title
7  or a position at Crowe Cayman Limited?
8      A.  Director.
9      Q.  When did you become a director at
10  Crowe?
11     A.  That was November 2019.
12     Q.  How long have you been affiliated
13  with Crowe?
14     A.  Since that date.
15     Q.  What does it mean to be an
16  insolvency practitioner?
17     A.  How long have you got?
18      What does it mean to be an
19  insolvency practitioner?
20     Q.  Mm-hmm.
21     THE COURT REPORTER:  "Yes"?
22  BY MR. MORRIS:
23     Q.  Yes.
24     A.  I am appointed official liquidator
25  or voluntary liquidator of Cayman entities.  I



Page 33

1          G. ROBINSON
2    also potentially assist companies with
3    financial matters.
4        Q.   And how long have you been an
5    insolvency practitioner?  When did you first
6    become one?
7        A.   Well, are you asking me when I
8    became licensed or when I -- how long have I
9    worked in insolvency matters?
10       Q.   We'll get to the license in a
11   moment.
12       A.   Okay.
13       Q.   When did you first start working in
14   the insolvency space?
15       A.   In 1993.
16       Q.   Can you describe for me generally
17   your educational background?
18       A.   Yes.  I'm obviously English, so
19   I've got O levels, A levels, and a degree.
20   And I also have accountancy qualifications,
21   but I'm not a chartered accountant.  And I
22   also have an insolvency qualification, formal
23   insolvency qualification, from the U.K.
24       Q.   So you're a chartered accountant?
25       A.   I am not a chartered accountant,

Page 34

1          G. ROBINSON
2    no.  I have accountancy qualifications, but I
3    am not a chartered accountant.
4        Q.   Okay.
5        THE COURT REPORTER:  Did you say O
6    level and A level?
7        THE WITNESS:  Yes.  O level and
8    then A level, yes.
9        Q.   And you have a license?
10       A.   I've got a -- yes, I have a
11   U.K. license through the Insolvency
12   Practitioners Association in the U.K.
13       Q.   When did you get that?
14       A.   I passed my qualification in 2000.
15   I got my license in 2008.
16       Q.   What does one need to do to obtain
17   a license?
18       A.   Short answer, certain amount of
19   hours worked and some exams that you need to
20   pass.
21       Q.   So is it fair to say that you
22   worked in the insolvency space for about 15
23   years before you obtained your license?
24       A.   Seven and eight is 15, yes.
25       Q.   Exactly.

Page 35

1          G. ROBINSON
2        Q.   Who were you employed by before you
3    joined Crowe in 2019?  Can you give me -- let
4    me back up.
5        From 1993, give me an overview of
6    your professional history and affiliations.
7        A.   I initially worked for a company
8    called Casson Beckman & Partners in
9    Manchester.
10       I left them and went to PwC,
11   PricewaterhouseCoopers.
12       I then left PricewaterhouseCoopers
13   and went to a company called RPG.
14       After RPGK I went to PKF.  After
15   PKF I went to Kroll, which is K-R-O-L-L.
16       I left Kroll in 2009 and went to
17   the Cayman Islands, where in the Cayman
18   Islands I worked for Robinson & Hunter until
19   2012.
20       I then went back to the U.K. in
21   2012.  I worked for myself and I also worked
22   for a company called BB Financial Services.
23       In 2014 I went back to the Cayman
24   Islands.  I then worked for Chris Johnson
25   Associates up until I started work for Crowe

Page 36

1          G. ROBINSON
2    Cayman Limited.
3        Q.   Okay.  When did you receive your
4    first appointment as an official liquidator in
5    the Cayman Islands?
6        A.   That would be two thousand and --
7    it's going to be late 2009 or early 2010.
8        Q.   Can you give me an estimate of how
9    many times you've been appointed an official
10   liquidator by the Cayman courts?
11       A.   Ten to 15.
12       Q.   And does that include the several
13   that you have mentioned today?
14       MR. McDONALD:  Objection to form.
15       A.   Yes.
16       Q.   Have you ever been appointed a
17   liquidator in any jurisdiction other than the
18   United Kingdom or the Cayman Islands?
19       A.   Well, the companies we referred to
20   today would be Singapore and Taiwan.  No.
21       Q.   Prior to this case have you ever
22   been involved in a Chapter 15 proceeding in
23   the United States?
24       A.   No.
25       Q.   I want to see if we can just make



Page 37

1           G. ROBINSON
2   sure that we have an understanding of kind of
3   where we started earlier with respect to the
4   corporate organization.  And I'm going to
5   just --
6           MR. MORRIS:  Let's mark as exhibit
7       2 a portion of a document that was filed
8       in the Chapter 7 -- Chapter 15
9       proceeding at Docket No. 77.  It's just
10      an organizational chart that I am going
11      to be focused on.
12          THE WITNESS:  Okay.
13          (Robinson Exhibit 2, Organizational
14      chart was marked for identification.)
15  BY MR. MORRIS:
16      Q.   I am going to represent to you that
17  we actually copied this from a filing I think
18  that originated in the Cayman Islands but that
19  was filed in New York.  I think it was part of
20  the complaint that was filed in the Cayman
21  Islands.
22          Have you seen this organizational
23  chart before?
24      A.   Yes.
25      Q.   And did you personally, in your

Page 38

1           G. ROBINSON
2   capacity as the official liquidator of
3   Ascentra Holdings, Inc., authorize it to be
4   filed on behalf of that entity?
5           MR. McDONALD:  Objection to form.
6       A.   Filed in which proceeding?
7       Q.   In the Cayman Islands.
8       A.   Yes.
9       Q.   And did you also authorize it to be
10  filed in the Chapter 15 proceeding in
11  New York?
12      A.   Yes.
13      Q.   To the best of your knowledge, is
14  this corporate organizational chart accurate?
15      A.   There is one error on this chart.
16      Q.   Can you just point that out to me,
17  please?
18      A.   The -- the shareholding in IR-P for
19  INTL Media has changed since this document has
20  been filed.
21      Q.   So I think you're referring to the
22  box that's below Martin Matthews and Mari
23  Matthews, is that right?
24      A.   Correct.  Yes.
25      Q.   Okay.  And can you describe for me

Page 39

1           G. ROBINSON
2   your understanding of what has changed?
3       A.   Basically, Mari Matthews holds her
4   50 percent shares in a separate entity.
5       Q.   Okay.  But she still now, instead
6   of directly, indirectly owns 50 percent of
7   International Media Holdings Inc. --
8   International Media Holdings, LLC; is that
9   your understanding?
10          MR. McDONALD:  Objection to form.
11      A.   She -- she doesn't own any -- she's
12  not a shareholder of INTL Media anymore.  But
13  she's a shareholder in her own right of IR-P
14  Holdings.
15      Q.   Okay.
16      A.   Through a separate entity to INTL.
17      Q.   Are there any other changes that
18  you're aware of?
19      A.   No.  That looks -- that looks okay.
20      Q.   Okay.  So now, just to make sure I
21  understood what you said earlier, if we look
22  at the chart, you'll see Ascentra Holdings,
23  Inc. is a Cayman Islands entity there; and
24  above that there are three shareholders, three
25  direct shareholders:  IR-P Holdings Inc.,

Page 40

1           G. ROBINSON
2   International Media Holdings, LLC, and then a
3   box called "Management and Related Parties."
4           Do I have that right?
5       A.   Yes.
6       Q.   And are those the people and the
7   entities that appointed you as the voluntary
8   liquidator back in June of 2021?
9       A.   Yeah.  I was appointed through the
10  shareholder resolutions.  Yes.
11      Q.   Yes.  And IR-P Holdings, Inc.
12  (Cayman Islands), that's one that you
13  mentioned earlier is in liquidation, is that
14  right?
15      A.   Yes.
16      Q.   And that's a solvent -- that's
17  subject to a solvency certificate, is that
18  right?
19          MR. McDONALD:  Objection to form.
20      A.   Yes.
21      Q.   Interush I think you said has been
22  dissolved, is that right?
23      A.   Interush -- sorry.  Interush
24  (Singapore), yes.
25      Q.   Yes.  Sorry for the ambiguity.  Let



Page 41

1          G. ROBINSON
2  me ask the question again.
3          Interush Singapore has been
4  dissolved, is that right?
5      A.  Yes.
6      Q.  Okay.  And HEC International
7  Company Limited in Taiwan, that's also subject
8  to liquidation, correct?
9      A.  Yes.
10     Q.  Okay.  HEC International Limited
11  Cayman Islands, that's also subject to
12  judicially supervised liquidation proceedings
13  in the Cayman Islands, right?
14     A.  Yes.
15     Q.  And you serve as the official
16  liquidator of that entity?
17     A.  Yes.
18     Q.  And that entity is also subject to
19  a solvency certificate, correct?
20         MR. McDONALD:  Object to the form.
21     A.  Yes.
22     Q.  I think there's a statement in
23  documents somewhere that HEC International,
24  Limited Singapore branch has stopped doing
25  business.

Page 42

1          G. ROBINSON
2          Is my recollection about that
3  correct?
4          MR. McDONALD:  Object to the form.
5      A.  That is correct.
6      Q.  Is that entity the subject of any
7  liquidation proceeding or has it simply ceased
8  doing business?
9      A.  It's not -- it's not in a
10  liquidation process.  And that branch has been
11  closed.
12     Q.  So am I right that all of the
13  entities that are directly beneath Ascentra
14  Holdings, Inc. Cayman Islands served as
15  operating companies of Ascentra Holdings,
16  Inc. before it ceased to do business in
17  early 2021?
18         MR. McDONALD:  Objection to form.
19     A.  They -- they -- I would -- they
20  were part -- they were part of the group and I
21  am sure at some time over the years --
22         (Reporter requests clarification.)
23     A.  Those entities underneath Ascentra
24  are part of the group, yes.  And they've all
25  been part of the operational business of

Page 43

1          G. ROBINSON
2  Ascentra over the years in one way, shape or
3  form.
4      Q.  On the lower left-hand corner of
5  this organizational chart there's four
6  entities under the name Ted Sanders.
7          Do you see that?
8      A.  Yes.
9      Q.  Do you have an understanding of who
10  Mr. Sanders is?
11     A.  Yes.
12     Q.  What's your understanding of who
13  Mr. Sanders is in relation to this
14  organizational chart?
15     A.  Mr. Sanders was the former CFO of
16  Ascentra.
17     Q.  Did he ever serve as a director, to
18  the best of your knowledge?
19     A.  Of Ascentra?
20     Q.  Let me ask a better question.
21         Do you know whether Mr. Sanders
22  ever served as a director of Ascentra
23  Holdings, Inc.?
24     A.  No.
25     Q.  Do you know if Mr. Sanders ever

Page 44

1          G. ROBINSON
2  served as a director -- withdrawn.
3          I am going to refer to the one,
4  two, three, four, five, six -- seven entities
5  below the Ascentra Holdings, Inc. box as
6  "Ascentra's subsidiaries."
7          Is that fair?
8      A.  Okay.
9      Q.  Do you know whether Mr. Sanders
10  ever served as the director of any of
11  Ascentra's subsidiaries?
12     A.  From my memory, no.
13     Q.  Do you know what period of time
14  Mr. Sanders served as the CFO of Ascentra?
15     A.  I know it was -- I don't know the
16  exact start date.  I know he was involved from
17  2018 up until his resignation in May 2021, and
18  that he could possibly be involved in the
19  group before April 2018.  Sorry, I can't fully
20  recall.
21     Q.  Do you know, did he serve as the
22  CFO of Ascentra Holdings, Inc.?
23     A.  Of Ascentra.
24     Q.  And when you use the phrase
25  "Ascentra" in the context of Mr. Sanders'



Page 45

1       G. ROBINSON
2   role, what do you mean?
3       MR. McDONALD:  Object to the form.
4       A.   Can you just explain the question
5   better for me, please?
6       Q.   Yes.  I'll try again.
7       You've got Ascentra Holdings,
8   Inc. and then you've got the seven
9   subsidiaries.  Right?
10      A.   Mm-hmm.  Yes.
11      Q.   Okay.  Let's take them separately.
12      Do you know whether Mr. Sanders
13  ever served as the CFO of any of the seven
14  subsidiaries?
15      MR. McDONALD:  Objection to form.
16      A.   In my view, Mr. Ted Sanders was the
17  CFO of Ascentra group, and that included
18  Ascentra Holdings, all the subsidiaries, and
19  also SPGK.
20      MR. McDONALD:  John, you're going
21      way off topic here.  Can you please
22      explain how any of this line of
23      questioning relates to any of the topics
24      that are set forth in the deposition
25      notice?

Page 46

1       G. ROBINSON
2       MR. MORRIS:  I will tell you that
3   it goes to, number 1, the likelihood of
4   success on the merits and the
5   relationship of these entities.  And
6   number 2, it's background.
7       And if you want to direct him not
8   to answer, you're free to do that at any
9   time.  I don't think this stuff is
10  controversial, but you'll defend your
11  witness as you wish.
12      MR. McDONALD:  It goes to number 1,
13  the certificate of solvency?
14      MR. MORRIS:  No, the last four.
15  The last four questions.  Likelihood of
16  success on the merits and facts relating
17  thereto.
18      MR. McDONALD:  Again, we're giving
19  you some latitude, but it's going to be
20  very limited.
21      MR. MORRIS:  You'll do what you do,
22  and I'll do what I do, and we'll do it
23  respectfully.
24      MR. McDONALD:  Okay.
25  Q.   Do you know whether Ascentra ever

Page 47

1       G. ROBINSON
2   had a direct or indirect ownership interest in
3   any of the four entities under Mr. Sanders'
4   name?
5       MR. McDONALD:  Objection to form.
6       A.   The two entities at the bottom
7   there, AOS Property Ventures, and they
8   obviously -- it's got formerly known as
9   Interush, Inc., and then there's also Interush
10  International, they may have been set over the
11  side of the structure at one time, but I can't
12  recall from memory.
13      Q.   Okay.  Is it fair to say that this
14  chart doesn't depict any direct or indirect
15  relationship between any of the four entities
16  under Mr. Sanders' names and any of the
17  Ascentra Holdings entities, is that fair?
18      MR. McDONALD:  Objection to form.
19      A.   Just say that again for me, please?
20      Q.   Yeah.  I am talking specifically
21  now of ownership.
22      A.   Okay.
23      Q.   Okay.  Do you have any reason to
24  believe, as you sit here today, that Ascentra
25  Holdings, Inc. or any of its subsidiaries ever

Page 48

1       G. ROBINSON
2   had a direct or indirect ownership interest in
3   any of the four entities under Mr. Sanders'
4   name?
5       MR. McDONALD:  Objection; form.
6       A.   Like I said, they might have had
7   some ownership of these two at one time
8   previously, but I don't believe they had any
9   direct or indirect of Asian Offshore Services
10  and SPGK International.
11      Q.   And what's the basis for that
12  belief?
13      A.   Just -- just from I know the names
14  Interush, and I believe that they might --
15  just from memory -- they might have been part
16  of a bigger group structure that Ascentra had
17  prior to -- prior to 2016.
18      Q.   Are you aware of any facts
19  concerning either how, when or why they would
20  have ceased to have an ownership interest in
21  those two entities at the bottom of the
22  left-hand corner?
23      MR. McDONALD:  Objection to form.
24      A.   I do have a memory that they --
25  that Ted could have -- Ted Sanders, sorry,



Page 49

1          G. ROBINSON
2   could have purchased those companies from
3   Ascentra.
4        Q.   Do you have any understanding or
5   memory as to when that may have happened?
6        A.   No.  I've got no memory.
7        Q.   In the upper left-hand portion of
8   the document you've got Mr. Yoshida, is that
9   right?
10        A.   Yes.
11        Q.   And then below him you've got two
12   entities, Scuderia Bianco Limited --
13        A.   Yes.
14        Q.   -- and Lequios Holdings?  Lequios?
15        A.   Lequios?
16        Q.   I'll go with your --
17        A.   I'm not good at any of those fancy
18   words.
19        Q.   And then there's also a third
20   entity called Growth Today Inc.
21            Do I have that right?
22        A.   Yes.  I see them.
23        Q.   Okay.  Do you know if Ascentra
24   Holdings, Inc. or any of its subsidiaries ever
25   had a direct or indirect ownership interest in

Page 50

1          G. ROBINSON
2   Scuderia Bianco Limited?
3        MR. McDONALD:  Objection to form.
4        A.   No.
5        Q.   Okay.  Do you know if Ascentra
6   Holdings, Inc. or any of its subsidiaries ever
7   had a direct or indirect ownership interest in
8   Lequios Holdings?
9        A.   No.
10        Q.   Do you know if Ascentra Holdings,
11   Inc. or any of its subsidiaries ever had a
12   direct or indirect ownership interest in
13   Growth Today Inc.?
14        MR. McDONALD:  Objection to form.
15        A.   Just so I'm clear, what do you mean
16   by "direct or indirect ownership"?
17        Q.   That they were -- that they held
18   shares in, that they held equity, that they
19   were a contributory, either in their own name
20   or through another entity or person that they
21   controlled.
22        MR. McDONALD:  I'm going to object
23        and direct the witness not to answer.
24        The ownership and interrelationship of
25        these entities is subject to the

Page 51

1          G. ROBINSON
2   proceeding in the Cayman Islands, and
3   SPGK has answered that complaint, we
4   have responded.  And to the extent that
5   there is any interrelationship between
6   these entities, which we allege there
7   is, will be dealt with in connection
8   with those proceedings.
9        MR. MORRIS:  I'm not asking if
10   there's a relationship between the two.
11   I'm asking a very narrow question.  Let
12   me just ask -- let me just ask --
13        MR. McDONALD:  Can you just
14   rephrase that question, please?
15        MR. MORRIS:  Yes, I appreciate
16   that.
17   BY MR. MORRIS:
18        Q.   To the best of your knowledge, sir,
19   has Ascentra Holdings, Inc. or any of its
20   subsidiaries ever had a direct or indirect
21   ownership interest in Growth Today Inc.?
22        A.   What do you mean by "ownership
23   interest"?
24   DIR   Q.   That they -- that they were an
25   owner of that entity.  That they held some

Page 52

1          G. ROBINSON
2   portion -- all or some portion of the shares.
3        A.   Shares.
4        MR. McDONALD:  Objection.
5        I direct the witness not to answer.
6        MR. MORRIS:  What's the basis for
7        the direction?  Just so the record's
8        clear.
9        MR. McDONALD:  That is a subject to
10        the litigation in the Cayman Islands,
11        and as we have stated to the Court, we
12        are not litigating the Cayman proceeding
13        here as part of this 30(b)(6).
14        MR. MORRIS:  You've made that
15        argument.  I just want to make my
16        record.
17        MR. McDONALD:  I just want to be
18        perfectly clear.
19        MR. MORRIS:  I appreciate that.
20        MR. McDONALD:  The
21        interrelationship between Growth Today,
22        its ultimate switch in ownership and the
23        relationship between its prior principal
24        and the principals of Ascentra are being
25        litigated in the Cayman Islands.



Page 53

G. ROBINSON
MR. MORRIS: So this is my
opportunity -- because I want to make my
record, too -- this is my opportunity to
inquire as to the facts that relate to
the likelihood of success on the merits
in New York. And I appreciate your
argument, and I know you made it to the
New York court and here we are.
So I believe that the answer to
this question goes to the likelihood of
success of the merits, which is why I am
asking it, to be clear.
And with that, if you are going to
direct him not to answer, we'll just
move on.
MR. McDONALD: I am directing him
not to answer.
MR. MORRIS: Okay. I am just going
to reserve my right, for all of the
questions that you direct him not to
answer, to either seek -- because I want
to be clear -- to seek a preclusion
order in New York from Ascentra offering
any evidence that would have been

Page 54

G. ROBINSON
responsive to these questions in the
New York proceeding, or to compel
further deposition.
So those are the two things that
I'm reserving my right for, and we'll
just go forward.
MR. McDONALD: And the judge made
it very clear that if you're inquiring
into the success of the Cayman
proceeding, that is privileged and that
goes beyond the scope of this
deposition. He made that crystal clear
at the last hearing, and we reserve our
rights as well.
MR. MORRIS: Okay. I don't think
he said anything about privilege.
MR. McDONALD: He did.
MR. MORRIS: I don't think he said
anything about privilege, but okay.
MR. McDONALD: John, he did. He
said if the question is basically do you
think you're going to win Cayman, and
all of these are going to that, he said
that's privileged. He was very clear.

Page 55

G. ROBINSON
BY MR. MORRIS:
DIR Q. Sir, do you know if Ascentra
Holdings, Inc. or any of its subsidiaries ever
had a contract with Growth Today Inc. or any
of its subsidiaries?
MR. McDONALD: Objection.
I direct the witness not to answer.
Q. Are you going to follow your
counsel's advice?
A. Yes.
Q. Do you know if Ascentra Holdings,
Inc. or any of its subsidiaries ever commenced
legal proceeding to enforce any agreement that
it contended it had with Growth Today or any
of its subsidiaries?
MR. McDONALD: Objection to form.
A. Just repeat the question, please?
Q. Yes, I appreciate that. I could do
better.
Prior to the commencement of the
Ascentra Holdings, Inc. Cayman Islands
liquidation proceeding, are you aware of any
enforcement action that Ascentra Holdings,
Inc. or any of its subsidiaries took against

Page 56

G. ROBINSON
Growth Today Inc. or any of its subsidiaries
with respect to any contract?
A. No.
Q. Okay. Thank you.
Do you know if Ascentra Holdings,
Inc., as distinguished from the subsidiaries,
do you know if Ascentra Holdings, Inc. ever
provided any goods or services to Growth Today
Inc. or any of Growth Today Inc.'s
subsidiaries?
MR. McDONALD: Objection to form.
A. Just say the question again,
please?
Q. Sure. Do you know whether Ascentra
Holdings, Inc. -- withdrawn.
Prior to the commencement of the
Cayman Islands liquidation proceedings do you
know whether Ascentra Holdings, Inc. ever
provided goods and services to Growth Today
Inc. or any of the three subsidiaries listed
underneath it in this organizational chart?
A. And you're asking me for
specifically Ascentra Holdings, Inc., or --
Q. Correct.



Page 57

1        G. ROBINSON
2        A.  -- or not the Ascentra group?
3        Q.   Exactly.
4        MR. McDONALD:  Objection to form.
5        A.   Then the answer is no.
6   DIR  Q.   Okay.  Do you know if Growth Today
7   or any of the entities beneath Growth Today
8   ever paid money to a third party for the
9   benefit of Ascentra Holdings, Inc. or any of
10  its subsidiaries?
11       MR. McDONALD:  Objection.
12       I direct the witness not to answer.
13       MR. MORRIS:  Can I ask him if he
14       knows the answer to the question?  I'm
15       going to ask him the question, and then
16       you can decide.
17  DIR  Q.   Without divulging the answer to the
18  question, just yes or no, do you know whether
19  Growth Today Inc. or any of the three entities
20  beneath it ever paid any third party for the
21  benefit of Ascentra Holdings, Inc. or any of
22  its subsidiaries?  Just yes or no.
23       MR. McDONALD:  I'm still going to
24       direct him not to answer.
25       MR. MORRIS:  You're not even going

Page 58

1        G. ROBINSON
2   to let me know if he knows the answer to
3   the question?
4        MR. McDONALD:  Yes.
5        MR. MORRIS:  Okay.
6        Q.   Are you going to follow counsel's
7   advice?
8        A.   Yes.
9        MR. McDONALD:  John, when you come
10       to an appropriate point, can we take a
11       break?
12       MR. MORRIS:  Yes.  Now would be
13       great.
14       MR. McDONALD:  Is that okay?
15       MR. MORRIS:  Yes.  So we agree he's
16       under oath.
17       MR. McDONALD:  Yes.
18       MR. MORRIS:  No communication with
19       the witness while the deposition
20       continues.  But I'm happy to take a
21       break.
22       MR. McDONALD:  Thank you.
23       MR. MORRIS:  You bet.
24       THE VIDEOGRAPHER:  This ends
25       unit 2.  We're off the record at 10:44.

Page 59

1        G. ROBINSON
2        (Recess taken.)
3        THE VIDEOGRAPHER:  This begins
4   unit 3.  We're on the record at 10:56.
5        MR. MORRIS:  I am going to mark as
6   the next exhibit, which I think is
7   number 3, Robinson number 3, a document
8   that was previously marked as Hernandez
9   exhibit 5.  And it's entitled Joint
10  Official Liquidators' Certificate.
11       (Robinson Exhibit 3, CWR Form
12       Number 13, Joint Official Liquidators'
13       Certificate was marked for
14       identification.)
15  BY MR. MORRIS:
16       Q.   All right, sir.  Do you have
17  Robinson exhibit 3 in front of you?
18       A.   Yes.
19       Q.   Okay.  Do you know what that is?
20       A.   Yes.
21       Q.   And what is this document?
22       A.   This is the Joint Official
23  Liquidators' Certificate of Determination of
24  Solvency for Ascentra Holdings, Inc.
25       Q.   And in this document it says that

Page 60

1        G. ROBINSON
2   the joint official liquidators, quote, "hereby
3   certify that they have determined that the
4   above-named company should be treated as
5   solvent."
6        Did I read that correctly?
7        A.   Yes.
8        Q.   How did you make that
9   determination?
10       A.   So when we -- when we are appointed
11  official liquidators, one of our duties is to
12  just analyze the books and records that we
13  have in our possession.  I spoke to
14  stakeholders, management, former officers of
15  the company.  Reviewed financial information
16  in our possession.  And we make a
17  determination on whether the -- the company is
18  solvent.  And that's also discussed in
19  consultation with our attorneys.
20       And then we make a decision that we
21  should -- whether we should -- what
22  determination we should file.
23       And after that initial review, in
24  consultation, the decision was taken to file a
25  certificate of solvency.



Page 61

1      G. ROBINSON
2      Q.  You used the phrase "stakeholders."
3      Do you recall which stakeholders
4  you communicated with with respect to the
5  decision to identify Ascentra Holdings,
6  Inc. as solvent?
7      MR. McDONALD:  Objection to form.
8  I think there's confusion.  I think
9  you're saying -- did you "stakeholders"
10  or "stockholders"?
11      MR. MORRIS:  I heard him say
12  "stakeholders."
13      MR. McDONALD:  Okay.
14      MR. MORRIS:  Let me try again.
15      MR. McDONALD:  It just came across
16  as stockholders or stakeholders.  I
17  wasn't sure which you were going with.
18      MR. MORRIS:  I'll try again.
19      Q.  Did you speak with any stakeholders
20  in connection with your determination to
21  declare Ascentra Holdings, Inc. to be solvent?
22      MR. McDONALD:  Objection to the
23      form.
24      A.  When I say the word "stakeholder,"
25  I am talking about numerous parties involved

Page 62

1      G. ROBINSON
2  in the affairs of the company.
3      Q.  Okay.  Can you identify those
4  parties who were involved in the affairs of
5  the company?
6      A.  That I spoke to?
7      Q.  Yes.
8      A.  On the process, okay.  Yes.
9      That would be employees of the
10  group.  It would have been Ted Sanders.  It
11  was also, I believe, from memory, that I also
12  had communications with Luke Ryu.  Marty
13  Matthews.  And that would be it.
14      Did I say staff?
15      Q.  You said employees.
16      A.  Employees, okay.  Yes.
17      Q.  Do you remember the names of any of
18  the employees?
19      A.  Communication on that would have
20  been with Whinney.
21      Q.  Okay.  Out of the people that you
22  just identified, did any of them disagree with
23  the determination that you ultimately made
24  that Ascentra Holdings, Inc. is solvent?
25      MR. McDONALD:  Objection to form.

Page 63

1      G. ROBINSON
2      A.  No.
3      Q.  You mentioned "books and records."
4      Do you recall, and I appreciate
5  it's been some time, do you recall what books
6  and records you reviewed and relied upon to
7  reach your determination that Ascentra
8  Holdings, Inc. is solvent?
9      A.  It would have been through
10  communication and discussions with the
11  stakeholders and with the financial
12  information that we were provided to --
13  provided with by Whinney.
14      Q.  Among that information, was there a
15  general ledger, if you recall?
16      A.  We were aware of the -- the assets
17  of the group and what pertained to the assets
18  of the Ascentra group.
19      Q.  Did the determination of solvency
20  take into account not just assets but
21  liabilities?
22      A.  Yes.
23      Q.  Is there a particular test that you
24  utilized to determine that Ascentra Holdings,
25  Inc. is solvent?

Page 64

1      G. ROBINSON
2      MR. McDONALD:  Objection to form.
3      A.  There is no -- there is no specific
4  test that official liquidators undertake when
5  he's determining solvency.  It's the joint
6  official liquidators' opinion.
7      Q.  Do you know whether Ascentra
8  Holdings, Inc. maintained financial statements
9  for itself and its subsidiaries?
10      A.  Yes.  There are -- there are.  Yep.
11      Q.  And would those financial
12  statements include balance sheets?
13      MR. McDONALD:  Object to the form.
14      A.  Yes.
15      Q.  What other financial statements are
16  you -- do you have in mind when you think back
17  to what you reviewed in connection with this
18  analysis?
19      A.  Yeah, okay.
20      MR. McDONALD:  Let him finish the
21      question.
22      A.  Say the question again?  Sorry.
23      Q.  Okay.  Did you review financial
24  statements in connection with your analysis of
25  solvency?

Page 65

1          G. ROBINSON
2       A.   So when we got -- when we appointed
3   and we were reviewing the books and records in
4   our possession -- so when you say "financial
5   statements," there were no audited statements
6   for the recent period leading up to the
7   liquidation.  There were management accounts
8   and financial summaries and bank statements
9   and Excel spreadsheets showing balances at
10  bank and assets and stuff that is very basic.
11  It wasn't complicated.  It was easy to look
12  at, easy to assess.  And we deemed, after
13  reviewing those kind of financials, that the
14  company -- that Ascentra should be deemed
15  solvent.
16      Q.   Thank you very much.
17          Do you recall whether Ascentra
18  Holdings, Inc. reported their financial
19  statements on a consolidated basis with their
20  subsidiaries?
21          MR. McDONALD:  Objection to form.
22      A.   We have seen draft financial
23  statements and previous signed financial
24  statements where the accounts are
25  consolidated, yes.

Page 66

1          G. ROBINSON
2       Q.   Do you know the last period for
3   which Ascentra Holdings, Inc. received audited
4   financial statements?
5       A.   I'm not a hundred percent, but I
6   think it could be either 2017 maybe or 2018.
7   But that's from memory.  Sorry.
8       Q.   Do you recall if Ascentra Holdings,
9   Inc. prepared its financial statements on a
10  calendar-year basis, or was there some other
11  time period that they utilized?  Or
12  year-basis, fiscal year?
13      A.   Again, from memory I think the
14  financial year-end was December, but I
15  don't -- I don't fully recall.  I'm sorry.
16      Q.   Do you remember the name of
17  Ascentra's outside auditors for the period of
18  time that audited financial statements were
19  completed?
20      A.   I don't recall the name, no.
21      Q.   In your capacity as Ascentra's
22  joint official liquidator did you ever speak
23  with Ascentra's outside auditors?
24      A.   There were no outside auditors
25  appointed at the time of my appointment.

Page 67

1          G. ROBINSON
2       Q.   Okay.  In your review of the
3   records did you see anything that would have
4   reflected any disagreement between Ascentra
5   Holdings, Inc. and the last outside auditor
6   that it did have?
7          MR. McDONALD:  Objection to form.
8       A.   I can't from memory remember if
9   there was any statements in the last signed
10  audited statements from the auditor
11  questioning anything, how the accounts were --
12  were shown.
13      Q.   Okay.  And I think you testified
14  that your recollection is the last audited
15  financial statements were for either 2018 or
16  2019.
17          Do I have that right?
18          MR. McDONALD:  Objection.
19      Q.   Or was it '17 and '18?
20      A.   You're talking about --
21      Q.   Audited.
22      A.   -- today?
23      Q.   Mm-hmm.
24      A.   Yeah, probably seven -- maybe 2017.
25      Q.   Are you aware of any reason why

Page 68

1          G. ROBINSON
2   audited financial statements were not
3   completed for any period after the last one?
4       A.   I would say from the financials it
5   would be how -- how the account should be
6   recorded, and all the parties involved, how
7   they wanted the account to be shown.
8       Q.   Okay.  I think you said you are an
9   accountant, is that right?
10      A.   I have accountant qualifications.
11      Q.   Do you know whether Ascentra's
12  books and records were maintained under GAAP
13  accounting or, I guess, IFRS?
14      A.   I do not know.
15      Q.   You don't know.
16          MR. McDONALD:  John, just to be
17  clear, when you say "Ascentra" you mean
18  Ascentra Holdings or Ascentra group?
19          MR. MORRIS:  I appreciate that.
20  Ascentra Holdings, Inc.  Yes.
21          MR. McDONALD:  Okay.
22      Q.   And the same question then for any
23  of the subsidiaries.
24          Do you know if --
25          MR. McDONALD:  Ascentra group.  You



Page 69

1          G. ROBINSON
2    distinguished between Ascentra and
3    Ascentra Holdings.  So just to be
4    precise.
5        MR. MORRIS:  Okay.
6        Q.  You have never withdrawn the
7    certificate that's been marked as Robinson
8    exhibit 3, correct?
9        A.  Correct.
10       Q.  Okay.  As an experienced and
11   licensed insolvency practitioner, can you
12   share with me your understanding of the
13   circumstances that would require you to either
14   withdraw or amend this certificate?
15       MR. McDONALD:  To the extent you
16       can answer that without divulging
17       attorney-client privilege, please
18       answer.
19       A.  Just say the question again?
20   Sorry.
21       Q.  Just as a Cayman Islands insolvency
22   practitioner can you tell me your
23   understanding of the circumstances that would
24   require you to withdraw, amend or modify the
25   certificate?

Page 70

1          G. ROBINSON
2        A.  This is a general question, not
3    related to Ascentra?
4        Q.  Correct.
5        A.  That would be, as an officer of the
6    court and you've got a duty to monitor the
7    solvency during a lifecycle of the
8    liquidation, you would look and check
9    constantly on asset values and liability
10   values.  And if those change.
11       Q.  So is it fair to say that they
12   haven't changed in a manner in which it caused
13   you to withdraw the solvency certificate?
14       MR. McDONALD:  Objection to form.
15       A.  Since I filed this in September
16   2021 there's nothing that's come into my
17   possession or been filed by the parties that
18   has made me determine my solvency
19   determination should change.
20       Q.  Okay, thank you.
21       MR. MORRIS:  We'll mark as the next
22       exhibit, it will be Robinson number 4.
23   It's one of your earlier declarations.
24       (Robinson Exhibit 4, Declaration of
25       Graham Robinson was marked for

Page 71

1          G. ROBINSON
2    identification.)
3        Q.  Mr. Robinson, do you see this is a
4    declaration that was submitted to the Court in
5    New York back in October 2021?
6        A.  Yes.
7        Q.  Okay.  And do you recall this
8    particular declaration?
9        A.  Yes.
10       Q.  And do you recall reviewing it
11   before it was filed with the court?
12       A.  Yes.
13       Q.  And did you have an opportunity to
14   make comments and changes to the declaration?
15       A.  I did, yes.
16       Q.  Okay.  Let's go to paragraph 18.
17   And if you could just read that to yourself
18   for the moment.
19       (The witness complied.)
20       A.  Okay.
21       Q.  Was it your understanding at the
22   time you signed this that that statement was
23   true and accurate?
24       A.  Yes.
25       Q.  Do you believe it's true and

Page 72

1          G. ROBINSON
2    accurate today?
3        A.  Yes.
4        Q.  Just one little wrinkle here.
5        It's a statement that's made as of
6    December 31, 2021, but the document is
7    prepared in October 2021.
8        Is this kind of a forward-looking
9    statement?
10       A.  Yeah, I would say that we probably
11   forecast what expenses were likely to incur up
12   to the end of the year, yes.
13       Q.  Was it also true as of the date you
14   filed the application in the Cayman Islands
15   court for supervision of the liquidation; was
16   this statement true at that time as well?
17       MR. McDONALD:  Objection to form.
18       MR. MORRIS:  Withdrawn.
19       Q.  The liquidation was commenced
20   officially in --
21       A.  17th of September.
22       Q.  September 17th.
23       If we changed "December 31, 2021"
24   to September 17, 2021, would the statement in
25   paragraph 18 be accurate?

Page 73

1              G. ROBINSON
2       A.   Accurate in what way?
3       Q.   Would there be any modification to
4  this statement if you just took it and turned
5  it back, you know, ten weeks, to the date of
6  commencement?
7       A.   So -- okay.  So you're saying
8  Ascentra's main liabilities as of 17th of
9  September, 2021, basically?
10      Q.   Correct.  Mm-hmm.
11      A.   Yes.
12      Q.   Okay.  And when you use the term
13  "main liabilities" there, are you aware of
14  any liabilities that Ascentra had as of
15  September 17, 2021 other than the costs that
16  were going to be incurred by the liquidators
17  and certain ordinary course operating
18  expenses?  Were there any other liabilities
19  that you can recall?
20      A.   At the time, are you talking about
21  17th of September, or are you talking about
22  the day of this declaration?
23      Q.   September 17.
24      A.   Okay.  So just state the question
25  again, please?

Page 74

1              G. ROBINSON
2       Q.   Sure.  When you use the phrase
3  "main liabilities" -- actually, let's do this
4  in pieces.
5            Are you aware of any other -- any
6  liabilities as of December 31, 2021 other than
7  the costs incurred by the liquidators and
8  certain ordinary course operating expenses for
9  storage and maintenance of Ascentra's
10  information?
11      A.   I think the key sentence there
12  would be "Ascentra may have other contingent
13  liabilities that my team and are I
14  investigating."
15      Q.   Okay.  I appreciate that and I want
16  to separate, you know, stuff that may be
17  subject to investigation from what you knew,
18  what was -- you know, what was on the books
19  and records, what you knew at the time.  Okay?
20           So with that distinction, were
21  there any liabilities that you're aware of
22  that existed as of the end of 2021 other than
23  the ones that are described here?
24           Any non-contingent liabilities.
25  How about that?

Page 75

1              G. ROBINSON
2       A.   That's a difficult question to
3  answer because what I think you're asking me
4  is did other creditors come about after the
5  31st of December 2021 that weren't potentially
6  contingent at that time or I was totally
7  unaware of at that time.
8            I can't recall.  Because as part of
9  the liquidation process, I've been dealing
10  with creditor -- previous creditors and
11  potential creditors through the whole
12  liquidation process.
13      Q.   Go back to exhibit 1, which was the
14  30(b)(6) notice.  And if you can turn I think
15  to the third page, at the bottom it says
16  "Amended Topics."
17      A.   Okay.
18      Q.   And 2(a) asks about the number of
19  creditors existing as of the date of
20  commencement.
21           Let me just modify that a tiny bit,
22  in light of what you just said.
23           Do you recall whether Ascentra had
24  any non -- any creditors who held
25  non-contingent claims, right, who you agree

Page 76

1              G. ROBINSON
2  they had a claim, as of the date of
3  commencement?  Did they have any such
4  creditors?
5            MR. McDONALD:  Objection to form.
6       A.   Yes.
7       Q.   Okay.  Do you recall how many
8  creditors they had that fell into that very
9  specific category of non-contingent claims?
10           MR. McDONALD:  Objection to form.
11      A.   I struggle for the exact number,
12  but you are looking, I would say, at ten, 12.
13  Ten to 12, maybe.
14      Q.   Okay.  So to the best of your
15  recollection, on the date of commencement
16  Ascentra Holdings, Inc. had approximately ten
17  to 12 creditors who held undisputed claims, is
18  that fair?
19      A.   Exactly the day of appointment you
20  don't know if they're going to be -- if they
21  may be still disputed until you've reviewed.
22  So ...
23      Q.   So when you referred to the ten or
24  12, were those ten or 12 disputed claims,
25  undisputed claims or a mix?



Page 77

1          G. ROBINSON
2      A.   We were provided with that list
3  when we got appointed, and then we reviewed
4  and analyzed it, and if they were not
5  disputed, they would have been paid.
6      Q.   Okay.  And as a total group, how
7  many disputed, undisputed or contingent claims
8  existed, to the best of your knowledge, on the
9  date of commencement?
10         MR. McDONALD:  Objection to form.
11     A.   Again, you don't know which ones
12  are disputed when you get appointed.
13     Q.   And that's why I am trying to say I
14  don't really care whether it's disputed or
15  undisputed or contingent.
16         How many claims existed, to the
17  best of your knowledge, on the commencement
18  date, irrespective of whether they were
19  contingent or disputed claims?
20     A.   So on top of the ten to 12 is --
21     Q.   Mm-hmm.
22     A.   I would say maybe another ten.
23     Q.   Okay.  So somewhere between 20 and
24  22 claims in total, which included undisputed
25  claims, disputed claims and contingent claims.

Page 78

1          G. ROBINSON
2      Is that fair?
3          MR. McDONALD:  Objection to form.
4      A.   I would say okay, yes.
5      Q.   Do you know the aggregate value of
6  those claims?
7          MR. McDONALD:  Objection to form.
8      A.   Which -- do you want to break it
9  down?
10     Q.   Sure.
11     A.   Are you asking for the full amount?
12     Q.   Let's start with the full amount.
13         MR. MORRIS:  Withdrawn.  Let me ask
14     a different question.
15     Q.   As of the commencement date, what
16  did Ascentra's books and records show as their
17  obligations owing to creditors?
18         MR. McDONALD:  Objection to form.
19     A.   I think from memory it was over
20  20 million U.S. dollars.  That is for
21  creditors and other potential creditors.
22     Q.   Right.  And was there any creditor,
23  to the best of your recollection, who held a
24  claim, whether it was disputed or not, that
25  was more than a million dollars?

Page 79

1          G. ROBINSON
2          MR. MORRIS:  Withdrawn.
3      Q.   What was the biggest claim?
4          MR. McDONALD:  Objection to form.
5      A.   If you exclude the monies that are
6  due to the members on the commissions, the
7  biggest creditor claim was -- for a service
8  provider was approximately 3.9 million.
9      Q.   Do you know whether under the
10  Cayman Companies Act a solvent entity
11  liquidating under court supervision is
12  required to pay creditors within 12 months?
13         MR. McDONALD:  Objection to form.
14     A.   Sorry, say again.
15     Q.   Do you know whether under the
16  Cayman Companies Act a solvent entity
17  operating under court supervision is required
18  to pay its debts within 12 months?
19         MR. McDONALD:  Objection to form.
20     Q.   You can answer.
21     A.   Under court supervision, no.
22     Q.   Is that a rule that applies outside
23  of court?
24         MR. McDONALD:  Objection to form.
25     A.   For a voluntary liquidation --

Page 80

1          G. ROBINSON
2  well, a director, if he signs a declaration of
3  solvency, he's swearing in the declaration
4  that all the debts of the company will be paid
5  off in full within 12 months.
6      Q.   That's what I am asking.
7          Did that happen in this case?
8      A.   No.
9      Q.   So which debts were not paid in
10  full within 12 months?
11         MR. McDONALD:  Objection to form.
12     A.   Within 12 -- in the first 12
13  months?
14     Q.   Mm-hmm.
15     A.   I don't know from memory.  As I
16  said, there's no requirement for debts to be
17  paid, all creditors to be paid in 12 months.
18         Like I said before, and I'll repeat
19  again, we've been dealing with creditors for
20  the full -- through the whole liquidation
21  process, and some have been paid, some have
22  been agreed and paid, and we have probably
23  some creditors that we have not verified and
24  paid.
25     Q.   Has Ascentra paid all creditors in

Page 81

1        G. ROBINSON
2   full who hold undisputed claims?
3        MR. McDONALD: Objection to form.
4    A. Yes.
5    Q. And is the only reason the
6   remaining creditors haven't been paid in full
7   is because there's a dispute as to either the
8   validity or the amount of their claim?
9        MR. McDONALD: Objection to form.
10   A. Yes, the verification -- I would
11  say that the verification -- sorry. The
12  verification of the process of agreeing the
13  claims is still ongoing.
14   Q. How many claims are subject to
15  dispute today?
16   A. Seven.
17   Q. Are those seven claims held by
18  seven different people and entities, or does
19  one or more entity own one or more of those
20  disputed claims?
21        MR. McDONALD: John, just to
22        interject. There are reports filed with
23        the Cayman court, and we're kind of
24        cutting close to a line here.
25        To the extent generally you can

Page 82

1        G. ROBINSON
2   answer.
3        But the court has sealed these
4   reports, and they remain subject to
5   court seal. So I'm just trying to keep
6   that in mind here so that the witness
7   isn't divulging information that is
8   currently subject to a court order under
9   seal.
10        MR. MORRIS: Okay. I appreciate
11  that --
12        MR. McDONALD: In generality, yes.
13        MR. MORRIS: I have no knowledge of
14  any of that. And you'll instruct him
15  not to answer if you think it's your
16  responsibility to do that.
17        MR. McDONALD: Right. I just
18  wanted to make you aware of that, and
19  that may be an objection or a direction
20  at some point.
21        MR. MORRIS: Okay.
22        MR. McDONALD: Okay?
23        MR. MORRIS: Can we have the
24  question read back, please?
25        (Requested portion of the record

Page 83

1        G. ROBINSON
2   read back.)
3    A. Seven separate entities.
4    Q. Okay. So is it fair to say that
5   Ascentra Holdings, Inc. has paid all creditors
6   in full except for the seven entities who hold
7   one disputed claim each?
8        MR. McDONALD: Objection to form.
9    A. Yes.
10  DIR Q. Does the Ascentra Holdings estate
11  have sufficient assets to pay those disputed
12  claims in full if the holders of those claims
13  prevail on their position that their claims
14  are valid?
15        MR. McDONALD: We're getting into
16        the -- that line, and I'm going to
17        object and direct the witness not to
18        answer.
19        MR. MORRIS: I just want to be
20        really clear. I'm just asking for a
21        yes-or-no answer here.
22  DIR Q. Does the state -- does the estate
23  have the sufficient assets to satisfy those
24  contingent claims if they are ultimately
25  deemed to be valid in the amounts that the

Page 84

1        G. ROBINSON
2   claim-holders contend?
3        MR. McDONALD: Again I'm going to
4        object and direct the witness not to
5        answer.
6    Q. Are you going to follow counsel's
7   advice?
8    A. Yes.
9    Q. Okay.
10        MR. McDONALD: And, again, the
11        basis of that is that it's requesting
12        information that is currently under seal
13        with the Cayman court by court order.
14  REQ     MR. MORRIS: I would request a copy
15        of that court order in due course.
16  BY MR. MORRIS:
17  DIR Q. Can you tell me the aggregate value
18  of the claims that are being asserted against
19  the Ascentra Holdings, Inc. entity by the
20  seven claim-holders?
21        MR. McDONALD: Again I am going to
22        object and direct the witness not to
23        answer.
24        MR. MORRIS: And is that also
25        because there's a court order that would



Page 85

1           G. ROBINSON
2     preclude him from answering?
3           MR. McDONALD:  There's a court
4     order that has sealed that information
5     that is contained in a report, yes.  It
6     would be requiring him to divulge
7     information that is currently under
8     seal.  And we will happily send you that
9     order.
10          MR. MORRIS:  Okay.
11   BY MR. MORRIS:
12   DIR  Q.   Can you identify for me the holders
13    of the seven disputed claims?
14          MR. McDONALD:  Objection.
15     I direct the witness not to answer.
16     Q.   Are you going to follow counsel's
17    advice?
18     A.   Yes.
19     Q.   Can you tell me the value of any of
20    the disputed claims?
21          MR. McDONALD:  I think that's been
22     answered already.
23          MR. MORRIS:  If you are objecting
24     as asked and answered, that's fine.  I
25     don't believe it was.  So I'll ask for

Page 86

1           G. ROBINSON
2     an answer.
3     A.   I believe I've answered that
4    question.
5     Q.   Okay.  Can you tell me again?
6     A.   3.9 million.
7     Q.   Oh, I -- so that's the answer to
8    the question of the largest claim, right?
9    That's what I understood.
10     A.   Yeah.
11     Q.   Okay.  Is that a disputed claim or
12    an undisputed claim?
13     A.   Again, we discussed this and
14    answered it was a disputed claim.
15     Q.   So that has not been paid, is that
16    fair?
17     A.   Yes.
18     Q.   Okay.  Has Ascentra Holdings, Inc.
19    made any reserve on account of these claims?
20          MR. McDONALD:  Objection to the
21     form.
22     A.   I'm uncertain if I can answer that
23    because that refers to the ongoing incoming
24    receipts and payments of the liquidation of
25    the estate, and that's within the court

Page 87

1           G. ROBINSON
2    reports, and that court report is sealed.
3     Q.   So I want to be really clear what I
4    am asking here.
5          Do you understand what a reserve
6    is?
7     A.   In what way?
8     Q.   Has Ascentra Holdings, Inc. set
9    money aside for the specific purpose of
10    satisfying these disputed claims at some point
11    in the future?  Just yes or no.
12     A.   I'm going to refer you to my last
13    answer.
14     Q.   Are you going to refuse to answer
15    that question?
16     A.   I can't answer that question
17    because it's based in the reports and those
18    reports are sealed.
19          So I'm not refusing to answer the
20    question.
21     Q.   You believe you have an obligation
22    not to disclose whether or not a reserve has
23    been established.
24          Do I understand that correctly?
25     A.   I'm an officer of the court in the

Page 88

1           G. ROBINSON
2    Cayman Islands.  My report's been filed with
3    the court, and the court has sealed it.  I'm
4    an officer of the court.  I follow what the
5    court has done.
6     Q.   Okay.  I just wanted to make sure.
7          Certain persons and entities have
8    made claims in the liquidation by way of proof
9    of debt, is that right?
10          MR. McDONALD:  Objection to form.
11     A.   Yes.
12     Q.   How many proofs of debt have been
13    filed?
14          MR. McDONALD:  Objection to form.
15     A.   Eight, I believe.
16          MR. MORRIS:  I'll mark as the next
17     exhibit, exhibit 5, Robinson 5, the
18     report that was filed with the
19     bankruptcy court in New York.
20          (Robinson Exhibit 5, letter to the
21     Court, dated December 29, 2023 was
22     marked for identification.)
23   BY MR. MORRIS:
24     Q.   You could take a quick look at it,
25    or take as long as you need to look at it.  My



Page 89

1              G. ROBINSON
2    first question for you is whether you have
3    seen this before?
4        A.   Yes, I've seen this document
5    before.
6        Q.   Okay.  And did you see it before it
7    was filed?
8        A.   Yes.
9        Q.   And so you were aware that it was
10   being filed on behalf of the joint official
11   liquidators in the Ascentra Chapter 15 case,
12   right?
13       A.   Yes.
14       Q.   Okay.  If you could go to I guess
15   the last substantive page, page 4.
16       A.   Okay.
17       Q.   So directing your recollection to
18   the middle of the page, underneath the heading
19   "Additional Actions Undertaken By the
20   Liquidators," your counsel informed the court
21   in New York, quote, "The liquidators continue
22   to correspond with potential creditors and
23   parties who have made claims in the
24   liquidation by proof of debt."
25           Have I read that first sentence

Page 90

1              G. ROBINSON
2    correctly?
3        A.   Yes.
4        Q.   Okay.  The phrase "potential
5    creditors," are those creditors who hold
6    contingent or disputed claims?
7        A.   The two referred to here are the
8    seven I listed before, yes.  Part of the
9    seven.  Yes.
10       Q.   Okay.  So the potential creditors
11   are seven, and there's two of whom that are
12   referred to in the second sentence, is that
13   fair?
14       A.   Yes.
15       Q.   Okay.  So if there are seven
16   potential creditors -- I think you mentioned
17   that there are eight proofs of debt that were
18   filed?
19           Do I have that right?
20       A.   From memory, yes.
21       Q.   And is that because one of the
22   proofs of debt was resolved?
23       A.   Yes.
24       Q.   And that proof of debt that was
25   resolved was paid in full, correct?

Page 91

1              G. ROBINSON
2            MR. McDONALD:  Objection to form.
3        A.   The proof of debt that was approved
4    by the liquidator has been paid, yes.
5        Q.   In full.  So again --
6            MR. McDONALD:  Objection to form.
7        Q.   So again, the only thing that is
8    outstanding today are the seven disputed
9    claims, is that fair?
10           MR. McDONALD:  Objection to form.
11       A.   In the Ascentra liquidation?
12       Q.   Yes, sir.
13       A.   Those seven, yes, and the members'
14   commissions that remain payable, yes.
15       Q.   Are the members' commissions
16   obligations of the company or are they part of
17   the members' equity?
18           MR. McDONALD:  Objection to form.
19       A.   (No response.)
20           MR. MORRIS:  Withdrawn.
21       Q.   When you use the phrase "members'
22   commission," what are you referring to?
23       A.   This -- this is the commissions
24   that are due to the -- to the members that
25   sold products on behalf of the Ascentra group.

Page 92

1              G. ROBINSON
2        Q.   And are those commissions subject
3    to the proof-of-debt process?
4        A.   Not at this stage.
5        Q.   Why not?
6        A.   No -- no -- no member has written
7    to the liquidators.
8        Q.   So as of today no claim has been
9    made for the payment of a member's commission,
10   is that fair?
11       A.   In the Ascentra liquidation?
12       Q.   Yes, sir.
13       A.   No.
14       Q.   That's not fair?
15       A.   Sorry.  No, they have not
16   submitted ...
17       Q.   Have members made claims for
18   commissions in any other liquidation that's
19   related to Ascentra Holdings, Inc.?
20       A.   No.
21       Q.   Would you have an obligation as the
22   joint official liquidator to pay the member
23   claim if you believe today that the claim was
24   valid?
25           MR. McDONALD:  Objection to form.

Page 93

1          G. ROBINSON
2     A.   Say the question again?  Sorry.
3     Q.   In your capacity as a joint
4  official liquidator, would you be duty-bound
5  to pay the commissions if you concluded that
6  they were a due and valid obligation of the
7  Ascentra Holdings, Inc. company?
8          MR. McDONALD:  Objection to form.
9     A.   If we've gone through the
10  verification process and we believed they were
11  due and payable, then they would be paid as
12  part of the liquidation process.
13     Q.   And did you, in your capacity as
14  the joint official liquidator, undertake a
15  review of whether any membership commissions
16  were due by Ascentra Holdings, Inc.?
17     A.   Yes.
18     Q.   And have you concluded that no
19  membership commissions are due by Ascentra
20  Holdings, Inc.?
21          MR. McDONALD:  Objection to form.
22     A.   Say the question again?
23     Q.   Have you concluded that Ascentra
24  Holdings, Inc. doesn't owe any membership
25  commissions?

Page 94

1          G. ROBINSON
2     A.   I have not concluded that, no.
3     Q.   You're still reviewing it?
4     A.   The review process of the
5  commissions has not been finalized.
6     Q.   Okay.  But no member has made a
7  claim for commission, correct?
8     A.   No member has made a claim for
9  commission in the Ascentra liquidation,
10  correct.
11     Q.   Okay.  Has any member made a claim
12  for commission in any other liquidation that
13  you are involved with?
14     A.   No.
15     Q.   Other than the seven disputed
16  claims or proofs of debt that you've
17  identified, are you aware of any other
18  contingent obligation that Ascentra Holdings,
19  Inc. has?
20          MR. McDONALD:  Objection to form.
21     A.   No.
22     Q.   Looking down, still staying with
23  the same report --
24     A.   Okay.
25     Q.   -- towards the end it says, quote,

Page 95

1          G. ROBINSON
2  "The liquidators also received three
3  additional proofs of debt from Mr. Sanders on
4  November 10, 2023, which have not been
5  adjudicated yet."
6          Have I read that correctly?
7     A.   You have.
8     Q.   And are those three proofs of debt
9  among the eight that you identified earlier?
10     A.   Yes.
11     Q.   Okay.  Does Mr. Sanders have any
12  other proofs of debt -- withdrawn.
13          Have any proofs of debt been filed
14  on Mr. Sanders' behalf other than those three?
15     A.   No.
16     Q.   And are those three proofs of debt,
17  are they filed on behalf of different entities
18  that are either owned or controlled by
19  Mr. Sanders, to the best of your knowledge?
20     A.   Yes.
21     Q.   So that among -- when you said
22  earlier that there were seven different
23  claim-holders or potential claim-holders,
24  three of them were affiliated with
25  Mr. Sanders, right?

Page 96

1          G. ROBINSON
2     A.   Yes.
3     Q.   Okay.  Of the other four, is there
4  any affiliation between the holders of those
5  potential claims?
6     A.   No.
7     Q.   So you've got Mr. Sanders plus four
8  other folks who collectively hold seven
9  disputed claims, correct?
10     A.   Yes.
11     Q.   Okay.  Can you describe for me the
12  nature of the three proofs of debt that were
13  filed on behalf of Mr. Sanders?
14          MR. McDONALD:  Objection to form.
15          To the extent you can disclose
16  that.
17     A.   No, we probably -- I probably
18  discussed the proof of debts with my Cayman
19  counsel, so I would say those discussions are
20  privileged.
21     Q.   But you've discussed it with
22  somebody representing Mr. Sanders, right?
23     A.   My attorneys have spoken to
24  Mr. Sanders' attorneys.
25     Q.   Okay.  So focussing on those



Page 97

1        G. ROBINSON
2 discussions, do you know what the nature of
3 Mr. Sanders' claim is?
4        Have you read the proofs of debt
5 that were filed on behalf of Mr. Sanders?
6    A.  Yes.
7    Q.  Do you have an understanding as to
8 the nature of the claim?
9    A.  He claims he's owed money.
10    Q.  Does he state why he believes he's
11 owed money?
12    A.  He does.
13 DIR  Q.  Does he cite to any contract that
14 he believes he's entitled to recover damages
15 for, for breach?
16        MR. McDONALD:  I'm going to object.
17    Those proofs of debt are still
18    confidential and the nature of those
19    claims and the nature of the
20    disagreement over those claims and the
21    negotiation of those claims are sealed
22    under -- as part of the report to the
23    court.
24        MR. MORRIS:  So you're not going to
25    let him tell me if there's a contract

Page 98

1        G. ROBINSON
2 claim or a tort claim?
3        MR. McDONALD:  No.
4    Q.  Do you dispute Mr. Sanders' claims?
5    A.  The verification process is still
6 ongoing.  So ...
7    Q.  You haven't agreed to pay the
8 claims, is that fair?
9    A.  The verification process is still
10 ongoing.
11    Q.  Do you dispute the validity of the
12 claims or the amount of the claims?
13    A.  The verification process is still
14 ongoing.
15    Q.  Can you describe for me what the
16 verification process is?
17    A.  We review the proof of debts and
18 make an assessment on whether it's valid or
19 invalid.
20    Q.  And when did he file the proofs of
21 debt?
22        MR. McDONALD:  Objection to form.
23    A.  I believe we received them in early
24 November 2023.
25    Q.  And are the proofs of debt filed

Page 99

1        G. ROBINSON
2 with the court, or are they just given to you
3 in your capacity as the joint official
4 liquidator?
5    A.  Just to me.
6    Q.  Okay.  So these are documents that
7 have not been filed with the court, correct?
8    A.  There's no requirement to file
9 proof of debts separately into the Cayman
10 court.
11    Q.  I appreciate that there's no
12 requirement.  I'm just asking you if it
13 happened.
14        To the best of your knowledge, were
15 Mr. Sanders' proofs of debt filed with the
16 Cayman court?
17    A.  No.
18    Q.  Okay.  Can you share with me
19 anything about the nature of the claims that
20 were delivered to you but not filed with the
21 Cayman court?
22    A.  Say that question again?  Sorry.
23    Q.  Can you tell me the amount of any
24 of the three claims that were given to you but
25 not filed with the court?

Page 100

1        G. ROBINSON
2        MR. McDONALD:  Again, that
3    information is subject to the seal
4    order.
5        MR. MORRIS:  But it wasn't filed
6    with the court, right?
7        MR. McDONALD:  The report
8    discussing the claims has been filed
9    with the court.  The claims have been
10    received by the liquidator.
11        MR. MORRIS:  And that's all I'm
12    asking about, is the claims -- I don't
13    care about any report filed with the
14    court.
15        So let me ask the question again.
16        MR. McDONALD:  So --
17        MR. MORRIS:  Let me ask the
18    question again.
19        MR. McDONALD:  Okay.
20 DIR  Q.  The claims that were given to you
21 but not filed with the Court, can you tell me
22 what the amount of those claims are?
23        MR. McDONALD:  I object.
24        Direct the witness not to answer.
25        The inspection of those proofs of



Page 101

G. ROBINSON

1
2  debt are limited to creditors and
3  contributories and are to be kept
4  confidential.  The discussion of those
5  are contained in a report that is filed
6  with the court and is subject to seal.
7      MR. MORRIS:  Just help me
8  understand, Hugh.  Is there an order
9  that was entered in this case that
10  you're relying upon, or is it a Cayman
11  Islands law?
12      MR. McDONALD:  It's a combination
13  of both.  There is, within the Cayman
14  Islands, the Companies Act, as well as
15  in the rules, a restriction on who can
16  inspect proofs of debt, and the
17  discussion of those proofs of debt are
18  contained in a report that are subject
19  to a court order sealing them.
20      And so --
21      MR. MORRIS:  Okay.  To be clear I'm
22  not asking about that report.
23      MR. McDONALD:  I understand that.
24  But the contents of those proofs of debt
25  are discussed in a report that is

Page 102

G. ROBINSON

1
2  subject to a seal.
3      MR. MORRIS:  Okay.  And you guys
4  will follow up with the identity of the
5  order that you're relying on and the
6  law, right?
7      MR. McDONALD:  Mm-hmm.
8      MR. MORRIS:  Okay.
9  BY MR. MORRIS:
10     Q.  Is there a deadline for the filing
11  of proofs of debt in this case, in the Cayman
12  Islands?
13     A.  No.
14     Q.  Based on your review of the
15  records, do you have any reason to believe --
16  withdrawn.
17         Based on your work as a joint
18  official liquidator, do you have any
19  expectation that any additional proofs of debt
20  are likely to be filed?
21      MR. McDONALD:  Objection to form.
22     A.  Specifically to the Ascentra --
23     Q.  Yes.
24     A.  -- liquidation?
25         I'm hopeful there's no other proof

Page 103

G. ROBINSON

1
2  of debts, yes.
3      Q.  Okay.  And do you have any
4  reason -- do you have any expectation that
5  they will be filed?  Is it more than a hope?
6  But based on your work, has anybody -- you
7  know, do you have any expectation --
8      MR. McDONALD:  Wait for him to
9  finish.
10     Q.  Okay.  Do you have any reason to
11  believe that somebody's going to file further
12  proofs of debt?  In the Ascentra Holdings,
13  Inc. case.
14     A.  Just from experience of being a
15  joint official liquidator and being involved
16  in restructuring for 30-odd years, you expect
17  the unexpected.
18     Q.  Okay.  Other than that, do you have
19  any reason to expect that any additional
20  proofs of debt will be filed in the Ascentra
21  Holdings, Inc. case?
22     A.  No.
23     Q.  Thank you.
24      MR. MORRIS:  Let's mark as the next
25      exhibit another report that was given to

Page 104

G. ROBINSON

1
2  the court in New York.
3      THE WITNESS:  Can we just do a
4  five-minute toilet break?
5      MR. MORRIS:  Sure, you bet.
6      THE VIDEOGRAPHER:  This ends
7  unit 3.  We're off the record at 11:52.
8      (Recess taken.)
9      THE VIDEOGRAPHER:  This begins
10  unit 4.  We're on the record at 12:03.
11      (Robinson Exhibit 6, Letter to the
12  Court dated June 30, 2023 was marked for
13  identification.)
14  BY MR. MORRIS:
15     Q.  All right.  Mr. Robinson, you have
16  in front of you what has been marked as
17  Robinson exhibit 6.  It's another document
18  that was filed with the court.
19         Have you taken a moment to look
20  at it?
21     A.  Yes.
22     Q.  Okay.  And you saw it before it was
23  filed, is that right?
24     A.  Yes.
25     Q.  Okay.  Directing your attention to



Page 105

1    G. ROBINSON
2    the second paragraph on the first page,
3    there's a statement in there that says, quote,
4    "As a result of various shareholder disputes,
5    on June 1, 2021 Ascentra was placed into
6    voluntary liquidation in the Cayman Islands by
7    its shareholders."
8        Have I read that correctly?
9    A.   Yes.
10   Q.   And is that accurate, to the best
11   of your knowledge?
12   A.   To the best of my knowledge, yes.
13   Q.   Okay.  Are you aware of any reason
14   that Ascentra was placed in voluntary
15   liquidation other than various shareholder
16   disputes?
17   A.   No.
18   Q.   Thank you.
19        And if you can go to the second
20   page on the back of the document.  The end of
21   the middle paragraph says, quote, "Further,
22   the liquidators have corresponded with various
23   potential creditors of Ascentra and requested
24   proofs of debt to be submitted."
25        Did I read that correctly?

Page 106

1        G. ROBINSON
2    A.   Which paragraph is that?
3    Q.   It's the middle one that begins "In
4    the Cayman proceeding."
5    A.   Okay.
6    Q.   So now I'm looking at the last
7    sentence that begins "Further --
8    A.   Oh, "Further."  I see it.  Sorry.
9    I see it.
10   Q.   That's okay.  Are you with me now?
11   Take a moment to read it.
12   A.   Okay, yes.
13   Q.   And so this is dated in June.
14   Would this have been part of the process of
15   soliciting the proofs of debt that resulted
16   in, I guess, the ones that we talked about
17   earlier?
18   A.   Yeah, these -- these relate to the
19   creditors we discussed previously.  Yes.
20   Q.   Okay.  And under what
21   circumstances, if you recall, did you request
22   that proofs of debt be submitted?  Like, why
23   do you do that?
24       MR. McDONALD:  Objection to form.
25   A.   Well, the official liquidator has

Page 107

1        G. ROBINSON
2    got a pretty simple function, and that is to
3    get in the assets, realize the assets, and
4    then distribute the assets to the creditors.
5        And one of my jobs as a joint
6    official liquidator is to approve creditor
7    claims, and that's in a quasi-judicial way as
8    an officer of the court.  So that's what we
9    do.
10   Q.   So is it fair to say that you
11   request a proof of debt if somebody comes to
12   you and says the entity that's being
13   liquidated owes them money, and then you say,
14   well, send me a proof of debt and we'll figure
15   it out?
16   A.   Yeah, there's no right or wrong way
17   of how a proof is received or not received or
18   how you agree a claim.  But yeah, one way
19   would be, if someone came to you and requested
20   a claim they were owed money, you would enter
21   correspondence and you could request they
22   submit a formal proof of debt.
23   Q.   Okay.  And this is the process that
24   led to the seven remaining proofs of debt,
25   correct?  That are disputed.

Page 108

1        G. ROBINSON
2        MR. McDONALD:  Objection to form.
3    A.   Yeah, creditors can come to you,
4    and you can go to potential creditors as well.
5    Q.   Okay.  How many proofs of debt did
6    the joint official liquidators request, as
7    opposed to how many proofs -- let's just start
8    with there.
9        How many did you request be filed?
10   A.   How many proof of debts did the
11   joint official liquidators of Ascentra request
12   from potential creditors?
13   Q.   Mm-hmm.
14   A.   I don't know the exact number from
15   memory.  Out of the eight that we received,
16   from memory I would say we requested six.
17   Q.   And would they include Mr. Sanders'
18   three?
19   A.   Yes.
20   Q.   Why did you request Mr. Sanders to
21   file proofs of debt?
22   A.   I don't -- SPGK and the defendants,
23   all the defendants are not an admitted
24   creditor in the liquidation, and you are not
25   entitled to that information.



Page 109

G. ROBINSON

1
2      THE COURT REPORTER:  Can you just
3  repeat that?  All of defendants are
4  not ...
5      A.  An admitted creditor in the
6  liquidation under Cayman law.
7      Q.  So you believe you have a duty not
8  to tell me the answer to the question because
9  in your view SPGK is not entitled to receive
10  it under Cayman law, is that right?
11      A.  Say that again?  Sorry.
12      Q.  I just want to make sure that I
13  understand.  I don't mean to be contentious at
14  all.
15      You're refusing to answer my
16  question because SPGK is not a creditor in the
17  Ascentra Holdings, Inc. bankruptcy, is that
18  right?
19      A.  I wouldn't -- I'm not refusing to
20  answer your question.  I can't answer your
21  question.
22      Q.  Okay.  That's --
23      A.  That's a big difference.
24      Q.  Well, you're refusing because you
25  believe you have an obligation not to disclose

Page 110

G. ROBINSON

1
2  it.  Is that fair?
3      A.  Under Cayman law -- you are not an
4  admitted creditor, and you're not entitled to
5  that information under Cayman law.
6      Q.  Okay.  So let me just ask you, as
7  an experienced insolvency practitioner in the
8  Cayman Islands and one licensed to serve as a
9  liquidator, do you have any ability to share
10  this information -- withdrawn.
11      I understand your position that
12  SPGK has no right to the information.  My
13  question for you:  Is there anything that
14  prohibits you from disclosing the information?
15      MR. McDONALD:  Objection to form.
16      A.  I think I'll just refer you to my
17  previous answer.
18      Q.  And I'm trying to parse that
19  through.
20      I understand that you believe that
21  under Cayman law -- and I don't mean to be
22  contentious --
23      A.  That's okay.
24      Q.  -- that under Cayman law SPGK has
25  no right to know anything about the subject

Page 111

G. ROBINSON

1
2  matters that we're talking about.
3      Is that fair?
4      A.  Yeah.  You're not an admitted
5  creditor.
6      Q.  Okay.  Let's start with what's an
7  admitted creditor?
8      A.  A creditor that the claim has been
9  admitted by the joint official liquidators.
10      Q.  Meaning that it's no longer
11  disputed?
12      A.  Yes.  It's admitted.
13      Q.  So Mr. Sanders is not an admitted
14  creditor, is that right?
15      A.  Correct.
16      MR. McDONALD:  Objection to form.
17      Q.  So I appreciate what you're saying,
18  and now I am going to ask you a different
19  question.
20      Even though they don't have the
21  right to the information, is there any legal
22  prohibition, to the best of your knowledge,
23  that would prohibit you from disclosing it?
24      A.  Just say the question again?
25  Sorry.

Page 112

G. ROBINSON

1
2      Q.  Is there any legal impediment, you
3  know, is there any legal prohibition that
4  prevents you from disclosing the information,
5  or it's just that SPGK has no right to
6  receive it?
7      A.  SPGK has no right to receive it.
8      Q.  I understand.  But is there any --
9  do you have a legal duty not to disclose it,
10  or is it just that they have no right to
11  receive it?
12      Do you understand the distinction
13  that I'm making?
14      MR. McDONALD:  Yeah, I'm going to
15  object.  I think as I discussed earlier,
16  the information concerning the proofs of
17  debt is contained in reports that have
18  been filed with the court that are
19  subject to seal.
20      So is there a legal impediment?
21  Yes.  He's an officer of the court, and
22  he's bound by the orders of the court.
23      MR. MORRIS:  So is there any
24  information at all that you are willing
25  to let him testify to other than the



Page 113

1        G. ROBINSON
2     number of outstanding disputed claims?
3        MR. McDONALD:  As to the nature and
4     identity and basis for the claims and
5     the nature of any disputes over the
6     claims?  No.  He's not going to be able
7     to testify.
8        MR. MORRIS:  And is that because
9     the information was filed with the
10     court, or is there something else that
11     prohibits it?
12        MR. McDONALD:  It's a combination
13     of the statute rules and orders of the
14     court that prohibit him from disclosing
15     that information.
16        MR. MORRIS:  Okay.
17     Q.  Okay.  We're going to go to topic 5
18  on the 30(b)(6) list, which was exhibit 1, and
19  that relates to applications for sanction.
20        Can you tell me what an application
21  for sanction is, in the context of a Cayman
22  Islands liquidation proceeding?
23     A.  Well, so to answer your question
24  for me as a joint official liquidator,
25  basically our powers are split between powers

Page 114

1        G. ROBINSON
2   that we need the court sanction for and powers
3   that we don't need sanction for.
4        So ultimately we -- if there are
5   certain things that we need to do as part of
6   the liquidation process, then we would, with
7   our counsel, we would make applications to the
8   courts.
9     Q.  So there are certain things that
10  you may want to do that you need court
11  permission for, is that fair?
12     A.  Yes.
13     Q.  Okay.  Do creditors and the
14  liquidation of a solvent entity have any
15  ability to apply for sanction?
16     A.  They have no ability to apply for
17  sanction.
18     Q.  Okay.  And so then is it fair to
19  say that no creditor or potential creditor of
20  Ascentra Holdings, Inc. has ever applied for
21  sanction in that case?
22     A.  Sorry.  Just say that again?
23     Q.  Is it fair to say then that no
24  creditor or potential creditor has applied
25  for sanction of the Ascentra Holdings,

Page 115

1        G. ROBINSON
2   Inc. proceedings in the Cayman Islands?
3        MR. McDONALD:  Objection to form.
4     A.  No creditor or potential creditor
5   has applied for sanction, yes.
6     Q.  Okay.  Is it your understanding as
7   a licensed insolvency practitioner that
8   creditors and potential creditors of an
9   insolvent company or a company of doubtful
10  insolvency have the ability to apply for
11  sanction?
12        MR. McDONALD:  Objection.  That's
13     calling for a legal conclusion.
14     Q.  Okay.  Subject to that objection
15  you can answer.
16     A.  Just repeat the question for me,
17  please?
18     Q.  Sure.  As a licensed insolvency
19  practitioner in the Cayman Islands, do
20  creditors or potential creditors of insolvent
21  companies or companies of doubtful insolvency,
22  do they have a right to apply for sanction?
23        MR. McDONALD:  Objection; calls for
24     a legal conclusion.
25     Q.  You can answer.

Page 116

1        G. ROBINSON
2     A.  Yes.
3     Q.  Okay.  Do you know whether any
4   potential creditor -- withdrawn.
5        Do you know whether any creditor or
6   potential creditor -- withdrawn.
7        Is the Ascentra Holdings, Inc. case
8   pending before a particular bankruptcy --
9   withdrawn.
10        Is the Ascentra Holdings, Inc. case
11  pending before a particular judge in the
12  Cayman Islands?
13     A.  Yes.
14     Q.  And what's the name of the judge?
15     A.  Doyle.
16     Q.  Doyle.  Can I refer to him as Judge
17  Doyle, or is it Justice Doyle?
18        MR. COWAN:  Mr. Justice Doyle.
19        MR. MORRIS:  Mr. Justice Doyle.
20     Q.  To the best of your knowledge,
21  since the case was commenced has any creditor
22  or potential creditor appeared before
23  Mr. Justice Doyle?
24     A.  In the Ascentra liquidation?
25     Q.  Yes.



Page 117

G. ROBINSON
1
2      A.   Yes.
3      Q.   Okay.  Can you identify the
4   creditor or potential creditor who appeared
5   before Mr. Justice Doyle in the Ascentra
6   bankruptcy case?
7      A.   Your defendants.
8      Q.   Okay.  Is there any other creditor
9   or potential creditor -- withdrawn.
10        When you refer to my defendants
11  you're referring to my clients who are the
12  defendants in the complaint that was filed on
13  your behalf in the Cayman Islands, is that
14  right?
15     A.   That's the party that I'm
16  referring to, if you said they have been in
17  front -- they have appeared in the sanction,
18  then yes.
19     Q.   Other than my clients, is there any
20  other creditor or potential creditor who has
21  ever appeared before Mr. Justice Doyle in the
22  Ascentra Holdings, Inc. liquidation case?
23     A.   No.
24     Q.   Do you have access to the documents
25  that are filed with the court in the Cayman

Page 118

G. ROBINSON
1
2   Islands?
3      A.   Only through my Cayman attorneys.
4      Q.   And is it one of your
5   responsibilities to be at least generally
6   familiar with the documents that are filed in
7   the Cayman court in connection with the
8   Ascentra Holdings, Inc. bankruptcy?
9      A.   Yes.
10     Q.   Okay.  And in carrying out that
11  responsibility, are you aware of any
12  document that was filed in the Ascentra
13  Holdings, Inc. liquidation case by a creditor
14  or potential creditor other than my clients?
15     A.   No.
16     Q.   Thank you.  Have my clients
17  appeared in the Cayman case of Ascentra
18  Holdings, Inc. in any capacity other than as
19  defendants in the lawsuit that was commenced
20  against them?
21        MR. McDONALD:  Objection to form.
22     A.   When you say "the lawsuit," are
23  you referring to the one that we filed on the
24  11th of October 2023?
25     Q.   Yes, sir.

Page 119

G. ROBINSON
1
2      A.   So have they appeared in something
3   else?
4      Q.   Correct.
5      A.   Yes.
6      Q.   Do you have an understanding of
7   what -- in what capacity they appeared before
8   Mr. Justice Doyle other than as a defendant in
9   that lawsuit?
10     A.   Say that again?  Sorry.
11     Q.   It's okay.  My clients have the
12  information.
13        MR. MORRIS:  Let's move along.
14  We've got -- the next document is
15  what?  7?
16        THE COURT REPORTER:  Yes.
17        MR. MORRIS:  It's going to be the
18  foreign representatives' objection to
19  the motion to terminate the restraint.
20        THE WITNESS:  Okay.
21        (Robinson Exhibit 7, Foreign
22  Representatives' Objection to Motion of
23  SPGK to Terminate Restraint was marked
24  for identification.)
25        MR. McDONALD:  I'm sorry, this was

Page 120

G. ROBINSON
1
2   7 you said?
3        MR. MORRIS:  Yes.
4        THE COURT REPORTER:  Yes.
5   BY MR. MORRIS:
6      Q.   I'll just mark it to identify it,
7   but I don't know that I am going to ask you
8   any questions in hindsight.
9        Is this the objection that was
10  filed on your behalf in New York with respect
11  to SPGK's motion to terminate the restraint on
12  the Planet Payment funds?
13        (The witness reviews document.)
14     A.   Yes.
15     Q.   Okay.  And if you turn to just
16  page 27, I guess I'll ask one question.
17     A.   Twenty-seven.  Okay.
18     Q.   In the middle of the page, under
19  "Likelihood of Success on the Merits," you'll
20  see there's a statement, "Second," quote, "as
21  to the liquidators' claim to the Planet
22  Payment Funds as set forth in detail above,
23  the contractual and equitable bases remain and
24  indeed are stronger following Mr. Yoshida's
25  deposition."



Page 121

1       G. ROBINSON
2    Do you see that?
3    A.  Where does it start?
4    Q.  The word "Second" begins at the end
5 of about the fifth line down.
6    A.  Yes.
7    Q.  So I'm just focused on that
8 particular sentence.
9    A.  Okay.
10    Q.  And do you understand that SPGK has
11 asked the bankruptcy court in New York to lift
12 the restriction on the funds that originated
13 at Planet Payment?
14    A.  Yes.
15    Q.  And do you understand that your
16 counsel on your behalf has opposed that motion
17 saying that they have a legal and equitable
18 right to the Planet Payment money?
19    A.  Yes.
20    Q.  Okay.  And do you understand that
21 topics 6 through 9 of the 30(b)(6) topics are
22 intended to cover the documents and facts
23 concerning your position as to the legal and
24 equitable bases to the claim to the money?
25    A.  I've read paragraph 6 to 9.

Page 122

1       G. ROBINSON
2    Q.  Okay.
3    MR. MORRIS:  Let's now mark as the
4 next exhibit, which I guess is 9 --
5    THE COURT REPORTER:  8.
6    MR. McDONALD:  8.
7    MR. MORRIS:  8.  Thank you.
8    -- a report to the Court dated
9 October 11.
10    (Robinson Exhibit 8, Letter to the
11    Court dated October 11, 2023 was marked
12    for identification.)
13 BY MR. MORRIS:
14    Q.  Were you aware that this letter was
15 sent to the court in New York in October 2023?
16    A.  Yes.
17    Q.  Okay.  And so did you authorize
18 your counsel to give the judge in New York a
19 copy of the pleading, the amended pleading
20 that was filed in the Cayman Islands?
21    A.  Yes.
22 DIR  Q.  And was the purpose of providing
23 that to the Court so that the Court would see
24 the contractual and equitable claims that the
25 Ascentra Holdings, Inc. company was asserting

Page 123

1       G. ROBINSON
2 against the Planet Payment money?
3    MR. McDONALD:  Objection.
4    Q.  You can answer.
5    MR. McDONALD:  It calls for the
6 disclosure of attorney-client
7 communication.
8    MR. MORRIS:  I'm not asking for
9 anything about any communication.  I'm
10 asking for --
11    MR. McDONALD:  You're asking why.
12 That was done in consultation with
13 counsel.
14    MR. MORRIS:  Are you directing him
15 not to answer?
16    MR. McDONALD:  I am directing him
17 not to answer.
18    MR. MORRIS:  So if he was in front
19 of the judge today and the judge said,
20 "Why did you send me this," you would
21 say, "I can't tell you"?
22    You would direct him not to answer
23 because --
24    MR. McDONALD:  It's an obligation
25 of a foreign representative to apprise

Page 124

1       G. ROBINSON
2 the court of any developments in the
3 foreign jurisdiction, and we have done
4 so.  That is set forth in Chapter 15.
5    Q.  Is it your understanding that the
6 complaint sets forth contractual and equitable
7 bases for Ascentra Holdings, Inc. claim to the
8 Planet Payment money?
9    MR. McDONALD:  Objection to form.
10    A.  Say the question again, please?
11    Q.  Is it your understanding that the
12 complaint that was filed in the Cayman Islands
13 sets forth the contractual and equitable bases
14 for Ascentra Holdings, Inc.'s claim to the
15 Planet Payment funds?
16    A.  The facts and documents that
17 support our claim are set out in this amended
18 complaint.
19 DIR  Q.  Okay.  I just have a few questions
20 about that.  If we can go to paragraph 37.
21    Paragraph 37 identifies three
22 specific agreements.
23    Do I have that right?
24    MR. McDONALD:  I am going to object
25    and direct the witness not to answer.

Page 125

```
1              G. ROBINSON
2         We're not taking a deposition in the
3    Cayman proceeding here.  Your client has
4    answered, asserted defenses and a
5    counterclaim.  We have responded.  The
6    matter is taking place in the Cayman
7    Islands.
8         MR. MORRIS:  We don't need the
9     speech.  We understand it.  You could
10    just direct him not to answer on the
11    account -- on account that there's a
12    pending proceeding.
13        MR. McDONALD:  I'm directing him
14    not to answer on account there's a
15    pending proceeding.
16        MR. MORRIS:  Okay.  But I am going
17    to ask my questions anyway, and we'll
18    make the record.  Is that fair?
19        MR. McDONALD:  That's fine.
20        MR. MORRIS:  Okay.
21   DIR  Q.  Does paragraph 37 set forth --
22   identify three particular documents that were
23   executed by SPGK Cayman?
24        MR. McDONALD:  The same
25     instruction.
```

Page 126

```
1              G. ROBINSON
2      Q.  Are you going to follow counsel's
3    advice?
4      A.  Yes.
5    DIR  Q.  Okay.  Are these documents relevant
6    to Ascentra Holdings, Inc.'s claim to the
7    Planet Payment funds?
8        MR. McDONALD:  Objection.  The same
9     direction.
10     Q.  Are you going to follow counsel's
11   advice?
12     A.  Yes.
13   DIR  Q.  Have you personally reviewed these
14   three documents?
15        MR. McDONALD:  Objection.  The same
16     direction.
17     Q.  Are you going to follow counsel's
18   advice?
19     A.  Yes.
20   DIR  Q.  Do you know why these three
21   documents are cited in this complaint?
22        MR. McDONALD:  The same objection.
23     The same direction.
24     Q.  Are you going to follow counsel's
25   advice?
```

Page 127

```
1              G. ROBINSON
2      A.  Yes.
3    DIR  Q.  Do you know whether the legal
4    and equitable bases for Ascentra Holdings,
5    Inc. claim to the Planet Payment funds are set
6    forth anywhere other than this document and
7    exhibit 7?
8        MR. McDONALD:  The same objection.
9     The same direction.
10        MR. MORRIS:  So we can't even find
11     out if there's another place to look?
12        MR. McDONALD:  As I said, your
13     client has submitted defenses.  We have
14     responded to those.  There will be a
15     hearing in the Caymans where additional
16     evidence will be adduced and presented
17     to the Court.  So he's not testifying
18     about that.  That's all privileged, as
19     to whether or not there will be anything
20     else forthcoming in this matter.
21        MR. MORRIS:  Like I said, we'll
22     either do the preclusion order or we'll
23     do the follow-up.  But I appreciate
24     that.
25        Can we take a break?
```

Page 128

```
1              G. ROBINSON
2        MR. McDONALD:  Sure.
3        THE VIDEOGRAPHER:  This ends
4     unit 4.  We're off the record at 12:32.
5        (Recess taken.)
6        THE VIDEOGRAPHER:  This begins
7     unit 5.  We're on the record at 12:44.
8    BY MR. MORRIS:
9      Q.  Mr. Robinson, can you grab exhibit
10   number 1, please.
11     A.  Okay.
12   DIR  Q.  Look at topic 6.
13        Can you identify for me the
14   documents that the foreign representatives
15   contend support their assertion that they can
16   establish a likelihood of success on the
17   merits with respect to their contractual basis
18   for entitlement to the Planet Payment funds?
19        MR. McDONALD:  Objection.
20        I direct the witness not to answer
21     on the basis of a pending proceeding.
22     Q.  Are you going to follow counsel's
23   advice?
24     A.  Yes.
25   DIR  Q.  Can you turn the page, please, to
```



Page 129

1          G. ROBINSON
2    number 7.
3          Can you describe for me all facts
4    that the foreign representatives contend
5    support their assertion that they can
6    establish a likelihood of success on the
7    merits with respect to a contractual basis for
8    entitlement to the Planet Payment funds?
9          MR. McDONALD:  The same objection.
10   The same direction.
11         Also calls for divulging
12   attorney-client communications.
13   Q.  You are going to follow counsel's
14   advice?
15   A.  Yes.
16         MR. MORRIS:  To be clear, I'm not
17   asking for any attorney-client
18   privileged communications.  I'm just
19   asking for facts.
20         MR. McDONALD:  Understood.
21         MR. MORRIS:  Okay.  So I want to
22   just --
23         MR. McDONALD:  The same objection.
24   The same direction.
25         MR. MORRIS:  Okay.

Page 130

1          G. ROBINSON
2    DIR  Q.   Looking at topic number 8, can you
3    please tell me all of the documents that the
4    foreign representatives contend support their
5    assertion that they can establish a likelihood
6    of success on the merits with respect to an
7    equitable basis for entitlement to the Planet
8    Payment funds?
9          MR. McDONALD:  The same objection.
10   The same direction.
11         MR. MORRIS:  Does that include
12   attorney-client privilege or just the
13   pending-proceeding objection?
14         MR. McDONALD:  You said you're not
15   asking for any attorney-client
16   privileged information.
17         MR. MORRIS:  Correct.
18         MR. McDONALD:  So I'm just going
19   with the same objection, the same
20   direction.
21         MR. MORRIS:  Thank you.
22         MR. McDONALD:  And to the extent it
23   does call for divulging attorney-client
24   privilege, as I said before ...
25         MR. MORRIS:  But, again, I'm just

Page 131

1          G. ROBINSON
2    asking for documents.
3    Q.  Number 9.  Can you please -- are
4    you going to follow counsel's advice?
5    A.  Yes.
6    DIR  Q.   Number 9.  Can you please share
7    with us the facts that the foreign
8    representatives contend support their
9    assertion that they can establish a likelihood
10   of success on the merits with respect to an
11   equitable basis for entitlement to the Planet
12   Payment funds?
13         MR. McDONALD:  The same objection.
14   The same direction.
15   Q.  Are you going to follow counsel's
16   advice?
17   A.  Yes.
18   DIR  Q.   Do you know if Ascentra Holdings,
19   Inc. ever had a contract with Planet Payment
20   for any purpose?
21         MR. McDONALD:  Objection; the same
22   direction.
23   Q.  Are you going to follow counsel's
24   advice?
25   A.  Yes.

Page 132

1          G. ROBINSON
2    DIR  Q.   Do you know whether any subsidiary
3    of Ascentra Holdings, Inc. ever had a contract
4    of any kind with Planet Payment?
5          MR. McDONALD:  The same direction.
6    The same objection.  The same direction.
7    Q.  Are you going to follow counsel's
8    advice?
9    A.  Yes.
10   DIR  Q.   Does Ascentra Holdings, Inc. rely
11   upon the cancellation agreement to support its
12   claim to the Planet Payment funds?
13         MR. McDONALD:  The same objection.
14   The same direction.
15   Q.  Are you going to follow counsel's
16   advice?
17   A.  Yes.
18   DIR  Q.   Do you understand what the
19   cancellation is agreement -- withdrawn.
20         Do you understand what the
21   cancellation agreement is that I referred to?
22         MR. McDONALD:  The same
23   direction -- the same objection.  The
24   same direction.
25         MR. MORRIS:  All right.  I'll show



Page 133

1        G. ROBINSON
2    it to him just so there's no ambiguity.
3        Let's mark as the next exhibit --
4        What is it, number 9?
5        THE COURT REPORTER:  Yes, sir.
6        MR. MORRIS:  -- the cancellation
7    agreement.
8        (Robinson Exhibit 9, Exhibit E to
9        declaration of Graham Robinson was
10       marked for identification.)
11       Q.   Have you seen this document
12   before, sir?
13       A.   Yes.
14       Q.   And do you recall that this
15   document was attached as an exhibit to one of
16   the declarations that was filed on your behalf
17   in the Ascentra Holdings, Inc. Chapter 15
18   matter?
19       A.   Yes.
20   DIR  Q.   Okay.  Does Ascentra Holdings,
21   Inc. rely on this document in any way to
22   support its contention that it's likely to
23   succeed on the merits of its claim to the
24   Planet Payment funds?
25       MR. McDONALD:  The same objection.

Page 134

1        G. ROBINSON
2    The same direction.
3        Q.   Are you going to follow counsel's
4    advice?
5        A.   Yes.
6        MR. MORRIS:  Let's take one more
7    short break.
8        Hold it.  Before we go off the
9    record.
10       Are you going to direct him not to
11   answer any question that concerns any
12   allegation or assertion that's set forth
13   in the complaint?
14       MR. McDONALD:  Yes.
15       MR. MORRIS:  And if you are given
16   those directions, do you intend to
17   follow them?
18       THE WITNESS:  Yes.
19       MR. MORRIS:  Would you direct him
20   not to answer any question relating to
21   any allegation or contention set forth
22   in the objection that was filed on
23   behalf of Ascentra Holdings that was
24   marked as one of the earlier exhibits?
25       MR. McDONALD:  Yes.

Page 135

1        G. ROBINSON
2        MR. MORRIS:  And would you follow
3    counsel's advice in that regard?
4        THE WITNESS:  Yes.
5        MR. MORRIS:  Okay.  Now let's go
6    off the record, and we may just be done.
7        MR. McDONALD:  Okay.
8        THE VIDEOGRAPHER:  This ends
9    unit 5.  We're off the record at 12:51.
10       (Pause in proceedings.)
11       THE VIDEOGRAPHER:  This begins
12   unit 6.  We're on the record at 12:56.
13       MR. MORRIS:  Okay.  Just a couple
14   of more questions I think.  In light of
15   the instructions that you've been given,
16   I don't want to waste people's time
17   here.
18   BY MR. MORRIS:
19   DIR  Q.   Can you tell me what relief
20   Ascentra Holdings, Inc. is seeking against
21   SPGK in the Cayman Islands?
22       MR. McDONALD:  The same objection.
23   The same direction.
24       Q.   Are you going to follow counsel's
25   advice?

Page 136

1        G. ROBINSON
2        A.   Yes.
3    DIR  Q.   Are you seeking anything other than
4    the recovery of money from SPGK?
5        MR. McDONALD:  The same objection.
6    The same direction.
7        Q.   Are you going to follow counsel's
8    advice?
9        A.   Yes.
10       MR. MORRIS:  I have no further
11   questions.  You know, subject to the
12   reservation of rights that I made early
13   on about either seeking a preclusion
14   order or motion to compel.  But I don't
15   want to waste anybody's time here.
16   So --
17       MR. McDONALD:  We appreciate that.
18       MR. MORRIS:  -- I'm done for the
19   day.
20       MR. McDONALD:  Okay.
21       THE VIDEOGRAPHER:  This is the
22   videographer.
23       Will anyone be ordering the video?
24       MR. McDONALD:  No.
25       MR. MORRIS:  Yes, we will.



Page 137

```
1              G. ROBINSON
2         THE VIDEOGRAPHER: Okay. This
3    concludes today's proceedings. The
4    total number of video units was 6.
5    We're off the record at 12:58.
6              ---
7         (Time noted: 12:58 p.m. EST)
8
9    _____
10             GRAHAM ROBINSON
11
12   Sworn and subscribed to before
13   me this _____day
14   of _____, 2024,
15   in the jurisdiction aforesaid.
16
17   _____
18             NOTARY PUBLIC
19
20
21
22
23
24
25
```

Page 138

```
1         C E R T I F I C A T E
2    STATE OF NEW YORK      )
3    COUNTY OF NEW YORK     )
4         I, FRANK J. BAS, a Certified Shorthand Reporter
5    and Notary Public within and for the State of New
6    York, do hereby certify:
7         That the witness whose testimony is hereinbefore
8    set forth, was duly sworn by me and that such
9    testimony given by the witness was taken down
10   stenographically by me and then transcribed.
11        I further certify that I am not related by blood
12   or marriage to any of the parties in this matter and
13   that I am in no way interested in the outcome of this
14   matter.
15        That any copy of this transcript obtained from a
16   source other than the court reporting firm, including
17   from co-counsel, is uncertified and may not be used at
18   trial.
19        IN WITNESS WHEREOF, I have hereunto set my hand
20   this 29th day of February, 2024.
21              Frank Bas
22        FRANK J. BAS, RPR, CRR
23
24
25
```

Page 139

```
1    --------------- I N D E X ----------------------
2    WITNESS         EXAMINATION BY          PAGE
3    G. ROBINSON    MR. MORRIS              6
4    --------------- EXHIBITS-----------------------
     ROBINSON                               PAGE
5
     Robinson Exhibit 1, Amended Notice of   27
6    Deposition of Ascentra Holdings, Inc.
7    Robinson Exhibit 2, Organizational chart 37
8    Robinson Exhibit 3, CWR Form Number 13,  59
     Joint Official Liquidators' Certificate
9
     Robinson Exhibit 4, Declaration of Graham 70
10   Robinson
11   Robinson Exhibit 5, Letter to the Court,  88
     dated December 29, 2023
12
     Robinson Exhibit 6, Letter to the Court  104
13   dated June 30, 2023
14   Robinson Exhibit 7, Foreign              119
     Representatives' Objection to Motion of
15   SPGK to Terminate Restraint
16   Robinson Exhibit 8, Letter to the Court  122
     dated October 11, 2023
17
     Robinson Exhibit 9, Exhibit E to         133
18   declaration of Graham Robinson
19
20
21
22
23
24
25
```

Page 140

```
1    --------------- I N D E X (Continued) ---------------
2    DIRECTIONS NOT TO ANSWER
3    Page   Line   Page   Line   Page   Line
4    18     6      97     13     131    6
     18     25     100    20     131    18
5    19     13     122    22     132    2
     22     21     124    19     132    10
6    51     24     125    21     132    18
     55     3      126    5      133    20
7    57     6      126    13     135    19
     57     17     126    20     136    3
8    83     10     127    3
     83     22     128    12
9    84     17     128    25
     85     12     130    2
10
11
12   REQUESTS
     Page   Line
13
     84     14
14
15
16
17
18
19
20
21
22
23
24
25
```



**Page 141**

1   DEPOSITION ERRATA SHEET
2   Our Assignment No. J10806182
    Case Caption:  In re Ascentra Holdings, Inc.
3
        DECLARATION UNDER PENALTY OF PERJURY
4       I declare under penalty of perjury that I have
    read the entire transcript of my deposition taken in
5   the above-captioned matter or the same has been read
    to me, and the same is true and accurate, save and
6   except for changes and/or corrections, if any, as
    indicated by me on the DEPOSITION ERRATA SHEET
7   hereof, with the understanding that I offer these
    changes as if still under oath.
8       Signed on the _____ day of _____
    20___.
9       _____
        GRAHAM ROBINSON
10
11
12      Subscribed and sworn to on the ____ day of
13  _____ 20 ____ before me.
14  _____
15
16  Notary Public, in and for the State of
17  _____.
18
19
20
21
22
23
24
25

**Page 142**

1   DEPOSITION ERRATA PAGE
2   Page No.____ Line No. _____ Change to:_____
3   _____
4   Reason for change:_____
5   Page No.____ Line No. _____ Change to:_____
6   _____
7   Reason for change:_____
8   Page No.____ Line No. _____ Change to:_____
9   _____
10  Reason for change:_____
11  Page No.____ Line No. _____ Change to:_____
12  _____
13  Reason for change:_____
14  Page No.____ Line No. _____ Change to:_____
15  _____
16  Reason for change:_____
17  Page No.____ Line No. _____ Change to:_____
18  _____
19  Reason for change:_____
20  Page No.____ Line No. _____ Change to:_____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24      GRAHAM ROBINSON
25

**Page 143**

1   DEPOSITION ERRATA PAGE
2   Page No.____ Line No. _____ Change to:_____
3   _____
4   Reason for change: _____
5   Page No.____ Line No. _____ Change to:_____
6   _____
7   Reason for change:_____
8   Page No.____ Line No. _____ Change to:_____
9   _____
10  Reason for change:_____
11  Page No.____ Line No. _____ Change to:_____
12  _____
13  Reason for change:_____
14  Page No.____ Line No. _____ Change to:_____
15  _____
16  Reason for change:_____
17  Page No.____ Line No. _____ Change to:_____
18  _____
19  Reason for change:_____
20  Page No.____ Line No. _____ Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25      GRAHAM ROBINSON



# EXHIBIT 2



Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street | New York, NY 10019-6131 | tel 212.858.1000 | fax 212.858.1500

John A. Pintarelli
tel: +1.212.858.1213
john.pintarelli@pillsburylaw.com

December 29, 2023

**<u>Via ECF</u>**

Honorable David S. Jones
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Courtroom 701
New York, NY 10004-1408

      **Re:**    *In re Ascentra Holdings, Inc. (In Official Liquidation)*, **Case No. 21-11854**
              **Fourth Letter to Court Re Status Report**

To the Honorable David S. Jones:

      Pursuant to the Court's *Scheduling Order* [ECF No. 23], I write on behalf of Graham Robinson and Ivy Chua Suk Lin, the duly appointed joint official liquidators and foreign representatives (the "**Liquidators**" or "**Foreign Representatives**") of Ascentra Holdings, Inc. (In Official Liquidation) ("**Ascentra**") in the above-referenced case and submit this letter stating (a) the procedural status and nature of activities in this case and the Cayman Proceeding (defined below), and (b) what is anticipated in the ensuing six months.

      At a status conference held before this Court on December 21, 2023 (the "**Status Conference**"), I presented to the Court an overview of the actions that the Liquidators have undertaken in furtherance of their statutory obligations under Cayman Islands law to preserve and collect Ascentra's assets for the benefit of its stakeholders—creditors and contributories (*i.e.*, shareholders)—and to distribute those assets in accordance with the Cayman Islands statutory priority scheme and ultimately dissolve Ascentra. The Liquidators sought recognition of Ascentra's foreign proceeding in the Cayman Islands (the "**Cayman Proceeding**") in aid of those statutory obligations. At the risk of repeating that presentation, I set out below the activities undertaken by the Liquidators in the Chapter 15 case and the Cayman Proceeding.



EXHIBIT   5
WIT: Robinson
DATE: 2/29/24
FRANK BAS, RPR, CRR

Hon. David S. Jones
December 29, 2023
Page 2

### **The Chapter 15 Case**

The Foreign Representatives assume the Court's familiarity with the prior status reports filed with this Court [ECF Nos. 26, 29, and 34] and filings related to Shang Peng Gao Ke Inc. SEZC ("**SPGK Cayman**") and SPGK Pte Ltd's ("**SPGK Singapore**", and together with SPGK Cayman referred to as, "**SPGK**") motions to (i) terminate recognition of the Cayman Proceeding and (ii) lift the restraint against SPGK regarding funds previously held by Planet Payment Solutions LLC ("**Planet Payment**") [ECF Nos. 37, 42, 62, and 64], including this Court's December 5, 2023 decision resolving discovery disputes related to SPGK's motions [ECF No. 80].

As the Court is aware, this case and the Cayman Proceeding were commenced to preserve certain assets and investigate potential assets and claims against former Ascentra officers, directors and shareholders, and third-party vendors. To aid those efforts, the Court entered an order (the "**Recognition Order**") [ECF No. 22] recognizing the Cayman Proceeding as a foreign main proceeding, which imposed an automatic stay against actions against Ascentra and its assets within the territorial jurisdiction of the United States and entrusted the collection of Ascentra's assets to the Foreign Representatives. In addition, the Recognition Order provided for additional assistance to the Foreign Representatives under section 1521 of the Bankruptcy Code by (i) authorizing the Foreign Representatives to issue subpoenas and commence document discovery and (ii) permanently restrained the transfer of funds held by Planet Payment (the "**Planet Payment Funds**"). Since the last status update filed with the Court on June 30, 2023 [ECF No. 34], Ascentra, SPGK, and Planet Payment agreed to transfer the Planet Payment Funds into the Court's Disputed Ownership Fund (the "**Court Registry**") and the Court entered an order directing Planet Payment to pay the Planet Payment Funds into the Court Registry [ECF No. 60].

*Investigation and Turnover of U.S. Assets*

Ever Innovation, Inc. ("**EII**"), a California corporation, acted as operations and technology support for Ascentra and its affiliated companies. Ascentra was EII's only client and funded the entirety of EII's operations up to the date of the termination of their contractual agreement on August 31, 2021. Prior to entry of the Recognition Order, EII turned over to Ascentra all of its servers and remotely stored back-up files.

After entry of the Recognition Order, as part of its investigation into potential litigation claims, Ascentra served subpoenas on EII, its CEO, Masami Nakano, and its Chief Technology Officer, James Koshimoto, seeking documents related to work performed by Ms. Nakano and Mr. Koshimoto for an Ascentra affiliated party. Ms. Nakano also agreed to and sat for an informal interview with the Liquidators and counsel.

The Liquidators' investigation has also led to the discovery of monies held by Theodore Sanders, the former Chief Financial Officer of Ascentra. Ascentra and Mr. Sanders have agreed to escrow the funds until Mr. Sanders' claims to the funds can be adjudicated (as discussed in more detail below).

Hon. David S. Jones
December 29, 2023
Page 3


The Liquidators have also served a subpoena on International Payout Systems Inc. as part of its investigation into the calculation, booking, and payment of sales commissions to third party "leaders" or "affiliates", individuals that marketed and sold Ascentra products in various Asian markets.

### The Cayman Proceeding

*Litigation Against SPGK and its Affiliates*

On September 20, 2023, the Liquidators filed an application with the Grand Court of the Cayman Islands (the "**Grand Court**") seeking sanction (authorization) to bring claims against SPGK and its affiliates in connection with the sales proceeds paid into its bank accounts for the sale of Ascentra products. On September 25, 2023, the Grand Court sanctioned the Liquidators' application.

On October 4, 2023, the Liquidators filed a Writ of Summons and Statement of Claim under case reference FSD 300 of 2023 (the "**Litigation**") in the Grand Court against Ryunosuke Yoshida, SPGK, Growth Today, Inc., and Scuderia Bianco Pte Ltd. (the "**Defendants**"). An Amended Writ of Summons and Amended Statement of Claim was filed on October 11, 2023, and the Defendants acknowledged service of the Amended Statement of Claim on October 25, 2023, and submitted to the jurisdiction of the Cayman Islands. As reported to this Court [ECF No. 77], the Amended Statement of Claim alleges multiple claims against the Defendants, including breach of fiduciary duty, unjust enrichment and trust claims, and the lawsuit is a result of the Liquidators' two-year investigations into claims and causes of action against Mr. Yoshida, SPGK and SPGK's related entities. On December 22, 2023, the Defendants filed a defence and counterclaim.

Following the commencement of the Litigation, the Liquidators have been in regular correspondence with the Defendants. In particular, the Liquidators have asked the Defendants to agree to pay all of the disputed funds that are currently held in accounts in Taiwan (which, together with the funds currently held in the Court Registry, are the subject of the Litigation) into the Grand Court for their safekeeping while the dispute between the Liquidators and the Defendants is resolved, however, the Defendants have refused. Accordingly, the Liquidators have indicated that, in the absence of a consensual agreement, the Liquidators will be seeking an order from the Grand Court.

*Liquidation and Dissolution of Ascentra's Affiliates*

Aside from the Litigation, the Liquidators have been proceeding with the liquidation and dissolution of Ascentra's affiliates, including its subsidiary, HEC International Ltd. ("**HEC**"), which is the subject of an official winding up proceeding in the Cayman Islands. Mr. Graham Robinson is the sole liquidator of HEC (in such capacity, the "**Liquidator**"). As stated at the Status Conference, the Liquidator has made the initial determination that HEC is solvent, which would eventually entitle Ascentra to a dividend if the determination holds up.

Hon. David S. Jones
December 29, 2023
Page 4

The Liquidator has been involved in defending claims asserted against HEC by SPGK Cayman, as a purported creditor. In the first instance, the Grand Court ruled in favor of HEC and denied SPGK Cayman leave to assert a proprietary claim to certain funds held by HEC. SPGK Cayman has appealed this decision. The judgment from the Cayman Islands Court of Appeal is currently pending.

Further, and in connection with the HEC liquidation, the Liquidator has been working to dissolve HEC's wholly owned Delaware subsidiary, iHealthscience, LLC ("**iHS**"). To that end, the Liquidator had to first wind-up iHS' Hong Kong branch, which was recently completed. The Liquidator is now completing the process of dissolving iHS under Delaware law.

The Liquidators are also in the process of liquidating a Taiwan subsidiary and a Hong Kong subsidiary, as part of the operational wind-down of the Ascentra group.

*Additional Actions Undertaken by the Liquidators*

The Liquidators continue to correspond with potential creditors and parties who have made claims in the liquidation by way of proof of debt. In that regard, two (2) proofs of debt filed have not yet been adjudicated because the underlying claims are based on damages in connection with warrants issued by Ascentra. Specifically, the Liquidators have not yet adjudicated these proofs of debt because, *inter alia*, the current amount of assets held by Ascentra would preclude a distribution to common shareholders. As stated in the most recent status report, the Liquidators have been in communication with these purported creditors. The Liquidators also received three (3) additional proofs of debt from Mr. Sanders on November 10, 2023, which have not yet been adjudicated. The Liquidators and their counsel have been in communication with Mr. Sanders and his Cayman counsel.

Finally, in the Singapore proceeding, on October 18, 2023, the Court of Appeal of the Republic of Singapore (the "**Court of Appeal**") reversed the High Court for the Republic of Singapore's (the "**High Court**") decision denying the Liquidators' application for recognition of the Cayman Proceeding in Singapore [ECF No. 78]. The appellate decision recognized the Cayman Proceeding. Following the decision, the Liquidators and SPGK Singapore filed written submissions on whether the recognition of the Cayman Proceeding in Singapore should be made subject to any conditions. Among others, SPGK Singapore has argued that the automatic stay under Article 20 of the Singapore Model Law should be terminated and that the Liquidators should be required to seek leave of the High Court before taking any investigation action. The Court of Appeal has yet to provide any direction on this issue.

## Expectations Over the Next Six Months

In the instant case, in the next six (6) months, the Foreign Representatives will seek to finalize their investigations concerning Ascentra's assets, including their review and analysis of documents produced to date. Ascentra will be filing a reply to the Defendants' defence and a defence to the counterclaim filed in the Litigation. The Foreign Representatives' continued focus

Hon. David S. Jones
December 29, 2023
Page 5

is to implement a strategy to wind down and close the operations of Ascentra and Ascentra's subsidiaries, including HEC and iHS.

Respectfully submitted,

*/s/ John A. Pintarelli*
John A. Pintarelli
Partner

# EXHIBIT 3

**Page 1**

1   IN THE UNITED STATES BANKRUPTCY COURT
2   FOR THE SOUTHERN DISTRICT OF NEW YORK
3   -------------------------------------x
4   In re
5   ASCENTRA HOLDINGS, INC. (In Official
6   Liquidation),                Chapter 15
7                        Case No.21-11854(DSJ)
8
9           Debtor in a
10          Foreign Proceeding.
11  -------------------------------------x
12
13
14      DEPOSITION OF ALEXANDER GRAY HENDERSON, KC
15          New York, New York
16          Thursday, September 28, 2023
17
18
19
20
21
22
23  Reported by:
    Frank J. Bas, RPR, CRR
24  Job No. J10291184
25

**Page 2**

1
2
3               September 28, 2023
4               9:19 a.m. EDT
5
6       Deposition of ALEXANDER GRAY
7   HENDERSON, KC, held at the offices of
8   Pachulski Stang Ziehl & Jones, 780 Third
9   Avenue, New York, New York, before Frank J.
10  Bas, a Registered Professional Reporter,
11  Certified Realtime Reporter, and Notary Public
12  of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1   A P P E A R A N C E S:
2
3   PILLSBURY WINTHROP SHAW PITTMAN LLP
    Attorneys for Petitioners
4       31 West 52nd Street
        New York, New York 10019
5
    BY: HUGH M. McDONALD, ESQ.
6       (hugh.mcdonald@pillsburylaw.com)
        JOHN A. PINTARELLI, ESQ.
7       (john.pintarelli@pillsburylaw.com)
8           -and-
9   PILLSBURY WINTHROP SHAW PITTMAN LLP
        725 South Figueroa Street
10      Los Angeles, California 90017
11  BY: CLAIRE K. WU, ESQ. (Via Zoom)
        (claire.wu@pillsburylaw.com)
12
13  CAMPBELLS LLP
    JOLs Cayman Islands Counsel
14      Floor 4, Willow House, Cricket Square
        Grand Cayman KY1-9010
15      Cayman Islands
16  BY: NIENKE LILLINGTON, ESQ.
        (nlillington@campbellslegal.com)
17      GUY COWAN, ESQ.
        (gcowan@campbellslegal.com)
18
        KATIE LOGAN, ESQ.(Via Zoom)
19      (klogan@campbellslegal.com)
20
    BLAIR LEAHY KC (Via Zoom)
21      For Joint Liquidators of Ascentra Holdings
        20 Essex St. Chambers
22      London, England, United Kingdom
        (bleahy@twentyessex.com)
23
24
25

**Page 4**

1   A P P E A R A N C E S:
2
3
    WILBERFORCE CHAMBERS
4       8 New Square, Lincoln's Inn
        London, WC2A 3QP United Kingdom
5
    BY: GRAEME HALKERSTON, Barrister (Via Zoom)
6       (ghalkerston@wilberforce.co.uk)
7
8   HARNEY WESTWOOD & RIEGELS
    3rd Floor, Harbour Place
9   103 South Church Street
    Grand Cayman
10  PO Box 10240 KY1-1002
    Cayman Islands
11
    BY: JESSICA WILLIAMS, ESQ.(Via Zoom)
12      (jessica.williams@harneys.com)
13
14  PACHULSKI STANG ZIEHL JONES
    Attorneys for SPGK Pte. Ltd.
15      780 Third Avenue
        New York, New York 10017
16
    BY: JOHN A. MORRIS, ESQ.
17      (jmorris@pszjlaw.com)
        JEFFREY DINE, ESQ.
18      (jdine@pszjlaw.com)
19
20  ALSO PRESENT VIA ZOOM:
21      JAMES PARKINSON
        CAITLIN MURDOCK, Harneys
22      ANDREW JOHNSTONE
        ANDREA BIANCA
23      KWAME AKUFFO
        ALIANA DODDS
24
                        - oOo -
25



Page 5

1           A. Henderson
2           THE COURT REPORTER:  On the record.
3    I'll ask counsel to state their
4    appearances, for the record.
5           MR. MORRIS:  John Morris, Pachulski
6    Stang Ziehl & Jones for SPGK.
7           MR. DINE:  Jeffrey Dine, Pachulski
8    Stang Ziehl & Jones for SPGK.
9           MR. McDONALD:  Hugh McDonald,
10   Pillsbury Winthrop Shaw Pittman for the
11   foreign representatives of Ascentra
12   Holdings.
13                _ _ _
14
15   ALEXANDER GRAY HENDERSON,
16   called as a witness, having been first duly
17   sworn by a Notary Public, was examined and
18   testified as follows:
19   EXAMINATION BY
20   MR. MORRIS:
21      Q.   Good morning, Mr. Henderson.
22      A.   Good morning.
23      Q.   My name is John Morris, I'm an
24   attorney at Pachulski Stang Ziehl & Jones and
25   we're counsel for SPGK.

Page 6

1           A. Henderson
2      A.   Thank you.
3      Q.   And we're here today for your
4    deposition.  Do you understand that?
5      A.   Yes.
6      Q.   Have you ever been deposed before?
7      A.   No.
8      Q.   Okay.
9      A.   I've participated in hundreds of
10   depositions as counsel, if that helps.
11     Q.   But you've never served as a
12   witness, is that right?
13     A.   No.
14     Q.   Did any of those hundreds of
15   depositions that you've participated in take
16   place in the United States?
17     A.   I've attended depositions in the
18   United States.
19     Q.   Okay.  Some really simple ground
20   rules, I am going to ask a series of
21   questions, it's very important that you allow
22   me to finish my question before you begin to
23   answer.  Do you understand that?
24     A.   Yes.
25     Q.   It's also very important that I

Page 7

1           A. Henderson
2    allow you to finish your answer before I begin
3    the next question, and if I fail to do that,
4    and it might happen, will you let me know?
5      A.   Yes.
6      Q.   And if I ask a question that you
7    don't understand, will you let me know that,
8    too?
9      A.   Yes.
10     Q.   If you want to break at any time,
11   just tell me and I'll be happy to accommodate
12   you as long as a question is not pending.
13   Okay?
14     A.   Thank you.
15     Q.   And I think you're familiar with --
16   I assume you're familiar based on those
17   hundreds of depositions that from time to time
18   your lawyer might lodge objections to my
19   questions.  Are you familiar with that
20   process?
21     A.   Yes.
22     Q.   But that unless he specifically
23   directs you not to answer, I'll either have an
24   opportunity to rephrase the question or I'll
25   just ask you to answer the question.  Is that

Page 8

1           A. Henderson
2    fair?
3      A.   Yes.
4      Q.   Okay.  Did you do anything to
5    prepare for today's deposition?
6      A.   I read over the declaration of
7    Ms. Pearson.  That was this morning.  On prior
8    days I've done things to prepare as well.
9      Q.   How many prior days did you spend
10   preparing for today's deposition?
11     A.   I did a fair bit of reading in the
12   Cayman Islands a couple of weeks ago.  That
13   would be probably a day or so.  And I met with
14   counsel yesterday for preparation.
15     Q.   And the things that you read, did
16   you read them for the purposes of refreshing
17   your recollection as to the matters that are
18   at issue here?
19     A.   Yes, that would be one of the
20   purposes.
21     Q.   Okay.  Can you describe for me
22   everything you recall reading in connection
23   with the preparation for today's deposition?
24     A.   I recall reading my declaration,
25   Ms. Pearson's declaration.  I recall reading

Page 9

1    A. Henderson
2  some of Ms. Pearson's deposition.  At one
3  time, I suppose this would be quite early on,
4  I read the motion, and Mr. Robinson's evidence
5  or declaration.  And Mr. Cowan's.
6    Q.  Do you recall that in your
7  declaration --
8    MR. MORRIS:  Withdrawn.
9    Q.  You signed a declaration in support
10  of the liquidators in this case, correct?
11    A.  Correct.
12    Q.  And do you recall that in that
13  declaration you identified certain documents
14  that you had reviewed --
15    A.  Correct.
16    Q.  -- in order to form your opinions?
17    A.  Yes, I do recall that.
18    Q.  In preparing for today's deposition
19  do you recall reviewing any document that
20  wasn't identified in your declaration?
21    A.  I looked at the 1862 Joint Stock
22  Companies Act in the U.K. to refresh my memory
23  on a bit of history.
24    I looked at a couple of 19th
25  century chancery court cases for the same

Page 10

1    A. Henderson
2  purpose.
3    Q.  Anything else that you can recall?
4    A.  There was that Singapore judgment.
5  I read part of it.
6    Q.  Is the Singapore judgment relevant
7  to the opinions that are set forth in your
8  declaration?
9    A.  No.
10    Q.  I appreciate that.  Because I think
11  I saw it identified, but I didn't see any
12  substantive opinion expressed with respect --
13    A.  It was given to me to be read and I
14  read it.
15    Q.  Okay.  You met with counsel to
16  prepare for today's deposition, do I have that
17  right?
18    A.  Correct.  Yes.
19    Q.  And was that yesterday?
20    A.  Yes.
21    Q.  Was it just attorneys from
22  Pillsbury?
23    A.  No.  Attorneys from Campbells as
24  well.
25    Q.  Okay.  And did anybody else

Page 11

1    A. Henderson
2  participate in the meeting?
3    A.  No.  There were two attorneys from
4  Pillsbury, two from Campbells, and myself.
5    Q.  And how long did you meet?
6    A.  From 10 a.m. until roughly 3 p.m.
7  or 3:30.
8    Q.  I do want to just thank you on the
9  record for your willingness to come to
10  New York.
11    A.  It's always a pleasure to come to
12  New York.
13    Q.  If there's one thing that I hope
14  that the parties can agree on, it's that
15  saving costs is helpful and you're the reason
16  that we're able to do that.  So thank you.
17    A.  Okay.
18    MR. McDONALD:  John, before we go
19    on, if we could just put on the record
20    that we're agreeing that all objections
21    are preserved?
22    MR. MORRIS:  Yes.
23    MR. McDONALD:  All right?  Do you
24    want the transcript read --
25    MR. MORRIS:  Except as to form.

Page 12

1    A. Henderson
2    MR. McDONALD:  Right.  Except as to
3    form.
4    MR. MORRIS:  Yes.  We'll do the
5    same process that we did.
6    MR. McDONALD:  The same as we had
7    before?
8    MR. MORRIS:  Yes.
9    MR. McDONALD:  Okay.  Thank you.
10    Q.  You've been engaged by Ascentra
11  Holdings to provide expert testimony in
12  Ascentra's Chapter 15 proceeding in New York,
13  is that right?
14    A.  That is correct.
15    Q.  Do you recall when you were first
16  engaged?
17    A.  Not really.  It might -- it must
18  have been in August sometime.
19    Q.  Sometime over the summer, is that
20  fair?
21    A.  Probably.
22    Q.  And what were the circumstances
23  that led to your engagement by Ascentra?
24    A.  I don't know.  Ascentra would have
25  to ask that -- answer that.

1          A. Henderson
2     Q.   Did somebody call you or send you
3 an email?
4     A.   Oh, somebody sent me an email I
5 think.  I think it was an email rather than a
6 phone call.
7     Q.   And do you recall who first
8 approached you?
9     A.   Somebody from Campbells.
10     Q.   But you --
11     A.   I'm sorry.  I don't recall the
12 name.  I probably have it in my file
13 somewhere.  But I don't recall the name.
14     Q.   Did you subsequently speak with
15 somebody about the potential engagement?
16     A.   Yes.
17     Q.   Do you recall who you spoke with?
18     A.   With Ms. Lillington, who is here.
19 Mr. Cowan, who is here.  There may have been
20 someone else as well.
21     Q.   And who is Ms. Lillington?
22     A.   She works at Campbells.
23     Q.   And how about Mr. Cowan?
24     A.   He works at Campbells.
25     Q.   Do you recall what they told you in

1          A. Henderson
2 your initial conversation about why they were
3 calling you and what they were seeking?
4     A.   I don't really.  I mean, it would
5 have been they want evidence given in
6 connection with a winding up proceeding, and I
7 would have quoted them my hourly rate.  They
8 would have provided me with a list of
9 potential conflicts so that I can do a
10 conflicts search.
11     Q.   Are these things that you recall
12 happening or things that you just assume
13 happened because --
14     A.   I think because I don't recall
15 really.
16        (Reporter requests clarification.)
17     Q.   Did there come a time when you were
18 given a specific assignment?
19     A.   Yes.
20     Q.   And do you recall when that was?
21     A.   No.
22     Q.   Do you recall what the assignment
23 was?
24     A.   Yes.  I do.
25     Q.   Can you please tell me everything

1          A. Henderson
2 you recall about the assignment you were
3 given?
4     A.   I was --
5        MR. McDONALD:  To the extent you
6     discussed it with Cowan's [sic] or us
7     after your engagement, I counsel that
8     it's privileged.  Okay?
9        THE WITNESS:  Yes.
10     A.   The initial assignment was fairly
11 vague, as I recall.  It was to give evidence
12 on Cayman Islands law involving a winding up
13 proceeding with a view to supporting a
14 recognition order in New York.  I think that
15 would be the summary.
16     Q.   And did that initial vague
17 assignment take on more specificity later in
18 time?
19     A.   Yes.
20     Q.   And in what way did that vague
21 assignment become more specific?
22     A.   Well, it became clear that
23 Ms. Pearson had submitted a declaration and in
24 fact had been deposed as well, and I was to
25 respond to that.

1          A. Henderson
2     Q.   Did you help the attorneys
3 representing the liquidators prepare for
4 Ms. Pearson's deposition?
5     A.   No.
6     Q.   At the time you were engaged
7 Ms. Pearson had already submitted a
8 declaration in support of SPGK's motions, do
9 you understand that?
10     A.   I assume that to be true.  I only
11 saw it sometime later.  But ...
12     Q.   Is it fair to say that you were
13 given two assignments, one was to opine on
14 Cayman Islands winding up law and the other
15 was to review and opine on Ms. Pearson's
16 declaration and opinions?
17     A.   No.  It was one assignment
18 described in general terms at first and more
19 specific terms later, I think.
20     Q.   Okay.  So the general terms in the
21 beginning were that you were asked to opine on
22 Cayman Islands law on winding up in order to
23 support the recognition proceeding --
24     A.   Yes.
25     Q.   -- in the United States, do I have

Page 17

1           A. Henderson
2    that right?
3        A.   A general -- that was a general
4    description.
5           MR. McDONALD:  Let him finish the
6        question.  Pause a little bit, okay?
7           THE WITNESS:  Okay.
8        Q.   And then -- it is a little tricky
9    sitting in that seat.
10          And then you were asked to expand
11   on that further to deal with Ms. Pearson, is
12   that fair?  Or did the assignment change in
13   other ways?
14       A.   No.  It wasn't a question of
15   expanding on it.  There was a very general
16   description given of the field of expertise
17   that was required, which is typical in these
18   assignments.  And then after the conflict
19   search is done and the hourly rate is agreed
20   to and that sort of thing, then the specifics
21   were given to me.
22          MR. MORRIS:  Let's mark as exhibit
23       1 your declaration.  And I do know that
24       your declaration had some attachments,
25       but I've broken them out into pieces.

Page 18

1           A. Henderson
2        So for the moment I'm just going to hand
3        to you your declaration.  Okay?
4           THE WITNESS:  Sure.
5           (Henderson Exhibit 1, Declaration
6        of Mr. Henderson was marked for
7        identification).
8        Q.   This is your declaration, sir, is
9    that right?
10       A.   Yes.
11       Q.   And you signed it on the last page,
12   do I have that correct?
13       A.   Yes.
14       Q.   Did you review it before signing
15   it?
16       A.   Yes.
17       Q.   And did you authorize counsel to
18   file this in New York on your behalf?
19       A.   That was implied.
20       Q.   Okay.  Who wrote this document?
21       A.   I did.
22       Q.   And how long did it take you to
23   write?
24       A.   Several hours.  I don't know how
25   long exactly.

Page 19

1           A. Henderson
2        Q.   Did you go through multiple drafts
3    or is it just one draft?
4        A.   No.  There would be multiple
5    drafts.
6        Q.   Do you recall how many drafts you
7    wrote?
8        A.   Probably three or four.  It would
9    be one of those two.  Three or four.
10       Q.   Did you share any draft with
11   anybody at any time?
12       A.   Oh, yes.  With counsel.
13       Q.   Did counsel provide to you any kind
14   of outline that they wanted you to follow in
15   preparing the declaration?
16       A.   No.
17       Q.   Did counsel provide any comments to
18   any draft that you prepared?
19       A.   Yes.
20       Q.   Do you recall any comments that any
21   lawyer, or anybody, provided to any draft of
22   your declaration?
23       A.   I don't recall any specific
24   comments.
25       Q.   Did they provide written comments

Page 20

1           A. Henderson
2    to you?
3        A.   Yes.  They would have provided
4    comments embedded in a Microsoft Word version
5    of the document.
6        Q.   But you don't remember any of those
7    comments?
8        A.   No.
9           MR. McDONALD:  I am going to
10       object.  That's privileged.
11          MR. MORRIS:  I don't agree with
12       that, but are you directing him not to
13       answer?
14          MR. McDONALD:  I am directing him
15       not to answer that question.
16          MR. MORRIS:  Okay.
17       Q.   Did you have all of the information
18   that you believed you needed in order to
19   render your opinions at the time that you
20   prepared this declaration?
21       A.   Yes.
22       Q.   Is there any information that you
23   can think of that was relevant to your
24   analysis as set forth in the declaration that
25   you were unable to obtain?



Page 21

1          A. Henderson
2          MR. McDONALD:  Objection to form.
3          THE WITNESS:  I'm sorry, I
4    didn't --
5          MR. McDONALD:  I just objected to
6    form.  You can answer.
7          THE WITNESS:  I see.
8          A.  The answer would be no.
9          Q.  And if we go to paragraph 11, as I
10   referred to earlier.
11         A.  Yes.
12         Q.  That's the list of documents and
13   materials that you reviewed to understand the
14   context in which your opinions were being
15   provided, is that correct?
16         A.  Yes.
17         Q.  And how did you obtain this
18   information?
19         A.  It was given to me by counsel.
20         Q.  And did counsel identify the
21   documents that are listed in paragraph 11?
22         A.  Did counsel identify them?
23         Q.  Yeah.  I mean you didn't --
24         A.  No.  The counsel just sent them to
25   me by email.

Page 22

1          A. Henderson
2          Q.  Okay.  So they selected the
3    documents that you reviewed, is that fair?
4          A.  Correct.
5          Q.  I may have asked you this earlier.
6    If I did, I apologize.
7          In formulating your opinions did
8    you consider any information that's not
9    disclosed in paragraph 11?
10         A.  Well, I remember, as I say, going
11   and taking a look at the 1862 Joint Stock
12   Companies Act in the U.K. and looking at two
13   or three decisions from that era in the U.K.
14   chancery court.
15         Q.  Anything else you can recall?
16         A.  No.  Nothing else that I can
17   recall.
18         Q.  Okay.  Is there anything in your --
19         MR. MORRIS:  Withdrawn.
20         Q.  You reviewed this declaration as
21   part of your preparation for today's
22   deposition, correct?
23         A.  Yes.
24         Q.  Okay.  Is there anything in your
25   declaration that you now believe is

Page 23

1          A. Henderson
2    inaccurate?
3          A.  No.
4          Q.  Is there anything in your
5    declaration that you now believe is
6    incomplete?
7          A.  No.
8          Q.  Is there anything in your
9    declaration that you now believe needs to be
10   updated or modified in any way to ensure that
11   it fully and accurately reflects all of your
12   opinions?
13         A.  No.
14         Q.  Okay.  You attached two documents
15   to your declaration, is that right?
16         A.  Yes.
17         Q.  The first was the Cayman Islands
18   Companies Act, correct?
19         A.  Yes.
20         Q.  And Part V of the Companies Act
21   provides rules concerning the winding up of
22   Cayman Islands entities, is that fair?
23         MR. McDONALD:  Object to the form.
24         A.  Yes.
25         Q.  Is that fair, sir?

Page 24

1          A. Henderson
2          A.  Yes.
3          MR. MORRIS:  Okay.  I am going to
4    mark as exhibit 2 the copies that I have
5    of the Companies Act.
6          (Henderson Exhibit 2, Companies Act
7    was marked for identification).
8          Q.  And I will represent to you if
9    you'll look at the top of the document there's
10   a bunch of numbers and statements.  This
11   document was attached to your declaration, do
12   I have that right?
13         A.  Yes.
14         Q.  Why did you attach this document to
15   your declaration?
16         A.  Counsel wanted me to.
17         Q.  And the other document that you
18   attached to your declaration is known as the
19   Companies Winding Up Rules, is that right?
20         A.  Yes.
21         MR. MORRIS:  Let's mark that as
22   exhibit 3.
23         (Henderson Exhibit 3, Companies
24   Winding Up Rules was marked for
25   identification).



Page 25

1  A. Henderson
2      Q.  And did you also attach that
3  document to your declaration at the request of
4  counsel?
5      A.  Yes.
6      Q.  Taken together, do Part V of the
7  Companies Act and the Winding Up Rules taken
8  together, does that constitute the Cayman
9  Island law that relates to the winding up of
10  companies in the Cayman Islands?
11      A.  Not entirely.
12      Q.  Can you describe for me what other
13  rules apply to the winding up of Cayman
14  Islands companies that are not contained in
15  those two documents?
16      MR. McDONALD:  Objection to form.
17      A.  The régime manifested in a couple
18  of hundred years of decisions in the U.K.
19  emanating from the court of chancery.
20      Q.  I appreciate that.  And is it fair
21  to say that you didn't cite to any of those
22  decisions in your declaration?
23      A.  That's correct.
24      Q.  Okay.  So there's no decision that
25  you are specifically relying on in order to

Page 26

1      A. Henderson
2  formulate your opinions?
3      A.  No specific decision, correct.
4      Q.  Okay.  Just to try to make this a
5  little easy, can we refer to the Part V of the
6  Companies Act and the Winding Up Rules
7  together as the winding up laws of the Cayman
8  Islands?
9      A.  Yes.
10      Q.  Okay.  Do you know why the Winding
11  Up Rules are broken out into two pieces; one
12  that's Part V of the Companies Act and one
13  that are the Winding Up Rules?
14      A.  I don't think I do know why, no.
15      Q.  Is there a custom or practice in
16  which the two sets of rules are used in the
17  Cayman Islands?
18      A.  There's a trend in the Cayman
19  Islands, to which I largely object, that
20  important provisions in the law are relegated
21  to rules rather than set out in statutes.
22      Q.  Is Part V of the Companies Act, is
23  that a statute?
24      A.  Yes.
25      Q.  And who passed that statute?

Page 27

1      A. Henderson
2      A.  The Parliament of the Cayman
3  Islands.
4      Q.  And who adopted the Winding Up
5  Rules?
6      A.  The Rules Committee in the first
7  instance would have adopted them or perhaps
8  more technically recommended them, and then
9  they would have been adopted either by the
10  governor or by the cabinet.
11      Q.  Do you know who adopted the
12  document we have marked as exhibit 3, the
13  Companies Winding Up Rules?
14      A.  I don't.  I would have to look it
15  up.
16      Q.  Do you know when they were adopted?
17      A.  I would have to look it up.
18      Q.  Do you know when the Companies Act
19  was enacted?
20      A.  Not precisely, no.  I only came to
21  the Cayman Islands in the year 2000.
22      Q.  Was Part V of the Companies Act --
23  had it been adopted at the time that you got
24  to the Cayman Islands?
25      A.  Yes.

Page 28

1      A. Henderson
2      Q.  And how about the Companies Winding
3  Up Rules, had they been adopted by the time
4  you got to the Cayman Islands?
5      A.  I think so, but I'm not sure.
6      Q.  You referred to a Rules Committee.
7  What Rules Committee are you referring to?
8      A.  It's a committee appointed by the
9  attorney general and the chief justice to
10  create rules for court proceedings.  They
11  draft the rules.  They don't necessarily give
12  them legal effect themselves.  The rules may
13  require promulgation by the governor or by the
14  cabinet.
15      Q.  And are the company Winding Up
16  Rules in exhibit 3, are those binding on
17  parties to winding up proceedings in the
18  Cayman Islands?
19      A.  They're binding.
20      Q.  If the take Part V of the Companies
21  Act and the Winding Up Rules, is there one set
22  of rules that are either more important or
23  that take precedent over the other?
24      MR. McDONALD:  Objection to form.
25      A.  Yes, there is.



Page 29

1        A. Henderson
2     Q.  Can you tell me how that works?
3     A.  Part V of the Companies Act is
4  primary legislation and takes precedence over
5  the rule-making power.  The Companies Winding
6  Up Rules are subordinated legislation made
7  pursuant to a power that I presume is found in
8  the Companies Act.  The rule making cannot
9  extend beyond the jurisdiction granted for
10  that purpose by the Companies Act.
11     Q.  Are you aware of any aspect of the
12  Companies Winding Up Rules that conflicts with
13  Part V of the Companies Act?
14     A.  No, I haven't directed my mind to
15  it.  But I'm not aware of any.
16     Q.  Do parties to a winding up
17  proceeding in the Cayman Islands that's under
18  judicial supervision, they're obligated to
19  follow both the Companies Act and the Winding
20  Up Rules, right?
21     A.  That is correct.
22     Q.  Okay.  We've used the phrase
23  "winding up," right?
24     A.  Yes.
25     Q.  And I think the phrase

Page 30

1        A. Henderson
2  "liquidation" is also used in your declaration
3  from time to time, is that right?
4     A.  Yes.  Certainly.  Yes.
5     Q.  In your opinion is there any
6  substantive difference between a winding up
7  proceeding and a liquidation?
8     A.  Not in practice.  I suppose in
9  theory you could have a company that has no
10  assets and no liabilities.  So you simply wind
11  it up.  There's no need to liquidate anything.
12  In fact, I shouldn't say in theory.  I think
13  that happens fairly regularly.
14     Q.  I appreciate that.  With that
15  exception, are the terms in your opinion --
16     A.  Yes.
17     Q.  -- interchangeable?
18     A.  They're functionally equivalent.
19     Q.  Okay.  Can you turn to paragraph 16
20  of your declaration, please?
21     A.  Yes.
22     Q.  In paragraph 16 your first sentence
23  says, quote, "strictly speaking there is no
24  such thing as an insolvency proceeding in the
25  Cayman Islands."

Page 31

1        A. Henderson
2     Do you see that?
3     A.  Yes.
4     Q.  What does that mean?
5     A.  I'm sorry?
6     Q.  What does that mean?
7     A.  It means what I have said after the
8  semi-colon, there is no statutory provision or
9  common law rule that authorizes a legal
10  proceeding exclusively for the purpose of
11  addressing the consequences of insolvency.
12  Insolvency is simply a justification or a
13  ground for winding up the company.
14     Q.  And is it fair to contrast that
15  with Chapter 11 in the United States as a
16  general matter?
17     MR. McDONALD:  Objection to form.
18     A.  I don't have enough knowledge of
19  Chapter 11 to contrast anything with it.
20     Q.  Okay.  There's no proceeding in the
21  Cayman Islands that would allow a company to
22  reorganize, is that fair?
23     A.  No, we have -- we now have
24  provisions that allow for corporate
25  reorganization.

Page 32

1        A. Henderson
2     Q.  And are they set forth in Part V of
3  the Companies Act?
4     A.  They're in the Companies Act.  I
5  don't think they're in Part V.
6     Q.  Okay.
7     A.  They're probably in Part IV.
8     Q.  So that concept of reorganization
9  is unrelated to the concept of winding up in
10  liquidation, is that fair?
11     A.  Yes.
12     Q.  Would you agree that a winding up
13  or liquidation proceeding is a proceeding
14  whereby a company undertakes a process with
15  the express purpose of ending its corporate
16  existence?
17     A.  Yes.
18     Q.  And that's what we've defined as
19  the winding up laws are intended to do, is
20  that fair?
21     A.  Yes.
22     Q.  And that's why in your opinion it
23  doesn't matter if a company is solvent,
24  insolvent or of doubtful insolvency, as long
25  as the process is one that's undertaken for



Page 33

1          A. Henderson
2  the purpose of ending the corporate existence,
3  then it's one that has to be undertaken
4  pursuant to the winding up laws, is that fair?
5          A.  Yes, I think that's fair.
6          Q.  And in fact in paragraph 17 you
7  specifically state that insolvency is just one
8  circumstance that could lead to a winding up
9  proceeding, right?
10         A.  Yes.
11         Q.  Quote, "Whatever the justification
12  for a winding up order there's just one
13  available proceeding, an action commenced by
14  petition in the Grand Court."
15             Have I read that correctly?
16         A.  Yes.
17         Q.  And is it fair to say that's the
18  heart of your opinion?
19         A.  Yes.
20         Q.  And that opinion is really the
21  foundation for your opinion back in paragraph
22  14, that the Cayman proceeding actually does
23  satisfy the elements that you've identified in
24  paragraph 14, right?
25         A.  I'm sorry.  I don't understand --

Page 34

1          A. Henderson
2          Q.  Really bad question.  Really bad
3  question.
4              I'm just taking you from 17 back to
5  14.  Paragraph 14 identifies three elements?
6          A.  Yes, it does.
7          Q.  Okay.  And based on your opinions
8  set forth in paragraph 17 as a general matter
9  you believe that because the winding up
10  régime, regardless of the cause of the winding
11  up, results in the liquidation of the
12  corporate entity, it therefore satisfies the
13  three elements that are in paragraph 14, is
14  that fair?
15             MR. McDONALD:  Objection to form.
16         A.  Well, if I understand the question,
17  no.  I mean, I've identified in paragraph 14
18  what I understand to be the three live issues
19  in this proceeding.  All I'm doing is
20  paragraph 14 is setting them out.  I address
21  them subsequently.
22             My opinion on those three issues
23  certainly depends heavily upon my
24  understanding that there is just one sort of
25  proceeding, it's a winding up proceeding.

Page 35

1          A. Henderson
2          Q.  Because Ascentra's proceeding in
3  the Cayman Islands is a winding up proceeding,
4  it is therefore a collective proceeding in
5  your opinion, is that right?
6          A.  Yes.
7          Q.  And because it is a winding up
8  proceeding under the winding up laws it is a
9  proceeding conducted under a law relating to
10  insolvency or the adjustment of debt, is that
11  right?
12         A.  Yes.
13         Q.  And because it's a proceeding in
14  the Cayman Islands for the purpose of winding
15  up Ascentra, it is also a Cayman proceeding
16  for the purpose of reorganization or
17  liquidation, correct?
18         A.  Yes.
19         Q.  So that one concept can really be
20  used to satisfy all three elements --
21         A.  Yes.
22         Q.  -- in your opinion, is that fair?
23         A.  Yes.  It grounds my opinion of the
24  three elements.
25         Q.  Okay.  And all of those opinions

Page 36

1          A. Henderson
2  are unaffected by the reason for the winding
3  up, is that fair?
4          A.  Well, the reason for the winding up
5  certainly plays an important role, because it
6  governs where the Court will put the weight
7  when considering the opinions of the
8  creditors, the shareholders and it governs
9  other things as well, including standing to
10  bring applications.  So I'm not sure I could
11  agree with what you've just asked me.
12         Q.  Whether a company is solvent,
13  insolvent or of doubtful solvency, if they
14  want to liquidate under court supervision in
15  the Cayman Islands they must operate under the
16  winding up laws, correct?
17         A.  Correct.
18         Q.  Okay.  And once you're winding up
19  under the winding up laws in the Cayman
20  Islands, you necessarily satisfy each of the
21  three elements in paragraph 14, right?
22         A.  I think so, yes.
23         Q.  Okay.  Let's go to paragraph 24.
24         A.  Yes.
25         Q.  And here's where you address the

Page 37

1          A. Henderson
2    question of whether the Cayman proceeding is a
3    collective proceeding, right?
4          A.  Yes.
5          Q.  Okay.  And you don't cite to any
6    law to support any of the opinions in
7    paragraphs 24 or 25, right?
8          A.  No.
9          Q.  And it's your opinion that
10   regardless of the reason for the winding up,
11   and by that I mean solvent, insolvent or of
12   doubtful insolvency, regardless of the reason
13   you believe it's a collective proceeding
14   because creditors and shareholders both have a
15   stake in the outcome, is that fair?
16         A.  Yes.
17         Q.  You do acknowledge that creditors
18   have no right to bring on sanctions,
19   applications or to sit on liquidation
20   committees of a solvent entity, correct?
21         A.  Yes.
22         Q.  Okay.  But you do express the
23   opinion that the Cayman proceeding is a
24   collective proceeding because among other
25   things a Cayman judge has a duty to listen to

Page 38

1          A. Henderson
2    any creditor who complains, is that right?
3          A.  Yes.  Because of the supervisory
4    role played by the Court.
5          Q.  Is there any part of the winding up
6    laws that you can cite me to for that
7    proposition?
8          A.  Not -- you don't find it set out
9    expressly in the Companies Act and the Rules,
10   as I recall.  Although I could be wrong.  But
11   certainly there's many, many decisions in the
12   U.K. that refer to it.
13         Q.  Okay.  Dealing with the Ascentra
14   case itself, are you aware of any complaint
15   that any creditor has brought to the court's
16   attention?
17         A.  No.
18         MR. McDONALD:  Objection to form.
19         Q.  Did you ever ask anybody whether
20   any creditor had any -- had ever complained in
21   the context of the Ascentra winding up
22   proceeding in the Cayman Islands?
23         A.  No.
24         Q.  Would it be relevant to you whether
25   or not a creditor ever lodged a complaint with

Page 39

1          A. Henderson
2    the Court as part of the --
3          MR. MORRIS:  Withdrawn.
4          Q.  Would it be relevant to your
5    opinions --
6          A.  Ah.
7          Q.  -- if a creditor lodged a complaint
8    with the Court in the Ascentra winding up
9    proceeding?
10         A.  No.
11         Q.  Okay.  And is that why you didn't
12   ask anybody?
13         A.  Yes.
14         Q.  Great.
15         In the last sentence of paragraph
16   25 you state, quote, "Put another way,
17   although a creditor has no right to be heard,
18   the Court has a discretion to permit it as a
19   necessary adjunct of the supervisory's
20   function and the discretion will ordinarily be
21   exercised in the creditor's favor."
22         Have I read that fairly?
23         A.  Correct.
24         Q.  Are you aware of any part of the
25   winding up laws that supports that opinion or

Page 40

1          A. Henderson
2    observation?
3          A.  There was nothing in the Companies
4    Act or the Winding Up Rules that expressly
5    provides for it.  But the supervisory function
6    cannot be carried out correctly and fully
7    without the Court paying attention to all
8    relevant information from whatever source.
9          Q.  Do you know if the Court in the
10   Ascentra winding up proceedings has ever been
11   called upon to exercise the discretion that
12   you've described in the last sentence of
13   paragraph 25?
14         A.  No.
15         Q.  Did you ask anybody whether the
16   Cayman court ever exercised its discretion in
17   the way you've described in the last sentence
18   of paragraph 5?
19         A.  No.
20         Q.  And that's because that's
21   irrelevant to your opinions, is that right?
22         A.  Yes.  My opinion is a general one.
23         Q.  Yes.  Thank you.
24         Paragraph 26 sets forth your
25   opinions as to why you believe the Cayman



Page 41

1          A. Henderson
2    proceeding authorized or conducted --
3          MR. MORRIS:  Withdrawn.
4        Q.   Paragraph 26 sets forth your
5    opinions as to why the Cayman proceeding
6    relates to insolvency with the adjustment of
7    debt, do I have that right?
8          MR. McDONALD:  Object to the form.
9        A.   Yes.
10        Q.   Would you agree that the winding up
11    laws as we've defined them are not laws of
12    insolvency?
13        A.   I would not agree.
14        Q.   Well, I thought your opinion
15    earlier stated that there is no law of
16    insolvency in the Cayman Islands?
17        A.   I didn't say that.
18        Q.   I apologize.  I don't mean to put
19    words in your mouth.
20        A.   I said strictly speaking, there is
21    no such thing as an insolvency proceeding.
22        Q.   Correct.
23        A.   Rather, there is a winding up
24    proceeding, which may be launched on any one
25    of a number of grounds and one of those

Page 42

1          A. Henderson
2    grounds is insolvency.
3        Q.   If the grounds are solvency would
4    you agree that it's not a proceeding relating
5    to insolvency?
6          MR. McDONALD:  Object to the form.
7        A.   So solvency is not a ground for
8    winding up.  The ground is that the
9    shareholders have resolved to wind up the
10    company or that the company has reached its
11    term limit as set out in the articles or
12    perhaps some other ground.
13        Q.   So if shareholders agree to wind up
14    a solvent company --
15        A.   Yes.
16        Q.   -- would you agree that it would do
17    so under laws that do not relate to
18    insolvency?
19          MR. McDONALD:  Objection to form.
20        A.   I don't -- when they do that they
21    are doing so under the auspices of the
22    Companies Act, and the Companies Act in Part V
23    does relate to insolvency.  The shareholders
24    may not be relying on any particular provision
25    aimed at insolvent entities.  But they are

Page 43

1          A. Henderson
2    working under or operating under a statute
3    that governs insolvency.
4        Q.   Can you identify any provision of
5    Part V of the Companies Act that pertains to
6    insolvent entities that a solvent entity in a
7    winding up proceeding would be obligated to
8    follow?
9        A.   Well, I suppose section 92 itself,
10    which provides the jurisdiction to wind up the
11    Court.  That section provides for a winding up
12    proceeding in the case of entities that are
13    alleged to be insolvent and also in the case
14    of entities where the company has passed a
15    special resolution.
16        Q.   But isn't it true that only the
17    portion of section 92 relating to the passage
18    of a special resolution would apply to a
19    company that's winding up that is also
20    solvent?
21        A.   That's true.
22        Q.   Okay.  So I am going to ask you
23    again:  Can you identify any provision in
24    Part V of the Companies Act that pertains to
25    insolvent entities, that a solvent liquidation

Page 44

1          A. Henderson
2    would be obligated to follow?
3        A.   Well, I mean -- and I hope I'm
4    understanding your question correctly, but
5    under section 94 sub 1:  An application to the
6    Court for the winding up of a company shall be
7    by petition.  That applies to both solvent and
8    insolvent entities.
9        Q.   I appreciate that.  Thank you so
10    much.
11          But you would agree with me that
12    there were certain provisions in Part V that
13    only pertain to insolvent entities, correct?
14        A.   Yes, I do.
15        Q.   Okay.  And with respect to that set
16    of provisions, are there any that a solvent
17    entity in a winding up proceeding would also
18    be required to follow?
19        A.   Perhaps not.  But I would have to
20    go through the entire part of Part V to be
21    sure about it.
22        Q.   Okay.
23        A.   But most likely not.
24        Q.   Is there a process for the
25    adjustment of debt that's applicable to a



Page 45

1          A. Henderson
2    winding up proceeding for its solvent entity?
3          A.   There's nothing specific set out in
4    the Companies Act or the Winding Up Rules.
5          Q.   And is it fair to say that --
6          MR. MORRIS:  Withdrawn.
7          Q.   Would you agree that if you are a
8    solvent entity in a winding up proceeding in
9    the Cayman Islands, creditors are required to
10   be paid in the ordinary course of business?
11         MR. McDONALD:  Object to the form.
12         A.   Creditors are required to be paid
13   in the so-called ordinary course.  The only
14   comment I would make is that the company
15   that's being wound up is not in the ordinary
16   course of business.  But that's something the
17   Rules Committee should take into account.
18         Q.   But a company in, even a solvent
19   company --
20         MR. MORRIS:  Withdrawn.
21         Q.   Any company that's winding up is
22   going to take time --
23         MR. MORRIS:  Withdrawn.
24         Q.   Is it fair to say that except for
25   the circumstance that you mentioned earlier,

Page 46

1          A. Henderson
2    where a company has no assets and no
3    liabilities, we'll call that a shell company,
4    is that fair?
5          A.   Yes.
6          Q.   Except for shell companies --
7          A.   Call it a Cayman Islands company.
8          Q.   Except for that type of company,
9    any company, whether it's solvent or insolvent
10   is going to have to go through a process to
11   complete the winding up, right?
12         A.   Yes.
13         Q.   And that process can be completed
14   in days, weeks, months or years, right?
15         A.   Yes.
16         Q.   And during that process the company
17   that's being wound up is going to have
18   expenses, right?
19         A.   Yes.
20         Q.   And it's going to have to pay those
21   expenses, right?
22         A.   Yes.
23         Q.   And it might even have expenses
24   that it carried on its books that existed
25   before the petition was filed, isn't that

Page 47

1          A. Henderson
2    right?
3          MR. McDONALD:  Object to the form.
4          A.   Yes.
5          Q.   And a solvent entity is going to be
6    required to pay its creditors, whether the
7    debt arose before the petition was filed or
8    after --
9          A.   Yes.
10         Q.   -- in the ordinary course of
11   business, right?
12         MR. McDONALD:  Object to the form.
13         A.   It's required to pay those
14   creditors, yes.
15         Q.   And that's why there is no
16   adjustment of debt for a winding up proceeding
17   involving a solvent debtor, fair?
18         MR. McDONALD:  Objection.
19         A.   It's fair with one proviso.  The
20   liquidators may from time to time determine
21   that one of the claimed debts is not in fact
22   owing.
23         Q.   I appreciate that.
24         A.   But aside from that, yes.
25         Q.   Yes.  Putting aside disputed

Page 48

1          A. Henderson
2    debts --
3          A.   Right.
4          Q.   Let me just finish the question.
5    Putting aside disputed debts, the liquidators
6    of a solvent entity undergoing a winding up
7    will be required to pay their debts in the
8    ordinary course regardless of whether those
9    debts were accumulated before the petition was
10   filed or after, correct?
11         A.   Correct.
12         Q.   Okay.  And in paragraphs 27 and 28
13   you address the third element that you
14   identified at paragraph 14, and that is
15   whether the Cayman proceeding is, one,
16   conducted for the purpose of reorganization or
17   liquidation, is that fair?
18         A.   Yes.
19         Q.   And you express the view that
20   regardless of the cause of the winding up, and
21   regardless of whether the entity is solvent or
22   insolvent, the Cayman proceeding is one
23   undertaken for the purpose of liquidation, is
24   that fair?
25         A.   Yes.

Page 49

1          A. Henderson
2      Q.   Okay.  Is it fair to say that
3   paragraphs 24 through 28 set forth all of your
4   opinions as to why you believe the Ascentra
5   proceeding in the Cayman Islands satisfies the
6   three elements that are set forth in paragraph
7   14?
8      A.   Yes, that's the entirety of my
9   opinion.
10     Q.   Okay.  Can we go to paragraph 20.
11     A.   Yes.
12     Q.   The first sentence expresses the
13  view that, quote, "Limitations have been
14  introduced for the purpose, in your opinion,
15  of ensuring efficient use of court time as
16  well as fairness between classes."  And that's
17  the end of the quote.  Have I read that
18  correctly?
19     A.   Yes.
20     Q.   Okay.  What's the basis for that
21  opinion?
22     A.   Discussions I've had with members
23  of the Rules Committee and other attorneys,
24  and my overall understanding of how winding up
25  proceedings are supposed to work.

Page 50

1          A. Henderson
2      Q.   And what do you mean when you use
3   the phrase, "fairness between classes"?
4      A.   Well, if for example, the entity is
5   thought to be solvent, then primarily it's the
6   interests of the shareholders that have to be
7   considered.
8      Q.   And why is that?
9      A.   Because they're the ones who have
10  the financial stake in the ultimate outcome.
11  Or perhaps I should say the largest or the
12  preeminent financial stake.
13     Q.   If an entity is solvent, do
14  creditors have any economic interest other
15  than making sure the law is followed and they
16  receive payment in the ordinary course?
17     A.   They have an economic interest, but
18  it's not other than that.
19     Q.   Thank you.
20     A.   That is their interest.
21     Q.   The next sentence says, quote,
22  "Where the company appears to be solvent, the
23  right of the creditor class to address the
24  Court or to make important decisions is
25  curtailed."

Page 51

1          A. Henderson
2      A.   Yes.
3      Q.   You've got a footnote there,
4   footnote 7.
5      A.   Mm-hmm.
6      Q.   Is that footnote intended to
7   identify all of the ways in which you believe
8   the rights of a creditor class will be
9   curtailed in the case of a solvent entity?
10     A.   No.
11     Q.   Are there other ways in which the
12  creditors class's rights will be curtailed
13  that you didn't identify in footnote 7?
14     A.   Yes.  It's meant to be illustrative
15  only.
16     Q.   Can you tell me what other rights
17  will be curtailed, what other rights of the
18  creditor class will be curtailed in a winding
19  up proceeding of a solvent entity?
20          MR. McDONALD:  Is it beyond what
21      he's set forth in the footnote?
22          MR. MORRIS:  Yes.  Thank you for
23      the clarification.
24          MR. McDONALD:  Thank you.
25     A.   Without looking --

Page 52

1          A. Henderson
2          MR. MORRIS:  In fact, let me
3      rephrase the question.
4      Q.   Other than the rights that are
5   identified in footnote 7, can you identify any
6   other rights of the creditor class that in
7   your view are curtailed in the case of a
8   solvent entity?
9      A.   Well, I don't recall by section
10  number exactly which rights I've referred to
11  there, but the emphasis that the Court will
12  place upon the views of the creditors is
13  significantly diminished.  And that appears at
14  various times.
15     Q.   Can you think of any right that the
16  creditor class has in the case of a winding up
17  proceeding involving a solvent debtor other
18  than the right to get paid in the ordinary
19  course?
20          MR. McDONALD:  Objection to form.
21     A.   There's one or two, I think, rights
22  that they are provided by the Winding Up
23  Rules.  But I would have to go through the
24  rules to identify them.
25     Q.   I do appreciate that.  But off the



Page 53

1        A. Henderson
2    top of your head you can't think of any, is
3    that fair?
4        A.   No.  As far as rights go, no.
5        Q.   Okay.  You are currently an
6    attorney with Dentons, do I have that right?
7        A.   Correct.
8        Q.   Have you ever been licensed to
9    practice law in the United States?
10       A.   No.
11       Q.   Do you consider yourself an expert
12   on any aspect of United States law?
13       A.   No.
14       Q.   So you are not offering any
15   opinions as to any aspect of United States
16   law, is that fair?
17       A.   Not at all.
18       Q.   Okay.  Your opinions are limited to
19   matters involving Cayman Islands law, is that
20   right?
21       A.   That's correct.
22       Q.   Have you ever filed a declaration
23   in any court in the United States?
24       A.   Oh, yes.
25       Q.   How many times have you done that?

Page 54

1        A. Henderson
2        A.   It would be probably less than ten.
3    Seven, eight.  Something like that.
4        Q.   Have any of them been in connection
5    with a Chapter 15 case?
6        A.   Probably, but I don't remember for
7    sure.
8        Q.   As you sit here today right now you
9    can't identify an instance where you offered
10   opinions concerning a Chapter 15 entity, is
11   that right?
12       A.   I can't remember offhand, no.
13       Q.   And you mentioned the law firm
14   Campbells earlier, do I have that right?
15       A.   Yes.
16       Q.   And do you have an understanding of
17   who Campbells represents in connection with
18   this proceeding?
19       A.   I understand they are on the
20   Ascentra side of things.
21       Q.   Okay.  And you've given expert
22   evidence on other occasions for Campbell
23   clients, correct?
24       A.   Yes.
25       Q.   How many times have you done that?

Page 55

1        A. Henderson
2        A.   Three, four, five maybe.  I don't
3    know.
4        Q.   Before you were contacted in
5    connection with this case when was the last
6    time --
7        MR. MORRIS:  Withdrawn.
8        Q.   Are you working with Campbells in
9    any other case at this time?
10       A.   I was contacted a couple of days
11   ago about a case, and I don't know if it was
12   someone in connection with Campbells or not.
13   I would have to ask counsel.
14       Q.   Is there a particular person or
15   group at Campbells with whom you have a
16   business relationship?
17       MR. McDONALD:  Objection to form.
18       A.   I don't think I would call it a
19   business relationship.  The litigation
20   department at Campbells from time to time asks
21   me to give expert evidence.  And I've also
22   acted as arbitrator in cases where Campbells
23   was on one side of the matter.
24       Q.   Of the three or four times that you
25   recall providing expert opinions on behalf of

Page 56

1        A. Henderson
2    a Campbells client, when was the last time you
3    did that before this case?
4        A.   I don't know.  It would either be
5    this year or last year.  But I don't know.
6        Q.   Is that case complete or is it
7    still going?
8        A.   Yes, all the other cases are
9    complete.  Yes.
10       Q.   Okay.  You were a barrister in
11   Canada for I guess about 25 years?
12       A.   Correct.
13       Q.   What type of matters did you work
14   on during that time?
15       A.   Broad variety of litigation matters
16   with an emphasis on prosecuting white-collar
17   crime.  I acted for the Securities and
18   Exchange Commission in British Columbia as
19   outside counsel.  But it was a broad practice.
20       Q.   Did you have any matters during
21   that 25-year period that had anything to do
22   with Cayman Islands insolvency laws?
23       A.   No.
24       Q.   Anything during that 25-year period
25   that had anything to do with the winding up



Page 57

1          A. Henderson
2    laws as we've defined them?
3          A.   No.
4          Q.   Anything to do with the liquidation
5    of companies --
6          MR. MORRIS:  Withdrawn.
7          Q.   During that 25-year period did you
8    provide any advice to anybody in connection
9    with the winding up or liquidation of a
10   corporate entity?
11         A.   Probably not.
12         Q.   That's relevant -- I was going to
13   say, that's relevant to your opinions today.
14         A.   Oh, that's relevant to my opinion?
15         Q.   Yeah, let's cut to the chase.
16         A.   No.  No.
17         Q.   And then for about eight years
18   thereafter from 1995 to 2003 you were a judge
19   in Canada, do I have that right?
20         A.   That is correct.
21         Q.   And what court did you sit on?
22         A.   Supreme Court of British Columbia.
23         Q.   And what kind of cases did you hear
24   as a member of the Supreme Court of British
25   Columbia?

Page 58

1          A. Henderson
2          A.   Well, there was no formal
3    specialization there, so I heard all types of
4    cases.
5          Q.   Did any of the cases that you
6    oversaw as a judge during that eight-year
7    period involve the winding up laws as we've
8    defined it?
9          MR. McDONALD:  Objection to the
10   form.
11         A.   I don't recall ever having been the
12   assigned judge on a, what I'll call a
13   substantial winding up case in Canada.  I may
14   have heard motions in chambers from time to
15   time.  I probably did.
16         Q.   Is there anything about your time
17   as a judge in Canada that you are relying upon
18   in order to formulate your opinions in this
19   case?
20         A.   No.
21         Q.   Okay.  So is it fair to say that
22   nothing you did in Canada from 1970 to 2003
23   concerned the interpretation of any aspect of
24   the winding up laws?
25         A.   That is fair.

Page 59

1          A. Henderson
2          Q.   And is it fair to say that nothing
3    that you did during those 33 years helped form
4    your opinions set forth in your declaration?
5          A.   That's fair, other than, you know,
6    very broadly, 33 years of legal experience
7    goes into it.
8          Q.   And then from 2003 to 2015 you sat
9    as a judge on the Grand Court of the Cayman
10   Islands, correct?
11         A.   Yes.  So from 2000 to 2003 I sat as
12   an acting judge on a number of occasions.
13         Q.   During your time as a judge in the
14   Cayman Islands, did you ever oversee a winding
15   up proceeding involving a solvent entity?
16         A.   Oh, I'm sure I did.  Yes, I must
17   have.  I don't recall specifically.  But a lot
18   of solvent winding-ups take place there.
19         Q.   And during that 12-year period, did
20   you ever have occasion to exercise your
21   discretion to permit a creditor to bring
22   complaints to you?
23         MR. MORRIS:  Withdrawn.
24         Q.   During the 12-year period,
25   focussing only on the cases of solvent

Page 60

1          A. Henderson
2    entities in winding up proceedings, did you
3    ever have occasion to adjudicate a creditor
4    complaint?
5          MR. McDONALD:  Objection to form.
6          A.   I probably did.  I would certainly
7    have no reason to close my ears to the
8    complaint, if it were made.
9          Q.   I appreciate that.  I am just going
10   to ask you if you can identify any case where
11   you had to use your discretion in resolving a
12   creditor complaint that was lodged in the case
13   of a solvent entity that was winding up?
14         A.   I have no specific recollection of
15   any such case.
16         Q.   During your time on the bench in
17   Cayman Islands, did you ever rule on a
18   sanction application that was filed by a
19   creditor in a winding up proceeding involving
20   a solvent entity?
21         A.   Well, I mean I don't remember, but
22   probably not because a creditor has no
23   standing to file a sanction application.  A
24   creditor could make a complaint informally by
25   writing to the Court, something of that sort.



Page 61

1   A. Henderson
2 But they can't file a formal application.
3   Q. We'll talk about that more in a
4 minute.
5   Do you have any recollection of a
6 creditor filing a complaint with the Court in
7 connection with a winding up proceeding
8 involving a solvent entity?
9   A. No specific recollection, no.
10   Q. And is it fair to say that during
11 your time on the bench there was never an
12 instance where a creditor sat on the
13 liquidation committee of a solvent entity that
14 was being wound up?
15   A. I can't answer that because I
16 wouldn't know who the members -- who all the
17 members are of the liquidation committee at
18 any given moment.
19   Q. But, in fact, creditors are barred
20 from sitting on the liquidation committee of a
21 solvent entity that's underlying a winding-up,
22 correct?
23   A. That is correct.
24   Q. And that's why really you can't
25 recall, because it never happened that a

Page 62

1   A. Henderson
2 creditor sat on a liquidation committee under
3 those circumstances, fair?
4   MR. McDONALD: Objection to the
5  form.
6   A. It's been my experience that
7 liquidation committees are rather loosely
8 organized. It's possible that a company that
9 was first believed to be insolvent would have
10 creditors on the liquidation committee, then
11 the opinion changes and the company is
12 expected to be solvent, and those creditors
13 continue to attend meetings. I could see that
14 happening. I don't have a recollection of it
15 happening. I don't know that it's happened.
16 But that's the kind of thing that could
17 happen.
18   Q. Well, but can it? Because under
19 the winding up laws, if the company is
20 solvent, creditors are barred from serving on
21 liquidation committees, isn't that the law?
22   MR. McDONALD: Object to the form.
23   A. Yes. It's not supposed to happen.
24   MR. MORRIS: Okay. If you would
25  forgive me I would like to just take a

Page 63

1   A. Henderson
2 short break?
3   THE WITNESS: Certainly.
4   THE COURT REPORTER: Ten minutes?
5   MR. MORRIS: Yes, that's fine.
6 (Recess from 10:26 a.m. to 10:41 a.m.)
7   MR. MORRIS: Just as a reminder,
8 you're still under oath.
9   Q. Do you understand, Mr. Henderson,
10 that Ascentra is an exempt Cayman Islands
11 company, correct?
12   A. Yes.
13   Q. That is your understanding, that's
14 in your declaration, right?
15   A. Yeah, if I said that, then I
16 understand it.
17   Q. And you also understand that in
18 2021 the shareholders of Ascentra resolved
19 unanimously to place Ascentra in voluntary
20 liquidation, correct?
21   A. Yes.
22   Q. And did you learn those facts from
23 counsel?
24   A. Yes.
25   Q. Do you know who the shareholders of

Page 64

1   A. Henderson
2 Ascentra are?
3   A. No.
4   Q. Do you know if a liquidation
5 committee was formed in connection with the
6 Ascentra bankruptcy?
7   A. At the moment, no.
8   MR. MORRIS: Withdrawn. It was a
9  bad word.
10   Q. Do you know if the liquidation
11 committee was formed in connection with
12 Ascentra's winding up proceeding?
13   A. At the moment, no. I would have to
14 perhaps look at Mr. Robinson's declaration to
15 see what he said on the subject.
16   MR. MORRIS: I am just going to
17  mark as exhibit 4 a document that's
18  entitled CWR Form 15.
19   (Henderson Exhibit 4, CWR Form 15
20  was marked for identification).
21   Q. Are you generally familiar with CWR
22 Form 15?
23   A. Honestly, no. As a judge I'm not
24 much concerned with forms. I'm sure I have
25 seen it at one time or another, but it's not

Page 65

1        A. Henderson
2   something I pay a lot of attention to in the
3   ordinary course.
4        Q.   Okay.  Have you seen this
5   particular document before?
6        A.   It might have been attached to
7   Mr. Robinson's declaration, in which case I
8   would have seen it.  I don't remember.
9        Q.   Do you see that it says
10  specifically in the middle, that the company
11  is solvent?
12       A.   Yes, I see that.
13       Q.   And that's a declaration that's
14  made for purposes of section 110 --
15       A.   Yes.
16       Q.   -- of the Companies Act?
17       A.   Yes.
18       Q.   Looking at the three people who are
19  identified here, have you ever communicated
20  with any of those people?
21       A.   No.
22       Q.   Were you aware before this moment
23  of the identity of the members of the
24  liquidation committee?
25       A.   Probably not.

Page 66

1        A. Henderson
2        Q.   Is it fair to say that the
3   composition of the liquidation committee is
4   not relevant to your opinions?
5        A.   Yes, it's fair.
6        Q.   And you do understand that the
7   shareholders of Ascentra appointed
8   Mr. Robinson and Ivy Chua --
9        A.   Chua or Chua [pronouncing].
10       MR. MORRIS:  Chua?
11       MR. McDONALD:  Yes.
12       Q.   -- as Ascentra's liquidators?
13       A.   I understand that.
14       Q.   And can we just refer to them
15  together as the JOLs?
16       A.   Yes.
17       Q.   And you've been engaged in this
18  matter by the JOLs in fact, right?
19       A.   Yes.
20       Q.   Have you spoken with Ms. Chua about
21  this matter?
22       A.   No.
23       Q.   Have you spoken with Mr. Robinson
24  about this matter?
25       A.   No.

Page 67

1        A. Henderson
2        Q.   So they engaged you but you haven't
3   communicated with them about this matter?
4        A.   That is correct.
5        Q.   Have you ever worked with
6   Mr. Robinson before?
7        A.   I don't remember him, no.
8        Q.   Have you ever worked with Ivy Chua
9   before?
10       A.   I don't think so, no.
11       Q.   Now, it's your understanding that
12  the shareholders did not sign a declaration of
13  solvency, correct?
14       MR. McDONALD:  Object to the form.
15       A.   Correct.  Yes, yes.
16       Q.   That is your understanding?
17       A.   The directors did not sign a
18  declaration of solvency.
19       Q.   I apologize.  Let me rephrase the
20  question.
21       It's your understanding that
22  Ascentra's directors never signed a
23  declaration of solvency, is that correct?
24       A.   That is my understanding.
25       Q.   Okay.  Do you know why they didn't

Page 68

1        A. Henderson
2   sign?
3        A.   No.
4        Q.   Did you ever ask anybody?
5        A.   No.
6        Q.   Is the reason they didn't sign the
7   solvency certificate relevant to your opinions
8   in any way?
9        A.   No.
10       Q.   But because they didn't sign,
11  Ascentra's liquidation process was brought
12  under the supervision of the Grand Court of
13  the Cayman Islands, is that fair?
14       A.   That is correct.
15       Q.   Okay.  And within a week of the
16  filing you understand that the JOLs filed a
17  certificate stating that Ascentra should be
18  treated as a solvent entity, correct?
19       MR. McDONALD:  Object to the form.
20       A.   Yes.
21       Q.   And that's set forth in paragraph
22  12 of your declaration, right?
23       A.   Yes.
24       MR. MORRIS:  Let's mark as exhibit
25       5 a document titled CWR Form Number 13.

Page 69

1        A. Henderson
2        (Henderson Exhibit 5, CWR Form
3    Number 13 was marked for
4    identification).
5    Q.   Have you seen this document before?
6    A.   As with the previous one, I -- I
7  don't know if I've seen it or not.  That
8  probably depends upon whether it was attached
9  to Mr. Robinson's declaration or not.
10    Q.   Well, you did mention --
11    A.   I was instructed that the JOLs made
12  a determination of solvency.  But whether I
13  saw CWR Form 13 or not, I don't remember.
14    Q.   Is the fact that --
15        MR. MORRIS:  Withdrawn.
16    Q.   Have you ever been instructed that
17  the JOLs have filed with the Cayman court any
18  amendment or change to the determination that
19  Ascentra is solvent?
20    A.   No.
21    Q.   Are your opinions affected or
22  impacted in any way by the fact that the JOLs
23  have determined that Ascentra is solvent?
24    A.   Well, yes, that's an important
25  fact.

Page 70

1        A. Henderson
2    Q.   And why is it an important fact?
3    A.   Because it elevates the concerns of
4  the shareholders above those of the creditors.
5    Q.   And when you use the phrase
6  "elevates," you mean that -- is it fair to say
7  that you mean that the rights of creditors
8  change or are different for a solvent entity
9  than they are for an entity that is not
10  solvent?
11    A.   Yes.  The creditors have fewer
12  rights.  And in addition, their views or their
13  wishes will be entitled to less weight.
14    Q.   Will their views or wishes as a
15  class be entitled to any weight?
16    A.   It depends on the question, I
17  suppose.  It probably depends on the question.
18    Q.   Can you identify any provision in
19  the winding up laws that would entitle a class
20  of creditors to have weight given to their
21  views?
22    A.   In a solvent winding up?
23    Q.   Yes, thank you.
24    A.   No, not offhand.  No.
25        MR. McDONALD:  John, I don't think

Page 71

1        A. Henderson
2    the court reporter got your prior
3    question totally.
4        MR. MORRIS:  So let me ask it
5    again.
6        MR. McDONALD:  It says "Well, their
7    views or wishes as ..."
8        MR. MORRIS:  I appreciate that.
9    Let me re-ask the question then.
10    Q.   Is there any provision in the
11  winding up laws that would enable creditors as
12  a class to have their views heard in the case
13  of a solvent entity?
14    A.   I would have to go through the
15  rules section by section.  I think there
16  are one or two matters upon which their views
17  are entitled to be heard.  But I'm not -- I
18  don't have them at hand.
19    Q.   Can you think about the subject
20  matter in which their views might be heard,
21  even if you can't identify the specific
22  provision?
23    A.   I don't know.  Would it be removal
24  of the JOLs?  That might be one.
25    Q.   Okay.

Page 72

1        A. Henderson
2    A.   I don't know.
3    Q.   Okay.  Let's go -- if you could
4  grab the rules, which I think are exhibit 3.
5    A.   Yes.
6    Q.   Let's spends some time with them.
7  You're generally familiar with the Companies
8  Winding Up Rules, correct?
9    A.   Generally, yes.
10    Q.   And if we can turn to Order 8.  Is
11  it fair to say that the Winding Up Rules are
12  organized by what are described as orders and
13  then within each order there are specified
14  rules?
15    A.   Yes.  That is the English style.
16    Q.   Okay.  So can we go to Order 8,
17  Rule Number 1?
18    A.   Yes.
19    Q.   Which is on page 59.  That rule
20  requires liquidators to determine at the
21  outset of a winding up proceeding whether an
22  entity is solvent, insolvent or of doubtful
23  solvency, correct?
24    A.   Yes.  Summarily determined.
25    Q.   And the reason that that



Page 73

1      A. Henderson
2  determination is required is because there are
3  consequences to the determination, correct?
4      A.  Yes.
5      Q.  And the consequences of that
6  determination are how the rights of the
7  creditors and the shareholders will be
8  impacted, correct?
9      A.  Yes.
10      Q.  Okay.  And is it fair to say that
11  Order 8, Rule Number 1 also mandates that the
12  liquidation -- that the liquidators'
13  determination is final and binding on all
14  creditors and contributories unless and until
15  it's changed by the liquidator in accordance
16  with the rules?
17      MR. McDONALD:  Objection to the
18  form.
19      A.  Yes.
20      Q.  Do you have an opinion as to why
21  Cayman law requires liquidators to determine
22  at the outset whether a company should be
23  determined to be solvent, insolvent or of
24  doubtful solvency?
25      A.  Yes.  Primarily for the reason you

Page 74

1          A. Henderson
2  gave.  The determination will govern the
3  rights of the creditor class and the
4  shareholder class going forward.
5      Q.  And it's fair to say that those
6  rights will be different depending on which
7  determination is made?
8      A.  Yes.
9      Q.  Okay?
10      A.  In addition, certain procedures of
11  the liquidators will differ.
12      Q.  I think you said that the Winding
13  Up Rules are promulgated by a committee?
14      A.  The Rules Committee, yeah.
15      Q.  Is there anything --
16      MR. MORRIS:  Withdrawn.
17      Q.  Are you familiar with the phrase
18  "legislative history"?
19      A.  Yes.
20      Q.  And the legislative history is, as
21  I'm thinking of, might provide kind of the
22  debate or the policy reasons underlying a
23  particular rule or statute, is that a fair
24  view?
25      A.  It's fair as a general proposition.

Page 75

1          A. Henderson
2  But these rules would not be debated in
3  Parliament.
4      Q.  But are you aware of any source
5  that we could rely upon to discern the
6  purpose, intent or policy behind the Winding
7  Up Rules?
8      A.  Not really.  I mean, you have to
9  infer that from the rules themselves for the
10  most part.
11      Q.  Okay.
12      A.  Obviously case law may touch upon
13  them from time to time.
14      Q.  Okay.  How about with respect to
15  the Companies Act; is there any legislative
16  history or any source that we could obtain
17  that would shed light on the policy reasons
18  behind the provisions of the Companies Act?
19      A.  Well, when that Act is amended, and
20  indeed when it was first passed it would have
21  been debated in Parliament.  So there would be
22  a record.
23      Q.  And is there a name for that
24  record?
25      A.  Hansard.

Page 76

1          A. Henderson
2      (Reporter requests clarification.)
3      THE WITNESS:  H-A-N-S-A-R-D, I
4  guess.
5      Q.  And is that a source that you are
6  relying upon in formulating your opinions?
7      A.  No.
8      Q.  Is it a source that you reviewed or
9  consulted in formulating your opinions?
10      A.  No.  I've never heard Hansard cited
11  in relation to the Companies Act.  And I'm not
12  entirely sure that -- I don't think you could
13  cite it in court.
14      Q.  Is there anything besides Hansard
15  that one could turn to in order to determine
16  or discern the policy reasons behind any
17  particular provision of Part V of the
18  Companies Act?
19      A.  Judicial authorities.  Both in the
20  Cayman Islands and in England.
21      Q.  So for both the Companies Act and
22  the Winding Up Rules one could look to
23  judicial opinions in order to find
24  interpretations or policy reasons --
25      A.  Yes.



Page 77

1        A. Henderson
2     Q.   -- for the provisions, right?
3     A.   Yes.
4     Q.   Can you think of any record that
5  exists before the Companies Act was formally
6  adopted by the Cayman Parliament or the
7  Winding Up Rules were adopted by the committee
8  that one could turn to, to try to understand
9  how and why these rules came into existence?
10     A.   Well, I think history is probably
11  the best guide.  The Companies Act is largely
12  based on the 18 -- 1948 U.K. Companies Act,
13  which in turn is based upon a number of
14  earlier statutes running right back to about
15  1827 or so.  And prior to that the history
16  involved -- the history of joint stock
17  companies is really tied up with trust
18  indentures.
19     Q.   What you just described, unless
20  it's set forth in your declaration, is it fair
21  to say it's not material that you reviewed or
22  relied upon in formulating your opinions in
23  this case?
24        MR. McDONALD:  Objection to form.
25     A.   No, that's not fair.  I rely upon

Page 78

1        A. Henderson
2  my understanding of legal history.  And in
3  addition, I did refresh my memory on the 1862
4  Joint Stock Companies Act, as I've said
5  before.  So I relied upon that.
6     Q.   And that is mentioned in your
7  declaration, right?
8     A.   It is actually, yes.
9     Q.   Right.  So other than the 1862 Act,
10  is there anything else --
11        MR. MORRIS:  Withdrawn.  I've asked
12     these questions already.
13     Q.   Going back to your declaration.  Do
14  you have any knowledge concerning the Ascentra
15  winding up proceeding other than what's set
16  forth in paragraph 11 of your -- other than
17  what's set forth in paragraph 12 of your
18  declaration?
19     A.   No.
20     Q.   Do you know if Ascentra has any
21  creditors?
22     A.   No.
23     Q.   Did you ever ask?
24     A.   No.
25     Q.   Is it relevant to your opinions?

Page 79

1        A. Henderson
2     A.   No.
3     Q.   So then is it fair to say that the
4  opinions in your declaration would remain
5  unchanged even if one assumed that Ascentra
6  had no creditors?
7     A.   That is correct.
8     Q.   Do you know if any creditor ever
9  filed a notice of appearance in the Ascentra
10  windup proceedings?
11     A.   No.
12     Q.   Did you ever ask anybody?
13     A.   No.
14     Q.   And is that because it's not
15  relevant to your opinions?
16     A.   Yes.
17     Q.   And is it fair to say that your
18  opinions would not change even if you heard or
19  learned that no creditor had ever appeared in
20  the Ascentra windup proceeding?
21     A.   Yes.
22     Q.   Do you know if a creditor ever
23  filed a complaint with the court overseeing
24  Ascentra's windup proceedings?
25     A.   No.

Page 80

1        A. Henderson
2     Q.   Did you ever ask anybody?
3     A.   No.
4     Q.   And is that because it's not
5  relevant to your opinions?
6     A.   Yes.
7     Q.   And is it fair to say that your
8  opinions would remain unchanged even if you
9  were instructed that no creditor had ever
10  filed a complaint in the Ascentra windup
11  proceedings?
12     A.   Yes.
13     Q.   Do you know if the JOLs in the
14  Ascentra windup proceedings have ever disputed
15  a claim by a creditor?
16     A.   No.
17     Q.   Did you ever ask?
18     A.   No.
19     Q.   Is it relevant to your opinions?
20     A.   No.
21     Q.   So is it fair to say that your
22  opinions would remain unchanged even if you
23  were instructed that JOLs have never
24  disputed a creditor claim?
25     A.   Yes.



Page 81

1    A. Henderson
2    Q.   Do you know if the JOLs have ever
3  communicated with any creditor of Ascentra?
4    A.   No.
5    Q.   Did you ever ask?
6    A.   No.
7    Q.   Is it relevant to your opinions?
8    A.   No.
9    Q.   Is it fair to say that your
10  opinions would remain unchanged even if you
11  were instructed that the JOLs have never
12  communicated with a creditor of Ascentra?
13    A.   Yes.
14    Q.   Do you know if any creditor has
15  played any role in any aspect of the Ascentra
16  winding up proceedings?
17    A.   No.
18    Q.   Have you ever asked?
19    A.   No.
20    Q.   And is that because that issue is
21  not relevant to your opinions?
22    A.   Yes.
23    Q.   And is it fair to say that your
24  opinions would remain unchanged even if you
25  were instructed that no creditor has ever

Page 82

1    A. Henderson
2  played any role in the Ascentra windup
3  proceedings?
4    A.   Yes.
5    Q.   I think we touched on this but just
6  to finish it up.
7    Your understanding is that two
8  years ago the JOLs issued their solvency
9  certificate that we have marked as exhibit 5,
10  right?
11    A.   Yes.
12    Q.   And under Order 8 of the windup
13  rules, the JOLs have the right to change the
14  solvency determination if they no longer
15  believed that it's justified, correct?
16    A.   They have the right and the
17  obligation to.
18    Q.   Okay.  But that determination has
19  never been changed, to the best of your
20  knowledge, correct?
21    A.   Correct.
22    Q.   We talked about this generally, but
23  now let's talk about some specifics.  The
24  rights of creditors would change if the
25  determination under Order 8 were changed from

Page 83

1    A. Henderson
2  solvent to something other than solvent,
3  correct?
4    A.   That is correct.
5    Q.   For example, if we look at Order 9.
6  Order 9 addresses liquidation committees, do I
7  have that right?
8    A.   Yes.
9    Q.   And under Order 9, creditors of a
10  solvent entity cannot sit on a liquidation
11  committee, correct?
12    A.   Correct.
13    Q.   But --
14    MR. McDONALD:  Did you want to
15  point him to a specific provision?
16    MR. MORRIS:  Sure.
17    Q.   Order 9, Rule 1 (iii) --
18    A.   Mm-hmm.
19    Q.   -- states, that quote:  The
20  liquidation committee shall comprise of not
21  less than three nor more than five
22  contributories -- and I'm summarizing -- if
23  the official liquidator has determined that
24  the company should be regarded as solvent.
25    A.   Mm-hmm.

Page 84

1    A. Henderson
2    Q.   Is that fair?
3    A.   Yes.
4    Q.   And so that's -- so the law in the
5  Cayman Islands under Order 9 Rule 1 (iii) is
6  that creditors cannot sit on a liquidation
7  committee of a solvent entity, correct?
8    A.   Correct.
9    Q.   But if the JOLs changed the
10  determination to either insolvent or doubtful
11  solvency, then creditors would be required to
12  be appointed to the liquidation committee,
13  correct?
14    A.   Correct.
15    MR. McDONALD:  Object to the form
16  of the prior question.
17    Q.   In fact, just to be clear, that
18  provision is actually one that you cited in
19  footnote 7 in your declaration, right?  Order
20  9, Rule 1(3)?
21    A.   Okay.
22    Q.   Right?  So this is an example --
23    A.   Yes.
24    Q.   This is an example that you gave of
25  how the rights of creditors would be curtailed

Page 85

1          A. Henderson
2    in a solvent windup proceeding, correct?
3          A.  Yes.
4          Q.   Okay.  And you also cited to Part
5    VI of Order 9, Rule 1 as another instance
6    where the rights of creditors would be
7    curtailed in the case of a solvent windup
8    proceeding, correct?
9          A.  Yes.
10         Q.   And in what way does Part VI of
11   Order 9, Rule 1 curtail the rights of
12   creditors in a solvent windup proceeding?
13         A.   Well, Order 9, Rule 1 (vi) says
14   that if the determination is one of doubtful
15   solvency, the liquidation committee shall
16   comprise a majority of creditors and at least
17   one contributory.
18         Q.   Okay.  So right now Ascentra is a
19   solvent entity, correct?
20         A.  Yes.
21         Q.   And that hasn't changed, correct?
22         A.   That's my understanding.
23         Q.   And therefore under Order 9, Rule 1
24   (iii) they are barred from serving on a
25   liquidation committee, correct?

Page 86

1          A. Henderson
2          MR. McDONALD:  Object to the form.
3          A.   That is my understanding, yes.
4          Q.   But if the JOLs ever changed the
5    determination to either doubtful insolvency or
6    insolvent, then creditors would be required to
7    be appointed to the liquidation committee,
8    correct?
9          MR. McDONALD:  Objection to form.
10         A.  Yes.
11         Q.   Okay.  I apologize but I'm going to
12   jump around just a little bit.  Now let's go
13   to Order Number 11, which can be found on page
14   74 of the document.
15         A.  Yes.
16         Q.   And Order 11 concerns sanction
17   applications, do you see that?
18         A.  Yes.
19         Q.   Okay.  Under Order 11, Rule 3(4) --
20         MR. MORRIS:  Withdrawn.
21         Q.   What is a sanction application?
22         A.   It's an application for permission
23   to embark upon a particular step, typically an
24   important one.
25         Q.   Is it fair to say that a party in a

Page 87

1          A. Henderson
2    winding up proceeding can't embark on
3    important steps without obtaining court
4    approval in the process, for obtaining court
5    approval is to file a sanction application?
6          A.  Yes.  There are certain types of
7    actions or steps that cannot be taken by the
8    JOLs until they have sanction.
9          Q.   And there are certain things that
10   creditors or contributories cannot take
11   without getting sanction, is that fair?
12         A.   I'm not quite sure what you mean.
13         Q.   Well, if you just take a look at
14   Order 11, Rule 1 (1)(b), creditors or
15   contributories are required to seek sanction
16   if they want an order directing the official
17   liquidator to exercise or refrain from
18   exercising any of the liquidator's powers in a
19   particular way?
20         A.   That is correct.
21         Q.   Okay.
22         A.   It doesn't -- sanction doesn't
23   apply to the actions of the creditor or
24   contributory.  It applies to what the official
25   liquidator is doing, yes.

Page 88

1          A. Henderson
2          Q.   Okay.  So in certain
3    circumstances --
4          MR. MORRIS:  Withdrawn.
5          Q.   In all circumstances if a creditor
6    or a contributory wants to get an order that
7    directs the liquidator to do something or not
8    to do something, they've got to file a
9    sanction application?
10         A.  Yes.
11         Q.   Okay.
12         A.   I think, as I've made clear in my
13   declaration, if a creditor or a contributory
14   were to bring a concern about the actions of
15   the liquidators to the attention of the Court
16   informally, for example, by letter to the
17   judge, because of the supervisory jurisdiction
18   that the judge is exercising, the judge would
19   look into it.
20         Q.   But that informal process that
21   you've just described isn't founded on any
22   specific rule within the winding up laws,
23   correct?
24         A.   No.  It's just founded on the
25   obligation the Court has to supervise.



Page 89

1          A. Henderson
2      Q.   And that obligation to supervise,
3  to the best of your knowledge, has never been
4  exercised in the Ascentra bankruptcy case,
5  correct?
6      A.   I've never been told that it's been
7  exercised.
8      Q.   And you've never asked anybody,
9  correct?
10     A.   No.  That is correct.
11     Q.   And that's because it's not
12 relevant to your opinions, correct?
13     A.   My opinion is a general one.  It
14 doesn't depend upon the facts of the Ascentra
15 case really.
16     Q.   Okay.  Rule 2 of Order 11 sets
17 forth the rules as to who has to be served
18 with sanction applications, is that fair?
19     A.   Yes.
20     Q.   And is it also a fair
21 interpretation of Order 11, Rule 2 that unless
22 directed by a court there is no requirement
23 that any sanction application ever be served
24 on the body of creditors?
25     A.   That is correct, where the entity

Page 90

1          A. Henderson
2  is thought to be solvent.
3      Q.   Are you aware of any order that was
4  ever entered in the Ascentra winding up
5  proceeding that requires service of sanction
6  applications upon any creditor?
7      A.   No.
8      Q.   Have you ever asked?
9      A.   No.
10     Q.   And that's because that's not
11 relevant to your opinions, correct?
12     A.   Correct.
13     Q.   So to the best of your knowledge,
14 it would be your opinion that creditors of
15 Ascentra are not entitled to be served with
16 sanction applications in accordance with Rule
17 2 of Order 11?
18     A.   To the best of my knowledge, yes.
19     Q.   Now let's look at Rule 3 of Order
20 11.
21     A.   Yes.
22     Q.   Rule 3(4) is the provision that
23 bars creditors from being heard on a sanction
24 application, correct, for a solvent entity?
25          MR. McDONALD:  Objection to form.

Page 91

1          A. Henderson
2      A.   Rule 3(4) reads that the Court may
3  allow creditors to be heard if the company is
4  insolvent or of doubtful solvency.
5      Q.   Right.  But the Court has really no
6  authority to allow the creditor class to be
7  heard on a sanction application if the company
8  has been deemed to be solvent, correct?
9          MR. McDONALD:  Objection to form.
10     A.   They can't be heard -- they don't
11 have a right to be heard.  The Court -- it's
12 difficult.  And the rules are not necessarily
13 in the best form.  Because the Court has an
14 obligation to supervise the actions of its
15 officers, the JOLs.  And if the creditors as a
16 class, or if an individual creditor acting
17 alone has a complaint about something the JOLs
18 have done or failed to do, the Court in order
19 to fulfill its supervisory obligation needs to
20 look into it.
21     Q.   Okay.
22     A.   And that may involve hearing from
23 the creditor or from the class of creditors
24 for a period of time.
25          So the rules in this particular are

Page 92

1          A. Henderson
2  not well thought out.
3      Q.   Is it your opinion that there is
4  any circumstance where a creditor or the body
5  of creditors would be permitted to be heard on
6  a sanction application in a winding up
7  proceeding involving a solvent entity?
8      A.   Yes.
9      Q.   Have you ever heard that happen
10 before?
11     A.   I have no specific recollection of
12 it, but I imagine it would have happened.  I'm
13 reasonably sure that I would have done it at
14 one time or another in all the sanction
15 applications I've heard.
16     Q.   Wouldn't that conflict with the
17 very plain terms of Order 11, Rule 3(4)?
18     A.   Yes.
19     Q.   Okay.
20     A.   The rules in my view are for the
21 most part authoritative guidelines.  But the
22 Court has a discretion to depart from them if
23 necessary.
24     Q.   And what's the basis for that
25 opinion?

Page 93

1        A. Henderson
2        A.   First, we are exercising equitable
3    jurisdiction.  And secondly, we are engaged in
4    a supervisory process.
5        Q.   And you can't think -- you're not
6    aware of any instance where that happened in
7    the Ascentra bankruptcy, correct?
8        A.   No.  That's correct.
9        Q.   And you can't think of anything
10   that happened -- you can't think of a specific
11   instance during your tenure as a judge in the
12   Cayman Islands where you decided not to follow
13   Rule 11 -- Order 11, Rule 3(4) and permitted a
14   creditor to file a sanction application,
15   right?
16       A.   I wouldn't permit a creditor to
17   file a sanction application.  Because they
18   have no standing to do so.
19       Q.   Okay.
20       A.   But I would permit a creditor, or
21   the attorney for a creditor, to address the
22   Court.
23       Q.   Fair enough.
24       A.   That's the distinction.  I'm not
25   saying to the creditor you have a right to

Page 94

1        A. Henderson
2    speak.  I'm saying I will exercise by
3    discretion in favor of listening to you for a
4    period of time.  I would probably impose a
5    time limit, too.  I would want to get on with
6    it.
7        Q.   I appreciate that.  Okay.
8            And the flip side is also true; and
9    by "the flip side" I mean if you're a creditor
10   of an insolvent company or a company of
11   doubtful solvency you have the absolute right
12   to file a sanction application, right?
13       A.   An absolute right, yes.
14       Q.   And all of this is very consistent
15   with the Companies Act itself, right?
16       A.   I think it is.
17       Q.   Well, if you take a look at exhibit
18   2, Section 110 of the Companies Act which can
19   be found at page 84.
20       A.   Thank you.
21       Q.   Section 110 states in (4)(a) --
22       A.   Yes.
23       Q.   -- that in the case of a solvent
24   company, a sanction application may only be
25   heard -- may only be made by a contributory

Page 95

1        A. Henderson
2    and the creditors shall have no right to be
3    heard.
4            Have I read that correctly?
5        A.   That is correct.
6        Q.   And that's the law, right?
7        A.   That is the law.
8        Q.   Okay.  That's not a rule that's
9    optional, correct?
10       A.   No.  I mean, we're talking about
11   the right to be heard.
12       Q.   Right.
13       A.   That's a law.
14       Q.   And similarly if the company is
15   insolvent, under Section 110 of the Companies
16   Act part (4)(b), those creditors will have the
17   absolute right to make a sanction application?
18       A.   That is correct.
19       Q.   Whereas contributories in the case
20   of an insolvent company are absolutely barred
21   from making a sanction application?
22       A.   That is correct.
23       Q.   Okay.  This may cover ground that
24   we've covered again but I want to ask
25   specifically in this context.

Page 96

1        A. Henderson
2            Do you know what the purpose is of
3    barring creditors from filing sanction
4    applications in winding up proceedings
5    involving solvent entities but giving them the
6    right to do so if the entity is insolvent or
7    of doubtful insolvency?
8        A.   I think the purpose is to support
9    the efficiency of the Court's process.  It
10   would not be a useful use of time to hear from
11   the creditor class in a formal manner if the
12   entity is thought to be solvent.
13       Q.   And why is that the case, in your
14   opinion?
15       A.   Because the primary economic
16   interest is that of the shareholders.
17       Q.   And is that because the creditors
18   are required to be paid in full in the
19   ordinary course?
20       A.   Yes.
21       Q.   One of the things that you read in
22   connection with the preparation of your
23   opinions is the declaration of Mr. Robinson,
24   do I have that right?
25       A.   Yes.



Page 97

1           A. Henderson
2     Q.   Okay.
3          MR. MORRIS:  I am going to mark
4     that as an exhibit.
5          (Henderson Exhibit 6, Declaration
6     of Mr. Robinson was marked for
7     identification).
8     Q.   Do you have that before you, sir?
9     A.   I do.
10    Q.   Okay.  And if you turn to page 15,
11    do you see that it was signed on October 27,
12    2021?
13    A.   I'm having trouble locating the
14    page numbers.  Yes.  October 27, '21.
15    Q.   Okay.  And that's after the --
16    that's after Mr. Robinson had prepared and
17    filed with the Cayman court his solvency
18    certificate, right?  If you take a look at
19    exhibit 5.
20    A.   Yes, I see that.
21    Q.   So just looking at the documents
22    you can confirm for me that Mr. Robinson
23    signed his solvency certificate and filed it
24    with the Cayman Islands on September 23, 2021?
25    A.   That's what the document says.

Page 98

1           A. Henderson
2     Q.   And he signed and filed his
3     declaration in New York a little bit more than
4     a month later on October 27, 2021, right?
5     A.   I see that, yes.
6     Q.   Okay.  And you --
7          MR. McDONALD:  Just one moment.  At
8     the top of the page it has the number --
9     it has 2021-09-27.  I don't know if
10    that's a filed date versus the actual
11    date of the certificate itself.  It's
12    just to clarify.  You said filed.  I
13    don't know if that --
14    MR. MORRIS:  I'm sorry, Hugh.
15    Which document are you referring to?
16    MR. McDONALD:  On document 5.
17    Exhibit 5.  The top, which appears to be
18    from the docket of the Cayman court it
19    says 2021-09-27.  But it's dated the
20    23rd.  So you used the term "filed."  I
21    just want to be clear here.
22    MR. MORRIS:  Okay.  Let me ask it
23    this way.
24    Q.   You're very comfortable that
25    Mr. Robinson signed and filed in the Cayman

Page 99

1           A. Henderson
2     court the certificate of solvency in September
3     2021, which is exhibit 5?
4     A.   Yes.
5     Q.   And he signed and filed his
6     declaration in New York in October 2021,
7     correct?
8     A.   Yes.
9     Q.   Okay.
10         Now, you said you reviewed,
11    according to paragraph 11 of your declaration
12    you reviewed Mr. Robinson's declaration in
13    connection with the preparation of your
14    opinions, right?
15    A.   Yes.
16    Q.   If you just flip through it, unless
17    you have some other recollection, to the best
18    of your knowledge, Mr. Robinson did not attach
19    the solvency certificate to his declaration
20    that was filed in New York in October 2021,
21    correct?
22    A.   If you say that's correct, I'll
23    take it as correct.
24    Q.   I don't want you to take my word
25    for it.  You can look through it.  I mean, you

Page 100

1           A. Henderson
2     know, you said you --
3     A.   I don't see it here.
4     Q.   Okay.  And you don't have a
5     recollection of ever seeing it here, right?
6     A.   Oh, no.
7     Q.   And if we turn to paragraph 36 of
8     your declaration.  You specifically state,
9     quote, "Although these declarations do not
10    expressly -- do not say expressly that the
11    JOLs believe Ascentra to be solvent, I do not
12    find them misleading."
13         Do you see that sentence?
14    A.   Yes, I do.
15    Q.   Okay.  And when you use the phrase,
16    "declarations," you're referring not only to
17    Mr. Robinson's declaration that we've looked
18    at, but Mr. Cowan's declaration as well?
19    A.   Yes.
20    Q.   Okay.  So let me just mark
21    Mr. Cowan's declaration so that we've got it
22    in the record.
23         MR. MORRIS:  It's going to be
24    exhibit 7, I believe?
25         THE COURT REPORTER:  Yes, sir.

Page 101

1    A. Henderson
2    (Henderson Exhibit 7, Declaration
3 of Mr. Cowan was marked for
4 identification).
5    Q.  And so having reviewed --
6 withdrawn.
7    You reviewed Mr. Cowan's
8 declaration and Mr. Robinson's declaration in
9 connection with the preparation of your expert
10 report, correct?
11    A.  Yes.
12    Q.  Okay.  And having reviewed those
13 two declarations, you noticed that neither of
14 them expressly stated that the JOLs had
15 determined that Ascentra was solvent, correct?
16    A.  I noticed that.
17    Q.  And you also now know that neither
18 declaration included the solvency certificate
19 that was filed a month earlier in the Cayman
20 Islands, correct?
21    A.  Correct.
22    Q.  And in your opinion, that solvency
23 certificate has substantial implications
24 concerning the rights of creditors, correct?
25    MR. McDONALD:  Objection to form.

Page 102

1    A. Henderson
2    A.  It's not so much the certificate
3 has those implications, but the fact of
4 solvency.
5    Q.  Okay.  And the fact of solvency is
6 reflected in the certificate, right?
7    A.  Yeah.  It's the primary evidence of
8 it.
9    Q.  And until that certificate is
10 filed --
11    What happens between the period of
12 time when the petition is filed and the
13 liquidators make a declaration?
14    A.  Chaos, probably.
15    Q.  It's intended to be a fairly brief
16 period of time, right?
17    A.  Yes.
18    Q.  Okay.  So you would agree that the
19 filing of the insolvency certificate in the
20 Cayman Islands is an important event, right?
21    A.  Yes.
22    Q.  And it's an important event because
23 upon the filing of the solvency certificate,
24 the rights of creditors are curtailed, to use
25 your term, right?

Page 103

1    A. Henderson
2    A.  Yes.
3    Q.  And despite the fact that the
4 rights of Ascentra's creditors, assuming that
5 creditors actually exist, were curtailed in
6 September of 2021, neither Mr. Robinson nor
7 Mr. Cowan ever informed the New York court, to
8 the best of your knowledge, that that event
9 had occurred, correct?
10    MR. McDONALD:  Objection to form.
11    A.  Neither of them informed the
12 New York court in so many words that it had
13 occurred.
14    Q.  Okay.
15    A.  Mr. Robinson, whose evidence would
16 be the primary evidence on this subject, set
17 out facts, a couple of facts which lead the
18 reader to think that this is a solvent entity.
19    Q.  In fact, in your opinion in order
20 to discern the conclusion that Ascentra is
21 solvent, one needed to undertake a careful
22 reading of Mr. Robinson's declaration,
23 correct?
24    MR. McDONALD:  Objection to form.
25    A.  I don't know how careful it would

Page 104

1    A. Henderson
2 have to be.  But one needs to draw the
3 inference from certain statements that he
4 makes.
5    Q.  Well, in fact the very last
6 sentence of your declaration says, quote,
7 "Overall" --
8    A.  Yes.
9    Q.  -- "a careful reading of the
10 declaration leads to the conclusion," right?
11    A.  Okay.  Yes, it does.
12    Q.  So in your own words the only way a
13 reader would know that Ascentra was solvent is
14 by undertaking a careful reading, correct?
15    MR. McDONALD:  Objection to form.
16    A.  That's not -- I suppose.  It's not
17 really part of my expertise, whether it's a
18 careful reading or an ordinary reading, is not
19 something I have an opinion on really.
20    Q.  Well, you needed to undertake a
21 careful reading in order to come to the
22 conclusion, correct?  That's why you swore --
23    MR. McDONALD:  Objection to form.
24    Q.  -- it was true, correct?
25    MR. McDONALD:  Object to the form.



1          A. Henderson
2      A.  I needed to read his declaration,
3  and fit certain facts together in order to
4  determine that this was a solvent entity.
5      Q.  The word "solvent" -- do you recall
6  if the word "solvent" is used in either
7  declaration?
8      A.  I don't recall.
9      Q.  If it was, a careful reading
10  wouldn't be required, correct?
11      A.  Yeah, I mean if you put it up
12  front.
13      Q.  Did you ever ask anybody why
14  neither Mr. Robinson nor Mr. Cowan attached a
15  copy of the solvency certificate to their
16  declarations at the outset of the Chapter 15
17  proceeding?
18      A.  I don't know if I asked.  But if I
19  did it would be a privileged communication.
20  Wouldn't it?
21      Q.  I don't know.  I'll let your
22  counsel answer that.
23      A.  The honest answer is I don't
24  remember.
25      Q.  Then we don't have to worry about

1          A. Henderson
2  it.
3          Did you ever ask anybody why they
4  didn't just say in their declarations, that
5  Ascentra is solvent?
6      MR. McDONALD:  That is privileged.
7  I object.  I instruct you -- I instruct
8      the witness not to answer.
9      A.  There was at some point some
10  conversation about that.  But it seems to me
11  it's a privileged communication.
12      Q.  Okay.  So to the extent you ever
13  asked the question, you're not willing to
14  share with me what you were told about why
15  they chose not to include the word "solvent"
16  in their declarations, is that fair?
17      A.  I'm not willing to violate the
18  solicitor/client privilege enjoyed by my
19  client.
20      Q.  I appreciate that.
21          In reviewing the declarations in
22  connection with the preparation of your expert
23  opinions, do you recall any mention of the
24  curtailment of rights of creditors in the
25  Ascentra winding up proceeding in the Cayman

1          A. Henderson
2  Islands?
3      A.  I don't have a specific
4  recollection of that.  I would have to review
5  the whole document.
6      Q.  Is there anything in either
7  declaration that you recall that describes the
8  rights of creditors in a windup proceeding
9  involving a solvent entity?
10      A.  I don't recall that appearing in
11  these documents.
12      Q.  If you could take Mr. Cowan's
13  declaration, the one that's marked as exhibit
14  7.
15      A.  Yes, I have that.
16      Q.  And if you could turn to page 3.
17      A.  Yes.
18      Q.  Do you see at the bottom the
19  heading roman numeral III states, quote,
20  "Insolvency in the Cayman Islands"?
21      A.  I see that.
22      Q.  To the best of your knowledge and
23  as you've been instructed, Ascentra is not
24  insolvent, correct?
25      A.  It is not believed to be insolvent

1          A. Henderson
2  at this time.
3      Q.  It hasn't been determined to be
4  insolvent by the joint official liquidators,
5  correct?
6      A.  Correct.
7      Q.  The Cayman court has never been
8  told that Ascentra is anything but solvent,
9  correct?
10      A.  As far as I know, that's correct.
11      Q.  And there's no provision that
12  uniquely applies to insolvent corporations in
13  a winding up proceeding in the Cayman Islands
14  that would also apply to Ascentra in its
15  windup proceeding, correct?
16      MR. McDONALD:  Objection to form.
17      A.  Well, we touched on this earlier.
18  Yes, there are some proceedings that apply
19  whether the company is solvent or insolvent.
20      Q.  Correct.  And I apologize, I'm sure
21  it was my question.  I'm focused only on the
22  portion of the Winding Up Rules that apply to
23  insolvent companies.
24      MR. MORRIS:  Withdrawn.
25      Q.  There are certain rules in the

Page 109

1    A. Henderson
2  Winding Up Rules that apply only to solvent
3  companies, correct?
4      A.   That is correct.
5      Q.   And there are certain rules that
6  apply only to companies of doubtful solvency,
7  correct?
8      A.   Yes.
9      Q.   There are certain rules that only
10  apply to insolvent companies, correct?
11      A.   Yes.
12      Q.   And then there are certain rules
13  that apply to all of them?
14      A.   Yes.
15      Q.   Okay.  So I am focused on the
16  second and the third category:  Doubtful
17  insolvency and insolvency.
18      A.   Okay.
19      Q.   Only with respect to those specific
20  rules, none of them would apply to Ascentra,
21  correct?
22      A.   Correct.
23      Q.   Okay.  Can you think of any reason
24  why Mr. Cowan would describe the proceeding in
25  the Cayman Islands as, quote, "insolvency" at

Page 110

1      A. Henderson
2  the bottom of page 3?
3          MR. McDONALD:  Objection to form.
4      A.   I don't want to speculate on why
5  Mr. Cowan would or would not have done certain
6  things.
7      Q.   I don't want you to do that either
8  so let me ask a better question.
9          As a former judge and as an expert
10  on Cayman Islands winding up laws, would you
11  ever describe the Ascentra windup proceedings
12  as an insolvency proceeding?
13          MR. McDONALD:  Objection to form.
14      A.   Not at the moment, no.
15      Q.   Okay.  And at no time -- to the
16  best of your knowledge, at no time since the
17  moment it was commenced, is that fair?
18      A.   Correct.
19      Q.   Okay.
20      A.   I would describe it as a winding up
21  proceeding.
22      Q.   Thank you.
23          MR. MORRIS:  All right, we can put
24      the declarations to the side for now.
25      Can you pull back the Winding Up Rules.

Page 111

1      A. Henderson
2          THE WITNESS:  Yes.
3          MR. MORRIS:  And let's go to Order
4      Number 16.  Which begins at page 93.
5          THE WITNESS:  Yes.
6      Q.   Order 16, Rule 1(i) is the rule
7  that provides that if the company being
8  liquidated is solvent, the liquidator is
9  required to pay the debts owing to its
10  creditors in the ordinary course, correct?
11      A.   Correct.
12      Q.   That's the source of that concept,
13  right?
14      A.   I suppose.  It seems to me inherent
15  in the process whether you have a rule that
16  says so or not.
17      Q.   Well, if you have a rule you're
18  kind of required to follow it, right?
19          MR. McDONALD:  Object to the form.
20      A.   Yeah I --
21          MR. MORRIS:  Withdrawn.
22      Q.   Liquidators are required to pay
23  creditors --
24      A.   They are.
25      Q.   -- in the ordinary course --

Page 112

1      A. Henderson
2      A.   They are.
3      Q.   Okay.
4      A.   Even if you didn't have a rule, the
5  Court would certainly expect it.
6      Q.   Okay.  But expectations aside, you
7  do have a rule, right?
8      A.   We do have a rule, yes.
9      Q.   And liquidators must follow the
10  rule, correct?
11      A.   They must follow the rules.
12      Q.   Okay.
13      A.   Or they should.
14      Q.   Do you, as a former judge and
15  expert on the Winding Up Rules, have an
16  understanding of what ordinary course means?
17      A.   I wrote a Law Journal article on it
18  once.
19      Q.   Great.  So can you tell me what
20  your understanding of ordinary course means?
21      A.   In my view a company in a winding
22  up proceeding is not engaged in the ordinary
23  course of business.  I think the rules here
24  are inaptly worded, but the concept is that if
25  the company is solvent, the invoices submitted

Page 113

1      A. Henderson
2  by creditors should be paid within the time
3  that payment is due.
4      Q.  That's right.
5      A.  30 days, typically.
6      Q.  But invoices have different payment
7  terms, is that fair?
8      A.  Yes.
9      Q.  So some goods or service providers
10  will render invoices that require payment
11  within 30 days, right?
12      A.  Yes.
13      Q.  Some of them will allow for 45
14  days, correct?
15      A.  Yes.
16      Q.  Some of them want cash on delivery,
17  right?
18      A.  Probably, yes.  We don't use much
19  cash in the Cayman Islands.  It's disapproved
20  of.
21      Q.  But whatever the creditor's payment
22  terms, a liquidator of a solvent entity is
23  required under Order 16 Rule Number 1 (1) to
24  pay them in the ordinary course, correct?
25      A.  That is correct.

Page 114

1      A. Henderson
2      Q.  And because creditors may have
3  different payment terms, they're going to get
4  paid at different times if it's a solvent
5  entity, correct?
6      A.  Yes.  In a typical case.  I mean,
7  there are -- I suppose, one could imagine
8  circumstances where they wouldn't.  But in a
9  typical case, yes.
10      Q.  And the creditors of a solvent
11  entity under Order 16, Rule 1(1) are also
12  going to get paid in full in all instances,
13  correct?
14      MR. McDONALD:  Object to the form.
15      A.  In the typical case, yes.
16      Q.  That's what's expected and required
17  under that rule, correct?
18      MR. McDONALD:  Objection to form.
19      A.  Well, that would be the norm.  But
20  the liquidators still have to come to a
21  considered decision that the debt is due and
22  owing.
23      Q.  Okay.  So let's take that into
24  account.
25      A.  Yes.

Page 115

1      A. Henderson
2      Q.  Subject to the resolution of --
3      MR. MORRIS:  Withdrawn.
4      Q.  For undisputed debts --
5      A.  For undisputed debt, yes.
6      Q.  -- the liquidators of a solvent
7  entity are required to pay creditors in full
8  in the ordinary course, correct?
9      A.  Correct.
10      Q.  Okay.  And you note in your own
11  declaration that in fact while Ascentra is
12  winding down and the process of winding down
13  may not be in your view ordinary course to
14  begin with, they still engage service
15  providers, right?
16      A.  Oh, yes.
17      Q.  Right?
18      A.  They certainly do.
19      Q.  And among those that are mentioned
20  in paragraph 36 of your declaration are things
21  such as information, storage and maintenance,
22  right?
23      A.  Well, yes Mr. Robinson referred to
24  those.
25      Q.  Yes.  And so those service

Page 116

1      A. Henderson
2  providers and maintenance providers are
3  entitled to get paid in the ordinary course in
4  full under Order 16, Rule 1, right?
5      A.  Correct.
6      Q.  Under that rule creditors are also
7  entitled to get paid in the currency of the
8  obligation --
9      A.  Correct.
10      Q.  -- as if the company were still
11  operating, correct?
12      A.  Correct.
13      Q.  Now, in contrast, you would agree
14  that creditors of an insolvent company or
15  creditors of a company of doubtful solvency
16  have no right to get paid in full, correct?
17      MR. McDONALD:  Object to the form.
18      A.  They have no right to get paid in
19  full prior to the pari passu distribution that
20  we expect to take place.
21      Q.  So --
22      A.  If that distribution happened to be
23  100 cents on the dollar.  And it could happen
24  that they could be paid in full.  But ...
25      Q.  Right.  But other than that they're



Page 117

1         A. Henderson
2  just going to get paid pro rata along with
3  other creditors in their class?
4       A.  Correct.
5       Q.  How many cases are you aware of
6  that were filed as insolvent or of doubtful
7  insolvency where creditors got paid 100 cents
8  on the dollar?
9          MR. McDONALD:  Object to the form.
10      A.  Again, I'm not -- you know, I don't
11  remember specific cases, I've done so many of
12  them.  So the answer is zero.
13      Q.  Okay.
14      A.  But there probably were some.
15      Q.  But you can't remember any; fair?
16      A.  Fair.  Yeah, I mean, but anything
17  that can happen probably did happen at some
18  point.
19      Q.  And creditors of a solvent --
20          MR. MORRIS:  Withdrawn.
21      Q.  Creditors of an insolvent company
22  or a company of doubtful solvency had no right
23  to get paid in accordance with their payment
24  terms, correct?
25          MR. McDONALD:  Object to the form.

Page 118

1         A. Henderson
2       A.  No, their only right is to be the
3  recipient of a pari passu distribution towards
4  the end of the process.
5       Q.  Right.  And so they're going to
6  have to wait, isn't that right?
7       A.  They're going to have to wait.
8       Q.  They're not going to get paid in
9  accordance with their invoice terms, correct?
10         MR. McDONALD:  Object to the form.
11      A.  No.
12      Q.  Creditors of an insolvent company
13  or a company of doubtful solvency have no
14  right to get paid in the currency of the
15  obligation, correct?
16      A.  I'm not sure about that.  I would
17  have to look it up.  I mean, I think the pari
18  passu distribution would ordinarily be, take
19  into account the currency of the obligation.
20  Would it not?
21      Q.  You're the expert.
22      A.  I don't know without looking it up.
23      Q.  Fair enough.
24      A.  And it probably doesn't matter to
25  you, does it?

Page 119

1         A. Henderson
2       Q.  I think -- I think we can see
3  from -- it does matter, actually.  We can see
4  from Order 16, Rule 1(1) that creditors of a
5  solvent entity have the --
6       A.  Yeah.
7       Q.  -- absolute right to get paid in
8  the currency of the obligation, correct?
9       A.  Correct.
10      Q.  Can you point me to anywhere in the
11  windup laws that gives creditors of an
12  insolvent company or a company of doubtful
13  solvency that same right?
14      A.  No.
15      Q.  You used the phrase pari passu a
16  few moments ago.  Did I hear that correctly?
17      A.  Yes.
18      Q.  And do you have an understanding of
19  that term?
20      A.  Yes.
21      Q.  What's your understanding of the
22  phrase pari passu?
23      A.  That each creditor would be given a
24  certain percentage of the distribution amount
25  that is in direct proportion to that

Page 120

1         A. Henderson
2  creditor's -- that is in the same proportion
3  as that creditor's debt is to the whole of the
4  debt.  It's ratable.
5       Q.  And do creditors of an insolvent
6  entity or an entity of doubtful solvency get
7  paid pari passu?
8       A.  Usually, yes.
9       Q.  Can you think of any instance where
10  creditors of an insolvent entity or an entity
11  of doubtful solvency got paid in any manner
12  other than pari passu?
13      A.  No.  I mean, I think by definition
14  if they were to get 100 cents on the dollar,
15  then the entity was solvent.
16      Q.  So fair to say the answer is no?
17      A.  Yes.
18      Q.  Okay.  And when you use the phrase
19  "pari passu," that also means that all
20  creditors will be paid at exactly the same
21  time, correct?
22         MR. McDONALD:  Objection to form.
23         MR. MORRIS:  Withdrawn.
24      Q.  When you use the phrase "pari
25  passu," you mean that distributions will be



Page 121

1          A. Henderson
2  made to creditors at the same time?
3       A.   Correct.
4       Q.   And that's different than what
5  happens for creditors of solvent entities who
6  get paid in the ordinary course, fair?
7       A.   Correct.
8       Q.   Do you have an understanding of the
9  policy rationale for using different payment
10  methods depending on whether the creditors are
11  of a solvent entity versus an entity that's
12  either insolvent or of doubtful solvency?
13       A.   I think I do.
14       Q.   Can you share that with me?
15       A.   Well, if the liquidators expect on
16  good grounds that the entity will be solvent,
17  then it would appear to be safe to pay the
18  creditors in full as their debts fall due.
19          Whereas, if the liquidators expect
20  on good grounds that the entity will be
21  insolvent, one wishes to wait until all the
22  proofs of debt have been adjudicated and then
23  make a ratable distribution.  I'm not sure if
24  I'm addressing your question or not.
25       Q.   I think that makes sense.  Do you

Page 122

1          A. Henderson
2  have anything to add?  Or is that --
3       A.   No, I don't.
4          MR. MORRIS:  Off the record.
5          (Discussion off the record.)
6          (Lunch recess taken at 11:55 a.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 123

1          A. Henderson
2  A F T E R N O O N   S E S S I O N
3          (12:35 p.m.)
4          – – –
5
6  ALEXANDER HENDERSON,
7     resumed as a witness, having been
8     previously sworn by a Notary Public,
9     was examined and testified further as
10     follows:
11          MR. MORRIS:  We are back on the
12     record.
13  EXAMINATION BY
14  MR. MORRIS:
15       Q.   Mr. Henderson, could I trouble you,
16  please, to take the Wind Up Rules which are
17  exhibit 3.
18       A.   Yes.
19       Q.   I just have a few more rules I
20  would like to hit and then we'll deal with
21  Ms. Pearson and then we'll be done.
22          So if you can turn to page 59,
23  which is Order 8.
24       A.   Yes.
25       Q.   Order 8 addresses meetings of

Page 124

1          A. Henderson
2  creditors and contributories, right?
3       A.   Yes.
4       Q.   And contributories is a phrase
5  that's used in the Cayman Islands that would
6  be analogous to the phrase that's used in the
7  United States for shareholders, right?
8       A.   Correct, or members is another
9  term.
10       Q.   Or members.  So depending on
11  whether it's a corporation or a limited
12  liability type company, it's either a
13  shareholder or a member, right?
14       A.   Okay.
15       Q.   Okay.  I am asking you, is my
16  understanding correct?
17       A.   Yes.
18       Q.   Okay.  And if you'll look down at
19  Order 8, Rule 1(5), as long as the liquidator
20  determines that the company is solvent, then
21  the liquidator is required to convene meetings
22  only with contributories, correct?
23       A.   Correct.
24       Q.   But if the liquidator determines
25  that the entity is insolvent, only creditors



Page 125

1          A. Henderson
2   will be permitted to participate in official
3   meetings under (4), correct?
4      A.   Correct.
5      Q.   Okay.  And, again, do you have an
6   understanding of what the policy is behind the
7   rules that require the participation of
8   creditors in meetings of insolvent entities
9   but bar the participation of creditors of
10  meetings concerning solvent companies?
11         MR. McDONALD:  Objection to form.
12     A.   Yes, I have.
13     Q.   Can you share that with me?
14     A.   If the entity is insolvent, the
15  creditors are going to have the ultimate
16  economic interest in the outcome.  They are
17  going to be paid ratably, according to the
18  proportionate size of their debts.
19         If the entity is solvent, one
20  assumes that the creditors will be paid in
21  full in the so-called ordinary course, and the
22  shareholders will have the ultimate financial
23  interest.
24     Q.   By the way, I don't think we
25  covered this.  Can you just tell me what a

Page 126

1          A. Henderson
2   liquidation committee is in the context of a
3   winding up proceeding?
4      A.   It's a committee of those who are
5   presumed to have the primary financial
6   interest in the outcome.  They are to
7   represent their classes.  So in an insolvent
8   winding up, the committee would be composed of
9   representatives of the creditor class.
10     Q.   And is it true that the rights and
11  powers of liquidation committees are actually
12  set forth in Order Number 9?  And that begins
13  on page 65.
14     A.   It deals with liquidation
15  committees, yes.  They don't have a lot of
16  rights and powers.  They are essentially
17  advisory in nature.  The JOLs consult them and
18  are expected to consult them.  Their views
19  have to be considered, have to be taken into
20  account.  But they don't have a lot of rights.
21  The rights reside mostly with the court.  The
22  JOLs acting on behalf of the court.
23     Q.   Do you know if liquidation
24  committees typically retain counsel?
25     A.   I would say typically they don't.

Page 127

1          A. Henderson
2   But sometimes counsel -- sometimes counsel get
3   involved.
4      Q.   Can liquidation committees hire
5   other professionals such as financial advisers
6   or investment bankers?
7      A.   They can always hire people.  The
8   question becomes whether the liquidation
9   estate is going to pay for it or not.  They
10  would need to consult with the JOLs, convince
11  the JOLs that it's a reasonable expenditure.
12     Q.   Do liquidation committees have the
13  right to receive notice of sanction
14  applications?
15     A.   Yes.  Yes, I think so.
16     Q.   Do they --
17     A.   I would certainly expect them to
18  receive notice.
19     Q.   And do liquidation committees also
20  have the right to file sanction applications?
21     A.   The committee itself?  I don't know
22  if it does or not.  I would have to look at
23  the wording of the rules.
24     Q.   Okay.  Are you aware of any source
25  of the powers, rights or authority of

Page 128

1          A. Henderson
2   liquidation committees other than what is set
3   forth in Order 9?
4      A.   No.
5      Q.   Now, if you could go back to the
6   Companies Act.  I just want to review some of
7   the rights that --
8      A.   Yes.
9      Q.   -- you have said have been
10  curtailed for creditors of solvent entities.
11  That's footnote 7.
12         So the first thing you refer to is
13  Companies Act Section 102(3)?
14     A.   Okay.
15     Q.   And can you just tell me your
16  understanding of how Section 102(3) curtails
17  the rights of creditors in a solvent winding
18  up proceeding?
19     A.   Yes.  This pertains to the
20  expenditure of money from the liquidation
21  estate.  And if the entity is thought to be
22  solvent, the JOLs must obtain the prior
23  approval of the contributories.  And if the
24  estate is thought to be insolvent, the prior
25  approval of the creditors under 102(3).



Page 129

1      A. Henderson
2    Q.  Okay.  Thank you.  And then you
3  also cited Section 105(3) of the Companies
4  Act?
5    A.  Yes.
6    Q.  What about that subsection of 105
7  curtails the rights of creditors in the case
8  of a winding up proceeding for a solvent
9  entity?
10    A.  Well, if the entity is thought to
11  be solvent, the liquidators within 28 days of
12  the date the winding up order is made shall
13  summon a meeting of the shareholders -- or
14  contributories -- only.  The creditors have no
15  right to attend.
16    Q.  All right.  Let's just go to your
17  declaration.  You can put the rules to the
18  side for the moment.  And I would ask you to
19  turn your attention to I guess beginning at
20  paragraph 29 through 36 where you offer some
21  responses --
22    A.  Oh, yes.
23    Q.  -- to portions of Ms. Pearson's
24  declaration.
25    A.  Mm-hmm.

Page 130

1      A. Henderson
2    Q.  Do you know Ms. Pearson?
3    A.  No.
4    Q.  Have you ever met her?
5    A.  No.
6    Q.  Do you know anything about her
7  reputation?
8    A.  No.
9    Q.  Do you know anything about her
10  experience?
11    A.  Only what I've read in her
12  declaration.
13    Q.  Have you done any due diligence to
14  try to ascertain Ms. Pearson's qualifications
15  to offer expert testimony?
16    A.  I don't regard that as part of due
17  diligence.  I have no reason to ascertain her
18  qualifications.
19    Q.  Okay.  And so at the time you
20  prepared the declaration you reviewed her
21  declaration as well, correct?
22    A.  Correct.
23    Q.  And the only portion of her
24  declaration that you chose to comment on are
25  the seven paragraphs from 69 to 76, correct?

Page 131

1      A. Henderson
2    MR. McDONALD:  Object to the form.
3    A.  Yes.
4    Q.  Okay.  This is the section, from 29
5  to 36, this is the section of your declaration
6  where you put pen to paper to describe your
7  views of paragraph 69 to 76 of Ms. Pearson's
8  deposition, correct?
9    A.  Yes.
10    Q.  Declaration.  Okay.  So let's go
11  through them one at a time.
12    A.  Okay.
13    Q.  In paragraph 30 you call her
14  criticism of Mr. Robinson and Mr. Cowan as set
15  forth in paragraph 70 of her declaration as
16  misguided.  Do you see that?
17    A.  I see that.
18    Q.  And the criticism in particular is
19  the fault that I guess you interpreted in
20  paragraph 70 for, quote, "failing to identify
21  the key differences between Cayman insolvency
22  proceedings and a solvent court supervisory
23  winding up."  Do I have that right?
24    A.  Yes.
25    Q.  You would agree that there are key

Page 132

1      A. Henderson
2  differences between Cayman insolvency
3  proceedings and a solvent court supervised
4  winding up, correct?
5    A.  No.
6    MR. McDONALD:  Object to the form.
7    (Discussion off the record.)
8    MR. McDONALD:  Could you re-ask the
9  question?
10    MR. MORRIS:  Sure.
11    Q.  We've spent time today,
12  Mr. Henderson, talking about the differences
13  between a winding up proceeding that involves
14  a solvent entity and winding up proceedings
15  that involve entities that are either
16  insolvent or of doubtful solvency, right?
17    A.  There are differences, but it's all
18  one type of proceeding.  It's a winding up
19  proceeding.  And that's where Ms. Pearson and
20  I differ.
21    (Pause in proceedings.)
22  BY MR. MORRIS:
23    Q.  Okay.  Are you ready,
24  Mr. Henderson?
25    A.  Yes.

Page 133

1          A. Henderson
2     Q.   So you agree that creditors of a
3  solvent entity have different rights than
4  creditors of an insolvent entity or an entity
5  that is of doubtful solvency as part of the
6  Cayman Island winding up proceeding scheme,
7  right?
8     A.   Yes.
9     Q.   Okay.  Where you differ with
10  Ms. Pearson is that you believe those
11  differences are irrelevant because in your
12  opinion whether the company is solvent or
13  insolvent or of doubtful solvency, it's all
14  under the winding up umbrella, whereas she
15  believes the differences are important, is
16  that fair?
17     A.   Not entirely, no.
18     Q.   Tell me where I got it wrong.
19     A.   I don't think they're irrelevant.
20  She seems to believe that there are two
21  different types of proceedings, one involving
22  an insolvent entity and one involving a
23  solvent entity.
24          I believe that there's just one
25  type of proceeding, that is to say a winding

Page 134

1          A. Henderson
2  up proceeding, and the subject matter of that
3  winding up proceeding may be in some cases a
4  solvent entity and in other cases an insolvent
5  entity.
6     Q.   So in your view they're all winding
7  up proceedings?
8     A.   Correct.
9     Q.   And she's focused on the
10  differences of the rules that apply, depending
11  on whether or not the entity is solvent,
12  insolvent or of doubtful solvency, is that
13  fair?
14     A.   She's focused on them, but beyond
15  that she seems to feel that the differences
16  are so stark that there are two different
17  types of proceedings.  One for solvency -- one
18  for solvent entities and one for insolvent
19  entities.  I don't see it that way.
20     Q.   There are different rules that
21  apply depending --
22     A.   Yes.
23     Q.   -- on whether an entity is solvent
24  or insolvent, is that fair?
25     A.   There are indeed -- yes.

Page 135

1          A. Henderson
2     Q.   And do you have any reason to
3  believe that the only point she's making is
4  that different rules apply depending on
5  whether the entity is solvent versus
6  insolvent?
7          MR. McDONALD:  Objection to form.
8     A.   I can only reply with my own
9  interpretation of the point she's making.
10     Q.   Okay.  All right.  Turning to
11  paragraph 31.
12     A.   Yes.
13     Q.   She's right, is she not, that
14  creditors of a solvent entity in a winding up
15  proceeding in the Cayman Islands are not going
16  to get paid on a pari passu basis, correct?
17     A.   That is correct.
18     Q.   Okay?
19          MR. McDONALD:  Object to the form
20     of the question.
21     Q.   So what's the criticism that you're
22  identifying in paragraph 71?  I'm not sure
23  that I follow.
24     A.   I think I'm simply reiterating that
25  in my view there's just one type of process,

Page 136

1          A. Henderson
2  the winding up process.
3     Q.   Okay.  So in your view there's one
4  process, it's the winding up --
5     A.   Yes.
6     Q.   -- proceeding?
7     A.   You could take an analogy to
8  criminal proceedings.  A criminal proceeding
9  may involve burglary or it may involve murder.
10  That is the subject matter of the proceeding.
11  But there's only one type of proceeding.
12     Q.   Okay.
13     A.   That's the way I view winding up
14  proceedings.  Beyond that, I think that's the
15  way the bar and the bench views winding up
16  proceedings.
17          I've acted as chief justice on a
18  number of occasions.  If I had on one of those
19  occasions asked the court administrator to
20  give me a list of all of the types of
21  proceedings in the court and the number of
22  each, that list I expect would include a line
23  item for winding up proceedings.  It wouldn't
24  include two line items, one for solvency
25  proceedings and one for insolvency

Page 137

1      A. Henderson
2  proceedings.  That's the difference.
3      Q.  But you do understand, as you set
4  forth in paragraph 14 of your declaration,
5  that one of the things the Court in New York
6  is going to want to know is whether the
7  proceeding is not a winding up proceeding, but
8  whether the proceeding is an insolvency
9  proceeding or a proceeding to adjust debts,
10 right?
11     A.  Yeah, I'm aware of the definition
12 that the Court in New York is considering.
13     Q.  And in your expert opinion, are the
14 distinctions that Ms. Pearson is drawing
15 relevant to the question of whether or not the
16 proceeding is an insolvency proceeding or a
17 proceeding for the adjustment of debts?
18     A.  I think what she's saying is
19 relevant.  I think it's wrong.
20     Q.  And you think it's wrong because
21 whether the entity is solvent or insolvent or
22 of doubtful solvency, it falls under the
23 umbrella of the Winding Up Rules as we've
24 defined them, correct?
25     A.  Yes.  It's a winding up proceeding.

Page 138

1      A. Henderson
2  It's one type of proceeding.
3      Q.  Okay.  But whether it's a winding
4  up proceeding --
5      MR. MORRIS:  Withdrawn.  I'll just
6  leave it at that.
7      Q.  In paragraph 32 you note that
8  Ms. Pearson has taken issue with
9  Mr. Robinson's statement, that quote, "all
10 major stakeholders are actively
11 participating," and she asserts that creditors
12 are, quote, "barred as a matter of law from
13 participating."
14     Do you see that?
15     A.  Yes, I do.
16     Q.  Okay.  So let's take this in
17 pieces.  Do you have any basis to believe that
18 Mr. Robinson's statement that, quote, "all
19 major stakeholders are actively participating"
20 is true?
21     A.  Well, I don't know in the
22 individual case, being the Ascentra case,
23 what's happening.  But what I'm attempting to
24 say, perhaps imperfectly, is that from the
25 Court's point of view, the creditors remain

Page 139

1      A. Henderson
2  stakeholders even though the liquidators
3  believe the company will prove to be solvent.
4      They're stakeholders in the sense
5  that the Court would want to be assured that
6  they are treated fairly and properly
7  throughout the process.  It doesn't mean that
8  they are on the same level as the
9  shareholders.  But they are still
10 stakeholders.
11     Q.  But in this particular case, if we
12 could just focus on Ascentra, you don't know
13 if Ascentra has creditors, correct?
14     A.  No, I don't.
15     Q.  And you don't know if Ascentra has
16 creditors, whether they're actively
17 participating in the winding up proceeding,
18 correct?
19     A.  I don't know what they're doing or
20 not doing.
21     Q.  Okay.  So you don't have any reason
22 to validate Mr. Robinson's statement that,
23 quote, "all major stakeholder are actively
24 participating," correct?
25     MR. McDONALD:  Objection to form.

Page 140

1      A. Henderson
2      A.  I can't validate that statement.
3  I'm directing my mind more to the question of
4  who are the stakeholders.
5      Q.  Okay.  So you're talking general,
6  but those general --
7      A.  I'm talking general.
8      Q.  Okay.  And so those general
9  concepts -- you're not offering an opinion as
10 to whether those general concepts apply to the
11 Ascentra case because you don't even know if
12 there are creditors, is that fair?
13     A.  That is a fair statement.
14     Q.  Okay.  The next portion of the
15 sentence refers to Ms. Pearson's assertion
16 that, quote, "the creditors are barred as a
17 matter of law from participating."
18     A.  Yes.
19     Q.  And we've looked at a lot of the
20 provisions of the winding up laws, is that
21 fair?
22     A.  We've looked at some things, yes.
23     Q.  Okay.  And I'll ask you now:  Can
24 you identify any rule in the Winding Up Rules,
25 or any section or provision of Part V of the



Page 141

1        A. Henderson
2   Companies Act that gives creditors of a
3   solvent entity a right to participate in the
4   winding up proceeding?
5        A.  Well, again, we come back to the
6   supervisory jurisdiction of the Court.  The
7   Court has an obligation to ensure that its
8   agents, the JOLs, are acting appropriately,
9   competently, fairly, et cetera, and the Court
10  cannot do that without entertaining complaints
11  from all those who are involved, which could
12  include a creditor.  Even though it's a
13  solvent entity, if a creditor were to write to
14  the Court, for example, and say I submitted --
15  we submitted our invoice four months ago, it
16  should have been paid within 30 days, it was
17  not, the liquidators will not tell me why they
18  have not paid it, can you help.
19        I would either set the matter down
20  to be addressed at the next interlocutory
21  application in the case or I might even call
22  in the liquidators and ask them.  Because I'm
23  supervising.
24        Q.  And that opinion that you just
25  articulated is an opinion that emanates from

Page 142

1        A. Henderson
2   the equitable powers of the Court, is that
3   fair?  Is didn't emanate from any particular
4   rule, is that right?
5        MR. McDONALD:  Objection to form.
6        A.  I'm sure there's something in the
7   Companies Act.
8        MR. McDONALD:  Take a moment.  If
9   you want to look through it, take a
10       moment.  You don't have to rush.
11       A.  I mean, the application that was
12  made in this case as in all similar cases is
13  for an order that the liquidation continue
14  under the supervision of the Court.
15       Q.  Correct.
16       A.  So the Court is mandated to
17  supervise.
18       Q.  Okay.  Anything else?
19       A.  That's the way it's always been.
20       Q.  Okay.
21       A.  Sometimes statutes don't set out
22  bedrock principles because they're deemed to
23  be so obvious that that's unnecessary.
24       Q.  All right.  As opposed -- I want to
25  distinguish the court's supervisory role as

Page 143

1        A. Henderson
2   you've described it from actual rights that
3   creditors have.
4        A.  Yes.  That's an important
5   distinction.
6        Q.  Okay.  So other than the right to
7   get paid in the ordinary course, can you
8   identify any right that a creditor or the body
9   of creditors has in a winding up proceeding
10  involving a solvent entity?
11       A.  There's probably one or two.  I
12  would have to go through the law and the rules
13  to identify them.  For the most part they
14  don't have rights, because it's a solvent
15  entity.  They have a broad right to be treated
16  fairly by the JOLs, and a right, as I've been
17  at pains to express, to complain to the Court
18  if they are not treated fairly.
19       Q.  In paragraph 33 you quote from
20  Ms. Pearson's declaration where she says that,
21  quote, "a solvent supervised winding up is
22  conducted for the benefit of the shareholders,
23  not the creditors."
24       And you acknowledge that this is,
25  quote, "largely true."

Page 144

1        A. Henderson
2        A.  Correct.
3        Q.  Okay.  The only quibble that you
4   have with her opinion in that regard is that
5   creditors benefit by having the liquidators
6   comply with the law that says they must pay
7   creditors in the ordinary course?
8        A.  Yes.
9        Q.  Okay.
10       A.  And that they may in some cases
11  have to liquidate assets to do that.
12       Q.  A solvent entity that was not
13  subject to a winding up proceeding would be
14  legally obligated to pay its debts in the
15  ordinary course, isn't that right?
16       A.  Yes.
17       Q.  So that from the creditors'
18  perspective there is no difference when
19  dealing with a solvent entity, whether it's in
20  a winding up proceeding or not in a winding up
21  proceeding, is that fair?
22       A.  Their right to be paid remains the
23  same.
24       Q.  Thank you.
25       A.  The practicality of it may differ.



Page 145

1        A. Henderson
2   Often these entities, even though solvent, are
3   not being managed properly.  The liquidators
4   step in and hopefully and presumably bring a
5   higher level of organization to the management
6   of it.
7       Q.  Looking at paragraph 34.
8       A.  Yes.
9       Q.  Are you disagreeing with anything
10  Ms. Pearson said in paragraph 74 or are you
11  just putting a little -- well, I'll just leave
12  it at that.
13        Is there a disagreement that's
14  identified in paragraph 74 or a criticism?
15      A.  I'm not sure if it's a
16  disagreement.  I'm pointing out, though,
17  that -- to quote myself, "if a serious
18  challenge were brought, I expect the Court
19  would listen to the submission (probably with
20  a time limit) and give a direction to the
21  liquidators if fairness required it.  The
22  rules of standing must (in winding up
23  proceedings) be enforced with a degree of
24  flexibility; a judge has a discretion to
25  listen to a creditor even though that creditor

Page 146

1        A. Henderson
2   has no right to insist on being heard."
3       I'm just making that point.
4       Q.  Okay, fair enough.
5         And then finally in paragraph 35
6   you take strong exception to the charge in
7   paragraph 75 that Mr. Cowan and Mr. Robinson
8   didn't provide the New York court with, quote,
9   a fair representation of the nature of a
10  supervised solvent winding up, have I read
11  that correctly?
12      A.  Yes.
13      Q.  You've got the Cowan and Robinson
14  declarations in front of you.
15      A.  Mm-hmm.
16      Q.  I am going to grab a cup of coffee.
17  I would ask you to take a look at them and
18  tell me where in those declarations either
19  declarant describes in any way at all the
20  nature of a supervised solvent winding up?
21      A.  Okay.  I'll have a look.
22      MR. McDONALD:  Which one do you
23      have, Cowan or --
24      THE WITNESS:  I have the Robinson
25      declaration in front of me.

Page 147

1        A. Henderson
2       MR. MORRIS:  Can we have him look
3   at the exhibit and not your copy?
4       MR. McDONALD:  He wanted to make a
5       mark for --
6       MR. MORRIS:  He can mark it on
7       the --
8       MR. McDONALD:  I don't want him
9   marking the official --
10      MR. MORRIS:  He's not going to mark
11      yours.  Unless we're going to mark that
12      as an exhibit.
13      A.  Is this the official exhibit or is
14  this just a copy?
15      Q.  Yes, the one with the yellow.  If
16  you want to mark it, you can mark.
17      MR. MORRIS:  I'm not asking him to
18      mark anything, but if he prefers to do
19      that, he's got to do that on the exhibit
20      because that's got to go into court.
21      (The witness complied.)
22      A.  Okay.  Should I answer?
23      Q.  Yes, please.  Can you identify
24  every place in Mr. Robinson's declaration
25  where you believe he fairly represented to the

Page 148

1        A. Henderson
2   New York court the nature of the supervised
3   solvent winding up?
4       A.  I may not be able to identify every
5   place, but I'll identify the --
6       Q.  Sure.
7       A.  -- main places that appear to me.
8   Paragraph 24.
9       Q.  Okay.
10      A.  He makes the important point that
11  Ascentra's liquidation is under the Cayman
12  court's supervision.  So that's the most
13  critical point.
14      Q.  Okay.  Can I stop you there for a
15  second?
16      A.  Yes.
17      Q.  And that would be true regardless
18  of whether the entity was solvent, insolvent
19  or of doubtful solvency, correct?
20      A.  Yes.  Absolutely.
21      Q.  So that's not a representation of
22  the nature of a supervised solvent winding up,
23  correct?
24      A.  Well, it doesn't address a rule
25  that applies only to a solvent entity.



Page 149

1     A. Henderson
2     Q.   Right.  That's really what I think
3  Ms. Pearson was focused on.
4          MR. McDONALD:  Objection to form.
5     Q.  Well, continue.  I don't mean to
6  interrupt.  Is there any other section or --
7     A.  I'll just go through them.
8     Q.  Sure.
9     A.  In paragraph 27 he says, "all major
10  stakeholders are actively participating."
11     Q.   Right.
12     A.  I take that to mean that their
13  interests are being considered in some manner.
14         I anticipate that most disputes
15  among the beneficial holders of Ascentra's
16  equity will be resolved by the Grand Court."
17         I presume that to be an important
18  sentence.
19         And in paragraph 29 he gives us a
20  list of things that have been done since the
21  supervision order was made.
22         In paragraph 32 he talks about
23  imposition of the automatic stay will prevent
24  creditors from pursuing extrajudicial
25  remedies.  That's an important point that the

Page 150

1          A. Henderson
2  court would want to know about I think, the
3  U.S. court.
4          "And will ensure that the assets
5  are preserved for the benefit of all
6  stakeholders."
7     Q.  Where is that?
8     A.  It's still paragraph 32, right at
9  the end.  The last sentence.
10     Q.  Got it.  Thank you.
11     A.  It's a general statement.  In
12  paragraph 40:  "As liquidators we have
13  displaced the prior board of directors of
14  Ascentra."
15         That's an important concept.  The
16  liquidators step into the shoes of the
17  directors and enjoy all of the powers, and
18  most of the obligations that the directors
19  previously had.  Liquidators are fiduciaries.
20         Paragraph 41, talking about the
21  requisite notices and filings have been done.
22  Arranged for the transfer of the books and
23  records.
24         Paragraph 42, Ascentra's nerve
25  center has been the Cayman Islands.

Page 151

1          A. Henderson
2     I think it covers the ground in
3  general terms.
4     Q.  Okay.  So going back to your
5  declaration --
6     A.  Yes.
7     Q.  -- the quote that you included in
8  paragraph 35 is the quote that you take strong
9  exception to, and that is the statement that
10  Ms. Pearson didn't believe Mr. Cowan or
11  Mr. Robinson provided the Court with, quote,
12  "a fair representation of the nature of a
13  supervised solvent winding up."  Do you see
14  that?
15     A.  I see that.
16     Q.  Okay.  Did you see anywhere in
17  Mr. Robinson's declaration where he disclosed
18  to the New York court that creditors would get
19  paid in the ordinary course?
20     A.  Not expressly, no.
21     Q.  And that's a concept that is unique
22  to a winding up proceeding of a solvent
23  entity, correct?
24     A.  Yes.  Yes, that's true.
25     Q.  Okay.  Did you see anywhere in

Page 152

1          A. Henderson
2  Mr. Robinson's declaration where he disclosed
3  to the New York court that a liquidation
4  committee had been appointed that was
5  comprised as it was required to be of only
6  contributories?
7     A.  I don't recall seeing that.
8     Q.  But that's a rule in the Cayman
9  Islands that applies only to winding up
10  proceedings of solvent entities, correct?
11     A.  That is correct.
12     Q.  Okay.  Did you see anywhere in
13  Mr. Robinson's declaration where he disclosed
14  to the New York court that creditors could not
15  participate in duly convened meetings that are
16  conducted by the joint official liquidators?
17     A.  No, he doesn't address that I don't
18  think.
19     Q.  And that's a rule that applies only
20  to winding up proceedings involving solvent
21  entities, correct?
22     A.  Yes.
23     Q.  Did you see anywhere in
24  Mr. Robinson's declaration where he discloses
25  to the New York court that creditors have no

Page 153

1         A. Henderson
2  right to file a sanction application in the
3  Ascentra bankruptcy?
4      A.  No, I don't think he mentioned
5  that.
6      Q.  And that's a concept, again, that's
7  unique to a winding up proceeding involving a
8  solvent entity, correct?
9      A.  Yes.
10     Q.  Did you see anywhere in
11  Mr. Robinson's declaration where he disclosed
12  to the New York court that creditors have no
13  consent rights as to whether or not to use
14  estate expenses to fund the liquidators'
15  investigations?
16     A.  He didn't mention that.
17     Q.  And that's a concept that is unique
18  to a winding up proceeding involving a solvent
19  entity, correct?
20     A.  Yes.
21     Q.  And now let's look at the items
22  that he did mention.  Turning to paragraph 27.
23  You focused on the first two sentences.  And I
24  would ask you, sir, if anything in those two
25  sentences would have caused the New York court

Page 154

1         A. Henderson
2  to believe that the proceeding in the Cayman
3  Islands involved one of a solvent entity?
4      MR. McDONALD:  Objection to form.
5      A.  I don't know to what extent -- what
6  sort of inferences --
7      MR. MORRIS:  You know what?  I'll
8   withdraw the question.  That's a fair
9   objection.  I am going to ask you what
10   you think.
11     Q.  The statements that are in those
12  first two sentences would apply to any winding
13  up proceeding, isn't that fair?
14     A.  The second sentence talking about
15  disputes between the beneficial holders of
16  equity hints at the fact that this is a
17  solvent winding up.
18     Q.  But if you weren't an expert in
19  Cayman Islands law you would -- would you
20  think you would have any reason to believe
21  that?  You know that only --
22     MR. MORRIS:  Withdrawn.
23     Q.  You know that or you believe that
24  only because you're an expert, right?
25     A.  I think you would have to be an

Page 155

1         A. Henderson
2  expert in bankruptcy or Cayman Islands law.
3      Q.  Okay.  Let's go --
4      A.  But I take it that His Honor will
5  be that expert.
6      Q.  Right.  I think that's why he wants
7  to hear from you, actually.
8      A.  That's right.
9      Q.  Go to paragraph 29.  You pointed to
10  that paragraph as one that caused you to take
11  strong exceptions to the statement made in
12  paragraph 75.
13     A.  He's setting out what he did.
14     Q.  Yes.  Is there anything in
15  paragraph 29 that is unique to a winding up
16  proceeding involving a solvent debtor?
17     MR. MORRIS:  Withdrawn.
18     Q.  Is there anything in paragraph 29
19  that is unique to a winding up proceeding
20  involving a solvent entity?
21     A.  No.
22     Q.  In fact, if you look at D --
23     A.  G?
24     Q.  D, as in David.
25     A.  Oh, D.  Yeah.

Page 156

1         A. Henderson
2      Q.  That's kind of misleading, isn't
3  it?
4      MR. McDONALD:  Objection to form.
5      A.  I don't know that it's misleading.
6  It's non-specific.  It doesn't say he wrote
7  just to the shareholders.
8      Q.  But in fact, given the proceeding
9  in the Cayman Islands involves a solvent
10  entity, he would have only written to
11  contributories about constituting a
12  liquidation committee, correct?
13     A.  That is correct.
14     Q.  Okay.  He wouldn't have written to
15  stakeholders, if you define stakeholders to
16  include --
17     A.  No, he would have written to --
18  sorry.  Go ahead.
19     Q.  He wouldn't have written to
20  stakeholders -- if you define stakeholders to
21  include contributories and creditors, he never
22  would have written to, quote, stakeholders
23  about constituting a liquidation committee,
24  right?
25     A.  He didn't write to all



Page 157

1    A. Henderson
2 stakeholders. He wrote to one subset of them.
3       Q. And which subset was that?
4       A. Well, the shareholders.
5       Q. And you would never know that the
6 way subpart D is crafted, correct?
7       A. I don't think you would know it,
8 no.
9       Q. You would have to be an expert in
10 Cayman Islands law, right?
11      A. I guess, yeah.
12      Q. Right? You would have to be an
13 expert in Cayman Islands law to know that only
14 contributories would participate in a
15 liquidation committee involving a solvent
16 entity, correct?
17         MR. McDONALD: Objection to form.
18      A. I suppose so.
19      Q. Yes. Let's go to the end of
20 paragraph 32. You referred to the imposition
21 of the automatic stay as something --
22      A. Oh, yes.
23      Q. -- something you believed the
24 New York court should know, right?
25      A. Yes.

Page 158

1    A. Henderson
2       Q. Does the automatic stay apply to
3 all winding up proceedings?
4       A. I don't know. I would have to -- I
5 would have to dig into the legislation.
6       Q. Is there anything about that
7 sentence that you have cited to, that you
8 believe fairly puts the reader on notice that
9 the automatic stay applies to solvent
10 entities?
11         MR. McDONALD: Objection to form.
12      A. No, I'm just pointing out that that
13 sentence would probably be important to the
14 New York judge.
15      Q. Okay. You're not pointing to that
16 sentence as a statement that discloses that
17 the proceeding in the Cayman Islands involves
18 a solvent entity, correct?
19      A. Yeah. Correct.
20      Q. Okay. And let's go to paragraph
21 40. You refer to the first sentence
22 concerning the displacement of the board?
23      A. Yes.
24      Q. And would the board be displaced in
25 any winding up proceeding regardless of

Page 159

1    A. Henderson
2 whether it was one involving a solvent,
3 insolvent or an entity of doubtful solvency?
4       A. Yes.
5       Q. So there's nothing about the first
6 sentence of paragraph 40 that would alert the
7 reader to the fact that the Cayman proceeding
8 involved a solvent entity, is that fair?
9       A. Nothing about that sentence, no.
10      Q. Okay. The same questions with
11 respect to the first sentence of paragraph 40:
12 The requisite notices and filings have been
13 filed and published.
14         Do you see that?
15      A. I'm sorry. What is the number?
16      Q. Forty-one?
17         MR. McDONALD: You said 40.
18         MR. MORRIS: Yeah, my mistake.
19      A. I see. Yes, I see that.
20      Q. That's also a general statement
21 that would apply to any winding up proceeding,
22 is that fair?
23      A. Mm-hmm, yes.
24      Q. So there's nothing in that
25 statement that you believe, based on your

Page 160

1    A. Henderson
2 experience, would alert a non-Cayman Islands
3 expert to the fact that the winding up
4 proceeding involved a solvent entity, correct?
5       A. Yes. True.
6       Q. Fair? Okay. Let's do the same
7 thing now with Mr. Cowan's declaration. You
8 know, before we do that, let's just finish
9 this up. Going back to 35 of your
10 declaration.
11      A. Okay.
12      Q. Do you still take -- having
13 reviewed Mr. Robinson's declaration and having
14 discussed the provisions that you've
15 identified, do you still take strong exception
16 to Ms. Pearson's view that Mr. Robinson did
17 not provide the New York court with a fair
18 representation of the nature of a supervised
19 solvent winding up?
20      A. Well, I take her -- I take her view
21 to be essentially that Messrs. Cowan and
22 Robinson deliberately or intentionally
23 misrepresented the nature of the proceeding to
24 the New York court. I just don't see that to
25 be the case.



Page 161

1    A. Henderson
2    Q.  Okay.  And if you take out the
3 pejorative language that you have used,
4 deliberately or intentionally, do you take
5 issue with -- let me ask you this question.
6    Do you believe, having reviewed
7 Mr. Robinson's declaration, that it fairly
8 represented to the New York court the nature
9 of the supervised solvent winding up
10 proceeding that's occurring in the Cayman
11 Islands?
12    A.  I believe that it made no
13 misrepresentation of the situation.
14    Q.  I appreciate that.
15    A.  It could have gone farther, in
16 terms of describing the process.  I don't know
17 if the New York court wants that sort of thing
18 or not.  But I do not believe that it
19 misrepresented the situation.
20    Q.  Do you believe it fairly
21 represented the nature of a supervised solvent
22 winding up?
23    A.  It fairly represented the nature of
24 the winding up.
25    Q.  Thank you.  And I am going to ask

Page 162

1    A. Henderson
2 you just to listen carefully to my question.
3 Because it included the word "solvent."
4    Having reviewed -- let me ask the
5 question.
6    Having reviewed Mr. Robinson's
7 declaration, do you, as a former judge and an
8 expert in Cayman Islands law, have the opinion
9 that Mr. Robinson fairly represented to the
10 New York court the nature of a supervised
11 solvent winding up?
12    A.  Well, he doesn't say a lot about
13 the solvent aspect.  But I think that his
14 affidavit is fair.  It's not misleading.
15    Q.  Okay.  Let's go to Mr. Cowan's
16 declaration.
17    A.  Yes.
18    Q.  And why don't you take the time
19 that you need to review it and identify any
20 statement or disclosure in that declaration
21 that you believe contains a fair
22 representation of the nature of a supervised
23 solvent winding up?
24    A.  Well, his declaration is much
25 shorter.  It's really supplementary to what

Page 163

1    A. Henderson
2 Mr. Robinson has said, I guess.
3    (The witness complied.)
4    A.  Well, on my reading of Mr. Cowan's
5 declaration he doesn't really address the
6 distinction between solvent and insolvent
7 entities.  He doesn't address it.
8    Q.  So is it fair to say that having
9 reviewed the declaration you didn't see
10 anything in Mr. Cowan's declaration that
11 alerted you to the fact that the Cayman
12 proceeding was one involving a solvent entity,
13 correct?
14    A.  There was nothing in Mr. Cowan's
15 declaration.  There was something in
16 Mr. Robinson's declaration that alerted me to
17 that.
18    Q.  And what is that?  Because I'm
19 happy to go back there.
20    A.  Yeah, it was his assertion that
21 there were some $200 million in assets.
22    Q.  Right.  That's the paragraph 17 and
23 18 that you referred to in your declaration,
24 in paragraph 36?
25    A.  I referred to it in my declaration.

Page 164

1    A. Henderson
2    Q.  Yes.  Anything else?
3    A.  Well, you weigh that against what
4 he said in paragraph -- his paragraph 18,
5 "Ascentra's main liabilities as of December
6 31, 2021, which is a year later, include the
7 costs incurred by the liquidators," which I
8 know from experience would be probably in the
9 seven figures by then.  "And certain ordinary
10 course operating expenses for storage and
11 maintenance of Ascentra's information," which
12 is going to be -- certainly not going to be
13 anything approaching $200 million.
14    Q.  And what does the last sentence of
15 paragraph 18 say?
16    A.  Paragraph 18?
17    Q.  Mm-hmm.
18    A.  Yeah, "may have other contingent
19 liabilities that my team and are I
20 investigating."
21    Q.  And do you have any idea where that
22 investigation lies today?
23    A.  No.
24    Q.  Do you have any idea what
25 contingent liabilities he referred to there?



Page 165

1          A. Henderson
2     A.  No.  It appears to be a sort of
3  throwaway line.  I mean, in any liquidation in
4  the early stages there may be contingent
5  liabilities that the JOLs don't know about.
6  Which is a sort of a statement of the obvious.
7     Q.  This may be my last question.
8        You said I think you reviewed
9  portions of Ms. Pearson's deposition
10  transcript, do I have that right?
11     A.  Yes.
12     Q.  Is there anything about that
13  transcript that alters any of the opinions
14  that are set forth in your declaration?
15     A.  No.  I mean, Ms. Pearson and I are
16  in agreement on a lot of things.  But I still
17  disagree with her view that there are two
18  separate and distinct types of proceedings.
19  One for solvent entities and one for insolvent
20  entities.  I think that's -- to my mind that's
21  a mischaracterization of the process.
22     Q.  Would it be fair to say that even
23  though they're both winding up proceedings,
24  there are certain rules that are different
25  depending on whether the entity that's subject

Page 166

1          A. Henderson
2  to the winding up proceeding is solvent versus
3  insolvent or doubtfully insolvent?
4        MR. McDONALD:  Objection to the
5     form.
6     A.  Yes, there are differences in the
7  rules.  Just as there would be between a
8  murder case and a rape case.
9     Q.  Right.
10        Is there anything else that you
11  recall having an opinion on with respect to
12  Ms. Pearson's deposition transcript?
13     A.  She doesn't put much emphasis on
14  the supervisory nature of the process.
15     Q.  Okay.  Anything else?
16     A.  Nothing that I recall right now.
17        MR. MORRIS:  Let's just take a very
18     short break.  Let me speak to my boss
19     here and see if I have anything left.
20        MR. McDONALD:  Okay.
21        THE WITNESS:  And I'm still not
22     permitted to speak to counsel?
23        MR. MORRIS:  Correct.  You're still
24     under oath.
25     (Recess from 1:36 to 1:44 p.m.)

Page 167

1          A. Henderson
2  BY MR. MORRIS:
3     Q.  Mr. Henderson, during the break did
4  you think of anything that you wanted to share
5  with me in the form of amending, modifying,
6  changing or supplementing any testimony you've
7  given today?
8     A.  Well, I could supplement one thing.
9     Q.  Okay.
10     A.  I refreshed my memory on Section 96
11  of the Act.
12     Q.  Okay.  Let me grab it.  Hold on one
13  second.
14     A.  I'll wait.
15     Q.  Okay.  What page is it?  Do you
16  have that?
17     A.  Page 78 of the Act.
18     Q.  Got it.
19     A.  Section 96.  This is an example of
20  something that either a creditor or a
21  contributory may ask for without regard to
22  whether the entity is thought to be solvent or
23  insolvent.  They may, either a credit or a
24  contributory may apply to the court for a stay
25  of proceedings.

Page 168

1          A. Henderson
2     Q.  And that rule only applies for the
3  interim period between the time the winding up
4  petition is presented and the time that the
5  winding up order is entered, is that fair?
6     A.  That is correct as a practical
7  matter.  And then in section 97 --
8     Q.  Before we go on, and is it fair to
9  say that under Cayman Islands law the decision
10  as to whether or not the entity is solvent,
11  insolvent or of doubtful solvency is going to
12  be made only after the winding up order is
13  entered?
14     A.  Well, the liquidator generally
15  tries to come to a decision as soon as
16  possible.
17     Q.  I appreciate that.  But is he going
18  to enter his decision, is he going to --
19     A.  His formal certificate?
20     Q.  Is he going to file his certificate
21  even before --
22        MR. MORRIS:  Withdrawn.  Let me ask
23     you this.
24     Q.  What is a winding up order?
25     A.  Well, it appoints -- it's an order



Page 169

1     A. Henderson
2  that appoints one or more persons and empowers
3  them with various rights and certain
4  obligations for the purpose of liquidating the
5  assets of the company, distributing the
6  results appropriately, and ultimately
7  dissolving the company.
8     Q.  So the winding up order is the
9  order of the Cayman Islands court that
10 appoints the official liquidator, or maybe the
11 provisional liquidator, is that fair?  And
12 sets forth the liquidators scope of duties?
13    A.  An order appointing a provisional
14 liquidator would not be a winding up order.
15    Q.  Okay.  Then I want to make sure I
16 get this right.
17    A.  Because they're just there to hold
18 the line.
19    Q.  Okay.  But a winding up order then
20 would be the order pursuant to which the
21 official liquidators are appointed and the
22 order would set forth the official
23 liquidators' duties and responsibilities,
24 correct?
25    A.  Yes.

Page 170

1     A. Henderson
2     Q.  And so a liquidator is not going to
3  file his solvency certificate until he or she
4  has been appointed, is that fair?
5     A.  I think in many cases that's true.
6  The Court may ask -- the Court probably would
7  ask at the outset, is this a solvent or an
8  insolvent entity that we're dealing with.
9     Q.  Okay.  But the credit --
10    A.  But the certificate would most
11 likely come later.
12    Q.  And the creditor's rights under
13 section 96 terminate upon the entry of a
14 winding up order, correct?
15    A.  Yes, that is correct.
16    Q.  Okay.  So now let's go on to the
17 next provision.
18    A.  Well, the other one is Section 97.
19 Once the winding up order has been made,
20 there's the automatic stay.
21    Q.  And that applies --
22    A.  That applies whether the entity's
23 solvent or insolvent.
24    Q.  Okay.  Is there anything else that
25 you reviewed or want to share with me before

Page 171

1     A. Henderson
2  we close the record --
3     A.  No, there's nothing else I
4  reviewed.
5     Q.  And do you have any other thoughts
6  that you want to share in order to modify,
7  expand, change?
8     A.  No.  I think it's all on the
9  record.
10    MR. MORRIS:  Excellent.  I have no
11    further questions.
12    MR. McDONALD:  Give me a moment,
13    John?
14    MR. MORRIS:  Sure.
15    MR. McDONALD:  Thank you.  I just
16    need to ask a clarifying question about
17    his report.
18 EXAMINATION BY
19 MR. McDONALD:
20    Q.  Can you open up exhibit 1 to your
21 report, please?
22    MR. MORRIS:  Give me one second.
23    Q.  And if you could turn to paragraph
24 31?
25    A.  Thirty-one?

Page 172

1     A. Henderson
2     Q.  Yes, of your declaration.
3     A.  Okay.
4     Q.  What do you understand the term
5  "pari passu" to mean?
6     A.  Well, in this context, I'm not
7  giving a literal interpretation, but in this
8  context it means paying out the creditors a
9  proportion -- the proportion that their debt
10 bears to the total debt, that dictates the
11 proportion of the amount for distribution that
12 they will receive.  Did I confuse that?
13    Q.  Slightly.  Because you say later
14 on, "if the liquidator expects the liquidation
15 to prove solvent, they will pay 100 cents on
16 the dollar."  Do you see that where you said
17 that?
18    A.  Yes.
19    Q.  So would the creditor be paid in
20 proportion to the total amount of debt if it
21 receives 100 cents?
22    MR. MORRIS:  Objection to the form
23    of the question.
24    A.  No.  This sentence that mentions
25 creditors receiving 100 cents on the dollar



**Page 173**

1    A. Henderson
2 refers to payments that are made in the
3 so-called ordinary course.  Ordinary course of
4 business.
5    Q.  But if a creditor receives 100
6 cents --
7    A.  Yeah.  On the dollar, yeah?
8    Q.  -- it has received its equal and
9 ratable share of --
10    MR. MORRIS:  Objection to the form
11    of the question.
12    A.  It ceases to become a creditor at
13 that point, too.  Yeah.  Yes, it's
14 received its -- it's received all of its debt.
15 It's been paid.  It's no longer a creditor.
16    Q.  After satisfaction of the claim?
17    A.  Yeah.  Once it's been paid, it's no
18 longer a creditor.  Are we at cross purposes?
19    Q.  No.
20    MR. McDONALD:  I have no further
21    questions.  I just wanted to clarify
22    that.
23    MR. MORRIS:  I have nothing
24    further.  That's fine.
25    THE WITNESS:  Thank you.

**Page 174**

1    A. Henderson
2    THE COURT REPORTER:  Counsel,
3    you'll read and sign?
4    MR. McDONALD:  Yes.
5    ---
6    (Time noted:  1:52 p.m. EDT)
7
8    _____
9    ALEXANDER GRAY HENDERSON
10
11 Sworn and subscribed to before
12 me this _____day
13 of _____, 2023,
14 in the jurisdiction aforesaid.
15
16 _____
17    NOTARY PUBLIC
18
19
20
21
22
23
24
25

**Page 175**

2    C E R T I F I C A T E
3 STATE OF NEW YORK    )
4 COUNTY OF NEW YORK   )
5    I, FRANK J. BAS, a Certified
6 Shorthand Reporter and Notary Public within
7 and for the State of New York, do hereby
8 certify:
9    That the witness whose testimony is
10 hereinbefore set forth, was duly sworn by me
11 and that such testimony given by the witness
12 was taken down stenographically by me and then
13 transcribed.
14    I further certify that I am not
15 related by blood or marriage to any of the
16 parties in this matter and that I am in no way
17 interested in the outcome of this matter.
18    That any copy of this transcript
19 obtained from a source other than the court
20 reporting firm, including from co-counsel, is
21 uncertified and may not be used at trial.
22    IN WITNESS WHEREOF, I have hereunto
23 set my hand this 28th day of September 2023.
24    _Frank Bas_
25    FRANK J. BAS, RPR, CRR

**Page 176**

1 --------------- I N D E X ----------------
2 WITNESS           EXAMINATION BY         PAGE
3 ALEXANDER HENDERSON  MR. MORRIS            5
                      MR. McDONALD         171
4
5 --------------- EXHIBITS------------------
(Exhibits retained by the court reporter.)
6
DEPOSITION                              PAGE
7
  Henderson Exhibit 1, Declaration of     18
8   Mr. Henderson
9 Henderson Exhibit 2, Companies           24
    Act
10
  Henderson Exhibit 3, Companies Winding Up  24
11  Rules
12 Henderson Exhibit 4, CWR Form 15        64
13 Henderson Exhibit 5, CWR Form Number 13  68
14 Henderson Exhibit 6, Declaration of     97
    Mr. Robinson
15
  Henderson Exhibit 7, Declaration of    100
16  Mr. Cowan
17
18
19
20
21
22
23
24
25



Page 177

1   DEPOSITION ERRATA SHEET
2   Assignment No. J10291184
3   Case Caption: In re Ascentra Holdings, Inc. (In
4   Foreign Liquidation)
5       DECLARATION UNDER PENALTY OF PERJURY
6       I declare under penalty of perjury that I have
7   read the entire transcript of my deposition taken in
8   the above-captioned matter or the same has been read
9   to me, and the same is true and accurate, save and
10  except for changes and/or corrections, if any, as
11  indicated by me on the DEPOSITION ERRATA SHEET
12  hereof, with the understanding that I offer these
13  changes as if still under oath.
14      Signed on the _____ day of _____
15  20___.
16
        _____
        ALEXANDER GRAY HENDERSON
17
18
19      Subscribed and sworn to on the ____ day of
20  _____ 20 ____ before me.
21
22  _____
23  Notary Public, in and for the State of
24  _____.
25

Page 179

1   DEPOSITION ERRATA PAGE
2   Page No.____ Line No. _____ Change to:_____
3   _____
4   Reason for change: _____
5   Page No.____ Line No. _____ Change to:_____
6   _____
7   Reason for change:_____
8   Page No.____ Line No. _____ Change to:_____
9   _____
10  Reason for change:_____
11  Page No.____ Line No. _____ Change to:_____
12  _____
13  Reason for change:_____
14  Page No.____ Line No. _____ Change to:_____
15  _____
16  Reason for change:_____
17  Page No.____ Line No. _____ Change to:_____
18  _____
19  Reason for change:_____
20  Page No.____ Line No. _____ Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25          ALEXANDER GRAY HENDERSON

Page 178

1   DEPOSITION ERRATA PAGE
2   Page No.____ Line No. _____ Change to:_____
3   _____
4   Reason for change:_____
5   Page No.____ Line No. _____ Change to:_____
6   _____
7   Reason for change:_____
8   Page No.____ Line No. _____ Change to:_____
9   _____
10  Reason for change:_____
11  Page No.____ Line No. _____ Change to:_____
12  _____
13  Reason for change:_____
14  Page No.____ Line No. _____ Change to:_____
15  _____
16  Reason for change:_____
17  Page No.____ Line No. _____ Change to:_____
18  _____
19  Reason for change:_____
20  Page No.____ Line No. _____ Change to:_____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24          ALEXANDER GRAY HENDERSON
25



```
 1                    A. Henderson
 2           THE COURT REPORTER:  Counsel,
 3       you'll read and sign?
 4           MR. McDONALD:  Yes.
 5                    ---
 6       (Time noted:  1:52 p.m. EDT)
 7
 8                    a. G. Henderson
 9              ALEXANDER GRAY HENDERSON
10
11   Sworn and subscribed to before
12   me this    4    day
13   of  October            , 2023,
14   in the jurisdiction aforesaid.
15
16   _____
17        NOTARY PUBLIC
18
19
20
21
22
23
24
25
```

**Len de Vries**
Notary Public in and for the Cayman Islands
My commission expires on January 31st, 20 24



```
 1
 2              C E R T I F I C A T E
 3    STATE OF NEW YORK        )
 4    COUNTY OF NEW YORK       )
 5              I, FRANK J. BAS, a Certified
 6    Shorthand Reporter and Notary Public within
 7    and for the State of New York, do hereby
 8    certify:
 9              That the witness whose testimony is
10    hereinbefore set forth, was duly sworn by me
11    and that such testimony given by the witness
12    was taken down stenographically by me and then
13    transcribed.
14              I further certify that I am not
15    related by blood or marriage to any of the
16    parties in this matter and that I am in no way
17    interested in the outcome of this matter.
18              That any copy of this transcript
19    obtained from a source other than the court
20    reporting firm, including from co-counsel, is
21    uncertified and may not be used at trial.
22              IN WITNESS WHEREOF, I have hereunto
23    set my hand this 28th day of September 2023.
24
25              FRANK J. BAS, RPR, CRR
```



1        ---------------- I N D E X ------------------
2     WITNESS                  EXAMINATION BY          PAGE
3     ALEXANDER HENDERSON   MR. MORRIS                  5
                            MR. McDONALD              171
4
5        ---------------- EXHIBITS-------------------
      (Exhibits retained by the court reporter.)
6
      DEPOSITION                                  PAGE
7
       Henderson Exhibit 1, Declaration of          18
8      Mr. Henderson
9      Henderson Exhibit 2, Companies               24
       Act
10
       Henderson Exhibit 3, Companies Winding Up    24
11     Rules
12     Henderson Exhibit 4, CWR Form 15             64
13     Henderson Exhibit 5, CWR Form Number 13      68
14     Henderson Exhibit 6, Declaration of          97
       Mr. Robinson
15
       Henderson Exhibit 7, Declaration of         100
16     Mr. Cowan
17

18

19

20

21

22

23

24

25



```
1              DEPOSITION ERRATA SHEET
2    Assignment No. J10291184
3    Case Caption: In re Ascentra Holdings, Inc. (In
4    Foreign Liquidation)
5          DECLARATION UNDER PENALTY OF PERJURY
6       I declare under penalty of perjury that I have
7    read the entire transcript of my deposition taken in
8    the above-captioned matter or the same has been read
9    to me, and the same is true and accurate, save and
10   except for changes and/or corrections, if any, as
11   indicated by me on the DEPOSITION ERRATA SHEET
12   hereof, with the understanding that I offer these
13   changes as if still under oath.
14          Signed on the   4th   day of   October
15   20 23 .
16          A.G. Henderson
            ALEXANDER GRAY HENDERSON
17
18
19          Subscribed and sworn to on the   4   day of
20   October   20 23   before me.
21
22          _____
23   Notary Public, in and for the State of
24   Cayman Islands           .
25   Len de Vries
     Notary Public in and for the Cayman Islands
     My commission expires on January 31st, 20 24
```



```
 1   DEPOSITION ERRATA PAGE
 2   Page No. 39  Line No. 19  Change to: delete " 's "
 3   _____
 4   Reason for change: ____grammar_____
 5   Page No. 40  Line No. 3  Change to: "was" to "is"
 6   _____
 7   Reason for change: ____accuracy_____
 8   Page No. 43  Line No. 11  Change to: "Court" to "company"
 9   _____
10   Reason for change: ____accuracy_____
11   Page No. 52  Line No. 22  Change to: delete "they"
12   _____
13   Reason for change: ____grammar_____
14   Page No. 75  Line No. 19  Change to: "is" to "was"
15   _____
16   Reason for change: ____accuracy_____
17   Page No. 91  Line No. 17  Change to: insert comma
18   _____
19   Reason for change: ____grammar_____
20   Page No. 94  Line No. 2  Change to: "ly" to "my"
21   _____
22   Reason for change: ____typo_____
23   SIGNATURE: A. G. Henderson     DATE: Oct. 4/23
24              ALEXANDER GRAY HENDERSON
25
```



```
DEPOSITION ERRATA PAGE
Page No. 120 Line No. 4 Change to: rateable

_____

Reason for change: spelling
Page No. 125 Line No. 17 Change to: rateably

_____

Reason for change: spelling
Page No. 173 Line No. 9 Change to: rateable

_____

Reason for change: spelling
Page No.____ Line No. ____ Change to:_____

_____

Reason for change:_____
Page No.____ Line No. ____ Change to:_____

_____

Reason for change:_____
Page No.____ Line No. ____ Change to:_____

_____

Reason for change:_____
Page No.____ Line No. ____ Change to:_____

_____

Reason for change:_____
Page No.____ Line No. ____ Change to:_____

_____

Reason for change:_____

SIGNATURE: A.G. Henderson    DATE: Oct. 4/23
            ALEXANDER GRAY HENDERSON
```



# EXHIBIT 4

## IN THE COURT OF APPEAL OF THE REPUBLIC OF SINGAPORE

## [2023] SGCA 32

Court of Appeal / Civil Appeal No 23 of 2022

Between

(1) Ascentra Holdings, Inc (in official liquidation)
(2) Chua Suk Lin Ivy
(3) Graham Robinson

… *Appellants*

And

SPGK Pte Ltd

… *Respondent*

In the matter of Originating Summons No 16 of 2022

Between

(1) Ascentra Holdings, Inc (In Official Liquidation)
(2) Graham Robinson
(3) Chua Suk Lin Ivy

… *Applicants*

And

SPGK Pte Ltd

… *Non-party*

# JUDGMENT

[Insolvency Law — Cross-border insolvency — Recognition of foreign insolvency proceedings — Recognition of foreign solvent liquidation proceedings]

This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.

## Ascentra Holdings, Inc (in official liquidation) and others
### v
## SPGK Pte Ltd

**[2023] SGCA 32**

Court of Appeal — Civil Appeal No 23 of 2022
Sundaresh Menon CJ, Steven Chong JCA and Belinda Ang Saw Ean JCA
3 August 2023

18 October 2023                                   Judgment reserved.

**Sundaresh Menon CJ (delivering the judgment of the court):**

**Introduction**

1       This appeal arises from the decision of a High Court judge (the "Judge") in HC/OS 16/2022 ("OS 16"), which considered whether a voluntary liquidation qualified as a "foreign proceeding" within the meaning of Art 2(*h*) of the Third Schedule to the Insolvency, Restructuring and Dissolution Act 2018 (2020 Rev Ed) (the "IRDA"). The Third Schedule of the IRDA sets out Singapore's adapted enactment of the Model Law on Cross-Border Insolvency, that was developed by the United Nations Commission on International Trade Law (the "UNCITRAL Model Law"). For convenience, we refer to Singapore's adaptation of the UNCITRAL Model Law as the "SG Model Law".

2       The present appeal raises the important question of whether the SG Model Law encompasses within its ambit foreign insolvency, restructuring or

liquidation proceedings concerning solvent companies. This question must be determined having regard to a range of considerations, including: (a) any modifications which Parliament made to the UNCITRAL Model Law when enacting it as the SG Model Law, and Parliament's intent in making any such modifications; (b) the approaches adopted by courts in other jurisdictions when interpreting the UNCITRAL Model Law or the corresponding provisions in those jurisdictions; and (c) the broader practical implications that would follow if we were to decide that proceedings involving solvent companies do fall within the scope of the SG Model Law.

**Facts**

***The parties***

3        We begin by recounting the facts. The first appellant is Ascentra Holdings, Inc (in official liquidation) ("Ascentra"). Prior to its liquidation, Ascentra was in the business of selling health and beauty products as well as computer communications software in Hong Kong, Taiwan and Singapore (*Re Ascentra Holdings, Inc (in official liquidation) and others (SPGK Pte Ltd, non-party)* [2023] SGHC 82 ("GD") at [5]).

4        The second and third appellants are Ms Chua Suk Lin Ivy ("Ms Chua") and Mr Graham Robinson ("Mr Robinson") respectively. They are the joint official liquidators of Ascentra appointed by the Grand Court of the Cayman Islands (the "Cayman Grand Court") and we refer to them collectively as the "Liquidators" (GD at [6]).

5        The respondent is SPGK Pte Ltd, a company incorporated in Singapore, and a wholly-owned subsidiary of Shang Peng Gao Ke, Inc ("SPGK Cayman"), a company incorporated in the Cayman Islands. The appellants maintain that

Ascentra has potential claims against the respondent, SPGK Cayman as well as another company incorporated in Singapore, Scuderia Bianco Pte Ltd ("Scuderia Bianco") (GD at [8]). In particular, it is alleged that SPGK Cayman owes certain sums of money to Ascentra, some of which is held by the respondent and Scuderia Bianco.

### Background to the dispute

*Ascentra's liquidation*

6       Ascentra's ultimate beneficial shareholders are seven natural persons. From sometime in 2018, a number of disputes arose between these shareholders over the strategic direction of Ascentra's business (GD at [10]–[11]). On 1 June 2021, Ascentra's shareholders resolved to place it in voluntary liquidation and to appoint Mr Robinson as the "voluntary liquidator". On 2 June 2021, Ascentra filed with the Cayman Islands Registrar of Companies, the documents that were required under the Companies Act (2021 Revision) (Cayman Islands) (the "Cayman Act") to initiate its voluntary liquidation. Ascentra's voluntary liquidation is deemed to have commenced on 2 June 2021.

7       Pursuant to s 124(1) of the Cayman Act and O 15 r 1 of the Cayman Islands Companies Winding Up Rules 2018 (the "Cayman CWR"), Ascentra's directors were required to file a declaration of solvency no later than 28 days after the voluntary liquidation had commenced (that is, by 30 June 2021), failing which the liquidator was required to apply to the Cayman Grand Court for an order that the voluntary liquidation continue under the supervision of the court. As Ascentra's directors failed to file the declaration for undisclosed reasons, Mr Robinson duly presented a petition to the Cayman Grand Court on 2 July 2021 for the liquidation to proceed under court supervision (GD at [12]–[13]).

8       On 17 September 2021, the Cayman Grand Court allowed
Mr Robinson's petition and ordered, among other things, that:

(a)     the liquidation of Ascentra be continued under the supervision
        of the Cayman Grand Court pursuant to s 124 of the Cayman Act
        (the "Supervision Order"); and

(b)     Mr Robinson and Ms Chua be appointed as the joint official
        liquidators of Ascentra.

*Ascentra's solvency*

9       On 23 September 2021, the Liquidators filed a certificate in the Cayman
Grand Court as to Ascentra's solvency in the following terms:

> **JOINT OFFICIAL LIQUIDATORS' CERTIFICATE**
>
> Ascentra Holdings, Inc – In Official Liquidation (the
> "Company")
>
> …
>
> TAKE NOTICE that the Joint Official Liquidators hereby certify
> that they have determined that the above-named Company
> should be treated as **solvent**, for the purposes of section 110(4)
> of the [Cayman Act] and [Cayman CWR] Orders 8 and 9.
>
> AND FURTHER TAKE NOTICE that the Joint Official
> Liquidators may change their determination from time to time
> in the light of changes of relevant circumstances and/or their
> assessment of the Company's financial position.
>
> [emphasis in original]

10      On 14 October 2021, in a letter addressed to Ascentra's shareholders,
Mr Robinson similarly stated that the Liquidators had determined that Ascentra
was solvent.

*The application in OS 16*

11      On 6 January 2022, the appellants filed OS 16 pursuant to Art 15 of the SG Model Law, seeking the following orders (GD at [15]):

> (a)     an order recognising Ascentra's liquidation in the Cayman Islands ("Ascentra's Cayman Liquidation") in Singapore and, by our courts, as a "foreign main proceeding" within the meaning of Art 2(*f*) of the SG Model Law;
>
> (b)     an order recognising the Liquidators as "foreign representatives" of Ascentra within the meaning of Art 2(*i*) of the SG Model Law; and
>
> (c)     an order granting the Liquidators such powers in relation to Ascentra's property and assets "as are available to a liquidator under Singapore insolvency law".

It is evident that the Liquidators seek these powers with a view to pursuing possible claims against the respondent and/or Scuderia Bianco. The Liquidators' application is resisted by the respondent (GD at [7]–[9]).

**The decision below**

12      The Judge considered that the only issue arising in OS 16 was whether Ascentra's Cayman Liquidation had its basis in a law relating to insolvency within the meaning of Art 2(*h*) of the SG Model Law. The Judge held that Art 2(*h*) of the SG Model Law had to be interpreted purposively pursuant to s 9A of the Interpretation Act 1965 (2020 Rev Ed) (the "IA"), and applying the approach to interpretation that was formulated in *Tan Cheng Bock v Attorney-General* [2017] 2 SLR 850 ("*Tan Cheng Bock*") at [37] (the "Purposive Approach"). Specifically, the Judge took the view that the critical words within

Art 2(*h*) of the SG Model Law that he had to interpret were "law relating to insolvency": see GD at [24] and [28].

13    For convenience, we set out Art 2(*h*) of the SG Model Law here:

> **Article 2. Definitions**
>
> For the purposes of this Law —
>
> ...
>
> (*h*) "foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation;

14    The Judge first *separately* interpreted the words "insolvency", "law" and "relating to" and proceeded in the following manner:

> (a)    The proper characterisation of a "foreign proceeding" under Art 2(*h*) of the Model Law would take into account the law of the foreign state. However, there was no material difference between the concept of insolvency under Cayman law as opposed to Singapore law, given the similarity in the language of s 125(2)(*c*) of the IRDA and its analogue, s 93(c) of the Cayman Act. In any event, as the test for insolvency under Cayman law had not been proved, it was presumed that the test for insolvency under Cayman law was the same as that under Singapore law. Accordingly, "insolvency" for the purposes of Art 2(*h*) of the SG Model Law referred to a company's inability to pay debts which had already fallen due or which will fall due within the reasonably near future, following the position set out by this court in *Sun Electric Power Pte Ltd v RCMA Asia Pte Ltd (formerly known as Tong Teik Pte Ltd)* [2021] 2 SLR 478 at [56], [65] and [66] (GD at [45]–[52]).

6

(b)    For the purposes of Art 2(*h*) of the SG Model Law, "law" encompassed both legislation and judge-made law, and would include the Cayman Act (GD at [55]–[56]).

(c)    The appellants' submission that a law "relating to" insolvency is simply one that is contained within a statute that deals generally with the subject matter of insolvency was rejected. Such an approach subordinated substance to form as any type of proceeding, no matter how far removed that proceeding was from any connection to insolvency, would fall within the scope of Art 2(*h*) of the SG Model Law as long as it was commenced under a provision contained within a statute that also dealt generally with insolvency (GD at [58]–[63]).

15     The Judge then considered the phrase "under a law relating to insolvency" as a whole and held that the ordinary meaning of that phrase must refer to a body of rules, whether statutory or judge-made, which governs a company that is insolvent. This includes a company which apprehends becoming unable to pay its debts as they fall due in the reasonably near future, and therefore can be said to be in severe financial distress in the present (GD at [64]). The Judge further observed that such an interpretation was consistent with and confirmed by the underlying purpose of the UNCITRAL Model Law (GD at [72]–[79]), as well as the preparatory records and documents relating to the UNCITRAL Model Law such as: (a) various reports and papers of the UNCITRAL Working Group on Insolvency Law (the "Working Group"); (b) *Cross-Border Insolvency: Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency*, 30th Sess, UN Doc A/CN.9/442 (1997) (the "1997 Guide"); and (c) *UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation*, UN Sales No E.05.V.10 (2013) (the "2013 Guide") (GD at [81]–[99]).

16      As to the relevant case law, the Judge observed as follows:

(a)      The Court of Appeal in *United Securities Sdn Bhd (in receivership and liquidation) and another v United Overseas Bank Ltd* [2021] 2 SLR 950 ("*United Securities*") had implicitly affirmed in *obiter* that the relevant foreign law under Art 2(*h*) of the SG Model Law must be one which deals with or addresses insolvency or severe financial distress (GD at [107]).

(b)      Under the bankruptcy law of the United States (the "US"), chiefly as reflected in *Re Betcorp Limited (in liquidation)* 400 BR 266 (Nevada US Bankruptcy Court, 2009) ("*Re Betcorp*"), the requirement that a "foreign proceeding" be commenced under a law relating to insolvency or the adjustment of debts does not require the company to be either insolvent or contemplating the adjustment of debt (GD at [124]). In the absence of direct evidence as to what Parliament intended, it could not be said that by adopting the words "adjustment of debt" from Chapter 15 of the Bankruptcy Code 11 USC (US) (1978) (the "US Bankruptcy Code") in Art 2(*h*) of the SG Model Law, Parliament thereby intended to endorse the prevailing position under US bankruptcy law (GD at [116]–[117]). Moreover, the US approach has been criticised and should not be followed (GD at [132]–[142]). To the extent that the position under Australian law is similar to US bankruptcy law, it should likewise not be followed (GD at [153]–[159]).

(c)      It was held in the decision of the High Court of England and Wales in *Re Sturgeon Central Asia Balanced Fund Ltd (in liquidation) (No 2); Carter v Bailey and another (as foreign representatives of Sturgeon Central Asia Balanced Fund Ltd)* [2020] EWHC 123 (Ch)

("*Re Sturgeon*") that it would be contrary to the UNCITRAL Model Law's purpose and object to enlarge its scope by interpreting "foreign proceeding" as including proceedings concerning solvent companies and proceedings which may be expected to result in the payment of all creditors in full and produce a surplus for members. *Re Sturgeon* is not an outlier among English cases and should be followed in Singapore (GD at [130] and [143]–[152]).

17     The Judge accordingly held that Ascentra's Cayman Liquidation is not a "foreign proceeding" within the meaning of Art 2(*h*) of the SG Model Law, because the legislative "track" under which Ascentra's liquidation was commenced (that is, s 116(c), which provides that a company may be voluntarily wound up if the company so resolves by special resolution, read with s 124 of the Cayman Act) does not and cannot apply to a company that is insolvent or in severe financial distress (GD at [161] and [165]). The Judge also noted, in any event, that Ascentra is solvent.

**The parties' cases on appeal**

*The appellants' case*

18     In relation to the ordinary meaning of Art 2(*h*) of the SG Model Law, the appellants argue that the Judge erred in the approach he took in interpreting Art 2(*h*). By isolating the word "insolvency" and equating its meaning in Art 2(*h*) with that under s 125(2)(*c*) of the IRDA, he failed to appreciate that the collection of words "law relating to insolvency or adjustment of debt" is framed broadly and should therefore be interpreted broadly, such that while it would include laws dealing with various issues that arise in a situation where a company is or might be unable to pay its debts, it should not be *confined* to this.

19      Following from this, the appellants submit that the Judge took an unduly narrow approach by focusing on the specific provisions of the Cayman Act under which Ascentra's Cayman Liquidation is being conducted (which we will refer to, for convenience, as the "Narrow Approach"). Instead, the correct inquiry is whether Part V of the Cayman Act on "Winding up of Companies and Associations", which contains those specific provisions as well as other provisions that also cover insolvent companies, is, as a whole, a law relating to insolvency (we refer to this as the "Broad Approach"). The appellants contend that Part V of the Cayman Act (as a whole) is a law relating to insolvency because it contains all the provisions necessary to wind up any company in the Cayman Islands. The appellants thus submit that Ascentra's Cayman Liquidation, which was conducted pursuant to provisions contained in Part V of the Cayman Act, falls within the ambit of Art 2(*h*) of the SG Model Law and should therefore be recognised in Singapore as a foreign main proceeding.

20      Relatedly, the appellants submit that the SG Model Law and the extrinsic materials do not impose any requirement for an applicant company to be either insolvent or in severe financial distress for a proceeding involving that company to be regarded as taking place under a "law relating to insolvency" within the meaning of Art 2(*h*) of the SG Model Law. On the contrary, it is evident from the preparatory material surrounding the UNCITRAL Model Law that the words "law relating to insolvency" were not intended to confine the application of the recognition regime to insolvent or severely financially distressed companies. In oral submissions, counsel for the appellants, Mr Lee Eng Beng SC ("Mr Lee") also emphasised that the words "or adjustment of debt" were adopted from the US Bankruptcy Code into Art 2(*h*) of the SG Model Law and that this was done to allow the Singapore courts to recognise proceedings akin to those under Chapter 11 of the US Bankruptcy Code (these

being corporate reorganisations) which are not limited to insolvent companies. The appellants thus argue that the Judge erred in holding that Ascentra's Cayman Liquidation was not a "foreign proceeding" under Art 2(*h*) of the SG Model Law on account of Ascentra's apparent solvency.

21     The appellants further highlight that allowing the recognition of proceedings involving solvent companies is consistent with the weight of the authorities in the US, the United Kingdom ("UK") (with the exception of *Re Sturgeon*), Australia and New Zealand. In this regard, the appellants submit that *Re Sturgeon* should not be followed because: (a) it is an outlier even among English cases; (b) in any event, the English cases should be approached with some caution due to differences between the legislative regimes in the UK and Singapore; and (c) the position under US bankruptcy law should be preferred given that Parliament had adopted the definition of "foreign proceeding" in Art 2(*h*) of the SG Model Law from the US Bankruptcy Code and further, because the preponderance of authorities in various jurisdictions have adopted the US position.

22     In addition, the appellants also submit that the introduction of a requirement of insolvency or severe financial distress would introduce significant uncertainty and complexity into the recognition process and undermine the purpose of the SG Model Law. This is said to follow from the need that would then arise for our court to determine the precise requirements as to insolvency under a foreign law. Mr Lee also suggested in his oral submissions that the threshold for recognition should be a light one, given that the court retains the power to make the order subject to suitable terms, thus enabling the court to avoid any overreach.

**The respondent's case**

23      The respondent, on the other hand, submits that Ascentra's Cayman Liquidation does not satisfy the definitional requirements in Art 2(*h*) of the SG Model Law because it is not a proceeding under a law relating to insolvency, and also because its purpose is not to secure the liquidation of the company within the meaning of Art 2(*h*). To that end, counsel for the respondent, Mr Balakrishnan Ashok Kumar ("Mr Kumar"), makes the following submissions:

(a)      A "foreign proceeding" under Art 2(*h*) refers only to proceedings involving companies that are insolvent or in severe financial distress. This is confirmed by the context and purpose underlying the SG Model Law, as gleaned from the preamble of the SG Model Law as well as extrinsic material such as the 1997 Guide, the 2013 Guide and the corresponding working papers of the Working Group.

(b)      The *UNCITRAL Legislative Guide on Insolvency Law* (2004) (the "Legislative Guide") confirms that the UNCITRAL Model Law was intended to be limited to proceedings involving debtors that are unable to meet their debts as they fall due and hence to be confined to insolvent liquidations.

(c)      *Re Sturgeon* was correctly decided by the UK court and is not an outlier among English cases. Moreover, the principles that were applied in *Re Sturgeon* are aligned with the preparatory material pertaining to the UNCITRAL Model Law. The purported concerns over the difficulties which the recognising court would allegedly face in determining the financial status of the company concerned in the relevant foreign proceeding are unfounded, because the recognising

court would typically rely on the foreign court's assessment. In any case, it would be obvious in most cases when a company is solvent.

(d)      *Re Betcorp* should not be followed as it was wrongly decided and has been criticised. Moreover, in many of the cases where *Re Betcorp* was applied, the recognising court had nonetheless gone on to consider whether the company involved in the relevant foreign proceeding was insolvent or in financial distress. Indeed, even the US courts have acknowledged that the insolvency or financial distress of a company is a relevant consideration in determining whether recognition should be granted.

(e)      The approach suggested by the appellants would "open [the] floodgates for recognition and assistance applications", allow solvent companies to take advantage of the SG Model Law even where its purpose is not engaged, and create potentially absurd outcomes under the SG Model Law.

24      Mr Kumar accordingly contends that Ascentra's Cayman Liquidation, which is being conducted under a "track for solvent companies" and involves a company that has been solvent at all material times, cannot be regarded as a "foreign proceeding" within the meaning of Art 2(*h*) of the SG Model Law, and ought not to be recognised under the SG Model Law.

25      The respondent also submits in any event that the Singapore court does not have the requisite jurisdiction to hear and determine the application for recognition of Ascentra's Cayman Liquidation pursuant to Art 4(2)(*a*)(ii) of the SG Model Law, because Ascentra allegedly has no property in Singapore. Finally, the respondent argues that even if Ascentra's Cayman Liquidation was

to be recognised under the SG Model Law, the discretionary reliefs sought by the appellants ought not be granted, or in any event, any order made by the court should be circumscribed by the imposition of suitable conditions.

**General principles and issues to be determined**

26      To situate the specific issues arising for our consideration in the proper context, it is apposite to first set out the relevant provisions of the SG Model Law governing the recognition of foreign proceedings in Singapore.

27      Pursuant to Art 15(1) of the SG Model Law, a foreign representative may apply to the court for recognition of the foreign proceeding in which the foreign representative has been appointed. Article 17(1) of the SG Model Law further stipulates circumstances in which a foreign proceeding must be recognised:

> **Article 17. Decision to recognise a foreign proceeding**
>
> 1. Subject to Article 6, a proceeding must be recognised if —
>
>> (*a*) it is a foreign proceeding within the meaning of Article 2(*h*);
>>
>> (*b*) the person or body applying for recognition is a foreign representative within the meaning of Article 2(*i*);
>>
>> (*c*) the application meets the requirements of Article 15(2) and (3); and
>>
>> (*d*) the application has been submitted to the Court mentioned in Article 4.

28      We set out again Art 2(*h*) of the SG Model Law, which defines a "foreign proceeding" in the following terms:

> **Article 2. Definitions**
>
> For the purposes of this Law —
>
> …

> (*h*) "foreign proceeding" means a collective judicial or
> administrative proceeding in a foreign State, including an
> interim proceeding, under a law relating to insolvency or
> adjustment of debt in which proceeding the property and affairs
> of the debtor are subject to control or supervision by a foreign
> court, for the purpose of reorganisation or liquidation;

29     It seems to us that Art 2(*h*) of the SG Model Law prescribes at least five different and cumulative requirements for a proceeding to qualify as a "foreign proceeding" (see also *United Securities* at [53]):

(a)     First, that proceeding must be collective in nature.

(b)     Second, that proceeding must be a judicial or administrative proceeding in a foreign State.

(c)     Third, that proceeding must be conducted under a law relating to insolvency or adjustment of debt.

(d)     Fourth, the property and affairs of the debtor company must be subject to control or supervision by a foreign court in that proceeding.

(e)     Fifth, that proceeding must be for the purpose of reorganisation or liquidation.

While the Judge proceeded on the basis that only the third requirement was in issue, the respondent takes the position before us that the first and fifth requirements are also unsatisfied.

30     Finally, pursuant to Art 4(2)(*a*)(ii) of the SG Model Law, the General Division of the High Court in Singapore will have jurisdiction to recognise foreign proceedings under Art 17(1) if the company in question has property situated in Singapore.

31     In the light of the parties' submissions and the foregoing statutory provisions, the following issues arise for our consideration:

(a)     whether Ascentra's Cayman Liquidation is being conducted "under a law relating to insolvency or adjustment of debt" under Art 2(*h*) of the SG Model Law;

(b)     whether Ascentra's Cayman Liquidation is a collective proceeding under Art 2(*h*) of the SG Model Law;

(c)     whether Ascentra's Cayman Liquidation is being conducted "for the purpose of liquidation or reorganisation" under Art 2(*h*) of the SG Model Law; and

(d)     whether the Singapore courts have jurisdiction to recognise Ascentra's Cayman Liquidation under Art 4(2)(*a*)(ii) of the SG Model Law.

**Whether Ascentra's Cayman Liquidation is being conducted under a law relating to insolvency or adjustment of debt**

32     Before we set out our analysis on the first issue, we make two preliminary observations on the approach taken by the Judge towards interpreting Art 2(*h*) of the SG Model Law. First, we note that the Judge focused on the interpretation of the words "under a law relating to insolvency", and largely excluded consideration of the words "adjustment of debt". With respect, we disagree with this approach. For reasons we explain in greater detail below, we are satisfied that the inclusion of the words "or adjustment of debt" in Art 2(*h*) sheds significant light on Parliament's intention with regard to the ambit of Art 2(*h*) at least in the context of the SG Model Law. The phrase "under a law relating to insolvency or adjustment of debt" must therefore be interpreted as a collective whole.

33      Second, both the Judge and the parties dealt, in considerable detail, with the question of whether the Narrow Approach or Broad Approach should be adopted in Singapore, that is to say whether the phrase "law relating to insolvency" in Art 2(*h*) of the SG Model Law refers narrowly to the specific provision(s) under which the foreign proceeding is conducted or more broadly to the general statutory regime or part of the relevant legislation containing those specific provision(s) in addition to others. The key difference between the Narrow Approach and the Broad Approach is that with the latter, it will suffice that the relevant proceeding is conducted under a law which *contains* provisions relating to insolvency or adjustment of debt, even if the specific provisions governing the relevant proceeding do not deal with insolvency or adjustment of debt. Conversely, in the former, the specific provisions pursuant to which the relevant proceeding is being conducted must relate to insolvency or adjustment of debt.

34      In practical terms, the difference between the Broad Approach and the Narrow Approach may be reduced to a more fundamental inquiry: whether the Singapore Parliament intended that the words "under a law relating to insolvency or adjustment of debt" in Art 2(*h*) of the SG Model Law should be limited to laws that are applicable *only* to companies in insolvency or severe financial distress. The point is significant because there is nothing in either the UNCITRAL Model Law or the SG Model Law that expressly defines the recognition regime by reference to the solvency status of the company in question. Instead, the recognition regime is drafted in terms that accord recognition to foreign proceedings by reference to a number of defining characteristics of those proceedings, including the laws under which they are being conducted. If the narrow view were adopted, the consequence would be

to confine the recognition regime in Singapore to insolvent and/or severely financially distressed companies to the exclusion of solvent companies.

35     This seems somewhat counter-intuitive for two related reasons: first, if that was the intention, it would have been far easier and clearer to achieve that intention by making the solvency status of the company a necessary criterion; and second, the choice of the words "law relating to" seems deliberate and their purport is broad especially when seen in the light of the fact that in many legislative regimes, including ours, and that which applies in the Cayman Islands, laws relating to insolvency will frequently include or overlap with laws relating to the dissolution of companies that may not be insolvent.

36     In that light, we first summarise our conclusion on this issue. In our judgment, Art 2(*h*) of the SG Model Law should be interpreted broadly to include within its ambit foreign proceedings concerning companies that are neither insolvent nor in severe financial distress. We arrive at this conclusion for a number of reasons:

    (a)    First, it is evident from the ordinary meaning of the relevant provisions of the SG Model Law that there is no express requirement for a company to be insolvent or in severe financial distress for a proceeding concerning that company to be recognised as a foreign proceeding under the SG Model Law. This is made demonstrably clear by the inclusion of the words "or adjustment of debt" in Art 2(*h*) as well as the statutory presumption of insolvency in Art 31. Significantly, there is no reference at all in Art 2(*h*) to the solvency status of the company in question. In our judgment, one is driven to the conclusion that the solvency status of the company is not a relevant consideration both as a matter of the plain

interpretation of Art 2(*h*), as well as by the correct application of the Purposive Approach.

(b)      Second, even if we were to ignore the words "or adjustment of debt" in Art 2(*h*) and assume that Parliament had adopted the UNCITRAL Model Law in its original form, we are not satisfied that the drafters of the UNCITRAL Model Law intended to *exclude* solvent companies from the scope of the UNCITRAL Model Law for the purposes of recognition. The Judge considered that the Broad Approach would undermine the purpose of the UNCITRAL Model Law by bringing proceedings concerning solvent companies within its scope, and accordingly interpreted the phrase "under a law relating to insolvency" as referring to a body of rules which governs a company that is insolvent or in severe financial distress. On that basis, the Judge held that Ascentra's Cayman Liquidation was not a "foreign proceeding" within the meaning of Art 2(*h*) because the specific provisions under which it was commenced are not provisions that apply to companies that are either insolvent or in severe financial distress. Further, he considered that Ascentra is solvent, which was accepted by the Liquidators (GD at [16]–[19] and [161]–[168]). On the last point, although the appellants submitted in their Supplemental Case that Ascentra was *prima facie* insolvent when the Cayman Grand Court granted the Supervision Order, Mr Lee did not pursue this argument in oral submissions. Even accepting that Ascentra is solvent, it is not at all clear to us how *extending* the scope of Art 2(*h*) to cover proceedings involving solvent companies would undermine the purpose of the SG Model Law.

(c)      Third, we are satisfied that Art 2(*h*) should be interpreted in a way that is broadly harmonious with the approaches adopted in other jurisdictions. The weight of the authorities in other jurisdictions favours the interpretation we take, which would enable the recognition of proceedings concerning solvent companies as foreign main proceedings.

(d)      Fourth, the practical concerns that the respondent submits would arise from allowing the recognition of proceedings concerning solvent companies may be easily dealt with.

We elaborate on each of these points.

**Whether the scope of Art 2(h) extends to solvent companies**

*The ordinary meaning of Art 2(h)*

37      We begin our analysis with the ordinary meaning of Art 2(*h*) of the SG Model Law. At the outset, we reiterate that there is nothing in the SG Model Law, whether in Art 2(*h*) or elsewhere, which encompasses a specific requirement that a particular proceeding must involve a company that is insolvent or in severe financial distress to qualify as a "foreign proceeding" within the meaning of Art 2(*h*). On the contrary, Art 2(*h*) has been drafted broadly to refer to proceedings conducted under laws *relating to* insolvency or adjustment of debt (as opposed to, for instance, proceedings conducted under laws that are *applicable only to* companies that are insolvent or in severe financial distress).

38      Further, in considering the terms of Art 2(*h*) of the SG Model Law, it is relevant to consider the UNCITRAL publication, *UNCITRAL Model Law on Cross-Border Insolvency: The Judicial Perspective*, UN Sales No 23.V.I (2022) ("*The Judicial Perspective*"), which discusses the UNCITRAL Model Law

from a judge's perspective with the aim of providing general guidance on the issues that a judge might need to consider in a given case, based on the intentions of the drafters of the UNCITRAL Model Law and the experiences of those who have used it in practice (*The Judicial Perspective* at para 3). The authors of *The Judicial Perspective* expressly recognise that where States have amended the UNCITRAL Model Law to suit local circumstances, different approaches might be required if a judge concludes that the omission or modification of a particular article from the text as enacted necessitates such a course (*The Judicial Perspective* at para 1).

39     In ascertaining Parliament's intention with regard to the ambit of Art 2(*h*) of the SG Model Law, it is therefore imperative to note that the UNCITRAL Model Law was not adopted in Singapore without modification. In particular, Art 2(*a*) of the UNCITRAL Model Law, which corresponds to Art 2(*h*) of the SG Model Law, defines a "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, *pursuant to a law relating to insolvency* in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation" [emphasis added]. When Parliament adopted the UNCITRAL Model Law in the Third Schedule to the IRDA as the SG Model Law, it added the words "or adjustment of debt" to the definition of "foreign proceeding" in Art 2(*h*). What is significant is that s 101(23) of the US Bankruptcy Code, which is the analogue of Art 2(*h*) of the SG Model Law, contains the same additional words "or adjustment of debt". The appellants referred us to a working draft of the Companies (Amendment) Bill 2017, which indicates that Art 2(*h*) of the SG Model Law was adapted from s 101(23) of the US Bankruptcy Code, and this was not seriously disputed.

40      In this regard, we note that the phrase "adjustment of debt" appears in various provisions within Chapter 11 of the US Bankruptcy Code. The purposes of Chapter 11 include: (a) the preservation of going concerns and the maximisation of property available to satisfy creditors (see *Bank of America National Trust and Savings Association v 203 North LaSalle Street Partnership* 526 US 434 at 453); and (b) restructuring a business's finances so that it may continue to operate, pay its creditors and produce a return for its stockholders (see *In re The Bible Speaks* 65 BR 415 (Massachusetts US Bankruptcy Court, 1986) at 425). It is thus apparent, and the respondent does not dispute, that the inclusion of the words "adjustment of debt" in Art 2(*h*) of the SG Model Law permits the recognition of foreign proceedings involving: (a) the restructuring of a company's debts; and/or (b) the reorganisation of a company's affairs through schemes of arrangement: see Neil Hannan, *Cross-Border Insolvency: The Enactment and Interpretation of the UNCITRAL Model Law* (Springer, 2017) at p 65; Gerard McCormack & Wan Wai Yee, "The UNCITRAL Model Law on Cross-Border Insolvency Comes of Age: New Times or New Paradigms?" (2019) 54(2) Texas International Law Journal 273 at 289; and Look Chan Ho, "Recognising an Australian Solvent Liquidation under the UNCITRAL Model Law: *In re Betcorp*" (October 2009) Norton Journal of Bankruptcy Law and Practice ("Look's Article"). Neither of these situations is necessarily limited to insolvent companies, as we explain in the paragraphs that follow. In our judgment, it may also be inferred from Parliament's deliberate modification of Art 2(*a*) of the UNCITRAL Model Law in accordance with s 101(23) of the US Bankruptcy Code that Parliament intended to bring within the ambit of the SG Model Law proceedings that are recognisable under the provisions of US law that correspond to the SG Model Law, specifically Chapter 15 of the US Bankruptcy Code.

41      In sum, we are satisfied that the words "or adjustment of debt" were included in Art 2(*h*) of the SG Model Law to enable the Singapore courts to recognise under the SG Model Law:

> (a)      proceedings in foreign jurisdictions that are akin to schemes of arrangement commenced under Singapore law and/or reorganisations commenced under Chapter 11 of the US Bankruptcy Code; and

> (b)      proceedings recognisable under Chapter 15 of the US Bankruptcy Code (which sets out the US' adaptation of the UNCITRAL Model Law).

42      This is significant because neither of the categories of proceedings set out in the previous paragraph requires the subject company to be insolvent or in severe financial distress as a prerequisite for commencement. Schemes of arrangement may be commenced in Singapore under either Part 5 of the IRDA or Part 7 of the Companies Act 1967 (2020 Rev Ed) (the "SG Companies Act"). In relation to the former, s 63(1) of the IRDA provides that Part 5 will apply where there is a compromise or arrangement between the company and its creditors or any class of those creditors. In relation to the latter, under ss 210(1) and 210(2) of the SG Companies Act, the court has the power to order a meeting where a compromise or arrangement is proposed, upon the application of: (a) the liquidator (in the case of a company being wound up); or (b) the company or any creditor, member or holder of units of shares of the company (in any other case). There is nothing in Part 5 of the IRDA or Part 7 of the SG Companies Act that requires the subject company to be insolvent or in severe financial distress before the court may grant relief in aid of any scheme of arrangement or compromise contemplated in respect of the subject company. Indeed, in holding that the *pari passu* principle should *not* be extended to

schemes which do not concern an insolvent company, this court recognised in *Hitachi Plant Engineering & Construction Co Ltd and another v Eltraco International Pte Ltd and another appeal* [2003] 4 SLR(R) 384 at [85] that there are a myriad of situations in which schemes of arrangement could be deployed in the corporate restructuring of *solvent* companies, for instance, to reorganise the share capital of a company or in the reconstruction or merger of a group of companies.

43      Similarly, corporate reorganisations in the US may be commenced under Chapter 11 of the US Bankruptcy Code in respect of solvent companies (see *In re Integrated Telecom Express, Inc* 384 F.3d 108 (3rd Cir, 2004) ("*Re Integrated Telecom*") at 121). Section 1121 of the US Bankruptcy Code, which prescribes who may file a plan under Chapter 11, does not impose any requirement as to the insolvency or severe financial distress of an applicant. Likewise, s 109 of the US Bankruptcy Code, which prescribes the criteria to qualify as a debtor under Chapter 11, does not include any requirement of insolvency or severe financial distress.

44      As the US Bankruptcy Court observed in *In re Johns-Manville Corporation* 36 BR 727 (SD New York US Bankruptcy Court, 1984) at 736 and 741, the drafters of the US Bankruptcy Code envisioned that a financially beleaguered debtor with real debt and real creditors should not be required to wait until the economic situation is beyond repair in order to file a reorganisation petition. The reorganisation provisions of the US Bankruptcy Code were thus drafted with the aim of *liquidation avoidance* by granting ready, albeit not unfettered, access to Chapter 11. Indeed, it would make little sense to allow companies recourse to reorganisation only when they are already insolvent or in such severe financial distress as to be virtually insolvent. At the same time, we recognise that Chapter 11 petitions filed by financially healthy

companies with no reason to seek rehabilitation or reorganisation may be rejected by the US courts (see *Re Integrated Telecom* at 121). Chapter 11 was designed with the object of affording a rehabilitative platform and that, therefore, operates as a constraint on when it may be resorted to. But the critical point for our purposes is that this regime is not restricted to insolvent companies or those in severe financial distress.

45      As for proceedings that may be recognised under Chapter 15 of the US Bankruptcy Code, it is instructive to examine the authorities in which recognition of foreign proceedings was sought under that chapter. *Re Betcorp* involved an Australian company, Betcorp Limited ("Betcorp"), which was liquidated by its shareholders. Betcorp's liquidators applied successfully for the recognition of Betcorp's voluntary liquidation in Australia as a foreign proceeding under Chapter 15 of the US Bankruptcy Code, the US Bankruptcy Court holding that Betcorp's voluntary liquidation was a "foreign proceeding" within the meaning of s 101(23) of the US Bankruptcy Code. Importantly, the court held that the requirement that Betcorp's liquidation be authorised or conducted under a law related to insolvency or the adjustment of debt did not entail that Betcorp had either to be insolvent or already contemplating invoking the provisions of Australian law to adjust any debts (*Re Betcorp* at 282). To much the same effect, the US Bankruptcy Court in *In re ABC Learning Centres Ltd* 445 BR 318 (Delaware US Bankruptcy Court, 2010) ("*Re ABC Learning Centres*") and *In re Manley Toys Limited* 580 BR 632 (New Jersey US Bankruptcy Court, 2018) ("*Re Manley Toys*") granted recognition in respect of foreign proceedings without considering whether the companies involved in those proceedings were either insolvent or in severe financial distress.

46      Given what we have said at [40] above and in the light of the discussion at [42]–[45], it may be inferred that the addition of the words "or adjustment of

debt" to the definition of "foreign proceeding" in Art 2(*h*) of the SG Model Law was meant to empower the Singapore courts to recognise as foreign proceedings under the SG Model Law, proceedings concerning a company that were conducted under a foreign law relating to insolvency or adjustment of debt, even if that company was solvent.

47     In seeking to construe the provision purposively, the Judge had regard to certain extraneous materials to ascertain the purpose of Art 2(*h*) of the SG Model Law, to which we will turn shortly. We do not disagree with the Judge that pursuant to s 252(2) of the IRDA, in interpreting provisions of the SG Model Law, regard may be had to documents forming part of the record pertaining to the preparation of the UNCITRAL Model Law, as well as the 1997 Guide. Furthermore, the 2013 Guide may be considered where the 1997 Guide is silent and to the extent that there is no conflict with the 1997 Guide (see *Re Zetta Jet Pte Ltd and others (Asia Aviation Holdings Pte Ltd, intervener)* [2019] 4 SLR 1343 ("*Re Zetta*") at [37]). However, in construing the extraneous material, it is incumbent on the court to do so in the light of the fact that Parliament did not adopt the UNCITRAL Model Law in its original form but added the words "or adjustment of debt" to Art 2(*h*) of the SG Model Law. It seems clear that these words were intended to enable the recognition of certain types of foreign proceedings, including those that do not require that the company be insolvent or in severe financial distress. To the extent that the words "or adjustment of debt" were not considered in the material referred to by the Judge, we think, with respect, that he fell into error. As was noted in *Tan Cheng Bock* at [35], [43] and [54(c)(ii)], the legislative purpose of a statute should ordinarily be gleaned from the text itself, which has primacy over any extraneous material. The key textual amendment that was deliberately made by Parliament when it adopted the UNCITRAL Model Law considerably

diminishes the weight of the other extraneous material that was relied on by the Judge. In any event, for the reasons we set out below at [55]–[68], we do not think the extraneous material demonstrates that it would undermine the purpose or object of the UNCITRAL Model Law to extend its scope to proceedings involving solvent companies.

48      This conclusion is also consistent with the presumption of insolvency under Art 31 of the SG Model Law, which provides that:

> In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a proceeding under Singapore insolvency law, proof that the debtor is unable to pay its debts within the meaning given to the expression under Singapore insolvency law.

If it were a pre-requisite for recognition that the company involved must be insolvent, then Art 31 of the SG Model Law, which presumes the insolvency of a company upon the recognition of a proceeding involving that company as a foreign main proceeding, would be largely superfluous.

*The Judge's application of the Purposive Approach*

49      We turn to consider how the Judge applied the Purposive Approach when he set out to interpret Art 2(*h*) of the SG Model Law. The Judge examined various academic commentaries and the preparatory material pertaining to the UNCITRAL Model Law (GD at [72]–[76] and [81]–[98]), on the basis of which he concluded that the underlying purpose of the UNCITRAL Model Law is to "empower a recognising court to extend recognition to a foreign proceeding the subject of which is a company that is insolvent or in severe financial distress". In line with this, the Judge considered that the words "under a law relating to insolvency" contemplate a law that prescribes a process applicable to a company that is either insolvent or in severe financial distress (GD at [99]). Thus far, we

have no real difficulty with the Judge's analysis and his conclusion that when the UNCITRAL Model Law was prepared, its primary purpose was to lay down a framework for the co-ordinated cross-border management of proceedings involving insolvent companies. But the Judge then held that the intent of the UNCITRAL Model Law was therefore to *exclude* from its scope the liquidation of solvent companies, and further that it would be *contrary to the underlying purpose of the UNCITRAL Model Law* to grant recognition of foreign proceedings concerning companies which are neither insolvent nor in severe financial distress. We do not follow this part of the Judge's analysis.

50     Simply put, it does not seem to us to follow from the primary purpose of the UNCITRAL Model Law being to prescribe a co-ordinated regime for proceedings involving insolvent companies, that this must therefore exclude such proceedings where they concern solvent companies; or that to extend the operation of the UNCITRAL Model Law to solvent companies would be contrary to or would otherwise undermine its primary purpose.

51     The Purposive Approach is enshrined in s 9A(1) of the IA and contemplates that in the interpretation of a written law, an interpretation that would promote the purpose or object underlying the written law shall be *preferred* over one that would not. To that end, the Purposive Approach requires the court to ascertain the possible interpretations of the relevant provision and to *compare* the possible interpretations against the purposes or objects of the relevant statute. We have explained at [37]–[48] above that *at least* in the context of the SG Model Law, the legislative purpose of that law was not as narrow as the Judge framed it. But even in the context of the UNCITRAL Model Law, the Purposive Approach does not yield the conclusion that the Judge arrived at because the Broad Approach does not seem to us to undermine the primary purpose of that instrument.

52      To put it another way, the present case does not require the court to choose between two interpretations of Art 2(*h*) which are incompatible or mutually exclusive, in the sense that one interpretation would further the underlying legislative purpose or object while the other would undermine that. Even in relation to the SG Model Law, it is uncontroversial that it is *primarily* intended to be applicable to insolvent or financially distressed companies. That much is clear from paras (*c*) and (*e*) of the preamble, which state that the purposes of the SG Model Law include the provision of effective mechanisms for dealing with cases of cross-border insolvency so as to promote:

>       (a)    the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor"; and

>       (b)    the "facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment".

53      And it is common ground among all parties that a proceeding concerning an insolvent company would, assuming the other conditions are met, be recognised as a foreign proceeding. But what then of solvent companies? In our judgment, extending the ambit of the UNCITRAL Model Law beyond its primary purpose of providing for the co-ordinated cross-border management of proceedings concerning insolvent companies to encompass such proceedings concerning solvent companies would equally advance its primary purpose, while conferring some additional advantages that are consistent with the broader goal of securing a co-ordinated approach to the liquidation of companies with transnational operations. We explain this in the next section where we consider the extraneous material that the Judge relied on.

54      In sum, we do not think the Purposive Approach leads us to the conclusion that the Judge arrived at because:

(a)      the addition of the words "or adjustment of debt" positively suggests a Parliamentary object to extend the SG Model Law to proceedings concerning solvent companies; and

(b)      even aside from this, extending the SG Model Law to such proceedings would not be contrary to or undermine the primary legislative object of facilitating the co-ordination of cross-border insolvencies.

**Whether solvent companies are excluded under the UNCITRAL Model Law**

55      As we have noted, based on the preparatory material pertaining to the purpose of the UNCITRAL Model Law, the Judge concluded that the intent of the UNCITRAL Model Law was to "exclude the liquidation of solvent companies from [its] scope" and instead it was to "empower a recognising court to extend recognition to a foreign proceeding the subject of which is a company that is insolvent or in severe financial distress" (see GD at [79] and [99]). We examine the following portions of the preparatory material, the 1997 Guide and the 2013 Guide which seem to lend the strongest support to the Judge's conclusion.

56      First, the 1997 Guide explains that the word "insolvency" as used in the title of the UNCITRAL Model Law refers to "various types of collective proceedings against insolvent debtors" (at para 51). This was elaborated upon in the 2013 Guide at para 48, which states:

> Acknowledging that different jurisdictions might have different notions of what falls within the term 'insolvency proceedings', the [UNCITRAL] Model Law does not define the term

'insolvency'. However, as used in the Model Law, *the word 'insolvency' refers to various types of collective proceedings commenced with respect to debtors that are in severe financial distress or insolvent.* The reason is that the [UNCITRAL] Model Law covers proceedings concerning different types of debtors and, among those proceedings, deals with proceedings aimed at liquidating or reorganizing the debtor as a commercial entity. *A judicial or administrative proceeding to wind up a solvent entity where the goal is to dissolve the entity and other foreign proceedings not falling within [Art 2(a)] are not insolvency proceedings falling within the scope of the Model Law.* Where a proceeding serves several purposes, including the winding up of a solvent entity, *it falls under [Art 2(a) of the UNCITRAL Model Law] only if the debtor is insolvent or in severe financial distress.* [emphasis added]

57     The 1997 Guide (at para 68) and the 2013 Guide (at para 63) further explain that, by specifying the required characteristics of a "foreign proceeding", Art 2(*a*) of the UNCITRAL Model Law serves to limit the law's scope of application. The 2013 Guide also states that the term "insolvency" in Art 2(*a*) is used to describe, on a broad level, "proceedings involving debtors that are in severe financial distress or insolvent", and that the focus of the UNCITRAL Model Law is upon such debtors and the laws that address the financial distress of those debtors (see the 2013 Guide at paras 65 and 67). Specifically in relation to the phrase "law relating to insolvency", the 2013 Guide explains at para 73 that:

This formulation is used in the [UNCITRAL] Model Law to acknowledge the fact that liquidation and reorganization might be conducted under law that is not labelled as insolvency law (e.g. company law), but which nevertheless deals with or addresses insolvency or severe financial distress. The purpose was to find a description that was sufficiently broad to encompass a range of insolvency rules irrespective of the type of statute or law in which they might be contained and irrespective of whether the law that contained the rules related exclusively to insolvency. *A simple proceeding for a solvent legal entity that does not seek to restructure the financial affairs of the entity, but rather to dissolve its legal status, is likely not one pursuant to a law relating to insolvency or severe financial distress.* [emphasis added]

58    The upshot of the extracts that we have reproduced in the preceding paragraphs is that the UNCITRAL Model Law, as originally contemplated by its drafters, was undeniably intended to be focused primarily on companies that are either insolvent or in severe financial distress. It is thus unsurprising that the 1997 Guide and the 2013 Guide explain, in that context, that for the purposes of Art 2(*a*) of the UNCITRAL Model Law, proceedings pursuant to a "law relating to insolvency" generally do not include proceedings concerning solvent companies. That was very likely the view at the time the UNCITRAL Model Law was drafted. It is also almost certainly the case that the need for a co-ordinated approach arose acutely in the context of insolvent companies.

59    That said, we do not think that the preparatory material, the 1997 Guide and the 2013 Guide go so far as to suggest that expanding the ambit of the UNICTRAL Model Law to include solvent companies would *undermine* the purpose of the UNCITRAL Model Law. Nor does the preparatory material suggest that the processes available under the provisions of the UNCITRAL Model Law were intended to be *excluded* from their application to solvent companies.

60    We are fortified in this view by the observations in *The Judicial Perspective* regarding the interpretation of the phrase "pursuant to a law relating to insolvency" in the 2013 Guide. At paras 83–85, the authors of *The Judicial Perspective* set out the different approaches that have been taken towards interpreting the phrase "law relating to insolvency". By then, *Re Stanford International Bank Ltd and another* [2010] 3 WLR 941 ("*Re Stanford (CA)*") and *Re Betcorp* had been decided and in these decisions, the courts in the UK and the US had held that the UNCITRAL Model Law could apply to solvent companies. The authors, having noted the developments in case law, observed at para 86:

> Following consideration and discussion of this issue in
> UNCITRAL Working Group V (Insolvency Law) and the
> Commission, the [2013 Guide] clarifies that the word
> 'insolvency', as used in the [UNCITRAL Model Law], refers to
> various types of collective proceedings commenced with respect
> to debtors that are in severe financial distress or insolvent. A
> judicial or administrative proceeding to wind up a solvent entity
> where the goal is to dissolve the entity and other foreign
> proceedings not falling within [Art 2(*a*) of the UNCITRAL Model
> Law] are not insolvency proceedings within the scope of the
> [UNCITRAL Model Law]. Where a type of proceeding serves
> several purposes, including the winding up of a solvent entity,
> it falls under [Art 2(*a*) of the UNCITRAL Model Law] only if the
> debtor is insolvent or in severe financial distress.

In making this observation, the authors also referred to para 48 of the 2013 Guide (which has been reproduced above at [56]). That is significant because, having acknowledged the different approaches that had been and may be taken to the interpretation of a "law relating to insolvency", the authors do not suggest that the position in *Re Betcorp* and *Re Stanford* is contrary to or otherwise undermines the underlying purpose of the UNCITRAL Model Law. There is also no suggestion that proceedings concerning solvent companies are positively to be *excluded* from the scope of the UNCITRAL Model Law.

61     Further, in the *Report of Working Group V (Insolvency Law) on the work of its thirty-ninth session*, UNCITRAL, 44th Sess, UN Doc A/CN.9/715 (2010), the Working Group noted that Art 2(*a*) of the UNCITRAL Model Law had "given rise to diverse interpretation in case law", and the question was raised as to whether the Working Group should clarify the definition of certain elements in Art 2(*a*). Specifically in response to the question of whether there was a need to define the requirement of the insolvency of the debtor, it was said that this was unnecessary as such a requirement "would flow from the terms 'pursuant to a law relating to insolvency'". The Working Group then stated at para 19:

> With respect to the need of providing a definition for the terms
> 'pursuant to a law relating to insolvency', it was felt that

difficulties in judicial interpretations of those terms had resulted from equating terminology of legislation of different jurisdictions. It was noted that *the Working Group did not aim for unification of insolvency laws*, but to provide clarity on concepts in the Model Law. In that respect, it was said that *it would be impossible to further detail the definition of a 'foreign proceeding' that would still capture all domestic proceedings*. It was further noted that the notion of 'a law relating to insolvency' already provided the desirable degree of flexibility. ... [emphasis added]

62     The reluctance of the Working Group to expressly prescribe a requirement of insolvency or severe financial distress in Art 2(*a*) of the UNCITRAL Model Law, despite being cognisant of the differing interpretations of Art 2(*a*) by various courts in different countries, reinforces our conclusion that extending the recognition regime under the UNCITRAL Model Law to proceedings concerning solvent companies is neither inconsistent nor incompatible with the primary purpose of the UNCITRAL Model Law.

63     We note in this regard that Mr Kumar accepted at the hearing before us that there is nothing in the preparatory material which suggests that solvent proceedings were meant to be *excluded* from the ambit of the UNCITRAL Model Law, much less that the purposes of the UNCITRAL Model Law would be undermined by the inclusion of such proceedings within its scope. We are therefore satisfied that even if the words "or adjustment of debt" were not added to Art 2(*h*) of the SG Model Law, and Art 2(*a*) of the UNCITRAL Model Law was adopted in its original form, it would not be contrary to the purpose of the UNCITRAL Model Law to extend its scope to include solvent companies.

64     We would venture further to say that the Broad Approach and consequently, interpreting Art 2(*h*) of the SG Model Law as encompassing solvent proceedings within its ambit, is consistent with the overall purpose of the UNCITRAL Model Law. The UNCITRAL Model Law is designed to

provide a harmonised approach to the treatment of cross-border insolvency proceedings in national legal systems, to facilitate co-operation between courts and office holders involved in the same insolvency across different jurisdictions, to provide for the recognition of proceedings (and the consequences of such recognition), and to afford direct access by foreign representatives of such companies to the courts of the enacting state (*Goode on Principles of Corporate Insolvency Law* (Kristin van Zwieten gen ed) (Sweet & Maxwell, 5th Ed, 2018) ("*Goode on Insolvency Law*") at para 16-16; see also 1997 Guide at paras 1–3 and 2013 Guide at paras 1–3). To this end, one of the four key principles underlying the UNCITRAL Model Law is the co-operation and co-ordination principle, which obliges courts and insolvency representatives to communicate and co-operate in order to ensure that the debtor's insolvency estate is administered fairly and efficiently, with a view to maximising benefits to creditors (*The Judicial Perspective* at para 14(d)). It appears to us, as the Judge noted (GD at [78]), that at least one of the fundamental objects of the UNCITRAL Model Law is to prevent creditors from rushing to satisfy their claims against a debtor company in a particular jurisdiction in order to gain an advantage over other creditors. This in turn ensures a sensible and orderly dissolution of a company or facilitates the successful rehabilitation of the company, as the case may be.

65      While the concerns mentioned above arise predominantly in the context of an insolvent company whose assets are insufficient to satisfy the claims of all its creditors in full, solvent regimes and insolvent regimes are seldom mutually exclusive. A company undergoing a solvent, voluntary liquidation may subsequently need to come under the court's supervision should it transpire that the company is insolvent. In such circumstances, the relevant legislation may provide for mechanisms to facilitate the transition between solvent and

insolvent regimes. For instance, pursuant to s 496(1)(a) of the Australian Corporations Act 2001 (Cth) (the "Australian Corporations Act"), where a liquidator is of the opinion that a company will not be able to pay or provide for the payment of its debts in full in accordance with the declaration of solvency filed by the company's directors pursuant to s 494, the liquidator must, among other things, apply for the company to be wound up in insolvency. Relatedly, s 467B allows the court to order the winding up of a company even if the company is already being wound up voluntarily. Conversely, s 482 empowers the court to terminate a winding up. Indeed, it was against this backdrop that the court in *Re Betcorp* considered that companies had "the statutory ability to shift among various forms of dissolution given changing circumstances" under the Australian Corporations Act (see *Re Betcorp* at 279 and 282). To similar effect, s 124(1) of the Cayman Act and O 15 r 1 of the Cayman CWR oblige a liquidator to apply for an order that the solvent, voluntary liquidation of a company continues under the Cayman Grand Court's supervision if the directors of the company fail to sign a declaration of solvency (see [7] above). In our judgment, the possibility of movement between solvent and insolvent regimes provides further support for adopting the Broad Approach. In view of the possibility that a proceeding concerning a solvent company might transition into one dealing with an insolvent entity, that proceeding should be regarded as one being conducted under a law relating to insolvency or adjustment of debt as long as the relevant law contains provisions dealing with insolvency or adjustment of debt.

66      Furthermore, it bears reiterating a proceeding must satisfy other requirements to qualify as a foreign proceeding within the meaning of Art 2(*h*) of the SG Model Law. In our judgment, the purposes of the UNCITRAL Model Law identified above, in particular, to ensure the co-ordinated and orderly

dissolution or successful rehabilitation of a company, would be engaged in respect of a proceeding which satisfies these other requirements, even if the company in question is solvent. Specifically, Art 2(*h*) requires among other things that: (a) the proceeding in question must be collective in nature, which as we elaborate below at [104], means that the proceeding must involve all creditors of the debtor generally and deal with substantially all of the debtor's assets and liabilities; (b) the property and affairs of the debtor must be subject to the foreign court's control or supervision; and (c) the overall purpose of the proceeding must be the reorganisation or liquidation of a company. The sum effect of these requirements is to exclude from the scope of the SG Model Law certain types of private liquidations or restructurings commenced by individual creditors in respect of only part of company's assets, simple proceedings such as striking a company off the register, and proceedings pertaining to the investigation of misappropriated corporate funds (see [105] below). Quite clearly, in such proceedings, the need for co-operation and co-ordination between creditors, office holders and courts in different jurisdictions simply does not arise.

67      Conversely, where a proceeding involves all the creditors of a company and its assets and liabilities for the purpose of the company's reorganisation or liquidation, and the company's property and affairs are placed under the foreign court's control or supervision, the importance of co-operation and co-ordination between the different stakeholders becomes paramount in securing an orderly dissolution and/or the successful rehabilitation of the company. Put simply, where the other requirements of Art 2(*h*) are satisfied, it seems to us that the rationale for according recognition of foreign proceedings would be engaged, at least to some degree, regardless of the solvency of the company in question. This is all the more so where the overall status of a company with transnational

operations may be solvent, while its branches may not be solvent within particular jurisdictions.

68     For these reasons, we are satisfied that adopting the Broad Approach, and in consequence interpreting Art 2(*h*) of the SG Model Law as encompassing solvent proceedings in its ambit, would not contradict or undermine the underlying object of the UNCITRAL Model Law. On the contrary, such an approach coheres with the purposes of the UNCITRAL Model Law which we have identified at [64] above.

### *The prevailing approach to the interpretation of the UNCITRAL Model Law*

69     A further factor that militates in favour of interpreting Art 2(*h*) of the SG Model Law as including proceedings concerning solvent companies is the desire to ensure that our interpretation of Art 2(*h*) of the SG Model Law is broadly harmonious with the approaches taken in other jurisdictions. Article 8 of the SG Model Law mandates that in the interpretation of the SG Model Law, regard is to be had to its international origin and the need to promote uniformity in its application and the observance of good faith. In this regard, the court in *Re Zetta* noted at [38] that as far as possible, Singapore courts ought to attempt to "tack as closely as possible to the general interpretive trends taken in other jurisdictions that apply the Model Law in its various enactments". It is noteworthy that in the majority of cases across various jurisdictions, courts have held that the scope of their respective adaptations of the UNCITRAL Model Law includes proceedings involving solvent companies. We set out the position in the US, the UK, Australia and New Zealand.

*The position in the US*

70    We first consider the position in the United States. The equivalent of Art 2(*h*) of the SG Model Law in the US is s 101(23) of the US Bankruptcy Code, which provides:

> The term 'foreign proceeding' means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

71    The position in the US is encapsulated in the landmark decision in *Re Betcorp*, to which we have referred, and which concerned an application for recognition of Betcorp's voluntary liquidation in Australia as a foreign proceeding under Chapter 15 of the US Bankruptcy Code. The US court held that there was no requirement for a company to be insolvent or contemplating the adjustment of any debts in order for a proceeding concerning that company to be regarded as being conducted under a law related to insolvency or the adjustment of debts. In particular, the court noted that the Australian Corporations Act "regulates the whole of the corporate life-cycle of an Australian corporation", and that several sub-parts of Chapter 5 of the Australian Corporations Act (on External Administration) contain provisions that deal with corporate insolvency and allow for the adjustment of debts (*Re Betcorp* at 282). These facts, coupled with "the statutory ability to shift among various forms of dissolution given changing circumstances", led the court to conclude that the Australian Corporations Act was a law related to insolvency or the adjustment of debt. On this basis, the US court held that Betcorp's voluntary winding up, which was conducted under the Australian Corporations Act, was a proceeding conducted under a law relating to insolvency or adjustment of debt for the purposes of s 101(23) of the US Bankruptcy Code:

see *Re Betcorp* at 281–282). In other words, the position in the US is that the requirement that a proceeding be conducted under a law relating to insolvency or adjustment of debt would be satisfied as long as the law in question that contained the specific provision under which the proceeding was conducted also contains provisions dealing with insolvency or the adjustment of debt, even if those provisions are not implicated in the case at hand. This is what we have referred to above as the Broad Approach.

72     *Re Betcorp* has attracted a degree of academic criticism. In *Cross-Border Insolvency* (Richard Sheldon QC gen ed) (Bloomsbury Publishing, 4th Ed, 2015) ("*Sheldon on Cross-Border Insolvency*"), it is noted at para 3.35 that although the members' voluntary winding up in *Re Betcorp* was initiated under a body of law which included provisions for an insolvent liquidation, "that coincidence does not necessarily justify bringing within the UNCITRAL Model Law's scheme of recognition and assistance a proceeding in relation to a solvent company, the purpose of which includes the return of a surplus to members". Importantly, however, this is qualified by the observation that:

> *Unless some specific modification is made to the UNCITRAL Model Law*, it is arguable that there is no obvious justification for allowing creditors' rights to be restrained by recognising a solvent liquidation as a foreign proceeding. [emphasis added]

73     As an example of such a modification, the authors refer to s 101(23) in the context of Chapter 15 of the US Bankruptcy Code, which "modifies the UNCITRAL Model Law to enable recognition of a solvent scheme of arrangement". In a similar vein, and as we have explained above at [37]–[46], the addition of the words "or adjustment of debt" to Art 2(*h*) of the SG Model Law was a deliberate modification of Art 2(*a*) of the UNCITRAL Model Law, which was meant to extend the scope of the SG Model Law to solvent companies.

74     The respondent also relies on the critique of *Re Betcorp* in Look's Article, where it is suggested that the decision in *Re Betcorp* is open to question for a number of reasons. Those pertinent to the present appeal may be summarised as follows:

(a)     The US Bankruptcy Court relied on the Australian version of the UNCITRAL Model Law to conclude that a members' voluntary winding up was a "foreign proceeding" for the purposes of Chapter 15 of the US Bankruptcy Code. However, the US court appears to have overlooked the legislative history behind Australia's adaptation of the UNCITRAL Model Law. In particular, the Commonwealth of Australia, Parliament, *Cross-Border Insolvency: Corporate Law Economic Reform Program Proposals for Reform Paper No 8* (Discussion Paper, 2002) ("the CLERP Paper") expressly states that the scope of the UNCITRAL Model Law as implemented in Australia would not extend to a members' voluntary winding up or a winding up by a court on just and equitable grounds as such proceedings may not be insolvency-related.

(b)     The US Bankruptcy Court also considered that Australia's Parliament viewed a voluntary winding up as a proceeding that is conducted under a law relating to insolvency under Australia's version of the UNCITRAL Model Law. The US Bankruptcy Court had relied on the explanatory memorandum (the "Explanatory Memorandum") accompanying the Cross-Border Insolvency Bill 2008 (Cth), which enacted the UNCITRAL Model Law in Australia. The Explanatory Memorandum identified "Chapter 5 (other than Parts 5.2 and 5.4A)" of the Australian Corporations Act as a law relating to insolvency. The US Bankruptcy Court thought it significant that Part 5.5 of Chapter 5 of the Australian Corporations Act, which governed the voluntary winding up

of a company, was not excluded from the description of laws relating to insolvency in the Explanatory Memorandum. However, it failed to appreciate the distinction between a members' voluntary winding up (which is generally a solvent liquidation) and a creditors' voluntary winding up (which is generally an insolvent liquidation). The fact that both forms of winding up are contained in Part 5.5 of Chapter 5 of the Australian Corporations Act, which was identified as a "law relating to insolvency", did not necessarily mean that a members' voluntary liquidation would fall within the ambit of Australia's version of the UNCITRAL Model Law.

(c)     Recognising a foreign members' voluntary liquidation could entail an automatic stay on all litigation against the company. Yet, it is difficult to see why a proceeding primarily aimed at conferring benefit on shareholders should have the effect of impeding creditors from enforcing their rights against the company through litigation.

75     In relation to the first two criticisms noted at [74(a)] and [74(b)] above, we accept that the US Bankruptcy Court in *Re Betcorp* may not have fully appreciated the legislative history behind Australia's adoption of the UNCITRAL Model Law. However, as the Judge pointed out, the question before the US court in *Re Betcorp* was whether Betcorp's voluntary liquidation was a "foreign proceeding" within the meaning of s 101(23) of the US Bankruptcy Code (GD at [139]). That is a question reserved for the recognising court which will determine this in accordance with its own application of the UNCITRAL Model Law. The US court is not bound by the way in which the foreign proceeding is characterised under Australian law (see *Re Agrokor DD and in the matter of the Cross-Border Insolvency Regulations 2006* [2017] All ER (D) 83 (Nov) ("*Re Agrokor*") at [34]). Furthermore, apart from Australia's

adoption of the UNCITRAL Model Law and the Explanatory Memorandum, there was another key pillar underlying the US court's conclusion that Betcorp's voluntary liquidation was conducted under a law relating to insolvency or adjustment of debt. That was the fact that several sub-parts of Chapter 5 of the Australian Corporations Act contain provisions that deal with corporate insolvency and also allow for the adjustment of debt. Further, these also contemplated the possibility of shifting among various pathways to dissolution in the light of changing circumstances (see above at [71]). Therefore, even if the US court had misunderstood the Australian legislature's intentions with regard to Australia's version of the UNCITRAL Model Law, that is not an adequate reason not to adopt the approach in *Re Betcorp*. As to the suggestion that the court in *Re Betcorp* may have misunderstood the legislative intention behind Australia's enactment of the UNCITRAL Model Law, we note that this is not how at least one Australian court has approached the question (see [90]–[91] below).

76     As to the third criticism at [74(c)] above, such concerns may be adequately managed through the recognising court granting recognition subject to conditions. We address this point in more detail below at [96].

77     We now consider other decisions of the US Bankruptcy Court. In *Re ABC Learning Centres*, the boards of an Australian Company ("ABC Learning") and its wholly-owned subsidiary ("ABC Holdings") resolved that the companies were likely to become insolvent and should enter voluntary administration pursuant to the Australian Corporations Act. Petitions were filed before the US Bankruptcy Court seeking recognition of the voluntary administration proceedings, which were subsequently converted by the creditors of the companies into liquidation proceedings. Endorsing *Re Betcorp*, the US court held that the liquidations of ABC Learning and ABC Holdings

were authorised or conducted under a law related to insolvency or the adjustment of debts for the purposes of s 101(23) of the US Bankruptcy Code, as numerous subsections within the Australian Corporations Act address corporate insolvency and the adjustment of corporate debt (see *Re ABC Learning Centres* at 331). Importantly, in determining that the Australian Corporations Act was a law related to insolvency or the adjustment of debts, the court did not consider the companies' solvency or financial status.

78      In *Re Manley Toys*, a Hong Kong company entered into voluntary liquidation in Hong Kong in the face of ongoing litigation, including a pending sanctions motion in a US court in connection with a judgment debt owed by the company, and alleged declining sales. The voluntary liquidation was commenced under the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap 32) (HK) (the "CWMPO"), which both parties' experts on Hong Kong insolvency law agreed set forth the framework for liquidating a company. The US Bankruptcy Court determined that the voluntary liquidation was conducted under a law related to insolvency or adjustment of debts (see *Re Manley Toys* at 638 and 643). As was the case in *Re Betcorp* and *Re ABC Learning Centres*, the solvency status of the company was not a relevant consideration in the court's decision that the Hong Kong proceeding was conducted under a law related to insolvency or adjustment of debts.

79      The respondent relies on *In re Global Cord Blood Corporation* 2022 WL 17478530 (SD New York US Bankruptcy Court) ("*Re Global Cord*"), to contend that even though the court in that case adopted the Broad Approach, the decision illustrates that courts in the US would nonetheless consider whether a foreign proceeding concerns an insolvent or severely financially distressed company in determining whether to grant recognition under Chapter 15 of the US Bankruptcy Code. In our judgment, the respondent's reliance on *Re Global*

*Cord* is misplaced. The US Bankruptcy Court accepted that the relevant
Cayman proceeding was brought under the "just and equitable" ground for
winding up with the purpose of preventing corporate misconduct, and not under
the insolvency provisions of the Cayman Act (*Re Global Cord* at 3 and 12). It
then went on to conclude that the Cayman proceeding was not a "foreign
proceeding" as was required for Chapter 15 recognition because the Cayman
proceeding was neither collective nor for the purpose of reorganisation or
liquidation within the meaning of s 101(23) of the US Bankruptcy Code (*Re
Global Cord* at 8–9 and 12–13).

80      What is material is that notwithstanding that the Cayman proceeding
was not brought under the insolvency provisions of the Cayman Act, the US
Bankruptcy Court in *Re Global Cord* opined that the Cayman Act satisfied the
definitional requirement of a "law relating to insolvency or adjustment of debt".
Importantly, the court's observation that the purpose of Chapter 15 was to assist
foreign courts dealing with "insolvency" was made in the limited context of
explaining the case law's focus on the role and impact of creditors in
determining whether a proceeding is "collective". The court did not, however,
hold that the solvency status of a company would bear on its decision to grant
recognition under Chapter 15. The court in fact expressly affirmed the decision
in *Re Betcorp*, observing (at 9):

> The relevant test is not whether the currently pending
> proceeding concerns insolvency or adjustment of [debt], or even
> whether the current proceeding in some sense relates to those
> objectives, but rather whether the proceeding is being brought
> under a 'law' that 'relat[es] to' insolvency or adjustment of debt.
> Further, section 101(23) is to be 'broadly construed.' … This
> guidance counsels against an unduly grudging application of
> this flexibly worded test by narrowly examining whether the
> specific subsections of the governing Cayman statutory scheme
> that are presently being applied redress insolvency or creditor
> rights.

81     On the court's observation that the foreign proceeding was neither "collective" nor "for the purpose of reorganization or liquidation" as the law requires, it was found on the facts of the case that the Cayman proceeding fell outside the range of matters that Chapter 15 was designed to address. In delineating the limits of this range of matters, the court should examine all the criteria spelt out in the relevant provision – in our context, Art 2(*h*) of the SG Model Law – without being fixated on the solvency status of the relevant company.

*The position in the UK*

82     The UK equivalent of Art 2(*h*) of the SG Model Law is Art 2(i) of Schedule 1 to The Cross-Border Insolvency Regulations 2006 (SI 2006 No 1030) (UK) (respectively, "Art 2(i) of the UK Model Law" and the "CBIR"), which defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation[.]

83     In *Re Stanford International Bank Ltd and others* [2009] EWHC 1441 (Ch) ("*Re Stanford (HC)*"), a company ("SIB") was liquidated by the court in Antigua and Barbuda pursuant to s 300 of the International Business Corporations Act (Cap 222) (Antigua and Barbuda) (the "IBCA"), and liquidators were appointed pursuant to ss 304–306 of the IBCA. Section 300 of the IBCA pertained to the liquidation and dissolution of companies under the supervision of the court where the company had failed to comply with regulatory requirements. Lewison J found that the liquidators of SIB were appointed pursuant to a law relating to insolvency, notwithstanding that

insolvency did not feature as a ground under s 300 of the IBCA. In particular, he observed at [94]:

> It is, in my judgment, clear from the court's order and the judgment of [the court in Antigua and Barbuda] that it was not basing the order on section 300 alone. It made the order because, having considered the evidence, it concluded that it was just and equitable that SIB be wound up. *An important part of the evidence was that SIB was insolvent and could not be reorganised via the receivership.* In my judgment at least one of the reasons why [the judge in Antigua and Barbuda] made the order that he did was that *he was satisfied that SIB was insolvent.* [emphasis added]

84     On appeal in *Re Stanford (CA)*, the Court of Appeal ("EWCA") came to the same conclusion as Lewison J albeit for slightly different reasons. The EWCA held that for the purposes of the definition of "foreign proceeding" under the Art 2(i) of the UK Model Law, it was necessary to start by identifying the law under which the relevant proceedings had been brought and was being pursued, before considering whether that law related to insolvency and whether in the light of the other factors to which the definition referred, the proceeding could be regarded as being brought "pursuant" to that law (*Re Stanford (CA)* at [24], *per* Sir Andrew Morritt C). Applying this approach, the EWCA identified Part IV of the IBCA as the law under which SIB's liquidation proceedings had been brought, and held that Part IV *was* a law relating to insolvency because it "provided for the winding up of corporations incorporated in Antigua for the purpose of carrying on an international trade or business on just and equitable grounds, which included insolvency, as well as infringements of regulatory requirements" (*Re Stanford (CA)* at [15]). A key point to note is that in *Re Stanford (CA)*, the insolvency of the company was not taken into account in determining whether the company's liquidation was conducted under a law relating to insolvency. Instead, the focus was on whether insolvency was *one of the grounds* for winding up within Part IV of the IBCA.

85      In *Re Agrokor*, a court in Croatia ordered the extraordinary administration of a company incorporated in Croatia ("Agrokor DD"), under the Law on Extraordinary Administration Proceeding in Companies of Systemic Importance for the Republic of Croatia (the "Extraordinary Administration Law"). The High Court of England and Wales held that the Extraordinary Administration Law was a law relating to insolvency for the purposes of the CBIR (*Re Agrokor* at [77]). In particular, having examined the relevant case law in the US, the UK and Australia, the court observed (at [63] and [73]):

> 63.     From these authorities and guides to interpretation, it is clear that the requirement that the law under which the proceeding is brought be 'an insolvency law' is satisfied *if insolvency is one of the grounds on which the proceeding can be commenced, even if (as in Re Betcorp) insolvency could not actually be demonstrated, and there was another basis for commencing the proceeding*. The matter is obviously all the clearer if insolvency can indeed be demonstrated.
>
> ...
>
> 73.     It is clear that the test applied [by the courts in Belgrade and Montenegro] for a law relating to insolvency is whether under the law concerned there must necessarily be insolvency shown in relation to all the companies concerned. That is far from the test applied in the 'common law' cases discussed above, where it was accepted that a law could be a law relating to insolvency if insolvency was one of the grounds on which a proceeding could be brought. Indeed, in [*Re Betcorp*], the evidence was that the company subject to members' voluntary winding up was in fact solvent. But insolvency would have been a basis for such a winding up, as it was in [*Re Stanford*]. In my judgment I should not reject the wider approach of those common law cases in favour of the narrower one adopted by the courts of Belgrade and Montenegro. ...
>
> [emphasis in original omitted; emphasis added in italics]

86      Nevertheless, the court also considered that the extraordinary administration of Agrokor DD could only be commenced on grounds of insolvency or impending insolvency, whether proved or deemed (at [68]), and

that there was evidence that Agrokor DD was in a state of serious financial distress (at [69]).

87    It appears to us, based on these cases, that to this point, the position in the UK with respect to the interpretation of Art 2(i) of the UK Model Law is broadly aligned with the US position. It is true that in these cases, the courts have also considered the insolvency and/or financially distressed state of the relevant companies. However, it seems to us that the most that can be said is that where the proceedings can be opened on multiple grounds, only some of which relate to insolvency, the proceedings would nonetheless *clearly* fall within the scope of the UK Model Law if they were opened on an insolvency-related ground or where an anticipation of insolvency might have influenced the decision to open proceedings on some other ground (see *Goode on Insolvency Law* at para 16-29). It is also apparent that in these cases, the inquiry into the solvency of the company was not a necessary step in coming to a decision on whether to accord recognition to the "foreign proceeding" under Art 2(i) of the UK Model Law.

88    Against the weight of these cases, the High Court in *Re Sturgeon* declined to follow the US position. In *Re Sturgeon*, a solvent Bermuda-registered company ("Sturgeon Ltd") was wound up in Bermuda on the just and equitable ground under s 161(g) of the Bermuda Companies Act 1981 (the "Bermuda Companies Act"). Notably, s 161(e) of the Bermuda Companies Act provided that a company may be wound up if it is unable to pay its debts (see *Re Sturgeon* at [9]). The liquidators obtained an *ex parte* order recognising the Bermudan liquidation in the UK, and the applicant, a former director of the company, applied to terminate the recognition order. An issue which the High Court had to determine was whether the solvent liquidation of Sturgeon Ltd on the just and equitable ground was a "foreign proceeding" within the meaning of

Art 2(i) of the UK Model Law. After undertaking a review of the Working Group's reports and preparatory papers, the High Court answered that question in the negative. In arriving at that conclusion, the court observed that the Working Group's reports were focused on "the need to recognise and provide relief upon recognition of foreign proceedings, that concerned debtors that either could not pay their debts or were struggling to pay their debts and seeking to reorganise" (*Re Sturgeon* at [70]). It was therefore thought to be contrary to the purpose and object of the UNCITRAL Model Law to interpret "foreign proceeding" as including proceedings that concerned solvent companies and proceedings that have the purpose of producing a return to members and not creditors (*Re Sturgeon* at [117]). The court criticised *Re Betcorp* as having made a wrong turn by recognising as a foreign proceeding the liquidation of a company which was neither insolvent nor in severe financial distress (see *Re Sturgeon* at [121]).

89      With respect, we do not agree with the criticisms levelled in *Re Sturgeon* against *Re Betcorp*. We accept, as we have already said, that the UNCITRAL Model Law was *primarily focused* on companies that are insolvent or in severe financial distress and was not drafted to deal specifically with solvent companies. However, as we explained above at [55]–[63], we do not think that it would be *contrary* to the purpose and object of the UNCITRAL Model Law to extend the scope of the UNCITRAL Model Law to proceedings concerning solvent companies. Indeed, as we have also explained at [64]–[68] above and as we will explain at [97] below, there are good reasons for construing the UNCITRAL Model Law as having this effect both as a matter of principle and practicality.

*The position in Australia*

90     The position in Australia is also aligned with the position in the US. In *Re Chow Cho Poon (Private) Ltd* (2011) 80 NSWLR 507 (SC, NSW), a Singapore-incorporated company ("CCP") was ordered to be wound up pursuant to s 254(1)(*i*) of the Singapore Companies Act (Cap 50, 2006 Rev Ed) (the "Companies Act 2006") on the just and equitable ground. The Supreme Court of New South Wales ("NSWSC") acknowledged at [40] that intuitively, the Singapore winding-up proceeding was not a proceeding "pursuant to a law relating to insolvency" as it was not the inability of CCP to pay its debts as they fell due that constituted the ground on which the Singapore court ordered that the company be wound up. Nevertheless, the NSWSC, endorsing the approaches taken in *Re Stanford (HC)*, *Re Stanford (CA)*, *Re ABC Learning Centres* and *Re Betcorp*, went on to observe at [51]:

> These English and American decisions point to a clear basis on which *the whole of the Singapore Companies Act or, at the least, the whole of its winding up provisions might be classified as 'a law relating to insolvency',* even though the particular winding up was ordered on the just and equitable ground alone and, so far as this court has been told, without any finding (express or implied) of insolvency. [emphasis added]

91     The NSWSC accordingly found that the winding up of CCP in Singapore was a "foreign proceeding" under Art 2(*a*) of sch 1 to the Australian Cross-Border Insolvency Act 2008 (Cth) (which is *in pari materia* with Art 2(i) of the UK Model Law), without giving further consideration to whether CCP was in fact insolvent or in financial distress.

*The position in New Zealand*

92     So too is the position in New Zealand broadly consistent with the US position in that the solvent status of a company does not exclude proceedings

concerning that company from the scope of the Insolvency (Cross-Border) Act 2006 (NZ) (the "NZ Cross-Border Insolvency Act"). In *ANZ National Bank Ltd v Sheahan and Lock* [2013] 1 NZLR 674 ("*ANZ National Bank*"), several Australian companies were placed into liquidation by creditors' resolutions. The liquidation in Australia produced a surplus after all the creditors had been paid, meaning that the Australian companies were solvent. The liquidators subsequently applied under the NZ Cross-Border Insolvency Act for an order that an employee of a bank which had financed the Australian companies attend for examination and produce documents on matters relating to the Australian companies. The bank opposed the application, arguing that the NZ Cross-Border Insolvency Act was not intended for use by foreign representatives of a solvent company. This submission was rejected by the Auckland High Court, which observed at [104]:

> … [W]hile the administration of the Australian liquidations happens to have produced a surplus, it remains appropriate to characterise the regime as a 'collective … proceeding … pursuant to a law relating to insolvency'. … The purpose [of a winding up] is 'to ensure that an orderly regime is imposed upon all interested parties to that none of them individually may enhance his position by exploiting some fortuitous circumstance which may yield an unfair advantage …'

### *Practical concerns*

93     Finally, we address the practical concerns that may arise if proceedings concerning solvent companies were included within the scope of the SG Model Law pursuant to the Broad Approach. This was alluded to by the Judge and by the respondent.

94     The Judge observed that the Broad Approach "subordinates substance entirely to form" because under the Broad Approach, any type of proceeding, no matter how far removed it may be from any connection to insolvency, would

be a proceeding under a law relating to insolvency within the meaning of Art 2(*h*) of the SG Model Law simply because that proceeding is commenced under a provision which happens to be found in a statute which deals generally with insolvency. The Judge raised as an example an applicant who has secured relief under s 216(2)(*c*) of the Companies Act 2006 to commence civil proceedings in the name of and on behalf of the company, noting the absurdity of categorising such a proceeding as a "foreign proceeding" under Art 2(*h*) simply because the Companies Act 2006 also contained provisions dealing with corporate insolvency (see the GD at [59]–[61]). In our judgment, the Judge's concerns are adequately addressed by the safeguards present in the other elements of Art 2(*h*). As the Judge noted at [62], and as was accepted by counsel for the respondent during the hearing before us, proceedings conducted under s 216 of the Companies Act 2006 would not be collective proceedings within the meaning of Art 2(*h*) of the SG Model Law since such proceedings do not deal with all of the company's creditors collectively. We elaborate below at [102]–[107] on the requirement that the foreign proceeding must be collective and whether Ascentra's Cayman Liquidation counts as such a proceeding. Aside from this, we reiterate the point we have made at [29] above that there are at least five criteria that must be met for a proceeding to come within Art 2(*h*). Accordingly, the concern that any type of proceeding, no matter how disconnected it may be from insolvency, may be brought into the ambit of Art 2(*h*) seems to us to be somewhat overstated.

95      Relatedly, the respondent submits that adopting the Broad Approach "open[s] [the] floodgates for recognition and assistance applications", which would allow solvent companies to take advantage of the SG Model Law and create absurd outcomes. In particular, it is suggested that:

(a)     The Broad Approach would result in an automatic moratorium being granted to solvent companies if proceedings concerning such companies are recognised as foreign main proceedings (see Art 20(1) of the SG Model Law). However, there is no justification for providing a moratorium to a solvent company, especially when doing so would afford the company a shield against litigation that they would not otherwise be entitled to.

(b)     The recognition of a foreign proceeding as a foreign main proceeding would give rise to a presumption of insolvency under Art 31 of the SG Model Law. This may lead to the absurd outcome where a solvent company is presumed to be insolvent for the purpose of commencing secondary proceedings under Singapore insolvency law, and would allow the solvent company to sidestep legislative requirements that would otherwise apply to it.

96      In our view, the policy concerns raised by the respondent are overstated. In relation to the risk of a moratorium being granted to a solvent company, Art 20(6) of the SG Model Law expressly provides that the court may, on the application of the foreign representative or a person affected by the moratorium, or of its own motion, modify or terminate such stay and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the court thinks fit. It is thus clear that the Singapore courts may recognise a foreign proceeding as a foreign main proceeding without an accompanying moratorium necessarily being maintained. This would prevent the legitimate claims of creditors against a solvent company from being unfairly stymied. As to the respondent's argument regarding the presumption of insolvency, this can be dealt with quickly. The presumption of insolvency in Art 31 of the SG Model Law is expressly qualified by the words "[i]n the absence of evidence to the

contrary". It is therefore inconceivable that a company which has been proved to be solvent would nonetheless be able to invoke the presumption of insolvency under Art 31 of the SG Model Law.

97     On the contrary, we agree with the appellants' submission that imposing a requirement that the subject company must be either insolvent or in severe financial distress may introduce some measure of complexity at the recognition stage. Assuming for the moment that the Judge was correct in holding that recognition would only be granted to foreign proceedings involving insolvent companies, and "insolvency" is to be determined having regard to the law of the foreign State in which the foreign proceeding was commenced (see the GD at [48]), that would require the Singapore court to determine whether the subject company is insolvent or in severe financial distress under the law of the foreign State. In other words, the applicant for recognition must be prepared, at the time of presentation of the petition for recognition, to prove the insolvency or severe financial distress of the subject company under the relevant foreign law. This may require that in contested cases, evidence be adduced not only as to the financial status of the company but conceivably as to foreign law (see *Pacific Recreation Pte Ltd v S Y Technology Inc and another appeal* [2008] 2 SLR(R) 491 at [54]). In our view, introducing such requirements at the recognition stage would be undesirable. On this, we agree with Mr Lee's suggestion that a light threshold should be imposed for recognition, which can then be tempered by granting recognition or relief subject to the imposition of appropriate conditions.

### *Conclusion on the first issue*

98     We are therefore satisfied that there is no requirement under the SG Model Law for a company to be insolvent or in severe financial distress before a proceeding concerning that company may be recognised as a foreign

proceeding under the SG Model Law. For this reason, we agree with the appellants that the approach taken in *Re Betcorp* towards the interpretation of the words "law relating to insolvency or adjustment of debt" (*ie*, the Broad Approach) should be adopted in Singapore. Interpreting Art 2(*h*) of the SG Model Law in that manner better coheres with its ordinary meaning and reflects Parliament's intention to include proceedings concerning solvent companies within the scope of the SG Model Law. We are also satisfied that such an interpretation does not undermine, and is indeed consistent with, the overall purpose of the UNCITRAL Model Law.

99      To reiterate, under the Broad Approach, the requirement that a proceeding be conducted "under a law relating to insolvency or adjustment of debt" within the meaning of Art 2(*h*) will be satisfied as long as the law or the relevant part of the law under which the relevant proceeding is conducted includes provisions dealing with the insolvency of a company or the adjustment of its debts. It will generally be irrelevant that the company concerned in the relevant proceeding is not insolvent or in severe financial distress.

100     We turn to consider whether Ascentra's Cayman Liquidation is a proceeding being conducted under a law relating to insolvency or adjustment of debt for the purposes of Art 2(*h*) of the SG Model Law. Ascentra's Cayman Liquidation had begun as a voluntary winding up commenced pursuant to a shareholders' resolution, the requirements of which are prescribed by s 116(c) of the Cayman Act. That provides that a company may be wound up voluntarily if it so resolves by special resolution. Ascentra's Cayman Liquidation was subsequently brought under the supervision of the Cayman Grand Court pursuant to s 124(1) of the Cayman Act (see [8] above).

101    Both ss 116(c) and 124(1) of the Cayman Act are contained within Part V of the Cayman Act, titled "Winding up of Companies and Associations". Part V of the Cayman Act also contains other provisions that indisputably deal with the insolvency or adjustment of debt of a company. For instance, s 92 of the Cayman Act sets out the circumstances in which a company may be wound up by the court, which includes the situation where the company is unable to pay its debts (see s 92(d) of the Cayman Act). The Cayman Act also contains provisions dealing with arrangements and reconstructions. Section 86 of the Cayman Act provides that the company may compromise with its creditors and members, while s 87 of the Cayman Act sets out provisions for facilitating the reconstruction and amalgamation of companies. Applying the approach set out at [98] and [99] above, we are satisfied that the Cayman Act is a law relating to insolvency or adjustment of debt. It follows that Ascentra's Cayman Liquidation, which is being conducted pursuant to provisions of the Cayman Act, is a proceeding being conducted under a law relating to insolvency or adjustment of debt for the purposes of Art 2(*h*) of the SG Model Law.

**Whether Ascentra's Cayman Liquidation is a collective proceeding**

102    The next issue is whether Ascentra's Cayman Liquidation is a collective proceeding within the meaning of Art 2(*h*) of the SG Model Law. Before the Judge, the parties accepted and proceeded on the basis that the Cayman proceeding was a collective proceeding. It is therefore not surprising that this point was not pursued by the respondent in its written submissions. However, during the hearing before us, Mr Kumar took a different stance and informed us that the respondent was not prepared to concede that Ascentra's Cayman Liquidation is a collective proceeding. Mr Lee did not object to Mr Kumar's withdrawal of his earlier concession.

103     The respondent's argument in this regard is contingent on its argument that Parliament did not intend for the SG Model Law to extend to proceedings involving solvent companies. However, for the reasons we have explained at [37]–[46] above, it is clear to us that Parliament had in fact modified Art 2(*h*) the SG Model Law to include proceedings concerning solvent companies within the scope of the SG Model Law.

104     In any event, the respondent has not pointed to any authority or material which suggests that a proceeding such as the present is not a collective proceeding for the purposes of the UNCITRAL Model Law just because it concerns a solvent company. The relevant principles and authorities concerning the requirement of a proceeding being collective were set out by this court in *United Securities* at [55]–[62] and may be summarised as follows:

> (a)     For a proceeding to be collective, it must concern *all* creditors of the debtor generally, in contrast to, for instance, one that is instigated at the request, and for the benefit, of a single secured creditor (*Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law* (Look Chan Ho gen ed) (Globe Law and Business Publishing, 4th Ed, 2017) at p 178).

> (b)     In evaluating whether a proceeding is collective, a key consideration is whether substantially all of the assets and liabilities of the debtor are dealt with in the proceeding, subject to local priorities and statutory exceptions, and to local exclusions relating to the rights of secured creditors (2013 Guide, part two at para 70).

105     In *Re Betcorp*, the US Bankruptcy Court similarly observed that a collective proceeding is one which considers the rights and obligations of *all*

*creditors*. On that basis, the US court held that the voluntary liquidation of Betcorp in Australia was a collective proceeding (*Re Betcorp* at 281). *Re Betcorp* may be contrasted with *Re Global Cord*, where the Cayman Grand Court appointed Joint Provisional Liquidators ("JPLs") as fiduciaries to, among other things, investigate and potentially recover allegedly misappropriated corporate funds. The JPLs sought recognition of the proceedings under Chapter 15 of the US Bankruptcy Code. The US court refused recognition, finding that the Cayman proceeding was not a collective proceeding because it did not involve all of the creditors of the company, which is the "main definitional hallmark" of a collective proceeding within meaning of s 101(23) of the US Bankruptcy Code (*Re Global Cord* at 7–9).

106    Applying these principles to the present case, we are satisfied that Ascentra's Cayman Liquidation is a collective proceeding within the meaning of Art 2(*h*) of the SG Model Law. Ascentra's Cayman Liquidation is subject to various provisions in the Cayman Act that are concerned generally with the rights of *all* of Ascentra's creditors. For instance, ss 140(1) and 140(2) of the Cayman Act provide:

> **Distribution of the company's property**
>
> 140. (1) Subject to subsection (2), the property of the company shall be applied in satisfaction of its liabilities *pari passu* and subject thereto shall be distributed amongst the members according to their rights and interests in the company.
>
> (2) The collection in and application of the property of the company referred to in subsection (1) is without prejudice to and after taking into account and giving effect to the rights of preferred and secured creditors and to any agreement between the company and any creditors that the claims of such creditors shall be subordinated or otherwise deferred to the claims of any other creditors and to any contractual rights of set-off or netting of claims between the company and any person or persons (including without limitation any bilateral or any multi-lateral set-off or netting arrangements between the company and any

person or persons) and subject to any agreement between the
company and any person or persons to waive or limit the same.

107     Moreover, the Liquidators were appointed by the Cayman Grand Court
as the joint official liquidators of Ascentra. In this connection, ss 110(1)(*a*) and
110(1)(*b*) of the Cayman Act prescribe that the function of an official liquidator
is to: (a) collect, realise and distribute the assets of the company to its creditors
and, if there is a surplus, to the persons entitled to it; and (b) report to the
company's creditors and contributories upon the affairs of the company and the
manner in which it has been wound up. In the premises, we are satisfied that the
voluntary liquidation of Ascentra is one which concerns all of Ascentra's
creditors generally and therefore qualifies as a collective proceeding under
Art 2(*h*) of the SG Model Law.

**Whether Ascentra's Cayman Liquidation is being conducted for the
purpose of reorganisation or liquidation**

108     We deal next with the respondent's contention that Ascentra's Cayman
Liquidation is not being conducted for the purpose of reorganisation or
liquidation within the meaning of Art 2(*h*) of the SG Model Law. The
respondent chiefly relies on para 35 of part one of the Legislative Guide (which
is a document intended by the UNCITRAL to be used as a reference by national
authorities and legislative bodies when preparing or reviewing laws and
regulations which address the financial difficulty of debtors):

> 35.     There are a number of legal and economic justifications
> for liquidation. Broadly speaking, it can be argued that a
> commercial business that is unable to compete in a market
> economy should be removed from the marketplace. A principal
> identifying mark of an uncompetitive business is one that
> satisfies one of the tests of insolvency, that is, it is unable to
> meet its mature debts as they become due or its debts exceed
> its assets. More specifically, the need for liquidation
> proceedings can be viewed as addressing inter-creditor
> problems (when an insolvent debtor's assets are insufficient to

> meet the claims of all creditors it will be in a creditor's own best interests to take action to recover its claim before other creditors can take similar action) and as a disciplinary force that is an essential element of a sustainable debtor-creditor relationship. …

On this basis, the respondent argues that "liquidation" within the meaning of the UNCITRAL Model Law was intended to refer to *insolvent* liquidation, and Ascentra's solvent liquidation therefore did not satisfy this requirement.

109    For the reasons set out at [37]–[99] above, we have concluded that the SG Model Law extends to the recognition of foreign proceedings concerning solvent companies. That being the case, interpreting the word "liquidation" in Art 2(*h*) as being limited to insolvent liquidations, as the respondent suggests, would be incompatible with our conclusion.

110    In any event, we do not accept the respondent's submission that the passage from the Legislative Guide that we have reproduced above shows that the UNCITRAL Model Law was intended to be limited to proceedings concerning *insolvent* liquidations. The passage in the Legislative Guide relied upon by the respondent states that *one of* the justifications for liquidating a company is its inability to compete in a market economy, which is evidenced by its insolvency. As the appellants rightly point out, that passage does not deal specifically with the UNCITRAL Model Law, let alone state that the word "liquidation" in Art 2(*a*) of the UNCITRAL Model Law was intended to refer only to insolvent liquidations.

111    In the premises, we hold that Ascentra's Cayman Liquidation was conducted for the purpose of liquidation within the meaning of Art 2(*h*) of the SG Model Law.

**Whether the Singapore courts have jurisdiction to recognise Ascentra's Cayman Liquidation**

112    Finally, we turn to consider whether the Singapore courts have jurisdiction to recognise Ascentra's Cayman Liquidation. Pursuant to Art 4(2)(*a*)(ii) of the SG Model Law, such jurisdiction will be established if the debtor has property situated in Singapore. Section 2(1) of the IRDA defines "property" broadly as: (a) money, goods, things in action, land and every description of property, wherever situated; and (b) obligations and every description of interest, whether present or future or vested or contingent, arising out of or incidental to property.

113    The appellants submit that the following constitute property situated in Singapore within the meaning of Art 4(2)(*a*)(ii) of the SG Model Law: (a) legal and/or equitable claims against the respondent and Scuderia Bianco; (b) retainer fees paid to its solicitors; and (c) shares in a Singapore-incorporated company, Interush (Singapore) Pte Ltd ("Interush"), which are held by Ascentra. The respondent does not dispute that Ascentra holds shares in Interush, nor that such shares constitute property situated in Singapore. Indeed, the respondent appears to have conceded in its submissions in the proceedings below that Ascentra's shares in Interush constitute property for the purposes of Art 4(2)(*a*)(ii) of the SG Model Law. That alone suffices to found jurisdiction in Singapore to recognise Ascentra's Cayman Liquidation under Art 17 of the SG Model Law. In the circumstances, it is unnecessary for us to determine whether Ascentra's legal and/or equitable claims against the respondent and Scuderia Bianco and/or the legal fees paid by Ascentra to its solicitors also constitute property within the meaning of Art 4(2)(*a*)(ii) of the SG Model Law.

**Conclusion**

114    For these reasons, we are satisfied that Ascentra's Cayman Liquidation qualifies as a "foreign proceeding" within the meaning of Art 2(*h*) of the SG Model Law. In particular, we are satisfied that Ascentra's Cayman Liquidation: (a) is a collective proceeding; (b) is being conducted under a law relating to insolvency or adjustment of debt; and (c) has as its purpose the liquidation of Ascentra. In addition, we are satisfied that we have jurisdiction to recognise Ascentra's Cayman Liquidation pursuant to Art 4(2)(*a*)(ii) of the SG Model Law.

115    As we have found the requirements for recognition under Art 17 of the SG Model Law to be fulfilled, we are obliged to recognise Ascentra's Cayman Liquidation as a foreign main proceeding in Singapore under Art 17 of the SG Model Law (see [27] above). We therefore allow the present appeal. However, we will hear the parties on the question of whether the recognition of Ascentra's Cayman Liquidation should be made subject to any conditions and give permission to the parties to make submissions on this within 14 days of the date of this judgment if they wish to seek the imposition of any conditions. If this is sought by either party, then the other party shall have 14 days to respond.

116    We award costs to the appellants fixed at $60,000 (inclusive of disbursements), this reflecting the position of both parties in their costs

submissions as to the appropriate quantum of costs. The usual consequential orders are to apply.

Sundaresh Menon
Chief Justice

Steven Chong
Justice of the Court of Appeal

Belinda Ang Saw Ean
Justice of the Court of Appeal

Lee Eng Beng SC and Yeo En Fei Walter (Rajah & Tann Singapore LLP) (instructed), Han Guangyuan Keith and Angela Phoon Yan Ling (Oon & Bazul LLP) for the appellants; Balakrishnan Ashok Kumar, Gloria Chan Hui En, Stanley Tan Sing Yee and Shreya Prakash (BlackOak LLC) for the respondent.

Certified True Copy

Senior Manager
Office of the Chief Justice
Supreme Court Singapore